**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MARY BILEK, individually and on behalf of others similarly situated, | ) | Case No. 1:18-cv-03083 |
| Plaintiff, | ) | |
| | ) | **Jury Trial Demanded** |
| v. | ) | |
| | ) | |
| NATIONAL CONGRESS OF EMPLOYERS, INC., NATIONAL BENEFIT BUILDERS, INC., ACCESSONE CONSUMER HEALTH, INC., UNIFIED LIFE INSURANCE COMPANY, HEALTH INSURANCE INNOVATIONS, INC., and DOES 1-10, Defendants. | ) ) ) ) ) ) ) ) | Hon. Judge Charles R. Norgle, Sr. Hon. Mag. Judge Jeffrey T. Gilbert |

## SECOND AMENDED CLASS ACTION COMPLAINT

1.    The Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, restricts telemarketing, in that it prohibits the making of nonconsensual autodialed or prerecorded calls, and has strict requirements as to adherence to "Do Not Call" rules and regulations. Illinois similarly restricts use of prerecorded message telemarketing, and prohibits caller ID spoofing.

2.    Defendants are engaged in a telemarketing practice that results in millions of unsolicited autodialed and prerecorded calls to consumers like Plaintiff, without proper regard to the TCPA, the Do Not Call rules, and in flagrant disregard for individual privacy.

3.    The scheme works like this: An impecunious telemarketer initiates unsolicited outbound telephone calls to American consumers. In the case of Mary Bilek, the calls were initiated by a company called Rising Eagle Capital Group LLC ("Rising Eagle"), located in Austin, Texas. Rising Eagle used a host of fake caller IDs for these calls in order to trick consumers into answering its calls.

4.    When a consumer presses "1" to speak with a representative, calls are "warm

transferred"[1] to an insurance agency. In the case of Mary Bilek, the insurance agency was located in south Florida; most likely that of Sean Duffie and Enrollment Center of America,[2] who are again impecunious.

5.     Impecunious does not mean unproductive: Rising Eagle warm-transferred a staggering number of telemarketing calls: more than 6,000,000 calls to more than 3,000,000 unique phone numbers during 2017-2019, to Enrollment Center of America and similar agencies and salespeople in south Florida.

6.     Once the calls are transferred to insurance agencies such as Enrollment Center of America or their salespeople, a live operator comes onto the call, and the operator tries to sell the consumer health-related products and services.

7.     Defendant Health Insurance Innovations ("HII") is at the center of this telemarketing scheme. HII enlists insurance agents such as Enrollment Center of America to sell health-related products and services, such as membership in National Congress of Employers, Inc. ("NCE") branded programs and life insurance such as from Unified Life Insurance Company ("Unified").

8.     Although HII is the facilitator and orchestrator for these telemarketing sales, NCE has worked hard to actively prevent disclosure of HII in this litigation. NCE was successful for almost a year, until approximately June 2019.

9.     HII provides quotations for different sellers' products and services – for example, NCE and Unified – for agents like Enrollment Center of America to quote during telemarketing calls.

---

[1]     A "warm transfer" is where an existing phone call is transferred to another party, during the original call.

[2]     As used here, "Enrollment Center of America" is a generic term that encompasses Health Advisors of America, Inc., as well as Duffie, Zach Cox, Mike Smith, and their sales agents.

10. In providing the scripts and pricing information for agents like Enrollment Center of America to use during illegal telemarketing calls that were initiated by Rising Eagle (and others), HII "made" the calls, thus subjecting it to direct TCPA liability.

11. HII helps agents and salespeople such as Enrollment Center of America with their telemarketing efforts through a program whereby it advances the cost of telemarketing efforts. HII takes a security interest in the agents' businesses in exchange, which is what it did with Enrollment Center of America . In other words, HII *paid* for the telemarketing calls to Plaintiff and many – or most – of the class members.

12. HII knows all about the telemarketing complained of herein, but continues to facilitate sales of healthcare related goods and services arising from telemarketing – including autodialed and prerecorded-voice telemarketing – despite this. *See, e.g.,* HII Form 10-K (Mar. 2, 2017) ("[W]e are subject to various federal and state telemarketing regulations, including the Telephone Consumer Protection Act ("TCPA") and the FCC's implementing regulations, as well as various state telemarketing laws and regulations. We, our distributors, and our carriers have been, and may continue to be, the subject of allegations of TCPA violations, and we could be responsible for some of the costs incurred by distributors or carriers who are the subject of allegations of TCPA violations. Any violation of these regulations could expose us to damages for monetary loss, statutory damages, fines, penalties and/or regulatory inquiries.") (available at https://www.sec.gov/Archives/edgar/data/1561387/000149315217002078/form10-k.htm).

13. HII continued to reap the financial gain from the telemarketing complained of here, even though it knew such financial gain was the result of illegal calls. HII continued accepting business from Enrollment Center of America into 2019, even though this lawsuit was filed in 2018.

14. Unified, too, knows all about the telemarketing complained of herein. Despite this, Unified has continued to reap the financial gain from the telemarketing complained of here, even though it knew such financial gain was the result of illegal calls as alleged herein.

15. NCE, AccessOne and NBBI work together to offer health and lifestyle discount and insurance-related programs, which too are sold through HII's telemarketing scheme. For example, but not limitation, AccessOne underwrites certain discount products or services, which NBBI then packages and contracts with NCE to solicit as a "benefit" of NCE membership or through other NCE-branded products or services, such as "NCE Premier Platinum Plus," "NCE Core Connect," "NCE Generations Plus", and others.

16. After a year of pendency of this case, not a single iota of discovery or evidence has come to light that might suggest that any Defendant had "prior express consent" to make the calls that are the subject of this case.

17. As such, and as further alleged below, Plaintiff Bilek brings this action against Defendants National Congress of Employers, Inc., National Benefit Builders, Inc., AccessOne Consumer Health, Inc., Unified Life Insurance Company, Health Insurance Innovations, Inc., and Does 1-10, to secure redress for Defendants' practice of causing the cell phone numbers of Plaintiff and others to be called using an automatic telephone dialing system and prerecorded voice, and for calling telephone numbers after requests to stop, in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, as well as for playing prerecorded messages during autodialed calls to Plaintiff and others, and impeding caller identification, in violation of the Illinois Automatic Telephone Dialers Act ("ATDA"), 815 ILCS 305/1 *et seq*.

