**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MARY BILEK, individually and | ) | |
| on behalf of others similarly situated, | ) | Case No. 1:18-cv-03083 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NATIONAL CONGRESS OF EMPLOYERS, | ) | Hon. Judge Charles R. Norgle, Sr. |
| INC., et al., | ) | Hon. Mag. Judge Jeffrey T. Gilbert |
| Defendants. | ) | |

**PLAINTIFF'S OPPOSITION TO ALL MOTIONS TO DISMISS**

# TABLE OF CONTENTS

**Page**

I.     BACKGROUND .................................................................................................2

     A.     Statutory Background .........................................................................2

     B     Facts ....................................................................................................3

II.     ARGUMENT .....................................................................................................8

     A.     Personal Jurisdiction Exists. ..............................................................8

         1.     NCE Assented to this Court's Jurisdiction. ................................9

         2.     NCE, NBBI and AccessOne Waived Personal Jurisdiction through Litigation. ...............................................................................10

         3.     Defendants' Alleged Conduct Establishes Specific Personal Jurisdiction. ...........................................................................12

         4.     Defendants' Argument that the Class Should Be Limited to Illinois Residents Fails. .....................................................................14

     B.     Plaintiff Has Pleaded Defendants' Liability. ...................................19

         1.     Participation in Telemarketing Process. ....................................19

         2.     Implied Actual Authority. .........................................................20

         3.     Apparent Authority. ..................................................................22

         4.     Ratification. ..............................................................................24

     C.     There Exists a Private Right of Action under Internal Do Not Call Rules, and Plaintiff Has Pleaded a Plausible Claim. ...........................................27

     D.     Plaintiff Has Pleaded Facts to Support an Illinois Automatic Telephone Dialer Act Claim. ................................................................................................29

III.     CONCLUSION ................................................................................................30

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*1st Nat. Bank v. El Camino Res., Ltd.*,
  447 F. Supp. 2d 902 (N.D. Ill. 2006) ...................................................... 13

*ABN AMRO, Inc. v. Capital Int'l, Ltd.*,
  595 F. Supp. 2d 805 (N.D. Ill. 2008) ...................................................... 9

*Al Haj v. Pfizer Inc.*,
  338 F. Supp. 3d 815 (N.D. Ill. 2018) ...................................................... 19

*Alea London Ltd. v. Am. Home Servs., Inc.*,
  638 F.3d 768 (11th Cir. 2011) ................................................................. 3

*Am. Patriot Ins. Agency, Inc. v. Mut. Risk Mgmt., Ltd.*,
  364 F.3d 884 (7th Cir. 2004) ................................................................... 11

*Aranda v. Caribbean Cruise Line, Inc.*,
  179 F. Supp. 3d 817 (N.D. Ill. 2016) ...................................................... 25

*Bailey v. Domino's Pizza, LLC*,
  867 F. Supp. 2d 835 (E.D. La. 2012) ...................................................... 29

*Blow v. Bijora, Inc.*,
  855 F.3d 793 (7th Cir. 2017) ................................................................... 29

*Brady v. Sullivan*,
  893 F.2d 872 (7th Cir. 1989) ................................................................... 16

*Braver v. Northstar Alarm Servs., LLC*,
  329 F.R.D. 320 (W.D. Okla. 2018) ......................................................... 23

*Brennan v. Midwestern United Life Ins. Co.*,
  450 F.2d 999 (7th Cir. 1971) ................................................................... 18

*Bresgal v. Brock*,
  843 F.2d 1163 (9th Cir. 1987) ................................................................. 16

*Bristol-Myers Squibb Co. v. Super. Ct.*,
  137 S. Ct. 1773 (2017) ............................................................................ 17

*Burdge v. Ass'n Healthcare Mgmt., Inc.*,
  No. 10-100, 2011 WL 379159 (S.D. Ohio Feb 2, 2011) ........................ 28

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985) ............................................................................................ 8

*C.A.M. Affiliates, Inc. v. First Am. Title Ins. Co.*,
  306 Ill. App. 3d 1015 (1999) ............................................................................ 21

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) .................................................................................... 14, 16

*Chapman v. First Index, Inc.*,
  796 F.3d 783 (7th Cir. 2015) ............................................................................ 19

*Charvat v. GVN Michigan, Inc.*,
  561 F. 3d 623 (6th Cir. 2009) ........................................................................... 28

*Charvat v. NMP, LLC*,
  656 F. 3d 440 (6th Cir. 2011) ........................................................................... 28

*Charvat v. Valente*,
  No. 12-5746, 2015 WL 3575636 (N.D. Ill. June 8, 2015) ............................ 21, 25

*Clark v. Allied Interstate LLC*,
  No. 16-2409, 2017 WL 2903358 (N.D. Ga. Jan. 20, 2017) ............................... 30

*Clark v. Universal Builders, Inc.*,
  501 F.2d 324 (7th Cir. 1974) ............................................................................ 18

*Coleman v. Labor & Industry Review Comm'n*,
  860 F.3d 461 (7th Cir. 2017) ............................................................................ 18

*Conn. Nat. Bank v. Germain*,
  503 U.S. 249 (1992) .......................................................................................... 20

*Cont'l Bank, N.A. v. Meyer*,
  10 F.3d 1293 (7th Cir. 1993) ............................................................................ 11

*Cordoba v. DirecTV, LLC*,
  320 F.R.D. 582 (N.D. Ga. 2017) ...................................................................... 28

*Curran v. Bayer Healthcare LLC*,
  No. 17-7930, 2019 WL 398685 (N.D. Ill. Jan. 31, 2019) ................................. 19

*Davis v. Carter*,
  61 F. App'x 277 (7th Cir. 2003) .......................................................................... 9

*Day v. Persels & Assoc., LLC*,
  729 F.3d 1309 (11th Cir. 2013) ........................................................................ 18

- iii -

*Devlin v. Scardelletti,*
 536 U.S. 1 (2002) ......................................................................................... 18

*Early v. Bankers Life & Cas. Co.,*
 959 F.2d 75 (7th Cir. 1992)........................................................................... 3

*Early v. Bankers Life and Casualty Co.,*
 959 F.2d 75 (7th Cir. 1992)......................................................................... 19

*Engle v. Unified Life Ins. Co., Inc.,*
 No. 14-1908, 2014 WL 12508347 (S.D. Cal. Oct. 27, 2014) ...................... 1

*Exley v. Burwell,*
 No. 14-1230, 2015 WL 3649632 (D. Conn. June 10, 2015)....................... 16

*Federated Rural Elec. Ins. Corp. v. Inland Power & Light Co.,*
 18 F.3d 389 (7th Cir. 1994)......................................................................... 13

*Felland v. Clifton,*
 682 F.3d 665 (7th Cir. 2012)......................................................................... 8

*Garcia v. Johnson,*
 No. 14-1775, 2014 WL 6657591 (N.D. Cal., Nov. 21, 2014)..................... 16

*Golan v. Veritas Entm't, LLC,*
 No. 14-69, 2016 WL 880402 (E.D. Mo. 2016) .......................................... 24

*Gould v. Farmers Ins. Exch.,*
 288 F. Supp. 3d 963 (E.D. Mo. 2018)......................................................... 22

*Henderson v. United Student Aid Funds, Inc.,*
 918 F.3d 1068 (9th Cir. 2019)............................................................... 25, 27

*In re Amtrak Train Derailment,*
 No. 15- 2654, 2016 WL 1359725 (E.D. Pa. Apr. 6, 2016) ........................ 16

*In re Jiffy Lube Int'l, Inc., Text Spam Litig.,*
 847 F. Supp. 2d 1253 (S.D. Cal. 2012) ...................................................... 22

*Izsak v. Draftkings, Inc.,*
 191 F. Supp. 3d 900 (N.D. Ill. 2016) ......................................................... 30

*Jamison v. First Cred. Servs., Inc.,*
 290 F.R.D. 92 (N.D. Ill. 2013) ................................................................... 25

*Keim v. ADF MidAtlantic, LLC,*
 199 F. Supp. 3d 1362 (S.D. Fla. 2016)....................................................... 12

*Keim v. ADF Midatlantic, LLC*,
    No. 12-80577, 2015 WL 11713593 (S.D. Fl. 2015) ................................................................ 26

*Klein v. Commerce Energy, Inc.*,
    256 F. Supp. 3d 563 (W.D. Pa. 2017) .................................................................................. 26

*Krakauer v. Dish Network, LLC*,
    925 F.3d 643 (4th Cir. 2019).................................................................................................. 27

*Levin v. Posen Found.*,
    62 F. Supp. 3d 733 (N.D. Ill. 2014) ...................................................................................... 9

*Lowe v. CVS Pharmacy, Inc.*,
    233 F. Supp. 3d 636 (N.D. Ill. 2017) .................................................................................... 14

*Luna v. Shac, LLC*,
    No. 14-607, 2014 WL 3421514 (N.D. Cal. July 14, 2014)................................................... 12

*Matlin v. Spin Master Corp.*,
    921 F.3d 701 (7th Cir. 2019)................................................................................................. 12

*Mey v. Castle Law Grp.*,
    No. 19-185, 2019 WL 4579290 (N.D.W. Va. Sept. 20, 2019) ............................................. 12

*Mey v. Venture Data, LLC*,
    245 F. Supp. 3d 771 (N.D. W. Va. 2017) .......................................................................... 25, 26

*Mims v. Arrow Fin. Servs., LLC*,
    132 S. Ct. 740 (2012) ............................................................................................................ 2

