**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MARY BILEK, individually and on behalf of others similarly situated, | ) ) | Case No. 1:18-cv-03083 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NATIONAL CONGRESS OF EMPLOYERS, INC. et al., | ) ) | Hon. Judge Charles R. Norgle, Sr. Hon. Mag. Judge Jeffrey T. Gilbert |
| Defendants. | ) | |

**PLAINTIFF'S MOTION TO COMPEL WRITTEN DISCOVERY AND TESTIMONY
FROM DEFENDANT HEALTH INSURANCE INNOVATIONS, INC.**

## <u>TABLE OF CONTENTS</u>

**Page**

I.     BACKGROUND ...................................................................................................1

II.    LEGAL STANDARD.........................................................................................3

III.   ARGUMENT ...................................................................................................4

      A.    HII should provide full and complete responses to Plaintiff's interrogatories and requests for production. ........................................................................4

            1.    HII should produce discovery on products and services sold through its platform, how such lead generation occurred, and the parties involved......7

            2.    HII should produce discovery on its relevant policies, practices, and procedures. ...............................................................................13

            3.    HII should produce discovery on complaints and audits pertaining to illegal telemarketing................................................................15

      B.    HII should provide a Rule 30(b)(6) deponent properly prepared to testify on Plaintiff's designated topics..............................................................17

            1.    HII should provide a deponent to explain the initial phase of its lead generation process...........................................................18

            2.    HII should provide a deponent to explain the second phase of its lead generation process...........................................................24

            3.    HII should provide a deponent to provide information on relevant third parties...........................................................................31

             4.    HII should provide a deponent to provide information pertaining to Plaintiff and the quotes she received through it........................................32

IV.   CONCLUSION.................................................................................................33

# **TABLE OF AUTHORITIES**

**Page(s)**

### **Cases**

*Aranda v. Caribbean Cruise Line, Inc.*,
179 F. Supp. 3d 817 (N.D. Ill. 2016) ...................................................................... 8

*Bilek v. NCE*,
2020 WL 5033534 (N.D. Ill. July 1, 2020) ........................................................... 22

*Brodsky v. HumanDental Ins. Co.*,
2012 WL 12973195 (N.D. Ill. May 18, 2012) ...................................................... 16

*Duracell U.S. Operations, Inc. v. JRS Ventures, Inc.*,
2018 WL 704686 (N.D. Ill. Feb. 5, 2018) .............................................................. 4

*Edeh v. Midland Credit Mgmt., Inc.*,
748 F. Supp. 2d 1030 (D. Minn. 2010) ........................................................... 15, 16

*Golan v. Veritas Entm't, LLC*,
788 F.3d 814 (8th Cir. 2015) ................................................................................ 31

*Guzman v. Irmadan, Inc.*,
249 F.R.D. 399 (S.D. Fla. 2008) ............................................................................. 6

*Hangzhou Aoshuang E-Commerce Co. v. 008fashion*,
2020 WL 3429735 (N.D. Ill. June 23, 2020) .......................................................... 5

*Henderson v. United Student Aid Funds, Inc.*,
2015 WL 4742346 (S.D. Cal. July 28, 2015) .......................................................... 9

*Hickman v. Taylor*,
329 U.S. 495 (1947) ................................................................................................ 3

*In re John C. Spiller*,
2020 WL 3091143 (FCC June 10, 2020) ...................................................... 1, 2, 31

*Johansen v. Liberty Mut. Grp., Inc.*,
2017 WL 6045419 (D. Mass. Dec. 6, 2017) ......................................................... 17

*Krakauer v. Dish Network, LLC*,
925 F.3d 643 (4th Cir. 2019), *cert. denied*, 140 S. Ct. 676 (2019).......................... 17

*Lowe v. CVS Pharmacy, Inc.*,
No. 14-3687, 2015 WL 13427768 (N.D. Ill. Feb. 6, 2015) ................................... 15

*Medina v. Enhanced Recovery Co.*,
  2017 WL 5196093 (S.D. Fla. Nov. 9, 2017)...........................................................16

*Mims v. Arrow Fin. Servs., LLC*,
  132 S. Ct. 740 (2012).........................................................................................1

*Moore v. Armour Pharm. Co.*,
  927 F.2d 1194 (11th Cir. 1991)............................................................................3

*O'Shea v. Am. Solar Sol., Inc.*,
  2016 WL 701215 (S.D. Cal. Feb. 18, 2016).........................................................15

*Sawyer v. Atlas Heating & Sheet Metal Works, Inc.*,
  642 F.3d 560 (7th Cir. 2011).........................................................................7, 18

*Sliwa v. Bright House Networks, LLC*,
  2018 WL 1183350 (M.D. Fla. Feb. 14, 2018).......................................................17

*Taylor v. Universal Auto Grp. I, Inc.*,
  2015 WL 1810316 (S.D. Ohio Apr. 17, 2015)......................................................17

*Warnick v. DISH Network LLC*,
  2013 WL 788090 (D. Colo. Mar. 1, 2013)...........................................................17

## Statutes

47 U.S.C. § 227(b)(1)(A)(iii)...................................................................................2

47 U.S.C. § 227(b)(3)......................................................................................16, 33

47 U.S.C. § 227(c)(5).............................................................................................33

815 ILCS 305/15(d)..................................................................................................2

815 ILCS 305/30(b)..................................................................................................2

## Other Authorities

*In re Rules & Regs. Implementing the TCPA*,
  30 FCC Rcd. 7961 (2015).....................................................................................1

Rest. (3d) Agency § 4.01.........................................................................................8

Rest. (3d) Agency § 4.06.......................................................................................16

## Rules

Fed. R. Civ. P. 26...........................................................................................10, 29

Fed. R. Civ. P. 26(a)(1)(A)(ii) ................................................................................................ 10

Fed. R. Civ. P. 26(b) ............................................................................................................... 3

Fed. R. Civ. P. 26(b)(1) ......................................................................................................... 14

Fed. R. Civ. P. 33(b)(3) ........................................................................................................... 6

Fed. R. Civ. P. 33(b)(4) ........................................................................................................... 6

Fed. R. Civ. P. 34(b)(2)(B) ...................................................................................................... 4

Fed. R. Civ. P. 34(b)(2)(C) .................................................................................................. 4, 6

## Regulations

47 C.F.R. § 64.1200(d) ....................................................................................................... 2, 14

47 C.F.R. § 64.1200(d)(1) ...................................................................................................... 14

This case seeks damages against Defendant Health Insurance Innovations, Inc. ("HII") for what the FCC called the largest illegal robocall campaign it has ever encountered. *In re John C. Spiller*, 2020 WL 3091143 (FCC June 10, 2020). Although the more than *one billion* robocalls were placed by other parties, HII was the ringleader of the telemarketing scheme, and funneled business derived from these calls to its codefendants. As such, HII has highly relevant documents and information, but as explained below has produced <u>nothing</u>.

Plaintiff issued interrogatories and production requests to HII, to which it refused to produce a single document. By agreement, Plaintiff also propounded an initial Fed. R. Civ. P. 30(b)(6) deposition notice on HII on certain preliminary topics pertaining to how the lead generation process worked—to which HII has, similarly, provided objections that fail to inform Plaintiff as to the extent HII will be providing responsive testimony.

In light of HII's equivocating responses and non-production, Plaintiff respectfully requests that the Court enter an order compelling HII to provide full responses to her discovery requests identified herein, and the requested deposition testimony,[1] as further detailed below.

## I. <u>BACKGROUND</u>

The TCPA, 47 U.S.C. § 227, was enacted in response to widespread public outrage over the proliferation of intrusive, nuisance calling practices. *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 745 (2012). Indeed, "[m]onth after month, unwanted robocalls and texts …top the list of consumer complaints received by the [FCC]." *In re Rules & Regs. Implementing the TCPA*, 30 FCC Rcd. 7961, ¶ 72 (2015). To that end, the statute broadly bans making any non-emergency call using an automatic telephone dialing system ("ATDS" or "autodialer") or an artificial or prerecorded voice to a cell phone number without "prior express consent." 47 U.S.C. §

---

[1] HII's responses to Plaintiff's discovery requests are attached as <u>Exhibit A</u>. HII produced no documents. HII's initial response to Plaintiff's deposition notice is attached as <u>Exhibit B</u>; its amended response is attached as <u>Exhibit C</u>.

227(b)(1)(A)(iii). The TCPA also prohibits "initiat[ing] any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity[.]" 47 C.F.R. § 64.1200(d). A similar state statute, the Illinois Automatic Telephone Dialers Act ("ATDA"), likewise prohibits "play[ing] a prerecorded message placed by an autodialer without the consent of the called party" or impeding caller IDs during telemarketing calls. 815 ILCS 305/15(d); 30(b).

In this putative class action, Plaintiff Mary Bilek alleges that Defendant HII and its co-defendants caused repeated, automated telemarketing calls to be made to her cell phone promoting insurance-related products or services, even after she made a do-not-call request, with HII acting as the ringleader for the scheme. Dkt. 116, SAC ¶¶ 7-8, 67-80. Specifically, sellers like Defendant National Congress of Employers, Inc. ("NCE")—in conjunction with its partners, Defendants National Benefit Builders, Inc. ("NBBI") and AccessOne Consumer Health, Inc. ("AccessOne")—use HII to develop business for their products and services. *Id.* ¶¶ 43-44. HII, in turn, enlists insurance agents, such as Health Advisors of America, Inc. ("HAA"),[2] to sell these products, often soliciting multiple products as a single, bundled offering to the consumer (e.g., NCE-branded medical discount plan with added life insurance through an insurer). *Id.* ¶¶ 7, 37-39, 42, 45, 51.

