## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| MARY BILEK, individually and on behalf of others similarly situated, | ) ) | Case No. 1:18-cv-03083 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NATIONAL CONGRESS OF EMPLOYERS, INC., et al., | ) ) | Hon. Judge Jorge L. Alonso Hon. Mag. Judge Jeffrey T. Gilbert |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

"These TCPA ██████████ are coming in like a snowstorm, except that while no two snowflakes are alike, all of these ████████ seem to be."

Email from Health Insurance Innovations Inc.'s
Vice President of Compliance, August 28, 2018
Ex. PP at Cmplts169.

## **TABLE OF CONTENTS**

**Page**

I.    BACKGROUND ..................................................................................................3

     A.    The TCPA and ATDA. ...........................................................................3

     B.    Plaintiff and the Class Members' Claims. ............................................3

II.    LEGAL STANDARD .......................................................................................18

III.    ARGUMENT ....................................................................................................19

     A.    All Rule 23(a) Requirements Are Satisfied. .......................................19

         1.    The Classes are sufficiently numerous. ...................................19

         2.    Common questions of law or fact exist....................................20

         3.    Plaintiff's claims are typical of those of the other Class members...........21

         4.    Plaintiff will adequately represent the Class.............................21

     B.    Rule 23(b)(2) Is Satisfied as to the Injunctive Class...............................22

         1.    Plaintiff Is Likely to Prevail.......................................................23

             i.    Plaintiff is likely to prevail on the merits of the Injunctive Class's claims. ...........................................24

             ii.    Plaintiff is likely to establish Defendants' vicarious liability for the calls to the Injunctive Class through actual authority. .......25

             iii.    Plaintiff is likely to establish Defendants' vicarious liability for the calls to the Injunctive Class through ratification...............28

         2.    Absent Injunctive Relief, Defendants Will Continue to Accept Business Derived from Illegal Telemarketing. ..........................................31

3. The Court Should Order a Nominal Bond or No Bond. ............................32

4. The Class Will Be Irreparably Harmed Absent an Injunction. .................33

5. Money Damages Are Not an Adequate Remedy. .....................................34

6. Money Damages Are Not an Adequate Remedy. .....................................34

7. A Preliminary Injunction Is in the Public Interest. ..................................35

C. Rule 23(b)(3) Is Satisfied, as to the Damages Class and IDNC Class..................35

1. Common questions of law or fact predominate. .......................................36

2. A class action is the superior means for resolving the Class' claims. .......39

IV. CONCLUSION...................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Amchem Products, Inc. v. Windsor,*
521 U.S. 591 (1997) .................................................................................. 21, 36

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds,*
133 S. Ct. 1184 (2013) ...................................................................................... 36

*Aranda v. Caribbean Cruise Line,*
179 F. Supp. 3d 817 (N.D.Ill. 2016) ................................................................. 25

*Bakov v. Consol. World Travel, Inc.,*
2019 WL 6699188 (N.D. Ill. Dec. 9, 2019) ...................................................... 26

*Birchmeier v. Caribbean Cruise Line, Inc.,*
302 F.R.D. 240 (N.D. Ill. 2014)......................................................................... 40

*Breda v. Cellco P'ship,*
934 F.3d 1 (1st Cir. 2019)................................................................................... 37

*Brown v. DirecTV, LLC,*
562 F.Supp.3d 590 (C.D.Cal. 2021).................................................................. 27

*Butler v. Sears, Roebuck & Co.,*
702 F.3d 359 (7th Cir. 2012).............................................................................. 36

*Butler v. Sears, Roebuck & Co.,*
727 F.3d 796 (7th Cir. 2013).............................................................................. 36

*Cadence Design Sys., Inc. v. Avant! Corp.,*
125 F.3d 824 (9th Cir. 1997).............................................................................. 34

*Caldera v. Am. Med. Collection Agency,*
320 F.R.D. 513 (C.D. Cal. 2017) ....................................................................... 39

*CFTC v. Oystacher,*
2016 WL 3693429 (N.D. Ill. July 12, 2016) ..................................................... 23

*Chapman v. Wagener Equities Inc.,*
747 F.3d 489 (7th Cir. 2014) ............................................................................. 19

*Coca-Cola Co. v. Purdy,*
382 F.3d 774 (8th Cir. 2004)............................................................................... 35

*D.U. v. Rhoades*,
   825 F.3d 331 (7th Cir. 2016) ................................................................... 24

*Deposit Guar. Nat. Bank v. Roper*,
   445 U.S. 326 (1980) ................................................................................ 40

*FTC v. Benefytt Technologies, Inc.*,
   No. 8:22-cv-01794 (M.D.Fla.) (Dkt. 15) ............................................... 11

*FTC v. Lifewatch Inc.*,
   176 F. Supp. 3d 757 (N.D. Ill. 2016) ..................................................... 32

*G.M. Sign, Inc. v. Finish Thompson, Inc.*,
   2009 WL 2581324 (N.D. Ill. Aug. 20, 2009) ......................................... 20

*Gomez v. St. Vincent Health, Inc.*,
   649 F.3d 583 (7th Cir. 2011) ................................................................... 21

*Green v. Serv. Master On Location Servs. Corp.*,
   2009 WL 1810769 (N.D. Ill. June 22, 2009) .......................................... 39

*Hatch v. Sunbelt Commc'ns & Mktg.*,
   282 F. Supp. 2d 976 (D. Minn. 2002) ..................................................... 23

*Hatch v. Sunbelt Commc'ns. & Mktg.*,
   282 F.Supp.2d 976 (D. Minn. 2002) ....................................................... 34

*Heather K. v. City of Mallard*,
   887 F. Supp. 1249 (N.D. Iowa 1995) ...................................................... 35

*Henderson v. United Student Aid Funds, Inc.*,
   918 F.3d 1068 (9th Cir. 2019) ................................................................. 29

*Holmes v. Godinez*,
   311 F.R.D. 177 (N.D. Ill. 2015) .............................................................. 19

*In re Visa Check/MasterMoney Antitrust Litig.*,
   280 F.3d 124 (2d Cir. 2001) .................................................................... 40

*Iowa Utilities Bd. v. FCC*,
   109 F.3d 418 (8th Cir. 1996) ................................................................... 33

*Ira Holtzman, C.P.A., & Assocs. v. Turza*,
   728 F.3d 682 (7th Cir. 2013) ............................................................ 18, 20

*J2 Glob. Commc'ns, Inc. v. Blue Jay Inc.*,
   2009 WL 4572726 (N.D. Cal. Dec. 1, 2009) ......................................... 23

*Keim v. ADF MidAtlantic, LLC*,

328 F.R.D. 668 (S.D. Fla. 2018) ........................................................................ 40

*Krakauer v. Dish Network, L.L.C.*,
925 F.3d 643, 658 (4th Cir. 2019) ............................................................. 36, 37

*Life Spine, Inc. v. Aegis Spine, Inc.*,
8 F.4th 531 (7th Cir. 2021) ................................................................................ 23

*Lineback v. Spurlino Materials, LLC*,
546 F.3d 491 (7th Cir. 2008) ............................................................................. 35

*Lynn v. Monarch Recovery Mgmt., Inc.*,
2013 WL 1247815 (D. Md. Mar. 25, 2013) ...................................................... 23

*Meyer v. Portfolio Recovery Assocs., LLC*,
707 F.3d 1036 (9th Cir. 2012) ..................................................................... 23, 33

*Mims v. Arrow Fin. Servs., LLC*,
132 S. Ct. 740 (2012) ........................................................................................... 3

*Mullins v. Direct Digital, LLC*,
795 F.3d 654 (7th Cir. 2015) ............................................................................. 40

*Nolan v. Reliant Equity Inv'rs, LLC*,
2009 WL 2461008 (N.D. W. Va. Aug. 10, 2009) ............................................. 39

*Northshore Univ. HealthSystem*,
669 F.3d 802 (7th Cir. 2012) ............................................................................. 18

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Allied Van Lines, Inc.*,
231 F.R.D. 280 (N.D. Ill. 2005) ........................................................................ 21

Rest. (3d) of Agency § 3.15 ............................................................................... 26

*Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Engineers*,
826 F.3d 1030 (8th Cir. 2016) ........................................................................... 32

*Sandusky Wellness Ctr., LLC v. Wagner Wellness, Inc.*,
2014 WL 6750690 (N.D. Ohio Dec. 1, 2014) ................................................... 39

*Siding & Insulation Co. v. Beachwood Hair Clinic, Inc.*,
279 F.R.D. 442 (N.D. Ohio 2012) ..................................................................... 39

*Snyder v. Ocwen Loan Servicing, LLC*,
258 F. Supp. 3d 893 (N.D. Ill. 2017) ........................................................... 19, 21

*Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.*,
376 F.3d 664 (7th Cir. 2004) ............................................................................. 29

*Spiegel v. Carlson*,
  2016 WL 5477529 (N.D.Ill. Sept. 29, 2016) ........................................................... 8

*Toney v. Quality Res., Inc.*,
  323 F.R.D. 567 (N.D. Ill. 2018) ............................................................................ 38

*Turnell v. CentiMark Corp.*,
  796 F.3d 656 (7th Cir. 2015) ................................................................................ 35

*U.S. v. Bethlehem Steel Corp.*,
  38 F.3d 862 (7th Cir. 1994) .................................................................................. 35

*U.S. v. Davison*,
  691 F. Supp. 2d 1033 (W.D. Mo. 2009) ................................................................ 24

*U.S. v. Dish Network, L.L.C.*,
  2016 WL 29244 (C.D. Ill. Jan. 4, 2016) ................................................................ 24

*United States v. Davison*,
  691 F. Supp. 2d 1033 (W.D. Mo. 2009) ................................................................ 32

*United States v. Dish Network, LLC*,
  954 F.3d 970 (7th Cir. 2020) ........................................................................... 3, 26

*United States v. Stover*,
  650 F.3d 1099 (8th Cir. 2011) .............................................................................. 23

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ............................................................................................. 36

## Statutes

47 U.S.C. § 227(b)(1)(A)(iii) ........................................................................... 1, 3, 37

47 U.S.C. § 227(b)(3) .......................................................................................... 38

47 U.S.C. § 227(c)(5) .................................................................................. 23, 34, 38

815 ILCS 305/1 ................................................................................................. 1, 3

PL 102-243, 105 Stat. 2394 (Dec. 20, 1991) .......................................................... 34

## Other Authorities

*In re Spiller*, *Forfeiture Order*,
  36 FCC Rcd. 6225, 2021 WL 1056077 (Mar. 18, 2021) ................................... 1, 4, 5

*In re Spiller, Notice of Apparent Liability*,

35 FCC Rcd. 5948, 2020 WL 3091143 (June 10, 2020).......................................................... 1

*In re TCPA*,
    18 FCC Rcd. 14014 (2003) ...................................................................................... 20

*In re TCPA*,
    20 FCC Rcd. 13664 (2005) ........................................................................................ 3

*In re TCPA*,
    23 FCC Rcd. 559 (2008) ......................................................................................... 35

Rest. (3d) Agency § 1.01 ................................................................................................ 25

Rest. (3d) of Agency § 4.01 ........................................................................................... 29

Rest. (3d) of Agency § 7.04 ........................................................................................... 28

S. Rep. 102-178, 1, 1991 U.S.C.C.A.N. 1968, 1969 (Oct. 8, 1991)............................. 34

## Rules

Fed.R.Civ.P.  23(b)(2)................................................................................................... 22

Fed.R.Civ.P. 23(b)(3).................................................................................................... 35

Fed.R.Civ.P. 65(c) ........................................................................................................ 32

## Regulations

47 C.F.R. § 64.1200(a)(2) ............................................................................................... 3

47 C.F.R. § 64.1200(d) .......................................................................................... passim

47 C.F.R. § 64.1200(d)(1)....................................................................................... 18, 38

47 C.F.R. § 64.1200(d)(2)............................................................................................. 38

47 C.F.R. § 64.1200(d)(3)............................................................................................. 38

Aimed at controlling the "scourge of modern civilization" the Telephone Consumer Protection Act prohibits prerecorded-voice telemarketing calls to cell phones, 47 U.S.C. § 227(b)(1)(A)(iii), and telemarketing to consumers who have requested not to receive calls, known as the "internal" do-not-call ("IDNC") rules, 47 C.F.R. § 64.1200(d). The Illinois Automatic Telephone Dialers Act, 815 ILCS 305/1 *et seq.*, similarly protects against nonconsensual robocalls and impeding caller ID, also known as "spoofing."[1]

This case challenges Defendants' improper telemarketing conduct and practices, including prerecorded message "robocalls" nonparty Rising Eagle made on their behalf that resulted in the largest forfeiture ever assessed in FCC history: $225,000,000. *In re Spiller*, *Forfeiture Order*, 36 FCC Rcd. 6225, 6226, 2021 WL 1056077, at *1, 3 (Mar. 18, 2021) ("*Spiller II*"). FCC Commissioner Ajit Pai explained the scheme this way:

> Rising Eagle—John C. Spiller and Jakob A. Mears made approximately one billion spoofed robocalls—yes, that's billion with a "b"—in the first four-and-a-half months of 2019 with the intent to defraud, cause harm, and wrongfully obtain something of value, in apparent violation of the Truth in Caller ID Act.

