**BILEK, MARY**
10/06/2020                                                                    Pages 1–4

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE NORTHERN DISTRICT OF ILLINOIS
 3              EASTERN DIVISION
 4   MARY BILEK,              )
     INDIVIDUALLY AND ON      )
 5   BEHALF OF OTHERS         )
     SIMILARLY SITUATED,      )
 6                            ) No.  1:18-cv-03083
        Plaintiff,            )
 7                            )
           vs.                )
 8                            )
     NATIONAL CONGRESS OF      )
 9   EMPLOYERS, INC.,         )
     NATIONAL BENEFIT         )
10   BUILDERS, INC., ACCESS   )
     ONE CONSUMER HEALTH,     )
11   INC., UNIFIED LIFE       )
     INSURANCE COMPANY,       )
12   HEALTH INSURANCE         )
     INNOVATIONS, INC., AND   )
13   DOES 1-10,               )
                              )
14      Defendants.           )
15
16            DEPOSITION OF MARY BILEK
17            APPEARING REMOTELY FROM
18              COOK COUNTY, ILLINOIS
19               OCTOBER 6, 2020
20                 10:40 a.m.
21        (Proceedings ended at 3:01 p.m.)
22   Reporter:  Angela C. Loisi, CSR, RPR, FCRR
23   License No.:  084-004571
24   APPEARING REMOTELY FROM COOK COUNTY, ILLINOIS
```

Page 2

```
 1   REMOTE APPEARANCES:
 2      BURKE LAW OFFICES
 3         BY:  MR. ALEX BURKE
 4            MR. DAN MAROVITCH
 5      909 Davis Street, Suite 500
 6      Evanston, Illinois 60201
 7      (312) 729-5288
 8      Aburke@burkelawllc.com
 9      Dmarovitch@burkelawllc.com
10         Representing Plaintiff, Mary Bilek;
11
12      TABET DiVITO & ROTHSTEIN, LLC
13         BY:  MR. TIMOTHY HUDSON
14      209 South LaSalle Street, 7th Floor
15      Chicago, Illinois 60604
16      (312) 762-9450
17      Thudson@tdrlawfirm.com
18         Representing Health Insurance
19            Innovations, Inc.;
20
21
22
23
24
```

Page 3

```
 1   REMOTE APPEARANCES CONTINUED:
 2      GREENSPOON MARDER, LLP
 3         BY:  MR. AARON WILLIAMS
 4      200 East Broward Boulevard, Suite 1800
 5      Fort Lauderdale, Florida 33301
 6      (754) 200-7013
 7      Aaron.williams@gmlaw.com
 8         Representing the Health Insurance
 9            Innovations, Inc.;
10
11      GENOVA BURNS, LLC
12         BY:  MR. CHARLES MESSINA
13            MR. CHRISTOPHER ZAMLOUT
14      494 Broad Street
15      Newark, New Jersey 07102
16      (973) 533-0777
17      Cmessina@genovaburns.com
18      Czamlout@genovaburns.com
19         Representing National Benefit
20            Builders, Inc., and Access One
21            Consumer Health, Inc.;
22
23
24
```

Page 4

```
 1
 2   REMOTE APPEARANCES CONTINUED:
 3      THE LAW OFFICE OF JOSEF MYSOREWALA, PLLC
 4         BY: MR. JOSEF MYSOREWALA
 5            MR. GARRY O'DONNELL
 6      2000 South Dixie Highway, Suite 112
 7      Miami, Florida 33133
 8      (305) 356-1031
 9      JosefM@lawjmm.com
10      GarryO@lawjmm.com
11         Representing National Congress of
12            Employers, Inc.
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 5

1            I N D E X

2

3   WITNESS: MARY BILEK              PAGE

4   Examination by Mr. Williams        7

5   Examination by Mr. Messina      85, 167

6   Examination by Mr. Mysorewala   143, 166

7   Examination by Mr. Burke        157, 179

8

9

10          E X H I B I T S

11

12  MARY BILEK                      PAGE

13  Exhibit No. 3                    159

14

15      (EXHIBIT RETAINED BY ATTORNEY BURKE)

16

17

18

19

20

21

22

23

24

Page 6

1           THE COURT REPORTER:  The attorneys
2   participating in this deposition acknowledge
3   that I am not physically present in the
4   deposition room and that I will be reporting
5   this deposition remotely.
6           They further acknowledge that, in lieu
7   of an oath administered in person, the witness
8   will verbally declare his testimony in this
9   matter is under penalty of perjury.
10          The parties and their counsel consent
11  to this agreement and waive any objections to
12  this manner of reporting.
13          Please indicate your agreement by
14  stating your name and your agreement on the
15  record.
16          MR. BURKE:  Good morning.  Alex Burke
17  for the plaintiff, we agree.
18          MR. WILLIAMS:  Good morning.  Aaron
19  Williams on behalf of Defendant Health
20  Innovations -- Health Insurance Innovations,
21  we agree.
22          MR. MESSINA:  On behalf of NBBI and
23  Access One, Genova Burns, our law firm, Chris
24  and I agree.

Page 7

1           MR. MYSOREWALA:  Josef Mysorewala on
2   behalf of National Congress of Employers, we
3   agree.
4               (Witness sworn.)
5   WHEREUPON:
6               MARY BILEK,
7   called as a witness herein, having been
8   first duly sworn, was examined and testified
9   as follows:
10              EXAMINATION
11  BY MR. WILLIAMS:
12      Q.  All right.  Good afternoon from the
13  East Coast, and good morning to Central time.
14  Could you please tell us your name?
15      **A.  Mary G. Bilek.**
16      Q.  And, Ms. Bilek, where are you
17  currently located?
18      **A.  ████████, Illinois.**
19      Q.  And is anyone in the room with you?
20      **A.  No, there's not.**
21          MR. BURKE:  I think he asked where
22  you're at right now.
23          **THE WITNESS:  Oh, right now I'm in**
24  **Evanston, Illinois.  I apologize.**

Page 8

1   BY MR. WILLIAMS:
2       Q.  Ms. Bilek, have you ever had your
3   deposition taken before?
4       **A.  I have.  With this particular case?**
5       Q.  In any particular case?
6       **A.  I had a deposition before, yes.**
7       Q.  How many times have you been deposed
8   before?
9       **A.  I believe twice for the exact same**
10  **case.**
11      Q.  And what case was that?
12      **A.  That's a case I'm not able to speak**
13  **about.**
14      Q.  I'm sorry?
15      **A.  That's a case I'm not able to speak**
16  **about.**
17      Q.  So you're not able to tell me in what
18  case you were previously deposed?
19      **A.  Nope.**
20      Q.  Why not?
21      **A.  Because I signed a piece of paper.**
22      Q.  You signed -- so when you say you
23  "signed a piece of paper," do you mean you
24  entered into a settlement agreement?

BILEK, MARY
10/06/2020

Page 9

1    A.  Yes.
2    Q.  So you settled that case?
3    A.  Yes.  And I'm not supposed to speak on
4  it.
5    Q.  Does -- did the settlement agreement
6  in that case say that you can't even say that
7  the -- I mean, was this a lawsuit that was
8  filed?
9    A.  Yes, it was.
10   Q.  Was it in federal court or state
11  court?
12   A.  I'm not sure about that.
13   Q.  Was Mr. Burke your attorney?
14   A.  No, he was not.
15   Q.  Who was your attorney in that case?
16   A.  Mr. Mancheck.
17   Q.  What was his first name?
18   A.  Brian Mancheck.
19   Q.  When was this case?
20   A.  I believe 2005.
21   Q.  And I'm just trying to understand,
22  because it's a little bit unusual for a
23  settlement agreement to prohibit you from even
24  mentioning that the case existed.  I'm not

Page 10

1  asking you in any way what the terms of that
2  settlement agreement were.  I'm not interested
3  in that.
4        I'm only asking what was the
5  name -- who -- were you the plaintiff or the
6  defendant in that lawsuit?
7        Were you being sued or was someone
8  suing you?
9    A.  No, I was suing them.
10   Q.  You were the plaintiff, okay.  Was
11  this a class action?
12   A.  No, it was not.
13   Q.  And what was the subject matter of
14  that litigation?
15   A.  Personal injury.
16   Q.  Okay.  And you said you were deposed
17  twice in that case?
18   A.  Yes, I was.
19   Q.  I'm sorry, ma'am?
20   A.  Yes, I was.
21   Q.  And was there ever a trial in that
22  case?
23   A.  Nope.
24   Q.  Did you give any other testimony,

Page 11

1  aside from the two times you were deposed?
2    A.  I don't recall.
3    Q.  Now, let me -- now, I asked the prior
4  deposition question because that kind of
5  depends on what kind of spiel I'm going to
6  give you now on how this deposition works.
7        Sounds like those happened a fairly
8  long time ago, so I'll go through what this
9  process is with you.
10       Now, how this works is myself, to
11  start with, and then the codefendants are
12  going to be asking you questions regarding
13  your lawsuit that you brought against us, our
14  clients -- my client, Health Insurance
15  Innovations.
16       We're going to be asking questions
17  about what is contained in your complaint and
18  questions about this case.  And I'm not asking
19  you to guess at any of your answers, I'm only
20  asking you what your knowledge is and what you
21  know about this case.
22       Does that work with you?
23   A.  Yes.
24   Q.  Okay.  If at any time you don't

Page 12

1  understand a question that I'm asking you or
2  any of the other lawyers are asking you,
3  please let us know and we will try to rephrase
4  the question so it makes better sense and that
5  you're able to respond to what we're actually
6  asking.
7        Is that okay with you?
8    A.  That's fine.
9    Q.  Okay.  So if there's -- if you're
10  going -- if you answer a question that we ask,
11  we're going to assume that you understand what
12  that question was.  Okay?
13   A.  Okay.
14   Q.  Now, have you prepared for this
15  deposition?
16   A.  I'm sorry?
17   Q.  Have you prepared for this deposition?
18   A.  Meaning?
19   Q.  Meaning, have -- did you do anything
20  prior to sitting down today for this
21  deposition to look at the facts in this case?
22   A.  I've tried to review some of my own
23  paperwork that was in my brain and that I gave
24  statements on.

Page 13

1    Q.  And when you say "gave statements on,"
2  what do you mean by that?
3    **A.  Stuff that I have went over that I**
4  **have proof of.**
5    Q.  And what are those?
6    **A.  Phone calls that were being made to**
7  **me, remember -- trying to remember some dates.**
8    Q.  So did you look at any documents or
9  was this all you just going through your own
10 memory and trying to make sure you understood
11 everything?
12   **A.  No.  I have a document in front of me.**
13   Q.  And what document is that in front of
14 you?
15   **A.  This is my case of United States**
16 **District Court of Northern Illinois.**
17   Q.  And if you could, could you show the
18 camera what document you're looking at?
19   **A.  [Indicating.]**
20   MR. WILLIAMS:  Now, Alex, that looks
21 to be the second amended complaint; is that
22 correct?
23   MR. BURKE:  Yeah, that's right.
24   MR. WILLIAMS:  Okay.

Page 14

1  BY MR. WILLIAMS:
2    Q.  Ms. Bilek -- thank you, Ms. Bilek.
3    And aside from the second amended
4  complaint that you're holding, are there any
5  other documents that you have with you?
6    **A.  I do.**
7    Q.  And what are those?
8    **A.  My phone log.**
9    Q.  Your what, I'm sorry?
10   **A.  Phone log, my subpoena from my**
11 ▮▮▮▮▮▮▮.
12   Q.  So, okay.  The ▮▮▮▮▮▮ records, okay.
13   Are there any other documents you have
14 with you?
15   **A.  No, there is not.**
16   Q.  Okay.  Did you review any other
17 documents in preparation for this deposition
18 today?
19   **A.  I did not.**
20   Q.  Did you -- and I'm going to ask -- I'm
21 going to preface this last question that I am
22 not asking for what you spoke about with your
23 attorney.
24   Did you meet with your attorney in

Page 15

1  preparing for this deposition?
2    **A.  Today's the first day we met.**
3    Q.  And how long did you spend with your
4  attorney preparing for this deposition?
5    **A.  Give or take maybe 20 minutes.**
6    Q.  Okay.  And do you feel prepared to go
7  forward with this deposition here today?
8    **A.  I do to the best of my knowledge.**
9    Q.  So is that a yes?
10   **A.  That's a yes.  Mm-hmm.**
11   Q.  Okay.  Do you have any reason that you
12 wouldn't be able to answer questions presented
13 in this deposition today?
14   For example, are you on any alcohol,
15 medication, anything like that?
16   **A.  I do not do any drugs and I do not**
17 **drink.**
18   Q.  Perfect.
19   And so there's no reason that you
20 wouldn't be able to truthfully answer the
21 questions that we're going to ask?
22   **A.  Absolutely not.**
23   Q.  Okay.  Excellent.
24   Now, if you could, just give us a bit

Page 16

1  of background information, Ms. Bilek.  Where
2  have you lived -- where do you live currently
3  and where have you lived for the last 10
4  years?
5    **A.  I live at ▮▮▮▮▮▮▮▮▮▮**
6  **▮▮▮▮▮▮▮▮▮.**
7    Q.  And how long have you lived at that
8  address for?
9    **A.  I lived there since ▮▮▮▮.**
10   Q.  Well, that makes it easy then for the
11 last 10 years.
12   And, Ms. Bilek, what do you do for a
13 living?
14   **A.  I'm a ▮▮▮▮▮▮▮.**
15   Q.  And what does that mean?
16   **A.  ▮▮▮▮▮▮▮▮▮▮▮▮▮**
17 ▮▮▮▮
18 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
19 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
20 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
21 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
22 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
23 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
24 ▮▮▮▮▮▮▮▮▮▮▮



Page 17

13    THE COURT REPORTER:  I'm sorry.  "A
14  couple weeks, a couple"?

Page 18

Page 19

Page 20

8    Q.  Got you.
9         Okay.  Thank you very much.
10        Now, Ms. Bilek, have you -- obviously
11  you mentioned the personal injury lawsuit from
12  2005.
13        Are there any other lawsuits that
14  you've been involved with over the years?
15    A.  Yes.
16    Q.  And if you could, please, what are
17  those?
18    A.  The -- we'll go back to -- I don't
19  remember the year, but it was with Kmart.  Do
20  you want me to --
21    Q.  And were you suing Kmart or was Kmart
22  suing you?
23    A.  No, I was suing Kmart.
24    Q.  Okay.  When approximately was that?

BILEK, MARY
10/06/2020

Pages 21–24

Page 21

1    A.  It was, to be exact -- one of their
2  employees sprayed pepper spray in my eye while
3  he was goofing around with pepper spray.
4    Q.  Okay.  So it sounds like another
5  personal injury lawsuit?
6    A.  Yes.
7    Q.  And when was that?
8    A.  That had to be over 20 years ago.
9    Q.  Do you remember if that was in
10  state or federal court?
11    A.  No, it was -- it was not even -- it
12  didn't make it to court.  Just -- they paid my
13  medical bills and settled outside of court.
14    Q.  Was there a lawsuit ever filed?
15    A.  That I don't know.
16    Q.  Okay.
17    A.  I had an attorney, but I know they
18  just paid for, like, my medical bills and
19  stuff.  So I don't know if it actually went
20  into court.  I never did a deposition on that.
21    Q.  Do you remember who the attorney was
22  in that case?
23    A.  No, I do not.
24    Q.  Okay.  All right.  So we have the

Page 22

1  Kmart, maybe, lawsuit 20 years ago.  Any other
2  litigation that you've been involved with?
3    A.  Define "litigation."
4    Q.  A lawsuit.
5    A.  Okay.  Referring to, like, what
6  category, every in general?
7    Q.  Every piece of litigation that you've
8  ever been involved with.
9    A.  Okay.  Bank of America.
10    Q.  And were you the plaintiff or
11  defendant?
12    A.  I was suing them so...
13    Q.  Okay.
14    A.  Plaintiff?
15    Q.  Plaintiff, yeah.  You're suing them,
16  you're the plaintiff.  You're being sued,
17  you're the defendant.  So, sorry -- and like I
18  said, if you don't understand any of the
19  questions I'm asking you, you know, please
20  just let me know and I will ask a better
21  question.
22    A.  Okay.  Just don't want to get the
23  wrong answer.
24    Q.  No, no.  That's the whole point.  We

Page 23

1  just want to make sure we all understand each
2  other.
3      MR. BURKE:  You're doing great, Mary.
4      THE WITNESS:  Okay.  Bank of America,
5  yes.  That was for mortgage fraud because they
6  took my payments and didn't apply it to my
7  mortgage.
8  BY MR. WILLIAMS:
9    Q.  Okay.
10    A.  So I had --
11    Q.  And when was that?
12    A.  2000.  No, no, wait.  I want to say
13  maybe 2000.  Maybe the year 2000.  It could be
14  longer than that.  I don't want to say the
15  exact -- because I don't know the exact date.
16    Q.  And who was your lawyer in that case?
17    A.  Keith, Keith Keyha [phonetic].
18    Q.  Keith Keyha, okay.
19      And do you remember if that was in
20  state or federal court?
21    A.  I don't know.
22    Q.  Not -- not asking you to guess.  So if
23  you don't know, that's an okay answer.
24    A.  I don't know.

Page 24

1    Q.  Okay.  All right.  So at -- aside from
2  the Bank of America lawsuit where you're the
3  plaintiff about 20 years ago, any other
4  litigation that you're involved with?
5    A.  Yes, there was -- it was called
6  American Home Mortgage.
7    Q.  Okay.
8    A.  And it was for the exact same thing.
9  They filed bankruptcy and tried to keep my
10  payments for my mortgage on my home.
11    Q.  Now, were you the plaintiff in that
12  one or the -- were you being sued?
13    A.  I was -- I was the plaintiff, yes.  I
14  was suing them, yes.
15    Q.  Okay.  And when approximately when was
16  this?
17    A.  That was around the same time the Bank
18  of America -- because it was first and second
19  mortgage.
20    Q.  Okay.  So also around 2000?
21    A.  Yes.
22    Q.  Okay.  And same attorney, Keith Keyha?
23    A.  Same attorney.
24    Q.  Okay.  All right.  And after the

BILEK, MARY
10/06/2020

Page 25

1  American Home Mortgage lawsuit, any others?
2      **A. Walmart. I was the plaintiff again.**
3  **That did not go to court. I actually released**
4  **that.**
5      Q. You settled the claim?
6      **A. No, no, no. Didn't settle, just**
7  **released -- did not proceed forward on it.**
8      Q. Okay. Do you know if a lawsuit was
9  filed or if you just made a demand to them?
10     **A. I -- I believe the attorney made a**
11 **lawsuit. I believe he filed a lawsuit.**
12     Q. And what was that over?
13     **A. That was over personal injury.**
14     Q. And who was your attorney?
15     **A. Brian Mancheck.**
16     Q. Okay. That was the same attorney from
17 the 2005 case?
18     **A. Correct.**
19     Q. And about when was the Walmart case?
20     **A. 2000- -- maybe '06 if I'm not**
21 **mistaken.**
22     Q. Okay.
23     **A. I don't want to guess, but I think it**
24 **was around there.**

Page 26

1      Q. Okay. And you said there was
2  no -- you didn't receive any amount from that
3  case; correct?
4      **A. No, nothing. I didn't receive nothing**
5  **[sic].**
6      Q. Okay. And let me just go back one
7  second, because I forgot to ask: In the Bank
8  of America or the American Home Mortgage case,
9  did you receive any money from those cases?
10     **A. I did.**
11     Q. And what did you receive?
12     **A. You want --**
13     MR. BURKE: Make sure that you're
14 not -- I don't know if those settlements are
15 confidential or not. Just make sure you're
16 not putting yourself -- yeah, I know.
17     Make sure you're not putting yourself
18 in jeopardy here. Do you know, Mary, whether
19 those settlements are supposed to be
20 confidential?
21     **THE WITNESS: I believe I did**
22 **sign -- yes, I believe I did sign a piece of**
23 **paper for Bank of America also not to speak of**
24 **it.**

Page 27

1  BY MR. WILLIAMS:
2      Q. When you say "a piece of paper," I
3  mean, you signed a settlement agreement with
4  Bank of America and with American Home
5  Mortgage?
6      **A. Meaning the judge was in the room when**
7  **I had -- obligated not to speak of the case.**
8      Q. I'm sorry. Can you say that again?
9      **A. I had to sign an arranged agreement**
10 **not to speak of the case. So when -- when it**
11 **was settled, I cannot speak of it.**
12     Q. So there was a judge in the room,
13 though?
14     **A. A mediation judge.**
15     Q. A mediator, a mediator. Okay. So you
16 went to a mediation --
17     **A. Right.**
18     Q. -- and you settled the cases with Bank
19 of America and American Home Mortgage?
20     **A. Correct.**
21     Q. Okay. So what you're telling me
22 is -- and I'm just trying to
23 understand -- that you have a confident
24 settlement agreement with them --

Page 28

1      **A. Correct.**
2      Q. -- is that correct?
3      **A. Correct.**
4      Q. Okay. So I'm not asking for a
5  specific amount, then.
6      Did you receive any money from that
7  lawsuit -- those lawsuits?
8      **A. No.**
9      Q. You got no money from Bank of America
10 or American Home Mortgage?
11     **A. American Home Mortgage, just so you**
12 **understand it properly, so I'm not**
13 **exaggerating nothing [sic], it was just to get**
14 **my mortgage back to where it was. I did not**
15 **win a settlement. I did not win money from**
16 **them. They -- the new company put my mortgage**
17 **back to where it was before they took my**
18 **mortgage payments and stole them from me.**
19     Q. Okay. Same with Bank of America?
20     **A. Same thing. I was not suing them. I**
21 **was not suing them to make a fortune, I was**
22 **suing them to get my mortgage back to my name.**
23     Q. So you weren't trying to get any money
24 out of those lawsuits, it was to basically fix

BILEK, MARY
10/06/2020

Page 29

1  the mortgage issue?

