Page 1

1          IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
2

      ROBERT HOSSFELD,
3            Plaintiff,
4      vs.
                                Civil Action
5      AMERICAN FINANCIAL SECURITY LIFE      No.
      INSURANCE COMPANY, et al.,      0:19-cv-60597
6                  Defendants.
      _____
7

      MARY BILEK, individually and on behalf
8      of others similarly situated,
                  Plaintiff,          UNITED STATES
9      vs.                            DISTRICT
                                      COURT FOR THE
10     NATIONAL CONGRESS OF EMPLOYEES, INC.,   SOUTHERN
      NATIONAL BENEFIT BUILDERS, INC.,      DISTRICT OF
11     ACCESSONE CONSUMER HEALTH, INC.,      FLORIDA
      UNIFIED LIFE INSURANCE COMPANY, HEALTH
12     INSURANCE INNOVATIONS, INC., and DOES   Civil Action
      1 - 10,                         No.
13                  Defendants.      1:18-cv-03083
14     _____/
15     VIDEOTAPED
      DEPOSITION OF:   CHRISTINE GILLIS
16
      DATE:           August 3, 2022
17
      TIME:           9:35 a.m. to 6:17 p.m.
18
      PLACE:          401 E. Jackson St., Suite 3300
19                     Tampa, Florida
20     PURSUANT TO:    Notice by counsel for Plaintiff
                        for purposes of discovery, use at
21                     trial or such other purposes as
                        are permitted under the Federal
22                     Rules of Civil Procedure
23     REPORTED BY:    Aaron T. Perkins, RMR, CRR, CRC
                        Notary Public, State of
24                     Florida at Large
25

Page 2

```
 1   APPEARANCES:
 2   ON BEHALF OF PLAINTIFFS
 3     ALEXANDER H. BURKE, ESQUIRE
       DANIEL MAROVITCH, ESQUIRE  (via videoconference)
 4   Burke Law Offices, LLP
       909 East Davis Street
 5     Suite 500
       Evanston, Illinois  60201
 6
 7
     ON BEHALF OF DEFENDANT HEALTH INSURANCE INNOVATIONS,
 8     INC.
 9     DANIELLE CHATTIN, ESQUIRE
       MAX AFRICK, ESQUIRE  (via videoconference)
10   King & Spalding, LLP
       1180 Peachtree Street, NE, Suite 1600
11   Atlanta, Georgia  30309
12
13   ON BEHALF OF DEFENDANT AMERICAN FINANCIAL SECURITY LIFE
       INSURANCE COMPANY
14
       JOHN L. McMANUS, ESQUIRE
15   Greenberg Traurig, P.A.
       401 East Las Olas Boulevard
16   Suite 2000
       Fort Lauderdale, Florida  33301
17
18   ON BEHALF OF DEFENDANT NATIONAL BENEFIT BUILDERS and
     ACCESS ONE CONSUMER HEALTH, INC.
19   CHARLES J. MESSINA, ESQUIRE
20     VICTOR ANDREOU, ESQUIRE  (via videoconference)
       PETER F. BERK, ESQUIRE  (via videoconference)
21   Genova Burns, LLC
       494 Broad Street
22   Newark, New Jersey  07102
23
24
     Continued:
25
```

Page 3

```
 1
     Appearances continued:
 2
 3
 4   ON BEHALF OF DEFENDANT NATIONAL CONGRESS OF EMPLOYERS,
       INC.
 5
       JOSEF MYSOREWALA, ESQUIRE
 6   Law Office of Josef Mysorewala, PLLC
       2000 South Dixie Highway
 7   Suite 112
       Miami, Florida  33133
 8
 9
10
11
12
     ALSO PRESENT:
13   Craig Black, videographer
       Michael J. Talaia, Esquire  (Benefytt Technologies)
14     (via videoconference)
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                    I N D E X
 2   PROCEEDINGS                      Page 7
 3   DIRECT EXAMINATION BY MR. BURKE        Page 9
 4   CROSS-EXAMINATION BY MR. MESSINA       Page 244
 5   CERTIFICATE OF OATH              Page 246
 6   REPORTER'S CERTIFICATE           Page 247
 7   ERRATA LETTER              Page 248
 8   SIGNATURE PAGE              Page 249
 9
10
11
12                    E X H I B I T S
13   Exhibit A   Deposition Notice of   Page 48
       Christine Gillis and
14     Third Amended Notice
       of Fed.R.Civ.P.
15     30(b)(6) Deposition of
       Defendant HII.
16   Exhibit B   Subagent agreement.   Page 42
17   Exhibit C   General agent         Page 50
       agreement.
18
     Exhibit D   A two-page document   Page 64
19     Bates stamped HII
       3354.
20
     Exhibit E   An e-mail from Aaron   Page 75
21     Hruszczyk and Amy
       Brady.
22
23
     Continued:
24
25
```

Page 5

```
 1   Exhibit Index Continued:
 2
 3   Exhibit F   An eight-page         Page 81
       containing a master
 4     commission advance
       agreement beginning at
 5     Bates stamp HII 6659.
 6   Exhibit G   A lead investigation   Page 84
       document Bates stamped
 7     3349 through 3355.
 8   Exhibit H   A proposal for lead    Page 107
       generation Bates
 9     stamped 112842 to
       112843 and 96877
10     through 96884.
11   Exhibit J   An e-mail Bates        Page 110
       stamped HII 133553
12     through 554.
13   Exhibit K   A site visit report    Page 115
       Bates stamped HII 4040
14     through 4044.
15   Exhibit L   Not formally           Page 122
       identified.
16
     Exhibit M   A site visit report    Page 122
17     Bates stamped HII 4098
       through 4108.
18
     Exhibit N   An outbound call       Page 130
19     policy Bates stamped
       Bates BFYT852 to 856.
20
     Exhibit O   An e-mail chain Bates   Page 145
21     stamped HII 114429
       through 4433.
22
     Exhibit P   An e-mail exchange      Page 152
23     Bates stamped 8540
       through 8541.
24
25   Continued:
```

2 (Pages 2 - 5)

Page 6

Exhibit Index Continued:

Exhibit Q   An e-mail chain Bates   Page 155
            stamped HII 2954
            through 2956.

Exhibit R   An e-mail chain, not   Page 157
            formally identified.

Exhibit T   A declaration Bates   Page 214
            stamped Bates No.
            116537.

Exhibit U   An e-mail chain Bates   Page 222
            stamped ACTPRO 629
            through 633.

Exhibit V   A training document   Page 224
            Bates stamped HII
            133454.

Exhibit W   A 25-page documents   Page 237
            containing e-mails and
            attachments, with a
            beginning Bates stamp
            of HII 136556.

Exhibit X   A PowerPoint Bates   Page 242
            stamped HII 128128.

            (All exhibits were retained by counsel.)

Page 7

* * * * *

PROCEEDINGS

* * * * *

THE VIDEOGRAPHER: Good morning. We are going on the record at 9:35 a.m. on August 3rd, 2022.

This is Media Unit No. 1 of the video-recorded deposition of Christine Gillis taken by counsel for the plaintiff in the following matters:

Mary Bilek, et al., v. National Congress of Employers, Incorporated, et al., filed in the U.S. District Court for the Northern District of Illinois, Eastern Division, Case No. 1:18-cv-03083; and the matter of Robert Hossfeld v. American Financial Security Life Insurance, et al., filed in the U.S. District Court for the Southern District of Florida, Case No. 0:19-cv-60597.

The location of this deposition is 401 East Jackson Street, Suite 3300, Tampa, Florida 33602.

My name is Craig Black representing VICI dial, and I am the videographer. The court reporter is Aaron Perkins from the firm Veritext Legal Solutions.

Page 8

Will counsel now please state your appearances and affiliations for the record, beginning with the noticing attorney.

MR. BURKE: Good morning. Alex Burke here for the plaintiff.

MS. CHATTIN: Danielle Chattin from King & Spalding representing Health Insurance Innovations and the witness.

MR. McMANUS: Good morning. John McManus on behalf of Defendant American Financial.

MR. MYSOREWALA: Good morning. Josef Mysorewala on behalf of Defendant National Congress of Employers, Inc.

MR. BURKE: And we have some folks on the phone.

MR. MESSINA: Good morning. This is Charles Messina here on behalf of Defendant AccessOne and National Benefit Builders.

MR. MAROVITCH: Good morning. Dan Marovitch for the plaintiff.

MR. BURKE: Good morning. Peter Burke, also from Genova Burns for NBBI and AccessOne.

MR. AFRICK: Max Africk also on behalf of Defendant Health Insurance Innovations.

THE REPORTER: I'm sorry, you will have to

Page 9

repeat that last one.

MR. AFRICK: Max Africk on behalf of Defendant Health Insurance Innovations.

MR. TALAIA: Michael Talaia, assistant counsel for Health Insurance Innovations.

THE VIDEOGRAPHER: Thank you. Will the court reporter please swear in the witness and we may proceed.

CHRISTINE GILLIS, the witness herein, being first duly sworn on oath, was examined and deposed as follows:

THE WITNESS: I do.

THE REPORTER: You're under oath.

DIRECT EXAMINATION

BY MR. BURKE:

Q. Good morning.

A. Good morning.

Q. Would you state your name for the record, please?

A. Christine Gillis.

Q. And, Ms. Gillis, where do you work?

A. I work for Benefytt, formerly known as Health Insurance Innovations.

Q. How long have you worked there?

A. About nine years.

3 (Pages 6 - 9)

Page 10

1    Q.   Have you ever given a deposition before?
2    A.   I have.
3    Q.   Okay.  How many times?
4    A.   Approximately six.
5    Q.   Okay.  Were any of those depositions
6    concerning marketing or telemarketing?
7    A.   I believe so.
8    Q.   Okay.  How many of the, roughly, six
9    depositions had to do with marketing or telemarketing?
10   A.   I want to say at least one.
11   Q.   Okay.  Was that in the Moser case?
12   A.   Yes.
13   Q.   Any others that had to do with marketing or
14   telemarketing?
15   A.   To be honest, since I generally show up as
16   corporate representative, I don't remember all of them
17   are specifically concerning.
18   Q.   Is it fair to say that some of those
19   depositions you were a corporate representative for
20   cases unrelated to telemarketing?
21   A.   Most likely, yes.
22   Q.   Well, here's the deal.  It sounds like you
23   know the deal.  You've got to give verbal answers.
24   Okay?
25   A.   Uh-huh (indicates affirmatively).  Yes.

Page 11

1    Sorry.
2    Q.   And if you need a break, let me know and we'll
3    have a break as soon as practicable.  Okay?
4    A.   Okay.
5    Q.   And if I ask you a question and you don't
6    understand, just let me know and we'll try to fix it.
7    Okay?
8    A.   Okay.
9    Q.   But if I ask a question and you give an
10   answer, I'm going to understand that that answer is
11   complete and truthful.
12        Does that make sense?
13   A.   Yes.
14   Q.   All right.  For this deposition, you know, I
15   think a lot has happened over at HII in the last six
16   years.  And so we're going to have to keep track of the
17   chronological scope.  So, you know, when I ask a
18   question about policies or things that were happening,
19   we're generally talking about 2016 to the present.
20   Okay?
21   A.   Okay.
22   Q.   And I'm going to give you the time and the
23   leeway to explain how things have changed, if they have.
24   All right?
25   A.   Okay.

Page 12

1    Q.   And if we want to go farther back, I will let
2    you know.  And if we want to pinpoint a particular time
3    period, I will let you know that too.
4        Does that make sense?
5    A.   Yes.
6    Q.   Okay.  So if you've been working at HII for
7    about nine years, what's 22 minus 9?  Thirteen?
8    A.   Don't ask me to do math.  That's not fair.
9    Yes.  So I started in May of 2013.
10   Q.   Okay.  And when you started at HII, what were
11   you doing?
12   A.   I actually worked in customer support.
13   Q.   What does that mean?
14   A.   So that means that I worked on sending out
15   fulfillment to consumers.  I took e-mail inquiries from
16   consumers, periodically phone calls, and did my best to
17   assist them.
18   Q.   So inbound phone calls from actual customers,
19   are you saying?
20   A.   Yes.
21   Q.   Okay.
22   A.   That was a relatively small part of the job.
23   It was mostly on e-mail responses.
24   Q.   And so e-mail responses are from potential
25   customers or actual customers or from insurance

Page 13

1    companies?  From whom?
2    A.   So the majority of customer support e-mails
3    are going to come from existing consumers.  You do
4    periodically get some from people that are not consumers
5    of yours or that are looking to become consumers of
6    yours, but I would say probably in the neighborhood of
7    90 percent are going to be from existing customers.
8    Q.   And just tell me generally what HII does.
9    A.   So HII has changed a little bit over time.  At
10   the time that I started, we primarily were working as a
11   distribution channel and a third-party administrator for
12   billing and fulfillment.
13        So what that means is we provided a platform
14   for carriers to be able to put products on for
15   independent distribution agents to access those
16   products, quote those products.  And then our
17   responsibility was once those products had been quoted
18   and a consumer had made a purchase, we would send out
19   policy fulfillment.  We would take over any billing on
20   those particular products and provide service on that
21   front.
22   Q.   Okay.  And then how did it morph over time?
23   A.   So over time, just through acquisitions and
24   restructuring, we ended up taking on a
25   direct-to-consumer channel.  Within the past couple of

4 (Pages 10 - 13)

Page 14

1    years, we've built out more of an agency business, the
2    Medicare side of the space.  And then in the last year,
3    year and a half we've kind of divorced ourselves from
4    that independent distribution.  We really only have one
5    of those distributors left that's active, and we're
6    moving towards more of a platform as a service model.
7         So the technology will still be utilized, you
8    know, and billing and fulfillment will still happen, but
9    we won't be doing as much of the back end support of the
10   agencies or the carriers.  That will stay with the
11   carriers.
12        Q.  And so what's the direct-to-consumer facing
13   agency that looks like it's going to continue?  Was
14   that --
15        A.  Oh, sorry.  So direct to consumer is a little
16   bit of an industry term.  What that basically means is
17   that you have an online presence.  So there's a website
18   where consumers can go on and look at policies
19   themselves.  They can make all of their elections.  They
20   can review everything themselves.  They don't have to
21   interface with an agent to purchase a policy.
22        Q.  Okay.  Have you ever heard of Total Insurance
23   Brokers?
24        A.  Yes.
25        Q.  What is that?

Page 15

1        A.  So Total Insurance Brokers is a previous
2    independent distributor that was acquired, I want to
3    say, approximately 2019, but I don't know what the final
4    date on that was.  And that was the agency that was kind
5    of the basis of building out the Medicare side of the
6    business.
7        Q.  And Total Insurance Brokers is still around,
8    right?
9        A.  As a corporate entity, yes.  I believe that
10   most of the business has actually been transferred under
11   the Together Health aegis, though.
12        Q.  Tell me, what is Together Health aegis?
13        A.  So Together Health is another acquisition.
14   They did primarily marketing in the Medicare space, so
15   they had a specific corporate entity and brand, and
16   they're the ones that are kind of the brand for the
17   Medicare business at this point.
18        Q.  And then you said "aegis"?
19        A.  Sorry.  Aegis, so kind of the umbrella.
20        Q.  So how does that work?  Are those under -- are
21   those subsidiaries of the defendant in this action,
22   which is Health Insurance Innovations, I think, Inc.?
23        A.  So my understanding -- and I freely admit I'm
24   not a lawyer, so I don't get into all the ins and outs
25   of corporate; I will do my best on this one -- is that

Page 16

1    Health Insurance, Inc. -- Health Insurance Innovations,
2    Inc., is kind of the top, and then there's Health Plan
3    Intermediaries Holdings, and then the various business
4    units or subsidiaries of Health Plan Intermediaries
5    Holdings.
6        Q.  And so is it your understanding that Together
7    Health is a subsidiary --
8        A.  Yes.
9        Q.  -- of the defendant in this action?
10       A.  I don't know whether or not Health Insurance
11   Innovations was the specific one named.  If so, then,
12   yes, because there was Health Insurance Innovations,
13   Inc., and then I think there was another Health
14   Insurance Innovations that existed.  It might have been
15   an LLC, or something like that.  Again, corporate is
16   not -- it is not the thing that I am best in explaining
17   the corporate structure.
18       Q.  Right.  Let's just make sure we're talking
19   apples to apples.
20            Health Insurance Innovations, Inc., is our
21   defendant.  So is it accurate to say that Together
22   Health is a subsidiary of Health Insurance Innovations,
23   Inc.?
24       A.  That would be my belief, yes.
25       Q.  What about Total Insurance Brokers, is that

Page 17

1    also a subsidiary of Health Insurance Innovations, Inc.?
2        A.  That would be my understanding, yes.
3        Q.  Have you heard of an entity that is referred
4    to as ASIA?
5        A.  That's the American Service Insurance Agency,
6    and, yes, that would also be a subsidiary.
7        Q.  Of our Defendant Health Insurance Innovations,
8    Inc.?
9        A.  Yes.
10       Q.  And tell me what ASIA does or did.
11       A.  So ASIA was an agency that was based out in
12   Texas, you know.  Again, as corporate structure and
13   different concepts happened over the years, ASIA was
14   purchased probably, I want to say, before I started, so
15   maybe 2012, 2013.  They were a very small office that
16   worked out of Texas and that did some direct selling to
17   consumers.  And then over time, you know, who they were
18   interacting with changed a little bit.  And, currently,
19   while it's still an active corporate entity, I don't
20   think anybody is actually operating under that corporate
21   name or umbrella at this point.
22       Q.  Okay.  Let's reshuffle for a second.
23            What's the highest level of education you've
24   obtained?
25       A.  High school.

5 (Pages 14 - 17)

Page 18

1    Q.   And did you finish high school?
2    A.   Yes.
3    Q.   Whereabouts?
4    A.   Here in Tampa.
5    Q.   And can you give me the CliffsNotes of your
6    career after high school?
7    A.   So after high school, I did go to college
8    briefly, but I didn't get a degree.  I also worked as a
9    nanny.  I spent some time in various corporate call
10   centers for different companies like Hilton, Coca-Cola.
11       I was briefly an electrical apprentice for the
12   local union.  And then I ended up, after doing call
13   center at Coca-Cola, I moved over to a third-party
14   administrator in the St. Pete/Clearwater area that did
15   claims and benefits for limited medical policies and
16   then also had a managed care Medicaid program.  And then
17   from there, I moved over to HII.
18       Q.   And when you started at HII -- well, we
19   already know you were in customer support.  So would you
20   give me the CliffsNotes of your assent at HII?
21       A.   So when I worked at the third-party claims
22   administrator, I became a customer service supervisor
23   and then a claims supervisor.  When I moved to HII and I
24   started in customer support, about a year later, I think
25   it was -- no.  It was.  It was April 1st, 2014, because

Page 19

1    I remember saying, This is a joke; I won't be happy.
2        I moved into the compliance department, and I
3    started off just as a compliance representative.  I
4    worked on DOIs; I worked on various reports.  Over time,
5    you know, because I was good with Excel, because I was
6    good at looking at numbers, I moved into a role as a
7    reporting specialist, held that for a couple of years.
8        And then from there I became an assistant
9    manager.  When our manager left, I was moved up to the
10   agency of compliance manager, and then I was moved to
11   senior compliance manager and had both the agency
12   compliance department and our agent contracting
13   department reporting to me.
14       And then I was moved to director of compliance
15   technology and operations, and then I just recently had
16   a title change this year to general compliance
17   operations, so still a director.
18       Q.   And so when did you become director of
19   compliance operations?
20       A.   The director of general compliance operations
21   would have been about March or April of this year.  When
22   that title change happened, the director of compliance
23   technology and operations, I want to say, was
24   approximately November of 2019.
25       Q.   And so 2017, '18, what was your title and your

Page 20

1    role?
2        A.   During that time frame, I think, was when I
3    was moving from assistant compliance manager to senior
4    compliance manager.
5        Q.   And during that time frame, who was your
6    direct report?
7        A.   I reported to Dan Garavuso.
8        Q.   Do you remember his title at the time?
9        A.   I believe during that time frame, he was VP of
10   compliance.
11       Q.   In the 2017/2018 time period, can you tell me
12   the top, you know, three or four compliance issues that
13   took your time?
14           MS. CHATTIN:  Object to the form.
15           You can answer.
16           THE WITNESS:  I mean, that is something that
17       is really going to be slightly variable --
18       right?  -- because I don't know that it stayed
19       the same throughout at a time period.  I know
20       claims was a big concern in terms of we had, you
21       know, things that were coming in through various
22       regulatory bodies where consumers were concerned
23       about how claims were getting paid, how they were
24       getting assessed, you know.
25           We did have some issues with people

Page 21

1    reporting that there may have been
2    misrepresentations on policies.  And then we also
3    had, you know, concerns -- and it really kind of
4    started at that point where, like a lot of people
5    in the marketplace, we started getting complaints
6    about, I'm getting calls from people and I don't
7    know why.
8    BY MR. BURKE:
9        Q.   And as to that third one, people complaining
10   they were getting calls and they don't know why, you
11   know, how did that sort of start up and when did those
12   complaints start beginning?
13       A.   So I think -- and there's -- I should probably
14   clarify.  There's a little bit of a difference between
15   people saying, I don't know why I'm getting calls, and
16   people who were reaching out and saying, I believe I was
17   improperly contacted.
18       A lot of the people who were reaching out and
19   saying I believe I was improperly contacted, the first
20   few that we got were people that, you know, had given
21   interviews.  They had given, you know, television
22   interviews or print interviews, and they showed up a lot
23   in industry litigation around consent to contact.  So it
24   was a little bit different than when we had consumers
25   who were coming in and saying, I'm getting these calls,

6 (Pages 18 - 21)

Page 22

1 and I think it might be you.
2    I think the first one that we got was
3 approximately 2015, and it was a gentleman by the name
4 of Craig Cunningham. And it was not easy to track down
5 what he was talking about. The information that he
6 provided was, you know, not very straightforward. It
7 was very difficult to identify, you know, whether or not
8 we had anything to do with contacting him, you know.
9    As an organization, we really don't make
10 outbound calls, but, obviously, we worked with these
11 independent distribution agencies, and our focus was to
12 try to identify, you know, Did he actually get contacted
13 by a distributor that worked on our platform, and, if
14 so, who was it? so that we could try to take remediative
15 action.
16    And that was kind of the beginning of all of
17 that, and we had to put things together and try to
18 figure out what the best path forward was, how the best
19 way to handle it was, so that we could make sure that,
20 you know, we could identify who distribution was in
21 these instances, and so that we could address it
22 appropriately.
23    Q. So who was in charge, at least in the very
24 beginning, you know? In the Cunningham complaint, who
25 was in charge of trying to figure out the origin of the

Page 23

1 calls?
2    A. Well, with Mr. Cunningham specifically, he
3 sent in a large volume of information in a variety of
4 different formats. So since it was the only one we had
5 at that point, you know, mostly everybody in the
6 department was working on trying to parse out what this
7 information actually was, what it meant, how to try to
8 tie it back to anybody.
9    So all of us kind of had a piece of it, and
10 then it got reported back to, at the time, I want to
11 say, through Dan and outside counsel.
12    Q. And what was the result? Did HII figure out
13 who made the calls?
14    A. With Mr. Cunningham, I'm not 100 percent
15 certain. I don't remember, because I wasn't dealing
16 with the actual aftermath of that.
17    Q. Okay. After Cunningham, were there more
18 complaints about receiving calls that people don't know
19 why, or more formal complaints like Cunningham?
20    A. I would say there was some time between that
21 one and the next ones that came in. The next ones that
22 came in really started probably about 2017 or so, is
23 when we started seeing, you know, a lot of noise in the
24 market in general about that.
25    There were a lot of people who were, you know,

Page 24

1 from carriers or from other, you know, agencies or other
2 distribution who were saying that, you know, there were
3 these lovely calls going out from Ann. And so pretty
4 much everybody in the market was getting something
5 saying that some consumer had been contacted by Ann, who
6 was trying to sell them healthcare, and everybody was
7 really trying to figure out, okay, where is this coming
8 from and what is this about.
9    Q. When somebody called in or wrote an e-mail in
10 saying that they got calls but they don't know why, how
11 were those inquiries handled at HII?
12    A. So, typically, if somebody was saying, you
13 know, I got a call; I think it might be you; I don't
14 want to be contacted again, we did have a process for
15 adding, you know, people, obviously, to the DNC. If you
16 don't want to be contacted, we'll get you into our
17 internal DNC, making sure we're not contact you.
18    We also had processes in place to try to
19 communicate that information out to the independent
20 distribution so that they could add those numbers to the
21 DNC, at least as far as we didn't want our products to
22 be dealt with, with those consumers.
23    We also had investigation of any information
24 that the consumer would give us. Right? If they told
25 us that it was coming from a specific phone number, we

Page 25

1 would look to see if we had any records of that phone
2 number associated with any distribution. If we had, you
3 know, specific dates or times or products that were
4 mentioned, we would try to track that down to see if we
5 could identify who might be involved in this.
6    Again, that process kind of changed over time
7 and -- as we, you know, figure out better ways to do
8 things. But, you know, in some instances, we were able
9 to find some results and we were able to, you know,
10 identify things and take action. In a lot of other
11 instances, you know, the information that they would
12 give us wouldn't match to anything on our end.
13    So our standard was to communicate that out
14 just to educate everybody that we worked with that, hey,
15 this consumer that has contacted us, there seems to be
16 an issue; we can't find anything to do with them, so we
17 don't know that it has anything to do with our
18 platform, but FYI.
19    Q. So how did those inquiries where somebody just
20 says, I got calls; I think it's you guys; I don't know
21 why I'm getting them, how were those logged at HII?
22    A. So, for the most part, it was handled by our
23 legal department. So if something came in through an
24 e-mail or through mail, it would have been given over
25 to -- you know, when we first started, we had outside

7 (Pages 22 - 25)

Page 26

1  counsel and then we had an inside counsel who started,
2  and they would get that.
3      You know, depending on what was contained
4  therein, the number would be communicated out through
5  the compliance channels as far as please add this to
6  your DNC. And then if there was any investigation that
7  needed to be done, legal would typically tell us, Hey,
8  look for this information, tell us what you can find
9  out, and we would report that back to legal.
10     Q. So say I'm just like John Doe who gets a call
11  and I figure out that it's connected with HII and I look
12  at HII up on the Internet and I get the phone number and
13  I tried to call, would that be routed to customer
14  service?
15     A. So if you were somebody who believed that you
16  were being contacted by HII and you found our, you know,
17  publicly published number, then, yes, that would go to
18  customer service. You know, again, customer service is
19  going to be able to look at what they have for
20  consumers. They probably would have educated and said,
21  Hey, we don't make direct calls, so if you have reason
22  to believe that you were contacted by a distributor
23  working with us, you know, please give us whatever
24  information you can.
25     That would have been then reported on to legal

Page 27

1  and compliance for further handling. If it was a
2  consumer that had a record in our system, then we would
3  put them on the DNC list. We would handle that however
4  they wanted it to be handled.
5      Q. So the customer service folks, did they have
6  like a platform or a system where they kept track of
7  this stuff?
8      A. It really kind of depends on whether it was a
9  consumer or whether it was just a person calling in. If
10  it was a person calling in that didn't have a customer
11  record, there wasn't really a platform for them to put
12  that information in, so it would most likely have been
13  communicated via e-mail.
14     If it was a consumer that had some kind of
15  record in the system, then they would have left notes on
16  that particular profile. Depending on the severity of
17  the situation and whether or not they felt they were
18  able to handle it at the first level, then they might
19  have given us an FYI on an e-mail or they may have
20  escalated it to our tier 2 team for handling.
21     Q. So in this early period, '15, '16, you know,
22  was there a formal process for handling, you know,
23  customer service inbound communications concerning
24  telemarketing?
25     MS. CHATTIN: Object to the form.

Page 28

1      You can answer.
2      THE WITNESS: I don't know if there was a
3  documented process, if that's what you mean by
4  "formal." We were a pretty small company. So,
5  you know, we talked to customer service on a
6  daily basis. You know, the representatives who
7  took the inbound calls had very close
8  communication with their management, and their
9  management had close communication with us. So I
10  don't know that anybody wrote that down as far as
11  an inbound call that was received. But, again,
12  it would have been communicated to us.
13  BY MR. BURKE:
14     Q. Well, so the customer service folks on the
15  phone -- on the phones taking phone calls, did they have
16  a system in front of them on their computers where they
17  are supposed to log what happens during communications?
18     A. So the customer service setup is really
19  modeled around existing consumers, right? So people who
20  have policies and products. So there's room for them to
21  be able to document on that policy or product. But if
22  it's a person who does not have a policy or product,
23  then there wouldn't be a formal system for them to enter
24  it in.
25     Again, the standard at that point is, if you

Page 29

1  had a consumer who needed some kind of assistance, it
2  was typically communicated up to the management via
3  e-mail.
4      Q. And so who is the person at management that
5  would receive those communications?
6      A. At that point in time, most likely, would be
7  Susan Adcock.
8      Q. And then at some point was there a more formal
9  system set up to deal with these inbound communications
10  having to do with telemarketing from non-customers?
11     MS. CHATTIN: Object to the form.
12     THE WITNESS: So call-wise, again, I mean,
13  our systems are not really set up to be able to
14  document non-customers. And we didn't get a lot
15  of that, so I don't think there was ever a need
16  that was felt for that.
17     As far as if somebody reached out in writing
18  or via e-mail, certainly that would be forwarded
19  immediately and that would go to legal and
20  compliance. It would be documented and saved and
21  stored in our, you know, e-mail inboxes and
22  whatnot.
23  BY MR. BURKE:
24     Q. Whose e-mail inboxes?
25     A. The most common way for people to reach out to

8 (Pages 26 - 29)

1   the company would have been via our support inbox and
2   that is actually a shared inbox.
3      Q.  What does that mean, "a shared inbox"?
4      A.  So a shared inbox means that multiple people
5   have access to it and have the ability to work the
6   e-mails that come in.
7      Q.  For example, I mean, did you at some point
8   gain access to the support inbox?
9      A.  When I first started, that was the inbox that
10  I worked.
11      Q.  And so if a complaint like this came in or
12  just somebody saying, Hey, are you guys calling me, and
13  you got that e-mail from the support inbox, where did
14  you send those?
15      A.  So in 2013, when I started -- and I don't
16  recall ever getting an e-mail like that in that time
17  frame -- anything that came through like that I probably
18  would have reached out to my supervisor and said, Hey,
19  who is the best person to, you know, look into this and
20  try to address it?
21      Q.  What happened in, like, the '15, '16 time
22  period that, you know, these inbound communications
23  concerning telemarketing began?  I mean, what was the
24  change at HII that sort of changed that?
25      A.  So --

1      MS. CHATTIN:  Sorry.  Object to the form.
2   Go ahead.
3      THE WITNESS:  Yeah, I don't think there was
4  a change at HII, right?  I think that it was a
5  change in the overall marketplace.  '15, '16,
6  there was a very increased interest in people
7  acquiring health insurance, so you had a lot of
8  people who were moving into that space.  You
9  know, you had a lot of new agencies that were
10  coming on board.  You had a lot of people that
11  were looking to be able to find consumers, who
12  wanted to purchase insurance.  You had a lot of
13  consumers who previously hadn't had insurance who
14  were looking to purchase insurance.
15      So, you know, the marketplace really kind of
16  blew up in terms of -- it went from the
17  individual marketplace being a relatively kind of
18  steady and -- I'm not going to say small, but a
19  smaller niche of the overall health insurance
20  marketplace; it wasn't how most people got their
21  insurance -- to there being a massive influx of
22  interest in getting individual insurance.
23      And we saw volumes go up across the board.
24  Most of our partners saw volumes go up across the
25  board.  So I think when we started seeing those

1   things coming in, it felt like, okay, this is
2  part of, you know, the overall increase in volume
3  that's occurring, is that there's going to be
4  some of these instances that may happen.
5  BY MR. BURKE:
6      Q.  And then would it be accurate to say that,
7  then, around 2017 things sort of ballooned even more?
8      MS. CHATTIN:  Object to the form.
9      THE WITNESS:  So things kept steadily moving
10  forward.  Right?  They just kept growing and
11  growing.  Volumes kept going up and up and, you
12  know, I think that -- personal opinion from
13  conversations that I had with consumers, I think
14  that it was once people got used to having an
15  insurance card in their pocket, they didn't want
16  to go without that again.
17      So there was renewed interest from the
18  people who started.  There was continued interest
19  because health insurance coverage was still a
20  very popular topic on late night news, right?  So
21  people were hearing about it very consistently.
22  People were hearing about, you know, friends of
23  family members who had gone out and purchased
24  insurance coverage and they thought maybe that's
25  a good idea for me to get that as well.

