1       UNITED STATES DISTRICT COURT
                 FOR THE
2        NORTHERN DISTRICT OF ILLINOIS
     MARY BILEK            §
3                          §
        Plaintiff          §
4                          §
         V.                §   Civil Action No.
5                          §   1-18-cv-03083
     NATIONAL CONGRESS OF   §
6    EMPLOYERS, INC. et al. §
                           §
7        Defendant          §

8

9

10       ORAL AND VIDEOTAPED DEPOSITION OF
                   JOHN SPILLER
11                JUNE 30, 2022

12

13

14       ORAL AND VIDEOTAPED DEPOSITION OF JOHN SPILLER,

15   produced as a witness at the instance of the Plaintiff

16   and duly sworn, was taken in the above styled and

17   numbered cause on Thursday, June 30, 2022, from

18   9:22 a.m. to 12:59 p.m., before DONNA QUALLS, Notary

19   Public in and for the State of Texas, reported by

20   computerized stenotype machine, at the offices of King &

21   Spalding, LLP, 1100 Louisiana, Suite 4000, Houston,

22   Texas, pursuant to the Federal Rules of Civil Procedure,

23   the First Emergency Order Regarding the COVID-19 State

24   of Disaster, and any provisions stated on the record or

25   attached hereto.



John Spiller

June 30, 2022
Pages 2 to 5

## Page 2

```
 1            A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFF MARY BILEK:
         ALEXANDER H. BURKE
         DANIEL J. MAROVITCH (BY ZOOM)
 4       BURKE LAW OFFICES, LLC
         155 North Michigan Avenue, Suite 9020
 5       Chicago, Illinois 60601
         (312) 729-5288
 6       aburke@burkelawllc.com
         dmarovitch@burkelawllc.com
 7
 8
 9   FOR THE DEFENDANT NATIONAL CONGRESS OF EMPLOYERS, INC.:
         JOSEF M. MYSOREWALA
         LAW OFFICE OF JOSEF M. MYSOREWALA, PLLC
10       2000 S. Dixie Highway, Suite 112
         Miami, Florida 33133
11       (305) 356-1031
         josefm@lawjmm.com
12
13
14   FOR THE DEFENDANT AMERICAN FINANCIAL:
         AIMEE E. HOUSINGER
15       GREENBERG TRAURIG, LLP
         1000 Louisiana, Suite 6700
         Houston, Texas 77002
16       (713) 374-3570
         housingera@gtlaw.com
17
18
19   FOR THE DEFENDANT NATIONAL BENEFIT BUILDERS AND ACCESS
     ONE:
         CHARLES J. MESSINA
20       JEREMY BROOKS (BY ZOOM)
         GENOVA BURNS LLC
21       494 Broad Street
         Newark, New Jersey 07102
22       (973) 646-3278
         cmessina@genovaburns.com
23
24
25
```

## Page 3

```
 1   FOR DEFENDANT HEALTH INSURANCE INNOVATIONS, INC.
         DANIELLE CHATTIN
 2       KING & SPALDING, LLP
         1180 Peachtree Street, NE, Suite 1600
 3       Atlanta, Georgia 30309
         (404) 572-3546
 4       dchattin@kslaw.com
 5
 6   Also Present:
         MAX AFRICK (BY ZOOM)
 7       DANIEL ALPIZAR, THE VIDEOGRAPHER
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1                  INDEX
 2                                          PAGE
 3
     APPEARANCES.................................  2
 4
 5   JOHN SPILLER
 6     Examination by Mr. Burke......................   7
       Examination by Ms. Chattin...................  59
 7     Examination by Mr. Messina................... 111
       Examination by Ms. Housinger................ 122
 8     Further Examination by Mr. Burke............. 124
 9
     Signature Waived
10
11   Reporter's Certificate........................ 126
12
                   EXHIBIT INDEX
13
14   NUMBER       DESCRIPTION                    PAGE
       Exhibit A    Declaration of John Spiller    33
15     Exhibit B    Declaration of John Spiller    91
16
17
18
19
20
21
22
23
24
25
```

## Page 5

```
 1       THE VIDEOGRAPHER:  We are now on the
 2   record.  This begins Videotape No. 1 in the deposition
 3   of John Spiller in the matter of Mary Bilek versus
 4   National Congress of Employers, Incorporated.
 5       Today is June 30th, 2022.  The time is
 6   9:22.  This deposition is being taken at King & Spalding
 7   at the request of the Burke Law firm.  The videographer
 8   is Daniel Alpizar of Magna Legal Services, and the court
 9   reporter is Donna Qualls with Magna Legal Services.
10       Will counsel and all parties present state
11   their appearances and whom they represent.
12       MR. BURKE:  Good morning.  Alex Burke here
13   for the plaintiff.
14       MS. HOUSINGER:  Aimee Housinger on behalf
15   of American Financial.
16       MR. MESSINA:  Charles Messina on behalf of
17   National Benefit Builders and Access One.
18       MS. CHATTIN:  Danielle Chattin from King &
19   Spalding on behalf of Health Insurance Innovations.
20       MR. MYSOREWALA:  Josef Mysorewala on behalf
21   of National Congress of Employers, Inc.
22       MR. BURKE:  And then on the phone we have a
23   couple of folks.  We have Dan Marovitch from the Burke
24   Law Offices.
25       And is there anyone else?
```



John Spiller

June 30, 2022
Pages 6 to 9

Page 6

1        MR. MESSINA:  I believe my colleague,
2  Jeremy, also with Genova Burns.  Let me just confirm.
3        MR. BURKE:  Or not --
4        MR. BROOKS:  Yes, I'm on as well.
5        MR. BURKE:  And it's a Zoom, not a phone, I
6  should say.
7        MS. CHATTIN:  And I believe Max Africk on
8  behalf of Health Insurance Innovations is probably on.
9        THE VIDEOGRAPHER:  The court reporter may
10  now swear in the witness.
11             JOHN SPILLER,
12  having been duly sworn, testified as follows:
13        (Simultaneously speaking.)
14        MR. MESSINA:  Just as initial matter --
15  yeah, you guys want to do -- put some stuff on the
16  record?
17        MS. CHATTIN:  Yeah.  I think we just wanted
18  to stipulate that one objection from defense counsel
19  will apply to all defense -- defendants.
20        Does everyone agree to that?
21        MR. MESSINA:  Yes.
22        MR. MYSOREWALA:  Sure.
23        MR. BURKE:  Yes.
24        MS. CHATTIN:  And we also wanted to make a
25  note that Mr. Spiller needs to leave at 2:00 p.m.  And

Page 7

1  so counsel have all conferred about divvying up the time
2  to question the witness and will accommodate each other
3  accordingly.
4        Does everyone agree to that?
5        MR. MYSOREWALA:  Yes.
6        MR. BURKE:  Yes.
7        MS. CHATTIN:  Great.  Thank you.
8             EXAMINATION
9  BY MR. BURKE:
10    Q.  All right.  Would you state your name for the
11  record.
12    A.  John Caldwell Spiller, II.
13    Q.  And, Mr. Spiller, where do you live?
14    A.  Houston, Texas.
15    Q.  And what do you do now for a living?
16    A.  I run and operate a -- my own SMS platform.
17    Q.  And what's the highest level of education
18  you've attained?
19    A.  Went to my master's.  I did two years in my
20  master's, and then I dropped out.
21    Q.  Master's in?
22    A.  Accounting.
23    Q.  Where?
24    A.  University of Texas.
25    Q.  And I understand part of your career, or most

Page 8

1  of your career, has had to do with marketing; is that
2  right?
3    A.  Pretty much.
4    Q.  Pretty much.  Okay.
5        When did you first start doing anything
6  relating to marketing?
7    A.  I took a job -- my last job in the corporate
8  world was with a company called All Web Leads.  They're
9  based out of Austin, Texas.  I got a -- I got a job with
10  them selling insurance leads, and that's kind of where
11  it got me into understanding how to sell insurance
12  leads.  I was able to acquire some insurance leads at
13  some point after I left All Web.  Within 11 months -- I
14  told myself, if I can take this company from where it
15  was at, at 3 million up, if I can increase their
16  revenue, I would quit that firm.  And I would end up
17  starting my own company and start selling for myself.
18        So I ended up doing that.  I proved myself
19  in the first six months.  I became their number one
20  sales rep.  I increased their revenue up about
21  3 million.  So at that point I resigned, and I went off
22  and I acquired my own leads, and that's when I got into
23  the marketing world.
24    Q.  Roughly what dates were you at All Web Leads?
25    A.  Oh, shit.  Good question.  2014 to 2015, I

Page 9

1  believe.
2    Q.  Okay.  And so, when you left All Web Leads
3  around 2015 --
4    A.  Uh-huh.
5    Q.  -- you said you started your own gig; is that
6  right?
7    A.  Uh-huh.
8    Q.  Yes?
9    A.  Yes.
10    Q.  And so what was that new business called?
11    A.  Rising Eagle Capital Group.
12    Q.  And when you started Rising Eagle in around
13  2015, what was Rising Eagle doing?
14    A.  Selling insurance leads.  That was it -- trying
15  to connect my clients that were in south Florida with
16  guys that sold live transfers.  I even tried to start my
17  own live transfer platform at one point.  That was a
18  huge mistake.  That cost me about 110,000 and went down
19  the drain pretty quick.
20    Q.  So -- so when you say "selling insurance
21  leads," what does that mean?  What's an insurance lead?
22    A.  I was acquiring insurance leads.  There were
23  people that went online and opted in to being
24  recalled -- to be -- opted in to be called for health
25  insurance or car insurance or auto insurance or -- or



John Spiller

June 30, 2022
Pages 10 to 13

Page 10

1 life insurance.
2         And a lead came with the person's first
3 name, last name, IP address, address, city, state, ZIP;
4 and some of them also came with a attached opted-in
5 lingo from, let's say a -- a company that's out there
6 that puts these 13 to 15 character digits at the end of
7 every lead.
8     Q. And so these are like CSV flat files?
9     A. CSV files, yeah.
10     Q. And each lead is like a -- a row of data; is
11 that right?
12     A. Uh-huh, uh-huh.
13     Q. "Yes"?
14     A. Yes.
15     Q. And -- okay. And so, at some point, did Rising
16 Eagle begin making outbound calls?
17     A. That's pretty much a -- yeah. I mean, at some
18 point, it did. I mean, it took -- it took me roughly
19 two years from the time that I started Rising Eagle
20 Capital Group. I think I started that company in 2014,
21 and it took me 2 1/2 years from the incorporation of
22 Rising Eagle Capital Group to be approached by a
23 gentleman named Michael Smith in 2016 -- the end of
24 2016, the beginning of 2017.
25         He had told me that my ex-business partner

Page 11

1 was sending them calls. And I didn't know anything
2 about robo dialing. I didn't know anything about any of
3 that nonsense until after Michael Smith introduced me to
4 it. He told me this is how he's generating the calls.
5 And I was, like, okay. This is interesting.
6         So at that point, I decided to -- instead
7 of me selling insurance leads, I started selling calls.
8 I was selling a call for $200 a sale. So when the agent
9 answers the phone and they make a sale, they have to
10 show me their dialer. So I get to see their dialer. I
11 get to see all that they're -- calls that they're
12 receiving. And I can have access to the back end of
13 their system where I can be -- be able to go into
14 Veriswitch -- or not Veriswitch; it's VICIdial -- in the
15 back end of their system. And I can pull a report to
16 see how many sales they had for the day.
17         Based upon on how many sales they had of
18 the day, I knew how to calculate that times $200, and
19 that'd be roughly my pay from that one center for the
20 day.
21         When I had started, it was only for Scott
22 Shapiro and Michael Smith with HAA, Health Advisors of
23 America. I believe Michael Smith had just acquired that
24 company from Scott Shapiro. Regardless -- okay.
25         So then came my beginning of my robo

Page 12

1 dialing career. Started out at the end of 2016, the
2 beginning of 2017. I first was with a company for six
3 months called Celerity Telecom. Celerity --
4     Q. Okay. Let's -- hold on.
5     A. Okay.
6     Q. Let me -- let me just redirect here.
7     A. Okay.
8     Q. So when Mike Smith approached you in around
9 2017, I think you said, or 2016, what did he say? What
10 did he want?
11     A. He said he heard about me through the grapevine
12 of me being in insurance sales, lead sales. And he said
13 he heard that I was also a business partner with a
14 former -- one of his former constituents Matthew Jones.
15 And I was, like, okay. This is interesting. And he
16 said Matt Jones was sending him calls.
17         And I said, "Okay, what's a call?"
18         He's like, "Well, it's a" -- "you're going
19 to play a prerecorded message."
20         I was like, "Okay, what's a prere-" -- so
21 again, he had to teach me what a -- what I was going to
22 start doing.
23     Q. And at this time, was Mike Smith working for
24 Health Advisors of America?
25     A. Yes.

Page 13

1     Q. Okay. And -- and, to your knowledge, what --
2 what was Health -- Health...
3     A. Advisors of America?
4     Q. Advisors of America?
5     A. It was a call center, a massive call center. A
6 really awesome call center. I mean, that was one of the
7 things that I prided Scott and Mike Shapiro -- Michael
8 Smith on, was they were able to build themselves a
9 massive call center. They had -- shit, the first time I
10 went to their office was in 2017; and they had, I mean,
11 around 100, 150 individuals in that small little call
12 center. I mean, that was insane for me. I'd never been
13 a part of anything like that.
14     Q. And where was that call center?
15     A. Fort Lauderdale. I don't remember the address.
16     Q. And so how -- how did you come to -- to visit
17 the Fort Lauderdale offices of Health Advisors of
18 America or HAA?
19     A. They invited me.
20     Q. When about was that?
21     A. It happened in 2017, twice or three times in
22 2018, and four times in 2019 and no times in 2020.
23 After I got served with my lawsuit, they all fell away.
24     Q. What lawsuit are you referring to?
25     A. The lawsuit against me and the FCC,



John Spiller

June 30, 2022
Pages 14 to 17

Page 14

1  $225 million lawsuit.
2      Q.  Okay.  So I think you said Smith at HAA
3  approached you.
4          And so did you -- did you begin working
5  with HAA?
6      A.  So he had -- so he had approached me.  And he
7  had said that he had a friend of his, a mutual friend of
8  ours that he knew I wasn't in a rel- -- I didn't have a
9  close relationship with, and that was Scott Shapiro at
10  that time.  In 2016, I had sold -- sold Scott some --
11  some auto insurance leads.  During the time that I met
12  Scott was like in 2015 through my ex-business partner,
13  Lewis Rietti.  And Lewis Rietti introduced me to Scott
14  Shapiro and the whole south Florida region of insurance
15  guys; also to a gentleman of the name -- what is his
16  name?  He's huge in south Florida -- Seth Cohen.
17          Well, anyways -- I mean, I'm certain HII
18  knows about Seth Cohen.  Anyways...
19      Q.  Why do you think HII knows about Seth Cohen?
20      A.  Because Seth Cohen sold a shit ton of insurance
21  products for HII and for all those groups in south --
22  but he was never in robo dialing.  He never did anything
23  along those lines.
24      Q.  How did he generate those leads as far as you
25  know?

Page 15

1      A.  He had -- he had agents that sat in his office,
2  about 150 of them, answering phone calls when someone
3  would pick up a phone.  They would use what's called
4  a -- predictive dials.  Someone would pick up the phone,
5  an agent would pick up the phone, and they would end up
6  talking with each other.  So there was no prerecorded
7  message in between them two.
8      Q.  And what was Seth Cohen's company called?
9      A.  Can I look at my phone?
10      Q.  Yeah.
11      A.  This is him.  Insurance Care Direct, ICD.
12      Q.  Do you have any idea if Scott -- or Seth Cohen
13  is related to Jared Cohen?
14      A.  I don't know anything along those lines.
15      Q.  Okay.  Have you ever heard of America's Health
16  Center?
17      A.  No.
18      Q.  Okay.  All right.  So did you eventually begin
19  making outbound phone calls for HAA?
20      A.  Yes.
21      Q.  When did that begin?
22      A.  The end of 2016, the beginning of 2017.
23      Q.  And --
24      A.  I think in the beginning, I only was able to
25  send them about 1,000 calls.  That was -- that happened

Page 16

1  for like the first three weeks.  Celerity System, that
2  was the -- in the beginning, I didn't even know how to
3  build a -- a message.
4          After I figured out that they used actual
5  individuals to record the messages, I eventually hired
6  those same individuals to record my messages for us on
7  Fiverr.  They were eventually shared with Scott Shapiro
8  and Michael Smith to approve them.  They were loaded in
9  the system.
10      Q.  So you said, when you began making outbound
11  calls through Celerity in late 2016, early 2017 for HAA,
12  you were only able to send them 1,000 calls a day.
13      A.  Uh-huh.
14      Q.  What do you mean send them 1,000 doll- -- calls
15  a day?  Is that the total number of outbound calls, or
16  is that just the number --
17      A.  No, that's just the number of calls that
18  pressed "1" and wanted to speak with a live agent.
19      Q.  Will you explain how that -- how that works,
20  between, like, the placement of the call to when the
21  call is transferred?
22      A.  You play a prerecorded message.  Says something
23  along the lines of "We have health insurance like Blue
24  Cross Blue Shield" -- "like Blue Cross Blue Shield,"
25  "like Aetna," all these other names of -- common names

Page 17

1  of household name insurance companies like them.  I
2  never said that they had insurance, per se, that was
3  H- -- that was Blue Cross Blue Shield.  I said "like" in
4  the message.
5          Regardless, they would end up pressing "1"
6  if they would like to speak with an insurance agent, or
7  they can press "9" to be placed on our "do not call"
8  list.
9          All the people that pressed "9," they went
10  into our internal call list.  The only ones that did not
11  was the agent -- was the clients that got through the
12  system, contacted HAA, and told -- told the agent that
13  they would like to be removed and placed on the "do not
14  call" list.  Those DNC lists were never sent to me until
15  2019.
16      Q.  All right.  So...
17      A.  So that's basically the -- the scope of how it
18  works.
19      Q.  All right.  So --
20      A.  When the message is played, the client
21  presses -- the prospect presses "1" to get transferred
22  to an agent or presses "9" to be placed on our "do not
23  call" list.
24      Q.  Okay.  So is it accurate that the -- the dialer
25  makes a call, right?