## INTRODUCTION

18. Advancements in telephone dialing technology by the 1980s and 90s made

reaching a large number of consumers by telephone easier and more cost-effective. However, this technology has also brought with it an onslaught of unsolicited robocalls, spam text messages, and junk faxes that intrude on individual privacy and waste consumer time and money. As a result, the federal government and numerous states have enacted legislation to combat these widespread telecommunications abuses. As Congress recognized:

> Many customers are outraged over the proliferation of intrusive, nuisance calls to their homes…. Banning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion.

Pub. L. No. 102-243, 105 Stat. 2394 § 2(6, 12) (1991).

19. As is relevant here, federal law under the TCPA prohibits "mak[ing] any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service[.]" 47 U.S.C. § 227(b)(1)(A)(iii). The statute further prohibits initiating a telemarketing call to any residential line "using an artificial or prerecorded voice to deliver a message without the prior express written consent of the called party[.]" 47 C.F.R. § 64.1200(a)(3). The TCPA provides for injunctive relief and the greater of actual damages or $500 per such violation, which can be trebled where the statute was "willfully or knowingly" violated. 47 U.S.C. § 227(b)(3).

20. The TCPA also prohibits "initiat[ing] any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity[.]" 47 C.F.R. § 64.1200(d). Where a person has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of this

prohibition, the TCPA provides for injunctive relief and the greater of actual damages or up to $500 per violation, which can be trebled where the statute was "willfully or knowingly" violated. 47 U.S.C. § 227(c)(5).

21.     In Illinois, the ATDA also prohibits, *inter alia*, "play[ing] a prerecorded message placed by an autodialer without the consent of the called party" or impeding caller IDs during telemarketing calls. 815 ILCS 305/15(d); 30(b). The ATDA provides for treble actual damages, statutory damages of $500 per violation, and costs and reasonable attorneys' fees. 815 ILCS 305/30. Passage of the 2013 amendments to the ATDA providing for statutory damages, as invoked here, was unanimous in the Illinois legislature.

22.     Defendants caused multiple autodialed, prerecorded-voice calls to be made to the cell phones of Plaintiff and others without their consent, in many instances using "spoofed" numbers that impeded caller identification, and Plaintiff files this class action complaint on behalf of herself and others similarly situated, seeking relief from Defendants' illegal calling practices.

## PARTIES

23.     Plaintiff Mary Bilek is a natural person who resides in Cook County, Illinois.

24.     Defendant National Congress of Employers, Inc. ("NCE") is a Delaware corporation headquartered, on information and belief, at 100 Garden City Plaza, Suite 102, Garden City, New York 11530.

25.     Defendant National Benefit Builders, Inc. ("NBBI") is a New Jersey corporation headquartered at 25 Hanover Road, Florham Park, New Jersey 07932.

26.     Defendant AccessOne Consumer Health, Inc. ("AccessOne") is a Florida corporation headquartered at 84 Villa Road, Greenville, South Carolina 29615.

27.     Defendant Unified Life Insurance Company ("Unified") is a Texas corporation headquartered at 7201 West 129th Street, Suite 300, Overland Park, Kansas 66213.

28.     Defendant Health Insurance Innovations, Inc. ("HII") is a Delaware corporation headquartered at 15438 North Florida Avenue, Suite 201, Tampa, Florida 33613.

29.     Does 1-10 are yet-unidentified sellers or participants and/or facilitators as to the calls at issue to Plaintiff and the class that may have liability.

## JURISDICTION AND VENUE

30.     This Court has federal question subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 with respect to Plaintiff's TCPA claims. *Mims v. Arrow Financial Services, Inc.*, 132 S. Ct. 740 (2012).

31.     The Court has personal jurisdiction over Defendants and venue is appropriate in this District under 28 U.S.C. § 1391(a) because all Defendants do business in this District, made or facilitated the calls or lead generation that is the subject of this lawsuit to Plaintiff and others in this District, and because a substantial portion of the events giving rise to this cause of action occurred in this District. Plaintiff resides in this District, and received the calls that are the subject of this case here.

## FACTS

32.     Defendants caused autodialed and prerecorded-voice calls to be made to the cell phones of Plaintiff and other consumers, without the prior express consent of the called party.

33.     The equipment used to call Plaintiff and others not only had the capacity to store or produce telephone numbers to be called using a random or sequential number generator (and to dial such numbers), but was programmed to sequentially or randomly access stored telephone numbers to automatically call such numbers.  These calls were made with equipment capable of

dialing numerous phone numbers in a short period of time without human intervention, as part of an automated process. Moreover, the calls to Plaintiff and the class were made using these capabilities.

34.     Defendants also employed unattended messages in calls to Plaintiff and the class; that is, messages that were recorded ahead of time, and then automatically played when Plaintiff or the other class member answered or their voicemail picked up.

35.     None or almost none of the people called as part of this scheme ever consented to receive such calls.

36.     Most call recipients were sent more than one call, and Defendants lack an adequate system for preventing autodialed or prerecorded-voice calls to phones for which they do not have consent.

37.     Defendant NCE is an association that purports to be "focused primarily on political advocacy, education and service," but which in reality conspires with its partners to solicit NCE-branded insurance and medical and other discount products and services to consumers across the country.

38.     For example, Defendant NBBI maintains a network of certain medical and lifestyle discount programs, for which NCE contracts with NBBI to promote through the NCE brand, such as the "NCE Premier Platinum Plus Discount Medical Program," the "NCE GapAfford Discount Program," the "NCE Diabetic Discount Program," and others.