*Mobile Anesthesiologists Chicago, LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.*,
    623 F.3d 440 (7th Cir. 2010).................................................................................................. 10

*Moser v. Health Ins. Innovations, Inc.*,
    No. 17-1127, 2018 WL 325112 (S.D. Cal. Jan. 5, 2018)....................................................... 1

*Mussat v. Enclarity, Inc.*,
    362 F. Supp. 3d 468 (N.D. Ill. 2019) .................................................................................... 11

*Nece v. Quicken Loans, Inc.*,
    No. 16-2605, 2017 WL 2865047 (M.D. Fla. Jan 3, 2017)..................................................... 28

*Opp v. Wheaton Van Lines, Inc.*,
    231 F.3d 1060 (7th Cir. 2000)........................................................................................ 21, 22, 23

*Payton v. Kale Realty, LLC*,
    No. 13-8002, 2014 WL 4214917 (N.D. Ill. Aug. 26, 2014)................................................... 12

*Phillips Petroleum v. Shutts*,
   472 U.S. 797 (1985) .................................................................... 15, 16, 18

*Purdue Research Found. v. Sanofi-Synthelabo, S.A.*,
   338 F.3d 773 (7th Cir. 2003) ............................................................. 12

*Purdue Research Foundation v. Sanofi-Synthelabo, S.A.*,
   338 F.3d 773 (7th Cir. 2003) ............................................................... 9

*Restoration Hardware, Inc. v. Haynes Furniture Co.*,
   No. 16-10665, 2017 WL 2152438 (N.D. Ill. May 17, 2017) ................. 10

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.*,
   490 U.S. 477 (1989) ......................................................................... 17

*Smith v. Bayer Corp.*,
   564 U.S. 299 (2011) ......................................................................... 18

*Smith v. Royal Bahamas Cruise Line*,
   No. 14-3462, 2016 WL 232425 (N.D. Ill. Jan. 20, 2016) ................... 12

*Sojka v. DirectBuy, Inc.*,
   35 F. Supp. 3d 996 (N.D. Ill. 2014) ................................................... 30

*Williams v. Gen. Elec. Capital Auto Lease, Inc.*,
   159 F.3d 266 (7th Cir. 1998) ............................................................. 17

*Worsham v. Travel Options, Inc.*,
   No. 14-2749, 2016 WL 4592373 (D. Md. Sept. 2, 2016) ................... 29

## **Statutes**

47 U.S.C. § 227 ............................................................................................. 2

47 U.S.C. § 227(b) ...................................................................................... 28

47 U.S.C. § 227(b)(1)(A)(iii) ................................................................... 2, 20

47 U.S.C. § 227(b)(1)(B) ............................................................................ 20

47 U.S.C. § 227(c) ................................................................................. 27, 28

47 U.S.C. § 227(c)(5) ......................................................................... 27, 28, 29

47 U.S.C. § 227(d) ...................................................................................... 27

815 ILCS 305/1 ............................................................................................. 3

815 ILCS 305/15(d) .................................................................................. 3, 29

815 ILCS 305/30 ............................................................................................................ 3

815 ILCS 305/30(b) ..................................................................................................... 29

## **Other Authorities**

1 *McLaughlin on Class Actions* § 2.44 n. 5 (15th ed.) ............................................... 19

*In re Joint Pet. Filed by DISH Network, LLC*,
    28 FCC Rcd. 6574 (2013) ................................................................................... passim

*In re Rules & Regs. Implementing the TCPA*,
    30 FCC Rcd. 7961 (2015) .......................................................................................... 20

Rest. 3d Agency ........................................................................................................ passim

William B. Rubenstein, *Newberg on Class Actions* § 6.28 (5th ed.) ........................... 15

## **Rules**

Fed. R. Civ. P. 12(b)(2) ................................................................................................. 9

Fed. R. Civ. P. 12(h)(1) ................................................................................................. 9

Fed. R. Civ. P. 23 .................................................................................................. 17, 18

Fed. R. Civ. P. 8(a) ...................................................................................................... 30

## **Regulations**

47 C.F.R. § 64.000(d) .................................................................................................... 3

47 C.F.R. § 64.1200(d) ................................................................................ 2, 27, 28, 29

This case is relatively simple: Health Insurance Innovations, Inc. ("HII") uses insurance agents and lead generators to solicit the purchase of its co-defendants' health insurance and related discount products through robocalls. HII is liable because it actively participated in the sales calls, and knowingly benefitted from the challenged telemarketing. The rest of the Defendants – the companies whose products were marketed and sold during these calls – are liable because they authorized HII and the insurance agents to use their names and sell their products to call recipients, thus creating the (correct) impression to recipients that they authorized such calls. The Seller Defendants are also liable because they knowingly accepted the benefits of the illegal telemarketing, and because they continue to do so to this day. Exhibits B-D (insurance quotes from three calls; two after filing).

HII and NCE have tried to wriggle out of lawsuits like this one before, having lost nearly identical motions to dismiss in *Moser v. Health Ins. Innovations, Inc.*, No. 17-1127, 2018 WL 325112, at *7 (S.D. Cal. Jan. 5, 2018), and *Engle v. Unified Life Ins. Co., Inc.*, No. 14-1908, 2014 WL 12508347 (S.D. Cal. Oct. 27, 2014). Both *Moser* and *Engle* concern the same telemarketing scheme as this case. Additionally, *Moser* was certified as a class action for a subset of the class alleged here. 2019 WL 3719889 (S.D. Cal. Aug. 7, 2019); *see also Cunningham v. Health Plan Intermediaries Holdings, LLC*, No. 18-919, 2018 WL 7350924 (M.D. Fla. Nov. 15, 2018) (same, as to HII, only).

To the extent one might consider it plausible that the Seller Defendants other than HII and NCE were unaware of *Moser* or *Engle*, HII and NCE were defendants in a TCPA case filed in Charleston County, South Carolina on October 11, 2017, Exhibit A, placing them on direct notice of the conduct alleged to have been illegal here.

The first calls to Bilek were in spring 2018; Defendants continue to make substantively

1

identical calls that continue *to this day*. For example, on February 13, 2019, a consumer named Robert Hossfeld received a call similar to the one Plaintiff Bilek received, and during such call HII quoted him NCE products and services, among others. Exhibit B. Hossfeld received another call on May 22, 2019, resulting in HII quotes for NCE and other "add on" products, Exhibit C, and on August 14, 2019, consumer Robert Hossfeld received *another* HII telemarketing call. Exhibit D. These calls all arose from the telemarketing scheme alleged here. During that call HII quoted him policies for health insurance and other "add on" health related products and services. Exhibit C. To be sure, Fed.R.Civ.P. 9(b) states that allegations of "knowledge … may be alleged generally," but these prior TCPA cases involving nearly identical allegations *prove* that those Defendants continued to accept business with full knowledge that it was derived from robocalls.

The core facts herein are well-pled, publicly indisputable, and expose Defendants' motion as nothing but a red herring. The Complaint contains numerous detailed factual allegations, far exceeding the requisites of Rule 8. For all of these reasons, the motions to dismiss, Dkt. 140 and 147, should be denied.

## I.     **BACKGROUND**

### A.     **Statutory Background**

The Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, was enacted in response to widespread outrage over the proliferation of intrusive, nuisance calling practices. *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 745 (2012). It broadly prohibits making nonconsensual autodialed or prerecorded-voice calls to cell numbers, or telemarketing without having instituted required procedures for maintaining a list of persons who request not to be called. 47 U.S.C. § 227(b)(1)(A)(iii); 47 C.F.R. § 64.1200(d). It also prohibits "initiat[ing] any call for telemarketing purposes to a residential telephone subscriber unless such person or entity

has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity." 47 C.F.R. § 64.000(d). "[A] seller … may be held vicariously liable under federal common law principles of agency for violations … that are committed by third-party telemarketers[.]" *In re Joint Pet. Filed by DISH Network, LLC*, 28 FCC Rcd. 6574, ¶ 1 (2013) ("*In re DISH*"). "The TCPA is essentially a strict liability statute[;] … [it] does not require any intent for liability except when awarding treble damages." *Alea London Ltd. v. Am. Home Servs., Inc.*, 638 F.3d 768, 776 (11th Cir. 2011).

The Illinois equivalent to the TCPA, the Illinois Automatic Telephone Dialers Act ("ATDA"), 815 ILCS 305/1 *et seq.*, provides further consumer relief, as well—prohibiting callers from impeding caller identification, in addition to protecting against unsolicited autodialed telemarketing. 815 ILCS 305/15(d) and 30.