To generate the desired sales, HAA and other contracted HII insurance agents/lead generators, or their vendors (like HAA telemarketer Rising Eagle), make autodialed and

---

[2]      HAA (a/k/a "Health Enrollment Center" or "Enrollment Center of America") is a business owned, created by, or affiliated with insurance agents Michael Smith, Zachary Cox, and Sean Duffie, and office manager Marsha Griffin, and others, to assist with their telemarketing efforts for HII, and referenced in the FCC's enforcement action *In re Spiller* as having engaged in substantial illegal telemarketing for the purpose of "s[elling] health insurance through Health Insurance Innovations, Inc." *In re Spiller*, 2020 WL 3091143, n. 20 & 63 (FCC June 10, 2020). Additional known insurance agents affiliated with HAA include Ann Fils, Ashley Eastlack, and Ramon Warren, among others.

prerecorded-voice calls to consumers' phones, during which HII's online platform provides quotes, sends applications to the call recipient, and processes sales of the Seller Defendants' products. *Id.* ¶¶ 5, 9, 42, 44-46, 51, 57-58, 60, 76, 101, 104. Many of these calls are made to cell phones, and none or almost none of the people called as part of this scheme ever consented to receive such calls. *Id.* ¶¶ 32, 35, 104. For example, despite prior do-not-call requests, on March 16, 2018, Plaintiff received a robocall through HAA (transferred from its telemarketer Rising Eagle), during which she was solicited an NCE-branded, $143.09/month plan on the MultiPlan PPO network, which included life insurance, among other benefits. *Id.* ¶¶ 71-77. During another such call on September 20, 2018, Plaintiff received a quote for a $294.13/month insurance policy, also on the MultiPlan PPO network. Recordings of both of these calls, and others, have been provided to defense counsel, with transcriptions attached as Exhibits D and E.

As detailed herein, Plaintiff's motion to compel should, respectfully, be granted.

## II.    LEGAL STANDARD

"Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation. To that end, either party may compel the other to disgorge whatever facts he has in his possession." *Hickman v. Taylor*, 329 U.S. 495, 507 (1947). The scope of discovery is broad—parties may obtain discovery regarding "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b). As such, "[t]he Federal Rules of Civil Procedure ... strongly favor full discovery whenever possible." *Moore v. Armour Pharm. Co.*, 927 F.2d 1194, 1197 (11th Cir. 1991).

### III.   <u>ARGUMENT</u>

    **A.    HII should provide full and complete responses to Plaintiff's interrogatories and requests for production.**

Despite requesting an extension, and then blowing it, HII's responses to Plaintiff's written discovery requests produced ***zero*** responsive documents or information, and instead presented only the following block of objections it **<u>cut-and-pasted for every single request</u>**:

> Objection. Plaintiff's claims rest upon alleged telephone calls "Defendant caused" involving the sale of NCE Premier Platinum and a quote Plaintiff received during a telephone conversation on March 16, 2018. (Dkt. 116, ¶¶72, 73, and 76). HII does not sell or allow third parties to use the HII portal to sell the NCE Premier product referenced in the Second Amended Complaint so no quotes would be issued on the HII portal for that product. A search of HII's database located no quote issued on March 16, 2018, policies or other information that matched the date of birth, zip code, mailing address and phone number provided by Plaintiff. Thus, HII submits that bifurcating discovery in this putative class action will preserve judicial resources and the litigants' resources on a threshold issue whether Plaintiff has standing to bring this case. Conversely, without a bifurcation for an early and efficient determination regarding Plaintiff's standing, the overriding purpose of Rule 1 will not be served. *See* Fed. R. Civ. P. 1 (the civil rules "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding"). Thus, HII objects to this Interrogatory[3] as overbroad, unduly burdensome, not limited to and far beyond the scope of permissible discovery and not relevant to any party's claim or defense, nor proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Non-specific objections such as these – e.g., "overbroad, unduly burdensome, not limited to and far beyond the scope of permissible discovery and not relevant to any party's claim or defense, nor proportional to the needs of the case" – are improper under the Federal Rules such as Fed.R.Civ.P. 34(b)(2)(B)-(C), and are subject to waiver. *Duracell U.S. Operations, Inc. v. JRS Ventures, Inc.*, 2018 WL 704686, at *6 (N.D. Ill. Feb. 5, 2018) (such objections are "'tantamount to not making any objection at all'") (quoting *E.E.O.C. v. Safeway Store, Inc.*, 2002 WL

---

[3]     HII's responses to production requests merely replaced "Interrogatory" here with "Request."

31947153, *2-3 (N.D. Cal. 2002)); *see also Hangzhou Aoshuang E-Commerce Co. v. 008fashion*, 2020 WL 3429735, at *2 (N.D. Ill. June 23, 2020) ("Unexplained, conclusory objections … which the defendant has reflexively raised against both interrogatories and document requests, are tantamount to no objection at all and constitute a waiver of any meaningful, amplified objection along those lines that might have been properly raised had there been explanation instead of mere conclusions.") (citing cases).

Not only that, but these objections are baseless. They presuppose that the Court would bifurcate discovery, which did not happen. HII committed to providing supplemental responses shortly after the Court rejected HII's bifurcation request on June 24, 2020, but has not supplemented in the three months thereafter. The responses also presuppose that no responsive information exists to any of these requests based on HII's position on the merits that it purportedly doesn't sell "NCE Premier Platinum"—even though its own lead generator HAA (who *solicited* Plaintiff the NCE-branded product) has declared under penalty of perjury that all NCE-branded offerings were for HII, which proves that HII's "early summary judgment" theory is bogus. *See* Exhibit F, HAA Decl. ¶ 5. Even further, the objections improperly try to limit the scope of this case to calls for "NCE Premier Platinum" when: (1) Plaintiff's discovery requests are not so limited; (2) this *case* isn't limited to "NCE Premier Platinum" calls (indeed, only one of Plaintiff's *four* proposed classes is limited to recipients of calls for NCE products or services, *see* Dkt. 116, SAC ¶ 104); and (3) the first recorded HII-related call Plaintiff received involved other products than just "NCE Premier," *see* Exhibit D, and the second recorded HII-related call Plaintiff received wasn't for NCE at all, *see* Exhibit E (transcript). Consequently, HII lacks any valid basis for limiting the scope of discovery to a single product that doesn't even reflect the calls Plaintiff received.

Likewise, HII's objection that bifurcation is needed because it claims it didn't find anything in a search for Plaintiff's information conveniently ignores the fact that the parties are currently in dispute over the effectiveness of HII's search, which is equivocal and appears to have been done in such a way to guarantee nothing would be found.[4] Moreover, the Court has repeatedly rejected HII's requests to bifurcate discovery. *See* Court's Case Management Order No. 1, Dkt. 272. Thus, there is no valid reason for HII to withhold discovery on this basis.

Finally, these responses are facially deficient under the Federal Rules because they fail to identify what, if anything, is being withheld based on any objection, or whether no responsive information or materials actually exist. *See* Fed. R. Civ. P. 33(b)(3)-(4) ("Each interrogatory must, to the extent it is not objected to, be answered separately and fully in writing under oath.... The grounds for objecting to an interrogatory must be stated with specificity. Any ground not stated in a timely objection is waived unless the court, for good cause, excuses the failure."); Fed. R. Civ. P. 34(b)(2)(C) ("An objection must state whether any responsive materials are being withheld on the basis of that objection. An objection to part of a request must specify the part and permit inspection of the rest."); *e.g., Guzman v. Irmadan, Inc.*, 249 F.R.D. 399, 401 (S.D. Fla. 2008) ("[S]uch practice leaves the requesting party uncertain as to whether the question has actually been fully answered, or only a portion of it has been answered."). Because no good cause exists for these blatantly non-specific, cut-and-paste objections made in total disregard for the Federal Rules, HII's objections should be deemed waived for this reason, too.

As further detailed below, Plaintiff's requests seek highly relevant information and

---

[4]     For example, *of course* HII wouldn't find anything searching for Plaintiff's address and phone number: It doesn't even collect that information during the part of the process Plaintiff completed during the calls at issue. *See* Exhibit G, Duffie Dep. at 19.

materials, and should be compelled.[5]

> ### 1. HII should produce discovery on products and services sold through its platform, how such lead generation occurred, and the parties involved.

Plaintiff propounded Interrogatory Nos. 1, 5-6, and 8 and Request for Production Nos. 2-4 to obtain information and materials pertaining to understand how HII's lead generation process works, including the products and services sold through HII and who was involved:

> **Interrogatory No. 1.** Identify the manner, method, and factors under which leads or prospective customers are offered NCE, NBBI, AccessOne or Unified products, goods, or services during telephone calls, including any associated policies, practices, or procedures, and all persons who are responsible for or assisted in setting or determining such.
> **ANSWER:** [identical boilerplate, cut-and-pasted objection]

> **Interrogatory No. 5.** Identify all third parties that develop business for you or your codefendants in this case, through placement of outbound telephone calls.
> **ANSWER:** [identical boilerplate, cut-and-pasted objection] Additionally, the term "develop business" is vague and ambiguous.