> Like other nefarious robocalling scams, Rising Eagle primarily used spoofed Caller ID numbers to flood consumers with prerecorded calls. The robocalls misled consumers into thinking that the calls were from well-known and reputable health insurance providers, such as Cigna and Blue Cross Blue Shield. But that was far from the truth. Instead, the unsuspecting recipients of these robocalls were transferred to Rising Eagle's clients, which attempted to sell them short-term, limited-duration health insurance plans offered by lesser known entities—a far cry from expectations.

*In re Spiller, Notice of Apparent Liability*, 35 FCC Rcd. 5948, 5976, 2020 WL 3091143, at *20-21 (June 10, 2020) ("*Spiller I*"). Defendant HII and its clients like co-defendants NCE, NBBI, and AccessOne are the "lesser known entities" for these illegal robocalls were chiefly made:

> Neither Cigna nor Blue Cross Blue Shield authorized Rising Eagle's largest client, Health Advisors, to sell their products. Instead, Health Advisors sold health

---

[1] "Spoofing is when a caller deliberately falsifies the information transmitted to your caller ID display to disguise their identity." https://www.fcc.gov/spoofing.

1

insurance through Health Insurance Innovations, Inc. (HII), an online distributor of short-term, limited-duration health plans.

*Spiller II*, 2021 WL 1056077 at fn. 98 (internal citations omitted). Michael Smith, president of Health Advisors ("HAA"), testified that the primary purpose and intent of each Rising Eagle call was to sell HII products and services. Ex. L, HAA/Smith Dep. at 72:6:22, 97:22-99:6.

This case seeks to hold HII and its co-defendants – the beneficiaries of Rising Eagle's and other vendors' nonconsensual, spoofed, robocalls – liable for calls made on their behalf, and to obtain forward-facing injunctive relief. Plaintiff seeks certification of the following classes under Fed.R.Civ.P. 23(b)(3):

> **Damages Class:** All cellular telephone subscribers whose cell phone numbers Rising Eagle called to encourage the purchase of any property, goods, or services, and played a message to "press 1" to speak with an agent, where the call was transferred to HAA using DIDs (321) 261-0979 or (979) 201-5297, between July 28, 2017 and April 30, 2019, where the area code called was in a state in which HII had authorized an HAA-affiliated agent to sell, such as Illinois and Florida. The Court and Court staff and the attorneys of record in this action are excluded from this definition.

> > **Illinois Subclass:** All Damages Class members who resided in Illinois at the time of such calls.

> **IDNC Class:** All residential subscribers who received more than one Rising Eagle robocall within 12 months of requesting – either directly to HII, NCE, NBBI or AccessOne or through a person engaged in developing business for them such as HAA – no more calls.

Illinois-specific samples identified at least 23,764 people in the Damages Class, and at least 134 people in the IDNC Class. Plaintiff also seeks certification of an injunctive relief class under Fed.R.Civ.P. 23(b)(2), as follows:

> **Injunctive Class:** All residential telephone subscribers in the United States who requested – either directly to HII, NCE, NBBI, or AccessOne or through a person engaged in developing business for them such as HAA – not to receive telemarketing calls.

Ms. Bilek also requests that she be appointed class representative, that Burke Law Offices, LLC

be appointed as class counsel, that the Court appropriate direct notice, and that the Court grant such other and further relief it deems reasonable and just.

## I.  BACKGROUND

### A.  The TCPA and ATDA.

The Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, was enacted in response to widespread public outrage over the proliferation of intrusive, nuisance calling practices. *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 745 (2012). To that end, the statute broadly bans making any call using an automatic telephone dialing system or an artificial or prerecorded voice to a cell number without "prior express consent." 47 U.S.C. § 227(b)(1)(A)(iii). In the case of telemarketing calls, "prior express *written* consent" is required. 47 C.F.R. § 64.1200(a)(2). The Illinois Automatic Telephone Dialers Act ("ATDA"), 815 ILCS 305/1 *et seq.*, similarly prohibits nonconsensual, prerecorded-voice calls made using an autodialer, as well as interference with caller identification. 815 ILCS 305/15(d), 30(a)-(b).

The TCPA's internal do-not-call ("IDNC") rules prohibit any telemarketing without first instituting procedures with certain minimum standards, such as having a written policy available "upon demand," training personnel, maintaining a do-not-call list, honoring requests not to be called, and providing adequate identification. 47 C.F.R. § 64.1200(d). There is no "consent" defense or safe harbor for IDNC claims; the violation is making calls without proper policies and procedures. *Simmons v. Charter Commc'ns., Inc.*, 222 F.Supp. 3d 121, 131 (D. Conn. March 30, 2016). IDNC lists must be coordinated among the seller and all those telemarketing on its behalf, *In re TCPA*, 20 FCC Rcd. 13664, 13668 ¶ 7 (2005), so that one IDNC request stops all calls by or on behalf of the entity. *United States v. Dish Network, LLC*, 954 F.3d 970, 976 (7th Cir. 2020).

### B.  Plaintiff and the Class Members' Claims.

3

Mary Bilek is an Illinois resident who, among millions of other American consumers, received dozens of unsolicited health insurance telemarketing robocalls on her cell phone that played the following prerecorded message (hereinafter, "robocall") like the following:

> ... limited health enrollment period for a few weeks, so you and your family can get a great insurance plan at the price you can afford. And we make it hassle-free to sign up. We have pre-approvals already in your area, including Cigna, Blue Cross, Aetna, United, and many more. Press "1" to get a hassle-free assessment, or press "2" to be placed on our do-not-call list. Thanks for your time, and be healthy and blessed. [Ex. A, Bilek Dep. at 16:1-9, 41:2-18, 46:4-8, 79:16-80:1, 119:24-121:10, 158:19-160:14; Ex. B, Bilek Decl. ¶¶ 2-6; Ex. C (screenshot/recording list).]

These calls persisted after Plaintiff pressed "2," and when she asked who the call was for and to "please stop scamming me" during a later call for which she pressed "1" on March 13, 2018, the HAA representative told her to "shut the f*ck up," using a slur. Ex. A, Bilek Dep. at 164:21-165:3, 166:13-20, 172:16-24, 179:18-180:19; Ex. B, Bilek Decl. ¶ 3; Ex. D. Plaintiff pressed "1" again on at least two later robocalls – for a total of three – that were similarly transferred to HAA, one of which occurred six months after this suit was filed. Ex. A, Bilek Dep. at 165:4-6; *e.g.,* Ex. E-G.[2] HII still engages in telemarketing. Ex. H, HII/Gillis Dep. at 112:7-113:5.

Nonparty robodialing vendor Rising Eagle Capital Group, Inc. ("Rising Eagle") and its president John Spiller made these robocalls to Plaintiff and millions of other American consumers from 2017 through 2019. *Forfeiture Order, In re Spiller*, 36 FCC Rcd. 6225, 6227-228 ¶ 6 (2021).[3] It did so using a dialer programmed to sequentially access uploaded lists of stored phone numbers and automatically connect the corresponding phone with its recorded message. Ex. I, Spiller Dep. at 19:1-8, 23:11-27:15. Rising Eagle manipulated its dialer's anti-spoofing functionality to display

---

[2] Rising Eagle's records for the original robocalls are unavailable, so this suit concerns those calls where the recipient pressed "1" and the call was transferred to HAA.

[3] Ex. A, Bilek Dep. at 158:19-160:14; Ex. G (Plaintiff-specific Rising Eagle call transfers to HAA); Ex. I, Spiller Dep. at 24:24-25:2, 45:6-16 (Rising Eagle called lead lists of millions of numbers 3-5 times a day; started with HAA in 2017-2019), 46:9-11 (all calls were "press 1" robocalls); Ex. J, Spiller Decl. ¶ 3.

an unassigned number as the caller ID, taken from a list of 350 million, such that Plaintiff and others who called back heard a busy signal or error notification. Ex. I, Spiller Dep. at 54:2-55:2, 57:4-58:5; 44:7-13, 273:13-275:4; Ex. K, TX Spiller Dep. at 33:16-20, 35:14-20, 37:17-24.[4] Ex. A, Bilek Dep. at 140:6-13. No written consent existed for the calls.[5] Ex. H, HII/Gillis Dep. at 209:25-210:2; Ex. K, TX Spiller Dep. at 207:8-14; Ex. L, HAA/Smith Dep. at 81:1-82:6; Ex. B, Bilek Decl. ¶ 3.

Rising Eagle's calls were designed to mislead the recipient by referencing Blue Cross and other well-known brands as a ruse to solicit less-comprehensive, short-term plans over HII's platform, including its co-defendants' ancillary products.[6] *Forfeiture Order*, 36 FCC Rcd. at 6235 ¶ 22 & n.98; Ex. J, Spiller Decl. ¶¶ 3-6; Ex. L, HAA/Smith Dep. at 72:6-22, 99:2-6. When call recipients pressed "1," calls were routed to representatives and insurance agents working out of a call center run by "Health Advisors of America, Inc." ("HAA"), Ex. I, Spiller Dep. at 12:23-13:13, 16:19-17:18, 46:5-8; Ex. L, HAA/Smith Dep. at 21:5-24:3. However, HAA, its telemarketers, and agents did not regularly use that name; instead they used loose, untraceable monikers like "Enrollment Center" during calls, and HII referred to HAA using numerous aliases such as Great Health Plans or simply as Scott Shapiro's shop.[7] Ex. H, HII/Gillis Dep. at 222:10-223:5. HII

---

[4]     According to the FCC, some of the supposedly unassigned numbers Rising Eagle used as caller IDs were actually assigned to innocent third parties, who were thereafter hounded with callbacks from angry call recipients *See also Forfeiture Order*, 36 FCC Rcd. at 6241-242 ¶¶ 32-33.

[5]     Rising Eagle also stopped scrubbing call lists against the National Do Not Call Registry because it found numbers on the Registry more readily answered. *Forfeiture Order*, 36 FCC Rcd. at 6257 ¶ 61.

[6]     Ex. I, Spiller Dep. at 16:22-17:17 (sharpshooting that "I never said that they had insurance, per se, that was … Blue Cross Blue Shield. I said 'like' in the message."); Ex. M, Brady Dep. at 42:2-5 ("HII sells or sold … short-term medical … and … ancillary plans"); *FTC v. Benefytt Techs., Inc.*, No. 8:22-cv-01794 (M.D.Fla.) (Dkt. 1, Compl. ¶¶ 46-60, available at https://ecf.flmd.uscourts.gov/doc1/047024636080).

[7]     HAA was Rising Eagle's first and primary client; indeed, Rising Eagle first started making its calls after being approached by HAA in around late 2016 or early 2017, for purposes of sending it live insurance lead transfers. Ex. I, Spiller Dep. at 11:21-12:2. HAA approved the prerecorded message that played during the calls, paid for Rising Eagle's servers, and send Rising Eagle the lists of leads it called. Ex. I, Spiller Dep. at 16:4-9, 22:1-25, 53:16-23. HAA sent Rising Eagle instructions multiple times a day on how to conduct its calling operations. Ex. K, TX Spiller Dep. at 293:18-294:5. And even for the roughly 5-10% of

contracted with the insurance agents working out of HAA's call center to generate sales of its and its co-defendants' products and services. Ex. L, HAA/Smith Dep. at 15:22-16:3.

HII knew agents received telemarketing calls through HAA: HAA administrator Marsha Griffin and lead generation "consultant" Scott Shapiro were HII's primary contacts with HAA's agents when it came to telemarketing, and HII understood that they were the ones in charge of the agents' operations. Ex. O at HII112912 ("███████████████████████████████████████

█████████████████ [.]").[8] Sean Duffie was the insurance agent for some (or all) of the calls Bilek received. Ex. B, Bilek Decl. ¶ 4; Ex. N. Because Shapiro couldn't himself write policies after several Departments of Insurance refused to license him due to a "Demonstrated Lack Of Fitness Or Trustworthiness,"[9] HII paid for his lead generation services under-the-table through "overrides," which were overpayments to HAA insurance agents with the excess earmarked for Shapiro. Ex. R (HII001981 and select attachments); Ex. H, HII/Gillis Dep. at 152:3-160:10, 235:17-237:2. HII also paid for HAA's TCPA "compliance" efforts, which were limited to scrubbing its call lists to avoid calling consumers who were frequent litigators, rather than actual compliance. Ex. S (contract "covered by HII"); Ex. T (HII077020); Ex. U at ACTPRO_000232;

---

Rising Eagle's calls that weren't for HAA, many were still for *other* HII agents, like the agencies of Matt Herman (HAA's upline) and Matt Panzer (a Herman downline). Ex. K, TX Spiller Dep. at 299:21-300:20; Ex. N at HII004042 (Health Benefit Group Site Visit Report).