2  **A.  Fix the mortgage issues that they have**
3  **caused where they sold it three times.**

4  Q.  Okay.  Thank you.

5  All right.  So after the Walmart
6  issue, any other lawsuits besides that?

7  **A.  I believe I had a small lawsuit.  I**
8  **don't remember the name of the company.**

9  Q.  When approximately was this?

10  **A.  I want to say, like, maybe two years**
11  **ago.**

12  Q.  And who was your lawyer?

13  **A.  Alex Burke.**

14  Q.  All right.  And what was the nature of
15  the lawsuit?

16  **A.  You know what?  I don't remember that**
17  **either.**

18  Q.  Was it personal injury?

19  **A.  No.**

20  Q.  Was it a TCPA lawsuit, like this one?

21  **A.  Class action?  What -- repeat that**
22  **question.  I don't know what TC...**

23  Q.  No worries.

24  Do you know why you were suing this

Page 30

1  entity?

2  **A.  Oh, yes.  For phone calls.**

3  Q.  For phone calls, okay.

4  **A.  Yeah.  There you go, sorry.  I had to**
5  **rephrase that.**

6  Q.  No, no.  It's okay.  I understand.

7  And you said that was about two years
8  ago?

9  **A.  I believe so, yes.**

10  Q.  But you don't remember who you were
11  suing?

12  **A.  No.  I don't want to give the wrong**
13  **name because I don't remember.**

14  Q.  Okay.  Could it have been Pro Recovery
15  Systems?

16  **A.  Possibly.  But again, I don't want**
17  **to -- I don't want to say yes if I don't**
18  **remember.**

19  Q.  Okay.  So aside from this -- but Alex
20  would have that information if we asked him
21  who that was?

22  **A.  I believe so.  He was my attorney.**

23  Q.  Okay.  So aside from this lawsuit two
24  years ago for phone calls that you're not sure

Page 31

1  against who, any other lawsuits?

2  **A.  To the best of my knowledge, none that**
3  **I could remember.**

4  Q.  Do you remember any lawsuit against
5  the Regional Adjustment Bureau?

6  **A.  Can you specify more about what it is?**

7  Q.  I'm asking you.  Was a lawsuit filed
8  in 2007 by you against the Regional Adjustment
9  Bureau?

10  Do you remember anything about that?

11  **A.  I -- that I can't say yes and I can't**
12  **say no.  I don't remember.**

13  Q.  Okay.  What about a lawsuit against a
14  Mr. Meynard?

15  **A.  Mr. Meynard.**

16  Q.  A Meynard lawsuit?

17  MR. BURKE:  How about Menards?

18  BY MR. WILLIAMS:

19  Q.  Menards?

20  **A.  Yes.  That -- that's --**

21  Q.  What's that lawsuit?

22  **A.  That's the very first lawsuit I told**
23  **you I cannot speak on.**

24  Q.  Oh, okay.  You didn't tell me the name

Page 32

1  on it so...

2  **A.  All right.**

3  Q.  No, no.  No worries, no worries.

4  Do you recall a lawsuit about Pro
5  Recovery Systems?

6  **A.  Pro Recovery, yes, I actually do.**
7  **That was a bill collector that was harassing**
8  **me.  Yes.  Thank you.  I do remember that one.**

9  Q.  And who was your attorney there?

10  **A.  I believe Alex, Mr. Burke.**

11  Q.  You said Alex?

12  **A.  Yes, I believe Mr. Burke.**

13  Q.  And what happened with that lawsuit?

14  **A.  I believe we settled.**

15  Q.  Did you receive any money from that
16  one?

17  **A.  Yes.**

18  Q.  How much?

19  **A.  Don't remember.**

20  Q.  If we asked Alex, would he have that
21  information?

22  **A.  I'm sure he would.**

23  Q.  And do you remember a lawsuit against
24  Blue Cross and Blue Shield?

BILEK, MARY
10/06/2020

Page 33

1  **A.  Blue Cross and Blue Shield?  I don't**
2  **remember a lawsuit against them.**
3      Q.  You never sued Blue Cross and blue
4  shield?
5  **A.  I don't recall.**
6      Q.  Okay.  And what about a lawsuit
7  against Mr. Hussain?
8  **A.  Mr. Hussain.  Oh, I believe that was**
9  **harassment phone calls.**
10     Q.  And what's happening with that case?
11 **A.  I have no idea.**
12     Q.  Now, all these lawsuits that you had
13 been involved with, did you have much
14 involvement in these lawsuits?
15 **A.  I'm sorry.  Can you make that more**
16 **understanding?**
17     Q.  Well, certainly.  I mean, in the
18 lawsuit against Mr. Hussain, for example, it
19 looks like it was filed in 2019.  But you just
20 stated that you don't really know or remember
21 anything about this lawsuit.  So how were you
22 involved in this lawsuit?
23     MR. BURKE:  Objection to form.
24

Page 34

1  BY MR. WILLIAMS:
2      Q.  You can answer.  And we didn't go over
3  this at the beginning, Ms. Bilek, so I
4  apologize for that.  Mr. Burke, I'm sure, is
5  going to object at times throughout this
6  deposition.  But unless he instructs you not
7  to answer, you still need to answer the
8  question.
9  **A.  Okay.  I apologize.  I didn't hear**
10 **what anybody had to say.  Can you repeat**
11 **it?  Everybody came at me at one time.**
12     Q.  No, I understand, not a problem.
13     I asked you regarding the lawsuit with
14 Mr. Hussain, what your involvement in that
15 lawsuit was?
16 **A.  Okay.  Mr. Hussain is the phone calls**
17 **I received for the harassment phone calls.**
18     Q.  And what are the harassment phone
19 calls, what happened there?
20 **A.  He was the one I believe trying to**
21 **sell me insurance and actually harassed me and**
22 **called me stupid because I wouldn't take his**
23 **insurance policies.**
24     Q.  So are you alleging -- do you -- what

Page 35

1  are you -- the claims that you're alleging in
2  that lawsuit?
3  **A.  Unwanted phone calls and harassment, I**
4  **believe.**
5      Q.  Okay.  And who was your lawyer in that
6  lawsuit?
7  **A.  Alex Burke.**
8      Q.  And what is happening in that lawsuit?
9  **A.  I don't know.**
10     Q.  What has been your involvement in that
11 case?
12 **A.  My involvement is the phone calls I**
13 **received.**
14     Q.  And so I guess I don't think I'm
15 asking this question the right say so I
16 apologize for that.
17     Have you been deposed in that case
18 yet?
19 **A.  I have not.**
20     Q.  Have you had any input in the motions
21 that have been filed in that case?
22 **A.  I don't recall.**
23     Q.  Do you know what is currently
24 happening in that case?

Page 36

1  **A.  I don't recall.**
2      Q.  I mean, do you know what's happening
3  in that case?
4  **A.  At this point, no.**
5      Q.  Okay.  Now, let's talk about this
6  case.
7      How long have you known Mr. Burke for?
8  **A.  Known him as my attorney?**
9      Q.  Yes, ma'am.
10 **A.  That's how I know him, as my attorney.**
11 **I don't know him on a personal base [sic].  I**
12 **know him as being my attorney.  So I want**
13 **that --**
14     Q.  And how long has he -- I'm sorry.  I
15 didn't mean to cut you off.
16 **A.  I want that clarified.  It's not a**
17 **personal friendship, it's an attorney-client**
18 **relationship.**
19     Q.  Certainly.
20     And how long has he -- have you had
21 that attorney-client relationship with
22 Mr. Burke for?
23 **A.  Probably over 10 years.**
24     Q.  And how did you come to meet him?

BILEK, MARY
10/06/2020

Pages 37–40

Page 37

1    A.  He worked at -- attorney's office that
2  represented me years and years ago.
3      Q.  In which case?
4    A.  The American Home Mortgage, the home
5  cases.
6      Q.  Okay.  Now -- so that was just -- I'm
7  trying to understand.  He represented you
8  starting, you said, 10 years ago, but the
9  American home cases were way before that;
10 correct?
11   A.  He worked in an office.  I -- and I
12 cannot sit here and say that he was the
13 personal attorney for it.  He worked in the
14 office of the firm that represented me.
15     Q.  Got you.  Okay.  Thank you.  Thanks
16 for clearing that up.
17         So aside from the personal injury
18 cases where it sounds like you had different
19 attorneys, for all the cases regarding the
20 phone calls that you described, the harassing
21 phone calls and the debt collection cases,
22 Mr. Burke represented you in all of those
23 matters?
24   A.  Yes.

Page 38

1      Q.  Okay.  Now, how did you decide to
2  bring your claims in this case?
3    A.  For the class action?
4      Q.  Yes, ma'am.
5    A.  For the best interest of me and the
6  people around us, the phone calls are very
7  harassing.  And they're a nuisance.  And I
8  just feel that this is not right to have
9  unwanted nuisance calls.
10     Q.  So you decided to bring these phone
11 calls because you feel that they're a nuisance
12 to the community at large?
13   A.  To myself.  I could speak on my
14 behalf, yes, to me.  Yes, it is.
15     Q.  Okay.  Are you familiar with any
16 others that you believe should be part of this
17 class action?
18   A.  I'm not familiar with it, but my
19 attorney is, Mr. Burke.
20     Q.  So do -- so you don't personally have
21 any knowledge of any others who received
22 harassing phone calls from the defendants in
23 this case?
24   A.  I do not.

Page 39

1      Q.  And is it your contention here today
2  that you received harassing phone calls from
3  all of the defendants in this case?
4    A.  I received phone calls.  I'm not sure
5  exactly which defendants.  That's my
6  attorney's job also, but I have --
7      Q.  So it's his -- so it's your contention
8  that it's his job to figure out who to sue?
9    A.  Yes.
10     Q.  Have you ever heard of a company
11 called Health Insurance Innovations?
12   A.  I've heard of them.
13     Q.  Who are they to you?
14   A.  Don't know who they are to me, but
15 I've heard of them.
16     Q.  Okay.  So how have you heard of them?
17   A.  They're on TV.
18     Q.  Okay.  And have you ever received a
19 call from Health Insurance Innovations?
20   A.  I can't say it was particularly from
21 them.
22     Q.  Have you ever spoken to anyone on the
23 phone saying that they're from Health
24 Insurance Innovations?

Page 40

1    A.  I don't recall.  I have had a lot -- a
2  lot of phone calls, and I don't recall every
3  single person that said who they were.
4      Q.  So I guess what I'm getting at,
5  Ms. Bilek, is how do you know who to sue here?
6    A.  That's my attorney's job.
7      Q.  Right.  No.  I understand, but you
8  realize that to sue someone you have to have
9  information about why you should be suing
10 them, obviously.
11         For example, in the Kmart case you
12 sued Kmart because one of their employees
13 sprayed pepper spray in your face.
14 That -- that makes sense.
15         So I'm just trying to understand why
16 you decided to bring a lawsuit against my
17 client, Health Insurance Innovations, when
18 your testimony here today is that you don't
19 even know if you ever received a phone call
20 from them?
21   A.  My answer is not going to change.  I
22 received harassing phone calls.  And I left it
23 in my attorney's hands to find out and figure
24 out who they were from.  My answer is not

Page 41

1 going to change.
2 Q. Okay. So you -- I'm just trying to
3 understand the process here. When you
4 received a -- what you considered to be a
5 harassing phone call, what did you do?
6 A. What did I do?
7 Q. Yes, ma'am.
8 A. I wrote down everything I needed to
9 write down, who they were, and the phone calls
10 just did not stop. Even asking them not to
11 call me again, they did not stop. They're a
12 nuisance that kept coming over and over and
13 over again.
14 Q. How many phone calls do you contend
15 that you received?
16 A. I want to say a good 30 of them --
17 Q. And for what time --
18 A. -- give or take.
19 Q. And over what time period did you
20 receive these calls?
21 A. Within a year, maybe less than that.
22 Q. So your lawsuit is because you
23 received 30 phone calls within or less than a
24 year --

Page 42

1 A. Right.
2 Q. -- that these are a nuisance that you
3 needed to bring a class action for?
4 A. Yes.
5 Q. Now, you just mentioned that you told
6 them not to call you. Who did you tell not to
7 call you?
8 A. Don't know who it was, but I spoke to
9 someone on the phone, told them not to call
10 me. And the same number called back 10
11 minutes later. And I asked them not to call
12 me again, and they called back again the same
13 10 minutes later.
14 Q. Are you aware of something called a
15 national do not call list?
16 A. I am.
17 Q. Are you on the national do not call
18 list?
19 A. I do believe I am.
20 Q. And what phone number is that that you
21 were on the national do not call list for?
22 A. ▇▇▇▇▇▇▇▇
23 Q. And do you have documentation showing
24 that you were on the national do not call

Page 43

1 list?
2 A. I don't believe I have documents.
3 Q. And when did you go on the national do
4 not call list with the ▇▇▇▇▇▇▇▇ number?
5 A. I went on that quite a few years ago.
6 Q. Do you recall when?
7 A. I don't recall when. Can't give you
8 an exact date.
9 Q. Do you have any other phone numbers
10 that you use?
11 A. No, just the ▇▇▇▇▇▇▇▇.
12 Q. Do you have any landlines at your
13 house?
14 A. I do not. Haven't had those in years.
15 Waste of money.
16 Q. Neither have I.
17 So the ▇▇▇▇▇▇ number, how long
18 have you had that number for?
19 A. I've had that for well over seven
20 years that I could remember. That's when I
21 believe I transferred to ▇▇▇▇▇, maybe
22 longer.
23 Q. So that answers my next question.
24 Your phone is with ▇▇▇▇▇?

Page 44

1 A. Correct.
2 Q. Okay. And the phone -- what kind of
3 phone do you currently have?
4 A. Right now I can't exactly answer that
5 because my husband actually picked it out for
6 me. So it's -- I know it's a ▇▇▇▇. It's
7 an ▇▇▇.
8 Q. It's a ▇▇▇▇ okay.
9 Now, how long have you had the ▇▇▇▇
10 ▇▇▇ for?
11 A. I just got that new one about five
12 months ago.
13 Q. So it's fair to say then that the
14 current phone that you're using is not the
15 same phone that you had when you received the
16 calls that you're bringing this lawsuit over?
17 A. It is not.
18 Q. Okay. Now, what phone did you have
19 when you -- what phone were you using when you
20 received these calls?
21 A. The ▇▇▇
22 Q. I'm sorry, ma'am?
23 A. ▇▇▇▇▇▇▇
24 Q. ▇▇▇▇



Page 45

1    A.  ▮▮▮▮▮▮▮▮▮▮▮▮
2    Q.  And that's a type of phone?
3    A.  Yes, it's a -- it's ▮▮▮▮▮
4    Q.  ▮▮▮▮ got you.  Okay.
5        And how long did you have that phone
6  for?
7    A.  That one I had for about four years.
8    Q.  So about from 2016 to 2020?
9    A.  That's safe to say, yes.
10   Q.  Okay.  And is it also safe to say that
11 that is the phone that you were using when you
12 received the calls you complained about?
13   A.  Yes.
14   Q.  Okay.  Do you still have that phone?
15   A.  I do not.
16   Q.  Where is it?
17   A.  It's in the possession of my attorney.
18   Q.  Okay.  So the phone is still in
19 existence?  It's not in the trash can?
20   A.  It's not in my possession, but it does
21 exist, yes.
22   Q.  Got you.  Alex has the phone.
23   A.  Alex --
24   Q.  Alex has the phone?