1      So it just -- it continued to kind of
2  increase.
3  BY MR. BURKE:
4      Q.  HII's business increased during this time
5  period too, right?
6      A.  Yes.
7      Q.  Okay.  And the communications having to do
8  with telemarketing from non-customers also increased
9  during this time, didn't they?
10      MS. CHATTIN:  Object to the form.
11      THE WITNESS:  I would say that we had
12  communications from people who were not on our
13  platform.  In some instances, you know, when we
14  did investigation, we found that, you know, they
15  had inquired about health insurance in general,
16  maybe they hadn't purchased anything.  But, you
17  know, they did have some level of interest.  In
18  other instances, we weren't really able to track
19  down who they were able to talk to or what they
20  had talked to them about.
21      So, again, I think that there was a
22  commensurate increase, but it didn't fell like it
23  was out of line with the overall increase in
24  volume.
25  BY MR. BURKE:

1    Q.   And so given the increase in inbound
2  communications having to do with telemarketing, at some
3  point did HII initiate some sort of policy to handle
4  those communications?
5    A.   Well, so, again, we had a policy in place in
6  terms of it would go to compliance and legal.  You know,
7  that policy was tweaked over time to try to better
8  capture things or avoid things that we had run into that
9  weren't working well for us, but the basics of the
10 policy were to -- you know, any communication that came
11 in would go over to legal, legal would then direct
12 compliance to make sure that it was being communicated
13 out internally and externally.
14      For the bulk of that time frame, you know,
15 that external communication was done through account
16 reps where they would then reach out to the individual
17 distributors that they worked with to say, Hey, we've
18 gotten a communication; here's a number; please add it
19 to your DNC list.
20      Things were added to internal DNC lists.  And,
21 again, whatever information we had to try to, you know,
22 identify who may have made the original calls, we would
23 investigate that to the best of our ability.
24    Q.   And so, you know, as we move into the '17, '18
25 time frame, who at HII was investigating and figuring

1  out or trying to figure out who was behind, you know,
2  communications that were the subject of these customer
3  service telemarketing inquiries?
4    A.   So legal coordinated everything, but during
5  '17 and '18, I want to say that the person they probably
6  worked most closely with would have been Alexis Taylor.
7  She was our compliance generalists.
8    Q.   And so would it be accurate to say that
9  Ms. Taylor would have been in charge of trying to figure
10 out the origin of the telemarketing that was the subject
11 of these complaints?
12    A.   She did a lot of the legwork.  But some of
13 that legwork was coordinating with account reps to say,
14 Hey, this is the information that came in.  Can you
15 reach out to the distribution and see if they have any
16 records?
17      You know, she would look to any internal
18 records to try to match anything up that she could.
19    Q.   And her name, Alexis?
20    A.   Taylor.
21    Q.   And who is Amy Brady?
22    A.   So Amy Brady was one of our account reps.
23    Q.   Okay.  And what was her role in all of this?
24      MS. CHATTIN:  Object to the form.
25      THE WITNESS:  Do you mean her role within

1  HII or her role specific to TCPA?
2  BY MR. BURKE:
3    Q.   What was Amy Brady's role with regard to these
4  telemarketing complaints?
5    A.   So as an account rep, she would have been
6  responsible for communicating out to her agencies any
7  numbers that needed to be added to their internal DNC
8  lists.  She also would have been responsible for
9  providing any information that we may have had around
10 dates, times, originating phone numbers, to ask those
11 accounts, you know, do you have any record of contacting
12 this consumer.
13      If they came back and said that they had
14 contacted that consumer, that they did have some kind of
15 record, then she would have been responsible for
16 coordinating, you know, getting a lead validation to
17 make sure that there was appropriate consent to contact.
18    Q.   And so did you ever reach out to, you know,
19 these folks that -- it's sort of an amorphous thing
20 right now.
21      As a general matter, who was making the
22 outbound telephone calls, generally?
23    A.   As a general matter, outbound telephone calls
24 would have been the independent distribution.
25    Q.   What do you mean by "independent

1  distribution"?  Like insurance agents?
2    A.   So insurance agents and agencies, our platform
3  allows independent agencies to come on board via a
4  contracting relationship to say, You're going to have
5  access to this particular platform and this suite of
6  products.  Here's the set of expectations of things that
7  you are responsible for.  Here are the things that you
8  need to do in order to have access to those products.
9      So, for instance, being appropriately
10 licensed, making sure you have the correct lines of
11 authority, that would not be something that we would
12 assist with.  We have system controls to validate that,
13 but we wouldn't actually help you get licensed.  Right?
14      We didn't perform administrative functions of
15 any kind for those agents or agencies.  So if you wanted
16 to find consumers to present the products to you, that
17 was 100 percent your responsibility to do.  And those
18 were your customers, you know.
19      If you wrote a policy, that policy was yours.
20 That consumer was yours.  We did not share that
21 consumer's information with any other independent
22 distributor.
23    Q.   So HII worked directly with insurance agents
24 and agencies, right?
25    A.   We worked with insurance agents and agencies

10 (Pages 34 - 37)

Page 38

1　in a limited and defined fashion.  We worked with
2　carriers in a limited and defined fashion.  And then we
3　worked directly with consumers in a limited and defined
4　fashion.
5　　　Q.  Okay.  So as to insurance agencies, is it
6　accurate to say that -- well, what was the relationship?
7　What did insurance agencies do with regard to HII?
8　　　A.  So as distributors, they were provided access
9　to the platform, and they would be able to be appointed
10　with carriers on the platform.  They would then be able
11　to quote to their consumers any of the products that
12　were built on that platform.  So they would do the
13　actual, you know, contacting of the consumer, the
14　validation of what their consumer was looking for, make
15　the determination as to whether or not there was a good
16　product fit.
17　　　If there was a good product fit, then they
18　would be the one actually, you know, presenting that
19　product, completing the application on behalf of that
20　consumer.  You know, there were verification steps that
21　the consumer had to go through to make sure that they
22　understood the policy purchase.  Once the purchase
23　actually went through, that was really where HII then
24　kind of came in to deal with the consumer.
25　　　And as the agency had a lot of that

Page 39

1　responsibility for the front end.  If the consumer had
2　an issue somewhere on the back end after the policy
3　purchase where they said they had a concern with some
4　aspect of that front end, we would interface with that
5　agency to try to get the information as to, Okay, what
6　actually occurred?  What kind of records do you have?
7　you know, and really validate was everything done
8　correctly and appropriately.
9　　　Q.  So is it accurate to say that the insurance --
10　that the insurance agents were doing the marketing?
11　　　A.  Yes.
12　　　Q.  Okay.  And is it accurate to say that the
13　insurance agents were doing some of the marketing by use
14　of outbound calls?
15　　　A.  So that, I think, would really depend on the
16　agency.  Not every agency did outbound calls directly.
17　Some of them had, you know, other -- they did Internet
18　marketing, or they worked with the vendors who would
19　take care of the initial outbound contact, do some
20　prequalification, and then transfer qualified consumers
21　over to them.  That was really up to each agency's
22　comfort level and how they chose to do things.
23　　　Some of them may have made direct outbound
24　calls.  That wasn't really something that, you know --
25　as independent distribution, that was one of those areas

Page 40

1　that, because it was fully within their wheelhouse and
2　their responsibility, unless there was a specific issue
3　that came up, they were not always very open about
4　wanting to speak about how they actually sourced their
5　consumers.
6　　　Q.  But the insurance agents were allowed to
7　engage lead generators, lead vendors, right?
8　　　MS. CHATTIN:  Object to the form.
9　　　THE WITNESS:  I mean, that's a pretty
10　　standard industry practice, so, yes.
11　BY MR. BURKE:
12　　　Q.  Okay.  And was there any, like, anything
13　written that said go ahead and hire lead generators, or
14　was it just understood?
15　　　A.  I don't think that there was anything in
16　writing that specifically said you have the
17　authorization to hire a lead vendor.  I think what would
18　have been documented would have been more the details of
19　what your responsibilities are for anything that you
20　source, making sure that you have consent to contact,
21　making sure that, you know, any marketing messages or
22　communications are going to be compliant with various
23　regulation.
24　　　If you're going to mention specific products,
25　their carriers, or if you were going to mention our

Page 41

1　distribution channel, all of that would have had to have
2　been reviewed and approved before you would have been
3　authorized to use it.
4　　　So I don't believe that we ever had anything
5　in writing saying, yes, please go use lead vendors, but
6　I do know that we had a lot of things that talked about
7　however you choose to source your consumers, these are
8　the things that you're going to be responsible for.
9　　　Q.  So like in the '17, '18 period, what were the
10　writings that, you know, set the parameters for agents
11　who were using telemarketing and lead generators to
12　create business for HII?
13　　　MS. CHATTIN:  Object to the form.
14　　　Go ahead.
15　　　THE WITNESS:  So in terms of what
16　　specifically would have been documented that
17　　every agent or agency would have seen, you know,
18　　any of our MGA, GA agreements, things of that
19　　nature.  Right?  When you first come onto the
20　　platform, you're applying.  You would like to
21　　have access to it.  There are several places
22　　within those agreements that are going to
23　　specifically talk about making sure that you're
24　　following all telemarketing rules and guidelines,
25　　whether state, local, or federal.

11 (Pages 38 - 41)

Page 42

1     There was specific language, I believe, to
2  making sure that you have DNC managers, DNC
3  processes, so that any of your agents that you're
4  employing or working with know what to do in
5  those instances.
6  BY MR. BURKE:
7     Q.  Wait.  I'm just trying to -- I'm just trying
8  to find out what the documents are.
9     A.  So it would be the agent agreements, so the
10  MGA agreement --
11     Q.  Okay.
12     A.  -- the GA agreement.  I think the subagent
13  agreement had a little bit about it.
14     Q.  Wouldn't you know, the first exhibit I don't
15  think I have printed.  Actually, we will let -- label
16  this Exhibit B.
17     (Exhibit B was marked for identification.)
18  BY MR. BURKE:
19     Q.  Okay.  So I'm going to screen share this
20  document.  And wouldn't you know, it doesn't have Bates
21  numbers.  You can see, I think, on your computer, and it
22  should go up on the screen in front of you in a sec.
23     Okay.  So what I've got on the screen is what
24  I think you're talking about.  This was produced by Sean
25  Duffie, who was an insurance agent that was developing

Page 43

1  business for HII.
2     Is that true, that Sean Duffie was an
3  insurance agent developing business for HII?
4     A.  So Mr. Duffie was one of the independent
5  distributors who did have access to our platform;
6  however, that was not an exclusive relationship.  It was
7  never an exclusive relationship with any of the
8  independent distribution.  So they might place a policy
9  through our platform, they might place it through a
10  competitor's platform, or they might have, in some
11  instances, direct relationships with carriers.
12     Q.  Well, if an insurance agent is trying to sell
13  an insurance policy, that agent must have a direct
14  relationship with the carrier; isn't that right?
15     A.  They are appointed with the carriers, so
16  there's an appointment relationship in terms of the
17  carrier is authorizing them to sell their products.  But
18  they may not have, like, a direct distribution contract
19  where they're presenting it solely on behalf of that
20  carrier.
21     So it's a difference between an independent
22  distribution, like a captive agent where you can only
23  sell that carrier's products.
24     Q.  Either way, there's a direct relationship,
25  right?

Page 44

1     MS. CHATTIN:  Object to the form.
2     THE WITNESS:  I'm not a lawyer, so I want to
3  be very careful that I'm not, like, saying
4  something that's legal.  They would be required
5  to fill out an appointment contract.  The carrier
6  would have standards as to whether or not that
7  agent was authorized to present their product and
8  then the carrier would appoint if sales were
9  made.
10  BY MR. BURKE:
11     Q.  And why do you keep talking about these
12  insurance agents as distributors, though?  I just did a
13  search on this contract and "distributor" doesn't even
14  appear at all.  I mean --
15     A.  So distribution is really how we think of it
16  in terms of, you know, they're distributing products out
17  into the, you know, marketplace.  Again, they don't have
18  direct exclusive relationships with us.  Most of these
19  contracts were probably drafted, you know, 2013, 2014,
20  or earlier, so a lot of them speak to agent, because an
21  agent is what they actually are.  They're a licensed
22  agent.  We don't contract with non-licensed people.
23     Q.  Okay.  So when you gave the testimony a few
24  minutes ago about, like, there's a contract with the
25  distributor or the agent, is Exhibit B that I'm sort of

Page 45

1  showing you on the screen share, is this what you're
2  talking about?
3     A.  So that is a specific version.  That is a
4  subagent version, which, you know, each hierarchical
5  level had different roles and responsibilities.  They
6  had different levels of access and authority, so as a
7  higher level agent, you could recruit downline agents as
8  a subagent.  You typically would not be paid directly by
9  HII; you would assign your commissions to an upline.
10  HII would have reimbursed that upline for any sales and
11  you would not have had any authority to recruit any
12  downline agents and be an upline yourself.
13     And you said this was produced by Mr. Duffie?
14     Q.  It was either Duffie or Zach Cox or one of
15  those folks from Ft. Lauderdale.
16     A.  So, I mean, again, this is a subagent form, so
17  this is going to be kind of the most limited in terms of
18  what, you know, you're actually authorized and what is
19  actually spoken to, because you don't have a lot of
20  ability to recruit.
21     Like I said, I think there's, I want to say
22  maybe a little bit further down, conversation around
23  supporting DNC and making sure that you're ensuring
24  compliance with telemarketing sales role and TCPA, but
25  as a subagent -- and typically we would not have an

12 (Pages 42 - 45)

Page 46

1  expectation that a subagent is the one that is sourcing
2  any leads, so what we would anticipate for them is that
3  they know the processes, they know the policies, and
4  that they are able to report accordingly to whoever
5  their agency up line is.
6      Q.  Okay.  But these subagents are the ones who
7  are developing the business?
8      A.  So when you're saying "develop," can you
9  explain what you mean by "develop"?
10     Q.  Gaining new customers.
11     A.  So typically with a subagent, they would be
12  the ones actually speaking to a consumer and writing the
13  application; they wouldn't necessarily be the one going
14  out and locating the person to speak to.
15     Q.  Okay.  And they might use a lead generator or
16  telemarketer to go out and speak to -- to find folks to
17  try to sell?
18     A.  Subagents are generally not going to be the
19  ones doing that.  That's generally going to be their
20  upline.  I'm not going to say that it never occurs,
21  because it may very well.  Each agency structures
22  themselves differently.  But I would not anticipate that
23  a subagent would be the one saying, Hey, let's use this
24  lead vendor and get these leads.  Typically, they're
25  going to be working the phones and taking anything that

Page 47

1  comes in.
2      Q.  Okay.  So is this Exhibit B -- we're looking
3  at page 6 of Exhibit B.  There's a mention of the TCPA.
4      A.  Yes.
5      Q.  Is this one of the writings that you were
6  referring to when we talked about, you know, setting
7  parameters, HII setting parameters, for conduct with
8  regard to telemarketing?
9      A.  Yes.
10     Q.  Okay.  And that's in the '17, '18 time frame,
11  or is that across the whole spectrum of, you know, '16
12  to present?
13     A.  I will say that this is language that has
14  probably been in every contract's subagent form that I
15  have seen.
16     Q.  Okay.  And is the language in the -- in the
17  other tiers of agents, the master agent, is the language
18  different or is it similar?
19     A.  It is similar, but it is enhanced for the GA
20  and the MGA agreements.
21     Q.  Okay.  If I was going to try to find one in
22  the materials that were produced in the action, what
23  would I search for?
24     A.  Probably GA agreement.
25     Q.  Just GA agreement?

Page 48

1      A.  Yeah.  I mean, I don't know how it would have
2  been titled, but a GA or general agent.
3      Q.  So like general agent agreement?
4      A.  Yes.
5          MS. CHATTIN:  Do you want to take a quick
6  break, Alex?
7          MR. BURKE:  Sure.
8          MS. CHATTIN:  We can probably -- we can do
9  this off the record.
10         MR. BURKE:  You guys can help me find one.
11         MS. CHATTIN:  Yeah.  I was going say, I'm
12     sure Max can find one.
13         MR. BURKE:  Sure.
14         THE VIDEOGRAPHER:  The time is 10:32 a.m.,
15     and we are now off the record.
16         (A recess was taken.)
17         (Exhibit A was marked for identification.)
18         THE VIDEOGRAPHER:  The time is 10:44 a.m.
19     and we are back on the record.
20  BY MR. BURKE:
21     Q.  Okay.  So would you have a look at what's the
22  been marked as Exhibit A.  This is the 30(b)(6)
23  deposition notice for today, and there's a list of
24  topics.
25     A.  And the parties have agreed to an additional

Page 49

1  topic, which reads, "Identify when HII first became
2  aware of Rising Eagle or John Spiller.  Explain what
3  investigations were performed to determine whether
4  customers were being developed through them, what the
5  results of such investigation was and what was done to
6  repudiate them, if anything."
7          So taking the deposition notice topics, plus
8  that additional topic, are you prepared to testify on
9  behalf of the defendant HII, Health Insurance
10  Innovations, Inc., on these topics?
11         MS. CHATTIN:  For the record, counsel has
12     reached agreements on topics 26 and 29, but other
13     than that, you can answer.
14         THE WITNESS:  Okay.  Yes, I believe so.
15         MR. BURKE:  Okay.  And the agreement that
16     counsel made is in writing and in an e-mail,
17     right?
18         MS. CHATTIN:  That's right, Alex.  Thank
19     you.
20  BY MR. BURKE:
21     Q.  And what did you do to prepare to testify on
22  these topics?
23     A.  So I reviewed with counsel the documents that
24  were produced to make sure that I felt fairly
25  comfortable and familiar with them.  And then on a

13 (Pages 46 - 49)

Page 50

1    couple of the topics that have less of my day-to-day
2    knowledge and experience, we reached out to Elizabeth
3    Brill, who is our VP of accident health, just to kind of
4    go over and make sure that I was going to be able to
5    explain those, hopefully, accurately and correctly.
6        Q.   Okay.  So before we took a break, we were
7    talking about the documents that set the parameters for
8    agents', subagents' telemarketing activities.  And we
9    looked at Exhibit B, which is on the screen, which is, I
10   think, the Zach Cox subagent agreement.  And you
11   mentioned that there was also a general agent agreement,
12   which I have -- I think I have found.  We're going to
13   mark this Exhibit C.
14           (Exhibit C was marked for identification.)
15   BY MR. BURKE:
16       Q.   And I'm going to e-mail this to everybody,
17   including the court reporter, later on.  This document
18   begins at HII 93637 and is nine pages long.
19           So this document that's entitled General Agent
20   Agreement, is this what you were talking about when --
21   before we took the break as the other document that
22   governed agents of TCPA-related activities?
23       A.   Yes.
24       Q.   Okay.  And so if I do a search for "telephone"
25   on this document, I see that there's a reference here,

Page 51

1    paragraph J, under general agent's duties.  It says, "As
2    a general agent of HII, GA agrees to use GA's best
3    efforts to," and J says, "ensure compliance with all
4    applicable telemarketing rules, including local, state,
5    and federal laws promulgated pursuant to the Telephone
6    Consumer Protection Act."
7            Is that what you were referring to in your
8    earlier testimony?
9        A.   Yes.  That paragraph and then some of the
10   succeeding ones.
11       Q.   Okay.  And so on my search for the word
12   "telephone," I also came up with paragraph K and L.
13   They look like they also relate to telemarketing.  Would
14   you agree?
15       A.   Yes.
16       Q.   Okay.  So we're looking at paragraphs J, K,
17   and L.
18           Are there any other portions of this document
19   that have to do with telemarketing compliance?  I'm sort
20   of scrolling through on the screen here.
21       A.   I mean, I not have the document in front of me
22   in terms of being able to scroll it myself.  I believe
23   that's where the bulk of it would be located.
24       Q.   Okay.  Well, let's scroll through the whole
25   thing, because we want to make sure that we get

Page 52

1    everything.
2            It looks like this is the Sean Duffie general
3    agent agreement.  Would you agree?
4        A.   Yes.
5        Q.   Okay.  And who was Sean Duffie?
6        A.   Sean Duffie was a GA level distributor.
7        Q.   Okay.  And so that means that Mr. Duffie had
8    subagents underneath him; is that right?
9        A.   Mr. Duffie did, yes.  Not every GA would,
10   but --
11       Q.   Other than Exhibit B and Exhibit C, are there
12   any other documents that govern agent telemarketing
13   efforts?
14       A.   So there would also be a MGA agreement, which
15   is a level above GA.  I believe that the language
16   speaking specifically to telemarketing TCPA is
17   fundamentally the same at the MGA level and the GA
18   level.
19       Q.   Okay.
20       A.   You know, there were also -- during the time
21   period in question, 2017, 2018, there were some things
22   that were, you know, being developed, some things that
23   were launched at various points there, where we would
24   review with the agents.  I believe the partner annual
25   certification was launched approximately 2018, and that

Page 53

1    had some language that, you know, discussed, okay,
2    we're, you know, sending this around to you again; we're
3    reiterating what your responsibilities are, and I
4    believe that it had some initial language regarding
5    telemarketing.
6            And then when we started to see some more of
7    these types of things come into the marketplace, we
8    enhanced that document to, you know, add a little bit of
9    additional language to further underscore, you know, if
10   you're sourcing these client, it is your responsibility
11   to really make sure that you're going to be able to
12   provide validation.
13       Q.   Okay.  So this -- you mentioned the partner
14   certification?
15       A.   Yes.
16       Q.   If we're searching through the 200,000
17   documents, should we search for "partner certification"
18   here?
19       A.   I would imagine it would be titled either
20   Partner Annual Certification or PAC.  That was
21   eventually added to the contracting documents, but I
22   don't know if it happened in 2018.
23       Q.   So -- well, I guess we can keep looking at
24   this.
25           So Exhibit C mentions "do not call" in

14 (Pages 50 - 53)

Page 54

1  paragraph K and L.
2      K says that the master -- let's see. The
3  general agent is supposed to create a DNC list; is that
4  right?
5      A.  Yes.
6      Q.  Okay.  What did HII do to ensure that, if
7  anything, to ensure that master agents or general agents
8  were creating and maintaining an internal do-not-call
9  list?
10     A.  So we did have, as agent, we did have
11  conversations with various agencies as to, you know, how
12  they were able to do these things.  Sometimes it was an
13  account rep during, you know, an initial onboarding,
14  sometimes it was compliance during an annual site visit
15  or review.  A lot of the agencies, to my knowledge, you
16  know, they used specific dialing systems, that software
17  had DNC capability within it, so they would say, we're
18  using this particular industry standard dialer which has
19  this capacity and capability.  We teach our agents, you
20  know, if somebody requests to be placed on do not call,
21  this is how they do that.
22     Q.  Okay.  So, for example, Duffie used the VICI
23  dial system, right?
24     A.  I do not know that off the top of my head,
25  but --

Page 55

1      Q.  Okay.
2      A.  -- that would be a common one, yes.
3      Q.  Okay.  And were there other agents that used
4  VICI dial?
5      A.  I believe there were several different
6  agencies that mentioned VICI dial.
7      Q.  And Duffie only used VICI dial for receiving
8  inbound calls, right?
9          MS. CHATTIN:  Object to form.
10         THE WITNESS:  I don't know that off the top
11     of my head.
12  BY MR. BURKE:
13     Q.  Okay.  Well, what was HII's understanding of
14  how Duffie complied with the internal do-not-call rules?
15     A.  So my recollection would be that when, you
16  know, there were site visits that were conducted, that's
17  one of the topics that's brought up.  They mentioned
18  that they use VICI dial, and that it has that particular
19  capacity and capability, and all of their agents were
20  directed to add people to do not call upon request and
21  that they did scrub against, you know, do-not-call
22  lists.
23     Q.  Okay.  Where did -- when specifically did
24  Duffie or anyone in Duffie's sphere of influence tell
25  HII that it was scrubbing its outbound calling lists

Page 56

1  against its do-not-call list?
2      A.  Again, without looking at a specific report, I
3  can't attest that there was an outbound call list.  I
4  know that it was a topic that was brought up on site
5  visits that were done in 2018 and details of that would
6  have been in, you know, the site visit report.
7      Q.  Okay.  So if we were to look at a site visit
8  report having to do with Duffie, whatever happened as to
9  the do-not-call list would be in that report?
10     A.  It is a topic that is addressed, you know,
11  what dialers do you use, how do you source leads, so any
12  information that was relayed during that site visit
13  would be in that report.
14     Q.  Okay.  As you sit here today, do you know
15  whether -- well, as you sit here today, do you know what
16  the report as to the internal do not call as to Duffie
17  in 2018 was?
18     A.  My recollection would be that they said they
19  use the dialer and they used the functionality within
20  the dialer.  If there was any other specific information
21  that was relayed, I would have to go back to the report.
22     Q.  You mentioned earlier today that HII had an
23  internal do-not-call list.
24         Do you remember that?
25     A.  Yes.

Page 57

1      Q.  When did HII start maintaining a do-not-call
2  list?
3      A.  So the do-not-call list that was in the
4  system, I want to say, we had two different avenues for
5  adding things.  The compliance one, which is one we
6  could just add on the fly and didn't need to put
7  requests in through our IT, that one, I want to say, was
8  maybe around 2016, 2017, somewhere in that area.  There
9  was a do-not-call list that also existed through our IT.
10  That one may have been created a bit earlier than that,
11  at least as far as accessibility.
12         I know that when I started, if somebody
13  requested, we could send requests off to IT to have them
14  put on a DNC list, but that specific system-oriented one
15  was just for contact to existing consumers.  Right?  We
16  didn't make calls to new or potential consumers.
17     Q.  So the IT DNC list was really for existing
18  customers who requested not to be contacted by HII; is
19  that right?
20     A.  Correct.
21     Q.  So it wasn't like a telemarketing-related DNC
22  list, right?
23     A.  No.
24     Q.  It was not?
25     A.  It was not.

15 (Pages 54 - 57)

Page 58

1    Q.  The compliance DNC list, when it was first
2  developed, where did it -- where did it reside?
3    A.  So we had that built into the proprietary
4  system, so that one had a little bit of additional
5  capacity to put in things that were not related to
6  specific consumers on the platform.  So if we had a
7  random person call in and say, This is my phone number;
8  I don't want to be contacted by you guys, that one had a
9  little bit of more flexibility.  You know, you could put
10  that in with just a phone number.  You didn't need to
11  tie it to a specific policy, and it was designed to be
12  able to be exported and shared.
13    Q.  Okay.  And so how would -- well, let's see.
14        Was there anything in writing that told folks
15  how to use it?
16    A.  Again, I don't know that we had a formal
17  policy on it that was ever written.  I know when it was
18  launched it was communicated to the account reps so they
19  would be able to go through and talk to their agencies
20  about how to access it.  Again, we kind of internally
21  had the ability to export that, and that was
22  communicated -- it was probably e-mails around it.  But
23  in small companies, some things were communicated
24  primarily by word of mouth.
25    Q.  So did HII ever have anything in writing in

Page 59

1  2016 telling its employees how to use the DNC -- the
2  internal DNC list?
3    A.  When it was launched, there would have been
4  instruction as to how to add things, so, again --
5    Q.  In writing?
6    A.  I would imagine that there may have been
7  e-mails that were sent on that.
8    Q.  Well, did you research that issue in
9  preparation for today?
10    A.  I did not look into that specifically, no.
11    Q.  So, as you sit here today, do you know of a
12  specific document that was circulated having to do with
13  the internal do not call, how to use the list?
14    A.  I do not recall that one, no.
15    Q.  As you sit here today, you know, you're
16  speaking on behalf of the company?
17    A.  Uh-huh (indicates affirmatively).
18    Q.  Has HII ever had anything in writing that
19  explained to its employees or folks who were handling
20  inbound requests not to receive telemarketing calls, you
21  know, how to use the list?
22    A.  So there are TCPA policies that mention, you
23  know, DNC and how to handle that.  As far as customer
24  service, again, a lot of that training is done via --
25  there's e-mails that are sent out or it's peer to peer.

Page 60

1    Q.  Right.  So it's important to the case to know
2  precisely what you're talking about.
3    A.  Uh-huh (indicates affirmatively).
4    Q.  So you mentioned DNC policies.  Tell me what
5  you mean.
6    A.  So TCPA policies, there are specific policies
7  around TCPA, and within those policies it is addressed
8  to, you know, circulate information on how to add people
9  to DNC that is communicated internally and then also
10  externally to independent distribution.
11    Q.  So when was that first -- when was the first
12  TCPA policy?
13    A.  I have seen what the earliest policy looks
14  like.  I do not remember precisely when it was written.
15  I want to say maybe 2015, 2016.  I know that it was
16  developed in conjunction with counsel.
17    Q.  So your testimony is HII had a do-not-call
18  policy in writing in place in 2015?
19        MS. CHATTIN:  Object to the form.
20        THE WITNESS:  I believe that's when the TCPA
21    policy was originally drafted, yes.
22  BY MR. BURKE:
23    Q.  Upon what do you base that belief?
24    A.  Recollection.  There's not a specific date on
25  that document, unlike some of our policies and

Page 61

1  procedures.
2    Q.  How can I find it in the 200,000 pages that
3  were produced?  Because my understanding, based on
4  conversations with counsel, is that there wasn't one.
5        MS. CHATTIN:  Object to form.
6  BY MR. BURKE:
7    Q.  I'm just --
8        MS. CHATTIN:  You can answer.
9  BY MR. BURKE:
10    Q.  I'm just saying.
11    A.  No.  That would probably be Telephone Consumer
12  Protection Act or TCPA.
13    Q.  Would it say "policy" as well?
14    A.  I don't remember if it said policy or not.
15    Q.  So was this policy that you're saying existed,
16  was it a standalone policy?
17    A.  It was a standalone policy.  I believe that it
18  did specifically call out that the legal that it should
19  be shared with, if something came in, was Greenspoon, so
20  that may be a key word.
21    Q.  I will just go through these documents.  Why
22  not, right?
23        So the search here is "Telephone Consumer
24  Protection Act" and "policy" and "Greenspoon."  And the
25  first hit is the complaint.  Pardon me.  A policy from

16 (Pages 58 - 61)

Page 62

1  2018.
2      A.  That would not be the one.
3      Q.  Okay.  The next one is a complaint by a person
4  named Robert Doane.
5      A.  No.
6      Q.  Doane again.  Doane.
7          MS. CHATTIN:  For the record, we're
8      scrolling through plaintiff's discovery platform,
9      correct?
10         MR. BURKE:  Right.
11         MS. CHATTIN:  Thanks.
12  BY MR. BURKE:
13     Q.  I'm hitting a lot of the consumer complaints.
14  Here's a 2019 document from Janis Rosenthal.
15     A.  No.
16     Q.  Okay.  We're now looking at a document, Bates
17  994, that's 293 pages long and apparently hit on some of
18  these.
19     A.  I don't think that it was contained in
20  anything like that.
21     Q.  Okay.  We hit on your prior deposition
22  testimony, Ms. Brady's prior deposition testimony, some
23  stuff produced by other defendants.
24         Was this policy ever shared outside of HII?
25     A.  I don't know.