John Spiller

June 30, 2022
Pages 18 to 21

Page 18

1    "Yes"?
2    A. Uh-huh. Yes.
3    Q. And then, when a person answers, the dialer
4 plays a prerecorded message that says "Press '1' if you
5 want insurance. Press '9' to be placed on our 'do not
6 call' list."
7         Is that right?
8    A. Yes.
9    Q. And so --
10    A. It also gave an 800-number at the end where
11 people can call in if they wanted to, to be put on our
12 "do not call" list as well.
13    Q. So if somebody pressed "9," then what "do not
14 call" list was their phone number put on?
15    A. Our internal one. That was -- basically, every
16 time we loaded a new lead list in, it would scrub it
17 against those internal DNC lists. So everyone that had
18 selected "9" prior, on another list, they would be taken
19 out of any new list that we loaded into the system.
20    Q. So did -- was that list maintained on the
21 VICIdial system?
22    A. No. It was maintained on Celerity. As well as
23 from Celerity, I transferred it to Hello Hunter's
24 system. That built me the massive robo dialing platform
25 that brought me here today.

Page 19

1    Q. So is it accurate that there were just two robo
2 dialing platforms that Rising Eagle used?
3    A. Uh-huh.
4    Q. "Yes"?
5    A. Yes.
6    Q. Okay. And those are Celerity and Hello Hunter,
7 right?
8    A. Yes.
9    Q. And did they essentially work the same way --
10 Celerity and Hello Hunter?
11    A. No, absolutely not.
12    Q. Okay. Well --
13    A. Celerity -- I continued crashing their entire
14 platform. I was on their system. So they also ran --
15 they were also a vendor for SMS -- I mean, a vendor for
16 a VoIP. And they would have their clients send them
17 calls, and they would end up charging them VoIP telecom
18 minutes. After coming on their system, for the first
19 two weeks, like I was saying, I was trying to understand
20 how to robo dial it in and understand the concept of it.
21         First off, I didn't think it was illegal
22 because I was selling health insurance. Regardless, now
23 I realize it was highly illegal. But regardless, that
24 was my mindset in the past.
25         So when I started robo dialing, in the

Page 20

1 first two weeks, I remember they were -- they were
2 joking with me, and they said, "You know what, I don't
3 think you can crash our system. We have a robist" --
4 "robust system. You can't crash it at all." Shit, give
5 it the 15th day after the two weeks, I crashed their
6 entire system so bad that their entire system went down
7 for six hours. Some days it went down for nine hours.
8 Some days it went down for 12 hours. Some days it
9 just -- it wouldn't run for me after I would crash it
10 for two or three days.
11    Q. Who was your contact at Celerity? Was it
12 Fernando?
13    A. Fernando was the individual I was working with
14 at the end. He was the one that controlled the minutes.
15 He was the one that owned the company. It was another
16 gentleman, a -- he no longer works there anymore. He
17 was one of their techs. I don't remember his name.
18    Q. Okay. From the consumer experience, the --
19 when they receive the phone calls, was the consumer
20 experience receiving calls through Celerity and Hello
21 Hunter the same?
22    A. Yeah, very similar.
23    Q. Okay. So --
24    A. Except for Hello Hunter was able to push out a
25 massive amount of calls unlike Celerity. Like I said,

Page 21

1 Celerity would crash after I'd send about 100,000
2 consecutive calls out.
3    Q. So -- and how many calls were you able to make
4 through Hello Hunter?
5    A. In the beginning, I only had one server. One
6 server in the beginning was able to produce me about
7 100,000 calls per second.
8    Q. Okay. And then did you build upon that server?
9    A. Uh-huh.
10    Q. "Yes"?
11    A. Yes.
12    Q. And so what was the -- what was the peak of the
13 capacity of that dialer?
14    A. 28 servers can produce 500,000 calls per
15 second, per server. So 28 servers times 500,000 calls
16 per second.
17    Q. So 14 million calls a second?
18    A. Something like that.
19    Q. And --
20    A. I mean, we never ran that much. But it could
21 have done it easily.
22    Q. And why were you developing more and more
23 capacity to make more calls?
24    A. Because Scott and Mike were hiring more and
25 more employees.



John Spiller

June 30, 2022
Pages 22 to 25

Page 22

1    Q.  And so is it accurate to say that Scott and
2  Mike at HAA wanted more calls; so you built more
3  servers?
4    A.  Yes.
5    Q.  All right.
6    A.  In the beginning, I believe they only had about
7  30 to 40 agents.  Like I'm saying, by 2017, when they
8  invited me down, they had 100 agents in their room.  In
9  the beginning, when I was sending them a thousand calls,
10  they were telling me they needed more like 10,000 calls.
11  By the time I got there in 2017, they had told me that
12  they needed more like 100,000 calls.  And I was like,
13  fuck, man, how the hell am I supposed to build you a
14  system that needs 100,000 calls?  It just -- it just
15  blew my mind at that point.  I was like, oh, that's
16  insane.
17        But it wasn't until I met Hello Hunter that
18  they were able to talk to me about the platforms that
19  they built and they were able to show me how it works
20  and they were able to put me in contact with their
21  friends, programmers that was able to cohesively merge
22  together servers.  So I had a 28 -- they were actually
23  owned by Scott and Mike.  They were offshore in the
24  Philippines.  And I brought them all the bills, and they
25  paid for it all.

Page 23

1    Q.  When the dialer was making its calls, was it --
2  was -- was the dialer dialing those calls in a -- in
3  sequence?
4    A.  Sequence?  Like -- not by numbers.  They
5  weren't --
6    Q.  Okay.
7    A.  They weren't dialed by, let's say, all the
8  1 (210) numbers.  I mean, it didn't go like 1 through 0
9  or 1 -- or 0 through 9.
10    Q.  Okay.
11    A.  But it did go by East Coast first, then
12  Central, then eventually, once 9:00 o'clock hit, around
13  Mountain Standard Time and Pacific Standard Time.  So
14  that's how they would work.  So in the beginning at like
15  8:00 a.m., we'd be able to call East Coast from Houston
16  because 9:00 -- 8:00 a.m. in the morning is 9:00 a.m.
17  East Coast time.  And once it hit 9:00 a.m. Central
18  Standard Time, we were able to open up the Central time
19  zone.  Then, once Mountain time turned into 9:00 a.m.,
20  which is an hour after us, after Central, we were able
21  to turn that list over.  But the computer system did it
22  for us.  The servers did it for us.  We set it.
23    Q.  And -- and so is it accurate to say that
24  someone would load a -- a lead list into the dialer?
25    A.  Uh-huh, yes.

Page 24

1    Q.  "Yes"?
2        Was that you or someone else that usually
3  did that?
4    A.  In the beginning, I was the one that ran
5  everything.  By the end, I hired a gentleman of the name
6  Jakob Mears.  He would help every once in a while.  But
7  majority of times, it was me that loaded it.  Or I
8  actually programmed my own system to pull files from a
9  database that I had created to upload the files at 6:00
10  in the morning so the files would all be loaded and
11  ready to go by the time the server was ready to push
12  "start."
13    Q.  Okay.  And so did somebody literally press
14  "start" at, you know, 8:00 o'clock a.m. Eastern time
15  every day?
16    A.  Uh-huh.
17    Q.  "Yes"?
18    A.  Yes.
19    Q.  And so then the dialer's got these lists in it
20  from the night before; is that right?
21    A.  From the night before, not -- not exactly.
22  Because we would -- we would run out of the lists that
23  same day.
24        So let's say Scott Shapiro was able to send
25  me a list.  He sent me a list of 3 million leads, right?

Page 25

1  So during that day, we ran through that list three to
2  four, even five times.  So by the end of the day, that
3  list is shot.  We basically trash that list.  We put it
4  in the back of our Rolodex.
5        So I had A lists in that program I wrote.
6  A lists were all the best contacts, had the best sales.
7  B list was middle of the road.  And then C was all the
8  shit leads more or less, the people that were screaming,
9  really upset, pissed off at us, that type of stuff.  So
10  those went to the C lists.  And then there were some
11  files that I would just trash because I realized that
12  they were just horrible.
13        Regardless, so at the end of the day, I
14  would run through every list, let's say, about three
15  times, sometimes five to six times.  So by the end of
16  the day, we had trashed -- we had put those leads in the
17  category that I stated.
18        And we would -- at 6:00 in the morning,
19  the -- the -- my computer system would -- would
20  ultimately go through the list of, if I -- if I told it
21  to pull a list from -- two lists from B and one list
22  from A, it would go in the next of line and grab one
23  list from A and two lists from B and load them in the
24  system.
25    Q.  And --



John Spiller

June 30, 2022
Pages 26 to 29

Page 26

1    A.  So by 8:00 in the morning, we would push
2  "play."
3    Q.  So when --
4    A.  "Start."
5    Q.  So the system received those lists before it
6  was making the calls, right?
7    A.  Yes.
8    Q.  And so that stored those numbers, right, those
9  lists?
10    A.  Yes.
11    Q.  And then it reordered the lists based upon time
12  zone, right?
13    A.  Yes.
14    Q.  And then it just dialed those lists, right?
15    A.  Yes.
16    Q.  Okay.  And was that the same for Celerity and
17  for Hello Hunter?
18    A.  Celerity -- I had to load the lists myself.
19  Sometimes I would -- I would leave a list in the dialer
20  from the next day over.  Because, you got to understand
21  something, when I had started this, Scott was sending me
22  a million leads a day, sometimes two million leads a
23  day.  And when I had started, I was sitting there going
24  what the fuck am I supposed to do with all these leads?
25  I was thinking about just reselling the leads because

Page 27

1  that would be something I used to do in the past.  But
2  in actuality at this time I was trying to build a new
3  business.  So I was stuck.  I didn't know what to do
4  with them.
5        So, like I was saying, he was sending me
6  2 million leads a day.  I was only going through about
7  300,000 leads because Celerity's system would crash or I
8  wouldn't know how to load the files, something along
9  those lines.  So it always messed me up.
10    Q.  But what I -- what I meant to ask was the
11  process of loading the numbers into the Celerity dialer,
12  the storage of those numbers by the dialer, and then the
13  sorting by time zone and then the calling was the same
14  for Celerity and Hello Hunter; is that right?
15    A.  Yes.
16    Q.  Okay.
17        THE WITNESS:  You look so familiar.
18    Q.  (BY MR. BURKE)  Have you ever heard of an AI
19  call?
20    A.  Yes.
21    Q.  What's an AI call, under your understanding?
22    A.  So, yesterday, I was schooled by my girlfriend.
23  She was able to prove to me that Google came out with
24  their own AI call that is fully autonomous.  Back in
25  2016, 2017, 2018, 2019, I don't think they had an AI

Page 28

1  that they do now.  The AI calls that they had back in
2  those days were a prerecorded message.  When a prospect
3  picked up the phone, an agent would pick up the phone on
4  their end, and the individual would be pressing numbers.
5  There would be prerecorded messages through letters or
6  through numbers, 1 through 9.  And based upon what the
7  prospect was answering the recording, would press "1"
8  through "9" to give a response back.
9        So, for instance, let's say it was a call
10  for health insurance, right?  Let's say the -- the
11  health insurance call was -- and I'm the prospect.  I'll
12  play both roles.
13        So I say, "Hello, this is John Spiller.
14  How may I help you?"
15        And then the recording would say, "Hi, this
16  is King from HAA, Health Advisors of America.  And we're
17  looking and we had information that you were interested
18  in health insurance not too long ago."
19        If I stopped and said, "Hey, hold on a
20  second.  What did you say your name was again?" that
21  individual who's listening on the other phone line was
22  able to push number 4 or whatever 1 through 9 was.  It
23  was list "My name is King from HAA" and then go right
24  back into the spiel.
25    Q.  Now, did Rising Eagle ever use AI calls for

Page 29

1  HAA?
2    A.  No.
3    Q.  Okay.  Would you say that AI calls are
4  essentially the same as press "1"s in the sense that
5  they both use prerecorded messages?
6    A.  Yes.
7        MS. CHATTIN:  Object to the form of the
8  question.
9        Go ahead.  You can answer.
10        THE WITNESS:  Oh.
11    A.  Yes.
12    Q.  (BY MR. BURKE)  And, I mean, it sounds to me
13  like the -- the real difference is that in a press "1,"
14  you've got the consumer pressing a button and, in an AI
15  call, you just have someone on the -- on the caller end
16  pressing -- pressing a button.
17        Is that accurate?
18    A.  You get a verbal confirmation.
19        So all the calls are recorded, right?  So
20  even on a press "1," a robo call, when the person
21  presses "1," all that stuff is recorded on the server
22  side as well as on the VICIdial side.  When the call
23  comes into the VICIdial, it captures the call, right?
24  So that's how you're able to determine that.
25        On an AI call, the confirmation is on the



John Spiller

June 30, 2022
Pages 30 to 33

Page 30

1  voice.  So when the person says, "Yes, I would like to
2  speak with a live agent" -- "Would you like to speak
3  with a live agent?  Answer 'yes' or 'no.'"  Either they
4  say "yes," they'd like to speak to a live agent, and
5  then that person on the other side presses "1" that they
6  want to speak to a live agent and gets transferred to
7  the live agent; or, if the person says "no," then the
8  person would either press -- whatever number it is to
9  send the call to "do not call" list or whatever it is
10  that they're going to do with the call.
11      Q.  Now, I've seen, in other deposition testimony
12  and some documents, reference to AI calls particularly
13  between you and Scott Shapiro.
14      A.  Yeah.
15      Q.  When you were talking with -- or, you know,
16  communicating with Scott Shapiro, what was an AI call?
17  What did that mean?
18      A.  It was a term we came up with in 2017 -- or,
19  actually, it was in the beginning of 2018.  He didn't
20  want me to use any more, over the phone, robo calls.  He
21  wanted me to stay away from it.  He said that it was
22  bringing him too much heat.
23      Q.  Use of the -- the word "robo call"?
24      A.  Yes.
25      Q.  Okay.

Page 31

1      A.  He said that that would end up shutting his
2  business down.
3          So I was, like, okay.  So I said, "Why
4  don't we use AI call?
5          AI call is still a prerecorded message, but
6  it sounds nicer.  It sounds cleaner.  It sounds better
7  than using a robo call.
8          He said, "Okay.  That works."
9      Q.  Okay.  So even though the terminology changed
10  to AI, the --
11      A.  We were still robo dialing a massive amounts of
12  calls every single day for those.  Because you can
13  listen to -- shit, was it in 2018 -- the beginning of
14  2018 and the end of 2019, I went to jail for a -- I had
15  violated my probation on a DWI in 20- -- 2018.  And I
16  went on -- basically, I just would never check in to my
17  probation because I know they were going to violate me.
18  So I rolled it out all 2018.  I didn't have an issue.
19  Because I knew I was going to eventually go back to
20  jail, I just had to sit it out for a little bit, but I
21  needed to run my business.  So I went underground.
22          And when I -- when I came back out, I went
23  to my probation meeting, and I ended up getting
24  arrested, and I knew I was going to get arrested.  And
25  they took me to jail.