39.     These NCE-branded discount products via NBBI are ultimately provided through Defendant AccessOne. *See* https://www.ncepremierplus.com/agreement.aspx (NBBI's "NCE Premier Platinum Plus" website, reflecting that, "[a]s a member of [the NCE] Premier Platinum Plus Discount Medical Program you are a participant in a Discount Medical Plan Organization

provided by Access One Consumer Health[;] … [t]his agreement is between you and Access One Consumer Health"). It was this "NCE Premier" product, or a similar product, that Defendants attempted to sell during the calls to Plaintiff.

40. NCE, NBBI and AccessOne all knowingly benefit from the illegal calls alleged herein, thereby ratifying the illegal conduct.

41. NCE contracts with insurers and other entities for other NCE-branded products and services, as well.

42. Many of these NCE-branded product or services are bundled with other insurance or medical discount-related products—for example, with life insurance through, on information and belief, Defendant Unified or a different insurer, accidental death and dismemberment insurance through another insurer, or additional medical discount plans through still other entities. *See, e.g.,* Dkt. 85-5 (NCE Membership Application forms contained in bundled "AdvantHealth STM" application materials provided to consumer through Defendant HII after telemarketing calls with lead generator Enrollment Center of America).

43. The solicitation of these bundles is facilitated through Defendant HII and other third-party administrators or program managing entities. Alternatively, NCE and/or its broker, Group Plan Administrators Inc. ("GPA") facilitate the creation of these bundles directly.

44. For example, in April 2015, NCE entered into a Program Manager Agreement with a managing general underwriter of Unified called Xchange Benefits, LLC ("Xchange") and Defendant HII's wholly-owned subsidiary Health Plan Intermediaries Holdings, LLC ("HPIH"), through which HPIH was appointed Unified's agent as to the sale of NCE-branded short term medical or other insurance-related products underwritten by Unified, and agreed to solicit individuals to purchase such products.

45.     HII, in turn, contracted with further entities—such as Duffie or Enrollment Center of America—to generate the leads and prospective customers/members for these NCE-branded products or services, who in turn paid their own vendors for leads generated through telemarketing to Plaintiff and other class members.

46.     During these phone calls with consumers – at HII's design and request – the insurance agents and marketers access HII's web portal, which includes product and pricing information for standalone or bundled NCE-branded products or services.

47.     HII has a policy of assisting insurance agents and subagents in paying for marketing leads, and materially assisted the insurance agents associated with Plaintiff and the class with paying for the telemarketing and lead generation that is the subject of this case.

48.     NCE-branded products or services are solicited through other entities, as well.

49.     However, to date, NCE has refused to disclose to Plaintiff all of the companies with whom it partners or that are used to generate memberships or sales of NCE-branded products or services.

50.     Indeed, in purporting to investigate Plaintiff's claims in this case, NCE's executive director Chris Sabatella suggested in an email to HII that he would like to find a way to avoid disclosing HII to Plaintiff's counsel in this litigation.

51.     HII operates as an intermediary between insurance agents and marketers like Rising Eagle and Enrollment Center of America on the one hand, and insurance or medical discount-related companies such as Defendants NCE, NBBI, AccessOne, and Unified, on the other. Of course, HII knows of the illegal telemarketing, and continues to reap its benefits notwithstanding such.

52.     NCE, NBBI, AccessOne and Unified have authorized these marketers and

insurance agents to sell products and services. Marketers and insurance agents are authorized to bind NCE (including in conjunction with NBBI and AccessOne) and Unified into contractual relationships with consumers; they are also authorized to bind Defendants through the common relationship with HII.

53.     NCE (including in conjunction with NBBI and AccessOne), Unified, and the other entities whose products are bundled with NCE-branded products and services, each authorize the marketers and insurance agencies that work with HII to sell their products and services in this manner.

54.     NCE (including in conjunction with NBBI and AccessOne), Unified, and the other entities whose products are bundled with NCE-branded products and services also authorize HII and its marketers and insurance agents to use of their corporate names during the telemarketing process. HII's web portal, too, contains their trademarked logos.

55.     Once a consumer indicates that he is interested, calls are transferred to "closers," who take the consumer's demographic and health information, read special scripts to the consumers that are provided by HII and approved by NCE (including in conjunction with NBBI and AccessOne), Unified, and the other entities whose products are bundled with NCE-branded products and services, and send an email to the consumer from an email address associated with HII such as MyBenefitsKeeper.com. *See, e.g.,* Dkt. 84-4 at 1-15 (sample NCE/HII scripts produced by Enrollment Center of America).

56.     Through discovery, Plaintiff has already obtained a gigantic database of millions of call transfers from Rising Eagle to Enrollment Center of America, as well as recordings of many of those calls.

57.     Because Enrollment Center of America insurance agents and salespeople were

logged in to HII's portal when they quoted products and services, HII had real-time and active participation in each call.

58.     Moreover, once a consumer answered some initial questions from Enrollment Center of America, she was passed to a "closer," who logged additional information into HII's database, which typically resulted in an email being sent to the consumer from HII with a link to contracts for NCE (and therefore NBBI and AccessOne) and Unified products and services.

59.     HII has information to show what Health Enrollment Center users were logged in to its portal at what times.

60.     HII makes money when products or services are sold using its portal.

61.     Indeed, if there is any question as to whether Defendants knew about the illegal telemarketing here, consumer Robert Hossfeld received two robocalls that were substantially similar to those made to Mary Bilek, approximately a year after this lawsuit was filed. The calls were initiated by Rising Eagle, and warm-transferred to Enrollment Center of America. NCE and Unified-branded products and services were quoted during those calls, among others. The undersigned is counsel for another class action against some of the same defendants pending in the Southern District of Florida, *Hossfeld v. Am. Fin. Sec. Life Ins. Co.*, No. 0:19-cv-60597-DPG.

62.     Rising Eagle - the entity that initiated many of the calls about which this case complains, did not have a written Do Not Call policy for the entire time it made calls for Defendants. Neither Duffie, Smith, Cox, Enrollment Center of America, nor the sales agents they worked with had written Do Not Call policies; nor do Defendants. Alternatively, to the extent that NCE, NBBI, AccessOne, HII, or Unified has Do Not Call policies, they do not adhere to the policies that exist.