**B      Facts[1]**

Defendants are engaged in a telemarketing practice that results in millions of unsolicited autodialed and prerecorded calls to consumers like Plaintiff, without proper regard to the TCPA's automated-call and do-not-call rules, and in flagrant disregard for individual privacy. SAC ¶¶ 2, 22. Specifically, Defendant Health Insurance Innovations, Inc. ("HII") is a facilitator and orchestrator for telemarketing sales of healthcare-related products and services. SAC ¶¶ 7-8. Defendants National Congress of Employers, Inc. ("NCE"), AccessOne Consumer Health, Inc. ("AccessOne"), and National Benefit Builders, Inc. ("NBBI") (together with Defendant Unified Life Insurance Company ("Unified"), the "Seller Defendants") work together to offer health and

---

[1]      The facts laid out here are either specifically laid out in the Second Amended Complaint ("SAC"), Dkt. 116, or are proffered as additional facts that are consistent with those allegations. *See Early v. Bankers Life & Cas. Co.*, 959 F.2d 75, 79 (7th Cir. 1992) ("[A] plaintiff is free, in defending against a motion to dismiss, to allege without evidentiary support any facts he pleases that are consistent with the complaint, in order to show that there is a state of facts within the scope of the complaint that if proved (a matter for trial) would entitle him to judgment.").

lifestyle discount and insurance-related products that are sold through HII's telemarketing scheme—for example, AccessOne underwrites certain discount products or services, which NBBI then packages and contracts with NCE to solicit as a "benefit" of NCE membership or through other NCE-branded products or services (e.g., "NCE Premier"). SAC ¶ 15.[2]

HII enlists insurance agents, such as Enrollment Center of America, to sell these products, often soliciting multiple products as a single, bundled offering to the consumer (e.g., NCE's medical discount program with added life insurance through Unified or another insurer).[3] SAC ¶¶ 7, 37-39, 42, 51. To generate the desired sales, Enrollment Center of America and other contracted HII insurance agents, or their vendors, make autodialed and prerecorded-voice calls to consumers' phones, during which HII's online platform provides quotes, sends applications to the call recipient, and processes sales of the Seller Defendants' products. SAC ¶¶ 9, 42, 44-46, 57-58, 60, 76, 101, 104. Many of these calls are made to cell phones (as in the case of Plaintiff and the members of the Robocall Class), and none or almost none of the people called as part of this scheme ever consented to receive such calls. SAC ¶¶ 32, 35, 104.[4] The calls at issue were made using an automatic telephone dialing system and a prerecorded voice. SAC ¶¶ 33-34.

---

[2] *E.g.,* https://www.ncepremierplus.com/agreement.aspx (NBBI's "NCE Premier Platinum Plus" website, reflecting that, "[a]s a member of [the NCE] Premier Platinum Plus Discount Medical Program you are a participant in a Discount Medical Plan Organization provided by Access One Consumer Health[;] … [t]his agreement is between you and Access One Consumer Health"). It was this "NCE Premier" product or similar that Defendants attempted to sell during the calls to Plaintiff. SAC ¶ 39.

[3] Alternatively NCE and/or its broker, Group Plan Administrators Inc. ("GPA") facilitate the creation of these bundles directly. SAC ¶43. For example, in April 2015, NCE entered into a Program Manager Agreement with a managing general underwriter of Unified called Xchange Benefits, LLC ("Xchange") and Defendant HII's wholly-owned subsidiary Health Plan Intermediaries Holdings, LLC ("HPIH"), through which HPIH was appointed Unified's agent as to the sale of NCE-branded short term medical or other insurance-related products underwritten by Unified, and agreed to solicit individuals to purchase such products. SAC ¶ 44. NCE also contracts with insurers and other entities for other NCE-branded products and services, as well. SAC ¶¶ 41, 42; *see, e.g.,* Dkt. 85-5 (NCE Membership Application forms contained in bundled "AdvantHealth STM" application materials provided to consumer through HII after telemarketing calls with lead generator Enrollment Center of America).

[4] Indeed, Defendants knew they did not have Plaintiff's consent for these calls. SAC ¶ 77. Plaintiff asked the caller not to call her, including through pressing "2" during the IVR process in some calls she received, but continued to receive calls in spite of this. *Id.*

In the case of Plaintiff Bilek—a resident of Cook County, Illinois, who received all of the calls at issue to her cell phone within this District, *see* SAC ¶¶ 24, 31—the calls were initiated by an Enrollment Center of America vendor called Rising Eagle Capital Group LLC ("Rising Eagle"). SAC ¶ 3. Rising Eagle and other callers for Defendants used spoofed caller IDs for these calls in order to trick consumers into answering. SAC ¶¶ 3, 79. When a consumer follows the call's prerecorded prompt and presses "1" to speak with a representative,[5] the call is "warm transferred" to Enrollment Center of America, whose representatives then attempt to sell NCE-branded and other healthcare-related products and services, through HII. SAC ¶ 4; Exhibit E. Once a consumer indicates interest, calls are transferred to "closers," who take the consumer's demographic and health information, read special scripts to the consumers that are provided by HII and approved by NCE (including in conjunction with NBBI and AccessOne) and the other entities whose products are bundled with NCE-branded products and services, and send an email to the consumer from an email address associated with HII such as MyBenefitsKeeper.com. SAC ¶ 55.[6]

Plaintiff has received dozens of these same, autodialed calls, which utilize the same or similar prerecorded message. SAC ¶¶ 67-72. During one such call on March 16, 2018, after Plaintiff "pressed 1" through the automated prompt to speak with a representative, Defendants' representative gave her a $143.09/month quote for what Plaintiff was informed was a group insurance "NCE Premier Platinum" plan covering health, dental, and vision, plus $275,000 in life insurance coverage. SAC ¶ 73.

Defendants are each directly or vicariously liable for the TCPA violations at issue. For its

---

[5]    The use of an ATDS is evident by the voluminous extent of calls that Rising Eagle warm-transferred to Enrollment Center of America: more than 6,000,000 calls to more than 3,000,000 unique phone numbers during 2017-2019.  SAC ¶ 5.

[6]    *See, e.g.,* Dkt. 84-4 at 1-15 (sample NCE/HII scripts produced by Enrollment Center of America).

part, HII—which makes money when products or services are sold using its portal, SAC ¶ 60—
was directly involved in the calls: It provided quote/pricing information and scripts for the Seller
Defendants' products and services for agents like Enrollment Center of America to quote during
the calls at issue, helped agents and salespeople such as Enrollment Center of America with their
telemarketing efforts by advancing the costs in exchange for a security interest in the agents'
businesses (thereby paying for the telemarketing calls to Plaintiff and other class members), had
real-time and active participation in each call by virtue of Enrollment Center of America
insurance agents and salespeople being logged into HII's portal to effectuate the telephone
solicitations, and allowed its agents to access and input consumer data into its platform during
the verification stage of the calls, which would result in HII sending an email (using its
tradename) to the call recipient containing applications/contracts for the quoted products. SAC
¶¶ 9-11, 57-58, 102; *see also* Dkt. 84-5 (examples of emailed application materials for NCE-
branded products sent by HII as a result of Enrollment Center of America telemarketing). HII
continued to reap the financial gain from the telemarketing complained of here, even though it
knew such financial gain was the result of illegal calls; in fact, it *continued* accepting business
from Enrollment Center of America into 2019, despite knowing about this lawsuit since at least
spring 2018. SAC ¶ 13; Dkt. 101-2 (May 2018 email between NCE and HII regarding case).[7]

The Seller Defendants, and HII, were aware of the nature of the telemarketing campaign
through which Plaintiff and the class were called—including that nonconsensual, automated calls
were being made—but they knowingly continued to engage such services, anyways, accepting

---

[7]     If there is any question as to whether Defendants knew about the illegal telemarketing here,
consumer Robert Hossfeld—the plaintiff in a separate TCPA action against HII and NCE, among
others—received two robocalls that were substantially similar to those made to Plaintiff Bilek roughly *a
year after this lawsuit was filed*. SAC ¶ 61. The calls were initiated by Rising Eagle, and warm-
transferred to Enrollment Center of America. *Id.* NCE and Unified-branded products and services were
directly quoted during those calls, among others. *Id.*

the benefits of advertising, quote issuance to consumers, applications, and profits derived from issuing memberships and insurance policies to persons who accepted quotations or applied for their products, services, or membership as a result of these calls (and, in the case of HII, compensation for obtaining such). SAC ¶¶ 12, 60, 95-98. Defendants each knew (or reasonably should have known) that their telemarketers were violating the TCPA on their behalf, and failed to take effective steps within its power to force the telemarketer to cease that conduct. SAC ¶ 99.[8] At all relevant times, HII and the Seller Defendants each maintained control over their lead generators' actions in telemarketing and generating leads on their behalf, and had control over whether, and under what circumstances, they issued an insurance quote or membership in their discount products to a prospective customer, as well as over the sort of lead generation from which they would accept business. SAC ¶¶ 93-95.

Despite this, NCE (in conjunction with NBBI and AccessOne) authorized – and in some cases, such as with the development of scripts and application materials, facilitated – the selling of products and services during the telemarketing calls at issue, engaged HII and the insurance agents HII works with to bind them into contractual relations on their behalf, knowingly compensated HII for the sale of products and services resulting from such nonconsensual, automated calling, and issued quotes for insurance or acquired memberships derived from such calls. SAC ¶¶ 40, 52-53, 89-91. Indeed, Defendants continued to use these telemarketing-based lead generators through HII despite the pendency of this lawsuit—and even after NCE, NBBI,

---

[8]    *See, e.g.,* HII Form 10-K (Mar. 2, 2017) ("[W]e are subject to various federal and state telemarketing regulations, including the Telephone Consumer Protection Act ("TCPA") and the FCC's implementing regulations, as well as various state telemarketing laws and regulations. We, our distributors, and our carriers have been, and may continue to be, the subject of allegations of TCPA violations, and we could be responsible for some of the costs incurred by distributors or carriers who are the subject of allegations of TCPA violations. Any violation of these regulations could expose us to damages for monetary loss, statutory damages, fines, penalties and/or regulatory inquiries.") (available at https://www.sec.gov/Archives/edgar/data/1561387/000149315217002078/form10-k.htm).

and HII were sued in subsequent litigation under the TCPA. SAC ¶ 92. NCE (including in conjunction with NBBI and AccessOne) also authorize HII and its marketers and insurance agents to use of their corporate names during the telemarketing process.[9] SAC ¶¶ 54, 101.