> **Interrogatory No. 6.** Identify the system(s) or vendors you use to keep track of and/or communicate with, existing or potential customers, including the sending of emails with for example the "@mybenefitskeeper.com" email address and hiiquote.com.
> **ANSWER:** [identical boilerplate, cut-and-pasted objection]

> **Interrogatory No. 8.** At your website, https://www.hiiq.com/agent/product/, you list various categories of products that are sold through HII: Life Insurance; Short Term Medical; Accident, Sickness & Hospital Plans; Ancillary Insurance; Lifestyle & Discount Services; and Dental and Vision. Identify the entities whose products are available through HII, and describe any groups or bundles of products or services that are sold together.
> **ANSWER:** [identical boilerplate, cut-and-pasted objection]

> **Request for Production No. 2.** Identify all goods or services that were quoted during the March 16, 2018, telemarketing call to Mary Bilek, transcribed at Dkt. 127-2[, or the September 20, 2018 call for which a recording has since been provided].[6]

---

[5] Unless otherwise stated, **_all_** written discovery requests are subject to a default temporal scope going back to January 1, 2014—i.e., a few months longer than the TCPA's 4-year statute of limitations. *Sawyer v. Atlas Heating & Sheet Metal Works, Inc.*, 642 F.3d 560, 561 (7th Cir. 2011).

[6] During the meet-and-confer process, Plaintiff's counsel explained that Plaintiff is also seeking equivalent information responsive to Request for Production No. 2, for a separate HII-related call Plaintiff

**RESPONSE:** [identical boilerplate, cut-and-pasted objection]

**Request for Production No. 3.** Produce all documents, manuals and other materials that describe the system that salespeople (including but not limited to insurance agents and entities such as Health Enrollment Center [i.e., HAA]) use to sell products and services, including but not limited to the "quoting tools, training materials, sales support and other essential information" available to agents when they log in to hiiquote.com/agents/login.
**RESPONSE:** [identical boilerplate, cut-and-pasted objection]

**Request for Production No. 4.** Produce all data and documents concerning marketing activity by Health Enrollment Center [i.e., HAA], Duffie, Cox or Michael Smith (or their agents, subagents, telemarketers or affiliates), broken down by login. Include for example data sufficient to ascertain what agents were logged in at what times, what products/services were offered or quoted by such agents, and what products/services were sold by such agents.
**RESPONSE:** [identical boilerplate, cut-and-pasted objection]

These seven discovery requests are all directly pertinent to understanding the scope and nature of HII's lead generation relevant to this case, and should be compelled.

For instance, Plaintiff issued Interrogatory No. 1 to understand how solicitations of NCE-branded products (and those of its co-defendants) are conducted through HII, including applicable policies, practices, procedures, and people. Such information is inherently relevant to the parties' claims and defenses, in accordance with Fed. R. Civ. P. 26(b)(1), because they will provide basic information about how the lead generation process worked and support Plaintiff's vicarious liability allegations based on HII's participation and knowledge. *See, e.g., Aranda v. Caribbean Cruise Line, Inc.*, 179 F. Supp. 3d 817, 831 (N.D. Ill. 2016) (ratification occurs through knowingly acceptance of actor's conduct on one's behalf); Rest. (3d) Agency § 4.01 at cmt. b (ratification subjecting one to vicarious liability may occur where one ratified acts of another despite knowing that full knowledge was lacking, i.e., willful ignorance) There is no justification for HII's refusal to provide this basic information.

received on September 20, 2018, through HII's lead generator HAA. Plaintiff offered to issue a new discovery request on this point if necessary, but notes that such discovery is responsive to Request for Production No. 1 (seeking all documents for Plaintiff), regardless.

Interrogatory No. 5 seeks the identities of the lead generators, telemarketers, and other third parties that generated leads, applications, or sales with respect to HII's and its co-Defendants' businesses, by phone. HII necessarily knows the third parties from whom it received business; some have even been identified through Plaintiff's own efforts, such as Rising Eagle, HAA, and others referenced in other litigation like Donisi Jax/Helping Hand Health Group (from *Moser v. HII*, No. 3:17-cv-01127 (S.D. Cal.) or Simple Health Plans (from *FTC v. Simple Health Plans LLC*, No. 0:18-cv-62593 (S.D. Fla.)). This request for the mere *identities* of the third parties who developed business for Defendants by phone is in no way "unduly burdensome," and Plaintiff disagrees that there is any ambiguity or vagueness about what it means to "develop business" in the context of a TCPA lawsuit arising from third-party lead generation. This request should thus be compelled. *See Henderson v. United Student Aid Funds, Inc.*, 2015 WL 4742346, at *5 (S.D. Cal. July 28, 2015) (compelling TCPA defendant to "identify all of the … vendors [it] utilized to make calls on its behalf … during the class period").

Interrogatory No. 6 seeks to learn what systems or vendors are involved in this or other processes for tracking or communicating with existing or potential customers like Plaintiff and other class members. For instance, part of HII's lead generation process involves emailing call recipients applications to be completed with the agent while on the call, through its MyBenefitsKeeper platform. *E.g.,* Dkt. 171-2 to 171-4 (example emailed HII application materials); *accord* Exhibit G, Duffie Dep. at 23. This request is thus relevant because it will allow Plaintiff to develop arguments on ascertainability with respect to class certification, and identify third parties with relevant information and records. HII identifies nothing "unduly burdensome" about simply identifying its relevant systems and vendors, and it should be

compelled to do so.[7]

Interrogatory No. 8 seeks the mere *identity* of the entities whose products are available through HII, along with the associated groups or bundles of products or services sold together. This request will enable Plaintiff to understand the interrelationships between, for example, NCE-branded products and those of other sellers with whom they are bundled—including, for example, the undisclosed life insurance that was solicited to Plaintiff Bilek during the call on March 16, 2018. Plaintiff has long been trying to pin down this information, with the intent of potentially adding that entity as a defendant, but all of HII's co-Defendants have pled ignorance and finger-pointed at HII. This request is also important because HII has been playing a game of "hide the ball" as to the NCE-branded products it offered, and using its assertion that it purportedly never offered the "NCE Premier Platinum" product referenced in one of the calls Plaintiff Bilek received as a basis for refusing to produce *any* discovery. Plaintiff thus believes that this request will shine light on HII's connection with NCE and related products, and provide some clarity to this issue. HII has failed to articulate any "undue burden" in simply identifying whose products it sold, and what they were, and Interrogatory No. 8 should thus be compelled.

Request for Production No. 2 asks HII to produce documents sufficient to identify the goods and services were encompassed in the quotes Plaintiff Bilek received during the calls on March 16, 2018 and September 20, 2018. These requests are specific to Plaintiff, and will demonstrate HII's awareness and connection with the associated sellers (and them with each other), as well as identify additional third parties with relevant information pertaining to the lead

---

[7]     Indeed, identification of systems containing relevant ESI is also something HII should have disclosed long ago, but Defendant refused. *E.g.,* Fed. R. Civ. P. 26(a)(1)(A)(ii) (requiring "description by category *and location* … of all … electronically stored information … that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses") (emphasis added); *see also* Fed. R. Civ. P. 26 Committee Notes, *Subdivision (f)* (2006 Am.) (discussing importance for parties to discuss and become familiar with systems applicable to ESI in order to develop discovery plan).

generation at issue, or even additional defendants. HII is expected to claim that it did not quote anything at all for Bilek based upon its telemarketer's reference to a product it allegedly does not sell, but HII has refused to do follow up searches for, for example, products that were being sold during that timeframe for the prices or parameters (e.g. $250,000 in life insurance coverage) that Bilek was quoted. Defendant identifies no "undue burden" in simply products documents sufficient to identify these third parties and their products/services, and it should consequently provide the requested materials.

Request for Production No. 3 seeks manuals, training materials, and similar documents that describe HII's system or online platform that HAA and the other HII vendors use to facilitate sales to consumers. This request is important because it will detail the physical mechanism and practices by which HAA and HII interacted on a per-call or routine basis, and how NCE's and other sellers' quote and pricing information was exchanged for use during the telephone solicitations at issue. In addition to supplying basic information about how the lead generation at issue worked, this will also provide support to Plaintiff's vicarious liability allegations against HII, by showing its knowledge and, indeed, participation in the sales calls with Plaintiff and other class members via its platform. It is a highly relevant request for basic documentation that HII should readily have on hand, and for which it has failed to articulate any "undue burden" or other legitimate basis to withhold production. Consequently, Request for Production No. 3 should be compelled.