[8]     *See also* Ex. L, HAA/Smith Dep. at 106:5-107:17 (explaining that HAA's call center agents knew better than to overstep HAA's authority as to the relationship with HII, as they were "in HAA's office using their toolage, their marketing, their everything, … [p]retty much plug and play"). Griffin, for example, coordinated HAA agents' licensing and contracting/onboarding with HII, and both she and Shapiro were HII's primary contacts for HII's site visits to HAA's call center (e.g., Ex. N), TCPA issues like do-not-call requests, handling consumer TCPA complaints and investigations, and performance improvement plans in relation to HAA affiliated agents. Ex. P, Griffin Dep. at 9:20-10:2, 12:2-13, 13:11-14:13, 18:11-18; Ex. N (site visit reports citing Shapiro); Ex. M, Brady Dep. at 266:19-267:5.

[9]     HII knew that its other HAA contact, Marsha Griffin, wasn't trustworthy, either: In fact, HII previously terminated Marsha Griffin as an agent and threatened to sue her in 2017, after catching her making unsolicited cold calls to try to flip existing customers, Ex. Q (group exhibit encompassing HII007273-276 and HII103161). This was the person HII deemed fit to handle TCPA compliance for its agents. Ex. M, Brady Dep. at 266:2-267:5.

Ex. V, ActiveProspect/Chickman Dep. at 18:8-11, 20:5-21:6; 31:6-15, 41:20-42:5, 51:14-21.

After calls were transferred from Rising Eagle, HAA representatives and agents attempted to sell HII and the other Defendants' products and services. Ex. L, HAA/Smith Dep. at 15:22-16:3, 17:12-18:21, 21:5-23, 27:10-28:13, 63:24-64:6; Ex. I, Spiller Dep. at 15:18-17:23. HAA agents remained logged into HII's online platform, and entered information provided by the call recipient into HII's portal to generate a quote. Ex. L, HAA/Smith Dep. at 31:14-32:4, 76:13-77:2.[10] HII products and services were always pitched first; non-HII plans were only offered if no products were available through HII for the consumer's state or if the consumer wasn't interested in the available HII products. Ex. L, HAA/Smith Dep. at 72:6-22, 99:5-6. When a consumer agreed to make a purchase, the agent submitted their information through HII's online platform, and HII then emailed the consumer a link to an online application. Ex. L, HAA/Smith Dep. at 31:20-33:9; Ex. W, Duffie Dep. at 22:2-23:18. The agent then transferred the consumer to an HAA "verifier" who assisted the consumer in submitting the electronic application to HII in real time—using a script provided by HII and approved by its applicable clients. Ex. L, HAA/Smith Dep. at 33:13-36:13.[11] HII then sent an email to the call recipient to confirm receipt. Ex. L, HAA/Smith Dep. at 33:23-34:3. HII prohibited telemarketers like HAA from mentioning HII's name until *after* the

---

[10]     For example, after providing basic information like state and ZIP code to an HAA representative with whom Plaintiff was connected after pressing "1" in response to a Rising Eagle robocall to her cell phone on March 16, 2018, Plaintiff received a $143.09/month quote for a group insurance NCE plan covering health, dental, and vision, plus $275,000 in life insurance coverage. Ex. D (transcript); Ex. A, Bilek Dep. at 59-60. During another prerecorded call Rising Eagle made to her cell phone on September 20, 2018 (after Plaintiff filed this lawsuit), the HAA representative who was connected after Plaintiff pressed "1" quoted her for a $294.13/month policy on the MultiPlan network. Ex. E (transcript). Both of these calls were made for the purpose of encouraging the sale of Defendants' products and services. Ex. L, HAA/Smith Dep. at 72 ("The only way we didn't sell HII in an HII state is if the customer didn't want it ... or if they already were insured by them."), 102 ("[W]e never sold NCE as their own entity separate. It was always through HII."), 130 (confirming that "HII used MultiPlan").

[11]     *See also* Ex. X at NBBI667-671 (████████████████████████████████████ ████████████████); Ex. Y, NBBI/Marszalowicz Dep. at 196:9-21; Ex. Z, AccessOne/Moore Dep. at 40:11-18.

potential customer agreed to purchase an HII plan. Ex. L, HAA/Smith Dep. at 71:5-72:22.

HAA used direct inward dial ("DID") phone numbers[12] to track the source of lead transfers; for example, call transfers HAA received via (321) 261-0979 and (979) 201-5297 were specific to Rising Eagle, and any transfer HAA received from those DIDs originated with the "press 1" prerecorded message that Plaintiff received. Ex. L, HAA/Smith Dep. at 21:17-20; Ex. I, Spiller Decl. ¶ 4. HAA's call center solutions vendor, Fextel, kept track of the data for these transferred calls, and produced HAA's DID log records that show them. Ex. AA, Fextel Decl. ¶ 4; Ex. G (DID data for Plaintiff). HAA's DID logs show that Rising Eagle transferred 5,755,107 calls with 3,059,787 unique phone numbers to HAA for solicitation purposes between July 28, 2017 and April 30, 2019, using the same Rising Eagle-specific (321) 261-0979 and (979) 201-5297 DIDs used in calls with Plaintiff Bilek—each for the purpose of soliciting HII and its clients like NCE. Ex. BB, Verkhovskaya Rep. ¶ 54; Ex. L, HAA/Smith Dep. at 72:15-24, 97:22-99:6.

Each of these 5,755,107 call transfers originated with a similar, unsolicited prerecorded message, and the purpose of each of those calls – pursuant to HAA's directive (implemented at HII's behest) – was to try to sell HII products and services, first. Ex. I, Spiller Decl. ¶ 3; Ex. I, Spiller Dep. at 39:20-22; Ex. L, HAA/Smith Dep. 71:5-72:22, 99:5-6. None of Rising Eagle's calls identified any Defendant as part of the prerecorded message, but they did identify insurance companies not sold through HII, like Blue Cross, Ex. I, Spiller Decl. ¶ 3; Ex. M, Brady Dep. at 119:11-14, and displayed a random caller ID taken from a list of 350 million unassigned numbers. Ex. I, Spiller Dep. at 57:4 -58:5; 44:7-13; Ex. K, TX Spiller Dep. at 33:16-20, 35:14-20.

Many of these 5,755,107 robocalls were made to Illinois-area code cell numbers, and most

---

[12]     "[A] a DID ('direct inward dial') or access number, is a telephone number that lacks a directly associated telephone line. Virtual numbers can be programmed to forward phone calls (that come into that phone number) to different pre-set telephone numbers chosen by the client." *Spiegel v. Carlson*, 2016 WL 5477529, at n. 3 (N.D.Ill. Sept. 29, 2016).

of those had Illinois billing addresses at the time of the calls. We know this because Plaintiff took a 77,610-call sample of these Rising Eagle call transfers from DIDs (321) 261-0979 and (979) 201-5297 (limited to 49,128 unique Illinois area code phone numbers), and subpoenaed the major cellular carriers for corresponding historical customer information. Ex. 1, Burke Decl. ¶ 16. AT&T returned subscriber/user name, address, and other contact information for 11,424 cell numbers. *Id.*; Ex. CC, AT&T Decl. ¶¶ 3-5 & Appended Data Sample. Verizon returned similar data for 21,511 calls with 12,394 unique cell numbers. Ex. 1, Burke Decl. ¶ 16; Ex. DD, Verizon Decl. ¶¶ 3-6 & Appended Data Sample.[13] While underinclusive,[14] this proof of concept demonstrates that there were at least **40,571** calls to **23,764** unique cell numbers initiated by Rising Eagle using the same equipment, that played the same "Blue Cross" prerecorded message, that were transferred to HAA on DIDs via (321) 261-0979 and (979) 201-5297, that were made for the purpose of selling HII products and services, corresponding to the Damages Class. Ex. 1, Burke Decl. ¶ 16.

Defendant National Congress of Employers, Inc. ("NCE") used HII to generate memberships and sales of NCE-branded products. Ex. FF, NCE/Sabatella Dep. at 12:11-13:3; Ex. GG (contracts). NCE is a one-employee company that re-sells Defendant National Benefit Builders, Inc. ("NBBI") discount plan products and services. Ex. FF, NCE/Sabatella Dep. at 11:17-23, 33:10-24; Ex. HH p. 1 (NCE-NBBI Agreement). NBBI, in turn, is a reseller of healthcare

---

[13]     Deduplicated, AT&T's and Verizon's subpoena responses reflect subscriber and user information for 23,764 unique cellular telephone numbers that Rising Eagle robocalled and transferred to HAA for purposes of selling HII's co-defendants' discount medical plans and other products over HII's platform, plus Plaintiff. Ex. 1, Burke Decl. ¶ 16; Exs. CC-DD (appending carrier data samples); Exs. C-G.

[14]     This is not the *total* number of class members for the Damages Class; it (a) reflects calls to Illinois area codes, only, and (b) reflects "hits" on AT&T's and Verizon's systems, only. Other carriers can provide similar data, e.g., Ex. EE, T-Mobile Decl. ¶ 11, and other, commercially available reverse-lookup services are also available to identify the subscribers of cell numbers, which may be used in order to provide notice and to pay any judgment. Ex. BB, Verkhovskaya Decl. ¶ 59. The number will thus rise significantly when (a) all states in which HAA was selling HII products are added, for example Florida, and (b) it is determined which of the remaining phone numbers were cellular at the time of such calls.

discount plans of AccessOne Consumer Health, Inc. ("AccessOne")—including those resold through NCE. Ex. Z, AccessOne/Moore Dep. at 27:2-13; Ex. II at p. 1 (AccessOne-NBBI Agreements). NCE (and thus also NBBI and AccessOne) was pitched during many of the calls where HII was intended to be sold; indeed, HAA only sold NCE through HII. Ex. L, HAA/Smith Dep. at 121:1-4. HII produced daily quote data for HAA-related agents demonstrating that HII's co-defendants' products were prolifically sold. Ex. JJ (example HII daily quote data, showing numerous quotes for ConsoliCare, Vital AD&D, Health Choice +, and other plans in which NCE was bundled, *see* Ex. KK, HII111416);[15] *compare* Ex. MM (HII001944, listing similar products sold by HAA Duffie agency in "Sold Member Details" tab), *with* Ex. LL (plan brochures showing NCE and NBBI are sold as bundles with. E.g., ConsoliCare, Vital AD&D, Health Choice +).

Defendants had substantial control over their downlines, including the right to audit, provide instructions, and terminate. Ex. OO at HII000019-21, 28 (HII agent examples for Duffie and subagent); Ex. GG at HII00106-114/176-183 ¶¶ 3, 5, 13, 15, HII00120-121/189-190 ¶ A.6(d), A.8, B.2, and HII000139-145 ¶¶ 1-4, 5.c, 12, 14 (NCE-HII Agreements), Ex. HH ¶¶ III, IV(A), VI(B), VII(A), IX, XIV (NCE-NBBI agreement); Ex. II ¶¶ 2, 10, 15-16 & Ex. B ¶¶ 2, 4, 7 (NBBI-AccessOne agreement); Ex. FF, NCE/Sabatella Dep. at 56:7-23, 57:2-19, 58:8-62:19, 73:9-10, 95:19-96:4, 102:18-105:17, 105:5-12; Ex. X at NBBI667-671 (example); Ex. Y, NBBI/Marszalowicz Dep. at 196:9-21; Ex. Z, AccessOne/Moore Dep. at 40:11-18.

Neither HII, HAA, Rising Eagle, NCE, NBBI, nor AccessOne had a written do-not-call policy "available upon demand" during the class period as the TCPA requires, 47 C.F.R. §

---

[15]    For example, the daily quote data at Ex. JJ reflects that HII issued a quote to a female consumer in Plaintiff's ZIP code, with the age she provided, for its "Health Choice +" product through HAA agent Sean Duffie on September 20, 2018, which is under the same "MultiPlan" network the HAA agent identified for Plaintiff during the quote she similarly received on that date. Ex. F (call transcript/recording); *e.g.*, Ex. LL at HII001601 (HII "Health Choice +" brochure, also identifying NBBI at bottom footnote of HII001602).