Page 46

1    A.  I'm sorry.  Yes.  I apologize.  Alex
2  has it.
3    Q.  No, no.  Not a problem at all.
4  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
5  ▮▮▮▮▮▮▮
6  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
7  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
8  ▮▮▮▮▮▮▮▮▮▮▮▮
9  ▮▮▮▮▮▮▮▮▮▮▮
10 ▮▮▮▮▮▮▮▮▮
11 ▮▮▮▮▮▮
12 ▮▮▮▮▮▮▮
13 ▮▮▮▮▮▮▮▮▮▮▮
14 ▮▮▮▮▮▮▮▮▮▮
15 ▮▮
16 ▮▮▮▮
17 ▮▮▮▮▮▮
18 ▮▮▮▮▮▮▮
19 ▮▮▮▮▮
20 ▮▮▮▮▮▮▮▮▮
21 ▮▮▮▮▮▮▮▮▮▮▮
22 ▮▮▮▮▮▮▮▮▮▮
23 ▮▮▮▮
24 ▮▮▮▮▮▮▮

Page 47

1  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
2  ▮▮
3  ▮▮▮▮
4    Q.  Now, I want to ask you about how you
5  use your phone.  Do you have your phone set up
6  to record calls?
7    A.  I do not.  The only thing on my phone
8  is I have an extra -- I pay $4 a month for an
9  external voice messaging where it converts
10 into text message.
11   Q.  So you don't record all your phone
12 calls as they come in?
13   A.  I don't -- no, I do not.
14   Q.  Some people do.
15   A.  If they leave a message, then
16 obviously they're being recorded, but I do
17 not --
18   Q.  Right.
19       THE COURT REPORTER:  I'm sorry.  You
20 guys overlapped there.
21       "But I do not do it on"?
22       THE WITNESS:  I don't do it on my
23 personal basis.
24

Page 48

1  BY MR. WILLIAMS:
2    Q.  Right.  So you're not -- just so I
3  understand, you're not actively trying to
4  record phone calls?
5    A.  No.
6    Q.  Okay.  Now, Ms. Bilek, do you take
7  notes when you receive phone calls from what
8  you perceive to be telemarketers?
9    A.  Yes, I do.
10   Q.  Why?
11   A.  So I know what to tell them the next
12 time they call me with the exact same phone
13 number, the exact same spiel, and exact same
14 thing they're trying to sell me.
15   Q.  Do you usually answer the phone when
16 they call you?
17   A.  If I can get to it.  ▮▮▮▮▮▮▮▮▮▮
18 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
19 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
20 ▮▮▮▮▮▮▮▮▮▮  And it
21 becomes a nuisance when I have to answer phone
22 calls like that.
23   Q.  Okay.  Now, when you receive phone
24 calls like that, do you immediately call

Page 49

1  Mr. Burke afterwards?
2  **A. I do not. Not automatically --**
3  **not --**
4  Q. Have you -- I'm sorry, ma'am.
5  **A. I don't call him immediately. I'll**
6  **write it down and when I get around to it, I**
7  **will advise him of the phone call I received.**
8  Q. Have you ever called Mr. Burke
9  immediately after receiving such a phone call?
10  **A. Immediately after? I may have thrown**
11  **him a text here and there, but I don't believe**
12  **I just pick up a phone and, like, call him.**
13  Q. So is it your testimony then you're
14  not actively looking for litigation like this?
15  **A. No, I don't** ███████████████████
16  █████████████████████████████████████
17  █████████████████████████████████████
18  ████████████████████████████████
19  ██████████████████████████████████████
20  ██████████████████████████████████████
21  ██████████████████████████
22  MR. BURKE: Mary, do you need a break?
23  **THE WITNESS: Yes, I do.**
24  MR. BURKE: All right. Let's, please,

Page 50

1  take a five-minute break.
2  (Whereupon, a recess was
3  had.)
4  BY MR. WILLIAMS:
5  Q. Just wanted to touch base. So,
6  Ms. Bilek, during the break did you review any
7  of your notes or go over anything preparetic
8  more for this deposition?
9  **A. Truthfully, actually, all that was**
10  **said is I was doing good and how you were kind**
11  **of getting on my nerves.**
12  MR. BURKE: Mary, be careful. Be
13  careful not to talk about what you and I talk
14  about. He just asked you if you reviewed your
15  notes or anything like that. So we're -- I
16  don't want to waive any attorney-client
17  privilege, and we don't want to tell them what
18  we talked about.
19  So his question was limited to asking
20  about whether you reviewed your notes or
21  anything like that.
22  **A. No, I did not.**
23  Q. Okay. And I'm just trying to
24  understand the setup of your room, because --

Page 51

1  MR. WILLIAMS: And I know, Alex, I
2  think you said you're in different rooms and I
3  believe you.
4  Is this like a glass box or a door and
5  a wall in the middle, because I keep seeing
6  you guys turn to each other when you're
7  talking.
8  MR. BURKE: Yeah. I mean, I can tell
9  you the setup, or the witness can. There's a
10  glass door between us which is closed.
11  MR. WILLIAMS: Okay. I'm just trying
12  to understand. I don't care if you're even in
13  the same room. You're on video. I'm just
14  trying to understand, you know, the setup
15  so...
16  MR. BURKE: Yeah.
17  MR. WILLIAMS: There's a glass door in
18  the middle. Thank you, I appreciate that.
19  MR. BURKE: We have it set up that way
20  because of the pandemic.
21  MR. WILLIAMS: No, no. Of course.
22  Hence why I'm in my home office.
23  MR. BURKE: Right. And I'm sitting
24  here with a mask on and we've got the witness

Page 52

1  in a room by herself with her mask off.
2  MR. WILLIAMS: Understood. Thank you.
3  BY MR. WILLIAMS:
4  Q. Okay. Ms. Bilek, if you could, from
5  all of your prior lawsuits, what is the total
6  amount of money that you received?
7  **A. I can't speak on that.**
8  Q. More than 10,000?
9  **A. Again, I can't speak on that.**
10  Q. So is all -- all the times that you
11  have received money in lawsuits, it's all
12  confidential settlements?
13  **A. Yes.**
14  Q. Okay. All right. Now, Ms. Bilek, do
15  you have a computer at home?
16  **A. I do.**
17  Q. Do you make purchases on your
18  computer?
19  **A. My children do that, because honestly**
20  **I'm not the best at picking things out. So I**
21  **leave my kids in charge with that.**
22  Q. So they can't touch the phone, but
23  they can touch the computer?
24  **A. Yes. We actually -- we all have our**



Page 53

1  own computers.  But actually, my computer
2  there's something to hide so my kids aren't
3  allowed to use my computer.
4      Q.  Fair enough.
5          So it's safe to say then the family
6  makes purchases on the computer?
7      A.  Yes.
8      Q.  Okay.  Now, when you say you've had a
9  computer, I assume, in 2018?
10     A.  Yes.
11     Q.  Prior to that as well?
12     A.  Yes.
13     Q.  And do you have Internet access as
14 well?
15     A.  Yes, we do.
16     Q.  Okay.  Now, did you ever search for
17 any health insurance on the computer?
18     A.  I do not.
19     Q.  And let me ask you a more basic
20 question.  I apologize if I jumped ahead.  Do
21 you have health insurance?
22     A.  Yes.  It's required by state of law or
23 you're penalized, so yes, I do.
24     Q.  Okay.  And I think there's no penalty

Page 54

1  anymore.  They changed the law on that.
2      A.  You don't live in Illinois.
3      Q.  Oh, got you.  Okay.  Well, how long
4  have you had health insurance for?
5      A.  Pretty much all my life.
6      Q.  Okay.  Has there ever been a gap
7  period where you didn't have health insurance
8  or were looking for it?
9      A.  No.
10     Q.  Okay.

Page 55

13     Q.  Have you --
14         (Indiscernible simultaneous
15          colloquy.)
16 BY MR. WILLIAMS:

21     Q.  Okay.  Have you ever done any Google
22 searches for health insurance?
23     A.  No

Page 56

4      Q.  Okay.  So if you -- you've
5  never -- it's your testimony that you've never
6  made any searches for health insurance on the
7  computer?
8      A.  Nope.

21         THE COURT REPORTER:  I'm sorry.  I
22 didn't hear the end of that.  Ms. Bilek, can
23 you please repeat that?
24         THE WITNESS:  Okay.  I was lost.  I

Page 57

1 **don't remember what I said. What did you --**
2 BY MR. WILLIAMS:
3 ███████████████████████████
4 ███████████████████████████████
5 ████████████████████████████████████
6 ██████████████████████████████
7       MR. BURKE: Mary, just make sure
8 you're just answering the question that he's
9 asking.
10       **THE WITNESS: Okay.**
11 BY MR. WILLIAMS:
12 ██████████████████████████████
13 ███████████████████████████████████
14 ██████████████████████████████████
15 ████████████
16 ████████████████████████████████████
17 █████████████████████████████████████
18 █████████████████████
19       Q. You don't know, okay.
20       Do you -- when you're online, do you
21 have advertisement banners ultimately come up
22 on the Internet. Do you ever click on those
23 banners?
24       **A. No.**

Page 58

1       Q. Have you ever provided personal
2 information about yourself on the Internet?
3       **A. No.**
4       Q. Have you ever put your phone number
5 out there on the Internet asking for someone
6 to call you?
7       **A. Nope.**
8       Q. Have you ever given your email address
9 when you're on the Internet?
10       **A. No.**
11       Q. Have you ever visited the website
12 HIIQ.com?
13       **A. No.**
14       Q. Now, Ms. Bilek, there's a couple of
15 phone call recordings that you provided in
16 this case. Are you aware of that?
17       **A. Yes.**
18       Q. And what are these recordings?
19       **A. Recordings of them trying to sell me**
20 **insurance.**
21       Q. Who's "them"?
22       **A. Don't know exactly which one you're**
23 **referring to, so I --**
24       Q. No problem. Let's talk about the

Page 59

1 March of 2018 phone call that is identified.
2 And I think you have the second amended
3 complaint in front of you; correct, ma'am?
4       **A. I do.**
5       Q. If you could, please turn to page 14
6 and take a look at -- at the bottom of
7 page 14, take a look at the paragraph
8 number 73. Just let me know when you're
9 there.
10       **A. Okay. I'm at 73 on page 14.**
11       Q. Yes, ma'am.
12       **A. Okay.**
13       Q. And do you see -- thank you.
14       And do you see where it says [as
15 read]:
16             "During the call
17             Plaintiff" --
18       You.
19             -- "received from
20             Defendants on
21             March 16, 2018."
22       You pressed 1 to speak with a
23 representative; is that correct?
24       **A. That's correct.**

Page 60

1       Q. And that you were offered group
2 insurance from NCE Premier Platinum; is that
3 right?
4       **A. Correct.**
5       Q. Okay. Now, do you recall this phone
6 call?
7       **A. Yes, I do.**
8       Q. Did you record this phone call?
9       **A. I did not record this phone call.**
10       Q. Okay. You have -- if you go down to
11 paragraph 75, it states that this
12 March 16, 2018, call was placed by Rising
13 Eagle.
14       Do you see that?
15       **A. Yeah.**
16       Q. Did you provide that information to
17 Mr. Burke?
18       **A. Yeah.**
19       Q. So who's Rising Eagle?
20       **A. An insurance company.**
21       Q. So Rising Eagle is the insurance
22 company who was calling you?
23       **A. Yes.**
24       Q. Okay. Now, you also talk about

BILEK, MARY
10/06/2020

Page 61

1  speaking with -- excuse me, the Enrollment
2  Center of America, who's that?
3      **A.  Another company that called.**
4      Q.  So is this the same call on March 16th
5  or a different call?
6      **A.  I don't remember.**
7      Q.  Okay.  Now, when you spoke to someone
8  on March 16th, did you provide them with your
9  information?
10     **A.  I did not.**
11     Q.  Did you ever have a -- an extended
12  call with a sales agent?
13     **A.  Extended call, meaning?**
14     Q.  Meaning, where you had a conversation
15  with them?
16     **A.  Oh, yes.**
17     Q.  When was that?
18     **A.  I don't recall the date, but I have**
19  **had many calls with these people.**
20     Q.  And have you ever had a discussion
21  with them about --
22     **A.  Let me correct this.**
23     Q.  I'm sorry.
24     **A.  I need to correct that.  Made**

Page 62

1  **conversations with these people.**
2      Q.  And "these people" you mean the people
3  that are calling you to try and sell you
4  health insurance?
5      **A.  Yes.**
6      Q.  Okay.  And when you have these calls
7  with these people, what are they regarding?
8      **A.  Health insurance.**
9      Q.  So you've discussed purchasing health
10  insurance?
11     **A.  I went through the phone calls with**
12  **them, yes.**
13     Q.  Why?
14     **A.  To see what they had to sell.**
15     Q.  And you just testified that you've had
16  health insurance always.  And you've had
17  health insurance through Marketplace for at
18  least the past five years.
19         Why would you have these phone calls
20  if you weren't interested in purchasing health
21  insurance?
22     **A.  Because they're the same phone calls**
23  **that keep coming over and over and over again.**
24     Q.  So you went through an entire phone

Page 63

1  call with them talking about purchasing health
2  insurance.  Did you ever have any intention to
3  purchase health insurance?
4      **A.  No.**
5      Q.  Then why did you have a phone call?
6         MR. BURKE:  Asked and answered.
7  BY MR. WILLIAMS:
8      Q.  You can answer.
9      **A.  Because I went through the whole -- to**
10  **find out what they had to say again so I could**
11  **tell them to stop calling me again.**
12     Q.  Are you aware that in the transcript
13  that you produced in this case from the call
14  where you went through everything with them
15  you never told them to stop calling you?
16     **A.  I don't recall what phone call I told**
17  **them to stop calling me.**
18     Q.  So not -- so is it your testimony that
19  you didn't always tell them to stop calling
20  you?
21     **A.  No.  I didn't always, but I can**
22  **testify that I did a few times tell them to**
23  **stop calling me and they did not listen.**
24     Q.  Okay.  So you -- is it -- you spoke to

Page 64

1  them on March 16, 2018; correct?
2      **A.  Correct.**
3      Q.  And that's what we just noted in your
4  complaints; is that right?
5      **A.  Yeah.**
6      Q.  And that call was placed by the Rising
7  Eagle insurance company you testified?
8      **A.  Yeah.**
9      Q.  Okay.  Now, Ms. Bilek, you were on the
10  phone based upon the transcript that you filed
11  in this case at document number 273-4 for
12  approximately 22 minutes.
13         Does that sound about right?
14     **A.  Yes.**
15     Q.  And this call took place, looks like
16  beginning in late morning; is that right?
17         Can everyone hear?  I think her audio
18  is going out a little bit.
19     **A.  Yes.  Can you hear me?**
20     Q.  Okay.  There you are.  Yeah, I can
21  now.  For some reason it just -- maybe it's my
22  headset.
23         Now, Ms. Bilek, you -- you're clearly
24  a busy person with all of your

BILEK, MARY
10/06/2020

Pages 65—68

Page 65

1    responsibilities around the house; is that
2    right?
3        **A.  Yes, I am.**
4        Q.  Why would you take over 22 minutes to
5    talk to someone, a telemarketer, on the phone
6    that you have no interest in buying their
7    product?
8        **A.  Because this is the same one that**
9    **keeps calling me over and over and over again.**
10   **They're nothing but a nuisance to society.**
11       Q.  So in the transcript that you
12   produced, and you even filed in this case, you
13   never mentioned that you don't want to be
14   called anymore.  Why is that?
15       MR. BURKE:  You know, do you -- do you
16   want us to print out the transcript that
17   you're talking about?
18       MR. WILLIAMS:  No, I can share it on
19   my screen.
20       MR. BURKE:  The named Plaintiff, you
21   know, she doesn't have access to ECF.
22   Referring to stuff by ECF numbers is just not
23   a meaningful way to talk about stuff.
24

Page 66

1        MR. WILLIAMS:  So let me ask a
2    different question.  I'm happy to share my
3    screen and share it with her so she can look
4    at it.
5    BY MR. WILLIAMS:
6        Q.  So, Ms. Bilek, were you aware that
7    this call transcript was filed in this case?
8        **A.  Yes.**
9        Q.  Are you getting copies of everything
10   that has been filed in this case?
11       **A.  Yes.**
12       Q.  Okay.  Now, I am going to show you
13   your call transcript, and let me know when the
14   share screen comes up.  It's shared there.  Do
15   you see that?
16       **A.  I do.**
17       Q.  Okay.  Wonderful.  Modern technology.
18       So this is a transcript of your
19   March 16, 2018, call to your cell phone.  And
20   this was filed by your attorney a couple weeks
21   ago in this case.
22       And this is the call that I'm
23   referring to that went on for about 22 and a
24   half minutes.

Page 67

1        Have you seen this transcript before?
2        **A.  I don't believe I've seen this**
3    **transcript.**
4        Q.  So I'm just trying to understand your
5    testimony from a few minutes ago.  So have
6    you -- are you receiving all the documents
7    that are being filed in this case or not?
8        **A.  I just answered.  For the most part I**
9    **know what my documents are.**
10       Q.  Okay.  So have you seen this document?
11       **A.  You keep asking me.**
12       Q.  I understand.  But your answer that
13   you just gave was inconsistent with what you
14   had just said.  So I'm trying to understand
15   and clarify what we're discussing here.
16       MR. BURKE:  It's not inconsistent.
17   You're just not understanding --
18       MR. WILLIAMS:  Alex --
19       MR. BURKE:  -- and you're trying
20   to -- and you're not allowed -- you're not
21   allowed to talk about --
22       (Indiscernible simultaneous
23       colloquy.)
24       MR. WILLIAMS:  -- speaking objections

Page 68

1    like this.
2        MR. BURKE:  No.  But you're not
3    allowed to call her testimony inconsistent
4    either.  I object --
5        MR. WILLIAMS:  Alex --
6        MR. BURKE:  -- to the form of that
7    question.
8        MR. WILLIAMS:  I'm happy for you
9    objecting to form.
10   BY MR. WILLIAMS:
11       Q.  So, Ms. Bilek, just to clarify, have
12   you seen this transcript before?
13       **A.  I have not seen this transcript**
14   **before.**
15       Q.  Would you like to look through it?
16       **A.  Sure.**
17       Q.  Okay.
18       MR. WILLIAMS:  Alex, would you like me
19   to send it to you so you can print it off and
20   she can review it or do you have it?
21       MR. BURKE:  I -- I mean, it's going to
22   take 5 minutes, 10 minutes to print it out for
23   you.
24       MR. WILLIAMS:  That's fine.  We can

BILEK, MARY
10/06/2020

Page 69

1  take five minutes and come back and ask
2  questions about this transcript.
3         MR. BURKE:  All right.  Email it to me
4  and I'll go take care of it.
5         MR. WILLIAMS:  Fine.  Thank you.
6         MR. MESSINA:  Can I make another
7  suggestion that might make this go a bit
8  quicker, because I don't know if that -- if
9  there's question that you have about certain
10 portions of the transcript, Aaron, does it
11 make sense if Ms. Bilek can see the screen now
12 so she can see the shared screen?
13        MR. WILLIAMS:  Yeah.  I'm happy to
14 scroll down and show her the whole screen.
15 It's however we want to do this.
16        MR. BURKE:  It's up to you, man.  I
17 mean, you know, the transcript is -- you know
18 it was filed.  There's also, you know, a
19 recording.  It just is what it is.  It's an
20 unverified transcript.
21        MR. WILLIAMS:  Let me -- let's do
22 this --
23        MR. BURKE:  I don't know what you're
24 getting at asking her about, like, an

Page 70

1  unverified transcript she's never seen about a
2  recording that you have.
3         MR. WILLIAMS:  I'm trying to
4  understand what her testimony is about these
5  calls.  That's what I'm trying to understand.
6  I know what the transcript says, and
7  I -- you're 100 percent right.  I heard the
8  calls.  I know exactly what it said.
9         But I'm trying to understand what your
10 client's testimony is as to the same.
11        MR. BURKE:  That's fine.
12            (Indiscernible simultaneous
13             colloquy.)
14        MR. BURKE:  You can use your time for
15 the deposition however you want.  But if
16 you're going to ask her whether she remembers
17 stuff, that's one thing.  But if you're going
18 to ask her what the transcript says, I mean, I
19 just don't know where we're going with this.
20        MR. WILLIAMS:  Okay.
21            (Indiscernible simultaneous
22             colloquy.)
23        MR. BURKE:  The transcript is, and the
24 recording is, and her memory is.  And so if

Page 71

1  you want to ask her about one or the other,
2  but, like, having us print out the transcript
3  and then having her read it, and then having
4  her -- I mean, I don't know what you're going
5  to ask her.  I mean, the transcript just is.
6  BY MR. WILLIAMS:
7      Q.  Well, let me ask you this, Ms. Bilek,
8  let me ask you this:  Would you agree that the
9  transcript of your call that has been filed in
10 this case by your attorney is accurate?
11     **A.  Yes.**
12        MR. BURKE:  Objection.  I mean...
13        MR. WILLIAMS:  You can object to form.
14 BY MR. WILLIAMS:
15     Q.  Ms. Bilek, do you have any reason to
16 believe that the transcript filed by your
17 attorney in this case is inaccurate?
18     **A.  I do not.  If you got the -- if you**
19 **got the recordings and the call, then how**
20 **could it be?**
21        THE COURT REPORTER:  I'm sorry?
22        **THE WITNESS:  If you have the**
23 **recordings, how can it be inaccurate?**
24

Page 72

1  BY MR. WILLIAMS:
2      Q.  I'm merely asking you, on your call
3  with the people that you mentioned on
4  March 16, 2018, when you spent 22 minutes on
5  the phone with them, did you ever ask to not
6  be called?
7      **A.  I don't remember in that particular**
8  **phone call.  So I'm not going to sit here --**
9      Q.  Okay.  So you don't know, is that your
10 answer?
11     **A.  I don't know.**
12     Q.  Okay.  My next question then is, like,
13 you stated, we have a copy of the call, a
14 recording of the call and this transcript.
15        Would you agree that that transcript
16 and the voice recording accurately reflects
17 the call?
18        MR. BURKE:  Objection.  She already
19 testified --
20 BY MR. WILLIAMS:
21     Q.  You can answer.
22        MR. BURKE:  -- that she's never seen
23 this before.  It's not a fair question.  I
24 mean, what are you -- I don't know where

BILEK, MARY
10/06/2020

Page 73

1  you're going with this.  Are you trying to
2  trick her?  She testified she's never seen the
3  transcript.  How can she testify as to whether
4  it's accurate or not?
5          MR. WILLIAMS:  Alex, I appreciate your
6  position.
7          MR. BURKE:  It's just --
8          MR. WILLIAMS:  Alex, I appreciate your
9  position on this, but there are no speaking
10 objections.  If you want to object to form,
11 you're more than welcome to object to form.
12 BY MR. WILLIAMS:
13     Q.  Ms. Bilek.
14     **A.  I'm not going to say -- I'm not going**
15 **to say yes on something I didn't see.**
16     Q.  Okay.  So you don't remember on the
17 call if you asked them not to call you?
18     **A.  Correct.**
19     Q.  That's your answer?
20     **A.  I just stated that I don't remember.**
21     Q.  Okay.  Would you agree then that the
22 recording of the call accurately reflects that
23 call?  I'm not asking about the transcript,
24 I'm asking about the recording.