Page 63

1      Q.  So I just went through all 19 of the hits on
2  that search, and I didn't come up with it.  Is it
3  possible that HII did not have a do-not-call policy in
4  2015, 2016?
5          MS. CHATTIN:  Objection to the form.
6          THE WITNESS:  So the reason that I believe
7      that was 2015, 2016 is it was in the documents
8      that we reviewed.  I just don't remember the
9      exact title of the document.  So I know that the
10     one that I'm speaking of did exist in the
11     production because we reviewed it in the prep,
12     and it was the one that did not have a date on it
13     and -- when we did our review.  So that was about
14     2015, 2016, because we worked with Greenspoon on
15     those at that point.
16  BY MR. BURKE:
17     Q.  How can we find it?
18         MS. CHATTIN:  Do you want to go off the
19     record for a second?
20         MR. BURKE:  Sure.
21         THE VIDEOGRAPHER:  The time is 11:11 a.m.,
22     and we are now off the record.
23         (A brief recess was taken.)
24         THE VIDEOGRAPHER:  This is the start of
25     Media Unit No. 2.  The time is 11:24 a.m., and we

Page 64

1  are back on the record.
2          MR. BURKE:  Okay.  Thanks.
3  BY MR. BURKE:
4      Q.  So we did some work offline here, and we came
5  up with this document that I'm going to label as
6  Exhibit D.  It's at HII 3354.  It's a two-page document.
7          THE REPORTER:  Didn't we already have a B?
8          (Exhibit D was marked for identification.)
9          MR. BURKE:  D.
10         THE REPORTER:  D.  Gotcha.  Sorry.
11  BY MR. BURKE:
12     Q.  And is this the document that you were talking
13  about?
14     A.  Yes.
15     Q.  So my question, I believe, was:  What's the
16  document that told customer service employees and others
17  at HII how to use the internal do-not-call list?  And
18  this is the document that you say is the answer to that?
19     A.  Again, you have it up.  I haven't read it
20  today, but I believe most of the TCPA procedures that we
21  had mentioned DNC.
22     Q.  Okay.  Well -- so I'm just looking for an
23  answer to my question, of course, right?
24         So the question is:  Is this the policy that
25  you were referencing that tells employees what to do

Page 65

1  when they receive a request not to receive telemarketing
2  calls in the early period, '15, '16, '17?
3          MS. CHATTIN:  Object to the form.
4          Go ahead.
5          THE WITNESS:  Yes.  Do you mind scrolling
6      down, because, again, I reviewed this briefly.
7          Okay.  My apologies.  It doesn't mention
8      that in this particular procedure.
9  BY MR. BURKE:
10     Q.  When did HII first have a policy that told
11  employees what to do if they got a request for no more
12  calls?
13     A.  Well, we always had a policy, I mean, in terms
14  of there was always direction that was provided.  In
15  terms of a written documented policy, if it was not
16  mentioned in this, then the first instance would
17  probably be in the 2017 policies and procedures.
18     Q.  And you say that there was always a policy,
19  just not written.
20         Was there any sort of training that mentioned
21  internal do not call?
22     A.  Again, a lot of our training was peer to peer,
23  especially in the early days.  There were nine of us in
24  a room, so if you were going through training, you were
25  advised, you know, if somebody wants to be not contacted

17 (Pages 62 - 65)

1  anymore, here are the steps that you can take.
2      Q.  And what were the steps?
3      A.  When I first started, I don't believe we had
4  the IT master list, so really what we did is we just
5  changed the phone number on file.
6      Q.  We're just talking about compliance here.
7  We're not talking about the IT list.  Okay?
8      A.  So the compliance DNC list didn't exist until
9  later, and that communication, again, would have been
10  when it was launched.  We, I think, probably sent an
11  e-mail around, but we also, you know, physically went
12  down and talked to our customer service team to advise
13  them this is how you can add things to it.
14      Q.  When was that?
15      A.  I want to say approximately 2016, 2017 for the
16  compliance DNC list.
17      Q.  What did you do to research when HII first had
18  an internal do-not-call list, the compliance list?
19      A.  I didn't do specific research on that
20  particular item, because it's knowledge that I, you
21  know, recollect.  I didn't go back and verify a specific
22  date.
23      Q.  Did you look to see whether there really was
24  an e-mail telling people how to use the internal
25  do-not-call list?

1      A.  I did not.
2      Q.  What was the internal do-not-call list
3  document that you referenced that began in 2017?
4      A.  So in 2017, our VP of compliance started
5  writing up more formal policies and procedures for
6  compliance.  TCPA was one of those, and do not call was
7  mentioned in that particular policy.
8      Q.  Okay.  How can I find that one?
9      A.  So it should be the policy for Telephone
10  Consumer Protection Act, and then I think it may have
11  also been in the lead review policy.
12      Q.  And to be clear, did that policy tell HII
13  employees how to handle requests not to receive calls?
14      A.  It goes over the steps that we take when we
15  have TCPA issues.  Do not call is a part of that, but I
16  don't think that it provides specific direction on:  Go
17  to this area of the system and do this.
18      Q.  Has HII ever had a written policy that tells
19  its employees what to do when they receive requests not
20  to receive telemarketing calls?
21      A.  It may have been included in some of the
22  customer service training documents, but I don't know
23  that there's a specific policy.
24      Q.  Okay.  So, as you sit here today, you're not
25  sure whether there was any written policy directing

1  employees of HII what to do if they receive a request
2  not to receive -- not to receive telemarketing calls; is
3  that right?
4      A.  For customer service, correct.
5      Q.  Well, no, that wasn't my question.  I asked
6  about employees at HII, not just customer service.
7      A.  Again, compliance will review the TCPA policy
8  and that does discuss it, but a specific policy that
9  says go to this part of the system and do this specific
10  action, to my knowledge, no.
11      Q.  Has HII ever had, at any time, training that
12  explains, you know, what to do when a consumer requests
13  not to receive telemarketing calls?
14      A.  A lot of that training over time has been peer
15  to peer, so it's, you know, sitting with somebody and
16  going over here's how you, you know, take these
17  particular steps in these particular scenarios.
18      Q.  So nothing written?
19      A.  Not that I'm aware of, no.
20      Q.  And although HII started out with nine
21  customer service employees, that got much bigger, didn't
22  it?
23      A.  Our internal customer service team is still
24  pretty small.  There was a point, again, when the market
25  kind of exploded, and we had a massive increase in

1  volume that we brought on a BPO firm.  Basically, we
2  contracted out some of the first line call center
3  requirements.
4      Q.  Did HII ever review the internal do-not-call
5  policies of agents, for example, Duffie?
6      A.  Where they had written policies and
7  procedures, that would be something that we would have
8  reviewed on a site visit.  A lot of the smaller
9  distributors did not have written policies and
10  procedures.
11      Q.  I see.
12          And so did Duffie have a policy?
13      A.  I do not recall if he had one.
14      Q.  And so if the, you know, agents did not have a
15  policy, what did HII do?
16      A.  Again, our interviews were mostly about what
17  are your processes for handling these things in a
18  smaller office.  If it was advised that, you know, this
19  is shared via peer-to-peer training and this is part of
20  their system knowledge, they're taught how to use the
21  dialer, then we would have relied upon that.
22      Q.  And has HII ever worked to make sure that one
23  agent's do-not-call list is shared with other agents'
24  do-not-call lists?
25      A.  So this goes back to independent distribution,

Page 70

1  right? Each of these entities are pretty much
2  independent of one another, so a request that is made to
3  one agency does not necessarily cover all agencies. The
4  other piece of that being we don't own those dialers or
5  those lists, so they're not in our possession or control
6  to be able to share them. You know, if there was a
7  specific communication about, you know, I don't want to
8  hear about these specific policies that were through our
9  platform, our expectation is that the agency would
10  communicate that to us so that we could then communicate
11  that back out to the larger distribution network.
12  But --
13      Q. Where did that expectation manifest in writing
14  to the agents?
15      A. So there are items within the GA agreement
16  talking about specific complaints related to HII
17  products need to be reported to HII. That was also an
18  item that would be discussed on, you know, site visits
19  and things that we would expect account reps would go
20  over as part of the, you know, onboarding process.
21      Q. So is there any written document that says,
22  Hey, if you get a do-not-call request, you know, Duffie
23  insurance company, make sure you tell us so that we can
24  tell the other insurance agents?
25      A. I think the only communication about reporting

Page 71

1  specifies regulatory complaints. I don't know that it
2  says DNC specifically.
3      Q. So no?
4      A. No.
5      Q. So, like, even if Duffie were to honor a
6  request not to receive calls on behalf of HII, some
7  other insurance agent would never know that there had
8  been a request not to receive calls on behalf of HII,
9  right?
10      MS. CHATTIN: Object to the form.
11      THE WITNESS: If we did not know about it,
12   then no.
13  BY MR. BURKE:
14      Q. Well, even if -- let me ask you this: Has HII
15  ever shared its internal do-not-call list with agents?
16      A. Agents do have access to it. That is one of
17  the things. There also have been carriers who have
18  given us DNC lists and we've distributed that to the
19  agencies.
20      Q. Okay. When did HII first make its compliance
21  DNC list -- again, all these questions have to do with
22  the compliance DNC list.
23      When did HII first make its compliance DNC
24  list available to agents?
25      A. It would have been exportable from the time

Page 72

1  that it was launched, so, again, approximately 2016,
2  2017, which is when it was launched, and it would have
3  been available for download.
4      Q. When did HII first tell agents that that DNC
5  list was something they were supposed to scrub against,
6  if ever?
7      A. That would be something that would have been
8  up to the account reps to communicate.
9      Q. Did it ever happen?
10      A. To my direct knowledge, no.
11      Q. Well, you're testifying today on behalf of
12  HII, so the question is not: Ms. Gillis, do you know
13  whether it happened? The question is: Did it ever
14  happen?
15      A. I did not see anything like that in the
16  documents that we reviewed.
17      Q. So no?
18      MS. CHATTIN: Object to the form.
19      Go ahead.
20  BY MR. BURKE:
21      Q. Right?
22      A. No.
23      Q. And, of course, since lead generators and
24  telemarketers that were being hired by those agents had
25  access to the agents, if the agents didn't have access

Page 73

1  to the list or didn't know they had access to the list,
2  of course, the folks making the telephone calls didn't
3  know how to access that list; isn't that right?
4      MS. CHATTIN: Object to the form.
5      THE WITNESS: So the complete list itself is
6  exportable. The individual numbers that were
7  added to that list were typically distributed
8  throughout our TCPA process, so they would get
9  individual notifications on most of those numbers
10  to add them to their DNC lists and dialers.
11      Again, I can't speak to what an agency may
12  or may not have shared with a lead vendor
13  proactively, but, presumably, when they were
14  being transferred, there would be a scrubbing
15  process to say, Hey, I don't want this number.
16  BY MR. BURKE:
17      Q. Right.
18      You know, I saw some correspondence between
19  Amy Brady at HII and Marsha Griffin, who worked for
20  Health Advisors of America, with sort of ad hoc
21  do-not-call phone numbers to add to the DNC list.
22      Is that sort of what you're talking about?
23      A. Yes. In terms of when Marsha was working
24  with -- well, we knew them as Happy Health at the time.
25  But when -- she would have been one of the people that

19 (Pages 70 - 73)

1    Amy would have communicated with.
2        Q.   And Happy Health was Duffie's agency, right?
3        A.   Yes.
4        Q.   And Duffie's agency was also known as Health
5    Advisors of America, right?
6            MS. CHATTIN:  Object to the form.
7            THE WITNESS:  So that was not a thing that
8        we knew contemporaneously.  That was the thing
9        that, you know, came out after the -- there was
10       some kind of relationship with Health Advisors of
11       America.
12   BY MR. BURKE:
13       Q.   How do you know that it wasn't something that
14   HII knew contemporaneously, like, for example, in the
15   beginning of 2018?
16       A.   So in terms of how our system, you know,
17   classifies things, each agent, each agreement is going
18   to have a specific system record.  And there was, within
19   that system record, no association with that particular
20   name.
21           I believe that there may have been some ad hoc
22   communications that mentioned that name, but it wasn't
23   anything that was formally recorded within our system as
24   being associated with that individual.
25       Q.   Okay.  So I didn't ask you whether there was a

1    formal association in the system for Health Advisors of
2    America, and you didn't provide that clarification when
3    you first testified about it.  Duffie's agency was known
4    at HII to be several things, including Health Advisors
5    of America, essentially, from the beginning of 2018;
6    isn't that right?
7            MS. CHATTIN:  Object to the form.
8            THE WITNESS:  I believe that there were
9        communications with that name in them for certain
10       departments, yes.
11   BY MR. BURKE:
12       Q.   Well -- so the answer is yes, right?
13       A.   Yes.
14       Q.   So, for example --
15           MR. BURKE:  This will be Exhibit E.
16       (Exhibit E was marked for identification.)
17   BY MR. BURKE:
18       Q.   Who is Aaron Hruszczyk?
19       A.   Aaron Hruszczyk is in our finance department.
20       Q.   Okay.  And so we have an e-mail from Aaron
21   Hruszczyk and Amy Brady.  "I'm putting together the
22   agreement for Duffie.  What's the name of his agency?"
23           And the answer is "Health Advisors of
24   America."
25           Is this the communication that you're talking

1    about?
2        A.   Yes.
3        Q.   This was in February of 2018, right?
4        A.   Yes.
5        Q.   So is it true that HII knew that Health
6    Advisors of America was affiliated with Duffie in the
7    beginning of 2018, at least as early as February of
8    2018?
9        A.   Based on that e-mail, yes.
10       Q.   When did HII first learn about Health Advisors
11   of America?
12           MS. CHATTIN:  Object to the form.
13           Go ahead.
14           THE WITNESS:  Yeah.  I mean, to my
15       knowledge, that's the e-mail where it was
16       mentioned and there was an association that was
17       drawn.
18   BY MR. BURKE:
19       Q.   Did you research this issue?
20       A.   I reviewed the documents that we had relating
21   to that particular term.  There was this e-mail.  I
22   believe there was a slightly later e-mail from somebody
23   in our implementation department that also mentioned
24   that name, and then anywhere else that it appeared in
25   the system it had a relationship with a different

1    person.
2        Q.   Did you call Amy Brady to talk about this
3    e-mail?
4        A.   No.
5        Q.   Why not?
6        A.   She does not work for the company anymore.
7        Q.   In fact, Ms. Brady testified that she never
8    heard about Health Advisors of America until after this
9    lawsuit was filed; isn't that right?
10           MS. CHATTIN:  Object to the form.
11           THE WITNESS:  I don't know.  I didn't review
12       her testimony.
13   BY MR. BURKE:
14       Q.   At some point was Health Advisors of America
15   put into HII's computer systems?
16       A.   So as far as our, like, proprietary systems,
17   the only instance that I ever saw with Health Advisors
18   of America when we researched that system was in
19   relation to a link for a different agent that was
20   created to help maintain a -- what is called a takeover
21   or a runoff block from policies that were sold through a
22   completely different company.
23           So there was not anybody who had an
24   association with that name who had the ability to
25   present products in our system.

Page 78

1     Q. So the question was, was Health Advisors of
2 America ever put into HII's system, not just its
3 proprietary systems, but its systems, ever?
4     MS. CHATTIN: Object to the form.
5     THE WITNESS: I don't believe that there
6    would have been another system that would have
7    recorded that.
8 BY MR. BURKE:
9     Q. Wasn't HAA -- is it okay if we prefer to
10 Health Advisors of America as HAA?
11     A. Yes.
12     Q. Wasn't HAA put into the system in 2019?
13     MS. CHATTIN: Object to the form.
14     THE WITNESS: I'm not sure what system you
15    would be referencing. I didn't see anything
16    about that in the documents I reviewed.
17 BY MR. BURKE:
18     Q. When did Sean Duffie start as an agent for --
19 working through HII?
20     MS. CHATTIN: Object to the form.
21     THE WITNESS: I want to say probably late
22    2017, maybe early 2018.
23 BY MR. BURKE:
24     Q. Okay.
25     A. I don't remember the exact date off the top of

Page 79

1 my head.
2     Q. Okay. And so this e-mail, Exhibit E from
3 February 2018 where Mr. Hruszczyk is putting together
4 the agreement for Duffie, that doesn't necessarily tell
5 us the pinpoint time when Duffie started working through
6 HII?
7     A. No, because advance agreements can be entered
8 into at any point during an agent's life cycle.
9     Q. What's an advance agreement?
10     A. So an advance agreement is an agreement to pay
11 forward a certain amount of money based on initial
12 policy sales and then that money is recouped based on
13 renewals.
14     Q. But wouldn't there be like a contract for
15 that?
16     A. I believe that there's a specific document for
17 it.
18     Q. Is that like the subagency contract?
19     A. No. Those are generally handled separate.
20 Not every agency is going to have an advance agreement.
21     Q. Was there an advance agreement for Duffie?
22     A. I believe so.
23     Q. Does the advance agreement mention anything
24 having to do with the TCPA?
25     A. I don't recall.

Page 80

1     Q. Is the title of the document Advance
2 Agreement?
3     A. It should be, yes.
4     Q. So have you ever heard of the term "robocall"?
5     A. Yes.
6     Q. What's a robocall, in your eyes?
7     A. From my understanding, a robocall would be a
8 call that is automatically dialed out, doesn't
9 necessarily have a specific intervention manually. That
10 would be the most common usage I have heard for it.
11     Q. Okay. And do robocalls, like, play like
12 prerecorded messages or portions of a prerecorded
13 message also?
14     MS. CHATTIN: Object to the form.
15     THE WITNESS: They can.
16 BY MR. BURKE:
17     Q. Okay. And were agents allowed to engage
18 vendors to make outbound calls using robocalls or
19 prerecorded messages?
20     MS. CHATTIN: Object to the form.
21     THE WITNESS: So in the instance of trying
22    to use a robocall or a prerecorded message, any
23    recorded messages should be reviewed and approved
24    by the agency for any -- you know, anything that
25    is going to directly reference them and what

Page 81

1    services they're providing. If you were going to
2    reference a specific product or products, then
3    that should undergo a carrier review before it is
4    authorized. And, of course, any calls that are
5    made should always have express written consent.
6 BY MR. BURKE:
7     Q. Okay. What document tells the agents that,
8 you know, of these parameters?
9     A. I believe it's the lead investigation document
10 that specifically talks about prerecorded messages.
11     Q. Lead investigation. When was that document
12 first promulgated?
13     A. Approximately 2018.
14     Q. And that one is called Lead Investigation?
15     A. I believe so.
16     Q. Okay. And I'm going to try to find it.
17    What is the -- what does it say -- well, let's
18 see. You testified -- so in HII's view -- let me see if
19 I can find this document. Okay. All right. I think
20 that I found the advance agreement.
21    So I have marked this as Exhibit F.
22    (Exhibit F was marked for identification.)
23 BY MR. BURKE:
24     Q. It's eight pages long, beginning at HII 6659,
25 which is a cover e-mail. I can't tell who sent it.

21 (Pages 78 - 81)

Page 82

1  Maybe it was Aaron Hruszczyk.
2      A. I believe that was probably Amy.
3      Q. Amy Brady?
4      A. Yes.
5      Q. Okay. So Mr. Duffie's contract was sent to
6  Scott Shapiro, and we're looking at a master commission
7  advance agreement from December 2017.
8          Would you agree that that's the advance
9  agreement for Duffie?
10     A. Can you scroll down?
11         Yes. That looks like it should be an advance
12 agreement.
13     Q. Okay. I don't see anything in here about
14 telemarketing or telephone calls.
15     A. I believe that these agreements were designed
16 to be kind of hand in hand with the general agent
17 agreements and MGA agreements. Again, not every agent
18 is going to get an advance, so it kind of refers back to
19 you have to meet the requirements and adhere to the
20 requirements of your MGA or your GA agreement. And then
21 it spells out more specific considerations around what
22 happens with the finances on the actual advances.
23     Q. Okay. So I see a reference to a general agent
24 agreement as effective of December 6th.
25         How does someone know what general agent

Page 83

1  agreement this is referring to?
2      A. So you would go to that particular producer's
3  link and the contracting documents would be on their
4  link.
5      Q. How do you know the producer? Oh, it's Sean
6  Duffie?
7      A. Uh-huh (indicates affirmatively).
8      Q. But I thought we established that Sean Duffie
9  had a general agent agreement no earlier than
10 February 2018?
11         MS. CHATTIN: Object to the form.
12         THE WITNESS: No. I said that I believe it
13     was late 2017 or early 2018. The e-mail that we
14     looked at was from February of 2018.
15 BY MR. BURKE:
16     Q. Tell me more about this lead investigation
17 document.
18     A. It was a policy and procedure that was
19 created, again, I want to say approximately 2018, and it
20 was to kind of enhance what we were looking for in terms
21 of valid leads. You know, we didn't really require
22 anything else outside of what's already required under
23 the various telemarketing rules. But as we were going
24 through some of these processes and getting some of
25 these complaints, we tried to enhance our documentation,

Page 84

1  our communications around it, even though we did still
2  believe that it was 100 percent, you know, the agent's
3  responsibility to make sure that they were adhering.
4          MS. CHATTIN: Do you need help, Alex? I may
5      have a Bates number.
6          MR. BURKE: (Nods affirmatively.)
7          MS. CHATTIN: 3350.
8  BY MR. BURKE:
9      Q. All right. I'm pulling up -- this is a group
10 exhibit, F -- or G.
11         (Exhibit G was marked for identification.)
12 BY MR. BURKE:
13     Q. All right. Exhibit G is seven pages long and
14 it starts at 3349. I want to make sure it's
15 consecutive. It goes to 3355. I think it's two policy
16 documents, maybe three.
17         All right. So 3350 --
18         MR. BURKE: Would you please read my last
19     question back?
20         THE REPORTER: Sure.
21         (The portion requested was read back for
22     counsel.)
23 BY MR. BURKE:
24     Q. So is this, 3350, the lead investigation
25 document you were talking about?

Page 85

1      A. Yes.
2      Q. All right. And this is the document -- was
3  this document shared with folks outside of HII?
4      A. Policies and procedures were typically gone
5  over during site visits.
6      Q. Were they provided during site visits or just
7  orally gone over?
8      A. It would depend on the visit. Sometimes it
9  might have been orally reviewed. Sometimes it might
10 have been e-mailed in advance of the visit. Sometimes
11 it may have been a physical hard copy that was left
12 behind.
13     Q. Okay. So for this document at 3349 to 3350,
14 was there ever a policy having to do with prerecorded
15 messages?
16     A. So the policy for prerecorded messages would
17 have been, again, you know, anything should be reviewed
18 in advance of being used. But during an actual site
19 visit, if as part of that visit it was disclosed that
20 they were using preordered messages, we would
21 immediately request a copy so that we could do a review
22 of that.
23     Q. And so what was the review tailored to? Why
24 would HII want to review the prerecorded message?
25     A. We would just want to make sure that, you

22 (Pages 82 - 85)

Page 86

1 know, it was accurate and correct to what was actually
2 available to be offered.
3     Q.  And other than when a complaint was lodged,
4 did HII ever take efforts to make sure that there was
5 proper consent to use prerecorded messages by agents or
6 their venders or subvendors?
7     A.  There were some instances with specific
8 agencies that we may have put on performance improvement
9 plan, where we would proactively request things from
10 that agency.  You know, in terms of a general
11 perspective, no, not to my recollection.
12     Q.  Did you ever communicate directly with Scott
13 Shapiro?
14     A.  Yes.
15     Q.  Tell me about that.  Was it on the phone?  Was
16 it by e-mail, both, in person?
17         MS. CHATTIN:  Object to the form.
18         You're asking in her individual capacity?
19 Christine?
20         MR. BURKE:  Yeah, Christine.
21         MS. CHATTIN:  Okay.  Go ahead.
22         THE WITNESS:  So, yes.  Scott Shapiro, to my
23     knowledge, was an administrator for Sean Duffie's
24     agency, and in that capacity, I communicated to
25     him definitely via e-mail.  I think I met him

Page 87

1     once or twice in person and may have had phone
2     calls with him, but that doesn't particularly
3     stick out.
4 BY MR. BURKE:
5     Q.  So like one of the takeaways from an earlier
6 deposition I did with Amy Brady was that sometimes Scott
7 Shapiro or Sean Duffie or others would send proof of
8 prior express written consent directly to you.
9         Do you remember this ever happening?
10     A.  To me as a sole individual, that doesn't stick
11 out, but in terms of sending it to the compliance
12 department, yes, if we requested it, it probably would
13 have had me on a cc.
14     Q.  Okay.  So those would have gone to either
15 you -- well, they would have gone to you, right?
16     A.  Probably as a copy, yeah.
17     Q.  Okay.  And who else must they have gone to?
18 Mr. Garavuso?
19         MS. CHATTIN:  Object to the form.
20         Go ahead.
21         THE WITNESS:  Again, it probably depends on
22     the time frame in question and who was doing the
23     requesting.  Dan may have been included.  Ruben
24     Gardner, who was our site analyst for most of
25     that time period, likely would have been somebody

Page 88

1 who received them.  You know, Dominic Meitzen,
2 who was our agency compliance manager for a
3 portion of that time period, may have been cc'd
4 on them.
5     You know, if there was a specific complaint
6 or specific reason or specific consumer to reach
7 out about, it's possible somebody else in the
8 department was tasked to make that request, like
9 Alexis or somebody else who may have had
10 bandwidth and was available.  It's a small
11 department.  We all pretty much worked hand in
12 hand.
13 BY MR. BURKE:
14     Q.  And so what was HII looking for when it
15 received, you know, quote, proof of prior express
16 written consent from an agent such as Duffie?
17     A.  So that was one of our challenges in terms of
18 as we kind of moved into this space, we had not been in
19 the business of validating leads, because that was
20 contractually the agent's responsibility.  We got
21 different types of responses, depending on which vendors
22 were supposedly being used.  Sometimes it was a name, a
23 date, a phone number, an IP address, and a web link.
24 Sometimes it was just an Excel sheet that was name,
25 date, and time.

Page 89

1     It was not always simple or straightforward to
2 say, Okay, I feel really comfortable and confident that
3 as a layperson I can give this back to a consumer and
4 say that this is you who did this at this date and this
5 time.
6     It's one of the reasons we moved towards
7 working with ActiveProspect, who was a vendor, and their
8 TrustedForm product so that we could try to get some
9 degree of consistency on that.
10     Q.  When were agents first onboarded to
11 TrustedForm?
12     A.  I think that started early to mid-2018, when
13 we started trying to work with the TrustedForm and
14 getting the agents on boarded to it.
15     Q.  When was -- when were the folks that were
16 working with Scott Shapiro first onboarded to
17 TrustedForm?
18     A.  So that was a bit of a challenge for us, you
19 know.  We had probably, I want to say, late summer of
20 2018, you know, talked to them about some concerns that
21 we had.  And one of the things that we did when we put
22 them on a performance improvement plan was talk to them
23 about getting onboarded with TrustedForm.  That was
24 still a new product and a new process at the time.  We
25 had some back and forth where they were using some of

Page 90

1 the products from ActiveProspect, but they did not, I
2 think, actually ever successfully get on boarded to the
3 full TrustedForm product.
4     Q.  Right.
5         And then what were the products from
6 ActiveProspect or through ActiveProspect that they were
7 using that the Scott Shapiro folks were using?
8     A.  I believe that they used the DNC scrub.  I
9 think they may have also used the litigator scrub.
10    Q.  DNC scrub.  What do you mean?
11    A.  So as part of our agreement with
12 ActiveProspect, they have what they call scrub
13 processes, so it was really three products.  It was
14 TrustedForm, which was a full integration to various
15 leads websites, you know, that generated a certificate,
16 gave you kind of a snapshot of people actually entering
17 information.
18        There was a litigator scrub, basically a list
19 of numbers that were associated with pre -- previous
20 TCPA litigation.
21        And then there was the general DNC scrub,
22 which, I think, is pulled from a DNC list, so the main
23 do-not-call list federally.
24    Q.  And so how do you know they were using -- the
25 Scott Shapiro folks were using a DNC scrub?

Page 91

1     A.  They advised us.
2     Q.  When?
3     A.  I want to say that that was probably -- we
4 probably started that conversation at some point in
5 August.  We ended up shutting them down in November.  I
6 think it may have been September or October.
7     Q.  When did HII shut Scott Shapiro's folks down?
8     A.  Early November of 2018 for the Duffie agency.
9     Q.  Okay.  What about the rest of them?
10    A.  The only other one that I'm aware of would
11 have been Beau Blanchard, which was an agent that had
12 worked with Duffie, and Shapiro was going to work with
13 him again as an administrator.
14        When we saw that they were going back through
15 contracting, because of the concerns that we had with
16 Duffie's room, we actually put them on an onboarding
17 plan and said that, you know, you can contract through
18 another agent if you're saying this was all being
19 sourced through somebody else and that these practices
20 aren't going to continue, but we are going to do an
21 enhanced degree of due diligence.
22        And one of the criteria for that was that the
23 new room needed to go on TrustedForm, which I don't
24 think they ever did and then they stopped selling, like,
25 the end of November 2018.