Page 32

1          And Scott Shapiro was on a phone call with
2  me while we were in jail, and he said -- he said in that
3  phone call with -- or actually before that in text
4  messages to me, he was telling me to speed up the
5  dialer, slow down the dialer, speed up the dialer, slow
6  down the dialer.  All these text messages are in a --
7  are in the AGs' depositions.  They have all these text
8  messages in a one -- in a OneDrive.
9          But anyways, regardless, I was able to
10  provide them four cell phone numbers from 2016 all the
11  way through 20- -- 2021 or 2020.  They were able to
12  withdraw or extract all my text messages between myself
13  and Scott Shapiro and myself and Michael Smith and
14  myself and other individuals I was doing business with.
15      Q.  Okay.  What is a DID?
16      A.  It's a -- it's a number that is purchased that
17  gives the caller a specific caller ID, in a sense, to be
18  able to be returned a call back.
19      Q.  And in the lead generation business, what is --
20  what are DIDs used to do?
21      A.  In the lead generation business?
22      Q.  How did you use DIDs with respect to HAA?
23      A.  Oh.  I assigned them DIDs so that we can track
24  the calls that I was sending them.
25      Q.  Okay.  And so how did that -- how did that

Page 33

1  tracking work?
2      A.  Um...
3      Q.  So when -- when you --
4      A.  When I would dial outbound, I -- we ended up --
5  I think I ended up acquiring for them about 250,000 DIDs
6  because I was dialing about 20,000 ports of traffic by
7  the end of our run.
8      Q.  No, wait.  DID -- 20 -- 250,000 DIDs or
9  caller IDs?
10      A.  DIDs is also known as a caller ID in the
11  industry.
12      Q.  Okay.  Let me show you an exhibit.
13      A.  Okay.
14          MR. BURKE:  This will be Exhibit A.
15          (Exhibit A was marked.)
16      Q.  (BY MR. BURKE)  I'm showing you what's been
17  marked as Exhibit A.
18      A.  Uh-huh.
19      Q.  This is a declaration signed by you.  Would you
20  agree?
21      A.  I would agree.
22      Q.  Okay.  And --
23      A.  This was signed in 2018, right?
24      Q.  Let's look.
25          2020.



John Spiller

June 30, 2022
Pages 34 to 37

Page 34

1      A.  2020.  I don't remember it.  But I -- let me
2  read it real quick.
3      Q.  Yeah, sure.
4      A.  (Reading to self.)  That's true.
5          Yeah, that's true.  I mean, that was the
6  only -- the only reason why I know that HAA worked with
7  HII was because Scott Shapiro told me in 2018, when HII
8  called him and told him that he was getting too many
9  TCPA violations, that was one of the reasons why he had
10  told me at that point we needed to come up with a
11  different name than robo dialing, and I came up with AI.
12      Q.  So let's look at paragraph 4 of Exhibit A.
13      A.  Uh-huh.
14      Q.  And --
15      A.  Cost of acquisition, yep.
16      Q.  The -- the last sentence talks about DIDs.
17      A.  Yep.
18      Q.  Okay.  And so --
19      A.  And those are just a small number of DIDs used.
20  HAA would end up acquiring -- they ended up getting me
21  about 3,000 DIDs in the past from VICIdial.  We burned
22  through those relatively quickly.
23      Q.  So these DIDs...
24      A.  They were inbound DIDs.
25      Q.  So these are the -- essentially, the call

Page 35

1  transfer DIDs that helped HAA keep track of where its --
2  where its inbound calls came from; is that right?
3      A.  Yes.
4      Q.  Okay.  So we can look at the VICIdial database
5  DID log and figure out which inbound calls arose from
6  Rising Eagle robo calls by looking at DIDs, including
7  these, right?
8      A.  Yes.
9      Q.  Okay.  And Rising Eagle's outbound calls
10  included, I think you said, a quarter-million different
11  caller IDs; is that correct?
12          THE WITNESS:  Give me one second.  I have
13  to answer.
14      A.  Okay.  Yeah, I mean, that's correct.
15      Q.  (BY MR. BURKE)  Okay.  And where did Rising
16  Eagle obtain those quarter-million caller IDs?
17      A.  Bought them through a company called R Squared
18  back in the day.
19      Q.  Why did Rising Eagle use so many different
20  caller IDs?
21      A.  Because it was dialing about -- by 2018, I
22  think I was dialing close to 100 million numbers a day.
23  100 million numbers a day usually gets flagged for "scam
24  likely" calls, or it gets flagged for other calls, you
25  know.  The reason why you use that many DIDs is so that

Page 36

1  you're able to monitor.  You want to make sure you don't
2  get a "scam likely."  Once you get a "scam likely" on a
3  DID, that ultimately burns that number.  You have to get
4  rid of that number some other way.
5      Q.  And so, for example, if somebody received a
6  phone call on, you know, March 12th and tried calling
7  that phone number back a couple of days later, if the
8  DID had been shut down, that phone call would go
9  nowhere, right?
10      A.  Not exactly.  The DIDs were never, ever really
11  shut down.  They were just taken out of our dialer.  So
12  they would just -- they were just taken out of our -- we
13  would stop using them as an outbound dial, as an
14  outbound CID or DID.  We would put it on the side.  And
15  then any calls that those are still coming in will still
16  go to HI- -- HAA because they were affiliated with HAA.
17      Q.  When did those caller IDs generally stop
18  working?  Because I -- I personally experienced this.
19  You know, my client got calls, and I called the number
20  back.  And --
21      A.  You got an IVR?
22      Q.  The -- the client got IVR calls from --
23          (Simultaneously speaking.)
24      A.  Yeah, but did you ever receive an IVR when you
25  called back?

Page 37

1      Q.  (BY MR. BURKE)  Oh, yeah, maybe we got IVRs
2  sometimes.
3      A.  So when you called back, you would get an IVR.
4  All the inbound call -- the numbers that we assigned to
5  HII were assigned to our IVR.
6      Q.  Oh?
7      A.  Our IVR would capture those calls, run them
8  through a second verification to make sure that they
9  were actually looking for health insurance to help scrub
10  out the unwanted calls that they were receiving or that
11  HA- -- HII was complaining about they were getting too
12  many TCPA violations.  I believe in 20- -- 2018 -- 2017,
13  2018, 2019, Scott Shapiro and Michael Smith lost about
14  100,000, I would say, in lawsuits that they had to pay
15  out -- 5,000 here, 5,000 there, 10,000 there, 30,000
16  there, 10,000 there, 5,000 there.  You know, that...
17      Q.  And so when you say there was an IVR on the
18  inbound callbacks, what does IVR mean in that sense?
19      A.  It's another prerecorded message, but it's an
20  inbound call.  Therefore, all inbound calls are all
21  legal.
22      Q.  Right.  Sure.  So --
23      A.  That's why -- that's why there's an IVR there,
24  to capture those calls and to make sure that they know
25  they're calling into a health insurance room.  And if



John Spiller

June 30, 2022
Pages 38 to 41

Page 38

1 they're looking for health insurance, press "1." If
2 they're looking be placed on a "do not call" list, press
3 "9."
4    Q. And so if somebody pressed "1," then what
5 happened?
6    A. Go to a live agent.
7    Q. And did it sometimes happen that the call
8 centers were too busy to accept those inbound calls?
9    A. No. I mean -- I believe Scott and Mike, by the
10 time that we incorporated that IVR, they had, like I
11 said, about 50 employees that was in charge of answering
12 inbound calls, and there was about 150 agents to answer
13 any robo calls. I mean, they were 100 percent running
14 off of all the calls that I was sending them.
15    Q. That data should be in the VICIdial system,
16 shouldn't it?
17    A. It is in the VICIdial system. You said you had
18 it.
19    Q. Right.
20    A. Therefore, you're going to have it.
21    Q. Yeah. So the inbound -- there should be data
22 in that system having to do with those inbound calls in
23 the IVR; is that right?
24    A. Uh-huh.
25    Q. "Yes"?

Page 39

1    A. Yes.
2    Q. Okay. You just read through this declaration a
3 moment ago.
4        Is there -- is there anything in the
5 declaration that you saw that was incorrect, that you
6 would want to change?
7    A. No.
8    Q. Okay. And it says that -- that Rising Eagle
9 used Celerity but -- I mean, that's true except that
10 Rising Eagle also used Hello Hunter to -- to, you know,
11 make the robo calls, right?
12    A. That's correct.
13    Q. And the prerecorded message that's listed
14 here --
15    A. But I think this was also in regards to some
16 calls that came from Mary Bilek in 2018. That is why I
17 was using what I used in 2018.
18    Q. Sure.
19    A. Yeah.
20    Q. And -- and the prerecorded message listed in --
21 in paragraph 3, that's -- that's true and correct?
22    A. Yes.
23    Q. Okay. Let's shift gears a little bit to
24 internal do not call, or -- or company-specific do not
25 call.

Page 40

1        Did HAA ever share their
2 company-specific --
3    A. I never spoke with HAA. H- -- H who?
4    Q. -AA? HAA, yeah.
5    A. Oh, sorry.
6    Q. Yeah. Did those guys ever share their "do not
7 call" list with -- with Rising Eagle?
8    A. Not until 2018.
9    Q. Around when in 2018 did they first share the
10 list?
11    A. September or October, sometime around there.
12    Q. Okay.
13    A. I was bitching at them nonstop. I told them --
14 at some point, I ended up freezing their account. I
15 told them I wasn't going to send them any more calls.
16 And by about 10:00 a.m. in the morning, he -- Scott
17 called me all panicky, "What the fuck? Where the fuck
18 are the calls?"
19        And I said, "Listen, man, you need to send
20 me" -- "start sending me your DNC list because I'm tired
21 of getting these TCPA violations from HII. They're
22 gonna eventually shut you down."
23        He said, "I agree."
24        I said, "You need to start sending me
25 your" -- "all the individuals that are asking you to be

Page 41

1 removed, to being placed on the 'do not call' list --
2 you need to start sending those to me."
3        He said, "Okay. Will do."
4        I said, "Before I even start today, you
5 need to pull up in their rears and send me all your 'do
6 not call' lists." And he had to do that. And it took
7 him all the way until about noon.
8    Q. Okay. And so, when he did that, did you
9 integrate that list --
10    A. Yes.
11    Q. -- in -- into Rising Eagle's list?
12    A. Uh-huh. And then HII would eventually start
13 sharing with Scott Shapiro their own internal "do not
14 call" list, and that list would come directly from Scott
15 Shapiro to myself.
16    Q. And how did you receive that list?
17    A. By e-mail.
18    Q. And was that, like, a big flat file; or was it,
19 like, piecemeal, one at a time?
20    A. No, a flat file. Had about -- I would assume
21 it probably had around 3 -- 3 1/2 million do not call.
22 It was basically all the individuals that are known
23 as...
24    Q. Frequent litigators?
25    A. They were -- they were called something else in



MAGNA ▸
LEGAL SERVICES

John Spiller

June 30, 2022
Pages 42 to 45

Page 42

1  the industry -- catfish, more or less. The people that
2  are at the bottom that eat the shit off the ground.
3      Q. I see.
4      A. Yeah.
5      Q. And so the list was a list -- is it accurate to
6  say that the -- the "do not call" list that you received
7  from HII was a list of catfish? That was your
8  understanding?
9      A. It was a list of bottom-feeders, yeah.
10     Q. Okay.
11     A. I needed to prevent.
12     Q. And have you ever heard of TrustedForm?
13     A. Yes.
14     Q. What's your understanding of what TrustedForm
15  is?
16     A. TrustedForm is an opted-in information that --
17  that's one of those 15-digit codes that's put at the
18  back.
19         (Simultaneously speaking.)
20     Q. (BY MR. BURKE) Right. You were testifying
21  about this earlier.
22     A. Uh-huh.
23     Q. Yeah?
24         Do you have any idea where HII got that
25  catfish list? Maybe -- do -- do you have any idea where

Page 43

1  they got that --
2         (Simultaneously speaking.)
3         MS. CHATTIN: Object to the form.
4         Did you say HII?
5         (Simultaneously speaking.)
6         MR. BURKE: Yeah, HII. That was the
7  testimony, that the --
8         MS. CHATTIN: Okay.
9         MR. BURKE: -- the list came from HII.
10     Q. (BY MR. BURKE) Do you have any idea where HII
11  got that catfish list?
12     A. Huh-uh, I have no clue.
13     Q. Okay.
14     A. It's called a bottom-feeder list.
15     Q. Right.
16     A. It was all the attorneys or even nonattorneys
17  that were acting as attorneys that wanted to make some
18  money from robo dialing or any kind of bullshit. They
19  were basically bottom-feeders.
20     Q. Okay. And going back to the DIDs, caller IDs,
21  when a consumer received the Rising Eagle call and saw
22  the caller ID, at least my client's experience was that
23  it looked like a local caller ID.
24     A. We never -- we never did neighborhood spoofing.
25  We didn't even have the technology for neighborhood

Page 44

1  spoofing.
2         A lot of times, the system would pick a
3  random number, and sometimes the number that it was
4  receiving would have been the same area code. That's
5  just on -- on circumstance. We never used neighborhood
6  spoofing. We never had technology for spoofing.
7         We were actually also assigned about
8  350 million DIDs at one point from a -- from a company
9  within the telemark- -- the telecom world. He gave me a
10  list of 350 million DIDs to use. As long -- he also
11  gave us a website to go to where we could enter in those
12  phone numbers; and as long as they don't come up as
13  Verizon, T-Mobile, AT&T, we can use them. And at some
14  point, we started using those before I started buying
15  DIDs for Scott and Mike.
16     Q. Did anyone ever tell you not to use the
17  quarter-million or the 350 million --
18     A. No.
19     Q. -- caller IDs?
20     A. They told me to use them because they were
21  unlisted numbers.
22     Q. And so as long as the phone number was not from
23  one of the major cellular companies, that was free game
24  to use those numbers?
25     A. Uh-huh.

Page 45

1      Q. "Yes"?
2      A. Yes.
3      Q. Let's talk about the timeline here. I think
4  that you testified that you began making robo calls --
5         THE WITNESS: Give me a second. Okay.
6      Q. (BY MR. BURKE) Okay. I think you testified
7  that you began making robo calls for HAA in around 2017;
8  is that right?
9      A. Uh-huh.
10     Q. "Yes"?
11     A. Yes.
12     Q. When did Rising Eagle stop making robo calls
13  for -- for HAA?
14     A. In 20- -- the end of 2019, December 15th, 2019,
15  I ended up turning over the entire platform to Scott
16  Shapiro and Michael Smith.
17     Q. Now --
18     A. Well, by that time, Scott Shapiro had --
19  already had bowed out of the dialer world. He was still
20  an owner of all the products that they were selling.
21         But, regardless, he -- he was still my
22  point of contact somewhat, but Michael Smith became my
23  massive point of contact at that point.
24     Q. And what was your understanding of -- of what
25  those calls were doing, you know, in 2019? Was it any



John Spiller

June 30, 2022
Pages 46 to 49

Page 46

1  different than the calls in 2018?
2      A.  Huh-uh.
3      Q.  No?
4      A.  No.
5      Q.  Okay.  And so where -- where were those calls
6  being transferred to?  Was it the same call center in
7  Fort Lauderdale as far as you knew?
8      A.  Uh-huh.  Yep, it was the same call center.
9      Q.  Did Rising Eagle ever make any calls for HAA
10  that were not press "1" robo calls?
11     A.  No.
12     Q.  They were all press "1" robo calls, right?
13     A.  Yes.  You got to understand something -- Scott
14  and Mike were extremely cheap.  They didn't like to
15  spend their money on anything that was too expensive.
16  If they could cut and they can make money off of a, in
17  their mind, a $0.50 call or even a $0.03 call, that
18  would eventually cost them about $200.  At the end of
19  the day, they make a sale.  A lot of those guys, they
20  didn't really care about that.  They just cared about
21  cutting as much cost as they could and making as much
22  profit as they could.
23     Q.  Did Mike Smith or Scott Shapiro ever tell you
24  about how they were compensated?
25     A.  They were -- he -- he, at one point, tried

Page 47

1  to -- tried to put me on as a -- to receive about
2  20 percent.  I said no.  I said I just want cash.  I
3  didn't really want to be a part of any -- I didn't want
4  to be a part of anything like that, you know.
5      Q.  So, wait.  Are you saying Scott Shapiro offered
6  to try to get you 20 percent?
7      A.  Uh-huh.
8      Q.  Yeah?
9      A.  I told him no.  I said I just didn't want any
10  part of it.
11     Q.  And do you know what he was talking about?
12  20 percent of what?
13     A.  Of the total sales that is generated per month.
14  Which I didn't realize that they were making about -- I
15  mean, I'm certain by the time -- I read in the
16  deposition that Scott Shapiro did is that he put away
17  about 4 million.
18     Q.  Yeah.
19     A.  And he -- he was only paying me about 120- --
20  -20,000 to 300,000 a year.  So if he was putting away in
21  his offshore account 4 million, and I know Michael Smith
22  and Scott Shapiro bought themselves about -- both of
23  them bought themselves an AMG Mercedes Benz GT3.  That's
24  about a $350,000 car.  Michael Smith built his -- him
25  and his family a house around 1.2 million.