63.     Companies are not permitted to make telemarketing calls – or accept business

- 12 -

derived from telemarketing calls – unless they and the entities that initiate calls have implemented and adhere to a valid Do Not Call policy. Neither NCE, NBBI, AccessOne, Unified, nor HII has and/or adheres to a valid internal Do Not Call Policy, and these companies do not take adequate steps to ensure that the entities making calls to sell their products and services have and adhere to any internal Do Not Call policy, either.

64. Defendants here cannot legally accept business derived from telemarketing, if the entities that are initiating such telephone calls do not have or adhere to valid Do Not Call policies. Pursuant to the TCPA, 47 U.S.C. § 227(c)(5) and 47 C.F.R. § 64.1200, sellers like Defendants here are liable for noncompliant calls initiated by telemarketers on their behalf.

65. NCE, NBBI, AccessOne, HII, and Unified were so involved in these calls that they should be held directly liable. Alternatively, these entities worked in concert to effectuate the calls and telemarketing described here, and should be held liable for the calls through principals of vicarious liability and other theories.

66. The violations were negligent. Alternatively, the violations were intentional, and Defendants were aware of the TCPA's and ATDA's prohibitions against use of autodialers or an artificial or prerecorded voice in calls to consumers, honoring do-not-call requests, and impeding caller identification, but made the business decision to cause these calls to be made, anyway.

**Facts Relating to Plaintiff**

67. Defendants and/or some additional parties on their behalf have made multiple calls to Plaintiff's cellular telephone number, including on March 22, 2018, April 18, 2018, and April 19, 2018, among numerous other instances, which are not specifically delineated by date here, but all of which are alleged to be part of this case.

68. Plaintiff recalls having received dozens of such calls.

- 13 -

69.     These calls to the cell phones of Plaintiff and others were made using an automatic telephone dialing system ("autodialer" or "ATDS") under the TCPA, and an autodialer under the ATDA. The equipment had the capacity to store or produce telephone numbers to be called using a random or sequential number generator, and to dial such numbers. In other words, no human being physically dialed each digit of Plaintiff's and the other class members' telephone numbers to call their phones—the calls were made using equipment with the capacity to dial a large number of phone numbers in a short period of time, without human intervention. The equipment used to call Plaintiff and the other class members sequentially or randomly accessed their stored telephone numbers, and automatically called them.

70.     These calls to Plaintiff's and others' phone numbers were also made using an artificial or prerecorded voice.

71.     The automated nature of Defendants' calls is evidenced by the fact that they repeated the same message across multiple calls to Plaintiff. For example, Plaintiff received voicemail messages on her cell phone from caller ID (773) 273-6136 at approximately 6:01 p.m. and 6:39 p.m. on March 22, 2018, from caller ID (703) 348-6954 at approximately 11:39 a.m. on April 18, 2018, and from caller ID (980) 242-3698 at approximately 10:16 a.m. on April 19, 2018, among other instances, all of which played the following previously-recorded message:

> ... limited health involvement period for a few weeks, so you and your family can get a great insurance plan at the price you can afford. And we make it hassle-free to sign up. We have pre-approvals already in your area, including Cigna, Blue Cross, Aetna, United, and many more. Press "1" to get a hassle-free assessment, or press "2" to be placed on our do-not-call list. Thanks for your time, and be healthy and blessed.

72.     Defendants caused other calls to be made to Plaintiff's cell phone, too.

73.     During a call Plaintiff received from Defendants on March 16, 2018, after Plaintiff "pressed 1" through the automated prompt to speak with a representative, Defendants'

- 14 -

representative gave her a $143.09/month quote for what Plaintiff was informed was a group insurance "NCE Premier Platinum" plan covering health, dental, and vision, and which was also represented to be bundled with $275,000 in life insurance coverage. Upon information and belief, and alternatively, the quote was truly for the "NCE Premier" health care discount program, masqueraded as health insurance, as described by the FTC:

https://www.consumer.ftc.gov/articles/0165-discount-plan-or-health-insurance.

74.     The life insurance coverage offered to Plaintiff was Unified insurance. Alternatively, the life insurance coverage offered was from some other insurance company that NCE has failed to disclose.

75.     This March 16, 2018 call was placed by Rising Eagle.

76.     When Plaintiff "pressed 1" during the prerecorded portion of the March 16, 2018 call in order to speak with a live person, she was transferred to contracted HII vendor Enrollment Center of America (which identified itself as "HappyHealthPlans.com," owned by Enrollment Center of America's Sean Duffie), and it was Enrollment Center of America that provided her with the "NCE Premier" quote, based on information obtained from HII's internet platform.

77.     No Defendant had permission or consent for the calls. Indeed, Plaintiff asked the caller not to call her, including through pressing "2" during the IVR process in some calls she received, but continued to receive calls in spite of this. Defendants knew they did not have Plaintiff's consent for these calls.

78.     When Plaintiff protested receiving these calls during one she received on or about March 13, 2018, the agent said, "Oh, shut the fuck up. This lady's retarded[,]" and hung up.

79.     Defendants also utilized "spoofed"[3] numbers in some of the calls to Plaintiff and other class members. For example, Plaintiff received autodialed, prerecorded-voice calls to her cell phone's voicemail using caller ID number (303) 284-2161 on July 25, 2018, and caller ID numbers (303) 284-2165 (for two calls) and (303) 284-2169 on July 26, 2018. Pursuant to a subpoena, Comcast confirmed that none of these numbers were assigned in July 2018, indicating that the caller identification for any call made using such numbers during the relevant time period was manipulated in order to trick call recipients into answering calls they would not have otherwise answered.

80.     Plaintiff and the class have been damaged by Defendants' calls. Their privacy was improperly invaded, Defendants' calls temporarily seized and trespassed upon the use of their phones, and they were forced to divert attention away from other activities to address the calls. Defendants' calls were annoying and a nuisance, and wasted the time of Plaintiff and the class. *See, e.g., Mims v. Arrow Fin. Servs., Inc.*, 132 S. Ct. 740 (Jan. 18, 2012) (discussing congressional findings of consumer "outrage" as to autodialed and prerecorded calls).