Rising Eagle – the entity that initiated many of the calls about which this case complains – did not have a written Do Not Call policy for the entire time it made calls for Defendants. SAC ¶ 62. Likewise, neither Enrollment Center of America nor Defendants had written do-not-call policies, or they do not adhere to the policies that exist. *Id.* Defendants do not take adequate steps to ensure that the entities making calls to sell their products and services have and adhere to any internal Do Not Call policy, either. SAC ¶ 63.

Plaintiff and the class have been damaged by Defendants' calls. Their privacy was improperly invaded, the calls temporarily seized and trespassed upon the use of their phones, and they were forced to divert attention away from other activities to address the calls. Defendants' calls were annoying and a nuisance, and wasted the time of Plaintiff and the class. SAC ¶ 80.

## II.  ARGUMENT

### A.  Personal Jurisdiction Exists.

Specific personal jurisdiction over an out-of-forum defendant requires that "(1) the defendant … purposefully availed himself of the privilege of conducting business in the forum state or purposefully directed his activities at the state[;] (2) the alleged injury … [arose] from the defendant's forum-related activities[;] and (3) the exercise of jurisdiction … comport[s] with traditional notions of fair play and substantial justice[.]" *Felland v. Clifton*, 682 F.3d 665, 673 (7th Cir. 2012). "Jurisdiction cannot be avoided simply because a defendant did not physically enter the forum state[.]" *Id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 481 (1985)).

The Federal Rules permit dismissal of claims based on lack of personal jurisdiction. Fed.

---

[9]      HII's web portal, too, contains NCE's trademarked logo.  SAC ¶ 54; *e.g.,* Dkt. 84-5 at 2.

R. Civ. P. 12(b)(2). Upon a motion to dismiss under Rule 12(b)(2), the burden of proof is on the party asserting jurisdiction. *Levin v. Posen Found.*, 62 F. Supp. 3d 733, 738 (N.D. Ill. 2014). "The Court draws all reasonable inferences consistent with the complaint in the plaintiff's favor." *ABN AMRO, Inc. v. Capital Int'l, Ltd.*, 595 F. Supp. 2d 805, 818 (N.D. Ill. 2008).

"In considering a motion to dismiss for lack of personal jurisdiction, the court may review affidavits submitted by the parties." *Levin*, 62 F. Supp. 3d at 738. "[I]f the defendant submits affidavits or other evidence in opposition [to the existence of jurisdiction], the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the existence of jurisdiction." *ABN AMRO, Inc.*, 595 F. Supp. 2d at 818.

However, when the court rules on a motion to dismiss under Rule 12(b)(2) "based on the submission of written materials, the plaintiff need only make out a *prima facie* case of personal jurisdiction…." *Id.* (internal quotations omitted). "In evaluating whether the *prima facie* standard has been satisfied, the plaintiff is entitled to the resolution in its favor of all disputes concerning relevant facts presented in the record." *Purdue Research Foundation v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003) (internal quotations omitted).

### 1.    NCE Assented to this Court's Jurisdiction.

Federal Rule of Civil Procedure 12(h)(1), provides that a defense of lack of jurisdiction over the person is waived if it is neither made by motion under the rule nor included in a responsive pleading or an amendment thereof permitted by Rule 15(a) to be made as a matter of course. Fed. R. Civ. P. 12(h)(1). Neither NCE's answer to the original complaint, Dkt. 14, nor its answer to the amended complaint, Dkt. 46, asserted lack of personal jurisdiction as a defense. It has therefore waived the issue. *See Davis v. Carter*, 61 F. App'x 277, 279 (7th Cir. 2003) ("If they filed proper answers to the complaint, then the omission from the answers of a contention

that the court lacks personal jurisdiction forfeits that line of argument."); *Restoration Hardware, Inc. v. Haynes Furniture Co.*, No. 16-10665, 2017 WL 2152438, at *2 (N.D. Ill. May 17, 2017) (finding waiver where "Defendants answered the amended complaint in this case on January 6, 2017, and other than a general denial of the paragraph alleging personal jurisdiction, failed to include any affirmative contention that the Court lacked personal jurisdiction over them").

**2.     NCE, NBBI and AccessOne Waived Personal Jurisdiction through Litigation.**

A party may waive personal jurisdiction through litigation conduct, even if that party raised personal jurisdiction in its answer. "To waive or forfeit a personal jurisdiction defense, a defendant must give a plaintiff a reasonable expectation that it will defend the suit on the merits or must cause the court to go to some effort that would be wasted if personal jurisdiction is later found lacking." *Mobile Anesthesiologists Chicago, LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440, 443 (7th Cir. 2010).

Here, NCE, NBBI and AccessOne have actively participated in discovery. NCE has defended the case for 17 months, and NBBI/AccessOne for six months. NBBI and AccessOne answered Plaintiff's First Amended Complaint (Dkt. 60-61), actively participated in four discovery and status hearings (Dkt. 57, 92, 100, 131), issued discovery requests to Plaintiff to which she was forced to respond with hundreds of pages of documents, acquiesced to Plaintiff's status report and proposed discovery schedule without identifying *any* intent to move to dismiss based on personal jurisdiction (Dkt. 74), and later coordinated with Plaintiff's counsel to submit a proposed discovery plan to the Court, again without raising personal jurisdiction (Dkt. 118). *See Restoration Hardware, Inc.*, 2017 WL 2152438, at *2 (finding waiver of personal jurisdiction where defendant didn't identify intent to move on that basis in joint initial status report). They have also responded to Plaintiff's own discovery requests, met-and-conferred

10

regarding discovery disputes, defended against Plaintiff's motion to compel (Dkt. 138),[10] and

participated in the deposition of Sean Duffie. Exhibit E at 2. They also filed response briefs

addressing issues and ultimately acquiescing to Plaintiff's motion to amend her complaint to add

HII. Dkt. 109-110. These substantive and active defense activities are purposeful, and

demonstrate NCE's, NBBI's, and AccessOne's acquiescence to the Court's jurisdiction.[11]

By failing to substantively raise personal jurisdiction, and instead litigating the case past

the end of the prior-entered discovery period, Dkt. 75,[12] Defendants engaged in the precise

conduct the Seventh Circuit condemned in finding that even where defendants properly

preserved a personal jurisdiction defense under Rule 12(h)(1), they later waived it by conduct:

> Here, the defendants fully participated in the litigation of the merits for over two-
> and-a-half years without actively contesting personal jurisdiction. They
> participated in lengthy discovery, filed various motions and opposed a number of
> motions filed by the bank. While the defendants literally complied with Rule
> 12(h), they did not comply with the spirit of the rule, which is to expedite and
> simplify proceedings in the Federal Courts. The district court could properly
> conclude that the defendants' delay in urging this threshold issue manifests an
> intent to submit to the court's jurisdiction.

*Cont'l Bank, N.A. v. Meyer*, 10 F.3d 1293, 1297 (7th Cir. 1993) (internal citations and quotations

omitted); *see also Mussat v. Enclarity, Inc.*, 362 F. Supp. 3d 468, 476 (N.D. Ill. 2019) (finding

TCPA defendant waived personal jurisdiction defense as to claims of non-Illinois residents by

---

10      In addition to answering Plaintiff's initial and first amended complaints (Dkt. 14, 46), NCE also
defended against an earlier motion to compel (Dkt. 71), as well as Plaintiff's second motion to compel
and for sanctions, s*ee* Dkt. 138. NCE has similarly issued and responded to discovery to Plaintiff,
participated in the deposition of Sean Duffie, and participated in every status and discovery hearing in this
action since its inception well over a year ago. Indeed, NCE has now *twice* opted to not oppose Plaintiff's
amending of her complaint. *See* Dkt. 30, 110.
11      *See Am. Patriot Ins. Agency, Inc. v. Mut. Risk Mgmt., Ltd.*, 364 F.3d 884, 887 (7th Cir. 2004)
(The defense is "strictly for the convenience of the defendant; he doesn't have to engage in discovery to
know whether the forum chosen by the plaintiff is a convenient one; and so there is no reason to allow
him to lie back, wait until the plaintiff has invested resources in preparing for suit in the plaintiff's chosen
forum, wait perhaps to assess his prospects in that forum, and only then demand that the case start over
elsewhere.").
12      The Court's discovery schedule set on May 7, 2019, adopted the proposed fact discovery cutoff in
the status report Plaintiff shared with defense counsel prior to filing, without opposition. Dkt. 74-75.

waiting eight months after *Bristol-Myers* was decided to move on the issue).

### 3. Defendants' Alleged Conduct Establishes Specific Personal Jurisdiction.

When considering a personal jurisdiction motion to dismiss, the Court takes "as true all well-pleaded facts alleged in the complaint and resolve any factual disputes in the affidavits in favor of the plaintiff[s]." *Matlin v. Spin Master Corp.*, 921 F.3d 701, 705 (7th Cir. 2019). Defendants here have not submitted affidavits with their motions to dismiss, so the Court must take the allegations in the complaint and construe them in the light most favorable to Plaintiff. *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782-83 (7th Cir. 2003).