Request for Production No. 4's request for data and materials concerning HAA's marketing activity is a key discovery request. HAA is the HII lead generator through which all of the calls to Plaintiff Bilek were made, for which Plaintiff possesses a trove of millions of inbound call transfers of robocall solicitations from its telemarketer Rising Eagle, and which has

confirmed that all of its NCE-branded sales were for HII. *E.g.,* Dkt. 116, SAC ¶¶ 5, 76; Exhibit F, HAA Decl. ¶ 5. This request is thus relevant to establishing the relationship between HII and HAA (which may have occurred through multiple insurance agent intermediaries), identification of applicable sales agents and other third parties that possess relevant information, the compensation and transfer of consideration for the leads and sales derived from the calls at issue, and class certification issues such as ascertainability, numerosity, and predominance, based on Plaintiff's ability to identify and establish which of the calls in her database are attributable to HII and NCE, as opposed to some other HII customer. This request is also germane to Plaintiff's ability to ultimately hold HII liable for the calling at issue, since its proof of the day-to-day interactions between it and HAA is pertinent to establishing a principal-agent relationship supporting vicarious liability.

And while, in meet-and-confer discussions, HII has claimed that it doesn't know exactly which insurance agents were part of HAA (a/k/a "Health Enrollment Center" or "Enrollment Center of America"), it is indisputable that HII had a relationship with HAA's owners like Zach Cox (with whom HII recorded a financing statement[8]), and Plaintiff has identified numerous other examples of HAA agents and representatives through which HII can identify the business—such as principals Michael Smith and Sean Duffie, office manager Marsha Griffin (with whom HAA produced telemarketing-related emails between it and HII), and known insurance agents Ann Fils, Ashley Eastlack, and Ramon Warren, among others. HII's suggestion that it can't respond because it didn't explicitly contract with a "Health Advisors of America, Inc." demonstrates a failure to conduct a meaningful search given the known relationship and examples of relevant contacts provided. Given that HII's business model is purposefully

---

[8] https://www.floridaucc.com/uccweb/RetrieveImage.aspx?sst=&sov=6&sot=Document%20Number&st=201803963148&fn=201803963148&rn=1&ii=Y&ft=1&epn=

complex in order to thwart investigation, the request was <u>not</u> limited to entities with whom HII

has "contracts," and HII's repeated reference to "contracts" is non-sequitur. This is a highly

relevant request, and as HII fails to articulate any valid reason for withholding such discovery,

Request for Production No. 4 should be compelled.

In short, understanding understand how HII's lead generation process works, including

the products and services sold through HII and who was involved, is highly relevant discovery

that is germane to the parties' claims and defenses, and these requests should thus be compelled.

> **2. *HII should produce discovery on its relevant policies, practices, and procedures.***

Plaintiff propounded Request for Production Nos. 9, 12, 19, and 25 to obtain information

and materials pertaining to HII's relevant policies, practices, and procedures:

> **<u>Request for Production No. 9.</u>** Please produce all policy, practice, and procedure or other documents (e.g., emails) that pertain to the development or implementation of lead generation or telephone call campaigns or strategies, including but not limited to the campaign or strategy under which Plaintiff was called or she was ultimately offered goods and services through HII.
> **RESPONSE:** [identical boilerplate, cut-and-pasted objection]

> **<u>Request for Production No. 12.</u>** Produce your do not call policies, practices and procedures.
> **RESPONSE:** [identical boilerplate, cut-and-pasted objection]

> **<u>Request for Production No. 19.</u>** Produce all communications and other documents concerning marketing goods or services by telephone.
> **RESPONSE:** [identical boilerplate, cut-and-pasted objection]

> **<u>Request for Production No. 25.</u>** Produce your document retention/destruction policies.
> **RESPONSE:** [identical boilerplate, cut-and-pasted objection]

These four production requests seek policy, practice, and procedure documents and

communications on limited, case-relevant topics—lead generation and telemarketing (RFP 9 and

19), its do-not-call policy (which HII is *legally required* to make "available upon demand" under

47 C.F.R. § 64.1200(d)(1)) (RFP 12),[9] and document retention/destruction (RFP 25).

Defendant's policies, practices, and procedures are inherently relevant to understanding how the telemarketing and lead generation at issue works, whether HII's do-not-call practices existed and satisfied the "minimum standards" required under 47 C.F.R. § 64.1200(d), and whether and the extent to which once-existing responsive data might be recoverable. Not only that, but such discovery is necessary to address HII's Eight Affirmative Defense of "good faith":

> HII's actions, practices and procedures were reasonable and taken in good faith and with the well-founded belief that such conduct was at all times in compliance with applicable laws, rules and regulations. To the extent that any conduct alleged in the Second Amended Class Action Complaint may be actionable, such conduct was unintentional and occurred despite HII's reasonable good-faith efforts to be compliant.

Dkt. 256, HII's Answer to SAC at p. 38. What "actions, practices and procedures" is this defense referring to? Perhaps part of the answer resides in files relating to the action that several State Insurance Regulators initiated against HII, the settlement for which required HII to initiate substantial call recording (which HAA at least partially did, to the exclusion of the prerecorded portion of calls), and requires HII to put forth a comprehensive telemarketing "Compliance Plan." Exhibit H at 7. These requests are directly relevant to the parties' claims and defense, and thus fall within the permissible scope of discovery under Fed. R. Civ. P. 26(b)(1). Moreover, not only has HII failed to articulate *any* perceived undue burden or overbreadth in these requests, but Defendant cannot validly do so: During meet-and-confer discussions, Plaintiff offered to preliminarily limit the scope of these requests, in advance of the HII's upcoming Rule 30(b)(6) deposition, to: (1) HAA-related activities in 2018, as to RFP 9's request for documents pertaining to the development or implementation of lead generation or telephone call campaigns or strategies, (2) 2018, as to the do-not-call policies, practices, and procedures responsive to RFP

---

[9]     If HII lacks a written do-not-call policy, then it should revise its response to say so.

12, and (3) HAA-related activities, with respect to marketing goods or services by telephone responsive to RFP 19. However, HII refused Plaintiff's proposal to compromise, without offering any alternative.

Courts in TCPA cases routinely order defendants to produce policy, practice, and procedure materials. *E.g., O'Shea v. Am. Solar Sol., Inc.*, 2016 WL 701215, at *5 (S.D. Cal. Feb. 18, 2016) (compelling all "TCPA Compliance Documents and Communications," finding that such materials are "directly related to [plaintiff's] TCPA claim, and … therefore discoverable."); *Lowe v. CVS Pharmacy, Inc.*, 2015 WL 13427768, at *5 (N.D. Ill. Feb. 6, 2015) (compelling "[a]ll communications, policies, training materials, memoranda, and other documents relating to the TCPA, [IATDA] or any other telemarketing laws."); *Edeh v. Midland Credit Mgmt., Inc.*, 748 F. Supp. 2d 1030, 1045 (D. Minn. 2010) (compelling "policy manuals, procedure manuals, or other documents" distributed to employees, all lawsuits filed, and all court judgments and civil or administrative sanctions issued" against the defendant as to the TCPA, and other compliance materials). The Court should similarly compel Request for Production Nos. 9, 12, 19, and 25.

### 3. *HII should produce discovery on complaints and audits pertaining to illegal telemarketing.*

Plaintiff propounded Request for Production Nos. 18 and 26 to obtain information and materials pertaining to complaints, audits, and investigations regarding telemarketing:

**Request for Production No. 18.** Produce all documents concerning or relating to investigations, audits or testing that relate to telephone-based lead generation or telemarketing.
    **RESPONSE:** [identical boilerplate, cut-and-pasted objection]

**Request for Production No. 26.** Produce all complaints and related documents that concern telemarketing or unwanted calling, received from any source (including internally), including but not limited to:
    a. Lawsuits, counterclaims and arbitrations;
    b. The FCC, FTC, CFPB, Department of Justice, FBI, Postmaster General or any other federal authority;

     c.   Any state's attorney general, Department of Insurance or other state-level authority;

     d.   The Better Business Bureau or similar consumer-oriented entity;

     e.   Consumers or their representatives or attorneys.

          **RESPONSE:** [identical boilerplate, cut-and-pasted objection]

Investigations, audits, and affirmative complaints about telemarketing or unwanted calling not only put HII on notice that its practices are resulting in TCPA violations (or that, at the very least, that it should investigate further); they assist in identifying potential class members who received the illegal calls at issue, and in proving vicarious liability based on HII's "knowing retention" of benefits derived from illegal telemarketing. *See* Rest. (3d) Agency § 4.06 (discussing knowledge element of ratification theory). Not only that, but that HII *knew* about complaints, was investigated, or conducted its own investigation and audits of its vendors that revealed telemarketing violations, is the "smoking gun" supporting treble damages based on willfulness under 47 U.S.C. § 227(b)(3), and will assist in proving Plaintiff's vicarious liability case.

Given its inherent relevance to damages, merits, and even class issues, this discovery is routinely granted. *See Brodsky v. HumanDental Ins. Co.*, 2012 WL 12973195, at *3 (N.D. Ill. May 18, 2012) ("Courts have found that this type of [consumer complaint] information is relevant to the issue of whether a defendant acted willfully in violating the TCPA."); *Medina v. Enhanced Recovery Co.*, 2017 WL 5196093, at *8 (S.D. Fla. Nov. 9, 2017) (compelling defendant to produce "[a]ll consumer complaints RELATING TO the PHONE CALLS, regardless of whether lawsuits arose out of such complaints[,]" finding them "relevant to Plaintiffs' ability to identify potential class members and prove Rule 23 requirements such as numerosity and commonality").[10] The Court should similarly compel Request for Production

---

[10]     *See also Edeh*, 748 F. Supp. 2d at 1044-45 (finding TCPA plaintiff "is entitled to discover evidence that is relevant to whether Midland's violation of the TCPA was reckless[,]" such as

Nos. 18 and 26 here.