64.1200(d)(1). Ex. H, HII/Gillis Dep. at 127:11-132:10; Ex. I, Spiller Decl. ¶ 5;[16] Ex. L, HAA/Smith Dep. at 48:15-17; Ex. W, Duffie Dep. at 41:3-13; Ex. P, Griffin Dep. at 23:5-24:14; Ex. FF, NCE/Sabatella Dep. at 50:17-51:22; Ex. Y, NBBI/Marszalowicz Dep. at 69:2-4 (███); Ex. Z, AccessOne/Moore Dep. at 52:12-14 (███). Neither NCE, NBBI, nor AccessOne has ███. Ex. FF, NCE/Sabatella Dep. at 52:18-21; Ex. Y, NBBI/Marszalowicz Dep. at 68:13-15; Ex. Z, AccessOne/Moore Dep. at 52:15-16.

Neither HII nor its co-defendants coordinated internal do-not-call lists among their various telemarketers. Ex. L, HAA/Smith Dep. at 45:4-6, 47:16-48:2; Ex. H, HII/Gillis Dep. at 66:8-16, 69:22-72:22. Defendants also failed to properly train their agents as to internal do-not-call: Neither NCE, NBBI, nor AccessOne ███. Ex. FF, NCE/Sabatella Dep. at 51:23-52:4; Ex. Y, NBBI/Marszalowicz Dep. at 111:24-7; Ex. Z, AccessOne/Moore Dep. at 106:13-107:12. HII had no written training that explained to its employees or its agents how to use its IDNC list. Ex. H, HII/Gillis Dep. at 68:11-19, 72:4-22. HII never provided any internal do-not-call training to HII employee Amy Brady, even though she was HII's primary contact with HAA and its affiliated agents performing the telemarketing. Ex. M, Brady Dep. at 10:1-15, 103:13-15, 145:11-24, 266:19-267:5.[17] HII's unwritten telemarketing policy permits telemarketing calls to be made on its behalf to people who have previously asked not to receive calls if the caller believes consent exists. Ex. H, HII/Gillis Dep. at 132:20-133:19.

HII's poor IDNC practices resulted in telemarketing calls to consumers who had previously asked not to be called: For example, Plaintiff's expert analyzed HII's list of do-not-call requests

---

[16]   See also Ex. NN, Rising Eagle co-owner Jacob Mears Dep. at 134:5-136:6, 144:17-20 (Rising Eagle called numbers for which a do-not-call request was made).
[17]   Amy Brady is now permanently enjoined from telemarketing, and from selling healthcare products. FTC v. Benefytt Technologies, Inc., No. 8:22-cv-01794 (M.D.Fla.), at Dkt. 15 pp. 6-7 (available at https://ecf.flmd.uscourts.gov/doc1/047124651433).

from its current and former customers, and identified **39,697** Rising Eagle calls transferred to HAA with **10,994** unique phone numbers that received two or more telephone calls within a 12-month period, despite having been on that list between 31 days and five years—including **384** calls with **134** Illinois numbers. Ex. BB, Verkhovskaya Rep. ¶¶ 56-57; Ex. H, HII/Gillis Dep. at 57:17-23. This proof of concept can be expanded to phone numbers on *other* HII or (sub)vendor IDNC lists. *See* Ex. H, HII/Gillis Dep. at 57:1-25, 66:8-16 (discussing separate "compliance" IDNC list HII started in roughly 2017, years into using third parties to telemarket on its behalf); Ex. L, HAA/Smith Dep. at 46:2-5 (HAA did maintain a DNC list); *see also* Ex. A, Bilek Dep. at 164:21-165:3, 166:13-20, 172:16-24, 179:18-180:19; Ex. B, Bilek Decl. ¶ 3 (calls continued despite Plaintiff pressing "2" to try to get calls to stop in February-March 2018, directly indicated she did not want to be contacted during a subsequent call on March 16, 2018, and even after filing suit).

Numerous TCPA and robocall complaints ensured that HII knew that HAA's/Shapiro's lead generation derived from prerecorded-voice telemarketing. Ex. H, HII/Gillis Dep. at 230:10-232:23. Many of these complaints traced to HAA agents like Sean Duffie or their uplines specifically, such as the following:

- May 10, 2018 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Ex. PP at Cmplts071-72, 238.

- May 24, 2018 – ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Ex. PP at Cmplts069.

  o Mr. Todd had *twice* sued HII previously for robocalls before the 2018 complaint: *Todd v. HII*, 1:13-cv-04018 (N.D.Ill. filed May 30, 2013) (Kennelly, J.), Ex. PP at Cmplts001; and *Todd v. HII, NCE, NBBI & AccessOne*, 17-M5-52573 (Cook Cnty., Ill. Cir. Ct. filed April 17, 2017), Ex. PP at Cmplts022, 65.

- May 25, 2018 – ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

████████████████████████████ Ex. PP at Cmplts073-115; Ex. N (site visit report, identifying Duffie's agency as downline).

- o This same consumer made additional complaints on June 6, 2018 and June 11, 2018. Ex. PP at Cmplts238.

- June 1, 2018 – ████████████████████████████████████
████████████████ Ex. PP at Cmplts120-24.

  - o HII also received a TCPA complaint this day from another consumer, ████ ██████ which traced to HAA and settled. Ex. PP at Cmplts144, 238.

- June 12, 2018 – **_HII Employee_** ████████████████████████████
████████████████ Ex. PP at Cmplts125.

- June 27, 2018 – ███████████████████████████████████████████████
███████████████████████ Ex. PP at Cmplts126-128. Mr. Harris later filed a TCPA lawsuit against HII, which identifies his receipt of prerecorded-voice calls referencing Blue Cross and Cigna like Plaintiff received. Ex. PP at Cmplts129-142, ¶ 8.

- July 17, 2018 – ████████████████████████████████████████
████████████████ Ex. PP at Cmplts146, 276.

- August 3, 2018 – Robert Doane: ████████████████████████████
████████████████ Ex. PP at Cmplts147-160.

  - o This same consumer made an earlier complaint on June 30, 2018. Ex. PP at Cmplts238.

- August 27, 2018 – ████████████████████████████████████████
████████████████████████████████ Ex. PP at Cmplts172,
Cmplts162 ████████████████████████████████████████████
████████████████████

- September 4, 2018 – ███████████████████████████████████
████████████████████████████████████ Ex. PP at
Cmplts193, 203, 206.

- September 5, 2018 –

  ███████████████████████████████████████████
  ██████████████████████████ Ex. PP at Cmplts177-83 (
  ████████████████████████████████████████.

  o This same consumer made an earlier complaint on June 4, 2018. Ex. PP at Cmplts238.

- September 9, 2018 –

  ███████████████████████████████████████████
  ███████████████████████████ Ex. PP at Cmplts187-89. After the
  ████████████████, Ex. PP at Cmplts186, it ███████████████
  ███████████████. Ex. PP at Cmplts190-92.

- October 1, 2018 – Gregory Hasiak: HI ███████████████████████
  ███████████████████████████████████████████
  ████████████████ x. PP at Cmplts239-41.
  ████████████ Ex. PP at Cmplts242-44.

- October 4, 2018 – *HII Employee* ██████████████████████████
  ███████████████████████████████████████████
  ███████████████████████████████████████ Ex. PP
  at Cmplts245.

  o ███████████████████████████████████████
  ███████████████████████████████████████
  ███████████████████████████████████ Ex.
  PP at Cmplts246-47.
  o Rather than address the noncompliance, HII sent HAA a list of its employees'
  phone numbers to avoid calling so that they wouldn't be bothered with the
  robocalls at issue. Ex. PP at Cmplts248.

- November 9, 2018 – *HII Employee* ██████████████████████████
  ███████████████████████████████████████████
  ███████████████████████████ Ex. PP at Cmplts268.
  ███████████████████████████████████████ Ex. PP at Cmplts262-
  67.

- November 8, 2018 – Maurice Woolman: ██████████████████████
  ███████████████████████████████████████████
  ███████████████████████████ Ex. PP at Cmplts257, 259.
  ████████████████████████. Ex. PP at Cmplts256; Ex. L,
  HAA/Smith Dep. at 25:2.

14

- <u>March 6, 2019</u>: Consumer Robert Hossfeld sued HII, NCE, NBBI, and HAA for TCPA robocall and IDNC violations arising from HAA. <u>Ex. PP</u> at Cmplts278, 296-300.

- <u>March 28, 2019</u>:



Ex. PP at Cmplts312; *see also* Ex. PP at Cmplts317

- April 2, 2019 –

x. PP at Cmplts322.

- May 18, 2019 –

Ex. PP at Cmplts324-27; Ex. L,

Ex. PP at Cmplts328.

- May 1, 2020 –

Ex. PP at Cmplts332.

HII continued to retain the financial and advertising benefits of such notwithstanding the "whole slew of telemarketing complaints" about nonconsensual robocall and/or IDNC violations it traced to HAA-affiliated agents like Duffie. <u>Ex. H</u>, HII/Gillis Dep. at 92:1-93:15, 188:19-189:20.

 HII's efforts to stop the TCPA violations was a façade, designed to permit it to continue to gain new customers through HAA's calling, but lessen the chances it will be held liable. In September 2018, HII sent an email to Shapiro that his "

15



▮▮▮▮▮▮▮▮▮▮ Ex. PP at Cmplts238. Around that time HII tried to set HAA up with lead and "consent" verification vendor, ActiveProspect. However, HAA's leads were ineligible for that service because they were "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. T at HII077020. Thus, HII instead set HAA up on a "▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. T at HII077020 (▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ HII paid for HAA's use of the litigator scrub,

> for the soul [sic] purpose of limiting the amount of TCPA lawsuits they and their agencies face. This particular agency has had A TON of TCPA issues because they upload aged leads into a dialer. That said, they also wrote a lot of HII's policies.
>
> They're aware that TrustedForm can't help with the aged leads, but want to run the leads through Litigator Scrub to at least not dial any known litigators (they claim all complaints have come from known litigators).

Ex. U at ACTPRO_000232, Sept. 21, 2018 Email (paragraph break supplied); *see also* Ex. V, ActiveProspect/Chickman Dep. at 18:8-11, 20:5-20:7, 20:14-21:6; 41:20-42:5.

And even after HII continued to trace TCPA complaints to HAA agent Duffie, HII opted to instead extend ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮. Ex. QQ (plan); Ex. RR at HII088112. But termination of Duffie was window-dressing: After HII terminated Duffie's agency, it *continued* using other agents it knew to be telemarketing to leads received from HAA/ Shapiro to generate business, Ex. H, HII/Gillis Dep. at 117:6-127:10, into at least mid-2019, and continued to pay HAA for those

efforts through agents other than Duffie such as Jason McDowell and William Seminario. Ex. H, HII/Gillis Dep. at 157:17-158:160:10.[18] Some agents HII continued to use incurred their own TCPA complaints.[19] HII never exercised its right to instruct its agents not to use HAA/Shapiro to generate leads, never directed HAA or any agent working with it to provide proof that they were making consensual robocalls (probably because HII already knew this), never directed its agents to stop using outside lead vendors, and it never asked or told HAA/Shapiro to stop soliciting on behalf of HII and its clients. Ex. H, HII/Gillis Dep. at 96:25-97:10, 126:5-127:10, 134:9-12.

NCE, NBBI, and AccessOne, too, received multiple complaints – and even lawsuits – arising from HII's (sub)vendors' telemarketing going back to early 2017, but they failed to take meaningful action such as terminating HII, preventing (or discouraging) the use of HAA and other outside lead generators, or otherwise correcting any practices—each instead electing to "pass the buck" concerning TCPA compliance to their downlines.[20] E.g., Ex. PP at Cmplts049 (█████), Cmplts001, 22 (███ Cmplts162 (███ Cmplts116-19 (Bilek), Cmplts278 (Hossfeld);[21] Ex. FF, NCE/Sabatella Dep. at 49:22-50:16 (███████████████), 82:5-83:3 (████████ ████████████████████████); Ex.



---

[18]    See also, e.g., Ex. SS at HII087831 (HII ████████████████ ████); Ex. TT at HII008866 (██████████████████████████ ;[18] Ex. UU (HII ████████████████).

[19] ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████ .

[20] ████████████████████████ Ex. FF, NCE/Sabatella Dep. at 63:13-18.

[21] ████████████████████████████████████ FF, NCE/Sabatella Dep. at 82:18-24, 84:6-24, 102:11-106:20, 158:2-12, 177:16-178:20; Ex. Y, NBBI/Marszalowicz Dep. at 94:25-95:23, 121:2:123:9, 242:18-243:22; Ex. Z, AccessOne/Moore Dep. at 151:2-156:11.