Page 74

1          MR. BURKE:  Objection; form.
2  BY MR. WILLIAMS:
3      Q.  You can answer.
4      **A.  Again, my answer's going to be the**
5  **same.  I don't remember.**
6      Q.  Okay, okay.  I will stop sharing the
7  screen.  All right.  We're back.
8          Ms. Bilek, how many times would you
9  say did you ask the people calling you not to
10 call you anymore?
11     **A.  I do remember two for sure.**
12     Q.  So at least twice you asked not to be
13 called?
14     **A.  Yes.**
15     Q.  Do you remember when that was?
16     **A.  [Indiscernible].**
17         THE COURT REPORTER:  I'm sorry?
18         **THE WITNESS:  I do not remember dates.**
19 **I do know for sure -- [indiscernible].**
20         THE COURT REPORTER:  I'm sorry.  "I do
21 for sure"?
22 BY MR. WILLIAMS:
23     Q.  Okay.  Do you remember who you spoke
24 to when you asked not to be called?

Page 75

1      **A.  No.**
2      Q.  No, okay.  Now, we talked a little bit
3  earlier that you heard of HII based upon you
4  seeing them on commercials before; is that
5  right?
6      **A.  Yes, I heard about them.**
7      Q.  Who did you hear about them from?
8      **A.  I just told you, commercials.**
9      Q.  Okay.  Anything else?
10     **A.  No.**
11     Q.  Okay.  Do you know what kind of
12 business HII does?
13     **A.  I do not.**
14     Q.  Okay.  What do you believe HII is?
15     **A.  I don't know.**
16     Q.  And how many calls do you claim that
17 you received from HII?
18     **A.  I never -- I never claimed I received**
19 **any from HII.**
20     Q.  Okay.  Do you claim that you received
21 any of them from HII?
22     **A.  I just said, I did not say I received**
23 **any calls from HII.**
24     Q.  Well, no, I understand that.  I'm

Page 76

1  asking you:  Are you claiming now that you
2  received any calls from HII?
3      **A.  No.**
4      Q.  Okay.  Do you have any evidence that
5  HII directed the calls that you're complaining
6  about in your complaint?
7      **A.  I do not personally.**
8      Q.  You're the one bringing this lawsuit;
9  right?
10     **A.  Yes.**
11     Q.  Do you have any evidence that any of
12 the other defendants made calls in this case?
13     **A.  No.**
14     Q.  Do you have any evidence that any
15 agents of the defendants made calls in this
16 case?
17     **A.  No.  That's what I have an attorney**
18 **for.**
19         MR. BURKE:  Objection.
20 BY MR. WILLIAMS:
21     Q.  For what?
22     **A.  To do my investigation.**
23     Q.  And just to clarify, I think I -- this
24 maybe got a little mixed up from what we were

1  just talking about.
2      Q.  Do you have, in your possession, any
3  copies of the recordings of the phone calls?
4      **A.  I do not.**
5      Q.  Have you ever listened to any of the
6  recordings of the phone calls?
7      **A.  I didn't -- I -- only thing I listened**
8  **to is what they left on voicemails.  What are**
9  **you referring to?**
10     Q.  I'm asking you what you have, ma'am.
11 So I mean, the only thing you have and have
12 heard are the voicemails; correct?
13     **A.  Correct.  When they would leave**
14 **voicemails, that's it.**
15     Q.  On those voicemails, what products do
16 they mention that they were selling?
17     **A.  Health insurance and life insurance.**
18     Q.  And do they say what specific products
19 they were selling?
20     **A.  I don't recall specific products.**
21 **Some of them said Aetna, some of them said**
22 **Blue Cross, some of them said Prudential.**
23 **That's all I recall.**
24     Q.  Are you suing Aetna in this case?

1      **A.  I don't believe so.**
2      Q.  Blue Cross?
3      **A.  I don't believe so.**
4      Q.  Why aren't you suing those companies
5  since those are the ones mentioned on the
6  phone calls?
7      **A.  I'm not an attorney so how would I**
8  **know that?**
9      Q.  Well, you decided to bring the lawsuit
10 here.  So I'm wondering why you chose -- and
11 how you decided to sue who you sued?
12     **A.  Maybe you should talk to my attorney**
13 **about that.**
14     Q.  So it's your testimony that Mr. Burke
15 has all of the information regarding why
16 certain defendants were sued and why others
17 weren't?
18     **A.  I believe so.**
19     Q.  Okay.  How are you injured by these
20 phone calls?
21     **A.  How was I injured by these phone**
22 **calls?**
23     Q.  Yes, ma'am.
24     **A.  Let's see.  They're a nuisance.**

1  **They're a waste of time.  They're a waste of**
2  **my phone bill.  And, you know, they take a lot**
3  **of time out of my day.**
4      Q.  And you testified they were about 30
5  calls over the course of a year?
6      **A.  Yes.**
7      Q.  How many times -- how much time did
8  you spend on the phone with them?
9      **A.  Sometimes not long and sometimes long.**
10     Q.  Would you say that 22-minute call that
11 we looked at the transcript of, that was the
12 longest call?
13     **A.  Yes, I do believe so.**
14     Q.  I'm sorry, ma'am?
15     **A.  Yes, I do believe so.**
16     Q.  Okay.  Now, is it your allegation that
17 your privacy was invaded here?
18     **A.  Yes.**
19     Q.  How?
20     **A.  By my phone number being given out to**
21 **people that should not be calling my phone.**
22 **People that I did not ask to call my phone.**
23     Q.  Is your phone number confidential?
24     **A.  It's confidential to me.  If I don't**

1  give it out, it's considered confidential.
2      Q.  Now, you testified a moment ago that
3  they made charges on your phone bill.  What
4  kind of plan do you have with ███?
5      **A.  Family plan.**
6      Q.  Do you pay by phone call?
7      **A.  That I don't know.  My husband deals**
8  **with that.**
9      Q.  Okay.  So we'd have to ask your
10 husband about how the phone bill works?
11     **A.  Pretty much.**
12     Q.  Okay.  Your phone --
13     MR. BURKE:  You could -- another thing
14 you could do is just issue some discovery.
15     MR. WILLIAMS:  Thank you, Alex.  I
16 appreciate your input.
17     MR. BURKE:  You haven't done that.
18     MR. WILLIAMS:  Thank you.  I
19 appreciate your input, but this is an ongoing
20 deposition.  So thank you very much.
21 BY MR. WILLIAMS:
22     Q.  Now, Ms. Bilek, your phone, do you
23 keep it on ring or vibrate?
24     **A.  Ring.**

BILEK, MARY
10/06/2020                                                                    Pages 81–84

Page 81

1    Q.  Okay.  And what amount of damages are
2  you seeking in this case?
3    **A.  Do you want to rephrase that?**
4    Q.  How much money are you asking for?
5    **A.  I'm not asking for an amount of money.**
6    Q.  So you're -- you don't want any money
7  out of this lawsuit?
8    **A.  I -- looking for the best interest of**
9  **me and the other persons -- people that**
10 **suffered from this nuisance.**
11   Q.  And what do you expect to get out of
12 this lawsuit?
13   **A.  Don't know.**
14   Q.  So I'm just trying to understand here.
15 You filed a class-action lawsuit seeking
16 damages.  Do you want money out of this
17 lawsuit?
18   **A.  Yeah, I want money for me and**
19 **everybody else who suffers from this.**
20   Q.  And what do you want in terms of money
21 in this lawsuit?
22   **A.  Are you referring to me giving you an**
23 **amount?  I can't give you an amount.  I don't**
24 **know.**

Page 82

1    Q.  No, ma'am.  I'm asking you for what
2  damages you think you're entitled to?
3    **A.  Whatever the judge awards.**
4    Q.  So you -- okay.
5    MR. WILLIAMS:  Can we pause for two
6  minutes?  My AirPods just died.  I need to
7  switch out my headphones?
8    MR. BURKE:  Okay.  Why don't we take
9  five minutes.
10   (Whereupon, a recess was
11   had.)
12 BY MR. WILLIAMS:
13   Q.  All right.  Ms. Bilek, I just want to
14 understand and confirm one thing where we left
15 off.
16   So it is your testimony that you don't
17 make call recordings; correct?
18   **A.  Correct.**
19   Q.  Do you know how the
20 March 18, 2018, -- I'm sorry, March 16, 2018,
21 call was recorded?
22   **A.  The 2000...**
23   Q.  March 16, 2018, call, do you know how
24 that was recorded?

Page 83

1    **A.  I believe --**
2    Q.  And what --
3    (Indiscernible simultaneous
4    colloquy.)
5    THE COURT REPORTER:  I'm sorry.  Can
6  you repeat that, please.
7    **THE WITNESS:  Through my summons.  It**
8  **was recorded from me talking to them, I**
9  **believe.**
10 BY MR. WILLIAMS:
11   Q.  What do you mean it was recorded from
12 you talking to them?
13   **A.  Wait.  Can you clarify?  If you're**
14 **saying did I record it, no, I did not record**
15 **it.**
16   Q.  Okay.  But what I'm asking then is how
17 did you obtain that call recording from
18 March 16, 2018?
19   MR. BURKE:  Objection; form.
20 BY MR. WILLIAMS:
21   Q.  You can answer.
22   **A.  I don't have the recording.**
23   Q.  Does your attorney have the recording?
24   **A.  I don't know.**

Page 84

1    Q.  So you don't know how the call was
2  recorded?
3    **A.  No.  I know I did not record it.**
4    Q.  Okay.  So do you know how it was
5  recorded?
6    **A.  I do not.**
7    Q.  Okay.  Thank you, ma'am.
8    I'm almost through here with my
9  portion.  Give me one second.
10   Are you aware of a company called HAA?
11   **A.  I -- no.  Don't sound...**
12   Q.  Okay.
13   MR. WILLIAMS:  Okay.  I don't have any
14 further questions.  I'm going to leave it to
15 my codefendants to take this over.
16   Ms. Bilek, thank you very much for
17 your time, and I'm just going to go ahead and
18 put myself on mute.  Thank you.
19   MR. BURKE:  This is Alex Burke.  I'm
20 going to wait for redirect until we get
21 through everybody.
22   MR. MESSINA:  Josef, I can go next.
23 As I mentioned in the beginning, I was going
24 to have Chris just share the screen.  Can you

BILEK, MARY
10/06/2020                                                    Pages 85–88

Page 85

1  give me about two minutes because I want to
2  make sure -- obviously, I want to get up on
3  out of here as soon as possible.
4        MR. BURKE:  Yeah.
5            (Discussion was held off
6              the record.)
7                EXAMINATION
8  BY MR. MESSINA:
9     Q.  Hi, Ms. Bilek.
10    **A.  Hi, are you?**
11    Q.  I'm well.  My name is Charles Messina.
12  As you heard in the beginning, I represent
13  NBBI.  I'll refer to my client, National
14  Benefit Builders, as NBBI if that's okay.  And
15  Access One -- their full name just is Access
16  One.
17        So just to start because again, you
18  know, I'm going to try to avoid repeating any
19  questions that you've already answered here.
20        Were you familiar with -- I mean, are
21  you familiar, do you know anything about my
22  client's --
23        MR. MESSINA:  You don't have to share
24  the screen.  Yeah, Chris.  Okay.  You could

Page 86

1  take that off.
2  BY MR. MESSINA:
3     Q.  Are you familiar with what NBBI is as
4  an entity and what it does generally or
5  specifically?
6     **A.  No.**
7     Q.  Okay.  So safe to say you were not
8  familiar with NBBI prior to receiving any of
9  these alleged calls in the complaint; right?
10    **A.  Correct.**
11    Q.  Okay.  And the same goes with Access
12  One or just the same questions.  Are you
13  familiar with what Access One is as an entity
14  or, you know, what it does currently as a
15  business?
16    **A.  I can't say I do.**
17    Q.  Okay.  And were you familiar, same
18  question:  Were you familiar with Access One
19  prior to receiving any of the alleged calls
20  here --
21    **A.  No.**
22    Q.  -- in the second amended complaint?
23        Can you explain -- and I assume the
24  answer's going to be no, but I'll ask it

Page 87

1  anyway:  Can you explain to us the
2  relationship, as you understand it, between
3  NBBI and the other defendants as you at
4  least -- [indiscernible].
5        THE COURT REPORTER:  I'm sorry.  "As
6  you at least"?
7  BY MR. MESSINA:
8     Q.  Somewhere -- again, I'm going to ask
9  the same questions because there's different
10  defendants here.
11        But do you understand, assuming that
12  there's a relationship between Access One and
13  the other defendants in the second amended
14  complaint, can you explain that relationship
15  to us?
16    **A.  No, I cannot.**
17    Q.  Okay.  Is there -- do you -- how did
18  you come to believe that NCE -- in the amended
19  complaint it's alleged that -- and I'm just
20  going to put in quotes in the second amended
21  complaint.  NBBI, Access One -- I'm sorry [as
22  read]:
23              "NCE, Access One, and NBBI
24              worked together to offer

Page 88

1              health and lifestyle
2              discounts and
3              insurance-related
4              programs."
5        End quote.
6        How did you come to learn that, or if
7  you didn't learn it, can you describe why it's
8  in the complaint?
9     **A.  My attorney.**
10    Q.  When you say your attorney, just so I
11  fully understand the question, your attorney
12  was the one that came to believe that as
13  opposed to you?
14    **A.  Yes.**
15    Q.  And based on you receiving calls and
16  providing information about those calls to
17  your attorney, is that correct, without asking
18  about any attorney-client privilege, can you
19  --
20    **A.  Correct, correct.**
21    Q.  There's an allegation just in quotes
22  [as read]:
23              "Access One underwrites
24              certain discount products

BILEK, MARY
10/06/2020

Pages 89–92

Page 89

1    or services."
2        End quote.
3        Is there -- do you have personal
4 knowledge that Access One underwrites certain
5 discount products or services?
6    **A.  I do not.**
7    Q.  Okay.  Is there anyone such as your
8 husband that has worked on this investigation
9 in order to file the second amended complaint
10 to the best of your knowledge, other than your
11 attorney?
12    **A.  My husband has nothing to do with**
13 **this.**
14    Q.  Okay.  And anyone else, any other
15 friends, agents?
16        When I say "attorney," I mean the law
17 firm that Alex Burke works for.
18    **A.  Yes, just Alex.**
19    Q.  Okay.
20    **A.  Alex Burke law firm, that's correct.**
21    Q.  I understand.
22        And then there's another allegation
23 that [as read]:
24            "NBBI then packages and

Page 90

1            contracts with NCE to
2            solicit as a benefit of
3            NCE membership or through
4            other NCE-branded products
5            or services."
6        It's safe to say also that you don't
7 have any personal knowledge that NBBI --
8 again, I'll just repeat it -- packages and
9 contracts with NCE to solicit as a benefit,
10 NCE membership.
11    **A.  No personal knowledge.**
12    Q.  And again, I'm going to try -- I'm not
13 going to get through every single one of these
14 questions, because I know the answer is
15 probably going to be the same, but just a few
16 more because they're alleging our clients,
17 Ms. Bilek.
18        Did you come to believe that NBBI
19 maintains a -- in quotes [as read]:
20            "NBBI maintains a network
21            or a certain -- of certain
22            medical and lifestyle
23            discount programs."
24    **A.  Again, I didn't know that.**

Page 91

1    Q.  Is it fair to say that any of the
2 specific allegations against my clients, NBBI
3 and Access One, with respect -- because I
4 don't want to go through every single one of
5 these allegations -- with respect to, for
6 example, that all the defendants knowingly
7 benefit from the illegal calls, in quotes,
8 that's not coming from your personal
9 knowledge?
10    **A.  That's not my personal knowledge.**
11    Q.  Or any other evidence that you're
12 aware of that -- that you're aware of; is that
13 correct?
14    **A.  Correct.  Nothing, not aware of none.**
15    Q.  Do you know if NBBI and Access One
16 even benefited from these calls in any way
17 that you allegedly received?
18    **A.  I do not know that.**
19    Q.  Okay.  Is there anything that leads
20 you to believe that NBBI and Access One
21 knowingly accepted these alleged calls?
22    **A.  Again, I don't know that.**
23    Q.  Okay.  And just because I know Josef
24 represents your interest of NCE, I just don't

Page 92

1 want to keep you here all day asking you
2 similar questions.  I will let him obviously
3 ask his questions, but is it similar, with
4 respect to NCE, in terms of -- and I -- we
5 could read back through transcript.  I don't
6 want to do that to you on every single
7 question, but do you have any prior knowledge
8 of NCE prior to filing -- when I say "NCE,"
9 that's an acronym of National Congress of
10 Employers, that defendant here?
11    **A.  I do not.**
12    Q.  Okay.  Did any recording or agent ever
13 mention NBBI or Access One explicitly on any
14 calls that you could recall?
15    **A.  No, I don't recall.**
16    Q.  Okay.  No, you don't recall or no...
17    **A.  No, I don't recall hearing -- hearing**
18 **that.**
19    Q.  Okay.  I understand.
20        At any time were you ever prompted to
21 purchase any NBBI or Access One products?
22    **A.  No.**
23    Q.  Okay.  Did you -- did you follow any
24 prompts on any of the calls subject to the

BILEK, MARY
10/06/2020

1  second amended complaint?
2      Do you know what I mean by, like, a
3  telephone prompt?
4      **A.  No.  Can you explain that a little**
5  **better?**
6      Q.  Like, if you were prompted to purchase
7  any products, right, on a call that you
8  received, did you ever follow a prompt as
9  though you were about to purchase any of those
10 products?
11     MR. BURKE:  Object to form.
12 BY MR. MESSINA:
13     Q.  You can answer it.
14     **A.  I can't honestly say I remember.**
15     Q.  And this is -- and again, I don't want
16 to overlap with testimony that you've already
17 given today with Aaron, but let me ask it
18 maybe a different way.
19     Did you ever intend to
20 actually -- well, strike that.  Let me strike
21 that.
22     I understand that you testified that
23 you believe the calls were a nuisance to you
24 and harassing --

1      **A.  Yes.**
2      Q.  -- correct?
3      **A.  Yes.**
4      Q.  And I understand perhaps why you
5  would -- [indiscernible].
6      THE COURT REPORTER:  I'm sorry.  You
7  cut out there.
8          (Whereupon, the captured
9            testimony was read back.)
10 BY MR. MESSINA:
11     Q.  Why -- and you explained why you
12 attempted to sort of engage with these agents,
13 because it's -- there's evidence that
14 you -- you know, you called them back or that
15 you've spoken with them for longer than a
16 minute, rather than just saying, you know,
17 stop calling me; is that correct?
18     **A.  Correct.**
19     Q.  Is there -- was there ever any
20 intention to purchase any of those products?
21     **A.  No.**
22     Q.  Okay.  Is there anything that leads
23 you to believe that NBBI or Access One have
24 continued to make any calls or had made any

1  calls to you after initiating this
2  class-action lawsuit that we're here for
3  today?
4      **A.  You know what?  You broke up.  Can you**
5  **please repeat that?**
6      Q.  Yeah, of course.
7      Is there anything that leads you to
8  believe that defendants NBBI, Access One, or
9  NCE have continued to make calls to you
10 subsequently, after you filed the second
11 amended complaint?
12     **A.  No.**
13     Q.  Okay.  So you have -- I think you
14 showed it in the beginning some of your own
15 records.
16     MR. MESSINA:  Alex, I don't know if
17 you know if that includes Bilek 66, that's a
18 note.  If we could -- Chris, if you could pull
19 that on the shared screen so Ms. Bilek and
20 everyone can see it.
21     MR. BURKE:  And, Mary, you can turn to
22 page 66.  It's in that document.  See in the
23 lower right-hand corner there's numbers.
24