Page 92

1     Q.  When was the first complaint that concerned
2 telemarketing as to Shapiro or Duffie?
3     A.  I don't remember a specific date for the first
4 complaint.  I know the point at which we had, you know,
5 the concerns and decided to move forward with the
6 performance improvement plan was late June 2018,
7 thereabouts.
8     Q.  When did HII first learn that the
9 Shapiro-related agents were making robocalls?
10        MS. CHATTIN:  Object to form.
11        THE WITNESS:  I don't recall that that was
12     something that we knew contemporaneously.  I
13     believe that was something that came out after we
14     had stopped working with them.
15 BY MR. BURKE:
16    Q.  You're saying -- so when?
17    A.  I want to say approximately 2019, there was
18 some kind of blog article, press release, something to
19 that effect that said that they had been working with a
20 vendor that did robocalls.
21    Q.  So it's your testimony that HII had no idea
22 that the Shapiro folks were using robocalls until early
23 2019?
24        MS. CHATTIN:  Object to the form.
25        THE WITNESS:  I'm not 100 percent sure on

Page 93

1     the time frame in 2019, but I don't recall that
2     we had any knowledge of that contemporaneously,
3     and I also don't recall seeing anything to that
4     effect in any of the documentation that I
5     reviewed.
6 BY MR. BURKE:
7     Q.  Well, there were a whole slew of telemarketing
8 complaints in 2018 generally, right?
9     A.  Generally, yes.
10    Q.  Okay.  And several of those were traced back
11 to Duffie or Shapiro, right?
12    A.  Yes.
13    Q.  And those complaints complained about
14 robocalls, right?
15    A.  Some of them may have.
16    Q.  So wouldn't that suggest to any reasonable
17 person that Duffie and Shapiro were engaged in
18 robocalls?
19        MS. CHATTIN:  Object to the form.
20        THE WITNESS:  I think -- so I apologize.
21     This may be a point of clarification in terms of
22     how I'm interpreting the question.  When you say
23     that Duffie and Shapiro were engaged in robocalls
24     or making robocalls, my understanding was that
25     they were working with lead vendors and that some

24 (Pages 90 - 93)

Page 94

```
 1      of those vendors may have done that, not that
 2      they themselves had any ownership or any
 3      direction on that.
 4  BY MR. BURKE:
 5      Q.  When did HII first learn that Shapiro and/or
 6  Duffie were involved with lead generation through
 7  outbound robocalls with prerecorded messages?
 8      A.  Again, to my knowledge and based on what I
 9  have reviewed, the first time that we were aware that
10  there was any kind of relationship there was in 2019,
11  when there was an article published.
12      Q.  Well, then I have the same question.  If there
13  were a bunch of robocall complaints that were tied to
14  Shapiro and Duffie in 2018, including allegations of
15  prerecorded messages, doesn't that strongly suggest and
16  actually place HII on notice that those folks were
17  engaging vendors that were making prerecorded message
18  robocalls?
19      MS. CHATTIN:  Object to the form.
20      THE WITNESS:  So, to my recollection, when
21      we had those conversations, they said they were
22      no longer using those vendors and that had been
23      based on prior and that they had addressed the
24      issue and moved forward.
25  BY MR. BURKE:
```

Page 95

```
 1      Q.  When did HII first get wind that Shapiro
 2  and/or Duffie or folks in that room may be accepting
 3  leads that were generated through prerecorded message
 4  robocalls?
 5      A.  Again, approximately mid-2018 --
 6      Q.  2018?
 7      A.  -- from when those complaints started coming
 8  in.
 9      Q.  2018, right?
10      A.  As far as when those types of complaints came
11  in, yes.
12      Q.  When HII learned about these robocalls, what
13  did it do -- and we're talking about the Shapiro-related
14  robocalls, Duffie/Shapiro-related robocalls.  What did
15  HII do to try to stop them?
16      A.  So, again, from a general perspective, there
17  was a trend of complaints that were associated with that
18  particular room.  There was a conversation that was had
19  around, you know, how those particular calls had been
20  sourced or placed.  We were told that it was a prior
21  vendor that was no longer in use, and we placed the room
22  on a performance improvement plan to do an increased
23  level of monitoring.
24      Part of that was to request lead validations
25  on sales that were being made, and then over time, that
```

Page 96

```
 1  kind of moved into the, you know, we really want you to
 2  be on the TrustedForm so we can make sure that we have a
 3  consistent report on all of these validations.
 4      Q.  When was this conversation that happened?
 5      A.  I believe approximately June 2018.
 6      Q.  Who was the party to this conversation?
 7      A.  It was a series of conversations, so I would
 8  have been a part of that; Ruben Gardner, who was our,
 9  you know, site analyst, would have been a part of that;
10  Dan would have been a part of that as the VP of
11  compliance; and Amy Brady would have been a part of that
12  as their account rep.
13      Q.  Okay.  And were these in-person conversations,
14  telephone conversations, e-mail conversations?  What
15  kind of conversations were they?
16      A.  A combination of all three.  We did do a site
17  visit and sat down and had face-to-face communication
18  with them about expectations.  Ruben did several
19  subsequent site visits as part of the performance
20  improvement plan.  We e-mailed the improvement
21  performance plan and what the requirements were going to
22  be.  And then as far as I know, Amy Brady had, you know,
23  telephonic communications with them fairly regularly,
24  like she would with all of her accounts.
25      Q.  Did anyone send anything in writing to Shapiro
```

Page 97

```
 1  or Duffie or any of those folks that said, Hey, stop it
 2  with the robocalls?
 3      A.  I know the performance improvement plan
 4  specified, you know, that they needed to be able to
 5  provide validation on everything.  I don't recall if
 6  that particular document said anything about robocalls
 7  specifically.
 8      Q.  So no?
 9      MS. CHATTIN:  Object to the form.
10      THE WITNESS:  Not to my recollection, no.
11  BY MR. BURKE:
12      Q.  Why not?
13      MS. CHATTIN:  Object to the form.
14      THE WITNESS:  I believe that the way that we
15      were looking at it at the time is that it was a
16      larger issue in terms of how things were being
17      administered and sourced, and it wasn't specific
18      to robocalls so much as it was to the fact that
19      they didn't necessarily have the correct controls
20      in place with their lead vendors to be able to
21      provide validation.
22  BY MR. BURKE:
23      Q.  I saw some communications talking about
24  something called aged leads.  Have you ever heard of a
25  aged lead?
```

25 (Pages 94 - 97)

Page 98

```
1      A.  I have.
2      Q.  What's an aged lead?
3      A.  So in the manner that it was presented to me,
4  an aged lead is mostly a data-only lead, and it is going
5  to be near the end of its, you know, approved life
6  cycle.
7      Q.  So it's an old lead, right?
8      A.  It's an older lead, yes.
9      Q.  Okay.  Like months or years old?
10     A.  Okay.  Shouldn't be months or years old.
11  Generally, I think it's a -- I apologize, I haven't
12  looked at the statute directly, but I think it's like 30
13  to 90 days, is the maximum.
14     Q.  And so did HII ever tell the folks in Duffie's
15  room or Shapiro or Griffin or any of those folks to stop
16  using aged leads?
17     A.  So that was part of the conversation around
18  the TrustedForm implementation.  As we were going
19  through the process, one of the things that was
20  mentioned was that they were not able to get on the
21  TrustedForm because some of the vendors that they
22  purchased data leads from were not integrated or had not
23  been integrated at the time we purchased them, so they
24  were scrubbing them against DNC lists, and whatnot.  The
25  conversation that we had at that point was you can't
```

Page 99

```
1  afford to use anything that might be anywhere near
2  expiration date.  You need to be on this program if
3  we're going to continue doing business with you.
4      Q.  Right.
5          And they never got on the program, did they?
6      A.  They did not.
7      Q.  And Duffie was terminated in late 2018, right?
8      A.  Yes.  In November.
9      Q.  November 2018.
10         Around the time that this policy, Exhibit G,
11  was promulgated, November 1st, 2018.  So that was around
12  the same time that Duffie was terminated, right?
13     A.  Yes.
14     Q.  Did HII also cut ties with Shapiro?
15     A.  Again, Shapiro, as an administrator or
16  manager, came back briefly with Mr. Blanchard.  He was
17  another agent of record.  We were advised that he was
18  going to, you know, get on board, get everything
19  finished, that Duffie had really been part of the holdup
20  for why things were not going that way, and we put them
21  on an enhanced onboarding plan.  And when they were not
22  getting on TrustedForm, again, I think the end of
23  November 2018 was the end of that.
24     Q.  Isn't it true that HII has continued to do
25  business both with Shapiro and Duffie after
```

Page 100

```
1  November 2018?
2      A.  In what sense?
3      Q.  In any sense.
4      A.  I mean, they would probably -- well, Shapiro
5  would not have necessarily had anything, but Mr. Duffie
6  certainly had policies that would have been sold by him
7  that would still be eligible for any renewal
8  commissions.  In terms of new business, not to my
9  knowledge.
10     Q.  In 2018, isn't it true that HII employees
11  began receiving HII robocalls?
12         MS. CHATTIN:  Object to the form.
13         THE WITNESS:  What do you mean by "HII
14     robocalls"?
15  BY MR. BURKE:
16     Q.  Robocalls that were advertising HII, you know,
17  products.
18     A.  I know that in 2018 there were employees who
19  got calls just like a lot of people did for health
20  insurance in general.  I don't believe that the message
21  specifically called out HII, and in some of those
22  instances, they were, ultimately, connected to agents or
23  agencies who offered HII products as well as competitor
24  products.
25     Q.  Okay.  And the prerecords that were playing
```

Page 101

```
1  were the ones that say, hey, Blue Cross, Aetna, that
2  stuff, right?
3      A.  I believe so, yeah.
4      Q.  Okay.
5      A.  Those were ones that were all over the market.
6      Q.  Okay.  And, in fact, even some high-level
7  employees received those robocalls, right?
8      A.  I think most everybody was receiving those
9  robocalls at that point.
10     Q.  Did you get any?
11     A.  I don't typically answer the phone if I don't
12  recognize the number, so I do not recall getting any,
13  but --
14     Q.  There was an employee named Gamlen that got
15  one.
16     A.  Yes.  He was our -- I don't remember the exact
17  title, but he was basically over customer service.
18     Q.  Right.  He's like sort of a high up -- higher
19  up?
20     A.  I believe he's a VP.
21     Q.  Yeah.  Okay.  That's pretty high?
22     A.  Yeah.
23     Q.  And so what did Gamlen say about the robocall
24  he got?
25     A.  I believe he reported to us that it had tied
```

26 (Pages 98 - 101)

Page 102

1  back to Happy Health, plans and that was one of the
2  factors that ended up leading to the performance
3  improvement plan.
4      Q.  I mean, did HII interrogate Gamlen to
5  determine whether he had consented to receive this
6  robocall?
7      MS. CHATTIN:  Object to the form.
8      Go ahead.
9      THE WITNESS:  So my recollection at the time
10    was that there was an investigation that was
11    done.  I haven't seen any specific documentation
12    around it, and it was done at a higher level than
13    I occupied.  Most of the people involved in that
14    no longer work for the company.
15      But what was communicated back to us was
16    that a copy of an employee directory had been fed
17    into a lead vendor somehow, so those numbers had
18    been provided to a vendor.
19 BY MR. BURKE:
20     Q.  And it tied back to Duffie, right?
21     A.  Well, the actual call that Mr. Gamlen received
22 was transferred to an agent with Mr. Duffie.  As far as
23 how that list got out, I don't know the answer to that.
24     Q.  Well, were there -- were there any of these
25 calls, robocalls, that, you know, started with this

Page 103

1  whole CIGNA, Blue Cross, Aetna thing that were traced
2  back to anyone other than Duffie?
3      A.  Several of the employees who got them were
4  offered competitor products, so they had no way to
5  validate who was actually on the phone or who was
6  calling.  I think the only ones that I recollect that,
7  you know, we actually were presented a product in our
8  system and given enough information to determine who was
9  involved led back to Mr. Duffie's office.
10     Q.  Well, the other folks that were offered other
11 products or services, they could have just asked who it
12 was, right?
13     A.  Yes.  But you don't necessarily have a way to
14 tie that back.  If somebody gives you a first name of
15 Adam and they're not giving you a last name or they're
16 not giving you a license number, then there are multiple
17 Adams.  I don't know who Adam is.  I don't know how to
18 validate that at that point.
19     Q.  Well, if it's an insurance agent, they're
20 required to provide their name and license, right?
21     A.  They should, yes.
22     Q.  Did that ever happen as to the Duffie folks
23 that were affiliated with these robocalls received by
24 HII employees?
25     A.  I don't recall seeing that be called out one

Page 104

1  way or the other.
2      Q.  So what did HII do to try to -- I will phrase
3  this differently.
4      In addition to, you know, having Duffie --
5  these conversations with Duffie, is there anything else
6  that HII did to try to prevent these robocalls from
7  going to its employees?
8      A.  I don't know.  When you say prevent, like,
9  again, we investigated what we could, where we were able
10 to tie it back to specific agents or agencies.
11 Depending on, you know, what the trends were or what was
12 going on with those things, we would ask for
13 validations.  If we had concerns, then there would be,
14 you know, obviously, in Mr. Duffie's case, a performance
15 improvement plan.
16     In a more general sense, the TrustedForm
17 partnership was a part of understanding that we didn't
18 really have control over leads, because that's something
19 that was sourced by the agencies.  So we partnered with
20 them in such a way to take on the cost of that
21 particular product and program so that it would not be
22 prohibitive to agents using that.
23     We knew that it was not necessarily going to
24 be solely in relation to our products.  Again, a lot of
25 these distributors and agents presented for competitors,

Page 105

1  but we were willing to pay for it regardless because we
2  didn't want to have these types of things happening and
3  be tied to it in any way, shape, or form.
4      Q.  Anything else?
5      A.  We developed training specific to, you know,
6  TCPA, telemarketing sales rules.  That became a -- I
7  don't know that it launched in 2018.  It might have been
8  2019.  That became a requirement for every agent who was
9  going to be on the platform.  In order to access a
10 product, they would have to take that training and pass
11 an assessment before they would be able to present
12 anything or access anything.
13     We worked with some of our various carriers,
14 obviously, letting them know what was going on and what
15 we were hearing in the marketplace.  Some of the
16 carriers chose to develop some of their own trainings on
17 that.  Some of them sent us stations to be distributed.
18 You know, there were, again, some carriers that shared
19 DNC lists with us.
20     And then, ultimately, by 2020 we actually had
21 as a contractual addendum that in order to be on our
22 platform, you had to use TrustedForm or some equivalent
23 to be able to validate leads upon request.
24     Q.  Isn't it true that the first thing HII did to
25 try to prevent its employees from receiving these

27 (Pages 102 - 105)

Page 106

1  robocalls was to send an e-mail to Marsha Griffin and
2  Scott Shapiro with the company directory phone numbers
3  to be placed on their do-not-call list?
4      A.  I don't recall seeing that in any of what I
5  reviewed, so I don't know if that was the first thing,
6  if that was somewhere during the process.
7      Q.  Is that something that happened?
8      A.  It could potentially have happened.  Again, I
9  don't recall seeing anything for that, so I can't speak
10  to it.
11      Q.  You're supposed to know these things and have
12  researched them.
13      A.  And --
14          MS. CHATTIN:  Hold on.  Object to the form.
15  BY MR. BURKE:
16      Q.  Was the --
17          MS. CHATTIN:  Wait until he asks a question.
18  BY MR. BURKE:
19      Q.  Was the internal phone list sent to anyone
20  other than folks affiliated with the Shapiro folks and
21  Duffie?
22      A.  I don't know the answer to that.
23      Q.  I think maybe Matt Herman received it too.
24          You don't know?
25      A.  Again, I don't know the answer to that.

Page 107

1      Q.  When did HII first learn about the lead
2  generator called Rising Eagle or John Spiller?
3      A.  First time I'm aware of us knowing about it
4  was Rising Eagle was mentioned in conjunction with
5  Health Advisors of America and the article in 2019.
6      Q.  We've already established that HII knew about
7  Health Advisors of America from at least February of
8  2018.
9          What did HII do in 2019 when it learned that
10  HAA was working with Rising Eagle?
11          MS. CHATTIN:  Object to the form.
12          THE WITNESS:  So I don't know that there was
13      any specific action that would have been taken
14      for that, because HAA, Health Advisors of
15      America, and the people that were associated were
16      no longer actively selling.
17      (Exhibit H was marked for identification.)
18      MR. BURKE:  This will be G.
19      MS. CHATTIN:  H.
20      MR. BURKE:  H.
21      MS. CHATTIN:  Can we take a break after this
22      exhibit?  She --
23      MR. BURKE:  (Nods affirmatively.)
24      MS. CHATTIN:  Can I have one?  Thanks.
25  BY MR. BURKE:

Page 108

1      Q.  So I have given you what's been marked as
2  Exhibit H.  This is a compilation.
3          I will direct your attention -- well, let's
4  just identify it.  It's one of the last documents
5  produced, Bates number 112842, consecutive to 43.  And
6  then a second document, 96877 through 96884.  And if you
7  look at 96878, you see that, to me, it looks like a
8  proposal for lead generation with Health Advisors of
9  America.
10          Do you see that?
11      A.  Yes.
12      Q.  HII engaged this proposal, didn't it?  It
13  accepted this proposal or began working with HAA?
14      A.  So to be candid, this is the first time that I
15  have seen this particular document.  So based on what I
16  have reviewed, I do not have any knowledge that this
17  actually got off the ground or that it was actually
18  done.
19      Q.  Isn't it true -- I mean, did you research
20  whether HII began working with HAA in 2019 in
21  preparation for this deposition?
22      A.  So, again, HAA as an entity within our system
23  set up to be able to present anything was only ever tied
24  to takeover block.  I do not recall seeing anything
25  about Blanchard coming back on and being active.  In the

Page 109

1  research I did the last sales associated with him as an
2  agency was in late 2018.
3          MR. BURKE:  All right.  This is a fine time
4      for a break.  Should we -- let's go off the
5      record.
6          THE VIDEOGRAPHER:  The time is 12:41 p.m.,
7      and we are now off the record.
8          (A lunch recess was taken.)
9          THE VIDEOGRAPHER:  This is the start of
10      Media Unit No. 3.  The time is 1:41 p.m. and we
11      are back on the record.
12  BY MR. BURKE:
13      Q.  Okay.  So when we took a break, we were
14  looking at Exhibit H.  I don't know if you guys are
15  looking at what I'm doing here.
16          Exhibit H is going to be the electronic
17  version that I'm going to put on the screen in a sec
18  that it's just a few pages longer than the paper one I
19  circulated.
20          All right.  So Exhibit H is a compilation
21  beginning at HII 112842 and then to 843, and then HII
22  96877 to 96884.
23          So these are communications in January and
24  February 2019 about hiring Angelic Marketing Group,
25  which is in conjunction with Health Advisors of America.

28 (Pages 106 - 109)

Page 110

1 And my question was, Did HII go through with
2 this proposal?
3 A. So to clarify, I haven't seen this before the
4 break. I did try to do some research on the break to
5 find out about this. I do not believe that we went
6 through with this proposal with this entity. When we
7 did do a search of the system, there was a separate
8 agent who had Angelic, I believe, in their e-mail
9 address. I didn't see this directly, so I will give you
10 the best information I have here on this, what was
11 reported to me.
12 That agent was originally set up in July of
13 2018, and it looks like it was associated with a
14 different account rep. They were set up as an MGA.
15 There was a limited amount of business that was done in
16 late 2018 and earlier in 2019 associated with that.
17 That particular individual was also set up as a GA under
18 a completely different sales rep and MGA hierarchy in
19 July of 2019 and did not look like there was any
20 business associated with that. So I do not believe this
21 particular opportunity ever went anywhere.
22 (Exhibit J was marked for identification.)
23 BY MR. BURKE:
24 Q. So I'm showing you what I have marked as
25 Exhibit J. This is HII 133553 --

Page 111

1 A. Uh-huh (indicates affirmatively).
2 Q. -- to 554. And there's a person called
3 matt@angelicmarketinggroup.com. You're saying that
4 angelicmarketinggroup.com in Exhibit J is something
5 different than Angelic Marketing Group in Exhibit H?
6 A. So that particular one I'm not sure whether
7 there's a relationship between those two. What is
8 mentioned in Exhibit H is a specific opportunity for
9 direct-to-consumer platform through Angelic Marketing,
10 and I did not see anything that supported we move
11 forward with that.
12 This particular e-mail in Exhibit J looks like
13 it is related to more of the Medicare side of the
14 business and potentially using somebody by the name of
15 Angelic Marketing to source leads. I don't really have
16 any specific knowledge of that side of the business,
17 and, again, this was not a term that I was looking at
18 during the preparation for this.
19 Q. What is Total Insurance Brokers?
20 A. Total Insurance Brokers is an agency that was
21 purchased by HII in approximately May 2019, and they
22 work primarily on the Medicare side of the business.
23 Q. And was business for Total Insurance Brokers
24 developed through outbound telephone calls?
25 A. I don't have any information on that. That's

Page 112

1 not a side of the business that I deal with.
2 Q. What is Blacklist Alliance?
3 A. I believe that it is a company that operates
4 in the lead vendor space to do some validation and
5 scrubbing, but I don't have any direct relationship with
6 them or direct knowledge of them.
7 Q. So just to be clear, I mean, are HII
8 subsidiaries accepting business derived from
9 telemarketing today?
10 A. I can't speak for that on the Medicare side of
11 the business. I'm not involved in the Medicare side of
12 the business.
13 Q. I'm not asking about Medicare or anything.
14 I'm just asking, generally, has any business associated
15 with the Defendant HII being developed through outbound
16 calling today? If you don't know, just say "I don't
17 know."
18 A. Yeah. I don't know.
19 Q. I would rather get an "I don't know" than a
20 guess. I mean, to me this communication from June 2020
21 from Blacklist Alliance, some sort of TCPA compliance
22 company, to Matt@Angelic Marketing Group talking about a
23 TCPA claim strongly suggests that, at least in 2020,
24 Total Insurance Brokers was accepting business through
25 Angelic Marketing Group derived from telemarketing.

Page 113

1 Would you agree that it seems at least that
2 way?
3 A. I mean, based on what's on the document, yes.
4 Q. And this was produced by HII, right?
5 A. I believe so, yes.
6 Q. And Exhibit J -- well, Angelic Marketing Group
7 is associated with -- at least the one that's in
8 Exhibit H is associated with Sean Duffie, right?
9 MS. CHATTIN: Object to the form.
10 THE WITNESS: I mean, I have not done any
11 specific research on these particular entities,
12 so I don't know if it's a similar name or if
13 they're the same entity.
14 BY MR. BURKE:
15 Q. Right.
16 You mean Angelic Marketing Group and Angelic
17 Marketing Group, right?
18 A. Yes. I don't know if the Angelic Marketing
19 referenced in Exhibit H is the same as the one
20 referenced in Exhibit J.
21 Q. Well, we at least know that in January 2019,
22 Amy Brady is making a pitch to Michael Devries and Brian
23 Krul to engage Sean Duffie, roughly, three months after
24 he was terminated, right?
25 A. Yes.

29 (Pages 110 - 113)

Page 114

1    Q.  Why did -- whose idea was it to terminate Sean
2  Duffie?
3    A.  So through the process of the PIP, when we got
4  towards the end of that, we had advised that we were
5  likely to move forward with termination.  When we
6  advised that internally to Amy and reached out to Sean
7  Duffie's upline, Matt Herman, to advise that there had
8  been another issue and that we needed to talk about it,
9  he sent an e-mail back to say, yeah, just go ahead and
10  get rid of him at this point.
11    Q.  So it's the upline, Matt Herman, then, that
12  made the final decision?
13    MS. CHATTIN:  Object to the form.
14    THE WITNESS:  We were moving towards
15    termination, anyway, like we were actively
16    drafting that letter, and, essentially, our
17    outreach to him was to try to generate a phone
18    call to say that this is what was going to
19    happen.
20  BY MR. BURKE:
21    Q.  Why not terminate anyone that was working with
22  Scott Shapiro rather than terminating Sean Duffie?
23    A.  So our contract was with Sean Duffie, so we
24  could terminate the contract with Sean Duffie.  As far
25  as, you know, Shapiro being an administrative piece, you

Page 115

1  know, again, we didn't have a contract with Scott
2  Shapiro to terminate.  So I think that what was
3  presented to us after the Duffie termination was that
4  Duffie who had been involved in some of this and that
5  Shapiro was not going to be following the same
6  practices, and that's why we agreed to bring Blanchard
7  back but, again, in an increased oversight.
8    Q.  Well, in fact, HII continued working with
9  Shapiro for several years, didn't it?
10    A.  I do not have any knowledge of us actually
11  working with him for several years after that.
12    Q.  What was Health Benefits Group?
13    A.  Health Benefits Group was the name associated
14  with Joshua Herman and Matt Herman.  They were an MGA
15  who recruited a variety of different GA downlines.  Sean
16  Duffie was one of those.
17    (Exhibit K was marked for identification.)
18  BY MR. BURKE:
19    Q.  So I'm going to show you Exhibit K.  This
20  document is HII Bates labeled 4040 through 4044.
21  It's -- the first page says "Health Benefit Group site
22  visits."
23    What is this document?
24    A.  This looks like it would be a report of a site
25  visit that was done in relationship to one of the

Page 116

1  distribution agencies.  Typically, we had an analyst who
2  would go out and sit down with the agency, kind of take
3  a look at the space that they were operating in, review
4  a variety of topics with them.  Sometimes, you know,
5  those of us who are in management would attend that as
6  well, not every single time, but sometimes we would, and
7  it was just to kind of review where are you at, what
8  kind of numbers are we seeing, in terms of performance,
9  trends, anything that you want to bring up for us that
10  you're concerned with.
11    With Health Benefits Group, it was a little
12  bit different than some of the other MGAs we worked
13  with, because primarily they didn't have direct
14  subagents.  What they did is they recruited smaller
15  distribution agencies, primarily in the South Florida
16  area.
17    Q.  So this report says that Sean Duffie's lead
18  acquisition was being conducted by Scott Shapiro,
19  doesn't it?
20    A.  It does.
21    Q.  The date of this report is October 25th, 2018.
22    Do you agree?
23    A.  That's the date of the visit, not necessarily
24  the date that the report was completed.
25    Q.  Okay.  So is it correct to say that on

Page 117

1  October 25th, 2018, HII -- at least as of that date, HII
2  knew out in the open that Scott Shapiro was developing
3  leads for Sean Duffie?
4    A.  I would say that that information was probably
5  relayed during that visit, yes.
6    Q.  So, again, why terminate Sean Duffie when the
7  lead acquisition was being conducted by someone else?
8    A.  So, again, Sean Duffie is the person that we
9  have the contract with and the person whose access we
10  could terminate.  You know, I believe with
11  Mr. Blanchard, he was actually set up before the
12  termination was done with Duffie and based on the
13  attestations that were made to us by the account rep.
14    Q.  But the TCPA problem was with the lead
15  acquisition, right?
16    A.  Yes.
17    Q.  And other agents were working with Scott
18  Shapiro, right?
19    A.  Yes.  He had subagents.
20    Q.  Were those subagents terminated?
21    A.  I don't believe the subagents would have been
22  terminated for Sean Duffie's organization, because
23  subagents traditionally are not involved in any lead
24  acquisition.
25    Q.  So no?

30 (Pages 114 - 117)

Page 118

1    A. No.
2    Q. Was there any directive to other agents, Hey,
3 quit working with Scott Shapiro, he's on a black list?
4    A. Not to my knowledge, no.
5    Q. Why not?
6    A. I don't know.
7    Q. I mean, that could have really helped,
8 couldn't it?
9       MS. CHATTIN: Object to the form.
10      THE WITNESS: I mean, from that perspective,
11      knowing what we know now, yes, based on what we
12      knew at the time and how we were, you know,
13      dealing with it at the time, because this was
14      realtime decisions, I think we kind of relied
15      upon our attestation from our account rep that
16      things were going to be different and we felt
17      like we were taking steps to do increased
18      oversight to make sure that they would be.
19 BY MR. BURKE:
20   Q. So this report is seven days before Duffie was
21 terminated, right, roughly?
22   A. Approximately, yes.
23   Q. And instead of going out and saying -- and HII
24 knew that it was the lead generator, not the agent that
25 was making the calls, right?

Page 119

1    A. Typically lead generators are the ones that
2 made the calls, yes.
3    Q. So instead of, like, attacking the problem at
4 its source, Scott Shapiro, instead HII terminated the
5 middleman, Sean Duffie, right?
6       MS. CHATTIN: Object to the form.
7       THE WITNESS: So, again, this may be a
8       definitional understanding. When we were looking
9       at lead acquisition being conducted by Scott
10      Shapiro, we were looking at that from the
11      perspective of he was going out and sourcing
12      various lead vendors, not that he was actually
13      generating leads in and of himself.
14 BY MR. BURKE:
15   Q. Yeah.
16   A. So if he attested to us and it was attested to
17 us by our account rep that he had identified who the
18 problem vendors were and that he was not going to work
19 with those vendors and he was agreeing to additional
20 oversight and only to work through a program that we
21 felt comfortable was going to give us the validations we
22 needed, then we were willing to work with it at that
23 point and see what happened.
24      Ultimately, he didn't get on board with that,
25 and we didn't continue working with him.

Page 120

1    Q. So, wait. You're saying that Scott Shapiro
2 attested to something?
3    A. As far as telling us, the account rep, that he
4 was no longer going to be working with the particular
5 problem vendors.
6    Q. An attestation is like a sworn statement. Did
7 Mr. Shapiro ever make a sworn statement that he was
8 going to stop working with the bad actor lead
9 acquisition folks?
10   A. Not to my knowledge.
11   Q. Did HII ever ask Mr. Shapiro who he was
12 working for that was making so many illegal robocalls?
13   A. I don't know that we have names, no.
14   Q. Why would you not ask?
15      MS. CHATTIN: Object to the form.
16      THE WITNESS: Again, at the time, the way
17      that we looked at it was we thought we had a
18      solution, a place for him to move forward where
19      we could feel more comfortable that the leads he
20      would be getting would be good.
21 BY MR. BURKE:
22   Q. And that comfort was derived from Mr. Shapiro
23 just telling someone else that he was going to stop?
24      MS. CHATTIN: Object to the form.
25      THE WITNESS: It was a combination of that

Page 121

1 and the fact that he was agreeing to get on the
2 TrustedForm product that we had faith in.
3 BY MR. BURKE:
4    Q. Did Mr. Shapiro ever get on the TrustedForm
5 product?
6    A. No. The agency with Mr. Blanchard and
7 Mr. Shapiro did not.
8    Q. Right.
9       But HII kept working with Mr. Shapiro, didn't
10 it?
11   A. For approximately a month under the Beau
12 Blanchard setup.
13   Q. Not thereafter?
14   A. Not to my knowledge.
15   Q. And Shapiro had problems from the beginning,
16 didn't he?
17      MS. CHATTIN: I don't remember.
18      THE WITNESS: So I don't know that we would
19      have classified Shapiro as being a problem.
20      Shapiro was looked at as more of an office
21      manager, administrator.
22      I think that Duffie, you know, there were
23      some issues fairly shortly thereafter, again,
24      which, ultimately, culminated in him being put on
25      a performance improvement plan.