Page 48

1      Q.  Did Scott ever use the word "override" with
2  you?
3      A.  Yeah, he did.
4      Q.  What was your understanding of what an override
5  was?
6      A.  Override, to me, was money that he's receiving
7  from the groups that he's selling insurance plans for.
8      Q.  So, for example, was it your understanding that
9  Shapiro was receiving overrides from HII?
10         MS. CHATTIN:  Object to the form.
11         You can answer.
12     A.  I would say so.  I believe HII was one of their
13  groups that they sold insurance for.  You know, I
14  don't -- I don't really recollect any of these other
15  groups that are on this thing.
16     Q.  (BY MR. BURKE)  Okay.  And so was it your
17  understanding that Shapiro was offering you 20 percent
18  of his overrides from insurance companies or TPAs like
19  HII?
20         MS. CHATTIN:  Object to the form.
21     A.  Yes.  I mean, I'm certain he had other groups
22  other than HII.  I'm certain he sold for -- I mean,
23  there -- back in the day, there was another group that
24  was shut down.  It was ran by a gentleman -- actually, I
25  think he was affiliated.  Let me think about that guy

Page 49

1  real quick.
2         Can I look at my phone?
3      Q.  (BY MR. BURKE)  Sure.
4      A.  What was his name?
5         Dorfman.  Dorfman was his last name.
6      Q.  From Simple Health?
7      A.  Simple Health, yeah.  He worked directly with
8  HII as well.
9      Q.  And why -- what's the -- what's the meaning of
10  overrides as to Dorfman?
11     A.  Oh, Dorfman paid out a lot of overrides back in
12  the day.  He paid a lot to -- he had a marketing guy
13  that worked for his company.  I can't remember his name.
14  I haven't even been able to find him on LinkedIn since
15  my lawsuit happened.  I'm certain he went underground as
16  well.
17     Q.  Did HA- -- H- -- I'll start over.
18         Did Rising Eagle -- Eagle ever make robo
19  calls for Simple Health?
20     A.  No.
21     Q.  Okay.  So I -- is it what you're saying that --
22  is that you understood Dorfman was getting paid through
23  overrides from the folks that he was working for?
24     A.  Yeah, he was.
25     Q.  Okay.



John Spiller

June 30, 2022
Pages 50 to 53

Page 50

1    A.  As well.  Because that's what me and his last
2  marketing guy was talking about.  That was before he got
3  shut down.
4          MR. BURKE:  All right.  Let's take a --
5  let's take a 10-minute break.
6          THE VIDEOGRAPHER:  The time is 10:24.  Off
7  the record.
8          (Recess from 10:24 a.m. to 10:46 a.m.)
9          THE VIDEOGRAPHER:  The time is 10:47.  Back
10  on the record.
11    Q.  (BY MR. BURKE)  Okay.  We're almost done.  A
12  few more questions.
13          What I'm going to try to do is go through
14  this -- a few statements in this AG summary judgment
15  brief and -- and see if you agree that they are true.
16          Does that make sense?
17    A.  Uh-huh.
18    Q.  Yeah?
19    A.  Yes.
20    Q.  All right.  So one of these statements says "On
21  February 12th, 2018, Defendants Rising Eagle, Spiller,
22  and Mears began robo calling on behalf of Health
23  Advisors and Smith."  And then it cites some text
24  messages.
25          Would you agree that this refreshes your

Page 51

1  recollection that your robo calling for HAA began on
2  February 12th, 2018?
3    A.  No.
4    Q.  When did it begin?
5    A.  It began in 2017.  At the end of 2016, the
6  beginning of 2017, that's when I contacted Celerity
7  Telecom.
8    Q.  Okay.
9    A.  2018 was when I already had all the servers
10  under Hello Hunter.
11    Q.  There is a reference to a text string between
12  you and Smith on February 22, 2018, that says -- you are
13  texting Smith and saying "Sales are what I care about.
14  I know how many actual calls got through from press '1'
15  and I will hit that hard only tomorrow and onward.  No
16  more flooding your call center with bullshit calls, only
17  press '1's."
18          Is that a -- an accurate text message that
19  you sent to Smith?
20    A.  Yeah, it is.
21          MS. CHATTIN:  Can -- can I put an
22  objection?
23          Alex, can you either enter whatever you're
24  reading from as an exhibit or just state for the record
25  what you're reading from just so we're all clear?

Page 52

1          MR. BURKE:  I did.
2          MS. CHATTIN:  You said an AG brief.
3          Can you just be more specific about what
4  you're reading from --
5          MR. BURKE:  This is the --
6          MS. CHATTIN:  -- so we understand the
7  testimony?
8          MR. BURKE:  Well, I mean, I'm not trying to
9  prove the brief.  I'm just trying to prove that these
10  messages happened.  But -- and I really don't think it
11  matters where I'm reading from.  I'm just asking if
12  these messages happened.
13          But I'm reading from the Texas AG's action,
14  summary judgment brief against Shapiro that was filed on
15  May 26, 2022.
16          MS. CHATTIN:  Okay.
17    Q.  (BY MR. BURKE)  Do you remember sending that
18  text message or something like it to Shapiro -- Smith --
19  to Smith?
20    A.  Smith, yeah, I did.
21    Q.  Okay.  And Smith responded "Okay," and then
22  later texted you "Let's come up with another word
23  other than press '1'" --
24    A.  Uh-huh.
25    Q.  -- "LOL.  That makes me nervous."

Page 53

1          Did Smith send you those two texts?
2    A.  Yes, he did.
3    Q.  All right.  There's another text exchange
4  referenced here that says it was on May 28th, 2018,
5  where Smith texted you.  It says "Getting a lot of NC
6  state calls."
7    A.  North Carolina state calls.
8    Q.  Do you remember that one?
9    A.  They had told me to block North Carolina
10  because North Carolina was one of the com- -- the states
11  that was prosecuting them the most out of all the other
12  states.  They had a lot of TCPA violations.
13    Q.  Okay.
14    A.  And my statement to him was these are all the
15  lists -- the leads that Scott Shapiro sent me.
16    Q.  Okay.  You -- it says -- your text said "We're
17  only running leads Scott sent me."
18    A.  Yes.  Scott Shapiro sent me.
19    Q.  Okay.  And Smith responded "Okay.  Thanks."
20          Do you remember that?
21    A.  Yes.
22    Q.  All right.  And that happened?
23    A.  Yes.
24    Q.  All right.  We looked up the -- the forfeiture
25  order from the FCC.



John Spiller

June 30, 2022
Pages 54 to 57

Page 54

1    A. Uh-huh.
2    Q. In it, the -- the forfeiture order says that
3  "Rising Eagle informed the Traceback Group that the
4  company ceased spoofing caller ID information on
5  September 10th, 2019."
6         First of all, the first question is was
7  that you from Rising Eagle that was talking to the
8  Traceback Group?
9    A. I never spoke with the Traceback Group, per se.
10 I spoke with a gentleman of the name David Frankel of
11 the -- of the group. He was a representative of the
12 group that eventually got fired for doing some shady
13 shit, going behind clients' backs after he got them in
14 trouble with the FCC and try to steal clients away from
15 them for his own personal use.
16   Q. Can you tell me what it -- what it could
17 possibly mean that Rising Eagle "ceased spoofing caller
18 ID information on September 10th, 2019"?
19   A. September 10th, 2019, we stopped using the
20 350 million DIDs that we were -- we were given by a
21 company called Globex that had already gone under in
22 2019. They were the ones that gave us the 350 million
23 numbers, unregistered numbers, to use as caller IDs.
24 That's what we meant by spoofing.
25   Q. When did Rising Eagle start using those

Page 55

1  350 million caller IDs?
2    A. In 2017.
3    Q. I'm a little hazy about 2019 --
4    A. Uh-huh.
5    Q. -- with regard to HAA.
6         Did -- did -- I think you testified that,
7  at Rising Eagle at least, it was kind of business as
8  usual in 2019 --
9    A. Uh-huh.
10   Q. -- as to HAA; is that right?
11   A. Uh-huh.
12   Q. "Yes"?
13   A. Yes.
14   Q. Did the personnel over at HAA change in 2019 as
15 far as you guys knew?
16   A. It changed to -- I don't think the -- the
17 change hap- -- well, the change moved away from Scott.
18 Scott stopped showing up to the office. Michael Smith
19 would show up at the office and run the show. But --
20 let's see here.
21        In 2020, Michael Smith supposedly sold --
22 which really gave away the business to Omar Hibbert
23 which now runs HAA or also known as O Health Group.
24   Q. And is it your understanding that the entire
25 time until 2020 the transfers were being used to sell

Page 56

1  health insurance?
2    A. Yes.
3    Q. Do you have any idea whether those calls were
4  being used to sell health insurance through HII the
5  entire time?
6    A. No. I never -- again, I -- I didn't know. I
7  just knew that Scott got in trouble from HII in 2018
8  when an e-mail was sent to Scott Shapiro. Scott Shapiro
9  read the e-mail to me and said, "Shit, this is what I'm
10 receiving from HII, one of the carriers I'm using."
11        In the e-mail it says that you're --
12 you're -- you're on top of the list of all the TCPA
13 violations known to this firm, meaning HII. Out of all
14 the TCPA inquiries that TCPA had sent out to all the
15 individuals under HII's sales, all of them, more than
16 90 percent of them came from Scott and Michael Smith,
17 HIA [sic].
18   Q. How do you know that?
19   A. Because it said that in the e-mail. And that
20 e-mail is also in that declaration.
21        THE WITNESS: I have to sell something real
22 quick.
23        MR. BURKE: I have a couple more questions.
24        THE WITNESS: Yeah. Okay. Give me one
25 second. I need to just check something real fast.

Page 57

1         This is the peak time where majority of my
2  clients make -- make me payments. So I have to be
3  checking my phone relatively...
4    Q. (BY MR. BURKE) So thinking about the -- these
5  DIDs, caller IDs, is it true that the -- that the
6  Celerity and the Hello Hunter systems were capable of
7  just using a single caller ID for all the calls?
8    A. On Celerity, yes, because they didn't have an A
9  and I rotation. It wasn't until 2018, in February
10 of 2018, I got a part of Veriswitch. Veriswitch became
11 the switch that I put HAA on to be able to generate the
12 call volume that we were doing. Back in the day, when I
13 was using Celerity, I continued crashing their system
14 because their systems were not up to -- up to date with
15 me sending 100,000 calls a -- a second. Shit, they
16 wouldn't even allow me to send 100,000 calls an -- an
17 hour. Regardless, the -- the -- the DIDs were used
18 under Veriswitch because Veriswitch gave me the system
19 that I can load 200,000 DIDs and use them as CIDs and
20 they would randomly be chosen to call the next number in
21 line.
22   Q. If you had wanted to, could you have programmed
23 that thing to just use a single caller ID?
24   A. No. It's already programmed by the owner. His
25 name is Humberto Mautone. He's from Canada, a really





John Spiller

Page 58

1  good man.  He built that thing to -- to -- to do away
2  with spoofing.  He built the A and I rotator to buy
3  DIDs, to force his clients to buy DIDs, put them on his
4  system, and his system then would calculate which number
5  we'd use in the nonorganized manner.  So that's why,
6  when you said in 2019 you received some calls that were
7  also with the same area code, I knew that that was false
8  because Humberto's system was used to pull away from
9  that arena.
10  Q.  Well, we can look at the DID logs and the call
11  logs at --
12  A.  Yeah, you can.
13  Q.  At --
14  A.  Veriswitch, you can.
15  Q.  Veriswitch or -- or really the -- the inbound
16  transfer call logs on --
17  A.  Uh-huh.
18  Q.  -- the VICIdial to see whether there were any
19  correlations between, you know, local numbers and the
20  caller IDs, right?
21  A.  Yes.
22  Q.  All right.
23      THE WITNESS:  Give me one second.  I have
24  to respond to this guy real fast.
25      Okay.

Page 59

1      MR. BURKE:  All right.  I think I'm done
2  for now.
3      MS. CHATTIN:  Okay.  Can we take a break,
4  maybe 20 minutes, so we can caucus and try to --
5      MR. BURKE:  Okay.
6      MS. CHATTIN:  -- make our part more
7  efficient?
8      MR. BURKE:  Sure.
9      THE VIDEOGRAPHER:  The time is 11:02.  Off
10  the record.
11      (Recess from 11:01 a.m. to 11:31 a.m.)
12      THE VIDEOGRAPHER:  The time is 11:31.  Back
13  on the record.
14      THE WITNESS:  Okay.
15      EXAMINATION
16  BY MS. CHATTIN:
17  Q.  Okay.  Good morning.
18  A.  Good morning.
19  Q.  Or good afternoon, Mr. Spiller.  As I
20  introduced myself earlier to you, I'm Danielle Chattin.
21  I represent Health Insurance Innovations.  And I've got
22  a couple questions for you.
23      So earlier today you testified about an
24  event in 2018 where Scott Shapiro told you that he was
25  working with HII and that HII had brought to his

Page 60

1  attention a number of TCPA violations that were coming
2  through his --
3      (Simultaneously speaking.)
4  A.  Not a number, a lot.  Majority of the TCPA
5  violations that HII was dealing with was 100 percent
6  related to Scott Shapiro's room at HAA.
7  Q.  (BY MS. CHATTIN)  Okay.  And that -- you said
8  that was in 2018?
9  A.  Yes.
10  Q.  Okay.  Did you ever talk to Scott Shapiro about
11  HII any other time?
12  A.  When I asked him who was his -- I had asked him
13  at one point who was the companies that he's
14  representing.  He said HII.  He said, "It's the company
15  that you're familiar with."
16      And I was like, "Yeah, I know of them."  I
17  didn't know where y'all guys were located or anything,
18  but I did know of them.
19  Q.  Great.  And was that before or after this
20  TCPA --
21  A.  Before.
22  Q.  -- complaint?  Okay.
23      And did he mention any other carriers or
24  administrators that he was working with?
25  A.  Huh-uh.  No.

Page 61

1  Q.  No.  Thank you.
2      Did you ever talk to Michael Smith about
3  HII?
4  A.  No.  Michael Smith was just Scott's front man
5  for running the -- the call centers.  Scott was the one
6  that brought together the insurance plans that were sold
7  through Michael Smith or HAA.
8  Q.  Okay.  And just to back up, other than the two
9  conversations you just relayed to me with Scott Shapiro
10  about HII, did you have any other conversations with
11  Scott Shapiro about HII?
12  A.  I don't remember.
13  Q.  Okay.  Did you, Mr. Spiller, or Rising Eagle
14  ever have a direct business relationship with HII?
15  A.  No.
16  Q.  Okay.  Did you ever have any dealings with
17  anyone at HII as far as you know?
18  A.  I believe under one occasion, talking with --
19  one time, a -- a -- a woman from HII called Scott
20  Shapiro.  Scott put her on speaker so that I can hear
21  what she was saying about HII and the TCPA violations.
22  But that was the only -- that was the only time that
23  I've ever -- ever had any kind of -- and they didn't
24  even know I was listening on the conversation.
25  Q.  Okay.  Do you know approximately when that



John Spiller

June 30, 2022
Pages 62 to 65

Page 62

1 conversation happened -- when that phone call happened?
2    A. In 2018, sometime in 2018.
3    Q. Okay. And do you remember who the woman was,
4 what her name was?
5    A. I thought it started with -- it was either
6 Annie or Amy, something along those lines.
7    Q. Okay. And you were -- your testimony is that
8 you were in a room with Scott Shapiro?
9    A. I was in his office at his -- at his -- at his
10 headquarters in Fort Lauderdale.
11    Q. And how did you know that this woman was from
12 HII?
13    A. Because he said -- he said, "Hold on. You're
14 going to listen to HII right here."
15        And he put her on, and he said, "Hey, go
16 ahead and repeat what you just told me."
17        And she repeated what he -- she just told
18 him. She said, "The majority of the TCPA" -- "-A
19 violations that HII are dealing with right now is
20 stemming from your traffic that you're sending us, the
21 sales that you're sending us."
22    Q. Uh-huh.
23    A. And he said, "Okay. Then how can we fix this?"
24        And that's when she said, "Well, you need
25 to either run your own DNC lists cleaner" -- and that's

Page 63

1 when I started pressuring Scott to giving me his DNC
2 list, but it wasn't until 2019 that he actually complied
3 with that.
4    Q. Okay. Do you remember anything else about that
5 phone call that you listened in on?
6    A. No, that was pretty much about it.
7    Q. Okay.
8    A. He just wanted me to hear the lady tell me --
9 tell him that he's fucking up whatever he's doing to
10 generate this traffic. He needs to clean it up so that
11 they're able to get the TCEP -- TCPA violations under
12 50 percent. They were saying it would be better if they
13 would be under 10 percent. But...
14    Q. Uh-huh. Okay. And --
15    A. I don't even -- I don't ever think it got that
16 low.
17    Q. Okay. And your -- you testified that you did
18 not speak on that phone call; is that right?
19    A. Uh-huh, that's correct.
20    Q. Okay. So you don't have any reason to believe
21 that this HII representative knew that you were in the
22 room with Scott Shapiro; is that right?
23    A. That's correct.
24    Q. Okay. And other than this phone call, have you
25 ever spoken to anyone at HII as far as you know?