## **Defendants' Liability**

81.     Although they did not initiate these calls, Defendants – and in particular HII – are directly liable for their own participation and involvement in making and facilitating the calls at issue. *Maryland v. Universal Elections, Inc.*, 729 F.3d 370, 378 (4th Cir. 2013), also compare 47 U.S.C. § 227(b)(1)(A)(iii) (prohibiting the "making" of such calls), *with* 47 U.S.C. § 227(c)(5) (prohibiting the "initiating" calls).

82.     Additionally, the Federal Communication Commission ("FCC") has instructed that

---

[3]     *See* FCC, Caller ID Spoofing (available at https://www.fcc.gov/consumers/guides/spoofing-and-caller-id) (explaining that "[c]aller ID spoofing is when a caller deliberately falsifies the information transmitted to your caller ID display to disguise their identity").

sellers like Defendants may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because "[s]ellers may have thousands of 'independent' marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy."

*In re Joint Petition Filed by DISH Network, LLC et al. for Declaratory Ruling Concerning the TCPA Rules*, 28 FCC Rcd. 6574, at ¶ 37 (2013) ("*FCC 2013 Ruling*") (citations omitted).

83.     Third-party lead generators and insurance agents such as Rising Eagle, Duffie, Cox, Smith, and Enrollment Center of America make or facilitate the autodialed and prerecorded message calls described herein "on behalf of" HII, NCE, Unified, and each of the other Defendants, within the meaning of the FCC's Declaratory Rulings and 47 U.S.C. § 227(c)(5).

84.     The FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *See In re Rules & Regulations Implementing the TCPA*, 10 FCC Rcd. 12391, at ¶ 13 (1995).

85.     The FCC has "repeatedly acknowledged the existence of vicarious liability under the TCPA." *See Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 878 (9th Cir. 2014) (citing *FCC 2013 Ruling*, 28 FCC. Rcd. at 6574). Principles of apparent authority and ratification may also provide a basis for vicarious seller liability for violations of Section 227(b). *See Thomas v. Taco Bell Corp.*, 582 F. App'x 678, 679 (citing *FCC 2013 Ruling*, 28 FCC Rcd. at 6590 n. 124).

86.     More specifically, the *FCC 2013 Ruling* held that, even in the absence of evidence of a formal contractual relationship between the seller and the telemarketer, a seller is liable for

telemarketing calls if the telemarketer "has apparent (if not actual) authority" to make the calls. 28 FCC Rcd. at ¶ 34.

87.     The FCC has rejected a narrow view of TCPA liability, including the assertion that a seller's liability requires a finding of formal agency and immediate direction and control over the third-party who placed the telemarketing call. *Id.* at n. 107.

88.     The *FCC 2013 Ruling* further clarifies the circumstances under which a telemarketer has apparent authority:

> [A]pparent authority may be supported by evidence that the seller allows the outside sales entity access to information and systems that normally would be within the seller's exclusive control, including: access to detailed information regarding the nature and pricing of the seller's products and services or to the seller's customer information. The ability by the outside sales entity to enter consumer information into the seller's sales or customer systems, as well as the authority to use the seller's trade name, trademark and service mark may also be relevant. It may also be persuasive that the seller approved, wrote or reviewed the outside entity's telemarketing scripts. Finally, a seller would be responsible under the TCPA for the unauthorized conduct of a third-party telemarketer that is otherwise authorized to market on the seller's behalf if the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct.

28 FCC Rcd. at ¶ 46.

89.     Defendants are directly liable for the telemarketing calls at issue because they, among other things:

   a. Authorized or facilitated the selling of products and services during the telemarketing calls at issue in this case;

   b. Engaged HII and the insurance agents HII works with to enter into contractual relations on their behalf;

   c. knowingly compensated HII for the sale of products and services resulting from such calls; and

- 18 -

      d.   in the case of NCE and Unified, issued quotations for insurance or acquired memberships wholly derived from such calls.

90.    Defendants knowingly and actively accepted business that originated through the illegal telemarketing calls at issue, thus ratifying such.

91.    Defendants NCE (including in conjunction with NBBI and AccessOne), Unified and the other entities whose products are bundled with NCE-branded products and services, ratified the telemarketing calls that are the subject of this case by engaging HII and other third parties to generate telemarketing leads for them and issuing quotes or applications for their products and services, even despite actual knowledge that these leads were derived from nonconsensual robocalling.

92.    Indeed, Defendants have *continued* to use utilize these telemarketing-based lead generators through HII, despite the pendency of this lawsuit—and even after NCE, NBBI, and HII were sued in subsequent litigation under the TCPA.

93.    Moreover, Defendants maintain control over their lead generators' actions in telemarketing and generating leads on their behalf.

94.    At all times relevant, HII, NCE (including in conjunction with NBBI and AccessOne), Unified, and the other entities whose products are bundled with NCE-branded products and services, each had control over whether, and under what circumstances, they issued an insurance quote or membership in their non-insurance discount products to a prospective customer.

95.    At all times relevant, Defendants had control over what sort of lead generation they would accept business from. Defendants chose to accept and monetize marketing leads that were generated through outbound autodialed and prerecorded-voice calls to cell phones.

96.     Defendants were each aware of the nature of the telemarketing campaign through which Plaintiff and the class were called—including that automated calls were being made to consumers without prior express consent—but they continued to engage such services.

97.     NCE (including in conjunction with NBBI and AccessOne), Unified, and the other entities whose products are bundled with NCE-branded products and services issued memberships and insurance policies to persons who accepted quotations or applied for their products, services, or membership as a result of these calls, even though they knew the business arose from illegal telemarketing.

98.     Similarly, all Defendants knowingly accepted the benefits of the nonconsensual calls to Plaintiff and the class, including through accepting the advertising, and ultimately obtaining business as a result of such calls.

99.     Defendants each knew (or reasonably should have known) that their telemarketers were violating the TCPA on their behalf, and failed to take effective steps within its power to force the telemarketer to cease that conduct.

100.    The *FCC 2013 Ruling* states that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." *Id.* at ¶ 46. Moreover, evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at ¶ 46.