"[I]n the context of the TCPA, … personal jurisdiction is proper in the District where an unlawful communication is received." *Mey v. Castle Law Grp.*, No. 19-185, 2019 WL 4579290, at *4 (N.D.W. Va. Sept. 20, 2019); *see also Payton v. Kale Realty, LLC*, No. 13-8002, 2014 WL 4214917, at *3 (N.D. Ill. Aug. 26, 2014) ("[C]ourts have repeatedly held that sending a message into the forum state in violation of the TCPA is sufficient to confer specific personal jurisdiction over the defendant."); *Smith v. Royal Bahamas Cruise Line*, No. 14-3462, 2016 WL 232425, at *2 (N.D. Ill. Jan. 20, 2016); *Luna v. Shac, LLC*, No. 14-607, 2014 WL 3421514, at *3-4 (N.D. Cal. July 14, 2014); *Keim v. ADF MidAtlantic, LLC*, 199 F. Supp. 3d 1362, 1370-1371 (S.D. Fla. 2016) (finding specific jurisdiction where plaintiff alleged that TCPA-violating calls made by third parties on behalf of moving defendants were received in the forum).

The SAC plainly alleges facts that, if true, support personal jurisdiction here for all Defendants. The SAC alleges that Defendants NCE, NBBI, and AccessOne, acting in concert and with HII as their ringleader, caused the illegal calls at issue to be made to Plaintiff's cell phone in this District. SAC ¶¶ 7, 12, 31 (alleging that Defendants facilitated the calls or lead generation at issue to Plaintiff and others in this District, and that Plaintiff "resides in this

12

District, and received the calls that are the subject of this case here"); *see also* Dkt. 14, NCE Answer ¶ 8 (NCE previously admitting that it does business in this District). And not only does Plaintiff allege that the call violations were directed by or on behalf of Defendants to herself and other consumers in Illinois; she alleges that Defendants solicited their healthcare-related products to her and other consumers in this Illinois, as well. SAC ¶¶ 71-74, 104, 134-136, 142; *see 1st Nat. Bank v. El Camino Res., Ltd.*, 447 F. Supp. 2d 902, 910 (N.D. Ill. 2006) ("[I]n determining whether the defendant purposefully availed itself of a particular forum[,] …courts in this circuit have considered whether the defendant solicited the transaction in question within the proposed forum.") (denying motion to dismiss; quoting *Federated Rural Elec. Ins. Corp. v. Inland Power & Light Co.*, 18 F.3d 389, 394 (7th Cir. 1994)).

Defendants purposefully directed their activities at Illinois, and purposefully availed themselves of the privilege of conducting business here, by facilitating and knowingly accepting the benefits of telemarketing lead generation targeted at Illinois consumers like Plaintiff—including both by virtue of facilitating and hiring vendors to make the calls at issue to Plaintiff and other Illinois consumers as part of a nationwide marketing campaign, and by soliciting, participating in, and ultimately entering into transactions with Illinois consumers as a result of those calls. Plaintiff's and the class' injuries – TCPA and (for Illinois call recipients) ATDA violations – thus arise from these forum-related activities of Defendants and the vendors they retained to call or facilitate the telemarketing lead generation on their behalf.[13] SAC ¶¶ 37, 89-91. Plaintiff herself was directly solicited an "NCE Premier" product of Defendants in Illinois through HII's platform. SAC ¶¶ 31, 76. Indeed, Defendants' vendor even used a spoofed caller

---

[13]    *E.g.,* SAC ¶¶ 39 (quoting link from NBBI's "NCE Premier Platinum Plus" website, reflecting that, "[a]s a member of [the NCE] Premier Platinum Plus Discount Medical Program you are a participant in a Discount Medical Plan Organization provided by Access One Consumer Health[;] … [t]his agreement is between you and Access One Consumer Health"), 73 (alleging Plaintiff's receipt of telephone solicitation for NBE-branded "NCE Premier" product offered through NBBI and AccessOne).

ID with a local "773" area code to make it seem like it was coming from Illinois. SAC ¶ 71.[14]

Further, exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice because their forum-based activities reasonably should have caused them to anticipate being haled into court here: NCE, NBBI, and AccessOne knowingly used third parties to target Plaintiff and other Illinois consumers with the telephone solicitations at issue (and retained the proceeds of memberships/sales derived therefrom), and HII facilitated the Illinois telephone solicitations to Plaintiff and other Illinois class members both through its lead generators and the direct participation and use of its platform during the calls, themselves. *E.g.,* Dkt. 101-2 at 2 (email between NCE and HII, referencing sales in Illinois in reference to this case); *Lowe v. CVS Pharmacy, Inc.*, 233 F. Supp. 3d 636, 645 n.9 (N.D. Ill. 2017) (finding personal jurisdiction over TCPA defendants where calls at issue were made as part of a nationwide campaign that included Illinois). Consequently, because this Court has specific personal jurisdiction over Defendants, their motion should be denied.

### 4. Defendants' Argument that the Class Should Be Limited to Illinois Residents Fails.

All Defendants argue that this Illinois-based federal court cannot exercise personal jurisdiction over non-Illinois class members in this case brought under federal law. Defendants are wrong.

More than 30 years ago, the Supreme Court held in *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979), that a nationwide class action was proper even though it was not filed where the defendant was domiciled or had its principal place of business:

---

[14] What is more, because the lead generation process began with an initial screening provided by insurance agents that included reference to zip codes that were transmitted to HII, Exhibit E, Duffie Dep. at 19-23 and 59, HII *__knew__* it was providing this information to Plaintiff – and other Illinois residents – in Illinois when it provided the quote information. Similarly, the other Defendants, too, knew that they were targeting consumers in Illinois. *See, e.g.,* Dkt. 135-2 at 5 and 135-3 at 5 (AccessOne and NBBI acknowledging obtaining subscriber information for NCE-branded products).

**Nothing in Rule 23 ... limits the geographical scope of a class action that is brought in conformity with that Rule**. Since the class here was certified in accordance with Rule 23(b)(2), the limitations on class size associated with Rule 23(b)(3) actions do not apply directly. Nor is a nationwide class inconsistent with principles of equity jurisprudence, since the scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class. *Dayton Board,* 433 U.S., at 414–420. If a class action is otherwise proper, and if jurisdiction lies over the claims of the members of the class, the fact that the class is nationwide in scope does not necessarily mean that the relief afforded the plaintiffs will be more burdensome than necessary to redress the complaining parties.

We concede the force of the Secretary's contentions that nationwide class actions may have a detrimental effect by foreclosing adjudication by a number of different courts and judges, and of increasing, in certain cases, the pressures on this Court's docket. It often will be preferable to allow several courts to pass on a given class claim in order to gain the benefit of adjudication by different courts in different factual contexts. For this reason, a federal court when asked to certify a nationwide class should take care to ensure  that nationwide relief is indeed appropriate in the case before it, and that certification of such a class would not improperly interfere with the litigation of similar issues in other judicial districts. But **we decline to adopt the extreme position that such a class may never be certified. The certification of a nationwide class, like most issues arising under Rule 23, is committed in the first instance to the discretion of the district court**. On the facts of this case we cannot conclude that the District Court in Buffington abused that discretion especially in light of its sensitivity to ongoing litigation of the same issue in other districts, and the determination that counsel was adequate to represent the class.

(emphasis added).

Defendants' position, if adopted, would be that a national class can never be certified except where each of them is headquartered or chartered – i.e., that the case must be split into pieces, and that the national class certified in *Califano* was improper!

Also more than 30 years ago, the Supreme Court held that the Constitution does not require a court presiding over a class action to have personal jurisdiction over each absent class member. *Phillips Petroleum v. Shutts*, 472 U.S. 797, 811-12 (1985). In short, "*there is no requirement that the class action court have personal jurisdiction over absent plaintiffs*." William B. Rubenstein, *Newberg on Class Actions* § 6.28 (5th ed.) (emphasis in original). Under

15

*Shutts*, putative class members are not treated as if they are named parties. *Shutts*, 472 U.S. at 810-11. Rule 23 allows plaintiff to bind them to the outcome in this action without their individual joinder, so long as they are given adequate notice, an opportunity to request exclusion and plaintiff satisfies the due process requirements of Rule 23. *Id.* at 806-09.

Although Rule 23 has been amended on multiple occasions since 1979, neither Congress nor the Supreme Court have suggested that *Califano* or *Shutts* is no longer good law, or made any change in Rule 23 that negates their holdings. Subsequent decisions continue to hold that nationwide class actions brought in districts in which each class member could not have brought suit individually are proper, assuming that the class is properly certified and that a nationwide class is consistent with the exercise of discretion. *See also Brady v. Sullivan*, 893 F.2d 872, n. 7 (7th Cir. 1989) (reflecting Supreme Court's recognition of availability of nationwide class actions in *Califano*); *Bresgal v. Brock*, 843 F.2d 1163, 1170 (9th Cir. 1987) ("In *Califano* … the Court held that there are no legal limits on the geographical scope of a class action brought in federal district court."); *In re Amtrak Train Derailment*, No. 15- 2654, 2016 WL 1359725, at *8 (E.D. Pa. Apr. 6, 2016) ("[T]he certification of a nationwide class, like most issues arising under Rule 23, is committed in the first instance to the discretion of the district court.") (quoting *Califano*, 442 U.S. at 703 (1979)); *accord Exley v. Burwell*, No. 14-1230, 2015 WL 3649632, at *7 (D. Conn. June 10, 2015); *Garcia v. Johnson*, No. 14-1775, 2014 WL 6657591, at *15-16 (N.D. Cal., Nov. 21, 2014) (nationwide class certified though defendants not domiciled within district).

Defendants' argument implies that *Califano* was somehow overruled by *Bristol-Myers* absent an express statement by the Supreme Court. However, Supreme Court decisions are <u>not</u> overruled by implication: The rule is that "[i]f a precedent of this Court has direct application in

16

a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls[.]" *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989).