### 4. HII should produce documents that explain the meaning of its data.

Plaintiff propounded Request for Production No. 8 to obtain materials that will allow

Plaintiff to understand the data and records being produced in this action:

> **Request for Production No. 8.** Please produce any keys, data dictionaries, or other explanatory materials as to any document data that includes information concerning communications or indicia of consent (or lack of consent), as well as any other documents that may assist one in understanding any data, codes, columns, field names or other abbreviated matter produced in this action.
>
> **RESPONSE:** [identical boilerplate, cut-and-pasted objection]

Plaintiff necessarily needs to be able to comprehend the data and records HII produces in

this action, especially to the extent it uses internal codes or designations that only HII knows.

Plaintiff propounded Request for Production No. 8 to obtain HII's data dictionary or similar

materials that explain the meaning of its data, fields, and codes, and respectfully submits that

being able to know what the materials HII produces mean is not an unreasonable request. As

such, Request for Production No. 8 should be compelled.

### B. HII should provide a Rule 30(b)(6) deponent properly prepared to testify on Plaintiff's designated topics.

---

"information about what Midland's procedures required it to do to avoid violating the TCPA" and "information about what Midland did and did not tell its employees about the TCPA"), *aff'd*, 413 F. App'x 925 (8th Cir. 2011); *Johansen v. Liberty Mut. Grp., Inc.*, 2017 WL 6045419, at *3 (D. Mass. Dec. 6, 2017) (compelling documents relating to applicable audits, investigations, inquiries, or studies done concerning compliance with state and federal telemarketing laws); *Sliwa v. Bright House Networks, LLC*, 2018 WL 1183350, at *3 (M.D. Fla. Feb. 14, 2018) (compelling request seeking "[a]ll communications, reports, or audits concerning Defendant's compliance with the TCPA, including ensuring it was not calling wrong numbers or calling numbers after the called parties made requests not to call them" going back to 4-year TCPA statute of limitations period, finding it "relevant, proportional, and not burdensome"); *Taylor v. Universal Auto Grp. I, Inc.*, 2015 WL 1810316, at *8 (S.D. Ohio Apr. 17, 2015) (compelling production of "documents, communications, and databases related to complaints from individuals who received calls" as relevant and discoverable); *Warnick v. DISH Network LLC*, 2013 WL 788090, at *4 (D. Colo. Mar. 1, 2013) (compelling "[a]ll documents from any source that concern the legality or propriety of making telephone calls to customers' cellular phones" referencing the TCPA); *see also Krakauer v. Dish Network, LLC*, 925 F.3d 643, 662 (4th Cir. 2019), *cert. denied*, 140 S. Ct. 676 (2019) (referencing prior litigation and "half-hearted way in which Dish responded to consumer complaints" in affirming enhanced damages against TCPA violator).

Plaintiff and HII have agreed that Plaintiff will conduct an initial Rule 30(b)(6) deposition of HII intended to address certain disputed issues the parties addressed at the status conference on August 20, 2020—namely, aimed at understanding the basics of HII's lead generation process and how one might uncover responsive information pertaining to the calls to Plaintiff and those like her.[11]

### 1. HII should provide a deponent to explain the initial phase of its lead generation process.

HII's first active involvement in a lead generation call like the ones Plaintiff Bilek received occurs when an agent submits the call recipient's information into its online platform in order to obtain preliminary product and pricing information. *See* Exhibit G, Duffie Dep. at 19-21 (explaining that after an agent submits the call recipient's ZIP code, date of birth, and similar information into HII's portal and hit "quote," HII provides them with "all the plans in that person's area" to then solicit to the consumer). This occurred during both recorded calls with Plaintiff Bilek: Indeed, during the September 20, 2018 call, the agent directly *told* her that he was "going to put you on a brief hold, enter your date of birth, zip code, and state into my nationwide database," before providing her a $294.13/month quote for a MultiPlan PPO policy. Exhibit E.

Consequently, Plaintiff noticed Deposition Topic 1 in order to learn more about this initial phase of HII's lead generation process:

> **1.** We understand that HAA typically provided HII certain information and data in order to obtain initial quotations and/or pricing for products and/or services, including but not limited to for example birthdate and zip code. For this type of information or data, provide the following information:
>
> **RESPONSE:** Objection on the grounds that this introductory paragraph qualifies the twelve subtopics that follow with the phrase "HAA typically provided HII certain information and data." HII would have no designee with

---

[11] Unless otherwise stated, ***all*** deposition topics are subject to a default temporal scope going back to April 30, 2014, encompassing the TCPA's 4-year statute of limitations. *Sawyer*, 642 F.3d at 561.

information known or unreasonably known to the company on topics so modified. *See* Declaration of Bryan Krul (DE 168-2), par. 5 ("HII does not have a contract with Health Advisors of America, Inc. ("Health Advisors") or Rising Eagle Capital Group ("Rising Eagle") and Health Advisors and Rising Eagle are not permitted to make calls to sell insurance on behalf of HII, offer quotes on behalf of HII, or sell any product through the HII portal."). Thus, discovery in this area is overbroad, not related to a claim or defense, and is not proportional to the needs of the case.

      **a.**    Explain and identify all policies, practices or procedures concerning this phase of customer development;

      **RESPONSE:** Objection on the grounds that Plaintiff has never been a customer of HII so discovery in this area is not related to a claim or defense, nor is it proportional to the needs of this case. Furthermore, the matter of examination is not described with reasonable particularity and sufficient specificity. Thus, for any topic falling within the proper scope of discovery, HII cannot prepare a designee who can answer all questions theoretically falling within this vague and open-ended topic without temporal limits. Plaintiff is required to describe with specificity the factual subject matters which are substantively relevant to the claims and defenses in the case. Specifically, HII did not sell the NCE Premier product or allow third parties to use the HII portal to sell the NCE Premier product. *See* Declaration of Bryan Krul (DE 168-2), par. 6. Furthermore, any matters described with reasonable particularity and falling within the proper scope of discovery may be designated for deposition after October 15, 2020.

      Notwithstanding and without waiving the objections and clarifications above, HII will produce an initial designee regarding HII's general policy and practices with respect to information or data used to obtain initial quotations for premiums for products through HII's portal during the time period relevant to the Second Amended Complaint (i.e., the 2018 time period during which Plaintiff allegedly received the calls at issue).

      **b.**    Explain all methods of how HAA provided such information to HII;

      **RESPONSE:** Objection on the grounds that topic 1(b) is vague, overbroad, not related to a claim or defense, and is not proportional to the needs of this case. Plaintiff has never been a customer of HII. Specifically, HII did not sell the NCE Premier product or allow third parties to use the HII portal to sell the NCE Premier product. *See* Declaration of Bryan Krul (DE 168-2), par. 6. Furthermore, the matter of examination is not described with reasonable particularity and sufficient specificity. Thus, for any topic falling within the proper scope of discovery, HII cannot prepare a designee who can answer all questions theoretically falling within this vague and open-ended topic without temporal limits. Any matters described with reasonable particularity and falling within the proper scope of discovery may be designated for deposition after October 15, 2020.

      Notwithstanding and without waiving the objections and clarifications

above, HII will produce an initial designee regarding generally how persons with authorization to access HII's portal and obtain quotes provide information or data in connection with that process during the time period relevant to the Second Amended Complaint (i.e., the 2018 time period during which Plaintiff allegedly received the calls at issue).

      **c.**      Explain what information HII received (we expect the answer to include at least the birthdate and zip code, plus information about who at HAA provided such information—e.g., insurance agent, call center agent, etc.);

      **RESPONSE:** Notwithstanding and without waiving objections and clarifications above, and assuming that this topic is directed to the information that is inputted to receive a quote through the HII portal during the period of time alleged in the Second Amended Complaint (i.e., the 2018 time period during which Plaintiff allegedly received the calls at issue), HII will produce an initial designee regarding this topic.

      **d.**      Explain and identify the format of such information or data when received, what if anything happened to that information or data thereafter, and how it exists now;

      **RESPONSE:** Notwithstanding and without waiving the objections and clarifications above, and assuming that this topic concerns the quote that is generated during the relevant period of time alleged in the Second Amended Complaint (i.e., the 2018 time period during which Plaintiff allegedly received the calls at issue), HII will produce an initial designee regarding this topic.

      **e.**      Explain how such information may be queried, searched, retrieved and/or exported;

      **RESPONSE:** Notwithstanding and without waiving the objections and clarifications above, and assuming that this topic concerns the search for information regarding Plaintiff, HII will produce a designee regarding this topic.

      **f.**      Explain what HII did with information concerning this phase of the process;

      **RESPONSE:** Notwithstanding and without waiving the objections and clarifications above, and assuming that this topic concerns how information provided to HII in order to obtain quotes are maintained and archived during a relative period of time as alleged in the Second Amended Complaint (i.e., the 2018 time period during which Plaintiff allegedly received the calls at issue), HII will produce an initial designee regarding this topic.