Y, NBBI/Marszalowicz Dep. at 39:14-22, 242:18-243:22; Ex. Z, AccessOne/Moore Dep. at 152:10-156:11. ████████████████████████████████████████████████████

████████████ Ex. FF, NCE/Sabatella Dep. at 158:20-160:5; Ex. Y, NBBI/Marszalowicz Dep. at 242:18-243:22; Ex. Z, AccessOne/Moore Dep. at 33:14-34:11. NCE ████████████

████████████████████████████████████████████████████████████████████

████████. FF, NCE/Sabatella Dep. at 51:18-52:21, 65:17-66:4.[22]

Plaintiff filed this lawsuit on April 30, 2018, seeking redress on behalf of herself and other consumers who received the nonconsensual robocalls at issue on behalf of NCE. Dkt. 1, Compl. ¶¶ 26, 35-43. Plaintiff amended her complaint on March 15, 2019, to add NBBI and AccessOne as defendants, as well as IDNC and state law autodialer and caller ID claims. Dkt. 43, AC ¶¶ 42, 51-81. Plaintiff filed her operative second amended complaint to add HII as a defendant on August 20, 2019, Dkt. 116, although HII knew about this lawsuit since May 29, 2018, Ex. PP at Cmplts116-17. Plaintiff now respectfully asks that the Court grant class certification.

## II.    LEGAL STANDARD

In order to certify a class, a plaintiff must satisfy the requirements of Rule 23. First, a proposed class must satisfy Rule 23(a): (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *Messner v. Northshore Univ. HealthSystem,* 669 F.3d 802, 811 (7th Cir. 2012). Next, the proposed class must qualify as a type described in Rule 23(b). "Class certification is normal in litigation under [the TCPA], because the main questions … are common to all recipients." *Ira Holtzman, C.P.A., & Assocs. v. Turza*, 728 F.3d 682, 684 (7th Cir. 2013). The proposed Classes meet Rule 23's requirements, and they should thus be certified.

---

[22]     NCE's owner and Rule 30(b)(6) deponent claimed he ██████████████████████████████ ████████████████████████████████████████ *see* Dkt. 381-1 (RFP 17)—itself a violation of 47 C.F.R. § 64.1200(d)(1). Ex. FF, NCE/Sabatella Dep. at 50:20-51:16. As such, no evidence in this case supports its sufficiency under 47 C.F.R. § 64.1200(d).

## III.   ARGUMENT

### A.   All Rule 23(a) Requirements Are Satisfied.

#### 1.   The Classes are sufficiently numerous.

Under Rule Fed.R.Civ.P. 23(a)(1)'s numerosity requirement, "a court can certify a class without first determining its exact size as long as it is reasonable to believe the class is large enough to make joinder impracticable." *Snyder v. Ocwen Loan Servicing, LLC*, 258 F. Supp. 3d 893, 903 (N.D. Ill. 2017) (citing *Chapman v. Wagener Equities Inc.*, 747 F.3d 489, 492 (7th Cir. 2014)). "There is no objective threshold for numerosity, but … forty is typically enough to satisfy the requirement." *Holmes v. Godinez*, 311 F.R.D. 177, 217 (N.D. Ill. 2015).

From a sample of 77,610 Rising Eagle robocall transfers to HAA with 49,128 Illinois phone numbers,[23] there were 40,571 calls with 23,764 unique cell numbers that fell within the Damages Class definition – most of which according to the AT&T and Verizon were associated with an Illinois resident, relevant to the ATDA claims. Ex. 1, Burke Decl. ¶ 16; Ex. CC, AT&T Decl. ¶ 4 & Attached Data Sample; Ex. DD, Verizon Decl. ¶¶ 4-5 & Attached Data Sample. As to the IDNC Class, the data shows 39,697 Rising Eagle calls transferred to HAA as to 10,994 unique phone numbers that received two or more telephone calls within a 12-month period, despite having been on HII's "IT" IDNC list between 31 days and five years—including 384 calls to 134 Illinois numbers. Ex. BB, Verkhovskaya Rep. ¶¶ 56-57; Ex. H, HII/Gillis Dep. at 57:17-23. There is a "rebuttable presumption" that phone numbers an individual has requested not to receive calls on are those of "residential subscribers." *In re TCPA*, 18 FCC Rcd. 14014, 14039, at ¶ 36 & n.139

---

[23]   Again, HAA's call platform produced records of 5,755,107 call transfers for 3,059,787 unique phone numbers between July 28, 2017 and April 30, 2019, with the same Rising Eagle-specific (321) 261-0979 and (979) 201-5297 DIDs used in calls to Plaintiff—i.e., where the consumer "pressed 1" during the prerecorded prompt to be connected with a sales agent and would have thereafter been solicited for HII. Ex. BB, Verkhovskaya Rep. ¶ 54.

(2003). This presumption is buttressed by the fact that the calls that are the subject of this case were made to sell consumer health insurance policies and related products/services to individuals.

Although Plaintiff has not yet done an analysis of the number of class members from other states, and has not done an analysis of the number of violations as other IDNC lists (such as HAA's) to calling, these numbers demonstrate that numerosity is clearly met.

### 2. Common questions of law or fact exist.

Fed.R.Civ.P. 23(a)(2)'s commonality requirement for class certification requires that "there are questions of law or fact common to the class." Because large, automated calling campaigns are carried out *en masse*, a proposed TCPA class often contains common issues of law and fact. *See G.M. Sign, Inc. v. Finish Thompson, Inc.*, 2009 WL 2581324, at *4 (N.D. Ill. Aug. 20, 2009) (collecting cases); *Turza*, 728 F.3d at 684 ("Class certification is normal in litigation under § 227, because the main questions … are common to all recipients.")

Here, class members suffered the same injury and share several key questions of law and fact, for example:

- Were the Rising Eagle messages "prerecorded" messages under the TCPA and ATDA?

- Was there proper consent for the calls at issue (Counts I and III)?[24]

- Did Rising Eagle's use of spoofed caller ID numbers violate the ATDA's prohibition against impeding caller identification, 815 ILCS 305/15(d) (Count IV)?

- Did Defendants violate the TCPA when their policies permitted calls to phone numbers despite a prior do-not-call request, and prohibited mentioning HII's name?

- Should Defendants be held vicariously liable for Rising Eagle's calls?

- Were the violations "willful" under 47 U.S.C. § 227(b)(3) and/or 227(c)(5)?

---

[24] No evidence of consent for the calls at issue exists. Ex. H, HII/Gillis Dep. at 209:25-210:2; Ex. L, HAA/Smith Dep. at 81:16-82:6.

These questions are dispositive, apply equally to all applicable class members, and can be answered using common proof and uniform legal analysis. Commonality is satisfied.

### 3. Plaintiff's claims are typical of those of the other Class members.

Typicality is a "low hurdle ... [that] requires neither complete coextensivity nor even substantial identity of claims." *Owner-Operator Indep. Drivers Ass'n, Inc. v. Allied Van Lines, Inc.*, 231 F.R.D. 280, 282 (N.D. Ill. 2005). Rather, "[a] plaintiff's claim is typical if it arises from the same event, practice, or course of conduct that gives rise to the claims of other class members and is based on the same legal theory." *Snyder*, 258 F. Supp. 3d at 904 (citation omitted); *see also Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 626 n.20 (1997).

Here, Plaintiff's claims and the claims of the Classes follow the same factual and legal theory: They all "pressed 1" after receiving a spoofed-number robocall from Rising Eagle soliciting insurance, and were transferred to HAA for the purpose of marketing Defendants' goods and services; the IDNC Class and Injunctive Class were called despite a prior do-not-call request. What is more, although some courts deny class certification in TCPA cases because of individualized issues surrounding consent, there is no meaningful evidence of consent in this record. *See* Ex. L, HAA/Smith Dep. at 81:16-82:6 (HAA principal confirming there is "no way to trace [any phone number] … to any sort of real opt-in or consent"). Because there are no meaningful differences between Plaintiff's claims and those of the Class, typicality is satisfied.

### 4. Plaintiff will adequately represent the Class.

Under Fed.R.Civ.P. 23(a)(4) the Court considers "the adequacy of the named plaintiffs as representatives of the proposed class's myriad members, with their differing and separate interests." *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011). Here there is no conflict between Plaintiff's interests and those of the Classes. By investigating, filing, and

vigorously prosecuting this case for more than four years, Plaintiff Bilek has demonstrated her desire and ability to protect class members' interests. Ex. 1, Burke Decl. ¶ 14. *Id.*; Ex. A, Bilek Dep. ¶¶ 81-82, 163-164; Ex. B, Bilek Decl. ¶ 7.

Burke Law Offices, LLC, is adequate counsel, too. Fed. R. Civ. P. 23(g)(1) provides that "a court that certifies a class must appoint class counsel" and instructs the Court to consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources counsel will commit to representing the class." Counsel have investigated and identified the claims, have a firm handle on the facts and law in this action as demonstrated in this motion, and have the necessary experience and resources to represent the Classes. Ex. 1, Burke Decl. ¶¶ 2-13. Both Plaintiff and proposed class counsel are well-qualified to prosecute this action in the best interest of the Classes, and the Court should appoint them so that they may do so.

### B. Rule 23(b)(2) Is Satisfied as to the Injunctive Class.

A case may be certified as a class action under Rule 23(b)(2) where the "party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed.R.Civ.P. 23(b)(2). Defendant HII's policy of permitting telemarketing calls to phone numbers on IDNC lists by failing to maintain a Master IDNC List and coordinate such amongst its marketers adversely affect all persons who have asked not to receive calls by or on behalf of HII. Defendants' NCE, NBBI and AccessOne's failure to maintain IDNC lists, or have any meaningful policies related to such, also adversely affects anyone who requested not to receive calls on their behalf, too. The requested final injunctive relief, that each Defendant correct the offending policy

provisions and create and adhere to a Master IDNC List, will benefit the Class as a whole by substantially lowering the chances of telemarketing calls *they already asked not to receive*.

The TCPA specifically authorizes a plaintiff to seek "both" money damages and injunctive relief. 47 U.S.C. § 227(c)(5). There are two types of injunctions: a statutory injunction and a "traditional" injunction. "When an injunction is explicitly authorized by statute, proper discretion usually requires its issuance if the prerequisites for the remedy have been demonstrated and the injunction would fulfill the legislative purpose..... The traditional criteria for permanent injunctive relief need not be discussed." *United States v. Stover*, 650 F.3d 1099, 1106 (8th Cir. 2011) (citations omitted). For a statutory injunction, Plaintiff must prove (1) the defendant has committed a statutory violation and (2) that there is a reasonable likelihood of future violations. *CFTC v. Oystacher*, 2016 WL 3693429, at *6 (N.D. Ill. July 12, 2016).[25] For a traditional injunction, the plaintiff must show that "it is likely to succeed on the merits, and that traditional legal remedies would be inadequate, such that it would suffer irreparable harm without the injunction," as well as that the balance of harms supports granting the injunction, including considering the public interest. *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 539 (7th Cir. 2021). "If the plaintiff is likely to win on the merits, the balance of harms need not weigh as heavily in his favor." *Id.*

The requirements for an injunction are present, regardless of which standard is applied.

### 1.    Plaintiff Is Likely to Prevail.

The party seeking statutory injunctive relief must first demonstrate that a statutory violation

---

[25]     *See Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1043-44 (9th Cir. 2012); *Hatch v. Sunbelt Commc'ns & Mktg.*, 282 F. Supp. 2d 976, 979 (D. Minn. 2002) (traditional requirements need not be satisfied for TCPA injunctions); *J2 Glob. Commc'ns, Inc. v. Blue Jay Inc.*, 2009 WL 4572726, at *8 (N.D. Cal. Dec. 1, 2009) (same); *Lynn v. Monarch Recovery Mgmt., Inc.*, 2013 WL 1247815, at *7 (D. Md. Mar. 25, 2013), *on reconsideration in part*, 953 F. Supp. 2d 612 (D. Md. 2013), *and aff'd*, 586 F. App'x 103 (4th Cir. 2014), *as amended* (Oct. 17, 2014) ("[A] complainant [in a TCPA case] need not allege or prove irreparable harm when it invokes a statute that authorizes injunctive relief. All that need be proved is a violation of the statute."), *but see Snyder*, 258 F. Supp. 3d 893 (N.D. Ill. 2017).

23

has occurred. *U.S. v. Davison*, 691 F. Supp. 2d 1033, 1039-40 (W.D. Mo. 2009); *U.S. v. Dish Network, L.L.C.*, 2016 WL 29244, at \*1 (C.D. Ill. Jan. 4, 2016) (telemarketing context). Relatedly, for a traditional injunction, the plaintiff must show a likelihood of success on the merits, which is a low threshold. *D.U. v. Rhoades*, 825 F.3d 331, 338 (7th Cir. 2016).