1  BY MR. MESSINA:
2      Q.  Is it safe to presume that these are
3  your handwritten notes, Ms. Bilek?
4      **A.  Yes.**
5      Q.  These notes are from a call that you
6  received on March 16, 2018?
7      **A.  Yes.  You're breaking up.**
8      Q.  Okay.  I don't know how I can fix
9  that.  Can you hear me clearly now when I'm
10 talking?
11     **A.  I can.**
12     Q.  Now you can.  Okay.  Good.  If you
13 can't hear me or, you know, obviously I'm -- I
14 want to make sure you can hear me clearly,
15 just let me know and I can repeat the
16 question.  Okay?
17     **A.  Okay.  Thank you.**
18     Q.  Of course.
19     Were these notes made at the time that
20 you received that call on March 16, 2018, or
21 sometime after?
22     **A.  No.  As I was talking is when I was**
23 **writing them down.**
24     Q.  Okay.  Did you have a pad near you or

Page 97

1  something like that when you wrote the notes?
2  **A. Yes, a piece of paper.**
3  Q. Okay. So it's a singular
4  piece -- like, a computer paper or an actual
5  pad that you would rip pages out of?
6  **A. No. Actually, it was just a back of**
7  **a -- I believe one of my bills, like a piece**
8  **of paper.**
9  Q. I didn't know that you didn't
10  remember, but, you know, I wanted to ask.
11  Do you happen to still have that
12  original document of the back of the piece of
13  paper you wrote those notes on?
14  **A. I don't know. I can't say yes, I**
15  **can't say no. I don't know.**
16  Q. Without getting into any
17  communications with your attorney, do you
18  recall giving it to your attorney?
19  **A. Yes.**
20  Q. Okay. Do you have a notebook that you
21  keep with you? I mean, I know in this
22  instance you wrote on the back of a bill or
23  something, but do you have a notebook that you
24  keep, that you write down thoughts or calls

Page 98

1  like this on?
2  **A. No, I do not. If the call comes**
3  **through, I just pretty much grab it if**
4  **someone's there around me.**
5  Q. Okay. Do you always, like, write
6  notes contemporaneous to when you get calls
7  like this?
8  **A. No, not all the time.**
9  Q. Okay. Was there a reason that you
10  took notes on this particular call? I mean, I
11  know it was a longer call.
12  **A. It -- paper was there and I was just**
13  **writing it down. It's all I could say.**
14  Q. Okay. And back to the notes. You
15  didn't write the date of the call on here;
16  right?
17  **A. No, I don't believe so.**
18  Q. How do you know there are notes from
19  that March 16, 2018, call?
20  **A. That I -- that I can't tell you.**
21  Q. [Indiscernible].
22  THE COURT REPORTER: I'm sorry. You
23  broke up there. Can you please repeat that?
24

Page 99

1  BY MR. MESSINA:
2  Q. So is it safe to say that you are not
3  sure that these are notes from the
4  March 16, 2018, call?
5  **A. Well, I didn't write it down, but I**
6  **can compare the exact phone number to the**
7  **exact time and date on my actual printout from**
8  **my ███████.**
9  Q. Okay. So if we were to do that,
10  then --
11  **A. It would match.**
12  Q. -- you would guess that that -- it
13  would match?
14  **A. Yes.**
15  Q. Okay. I understand.
16  So let me show you -- and you have it
17  in front of you, Bilek 39 to Bilek 58. Want
18  to open it up?
19  And this purports to be, as I
20  understand it, Ms. Bilek, a copy of calls made
21  to your cell phone from January 1, 2017, until
22  June 28, 2018. Is that your understanding as
23  well?
24  **A. That's my understanding as well.**

Page 100

1  Q. Okay. Have you seen this before?
2  **A. I have not.**
3  MR. MESSINA: Chris, I'm looking at
4  your inbox.
5  BY MR. MESSINA:
6  Q. Can you go to page Bilek 43?
7  **A. I'm on that page.**
8  Q. Great. Thank you.
9  Do you see the entry that's circled
10  second from the top? It's a -- do you see
11  what I'm talking about right there?
12  **A. 3/16/2018, 927.**
13  Q. That's right. It's a call made on
14  March 16, 2018, at 9:27 a.m. --
15  **A. Yes.**
16  Q. -- from number (973) 273-6136 for
17  25 minutes; is that right?
18  **A. I do not see a 973. I see**
19  **(773) 273- --**
20  Q. I'm sorry. I messed it up. I just
21  read it wrong. That's because 973 is my area
22  code so...
23  **A. Oh, okay.**
24  Q. So is that entry circled because

Page 101

1  it's -- it's the call for which you took notes
2  on March 16, 2018?
3      A.  Yes.
4      Q.  Is that -- okay.
5          Did you circle that entry yourself?
6      A.  I did.
7      Q.  Okay.  So going back to your notes.
8          MR. MESSINA:  Chris, could you pull
9  the notes back up?
10         MR. BURKE:  You're referring to
11 Bates 66?
12         MR. MESSINA:  Yeah, Bates 66.
13             (Whereupon, a short
14              discussion was had off the
15              record between counsel.)
16 BY MR. MESSINA:
17     Q.  You wrote down what you believe to be
18 important parts of the call; is that correct?
19     A.  Yes.
20     Q.  I mean, at this point, were you
21 planning to file a lawsuit?
22     A.  I wasn't planning to do anything.
23     Q.  Okay.  You know, I -- Aaron said
24 before -- he asked about if -- one of the

Page 102

1  matters that he was asking about in your
2  history that had been filed was a TCPA
3  lawsuit.  And I recall -- and I don't want to
4  misconstrue your testimony, but you didn't
5  know what the TCPA was.
6          Do you know what the TCPA was or what
7  that stands for?
8      A.  I do not.
9      Q.  Do you know what the Telephone
10 Consumer Protection Act is?
11     A.  I heard about it, but I can't say I
12 actually, you know, acknowledge it 100 percent
13 to know what it is.
14     Q.  Okay.  Do you know anything generally
15 about the TCPA?
16         It's okay if the answer is no.  I'm
17 not trying to trick you.  I'm just asking what
18 your knowledge is.
19     A.  No, I don't.
20     Q.  Okay.  Let's go back to your phone
21 records.  Can we go to page Bilek 58?  If you
22 look at the third entry from the bottom, do
23 you see that number, it's (312) 729-5288?
24     A.  Yes.

Page 103

1      Q.  That's the number of your attorney, is
2  that right, Alex Burke?
3      A.  You know what?  I have him programmed.
4  I don't --
5      Q.  Other than my, like, parents and
6  siblings' numbers, I don't remember numbers at
7  this point either.
8      A.  I can't say I remember that exact
9  number.
10     Q.  Okay.  It looks like that was a short
11 call, one minute.  Then you have a number with
12 a call back at 3:43?
13         MR. MESSINA:  Chris, if you could
14 highlight that somehow.
15 BY MR. MESSINA:
16     Q.  The number is ██████████.  Do you
17 know that to be Alex Burke's cell phone
18 number?
19     A.  Not that I can recall.  Again,
20 it's -- I have all the names in the phone.
21     Q.  Okay.  Do you recall speaking with
22 Alex right after this call or sometime shortly
23 after the March 16, 2018, call?
24     A.  Okay.  I need to kind of correct you

Page 104

1  here because this call is on 3/8 of 2018.
2      Q.  Oh, I appreciate that.  And that's
3  what I meant to say.  So let's go back.
4          Just to clarify for the record, with
5  Bilek 58 and the numbers that I'm talking
6  about, third from the bottom, this is a
7  March 8th call with the (312) number.
8          And then the number at 3:43 above that
9  is a (773) number and that is also on
10 March 8th.
11         Is there a way for you to check your
12 cell phone, if you have Alex Burke's saved in
13 the cell phone, to determine whether that is
14 Alex's number?
15         And, Alex, I'm happy to confirm it.  I
16 just know that obviously it's your client
17 testifying and not you today.
18         THE WITNESS:  I would have to go get
19 my cell phone.  I don't have it on me.  I shut
20 it off.
21 BY MR. MESSINA:
22     Q.  I don't think that's necessary.
23     A.  Okay.
24     Q.  I can purport to you that my

BILEK, MARY
10/06/2020

Pages 105–108

Page 105

1  understanding is it is Alex's cell phone
2  number. And according to this -- I'm not
3  asking you about the content of your
4  conversations -- you had a 21-minute phone
5  call with him.
6      Do you recall on March 8th having a
7  telephone call without going into the content
8  of it with your attorney, Alex?
9  **A. I -- I don't recall.**
10     Q. Okay. I know it's a while ago so I
11  know that's a perfectly fine answer.
12     If we could go to Bilek 43. And these
13  are -- this should be -- this is March 16th.
14  So there's a call that's circled there. We
15  looked at this before; right?
16     This call is at 9:27 a.m., correct?
17  **A. Correct.**
18     Q. Okay. And then at 9:52, that's almost
19  immediately after. It looks like there's a
20  call to Alex Burke's office for 11 minutes.
21     Do you remember -- and I know I
22  answered -- I asked you this question before,
23  but it was with respect to the March 8th call.
24     Do you remember calling Alex after

Page 106

1  this March 16th call, which you took notes?
2  **A. I don't remember calling. I mean, if**
3  **I called, I called. I don't remember what it**
4  **was about, if that's what you're asking.**
5      Q. Okay.
6      MR. BURKE: Yeah. Mary, just -- he's
7  just asking you what you remember, but be
8  careful not to talk about the substance of our
9  calls.
10 BY MR. MESSINA:
11     Q. Yeah. That's right. I'm not asking
12  you about the content of your communications
13  with Alex. So going back to --
14  [indiscernible].
15     THE COURT REPORTER: I'm sorry?
16 BY MR. MESSINA:
17     Q. -- 2019 call, you wrote the name of
18  the person that you called -- that called you.
19  I think, you could tell me. See, if you look
20  at the top there it says "Kay," K-A-Y. And
21  next to that, "caller."
22     Is that what that meant, that the
23  caller's name was Kay?
24  **A. Caller's name was Kay, yes.**

Page 107

1      Q. Okay. Can you describe the
2  conversation with Kay, to the best of your
3  ability of what you recall her saying?
4  **A. Pretty much everything that's on here.**
5      Q. Okay. Well, you wrote down the number
6  that called you; right? It's (732) -- hold
7  on, 273-6136?
8  **A. I wrote that down.**
9      Q. Okay. Is that the number that called
10  you?
11  **A. Yes.**
12     MR. BURKE: It's -- again, it's (773).
13     MR. MESSINA: (773).
14  **THE WITNESS: Okay.**
15 BY MR. MESSINA:
16     Q. All right. It looked like a 1 to me.
17     You wrote down the details of what you
18  were told; right?
19  **A. What the -- what I was talking to them**
20  **about, yes.**
21     Q. Okay. And there's -- it says on here
22  [as read]:
23     "NCE Premier, National
24     Congress Plan for

Page 108

1      Employee."
2      Why did you write that down?
3  **A. Because that's exactly what they told**
4  **me they were.**
5      Q. They told you what -- what did you say
6  there? I missed it.
7  **A. They told me they were from National**
8  **Congress Plan for Employee.**
9      Q. Okay. You wrote down how much it
10  would cost as well; is that right?
11  **A. Yes.**
12     Q. You noted that you were switching to
13  another -- being switched to another lady,
14  correct, someone named Beatrice?
15     I just want to understand your notes.
16  Switched to another lady. And there's an
17  arrow, if you look at the notes, Beatrice.
18  **A. Beatha, B-E-A-T-H-A, Beatha.**
19     Q. Okay. Did you speak with Beatha or
20  Beatrice?
21  **A. I believe so, yes.**
22     Q. At some point you gave them your real
23  name. Do you remember that?
24  **A. I did give them my real name.**

BILEK, MARY
10/06/2020

Pages 109–112

Page 109

1    Q.  But then you also gave -- it says here
2  on the notes [as read]:
3              "Fake SS, fake DL, fake
4              address, and fake checking
5              info."
6    A.  Yep.
7    Q.  Did you make those numbers up on the
8  spot?
9    A.  Yes, I did.
10   Q.  It took a while to give that fake
11 information; right?
12   A.  I didn't write it down.
13   Q.  What do you mean by that?
14   A.  Wait.  Can you reask -- I'm sorry.
15 Can you reask the question?
16   Q.  It's okay.  I'm just asking, do you
17 recall taking some time, like some matter of
18 minutes, providing all of this fake
19 information?
20   A.  I can't.  I can't tell you what -- how
21 many minutes.
22   Q.  Okay.
23   A.  No.
24   Q.  Do you -- can you describe the

Page 110

1  conversation you had with Beatrice -- I'll
2  call her that, I don't know if you remember
3  exactly what her name is -- and what you
4  recall her saying, other than just what you
5  have on the notes here where it says "NCE
6  Premier"?
7    A.  Everything that I wrote down is
8  exactly what she said.
9    Q.  Okay.  Were you ever emailed anything?
10 You provided a fake email address;
11 correct?
12   A.  Correct.
13   Q.  Is that an email account that you ever
14 had access to?
15   A.  No.
16   Q.  Okay.  So you never got an email on
17 your actual account or from a fake account or
18 anything from the company?
19   A.  No.
20   Q.  Okay.
21   A.  Nope.
22   Q.  Okay.  I mean, you claim you were
23 provided with an NCE Premier quote, based on
24 information that came from HII's Internet

Page 111

1  platform in the complaint, in the second
2  amended complaint.  I mean, how do you know
3  that if you do, I mean, do you have any
4  evidence or reason to believe that the
5  information provided on this call to you,
6  Ms. Bilek, was provided off of HII's Internet
7  platform?
8    A.  No.  I don't have no proof of that.
9    Q.  Was that -- do you recall the
10 information about the NCE Premier that was
11 provided before you gave the fake information
12 about yourself?
13   A.  It would start NCE Premier.
14   Q.  Okay.
15   A.  And then you would go on to National
16 Congress for Employees [sic], exactly how I
17 wrote it down.
18   Q.  Okay.  I guess what I'm asking:  There
19 was more information just beyond the name that
20 was given to you.  Like, you have on the notes
21 here [as read]:
22              "Includes health, dental,
23              vision, life insurance,
24              et cetera."

Page 112

1              Was that information given to you
2  after you gave the fake information or before,
3  to the best of your recollection?
4    A.  That was -- that was before.
5    Q.  Okay.  Before you gave the fake
6  information?
7    A.  Yes, yes.
8    Q.  Okay.  The March 16th call took about
9  25 minutes, according to your phone bill.  Is
10 that how long you remember it taking about?
11   A.  Roughly around that time, yes.
12   Q.  Okay.  According to your notes it
13 looks like somebody went to get information
14 and the phone went dead.
15              Can you explain what that means?
16   A.  They went to get another party and
17 then the phone went dead.
18   Q.  Okay.  According to your notes you
19 never asked to be put on the do not call list;
20 is that right?
21   A.  I don't recall on this particular one.
22   Q.  What do you mean by that?
23   A.  I don't recall.  I can't say yes that
24 I said that on this one.

BILEK, MARY
10/06/2020

Page 113

1    Q.  Okay.

2    **A.  I don't remember.**

3    Q.  Okay.  I mean, that's nowhere in your

4  notes, though; right?

5        Your notes don't say you told them not

6  to call you or anything like that?

7    **A.  No.**

8    Q.  Okay.  Would you have written

9  something down like that?  I mean, you went

10  through a 25-minute call.  I assume this was

11  one of the calls, but I don't want to assume,

12  I'm asking you, where you didn't say, don't

13  call me and, like, hang up.

14        But -- and -- and there's no

15  reflection in the notes that you told them not

16  to call you.  So I know you don't have the

17  transcript in front of you right now, but

18  would you have written something down -- going

19  back to the question, would you have written

20  something down, you know, like, I said, don't

21  call me anymore?

22    **A.  No.  I can't say yes and I can't say**

23  **no.**

24    Q.  Okay.  Why, just so we understand and

Page 114

1  it's clear for the record?

2    **A.  If I don't remember, I can't say I**

3  **did.**

4    Q.  Okay.  I understand.  Thank you for --

5  you didn't ask how they got your number,

6  though, is that right, as far as you can

7  recall, or did you?

8    **A.  You know, that one, I don't recall**

9  **either.**

10    Q.  Would you have been curious on how

11  they got your telephone number?  Let me ask

12  you a different question.  How do you think

13  they got your telephone number?

14    **A.  I don't know.**

15    Q.  You didn't write down --

16  [indiscernible].

17        THE COURT REPORTER:  I'm sorry, you

18  broke up there.  Can you please repeat that?

19  BY MR. MESSINA:

20    Q.  Yeah.  On the notes, Ms. Bilek, you

21  didn't write down "NBBI" or "Access One"

22  either; right?

23    **A.  I did not.**

24    Q.  And according to your notes, neither

Page 115

1  entity was mentioned on the March 16th call;

2  right?

3        And that's consistent with your other

4  testimony?

5    **A.  Right.**

6    Q.  Is there a reason why you didn't

7  record the March 16th conversation?

8    **A.  It's not legal to record.**

9    Q.  Okay.  Is that why, because it's not

10  legal in the state that you reside?

11    **A.  Right.  You don't record stuff.**

12    Q.  I mean, different states have

13  different laws with respect to wiretapping so

14  that's why I'm asking.  I didn't know what

15  your reason was.

16        Were you -- you were prepared for the

17  call by taking notes?  Let me strike that.

18        So to clarify, you didn't record the

19  call because it's not -- your understanding is

20  it's not legal to do so?

21    **A.  You cannot record anybody's phone**

22  **call.**

23    Q.  Okay.  I understand that's your

24  belief.

Page 116

1        Is there a reason why you didn't just

2  press 2 and end this particular conversation?

3    **A.  Can't answer that either, don't know.**

4    Q.  Okay.  You didn't block the number on

5  your phone.  Is there a reason for that?

6    **A.  These phone numbers come in, in**

7  **different -- different numbers so, no.**

8    Q.  Okay.  But you're aware that you can

9  identify numbers and scan and block them;

10  right?

11    **A.  No.**

12    Q.  So you're not aware that you can block

13  numbers that call you like this?

14    **A.  All right.  You know what?  Rephrase**

15  **that.  Sorry.  Rephrase that.**

16    Q.  No.  And you could -- listen, you

17  could take your time, too.  Again, I'm not

18  trying to trick you here.  I'm just asking you

19  questions.  It's fine, let me ask again.

20        Are you aware, and were you aware at

21  the time, that you can block numbers -- or

22  identify numbers as spam and then block them?