31 (Pages 118 - 121)

1     MR. BURKE: I'm on Exhibit L.
2     (Exhibit L was marked for identification.)
3  BY MR. BURKE:
4     Q. Do you know who Billy Vargas is?
5     A. I don't recognize the name, no.
6     Q. Isn't it true that Shapiro had a licensed
7  insurance agency called Licensed Insurance Advisors?
8     A. I'm not familiar with that one.
9     Q. Or that Shapiro was working with Licensed
10  Insurance Advisors?
11     A. Again, I'm not familiar with that name.
12     (Exhibit M was marked for identification.)
13  BY MR. BURKE:
14     Q. I'm showing you what's been marked as
15  Exhibit M. This document is HII 4098 through 4108.
16  This is a site visit report, isn't it?
17     A. It is.
18     Q. Okay. And the site visit report says that
19  there was an agency file review and interview with the
20  agent of record and Scott Shapiro.
21     Do you see that?
22     A. I do.
23     Q. What was Scott Shapiro's relationship with
24  Licensed Insurance Advisors?
25     A. I'd have to refer to the report. I am not

1  familiar with it.
2     Q. Well, the report is here. You can read it.
3     MS. CHATTIN: It's up on the screen, for the
4     record.
5     MR. BURKE: Yeah. It's up on the screen.
6  BY MR. BURKE:
7     Q. And notice that the approach on page 6 of this
8  doesn't mention anything about the TCPA or
9  telemarketing.
10     Do you agree?
11     A. I believe issues related to TCPA or
12  telemarketing would likely be either in the audit
13  preparedness guide or the compliance audit agenda, but,
14  no, it doesn't specifically state that there.
15     Q. Okay. So, I mean, I'm just sort of scrolling
16  through this thing. There is a reference to a phone
17  system being VICI dial.
18     Do you see that?
19     A. Uh-huh (indicates affirmatively), yes.
20     Q. That's the same system that was being used at
21  that same time by Health Advisors of America, isn't it?
22     A. Yes, it is.
23     Q. And you see that the agent said they had an
24  internal DNC list and conducted training. And while
25  we're scrolling through, I'm sort of looking for

1  references for what Mr. Shapiro did, if anything,
2  different than what he did for Mr. Duffie's agency.
3     Do you have any reason to believe that
4  Mr. Shapiro's relationship with this company had
5  anything -- was anything different than the lead
6  generation relationship that he had with Mr. Duffie's
7  agency?
8     MS. CHATTIN: Object to the form.
9     THE WITNESS: Other than the fact that he
10     was mentioned as being in the meeting, I don't
11     have any idea of what he was involved with, with
12     that agency.
13  BY MR. BURKE:
14     Q. Okay. And Licensed Insurance Brokers was an
15  agency working with HII until at least 2020, right?
16     A. Again, I was not familiar with that one coming
17  in here.
18     Q. I put on the screen HII 128644. Who is Andrea
19  Brandenburg?
20     A. Andrea Brandenburg is an employee in our agent
21  contracting department.
22     Q. It looks like Licensed Insurance Advisors --
23  from this e-mail chain, it looks like Licensed Insurance
24  Advisors is either being re-onboarded, or something like
25  that.

1     Would you agree?
2     A. I apologize, I'm just reviewing the
3  documentation that's on the screen. Can you scroll
4  down?
5     So I don't know, based on this e-mail, whether
6  they were being onboarded to work on under 65 or whether
7  they were being considered as a potential downline for
8  Medicare. I know that there were, on the Medicare side,
9  kind of preaudit visits that they would go through and
10  they would validate things before determining to work
11  with somebody.
12     I was not involved in that process, so I don't
13  know the specifics of where this would have fallen in
14  that process.
15     Q. Why wouldn't -- maybe I asked this before, but
16  I just -- it comes to mind again. Why wouldn't HII --
17  or why didn't HII just stop working with anyone who had
18  anything to do with Scott Shapiro given that Mr. Shapiro
19  was in charge of a lead generation that caused so many
20  TCPA complaints?
21     A. So, again, to my knowledge and based on what I
22  reviewed for this, I didn't see any evidence that we
23  continued working with Mr. Shapiro. I can understand
24  that there's documentation there that says that it was
25  potentially an agency that was being considered. Again,

32 (Pages 122 - 125)

Page 126

1  I don't know if we moved forward or not. I don't know
2  if his presence would have been a reason to move forward
3  or not. I wasn't involved in those conversations at the
4  time.
5     Q. So why didn't HII just instruct everyone to
6  stop working with Scott Shapiro?
7     A. By "everyone," you mean our company?
8     Q. Everyone in the company and all of the
9  insurance agents that were working to market HII and
10  others goods and services?
11     A. So that comes from a perspective of I don't
12  know what kind of risk or liability might have been
13  considered in terms of us going out to a wider
14  marketplace and saying: Do not work with this
15  particular person.
16     I would imagine that that had to be weighed in
17  to any communications.
18     Q. Just a second. Is this the real reason or are
19  you just -- it sounds like you're saying you imagined.
20  I mean, do you know the reason, or are you just sort of
21  deducting a reason based upon --
22     A. I know --
23     MS. CHATTIN: Hold on.
24  BY MR. BURKE:
25     Q. -- your experience?

Page 127

1     MS. CHATTIN: Object to the form. Go ahead.
2     THE WITNESS: So --
3  BY MR. BURKE:
4     Q. I just want the real reason.
5     A. Yeah. From Mr. Shapiro, specifically, I have
6  never had any conversations about that or seen any
7  documentation around that.
8     Q. So as you sit here today testifying for HII,
9  there's no answer?
10     A. I don't know.
11     Q. Has HII ever had a written do-not-call policy
12  that was available upon demand to consumers?
13     A. My understanding is that if a consumer asks
14  for a do-not-call policy, they are given either a
15  written document, if it's an e-mail, to say this is our
16  process. There's also a policy and procedure that
17  contains do-not-call language in it, and I believe legal
18  has provided that in the past in a redacted format to
19  specify that particular section.
20     Q. So is the answer "yes" or "no"?
21     A. Yes.
22     Q. Okay. Tell me what that document is or are.
23     A. So in the more informal sense, it would have
24  been an e-mail that was sent to a consumer describing
25  what the process was. Once we moved to a formal

Page 128

1  document, there is a -- I believe it's in the outbound
2  call policy. There's a section that talks specifically
3  about DNC, and that has been provided on a redacted
4  basis, from my understanding, by legal.
5     Q. So that's two things, right?
6     A. Uh-huh (indicates affirmatively).
7     Q. Yes?
8     A. Yes. Sorry.
9     Q. So you are testifying here that there was an
10  e-mail that was sometimes sent, right?
11     A. An e-mail that would be generated, yes.
12     Q. Tell me about that e-mail.
13     A. Again, I don't believe that it was a formal
14  policy document. It would be more of a if a consumer
15  inquired as to what the do-not-call policy was and
16  wanted something in writing, and then customer support
17  would put down some bullet points and send that off to
18  the consumer.
19     Q. And you're sure that that e-mail exists?
20     A. I have been advised that that was the process.
21     Q. Who --
22     A. I haven't seen it.
23     Q. Who told you that that was the process?
24     A. Originally, I believes it was Dan Garavuso,
25  because this is an older process.

Page 129

1     Q. And what did the e-mail look like?
2     A. Again, I haven't seen a copy of one, so I
3  don't know.
4     Q. Well, I mean, you're here to testify about the
5  do-not-call policies, right?
6     A. Yes.
7     Q. But you've never seen it?
8     A. I have not seen that specific informal e-mail,
9  no.
10     Q. And did Mr. Garavuso tell you about that in
11  preparation for today's deposition or just in passing
12  ten years ago?
13     A. Historically when we were working in the
14  department, not for today's deposition.
15     Q. That e-mail doesn't exist, does it?
16     MS. CHATTIN: Object to the form of the
17     question.
18     THE WITNESS: I have not seen that. I can
19     only tell you what I was advised the process was.
20  BY MR. BURKE:
21     Q. So you don't even know, right?
22     MS. CHATTIN: Object to the form.
23     THE WITNESS: I don't know.
24  BY MR. BURKE:
25     Q. What's the second one?

33 (Pages 126 - 129)

Page 130

1    A.   The second one is the outbound call policy,
2   and that is a policy and procedure.  I'm not 100 percent
3   sure that's the appropriate title, but I know there is a
4   section that speaks to the DNC policy, and I was advised
5   that if there is a formal request made, then that
6   redacted version is sent specific to the DNC policy.
7    Q.   Okay.  And that policy is literally called
8   outbound call policy, isn't it?
9    A.   I believe so, yes.
10    Q.   And when was that policy initiated?
11    A.   I think it was first written approximately
12   2020.
13        (Exhibit N was marked for identification.)
14   BY MR. BURKE:
15    Q.   Okay.  I'm showing you what's been marked as
16   Exhibit N, Bates BFYT852 to 856.
17        Is this the document that you're talking
18   about?
19    A.   I believe so, yes.
20    Q.   Okay.  And, again, we're talking about the
21   public-facing do-not-call policy, right?
22    A.   Yes.
23    Q.   This document that has a footer that says
24   "Internal Use Only, Not For Distribution"?
25    A.   My understanding is that's why a redacted

Page 131

1   version is sent.
2    Q.   I see.
3        So what's redacted when this internal use-only
4   document is sent to a consumer that says, Hey, send me
5   your DNC policy?
6    A.   So this is sent by legal.  I don't actually do
7   the redaction.  What I was advised is that the specific
8   items talking about do-not-call lists is what is sent to
9   the consumer.  Anything outside of that would be
10   redacted.
11    Q.   So like we're on bullet point 4 on page 3 of
12   this policy, and there's seven paragraphs or eight
13   paragraphs under -- eight paragraphs under bullet
14   point 4.
15        Which ones are the ones that are sent to
16   somebody who requests a copy of HII's do-not-call
17   policy?
18    A.   To the best of my recollection on the example
19   that I saw, it would be paragraph 3, speaking about
20   do-not-call lists and how people are added to it.
21    Q.   So I see the effective date is May 26th, 2020,
22   and this is version No. 1.  So is it fair to say that
23   this is the first written policy of its kind?
24    MS. CHATTIN:  Object to the form.
25    THE WITNESS:  So that particular policy

Page 132

1   document was created with a number of other
2   policy documents.  It was just part of an
3   initiative, you know, to better capture things.
4        So this was the first version of that and would
5   have superseded anything previously.
6   BY MR. BURKE:
7    Q.   Well, the only thing previously is an e-mail
8   that we are not sure exists, right?
9    MS. CHATTIN:  Object to the form.
10    THE WITNESS:  Yes.
11   BY MR. BURKE:
12    Q.   All right.  So I notice that this policy
13   doesn't say whether or not you're allowed to call phone
14   numbers that are on the do-not-call list.
15    A.   It looks like -- I apologize.  I'm reading it.
16    MS. CHATTIN:  Sorry.  Is that a question?
17    MR. BURKE:  Yeah.
18    MS. CHATTIN:  What's the question?
19   BY MR. BURKE:
20    Q.   Does the policy tell folks whether they're
21   allowed to call phone numbers on the do-not-call list?
22    A.   It speaks to the fact that things would be
23   added, that they will be updated according to the
24   national list on a daily basis.  It doesn't look like it
25   specifically specifies that item, no.

Page 133

1    Q.   So, like, if a lead gen -- well, did --
2    A.   Can you -- I apologize.  Can you scroll down a
3   little?
4    Q.   Sure.
5    A.   So that was paragraph 3, 4, 5.  I believe
6   paragraph 6 -- sorry.  Under bullet 4, paragraph 6
7   specifies that outbound calls should follow caller ID
8   and authentication guidelines, only be made if the
9   source of the number is identified as TCPA-compliant,
10   and I believe the assumption there would be that
11   TCPA-compliant leads are either going to have the
12   express consent or have been scrubbed against the
13   do-not-call list.
14    Q.   So like under HII's policy, are lead gens or
15   agents for Total Insurance Brokers, or anyone, allowed
16   to make outbound telemarketing calls to phone numbers
17   that are on the do-not-call list if they believe they
18   have prior express written consent?
19    A.   That would be compliant with the TCPA, so yes.
20    Q.   And is that made clear here, I guess, in this
21   paragraph that says, "Lead lists will be TCPA-compliant
22   as attested to by the lead generation vendors"?
23    A.   Yes, in paragraph 2.
24    Q.   Why trust lead generation vendors who say that
25   they have TCPA-compliant lists?

34 (Pages 130 - 133)

1      MS. CHATTIN: Object to the form.
2      You can answer.
3      THE WITNESS: I will be honest, I don't know
4      how to answer that question, because it feels
5      slightly like a hypothetical question. If you're
6      not generating or sourcing your own leads, then
7      you would have to work with vendors.
8   BY MR. BURKE:
9      Q. Well, I mean, HII could just say, Hey,
10  insurance agents, stop working with lead generation
11  vendors and develop your own leads, right?
12     A. I mean, in theory. I --
13     Q. I mean, that should stop the problem of lead
14  generation vendors robodialing a billion phone numbers
15  in six months, right?
16     MS. CHATTIN: Object to the form.
17     THE WITNESS: So that would potentially
18     solve a problem with vendors. I don't know that
19     it would solve the underlying issue of making
20     sure that leads are TCPA-compliant, because you
21     would then be asking individuals who don't have
22     any particular administrative, legal, any of that
23     kind of experience to try to interpret those
24     guidelines themselves.
25  BY MR. BURKE:

1      Q. Well, you think the lead generation vendors
2   have better ideas about what is TCPA-compliant than your
3   agents?
4      A. I think that they are in the business of
5   creating leads and sourcing leads and that it is in
6   their interest to make sure that those leads are going
7   to be compliant with the regulations of that industry
8   and would have the infrastructure to do so --
9      Q. And that's -- I mean, is that the official
10  position of HII on that subject?
11     MS. CHATTIN: Object to the form.
12     THE WITNESS: That's not a specific
13     conversation that I have had. That's more of a
14     general.
15  BY MR. BURKE:
16     Q. Well, I want to know, for HII, why it trusts
17  the attestation of lead generation vendors rather than
18  just set up a system where you don't really have to
19  trust anybody that leads are, quote, TCPA-compliant?
20     MS. CHATTIN: Object to the form.
21     Go ahead.
22     THE WITNESS: Again, I don't know how to
23     answer that question when you're talking about
24     how the marketplace in general operates. And I
25     don't know that the company has taken a specific

1      position that the way the overall marketplace
2      operates is correct or incorrect.
3   BY MR. BURKE:
4      Q. Well, I mean, I'm not sure that was my
5      question. But, I mean, you can get customers in ways
6   other than telemarketing, right?
7      A. There are other options, yes.
8      Q. Okay. Like lots of them, right?
9      A. There are variations. It depends on what your
10  business model is.
11     Q. Right.
12     You can design your business to gain customers
13  in ways other than telemarketing for insurance, right?
14     A. Yes. I mean, you can do face to face. You
15  can do direct-to-consumer online platforms. There are
16  options.
17     Q. So, I mean, was it ever discussed at HII to
18  just prohibit telemarketing?
19     A. Again, at various points, possibly, yes. We
20  certainly did work on building out our
21  direct-to-consumer platforms. That was an initiative
22  that existed. That's an initiative that, you know, is
23  still in existence. In 2021 we basically stopped
24  working with the majority of the independent
25  distribution and call centers, because we decided to

1   restructure and reframe or business model on the
2   accident and the health side. I can't speak to
3   conversations that had been had on the Medicare side. I
4   didn't review that for today.
5      Q. Well, I mean, when all these complaints were
6   coming in, I think I saw a colorful e-mail calling this
7   complaint snowflakes, the complaints keep -- TCPA
8   complaints keep rolling in, they're like snowflakes, but
9   they're all the same.
10     I mean, if you've got stuff like that going
11  on, communications like that from the director of
12  compliance, shouldn't you start thinking about cutting
13  off the telemarketing?
14     MS. CHATTIN: Object to the form.
15     THE WITNESS: Well, I think that we did make
16     changes to how we, you know -- I apologize. I
17     want to make sure that I'm chronologically
18     putting this together. I think that the original
19     thought process when this first started happening
20     was that there was perhaps a gap in understanding
21     our education, so there were some efforts made
22     to, you know, reiterate what the responsibilities
23     were and what needed to happen. There was
24     training that was developed.
25     There was partnership on the technological

35 (Pages 134 - 137)

Page 138

1  side to try to provide something to these
2  telemarketing agencies to make sure that they
3  could get something that was going to be reliably
4  sourced and that everybody could feel confident
5  in. Direct to consumer was, you know, still
6  being built out as an option. There were
7  conversations with some of the various
8  independent agencies about moving to
9  direct-to-consumer platforms instead of doing
10  call center business.
11     But those types of initiatives, they take
12  time, right? We also started looking at how do
13  we enhance our controls. Can we add things like
14  TrustedForm or equivalence to our contract
15  addendums, which we did. And, you know, in
16  January of 2020 we had updated contracts and
17  addendums sent out to everybody.
18     You know, by August of 2021, we basically
19  identified that we didn't want to work with
20  telemarketing agencies on the accident and health
21  side anymore. This would have been a part of
22  that conversation, but, certainly, not all of it,
23  and we sent terminations to everybody and stopped
24  working with everybody except like one
25  independent distributor.

Page 139

1  BY MR. BURKE:
2     Q. What's the one independent distributor?
3     A. Assurance IQ.
4     Q. And so all during this time, the robocalling
5  continued, or at least through 2018 into 2019, right?
6     A. Again, there were still TCPA complaints that
7  came in. I don't know that every single one of them was
8  associated with robocalling.
9     Q. And so HII gained a lot of business through
10  prerecorded message telemarketing, didn't it?
11     MS. CHATTIN: Object to the form.
12     Go ahead.
13     THE WITNESS: I wouldn't know how to attest
14     to that. That's not a thing that I would be able
15     to track back and say, This particular call came
16     from this particular location with this
17     particular lead vendor across the board. You
18     know, that's not a data point that I can easily
19     pull out.
20  BY MR. BURKE:
21     Q. Well, didn't HII do an analysis of the phone
22  numbers that were taken from the VICI dial database and
23  compare it with its own customer and prospective
24  database?
25     A. I believe that was a request, but I don't know

Page 140

1  that I saw a copy of that.
2     Q. Thousands and thousands and thousands of phone
3  number matches.
4     Did -- other than as part of that
5  court-ordered process, did HII ever do any sort of
6  analysis of, you know, how many -- well, I know it did
7  this. HII kept track of how many new customers it
8  gained through particular agents, didn't it?
9     A. Yes. That's a data point that we would have.
10     Q. Does -- and HII also paid Scott Shapiro
11  directly, didn't it?
12     A. I do not know the answer to that one off the
13  top of my head.
14     Q. Have you ever heard of an override?
15     A. Yes.
16     Q. What's an override?
17     A. In broad strokes, an override is typically a
18  portion of a policy purchase that would be given to
19  somebody outside of the selling agent. Typically that's
20  going to go to an upline for the idea that they're
21  helping to serve administrative functions.
22     Q. Scott Shapiro got overrides, didn't he?
23     A. I have not seen that in the documentation that
24  I reviewed, so I don't know the answer to that.
25     Q. Isn't that the topic that we added a few days

Page 141

1  ago to research and provide testimony about, that we
2  read into the record this morning?
3     MS. CHATTIN: Objection.
4     You can answer if you can.
5     THE WITNESS: I apologize, I don't recall
6     the specifics of that topic. I thought it was
7     related to something else. Is it possible to
8     read that back? This morning was a long time
9     ago.
10     MR. BURKE: I guess so.
11     MS. CHATTIN: It's not the one you read into
12     the record. It's a different one. It's topic
13     35.
14     THE WITNESS: Yeah. I apologize. I looked
15     at it from the perspective of the people that I
16     knew he had a relationship with as an agency. I
17     didn't look specifically at compensation for him,
18     because he doesn't have an agent of record in our
19     system.
20     MR. BURKE: So --
21     MS. CHATTIN: Can we take a break when
22  you're ready to take a break?
23     MR. BURKE: Yeah. Let's take a break.
24  Let's take a break now.
25     MS. CHATTIN: Okay.

36 (Pages 138 - 141)

Page 142

1  THE VIDEOGRAPHER: The time is 2:35, and we
2  are now off the record.
3  (A recess was taken.)
4  THE VIDEOGRAPHER: The time is 2:57 p.m.,
5  and we are back on the record.
6  BY MR. BURKE:
7  Q. So in March 2019, who is Scott Shapiro and
8  Marsha Griffin working with to develop leads for HII?
9  A. I'm not aware that they were working with
10  anybody to develop leads for HII.
11  Q. Well, if they weren't working to develop leads
12  for HII, then why did HII send DNC requests to them in
13  that time period?
14  A. I think the only DNC requests that would have
15  been sent probably would have come from their account
16  rep, and it's possible she just had a distribution list
17  that she didn't update. I don't know a specific answer
18  to that.
19  Q. You don't know the answer, do you?
20  A. No.
21  Q. Because HII 146789 -- I will make this an
22  exhibit, I guess -- shows a specific DNC both from Brady
23  to Griffin and then Griffin to Brady, right?
24  A. It looks like Amy sent something that Griffin
25  received, yes.

Page 143

1  Q. And the only reason to send DNC information to
2  someone is if they're making outbound calls, right?
3  MS. CHATTIN: Object to the form.
4  THE WITNESS: I don't think that that's
5  true. I think there's a multiple number of
6  reasons that it could be sent, and I don't have
7  any context for that.
8  BY MR. BURKE:
9  Q. Except that you're the corporate witness
10  that's designated to testify about this, and this is the
11  precise subject matter of this lawsuit, right?
12  MS. CHATTIN: Object to the form of the
13  question.
14  THE WITNESS: Yes, in that this is part of
15  what was produced. But there's no context as to
16  why it was sent.
17  BY MR. BURKE:
18  Q. But you understand the purpose of this
19  deposition is for me to learn what the context is by
20  asking the representative of the corporation during this
21  deposition today, right?
22  A. Yes.
23  Q. I mean, what am I supposed to do? It seems
24  like you know just as little or less about this stuff
25  than I do. What did you do to research HII's

Page 144

1  relationship with Scott Shapiro in 2019 in preparation
2  for today's deposition?
3  MS. CHATTIN: Object to form.
4  You can answer.
5  BY MR. BURKE:
6  Q. Anything?
7  A. I reviewed the documents that were produced.
8  I --
9  Q. This is one of those.
10  MS. CHATTIN: Let her finish her answer.
11  Go ahead.
12  THE WITNESS: I went through the system
13  information that we had to try to build context
14  around those documents and answer these questions
15  as best as I am able to.
16  BY MR. BURKE:
17  Q. Well, it's been established -- I mean, we --
18  MR. BURKE: This is not right, Danielle.
19  It's not right. I think I'm terminating the
20  deposition.
21  MS. CHATTIN: Okay. Let's go off the
22  record.
23  THE VIDEOGRAPHER: The time is 3:01 p.m.,
24  and we are now off the record.
25  (A recess was taken.)

Page 145

1  THE VIDEOGRAPHER: The time is 3:19 p.m.,
2  and we are back on the record.
3  BY MR. BURKE:
4  Q. All right. Do you remember a person by the
5  name of Seminario?
6  A. Yes, I believe he was a GA.
7  Q. General agent?
8  A. Yes.
9  Q. Mr. Seminario was working with Scott Shapiro
10  and Marsha Griffin, wasn't he?
11  A. I know that he worked in the same area. I
12  know that he was part of the same Herman downline. I
13  don't specifically recall seeing that name.
14  Q. All right. Do you remember an e-mail exchange
15  in April 2019 about Seminario?
16  A. If it's possible to see it, but I don't recall
17  it off the top of my head, no.
18  Q. Okay. So I will mark this Exhibit O.
19  (Exhibit O was marked for identification.)
20  BY MR. BURKE:
21  Q. It's five pages, beginning at HII 114429.
22  A. Okay.
23  Q. Do you remember this exchange, as we scroll
24  down?
25  A. I don't remember the specific e-mail, but I

37 (Pages 142 - 145)

Page 146

1  think I remember the situation, which was we sent a site
2  analyst down, and they were supposed to be visiting with
3  Mr. Seminario. He was in the same office with Shapiro
4  and Griffin and Duffie, and so it was raised as a
5  concern.
6      Q. Okay. So does this refresh your recollection
7  as to whether Shapiro and Griffin were generating leads
8  for HII going into the spring of 2019?
9      A. I mean, they may have been generating leads
10  from Mr. Seminario. He wouldn't have been exclusive. I
11  think our overall concern was that at that point we
12  didn't really want to work with Shapiro and Griffin at
13  that point.
14     Q. How do you know that?
15     A. In reading the e-mail, we're talking about
16  there being specific concerns.
17     Q. Okay. Did HII do anything about Seminario
18  working in the same location as Health Advisors of
19  America using the same lead generator as Scott Shapiro
20  and office manager Marsha Griffin as Health Advisors of
21  America in April 2019?
22     A. I don't recall if there was a specific action
23  taken. I'm sorry.
24     Q. I see Ashley Eastlack as part of this group.
25         Who is Ashley Eastlack?

Page 147

1      A. She would have been an agent.
2      Q. Ashley Eastlack was the agent whose name was
3  on the e-mail that was sent to our plaintiff, Robert
4  Hossfeld, wasn't it?
5      A. Likely she was the writing agent listed, yes.
6      Q. At about this exact time, wasn't it, spring of
7  2019?
8      A. I don't remember the specific date. I'm
9  sorry.
10     Q. I mean, you were -- you were the director of
11  compliance during this period, weren't you?
12     A. During this period? No. I was a senior
13  compliance manager.
14     Q. What did you think about Scott Shapiro, Marsha
15  Griffin in the spring of 2019 working with HII?
16     A. From a personal perspective?
17     Q. Yes.
18     A. So from a personal perspective, it would
19  definitely be a thing that I would look at to say, All
20  right, this is an agency or an instance that we should
21  probably pay some additional attention to.
22     Q. You thought that Shapiro and Griffin should be
23  given a second or third chance here?
24         MS. CHATTIN: Object to the form.
25         THE WITNESS: So I'm in compliance. From a

Page 148

1  personal perspective, I'm pretty risk averse.
2  BY MR. BURKE:
3      Q. Yeah. You're wearing your compliance hat --
4      A. Yeah.
5      Q. -- but you're you. Tell me what you think.
6      A. From a compliance perspective, I would
7  probably not have wanted to continue to work with him as
8  an individual.
9      Q. Did you voice that concern with Mr. Garavuso
10  or Devries?
11     A. I have had that conversation with Dan.
12     Q. Mr. Garavuso?
13     A. Yes.
14     Q. About when?
15     A. I mean, candidly, probably from the time frame
16  that we first started doing the performance improvement
17  plan. For me, it was a bit of a manpower issue, you
18  know. We're putting a lot of resources and working with
19  an agency, and I'm not 100 percent sure that it's
20  worthwhile, but this was kind of the infancy, right? We
21  were still trying to figure out what we needed to do and
22  how we needed to do it. And the thought process was
23  that we should have documented processes and be able to
24  document that we've given people opportunities and
25  they've consistently not met it. And then if we choose

Page 149

1  not to work with them, we can move forward from there.
2         But that was kind of still all in the process
3  of being developed at that point in time. And,
4  candidly, we had a lot of pushback. You know, a lot of
5  the agencies and distributors that we worked with felt
6  that we were being overly aggressive considering they
7  weren't inclusive with us. We got a lot of feedback
8  that nobody else was making them jump through the kind
9  of hoops that we were making them jump through when it
10  came to lead validations, or things of that nature.
11        So it was -- it was a bit of a struggle. And,
12  again, that's one of the reasons why we tried to, you
13  know, enhance some of our overall contracting. We
14  advocated for technological approaches to try to make it
15  easier and more straightforward so that we can hopefully
16  cut down some of that pushback and some of that
17  feedback.
18     Q. I mean, Duffie was generating a lot of
19  business for HII, wasn't he?
20     A. I don't know that I would say a lot of
21  business.
22     Q. Then why not just get rid of him on the first
23  shot?
24     A. The conversations at the time were more about
25  having processes in place and that this was a good

38 (Pages 146 - 149)

Page 150

1  opportunity to define those processes, figure out what
2  those processes should be, what was going to work, what
3  wasn't going to work, and then we could implement those
4  going forward.
5      Q.  I asked you some questions about overrides and
6  Scott Shapiro earlier.
7      Do you have a better recollection of the
8  overrides with regard to Scott Shapiro now?
9      A.  So I think my confusion on that is my
10  familiarity with overrides is typically that it's
11  something that goes to an upline agent, and he was not
12  an upline agent.  So I would not anticipate that he
13  would have an override, because I didn't see him as an
14  upline anywhere in our system or anywhere in our
15  documentation.
16      You know, I can't speak to what happened once
17  we paid out commissions or whether or not he had access
18  to specific bank accounts.  That's not something that,
19  you know, I would have validation on once it goes out
20  the door.
21      Q.  So did HII pay Scott Shapiro overrides?
22      A.  Not that I was able to see, no.
23      Q.  So do you deny that Scott Shapiro received
24  override payments from HII, or were you just unable to
25  find them easily in a search?

Page 151

1      A.  When we did the search, there were no results
2  that came up from that, so I have no reason to believe
3  that it occurred.
4      Q.  I mean, there's a host of communications
5  between Amy Brady at HII and Scott Shapiro and Marsha
6  Griffin talking about overrides being paid to Shapiro.
7      Did you see those in your searches researching
8  this issue?
9      A.  So I think that may be, again, may be a
10  terminology issue.  If Amy was interacting with him as
11  an administrator from the office, that wouldn't
12  necessarily indicate to me that he personally was
13  getting an override as much as an office that he was
14  working with as the administrator was getting an
15  override.
16      Q.  Well, which one was it?
17      A.  I believe that it would have gone to the
18  office based on what I was able to see.
19      Q.  What office?
20      A.  Most likely Duffie.
21      Q.  And the stuff that I'm reading is inconsistent
22  with that setup.  I will put something down.  Okay.  So
23  this will be Exhibit -- sorry, guys.  Are we on P?
24      MS. CHATTIN:  Uh-huh (indicates
25      affirmatively).

Page 152

1      (Exhibit P was marked for identification.)
2  BY MR. BURKE:
3      Q.  All right.  Exhibit P is Bates 8540 to 8541.
4  And Amy Brady literally says, "Scott's account gets an
5  override of approximately $15 per core sale."
6      Do you see that?
7      A.  Yes.
8      Q.  Does that refresh your recollection as to
9  whether HII was paying the lead generator Scott Shapiro
10  directly for sales generated through Scott?
11      A.  So, again, in looking at this, Scott did have
12  links that were created within our system for him to be
13  able to sell.  There was never any business under those
14  links.  So looking at this, I would have thought this
15  would have gone to both of those items.  And in
16  validating there was no business on that, he would not
17  have actually gotten any overrides.
18      Q.  So you think Scott Shapiro negotiated for $15
19  per sale in December of 2017 and then received nothing?
20      A.  If he was under that link and he was to
21  recruit, he would get that.  But, yes, I would --
22      Q.  I'm not talking about links.  Do you think he
23  got nothing?  He negotiated for $15 per sale and then
24  got nothing?
25      A.  I --

Page 153

1      MS. CHATTIN:  Object to the form.
2      Go ahead.
3      THE WITNESS:  Yeah.  I don't think he
4  actually sold anything.
5  BY MR. BURKE:
6      Q.  I wonder if it was disclosed to the FTC that
7  there were overrides to Simple Health.
8      Are there any sort of like off-the-books
9  accounts or secret accounts where overrides are paid
10  from that wouldn't be accessible through the normal
11  database that you were searching?
12      MS. CHATTIN:  Object to the form.
13      THE WITNESS:  Not to my knowledge.
14  BY MR. BURKE:
15      Q.  Did you ever investigate that possibility?
16      A.  I mean, I have asked at various points how our
17  commissions are structured, and it's been through the
18  actual commission accounts, so it's based on what's sold
19  on a link and then there's commission addendums that
20  specify who gets what on that.
21      Q.  I'm not talking about contracts.  I'm talking
22  about something different, like what these e-mails are
23  talking about.
24      A.  I personally did not ask that question, no.
25      Q.  Even though you're the person who is in charge

39 (Pages 150 - 153)

Page 154

1  of looking into whether there were overrides, right?

2     MS. CHATTIN: Object to the form.

3     THE WITNESS: Again, looking at this e-mail,

4    looking at the information, I believed that I had

5    the correct and appropriate answer.

6  BY MR. BURKE:

7    Q. I mean, here's another e-mail in the same

8  chain: "Moneys on those plans go to the override to

9  Chicago" -- "to Shapiro and pays for the customer

10  service/retention process that goes to Simple Health."