Page 64

1    A. I spoke to the gentleman that worked for HII's
2 marketing team at one point. I can't remember his name.
3 Like I'm saying, this was about three or four years ago.
4        The gentleman that is right behind you
5 resembles him a lot. And that's one of the reasons why
6 I keep looking at him is because I know he's an attorney
7 and he's representing someone else but --
8    Q. Uh-huh.
9    A. Reason why I keep looking at him is I'm like,
10 shit, I know that guy from somewhere. But in actuality,
11 it's the other gentleman that worked for HII, the
12 marketing guy.
13        He also got hired by Steve Dorfman as well,
14 and he was also working -- so he moved from HII to work
15 for Steve Dorfman as the marketing arm.
16    Q. Okay. And when -- first, when was -- when was
17 the conversation you had with this marketing person that
18 you're talking about?
19    A. Oh, I was having my conversations with him in
20 2015 and 2016.
21    Q. Okay.
22    A. Again we touched base in 2017, in 2018, in
23 2019. It was until my lawsuit hit the band- -- the
24 bandwidths in 2020.
25        I didn't even know I was getting a lawsuit

Page 65

1 until I had a New York reporter call me and said I had a
2 lawsuit. I didn't even know that robo dialing was first
3 illegal, therefore -- but regardless, it is what it is
4 on that front.
5    Q. Okay. So you're -- you're saying that you were
6 in communication with someone at HAI -- -II on the
7 marketing team --
8    A. Uh-huh.
9    Q. -- intermittently between 2015 and 2019; is
10 that right?
11    A. He -- he eventually got hired on by Steve
12 Dorfman in 2018.
13    Q. Okay.
14    A. He went to work for Steve Dorfman in 2018, at
15 the end of 2018. So he stayed with Steve -- Steve
16 Dorfman until 2019, I think, until Steve Dorfman got
17 sued by the government as well for running that -- I
18 think he got sued by the FTC. I think he got shut down
19 by the FTC and got arrested for that.
20    Q. Uh-huh.
21    A. He was running fraud, scams, or whatever he was
22 doing.
23    Q. Okay. So you -- your understanding is that
24 this person worked for HII --
25    A. Uh-huh.



John Spiller

June 30, 2022
Pages 66 to 69

Page 66

1    Q. -- prior to 2018 and then left HII in 2018 to
2    work for Steve Dorfman?
3         Is that right?
4    A. Yes, that's correct.
5    Q. And what were the conversations that you were
6    having with this individual about?
7    A. He wanted to understand how I was generating
8    the calls. I told him I was generating the calls
9    through robo dial, prerecorded press "1"s. I would
10   actually call it press "1"s.
11        I never used the word "robo dial" until I
12   was trying to put Scott Shapiro out there. Because it
13   came to my recollection in 2019 that he was going to --
14   he was basically working up -- all his TCPA violations
15   he was having, he was dropping my company's name, saying
16   that I was the one generating these calls for him. And
17   in actuality, he was sending me the leads that we were
18   dialing. He knew what we were doing the entire time.
19        So I wanted to get him caught up in his own
20   words. So I said -- in a couple of my recorded messages
21   from Joe, I said, "Robo dialing -- I'm" -- "we're still
22   going to be robo dialing."
23        And he said, "Okay." And then, after that,
24   he called back, and he called Jakob back immediately,
25   and he got back on the conversation. He said, "Listen,

Page 67

1    I don't know anything about robo dialing. Only thing I
2    know about is AI."
3         And at that point, I said, "Okay, Scott."
4    You know, and that was what I said in the message.
5    Q. Okay. I just want to get the timeline clear.
6         So you're -- what you're telling me is you
7    believe that you -- prior to 2018, you spoke to someone
8    who was working at HII about --
9    A. The calls.
10   Q. -- robo dialing?
11   A. Yes, robo dialing calls I was generating.
12   Q. And specifically, Scott Shapiro's calls?
13   A. I wasn't specific on who I was working with. I
14   just told him that I was generating calls for a couple
15   of health insurance rooms in south Florida, generating
16   them from robo dialing.
17   Q. And why --
18   A. Or press "1"s.
19   Q. Uh-huh. And why -- why were you having these
20   conversations with this person?
21   A. Because this guy was in marketing, and he was
22   supposed to get me in the door with some more rooms that
23   HII were connected to that I can sell more calls to.
24   Q. And how did you get connected to this person
25   in -- in the first place?

Page 68

1    A. LinkedIn.
2    Q. You reached out to this person via LinkedIn or
3    they reached out to you?
4    A. I think he reached out to me first. He said,
5    "Hey, I heard you're in marketing, and I heard you're
6    sending calls to a couple of rooms in south Florida."
7         And I said, "Yeah, I am." I was like, "Do
8    you have an" -- "or do you work for a room?"
9         He said, "No, I don't. I work for HII."
10        I said, "Oh, okay." And at that point, I
11   thought HII was a call center. I didn't think it was
12   a -- a provider of insurance or of cut-rate insurance at
13   that, you know.
14   Q. Okay. And did you ever tell this person --
15   did -- I'm sorry.
16        Did you ever sell leads to this person?
17   A. No.
18   Q. Okay. And did you ever tell this person at any
19   time that you were selling leads to Scott Shapiro and
20   Michael Smith?
21   A. I don't know. I can't say that. Like I said,
22   I've had numerous conversations with him in the past. I
23   don't remember if I did or didn't.
24   Q. Okay. Okay. So other than this individual
25   that we're talking about and the conversation that you

Page 69

1    heard over speakerphone in Scott Shapiro's office.
2    A. Uh-huh.
3    Q. Have you ever spoken to anyone else at HII?
4    A. Nope.
5    Q. Okay. So you don't have any reason to believe
6    that anyone at HII knew that Scott Shapiro and Michael
7    Smith were getting leads from Rising Eagle; is that
8    correct?
9    A. Repeat that question.
10   Q. Sure. Do you have any reason to believe that
11   anyone at HII knew that Shapiro and Smith were getting
12   leads from Rising Eagle?
13   A. I believe they name-dropped me in enough places
14   to put the spotlight on Rising Eagle and John Spiller to
15   where the FCC was able to file a $225 million lawsuit
16   against me with Scott Shapiro using me as a patsy to try
17   to get away with robo dialing Americans.
18   Q. Uh-huh.
19   A. So, yes, I believe at some point he must have
20   said to HII and to other -- the other constituents
21   that's in here their -- y'all other individuals or the
22   people that are in this lawsuit -- that Rising Eagle
23   Capital and John Spiller was the one that sent all these
24   calls. But in actuality, if Scott Shapiro wasn't paying
25   my bills from the beginning, if he didn't pay for the



John Spiller

June 30, 2022
Pages 70 to 73

Page 70

1  servers, if he didn't pay for our time, and if he didn't
2  buy those leads, I wouldn't have been dialing anything.
3  So at the end of the day, it was all ran and
4  orchestrated by Scott Shapiro and Michael Smith from the
5  beginning.
6      Q.  Sure.  I understand that.
7          But just to be clear, you don't have any
8  personal knowledge that Shapiro or Smith name-dropped
9  you, you or Rising Eagle, to anyone at HII?
10     A.  I don't know for a fact, no.
11     Q.  Okay.
12     A.  But it goes to state that -- if you look at it
13  from a -- I'm a man of math, right?  So math, you always
14  have an answer when you're doing math, right?  So, if
15  you think about it, he name-dropped me to enough people
16  within other state AG offices why would you not think
17  that he wouldn't name-drop me and my company to a
18  carrier that he's selling products for?
19     Q.  Sure.  I understand.  I think you said
20  earlier -- I want to -- I want to clarify what you said.
21         Earlier today you said that you received
22  a -- a DNC list in 2018 from -- that you believed was
23  from HII; is that right?
24     A.  He forwarded to me from someone from HII.
25     Q.  Who -- who did?

Page 71

1      A.  Scott Shapiro did.
2      Q.  Scott Shapiro.  Okay.
3      A.  He would forward it to me once a week -- or
4  once a month, actually.  It became once a month.  It was
5  on a Thursday once a month.  I don't remember the -- the
6  exact dates, but I know it came once a month on a
7  Thursday.  It would be 3 -- 3 million, 3 1/2 million DNC
8  numbers to upload into our dialer to make sure we don't
9  allow any of those numbers to get through.
10     Q.  Okay.
11     A.  Because they were...
12     Q.  Yeah.  And you -- and you knew that it was from
13  HII because of the e-mail that was being forwarded to
14  you.
15     A.  Yes.
16     Q.  Is that right?
17     A.  Yes.
18     Q.  Okay.
19     A.  And I don't remember the person's name.
20     Q.  Sure.
21     A.  If I would, I would tell you.
22     Q.  Thank you.
23         And I think you mentioned earlier that your
24  belief was that this DNC list from HII was serial
25  litigators?

Page 72

1      A.  Uh-huh.  Or individuals that were not even real
2  litigators, they just wanted to get in the space.  They
3  wanted to jump on some kind of lawsuit, you know.
4      Q.  Okay.  And how did you come to that
5  understanding that that's what the DNC list was
6  comprised of?
7      A.  Because Scott Shapiro told me one time, he was
8  like, "These are all the bottom-feeders of society that
9  are trying to hone in on what you're doing."
10         I said, "Okay.  I'll block them."
11     Q.  Okay.  Okay.
12         Okay.  I want to ask you about this -- the
13  Exhibit A.
14         Do you still have Exhibit A handy?
15     A.  I do.
16     Q.  So this is a declaration signed by you in
17  October of 2020 --
18     A.  Uh-huh.
19     Q.  -- that we looked at earlier; is that right?
20     A.  Uh-huh.
21     Q.  I want to ask you, did you prepare this
22  declaration yourself?
23     A.  No.
24     Q.  Who did?
25     A.  My attorneys.

Page 73

1      Q.  Who are -- who are your attorneys?
2      A.  My attorneys at the time were -- 2020.  I don't
3  remember who my attorneys were on this.  I believe my
4  attorneys might have been a group out of Austin, Texas,
5  or it was the attorneys I hired for my FCC case.
6      Q.  Okay.
7      A.  Which was Roth and Jackson.
8          The ones from Austin, I do not remember
9  their names.  I know they were young guys.  They were
10  under the age of 30 years of age.
11     Q.  Okay.  So at one point -- well, let me ask you
12  this.
13         Who -- why did they ask you to sign this
14  declaration at this time?
15     A.  They said it was to -- let me read real quick.
16  "The investigation"...(reading to self).
17         I think this was a --
18     Q.  You know what, let me -- you know, Mr. Spiller,
19  let me back up.
20         Do you understand the nature of the case
21  that brings you here for this deposition today?
22     A.  No, I do not.
23     Q.  Okay.  So do you understand that this is a
24  class action lawsuit that's being brought by someone
25  named Mary Bilek?



John Spiller

Page 74

1        You see "Mary Bilek" on the front of this?
2        A.  Uh-huh, I do.
3        Q.  And Mary Bilek is claiming that she received a
4   call from --
5        (Simultaneously speaking.)
6        Q.  (BY MS. CHATTIN)  -- that was generated by
7   Rising Eagle.
8        A.  And I found that call.
9        Q.  Right.
10       A.  And I found -- I think I found like eight calls
11  that came from our system to her.  I believe in the past
12  she'd stated that she received hundreds of calls.  And I
13  negated that off the bat when I pulled up my records,
14  and I didn't have 100 calls.  I only had eight calls
15  that went to her.  And then eventually we blocked her.
16  She was eventually put on the federal "do not call"
17  registry.
18       Q.  Okay.  So when -- so you knew about Mary Bilek
19  at some point in the past that you're telling me about?
20       A.  Yeah.  I think it was like in 20- -- in 2019, I
21  was served.  Alex.
22       Q.  Served with what?
23       A.  With a summons to provide the call detail
24  reports for Mike -- for -- for Mary Bilek as well as for
25  other individuals.  And I was served this in 20- -- 2019

Page 75

1   or 2018.
2        Q.  Okay.  So you were served by -- and Mary
3   Bilek's attorney is Mr. Burke who's --
4        A.  Uh-huh.
5        Q.  -- who's here and just asked you questions.
6        So are you saying that you were served a
7   subpoena -- a subpoena or something?
8        A.  Yeah, subpoenas.  Yeah, I was served subpoenas.
9        Q.  And you responded to that subpoena and produced
10  documents to Mr. Burke and his client?
11       A.  I believe I -- I did, to them.  I also did to
12  another attorney.  His name was Abramhoff (phonetically)
13  or something like that, Aberhoff.  He's also a known
14  litigator in this space, a huge known litigator in the
15  space.  I produced him documents of calls that Scott
16  Shapiro was making through Rising Eagle Capital.
17       Q.  Uh-huh.
18       A.  I think I -- I sent him close to -- I think I
19  sent him three months' worth of dialing.
20       Q.  And that -- is that your understanding that
21  that was for a different case than the one that we're
22  here today, that --
23       (Simultaneously speaking.)
24       A.  I don't -- I don't remember -- I don't remember
25  which case that was for.

Page 76

1        Q.  (BY MS. CHATTIN)  Okay.
2        A.  But I do remember receiving Mary Bilek
3   information in 20- -- it was sometime in 20- -- in two
4   thousand --
5        THE WITNESS:  Can you -- can you share
6   about when --
7        MR. BURKE:  No.
8        THE WITNESS:  No?
9        MR. BURKE:  You just got to --
10       THE WITNESS:  Okay.
11       MR. BURKE:  -- say what you remember.
12       Q.  (BY MS. CHATTIN)  Yeah.  You just got to do
13  your best.
14       A.  Okay.  Well, I have no clue, then, about when I
15  received it.
16       Q.  Okay.  And when you were receiving this
17  subpoena for the Mary Bilek case --
18       A.  Uh-huh.
19       Q.  -- were -- did you communicate through your
20  lawyers at the time, or did you have any direct
21  communications with Mr. Burke or anyone else who
22  represents the plaintiff?
23       (Simultaneously speaking.)
24       A.  I believe I spoke directly to my clients -- I
25  mean my attorneys.