101.    Defendants NCE (including in conjunction with NBBI and AccessOne), Unified, and HII cloaked their lead generators with apparent authority to place the calls at issue on their behalf—including through the permitted use of their tradenames during such calls, and use of the

- 20 -

HII portal to issue insurance and other quotes for goods and services.

102. HII gives agents such as Duffie, Smith, Cox, and Health Enrollment and their salespeople the "ability … to enter consumer information into [its and its sellers'] sales or customer systems," as discussed in the *FCC 2013 Ruling*, including during the illegal calls themselves, further evidencing their apparent authority for such calling. The persons who interacted with Plaintiff and the class members during the calls that are the subject of this case had this ability, and engaged such ability to issue quotations for insurance and other products and services.

103. By knowingly retaining and paying their telemarketing lead generators for leads generated through the illegal calling alleged herein, Defendants ratified the illegal calling at issue.

## CLASS ACTION ALLEGATIONS

104. Plaintiff brings this action under Federal Rules of Civil Procedure 23(b)(2) and (b)(3), on behalf of the following classes:

**Robocall Class:** All persons in the United States whose cell phone number Rising Eagle called to encourage the purchase of any property, goods, or services, using an artificial or prerecorded voice or the same or similar dialing system used to call Plaintiff, where (1) the products or services offered were quoted using HII's portal, or (2) the tele-salesperson that spoke with the consumer was logged in to HII's portal at the time of such call.

**Internal DNC Class**: All persons who requested not to receive calls from any Defendant or their telemarketing intermediaries (e.g. Rising Eagle and Enrollment Center of America) during at least one call, and who received at least two telemarketing calls from any Defendant thereafter in any 12-month period.

**ATDA Class:** All persons in the State of Illinois who Rising Eagle called, and (1) the HII portal was used, and/or (2) NCE or Unified products or services were quoted.

**Caller ID Class:** All persons in the State of Illinois to whom an autodialed telephone call containing a recorded message for purposes of soliciting the sale of any NCE, HII or Unified property, goods, or services was made, where the caller ID displayed a telephone number other than a phone number publicly listed as that of Rising Eagle, Health Enrollment of America or any Defendant.

Plaintiff alleges that HII is liable for any call on which products or services were offered, quoted or sold using its portal, and/or the salesperson was logged in to HII's portal at the time of the call; that NCE, NBBI and AccessOne be liable for calls where NCE products or services were offered, quoted and/or sold, and that Unified be liable for calls offered Unified products or services were offered, quoted and/or sold.

105.    Plaintiff requests that members of the certified class in *Moser v. Health Ins. Innovations, Inc.*, 2019 WL 3719889 (S.D. Cal. Aug. 7, 2019), be excluded from the class here.

106.    There were more than 1,000 persons whose phone numbers Rising Eagle called on behalf of Defendants without permission, using the same autodialer equipment used to call Plaintiff, and where such calls used spoofed numbers and/or were made more twice in any 12-month period after a request not to receive calls.

107.    Common questions of law or fact exist as to all members of the classes, which predominate over any questions solely affecting any individual member, including Plaintiff. Such questions common to the classes include but are not limited to:

        a.    Whether the calls to Plaintiff and the TCPA Class and Sub-Class were made using an "automatic telephone dialing system" as such term is defined or understood under the TCPA and applicable FCC regulations and orders;

        b.    Whether the calls to Plaintiff and the TCPA Class and Sub-Class were made using an artificial or prerecorded voice as such terms are defined or understood under the TCPA and applicable FCC regulations and orders

        c.    Whether Defendants had "prior express consent" under the TCPA to call the cell phone numbers of Plaintiff and the TCPA Class and Sub-Class;

        d.    Whether Defendant had the "consent" of Plaintiff and the other ATDA Class

members to play a prerecorded message placed by an autodialer within the meaning of the statute;

e.  Whether Defendants instituted procedures for maintaining a list of persons who request not to receive telemarketing calls that met the standards set forth in 47 C.F.R. § 64.1200(d);

f.  Whether Defendants are liable for Rising Eagle's failure to have any written Do Not Call policy, when it made the calls that are the subject of this case;

g.  Whether, despite being capable of allowing the display of its telephone number, Rising Eagle's calls for Defendants impeded the function of the caller ID of Plaintiff and the other Caller ID Class members; and

h.  Damages, including whether any violations were performed willfully or knowingly, such that Plaintiff and the other members of the class are entitled to treble damages under 47 U.S.C. § 227(b)(3) or § 227(c)(5).

108.  Plaintiff's claims are typical of the claims of the other members of the classes. The factual and legal bases of Defendants' liability to Plaintiff and the other members of the classes are the same: Defendants violated the TCPA and ATDA by causing automated calls to be made to the telephone number of each class member, without consent (and, as to the TCPA Internal DNC Class, after a direct do-not-call request), and further violated the ATDA by impeding caller identification.

109.  Plaintiff will fairly and adequately protect the interests of the classes. Plaintiff has no interests that might conflict with the interests of the classes. Plaintiff is interested in pursuing her claims vigorously, and she has retained counsel competent and experienced in class and complex litigation, including with regards to the claims alleged herein.

110.     Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged herein.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail.  There are thousands of class members of each class, such that joinder of all members is impracticable.

111.     No difficulties are likely to be encountered in the management of this action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy.

112.     Defendants have acted and failed to act on grounds generally applicable to Plaintiff and the other members of each class, thereby making relief appropriate with respect to the class as a whole.  Prosecution of separate actions by individual members of the classes, should they even realize that their rights have been violated, would likely create the risk of inconsistent or varying adjudications with respect to individual members of the classes that would establish incompatible standards of conduct.

113.     The identities of the class members are readily identifiable from Defendants' and their vendors' records. For example, HII has records of the emails it sent quoting the other Defendants' products and services, as well as records of the quotes themselves.