Indeed, *Bristol-Myers* did not hold *anything* with respect to class actions at all, let alone federal class actions under Fed. R. Civ. P. 23. *See Bristol-Myers Squibb Co. v. Super. Ct.*, 137 S. Ct. 1773, 1787 n.4 (2017) (Sotomayor, J., dissenting) ("The Court today does not confront the question whether its opinion here would also apply to a class action[.]"). *Bristol-Myers* was not a class action, but a state law mass tort action in which more than 600 plaintiffs, most of whom were not citizens of California, filed only state law claims in California state court. *Id.* at 1777. The defendant was not incorporated in California, nor was its headquarters there. *Id.* at 1777-78. The Supreme Court held that the non-California plaintiffs had to show a connection between California and their individual claims. *Id.* at 1781. Because the out-of-state plaintiffs could not allege that they purchased the product at issue in California or suffered any injury in California, the California court lacked specific personal jurisdiction over their individual claims. *Id.* at 1782.

*Bristol-Myers* even distinguishes *Shutts* on the basis that it was a class action, stating "since our decision concerns the due process limits on the exercise of specific jurisdiction by a State, we leave open the question whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court." *Id*. at 1782-84.

The notion that due process principles require minimum contacts in Illinois between each non-Illinois class member and Defendants is flawed. As the Supreme Court held in *Shutts*, absent class members are not parties.[15] They are generally given a "free ride" under Fed.R.Civ.P. 23.

---

15      *See also Williams v. Gen. Elec. Capital Auto Lease, Inc.*, 159 F.3d 266, 269 (7th Cir. 1998) ("[A]bsent class members are not 'parties' before the court in the sense of being able to direct the litigation.... Instead, the named representative ... is the 'party' to the lawsuit who acts on behalf of the entire class.... This is an inherent part of representational litigation.").

*Shutts*, 472 U.S. at 810. For example, they are not subject to discovery except in limited circumstances and with a court order. *Brennan v. Midwestern United Life Ins. Co.*, 450 F.2d 999, 1005 (7th Cir. 1971); *Clark v. Universal Builders, Inc.*, 501 F.2d 324, 341 (7th Cir. 1974); *accord Smith v. Bayer Corp.*, 564 U.S. 299, 314 (2011) (nonparty preclusion "allows unnamed members of a class action to be bound, even though they are not parties to the suit"); *Day v. Persels & Assoc., LLC*, 729 F.3d 1309 (11th Cir. 2013) (magistrate judge can enter final judgment without consent of each class member); *Coleman v. Labor & Industry Review Comm'n*, 860 F.3d 461, 474 (7th Cir. 2017) ("Unnamed class members, for instance, are not full-fledged parties, and so they need not be served with process, their citizenship does not matter for diversity purposes, and they can obtain a direct seat at the table only by intervening.").

In short, "nonnamed class members" are "not parties" for jurisdictional purposes. *See Devlin v. Scardelletti*, 536 U.S. 1, 10 (2002) (absent class members "cannot defeat complete diversity"). If this were so, then absent class members would "destroy diversity in almost all class actions," and class cases would face an infeasible quagmire of jurisdictional discovery. *Id.* ("Ease of administration of class actions would be compromised by having to consider the citizenship of all class members, many of whom may even be unknown, in determining jurisdiction."). Unlike in *Bristol-Myers*, this is a Rule 23 *class action—*a representative proceeding in which one or a few named plaintiffs (i.e., Bilek) represent the interests of numerous unnamed, *absent* class members, and in which due process concerns as to absent class members are addressed through judicial oversight, the strict requirements of class certification, and a notice/opt-out process under Fed. R. Civ. P. 23.

This Court should, therefore, follow most courts to have addressed this issue, and deny Defendants' motion. *See Curran v. Bayer Healthcare LLC*, No. 17-7930, 2019 WL 398685, at *3

18

(N.D. Ill. Jan. 31, 2019) (citing 1 *McLaughlin on Class Actions* § 2.44 n. 5 (15th ed.), for

collecting cases reflecting that "'[m]ost courts' to address the issue nationwide 'have concluded

that *Bristol-Myers* does not apply to class actions[,]'" and denying motion to strike nationwide

class allegations based on *Bristol-Myers* argument); *Al Haj v. Pfizer Inc.*, 338 F. Supp. 3d 815,

820 (N.D. Ill. 2018) (similarly rejecting motion to strike nationwide class allegations under

*Bristol-Myers*, remarking that "[Defendant's] submission … boils down to this: Although absent

class members are *not* parties for purposes of diversity of citizenship, amount in controversy,

Article III standing, and venue, they *are* parties for purposes of personal jurisdiction over the

defendant. That cannot be right.").

### B.      Plaintiff Has Pleaded Defendants' Liability.

"A complaint must contain three things: a statement of subject-matter jurisdiction, a

claim for relief, and a demand for a remedy." *Chapman v. First Index, Inc.*, 796 F.3d 783, 785

(7th Cir. 2015).

"Plaintiff is free, in defending against a motion to dismiss, to allege without evidentiary

support any facts he pleases that are consistent with the complaint, in order to show that there is

a state of facts within the scope of the complaint that if proved (a matter for trial) would entitle

him to judgment. He doesn't … have to plead those facts. The federal rules, with the partial

exception of Rule 9(b), do not require fact pleading. The plaintiff can plead a conclusion … and

then if the conclusion is questioned in a motion or a brief hypothesized facts that if proved would

establish it. *Early v. Bankers Life and Casualty Co.*, 959 F.2d 75, 79 (7th Cir. 1992).

### 1.      Participation in Telemarketing Process.

The TCPA's regulations broadly prohibit the act of "initiating" a nonconsensual

telephone call using an autodialer or an artificial or prerecorded voice to a cell phone number. 47

C.F.R. § 64.1200(a)(1)(iii). The "initiation" of a call encompasses either "taking the steps necessary to physically place a telephone call[,]" or "being so involved in the placing of a specific telephone call as to be deemed to have initiated it." *In re Rules & Regs. Implementing the TCPA*, 30 FCC Rcd. 7961, 7980, ¶ 30 (2015).

However, 47 U.S.C. § 227(b)(1)(A)(iii), at issue in the motion, uses the term "make," instead of "initiate." *Compare* 47 U.S.C. § 227(b)(1)(B). It is clear that Congress intended a broader set of characters to have liability with regard to "making" calls than "initiating" them. *See Conn. Nat. Bank v. Germain*, 503 U.S. 249, 253 (1992) ("[C]ourts should disfavor interpretations of statutes that render language superfluous."). While "initiating" happens in an instant, such as pressing a button, "making" something connotes a multi-step process of creation that could involve multiple actors.

Here, the Second Amended Complaint alleges enough to support HII's direct liability for "making" the calls. HII's leadership and orchestration caused the violations at issue here. SAC ¶¶ 7-8. Moreover, with the authority of the Seller Defendants, HII actively participated in the telemarketing calls at issue, by providing scripts and pricing for sales agents to use on the phone, helping to pay for the telemarketing at issue, having its lead generators like Enrollment Center of America access its systems during the calls to retrieve pricing and product information and to add information pertaining to leads, and even emailing the quotes for goods and services during the calls themselves. SAC ¶¶ 10-11, 46, 55, 57, 76, 101. HII thus didn't just passively accept the benefits of the calling; it actively participated. Because this direct involvement is sufficient to plausibly plead its direct liability, Defendants' motions should be denied.

### 2. Implied Actual Authority.

"[A]ctual authority may be express or implied." *Opp v. Wheaton Van Lines, Inc*., 231

F.3d 1060, 1064 (7th Cir. 2000). "Implied authority is actual authority that is implied by facts and circumstances and it may be proved by circumstantial evidence." *Id.* (citation omitted). "Only the words and conduct of the alleged principal, not the alleged agent, establish the [implied] authority of an agent." *C.A.M. Affiliates, Inc. v. First Am. Title Ins. Co.*, 306 Ill. App. 3d 1015, 1021 (1999); *accord Opp*, 231 F.3d at 1064. "Thus, implied actual authority is created through words or conduct of the principal which, reasonably interpreted, cause an agent to believe that the principal consents to have an act done on his behalf." *Charvat v. Valente*, No. 12-5746, 2015 WL 3575636, at *2 (N.D. Ill. June 8, 2015).

HII may be held liable for the calls at issue in this case because it orchestrated the telesales at issue. These calls were made for the purpose of selling health insurance and related products/services, *through HII*. HII was the entity that generated the quotes for insurance and "add-ons," to be sold during these telemarketing calls. SAC ¶¶ 43, 46. HII enlists insurance agents to sell health-related products and services, and then provides quotes for the insurance agents to make such sales. HII even pays for part of the calls, which gave callers such as Enrollment Center of America the impression that HII wanted such calls to happen.

The Second Amended Complaint alleges that the Seller Defendants authorized HII to engage in a telemarketing lead generation campaign to generate sales of their insurance and medical discount products and services. SAC ¶¶ 52-53, 89.[16] HII and the Seller Defendants maintain control over their lead generators' actions in telemarketing and generating leads on their behalf, including by approving the scripts provided by HII to its lead generator for use in the calls, authorizing the use of their tradenames during the calls, through approved forms

---

[16]     "The classical definition of 'agency' contemplates 'the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control.'" *In re DISH*, 28 FCC Rcd. at 6586 (citing Rest. 3d Agency § 1.01).

provided to class members, and on HII's website, setting the pricing and other information for issuing quotes on the Seller Defendants' behalf, and directly authorizing HII and its lead generator to sell the Seller Defendants' products and bind them into contractual relationships with consumers. SAC ¶¶ 10-11, 46, 52, 55, 57, 76, 93, 101.