      **g.**      To the extent that any information or data concerning this phase of the process may not have been retained, or was lost, archived, deleted, is now unavailable, or otherwise used to exist but does not any more – including but not limited to arising from March 16, 2018 and September 20, 2018 – explain what happened to such;

      **RESPONSE:** Not applicable; but see HII's response to topic 1(d) above.

**h.** Explain how data was collected during this phase, and what happened to collected data for consumers who began but did not complete this phase of the process;

**RESPONSE:** HII incorporates by reference its responses to topics 1(c), 1(d), 1(e), and 1(f) above.

**i.** Explain how HII's pricing and quotation process worked;

**RESPONSE:** HII incorporates by references its responses to topics 1(a)-1(f) above. Responding further, and assuming that the reference to "pricing" concerns the price of quotes that are issued using HII's portal during the relevant time period (i.e., the 2018 time period during which Plaintiff allegedly received the calls at issue), HII will produce an initial designee regarding HII's understanding of how such prices are set and by whom.

**j.** Explain and identify any data that exists or once existed, concerning quote or pricing information that was conveyed to HAA, including but not limited to pricing that may have been provided to prospective customers during this phase of the process;

**RESPONSE:** HII incorporates by reference its responses to topics 1(c)-1(g), and 1(i) above.

**k.** Explain how quotations and pricing were conveyed to HAA;

**RESPONSE:** HII has no designee with information known or unreasonably known to the company on how such information was "conveyed to HAA." *See* Declaration of Bryan Krul (DE 168-2), par. 5 ("HII does not have a contract with Health Advisors of America, Inc. ("Health Advisors") or Rising Eagle Capital Group ("Rising Eagle") and Health Advisors and Rising Eagle are not permitted to make calls to sell insurance on behalf of HII, offer quotes on behalf of HII, or sell any product through the HII portal.").

**l.** Explain what was supposed to happen next if the consumer indicated interest in products or services to HAA.

**RESPONSE:** No quote was issued to Plaintiff through the HII portal, and HII has no information regarding Plaintiff based upon a reasonable search. HII has no business relationship with HAA. *See* Declaration of Bryan Krul (DE 160-2), par. 5. Notwithstanding and without waiving these objections, HII will produce an initial designee regarding how the application and quotation process worked through HII's portal during the time period relevant to the Second Amended Complaint (i.e., the 2018 time period during which Plaintiff allegedly received the calls at issue).

Plaintiff's lawsuit requires establishing not only that the calls she alleges were, in fact, made, but that HII and its co-Defendants should be held *liable* for them, whether through direct

participation, actual agency, ratification, apparent authority, or some other theory. *See Bilek v. NCE*, 2020 WL 5033534, at *4 (N.D. Ill. July 1, 2020) (denying motions to dismiss, finding Plaintiff "pleaded a plausible claim of Defendants' vicarious liability for the alleged unlawful robocalls [she] received through a chain of agency relationships based on implied actual authority"). This necessarily requires examining HII's conduct and knowledge with respect to the telemarketing lead generation at issue, applicable policies, practices, and procedures, what HII did (and if data associated with such actions exists and where/how it might be obtained), and the mechanism by which it interacted with lead generator HAA and call recipients.

Topic 1 is intended to delve into these pertinent issues with respect to the initial portion of the calls at issue, i.e., when the consumer first receives an oral quote via HII before proceeding to the verification process. These include applicable policies, practices, and procedures and how the process generally worked [1(a), 1(i), 1(l)], how and what information was transferred between HAA and HII with respect to this part of the process [1(b), 1(c), 1(d), 1(k)], how such data or information is collected, stored, or available for query, and the extent to which it has since become lost, archived or otherwise not readily available [1(e), 1(g), 1(h), 1(j)],[12] and what HII did vis-à-vis such information [1(f)]. A full understanding of this portion of the calls Plaintiff sued about and applicable ESI is inherently relevant and discoverable, particularly here, where a better understanding of the applicable data and systems will allow the parties to finally have an informed discussion about how and where data relevant to Plaintiff and

---

[12]     Plaintiff notes that her counsel have been trying to get such basic information about the nature of HII's relevant ESI for months, but that its counsel refuse to provide it. This is information HII should have provided with its Rule 26(a)(1) disclosures or the parties Rule 26(f)-type discussions well before HII's discovery responses were due. *See* Fed. R. Civ. P. 26 Committee Notes, *Subdivision (f)* (2006 Am.) ("It may be important for the parties to discuss those systems, and accordingly important for counsel to become familiar with those systems before the conference. With that information, the parties can develop a discovery plan that takes into account the capabilities of their computer systems. In appropriate cases identification of, and early discovery from, individuals with special knowledge of a party's computer systems may be helpful.").

the calls she received might exist or once existed. The Court should consequently compel HII to provide a properly-prepared Rule 30(b)(6) deponent on them.

Plaintiff disputes that HII has properly objected to these requests: It objects to all sub-topics by referencing a litany of objections, and then suggesting (except as to Topic 1(k), for which it refuses to produce *any* designee) that it will produce a deponent "without waiving" such objections—while at the same time limiting the topic's scope. Plaintiff wants HII to testify as to the topics as noticed. During the parties' meet-and-confer discussion, Plaintiff's counsel told HII's counsel that if HII intends to produce a designee on the topic as noticed, then it should say so and withdraw the objection. Instead, HII suppled this amended response that continues to unilaterally revise Plaintiff's noticed topics, "without waiving" objections. This provides Plaintiff no basis for expecting legitimate, complete responses to her inquiries, or that a prepared deponent will even appear.

HII's objections are meritless. Though HII fails to articulate the basis for such boilerplate objections to any degree of specificity as required, there is nothing "vague, overbroad, not related to a claim or defense, [or] not proportional to the needs of this case" about them. Rather, the sub-topics of Topic 1 break down a general topic seeking information on the initial phase of an HII lead generation call into discrete categories, ensuring clarity on what, exactly, the deposition will entail. *See Smithkline Beecham Corp. v. Apotex Corp.*, 2000 WL 116082, at *8 (N.D. Ill. Jan. 24, 2000) ("The effect of the rule is to place upon the business entity the burden of identifying witnesses who have knowledge responsive to subjects requested in the Rule 30(b)(6) requests of its opponent."). The physical process, what happened at this stage, HII's knowledge, and applicable policies, practices, and procedures are all relevant issues certain to reveal discoverable information tying HII to the illegal calling at issue and explaining how it occurred.

23

Likewise, HII's objections that "Plaintiff has never been a customer of HII so discovery in this area is not related to a claim or defense, nor is it proportional to the needs of the case[,]" is irrelevant because while Plaintiff was never an HII customer, she certainly experienced this phase of HII's lead generation process when its telemarketer HAA used HII's platform to provide her with quotes during the calls at issue. *E.g.,* Dkt. 116, SAC ¶ 76. But this objection is a red herring, anyway, because HII's lead generation process is germane to vicarious liability, applicable ESI, and Plaintiff's basic understanding of what occurs during these calls, *regardless* of whatever Plaintiff Bilek personally experienced.

HII also claims that it can't respond to these topics because it "does not have a contract with [HAA]." But regardless of whether HII has a signed contract with a "Health Advisors of America, Inc.," it certainly has a business relationship with HAA, including a recorded financing statement with HAA's co-owner Zach Cox,[13] emails exchanged with HAA's office manager Marsha Griffin that were produced earlier in the case by HAA, and knowledge of its other affiliated persons such as Michael Smith and Sean Duffie, and related insurance agents Ann Fils, Ashley Eastlack, and Ramon Warren, among others. In short, HII's objections are meant to avoid providing real answers by playing games with what entity HII specifically had a "contract" with. The Court should overrule this deceptive gamesmanship, and compel HII to provide designees fully prepared to testify as to the noticed topics.

### 2. HII should provide a deponent to explain the second phase of its lead generation process.

After completion of the first phase of HII's lead generation process described above, the consumer is then put through a "verification" or "application" process, through which HII sends

---

[13] https://www.floridaucc.com/uccweb/RetrieveImage.aspx?sst=&sov=6&sot=Document%20Number&st=201803963148&fn=201803963148&rn=1&ii=Y&ft=1&epn=

the consumer an email containing a link to application materials, which the agent then walks

through and has the consumer sign and electronically submit while still on the call. *See* Exhibit

G, Duffie Dep. at 22-24 (explaining verification process). This verification process was started

with Plaintiff Bilek: For example, before the March 16, 2018 call she received was dropped, the

agent explained that "[y]ou're only submitting an application and then once they send you the

application, via email, and they take you through signing it[,]" before transferring her to

"Beatrice" with the "verification department." Exhibit D.