> **i.      Plaintiff is likely to prevail on the merits of the Injunctive Class's claims.**

Plaintiff and thousands of others received more than one call made to telemarket Defendants' goods and services within 12 months after having requested not to receive calls. Ex. B, Bilek Decl. ¶ 2; Ex. BB, Verkhovskaya Rep. ¶¶ 56-57. These calls violated the TCPA's IDNC rules, 47 C.F.R. § 64.1200(d), because: (a) neither Rising Eagle, HAA, nor any Defendant had any written do-not-call policy "available upon demand" like the regulations require, Ex. H, HII/Gillis Dep. at 127:11-132:10; Ex. I, Spiller Decl. ¶ 5; Ex. L, HAA/Smith Dep. at 48:15-17; Ex. W, Duffie Dep. at 41:3-13; Ex. P, Griffin Dep. at 23:5-24:14; Ex. FF, NCE/Sabatella Dep. at 50:17-51:22; Ex. Y, NBBI/Marszalowicz Dep. at 69:2-4 (still none); Ex. Z, AccessOne/Moore Dep. at 52:12-14 (still none);"[26] (b) NCE, NBBI, and AccessOne have never maintained a do-not-call list, Ex. FF, NCE/Sabatella Dep. at 52:18-21; Ex. Y, NBBI/Marszalowicz Dep. at 68:13-15; Ex. Z, AccessOne/Moore Dep. at 52:15-16; (c) Defendants do not coordinate internal do-not-call requests amongst their various telemarketers, Ex. L, HAA/Smith Dep. at 45:4-6, 47:16-48:2; Ex. H, HII/Gillis Dep. at 66:8-16, 69:22-72:22; (d) Defendants fail to properly train their agents and employees as to internal do-not-call, Ex. FF, NCE/Sabatella Dep. at 51:23-52:4; Ex. Y,

---

[26]      *See* Ex. H, HII/Gillis Dep. at 127:11-132:10 (noting that only sometime in or after mid-2020 did HII supposedly develop a practice to have its lawyer crop a portion of its "Internal Use Only" and "Confidential" internal policy to email out if requested); Ex. I, Spiller Decl. ¶ 5; Ex. NN, Rising Eagle co-owner Jacob Mears Dep. at 134:5-136:6, 144:17-20 (Rising Eagle called numbers for which a do-not-call request was made); Ex. L, HAA/Smith Dep. at 48:15-17; Ex. W, Duffie Dep. at 41:3-13; Ex. P, Griffin Dep. at 23:5-24:14; Ex. FF, NCE/Sabatella Dep. at 50:17-51:22; Ex. Y, NBBI/Marszalowicz Dep. at 69:2-8; Ex. Z, AccessOne/Moore Dep. at 52:12-14.

NBBI/Marszalowicz Dep. at 111:24-7; Ex. Z, AccessOne/Moore Dep. at 106:13-107:12, Ex. H, HII/Gillis Dep. at 68:11-19, 72:4-22, Ex. M, Brady Dep. at 145:11-24; (e) HII's telemarketing policies permit telemarketing calls to be made on its behalf to people who have previously asked not to receive calls if the caller believes consent exists,[27] Ex. H, HII/Gillis Dep. at 132:20-133:19; and (f) HII prohibits its vendors to identify it during sales calls.[28] Ex. L, HAA/Smith Dep. at 71:5-72:22

Defendants' noncompliant practices resulted in telemarketing calls to consumers like Plaintiff who had previously asked not to be contacted: For example, HII maintained a list of do-not-call requests from people who purchased its products, to whom Plaintiff's expert identified 39,697 Rising Eagle calls transferred to HAA with 10,994 unique phone numbers that received two or more telephone calls within a 12-month period, despite being on the IDNC list between 31 days and five years—including 384 calls to 134 Illinois numbers. Ex. BB, Verkhovskaya Rep. ¶¶ 56-57; Ex. H, HII/Gillis Dep. at 57:17-23. It is easy to say that Plaintiff has a "better than negligible" likelihood of success on the merits. *D.U. v. Rhoades*, 825 F.3d 331, 338 (7th Cir. 2016).

### ii. Plaintiff is likely to establish Defendants' vicarious liability for the calls to the Injunctive Class through actual authority.

Agency is a "fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." *Aranda v. Caribbean Cruise Line*, 179 F. Supp. 3d 817, 830 (N.D.Ill. 2016) (quoting Rest. (3d) Agency § 1.01 (2006) ("Rest.")). "To establish actual authority, Plaintiffs must demonstrate that the principal controlled or had the right to control the purported agent. This right of control presupposes the

---

[27] There is no consent defense to an IDNC claim. *Simmons*, 222 F.Supp. 3d at 131.
[28] Again, none of the Defendants were identified during the prerecorded portion of the robocalls from Rising Eagle at all. Ex. D, Spiller Decl. ¶ 3.

principal's retention of the capacity to assess the agent's performance, to provide instructions to the agent, and to terminate the relationship by revoking the agent's authority."[29] *Bakov v. Consol. World Travel, Inc.*, 2019 WL 6699188, at \*5 (N.D. Ill. Dec. 9, 2019) (citing Rest. § 2.01). If authorized, "agents may appoint subagents to perform the agent's functions ... [whose actions] carry the same legal consequences as actions taken by the appointing agent." *Gebka v. Allstate Ins. Co.*, 2021 WL 4951520, at \*2 (N.D. Ill. Oct. 25, 2021)(citing Rest. § 3.15(1)-(2) & cmt. d).

The "right to control" can be evinced through a contract alone. For example, *United States v. Dish Network, LLC*, 954 F.3d 970, 975 (7th Cir. 2020), upheld a District Court's finding that Dish's independent contractor telemarketers were its "agents" based upon Dish's contractual right to change telemarketing policies alone, because it "gave DISH the right to control [its telemarketers'] performance." *Id.*[30] As in *Dish*, HII's agent contract—including for those telemarketing out of HAA's call center—requires them to "[███████████████████████████████ ███████]" Ex. OO at HII000019 ¶ 4.G. It also contemplates that agents may utilize subagents and subcontractors. *Id.* ¶¶ 4.A, 4.F. Under *Dish*, HII's power to dictate the "rules" for HAA's and its agents' solicitations on behalf of HII and its clients alone establishes an agency relationship.

HII's explicit control over its agents extends even further: its contract additionally (1)

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[29]     Actual authority may be express or implied: "An agent has express actual authority when the principal expressly grants the agent the authority to perform a particular act…. [I]mplied actual authority [occurs] when the principal's reasonably interpreted words or conduct would cause an agent to believe that the principal consents to have an act done on her behalf." *Aranda*, 179 F. Supp. 3d at 831 (citations omitted).

[30]     The Court also found that the fact that the telemarketers acted directly for Dish, entered consumer information directly into Dish's computer system, did not have their own inventory and were not resellers of Dish products, *Dish Network*, 954 F.3d at 975, all factors that are present here.



Moreover,

. Ex. M, Brady Dep. at 112:15-21;

*but see* Ex. L, HAA/Smith Dep. at 77:24-78:7 (wouldn't capture the prerecorded portion). HII also

participates during the calls by emailing call recipients applications to complete while on the phone

with the HAA agent, Ex. W, Duffie Dep. at 22:2-23:18, and even pays TCPA compliance service

through ActiveProspect—although, as to HAA, this was limited to scrubbing against a list of

known litigators for purposes of avoiding getting sued rather than actual compliance. Ex. V,

ActiveProspect/Chickman Dep. at 18:8-11, 31:6-15, 49:1-12. HII knew that HAA and its agents

were telemarketing on its behalf, including prerecorded-voice telemarketing using "aged" leads

---

[31] Whether HII used its rights is irrelevant; a principal "need not have actually exercised control, so long as it retained the right to control." *Brown v. DirecTV, LLC*, 562 F.Supp.3d 590, 609 (C.D.Cal. 2021).

that would result in violations. Ex. H, HII/Gillis Dep. at 165:21-24, 230:10-232:23, 235:17-237:2. It thus gave express or, at the very least, implied actual authority for the calling at issue.

NCE, NBBI, and AccessOne each also authorized the use of telemarketing to sell their products and services ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

█████████████████████████. Ex. GG at HII00106-114/176-183 ¶¶ 3, 5, 13, 15, HII00120-121/189-190 ¶ A.6(d), A.8, B.2, and HII000139-145 ¶¶ 1-4, 5.c, 12, 14 (NCE-HII Agreements), Ex. HH ¶¶ III, IV(A), VI(B), VII(A), IX, XIV (NCE-NBBI agreement); Ex. II ¶¶ 2, 10, 15-16 & Ex. B ¶¶ 2, 4, 7 (NBBI-AccessOne agreement); Ex. FF, NCE/Sabatella Dep. at 56:7-23, 57:2-19, 58:8-62:19, 73:9-10, 95:19-96:4, 102:18-105:17, 105:5-12; Ex. X at NBBI667-671 (example); Ex. Y, NBBI/Marszalowicz Dep. at 196:9-21; Ex. Z, AccessOne/Moore Dep. at 40:11-18.

Defendants' actions and omissions with regard to the specific telemarketing at issue demonstrate that they impliedly authorized and ratified the spoofed, prerecorded robocalls at issue, and given that no Defendant had proper IDNC policies or procedures – or even a true IDNC list – likewise authorized the actions that led to those violations.[32]

> **iii.** **Plaintiff is likely to establish Defendants' vicarious liability for the calls to the Injunctive Class through ratification.**

---

[32] A "person who orders or induces an actor's tortious conduct is subject to liability for harm resulting to a third person when the person knows or should know of circumstances that would make the conduct tortious if it were his own." Rest. (3d) of Agency § 7.04, *cmt. b*. This concept holds true "even when the relationship between two persons is **not** a relationship of agency." Rest. (3d) of Agency § 7.04, *cmt. b* (emphasis added)*.* "When a person is subject to liability as a consequence of this rule, it is immaterial whether the relationship between the person and the actor is a relationship of agency" *Id*. (citing Rest. (2d) of Torts § 877, "Directing or Permitting Conduct of Another," which provides liability under substantially identical principles). Thus, HII, NCE, NBBI and AccessOne may each be held liable for any TCPA violations – and in particular the IDNC violations – because the TCPA sounds in tort, albeit with a statutorily-created damages scheme.

"Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." Rest. (3d) of Agency § 4.01(1). This may occur through the knowing retention of the benefits of the act, or by "willful ignorance"— i.e., where the principal may not know all material facts, but has "ratified with awareness that such knowledge was lacking." Rest. § 4.01 at cmt. b; *Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068, 1075 (9th Cir. 2019). It may also "be inferred from surrounding circumstances, including long-term acquiescence, after notice, to the benefits of an allegedly unauthorized transaction." *Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.*, 376 F.3d 664, 677 (7th Cir. 2004).

Here, Defendants knew HII's agents were utilizing nonconsensual robocalling and making calls to people who previously asked not to be contacted on their behalf because they had received complaints from consumers about it since mid-2014. Ex. PP at Cmplts049 (*Moser*). Apart from placing Defendants on notice that HII's agents' use of third-party lead generation resulted in nonconsensual robocalls, HII traced more than twenty of these complaints to HAA agents like Sean Duffie or their uplines specifically. Ex. PP (group exhibit of complaint examples).

Most blatantly, this lawsuit placed Defendants on notice of the nonconsensual, spoofed robocalls that were developing business for them, and they sat back and enjoyed the spoils for *years*—not just as to HAA, but as to all telemarketing calls made on their behalf without a complete IDNC list and proper IDNC policies. *E.g.,* Ex. MM (HII001944, reflecting more than ███ sales by the Duffie agency for HII, post-suit). Indeed, Defendants didn't bother to ensure that *Plaintiff's* number was on their and their vendors' IDNC lists; she continued to get Rising Eagle robocalls for months after filing suit—even receiving another HII quote. Ex. B, Bilek Decl. ¶¶ 2, 5.