23        MR. BURKE:  Objection; form.

24

BILEK, MARY
10/06/2020

Pages 117–120

Page 117

```
 1  BY MR. MESSINA:
 2      Q.  You can answer.
 3      A.  I really don't pay attention, but I
 4  guess you can.
 5      Q.  Okay.  Were you -- I mean, did you
 6  know at the time that you could block numbers
 7  that you think are spam?
 8      A.  Again, I wasn't thinking about it.
 9      Q.  Okay.  So it's not like you're saying
10  you weren't aware, it's just that you weren't
11  thinking about doing that; correct?
12      A.  Correct.
13      Q.  Okay.  But then you're not -- would it
14  be fair to say that you're allowing your
15  privacy to be violated by not blocking the
16  numbers that are calling you?
17      A.  Why should I have to block my numbers?
18      Q.  Well, you were -- in this instance,
19  you were engaged on the phone with someone for
20  almost 25 minutes -- [indiscernible].
21          THE COURT REPORTER:  I'm sorry.  Your
22  phone is muffled.  Can you please repeat that?
23          MR. MESSINA:  Okay.
24
```

Page 118

```
 1  BY MR. MESSINA:
 2      Q.  I mean, in this instance you engaged
 3  on a telephone call for, you know, quite a
 4  decent amount of time.  So my question is why?
 5  Again, going back to similar questions, with
 6  this specific call, why did you allow this
 7  call to go on so long?
 8          MR. BURKE:  Asked and answered.
 9  BY MR. MESSINA:
10      Q.  You could answer.
11      A.  I don't have no answer for that.
12      Q.  Okay.  If we could go to the second
13  amended complaint, paragraph 71.  I could just
14  read it into the record [as read]:
15              "The automated nature of
16              Defendant's call is
17              evidenced by the fact that
18              they repeated the same
19              message across multiple
20              calls" -- [indiscernible].
21          THE COURT REPORTER:  "Across multiple
22  calls"?
23  BY MR. MESSINA:
24      Q.  [As read]:
```

Page 119

```
 1          -- "to Plaintiff.  For
 2          example, Plaintiff
 3          received voicemail
 4          messages on her cell phone
 5          from caller ID (773)
 6          273-6136 at approximately
 7          6:01 p.m."
 8      I won't read the rest of it, but it's
 9  right there where it's being highlighted.
10      Now, you object to being called from
11  this number as being harassing; correct?
12      A.  Correct.
13      Q.  But at the same time you didn't ask on
14  March 16th not to be called again; right?
15      A.  Correct.
16      Q.  And --
17      A.  Best of my knowledge.
18      Q.  Okay.
19          MR. MESSINA:  We can take that off
20  now, Chris, for now.  There's another -- well,
21  actually, let's go back -- you can bring 71
22  back up.
23  BY MR. MESSINA:
24      Q.  It goes on in 71 -- just a couple more
```

Page 120

```
 1  questions about this -- that you received a
 2  voicemail, and in quotes [as read]:
 3              "Limited health involvement
 4              period for a few weeks so
 5              you and your family"...
 6      Do you see that in the blocked quote
 7  right there?  [As read]:
 8              "So you and your family can
 9              get a great insurance plan
10              at a price you can
11              afford."
12      This is a voicemail that you allegedly
13  received.  Did you receive this voicemail
14  multiple times?
15      A.  I believe so.
16      Q.  That voicemail makes no reference to
17  NBBI or Access One; right?
18      A.  Correct.
19      Q.  There's no current defendant mentioned
20  in this voicemail at all, actually; right?
21      A.  Correct.
22      Q.  So I just want to understand.  Your
23  theory you were repeatedly called by the
24  defendants in this case right now, you know,
```

Page 121

1  of which the attorneys here represent, based
2  on voicemails in which none of them were
3  mentioned; is that right?
4      A.  That's right.
5      Q.  You've produced approximately 37
6  voicemails in this case; correct?
7          Or are you not aware of how many
8  voicemails have been produced in connection
9  with this?
10     A.  Yes, around there.
11     Q.  Do you know -- how do you know what
12 dates these calls were recorded?
13     A.  Cell phone records.
14     Q.  Okay.  When you say "cell phone
15 records" based on the -- [indiscernible].
16         THE COURT REPORTER:  I'm sorry.  You
17 cut out there.
18             (Whereupon, the captured
19              testimony was read back.)
20 BY MR. MESSINA:
21     Q.  The ████████ records.
22     A.  Based on call logs.
23     Q.  Based on the call logs, okay.
24         These are call logs that you went

Page 122

1  through yourself or -- and again, I'm not -- I
2  don't want to ask about conversations with
3  your attorney, but just with respect to you,
4  is this based on call logs that you went
5  through yourself and identified that those
6  were the voicemails yourself?
7      A.  Yes, myself.
8      Q.  Okay.  Recording 37 is actually a
9  video of someone holding your phone listening
10 to a voicemail.
11         Do you remember that?
12     A.  I'm sorry.  Where am I at?
13     Q.  Well, I'm not showing you anything
14 right now.  But there's a -- you produced in
15 discovery a video of someone holding your
16 phone listening to a voicemail.
17         Do you recall someone taking that
18 video of listening to a voicemail?
19     A.  I don't recall.  I may have had my
20 husband's phone in my hand at the time.
21     Q.  Okay.  Do you remember if it was,
22 like, you that recorded that call or your
23 husband or -- or an attorney or someone else?
24     A.  Yeah.  My husband has nothing to do

Page 123

1  with this.  Most likely, it was me.
2      Q.  Okay.  What -- I mean, so do you think
3  you used your husband's cell phone to actually
4  record that, is that what you're saying here?
5      A.  You know what?  I can't say
6  100 percent.
7      Q.  Okay.  Well, there was some other
8  device used to record you listening to the
9  voicemail.  Do you know what other device it
10 would be, other than your husband's cell
11 phone?  You mentioned you had children.  Would
12 it be their phones perhaps?
13     A.  No.  My kids always have their phones.
14     Q.  Okay.  Any -- any other device you
15 have?
16         Do you have, like, a second cell phone
17 that you would use to record something like
18 this?
19     A.  No.
20     Q.  Any other recording device, other than
21 your husband's cell phone, which probably
22 could do it?
23     A.  Nope.
24     Q.  Can you remember -- I mean, to the

Page 124

1  best of your recollection, I don't want you to
2  guess, but it sounds like there wouldn't be
3  any device in the house other than your
4  husband's cell phone; is that right?
5      A.  That's fair to say.  It wouldn't be my
6  kids.
7      Q.  And do you remember ever using your
8  husband's cell phone to record listening to a
9  voicemail like this?
10     A.  I don't -- I can't remember.
11     Q.  Okay.  But he would allow you to,
12 like, take his cell phone.  I know some
13 husbands and wives, for example, they don't
14 like each other sharing your cell phones.
15         With your husband -- I don't want to
16 get into anything personal, but would he allow
17 you to use his cell phone for something like
18 this generally?
19     A.  We hide nothing from each other.
20     Q.  Okay.  So he would have no issue with
21 you making a recording, and that's something
22 that could have happened?
23     A.  It could have, I can't say.
24     Q.  Okay.  So let's go back to that phone

BILEK, MARY
10/06/2020

Page 125

1    record, Bilek 53.
2         MR. MESSINA:  If, Chris, you could
3    pull it up.  The third and fourth entry from
4    the bottom of the page.
5         Can you highlight those, Chris?
6    BY MR. MESSINA:
7         Q.  Were the calls that you referred to in
8    your complaint these -- these other calls
9    your -- to the best of your recollection?
10        **A.  I -- I believe so.**
11        Q.  Okay.  Let's go to Bilek 59 on your --
12   on your packet, Ms. Bilek.  It's a screenshot.
13   Well, I'm saying it is, but let me ask you.
14        Can you tell me what this is?
15        **A.  That's a screenshot.**
16        Q.  Of your phone?
17        **A.  Of my phone.**
18        Q.  This is the call that you declined?
19        **A.  Yes.**
20        Q.  You didn't talk to anyone that was
21   called -- that was calling you from this
22   number?
23        **A.  Can you repeat that?**
24        Q.  You didn't talk -- you didn't actually

Page 126

1    talk to anybody that was calling from this
2    number?
3         **A.  No, it says "declined."**
4         Q.  Okay.  I just want to make sure.
5         So you don't know what they were
6    actually calling about, then?
7         **A.  I do not.**
8         Q.  Okay.  Same as Bilek 60.
9         MR. MESSINA:  Can we just scroll to
10   that real quick, Chris?
11   BY MR. MESSINA:
12        Q.  Same thing, this is a screenshot, and
13   you didn't answer the call; right?
14        **A.  Nope, declined.**
15        Q.  You don't know what that call would
16   have been about?
17        **A.  I can't say I do.**
18        Q.  Okay.  Without going through every
19   single one, can you look at 61 and 65 and just
20   confirm that these are calls that you did not
21   answer?
22        **A.  They all say "declined."**
23        Q.  Okay.  And so you would have no
24   knowledge about the nature of those calls; is

Page 127

1    that correct?
2         **A.  If I didn't talk to them, I can't say**
3    **I do.**
4         Q.  Okay.  So then -- okay.  Also this
5    might be obvious, but just to get the question
6    out, you can say with certainty, then, that
7    Defendants weren't mentioned on these calls
8    because you didn't have a conversation with
9    anyone?
10        **A.  I guess.**
11        Q.  On paragraph 79 of the second amended
12   complaint you claim in quotes that [as read]:
13             "Plaintiff received
14             autodialed prerecorded
15             voice calls to her cell
16             phone's voicemail using
17             caller ID number"...
18        And then there's a number of numbers
19   listed.  One is a (303) area code number on
20   July 25, 2018.  And then it says [as read]:
21             "And caller ID numbers
22             (303) 284-2165."
23        And in parens for two calls -- and
24   (303) 284-2169 on July 26, 2018.

Page 128

1         Do you have a phone bill that
2    references these calls?
3         **A.  I only have what I printed out.**
4         Q.  What do you mean by that, you only
5    have what you printed out?
6         **A.  My call log I was looking at.  Is that**
7    **what you're referring to?**
8         Q.  No.  I'm asking if there's a bill from
9    your telephone company that actually
10   references these calls?
11        **A.  Oh, I don't know.**
12        Q.  I mean, did you request a phone bill
13   that referenced these calls?
14        **A.  I -- [indiscernible].**
15        THE COURT REPORTER:  I'm sorry.  You
16   broke up there.  You were talking over each
17   other.  Could you please repeat that?
18        **THE WITNESS:  I don't recall.**
19   BY MR. MESSINA:
20        Q.  You don't recall.
21        MR. MESSINA:  But my question, if you
22   need that, Angela, was:
23   BY MR. MESSINA:
24        Q.  Did you request a phone bill from your

BILEK, MARY
10/06/2020

Page 129

1  company that references these calls?  And
2  just -- I want to make sure you understood
3  that question, Ms. Bilek.
4      **A.  Yes, I do.**
5      Q.  Okay.  And you don't recall requesting
6  it on the phone call?
7      **A.  Right.**
8      Q.  And you don't recall -- so then, it's
9  fair to say you don't recall if it's ever been
10  produced to your attorney or in this case;
11  right?
12      **A.  I don't recall.**
13      Q.  Okay.  Do you know if any of these
14  calls in paragraph 79 were ever recorded?
15      **A.  I don't recall these calls, so I can't**
16  **say that anything was recorded.**
17      Q.  Okay.  In paragraph 61 of the second
18  amended complaint you allege, quote [as read]:
19              "If there is any question
20              as to whether Defendants
21              knew about the illegal
22              telemarketing here,
23              consumer Robert Hossfeld
24              received two robo calls

Page 130

1              that were substantially
2              similar to those made to
3              Mary Bilek, approximately
4              a year after this lawsuit
5              was filed."
6      Have you ever spoken with Robert
7  Hossfeld?
8      **A.  I don't even know who he is, no.**
9      Q.  Okay.  Other than your attorney -- and
10  when I say "your attorney," I also mean the
11  law firm with Alex's colleagues.
12      Have you ever spoken to anyone about
13  robo calls?
14      MR. BURKE:  Objection, objection.  You
15  can't ask her -- are you asking about her
16  conversations with the lawyers or with other
17  people.
18      MR. MESSINA:  No, I thought that was
19  clear, but I can rephrase the question.
20  BY MR. MESSINA:
21      Q.  Other than your attorneys -- I don't
22  want to know about conversations ever during
23  this deposition or the context of those
24  conversations, Ms. Bilek.

Page 131

1      Have you ever spoken to anyone, other
2  than your attorneys, about robo calls that you
3  received?
4      **A.  No.**
5      Q.  Okay.  When you say "no," what about
6  your children, have you ever spoken to your
7  children about the calls?
8      Do you ever complain to them about the
9  calls?
10      **A.  I don't talk to them about my private**
11  **stuff.**
12      Q.  Okay.  Or your husband, do you ever
13  complain to him about the calls?
14      **A.  I complained a lot to him.  I don't**
15  **recall.**
16      Q.  Okay.  But you don't recall
17  specifically complaining about the calls
18  subject to this case to your husband?
19      **A.  I don't recall.**
20      Q.  Okay.  But it's possible that you did?
21      **A.  I can't say yes, I can't say no.  I**
22  **don't recall.**
23      THE COURT REPORTER:  I'm sorry.  You
24  spoke over each other.  I missed the question

Page 132

1  and answer.
2          (Whereupon, the requested
3              testimony was read back.)
4  BY MR. MESSINA:
5      Q.  And the question was:  Is it possible
6  that you spoke with your husband about these
7  calls?
8      **A.  And I said, I don't recall because I**
9  **complain a lot.**
10      Q.  Do you know anyone else that's filed a
11  TC- -- that's filed a class-action lawsuit
12  involving calls that were allegedly harassing?
13      **A.  I don't.**
14      Q.  What about your husband, are you aware
15  that he's filed any lawsuits about harassing
16  calls?
17      **A.  I don't recall.**
18      Q.  So you're not sure whether your
19  husband's ever been involved in any lawsuits
20  where he's received harassing calls; correct?
21      **A.  What he does, he does.  I don't get in**
22  **his business all the time to be honest with**
23  **you.**
24      Q.  Okay.  Can you tell me, so what's your

Page 133

1  current telephone number?
2  **A.** �_____
3    Q.  And what telephone provider is your
4  phone with, is it ▯____ still?
5  **A.** ▯____**, yes.**
6    Q.  Okay.  Has that number changed at all
7  in the past few years?
8  **A.  No.**
9    Q.  What were your previous telephone
10 numbers, if any?
11 **A.  That's been my number for a long time.**
12   Q.  Okay.  Just going to skip over some of
13 this stuff.  I don't want to keep you here
14 forever.
15       How many total calls -- well, scratch
16 that.
17       With respect to this complaint, the
18 second amended complaint, can you -- do you
19 recall the dates of the calls that you
20 received that are alleged to be harassing or
21 violative here?
22 **A.  There was a lot of dates.  I can't**
23 **give you exact ones.**
24   Q.  Okay.  Do you know -- do you recall

Page 134

1  approximately how many calls there were to you
2  that are subject to your second amended
3  complaint?
4  **A.  Again, I don't know exactly.**
5    Q.  Can you give me a range if you had
6  to -- I don't want you to guess, but a range
7  of calls that you're alleging were harassing?
8  **A.  Over 10 for sure.**
9    Q.  Over 10, okay.
10      Do you know what number these calls
11 came from?
12 **A.  Different ones.**
13   Q.  Different ones, okay.
14      And you -- you -- okay.  Let me strike
15 that.
16      Again, I want to try and ask you the
17 same questions.  Just give me 10 seconds.
18      Did your phone give you any indication
19 when you received these calls that it may have
20 been a spam call?  You know, sometimes your
21 phone will come up and it will say -- it will
22 identify as potential spam?
23 **A.  No.  I know what spam calls are.  It**
24 **did not come up.**

Page 135

1    Q.  Are you claiming it was an automated
2  call, the calls that are at issue in your
3  second amended complaint?
4  **A.  Some were automatic and some were**
5  **actual people?**
6    Q.  Okay.  So the calls subject to your
7  second amended complaint, you believe some
8  were automated and some were not; is that
9  accurate?
10 **A.  Yeah.**
11   Q.  The ones that you believe were
12 automated, how did you know they were
13 automated, or why do you believe they were
14 automated?
15 **A.  Because it was a machine that came on.**
16   Q.  You can tell it was a machine as
17 opposed to a live person?
18 **A.  Yes.**
19   Q.  Okay.  Have you received automated
20 calls prior to the calls at issue in this
21 second amended complaint?
22 **A.  I don't recall.  I received a lot of**
23 **calls.**
24   Q.  Okay.  Did you attempt to speak during

Page 136

1  what you believe was a machine or like a
2  recording from an automated...
3  **A.  Yes.**
4    Q.  What -- what did -- what do you
5  remember trying to say, if anything?
6  **A.  Who's calling, and it just continued**
7  **and -- prerecorded, there was no human on**
8  **there.**
9    Q.  Do you -- do you remember what the
10 recording said --
11 **A.  No.**
12   Q.  -- on any of --
13 **A.  No, I don't.**
14   Q.  But at some point you spoke to a live
15 person on the ones that were automated; right?
16 **A.  Yes.**
17   Q.  Do you remember any of the
18 individuals' names?
19 **A.  No, not all of them.**
20   Q.  Okay.  Do you know what any of these
21 people said to you?
22 **A.  Other than selling insurance, that's**
23 **what I could remember.**
24   Q.  And you didn't record any of those

**BILEK, MARY**
10/06/2020

Pages 137–140

Page 137

1  calls; right?
2  **A.  I did not.**
3      Q.  And -- but you did screenshot your
4  phone at least during one of those calls to
5  show the number was blocked; is that right, or
6  no?
7      **A.  No.  That's after you miss a phone**
8  **call, you can screenshot --**
9      Q.  Okay.
10     **A.  -- the detail.**
11     Q.  So no screen shots of your phone call
12  during the calls to show that the number is
13  blocked.  So why didn't you screenshot those
14  calls?
15         I -- we know obviously you did,
16  so -- with ones that were not picked up, but
17  why not screenshot the phone calls that you
18  received that were -- that are subject in this
19  second amended complaint?
20     **A.  I don't know.**
21     Q.  Is there any reason why you followed
22  the prompt where there was a prompt to speak
23  with -- like, for the ones that were automated
24  calls that you're alleging were machines or

Page 138

1  from an automated device, is there a reason
2  why you followed prompts to get to a live
3  person?
4      **A.  I just did.  I -- I don't know.  I**
5  **just did.**
6      Q.  Okay.  You mentioned before that you
7  believe that you knew it was Rising Eagle that
8  were making these calls.  Can you tell me why
9  you believe or think it was Rising Eagle that
10  was initiating these calls at issue on the
11  second amended complaint?
12     **A.  Repeat that.**
13     Q.  Yeah.  And I don't want to
14  mischaracterize your testimony, but I wrote
15  down notes before.  You said, you know, you
16  knew it was Rising Eagle that were making
17  these calls to you, initiating the calls in
18  the second amended complaint.
19         Is that based on your specific
20  knowledge or if not, how -- why do you think
21  it was Rising Eagle?
22     **A.  I believe they said it one of the**
23  **times.**
24     Q.  Okay.  That --

Page 139

1         (Indiscernible simultaneous
2           colloquy.)
3      THE COURT REPORTER:  I'm sorry --
4  BY MR. MESSINA:
5      Q.  -- think they said they were calling
6  from Rising Eagle?
7      **A.  I believe so.  I can't 100 percent say**
8  **that, but I believe so.**
9      Q.  Okay.  Other than someone mentioning
10  Rising Eagle on one of these calls
11  potentially, any other reason why you would
12  think it's Rising Eagle, beyond just hearing
13  an agent allegedly say that?
14     **A.  No.**
15     Q.  Okay.  Did you request any of the
16  calls in the second amended complaint to stop?
17     **A.  I don't recall.**
18     Q.  Okay.  So you don't recall ever making
19  that request, specifically with respect to the
20  calls at issue in the second amended complaint
21  to stop calling you?
22     **A.  No.**
23         MR. BURKE:  Objection.  Objection;
24  form.