11    Was Shapiro making calls for Simple Health

12  too?

13    A. So the customer service and retention process

14  that's listed there is not a lead process. At the time,

15  Simple Health was contracting with other agencies in the

16  area to provide customer service and retention services

17  to those agencies, so if Sean Duffie wrote a policy,

18  then potentially a consumer who called in and wanted to

19  speak about that policy would go to that setup with

20  Simple Health.

21    MR. BURKE: Let's take a quick break.

22    THE VIDEOGRAPHER: The time is 3:36 p.m.,

23  and we are now off the record.

24    (A recess was taken.)

25    THE VIDEOGRAPHER: The time is 3:45 p.m. and

Page 155

1  we are back on the record.

2    (Exhibit Q was marked for identification.)

3  BY MR. BURKE:

4    Q. Okay. So I'm showing you what's been marked

5  as Exhibit Q. This is a year later than the stuff we

6  were talking about before.

7    First of all, can you tell whose initials

8  those are at the top? Does that mean anything to you?

9    A. I have no idea.

10    Q. So reading this e-mail, which is at HII

11  2954 -- it's threes pages long -- what I understand this

12  to say is that because Scott Shapiro doesn't have

13  licenses in all the states that he markets to, he passed

14  the commission that he receives from HII to Sean Duffie.

15    Do you agree?

16    A. I apologize, I'm looking at the e-mail. Yes.

17    Q. Okay. So is it accurate to say that HII paid

18  Shapiro for the business that he created through

19  payments to Duffie's agency?

20    A. I would say that it is accurate that there was

21  payments that were assigned to specific codes for

22  Shapiro, yes.

23    Q. Okay. That's just a "yes" to my question,

24  right?

25    A. Sorry, yes.

Page 156

1    Q. Okay. And so Shapiro does have a code in the

2  system, right?

3    A. He does have a code in the system, yes.

4    Q. And so are those the codes you searched that

5  had nothing in them?

6    A. Yes. I did not see anything when I searched

7  it, but I searched for business written under those

8  codes.

9    Q. Because reading this e-mail it seems to me

10  that there was like a whole bunch of money that was

11  sitting at HII that was earmarked for Shapiro but they

12  weren't -- HII wasn't paying it to Shapiro because he

13  didn't have all the proper licenses.

14    Would you agree?

15    A. That looks like it was the original intention

16  and it wasn't paid, yes.

17    Q. And we've established that as of around this

18  same time, at least, HII knew that both Duffie and

19  Shapiro were affiliated with Health Advisors of America,

20  right?

21    MS. CHATTIN: Object to the form.

22    THE WITNESS: I apologize, I don't recall

23  the specific dates from the earlier e-mails where

24  it was communicated, but I do think it was

25  relatively early in 2018.

Page 157

1    (Exhibit R was marked for identification.)

2  BY MR. BURKE:

3    Q. Okay. So marked Exhibit R, which is like in

4  the September/November time period in 2018 where HII is

5  actively working with Scott Shapiro on what his

6  commissions are. Would you agree? Or, pardon me,

7  non-commissionable fees.

8    A. Yes. It looks like it's about specific

9  fees --

10    Q. Okay.

11    A. -- for specific products.

12    Q. And not commissions, right?

13    A. Not commissions, no.

14    Q. Is that an override, is a non-commissionable

15  fee?

16    A. I mean, again, I don't know the answer to that

17  one, I'm sorry, whether that would have been

18  interchangeable.

19    Q. Okay. So do you see these communications

20  bridge the gap in Shapiro's lead generation from

21  November 2018, when Duffie was terminated and when

22  Shapiro began working with other agents such as

23  McDowell? Would you agree with that?

24    A. It would appear so, yes.

25    Q. And HII knew that, didn't it?

40 (Pages 154 - 157)

Page 158

1    A.  Yes.
2    Q.  What are the other agents other than McDowell
3  and Duffie that Shapiro was the lead generator for?
4       MS. CHATTIN:  Object to the form.
5       Go ahead.
6       THE WITNESS:  So, again, there are
7    relationships that existed there that -- from the
8    perspective of a lot of what I looked at, it
9    looked like more of an administration.  I can't
10    say it was solely lead generation.
11       You know, some of the people that we've
12    looked at, Seminario, McDowell, Blanchard, he
13    definitely had relationships with them
14    presumably.  I mean, again, they're independent
15    agencies.  I didn't get into every single detail
16    of every single thing he did for them.
17  BY MR. BURKE:
18    Q.  Well, wait a second.  I mean, HII is paying
19  Scott Shapiro directly in a sort of an indirect way for
20  generating new business, right?
21    A.  So with any of the agencies.
22    Q.  Right?
23    A.  Well, we're paying him based on an arrangement
24  with Duffie.
25    Q.  That HII is complicit in?

Page 159

1       MS. CHATTIN:  Object to the form.
2  BY MR. BURKE:
3    Q.  Listen, Duffie is not copied on these e-mails,
4  is he?
5    A.  Not on these, no.
6    Q.  No.
7       These are e-mails between HII and the lead
8  generator Scott Shapiro?
9    A.  Between HII and Scott Shapiro, yes.
10    Q.  And these are commissions or
11  non-commissions -- these are HII paying Shapiro for any
12  business, right?
13    A.  It appears to be with some of the agencies,
14  yes.
15    Q.  Which agencies?
16    A.  In this specific one, it looks like McDowell
17  is mentioned here.
18    Q.  Any others?  Seminario, right?
19    A.  Yes.
20    Q.  What others?
21    A.  I am going to, again, presume that probably
22  there were some similar setups with Blanchard and
23  Duffie.
24    Q.  How could we find that out?
25    A.  Commission addendums or commission statements

Page 160

1  would likely exist for it.  I don't know how it
2  have been reported, but anything that went out the door
3  presumably is recorded by IT.
4    Q.  So like perhaps -- I'm seeing Exhibit Q --
5  Lora Kundivich or Erika Wurtzbacher would know, don't
6  you think?
7       MS. CHATTIN:  Object to the form.
8       Go ahead.
9       THE WITNESS:  Well, Lora is no longer with
10    the company, but potentially Erika, yes.
11  BY MR. BURKE:
12    Q.  And I noticed this handwritten thing in the
13  corner of Exhibit Q.  To me, that says that this was a
14  paper document that was produced rather than an
15  electronic document.
16    A.  Yeah.  I think commissions typically printed
17  certain things out and then scanned them in.
18    Q.  Well, I searched for this e-mail as part of a
19  regular e-mail, and it didn't show up, suggesting to me
20  that somebody deleted the e-mail but signed it and filed
21  it away somewhere.
22       Do you know anything about that?
23       MS. CHATTIN:  Object to the form of the
24    question.
25       THE WITNESS:  I don't think that it would

Page 161

1    have been deleted.  I know that as far as our
2    e-mails go, I have had conversations with our IT
3    before that some of the technology that was in
4    place didn't necessarily memorialize everything
5    until approximately June of 2018.
6  BY MR. BURKE:
7    Q.  Well, I mean, this e-mail was important enough
8  to do a paper file, right?
9    A.  Yes.
10    Q.  Yeah.  If you look at the bottom on page 1,
11  it's got like a pencil mark on it.  Seminario got sued
12  in 2019, didn't he --
13       MS. CHATTIN:  Object to the form.
14  BY MR. BURKE:
15    Q.  -- for TCPA?
16       MS. CHATTIN:  Object to the form.
17       THE WITNESS:  I don't recall.
18  BY MR. BURKE:
19    Q.  All right.  So when did HII roll out the
20  TrustedForm?  I think you said at the beginning it was
21  like the -- June or something 2018; is that right?
22    A.  We started working with them approximately the
23  summer of 2018.  There was some back and forth about how
24  to try to get things set up so that agencies would take
25  advantage of it and not feel like we were going to have

41 (Pages 158 - 161)

1  access to every single one of their lead sources or
2  leads.
3      And we started getting some of the various
4  agencies on it. You know, we were introducing it in
5  2018. The PIP was a part of it. I think the actual
6  project to get multiple agencies on it didn't start
7  until late 2018, early 2019.
8      Q. And so did any of these agencies that were
9  working with Shapiro ever truly get on to the
10 TrustedForm platform?
11     A. I don't recall off the top of my head. I know
12 that we had, you know, e-mails that went back and forth
13 with updates on it, but I don't remember which specific
14 agencies without looking at the documents.
15     Q. What documents?
16     A. Again, I think there was an e-mail. Adam
17 Chickman would have been our contact over at TrustedForm
18 who mostly communicated with Dan about what was going
19 on -- I'm sorry, Dan Garavuso, about what was going on
20 and what kind of progress we were making.
21     Q. So like communications -- is the one you're
22 thinking of the one between Mr. Garavuso and
23 Mr. Chickman about how Health Advisors of America wasn't
24 set up yet?
25     A. Again, without looking at it, I'm not sure. I

1  know the one that I was specifically looking at had a
2  grid on it for the different agencies and where their
3  progress was.
4      Q. But that's your best information as to
5  whether -- like that e-mail is your best information as
6  to when these agencies engaged TrustedForm?
7      MS. CHATTIN: Object to the form.
8      THE WITNESS: I mean, that's what I would
9      have reviewed at the time. That's what we looked
10     at when we did the preparation for, okay, here's
11     the listing of where the various agencies are at
12     and what the updates are.
13 BY MR. BURKE:
14     Q. Well, like, HII was paying for TrustedForm,
15 right?
16     A. Yes.
17     Q. And TrustedForm's records showed that it
18 was -- Health Advisors of America was the customer,
19 right?
20     A. Again, without looking at the document, I'm
21 not 100 percent.
22     Q. Well, I mean, we can look at HII 7118, which
23 is the contract -- I will rename this -- a contract
24 showing that HII is paying for Health Advisors of
25 America's TrustedForm services, right?

1      A. Yes.
2      Q. And this contract was in place for, you know,
3  several months, wasn't it?
4      A. Most likely, yes. So we -- I think to be
5  clear, what we did with these is we typically did an
6  introduction between the TrustedForm vendor and the
7  particular, you know, point of contact with the agency,
8  and then they would negotiate how to get it set up, how
9  to access it, and then we just agreed that we would pay
10 for it.
11     So we didn't have direct visibility into their
12 setup. That was happening between the vendor and
13 between the agencies, and that was something that was
14 arranged that way specifically because when we first
15 started discussing it, the No. 1 concern that we got
16 from all of the different distribution was, I don't want
17 you guys to have access to my lead data, because I don't
18 sell just for you.
19     And we knew that they were probably going to
20 be running through leads that had nothing to do with
21 items going on our platform. We considered that worth
22 it to try to make sure that, inasmuch as possible, these
23 leads were going to be valid and compliant.
24     Q. Well -- but this is an e-mail, HII 7116, from
25 ActiveProspect to HII with the Health Advisors of

1  America, Inc., contract attached, right?
2      A. Yes. It looks like Amy was included on that.
3      Q. Okay. So, I mean, HII knew that, you know,
4  Scott Shapiro was making these outbound calls, didn't
5  they?
6      MS. CHATTIN: Object to the form.
7      THE WITNESS: We knew he was evaluating
8      leads. Where those inbound leads or outbound
9      leads, you know, my understanding is a
10     TrustedForm product works for either.
11 BY MR. BURKE:
12     Q. Well, wait a second. But Shapiro never used
13 TrustedForm, right?
14     A. To my understanding, he used some of the
15 products that are listed on that. He did not fully
16 integrate with the TrustedForm products.
17     Q. Right. The only products he used was -- I
18 think your testimony was he used the litigator scrub and
19 the DNC scrub, right?
20     A. To my understanding, yes.
21     Q. Okay. And the reason he had only used those
22 two scrubs is because he had aged leads, right?
23     A. Because he was working with the data leads,
24 correct.
25     Q. HII doesn't think that Mary Bilek did anything

Page 166

1   wrong to receive these calls, does it?
2       MS. CHATTIN:  Object to the form.
3       THE WITNESS:  I mean, I don't believe so,
4   no.
5   BY MR. BURKE:
6   Q.  All right.  And same with Robert Hossfeld, I
7   mean, HII doesn't contend that he did something to, you
8   know, generate more phone calls, does it?
9       MS. CHATTIN:  Object to the form.
10      Go ahead.
11      THE WITNESS:  So, I mean, there are --
12   again, when you don't have the validation records
13   that you would like, it's hard to know one way or
14   the other.  You know, certainly, there are people
15   that I think have an understanding of how to get
16   their names into certain things.
17  BY MR. BURKE:
18  Q.  I'm just asking about one person.
19  A.  Yeah.  I mean, again, not having a validation
20  to be able to say this particular source, then, no, I'm
21  not going to state that about somebody.
22  Q.  All right.  And so if somebody is receiving
23  robocalls, I mean, other than saying, hey, quit it, put
24  me on your do-not-call list, what's that person supposed
25  to do to get those calls to stop?

Page 167

1       MS. CHATTIN:  Object to the form.
2       THE WITNESS:  I mean, again, if you ask to
3   be added to a do-not-call list, you should be
4   added to a do-not-call list.
5   BY MR. BURKE:
6   Q.  Okay.  Is there anything else other than
7   asking, you know, for the calls to stop that you can do,
8   a consumer can do other than file a lawsuit to force the
9   calls to stop?
10      MS. CHATTIN:  Object to the form.
11      THE WITNESS:  I mean, candidly, I -- I don't
12   know how to state for an entire industry that
13   you're going to be able to do something other
14   than take advantage of the tools that are
15   available, which is the do-not-call list.
16  BY MR. BURKE:
17  Q.  Maybe I should have been clearer.
18      With respect to calls that are being made on
19  behalf of HII, calls that are being made to try to sell
20  HII products and services, how is one supposed to get
21  those calls to stop other than ask for them to stop and
22  then sue?
23      MS. CHATTIN:  Object to the form.
24      Go ahead.
25      THE WITNESS:  So if you ask for them to

Page 168

1   stop, then, again, we put it on our internal
2   do-not-call list.  We communicate that out to all
3   the independent distribution that we do not want
4   our products associated with that particular
5   consumer because they have asked to not have
6   their products pitched to us.
7       But these are independent distributors.  If
8   they're representing something else or if they're
9   getting that number through a different source,
10   then, I mean, candidly, I'm not sure what else we
11   can do on that front.
12  BY MR. BURKE:
13  Q.  Did HII ever put Mary Bilek's phone number on
14  its internal do-not-call list?
15  A.  I believe so, yes.
16  Q.  When?
17  A.  I don't recall the exact date.  I'm sorry.
18  Q.  And was that information, the do not call as
19  to Mary Bilek, was that shared with agents?
20  A.  It should have been, yes.  And I believe it
21  would have been.
22  Q.  Was that information shared with insurance
23  companies?
24  A.  Specific to her, I'm not sure.  If she wasn't
25  mentioning a particular product, then it may not have

Page 169

1   been.
2   Q.  How about Robert Hossfeld, was his do-not-call
3   request communicated to any HII partners, insurance
4   companies, anything like that?
5   A.  I don't recollect.  I'm sorry.
6   Q.  Does HII have a process whereby do-not-call
7   requests to HII are actively shared with agents or
8   insurance companies or sort of ancillary partners like
9   NCE, NBBI, or AccessOne?
10  A.  So, again, that would probably depend on the
11   parameters of what the do-not-call request was.  If
12   there were specific products that were mentioned, then,
13   yeah, typically that information would have been shared.
14   We certainly added everything that we got to our
15   internal do-not-call lists and our process would be to
16   have the account rep share that information with the
17   distribution agencies.
18  Q.  But, again, there's no written policy that
19   says any of that should happen, is there?
20  A.  Outside of the communication to the agencies,
21   I don't believe so, no.
22  Q.  What do you mean the communication to the
23   agencies?
24  A.  That when a do not call is received, it's sent
25   to the account reps and account reps share that with

43 (Pages 166 - 169)

Page 170

1 external partners.
2     Q.   Okay.  So you mean -- in the stuff that was
3 produced in this case, there's a handful of those
4 e-mails, maybe two dozen.
5         Are you saying that there were more
6 do-not-call communications than were produced in the
7 case?
8         MS. CHATTIN:  Object to the form.
9 BY MR. BURKE:
10    Q.   More than two dozen?
11    A.   I mean, I don't know what the specific
12 parameters were for time frame.  I didn't do a count.
13 That would have been generated by our IT.
14    Q.   Are you talking like millions of phone numbers
15 or thousands or, like, two dozen?
16    A.   No.
17         MS. CHATTIN:  Go ahead.  You can answer.
18         THE WITNESS:  No.  It would not be millions
19     or thousands.
20 BY MR. BURKE:
21    Q.   Like a few dozen?
22    A.   (Nods affirmatively.)
23    Q.   Yes?
24    A.   Yes.  Sorry.  That would be consistent.
25    Q.   Okay.  As part of the discovery in this case,

Page 171

1 there was a database produced from HAA that contained a
2 do-not-call list of several million phone numbers.
3         Were those phone numbers added to HII's
4 internal do-not-call list ever?
5         MS. CHATTIN:  Object to the form of the
6     question.
7         THE WITNESS:  I do not know.
8 BY MR. BURKE:
9     Q.   Has HII ever reached out to American Financial
10 to make sure that its do-not-call list is coordinated
11 with American Financials do-not-call list?
12    A.   I don't believe so, no.
13    Q.   Why not?
14    A.   Well, we have more than just American
15 Financial as a product, so that request that's made to
16 American Financial would not necessarily apply to our do
17 not call or to the independent agencies.
18    Q.   Okay.  So it sounds like there's a little bit
19 of, like, sort of splitting hairs here happening with
20 the requests.
21         How are the folks at HII supposed to parse
22 through what you just described in that last answer if
23 there's no written policy telling them how to do that?
24         MS. CHATTIN:  Object to the form.
25         THE WITNESS:  In terms of when they are

Page 172

1     supposed to notify carriers or when they're
2     supposed to ask carriers?
3 BY MR. BURKE:
4     Q.   All of it.
5         MS. CHATTIN:  Object to the form.
6         Go ahead.
7         THE WITNESS:  I guess I'm a little unclear
8     as to what you mean by the folks at HII.
9 BY MR. BURKE:
10    Q.   Well, I understood a prior answer of yours to
11 say that, you know, if a consumer says, hey, I never
12 want to hear from American Financial again, that there's
13 some process in place where American Financial is
14 provided that phone number in like a one-off e-mail,
15 right?
16    A.   It might occur, yes.
17    Q.   But there's no policy that says it should,
18 right?
19    A.   No.
20    Q.   That it is correct, that there's no policy?
21    A.   There's no policy that a carrier has to advise
22 us of their do-not-call requests, no.
23    Q.   And there's no policy that says HII has to
24 notify carriers of do-not-call requests; isn't that
25 correct?

Page 173

1     A.   Correct.
2     Q.   And is that the same with, you know, any
3 ancillary company that's providing services like NCE or
4 NBBI or AccessOne?
5     A.   A written policy, no, there's no such.
6     Q.   What is NCE?
7     A.   NCE is an association group.
8     Q.   Okay.  What does that have to do with HII?
9     A.   Well, association groups, you know -- I'm not
10 going to say all of them, but a number of them do work
11 with various brokers and carriers to have specific
12 insurance products that are available to their
13 membership, and then HII would be looked at as a
14 distribution channel for some of those products.
15    Q.   I mean, is HII aware that NCE is a political
16 organization?
17         MS. CHATTIN:  Object to the form.
18         THE WITNESS:  By political, what do you
19     mean?
20 BY MR. BURKE:
21    Q.   Politics, right wing politics.
22         MS. CHATTIN:  Object to the form.
23         You can answer.
24         THE WITNESS:  No.
25 BY MR. BURKE:

44 (Pages 170 - 173)

1    Q.  And that its primary thing that NCE does is

2   support folks like the Republican Arkansas governor?

3        MS. CHATTIN:  Object to the form.

4        THE WITNESS:  I'm not sure that that would

5     be relevant to how we interact with them.

6   BY MR. BURKE:

7    Q.  No, I agree.  I'm just asking.

8    A.  Yeah.  I mean, it's not anything that I have

9   ever seen or am aware of having been discussed.

10   Q.  I mean, my understanding of what NCE is, is

11  that it's -- the testimony was verbatim.  It's primarily

12  a political organization and that they provide these

13  sort of health insurance bundles as a benefit to their

14  customers, but it's like a side benefit.

15       Is that surprising to you?

16   A.  Associations --

17       MS. CHATTIN:  Hold on.  Object to the form

18   of the question.

19       Go ahead.

20       THE WITNESS:  Associations absolutely exist

21    for purposes outside of having health insurance,

22    right?  So our interaction with those

23    associations is primarily in service of when they

24    have those health insurance products and choose

25    to use as a distributor.  What they're doing

1     outside of that, what services they're providing

2     to their membership outside of that is in not a

3     thing that I would think would be relevant.

4   BY MR. BURKE:

5    Q.  Well, I mean, what does HII do, if anything,

6   to ensure that folks who are signing up for NCE know

7   that they're supporting, you know, Republican reelection

8   efforts?

9        MS. CHATTIN:  Object to the form.

10       THE WITNESS:  Again, our role and our

11    interaction with it is going to be specific to

12    the membership levels that have insurance

13    attached to them.  There are approved

14    documentation that goes out to all of that, and

15    that, you know, provides information as to how to

16    look at the association and review association

17    benefits.

18  BY MR. BURKE:

19   Q.  Wait a second.

20       My question was, what does HII do, if

21  anything, to ensure that the folks who are signing up

22  for NCE know that they're supporting, you know,

23  Republican reelection efforts?

24   A.  Nothing, to my knowledge.

25       E-mail.  Sorry.

1        MS. CHATTIN:  Your e-mail is up, Alex.

2        MR. BURKE:  Oh.  Thank you.

3   BY MR. BURKE:

4    Q.  What is NBBI?

5    A.  So NBBI, to my understanding, is a, I want to

6   say, DMPO that NCE utilizes for specific association

7   benefits that are not associated with the health

8   insurance.

9    Q.  What is DMPO?

10   A.  Generally discount medical provider

11  organization.

12   Q.  And so would it be accurate to say that the

13  primary benefit -- one of the primary benefits

14  associated with being an NCE customer is this medical

15  discount service?

16       MS. CHATTIN:  Object to the form.

17       THE WITNESS:  I don't know that I can answer

18    that specifically, because, obviously, there are

19    going to be consumers who do not interact with

20    the health insurance products.  My experience

21    with that entity is through the consumers that

22    choose membership levels with the health

23    insurance products and those DMPO products.

24  BY MR. BURKE:

25   Q.  Well, isn't it true that HII oversees the

1   marketing efforts for NCE products and services?

2        MS. CHATTIN:  Object to the form.

3        THE WITNESS:  I'm sorry, can you define what

4     you mean by "oversees the marketing"?

5   BY MR. BURKE:

6    Q.  There's no relationship between Scott Shapiro,

7   who's doing the lead generation, and NCE except for

8   through HII, right?

9    A.  I wouldn't know the answer to that, because

10  NCE does use other distribution channels.  I believe in

11  the takeover block that I mentioned earlier today, which

12  was a block of policies that were sold through a

13  completely different distribution channel, there were

14  NCE products.  And Shapiro and some of the other names

15  we've mentioned were present in that, so they were

16  presenting NCE through other distribution.  How active

17  that was in the relevant time frame, I don't know.

18   Q.  So, I mean, it is correct that Shapiro's lead

19  generation efforts for Duffie and the other agents

20  included trying to sell NCE products and services or

21  memberships?

22   A.  Yes.  NCE would be one of the association that

23  had products that were sold through that channel, yes.

24   Q.  Okay.  And if NCE was sold, you know, many of

25  those NCE memberships were sold through HII, right?

Page 178

1    MS. CHATTIN: Object to the form.
2    Go ahead.
3    THE WITNESS: I don't know how to quantify
4    many, but I will say that, yes, there were those
5    membership levels sold through HII.
6    BY MS. CHATTIN:
7    Q. Thousands?
8    A. Candidly, I don't know if it's hundreds or
9    thousands.
10   Q. Okay. Not just a -- not just 10 or 15, right?
11   A. Not 10 or 15, no.
12   Q. Okay. Is there any sort of agreement between
13   HII and NBBI, either written or unwritten?
14   A. Not to my knowledge, no.
15   Q. What is AccessOne?
16   A. AccessOne is, again, kind of within that
17   framework of supporting those NCE non-insurance
18   products. Again, I don't deal with them directly, so I
19   am not fully comfortable on what their role is with NCE,
20   but I know that both NBBI and AccessOne have to do with
21   those association and membership benefits.
22   Q. And so when there was a complaint that
23   mentioned NCE or NBBI or AccessOne or an insurance
24   carrier like American Financial or Chubb, was it HII's
25   general practice to share that complaint with the

Page 179

1    companies that were mentioned in the complaint?
2    A. We would have shared with American Financial,
3    with Chubb, with NCE. I don't know that we had any line
4    of communication to NBBI or AccessOne.
5    Q. What eventually happened -- well, I will ask
6    that a different way.
7    Some TCPA-related complaints to HII were
8    resolved and some were not resolved. Is that fair to
9    say?
10   A. Yes.
11   Q. Okay. So as to the ones that wound up being
12   resolved, can you list the different ways that they
13   might be resolved?
14   MS. CHATTIN: Object to the form.
15   Go ahead.
16   THE WITNESS: So, primarily, resolution in
17   terms of we were able to identify specific
18   products or specific distribution, you know, that
19   would go through legal in terms of how they
20   actually handled things with the consumer. If we
21   had specific distribution that we could track it
22   back to, then we would have those conversations,
23   you know, look into it, like we did with Duffie.
24   And, again, specific resolution for the consumer,
25   that was primarily handled by legal, so I can't

Page 180

1    speak to how all of that may have happened and
2    what the specific results were.
3    BY MS. CHATTIN:
4    Q. Is it fair to say that there were settlement
5    agreements with some of these complainants?
6    A. I believe so, yes.
7    Q. Okay. Like formal written settlements, right?
8    A. I believe so, yes.
9    Q. And HII, if it was named in the settlements,
10   like to review the settlement agreements, right?
11   A. So I know that there were a couple that were
12   done by a distribution agency -- I believe that it was
13   Duffie -- where they proactively attempted to do a
14   settlement agreement and named us in it, which they did
15   not have the authorization or authority to do. Our
16   typical -- and I believe it is in the contracting
17   document -- is that anything that comes up like that
18   needs to be reviewed by HII and needs to be approved by
19   HII.
20   Q. So why would HII want to review a settlement
21   agreement that, you know, one of these agents enters
22   into, having to do with TCPA?
23   A. Only if our specific products were mentioned
24   during the presentation or in the course of the call.
25   If they did a settlement agreement for other products or

Page 181

1    calls that did not bring us up, we would have no
2    interest in that.
3    Q. Right. You don't want to settle cases that
4    have nothing to do with HII, right?
5    A. That have nothing to do with the products in
6    our platform, correct.
7    Q. I see.
8    So if the complaint had to do with products on
9    HII's platform, the documents say that HII is entitled
10   to review the settlement agreement?
11   A. Correct.
12   MS. CHATTIN: Object to the form.
13   THE WITNESS: Sorry.
14   MS. CHATTIN: Go ahead, yes.
15   BY MR. BURKE:
16   Q. It seems like there's a tripartite
17   relationship between insurance companies, HII, and the
18   insurance agents that are marketing the services. Can
19   you describe the duties and responsibilities of those
20   three entities, say, American Financial, an agent like
21   Duffie, and HII?
22   MS. CHATTIN: Object to the form.
23   THE WITNESS: So in terms of how a carrier
24   would interact with HII, HII would interact with
25   an agency and how those entities all interact

46 (Pages 178 - 181)

Page 182

1    with a consumer?
2  BY MR. BURKE:
3    Q. Well, yeah. So agents are licensed with
4  insurance companies, right?
5    A. No. Agents are licensed with states.
6    Q. Agents are licensed with states to sell a
7  particular insurance company's products and services,
8  right?
9    A. So for point of clarification, license has a
10  very specific utilization. I think what you're
11  attempting to get to is appointed.
12    Q. Okay. So is it true that American Financial,
13  for example, appointed Duffie?
14    A. I believe so, yes.
15    Q. All right. And so what does it mean to
16  appoint Duffie?
17    A. So appointment rules vary state by state.
18  Right? Most states will allow for an initial product
19  sale within that state, without requiring an
20  appointment. And then once that initial product sale
21  happens, a carrier would then have to approve that
22  particular agent to move forward. That's typically done
23  by the agent filling out an application. They would
24  have to meet specific requirements in terms of
25  background. There would be specific documentation

Page 183

1  around what their responsibilities were for representing
2  any of those products. In most cases, as long as that
3  agent meets the background requirements, most carriers
4  will move forward with the appointing.
5    Q. All right. So there's a direct relationship
6  between insurance agents and the insurance companies,
7  right, through appointment?
8    A. Through appointment, yes.
9    Q. Okay. And there is a direct relationship
10  between insurance companies and HII, isn't there?
11    A. Inasmuch as they contract with us for certain
12  products, yes.
13    Q. I'm not sure we have those contracts. What
14  should I look for to find a contract between, for
15  example, American Financial and HII?
16    MS. CHATTIN: Object to the form.
17    You -- you do have them.
18    MR. BURKE: Okay.
19    MS. CHATTIN: We can point them to you
20    later, if you want to.
21    THE WITNESS: Yeah, yeah. I'm not
22    100 percent sure what those documents would be
23    titled. Candidly, those agreements vary based on
24    how the contracting is done. Sometimes we
25    contract directly with the carrier. Sometimes we

Page 184

1  contract for specific products through, for
2  instance, an association. You know, all of those
3  documents, depending on whether it was using kind
4  of our template, their template, they all have
5  slightly different terminology on them, so I
6  don't know what the American Financial one would
7  be.
8  BY MR. BURKE:
9    Q. Well, so, like, an insurance agent appointment
10  would be -- at least my understanding is American
11  Financial or Chubb appoints an individual or an
12  insurance agency to market and sell their goods and
13  services.
14    Do you agree?
15    A. So when it comes to how things interact with
16  HII -- right -- which is different from a direct
17  point-to-point contract with the carrier, they're not
18  becoming a captive agent, they're not saying they're
19  only going to represent that particular carrier.
20    What typically occurs is if a carrier has a
21  product that is available in our system, they have
22  provided us with the paperwork that is required for
23  agents to fill out. They have required that that be
24  completed. They have specific background check
25  requirements that need to be met for that particular

Page 185

1  agent. And when an agent is coming on board to our
2  system, any products that they have elected that they
3  would like to represent, they will fill out that
4  paperwork. A review will be done to see whether or not
5  they meet those background check requirements. If they
6  do, they gain access to that product and then can
7  represent that product.
8    Q. I mean, I'm just trying to figure out if the
9  appointments call for marketing.
10    A. By -- so if you're talking about, like, is
11  there stuff in the specific paperwork that talks about
12  marketing?
13    Q. I want to know if when an insurance company
14  appoints an agent, if one of the agent's duties is to
15  market.
16    A. I would say yes.
17    Q. And so is it also true that the -- one of the
18  things that HII is supposed to do for the insurance
19  companies is also to market their goods and services?
20    MS. CHATTIN: Object to the form.
21    THE WITNESS: So we provide the platform
22    through which the products are able to be quoted
23    and marketed.
24  BY MR. BURKE:
25    Q. Great.