Page 77

1        Q.  (BY MS. CHATTIN)  Uh-huh.
2        A.  And I think my attorneys took care of all the
3   stuff.  That's -- that's how I got this.  And they told
4   me to sign it and then get a notary to sign it, and I
5   got a notary to sign it.
6        Q.  Uh-huh.
7        A.  I read it, and it sounded like it was all
8   pretty much true.  "A lead generation company of Austin,
9   Texas."  My company was founded in Austin, Texas.
10       Q.  Uh-huh.
11       A.  Jakob Mears was an employee.  Celerity Telecom
12  was a thing we used to use.  And that is part of the
13  message that we used.  Company through VICIdial.
14  HII [sic] paid Rising Eagle.  I mean -- and that -- and
15  that statement right there was a little --
16       Q.  Which statement are you talking about?
17       A.  The -- the "HAA paid Rising Eagle for leads."
18       Q.  Uh-huh.
19       A.  They paid us for calls, what's called a cost
20  per -- for acquisition.
21       Q.  Uh-huh.
22       A.  It's a CPA deal.  They paid us for everything
23  that was sold.  But come to find out, I don't think they
24  paid us for everything that was sold.
25       But -- okay.  So "whether the products were

John Spiller

June 30, 2022
Pages 78 to 81

Page 78

1 sold"..."Rising Eagle warm transfers." So, again, there
2 wasn't a warm -- warm transfers. It was kept -- it was
3 not either -- even warm transfers. It was straight cold
4 transfers. They weren't warm. They weren't -- there
5 wasn't an agent that vetted the client before the
6 transfer happened. It was a prerecorded message that
7 vetted the client.
8     Q. Uh-huh.
9     A. So that's not a true statement. They were not
10 warm transfers.
11    Q. Okay. Sorry. So are we in --
12        (Simultaneously speaking.)
13    Q. (BY MS. CHATTIN) We're in paragraph 3 --
14    A. 5. 5.
15    Q. "Calls were warm-transferred to HAA"?
16        (Simultaneously speaking.)
17    Q. (BY MS. CHATTIN) Do you see the top -- the top
18 of the page that you're looking at?
19    A. Yes, yes.
20    Q. So you're saying "Calls were warm-transferred
21 to HAA," that's not correct?
22    A. No, that's not correct. They were not
23 warm-transferred. Warm transfer in the industry of
24 marketing means that a -- a person is on the phone
25 vetting the -- the prospect before they transfer it to

Page 79

1 an agent. That's a warm transfer.
2     Q. Right.
3     A. A cold transfer is a press "1."
4     Q. Okay. Understood. Go ahead.
5         (Simultaneously speaking.)
6     A. Also, Scott and Mike paid me daily. They
7 didn't pay me on a monthly basis.
8     Q. (BY MS. CHATTIN) Uh-huh.
9     A. I did have a "do not call" policy from 2017 to
10 2019 based upon all the people that pressed "9" in our
11 system.
12    Q. Uh-huh.
13    A. 'Do not call' requests were not conveyed to HAA
14 and other entities associated with their business.
15       No, we never gave our "do not call" list to
16 HI- -- HAA.
17    Q. Uh-huh.
18    A. Because they weren't outbound dialing. They
19 were using my system to outbound dial with. There was
20 no reason to give that information to anyone.
21    Q. Right.
22    A. Those were all the numbers of "do not call"
23 registry, a quarterly basis. "If a client [sic] pressed
24 '2' during the interactive" -- okay. So I guess our
25 number was press "2." I remember our number being press

Page 80

1 "9."
2     Q. Well, who --
3         (Simultaneously speaking.)
4     Q. (BY MS. CHATTIN) Who gave your lawyers the
5 information to create this declaration?
6     A. Myself and Jakob Mears.
7     Q. Okay. So you do remember giving them the
8 information that they needed to write this?
9         (Simultaneously speaking.)
10    A. I remember giving them some of the information,
11 yeah. And some of it, I believe they just took it from
12 the information they got subpoenaed from me from the
13 FCC.
14    Q. (BY MS. CHATTIN) Okay.
15    A. Because I gave up all my e-mails. I gave
16 access to my entire computer system, and they downloaded
17 all the messages that we had on there. So...
18    Q. Okay. Is there anything else about the
19 declaration that you wanted to correct or clarify?
20    A. (Reading to self.) I had other customers
21 during the time. I don't know if they were a part of
22 HII or not.
23    Q. Uh-huh. Who -- what other customers did you
24 have during that time?
25    A. Sohails? I'm going to look at my phone real

Page 81

1 quick.
2     Q. Okay.
3     A. Hussain Sohail. I don't remember the name of
4 their group.
5     Q. And when -- when -- and when you say a
6 customer, this is somebody that you were also selling
7 leads to?
8     A. Uh-huh. Calls to.
9     Q. And during -- during what -- of -- calls.
10    A. Uh-huh.
11    Q. During what period of time?
12    A. 2018, 2019.
13    Q. Okay. Anyone else?
14    A. There were three brothers: Salman -- Salman,
15 Sohail, and Sumar. Three brothers.
16    Q. Okay. And you were selling them calls during
17 what time?
18    A. 2018 to 2019.
19    Q. Okay. Did you have any other customers?
20    A. Yeah. What is his name? Ofer Adler.
21    Q. Okay.
22    A. Oh, I had a gentleman. He was from -- he owned
23 an office, and I believe Scott put HII's products in his
24 office. That -- his name was Meedo, M-E-E-D-O.
25    Q. Okay. And you believe --

MAGNA >
LEGAL SERVICES

John Spiller

June 30, 2022
Pages 82 to 85

Page 82

1    A. Scott --
2    Q. -- Meedo was working --
3       (Simultaneously speaking.)
4    A. Under Scott.
5    Q. (BY MS. CHATTIN)  Under Scott.
6    A. Scott Shapiro.  Scott Shapiro --
7    Q. Okay.
8    A. -- was selling his products.
9       I mean, right now, he currently has seven
10   other rooms that are selling his products, you know,
11   so...
12   Q. Right.  Okay.
13   A. Give me a second.  I'll see if I can find
14   anyone else.  I cannot.  I cannot find anyone else.  I'm
15   certain I had -- if you can find the deposition that I
16   gave to the States, the attorney generals, I think
17   you'll have all the names of all the other clients I
18   used to work with.  I had them written down before I
19   went into that deposition.  I don't remember them now.
20   Q. Can I ask you, you've --
21   A. Uh-huh.
22   Q. You've been looking at your phone sometimes to
23   help refresh your recollection --
24   A. Uh-huh.
25   Q. -- today.

Page 83

1       Do you have note -- do you have notes on
2    your phone that you --
3    A. No.
4    Q. -- prepared for the deposition?
5    A. No.  I just have a customer's name -- like, I
6    remember, like, a first letter of a name, and it allows
7    me to go into my Rolodex.  I have over, probably, 10,000
8    people's information on my phone.  So when I put in,
9    let's say, "O" or "A" or "H," pulls up the people's last
10   name, and I'm able to look through the Rolodex
11   relatively quickly and be able to let you know the name
12   of the clients that I used in the past.
13   Q. Got it.  Okay.  And when you've been kind of
14   looking at your phone during the deposition to -- to
15   help refresh your recollection, you're -- you're saying
16   that you're just looking at, basically, your contact
17   list to pull names?
18   A. Yep.
19   Q. Okay.  Have you -- have you checked anything
20   else on your phone that helped you refresh your
21   recollection for your testimony today?
22   A. Huh-uh.
23   Q. Did you do anything to prepare for this
24   deposition today?
25   A. Nope.

Page 84

1    Q. Did you talk to anyone about the fact that you
2    were coming in for a deposition?
3    A. I spoke one time with Mr. Burke about coming
4    in.  And I also believe I received an e-mail from you or
5    from your office telling me to come in at this time.
6    Q. That's right.
7    A. Uh-huh.
8    Q. So you had one conversation with Mr. Burke
9    about the deposition; is that right?
10   A. I asked him -- I sent him a text message, and I
11   asked him if he can send me the address of this location
12   so that I can figure out where I was supposed to go.
13   And that's it.
14   Q. Okay.  Did you talk to anyone else about the
15   deposition today?
16   A. Huh-uh.
17   Q. Okay.
18   A. Besides my girlfriend, that was it.
19   Q. Okay.  And what did you talk to your girlfriend
20   about with respect to the deposition?
21      (Simultaneously speaking.)
22   A. That I had a deposition at 9:00 -- at 9:00 a.m.
23   in the morning.  And I asked her if she would go with
24   me, and she said yeah.  She decided to drive her own
25   car.  She also had to go do her errands as well.  So

Page 85

1    she's not here because of that.
2    Q. (BY MS. CHATTIN)  Okay.  Did you talk to your
3    girlfriend about any of the, you know, your testi- --
4    expected testimony that you were going to give today?
5    A. No.  I think she already went through with that
6    at the state AGs' deposition that I did.
7    Q. Uh-huh.
8    A. That was, like, a lot longer.  That took almost
9    an -- an entire day.  We did it from like 8:00 in the
10   morning until 6:00 in the evening or 7:00 in the
11   evening.  So...
12   Q. And what -- what do you mean she went through
13   that with you?
14   A. She saw my facial expressions.  Because Scott
15   Shapiro was in that meeting with me when I did that
16   deposition.  He was there to try to coerce me into not
17   putting him out in limelight.  Every time I said
18   something about HAA or Scott Shapiro, his face would get
19   all red hot.  He would -- tell I pissed him off at
20   something I said, but I didn't really give two shits
21   because at that point I was done with Scott Shapiro.
22   Q. Uh-huh.  So you -- what you're saying is your
23   girlfriend was in the deposition with you during --
24   A. Uh-huh.
25   Q. At that deposition, she was in the room?



John Spiller

June 30, 2022
Pages 86 to 89

Page 86

1   A. Uh-huh.
2   Q. "Yes"?
3   A. Yes.
4   Q. Yeah.
5   A. Yes.
6   Q. Okay. And since that deposition and today, did
7   you have any conversations with her about what your
8   testimony was going to be?
9   A. Huh-uh. I didn't even know what the questions
10  y'all were going to ask me. At least in that state
11  AG's, I kind of had an idea of what they were going to
12  ask. But this time, I'm clueless.
13      But, I mean, that -- again, though, it's
14  all the truth, and that's the only thing I'm going to
15  speak, right?
16  Q. Uh-huh.
17      A. Because that's -- first off, in the -- the
18  state AG's, if I would have fired my attorneys when I
19  first got into the lawsuit, if I would never have hired
20  any attorneys, I think the case within the state AG's
21  would have gone more in my favor than it would have gone
22  if I would have hired Roth and Jackson. Roth and
23  Jackson -- first off, great company, don't get me wrong.
24  They just -- very -- they wouldn't allow me to speak. I
25  had no voice. I didn't like that. So as soon as I

Page 87

1   fired them, it seemed like everything started clearing
2   up. I was able to talk to the AGs about getting me out
3   of the lawsuit, letting me live my life.
4   Q. Uh-huh.
5   A. Remove me from the lawsuit. And I think now,
6   in the next couple of weeks, I should be removed from
7   that lawsuit entirely. So...
8   Q. Okay. Well, we appreciate you being open and
9   honest with us here today as well.
10      So, other than your -- your girlfriend,
11  receiving an e-mail from me, and talking to Mr. Burke
12  about the logistics of this deposition, did you talk to
13  anyone else about your deposition today or your
14  testimony?
15  A. Huh-uh.
16  Q. Okay. And have you talked to anyone during the
17  deposition or messaged with anyone during the deposition
18  to help you refresh your recollection or --
19  A. No, I haven't.
20  Q. -- affect your testimony?
21  A. No, I haven't. I've only been chatting with
22  the clients I have. I told them that I'm meeting with
23  my clients -- with my attorneys. "Currently in an
24  attorney meeting. I won't be finished until about
25  3:00." I bought myself another hour. I told them I

Page 88

1   won't be done until 4:00. So they know what's going on,
2   why am I not by my computer right now.
3   Q. Got it. Okay. Okay. I think -- I just want
4   to be -- get a little clarity on the -- your, you know,
5   kind of participation in this lawsuit.
6       So I think what you've told me is in 2019
7   or 2018, when you were still represented by Roth and
8   Jackson --
9   A. Roth and Jackson didn't come in my life until
10  2020.
11  Q. Okay.
12  A. Before that, I was represented by two attorneys
13  from Austin, Texas. I think they were called Brown
14  Group or the Brown Law Group.
15  Q. Okay.
16  A. Brown -- something Brown.
17  Q. Okay. And so they were representing you in --
18  in connection with what matters?
19  A. All this.
20  Q. Okay. So you received a subpoena related to
21  this Mary Bilek case around that time?
22  A. Uh-huh. And I received another subpoena case
23  for another attorney called Aperhoff (phonetically).
24  Q. Right.
25  A. I don't even remember what that was for. I --

Page 89

1   I believe it was similar to this lawsuit.
2   Q. Uh-huh.
3   A. I don't remember, though.
4   Q. Okay. And at that time, your recollection is
5   that you did produce documents --
6   A. Uh-huh.
7   Q. -- through your lawyers --
8   A. Uh-huh.
9   Q. -- to Mr. Burke's client?
10  A. Not Mr. Burke's client but to the attorneys. I
11  never gave any -- I don't think my attorneys ever spoke
12  directly with --
13  Q. Mary Bilek?
14  A. -- Mary Bilek or anything along those lines. I
15  think he only spoke with the attorneys.
16  Q. Okay. So Mary Bilek's attorney is Mr. Burke
17  and someone named Dan Marovitch.
18      Have you ever spoken to --
19  A. No.
20  Q. -- Mr. Marovitch? Okay.
21  A. Not that I remember. I might have. He might
22  be able to give me recollection on that. But I don't --
23  I don't remember speaking to him.
24  Q. It doesn't ring a bell?
25  A. No.



John Spiller

June 30, 2022
Pages 90 to 93

Page 90

1    Q.  Okay.  So your recollection is that your -- the
2  Brown Law Group did produce documents to Mr. Burke?
3    A.  Whoever was representing Mary Bilek.  It was
4  either Mr. Burke or Dan Marovitch.
5    Q.  Okay.
6    A.  Marovitch.
7    Q.  And do you remember what documents you produced
8  or your lawyers produced at that time?
9    A.  The call detail reports, I would like to
10 assume.
11   Q.  What are call detail reports?
12   A.  The time of the call, the call that was
13 registered on my switch as well as registered on the
14 VICIdial.
15   Q.  Uh-huh.
16   A.  For the call.
17   Q.  Okay.
18   A.  The date timestamp.
19   Q.  Okay.  So after you received that subpoena for
20 documents, why did you -- do you know why a -- this
21 declaration was also created for you?
22   A.  I think it was because I told them that I'd be
23 willing to go under oath to admit to whatever they want
24 me to admit to.  Or to -- at least because I thought
25 this was an opportunity for me to get out and underneath

Page 91

1  this so this wouldn't continue going forward and trying
2  to loop me into this lawsuit as well.
3    Q.  And did you -- did Ms. Bilek's lawyers tell you
4  that they were planning on adding you to the lawsuit --
5    A.  They --
6    Q.  -- if you didn't do this?
7    A.  They didn't -- they didn't say that.  No one
8  exactly specifically stated that.
9    Q.  Uh-huh.
10   A.  But that was my fear because of everything else
11 that was going on in my life at the time.
12       In June of 2020, I got served with a
13 $225 million lawsuit from the FCC.  I mean, that
14 basically blew my world out of the water, you know?
15   Q.  You know, we're -- we're talking about dates a
16 lot, and I know the declaration that you have in front
17 of you is dated October 2020.
18       I want to hand you another exhibit.
19 This -- this is going to be B.
20       (Exhibit B was marked.)
21   A.  Okay.
22       MS. CHATTIN:  And, Alex -- thought I had
23 more copies.  Oh, I do.
24       You know what it is.
25   Q.  (BY MS. CHATTIN)  So, Mr. Spiller, I've just

Page 92

1  handed you Exhibit B.  It appears to be another
2  declaration of yours, and this one is dated July 11th,
3  2019.
4       You see that?
5    A.  Yeah.  Like I was saying -- like -- like I was
6  saying, I'm pretty sure I got served with this before
7  2020.
8    Q.  Right.  And to -- and you can feel free to
9  review, but these two, Exhibit A and Exhibit B, look to
10 be essentially identical declarations.
11       MR. BURKE:  You want to go off the record
12 for a second?
13       MS. CHATTIN:  Yeah.
14       THE VIDEOGRAPHER:  The time is 12:10.  Off
15 the record.
16       (Recess from 12:09 p.m. to 12:10 p.m.)
17       THE VIDEOGRAPHER:  The time is 12:11.  Back
18 on the record.
19   Q.  (BY MS. CHATTIN)  Okay.  We just had a -- an
20 off-the-record discussion to point out that the 2019
21 declaration, Exhibit B, had one of the DID numbers
22 incorrect and that the October 2020 declaration,
23 Exhibit A, is the same but with that one correction.
24   A.  Uh-huh.
25   Q.  Do you remember signing this corrected

Page 93

1  declaration in October 2020, Exhibit A?
2    A.  I don't remember the exact time I signed it,
3  but I do remember I signed it twice.
4    Q.  You do remember that?
5    A.  Yes, I do.
6    Q.  Okay.
7    A.  That's why I said I thought I received this in
8  2018 or 2019.
9    Q.  Okay.
10   A.  Around the time I received the subpoenas.
11   Q.  Got it.  And so Exhibit B, which was signed on
12 July 2019, is the original declaration?
13   A.  Uh-huh.
14   Q.  And that's the -- that's the first time --
15   A.  Yeah.
16   Q.  -- that you signed it.
17       And that's the time that we're talking
18 about when you received the subpoena; is that right?
19   A.  Yes, ma'am.
20   Q.  Okay.
21   A.  Around that time.
22   Q.  And you think, when you signed Exhibit B in
23 2019, you were represented by the Brown Law Group; is
24 that right?
25   A.  Uh-huh.  That's correct.