**COUNT I**
**Violations of the TCPA, 47 U.S.C. § 227**
**(On Behalf of Plaintiff and the TCPA Class and Sub-Class)**

114.     Plaintiff re-alleges and incorporates the foregoing allegations as if fully set forth herein.

115.     It is a violation of the TCPA to make any telemarketing call to a cellular or

- 24 -

residential landline number using an artificial or prerecorded voice. 47 U.S.C. § 227(b)(1)(A)(iii); 47 C.F.R. § 64.1200(a)(3).

116. Defendants made calls to the telephone numbers of Plaintiff and the other members of the TCPA Class and Sub-Class using an automatic telephone dialing system, as well as with an artificial or prerecorded voice. Alternatively and additionally, such calls were made on Defendants' behalf such that they are vicariously liable.

117. These calls were made without regard to whether or not Defendants had previously obtained express permission from the called party to make such calls. In fact, Defendants did not have prior express consent to call the phones of Plaintiff and the other members of the TCPA Class when the calls were made.

118. These calls were willful or knowing.

119. Defendants violated the TCPA by making non-emergency calls to the phones of Plaintiff and others using an automatic telephone dialing system or an artificial or prerecorded voice, without prior express consent.

120. To the extent that some of the calls to Plaintiff and the class were made by vendors of Defendants, Defendants are liable for those calls, too.

121. As a result of Defendants' conduct and pursuant to Section 227(b)(3) of the TCPA, Plaintiff and the other members of the TCPA Class and Sub-Class were harmed and are each entitled to a minimum of $500 in damages for each violation. Plaintiff and the TCPA Class and Sub-Class are also entitled to an injunction against future calls. 47 U.S.C. § 227(b)(3).

122. Because Defendants knew or should have known that Plaintiff and the other members of the class had not given prior express consent to receive its automated calls to their cell phones—and/or willfully caused automated calls to be made to the cell phones of Plaintiff

and the other members of the class without prior express consent—the Court should treble the amount of statutory damages available to Plaintiff and the other members of the class and sub-class, pursuant to Section 227(b)(3) of the TCPA.

WHEREFORE, Plaintiff Mary Bilek, individually and on behalf of the TCPA Class and Sub-Class, respectfully requests that the Court enter judgment against Defendants for:

A.     Certification of the TCPA Class and Sub-Class as alleged herein;

B.     A declaration that Defendants violated the TCPA as to Plaintiff and the TCPA Class and Sub-Class;

C.     Damages, pursuant to 47 U.S.C. § 227(b)(3);

D.     Injunctive relief, pursuant to 47 U.S.C. § 227(b)(3), aimed at ensuring the prevention of Defendants from violating the TCPA in the future, including:

     1.    Requiring Defendants to hire a Court-approved, independent auditing company to (a) investigate all allegations of TCPA violations, and (b) audit no less than 10% of outbound calls to ensure that they had consent and that the consumer had not previously asked that calls stop, and (c) report the results of the above investigations to the Court and Plaintiff's counsel on a quarterly basis.

     2.    Requiring Defendants to include an automated IVR opt-out mechanism at the beginning of any and all prerecorded-voice calls;

E.     Attorneys' fees and costs, as permitted by law; and

F.     Such other or further relief as the Court deems just and proper.

- 26 -

## COUNT II
### Violations of the TCPA, 47 U.S.C. § 227
### (On Behalf of Plaintiff and the TCPA Internal DNC Class)

123.    Plaintiff re-alleges and incorporates all allegations as if fully set forth herein.

124.    It is a violation of the TCPA to fail to stop calling a person or phone number after a request to stop calling. 47 C.F.R. § 64.1200(d).

125.    It is a violation of the TCPA not to include the name of the party on whose behalf calls are being made in the beginning of a telemarketing call. 47 C.F.R. § 64.1200(d)(4).

126.    It is a violation of the TCPA to accept business derived from telemarketing initiated by an entity that does not have a written Do Not Call policy, or that does not adhere to the policy that exists. Defendants did this.

127.    Defendants caused to be initiated calls to the telephone numbers of Plaintiff and the other members of the TCPA Internal DNC Class in violation of these regulations. The reason for the noncompliant calls is that no Defendant had telemarketing policies that complied with 47 C.F.R. § 64.1200(d), and the entities that "initiated" such calls such as Rising Eagle had no written policy at all. Alternatively and additionally, Defendants unreasonably and willfully failed to adhere to any policies that might have complied with the letter of 47 C.F.R. § 64.1200(d), thus causing the violative calls.

128.    These violations were willful or knowing.

WHEREFORE, Plaintiff Mary Bilek, individually and on behalf of the TCPA Internal DNC Class, respectfully requests that the Court enter judgment against Defendants for:

    A.    Certification of the TCPA Internal DNC Class as alleged herein;

    B.    A declaration that each Defendant violated the TCPA as to Plaintiff and the TCPA Internal DNC Class;

    C.      Damages, pursuant to 47 U.S.C. § 227(c)(5);

    D.      Injunctive relief, pursuant to 47 U.S.C. § 227(c)(5), aimed at ensuring the prevention of TCPA violations in the future, including:

        1.    Requiring Defendants, and each of them, to hire a Court-approved, independent auditing company to (a) investigate all allegations of TCPA violations, and (b) audit no less than 10% of outbound calls to ensure compliance, and (c) report the results of the above investigations to the Court and Plaintiff's counsel on a quarterly basis;

        2.    Requiring Defendants to honor any automated IVR opt-out mechanism at the beginning of any and all prerecorded-voice calls;

        3.    Prohibiting Defendants from misleading call recipients into believing that calls were for name-brand health insurance, when calls were truly designed to sell health benefit plans.

    E.      Attorneys' fees and costs, as permitted by law; and

    F.      Such other or further relief as the Court deems just and proper.

**COUNT III**
**Violations of the ATDA, 815 ILCS 305/1 *et seq.***
**(On Behalf of Plaintiff and the ATDA Class)**

129.    Plaintiff re-alleges and incorporates the foregoing allegations as if fully set forth herein.

130.    The ATDA prohibits "play[ing] a prerecorded message placed by an autodialer without the consent of the called party." 815 ILCS 305/30(b).