This is sufficient to plausibly allege actual authority. *In re Jiffy Lube Int'l, Inc., Text Spam Litig.*, 847 F. Supp. 2d 1253, 1258 (S.D. Cal. 2012) (denying motion to dismiss because of allegation that defendant had hired third-party to conduct marketing campaign in which text messages were sent in violation of the TCPA); *Gould v. Farmers Ins. Exch.*, 288 F. Supp. 3d 963, 969 (E.D. Mo. 2018) (actual authority plausible in part because of allegation that defendant directed the content of unlawful advertising and required approval of all text messages); *Aranda*, 179 F. Supp. 3d at 832 (actual authority plausibly alleged because defendant provided the telephone script, which demonstrated "control over the manner and means" by which the entity conducted sales).

As such, the motions to dismiss should be denied.

### 3. Apparent Authority.

"Apparent authority is the power held by an agent or other [non-agent] actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." Rest. (3d) of Agency § 2.03; *Opp*, 231 F.3d at 1065 ("Under the doctrine of apparent authority, a principal will be bound not only by the authority that it actually gives to another, but also by the authority that it *appears* to give.") (emphasis added). Apparent authority does <u>not</u> "presuppose the present or prior existence of an agency relationship[;]" rather, apparent authority "applies to actors who appear to be agents but are not, as well as to agents who act

22

beyond the scope of their actual authority." *Id.* In a TCPA case, "[b]ecause the inquiry is limited to how a reasonable person would perceive the calls at issue, there is no need to determine how individual class members perceived the calls." *Braver v. Northstar Alarm Servs., LLC*, 329 F.R.D. 320, 332 (W.D. Okla. 2018).

A reasonable person receiving the calls at issue would believe that the caller had authority to call on behalf NCE, NBBI, AccessOne, and HII because, as alleged: (1) NCE's, NBBI's, and AccessOne's NCE-branded products were solicited *during the calls*, e.g., SAC ¶ 73; (2) HII provided the quotes, and physically transmitted emails to class members containing application documents during the calls for such products through its online platform, using NCE's and HII's tradenames, SAC 55;[17] and (3) class members who followed through with the application process were informed that their agreement was provided through NBBI and AccessOne.[18] Plaintiff reasonably believed the representations she received, and relied upon them to her detriment by answering the call and going through the sales pitch, and ultimately receiving a quote for the "NCE Premier" product.

> Apparent authority may be supported by evidence that shows, for example:
>
> "the seller allows the outside sales entity access to information and systems that normally would be within the seller's exclusive control, including: access to detailed information regarding the nature and pricing of the seller's products and services or to the seller's customer information.";
>
> "The ability by the outside sales entity to enter consumer information into the seller's sales or customer systems";

---

[17]     In the case of HII, the tradename referenced was HII's MyBenefitsKeeper platform. *See* Dkt. 85-5 at 2-3; http://tmsearch.uspto.gov/bin/showfield?f=doc&state=4808:eu7185.2.1 (identifying HII subsidiary as trademark holder).

[18]     *See* SAC ¶ 39 (citing Member Agreement for "NCE Premier" product solicited to Plaintiff, on NBBI's website, which explains that "[a]s a member of [the NCE] Premier Platinum Plus Discount Medical Program you are a participant in a Discount Medical Plan Organization provided by Access One Consumer Health[;] … [t]his agreement is between you and Access One Consumer Health") (available at https://www.ncepremierplus.com/agreement.aspx).

"It may also be persuasive that the seller approved, wrote or reviewed the outside entity's telemarketing scripts."

*In re DISH*, 28 FCC Rcd. at 6592. All of these apply here.

To the extent that there was no actual authority for the calls, the outward impression for Plaintiff and others – an impression created by Defendants' own actions – was that there was. Defendants created the impression of actual authority by: "authoriz[ing] the marketers and insurance agencies that work with HII to sell their products and services," SAC ¶ 53, "permit[ing] use of their tradenames" during the calls and on the emails and contracts sent to call recipients by HII on the other Defendants' behalf, SAC ¶¶ 54-55, 58, 101, 113, authorizing forms and scripts, SAC ¶ 42, 55, Dkt. 85-5, providing quote/pricing information for use during the calls at issue, SAC ¶¶ 10, 46, 89, 91, permitting the telemarketers to enter information into HII's systems, SAC ¶¶ 46, 102, and by authorizing the marketers to bind them and issue policies and memberships for their products as a result of such calling. SAC ¶ 52.

"At a minimum, evidence of these kinds of relationships . . . should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Golan v. Veritas Entm't, LLC*, No. 14-69, 2016 WL 880402, *4 (E.D. Mo. 2016). Because Defendants have been placed on reasonable notice of a plausible entitlement for relief, the motions to dismiss should be denied.

### 4. Ratification.

"Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." Rest. (Third) of Agency § 4.01(1) (2006). A principal can ratify an act by conduct that justifies a reasonable assumption that the person so consents. *Id.* § 4.01(2). A principal, however, "is not bound by a ratification made

without knowledge of material facts about the agent's act unless the principal chose to ratify with awareness that such knowledge was lacking." *Id.* § 4.01 cmt. b. The FCC, quoting the Restatement, found that: "a seller may be bound by the unauthorized conduct of a telemarketer if the seller 'is aware of ongoing conduct ... by [the telemarketer]' and the seller 'fail[s] to terminate,' or, in some circumstances, 'promot[es] or celebrat[es]' the telemarketer." *In re DISH*, 28 FCC Rcd. 6574, 6594 ¶ 34 n.104 (quoting Rest. (Third) of Agency § 401 cmt. d); *Charvat*, 2015 WL 3575636, at *2.

Ratification occurs in the TCPA context when a party that did not place calls knowingly accepts their benefit, thereby assenting to the actions. *Aranda v. Caribbean Cruise Line, Inc.*, 179 F. Supp. 3d 817, 833 (N.D. Ill. 2016); *Jamison v. First Cred. Servs., Inc.*, 290 F.R.D. 92, 100 (N.D. Ill. 2013) (defendant unlikely to escape vicarious liability because it accepted a monetary benefit from calls). A party may also manifest assent by knowing retention of the benefits of the act,[19] or by "willful ignorance"—i.e., where the principal may not know the material facts, but has "ratified with awareness that such knowledge was lacking." Rest. (3d) Agency § 4.01 at cmt. b; *see also Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068, 1075 (9th Cir. 2019) (ratification possible where defendant remained silent and continued to accept benefits of collectors' tortious conduct despite knowing facts that would have led a reasonable person to investigate further).

In *Mey v. Venture Data, LLC*, 245 F. Supp. 3d 771, 788 (N.D. W. Va. 2017), the court held that a survey company was liable under the TCPA where it knew that its telemarketer was calling individuals in violation of the TCPA and accepted the benefit of those calls by using the data generated. The *Mey* court reasoned that "ratification does not require the existence of an

_____

19    *GDG Acquisitions LLC*, 849 F.3d at 1309 ("[A] form of conduct that may yield consent by ratification inheres in the retention of benefits generated by the agent's act.").

agency relationship." *Id.* (citing Rest. 3d Agency § 4.01 cmt. b); *see also* Rest. 3d Agency § 4.03 cmt. a. ("Ratification may create a relationship of agency when none existed before."); *Keim v. ADF Midatlantic, LLC*, No. 12-80577, 2015 WL 11713593, at *8 (S.D. Fl. 2015), (allegations were sufficient to state a claim that seller ratified conduct when it accepted the benefits of the conduct by having text messages sent on its behalf to phone numbers obtained on its behalf); *Klein v. Commerce Energy, Inc.*, 256 F. Supp. 3d 563, 588 (W.D. Pa. 2017).

The SAC adequately pleads that each Defendant ratified the illegal calling at issue. Plaintiff alleges that each Defendant was aware of the nature of the telemarketing campaign through which Plaintiff and the class were called—including that automated calls were being made to consumers without prior express consent—but they continued to engage such services, anyway, and accepted the benefits of the calls. SAC ¶¶ 11-13, 51 (HII); 40 (NCE, NBBI and AccessOne).

What is more, HII, NCE, NBBI, and AccessOne have continued to benefit (and, in HII's case, make and facilitate) from telemarketing calls and issue quotes *even after being sued*. SAC ¶¶ 61, 92; *see also* Exhibits B-D (post-suit quotes to consumer Robert Hossfeld).

In short: the Seller Defendants and HII have continued to gain business from the allegedly illegal telemarketing scheme in the Second Amended Complaint, even though they had been placed on notice of the probable illegality of such. Defendants each "manifested assent" to the telemarketing at issue by "knowingly and actively accept[ing] business that originated through [it]." SAC ¶ 90.

At the very least, given the multitude of lawsuits and acknowledged exposure faced by HII for TCPA violations by its third-party lead generators,[20] Defendants had sufficient notice to

---

[20]    *E.g., Moser v. Health Insurance Innovations, Inc.*, (S.D. Cal.) (TCPA class action against HII and NCE); *Izor v. Health Insurance Innovations, Inc.*, (M.D. Fla.) (TCPA class action against HII, Federal

investigate further, but instead chose to continue to reap its benefits. Rest. (3d) Agency § 4.01 at cmt. b; *Henderson*, 918 F.3d at 1075[21]; *Krakauer v. Dish Network, LLC*, 925 F.3d 643, 662–63 (4th Cir. 2019) ("repeated expressions of ignorance as to a widespread problem can evince more than simply negligence; they can also be a sign that the violations are known, tolerated, and even encouraged.) The SAC thus plausibly alleges that HII and the Seller Defendants ratified the telemarketing at issue, and Defendants' motion should, therefore, be denied.