Consequently, Plaintiff noticed Deposition Topic 2 in order to learn more about this

second phase of HII's lead generation process:

> **2.** We understand that if a consumer indicated interest in products or services
> through HII, there was a second phase of information and data gathering, possibly
> known as the "application" phase, which might result in sending of an email
> and/or written application(s) for goods and/or services. As to this phase of the
> process, provide the following information:
>     **RESPONSE:** HII objects on the grounds that this phase is not relevant to
> any claim or defense in this case and not proportional to the needs of this case as
> no quote was issued and no product was sold to Plaintiff through the HII portal.
> Notwithstanding and without waiving this objection, HII will produce a designee
> regarding the search it conducted and that no information was located reflecting
> any quote issued or product sold to Plaintiff through HII's portal.
>
>     **a.** Explain and identify all policies, practices, or procedures
> concerning this phase of customer development;
>     **RESPONSE:** HII objects on the grounds that this phase is not relevant to
> any claim or defense in this case and not proportional to the needs of this case as
> no quote was issued and no product was sold to Plaintiff through the HII portal.
> Further, this topic is vague, ambiguous and does not describe with reasonable
> particularity the topic on which Plaintiff's seeks testimony. Notwithstanding and
> without waiving these objections, HII will produce an initial designee regarding
> (i) the search it conducted and that no information was located reflecting any
> quote issued or product sold to Plaintiff through HII's portal, and (ii) HII's
> general policy and practices with respect to this phase of the process during the
> time period relevant to the Second Amended Complaint (i.e., the 2018 time period
> during which Plaintiff allegedly received the calls at issue).
>
>     **b.** Explain all methods of how HAA provided information to HII
> during this phase;

25

**RESPONSE:** HII has no designee with information known or unreasonably known to the company on how such information was "conveyed to HAA." See Declaration of Bryan Krul (DE 168-2), par. 5 ("HII does not have a contract with Health Advisors of America, Inc. ("Health Advisors") or Rising Eagle Capital Group ("Rising Eagle") and Health Advisors and Rising Eagle are not permitted to make calls to sell insurance on behalf of HII, offer quotes on behalf of HII, or sell any product through the HII portal."). Further, HII objects on the grounds that this phase is not relevant to any claim or defense in this case and not proportional to the needs of this case as no quote was issued and no product was sold to Plaintiff through the HII portal. Further, this topic is vague, ambiguous and does not describe with reasonable particularity the topic on which Plaintiff's seeks testimony. Notwithstanding and without waiving these objections, HII will produce an initial designee regarding its general policy and practices with respect to how information or data is provided to HII during this phase during the time period relevant to the Second Amended Complaint (i.e., the 2018 time period during which Plaintiff allegedly received the calls at issue).

    **c.**    Explain what information HII received (we expect the answer might include some or all of the following: first name, last name, SSN, email address, physical address, height, weight, occupation, income, driver's license number, smoker status, plus information about who at HAA provided such information);

**RESPONSE:** Not applicable regarding HAA, and this phase is not relevant to any claim or defense in this case and not proportional to the needs of this case as no quote was issued and no product was sold to Plaintiff through the HII portal. Further, this topic is vague, ambiguous and does not describe with reasonable particularity the topic on which Plaintiff's seeks testimony. Notwithstanding and without waiving these objections, HII will produce an initial designee regarding: (i) the search it conducted and that no information was located reflecting any quote issued or product sold to Plaintiff through HII's portal; and (ii) HII's general policy and practices with respect to information or data used during this phase during the time period relevant to the Second Amended Complaint (i.e., the 2018 time period during which Plaintiff allegedly received the calls at issue).

    **d.**    Explain and identify the format of information gathered at this stage when received, and how it exists now;

**RESPONSE:** HII objects on the grounds that this phase is not relevant to any claim or defense in this case and not proportional to the needs of this case as no quote was issued and no product was sold to Plaintiff through the HII portal. Notwithstanding and without waiving these objections, HII will produce an initial designee regarding: (i) the search it conducted and that no information was located reflecting any quote issued or product sold to Plaintiff through HII's portal; and (ii) how information obtained during this phase is stored and maintained during the time period relevant to the Second Amended Complaint (i.e., the 2018 time period during which Plaintiff allegedly received the calls at

issue).

**e.**     Explain how such information may be queried, searched, retrieved and/or exported;

**RESPONSE:** HII objects on the grounds that this phase is not relevant to any claim or defense in this case and not proportional to the needs of this case as no quote was issued and no product was sold to Plaintiff through the HII portal. Notwithstanding and without waiving its objections, HII will produce a designee regarding this topic.

**f.**     Explain what HII did with information obtained through this phase of the process;

**RESPONSE:** HII will produce a designee regarding how HII maintains information provided to it during this phase.

**g.**     To the extent that any information or data concerning this phase of the process may not have been retained, or was lost, archived, deleted, is now unavailable, or otherwise used to exist but does not any more – including but not limited to arising from March 16, 2018 and September 20, 2018 – explain what happened to such.

**RESPONSE:** Not applicable; but see HII's response to topic 2(c), 2(d) and 2(h).

**h.**     Explain how data was collected during this phase, and what happened to collected data for consumers who began but did not complete this phase of the process;

**RESPONSE:** HII objects that this phase is not relevant to any claim or defense in this case and not proportional to the needs of this case as no quote was issued and no product was sold to Plaintiff through the HII portal. Notwithstanding and without waiving these objections, HII will produce an initial designee regarding how information obtained during this phase is collected, stored and maintained during the time period relevant to the Second Amended Complaint (i.e., the 2018 time period during which Plaintiff allegedly received the calls at issue).

**i.**     Explain how HII's application, pricing and quotation process worked;

**RESPONSE:** HII objects that this phase is not relevant to any claim or defense in this case and not proportional to the needs of this case as no quote was issued and no product was sold to Plaintiff through the HII portal. Notwithstanding and without waiving these objections, HII will produce an initial designee regarding: (i) the search it conducted and that no information was located reflecting any quote issued or product sold to Plaintiff through HII's portal; (ii) how the application and quotation process worked through HII's portal during the time period relevant to the Second Amended Complaint (i.e., the 2018 time period during which Plaintiff allegedly received the calls at issue); and (iii)

assuming that the reference to "pricing" concerns the price of quotes that are issued using HII's portal during the relevant time period, HII's understanding of how such prices are set and by whom.

       **j.**      Explain how quotations, applications and pricing were conveyed to HAA, and the consumer (e.g. via email or the Internet);

       **RESPONSE:** HII has no designee with information known or unreasonably known to the company on how such information was "conveyed to HAA." See Declaration of Bryan Krul (DE 168-2), par. 5 ("HII does not have a contract with Health Advisors of America, Inc. ("Health Advisors") or Rising Eagle Capital Group ("Rising Eagle") and Health Advisors and Rising Eagle are not permitted to make calls to sell insurance on behalf of HII, offer quotes on behalf of HII, or sell any product through the HII portal."). Further, HII objects on the grounds that this phase is not relevant to any claim or defense in this case and not proportional to the needs of this case as no quote was issued and no product was sold to Plaintiff through the HII portal. Notwithstanding and without waiving these objections, HII will produce an initial designee regarding: (i) the search it conducted and that no information was located reflecting any quote issued or product sold to Plaintiff through HII's portal; (ii) how the application and quotation process worked through HII's portal during the time period relevant to the Second Amended Complaint (i.e., the 2018 time period during which Plaintiff allegedly received the calls at issue); and (iii) assuming that the reference to "pricing" concerns the price of quotes that are issued using HII's portal during the relevant time period, HII's understanding of how such prices are set and by whom.

       **k.**      Explain what was supposed to happen next if the consumer/HAA completed this phase of the new customer process.

       **RESPONSE:** Not applicable regarding HAA. HII also objects on the grounds that this phase is not relevant to any claim or defense in this case and not proportional to the needs of this case as no quote was issued and no product was sold to Plaintiff through the HII portal. Notwithstanding and without waiving these objections, HII will produce an initial designee regarding how the application and quotation process worked through HII's portal during the time period relevant to the Second Amended Complaint (i.e., the 2018 time period during which Plaintiff allegedly received the calls at issue).

As with the initial phase of an HII lead generation call, Plaintiff necessarily needs

information on what happened at the second and final stage of the call, i.e., the "verification" or

"application" process—particularly because this is the part of the process in which HII first itself

makes contact with the call recipient by way of emailing the application materials. Dkt. 116,

SAC ¶ 55. It is expected that this information will not only provide a background in HII's lead

generation process, but also supply a means of establishing ascertainability and numerosity necessary to establish class certification, for example, by pairing the customer relationship management data in HII's system with the HAA lead generation call records already produced in discovery, to show which are attributable to HII and NCE (as opposed to some other seller).

Thus, Topic 2 seeks information on this phase, and similarly breaks down relevant information into discrete categories to better apprise HII of the matters for examination, including relevant information concerning applicable policies, practices, and procedures and how the process generally worked [2(a), 2(i), 2(k)], how and what information was transferred between HAA, HII, and the consumer with respect to this part of the process [2(b), 2(c), 2(d), 2(j)], how such data or information is collected, stored, or available for query, and the extent to which it has since become lost, archived or otherwise not readily available [2(e), 2(g), 2(h)],[14] and what HII did with respect to such information [2(f)]. Such sub-topics are thus highly relevant to the parties' claims and defenses, and to Plaintiff's ability to establish an ascertainable class of similarly-called individuals.