Moreover, while ratification may still occur based on "willful ignorance," *Henderson*, 918 F.3d at 1075, HII had *actual knowledge* of the robocalling: It literally paid HAA's lead generation

29

consultant Scott Shapiro for the lead generation at issue, Ex. H, HII/Gillis Dep. at 235:17-237:2, and it did so knowing that such lead generation derived from prerecorded-voice telemarketing, *Id.* at 230:10-232:23. HII also knew that HAA was using "aged leads" █████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████. Ex. T at HII077020.[33]  Despite this knowledge, HII never exercised its right to instruct its agents not to use HAA/Shapiro to generate leads, never directed its agents to stop using outside lead vendors, and it never asked or told HAA/Shapiro to stop using robocalls to generate business for HII and its clients. Ex. H, HII/Gillis Dep. at 96:25-97:10, 126:5-127:10, 134:9-12. Indeed, even after HII terminated Duffie's agency in November 2018 at his upline's request,[34] HII continued to ratify HAA's calls on its behalf by allowing *other* agents to generate sales on its behalf through HAA/Scott Shapiro's telemarketing outfit, Ex. H, HII/Gillis Dep. at 117:6-127:10—into at least mid-2019.[35]

Despite recognizing that TCPA complaints were "█████████████████████████

█████████████████████████████████████████████," Ex. PP at Cmplts169, Defendants did little to stop these violations, even after receiving notice of this lawsuit. Ex. PP (complaints); Ex. FF, NCE/Sabatella Dep. at 49:22-50:16 (█████████████████████

███████), 82:5-83:3 (███████████████████████████████████████

---

[33]  *Cf.* Ex. U at ACTPRO_000232 ("HII is using our services for the soul purpose of limiting the amount of TCPA lawsuits they and their agencies face. This particular agency has had A TON of TCPA issues because they upload aged leads into a dialer. That said, they also wrote a lot of HII's policies. They're aware that TrustedForm can't help with the aged leads, but want to run the leads through Litigator Scrub to at least not dial any known litigators (they claim all complaints have come from known litigators)."); Ex. V, ActiveProspect/Chickman Dep. at 18:8-11, 20:5-20:7, 20:14-21:6; 41:20-42:5.

[34] ████████████████████. Ex. QQ at HII006173; Ex. RR at HII088112.

[35]  *See also, e.g.,* Ex. SS at HII087831 (███████████████████████████ Ex. TT at HII008866 (███████████████████████████████████████ Ex. PP at Cmplts312 ███████████████ ;[35] Ex. UU (████████████████████████████████).

was involved with the calls at issue); <u>Ex. Y</u>, NBBI/Marszalowicz Dep. at 39:14-22, 242:18-243:22; <u>Ex. Z</u>, AccessOne/Moore Dep. at 152:10-156:11. Defendants viewed complainants with contempt, rather than as injured parties whose grievances about unwanted calling should be taken seriously ████ ████████████████████████████████████████████████████████████████ <u>Ex. FF</u>, NCE/Sabatella Dep. at 182:18-23; <u>Ex. PP</u> at Cmplts069. ███████████████████████ ██████████████████████████████████████. <u>Ex. T</u> at HII077020.[36]

In the years since Plaintiff and other consumers complained to Defendants about TCPA violations, Rising Eagle (and other vendors) made millions of nonconsensual robocalls for the purpose of soliciting HII and its co-defendants, resulting in the sale of thousands of plans. <u>Ex. BB</u>, Verkhovskaya Rep. ¶ 54; <u>Ex.</u> MM (Duffie sales). Defendants knew their vendors were making these calls by virtue of this lawsuit and other complaints, e.g., <u>Ex. PP</u>, and their IDNC policies and practices are *still* noncompliant. Despite this, Defendants each retained the income benefit of these sales, as well as benefit of advertising and being able to decline or accept business generated from the calls. <u>Ex. H</u>, HII/Gillis Dep. at 188:19-189:20; <u>Ex. FF</u>, NCE/Sabatella Dep. at 29:11-19, 130:13-18, 158:20-160:5; <u>Ex. Y</u>, NBBI/Marszalowicz Dep. at 242:18-243:22; <u>Ex. Z</u>, AccessOne/Moore Dep. at 33:14-34:11; Rest. § 4.01(2) (requiring principal "manifest assent" that an act shall affect its legal relations, or partake in conduct that "justifies a reasonable assumption that [it] so consents"—without requiring the purchase of a product to ratify actor's acts). Consequently, Defendants ratified the calling at issue, subjecting themselves to vicarious liability.

In sum, as Plaintiff is likely to succeed on the merits, injunctive relief is appropriate.

## 2. Absent Injunctive Relief, Defendants Will Continue to Accept Business Derived from Illegal Telemarketing.

---

[36]     *See also* <u>Ex. FF</u>, NCE/Sabatella Dep. at 84:18-24 (conceding "whack-a-mole situation where NCE would get a complaint, it would investigate the complaint, and then in many cases there would be a settlement agreement where money was paid").

As to a statutory injunction, once a violation has been demonstrated, the moving party need only show there is a reasonable likelihood of future violations. *United States v. Davison*, 691 F. Supp. 2d 1033, 1039-40 (W.D. Mo. 2009); *FTC v. Lifewatch Inc.*, 176 F. Supp. 3d 757, 786 (N.D. Ill. 2016). The likelihood of future harm to consumers here is certain, as no Defendant has meaningfully altered its improper policies or practices. Indeed, because HII refuses to coordinate IDNC lists with those telemarketing on its behalf, and because it continues to engage in telemarketing, it is natural that it (or those on its behalf) continue to call phone numbers that should have been on its IDNC list, e.g., *Newman v. Benefytt Tech. Inc.*, No. 1:22-cv-04845 (N.D.Ill.). And neither HII, NCE, NBBI nor AccessOne is entitled to make or have telemarketing calls made on its behalf *at all* given that proper IDNC policies is a prerequisite to telemarketing, 47 C.F.R. § 64.1200(d), and these Defendants either do not have a policy, or have not updated their IDNC policies and practices so as to prevent calls to those who have requested not to receive such.

### 3.    The Court Should Order a Nominal Bond or No Bond.

Fed.R.Civ.P. 65(c) requires that a movant for a preliminary injunction give "security … in such sum as the court deems proper" before any preliminary injunction issues. "Courts in this circuit have almost always required a bond before issuing a preliminary injunction … but exceptions have been made ... where the damages resulting from a wrongful issuance of an injunction have not been shown." *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Engineers*, 826 F.3d 1030, 1043 (8th Cir. 2016) (affirming no bond; "some courts have not required a bond, or have only required a minimal bond"). Moreover, Plaintiff is not traditionally employed, and instead "care[s] for [her] husband and disabled brother full-time around the clock." Ex. A, Bilek Dep. at 16:12-23. However, this is the rare case where a bond is unnecessary because the requested injunction is not preliminary; instead, it will be entered as part of the final judgment.

32

### 4. The Class Will Be Irreparably Harmed Absent an Injunction.

"In order to demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Iowa Utilities Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996). Defendants' ongoing IDNC violations pose irreparable harm to the Class because the violations "keep on coming" despite this lawsuit.

There is no evidence that any Defendant has shored up its incomplete IDNC list to include telephone numbers of persons who requested during calls made on their behalf not to receive calls. To the contrary, all evidence shows that the challenged policy is still active and IDNC list still incomplete. Ex. H, HII/Gillis Dep. at 69:22-71:4, 72:4-22. What is more, because NCE, NBBI and AccessOne have never tried to maintain IDNC lists (or shore up compliant policies), and because HII's list is woefully incomplete in that it does not include persons who – like Plaintiff – pressed "2" during Rising Eagle's robocalls, there is no way to recreate a proper IDNC list. Because of these willful shortcomings and incomplete IDNC list, each Defendant risks violating the TCPA for their and their vendors' ongoing telemarketing, for five years after they shore up such policies and practices. 47 C.F.R. § 64.1200(d)(6); Ex. H, HII/Gillis Dep. at 112:7-113:5, and Ex. FF, NCE/Sabatella Dep. at 65:17-66:4 (HII and NCE continue to use telemarketing).

*Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1044 (9th Cir. 2012), is instructive. After suggesting that a TCPA plaintiff probably does not need to show "irreparable harm," the Ninth Circuit declined to decide that issue. Instead, it found that the plaintiff and "other class members will suffer irreparable harm from [the debt collector's] continuing violations of the TCPA, which violate the class members' right to privacy, and because the district court found in its written order that [the debt collector] would continue to violate the TCPA if an injunction was not issued. *Id.* at 1044. Here, such ongoing violations are not a possibility; they are a certainty.

33

### 5.  Money Damages Are Not an Adequate Remedy.

The TCPA authorizes money damages, an injunction or "both." 47 U.S.C. § 227(c)(5). Congress included injunctive relief as a remedy because other remedial tools "that might allow consumers to avoid receiving such calls are not universally available, are costly, are unlikely to be enforced, or place an inordinate burden on the consumer." PL 102-243, 105 Stat. 2394 (Dec. 20, 1991); S. Rep. 102-178, 1, 1991 U.S.C.C.A.N. 1968, 1969 (Oct. 8, 1991) (finding "[c]onsumers are especially frustrated because there appears to be no way to prevent these calls") .

In refusing to ensure TCPA compliance by developing Master IDNC lists, enforcing substantive personnel training, maintaining outside IDNC policies "available upon demand," in HII's case refusing to identify itself during sales calls, and in NBBI and AccessOne's case, develop any such policies at all, Defendants have made clear that the specter of money damages alone will not "do the trick"; injunctive relief is necessary to forcefully wrench compliance.

### 6.  Money Damages Are Not an Adequate Remedy.

Each Defendant's refusal to bring its system into compliance with the TCPA despite this lawsuit's four-year pendency demonstrates their recalcitrance and willfulness, tipping the scales in favor of imposing an injunction. "Where the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to [violate the law], such an argument in defense merits little equitable consideration on an appeal from a preliminary injunction." *Cadence Design Sys., Inc. v. Avant! Corp*., 125 F.3d 824, 830 (9th Cir. 1997); *Hatch v. Sunbelt Commc'ns. & Mktg*., 282 F.Supp.2d 976, 980 (D. Minn. 2002) ("no justification for why [Defendants] are entitled to profit in the interim, unencumbered by competition that is now undoubtedly suppressed due to the existence of a clear federal statute prohibiting their business practices").

Further, "courts will not balance the equities […] where the defendant's conduct has been

willful." *U.S. v. Bethlehem Steel Corp.*, 38 F.3d 862, 867-68 (7th Cir. 1994). Here, Defendants continue to willfully violate the TCPA's IDNC rules for financial benefit; they haven't altered their policies or practices, or shored up their IDNC lists, in the 4.5 years since this action was filed. Thus, the Court need not balance the equities, but if it does, the equities favor an injunction.

### 7.    A Preliminary Injunction Is in the Public Interest.

The public interest factor concerns "the effects, if any, that the grant or denial of the preliminary injunction would have on nonparties." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015); *Heather K. v. City of Mallard*, 887 F. Supp. 1249, 1260 (N.D. Iowa 1995) (noting "public interest" factor "frequently invites the court to indulge in broad observations about conduct that is generally recognizable as costly or injurious[,]" and finding "no difficulty" in identifying public interest in reference to purpose and intent of subject statute).

No third parties will be harmed by an injunction tailored to bring each Defendant's IDNC policies, practices and procedures into compliance. To the contrary, TCPA violations like those the requested injunction is designed to prevent "threaten public safety and inappropriately shift costs to consumers*." In re TCPA*, 23 FCC Rcd. 559, 566 ¶ 14 (2008).  An injunction is not overbroad if it "prohibits only those actions similar to the violations already committed." *Lineback v. Spurlino Materials, LLC,* 546 F.3d 491, 506 (7th Cir. 2008); *Coca-Cola Co. v. Purdy*, 382 F.3d 774, 790 (8th Cir. 2004). Plaintiff's proposed injunction does just that: it is narrowly tailored to bring Defendants' telemarketing into compliance with 47 C.F.R. § 64.1200(d), and to stop telemarketing to those who request such. It is in the public interest for these systematic violations of the TCPA arising from Defendants' sour IDNC policies and incomplete IDNC lists to stop.

### C.    Rule 23(b)(3) Is Satisfied, as to the Damages Class and IDNC Class.

Rule 23(b)(3) requires that: (1) "questions of law or fact common to class members

predominate over any questions affecting only individual members;" and (2) "a class action [be] superior to other available methods for fairly and efficiently adjudicating the controversy." The proposed Damages and IDNC Classes satisfy these requirements.

### 1. Common questions of law or fact predominate.

Predominance is "readily met" in certain consumer cases. *Windsor*, 521 U.S. at 625. The touchstone for predominance analysis is efficiency. *Butler v. Sears, Roebuck & Co.,* 702 F.3d 359, 362 (7th Cir. 2012) ("*Butler I*"), *vac'd on other grounds*, 133 S. Ct. 2768 (2013), *judgment reinstated*, 727 F.3d 796 (7th Cir. 2013) ("*Butler II*"). "[T]he requirement of predominance is not satisfied if 'individual questions … overwhelm questions common to the class.'" *Butler II,* 727 F.3d at 801 (quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds,* 133 S. Ct. 1184, 1196 (2013)). However, it is not the case that *every* issue must be common to *every* class member, as "a rule requiring 100% commonality would eviscerate consumer-fraud class actions." *Suchanek,* 764 F.3d at 759.[37] "An issue 'central to the validity of each one of the claims' in a class action, if it can be resolved 'in one stroke,' can justify class treatment." *Butler II*, 727 F.3d at 801 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).[38]

For example, *Krakauer v. Dish Network* affirmed a $61+ million TCPA judgment, finding predominance met because "all of the major issues in the case could be shown through aggregate [class call] records." 925 F.3d 643, 658 (4th Cir. 2019). "At bottom, the advantages of class resolution follow directly from the statute. The [TCPA] creates a simple scheme for determining if

---

[37]     "The entire notion of predominance implies that the plaintiffs' claims need not be identical[;] … a class can meet this requirement 'even though other important matters will have to be tried separately.'" *Krakauer*, 925 F.3d at 658 (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)).