Page 140

1  BY MR. MESSINA:
2      Q.  Okay.  Did you call any of those
3  numbers back, as far as you can recall?
4      **A.  I believe I did to see who was**
5  **calling.**
6      Q.  Okay.  Do you remember what you said
7  on the one -- to the extent that you made
8  calls back to the numbers that were calling
9  you?
10     **A.  I don't know.  I may have just**
11  **listened to what it was.  And some of the**
12  **calls you can't -- some of the calls when you**
13  **call back, it's not an existing number.**
14     Q.  Okay.
15         MR. MESSINA:  Chris, can you take that
16  pop-up that just came up off?
17         MR. BURKE:  Guys, I need like a
18  45-second break.
19         MR. MESSINA:  Okay.
20             (Discussion was held off
21              the record.)
22  BY MR. MESSINA:
23     Q.  Did you provide an email address
24  during any of the alleged calls in the second

BILEK, MARY
10/06/2020

Pages 141–144

Page 141

1    amended complaint, Ms. Bilek?
2         **A.   I did not.**
3         Q.   You did not, okay.
4         **A.   Whoa.  Second amended complaint?  Redo**
5    **that.**
6         Q.   Yeah, sure.  In the second amended
7    complaint -- and again, I'm not being tricky.
8    I thought it was your contention that you did
9    provide an email address during one or more of
10   the alleged calls.  Is that right or do you
11   not recall providing an email address of
12   yours?
13        **A.   It was not a real email address.**
14        Q.   Okay.
15        **A.   I never provided my own.**
16        Q.   What was the email address that you
17   provided that was fake?
18        **A.   I don't remember.**
19        Q.   Okay.  Did it have, like, a Gmail
20   ending or Hotmail or...
21        **A.   I don't know.**
22        Q.   Okay.  But did -- at some point during
23   some of these calls -- provide some personal
24   or identifying information about you; right?

Page 142

1    Your name --
2         **A.   Name only.**
3         Q.   Okay.  Other than your name, anything
4    else?
5         **A.   Not that I recall.**
6         Q.   Why did you provide your real name?
7         **A.   I can't explain that.**
8         Q.   How did you -- I mean, did you -- I
9    think Aaron went over this already, but just
10   to clarify.  So you are not aware, yourself,
11   of any other members of your class or
12   purported class who are receiving any similar
13   calls; is that right?
14        **A.   No.**
15             MR. BURKE:  Objection; form.
16   BY MR. MESSINA:
17        Q.   And none of those calls are being
18   placed directly by NBBI, Access One, or NCE;
19   fair?
20             MR. BURKE:  Form.
21             MR. MESSINA:  I think that's all I
22   have.
23             MR. BURKE:  Great.
24             MR. MESSINA:  We're done.

Page 143

1             MR. BURKE:  Josef, are you going to
2    go?
3             MR. MYSOREWALA:  Yeah.  I guess it's
4    my turn here.  So you guys can all hear me
5    good?
6             MR. BURKE:  Yes.
7                  EXAMINATION
8    BY MR. MYSOREWALA:
9         Q.   Mary, hi.  My name is Josef
10   Mysorewala.  I know it has been a long day.
11   I'll try to get through this quickly for you.
12   I represent National Congress of Employers,
13   Inc.  I will be referring to them as NCE
14   through this depo.  So when I refer to "NCE,"
15   I mean National Congress of Employers, Inc.,
16   so I'll just jump right into it.
17        Have you ever heard of NCE?
18        **A.   Just by one of the phone calls I**
19   **received when they said who they were.**
20        Q.   Prior to that call, have you ever
21   heard of NCE?
22        **A.   No.**
23        Q.   Do you know what NCE does?
24        **A.   I don't.**

Page 144

1         Q.   Why did you name NCE as a defendant in
2    this case?
3         **A.   I can't answer that question.**
4    **I -- I'm not understanding what you said.**
5             MR. BURKE:  Are you asking
6    about -- are you asking about case strategy?
7             MR. MYSOREWALA:  I'm just -- no.  I'm
8    not.  I'm not asking to any -- I'm just asking
9    why she named NCE as the defendant in this
10   case.  She brought the case, she named NCE,
11   why she named NCE as a defendant in the case.
12             MR. BURKE:  I'm going to object.  I
13   think that's an improper question.  You're
14   asking about case strategy.
15             MR. MYSOREWALA:  I'm not asking --
16             MR. BURKE:  Mary, if you're --
17   BY MR. MYSOREWALA:
18        Q.   I'm not asking about any conversations
19   with your attorney or anything like that.  I'm
20   just asking why you named NCE as a defendant
21   in this case?
22             MR. BURKE:  That's point blank asking
23   about case strategy.  I'm instructing her not
24   to answer.

BILEK, MARY
10/06/2020

Pages 145–148

1        MR. MYSOREWALA:  Okay.  I mean, I'll
2  let that go, but I think that's an appropriate
3  question here.  I mean, I'm just simply asking
4  what led her to believe and name NCE as a
5  defendant in this case.  I want to understand
6  what led her to bringing this claim against my
7  client.
8        MR. BURKE:  I mean, you -- that's a
9  different question.  That's a different
10  question.  That's a different question than
11  you asked.
12  BY MR. MYSOREWALA:
13     Q.  I'm going to ask it.  So, Mary, can
14  you please explain to me why you brought this
15  action against National Congress of Employers,
16  Inc.?
17     **A.  Don't know, can't answer it.**
18     Q.  Okay.  You previously stated that you
19  heard of NCE during a call that was made to
20  you; is that correct?
21     **A.  That is correct.**
22     Q.  Who was that call made on behalf of?
23  Was that call made by NCE?
24     **A.  Okay.  You're confusing me now.**

1     Q.  I'm asking you:  Was the call that you
2  received where you stated that the individual
3  caller stated NCE Premier, who was the caller
4  of that call?
5     **A.  Don't know.  They just mentioned that**
6  **name in the particular phone call.**
7     Q.  Okay.  And when they mentioned the
8  name, what was the context in which they
9  mentioned that name?
10     **A.  I don't recall.  I just said, they**
11  **mentioned that name.**
12     Q.  You don't remember why they mentioned
13  the name?
14     **A.  No, they just mentioned it.**
15        MR. BURKE:  Objection; form.
16  BY MR. MYSOREWALA:
17     Q.  Is it your belief that NCE was the
18  caller of that call?
19     **A.  I didn't say I believed they were the**
20  **caller, I just said what name they mentioned.**
21     Q.  I'm asking you if you do believe that
22  NCE was the caller of that call?
23     **A.  I don't know.**
24     Q.  In connection with that call, did you

1  receive any documents?
2        MR. BURKE:  What do you mean?
3  BY MR. MYSOREWALA:
4     Q.  Did you receive any documents?
5     Did you get anything in response?  You
6  submitted an email.  Did you receive any
7  documents after that call finished?
8     **A.  No, I don't believe so.**
9     Q.  Were there any other products or any
10  other names discussed during that call?
11     **A.  NEC [sic], whatever that is.**
12        MR. BURKE:  And, Josef, you're asking
13  about which call, the March 16th call that
14  we -- that she has the notes for?
15        MR. MYSOREWALA:  That's correct.
16        MR. BURKE:  Can she refer to her
17  notes?
18        MR. MYSOREWALA:  Yeah, that's fine.
19        MR. BURKE:  I mean, we have a
20  recording of this call.  So are you asking her
21  what she remembers about the call that we have
22  a recording of?
23        MR. MYSOREWALA:  Well, I'm just asking
24  her if there are any other products or

1  anything that was offered to her during that
2  call.  We don't know where the recording came
3  at this point either, Alex, so...
4        MR. BURKE:  Yes, you do.  It was
5  produced to you by me.  We received it from
6  Fextel.  You've had it in your possession for
7  almost a year.  So you -- you absolutely do
8  know where you had it -- got it from.
9        MR. MYSOREWALA:  Okay.  And I'm going
10  to ask your client questions about the call.
11  She was the one on the call.  I have some
12  questions about the call.
13        MR. BURKE:  That's fine.  I mean, I
14  don't object to you asking questions.  I'm
15  just saying, like, there's a recording of
16  almost that whole call.  And she told you guys
17  that she hasn't listened to it.  She hasn't
18  read the transcript.  So you're asking about
19  her, like, two-and-a-half-year-old memory of
20  the call, and you're acting like it's --
21        MR. MYSOREWALA:  I'm asking your
22  client the question.  I'm not here to debate
23  you over this.
24        MR. BURKE:  Yeah, it's fine.  I'm

BILEK, MARY
10/06/2020

Pages 149–152

Page 149

1 just -- you know, there's a recording of this
2 call, and you're asking her what she
3 remembers. I mean, I don't know. It just
4 doesn't seem like a good use of time, but this
5 is your time, so go ahead.
6 MR. MYSOREWALA: All right. I
7 appreciate that, Alex.
8 BY MR. MYSOREWALA:
9 Q. I mean, Mary, feel free to refer to
10 your notes as much as you want. I mean, this
11 is the Bilek 66 note that we discussed that
12 you were going over with Charles earlier.
13 I'm just asking some basic questions
14 because, yeah, I noticed that you do have NCE
15 Premier, and I want to understand what it is
16 that you were told about NCE Premier, and what
17 led you to believe that NCE Premier was
18 somehow involved here. And I just want some
19 further questions about that.
20 And so I just want to understand,
21 during the call, if you recall, was any other
22 products or were any other company names
23 mentioned?
24 **A. As far as I know, it was NC Premier**

Page 150

1 **[sic] and National Congress. That's all I'm**
2 **going to say.**
3 Q. Okay. Thank you.
4 Charles had previously gone over with
5 you the voicemails in paragraph 71 of the
6 second amended complaint, which I believe you
7 have in your -- in front of you. It's on
8 page 14, paragraph 71. There's a block quote
9 there. Are you on the page?
10 **A. What page are you referring to?**
11 Q. Page 14, paragraph 71.
12 **A. I have page 13, I don't have page 14.**
13 Q. All right. So maybe it's page 13, but
14 it's paragraph 71.
15 **A. Okay. That's what I was looking at.**
16 **Okay. Page 14.**
17 Q. Okay. In paragraph 71 it talks about
18 certain calls that you allege you received,
19 and voicemails that you allegedly received and
20 recorded.
21 I'm not going to read it again for the
22 record, I believe Charles did. There's a
23 block quote there on paragraph 71. It lists
24 specific insurance companies.

Page 151

1 Do any of these voice recordings -- or
2 does that quote mention NCE?
3 **A. No, they do not.**
4 Q. Do you recall any other conversations
5 you had with anyone in connection with any of
6 these calls that are at issue here today,
7 other than mentioned NCE?
8 **A. No, I do not.**
9 Q. When you received -- there's obviously
10 numerous calls. We know that some of them
11 went to your voicemail. Approximately how
12 many of these calls from these telemarketers
13 do you claim that you answered?
14 **A. Maybe three or four. The rest pretty**
15 **much went to my voicemail as much as I can**
16 **remember.**
17 Q. Okay. And those three or four that
18 you answered, do you recall if they were from
19 the same number or whether they were from
20 different numbers?
21 **A. Different numbers.**
22 Q. And with those different numbers, is
23 it your position that it's always the same
24 caller?

Page 152

1 **A. I don't know if it's the same caller.**
2 Q. Do you have any reason to believe it
3 was the same caller?
4 **A. I can't say yes and I can't say no.**
5 Q. All right. I want to ask you about a
6 few individuals. Maybe you know them, maybe
7 you -- not, maybe not. Just let me know if
8 you know these individuals or not.
9 Do you know who Sean Duffie is?
10 **A. I do not.**
11 Q. Have you ever heard the name Sean
12 Duffie before?
13 **A. I have not.**
14 Q. Do you know who Michael Smith is?
15 **A. I do not.**
16 Q. Have you ever heard the name Michael
17 Smith before?
18 **A. I have not.**
19 Q. Do you know who Ann Fils is?
20 **A. You cut out.**
21 Q. I said, do you know who Ann Fils is?
22 **A. I do not.**
23 Q. Have you ever heard the name Ann Fils?
24 **A. I have not.**

BILEK, MARY
10/06/2020

Page 153

1    Q.  Do you know who Benefits Matter is?
2    **A.  I do not.**
3    Q.  Have you ever heard the name Benefits
4  Matter before?
5    **A.  I have not.**
6    Q.  Do you know who HAA is?
7    **A.  I do not.**
8    Q.  Have you ever heard the name HAA
9  before?
10   **A.  I have not.**
11   Q.  Have you ever heard the name Zachary
12  Cox before?
13   **A.  I have not.**
14   Q.  Do you know who Enrollment Center of
15  America is?
16   **A.  Heard of them.**
17   Q.  And what did you hear about them?
18   **A.  They're on TV.  Enrollment Center, is**
19  **that who you're referring to?**
20   Q.  I'm talking about Enrollment Center of
21  America.  It is part of the second -- I
22  believe it's part of the second amended
23  complaint.
24   **A.  I don't know.  I've seen commercials,**

Page 154

1  **Enrollment Center, if that's who you're**
2  **referring to.**
3    Q.  Okay.  All right.  I look -- I'm
4  almost pretty much done here.  I think my
5  colleagues covered most of it.
6        I just want to ask you a couple
7  questions.  If you recall ever receiving a
8  call on September 20, 2018, that's at issue in
9  this case?
10   **A.  I receive a lot of phone calls.  I**
11  **don't recall a particular one.**
12   Q.  So when you -- we were talking a few
13  minutes ago, then.  I know you don't remember
14  a particular call.  You said you had answered
15  three or four calls.
16       When you had answered those calls and
17  you spoke to the individuals during those
18  calls, were the same products offered in all
19  those calls?
20   **A.  Very similar.**
21   Q.  What do you mean by "very similar"?
22       Was it the same -- the same company
23  named?
24   **A.  I don't remember the same companies,**

Page 155

1  **but they were selling insurance.  That I do**
2  **remember.**
3    Q.  Do you remember what kind of insurance
4  they were selling you?
5    **A.  Mostly health insurance.**
6    Q.  Was there any other offers of life
7  insurance?
8    **A.  Yes.  I believe in two of them there**
9  **was.**
10   Q.  Do you recall which two calls they
11  were offered in?
12   **A.  The one from the 16th that we're**
13  **referring to that I have my notes marked down,**
14  **and I do believe one other one.  Sorry.  I**
15  **can't remember.  I don't know the date of it.**
16   Q.  Do you recall roughly what the date of
17  that call was?
18   **A.  I'd be lying if I say I did.**
19   Q.  During any of those calls, did you
20  purchase any products?
21   **A.  I did not.**
22   Q.  Do you know if NCE benefited from any
23  of the calls you received?
24   **A.  Can you repeat that?**

Page 156

1    Q.  Do you know if NCE benefited from any
2  of the calls that you received?
3    **A.  I do not.**
4    Q.  And other than that March 16th call,
5  was NCE ever referenced in any of the other
6  calls?
7    **A.  I don't recall, no.**
8    Q.  I mean, other than that, I think my
9  colleagues covered mostly everything else.
10  Let me just ask you -- you had mentioned one
11  thing.  Sorry.  You had mentioned you don't
12  know who Mike Smith is; correct?
13   **A.  Correct.**
14   Q.  However, recently a declaration was
15  submitted that was obtained from Michael
16  Smith.
17       Did you receive that declaration from
18  Michael Smith?
19   **A.  I did not, 100 percent I did not.**
20   Q.  Okay.  That's all.
21       MR. BURKE:  Okay.  Are the defendants
22  done?
23       MR. MYSOREWALA:  Unless Aaron or
24  Charles has anything else to finish up with, I

BILEK, MARY
10/06/2020

Pages 157–160

Page 157

1   mean, that's it for me.
2         MR. BURKE:  Okay.  I'm going to have
3   some.
4         MR. WILLIAMS:  I have no further
5   questions right now.
6         MR. MESSINA:  Yeah, same with me.
7         MR. BURKE:  Okay.
8               EXAMINATION
9   BY MR. BURKE:
10    Q.  I'm going to try to play a recording
11  here.
12        THE COURT REPORTER:  And do you want
13  me to take it down or put an excerpt that a
14  recording was played?
15        MR. BURKE:  Here's what I would
16  propose:  Let's make it an exhibit and I'll
17  email it to you.  And I would like for it to
18  be part of the transcript, but it's -- you
19  know, these things are really hard to
20  transcribe, they're fast.  It's only the
21  beginning of the call.  It's the prerecorded
22  portion.  And the Bates stamp is number 1.
23        THE COURT REPORTER:  Okay.  So you
24  want me to take it down in the transcript?

Page 158

1         MR. BURKE:  Yeah.  It would be okay
2   with me if you were to do your best as we play
3   it and then shore it up using the exhibit
4   later.
5               (Discussion was held off
6               the record.)
7         MR. BURKE:  Does everybody agree with
8   that?  I mean, we produced it.
9         MR. WILLIAMS:  I think that's fine.
10        MR. MESSINA:  No objection from me,
11  Alex.
12        MR. BURKE:  Let me see.  Maybe it
13  won't work anyway.
14        MR. MYSOREWALA:  No objection here,
15  and it's...
16        MR. BURKE:  And it's not playing.
17              (Discussion was held off
18              the record.)
19        UNIDENTIFIED RECORDING:  At the price
20  you can afford, and we make it hassle free to
21  sign up.  We have preapprovals ready in your
22  area, including Cigna, Blue Cross, Aetna,
23  United, and many more.  Press 1 to get a
24  hassle-free assessment or press 2 to be placed

Page 159

1   on our do not call list.  Thanks for your time
2   and be healthy and blessed.
3         MR. BURKE:  All right.  Did you guys
4   hear that?
5         All right.  We're going to mark
6   that -- I don't know, I guess Bilek Deposition
7   Exhibit 3.
8               (Whereupon, BILEK
9               Deposition Exhibit No. 3
10              was introduced and
11              retained by Attorney
12              Burke.)
13  BY MR. BURKE:
14    Q.  Mary, do you recognize that recording?
15    A.  I do.
16    Q.  What is it?
17    A.  It's a recording a voice message left
18  on my phone.
19    Q.  Okay.  Is this one of the voicemails
20  that was left when you did those declined
21  calls?
22    A.  Yes, it was.
23    Q.  Okay.  How many of those did you get,
24  roughly?