47 (Pages 182 - 185)

1      And HII also, you know, works with the
2  scripts, the verification scripts to be read during the
3  telemarketing calls?
4      A.   Verification scripts are not always utilized.
5  It depends on which verification method is elected.  So
6  verification scripts in the instance where there's a
7  voice verification that is done, you know, kind of post
8  sale is going to be kind of listing of specific things
9  about that product that that carrier wants to have
10  communicated and make sure that that consumer
11  understands and agrees to.
12      Q.   Right.
13      So one of HII's jobs is to make sure that
14  those --
15      A.   Those scripts are available, sorry.
16      Q.   During the telemarketing calls, those scripts
17  are read, right?
18      A.   Again, it depends on the verification method
19  that's elected.  Those scripts are not read during every
20  call.
21      Q.   If a call -- if a script is supposed to be
22  read during a call, it's HII's job to make sure it's
23  read, right?
24      MS. CHATTIN:  Object to the form.
25      THE WITNESS:  I'm not trying to frustrate

1  you.  I apologize.  I feel like you're getting a
2      little frustrated.  So there are more than one
3      methodology applied for how a sale is verified.
4      In certain sales, voice verification is the
5      method, and in those instances, then, yes, we
6      host the verification scripts.  The agents are
7      responsible for reading those verification
8      scripts and being able to make those verification
9      calls available upon request.
10  BY MR. BURKE:
11      Q.   Right.
12      A.   And that is a post-sale wrap-up of what
13  occurs.
14      Q.   Well, that's during the telemarketing call,
15  right?
16      A.   Typically, but that's done by the agency,
17  so --
18      Q.   Okay.  What are the other verification
19  methods?
20      A.   Direct-to-consumer channel.  If a consumer is
21  applying directly themselves through a website or a web
22  link, that's enrollee signed, so that records the IP
23  address of the consumer, and they've actually viewed all
24  of the application process and completed all of the
25  application process themselves.

1      The other methodology would be the EchoSign
2  process which is basically electronic signature
3  documents that would be e-mailed out to the consumer.
4  The consumer would have to review those documents, sign
5  off on their understanding of everything before the
6  policy could actually be charged or issued.
7      Q.   So sometimes instead of reading a script
8  during a telemarketing call, I think this happened with
9  Hossfeld, HII will send an e-mail asking for those
10  consents to be performed through EchoSign.  Is that what
11  you're saying?
12      A.   It's a system-generated thing, so it's an
13  automated process.  I mean --
14      Q.   Was I wrong?
15      A.   Again, I want to clarify.  The agent initiates
16  the system-generated process through our system.  It's
17  sent out, and then once a completed signature is
18  received, our system would then process the application.
19      Q.   And does HII receive money when there is --
20  you know, with respect to a new customer?
21      MS. CHATTIN:  Object to the form.
22      THE WITNESS:  There's a portion of every
23      policy that would be kept for our administrative
24      costs and whatnot, yes.
25  BY MR. BURKE:

1      Q.   Okay.  And so -- and I understand that HII is
2  in charge of, like, distributing the money that it
3  collects from the insurance customers; is that right?
4      A.   Yes.  We handle the billing and then we
5  distribute it out.
6      Q.   So HII pays the insurance agent.  HII pays
7  Scott Shapiro.  HII pays the insurance companies.  HII
8  pays NCE, all for, you know, any new business that comes
9  in; is that right?
10      MS. CHATTIN:  Object to the form.
11      THE WITNESS:  It would depend on the
12      specific agreements in place for each product,
13      who is getting what kind of remit.  But, yes, any
14      money that is collected would be distributed
15      based on those agreements.
16  BY MR. BURKE:
17      Q.   I mean, none of this is for free, right?  If
18  there's a company that its products are being sold, it's
19  getting paid, right?
20      A.   To the best of my knowledge, yes.
21      Q.   Okay.  Going through the documents, it looks
22  like there have been some newer policies that were
23  initiated having to do with the TCPA like the 2020,
24  2021 time period.
25      Can you tell me about those?

48 (Pages 186 - 189)

Page 190

1      A.   Again, without looking at the specific
2  documents -- we looked at a lot of things.  I know that
3  pretty much all of those processes were, I'm going to
4  say, roughly, iterative.  They continue to be enhanced
5  and they continue to be refined based on how well things
6  were working for us and some of the changes that were
7  seen in the marketplace.
8      Q.   So what are the policy changes that we ought
9  to look for?  You know, I mean, we've talked about
10  TrustedForm.
11      A.   Uh-huh (indicates affirmatively).
12      Q.   You know, what are the other policy changes
13  that HII has done and implemented in order to, you know,
14  stop this snowstorm of complaints?
15          MS. CHATTIN:  Object to the form.
16          THE WITNESS:  So, again, some of the things
17      that happened, we enhanced some of our training
18      requirements.  We, you know, instead of just
19      having it be in a contractual document that's
20      signed, an agent may not look at that again.
21      There was specific training that was developed to
22      go over kind of the ins and outs of what agents
23      need to be aware of.  That became a mandated
24      thing that every agent, you know, whether MGA,
25      GA, or subagent had to complete before they would

Page 191

1      have the first bit of access to a product.
2          You know, we've, I think -- I'm trying to go
3      chronologically here.  One of the things that has
4      kind of happened is we've, again, sort of moved
5      away corporately from working with a lot of these
6      different independent distribution call centers.
7      You know, the majority of the business that's
8      coming in right now is either going to be through
9      our direct-to-consumer channels, which is
10      completely consumer led.  The consumer finds the
11      website.  They fill everything out themselves, or
12      it's through -- you know, the primary independent
13      distributor that's left is Assurance IQ, which
14      also has a very robust direct-to-consumer
15      platform.  And my understanding is most, if not
16      all, of the phone calls that they take or that
17      they support were generated through that
18      particular platform.
19          You know, our business model on the under 65
20      side has really changed to, you know, looking
21      into more platform as a service where we're
22      trying to develop direct-to-consumer leverage,
23      some of that technology, and make it available
24      for carriers or agents to be able to set up their
25      own -- they're called white label websites,

Page 192

1      right, so they can host their own
2      direct-to-consumer stuff with their own
3      particular branding and products.
4  BY MR. BURKE:
5      Q.   So are those agents calling their existing
6  customers to try to upsell?
7      A.   On the new platform as a service?  No.
8  That -- we are moving really out of doing a lot of that
9  oversight and just providing the technology that is
10  going to be available and sticking kind of with the
11  billing and the fulfillment pieces.  We're not doing the
12  contracting or the oversight or the vetting of the
13  agencies.  That's going to be going through more of a
14  direct carrier relationship.
15      Q.   Well -- okay.  But, I mean, are there
16  prohibitions against calling existing customers to
17  upsell?
18          MS. CHATTIN:  Object to the form.
19          THE WITNESS:  No, not to my knowledge.
20  BY MR. BURKE:
21      Q.   And is there a, you know, formal process by
22  where existing agents can scrub against the internal
23  do-not-call list when they're making those, you know,
24  upsell calls?
25          MS. CHATTIN:  Object to the form.

Page 193

1          THE WITNESS:  Again, talking about existing
2      agents through the independent distribution, they
3      would be looking at their own internal
4      do-not-call lists and then anything that they've
5      downloaded from us or any updates that they've
6      received from us.
7  BY MR. BURKE:
8      Q.   Has any agency ever really downloaded the
9  compliance do-not-call list from HII?
10      A.   That's not a data point that I have knowledge
11  of.  I don't think it's a thing that is tracked.
12      Q.   Well, there's never anything in writing
13  telling them how to do it, right?
14      A.   No.  It would have been communicated through
15  account reps.
16      Q.   And how would you do it?  Like if I wanted to
17  it right now, how do I do it?
18      A.   I mean, I know when I go through the system, I
19  have access to it and I can click "export data" when I
20  get to that section.  Again, my understanding is agents
21  have the exact same access.
22      Q.   So, like, what does it look like?  How do you
23  do it?
24      A.   I don't know if it would look exactly the same
25  from the agent perspective, because it is a proprietary

49 (Pages 190 - 193)

Page 194

1  system, so my access and an agent's access is not going
2  to look the same. But there is a specific section of
3  the system that houses the compliance DNC list and you
4  click into that section. There's a tab that will say
5  export data, and then it will download as an Excel file
6  so that it can be imported easily to a dialer.
7      Q. And is the customer DNC list also made
8  available to agents in a similar way or any way?
9      A. Again, I believe they would have access to
10 that.
11     Q. Do you know, or do you believe?
12     A. I believe. I didn't --
13     Q. You don't know for sure?
14     A. I didn't double-check that, no.
15     Q. Okay. Did you double-check that the
16 do-not-call list is actually available to agents?
17     A. No. I'm working off historical knowledge, so
18 I haven't checked recently on that.
19     Q. How did you come to that historical knowledge
20 that that agent -- that that DNC list was available on
21 the portal?
22     A. That was my understanding of one of the
23 reasons that we kind of built it out, was so that they
24 would have access to it.
25     Q. Do you know whether that was actually

Page 195

1  provided, whether it was actually made active?
2      A. I do not.
3      Q. Okay. You mentioned training here. Well,
4  going back, are there any other things that HII has done
5  in the more recent years, you know, '19, '20, '21, '22,
6  to try to prevent TCPA complaints or violations? You
7  may have finished. I just want to make sure.
8      A. Yeah. No. Again, we had a contract addendum
9  that was added in 2020 that specifically required, you
10 know, that they were going to use TrustedForm
11 alternative. We certainly had some indication that
12 decided not to work with us at that point, and then, you
13 know, ultimately, I think we did see some reduction in
14 that, but then we moved towards not working with the
15 independent distributors anymore.
16     Q. And so you mentioned training and
17 agent-specific training.
18        Can you describe that to me?
19     A. Yeah. So chronologically -- I'm going to do
20 my best on dates here. Initially, it was that all
21 products that are built into the system have specific
22 carrier-approved sections that you can go to, to review
23 all of the various products that are carrier approved,
24 brochures with all the details of the products.
25 Approximately 2017 we started working on what eventually

Page 196

1  became known as our agent training center, and that was
2  where we actually were taking some of that, you know,
3  carrier-approved material and turning it into a
4  presentation that would be viewable by the agents so
5  that they could go through and actually have a
6  presentation detailing everything that needed to be
7  done.
8         It started with a training known as the
9  non-negotiable training, which was just a general
10 industry best practices of how agents are supposed to
11 interact with consumers and things that they should be
12 aware of.
13     Q. So -- wait. Let's --
14     A. Sorry.
15     Q. -- get an overview. How many training
16 documents are we talking about in total --
17        MS. CHATTIN: Object to the form.
18 BY MR. BURKE:
19     Q. -- that were actually commented and shared
20 with the folks that were supposed to see them?
21        MS. CHATTIN: Same objection.
22        THE WITNESS: So, again, over time, once we
23     started developing the training modules, it would
24     have been, ultimately, two --
25 BY MR. BURKE:

Page 197

1      Q. Okay.
2      A. -- mandatory trainings. It started with the
3  non-negotiables. That was eventually revamped into the
4  compliance sales, and then the telemarketing fraud and
5  abuse.
6      Q. That's three.
7      A. No. The compliance sales took over for the
8  non-negotiables, so it replaced, so --
9      Q. So three documents, one of which replaced
10 another one; is that right?
11        MS. CHATTIN: Object to the form.
12        THE WITNESS: No, that is the --
13        MS. CHATTIN: Go ahead.
14        THE WITNESS: That's the kind of general
15     practice mandatory. You have to hit those before
16     you can even get into the product documents.
17        From there, every insurance product has its
18     own carrier-approved training piece, so however
19     many products we had during that time frame we
20     would have had training documents that would have
21     been launched over time for those.
22        And, ultimately, today, if you were
23     accessing the system, you have to take the
24     compliance sales guidelines and pass an
25     assessment on that. You have to take the

Page 198

1    telemarketing fraud and abuse and pass an
2    assessment on that. That will unlock the
3    product-specific documents, and then you have to
4    pass each of those product trainings and an
5    assessment before you can actually get into the
6    product.
7   BY MR. BURKE:
8    Q. Okay. I want to figure out what those
9   documents are. I have a quick aside that I want to look
10  at a couple docs here.
11   A. Okay.
12   Q. Let's see. And then I don't think I will make
13  them exhibits.
14       MS. CHATTIN: Do you need to take a break?
15       THE WITNESS: Yes. If you're looking for
16   stuff, can I run to the restroom?
17       MR. BURKE: Let's do this. This will be
18   quick, I think, and then we'll take the break
19   while we look for docs.
20       MS. CHATTIN: Is that okay?
21       THE WITNESS: That's fine.
22  BY MR. BURKE:
23   Q. Okay. You mentioned earlier that there was a
24  reference in 2018 to Rising Eagle -- or pardon me, not
25  Rising Eagle -- these robocalls that were happening and

Page 199

1   an e-mail having to do with like an update, a financial
2   services update.
3       Am I getting that right, kind of?
4    A. So I believe that these -- this would have
5   probably fallen under the category of what we looked at
6   as short reports. So at this point in time we were
7   publicly traded, being a publicly traded company. And
8   please don't ask me a lot of details about the stock
9   market. There are, to my understanding, people who
10  professionally try to evaluate stocks, purchased some
11  kind of future on them that that stock is going to lose
12  value, and so they create articles to try to say, hey,
13  this is why we think this particular stock is going to
14  lose value.
15   Q. Okay. So I've got two docs here. One is HII
16  66391. The second is an attachment to that e-mail is
17  HII 66393. And I think you referenced this earlier in
18  your testimony, and I just want to make sure that this
19  is the thing we're talking about.
20       The testimony, I think, had to do with like
21  robocalls and there was a report that was received.
22   A. I apologize. Continue.
23   Q. So is this -- is this e-mail what you were
24  talking about?
25   A. My recollection of the earlier question was

Page 200

1   kind of specific to Rising Eagle. I think that
2   particular announcement article, whatever it was, came
3   out later.
4    Q. Okay. What was HII's feeling about spoofing,
5   using a correct caller ID?
6       MS. CHATTIN: Object to the form.
7       THE WITNESS: I'm not 100 percent sure that
8    we had a feeling on spoofing other than, you
9    know, any phone numbers that are being utilized
10   should be able to connect back to you.
11  BY MR. BURKE:
12   Q. But was that in writing?
13   A. I don't believe so, no.
14       MR. BURKE: Okay. Let's take your break.
15   Sorry.
16       THE WITNESS: Yeah.
17       THE VIDEOGRAPHER: The time is 4:51 p.m.,
18   and we are now off the record.
19       (A recess was taken.)
20       THE VIDEOGRAPHER: The time is 5:04 p.m.,
21   and we are back on the record.
22  BY MR. BURKE:
23   Q. Okay. When we went off we were talking about
24  spoofing.
25   A. Yes.

Page 201

1    Q. And I think I asked you whether there was ever
2   anything written at HII that said to, you know, Shapiro
3   or agents that were developing business for it, hey,
4   don't spoof?
5    A. Not to my recollection.
6    Q. All right. And, really, spoofing was a
7   problem for HII, wasn't it?
8       MS. CHATTIN: Object to the form.
9   BY MR. BURKE:
10   Q. In the sense -- in the sense that spoofing
11  made it more difficult for HII to investigate complaints
12  of telemarketing?
13   A. Yes. In that sense, I think spoofing was a
14  challenge because it was harder to tie specific
15  instances to specific actors.
16   Q. It seems like Amy Brady was the person who was
17  tasked with trying to figure out who was affiliated with
18  a particular phone call. Is that true?
19   A. She may have been, yes.
20   Q. All right. And also it feels like if she
21  couldn't track it to anybody else, she basically
22  contacted Scott Shapiro?
23       MS. CHATTIN: Object to the form, but you
24   can answer.
25       THE WITNESS: Yeah. I don't know that that

51 (Pages 198 - 201)

Page 202

1    would have happened every time.  I can imagine it
2       probably did happen sometimes.
3    BY MR. BURKE:
4       Q.  Yeah.
5          Okay.  And did HII ever receive any
6    instructions or anything like that from American
7    Financial concerning telemarketing in general?
8       A.  In general, I know that a couple of the
9    various carriers -- again, this was a larger marketplace
10   issue.  It was coming up across the board.  A couple of
11   the different carriers did have specific things that
12   they put together for distribution.  I don't remember if
13   American Financial was one of them off the top of my
14   head.
15      Q.  So do you know whether American Financial ever
16   had any written or verbal or other communications with
17   HII concerning telemarketing really at all?
18      A.  Specific instances, I don't know.
19      Q.  All right.  And what did you try to -- what
20   did you do to try to figure out whether there were
21   telephone conversations or in-person conversations or
22   any other kind of communications between HII and
23   American Financial that have to do with telemarketing?
24      A.  So, again, we did review documents that were
25   generated based on the specific parties here.  I looked

Page 203

1    at a lot of them, so I'm saying I don't recall seeing
2    one specific to that.
3          I know that in general, again, during that
4    time frame, conversations were happening with various
5    partners in the industry.  I just don't have specific
6    dates or times.
7       Q.  Was there someone at HII who was in charge of
8    a relationship with American Financial?
9       A.  It varies a little in terms of like what
10   topics you might be discussing.
11      Q.  Telemarketing.
12      A.  I would say Brian Krul would probably be the
13   primary point person for carrier relations.  Dan
14   Garavuso had a direct channel to the carriers as well.
15      Q.  So did you talk to Brian and Dan about this
16   topic 37?
17      A.  I did not, no.
18      Q.  Did American Financial or NCE or NBBI or
19   AccessOne ever do anything to try to repudiate any
20   allegedly improper telemarketing?
21         MS. CHATTIN:  Object to the form.
22         THE WITNESS:  So, NBBI, AccessOne, we really
23      didn't have direct conversations or relationships
24      with them, so I don't have any information on
25      that.

Page 204

1    BY MR. BURKE:
2       Q.  Okay.  Well, I want to know yes or no.  Like,
3    did they do anything?  If there were no conversations,
4    then the answer is no.
5          MS. CHATTIN:  Object to the form.
6          Go ahead.
7    BY MR. BURKE:
8       Q.  Right.
9       A.  As far as what communications they may have
10   had with us, I don't believe so, no.
11      Q.  Okay.  And is HII aware of anything that NBBI
12   or AccessOne may have done not as a direct communication
13   with HII to repudiate improper telemarketing?
14         MS. CHATTIN:  Object to the form.
15         THE WITNESS:  I'm not aware, no.
16   BY MR. BURKE:
17      Q.  Okay.  And how about American Financial?  Did
18   American Financial ever do anything directly to
19   communicate to HII that it wanted to repudiate the
20   notion of improper telemarketing?
21      A.  Again, in the document review, I did see
22   things from various carriers.  I don't remember anything
23   specifically from American Financial.
24      Q.  So American Financial never said, Hey, if this
25   telemarketing continues, we're out of here?  Nothing

Page 205

1    like that?
2       A.  Not that I recall.
3       Q.  American Financial never wanted to, like,
4    contact the folks who might have been signed up through
5    improper telemarketing and apologize or anything like
6    that?
7       A.  Again, not that I recall.
8       Q.  And NCE never did that either, did they?
9       A.  Not that I recall, no.
10      Q.  Did NCE ever do anything to try to repudiate
11   improper telemarketing?
12         MS. CHATTIN:  Object to the form.
13         THE WITNESS:  Again, I don't recall seeing
14      anything specifically from NCE.
15   BY MR. BURKE:
16      Q.  So no?
17      A.  (Nods affirmatively.)  As far as their
18   communications, that's a "no."
19      Q.  Okay.  What about like generally at NCE, did
20   they manifest any, you know, desire to repudiate the
21   improper telemarketing other than defending lawsuits and
22   settling allegations?
23         MS. CHATTIN:  Object to the form.
24         THE WITNESS:  Not that I'm aware of.
25   BY MR. BURKE:

52 (Pages 202 - 205)

Page 206

1    Q.  Okay.  And we haven't talked about Michael
2  Smith very much.  Who is Michael Smith?
3    A.  Michael Smith at one point in time was -- he
4  was an agent who had a link in the system.  I believe
5  that he had a GA link, and, ultimately, again, I want to
6  say maybe 2014, 2015 there was a determination made not
7  to work with him.  I don't know all the specifics of
8  that.  I know that it was noted that we weren't going to
9  work with him, that it was known within the department
10 that we weren't going to work him again, but some of our
11 metrics for documenting that didn't exist in that time
12 frame.
13   Q.  And so were there directives having to do with
14 not working with Michael Smith, were those communicated
15 to agencies and lead generators?
16   A.  So typically when we say that we're not going
17 to work with somebody, that's specific to we're not
18 going to give them access to sell in our system.  But
19 it's not a communication that we make out to independent
20 distribution that, hey, we've decided not to work with
21 somebody, you should never work with them either.
22   Q.  Well, I mean, doesn't that just mean that
23 someone else could hire Michael Smith and use, you know,
24 Health Advisors of America to try too keep generating
25 leads for HII?

Page 207

1    A.  Our directive not to work with him was on more
2  of an agent basis, not selling specific plans, not being
3  the agent for specific plans.  You know, when that
4  occurred and when that happened, I don't know how --
5  where we would have been that he was working with Health
6  Advisors of America or in a lead generation space.
7    Q.  But, I mean, doesn't that sort of place a head
8  in the sand to what's really going on?  I mean, we see
9  this time and again at HII.  You know, HII knows it's
10 got Shapiro as the lead generator for Duffie, and
11 instead of prohibiting people from using Scott Shapiro,
12 HII just fires Duffie for using Shapiro, right?
13   MS. CHATTIN:  Object to the form of the
14 question.
15   THE WITNESS:  So, again, independent
16 agencies, right, but there's a limit to what we
17 can and cannot tell those people to do,
18 especially if they're presenting more than just
19 our business.
20   And, again, I think that this was -- this
21 was a bit of a learning curve for us, right, in
22 terms of how to appropriately address these
23 items.
24 BY MR. BURKE:
25   Q.  Wait.  You don't think that HII could direct

Page 208

1  folks not to use Scott Shapiro to develop business for
2  HII?
3    MS. CHATTIN:  Object to the form.
4    THE WITNESS:  Given that we don't have
5  direct access to the lead generation or the lead
6  vendors, I'm not sure that we would have
7  validation on that if we had done so.
8  BY MR. BURKE:
9    Q.  Well, why didn't you at least try?
10   A.  Again, this was an iterative process.  It was
11 a learning curve.  We did not walk into this with a full
12 understanding of lead generation and lead vending and
13 all the rest of it.  This is stuff that we learned as we
14 were going through some of these things.
15   Q.  Well, when did HII stop paying Scott Shapiro's
16 overrides?
17   A.  That is something that I would have to
18 research and look at.
19   Q.  Did Michael Smith begin getting overrides when
20 Scott Shapiro bowed out?
21   A.  I don't believe so, no.
22   Q.  Did Michael Smith receive any compensation for
23 overrides or any remediation of any kind associated with
24 developing leads?
25   A.  Not to my knowledge, no.

Page 209

1    Q.  Not even in the more recent years?
2    A.  Again, not to my knowledge.
3    Q.  Not pursuant to, like, e-mail agreements
4  that -- like what we saw from Scott Shapiro for
5  overrides?
6    MS. CHATTIN:  Object to the form.
7    THE WITNESS:  So the records that I had for
8  Michael Smith were his subagent links and codes,
9  which were shut down.  There were also some in
10 the takeover block that were sold by another
11 distributor, so there would have likely been
12 compensation through that channel, but it had
13 nothing to do with HII products that were sold.
14   Again, I saw no indication that there would
15 be anything there.
16 BY MR. BURKE:
17   Q.  One of my topics is if you're claiming you had
18 consent for the calls to plaintiff or other consumers in
19 the HAA teledatabase identified, you know, does HII
20 claim that there was consent for HAA's calls?
21   MS. CHATTIN:  Object to the form.
22   THE WITNESS:  That's not anything that I
23 saw, so I don't know the answer to that.
24 BY MR. BURKE:
25   Q.  All right.  So HII has no information

53 (Pages 206 - 209)

1  concerning consent for HAA's calls; is that right?
2      A.  I believe so, yes.
3      Q.  What about discipline? Was Scott Shapiro ever
4  disciplined by HII for his involvement in telemarketing?
5      A.  Shapiro directly, I don't believe that there
6  was any discipline, but some of the agencies that he was
7  associated with were on performance improvement plans or
8  onboarding plans.
9      Q.  Okay.  So Scott Shapiro, there was no
10  discipline; is that right?
11      A.  I don't believe so, no.
12      Q.  That's right?  That's correct, right?
13      A.  Correct.
14      Q.  And then what are the agents that were
15  disciplined who were using Shapiro to make their, you
16  know, lead generation who were disciplined? Duffie?
17      A.  Duffie -- Duffie was on a performance
18  improvement plan.  Blanchard was put on the onboarding
19  plan.  You know, I believe that there may have been a
20  Seminario PIP, a performance improvement plan.  I don't
21  recall off the top of my head.  I don't believe that I
22  saw anything in relation to McDowell.  Those are the
23  only ones that I can --
24      Q.  Were there any other agents that were
25  disciplined in connection with telemarketing outside of

1  HII or HAA?
2      A.  There were some other agencies we had
3  performance improvement plans with.  There was a
4  specific agency, I want to say.  I don't remember the
5  agency name, but Sergio Ortiz was the agent of record.
6  I think there were some telemarketing concerns there,
7  and he ended up being terminated.
8      Q.  When about was that with Mr. Ortiz?
9      A.  December of 2018.
10      Q.  Okay.  There are probably documents in the
11  production about that?
12      A.  Most likely, yes.
13      Q.  And Mr. Ortiz was also working through
14  Shapiro, wasn't he?
15      A.  I don't believe that I saw anything related to
16  that, but it was --
17      Q.  Yeah.
18      A.  -- same area, same downline.
19      MR. BURKE:  And, Danielle, my topic 25 is
20      the one about HAA annual customers and money.
21      MS. CHATTIN:  Uh-huh (indicates
22      affirmatively).
23      MR. BURKE:  Is this the one she -- that
24      we -- that you guys provided or are going to
25      provide in writing?

1      MS. CHATTIN:  That's right.  We're working
2  on generating a report for the agents that
3  you've -- that you've defined as HAA, all of the
4  agents you've defined as the HAA-affiliated
5  agents, and there is some scrubbing that needs to
6  be done to clean it up --
7      MR. BURKE:  Okay.
8      MS. CHATTIN:  -- but Christine and I are
9  working on that.
10      MR. BURKE:  And Shapiro is one of those, and
11  that might be a little more complex, but --
12      MS. CHATTIN:  Right.  Shapiro doesn't have
13  an agent's -- he's not in the system in that way,
14  so --
15      MR. BURKE:  Let's talk about --
16      MS. CHATTIN:  -- he's not in that report.
17      MR. BURKE:  There's a code we know now for
18  him, and we can look at what happened with that
19  code and we can try to recreate it, because
20  according to the e-mails, he was paid, just in a
21  different way.
22      MS. CHATTIN:  Okay.
23      MR. BURKE:  And the testimony says that too.
24  BY MR. BURKE:
25      Q.  Other than Shapiro and Simple Health, were

1  there any other lead gens, non-agents that were paid
2  through overrides or otherwise?
3      MS. CHATTIN:  Object to the form.
4      THE WITNESS:  So not to my knowledge.  That
5      wasn't something that I saw when we reviewed the
6      documentation.  I would not anticipate, but I
7      think that's something that can probably be
8      cross-checked.
9  BY MR. BURKE:
10      Q.  One of these add-on topics asked about
11  application numbers.  We came across this application
12  number HII 004247.  Were any of the agents' application
13  numbers conveyed to HII?
14      MS. CHATTIN:  Just for the record, I think
15      you just read the Bates number, not what the
16      application number is.
17      MR. BURKE:  Thanks.
18      MS. CHATTIN:  So she might be confused.
19      THE WITNESS:  Yeah.  I was going to say
20      that's not a format that I'm familiar with.
21  BY MR. BURKE:
22      Q.  The application number was HAA and then four
23  digits.
24      A.  That would not be an application number that
25  would be in our system.

54 (Pages 210 - 213)

Page 214

1    MR. BURKE: Okay. We noticed after I asked
2    you, Danielle, to run this down that the
3    application number is the same as their address.
4    MS. CHATTIN: Uh-huh (indicates
5    affirmatively). Same as --
6    MR. BURKE: On Cypress Avenue or whatever,
7    the four digits. What are the chances that one
8    complainant's application number was their
9    address.
10    MS. CHATTIN: Sorry, whose address? The
11    complainant's?
12    MR. BURKE: HAA's address.
13    MS. CHATTIN: Okay. There you go.
14    (Exhibit T was marked for identification.)
15    BY MR. BURKE:
16    Q. I'm going to show you what I have marked as
17    Exhibit T, because I might have doubled up on a prior
18    exhibit.
19    A. Okay.
20    Q. This is a declaration that was submitted by
21    HII in order to prevent me from obtaining information
22    pursuant to a subpoena. It's Bates No. 116537. The
23    metadata on this document says that it came from you as
24    a custodian.
25    Do you remember this declaration?

Page 215

1    MS. CHATTIN: Object to the form of the
2    question.
3    BY MR. BURKE:
4    Q. Do you remember this declaration?
5    A. I don't recall that one specifically, no.
6    Q. Paragraph 5 of this declaration says HII does
7    not have a contract with HAA and the date is July 23rd,
8    2019.
9    Haven't we seen two contracts that HII had
10    with Health Advisors of America, Inc., in the summer of
11    2019, one of which was for TrustedForm and another of
12    which was for paying Scott Shapiro overrides?
13    MS. CHATTIN: Object to the form.
14    THE WITNESS: So I believe the TrustedForm
15    was either late 2018 or early 2019, and then the
16    specific e-mails, I don't recall the dates on
17    those, but, again, I think that might have been
18    earlier than this specific document.
19    BY MR. BURKE:
20    Q. Didn't you just say a second ago that you
21    didn't know when Scott Shapiro stopped getting
22    overrides?
23    MS. CHATTIN: Object to the form.
24    You can answer.
25    THE WITNESS: Apologies, I thought you were

Page 216

1    asking about the specific document that we
2    referenced, and that document, I believe, was
3    dated earlier.
4    BY MR. BURKE:
5    Q. No. I'm not asking about like the date the
6    document was executed. I'm talking about like when
7    there were contracts that were in place. Weren't there
8    two contracts in place with Health Advisors of America
9    in the summer of 2019, one of which was the TrustedForm
10    one and one of which was the Scott Shapiro overrides?
11    MS. CHATTIN: Object to form.
12    THE WITNESS: So, again, I don't have the
13    specific dates on when the overrides were done
14    and over, so I can't necessarily speak to that at
15    this moment. As far as the situation with
16    TrustedForm, that was a contract with TrustedForm
17    to run their leads through those products, and,
18    again, as we've discussed, they never got on
19    TrustedForm, but they had been using some of the
20    other products.
21    BY MR. BURKE:
22    Q. I see here it says that Rising Eagle is not
23    permitted to make calls to sell insurance on behalf of
24    HII.
25    What's the basis for that?