John Spiller

Page 94

1    Q. And those are the lawyers that prepared the
2 2019 declaration; is that right?
3    A. Yeah. They -- they prepared both of the
4 dec- -- declarations.
5    Q. Okay.
6    A. I think that was the last time I spoke with the
7 Brown Group. I think his name is Andrew Brown out of
8 Austin, Texas.
9    Q. Got it.
10    A. Uh-huh.
11    Q. Okay. So, other than -- putting aside the
12 declaration, other than the -- well, hold on. Let me --
13 let me start over.
14        You've produced -- you said you produced
15 call detail reports?
16    A. Uh-huh.
17    Q. In response to a subpoena from Mary Bilek's
18 attorneys, right?
19    A. Uh-huh.
20    Q. Did you produce any other documents at that
21 time?
22    A. I don't -- I don't remember all the things I
23 produced. I mean, that was around, like I'm stating,
24 around 2019. I was approached by three attorneys. One
25 was Aperhoff. Another one was the Mary Bilek case. And

Page 95

1 another one was a random case from a nonpracticing
2 attorney acting as an attorney trying to sue Scott
3 Shapiro and Michael Smith for calls made to them. But I
4 never found their calls in our system; therefore, I just
5 put that to the side.
6    Q. Uh-huh.
7    A. But the Aperhoff situation, I did supply call
8 detail reports of the entirety of Scott Shapiro and
9 Michael Smith's calls to leads they gave me from -- I
10 think it was the -- August of 2018 through, I'd say,
11 around February or May -- or March of 2018 -- of 2019.
12    Q. Sorry. Who did you produce that to?
13    A. His name was Abramhoff.
14    Q. Okay.
15    A. If you -- I can find his name for you.
16    Q. No, that's okay.
17    A. Okay.
18    Q. Okay. And then, in connection with this case,
19 the Mary Bilek case --
20    A. Uh-huh.
21    Q. -- other than that subpoena response, have you
22 given any other documents to Mr. Burke or Ms. --
23 Mr. Marovitch?
24    A. Huh-uh. Not that I'm familiar with.
25    Q. Okay. Other than through your lawyers or to

Page 96

1 talk about where to go for this deposition, have you had
2 any other conversations with Mr. Burke?
3    A. Yeah. I believe he called me yesterday. He
4 asked if I was free. He called me yesterday, wanted to
5 make sure that I -- I was prepared and ready. And said
6 it would be a hard -- I told him it would be a hard stop
7 at 2:00 because I have a probation meeting at 3:00.
8    Q. Uh-huh.
9    A. And I believe that was about all of our
10 conversation was about. I even asked him what time he's
11 coming into town. He said he -- he said he was already
12 in town. I was like, oh, okay. And that was it.
13    Q. Okay. And before you started talking to
14 Mr. Burke about this deposition today, have you ever
15 talked to him before that?
16    A. Yeah. We've had a couple of talks about
17 producing documents. Or I think he wanted me to produce
18 documents, and then that's when I said, "Listen, I
19 don't" -- "I don't even have documents anymore. All the
20 documents are with the state AG's office. If you would
21 like to get with them, you can get with them, and I'm
22 certain they'll give it to you."
23        Some of the state AGs are kind of tight
24 with their information. They're not going to be giving
25 it up. But I told him I'd be open for a deposition. If

Page 97

1 he wants to sit -- sit down with me on a deposition,
2 I'll sit down with him.
3    Q. Okay.
4    A. And that's why we're here.
5    Q. Okay. And when did you have that -- that
6 conversation?
7    A. Like three months ago.
8    Q. Okay. And he reached out to you to ask you for
9 documents three months ago?
10    A. Yeah.
11    Q. Okay.
12    A. He asked if I can supply documents or things of
13 that nature to him, and I said I would, but I said I
14 don't -- I don't even think I have any more documents.
15 And I said I'd rather just go on oath and talk about
16 everything than not because, I mean, shit, my documents
17 are pretty much all destroyed, you know?
18    Q. Uh-huh.
19    A. I mean, whatever the States took, they took.
20 And they took it right out of my computer. I told them
21 to also delete it from my computer.
22    Q. Uh-huh.
23    A. Because I didn't want them anymore. I
24 didn't -- you know, that part of my life was over.
25    Q. Right.



John Spiller

June 30, 2022
Pages 98 to 101

Page 98

1    A.  Did not want it.  I don't want another
2  $225 million lawsuit.  I'm not going to be robo dialing
3  anymore.  I have -- I completely cut off everyone in the
4  health insurance space in south Florida.  I don't even
5  talk to my Uncle Joel anymore.  I just cut everybody off
6  from south Florida that I used to have business
7  relationships with.
8    Q.  Uh-huh.  Sure.  So -- so you didn't have any
9  documents to give Mr. Burke three months ago or since
10  then; is that right?
11    A.  That's correct.
12    Q.  Okay.  And before that conversation three
13  months ago, had you had any other conversations with
14  Mr. Burke?
15    A.  Not that I remember.
16    Q.  Okay.
17    A.  Only through e-mails.
18    Q.  Okay.  And how many -- when did you start
19  e-mailing with Mr. Burke?
20    A.  I don't have a clue.  Probably 2019, I'm
21  assuming.  That's probably around the time that I
22  received the subpoena and all this information.
23        And then, I believe out of the blue I
24  called his number one time because I think Jakob Mears
25  gave me his information.

Page 99

1    Q.  Uh-huh.
2    A.  In 20- -- in 2022, in the beginning of 2022,
3  around January or February.  And I had called him to get
4  him off of Jakob's back.  Because Jakob had only signed
5  up for my company, to be a part of my company around the
6  time that I wanted to get a house in Austin.
7    Q.  Uh-huh.
8    A.  I mean, in Houston.  I put him on as an owner of
9  the company.  That's kind of why he got looped into this
10  lawsuit.  But, regardless, he was -- he was always an
11  employee.  He was never an -- an actual "owner" owner of
12  the company.
13    Q.  Uh-huh.
14    A.  Even though on record he was.
15    Q.  So let me get this straight.
16    A.  So I wanted to reach out to Mr. Burke and let
17  him know that I was the owner of Rising Eagle Capital.
18  You could have any questions you want to ask me.  Ask me
19  directly, don't ask Jakob.  Leave him alone; leave him
20  out of it.
21    Q.  Okay.  So you understood that Mr. Burke was
22  contacting Mr. Mears --
23    A.  Uh-huh.
24    Q.  -- about this Mary Bilek case; is that right?
25    A.  Uh-huh.

Page 100

1    Q.  "Yes"?
2    A.  Yes.
3    Q.  Yes.
4    A.  Sorry.  I thought the head shakes would --
5    Q.  Yeah.
6    A.  -- make it certain.
7    Q.  Okay.  So you -- you started directly
8  communicating with Mr. Burke at that time, not through
9  lawyers; is that right?
10    A.  I didn't have a lawyer by that time, yeah.
11  That's correct.
12    Q.  Okay.  And you said you mostly communicated
13  with him through e-mails; is that right?
14    A.  Uh-huh.
15    Q.  How many times would you say you e-mailed with
16  Mr. Burke since then?
17    A.  Oh, I only think about two or three times.  I
18  don't even think that it's been that many times.  Like I
19  said, it was just in one of our conversations we had in
20  the past, about three months ago.  I told him, I said
21  I'd rather just go on -- go on record with you than have
22  this draw out and try to get -- waste my time in trying
23  to find documents.  I'd rather just come out and be open
24  and honest about what I know and what I remember or even
25  what I don't remember about than to have this draw out

Page 101

1  to be another six-month or a two-year process of trying
2  to get information from me.  It'd just be pointless.
3    Q.  Okay.  And did you ever give Mr. Burke or
4  Mr. Marovitch any information via e-mail about this case
5  or about Rising Eagle?
6    A.  I don't remember.  That would be a question I
7  would ask them.
8    Q.  Uh-huh.
9    A.  Yeah.  I don't -- I --
10    Q.  Sure.
11    A.  Just don't remember.
12    Q.  But -- exactly.  So --
13    A.  I mean, I'm -- I mean, I'm certain that I did
14  at one point send my attorneys some information, and my
15  attorneys 100 percent gave it to them.
16    Q.  Okay.
17    A.  But I don't -- I don't remember what those
18  things were.  I remember call detail reports at one
19  point.  But I don't remember the dates of those call
20  detail reports.  I don't remember --
21    Q.  Uh-huh.
22    A.  -- any other information that I sent them about
23  Rising Eagle Capital or John Spiller or anything else
24  along those lines.
25    Q.  Okay.  No, this is very helpful.  I appreciate



John Spiller

June 30, 2022
Pages 102 to 105

Page 102

1  you doing your best with your memory.
2          Can I ask you, does -- you mentioned
3  your -- your girlfriend went with you to the -- to
4  the -- your deposition with the AGs' offices.
5          Has anyone related to this lawsuit
6  contacted your girlfriend as far as you know?
7    A.  No.  She would have told me.
8    Q.  Okay.
9    A.  She doesn't -- she was only affiliated because
10 she was dating me.  She's been dating me for the past
11 seven years, right?
12   Q.  Uh-huh.
13   A.  So we can't get married until this lawsuit's
14 over -- or not so much y'all's lawsuit but the lawsuit
15 with the FCC.  So once that lawsuit finishes here in the
16 next two weeks, we're going to finally get married.  But
17 until then, we're still stuck as boyfriend and
18 girlfriend for seven years, and that's extremely too
19 long.  But, regardless, it was because of my choices in
20 life that got us in this boat.
21          And my choices in life are trying to get me
22 out of this boat by being open and honest about Scott
23 Shapiro's role, my role, Michael Smith's role, HAA's
24 role, everyone's role in this entire thing so that I'm
25 not put as the patsy.  And I know that's what Scott and

Page 103

1  Mike Shapiro -- Mike -- Michael Smith wanted to do.
2  They wanted to label me as the patsy for their entire
3  operation when, at the end of the day, if you follow the
4  money trail that went into my account from the beginning
5  of 20- -- the end of 2016, the beginning of 2017 all
6  came from Scott -- Michael Smith and Scott Shapiro.
7          And, I mean, shit, I remember times when
8  Scott Shapiro would show up at Michael Smith's office,
9  supposedly that was Michael Smith's room.  And he would
10 do all the payments to all the agents that they had on
11 their floor and everything.  You know, it was just -- it
12 was just insane that these guys paid me pretty well to
13 send calls to them.  Then, at the end of the day, they
14 want to drop my name and try to get me in trouble with
15 the FCC and other -- other consumers and -- and other
16 AGs' offices.  I didn't even know there was eight states
17 involved in that FCC lawsuit.
18   Q.  Uh-huh.
19   A.  But there's eight states.  I believe there were
20 seven states in the beginning, and then an eighth one
21 joined with them about 20- -- about the end of 2019.
22 Or the end of 2021, actually.
23   Q.  Uh-huh.  Okay.  So, as far as you know, no
24 one --
25   A.  Huh-uh.

Page 104

1    Q.  -- related -- you know, Mr. Burke,
2  Mr. Marovitch -- no one's contacted your girlfriend
3  about --
4    A.  Huh-uh.
5    Q.  -- about this case?
6    A.  No.  She wouldn't even know what to say about
7  it.
8    Q.  Right.  And Scott Shapiro, Michael Smith, have
9  they tried to contact her?
10   A.  No.
11   Q.  Have you talked to Scott Shapiro or Mike --
12 Michael Smith recently?
13   A.  Nope.  I had just sent Michael Smith a -- a
14 text message on Skype.  I said "Isn't it shitty that
15 Scott Shapiro is trying to play you as a patsy now?"
16 Because he was basically saying in his deposition that
17 he knew Michael Smith and knew of Michael Smith but he
18 had no affiliation with HAA.  But that wasn't true
19 because that -- the attorney generals wrote a letter
20 that's called a MS -- M -- MSJ?
21   Q.  A summary judgment motion?
22   A.  Yeah, summary judgment motion --
23   Q.  Uh-huh, yep.
24   A.  -- against Scott Shapiro, stating in that
25 summary judgment Scott Shapiro had orchestrated this

Page 105

1  entire thing.  They are telling him he's not getting out
2  of the lawsuit.  He's going to be in the lawsuit.
3    Q.  Uh-huh.
4    A.  And they basically were trying to tell me you
5  have a good weekend.  Now that you've given us all the
6  information that we needed to plant Scott Shapiro as the
7  foreman of the company, even though your name was under
8  Rising Eagle Capital -- you know, it was his money that
9  basically paid for everything.  Therefore, why am I, as
10 the -- why am I, the Judas of Iscariot, being persecuted
11 for all the millions of robo dials that Scott Shapiro
12 and Michael Smith paid me for?
13   Q.  Uh-huh.
14   A.  If I would have known it was illegal, I would
15 have most likely stopped it.  Or I would have turned
16 over the keys to them before 2020.  I would have turned
17 over the keys to them in 2018 and said, "Hey, listen, I
18 built it for you.  You're going to pay me 5,000 a month.
19 This is your system.  You do with" -- "what you want
20 with it," and then left.
21   Q.  Did you -- were you -- you said Mr. Shapiro was
22 in your deposition for the -- in the --
23   A.  Yeah.
24   Q.  -- in the AG action.
25          Were you in his deposition as well?



John Spiller                                                                                   June 30, 2022
                                                                                              Pages 106 to 109

Page 106

1    A.  No.
2    Q.  How do you know what he said in his deposition,
3  then?
4    A.  Because it was recorded.  And all that stuff
5  that's recorded is put on a OneDrive, and I have access
6  to that OneDrive.
7    Q.  Whose OneDrive?  It's -- it's part of the --
8    A.  State AGs'.
9    Q.  -- AGs' case?
10   A.  Yeah.
11   Q.  Okay.  Got it.  And you said you sent Michael
12  Smith a -- text -- a Skype message recently about
13  that?
14   A.  Uh-huh.  Uh-huh.  He had never replied.
15   Q.  He never replied?
16   A.  Yes.
17   Q.  Okay.
18   A.  But I just said, you know, "Isn't it shitty
19  that now you're being used as a patsy for Scott
20  Shapiro?"
21       And, you know, he -- he read it.  I got
22  confirmation that he read it.
23   Q.  Uh-huh.
24   A.  But no response.  And I wasn't planning on a
25  response.  I just wanted to tell him, look, that was

Page 107

1  pretty fucked up what you did to me.
2    Q.  Yeah.
3    A.  But at the same time, isn't it shitty now that
4  it's happening to you?
5    Q.  Got it.  And -- but other than that Skype
6  message, have you talked to --
7    A.  No.
8    Q.  -- either of them?
9    A.  Uh-huh.
10   Q.  Okay.  Oh, one other thing that you spoke about
11  earlier.
12       You mentioned someone named Seth Cohen and
13  his company, Insurance Care Direct.
14       Do you remember that?  Do you remember
15  talking about him earlier today?
16   A.  Yeah.  I thought it was called Insurance...
17   Q.  I might have gotten it wrong.
18   A.  ICD.  Yeah, you're right.  Insurance
19  Carrier [sic] Direct.  Yeah, that's it.
20   Q.  Okay.  I just wanted to make clear, you --
21  because you mentioned him --
22   A.  Uh-huh.
23   Q.  -- in your testimony this morning.
24       Did Rising Eagle ever sell leads to that
25  agency?

Page 108

1    A.  Huh-uh.
2       Oh, yeah, we -- I sold insurance leads to
3  that agency in the past -- insurance leads as in the
4  person's first name, last name, phone number, and all
5  that information.  But I never sold him calls.
6    Q.  Okay.  And you sold him leads but not calls?
7    A.  Yes.
8    Q.  And when -- when did you sell him leads?
9    A.  From 2015 through 2018.
10   Q.  Okay.  And --
11   A.  I had a contract with a individual that still
12  worked for All Web Leads.
13   Q.  All Web --
14   A.  And he was selling me lists of leads, opted-in
15  leads that came in through the back door, and he had a
16  way of pulling them out and selling them to me.  He
17  would sell them to me for 3,000.  I'd turn around and
18  sell them for 15- to 20,000.
19   Q.  Okay.  And were you selling those leads as
20  Rising Eagle at that time?
21   A.  Yeah.
22   Q.  Okay.
23       MS. CHATTIN:  Okay.  Maybe -- can we --
24  let's go off the record.
25       THE VIDEOGRAPHER:  The time is 12:28.  Off

Page 109

1  the record.
2       (Recess from 12:28 p.m. to 12:41 p.m.)
3       THE VIDEOGRAPHER:  The time is 12:41.  Back
4  on the record.
5    Q.  (BY MS. CHATTIN)  Okay.  Mr. Spiller, I just
6  have one more question for you.
7       The individual that we were talking about
8  before that you believe was a marketing person at HII
9  that you communicated with via LinkedIn -- is that
10  right?
11   A.  Uh-huh.
12   Q.  Do you have access to those LinkedIn
13  communications from back then that you could send us?
14       And you don't have to do it now.  We can
15  just do it after the deposition.
16   A.  I don't know if my LinkedIn is still -- give me
17  a second.
18   Q.  Yeah.  And we can -- you know, as long as you
19  agree, we can -- we can work this out after the
20  deposition.  I just wanted to --
21       (Simultaneously speaking.)
22       MR. MESSINA:  We can even do it here.
23       MS. CHATTIN:  Oh, go ahead, yeah.
24       MR. MESSINA:  Well, just because I know
25  people need to leave.



John Spiller

June 30, 2022
Pages 110 to 113

Page 110

1          MS. CHATTIN:  Yeah.
2          MR. MESSINA:  At the very end of
3 questioning --
4          MS. CHATTIN:  Right.
5          MR. MESSINA:  -- if you want to check.
6     Q. (BY MS. CHATTIN)  We can do it at the end --
7 off the record, at the end of the deposition.
8     A. I'd have to -- it depends if his name -- if he
9 deleted his complete identity on LinkedIn, might have to
10 get ahold of LinkedIn and ask them for his records
11 between me and him.
12     Q. Okay. How about this?  After --
13     A. I don't even remember his name.  I need to find
14 his name.
15     Q. Yeah. How about, after we go off the record
16 today, if -- if there's -- you have a little time before
17 you have to go, we would appreciate it if you could look
18 back and see if you can identify the person.
19     A. Okay.
20     Q. Can we -- can we agree to that?
21     A. Yeah, we can agree to that.
22     Q. Okay. All right.
23          MS. CHATTIN:  Well, then, other than that,
24 I have no further questions from HII at this time.
25          THE WITNESS:  Okay.