131.    Under the ATDA, an "autodialer" or "autodialer system" is defined as "any

- 28 -

telephone dialing or accessing device, machine, computer or system capable of storing telephone numbers which is programmed to sequentially or randomly access the stored telephone numbers in order to automatically connect a telephone with a recorded message[.]" 815 ILCS 305/5(a).[4]

132.    A "recorded message" refers to "any taped communication soliciting the sale of goods or services without live voice interaction." 815 ILCS 305/5(c).

133.    Defendants did not have the consent of Plaintiff or the other members of the ATDA Class to play a prerecorded message placed by an autodialer.

134.    Nonetheless, Defendants caused calls to be made to the phones of Plaintiff and the other members of the ATDA Class using a telephone dialing or accessing device, machine, computer or system capable of storing telephone numbers which is programmed to sequentially or randomly access the stored telephone numbers in order to automatically connect a telephone with a recorded message. No human being physically dialed each digit of Plaintiff's or the other ATDA Class members' phone numbers to connect their telephones with a recorded message.

135.    Defendants' prerecorded messages to the phones of Plaintiff and the other ATDA Class members included language soliciting the sale of goods or services without live voice interaction, including offering insurance or medical discount-related products.

136.    Consequently, Defendants violated the ATDA by playing a prerecorded message placed by an autodialer during calls to the phones of Plaintiff and the other ATDA Class members, without such persons' consent.

137.    As a result of Defendants' conduct and pursuant to Section 30(c)-(c-5) of the ATDA, Plaintiff and the other members of the ATDA Class were harmed and are each entitled to statutory damages of $500 per violation and three times any actual damages, as well as costs and

---

[4]    The term "autodialer" or "autodialer system" does not include "device[s] associated with a burglar alarm system, voice message system or fire alarm system." 815 ILCS 305/5(a).

attorneys' fees. 815 ILCS 305/30(c)-(c-5).

WHEREFORE, Plaintiff Mary Bilek, individually and on behalf of the ATDA Class, respectfully requests that the Court enter judgment against Defendants for:

A.     Damages, pursuant to 815 ILCS 305/30;

B.     Attorneys' fees and costs, as permitted by law; and

C.     Such other or further relief as the Court deems just and proper.

### COUNT IV
### Violations of the ATDA, 815 ILCS 305/1 *et seq.*
### (On Behalf of Plaintiff and the Caller ID Class)

138.    Plaintiff re-alleges and incorporates the foregoing allegations as if fully set forth herein.

139.    The ATDA prohibits "mak[ing] or caus[ing] to be made telephone calls utilizing an autodialer in a manner that does not comply with Section 15." 815 ILCS 305/30(a).

140.    Section 15 of the ATDA, in turn, provides that "[a]n autodialer may not be operated in a manner that impedes the function of any caller ID when the telephone solicitor's service or equipment is capable of allowing the display of the solicitor's telephone number." 815 ILCS 305/15(d).

141.    Under the ATDA, an "autodialer" or "autodialer system" is defined as "any telephone dialing or accessing device, machine, computer or system capable of storing telephone numbers which is programmed to sequentially or randomly access the stored telephone numbers in order to automatically connect a telephone with a recorded message[.]" 815 ILCS 305/5(a). A "recorded message" refers to "any taped communication soliciting the sale of goods or services without live voice interaction." 815 ILCS 305/5(c).

142.    Defendants, through HII, caused a prerecorded message soliciting the sale of NCE

(in conjunction with NBBI and AccessOne) and Unified goods or services to be placed by an autodialer in calls to the phones of Plaintiff and the other members of the Caller ID Class.

143.     Specifically, Defendants' calls to Plaintiff and the other Caller ID Class members were made by a telephone dialing or accessing device, machine, computer or system capable of storing telephone numbers, which was programmed to sequentially or randomly access Plaintiff's and the other Caller ID Class members' stored telephone numbers in order to automatically connect their telephones with a recorded message soliciting the sale of goods or services without live voice interaction.

144.     While, on information and belief, the service or equipment used to make such calls was capable of allowing the display of its telephone number, Defendants or their vendor(s) impeded caller identification by using spoofed numbers during the calls to Plaintiff and the other members of the Caller ID Class.

145.     As a result of Defendant's conduct and pursuant to Section 30(c)-(c-5) of the ATDA, Plaintiff and the other members of the Caller ID Class were harmed and are each entitled to statutory damages of $500 per violation and three times any actual damages, as well as costs and attorneys' fees. 815 ILCS 305/30(c)-(c-5).

WHEREFORE, Plaintiff Mary Bilek, individually and on behalf of the Caller ID Class, respectfully requests that the Court enter judgment against Defendants for:

A.     Damages, pursuant to 815 ILCS 305/30;

B.     Attorneys' fees and costs, as permitted by law; and

C.     Such other or further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff requests a trial by jury of all claims that can be so tried.

Respectfully submitted,

Dated: August 20, 2019                    MARY BILEK, individually and
                                          on behalf of others similarly situated

                                          By:  */s/ Alexander H. Burke*

Alexander H. Burke
Daniel J. Marovitch
BURKE LAW OFFICES, LLC
155 N. Michigan Ave., Suite 9020
Chicago, IL 60601
Telephone: (312) 729-5288
aburke@burkelawllc.com
dmarovitch@burkelawllc.com

*Counsel for Plaintiff*

### Document Preservation Demand

Plaintiff hereby demands that each Defendant take affirmative steps to preserve all recordings, data, databases, call records, consent to receive autodialed or artificial or prerecorded voice calls, e-mails, recordings, documents, and all other tangible things that relate to the allegations herein, Plaintiff, or the putative class members, or the making of telephone calls, the events described herein, any third party associated with any telephone call, campaign, account, sale, or file associated with Plaintiff or the putative class members, and any account or number or symbol relating to any of them. These materials are very likely relevant to the litigation of this claim. If Defendant is aware of any third party that has possession, custody, or control of any such materials, Plaintiff demands that Defendant request that such third party also take steps to preserve the materials. This demand shall not narrow the scope of any independent document preservation duties of Defendants.

                                          */s/ Alexander H. Burke*