### C. There Exists a Private Right of Action under Internal Do Not Call Rules, and Plaintiff Has Pleaded a Plausible Claim.

Defendants' argument that there exists no private right of action for violation of the Internal Do Not Call rules ("IDNC") is incorrect. Defendants' argument hinges upon outlier court decisions – many in pro se cases – finding that IDNC rules are "technical requirements" under 47 U.S.C. § 227(d), for which there is no private right of action. However, the IDNC rules, 47 C.F.R. § 64.1200(d), were implemented pursuant to 47 U.S.C. § 227(c), which *does* provide a private right of action. *See* 47 U.S.C. § 227(c)(5).

The FCC definitively answered the question as to what paragraph it relied upon when it promulgated the IDNC rules in 2013:

> [S]ection 227(c)(5)… empowers 'any person' to sue for damages and injunctive relief for do-not-call violations 'by or on behalf of' a company.
>
> In accordance with this statutory provision, the Commission's company-specific do-not-call rules provide that '[n]o person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or

---

Insurance, NCE, and Teladoc); HII Form 10-K (Mar. 2, 2017) (identifying serious concern by HII as to TCPA exposure) (www.sec.gov/Archives/edgar/data/1561387/000149315217002078/form10-k.htm).

[21] It is also immaterial whether an actor acted or purported to act as an agent on behalf of an undisclosed or unidentified principal, such as by placing calls without disclosing the seller on whose behalf the call was made. Rest. 3d Agency § 4.03 cmt. b; *see United States v. N. Arapahoe Tribe*, 2012 WL 12792142, at *1 (D. Wyo. Jan. 27, 2012) (contrasting the Second and Third Restatements of Agency, and noting that, "[u]nder the new rule, even an act that appeared to be performed solely on behalf of the actor may be ratified by a hidden principal, if it was indeed performed on behalf of such a principal") (citing Rest. 3d of Agency § 4.03 cmt. b).

entity has instituted procedures for maintaining a list of persons who request not
to receive telemarketing calls made by or on behalf of that person or entity[.]'

*In re DISH*, 28 FCC. Rcd. 6574, ¶ 29 (citing 47 C.F.R. § 64.1200(d)). This passage not only

directly states that consumers have a private right of action for damages under the IDNC rules, it

also makes clear that the FCC promulgated the IDNC rules pursuant to 47 U.S.C. § 227(c).

Most courts agree with the obvious conclusion of the FCC's order and the text of both the

TCPA and the company-specific do-not-call rule: The private right of action in 47 U.S.C. §

227(c)(5) applies. *See, e.g., Charvat v. GVN Michigan, Inc.*, 561 F. 3d 623, 628-29 (6th Cir.

2009) (finding that the private right of action in 47 U.S.C. § 227(c)(5) applies to violations of 47

C.F.R. § 64.1200(d)); *Cordoba v. DirecTV, LLC*, 320 F.R.D. 582, 587 (N.D. Ga. 2017)

(certifying a class under subsections 227(c) and 64.1200(d)); *Nece v. Quicken Loans, Inc.*, No.

16-2605, 2017 WL 2865047, at *1-2 (M.D. Fla. Jan 3, 2017) (rejecting the argument that the

company-specific do-not-call regulation was promulgated under subsection 227(d)).

Defendants primarily rely upon *Burdge v. Ass'n Healthcare Mgmt, Inc.*, No. 10-100,

2011 WL 379159 (S.D. Ohio Feb 2, 2011). However, *Burdge* conflicts with the law of its own

Circuit. *See Charvat*, 561 F. 3d at 628-29; *Charvat v. NMP, LLC*, 656 F. 3d 440, 443-444 (6th

Cir. 2011).  In addition, the plaintiff in *Burdge* made the nonsensical argument that the company-

specific do-not-call rule was promulgated pursuant to 47 U.S.C. § 227(b), which regulates

automated calls and unsolicited faxes. *Burdge*, 2011 WL 379159, at *3-4. Given the choice

between subsection 227(b) and (d), it is not a surprise that the Court sided with subsection (d).

Although likely the fault of the plaintiff, the *Burdge* court's failure to cite to subsection 227(c),

the FCC's implementing regulations, or binding Sixth Circuit authority undermines any

persuasiveness Defendants attribute to it.

Defendant's other cases fare no better. *Worsham v. Travel Options, Inc*. was before the

Court on a pro se Plaintiff's motion for default judgment, meaning the Plaintiff never had a chance to appropriately respond to the argument. No. 14-2749, 2016 WL 4592373 (D. Md. Sept. 2, 2016). It relies upon *Burdge* as its principal authority, and it too fails to conduct an analysis of subsection 227(c) or cite the FCC's Orders promulgating the regulation. *Id.* at *7. *Bailey v. Domino's Pizza, LLC*, 867 F. Supp. 2d 835, 842 (E.D. La. 2012), dismissed IDNC claims without prejudice, following *Burdge*, but left open the possibility of revisiting the matter, since the argument had only been raised by the defendant first in its reply brief. *Id.* at 842.

Plaintiff claims that Defendant violated the company specific do-not-call regulation, 47 C.F.R. § 64.1200(d), and such violations are actionable pursuant to 47 U.S.C. § 227(c)(5). This is supported by longstanding case law and FCC precedent that this Court is "bound to follow." *Blow v. Bijora, Inc.*, 855 F.3d 793, 802 (7th Cir. 2017). The motions to dismiss should be denied.

### D. Plaintiff Has Pleaded Facts to Support an Illinois Automatic Telephone Dialer Act Claim.

As is relevant here, the Illinois Automatic Telephone Dialer Act ("IATDA") prohibits: (1) playing prerecorded messages during telemarketing calls placed by an autodialer, without consent, 815 ILCS 305/30(b) (SAC Count III), and (2) impeding, or "spoofing" caller ID on telemarketing calls. 815 ILCS 305/15(d) (SAC Count IV).

Defendants seek dismissal on the ground (1) that they cannot be held liable for calls made by someone else, and (2) the SAC does not plead all of the necessary elements of a claim. On the first argument, Defendants concede that sellers may be held vicariously liable for calls, Dkt. 141 at 19. Plaintiff thus submits that her arguments as to vicarious liability above, which rest on common law principles of agency, apply with equal force as to IATDA claims.

Defendants' argument that the case should be dismissed because "Plaintiff fails to plead sufficient facts to allege all of the necessary elements" of a claim, Dkt. 141 at 19, does not

comport with the Federal Rules, which do not require recitation of the elements of a claim, but only a short and plain statement of what a case is about. Fed.R.Civ.P. 8(a); *see also Sojka v. DirectBuy, Inc.*, 35 F. Supp. 3d 996, 1002 (N.D. Ill. 2014) (recognizing line of cases holding that bare recitation of statute is sufficient to allege autodialer, in TCPA context, at the pleading stage). In any event, Plaintiff did allege all elements of her claim: She alleges receiving nonconsensual, autodialed calls to her cell phone that played a prerecorded telemarketing message, some of which used a spoofed caller ID, and goes so far as to quote the prerecorded "press 1" message she received, and to describe following the call's prerecorded prompt to get to a live agent. SAC ¶¶ 69-73, 79, 129-145. Her allegations that a prerecorded message was used, that she received dozens of identical calls, and that the calls persisted after she made a do-not-call request, are sufficient to plausibly allege the use of an autodialer and prerecorded voice. SAC ¶¶ 68-73, 77; *see Clark v. Allied Interstate LLC*, No. 16-2409, 2017 WL 2903358, at *4 (N.D. Ga. Jan. 20, 2017) (citing cases recognizing that an autodialer can be pleaded through allegations of repeated calling, calls after a do-not-call request, the use of a prerecorded voice, or that the consumer heard a pause or click before the dialer connected the call to an agent); *cf. Izsak v. Draftkings, Inc.*, 191 F. Supp. 3d 900, 904 (N.D. Ill. 2016).[22]

Defendants' argument is, frankly, frivolous: As they are aware, the company that physically called on their behalf, Rising Eagle, has ***admitted*** that the calls were made using an autodialer to play prerecorded messages for HII through Enrollment Center of America (a/k/a HAA). Exhibit F, Spiller Decl. ¶¶ 3, 6. Consequently, Defendants' motions should be denied.

## III.   **CONCLUSION**

For the foregoing reasons, Defendants' motions to dismiss should be denied.

---

[22]    Defendants seem to suggest that the omission of an explicit statement in paragraph 73 of the complaint that the prerecorded March 16, 2018 call Plaintiff received was "autodialed" is inadequate ignores the context of the pleadings, which makes clear that all of the calls were autodialed. SAC ¶ 69.

Respectfully submitted,

Dated: October 23, 2019

MARY BILEK, individually and
on behalf of others similarly situated

By: _/s/ Alexander H. Burke_

Alexander H. Burke
Daniel J. Marovitch
**BURKE LAW OFFICES, LLC**
155 N. Michigan Ave., Suite 9020
Chicago, IL 60601
Telephone: (312) 729-5288
aburke@burkelawllc.com
dmarovitch@burkelawllc.com

*Counsel for Plaintiff*

### CERTIFICATE OF SERVICE

I hereby certify that on October 23, 2019, I electronically filed the foregoing with the

Clerk of the Court, using the CM/ECF system, which will send notification of such filing to all

counsel of record.

_/s/ Alexander H. Burke_

31