HII's objections to Topic 2 are not well-taken. Its non-specific assertions of vague, ambiguous, irrelevant, and "not proportional to the needs of the case" are undercut by the objectively limited scale of the matters for examination—which focus on a *single portion* of HII's process for quoting during telephone calls for a single source, broken down by even further limited categories of information. The applicable policies, practices, and procedures, ESI, and

---

[14]     Plaintiff notes that her counsel have been trying to get such basic information about the nature of HII's relevant ESI for months, but that its counsel refuse to provide it. This is information HII should have provided with its Rule 26(a)(1) disclosures or the parties Rule 26(f)-type discussions well before HII's discovery responses were due. *See* Fed. R. Civ. P. 26 Committee Notes, *Subdivision (f)* (2006 Am.) ("It may be important for the parties to discuss those systems, and accordingly important for counsel to become familiar with those systems before the conference. With that information, the parties can develop a discovery plan that takes into account the capabilities of their computer systems. In appropriate cases identification of, and early discovery from, individuals with special knowledge of a party's computer systems may be helpful.").

facts applicable to what happens during this "verification" process is thus necessarily limited. Where HII fails to identify any specific burden in addressing these limited topics on the very limited issue of what happens during its verification process with HAA, its objections should be overruled.

Further, as with its objections to Topic 1, HII provides objections to each Topic 2 sub-topic, asserts that it will produce a designee on a narrowed, unilaterally-revised version of the matter for examination Plaintiff noticed, but "without waiving" its objections—except for Topic 2(j), for which HII says it won't provide a designee. This again fails to inform Plaintiff whether a properly-prepared designee will, indeed, be presented on the topics she actually noticed. If HII intended to provide a designee on the topics Plaintiff noticed, then there would be no need to object and revise them. The parties specifically discussed this during their meet-and-confer discussions, and Plaintiff therefore understands, from HII's unwillingness to simply state that a designee will be provided, that these modifications are material.

And, again, HII's objections are meritless. As with its objections to Topic 1, HII's objection to providing a designee as to Topic 2 because "no quote was issued and no product was sold to Plaintiff through the HII portal" both 1) rests on a contested factual issue, because Plaintiff *was* provided a quote HAA obtained through HII's portal, *see, e.g.,* Dkt. 116, SAC ¶ 76, and 2) is a red herring, because although Plaintiff did proceed to, but not complete, the verification process, *see, e.g.,* Exhibit D, whether she completed it or was emailed a quote does not somehow detract from her standing to sue for the TCPA violations at issue, let alone the relevance of HII's knowledge and participation of the calls, application materials and other evidence that may be used to establish numerosity, ascertainability, and other class certification requirements under Fed. R. Civ. P. 23, and applicable ESI and evidence of such. *See, e.g., Golan*

*v. Veritas Entm't, LLC*, 788 F.3d 814, 821 (8th Cir. 2015) (reversing district court's dismissal of TCPA class action because named plaintiffs didn't personally hear all of the telemarketing call, finding that standing to sue under TCPA did indeed exist).

And, as with Topic 1, Plaintiff disagrees with HII's deflection that it can't testify with respect to HAA. It has affirmatively known about HAA for over a year, *see* Dkt. 116, SAC ¶ 7 n.2, and faced multiple lawsuits and even a government investigation from the FCC in relation to Rising Eagle and "its largest client" HAA. *See In re Spiller*, 2020 WL 3091143, ¶ 5 & n. 20, 63 (FCC June 10, 2020) (explaining that HAA "sold health insurance through Health Insurance Innovations, Inc." and noting that its co-owner, Zach Cox, entered into a financing arrangement with HII). To suggest that HII really has no clue who HAA is reflects either willful acquiescence to these ongoing TCPA violations (supporting vicarious liability based on ratification), or an extreme lack of diligence on the part of HII and its counsel in responding to discovery. Plaintiff respectfully submits that she is entitled to an answer, either way.

### 3. *HII should provide a deponent to provide information on relevant third parties.*

Plaintiff noticed Deposition Topic 6 in order to learn the identities and participation of any third parties involved in the HAA-related lead generation:

> **6.** Identify any and all third parties or vendors involved in the process of obtaining new customers or leads that derive(d) through HAA, explain what that third party or vendor did and whether that vendor may have information or data concerning prospective customers, including but not limited to people who did not complete the quote and/or application process.
>
> **RESPONSE:** HII objects on the grounds that this topic is vague and ambiguous (as to third parties or vendors "involved in the process of obtaining new customers or leads," "what the third party or vendor did" and whether a vendor "may have information"), overbroad, unduly burdensome, seeks irrelevant information, and is not proportional to the needs of the case.

Topic 6 will provide Plaintiff with the identities of third parties with relevant information

31

pertaining HAA-related lead generation for HII, including, for example, other telemarketers akin

to Rising Eagle, and vendors HII may have used to store or process data applicable to the leads

or sales arising from HAA—such as third parties applicable to data warehousing, customer

relationship management, customers, and intermediaries. Plaintiff anticipates that there will only

be a small number of additional third parties that had anything to do with HAA-related lead

generation, but because these entities are highly likely to have relevant, discoverable

information, they should be identified.

> ### 4. HII should provide a deponent to provide information pertaining to Plaintiff and the quotes she received through it.

Plaintiff noticed Deposition Topics 5 and 7-8 in order to learn what HII did (if anything)

to prevent further calls to her, and to identify what products or services were being sold that

matched a similar description to what she was solicited during the calling at issue:

> **5.** Explain what steps you or any third party of which you are aware took, if any, to prevent Ms. Bilek from receiving additional telephone calls from HAA or anyone else, after you learned about this case, and why.
>
> **RESPONSE:** HII objects on the grounds that this request is vague and ambiguous, overbroad, seeks irrelevant information, and is not proportional to the needs of the case.
>
> **7.** Identify all products or services available, or for which quotations or applications were provided, where all or part (i.e. broken down by product or service) of the premium was $143.09/month, on March 16, 2018.
>
> **RESPONSE:** No information exists for Plaintiff. Further, HII objects on the grounds that this topic is overbroad as it seeks "all products or services" beyond the specific product that Plaintiff alleges in the Second Amended Complaint, unduly burdensome, and not proportional to the needs of the case.
>
> **8.** Identify all products or services available, or for which quotations or applications were provided, where all or part of (i.e. broken down by product or service) was $294.13/month, on September 20, 2018.
>
> **RESPONSE:** No information exists for Plaintiff. Further, HII objects on the grounds that this topic is overbroad, unduly burdensome, and not proportional to the needs of the case.

Topics 5, 7, and 8 are narrowly tailored to Plaintiff Bilek, and seek discrete information

pertaining to what HII did specifically to Plaintiff (Topic 5), and proffer the quote pricing information Plaintiff received during the calls at issue in order to identify what products were included in the packages solicited to her (Topics 7-8). Topic 5's request for information on what HII did, if anything, to prevent further calls to Plaintiff is germane to its willfulness, supporting enhanced damages under 47 U.S.C. § 227(b)(3) and 47 U.S.C. § 227(c)(5). Likewise, if HII did nothing despite knowledge of this action, and instead allowed Plaintiff to continue to get called, then this supports its vicarious liability through ratification. Topics 7 and 8 are of immediate importance, too, because they will allow Plaintiff to rebut HII's argument that it didn't haven't anything to do with the calling at issue since it purportedly never offered an "NCE Premier" product referenced in the first recorded call to Plaintiff.[15] By identifying products (or bundles of products) offered on the days Plaintiff was called at the same price-point, Plaintiff can trace-back to identify the specific plans solicited, regardless of how HII names them internally. HII should readily know what products it sold; for example, it should have records of such from other sales around that same time. Consequently, these Topics should be compelled.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court enter an order (1) deeming HII's boilerplate and non-specific objections waived, (2) compelling HII to produce full and complete responses to Plaintiff's Interrogatory Nos. 1, 5-6, and 8 and Request for Production Nos. 2-4, 8-9, 12, 18-19, and 25-26, (3) compelling HII to produce Rule 30(b)(6) deponents properly prepared to provide full and complete testimony on Plaintiff's noticed deposition topics, and (4) granting such other and further relief the Court deems reasonable and just.

---

[15] Note, however, that the second recorded call Plaintiff received didn't have anything to do with NCE Premier; thus, Plaintiff still needs information on the plan that was offered, beyond the fact that it was part of the MultiPlan PPO network.

Dated: September 18, 2020

Respectfully submitted,

MARY BILEK, individually and on behalf of others similarly situated

By: _s/ Alexander H. Burke_

Alexander H. Burke
Daniel J. Marovitch
BURKE LAW OFFICES, LLC
909 Davis St., Suite 500
Evanston, IL 60201
Telephone: (312) 729-5288
aburke@burkelawllc.com
dmarovitch@burkelawllc.com

*Counsel for Plaintiff*


## FED. R. CIV. P. 37(A)(1)/L.R. 37.2 STATEMENT

The undersigned certifies that Plaintiff, through counsel, has in good faith conferred with Defendant in an effort to obtain the discovery requested herein without court action, but that such attempts were unsuccessful, including through meet-and-confer calls between myself and co-counsel Daniel J. Marovitch, and HII's counsel Timothy Hudson and Garry W. O'Donnell on September 10, 2020 and September 16, 2020, and through numerous e-mails.

_/s/ Alexander H. Burke_


## CERTIFICATE OF SERVICE

I hereby certify that, on September 18, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

_/s/ Alexander H. Burke_

34