[38]     Rule 23(b)(3) requires that a *question* common to the class predominate, but does not require that the question will be answered in favor of the class. *Amgen*, 133 S. Ct. at 1191. "[T]he office of a Rule 23(b)(3) certification ruling is not to adjudicate the case; rather, it is to select the 'metho[d]' best suited to adjudication of the controversy 'fairly and efficiently.'" *Id.*  Whether this case is ultimately decided in favor of the class, its resolution will be determined by answering questions common to all class members.

a violation occurred, whether a defense is available, and what the damages ought to be." *Id.* at 659.

Like in *Krakauer*, this case is based on the TCPA's "simple scheme for determining if a violation occurred." The elements of a TCPA prerecorded message claim require showing that Defendants or someone on their behalf: (1) made a call in or into the United States, (2) using an artificial or prerecorded voice, (3) to call a cell phone number. 47 U.S.C. § 227(b)(1)(A)(iii); *Breda v. Cellco P'ship*, 934 F.3d 1, 4 (1st Cir. 2019). All of these major issues can be shown through aggregated class call records: HAA's telecommunications vendor, Fextel, produced call records that identify 5,976,518 calls to 3,151,231 unique phone numbers Rising Eagle transferred to HAA after the call recipient "pressed 1" during a telemarketing robocall between July 28, 2017 and April 30, 2019, using the same (321) 261-0979 or (979) 201-5297 DIDs used in calls with Plaintiff.[39]

Common questions predominate because all of the calls were made the same way, for the same purpose, in violation of the same statutory provision. Carrier subpoenas or reverse-lookup services can readily identify which calls went to a cell number—as Plaintiff has demonstrated with the 40,571 calls to 23,764 unique Illinois cell numbers identified through a sample. Ex. 1, Burke Decl. ¶ 16; Ex. CC, AT&T Decl. ¶¶ 3-5 (and data); Ex. DD, Verizon Decl. ¶¶ 3-6 (and data); *see also* Ex. EE, T-Mobile Decl. ¶ 11; Ex. BB, Verkhovskaya Rep. ¶ 59. HAA's owner testified that the purpose of all calls was to market for HII, if HII sold in that state, including in Illinois and dozens of others.[40] And as in *Krakauer*, all class members are subject to preset, statutory damages on a per-violation basis, thus "preventing the need to measure individual compensatory damages." 925 F.3d at 659; *see* 47 U.S.C. § 227(b)(3). The appropriateness of treble damages based on

---

[39]    Ex. BB, Verkhovskaya Rep. ¶ 54; Ex. AA, Fextel Decl. ¶ 4 (identifying SQL database productions for HAA a/k/a Enrollment Center of America, spanning June 2017 through July 2020); Ex. I, Spiller Decl. ¶ 3 (explaining that Rising Eagle programmed its dialer to play the same prerecorded "press 1" message).

[40]    Ex. L, HAA/Smith Dep. at 72:15-24, 97:22-99:6; *e.g.,* Ex. W, Duffie Dep. at 59 ("HII knew the state in which the consumer that was being quoted lived when it provided the quotes for insurance … [b]ecause it had the ZIP code"); Ex. MM (Duffie HII sales, showing states).

willfulness is also justiciable on a class-wide basis because Defendants "generally acted in the same manner towards all class members." *Toney v. Quality Res., Inc.*, 323 F.R.D. 567, 591 (N.D. Ill. 2018) (finding willfulness a common question in TCPA case); 47 U.S.C. § 227(b)(3), (c)(5).

Because Rising Eagle made all of its calls the same way, using the same kind of "press 1" prerecorded message as to all subclass members, and the caller ID for all calls was likewise similarly spoofed, all of the most important issues to the Illinois Subclass members are common, too. Ex. I, Spiller Dep. at 19:1-8, 23:11-27:15; Ex. K, TX Spiller Dep. at 33:16-20, 35:14-20, 37:17-24.

And while the affirmative defense of "prior express written consent" *sometimes* predominates in TCPA prerecorded message cases, it is not an issue here: As HAA's principal put it, there is "no way to trace [any phone number] … to any sort of real opt-in or consent." Ex. L, HAA/Smith Dep. at 81:16-82:6; *see also* Ex. H, HII/Gillis Dep. at 209:25-210:2 ("So HII has no information concerning consent for HAA's calls; is that right? A. I believe so, yes.").

Similarly, for the IDNC Class, common questions predominate because an IDNC claim itself is based on the cut-and-dry question of whether the Defendants' and their vendors' practices satisfied the requirements of 47 C.F.R. § 64.1200(d), and a company's practices necessarily operate in uniform fashion. For example, the Court can readily determine whether the absence of a public-facing, written do-not-call policy by Rising Eagle, HAA, and Defendants violated 47 C.F.R. § 64.1200(d)(1)'s requirement that one be "available upon demand" before a single telemarketing call was made. Likewise, either Defendants' lack of formal training satisfied 47 C.F.R. § 64.1200(d)(2)'s requirement that personnel engaged in telemarketing "be informed and trained in the existence and use of the do-not-call list," or it didn't. Either Defendants' systemic failure to coordinate do-not-call requests amongst all vendors satisfied 47 C.F.R. § 64.1200(d)(3)'s requirement that they honor do-not-call requests, or it didn't. And either the calls' prerecorded

message's failure to identify Rising Eagle, HAA, or any Defendant violated the TCPA's identification requirement, or it didn't (particularly as to HII, whose policy prohibits the mention of its name until after the consumer agrees to make a purchase, *see* <u>Ex. L</u>, HAA/Smith Dep. at 71:5-72:22). The Court finding in Plaintiff's favor on just *one* of these requirements means Plaintiff's IDNC claims succeed, 47 C.F.R. § 64.1200(d); as such, common questions predominate.

### 2. A class action is the superior means for resolving the Class' claims.

A class action is the best method for adjudicating this controversy. The TCPA's and ATDA's modest statutory penalties ($500 per violation) means that individual claims are generally not economically viable. *See, e.g.*, *Nolan v. Reliant Equity Inv'rs, LLC,* 2009 WL 2461008, at *6 (N.D. W. Va. Aug. 10, 2009) ("relatively small recovery" under federal statute made class action superior); *Sandusky Wellness Ctr., LLC v. Wagner Wellness, Inc.*, 2014 WL 6750690, at *6 (N.D. Ohio Dec. 1, 2014) ("This type of case weighs in favor of the class action as a superior device. Under the TCPA, the maximum recovery for each class member is $1,500, and it does not allow for fee shifting. Hence, individual class members are unlikely to litigate TCPA claims.").[41] What is more, most recipients of unsolicited robocalls do not know their rights have been violated; a class action is thus the only way to bring these potential claims to their attention.

Through the class action procedure, these common claims can be brought in one proceeding, preserving limited judicial resources, eliminating unnecessary duplication of

---

[41]    *See also Caldera v. Am. Med. Collection Agency*, 320 F.R.D. 513, 519 (C.D. Cal. 2017) ("[T]he Supreme Court has specifically contemplated plaintiffs bringing TCPA cases as class actions."); *Siding & Insulation Co. v. Beachwood Hair Clinic, Inc.*, 279 F.R.D. 442, 446 (N.D. Ohio 2012) ("Under the TCPA, each individual plaintiff is unlikely to recover more than a small amount (the greater of actual monetary loss or $500). Individuals are therefore unlikely to bring suit …, which makes a class action the superior mechanism for adjudicating this dispute."); *Green v. Serv. Master On Location Servs. Corp.*, 2009 WL 1810769, at *3 (N.D. Ill. June 22, 2009) ("[R]esolution of the issues [under the TCPA] on a classwide basis, rather than in thousands of individual lawsuits (which in fact may never be brought because of their relatively small individual value), would be an efficient use of both judicial and party resources.").

document and data discovery and depositions, and avoiding potentially inconsistent outcomes. Certifying the class is the *only* way to "vindicat[e] the rights of individuals who otherwise might not consider it worth the candle to embark on litigation in which the optimum result might be more than consumed by the cost." *Deposit Guar. Nat. Bank v. Roper*, 445 U.S. 326, 338 (1980).

This case does not present any of the manageability problems that might impact the superiority determination in other cases.[42] Providing notice to class members can be readily accomplished because HAA's Fextel database includes a list of phone numbers that received the calls at issue, and corresponding name and email (or U.S. Mail) addresses may be obtained carrier subpoenas and commercially-available reverse-lookup services that are routinely used in the class notice context. Ex. BB, Verkhovskaya Rep. ¶¶ 59, 69; *see Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 247 (N.D. Ill. 2014) (certifying TCPA class where plaintiffs similarly anticipated "determin[ing] class members' identities "using a combination of phone numbers in Defendants' records, the records of third-party phone carriers and third-party database providers"); *cf. Keim v. ADF MidAtlantic, LLC*, 328 F.R.D. 668, 679 (S.D. Fla. 2018). Thus, the proposed Class meets the superiority requirement of Rule 23(b)(3).

## IV. CONCLUSION

For the foregoing reasons, Plaintiff Bilek respectfully requests that the Court:

---

[42] Even if manageability concerns did exist—they do not—failure to certify a class action under Rule 23(b)(3) solely on manageability grounds is disfavored. *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 663-64 (7th Cir. 2015) ("[B]efore refusing to certify a class that meets the requirements of Rule 23(a), the district court should consider the alternatives as Rule 23(b)(3) instructs rather than denying certification because it may be challenging to identify particular class members.… [A] judge has discretion to (and we think normally should) wait and see how serious the problem may turn out to be after settlement or judgment, when much more may be known about available records, response rates, and other relevant factors. And if a problem is truly insoluble, the court may decertify the class at a later stage of the litigation.… Under this comparative framework, refusing to certify on manageability grounds alone should be the last resort."); *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 140 (2d Cir. 2001) (Sotomayor, J.) (refusing to certify "on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule").

As to the <u>Damages and IDNC Classes</u>: (1) certify the Classes pursuant to Fed.R.Civ.P. 23(b)(3); (2) appoint Plaintiff as class representative of each class; (3) appoint her attorneys as class counsel for both classes; and (4) order any other relief the Court finds proper; and

As to the <u>Injunctive Class</u>: (1) certify the Injunctive Class pursuant to Fed.R.Civ.P. 23(b)(2); (2) appoint Plaintiff as class representative; (3) appoint her attorneys as class counsel; and (4) enter an injunction:

a. Requiring that each Defendant assemble a Master IDNC list that is used by the Defendant and any telemarketer or lead generator making calls to develop business for them, consisting of all residential telephone numbers of consumers who asked not to be called during telemarketing calls made in furtherance of sale of their goods and services such as HAA and lead generators, for the five years prior to entry of the injunction;

b. Requiring each Defendant to adopt written IDNC policies that, at a minimum, do not permit marketing or lead generation calls to phone numbers on their Master IDNC list until five years have elapsed from the date of the request not to call, and that include instructions as to how to use the IDNC list;

c. Requiring each Defendant to develop formal IDNC training for anyone dealing with telemarketing on their behalf (including lead generators) that includes instructions as to how to use the IDNC list;

d. Prohibiting each Defendant from accepting business derived from outbound telemarketing calls (including lead generation calls), unless the name of the individual caller, the name of the person or entity on whose behalf the call is being made (including the defendant), and a telephone number or address at which the person or entity may be contacted is stated at the beginning of such call; and

e. Prohibiting each Defendant from making or accepting business derived from telemarketing or lead generation calls until all four of the previous conditions have been satisfied, or alternatively until conditions b through d are satisfied and five years has elapsed from the last telemarketing call made by them or on their behalf (including lead generation calls).

Dated: December 12, 2022

Respectfully submitted,

MARY BILEK, individually and on behalf
of others similarly situated

By: _/s/ Alexander H. Burke_____

Alexander H. Burke
Daniel J. Marovitch
BURKE LAW OFFICES, LLC
909 Davis St., Suite 500
Evanston, IL 60201
Telephone: (312) 729-5288
aburke@burkelawllc.com
dmarovitch@burkelawllc.com

*Counsel for Plaintiff*


## CERTIFICATE OF SERVICE

I hereby certify that, on December 12, 2022, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send notification of such filing to all

counsel of record.

_/s/ Alexander H. Burke_____

42