Page 160

1     A.  Over 20.
2     Q.  And so does this refresh your
3   recollection as to why you think those
4   declined calls were from the same folks as the
5   ones that you answered like the March 16th
6   call we've been talking about?
7     A.  I would say so, yes.
8     Q.  All right.  Why do you think they're
9   from the same people?
10    A.  Because they're numerous calls that
11  left numerous messages like that.
12    Q.  Okay.  And like that you mean, like,
13  with the same prerecorded message?
14    A.  Yes.
15    Q.  Okay.  And I noticed when we were
16  listening to that that it says that you can
17  press 1 to talk to somebody or 2 to place your
18  name on the do not call list.
19        Do you remember that?
20    A.  I do.
21    Q.  All right.  Did you ever press 2 to be
22  placed on the do not call list?
23    A.  Yes, I did.
24    Q.  All right.  And was that, like,

BILEK, MARY
10/06/2020

Pages 161–164

1  towards the beginning of the calls that you
2  started receiving or was it in the middle or
3  the end or what?
4      **A.  Towards the beginning.**
5      Q.  All right.  And did you receive, like,
6  more than two calls after you pressed that
7  button to not receive any more calls?
8      **A.  Possibly more than eight.**
9      Q.  All right.  So -- but certainly more
10  than two calls?
11      **A.  Yes.**
12      Q.  All right.  And did you sometimes
13  press 1 to speak with an operator?
14      **A.  Yes, I did.**
15      Q.  All right.  And of those roughly, you
16  know, roughly three or four calls that -- you
17  testified that you talked to somebody?
18      **A.  Yes.**
19      Q.  All right.  And -- and you testified
20  about Rising Eagle.  I mean, is it possible
21  that you learned about Rising Eagle from
22  someplace other than these phone calls?
23      **A.  That's a possibility, yes.**
24      Q.  All right.  And has that possibly,

1  like, come to light during conversations with
2  your attorneys?
3      **A.  That could have been.**
4      Q.  All right.  And you know there was a
5  question earlier today about how you were
6  damaged by these calls.  I'll ask it just a
7  little bit differently.
8          I mean, how did these -- how did these
9  robo calls affect you?
10      **A.  Well, they affected me because**
11  **answering the phone calls, thinking it was a**
12  **doctor when my father was on hospice and dying**
13  **while I was changing his diapers, changing his**
14  **puke, keeping him alive on a breathing machine**
15  **and attending to him around the clock care and**
16  **holding his hand to his last breath when these**
17  **phone calls were coming in that I was thinking**
18  **they were my sister and other people getting**
19  **off the plane.**
20      Q.  And so -- and that all happened in
21  2018?
22      **A.  Yes.**
23      Q.  And did your father finally pass?
24      **A.  Yes, he did.**

1      Q.  When did that happen?
2      **A.  On the 10th of September.**
3      Q.  And so would it be fair to say that
4  your whole 2018 was engulfed by your father's
5  illness and connection?
6      **A.  One hundred percent.**
7      Q.  And without talk- -- without telling
8  the audience what we talk about generally, I
9  mean, how often would you say you and I are in
10  communication?
11      **A.  Quite a bit.**
12      Q.  All right.  And do you feel reasonably
13  abreast of what's going on in these cases?
14      **A.  Yes, I do.**
15      Q.  And without going into specifics, I
16  mean, if you don't understand something about
17  the case, you know, do you and I have a
18  conversation?
19      **A.  You explained 100 percent to me.**
20      Q.  All right.  And what does it mean to
21  be a class action?
22      **A.  Class action means not just fight for**
23  **yourself, but fight for the other people that**
24  **are having these nuisance phone calls that are**

1  **interrupting their lives also by answering**
2  **these phones all the time.**
3      Q.  And I think you testified earlier that
4  we're trying to get money for these phone
5  calls and for the other folks.
6          Are we also trying to get these calls
7  to stop?
8      **A.  Yes, we are.**
9      Q.  Is that an important aspect of why we
10  sued?
11      **A.  Very important.**
12      Q.  Why?
13      **A.  Because some elderly people get**
14  **wrapped into these phone calls and can't**
15  **defend theirself and it just becomes a problem**
16  **with them over and over and over again.**
17  **Answering phone calls that they don't**
18  **understand, that they think they're getting**
19  **good insurance and they're not.  It's a**
20  **nuisance.  That's all I could say.**
21      Q.  And did you try to get these calls to
22  stop?
23      **A.  I did.**
24      Q.  And what did you do to try to get them

BILEK, MARY
10/06/2020

Pages 165–168

Page 165

```
1   to stop?
2       A.   Told them verbally, pressed the
3   number, and obviously they continued.
4       Q.   In fact, you kept getting calls even
5   after we sued, didn't you?
6       A.   I did, yes.
7            MR. BURKE:   All right.   I have nothing
8   more.
9            MR. MAROVITCH:   Alex, can we take
10  maybe five minutes actually?
11           MR. BURKE:   Okay.
12                (Whereupon, a recess was
13                 had.)
14           MR. MYSOREWALA:   I had one -- just one
15  follow-up question.   I don't know if we're
16  back on the record yet or not.
17           THE COURT REPORTER:   We're back on.
18           MR. MYSOREWALA:   Is everyone on?   It
19  looks like Charles -- yeah, it looks like --
20           MR. WILLIAMS:   We don't have Mary,
21  though.
22           MR. BURKE:   She's here.   She's here.
23  I just have her off.   Got her.
24       Mary, you're here; right?
```

Page 166

```
1            Can you talk, Mary?   Speak loud,
2   loudly.
3       THE WITNESS:   I'm here.
4            MR. BURKE:   Okay.
5                FURTHER EXAMINATION
6   BY MR. MYSOREWALA:
7       Q.   Okay.   I just have one quick follow-up
8   question for you.
9            MR. MYSOREWALA:   We're on the record;
10  right?
11           THE COURT REPORTER:   Correct.
12  BY MR. MYSOREWALA:
13      Q.   In talking with Alex right now, you
14  mentioned that multiple calls when you were
15  prompted with a 1 or 2, you had pressed 2.
16           Do you recall when those calls were?
17      A.   I do not.   It was in the beginning.
18      Q.   It was -- sorry.   What was that?
19      A.   It was in the beginning of the phone
20  calls.   In the --
21      Q.   So -- and so when you say "the
22  beginning," though, can you just give me like,
23  a reference of the time period?   What's the
24  beginning of the phone calls?
```

Page 167

```
1       A.   Somewhere after the -- March 16th of
2   2018.
3       Q.   So sometime after that?
4       A.   Yes.
5       Q.   Sorry.   What was that?
6       A.   Yes.
7       Q.   Okay.
8            MR. MYSOREWALA:   All right.   That's
9   all for me.   I don't know if any of the other
10  attorneys have any questions, Aaron or
11  Charles.
12           MR. MESSINA:   I just have a few
13  follow-up questions.   Aaron, do you have
14  anything?
15           MR. WILLIAMS:   Yeah.   No, go ahead,
16  Charles.
17                FURTHER EXAMINATION
18  BY MR. MESSINA:
19      Q.   Ms. Bilek, when your attorney was
20  asking you questions, it sounded -- it seemed
21  to me like you had, like, sort of a clear
22  recollection from what I was asking you
23  questions with respect to the call subject to
24  the second amended complaint.
```

Page 168

```
1            So my first question is:   Were you
2   looking at notes?
3       A.   I was not looking at any notes.
4       Q.   Okay.   And just with respect to the
5   first call, okay, that occurred --
6            MR. MESSINA:   Chris, could you pull up
7   the call log that we circulated to everyone on
8   the shared screen, and go to Excel number
9   25606, the February 20, 2018, call, subject to
10  the amended complaint.
11           Can you make that a little bigger?
12  25606.
13  BY MR. MESSINA:
14      Q.   So I can tell you the telephone number
15  before Chris gets to it, (703) 348-6954.   And
16  this was a call that -- your -- call that --
17  indicates you received on February 20, 2018.
18  You didn't recall this -- you didn't record
19  this call; is that right?
20      A.   I did not.
21      Q.   You remember who you spoke with on
22  this call?
23      A.   I do not.
24      Q.   Did you take any notes during this
```

**BILEK, MARY**
10/06/2020

Pages 169–172

Page 169

1  call?
2      A.  I don't recall if I did or not.  I
3  don't think so.  I took two note -- two notes
4  down.
5      Q.  What were those notes?
6      A.  The one we just went over.
7      Q.  Okay.
8      A.  And I believe another one.  I didn't
9  do more than that.  I know that for sure.
10     Q.  Okay.  Just going back to the first
11 note.  When you say "the first note we just
12 went over," are you referring to Bilek number
13 66, the March -- the March 2018 notes that we
14 had the share screen on earlier that
15 references NCE Premier that that -- that's
16 what you're referring to when you say "the
17 first one"?
18     A.  Yes.
19     Q.  Okay.  And that's with the March 2018
20 call.
21         When you say you took a second note,
22 what -- what do you mean by that, just so we
23 understand it?
24     A.  I believe I took a second note of

Page 170

1  incoming -- you know what?  I can't remember.
2  I'm -- right now, I'm really stressed.
3      Q.  Okay.  And you could take your time.
4  If you need time to remember.
5      MR. BURKE:  We need a little break
6  here, guys.  Can we take a break for five
7  minutes?
8      MR. MESSINA:  Yeah, that's fine, Alex.
9          (Whereupon, a recess was
10          had.)
11 BY MR. MESSINA:
12     Q.  Okay.  So we were on the
13 February 20, 2018, call.  Was any information
14 requested of you during this call, Ms. Bilek?
15     A.  I don't remember.
16     Q.  Okay.  Any information that you
17 provided them with, as far as you can recall?
18     A.  Don't know.  I don't remember.
19     Q.  So you don't remember if you provided
20 real or fabricated --
21     A.  I don't provide real information,
22 other than maybe my name.
23     Q.  Okay.  Do you recall blocking this
24 number or pressing 2?

Page 171

1      A.  I don't remember.
2      Q.  Okay.  Any voicemails that you can
3  recall associated with this particular call on
4  February 20, 2018?
5      A.  Don't remember.
6      Q.  Okay.  And fair to say you don't
7  remember if NBBI, Access One, or NCE were
8  mentioned?
9      A.  I don't remember, no.
10     Q.  Okay.  In terms of just going in order
11 here to make things easy with the second call,
12 subject to your second amended complaint on
13 February 23, 2018, that's Excel number 26094.
14     MR. MESSINA:  Find that, Chris.
15 BY MR. MESSINA:
16     Q.  Do you remember taking any notes
17 during this particular call?
18     A.  No, I don't recall.
19     Q.  And do you recall any information
20 requested of you during that call?
21     A.  No.
22     Q.  You don't remember trying to block the
23 number or pressing 2 with respect to this
24 call?

Page 172

1      A.  Nope, I don't.
2      Q.  And don't remember if you provided
3  your name or fake information and the like?
4      A.  I don't remember.  It's been a while.
5      Q.  Okay.  I understand.
6          You did have specific recollections
7  with respect to certain calls, so I'll be
8  quick.  I'm just going to go through the calls
9  that you allege are violative in your
10 complaint right now.  So I'm going to try to
11 make this as quick as possible.  The third
12 call on March 6, 2018.
13     MR. MESSINA:  It's Excel number 27438,
14 I think, Chris.
15 BY MR. MESSINA:
16     Q.  This is a March 6th call.  We were
17 talking about the March 8th calls earlier in
18 the day.  On March 6th, with this call subject
19 to your second amended complaint, do you
20 remember if you took any notes with respect to
21 this call?
22     A.  No.  I know one of the calls
23 I -- before that I had pressed -- pressed 2 so
24 they didn't call me back.

Page 173

1    Q.  Can you repeat that?  I just didn't
2  hear it.  I'm sorry.
3    **A.  Previous calls I -- one of the calls I**
4  **pressed 2 for them not to call me back.**
5    Q.  I understand.  On one of the calls you
6  pressed 2 so they didn't call back, but you
7  don't know which call that was?
8    **A.  I don't recall, no.**
9    Q.  Okay.  So you recall it happened once,
10  but not which call.
11        What about --
12        MR. BURKE:  I object to that, Charles.
13        MR. MESSINA:  Yes.  What's the basis
14  to your objection if it's not objection to
15  form?
16        MR. BURKE:  You're making statements
17  outside of your questions.  You're essentially
18  testifying.
19        MR. MESSINA:  Okay.  We can have
20  the -- I don't think it's necessary, but the
21  transcript will show what it shows and I'm
22  responsible for the question.
23        MR. BURKE:  Yeah, but you're trying to
24  guide her testimony and that's objectionable.

Page 174

1  It's a form objection, but it's enough to try
2  to -- you know, you can't do that.  If you
3  continue to do that sort of thing, provide
4  commentary while you're doing your
5  questioning, we're either going to call the
6  judge or we're going to stop the deposition.
7        MR. MESSINA:  Angela, would you mind
8  reading back the last two questions and
9  answers?
10        MR. BURKE:  No.  Object -- I just
11  object to that.  You're asking her to repeat
12  what you improperly said.
13        MR. MESSINA:  No, I'm asking her
14  because I disagree with the basis of your
15  objection.  We could argue about it now or we
16  can move on, but all I did is just repeat what
17  she said and sent it to the record with
18  response to my question.
19        MR. BURKE:  Just don't do it anymore.
20        MR. MESSINA:  Let's move on.
21  BY MR. MESSINA:
22    Q.  So with the fourth and fifth call, so
23  this is on March 8, 2018, it's a call from a
24  number (773) 273-6136.

Page 175

1        Did -- do you remember -- do you
2  remember taking any notes with respect to this
3  call, Ms. Bilek?
4    **A.  I do not.**
5    Q.  You had mentioned that there was a
6  second note, that's what you know you said.
7  Can you describe what you meant by that
8  before, you know, you needed to get off the
9  record for --
10    **A.  It was a mistake and had nothing to do**
11  **with this.**
12    Q.  Okay.  When you -- when you say "a
13  mistake," can you just explain what that means
14  so we understand it?
15    **A.  It's concerning a different case.  Not**
16  **this.  So we'll leave it at that.**
17    Q.  Okay.  A different litigation?
18    **A.  A different case.**
19    Q.  Okay.  Is that case involving claims
20  where you allege that you were receiving
21  calls --
22    **A.  No, it's not.**
23    Q.  It's not, okay.
24        MR. BURKE:  Charles, what is this

Page 176

1  document we're looking at, this ███████ call
2  log with a Bilek Bates number on it?
3        Is this a document we produced?
4        This doesn't look like our naming
5  protocol.
6        MR. MESSINA:  Chris, you're on this
7  call.  My understanding is this data was
8  emailed to you guys and produced by you guys.
9        MR. ZAMLOUT:  This was produced by you
10  on Bilek 38.  And this was emailed to you at
11  about 11:09 today.
12  BY MR. MESSINA:
13    Q.  So with respect to the fourth and
14  fifth call -- so this is March 8th, do you
15  ever -- did you ever call -- do you recall
16  calling any of these numbers and initiating a
17  call back?
18    **A.  I do not.**
19    Q.  I mean, based on your call records, it
20  looks like you did.  But, okay.  You don't
21  recall that.
22        Do you recall calling Alex, your
23  attorney, on March 8th after receiving calls
24  on March 8th?

BILEK, MARY
10/06/2020

Pages 177–180

Page 177

1     A.  I could have.  I don't -- if you have
2  a record, then obviously I did.  I mean, how
3  am I supposed to remember everything?
4     Q.  I'm not asking you -- if you don't
5  remember, that's a fine answer, if you
6  don't --
7     A.  I don't remember.
8     Q.  Okay.  But you don't have any specific
9  recollection of you calling or texting your
10  attorney that day?
11     A.  No, I don't.
12     Q.  Okay.  On March 9, 2018 -- and this is
13  Excel number 27994 and 27995 -- you received a
14  call on that day and then followed up.
15        Let me ask:  Do you recall receiving a
16  call that day on March 9th?
17     A.  I've received a lot of phone calls.  I
18  don't recall every single phone call, so no, I
19  don't.
20     Q.  Do you recall calling Mr. Burke back
21  after that 6th call 30 minutes later?
22     A.  I have contacted Alex a lot, so I
23  don't remember if I called back, what it was
24  for.

Page 178

1     Q.  Okay.  Would it surprise you if I told
2  you that for the rest of the calls, 7th, 8th,
3  9th, 10th, 11th, 12th, that after those calls,
4  sometime shortly after you called or texted,
5  and right after those calls were engaged...
6     A.  What?
7        MR. BURKE:  What's the question?
8  BY MR. MESSINA:
9     Q.  The question is:  Would it surprise
10  you to -- well, let me ask you a different
11  question.
12        Do you recall any specific calls with
13  your attorney or text messages that happened
14  immediately after any of the other calls at
15  issue in the second amended complaint?
16     A.  I don't recall.  I speak to my
17  attorney on different levels, so I don't know
18  what you're referring to.
19     Q.  Okay.
20     A.  Are you trying to ask me why I called
21  my attorney?
22        What are you trying to ask me?
23     Q.  I'm trying to ask you if you remember
24  calling your attorney or texting him?

Page 179

1     A.  I call him and text him a lot, so
2  that's irrelevant.  I don't remember what
3  anything is for, even if I did.
4     Q.  Okay.
5        MR. MESSINA:  I don't think I have any
6  further questions.  I don't know if Josef or
7  Aaron, you guys go.
8        MR. WILLIAMS:  I don't think I have
9  anything else.
10        MR. MYSOREWALA:  I was just saying I
11  have no more questions for Mary.  This is
12  Josef Mysorewala.  I don't know about Aaron.
13        MR. WILLIAMS:  No, no.  The same.
14        MR. BURKE:  All right.  I have a few
15  more.
16        FURTHER EXAMINATION
17  BY MR. BURKE:
18     Q.  So, Mary, did you press 2 to be placed
19  on a do not call list just once or multiple
20  times?
21     A.  I pressed it a couple times.
22     Q.  All right.  And thinking about the
23  notes that you took on the March 16th call, I
24  mean, does that refresh your recollection as

Page 180

1  to whether you had pressed 2 before that call
2  to have the calls stop?
3     A.  Yes, I do because I believe it was all
4  becoming -- to be a nuisance, and that's why I
5  believe I started taking it --
6  [indiscernible].
7        THE COURT REPORTER:  I'm sorry?
8             (Whereupon, the captured
9              testimony was read back.)
10     THE WITNESS:  The note that day
11  referring to the notes that I have on paper.
12  BY MR. BURKE:
13     Q.  Page 66?
14     A.  On -- at 9:27, page 66.
15     Q.  So in other words, you're saying that
16  at the time you took these notes on
17  March 16th, you had already asked that calls
18  stop?
19     A.  Yes.
20     Q.  And just to -- just to clarify, you
21  testified about taking some notes earlier and
22  that you had two sets of notes, and I think a
23  minute ago that you said it was for a
24  different case.

**BILEK, MARY**
10/06/2020

Page 181

```
 1        I mean, have -- have you turned all
 2   your handwritten notes over to me?
 3        A.  I turned in every single drop of
 4   evidence I have.  I have nothing hided [sic].
 5        Q.  And you did a full search of all your
 6   emails and everything all like that looking
 7   for stuff having to do with the case?
 8        A.  Yes.
 9        Q.  All right.  That's all.
10             MR. WILLIAMS:  Read or waive?
11             MR. MESSINA:  Ms. Bilek, thank you
12   very much for your time today.  I don't think
13   there's any other question on defense counsel.
14             MR. WILLIAMS:  Yeah.  Alex, will you
15   be reading or waiving?
16             MR. BURKE:  I suppose we'll read.
17             THE COURT REPORTER:  And would anyone
18   like to order the transcript?
19             MR. WILLIAMS:  Yes, we'll order it.
20             THE COURT REPORTER:  And would anyone
21   like a copy?
22             No?  Okay.  Thank you very much.
23             * * FURTHER DEPONENT SAITH NOT * *
24
```

Page 182

```
 1        IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                 EASTERN DIVISION
 3   MARY BILEK,                )
     INDIVIDUALLY AND ON        )
 4   BEHALF OF OTHERS           )
     SIMILARLY SITUATED,        )
 5                              ) No.  1:18-cv-03083
        Plaintiff,              )
 6                              )
            vs.                 )
 7                              )
     NATIONAL CONGRESS OF       )
 8   EMPLOYERS, INC.,           )
     NATIONAL BENEFIT           )
 9   BUILDERS, INC.,            )
     ACCESSONE CONSUMER         )
10   HEALTH, INC., UNIFIED      )
     LIFE INSURANCE COMPANY,    )
11   HEALTH INSURANCE           )
     INNOVATIONS, INC., AND     )
12   DOES 1-10,                 )
                                )
13        Defendants.           )
14        I, MARY BILEK, state that I have read
     the foregoing transcript of the testimony
15   given by me at my deposition on
     October 6, 2020, and that said transcript
16   constitutes a true and correct record of the
     testimony given by me at said deposition
17   except as I have so indicated on the errata
     sheets provided herein.
18
19
     _____
20        MARY BILEK
21   SUBSCRIBED AND SWORN to
     before me this _____ day
22   of _____, 2020.
23
24   _____NOTARY PUBLIC
```

Page 183

```
 1   STATE OF ILLINOIS   )
                         )  SS.
 2   COUNTY OF COOK      )

 4        I, Angela C. Loisi, Certified Shorthand
 5   Reporter, Registered Professional Reporter,
 6   do hereby certify that on October 6, 2020,
 7   the deposition of the witness, MARY BILEK,
 8   was taken remotely before me, reported
 9   stenographically, and was thereafter reduced
10   to typewriting under my direction.
11        The said deposition was taken from
12   Chicago, Illinois, and there were remotely
13   present counsel as previously set forth.
14        The said witness, MARY BILEK, was first
15   duly sworn to tell the truth, the whole
16   truth, and nothing but the truth, and was
17   then examined upon oral interrogatories.
18        I further certify that the foregoing is
19   a true, accurate, and complete record of the
20   questions asked of and answers made by the
21   said witness, MARY BILEK, at the time and
22   place hereinabove referred to.
23
24
```

Page 184

```
 1        The signature of the witness, MARY
 2   BILEK, was reserved by agreement of counsel.
 3        The undersigned is not interested in the
 4   case, nor of kin or counsel to any of the
 5   parties.
 6        Witness my official digital signature on
 7   this October 14, 2020.
 8
 9
10
11
12
13
14
15   _____
16   Angela C. Loisi, CSR, RPR
17   CSR No. 084-004571
18
19
20
21
22
23
24
```