Page 217

1    A. I would say that we probably had no records
2    related to Rising Eagle.
3    Q. Well, it doesn't say that, though. It says
4    they're not permitted to make calls; of course they
5    were. So the question is, was there a specific
6    directive that said Rising Eagle is not allowed to make
7    calls to sell insurance on behalf of HII?
8    MS. CHATTIN: Object to the form.
9    Go ahead.
10    THE WITNESS: Again, I don't know that we
11    had knowledge of Rising Eagle, so, no, there was
12    no specific directive about an entity that we
13    weren't aware of at the time.
14    BY MR. BURKE:
15    Q. Was there something that HII sent out to all
16    the folks that were telemarketing for it that said, make
17    sure you're not using Rising Eagle; they're not
18    permitted?
19    MS. CHATTIN: Object to the form.
20    THE WITNESS: Again, I don't think that
21    specific communication would have been sent, no.
22    BY MR. BURKE:
23    Q. In fact, there really was no prohibition
24    against Rising Eagle making calls to try to sell
25    insurance on behalf of HII in July 2019, was there?

55 (Pages 214 - 217)

Page 218

1     MS. CHATTIN: Object to the form.
2     THE WITNESS: To the best of my knowledge,
3    they had no access to sell products through our
4    system, so there would be no product for them to
5    sell on behalf of us.
6  BY MR. BURKE:
7    Q. Well, wait. We now know that Rising Eagle
8  made like a billion robocalls, right?
9     MS. CHATTIN: Object to the form.
10     THE WITNESS: That was what was in the
11  article, yes.
12  BY MR. BURKE:
13    Q. And HAA was its biggest customer, right?
14     MS. CHATTIN: Object to the form.
15     THE WITNESS: Again, I don't know that,
16  because I don't have those agreements. I don't
17  know what their distribution would have been on
18  that, but I --
19  BY MR. BURKE:
20    Q. That's what the FCC said.
21    A. -- would have said that they were a customer.
22    Q. That's what the FCC said, that they were --
23  that HAA was the biggest customer. And so, I mean, upon
24  what -- upon what was this statement that Rising Eagle
25  is not permitted to make calls to sell insurance on

Page 219

1  behalf of HII made? I mean, if there's no prohibition
2  against hiring Rising Eagle to make robocalls to try to
3  sell insurance on behalf of HII, then this declaration
4  is false; isn't that correct?
5     MS. CHATTIN: Object to the form.
6     THE WITNESS: I would say that we did not
7  have them as an approved distributor in our
8  system and that that would be the basis of that
9  declaration.
10  BY MR. BURKE:
11    Q. But you told me that almost none of your
12  distributors make their own calls, that they hire
13  vendors like Rising Eagle, right?
14    A. Some of them do, yes.
15    Q. You don't remember that declaration coming
16  across your desk in 2019?
17    A. I don't.
18    Q. If you had received it in 2019, would you have
19  balked and said, hold on a second, you know, maybe we
20  shouldn't sign this thing?
21     MS. CHATTIN: Object to the form.
22     THE WITNESS: If I received it in 2019, I
23  probably would have looked to see whether or not
24  either of those entities were listed in our
25  system to be able to sell product or to access

Page 220

1  quoted links, and if there was nothing there,
2  then I would have believed that statement to be
3  accurate and correct.
4  BY MR. BURKE:
5    Q. Well, we now know that the Shapiro thing was
6  kind of off the books, right?
7     MS. CHATTIN: Object to the form.
8     THE WITNESS: Again, there appears to have
9  been some relationship there that was not through
10  him directly presenting product.
11  BY MR. BURKE:
12    Q. I mean, knowing what you know now, would you
13  think that that declaration should be withdrawn?
14     MS. CHATTIN: Object to the form.
15     THE WITNESS: Knowing what I know now, I
16  would probably do different research than I would
17  have done at the time before I would have said
18  that that was a valid statement.
19  BY MR. BURKE:
20    Q. What kind of research would you do knowing
21  what you know today?
22    A. I would probably look specifically at some of
23  the codes that did not have product on it to see whether
24  or not there was any commissions associated.
25    Q. I mean, maybe you could look to TrustedForm to

Page 221

1  see whether there was any company that was engaged to do
2  telemarketing through TrustedForm?
3    A. So the way that the TrustedForm product works,
4  like that specific product, it has to be integrated onto
5  a website in order to capture everything, so I could
6  certainly inquire if that vendor is a vendor that they
7  have in their records.
8    Q. No. What I meant is you could have just
9  e-mailed Adam Chickman --
10     MS. CHATTIN: Object to the form.
11  BY MR. BURKE:
12    Q. -- right?
13     MS. CHATTIN: Object.
14  BY MR. BURKE:
15    Q. Okay. Hey, is there anyone -- is anyone using
16  your services for telemarketing for HII that is called
17  Health Advisors of America --
18     MS. CHATTIN: Same objection.
19  BY MR. BURKE:
20    Q. -- right?
21    A. Yes.
22    Q. And, really, Brian Krul and Dan Garavuso knew
23  all about that, didn't they, at the time?
24     MS. CHATTIN: Object to the form.
25     THE WITNESS: That?

56 (Pages 218 - 221)

Page 222

1　BY MR. BURKE:
2　　Q.　That Health Advisors of America was on the
3　TrustedForm platform. Well, using TrustedForm's
4　do-not-call list and Litigator Scrub, right?
5　　A.　I don't know if they had direct knowledge of
6　that at the time, no.
7　　　MR. BURKE: Let's make this Exhibit U.
8　　　(Exhibit U was marked for identification.)
9　BY MR. BURKE:
10　　Q.　Okay. I have put on the screen what was
11　produced by ActiveProspect at ACTPRO 629 through 633.
12　And here we have in January 9th, 2019, Chickman
13　e-mailing Garavuso about the agency's progress in
14　signing on to TrustedForm. And here we have Health
15　Advisors of America, aka, Great Health Plans, Health
16　Benefits Group, Enrollment Center, Scott Shapiro.
17　　　Do you see that?
18　　A.　Yes.
19　　Q.　All right. And there are all sorts of sort of
20　fun comments here about their communications with
21　Shapiro and that sort of thing. But, really, what I'm
22　offering it here is to demonstrate at least Garavuso,
23　but really HII, knew that Health Advisors of America was
24　working with TrustedForm.
25　　　Do you agree that it demonstrates that?

Page 223

1　　A.　That they were working to get set up, yes.
2　　Q.　Okay. And it also demonstrates that HII knew
3　all those aliases for Health Advisors of America,
4　including Scott Shapiro, right?
5　　A.　Yes.
6　　Q.　All right. So do you know how long Health
7　Advisors of America was an active customer of
8　TrustedForm?
9　　A.　Again, my understanding is they were going
10　through an integration process, but they never fully
11　completed that process, and that is my understanding of
12　kind of where things got left off, that they never
13　really finished the process of getting set up.
14　　Q.　Has HII done anything, other than, you know,
15　the policy changes that we've talked about -- which I
16　don't truly have a good idea of when those -- each of
17　these policies were implemented.
18　　　Has HII done anything to repudiate the
19　improper -- allegedly improper telemarketing we've
20　talked about today -- I will ask that in a different way
21　to make it a little easier to answer.
22　　　We've talked about a lot of stuff that HII has
23　done.
24　　A.　Uh-huh (indicates affirmatively).
25　　Q.　They terminated Duffie. They created some

Page 224

1　training programs which we haven't seen yet. They
2　phased out most of their outbound calling, right?
3　　A.　As far as the independent distribution, yes.
4　　Q.　Yeah.
5　　　So other than those things and whatever other
6　things we talked about today, has HII done anything to
7　repudiate the allegedly improper telemarketing that HAA
8　did?
9　　A.　I mean, I think those are most of the measures
10　that we took in response to what was going on in the
11　marketplace. I don't think that there was anything else
12　that was specifically done.
13　　　MR. BURKE: Okay. Let's go off the record
14　　for a sec.
15　　　THE VIDEOGRAPHER: The time is 5:41 p.m.,
16　　and we are now off the record.
17　　　(A recess was taken.)
18　　　THE VIDEOGRAPHER: The time is 5:44 p.m.,
19　　and we are back on the record.
20　　　(Exhibit V was marked for identification.)
21　BY MR. BURKE:
22　　Q.　All right. I have marked this document as
23　Exhibit V, like "Victor." It's HII 133454. 133454.
24　　　Do you recognize this document?
25　　A.　Yes.

Page 225

1　　Q.　What is it?
2　　A.　So that is the telemarketing fraud and abuse
3　training that was developed for use on our agent
4　training center, which is integrated with our
5　proprietary platform.
6　　Q.　Okay. So looking at page 19 of this thing,
7　HII 133472, I see there is some TCPA guidelines, right?
8　　A.　Correct.
9　　Q.　And so, like, it says companies must honor
10　the -- companies must maintain their own do-not-call
11　list.
12　　　Do you see that?
13　　A.　Yes.
14　　Q.　I mean, what does that mean?
15　　A.　They would be expected to have their own
16　internal do-not-call list, so if something or somebody
17　contacted them directly and said, hey, don't call me
18　again, they should have a list and they should have a
19　process for how to handle that and make sure that that
20　consumer is removed.
21　　Q.　And it says the do-not-call list must be
22　honored for five years.
23　　　What does that mean?
24　　A.　That if somebody is entered onto the
25　do-not-call list, then that particular request should be

57 (Pages 222 - 225)

Page 226

1 honored for at least five years.
2     Q. Did HII do anything to ensure that companies
3 were doing these things in '19, '20, '21, '22?
4     A. To my recollection, this is one of the things
5 that would have been covered in site visits where this
6 would have been a topic of conversation and discussion
7 to say, are you doing this, are you adhering to this? I
8 don't believe that I was in attendance for any of those
9 visits after this was launched.
10     Q. So if DNC was discussed at the site list -- at
11 the site visit, these audits, then it would be in the
12 report; is that right?
13     A. I would anticipate that it would be, yeah.
14     Q. Okay. And do you have any idea -- this is
15 dated 2019.
16     Do you have a date? Like, was it early, was
17 it late in 2019?
18     A. So I want to say that this was launched on
19 August 1st of 2019, but that might not be the exact
20 date. That's just my -- that's what stands out to me,
21 that this was launched August 21st, 2019.
22     Q. Okay. And so -- and this policy applies to
23 lead generators, doesn't it?
24     A. Yes. So this would have been talking about
25 specifically telemarketing sales role, TCPA. The idea

Page 227

1 behind these trainings was to give greater context to
2 the agents as to how these particular regulations apply
3 and what you need to be aware of.
4     Q. So the directives in this policy apply to lead
5 generators; isn't that right?
6     A. I believe in this context, it's talking
7 specifically about the rule and what the rule applies
8 to. And agents are supposed to be compliant with that
9 rule.
10     Q. You mean the laws that are on the prior page?
11     A. Yes.
12     Q. The FTC Act, the TCR, and the TCPA?
13     A. Yes.
14     Q. Okay. And then the lead generators, agencies,
15 call centers, and agents, are they also required to
16 follow the directives in this policy?
17     A. I mean, again, the agents and the agencies and
18 their contracting are supposed to be compliant with all
19 these rules to begin with. This is an educational
20 presentation to give them greater background as to what
21 those roles are and who those roles apply to so there's
22 no confusion over that.
23     We're attempting to eliminate the argument. I
24 wasn't aware that X, Y, Z thing needed to happen.
25     Q. And so where in the document does it say what

Page 228

1 you just explained, that these are not requirements of
2 HII, that it's just, you know, a summary of the law?
3     MS. CHATTIN: Object to the form.
4     THE WITNESS: So I think I'm a little
5 confused by the structure of the question. In
6 terms of how training modules were presented to
7 agents and what the agent training center was
8 speaking to was HII has specific requirements or
9 specific things that need to happen. One of
10 those things is that you have to be TCPA
11 compliant and complying with state, local,
12 federal regulations. These are the specific
13 regulations. These are what those regulations
14 are that you are supposed to be complying with.
15 BY MR. BURKE:
16     Q. I see.
17     Now, is there a subsequent training module?
18     A. That specific one is the one that's used
19 particularly for telemarketing. There are others
20 training modules.
21     Q. Like protecting the consumer, or is that what
22 we just looked at?
23     A. I think protecting consumers was the subtitle
24 for that one. I'd have to look at it and know. That
25 one is the one that is mandated for any independent

Page 229

1 distribution to complete.
2     Q. And was that policy Exhibit U sent to Scott
3 Shapiro?
4     A. I don't believe that he was on the system at
5 the time, so I don't know that he would have had access
6 to it.
7     Q. I mean, if HII knew that Scott Shapiro was a
8 lead generator, why not send him some stuff to help him
9 comply with the TCPA?
10     MS. CHATTIN: Object to the form.
11     THE WITNESS: Again, the agent training
12 center was designed to be in front of all agents
13 who have access to potentially sell products on
14 our system, so it was not distributed outside of
15 that. It was loaded into the system. Every
16 agent who came on board would have been required
17 to take it.
18 BY MR. BURKE:
19     Q. I get it. The question is why wasn't Scott
20 Shapiro required to take the course?
21     MS. CHATTIN: Object to the form.
22     Go ahead.
23     THE WITNESS: Because he -- he wasn't an
24 agent who had access to the system at that point
25 in time.

58 (Pages 226 - 229)

Page 230

1 BY MR. BURKE:
2     Q. But he was a person that HII was paying for
3 his lead generation efforts directly, right?
4         MS. CHATTIN: Object to the form.
5         THE WITNESS: The documentation that we've
6     looked at, it was specific to particular
7     agencies, and, again, as I have stated, I don't
8     know exactly when that ended.
9 BY MR. BURKE:
10     Q. I mean, did HII ever reach out to Shapiro or
11 Griffin and say, Hey, stop it with all of the
12 prerecorded message, press 1 robocalls?
13     A. I haven't seen anything to that effect, no.
14     Q. Why not?
15     A. Again, at the time I don't know that we knew
16 specifically that they were the ones generating that.
17 We thought that they were utilizing specific vendors
18 that were doing that.
19     Q. Do you really know that, or are you sort of
20 surmising that? I mean, we've seeing a lot of stuff
21 today that contradicts that narrative.
22         MS. CHATTIN: Object to the form.
23         THE WITNESS: Again, some of the things that
24     are there are, you know, administrative duties.
25     I don't know that I have seen anything that says

Page 231

1     Scott Shapiro specifically was creating these
2     leads and doing these things contemporaneous.
3     Some of the articles that came out later said
4     that there were relationships.
5 BY MR. BURKE:
6     Q. So --
7     A. So he may have been sourcing, but not
8 necessarily generating.
9     Q. So HII is sticking to its story that it had no
10 idea that Scott Shapiro was, you know, doing robocalls;
11 is that right?
12         MS. CHATTIN: Object to the form.
13         THE WITNESS: That he personally was doing
14     that and in control of that, no.
15 BY MR. BURKE:
16     Q. That his lead generation efforts were derived
17 from robocalls.
18         MS. CHATTIN: Object to the form.
19         Go ahead.
20         THE WITNESS: Again, I think we knew that he
21     had worked with vendors that had some robocall
22     issues, but we didn't necessarily know that he
23     specifically was involved in that.
24 BY MR. BURKE:
25     Q. Well, using vendors is specifically involved

Page 232

1 in it, isn't it?
2     A. I think there's a difference between hiring
3 somebody to do something and not vetting that person
4 correctly and appropriately versus being a person
5 actually running that particular organization.
6     Q. So HII was comfortable with Shapiro continuing
7 to accept money from HII for his lead generation efforts
8 because someone else was doing the lead generation?
9         MS. CHATTIN: Object to the form.
10         THE WITNESS: Again, this was a process over
11     time and a discovery over time. I think our
12     initial identification that there were problems,
13     we were trying to address upon on agency level,
14     and then there were, ultimately, some other
15     involvements there, where he was potentially
16     working with other agencies, and some of those
17     agencies were also put on performance improvement
18     plans or we stopped worker with them.
19 BY MR. BURKE:
20     Q. Yeah. It sounds like Scott Shapiro was like
21 doing all this bad stuff with lots of different
22 agencies, right?
23     A. Potentially, yes.
24     Q. Yeah.
25         And so the easiest thing would be, like, say

Page 233

1 to Scott, We're not going to pay you anymore, right?
2 Stop working for us?
3         MS. CHATTIN: Object to the form.
4         Go ahead.
5         THE WITNESS: So I don't think he worked for
6     us. I think he worked for the various agencies,
7     and, again, as I stated, at this point, I don't
8     know exactly when those payments may have ended.
9 BY MR. BURKE:
10     Q. You're saying Scott Shapiro didn't work
11 directly for HII even though HII paid Scott Shapiro
12 directly, albeit through probably an illegal scheme to
13 avoid licensing rules?
14         MS. CHATTIN: Object to the form of the
15     question.
16         Go ahead.
17         THE WITNESS: So I think that if a specific
18     agency indicated that a person should get an
19     override or somebody they were working with
20     should have an override, we would have worked
21     with that.
22 BY MR. BURKE:
23     Q. I want to know -- please just answer my
24 questions. It's late in the day and --
25     A. I'm attempting to. I really am.

Page 234

1  MS. CHATTIN: Hold on.
2  BY MR. BURKE:
3  Q. I don't know why you're talking about
4  hypotheticals. We're asking about a specific person and
5  specific actions that HII did or didn't do. Just answer
6  my questions, please.
7  MS. CHATTIN: Object to the form of the
8  question.
9  Go ahead.
10  THE WITNESS: Yeah. I don't think that
11  anything that I have seen tells me that we
12  contracted directly with Scott inasmuch as there
13  were arrangements that were made when Scott was
14  working with agencies to reimburse him for
15  certain aspects of those sales.
16  BY MR. BURKE:
17  Q. Yeah.
18  And so just to be clear, HII denies that it
19  paid Scott Shapiro for its -- his lead generation
20  efforts even though it was paying for the overrides; is
21  that right?
22  MS. CHATTIN: Object to the form.
23  THE WITNESS: I did not see anything in that
24  documentation that says specifically that it was
25  just for lead generation, so I can't --

Page 235

1  BY MR. BURKE:
2  Q. Listen, the answer doesn't have to come from a
3  specific document. I'm asking you HII's answer to that
4  question. It's not limited to a document. If something
5  happened in the world having to do with HII and Shapiro,
6  I want the answer. What happened? It's not -- the
7  question is not -- you know, I can read a document --
8  A. Uh-huh (indicates affirmatively).
9  Q. -- right? So can you. But your job as the
10  corporate representative is to do more than that. It's
11  to look beyond the documents and provide the testimony,
12  especially stuff like this that's directly in here,
13  about what HII knew, didn't know, and did and didn't do.
14  So I do not want you to answer any more
15  questions -- I mean, we're almost done. But my
16  questions are not what the document says. I know what
17  it says. The question is, is HII denying that it paid
18  Scott Shapiro directly for his lead generation efforts?
19  MS. CHATTIN: Objection.
20  Go ahead.
21  THE WITNESS: And I am stating that when I
22  looked at what we had available, I did not see
23  any product-specific remuneration. I understand
24  that there are documents. We had the
25  conversation about researching that. My

Page 236

1  understanding of Shapiro would be that he was
2  providing general administrative services and
3  part of that was sourcing leads.
4  BY MR. BURKE:
5  Q. What other administrative services was Shapiro
6  providing to whom?
7  A. Running offices, renting office space, helping
8  with payroll, things of that nature.
9  Q. How do you know that was what he was doing?
10  A. Again, this is what was communicated to us at
11  the time.
12  Q. By who?
13  A. That was part of what he was doing when we
14  went on our site visits, when we talked to the account
15  rep. It was, he comes in, he helps them with the
16  payroll, he helps them with the general administrative,
17  he helps with sourcing leads.
18  Q. So the answer is "yes," HII paid Scott Shapiro
19  for his lead generation efforts. It's just a caveat
20  that HII thinks it was paying for other stuff too
21  through Shapiro; is that right?
22  MS. CHATTIN: Object to the form.
23  THE WITNESS: I think that the setup was for
24  general administrative, yes.
25  BY MR. BURKE:

Page 237

1  Q. Including lead generation, right?
2  A. Including, yes.
3  Q. Got another exhibit on the screen.
4  (Exhibit W was marked for identification.)
5  BY MR. BURKE:
6  Q. This is Exhibit W. I think this is a
7  consecutive, but there's a bunch of stuff here, HII
8  136556. It's 25 pages long.
9  A. Uh-huh (indicates affirmatively).
10  Q. There's an attachment to these e-mails called
11  Protecting the Consumer, TCPA, FTC, TSR.
12  Do you see that?
13  A. Yes.
14  Q. What is this document?
15  A. So that document is a training that was being
16  developed. I believe the original intent was to replace
17  and/or update the telemarketing fraud and abuse one. I
18  don't recall if it was actually replaced for the
19  independent distribution, because this was during the
20  time period that we were sort of moving away from that
21  and more towards the Medicare space, so I --
22  Q. So was this policy ever implemented for
23  anybody?
24  A. I believe it may have been implemented on the
25  Medicare side, but I would have to check on dates and

60 (Pages 234 - 237)

Page 238

1  whether or not this is a final version.
2      Q.  Are there any other trainings other than these
3  two that we just looked at, Exhibit W and Exhibit B,
4  having to do with telemarketing for HII?
5      A.  Potentially the compliance sales guidelines
6  and I think a couple of the carriers when they went
7  through to prove their trainings had some pieces for
8  that.
9      Q.  The compliance sales guidelines we already
10  went through, didn't we?
11      A.  It's been a long day.  I'm sorry.  I don't
12  recall going through that one.
13      Q.  Yeah.
14          Other than compliance sales guidelines, did
15  you have -- there was one other thing that you said.
16      A.  I think some of the carrier trainings may have
17  referenced TCPA for specific products, but I don't
18  believe that any of them went into a ton of detail.  I
19  think it was more of a:  If it was mentioned, it was
20  mentioned as these are things that should be -- I think
21  the only one that went into real detail about it would
22  have probably the Chubb training.
23      Q.  Was there any training from American
24  Financial?
25      A.  American Financial did have product-specific

Page 239

1  training, yeah.
2      Q.  Did that mention telemarketing?
3      A.  I don't recall.  The carriers were all
4  certainly aware of the other trainings.  They knew how
5  the training process was supposed to work and that those
6  more general guidelines were being presented on the
7  front end as mandatory trainings, so some of them chose
8  to reiterate certain things.  Some of them chose to let
9  those trainings stand.
10      Q.  But we're talking about American Financial.
11      A.  And I don't recall if they specified in
12  theirs.
13      Q.  Did American Financial's training mention the
14  TCPA?
15      A.  I don't recall if it specified.
16      Q.  I'm searching for the compliance sales
17  guidelines.
18      A.  It should say compliance sales guidelines.
19      Q.  Is it like 70 pages long?
20      A.  I wouldn't think so, no.
21      Q.  Let me do a screen share on this.  We're
22  looking at HII 117988.
23          Do you know what this document is?
24      A.  So that is the policy and procedure manual for
25  compliance.

Page 240

1      Q.  So is the policy sales guideline within this,
2  do you think?
3      A.  No.  It would have been within the agent
4  training center, so any training documents.  I mean, I'm
5  not 100 percent the TCPA is mentioned in that.
6      Q.  Okay.  Let me just show you a quickie here,
7  and tell me if it might be in here.
8          MR. MESSINA:  Off the record for just a
9  second.
10          THE VIDEOGRAPHER:  The time is 6:06, and we
11  are now off the record.
12          MR. MESSINA:  I had a call at 6:00.  I
13  should have told you.  I don't want to interrupt
14  your deposition.  It's just going to take like
15  five minutes.  How much longer are you going to
16  be so I can text --
17          MR. BURKE:  I'm hoping to, like, find this
18  policy and then be done.
19          MR. MESSINA:  Okay.
20          THE WITNESS:  Do you mind if I run to the
21  restroom while you do that?
22          MR. BURKE:  Is it a long call?
23          MR. MESSINA:  No.  Literally three to five
24  minutes.  My client is leaving tomorrow on
25  vacation.

Page 241

1          (A recess was taken.)
2          THE VIDEOGRAPHER:  The time is 6:12 p.m.,
3  and we are back on the record.
4  BY MR. BURKE:
5      Q.  All right.  Oh, is there a compliance sales
6  PowerPoint?
7      A.  Yes.
8      Q.  But it's not "Protecting the Consumer"?
9      A.  No.  That would be a separate one.
10      Q.  All right.  Well, let's see what this is.
11  I've got 133809 on the screen, entitled "Compliant Sales
12  Guidelines."
13          Is this what you were talking about when you
14  testified about compliance sales guidelines?
15      A.  That would be a portion of it, so there's a
16  PowerPoint or presentation that is gone through where
17  there are specific slides that talk about particular
18  issues, and then this was a one-pager or takeaway that
19  was kind of a wrap-up designed to be a quick reference
20  guide.
21      Q.  So was this document circulated to anybody
22  ever?
23      A.  It would have been available in the agent
24  training center to every agent.
25      Q.  When was it first made available in the agent

61 (Pages 238 - 241)

Page 242

1 training center?
2    A. At the same time of the compliant sales
3 guidelines training launched. I want to say that was at
4 some point in 2019, but I don't remember the exact time.
5 I would have to research that.
6    Q. Let's see if we can find that dang PowerPoint.
7 Once again, Dan comes through.
8    Is this the compliance sales guideline
9 PowerPoint?
10    A. Yes.
11    Q. Awesome.
12    Let me -- this is -- I'm just going to label
13 it. This is HII 128128, Exhibit X.
14    (Exhibit X was marked for identification.)
15 BY MR. BURKE:
16    Q. All right. So how was this PowerPoint used?
17    A. Same thing. It was loaded into our agent
18 training center, which is integrated into the system,
19 and it is a mandatory presentation that has to be
20 reviewed and an assessment has to be passed before
21 agents can access specific product trainings.
22    Q. And were existing agents required to go
23 through this training?
24    A. Yes. So existing agents -- it kind of varied
25 depending on each of these various launches. I want to

Page 243

1 say it was between 90 and 180 days that they were given
2 the option to complete it at the end of whatever that
3 specified launch period was for that product. If they
4 haven't completed it, they would no longer have access.
5    Q. And when the agents were doing this training,
6 could they see these notes on the bottom?
7    A. No. Those particular notes I think were the
8 voiceover script. So it was a presentation.
9    Q. Like a movie?
10    A. Yeah.
11    Q. You click on it and it just plays for a few
12 minutes?
13    A. Yes.
14    Q. Okay. And this is the last of the training
15 materials that had anything to do with TCPA, right?
16    A. This would be the only other one that I would
17 think would specifically have something in it, yes.
18    MR. BURKE: Okay. So I'm going to leave the
19    deposition open because we had a bunch of
20    questions we didn't get answers to. I'm not sure
21    we got complete answers to everything. With that
22    stipulation -- with that objection and that
23    statement, I'm done for today.
24    MS. CHATTIN: We object to keeping it open,
25    for the record, but I don't have any questions

Page 244

1 for you, Christine.
2    THE WITNESS: Okay.
3         CROSS-EXAMINATION
4 BY MR. MESSINA:
5    Q. Christine, I know it's been a long day, so
6 just one question. And I represent defendants NBBI and
7 AccessOne in the litigation. I have a microphone now.
8 You were asked earlier, did NBBI -- or
9 basically, whether NBBI and AccessOne did anything to
10 repudiate alleged improper telemarketing.
11    Do you recall that question?
12    A. I do.
13    Q. Do you recall your response to that question?
14    A. I believe it was not to my knowledge, since we
15 didn't have a direct relationship.
16    Q. Okay. And that accurately describes your
17 answer, that, essentially, you don't know because there
18 was no direct relationship with HII?
19    MR. BURKE: Objection.
20    THE WITNESS: Correct.
21    MR. MESSINA: Okay. That's all I have.
22 Thank you.
23    MR. McMANUS: I have no questions.
24    MR. MYSOREWALA: I have no questions.
25    MS. CHATTIN: The witness will read and

Page 245

1 sign. Thank you.
2    THE VIDEOGRAPHER: We are off the record at
3 6:17 p.m., and this concludes today's testimony
4 given by Christine Gillis. The total number of
5 media units used was five and will be retained by
6 Veritext Legal Solutions.
7    (Deposition concluded at 6:17 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

62 (Pages 242 - 245)

Page 246

```
1
2          CERTIFICATE OF OATH
3
4   STATE OF FLORIDA
5   COUNTY OF HILLSBOROUGH
6
7       I, the undersigned authority, certify that
8   CHRISTINE GILLIS, appeared personally before me and was
9   duly sworn.
10
11      WITNESS my hand and official seal this 16th day
12  of August, 2022.
13
14
15
16
17
18
19
20       Aaron T. Perkins, RMR, CRR, CRC, CCR
         Notary Public - State of Florida
21       My Commission Expires:  4/1/2024
         Commission No. GG975331
22
23
24
25
```

Page 247

```
1        REPORTER'S CERTIFICATE
2
   STATE OF FLORIDA
3  COUNTY OF HILLSBOROUGH
4
       I, Aaron T. Perkins, Registered Merit Reporter
5   and Certified Realtime Reporter, certify that I was
    authorized to and did stenographically report the
6   deposition of CHRISTINE GILLIS; that a review of the
    transcript was requested; and that the transcript is a
7   true and complete record of my stenographic notes.
8
9       I further certify that I am not a relative,
    employee, attorney, or counsel of any of the parties,
10  nor am I a relative or employee of any of the parties'
    attorney or counsel connected with the action, nor am I
11  financially interested in the action.
12
13      Dated this 16th day of August 2022.
14
15
16
17
18
19
20       Aaron T. Perkins, RMR, CRR, CRC
21
22
23
24
25
```

Page 248

```
1              Veritext Legal Solutions
               1100 Superior Ave
2                 Suite 1820
               Cleveland, Ohio 44114
3              Phone: 216-523-1313
4
   August 18, 2022
5
   To: MS. CHATTIN
6
   Case Name: Bilek, Mary, Etc. v. National Congress Of Employers, Inc.,
7  Et Al.
8  Veritext Reference Number: 5335996
9  Witness:  Christine Gillis       Deposition Date:  8/3/2022
10
   Dear Sir/Madam:
11
12 Enclosed please find a deposition transcript.  Please have the witness
13 review the transcript and note any changes or corrections on the
14 included errata sheet, indicating the page, line number, change, and
15 the reason for the change.  Have the witness' signature notarized and
16 forward the completed page(s) back to us at the Production address
   shown
17
   above, or email to production-midwest@veritext.com.
18
19 If the errata is not returned within thirty days of your receipt of
20 this letter, the reading and signing will be deemed waived.
21
   Sincerely,
22
   Production Department
23
24
25 NO NOTARY REQUIRED IN CA
```

Page 249

```
1              DEPOSITION REVIEW
               CERTIFICATION OF WITNESS
2
       ASSIGNMENT REFERENCE NO: 5335996
3      CASE NAME: Bilek, Mary, Etc. v. National Congress Of
   Employers, Inc., Et Al.
       DATE OF DEPOSITION: 8/3/2022
4      WITNESS' NAME: Christine Gillis
5      In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7      I have made no changes to the testimony
   as transcribed by the court reporter.
8  _____
9  Date       Christine Gillis
10      Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
       They have read the transcript;
13     They signed the foregoing Sworn
           Statement; and
14     Their execution of this Statement is of
           their free act and deed.
15
   I have affixed my name and official seal
16
   this _____ day of_____, 20____.
17
18     Notary Public
19
       Commission Expiration Date
20
21
22
23
24
25
```

63 (Pages 246 - 249)