Page 111

1          EXAMINATION
2 BY MR. MESSINA:
3     Q. Hi, Mr. Spiller.
4          MS. HOUSINGER:  Can I grab this one?
5          (Off-the-record discussion.)
6     Q. (BY MR. MESSINA)  How you doing, Mr. Spiller?
7 My name is Charles Messina.  I represent clients Access
8 One and National Benefit Builders.
9          Just as an initial question, have you ever
10 heard of Access One or National Benefit Builders before
11 your subpoena in this case?
12     A. Never heard of y'all, even in the subpoena with
13 this case.
14     Q. All right. So fair to say that you're not
15 familiar even with what National Benefit Builders or
16 Access One does as a company?
17     A. Nope.
18     Q. Okay. So you had made a comment before when
19 you were being questioned that everyone in this room --
20 and I think you meant our clients --
21     A. Yeah.
22     Q. -- would have heard about you because Shapiro
23 was name-dropping you to everyone at the time.
24          Is it -- is it fair to say that there's no
25 basis to claim that my clients would know anything about

Page 112

1 Rising Eagle or you, considering you're not even aware
2 of whether or how they're involved in this case?
3     A. I don't --
4          MR. BURKE:  Object to the form.
5     Q. (BY MR. MESSINA)  Do you understand the
6 question?
7     A. No.
8     Q. Let me repeat it.
9     A. Yeah.
10     Q. Is it fair to say that there was no basis --
11 there's -- there's no actual basis to claim that my
12 clients know who you are or your company, considering
13 you don't know who they are?
14     A. I don't know who your clients are.  But at the
15 same time, though, like I'm saying, that Scott
16 Shapiro -- it's like the math equation again.  It goes
17 back to that same consus [sic], right?  If Scott
18 Shapiro, who is name-dropping my name to all the state
19 AGs' offices in the country as well as all the TCPA
20 violations he had, why wouldn't he -- but, again, I
21 don't know what your company represents.  I don't know
22 what your company does.  And I don't know what the hell
23 they're doing in this case.  No, I don't.  So...
24     Q. No, you don't?  Do you mean, no, you don't have
25 a basis to claim that they would know anything about

Page 113

1 your Rising Eagle or -- or --
2          (Simultaneously speaking.)
3     A. What I'm saying is, is I don't have a
4 recollection on what your companies do, nor do I know if
5 Scott Shapiro told them if my company was direct
6 relation with Scott Shapiro's company at all.  But
7 again, it's like the 1 plus 1 equals 2 scenario.  Scott
8 Shapiro was going around the nation telling everyone
9 that John Spiller, Rising Eagle Capital, was sending him
10 calls without telling them the truth, that he was
11 sending John Spiller leads to dial on.  Therefore, the
12 same consensus we can come to is, is that Scott Shapiro
13 might have told whoever your companies are.
14          But who does your companies -- are related
15 to?  Is your companies related to his companies?  Or her
16 companies?  Or HII?  I don't know.
17     Q. (BY MR. MESSINA)  Okay.  And I -- you know, I'm
18 not here -- I can't answer questions here.
19     A. Oh.
20     Q. But I -- but thank you for your response.
21          You -- you had mentioned earlier your
22 girlfriend, and congrats on the upcoming nuptials.  I
23 hope you get through all that.
24     A. Yeah.
25     Q. You mentioned she was knowledgeable about this



John Spiller

June 30, 2022
Pages 114 to 117

Page 114

1  TCPA- -- TCPA stuff and this company and that she sat in
2  on the AG deposition, right?
3      A. She sat on the AG deposition. She doesn't know
4  anything about TCPA violations.
5      Q. Okay. Got it.
6      A. Yeah.
7      Q. What's her name?
8      A. Maggie.
9      Q. Okay. Do you know if she communicated with
10  anyone other than you about this deposition? Like did
11  she ever have a conversation about Alex?
12      A. Huh-uh.
13          (Simultaneously speaking.)
14      A. She doesn't even know Alex Burke.
15      Q. (BY MR. MESSINA) Okay. And when you -- you
16  talked about that you had, it sounds like, a few calls
17  with Alex.
18          Was she listening to those calls as far as
19  you're aware?
20      A. I mean, I usually put in my earbuds.
21      Q. Yeah.
22      A. Right here on my key chain.
23      Q. Okay.
24      A. And when I put them in, the world goes dark,
25  and it's just me and the person talking. Who's ever in

Page 115

1  the room, they don't get to hear what the other person's
2  saying. They just hear what I'm saying. And a lot of
3  times, my girlfriend has to come over and tell me, "Hey,
4  tone it down a little. You're being a little too loud."
5  But outside of that, that's really about all she says.
6      Q. I -- I understand. And you ended up
7  explaining, when Danielle was questioning you just a
8  little bit earlier, that you spoke with Alex a few
9  times. One of those times, you said you called Alex --
10  the intention was to get Alex off of Jakob's back --
11  back; is that correct?
12      A. Yeah, that's correct.
13      Q. Do you recall Alex mentioning anything about
14  promising not to sue you or Mears if you were helpful
15  to --
16      A. No.
17      Q. -- his client pursuing HII or anything like
18  that?
19      A. No. That's why I was willing -- that's one of
20  the reasons why I wanted him to get off Jakob's back.
21  Because I realized Jakob was stressed out already. He
22  started a new job. He works in insurance sales. He
23  doesn't want anything to do with this lawsuit anymore.
24  He wants to be out of it, same as I do. And I told him
25  I got him.

Page 116

1          And that's one of the -- I called
2  Alex Burke. I said, "Listen, you can ask me all the
3  questions you want. I'll be able to give you all the
4  information. Rather, why don't we just do a deposition?
5  I just did an AG depo" -- "deposition. I'll give you a
6  deposition."
7      Q. And -- and to clarify, you don't -- you're not
8  presently represented by counsel now, right?
9      A. No, I am not.
10      Q. You had mentioned earlier you told this -- you
11  were -- you were texting with some of your clients
12  during the deposition earlier, right?
13      A. Uh-huh.
14      Q. But not about this case, correct?
15      A. Huh-uh.
16      Q. And you told your clients that you were meeting
17  with your attorneys, but that was because you didn't
18  want to mention this lawsuit?
19      A. Yes, that's correct.
20      Q. Okay. So just want to clarify, that's not true
21  and there's no attorneys here today?
22          (Simultaneously speaking.)
23      A. That's correct.
24      Q. (BY MR. MESSINA) Okay.
25      A. That's correct. None of y'all represent me.

Page 117

1  That's correct.
2      Q. And -- and you -- and -- and you mentioned that
3  there was -- that there was a text message exchanged --
4  I'm almost done -- that there was a text message
5  exchanged with Alex Burke.
6          Are -- can you pull that message now? Your
7  messages?
8      A. Yep.
9      Q. And just read it into the record whatever's
10  there?
11      A. Yeah. It says -- it says on June 22nd, 2022, I
12  said "Hey." He said "Still working on start time, but
13  we know we have it to be done by 2:00, probably
14  9:00 a.m."
15          "Can I bring my cell phone into the room
16  with me? And by wife" -- or my girlfriend is what I
17  meant to say.
18      Q. Yeah.
19      A. -- "will be with me as well."
20          "That's fine. There is a place for her to
21  hang out. Those offices are probably pretty swanky.
22  Cell phone would probably be fine as long as you're not
23  looking at it during the testimony."
24          "Understood. Will we have breaks so I can
25  answer back to my clients from time to time?"



John Spiller

June 30, 2022
Pages 118 to 121

Page 118

1 "Yes."
2 And then I had called him on -- I think it
3 was Saturday, this past Saturday. And he didn't --
4 didn't answer. So I -- I just told him "This is John
5 Spiller. Call me back when you get this message."
6 And he sent me a message on Sunday saying
7 "Hey, John, I've been in the woods in Wisconsin. Just
8 got your voicemail. Let's talk tomorrow about the
9 deposition if that's okay."
10 And then I said "I'll call you back."
11 He tried to call me on Monday morning. I
12 said "I'll call you back in five minutes when I finish
13 up this call I'm on."
14 And Monday at 5:00 o'clock, "What if I try
15 to call me [sic]. I apologize for the tech issue." Oh,
16 so in the morning, I tried to call him back and his
17 phone wasn't working. Anytime he would pick up, I
18 couldn't hear him. He could hear me; I couldn't hear
19 him. And, regardless, so that was our conversation
20 here.
21 "I'll call you back here in a few minutes,"
22 is what I told him.
23 "Okay. Will do. I'll find another phone
24 and call you. Might be tomorrow."
25 "Your phone isn't ringing at all. I have

Page 119

1 all my bars on my phone. I'm trying my girlfriend's
2 phone."
3 "It's" -- and then he says "It's like one
4 of us has Bluetooth connected or something. I turned
5 mine off."
6 I said "Okay. I'll try you again."
7 And then yesterday, at 9:00 a.m., I sent
8 him -- he tried to call me. I sent him another message.
9 "I'll call you back in five to ten minutes when I finish
10 with this call I'm on."
11 I sent him a text yesterday, "Send me the
12 address where we're supposed to meet tomorrow at
13 9:00 a.m."
14 He sent me "1100 Louisiana, Suite 4100,
15 Houston, Texas 77002. Law firm King & Spalding. Can
16 you chat for a minute?"
17 I said "Yes, sir, I can. Will call you."
18 And I said "Waiting."
19 And then he sent me a text this morning,
20 "We are here. Are you on your way? The court reporter
21 isn't here yet. So we're" -- "you're not holding
22 anything up yet. I just wanted to know you're on your
23 way."
24 I never responded.
25 Q. (BY MR. MESSINA) Okay. Thank you. And

Page 120

1 then -- and then, through those text messages, it sounds
2 like you guys were trying to just connect on the
3 telephone.
4 Other than the call that happened
5 yesterday, would -- were you able to connect -- you
6 mentioned there was one other call where you weren't
7 able to hear each other very well.
8 Did you end up speaking between like
9 Saturday and yesterday at all?
10 A. No. Like I'm saying, I think I spoke to him
11 just yesterday.
12 What's his name?
13 MR. MESSINA: Okay. I think that's it.
14 Let me just make sure.
15 That's all I have.
16 MR. MYSOREWALA: All right.
17 EXAMINATION
18 BY MR. MYSOREWALA:
19 Q. How's it going, John? Josef Mysorewala on
20 behalf of National Congress of Employers. Just
21 wanted -- quick question.
22 Have you heard of National Congress of
23 Employers, Inc., prior to this matter?
24 A. No. I have heard of DMEs, which is affiliated
25 with health insurance. They -- they're an add-on health

Page 121

1 insurance. Like 20, $25 a month gets you coverage on
2 additional health insurance. I've never sold any of it.
3 I don't know the first thing, but I know that's what
4 you -- who you represent.
5 Q. Well, no. To clarify, just want to make sure,
6 National Congress of Employers, Inc. -- you've never
7 heard of them? They're an entity.
8 A. Oh.
9 Q. Have you ever heard of that entity?
10 A. Huh-uh.
11 Q. Do you have any reason to believe that Scott
12 Shapiro ever contacted or communicated with National
13 Congress of Employers, Inc., regarding Rising Eagle?
14 A. Again, it goes back to that same math --
15 mathematical equation -- 1 plus 1 equals 2. He was
16 name-dropping my name with other individuals. Why
17 wouldn't he name-drop my name -- but I don't know what
18 your company does.
19 What does your company do?
20 Q. I appreciate that. But, yeah, I'm -- I'm not
21 here to answer the questions. And, yeah, that's why I
22 asked you if you knew what my -- my client does,
23 National Congress of Employers, Inc.
24 A. Unless -- unless that they sell that DME
25 product, then, yeah, I have heard of y'all's company,



John Spiller

June 30, 2022
Pages 122 to 125

Page 122

1  but not the name of it. The insurance, that $20-,
2  $25-a-month insurance. It's an add-on to health
3  insurance plans. Scott Shapiro used to sell the shit
4  out of that. That was one of the reasons that -- so the
5  people that couldn't afford the health insurance that we
6  were selling, they would go into a separate queue, and
7  that queue would be for all the 25 to $50 additional
8  addendum plans that they would sell.
9       MR. MYSOREWALA: I don't think I have
10  anything else. I think that's it.
11       MS. HOUSINGER: All right. I'm the last
12  one, and I only have a couple of questions for you.
13              EXAMINATION
14  BY MS. HOUSINGER:
15    Q. Aimee Housinger on behalf of American Financial
16  Security Life Insurance Company. I'm going to call that
17  American Financial for -- for short.
18       Have you heard of American Financial before
19  receiving the subpoena in this case?
20    A. I didn't even know you were on this case. It's
21  not even in the thing.
22    Q. So safe to say you have not --
23       (Simultaneously speaking.)
24    A. Yes, never heard, no.
25    Q. (BY MS. HOUSINGER) Let me finish the question

Page 123

1  just so I can get it clear.
2       It's safe to say you've never heard of
3  American Financial?
4    A. That's correct, yes.
5    Q. That's correct.
6       Your girlfriend's name is Maggie -- what's
7  her last name?
8    A. Lemus.
9    Q. And is that -- is Maggie short for something?
10    A. No.
11    Q. It's just --
12    A. It's Maggie.
13    Q. -- Maggie Lemus?
14       And then does she reside at your same home
15  address?
16    A. She does.
17    Q. Last questions -- or line of questions.
18       The call you had with Mr. Burke yesterday,
19  was that on the cell phone you have sitting in front of
20  you?
21    A. Yes.
22    Q. Does the call still appear on your call log?
23    A. I'll check.
24       It does.
25    Q. Do you know how to check the length of a call

Page 124

1  on your phone?
2    A. Hold on.
3       THE WITNESS: I didn't mean to just call
4  you.
5    Q. (BY MS. HOUSINGER) I can walk you through it
6  if you need help, but I'll have to pull out my phone and
7  figure out how to do it too.
8    A. Yeah, I have the length.
9    Q. Okay. Can you tell me the length of the call?
10    A. 15 minutes.
11       MS. HOUSINGER: Okay. Pass the witness.
12       MR. BURKE: Awesome.
13         FURTHER EXAMINATION
14  BY MR. BURKE:
15    Q. You testified a few minutes ago about a phone
16  call where there was an HII employee on the line and you
17  said the name was maybe Annie or Amy?
18    A. Uh-huh.
19    Q. Does it refresh your recollection to hear the
20  name Amy Brady?
21    A. Yeah.
22    Q. Was the person on the end of the line at HII
23  Amy Brady?
24       MS. CHATTIN: Object to the form.
25       You can answer.

Page 125

1    A. Yeah. Because I remember her -- she also was
2  subpoenaed by the state's AG office as well. I was also
3  cc'd on all those e-mails of all the subpoenas they sent
4  out. I remember seeing her name, Amy Brady, with HII.
5       And I know she gave a deposition as well
6  about Scott Shapiro and Michael Smith, and she threw
7  them under the bus. Like she -- everyone knew she was
8  going to. She's not going to take any heat for -- for
9  any -- anyone's bullshit, so...
10    Q. (BY MR. BURKE) And the person that you spoke
11  with at HII through LinkedIn or otherwise, was that
12  Robert Kneeter?
13    A. Kneeter, that's it. That's him.
14       (Call interruption.)
15       THE WITNESS: Oh, shit. Give me a second.
16       MR. BURKE: That's all.
17       THE VIDEOGRAPHER: The time is 12:59. Off
18  the record.
19       (Proceedings adjourned at 12:59 p.m.)
20
21
22
23
24
25



John Spiller

June 30, 2022
Page 126

                                                      Page 126
1   COUNTY OF HARRIS )
2   STATE  OF  TEXAS )
3
4              REPORTER'S CERTIFICATION
5
6       I, Donna Qualls, Notary Public in and for the State
7   of Texas, hereby certify that this transcript is a true
8   record of the testimony given and that the witness was
9   duly sworn by the notary.
10      I further certify that I am neither attorney nor
11  counsel for, related to, nor employed by any of the
12  parties to the action in which this testimony was taken.
13      Further, I am not a relative or employee of any
14  attorney of record in this cause, nor do I have a
15  financial interest in the action.
16      Subscribed and sworn to on this the 25th day of
17  July, 2022.
18
19
20  _____
21  DONNA QUALLS
    Notary Public in and for
22  The State of Texas
    My Commission expires 11/02/2022
23
    Magna Legal Services
24  Firm Registration No. 633
    16414 San Pedro, Suite 900
25  San Antonio, Texas 78232

