UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

STATE OF TEXAS, et al.,        *
                               *
    Plaintiffs,                *
                               *
    v.                         *   Case No. 4:20-cv-02021
                               *
RISING EAGLE CAPITAL           *
GROUP, LLC, et al.,            *
                               *
    Defendants.                *


IN-PERSON, VIDEOTAPED, AND

VIDEOCONFERENCED ORAL DEPOSITION OF

JOHN C. SPILLER, II

Wednesday, March 2, 2022

IN-PERSON, VIDEOTAPED, AND VIDEOCONFERENCED

ORAL DEPOSITION OF JOHN C. SPILLER, II, produced as a

witness at the instance of the Plaintiff, the State of

Texas, and duly sworn, was taken in the above-styled

and numbered cause on Wednesday, March 2, 2022, from

10:37 a.m. to 5:41 p.m., before Debbie D. Cunningham,

CSR, in and for the State of Texas, reported via Machine

Shorthand at the offices of the Texas Attorney General,

300 W. 15th Street, 9th Floor, Austin, Texas 78701,

pursuant to the Federal Rules of Civil Procedure.

--ooOoo--

**2**

```
1        APPEARANCES
2
3   FOR PLAINTIFF STATE OF TEXAS:
4     OFFICE OF THE ATTORNEY GENERAL OF TEXAS
        Consumer Protection Division
5     300 W. 15th Street, 9th Floor
        Austin, Texas  78701
6     (T) 512.463.2100
        By:  Patrick Abernethy, Esq.   (In Person)
7          Patrick.abernethy@oag.texas.gov
           AND
8          Chanele Reyes, Esq.    (In Person)
9
    FOR PLAINTIFF STATE OF ARKANSAS:
10
      OFFICE OF THE ARKANSAS ATTORNEY GENERAL
11    323 Center Street, Suite 200
        Little Rock, Arkansas  72201
12    (T) 501.682.7506 (McCoy)
        (T) 501.682.8062 (Johnson)
13    By:  David McCoy, Esq.   (Via Zoom)
           David.McCoy@ArkansasAG.gov
14         AND
           Peggy Johnson, Esq.   (Via Zoom)
15         Peggy.Johnson@ArkansasAG.gov
16
    FOR PLAINTIFF STATE OF INDIANA:
17
      OFFICE OF THE INDIANA ATTORNEY GENERAL
18    302 West Washington Street
        IGCS - 5th Floor
19    Indianapolis, Indiana 46204
        (T) 317.232.6294 (Swetnam)
20    (T) 317.234.1912 (Yeoman)
        By:  Douglas S. Swetnam, Esq.  (Via Zoom)
21         douglas.swetnam@atg.in.gov
           AND
22         Joseph D. Yeoman, Esq.   (Via Zoom)
           Joseph.Yeoman@atg.in.gov
23         AND
           Casey Klippel, Esq.   (Via Zoom)
24         Casey.Klippel@atg.in.gov
25
```

**3**

```
1   FOR PLAINTIFF STATE OF MICHIGAN:
2     MICHIGAN DEPARTMENT OF ATTORNEY GENERAL
        Corporate Oversight Division
3     P.O. Box 30736
        Lansing, Michigan  48909
4     (T) 517.335.7632
        By:  Kathy P. Fitzgerald, Esq.  (Via Zoom)
5          fitzgeraldk@michigan.gov
6
7   FOR PLAINTIFF STATE OF MISSOURI:
8     OFFICE OF THE MISSOURI ATTORNEY GENERAL
        P.O. Box 861
9     St. Louis, Missouri  63188
        (T) 314.340.7961
10    By:  Michelle L. Hinkl, Esq.  (Via Zoom)
           Michelle.Hinkl@ago.mo.gov
11
12
    FOR PLAINTIFF STATE OF NORTH CAROLINA:
13
      NORTH CAROLINA DEPARTMENT OF JUSTICE
14    Consumer Protection Division
        P.O. Box 629
15    Raleigh, North Carolina  27602
        (T) 919.716.6000
16    By:  Tracy Nayer, Esq.    (Via Zoom)
           tnayer@ncdoj.gov
17
18
    FOR PLAINTIFF STATE OF NORTH DAKOTA:
19
      OFFICE OF ATTORNEY GENERAL OF NORTH DAKOTA
20    Consumer Protection & Antitrust Division
        1720 Burlington Drive, Ste. C
21    Bismarck, North Dakota  58504
        (T) 701.328.5570
22    By:  Parrell D. Grossman, Esq. (Via Zoom)
           pgrossman@nd.gov
23         AND
           BRIAN M. CARD, Esq.    (Via Zoom)
24         bmcard@nd.gov
25
```

**4**

```
1   FOR PLAINTIFF STATE OF OHIO:
2     OHIO ATTORNEY GENERAL'S OFFICE
        Consumer Protection Section
3     30 E. Broad Street, 14th Floor
        Columbus, Ohio  43215
4     (T) 614.752.4730 (Leahy)
        (T) 614.728.1172 (Garrison)
5     By:  Erin B. Leahy, Esq.   (Via Zoom)
           Erin.Leahy@OhioAGO.gov
6          AND
           W. TRAVIS GARRISON, Esq.  (Via Zoom)
7          Travis.Garrison@OhioAGO.gov
8
9   FOR DEFENDANT SCOTT SHAPIRO:
10    BURNS & LEVINSON, LLP
        125 High Street
11    Boston, Massachusetts  02110
        (T) 617.345.3000
12    By:  Shepard Davidson, Esq.  (In person)
           sdavidson@burnslev.com
13
14
    FOR DEFENDANTS MICHAEL T. SMITH, JR.
15  AND HEALTH ADVISORS OF AMERICA, INC.:
16    THE FRANQUI FIRM
        1451 W. Cypress Creek Rd., Ste. 300
17    Ft. Lauderdale, Florida  33309
        (T) 954.947.3023
18    By:  Anthony G. Franqui, Esq. (Via Zoom)
           tony@thefranquifirm.com
19
20
    FOR DEFENDANT JOHN C. SPILLER, II,   (PRO SE)
21  AND RISING EAGLE CAPITAL GROUP, LLC:
22    JOHN C. SPILLER, II      (In person)
        9022 N. Ferndale Place Drive
23    Houston, Texas  77064
        rpgleads@gmail.com
24
25
```

**5**

```
1   ALSO PRESENT:  Scott Shapiro     (In person)
            Maggie Casanova     (In person)
2         Sgt. Joey Diaz      (In person)
            Sgt. Dan Smith      (In person)
3         Leann Moch         (Via Zoom)
            John Hathaway      (Via Zoom)
4         John Isaacs        (Via Zoom)
5
    VIDEOGRAPHER:  Bill Burns       (In person)
6
7   ZOOM TECH:    Brian Christopher   (Via Zoom)
8
9             --ooOoo--
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 6**

```
1              INDEX
2  APPEARANCES                    2
3
4  EXAMINATION OF JOHN C. SPILLER, II:
5  BY MR. ABERNETHY              11
6  BY MR. DAVIDSON              245
7  BY MR. FRANQUI               283
8  BY MR. ABERNETHY             291
9  BY MR. DAVIDSON              308
10
11
12  CHANGES AND SIGNATURE        312
13  REPORTER'S CERTIFICATION     314
14
15              --ooOoo--
16
17
18
19
20
21
22
23
24
25
```

**Page 8**

```
1  Exhibit 5   Skype conversations including   177
                John Spiller and Jakob Mears,
2               Bates labeled Skype000781
                through Skype002745
3
    Exhibit 50  Skype conversation between John  187
4               Spiller and James Wilson, Bates
                labeled Skype015202 through
5               Skype015219
6  Exhibit 57  Declaration of John C. Spiller   260
7
8              --ooOoo--
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 7**

```
1            EXHIBIT INDEX
2  Exhibit Number   Description          Page
3  Exhibit 59  Skype conversation between John   31
                Spiller and Umberto Mautone,
4               Bates labeled Skype018943
                through Skype020231
5
    Exhibit 7   Audio Clip 7.1 of a telephone    77
6               conversation amongst John
                Spiller, Jakob Mears, and Scott
7               Shapiro and Audio Clip 7.2 of a
                telephone conversation amongst
8               John Spiller, Jakob Mears, and
                Michael Smith
9
    Exhibit 8   Audio Clips 8.1 and 8.2 of a     86
10              telephone conversation amongst
                John Spiller, Jakob Mears, and
11              Scott Shapiro
12  Exhibit 10  6/2/20 John Spiller e-mail       109
                forwarding recordings to Jakob
13              Mears, Bates labeled
                Rising_Emails005850
14
    Exhibit 11  Audio clip of prerecorded "Ann"  111
15              message
16  Exhibit 53  Skype messaging between Michael  141
                Lansky and John Spiller, Bates
17              labeled Skype007942 through
                Skype008172
18
    Exhibit 54  Skype conversation between John  145
19              Spiller and Dean Hansen, Bates
                labeled Skype012544 through
20              Skype012630
21  Exhibit 64  A one-page Skype conversation    157
                between John Spiller and Michael
22              Smith, Bates labeled Skype015264
23  Exhibit 41  Skype conversation amongst John  158
                Spiller, Omar Aparicio, Jakob
24              Mears, and Michael Smith, Bates
                labeled Skype000001 through
25              Skype000011
```

**Page 9**

```
1       (Wednesday, March 2, 2022, 10:37 a.m.)
2           P R O C E E D I N G S
3           THE VIDEOGRAPHER:  This is the
4   deposition of John Spiller in the matter of
5   State of Texas, et al. versus Rising Eagle
6   Capital Group, LLC, et al.  Our location is 300
7   West 15th Street in Austin, Texas, Ninth Floor
8   Conference Room.  The time is 10:37.  We're on
9   the record.
10          My name is Bill Burns.  My
11  location is 11309 Pickard Lane, Austin, Texas
12  78747.  That's a business address.
13          Would all parties please
14  introduce themselves for the record, starting
15  with the Plaintiffs?
16          MR. ABERNETHY:  All right.  For
17  the State of Texas, Patrick Abernethy.
18          MS. REYES:  And Chanele Reyes.
19          MR. McCOY:  For the State of
20  Arkansas David McCoy and Peggy Johnson.
21          MR. YOEMAN:  For the State of
22  Indiana Joseph Yoeman, Douglas Swetnam, and
23  Casey Klippel.
24          MS. FITZGERALD:  For the State
25  of Michigan Kathy Fitzgerald.
```

10

1      MS. HINKL:  For the State of
2  Missouri Michelle Hinkl.
3      MS. NAYER:  For the State of
4  North Carolina Tracy Nayer.
5      MR. CARD:  For the State of
6  North Dakota Brian Card and Parrell Grossman.
7      MS. LEAHY:  For the State of
8  Ohio attorneys Erin Leahy and Travis Garrison
9  and Investigators John Hathaway and John Isaacs
10  as the Plaintiff's representative.
11      THE REPORTER:  Defense Counsel,
12  would you like to introduce yourselves?
13      MR. DAVIDSON:  Shepard Davidson
14  representing Scott Shapiro.
15      MR. FRANQUI:  And Anthony
16  Franqui on behalf of Michael Smith and Health
17  Advisors of America.
18      (Witness sworn in by the
19  reporter.)
20      MR. ABERNETHY:  All right.  So
21  we've agreed to the same stipulations as
22  yesterday?
23      MR. DAVIDSON:  Yes, except that
24  an objection by one Defense Counsel will be
25  deemed as an objection by all.

11

1      MR. ABERNETHY:  Correct.
2  Okay.  We'll get started?
3      MR. DAVIDSON:  Yep.
4      JOHN C. SPILLER, II,
5  having been duly sworn, testified as follows:
6      EXAMINATION
7  BY MR. ABERNETHY:
8      Q.  All right.  John, thanks for coming
9  in, again.
10      We'll get started with just some
11  of the background information.  Can you tell me
12  your name and address, please?
13      A.  John Caldwell Spiller, II.  My
14  address is 9022 North Ferndale Place Drive,
15  Houston, Texas 77064.
16      Q.  And who else lives there with you?
17      A.  My girlfriend.
18      Q.  And do you run any businesses from
19  that address right now?
20      A.  Yes, you can say that.
21      Q.  Can you name those businesses?
22      A.  I only have one business, and I'm
23  a -- I would say I'm a sales consultant for
24  that business.  It's called Great Choice
25  Telecom.

12

1      Q.  Okay.  And so you're not married?
2      A.  Huh-uh.
3      Q.  Okay.  And can you tell me your date
4  of birth, please?
5      A.  September 14th, 1981.
6      Q.  Thank you.
7      And legal history, do you have
8  any arrests or prior convictions?
9      A.  Yes, sir.
10      Q.  Do you have any -- oh, and for --
11  just for -- to make it clear on the record,
12  instead of "uh-huhs," can we just make all
13  answers verbal, so "yes" or "no," just to be
14  clear for the court reporter?
15      A.  Yes.
16      Q.  Thank you.
17      And do you have any other
18  pending legal actions, criminal or civil, right
19  now?
20      A.  I'm on felony probation currently out
21  of Harris County, as well as here, out of
22  Travis County.
23      Q.  Okay.  Can you tell me your
24  educational history, please?
25      A.  A bachelor's degree from the

13

1  University of -- Texas State University.
2      Q.  Okay.  And did you prepare with
3  anyone for this deposition?
4      A.  Huh-uh.
5      Q.  Did you talk to Mr. Mears about this
6  deposition?
7      A.  Huh-uh.
8      Q.  Okay.
9      MS. REYES:  Make sure he says
10  "no."
11      A.  No.
12      Q.  (BY MR. ABERNETHY)  Oh, sorry, yes.
13      A.  No.
14      Q.  "Yes" or "no," please.  Thanks.
15      And have you had your deposition
16  taken before?
17      A.  Not that I remember, no, sir.
18      Q.  Okay.  So you understand that you are
19  under oath, and that means sworn to tell the
20  truth?
21      A.  Uh-huh.
22      Q.  "Yes"?
23      A.  Yes.
24      Q.  Thank you.
25      And so even though we're in an

14

1  informal -- more informal setting here in the
2  office, it still carries the same weight as if
3  it was in a court?
4      A.  I understand.
5      Q.  Okay.  So are you prepared to answer
6  all of my questions today?
7      A.  Yes.
8      Q.  And there's nothing that will prevent
9  you from giving us your full attention?
10      A.  No, sir.
11      Q.  And you aren't take any medications
12  or other substances that would prevent you from
13  giving full complete, and truthful answers?
14      A.  No, sir.
15      Q.  Okay.  As we go, if you don't
16  understand any of my questions or something's
17  unclear, just let me know.  If I need to
18  rephrase or clarify, just let me know.
19          If you need a break at any time,
20  just let us know; and we can take a break.
21          And throughout the deposition,
22  just know that counsel might object to some of
23  my questions; but that should not change your
24  answer.  Just give a pause, let her mark that
25  down; and then just answer the question as you

15

1  would normally.
2          And, yeah, just -- again, just
3  try and make sure all answers are clear and
4  verbal so that we can get it clear for her on
5  the record.
6          What is your current occupation?
7      A.  Sales consultant.
8      Q.  Okay.  And that's for Great Choice
9  Telecom?
10      A.  Yes, sir.
11      Q.  Do you have any other jobs?
12      A.  No, sir.
13      Q.  And what do you do as a sales
14  consultant for Great Choice Telecom?
15      A.  I help them procure new relationships
16  with vendors and clients.
17      Q.  What types of vendors and clients?
18      A.  Vendors for telecommunications that
19  sell VoIP telecom minutes, such as, Verizon,
20  AT&T.
21      Q.  All right.  And how do you help
22  procure clients?
23      A.  They reach out to me on Skype or I
24  reach out to them, to their COO or their CTO of
25  the company, ask them if they're looking to

16

1  potentially bring Great Choice on as a future
2  vendor or a future client.
3      Q.  Okay.  All right.  And what was your
4  occupation before Rising Eagle?
5      A.  I worked for numerous jobs.
6  Primarily, I was always in sales.  So I worked
7  for All Web Leads.
8      Q.  Okay.
9      A.  That was a little bit before Rising
10  Eagle Capital.
11      Q.  And you were in sales?
12      A.  Yes.
13      Q.  What did that entail?
14      A.  Reaching out to clients that they had
15  already procured at All Web or finding new
16  clients by reaching out to the previous clients
17  we currently had, asking if they had any
18  referrals or if they knew of any other rooms
19  that were going on.  A lot of rooms are based
20  in Florida; and it's one of the reasons why
21  after I was let go from All Web, I transitioned
22  down there.
23      Q.  And why were you let go from All Web
24  Leads?
25      A.  They said a difference of opinion.

17

1  They didn't like the way that I was extremely
2  cocky on the sales process.
3      Q.  Okay.  And can you go back and just
4  tell me again what All Web Leads, what they did
5  as a company?
6      A.  Generated health insurance, life
7  insurance, auto insurance leads.
8      Q.  And can you tell me what you mean by
9  "a room," when you say "a room"?
10      A.  A call center.
11      Q.  Okay.  So did All Web Leads do
12  outbound calling?
13      A.  Yes.
14      Q.  Okay.  How did that work in the call
15  center?  Can you describe that for me?
16      A.  All Web Leads, in the beginning, they
17  were generating a lot of their traffic by
18  having agents -- it's called predictive dialing
19  when you have agents who are on the phone,
20  listening.  When a beep -- when a client picks
21  up the phone, it automatically goes back; and
22  the person in the call center hears it.  And
23  you can say "hello" immediately once you hear
24  the beep.
25      Q.  Okay.

18

1    A.  It usually takes about a hundredth of
2  a second.  And then, they're able to vet the
3  call to see if they qualify for what type of
4  health insurance or life insurance or auto
5  insurance; and then, once they vet the call,
6  then they're able to transfer the call to a
7  call center.
8    Q.  All right.  So after All Web Leads,
9  you started Rising Eagle Capital Group?
10   A.  Sometime after, yeah.
11   Q.  What did you do in between for work?
12   A.  Sold insurance leads.
13   Q.  For who?
14   A.  For myself.
15   Q.  Can you elaborate on that, that you
16  sold insurance leads for...
17   A.  I was getting insurance leads from
18  someone within All Web Leads.  They were
19  sending them to me.  I was able to take those
20  leads and resell them.
21   Q.  So you were still working with All
22  Web Leads; you just weren't employed by them?
23   A.  That's correct.
24   Q.  Okay.  Who did you sell the leads to
25  generally?

19

1    A.  Call centers.
2    Q.  Any particular call centers that you
3  can recall?
4    A.  I don't remember.  That was a real
5  long time ago.
6    Q.  When was this?
7    A.  2014, 2015, somewhere around there.
8    Q.  Okay.  And when did you start Rising
9  Eagle Capital Group?
10   A.  I don't remember.  It might have been
11  2015.  It says it in the paperwork, wherever my
12  paperwork's at.
13   Q.  And were you an owner of Rising
14  Eagle?
15   A.  I was.
16   Q.  And the CEO of Rising Eagle?
17   A.  I was.
18   Q.  Did you start Rising Eagle with
19  anybody else?
20   A.  I did.
21   Q.  Who?
22   A.  Luis Rietti.
23   Q.  Okay.  And was he an owner as well?
24   A.  Yes, he was.
25   Q.  Did he have any other roles?

20

1    A.  CEO.  He was the voice of the company
2  for a while.
3    Q.  Okay.  Were y'all both CEOs or...
4    A.  I became a CEO after 2016.
5    Q.  So he was the first CEO?
6    A.  Uh-huh.
7    Q.  Why did he leave?
8    A.  He wanted to take his -- his portion
9  of the business elsewhere.  He wanted to go
10  sell leads to other people that weren't -- I
11  wasn't that close to nor did I respect.
12   Q.  Okay.  So you became CEO right after
13  Luis?
14   A.  Uh-huh.
15   Q.  And what was your role generally as
16  CEO?
17   A.  To sell as many leads as possible.
18   Q.  Leads for what?
19   A.  Health insurance, life insurance,
20  auto insurance.
21   Q.  Who would you sell those leads to?
22   A.  Call centers.
23   Q.  Do you recall any particular call
24  centers for that?
25   A.  No.

21

1    Q.  Were there any other original owners
2  besides you and Luis?
3    A.  No.
4    Q.  Any other employees in the beginning?
5    A.  Huh-uh.
6    Q.  And so you know Jakob Mears?
7    A.  I do.
8    Q.  When did he join Rising Eagle?
9    A.  2018, I believe.
10   Q.  And before 2018, what were all the
11  roles of Rising Eagle?
12   A.  Rising Eagle, I think we got into bed
13  with Scott Shapiro and Michael Smith in 2017,
14  the beginning of 2017; or it might have been
15  the middle of 2016.  I don't remember the
16  dates.  The dates are real iffy for me.
17  Possibly you could direct that question to
18  Scott Shapiro.  He might be able to tell us a
19  little more.
20   Q.  So what did the company do at that
21  time?
22   A.  Before that we were selling only
23  insurance leads.  That was when I had met
24  Scott.  I met Scott originally when he was
25  looking for auto insurance leads.  I met him

John Spiller - 3/2/2022

22

1  through a friend of mine named Brian Failla.
2  Brian Failla was from Florida.  He said -- I
3  told him I had some insurance leads from All
4  Web.
5           He said, "Okay.  I have someone
6  who's interested in those leads."
7           I said, "Okay."
8           He gave me Scott's information.
9  I met Scott that direction.
10      Q.  And just to clarify, when you say
11  "sell leads," can you just explain what you
12  mean by that?
13      A.  I was acquiring leads from All Web
14  Leads and turning around and selling them to
15  call centers.
16      Q.  Can you just explain what you mean by
17  "leads"?
18      A.  A person's first name, last name,
19  e-mail address, phone number, address, IP
20  address.
21      Q.  Okay.  And back to Mr. Mears, how did
22  you meet him?
23      A.  He was walking door to door, giving a
24  survey to people about welfare and I answered
25  the question for him and then he came back to

23

1  my house probably three or four days later and
2  asked if -- what was my thoughts on real
3  estate.  And I said, "Well, it's kind of a
4  tough market," and told him my thoughts on it.
5           And then, about two weeks later,
6  he came back and knocked on my door again and
7  asked if he could help me with some stuff with
8  my business; and I was, like, "I really don't
9  have much room for you right now."  So in the
10  beginning he was only developing websites for
11  me.
12      Q.  What kind of websites was he
13  developing for you?
14      A.  Landing pages.
15      Q.  For what?
16      A.  Health insurance leads.
17      Q.  Okay.  Do you remember any of those
18  health insurance companies?
19      A.  No, I do not.
20      Q.  And how did you know leads were
21  insurance leads when you're getting that
22  information?
23      A.  Repeat that.
24      Q.  So when you said you were selling
25  leads, you were selling insurance leads, how

24

1  did you know they were insurance leads
2  specifically?
3      A.  Because I was getting them from
4  someone high up in All Web Leads and I knew
5  that when they said health insurance, I'd sell
6  them to a health insurance room.  That health
7  insurance room would call me back and tell me,
8  "Hey, I want to buy an additional hundred
9  thousand of those if you have them every week."
10  And they would spend 9,000 to $12,000 a week.
11      Q.  And who was that high-up contact at
12  All Web Leads?
13      A.  I don't remember his name.
14      Q.  Okay.  So when did Mr. Mears start
15  working for you under Rising Eagle?
16      A.  The middle of -- in the beginning of
17  2018.
18      Q.  Okay.  What were his roles, first
19  roles, at that time?
20      A.  Building websites, helping -- I was
21  teaching him how to learn how to use the
22  robodialer.
23      Q.  And was he the only employee at that
24  time?
25      A.  Uh-huh.

25

1      Q.  Once he joined, do you know what
2  clients he had at that time?
3      A.  No.
4      Q.  Do you know what type of clients?
5      A.  Call centers.  I had -- well,
6  actually, yeah.  I had -- Michael Smith had
7  reached out to me in the beginning and had told
8  me that he was -- he was in business with one
9  of my other business partners that was in the
10  past.  His name was Matt Jones, Matthew Jones.
11  And he said Matt was sending him transfers,
12  robo-dial transfers.  And I said, "Okay."
13           And he said he heard that I was
14  really good at that kind of stuff, and I don't
15  -- I don't even remember how the conversation
16  started.  He just said he would pay me if I was
17  able to generate him some live transfers.
18           I said, "Okay.  Will do."  So I
19  started generating him live transfers.  In the
20  beginning I wasn't able to meet the quota that
21  Matt Jones was able to deliver to Mike until
22  roughly about the six-month mark.  By then I
23  knew how to build a server, how to do that
24  entire process of the servers and how to set up
25  the server, how to load the leads properly.  In

26

1 the beginning he was sending me leads.
2         It wasn't, like I'm saying,
3 until roughly about month four or month five he
4 told me he was in business with Scott Shapiro.
5 He said he didn't want to bring it up to me in
6 the beginning because he was afraid that me and
7 Scott weren't on good terms, which I don't even
8 remember what the disagreement was in the past;
9 but...
10    Q.   So can you tell me when you started
11 working with Michael Smith exactly with Rising
12 Eagle?
13    A.   Like I'm saying, middle of 2017.
14    Q.   Okay.  And would you call him a
15 client at that time?
16    A.   He was, yeah, my only client.
17    Q.   Okay.  Your only client.
18         And where were you getting those
19 leads from?
20    A.   He was -- he was sending them to me.
21    Q.   Okay.  So was Health Advisors of
22 America a client?
23    A.   At one point, yeah, they were.
24    Q.   At which point would that be?
25    A.   It was whenever he sent me his -- the

27

1 first couple of wires came from him personally,
2 and then it started coming from the company
3 until after he introduced -- he said he was
4 working with Scott Shapiro.
5    Q.   So -- okay.  And when you said you
6 would load leads differently to get better
7 results after that six-month mark, can you
8 describe what you did differently in the
9 process to get those better results?
10    A.   We would end up -- we found a list of
11 DIDs.  The DID is an ANI that is --
12         THE WITNESS:  Sorry.  This chair
13 is uncomfortable.
14         MR. ABERNETHY:  They are a
15 little low.
16    A.   So an ANI is a DID and we've got a
17 list of DIDs from a vendor that were unmarked,
18 unused DIDs; and we were -- in the beginning,
19 we were just dialing to dial.  And I would only
20 buy a hundred DIDs, but a hundred DIDs would
21 get burned out roughly within the first two
22 hours.
23         So what we ended up started
24 doing was -- one of the things I taught Jakob
25 how to do was to take one of those numbers --

28

1 we were given the URL location where we can put
2 the number in to see if it came back or who it
3 came back as the owner of it; was it AT&T,
4 Verizon, T-Mobile.  Those are the three we're
5 not allowed to use.  We're only allowed to use
6 other ones that were off-brand ones.
7         So that's when [sic] Jakob was
8 doing for us in the beginning; but, anyways, he
9 would put those numbers in.  And we were
10 changing out the numbers every time they'd get
11 burned.  We would find out when they get burned
12 because we would call our own phone number from
13 our own Switch; and it would dial the number
14 and if it came up "Scam Likely," then we'd know
15 the number was burned.  So we would end up
16 using those 250 million DIDs that we received
17 that were on the -- registered as no ones as
18 our own and using those to dial from.
19    Q.   (BY MR. ABERNETHY)  And just to
20 clarify, can you define what a DID is?
21    A.   A DID is an ANI or it's also
22 considered an NPA-NXX, which is -- the first
23 part is the area code.  The second part is the
24 NPA, which is the part that determines where
25 you're at in the United States -- you could be

29

1 in Austin, Texas; you could be -- depending on
2 those next three numbers.
3    Q.   Uh-huh.
4    A.   And then the last four are just
5 random.  But a DID is an ANI.
6    Q.   Can you define ANI for me, as well,
7 then?
8    A.   It's a phone number.
9    Q.   Okay.  And when you say you burned
10 numbers, what do you mean by that?
11    A.   They would pop up as "Scam Likely."
12 Anytime they come up as "Scam Likely," you have
13 to change them out so that you're still able to
14 dial and still get people to answer the phone.
15    Q.   What would make them show up as "Scam
16 Likely"?
17    A.   Too many dials.  In the beginning
18 Verizon, AT&T in 2017 weren't that good on
19 "Scam Likely."  On those apps that they have
20 now, they didn't have any of those
21 configurations in the past.  Usually what would
22 happen would be you would end up calling 10,000
23 numbers on one number; and then out of all
24 those people, some of them would either report
25 it to the FTC or the FCC.  And once they report

---

**Page 30**

1  it, then, it basically becomes a spoofed
2  number.
3      Q.  And what does a spoofed number mean?
4      A.  It's a "Scam Likely" number.
5      Q.  So what is spoofing? Can you define
6  what --
7      A.  Spoofing is -- to me, is a automated
8  meth- -- automated system that automatically
9  picks out ANIs or DIDs out in the world without
10  caring if it's a person's number or if it's a
11  business number or if it's anyone's number.
12  They'll just pick it, put it as their own, and
13  use it and dial on it.
14      Q.  And did Rising Eagle spoof --
15      A.  We never -- we never -- we never
16  knew -- we never had that technology.
17      Q.  So you never -- Rising Eagle never
18  spoofed at all?
19      A.  No.
20      Q.  Did any clients ever ask you to
21  spoof?
22      A.  No.  My clients didn't even know what
23  spoofing was.
24          MR. ABERNETHY:  We're going to
25  pull Exhibit 59.  So, again, that should be

---

**Page 31**

1  loaded in the Zoom chat for anybody on Zoom.
2          (Exhibit 59 discussed.)
3      Q.  (BY MR. ABERNETHY) I'm going to hand you this,
4  John, to look at.  Do you recognize what this is?
5      A.  A conversation between myself and
6  Umberto Mautone.
7      Q.  Do you know what the conversation is
8  on, like, what platform?
9      A.  Skype.
10      Q.  And can you tell me who Umberto
11  Mautone is?
12      A.  He's the owner of Veriswitch.
13      Q.  And what is Veriswitch?
14      A.  It's a Switch that connects calls.
15  He basically created an application to connect
16  phone calls between states or between
17  countries.
18      Q.  Okay.  And so can you tell me who
19  the -- just clarify who the user, the Skype
20  user, "Umberto Mautone The Wise" is?
21      A.  He's the owner of Veriswitch.
22      Q.  And the Skype user "onlywebleads"?
23      A.  That's myself.
24      Q.  Okay.  Can you just read for me?
25  Starting at the top, just read the

---

**Page 32**

1  conversation; and let me know who's speaking at
2  each point.
3          MR. DAVIDSON:  What page are you
4  on?
5      Q.  (BY MR. ABERNETHY)  And it's going to
6  be the first page of 019518.
7      A.  I was speaking.  "I agree, but so far
8  I have been saying anything about this to
9  anyone."
10          Umberto Mautone,
11  "https:ohioattorneygeneral.gov."  It's a
12  complaint.
13          Umberto Mautone again.  "By
14  attempting to sell insurance or obtain
15  information to be used for the sale of an [sic]
16  insurance to Indian [sic] residents, Defendants
17  are [sic] attempting to defraud recipients of
18  the calls...to wrongfully obtain something of
19  value from the sell- -- the call recipients."
20          "Umberto Mautone The Wise, 'This
21  implies you're [sic] selling insurance to [sic]
22  attempt to defraud.'"
23          I said, "That's bullshit."
24          Umberto said, "'Defendants often
25  placed [sic] their actual number with a number

---

**Page 33**

1  with the same area code and prefix of the call
2  recipient to mislead the recipient into
3  believing the call is coming from someone local
4  and known to the recipient.  This practice is
5  typically referred to as neighborhood
6  spoofing.'"
7          MR. ABERNETHY:  And just one
8  second.
9          We are now on page 019519 of
10  Exhibit 59.
11          MR. DAVIDSON:  Sorry.  One more
12  time.
13          MR. ABERNETHY:  019519 of
14  Exhibit 59.  And John will continue reading at
15  the top.
16      A.  Umberto The Wise says, "This is only
17  spoofing if the ANI isn't a real number you
18  own."
19          I said, "In the past we did do
20  spoofing."
21          I said, "Until I changed my
22  business practices."
23          Umberto Mautone The Wise says,
24  "This is [sic] entire thing looks designed to
25  tie you up in court until you're broke, not to

---

34

1  get an actual win."
2      Q.  You can go ahead and stop, John.
3      A.  Uh-huh.
4      Q.  Thank you.
5          So do you know what you and
6  Umberto are discussing in this Skype
7  conversation?
8      A.  We were discussing the lawsuit that I
9  was given on June of -- June the 8th or June
10  the 9th of 2020.
11     Q.  And the lawsuit from whom?
12     A.  From y'all guys, from the FCC, from
13  everyone.
14     Q.  And do you know what you meant by
15  "spoofing" in this conversation?
16     A.  I meant in the past I was generating
17  -- we had 250 million numbers of DIDs in the
18  past that we were using to put them into the
19  dialer system.  That was the only thing I knew
20  what spoofing was.
21     Q.  And when in the past do you mean?
22     A.  2017, 2018, 2019.
23     Q.  This is with Rising Eagle?
24     A.  Yes.
25     Q.  And at this time under that

35

1  definition of spoofing, did you -- did any
2  clients ask you to do that?
3      A.  No.
4      Q.  Did any clients know that you were
5  doing that?
6          MR. FRANQUI:  Object to the
7  form.
8      I don't -- I don't remember.
9      Q.  (BY MR. ABERNETHY)  Did you ever
10  communicate to Health Advisors that Rising
11  Eagle was spoofing?
12         DEFENSE COUNSEL:  Objection.
13     A.  I never said that we were spoofing
14  because back in those days, we were -- like I
15  said, given 250 million numbers that were ANIs
16  that were not listed to any user.  Those are
17  the ANIs we would be putting into our Switch to
18  make it work, to make sure that the numbers
19  would not come up "Scam Likely" or "fraud
20  likely."
21     Q.  And where did you get those 250
22  million?
23     A.  From the gentleman that owned Globex,
24  Mohammed.
25     Q.  Do you know his full name?

36

1      A.  Mohammed Souheil.
2      Q.  And what was -- what did Globex do?
3      A.  They were -- they bought R Squared.
4  R Squared was my Number 1 vendor back in the
5  day when I started.
6      Q.  So did you buy those from Globex?
7      A.  Huh-uh.  He gave them to me.
8      Q.  Why did he give them to you?
9      A.  So that I'm able to dial freely.
10     Q.  And how did you know Mohammed
11  Souheil?
12     A.  I met him through Ryan, the owner of
13  R Squared.  He introduced me to him.
14     Q.  Okay.  Can you tell me what R Squared
15  is?
16     A.  A telecom company.
17     Q.  And just to clarify again, did you
18  ever communicate to Scott Shapiro that Rising
19  Eagle was spoofing at this time?
20         DEFENSE COUNSEL:  Objection.
21     A.  No, I never communicated to him that
22  we were spoofing.  Again, in those days, we
23  didn't notice what was going on with the DIDs;
24  but sometimes we would call his number.
25  Sometimes we'd call Michael's number on the

37

1  same DIDs to see if there was "Scam Likely" or
2  not; but the majority of times we would either
3  call our -- our individual phones.
4      Q.  (BY MR. ABERNETHY)  And did you ever
5  communicate to Michael Smith that you were
6  spoofing?
7          DEFENSE COUNSEL:  Objection.
8      A.  No.
9      Q.  (BY MR. ABERNETHY)  And what do you
10  mean, you'd call their numbers?
11     A.  We'd call their cell phone numbers,
12  Michael Smith's or Scott Shapiro's cell phone
13  number.
14     Q.  Did y'all communicate on the phone
15  often?
16     A.  Yeah.
17     Q.  Would you test those numbers?
18     A.  Yeah.
19     Q.  And how did that work?
20     A.  We'd make sure that no one picked up
21  the phone.  So as long as they gave us a busy
22  signal or "This phone number's no longer
23  working; please check the number and dial
24  again," we would use that number as our DID.
25     Q.  And you communicated with Michael

John Spiller - 3/2/2022

38

1 Smith about this?
2    A.  Yes.
3    Q.  And did you communicate with Scott
4 Shapiro about this?
5        DEFENSE COUNSEL:  Objection.
6    A.  I don't remember.  And, again,
7 Michael -- Scott Shapiro didn't come into the
8 business, like I'm saying, until about four or
9 five months into me starting out, building the
10 servers.
11    Q.  (BY MR. ABERNETHY)  And when you
12 called Michael Smith, did he ever ask you why
13 you were calling him on those --
14        (Simultaneous speakers.)
15    A.  Yeah, he knew.  Yeah, he knew.
16        DEFENSE COUNSEL:  Objection.
17    A.  He knew.  Both of them knew why I was
18 calling their number.  We wanted to make sure
19 that the numbers weren't burned.
20    Q.  (BY MR. ABERNETHY)  And you're -- to
21 your understanding, they knew that's why you
22 were calling?
23        DEFENSE COUNSEL:  Objection.
24    A.  Yes, because if I'd call them on my
25 phone, they would pick up and say, "What's up?"

39

1 But when I called them from a DID, if it came
2 up "Scam Likely," they would shoot us a text
3 back:  Hey, it's "Scam Likely."
4    Q.  (BY MR. ABERNETHY)  So did you
5 specifically discuss this with Michael Smith --
6        DEFENSE COUNSEL:  Objection.
7    Q.  -- that that's what you were doing?
8    A.  Yeah, yeah, we had an open discussion
9 about it.  We talked to both parties about it,
10 told them, "Hey, listen, during this time we're
11 going to be calling you throughout the day to
12 check our numbers to make sure that they're not
13 burned."
14    Q.  (BY MR. ABERNETHY)  By "both
15 parties," you mean Michael Smith and Scott
16 Shapiro?
17        DEFENSE COUNSEL:  Objection.
18    A.  Uh-huh.
19    Q.  (BY MR. ABERNETHY)  Did you talk
20 about this on the phone with Michael Smith?
21        MR. FRANQUI:  Objection.
22    A.  Uh-huh.
23    Q.  (BY MR. ABERNETHY)  And did you talk
24 about this on the phone with Scott Shapiro?
25        MR. DAVIDSON:  Objection.

40

1    A.  I don't remember.  I could have; but
2 during -- but during that time, the majority of
3 the communications were primarily done between
4 Jakob and Scott or Jakob and Mike --
5    Q.  (BY MR. ABERNETHY)  And how --
6    A.  -- around the -- around the
7 nine-month mark.
8    Q.  And how would Jakob communicate with
9 Michael Smith?
10        DEFENSE COUNSEL:  Objection.
11    A.  On the phone or text message.
12    Q.  (BY MR. ABERNETHY)  And with Scott
13 Shapiro?
14        DEFENSE COUNSEL:  Objection.
15    A.  Uh-huh, same.
16    Q.  (BY MR. ABERNETHY)  When you made
17 these test calls, were you doing this on a
18 dialer or on --
19    A.  A dialer phone.  Yeah, it was a
20 dialer.
21    Q.  And how did that work?
22    A.  It's been many years since I've been
23 on that dialer.  I remember we would have a
24 little box at the bottom.  You'd enter a phone
25 number.  Whatever DID is listed for those calls

41

1 would be loaded at the top.  We'd push "dial."
2 So we'd enter in Scott's Number, 956, blah,
3 blah, blah -- whatever it was.  Push "call."
4 We'd call his number.  When it'd pop up on his
5 phone, it'd either pop up as a number; or it'd
6 pop up as a "Scam Likely."
7    Q.  So what changed in your business
8 practices regarding spoofing?
9    A.  Regarding taking those numbers?  It
10 was in 2019 I met a vendor whose name was
11 Michael Lansky.  He was the owner of Avid
12 Telecom.  He helped me get away from using
13 unlisted numbers and buying DIDs.
14        So in the beginning I was buying
15 -- for 5 cents I was buying for Scott and Mike
16 Shapiro -- or Scott Shapiro and Michael Smith,
17 I was buying them around 300,000 DIDs every six
18 months.
19    Q.  Who were you buying those from?
20    A.  Michael Lansky.
21    Q.  Okay.  And so why did you make that
22 change?
23    A.  Because he told me what I was doing
24 was considered illegal and told me not to do it
25 any further.  I said, "Okay."  I didn't know

42

1  anything about it. This was the first time
2  ever in this industry. I never knew that using
3  an unlisted number is illegal or wrong nor did
4  I know what spoofing was during -- back in
5  those days. I didn't even know what I was
6  doing back in those days.
7       Q.  Had anyone ever told you that it was
8  illegal before Michael Lansky?
9       A.  Huh-uh, huh-uh.
10          MR. ABERNETHY:  I'm letting my
11 Zoom reconnect.
12      Q.  (BY MR. ABERNETHY) All right. So
13 back to Jakob Mears. At this time when he had
14 joined, did he live with you?
15      A.  No, he did not.
16      Q.  Did he live with you at any point
17 while he was working for Rising Eagle?
18      A.  Yes, he did.
19      Q.  When was that?
20      A.  2018, close to around June of 2018.
21      Q.  Why did he move in with you?
22      A.  He moved to Houston, Texas. That's
23 when he got put on as an owner of the business
24 so that we can get a house. Because I'm a
25 felon, it's hard for me to get a house or rent

43

1  a house in another state or in the state of
2  Texas, period.
3       Q.  Okay.
4       A.  So we put him on the business so he
5  can give the landlord the business records to
6  show how much money he was making.
7       Q.  And where did you live?
8       A.  In Houston, Texas.
9       Q.  At any point did Mr. Mears become an
10 owner of Rising Eagle?
11      A.  Yes.
12      Q.  And just to clarify, can you give me
13 the address of where you lived? Do you
14 remember?
15      A.  Huh-uh. It's off of -- I cannot
16 remember. It was off of Westheimer.
17      Q.  Okay. So when did Mr. Mears become
18 an owner of Rising Eagle?
19      A.  2018.
20      Q.  Why did you make that move?
21      A.  So that he can show the records to
22 the landlord to show that he was making 30,000
23 or 40,000 a month coming in so he can get us a
24 house.
25      Q.  So that was the only reason?

44

1       A.  That was the only reason.
2       Q.  Whose idea was that?
3       A.  Mine.
4       Q.  Okay. Did his role with the company
5  change with that?
6       A.  Huh-uh.
7       Q.  At that point what were his
8  day-to-day duties?
9       A.  Running my dialer.
10      Q.  Okay. Can you take us through a
11 typical day of what that means?
12      A.  He would wake up and start the dialer
13 by 7:00 a.m. He wouldn't shut the dialer off
14 until about 8:00 or 9:00, whenever the room
15 stops. We'd get access to see the room. They
16 would give us their VICIdial login. We would
17 have access to see the room and what they're
18 doing in production, see how many calls go into
19 sales, how many long calls they had, how many
20 calls are in hot pink; or hot purple means that
21 they've been on calls longer than 20 minutes --
22 or longer than 15 minutes.
23      Q.  And how much were you paying Jakob at
24 this time?
25      A.  $2,000 a week, 1,500 to $2,000 a

45

1  week.
2       Q.  So was that 30,000-to-40,000 number
3  just to help with getting the house?
4       A.  Yes, that's it.
5       Q.  Okay. Do you have any idea what you
6  paid him annually?
7       A.  No.
8       Q.  And what was your day to day looking
9  like at this time?
10      A.  Still helping him run the dialer for
11 the most part. In 2018 I got in trouble. I
12 got arrested in Houston, Texas for evading
13 arrest in a motor vehicle. So I was dealing
14 with a court case that took up a lot of my
15 time. And, also, in 2018 I pled guilty for my
16 fourth DWI in the state of Texas, here in
17 Houston -- or here in Austin, Texas. So I was
18 also dealing with that as well. So there was a
19 lot on my plate. So even though I was helping
20 him manage my business, my priorities were
21 pretty cram packed during those times.
22      Q.  Okay. And -- but his day was, you
23 said, 7:00 to 8:00 or 9:00. Is that central
24 time?
25      A.  Uh-huh.

John Spiller - 3/2/2022

46

```
1    Q.  Did you ever look at any other time
2    zones for where calls were going?
3    A.  Calls were usually going to the East
4    Coast, to Florida.  It wasn't until 2020 that I
5    started looking in -- or Twenty- -- it wasn't
6    until 2019, when I was getting phone calls from
7    people that heard that I was generating calls
8    for Scott and Mike's room.  When I was getting
9    phone calls from those guys, they would tell
10   me, "Hey, we'd pay you the exact same."
11        And I was, like, "Oh."  So in
12   the beginning, I would take them; but then,
13   eventually, Scott and Mike would find out and
14   end up telling me they were going to shut me
15   off.  And they were my main source of income.
16   So I was, like, "Oh, shoot.  I need to get --
17   get rid of all these guys."  So I got rid of
18   all of them.
19   Q.  Why were they threatening to shut you
20   off?
21   A.  Because I was using the leads that
22   they were providing me for -- to generate calls
23   for other rooms.
24   Q.  And who owned these other rooms?
25   A.  I can't remember all of them.  One
```

47

```
1    person was Tovere (PHONETICALLY SPELLED.)  I
2    don't remember his last name.  Matt Panzer was
3    another guy I had on probably for, like, two
4    months.  I don't remember all the guys.
5    Q.  Do you remember the timeframe of
6    that?
7    A.  2019, sometime in 2019.
8    Q.  And how did these guys find you or
9    hear you were sending leads?
10   A.  I don't know.  Through the grapevine.
11   I think someone had a relationship with a
12   gentleman of the name Matt Herman, out of
13   Florida.  Matt Herman heard about it and he had
14   his own rooms and I'm certain his own rooms
15   were contacting me, as well, because he reached
16   out to me.  And I had reached out to Scott when
17   he reached out to me; and I said, "Hey, did you
18   give my information to Matt Herman?"
19        He said, "No."
20        And I said, "Well, he just
21   called me."
22        Matt Herman is known in the
23   industry as a -- he basically stole a company
24   from a gentleman by the name of Bruce Goldberg,
25   took his entire book of business.  Regardless
```

48

```
1    of if it was right or wrong, it was still a low
2    blow, in my mind, so.
3    Q.  So when Mears became an owner, can
4    you tell me who were all of the clients of
5    Rising Eagle?
6    A.  Michael Smith, Scott Shapiro, or
7    Health Advisors of America.  By 2020 they had
8    switched.  Michael had sold the business or
9    traded the business off to O Health Insurance
10   or O Health Group or something of that nature,
11   owned by Hibbert.
12        I think Tovere (PHONETICALLY
13   SPELLED) might have been a client for two or
14   three months.  I mean, all of these guys were
15   just clients a very short -- very short span.
16   Some of them were only clients for six weeks;
17   some were only clients for two weeks.  Whenever
18   Scott and Mike would find out we were selling
19   more calls to more people and not giving them
20   the bulk of the calls, that's when they would
21   end up calling us out and telling us to stop;
22   and we'd stop.
23   Q.  And when you say "Hibbert," who is
24   that?
25   A.  Omar Hibbert, the owner of the room
```

49

```
1    now that Scott and Mike had started.
2    Q.  What's it called now?
3    A.  I don't know what it's called now,
4    but what it was called in 2020 was O Health
5    Group.
6    Q.  Okay.
7    A.  Or O Health "something."
8    Q.  Were there any other Rising Eagle
9    employees during this time?
10   A.  Huh-uh.
11   Q.  You mentioned Brian Failla or --
12   A.  Uh-huh.
13   Q.  Failla.  How did you know him?
14   A.  I met him in 2015 when I was working
15   for Seth Cohen.  I had got -- I had got a DWI,
16   my third DWI in the State of Texas in 2015; and
17   Brian came down here and bailed me out of jail.
18   That was the first time I remember meeting
19   Brian Failla.
20   Q.  And what was he doing at that time
21   for work?
22   A.  Working for Seth Cohen.
23   Q.  Who's Seth Cohen?
24   A.  He was a large provider of health
25   insurance deals.  He was -- he owned his own
```

50

1  health insurance room.
2      Q.  Okay.  So Brian was working for him?
3      A.  Uh-huh.
4      Q.  And what did that health insurance
5  room do?
6      A.  Sold health insurance.
7      Q.  So was it a call center?
8      A.  I wouldn't call it a call center in
9  the sense of they would make a lot of outbound
10  calls.  They weren't -- they were also
11  receiving inbound traffic as well.  They
12  weren't generating insurance leads --
13      Q.  So --
14      A.  -- not that I remember.
15      Q.  -- what type of insurance were they
16  selling?
17      A.  Health insurance.
18      Q.  And did Rising Eagle have any
19  relationship with that company?
20      A.  I don't remember.  That was years --
21  I was -- I wasn't even my real self in those
22  years.  I was -- those years are a blur to me.
23      Q.  Why is that?
24      A.  I was on drugs during those times.
25  When I got my third DWI, I realized I couldn't

51

1  drink anymore.  So I decided to -- I switched
2  to drugs.  I was using drugs on a regular
3  basis.
4      Q.  And then back to Brian, so did he
5  work with Rising Eagle?
6      A.  No.
7      Q.  He didn't work with Rising Eagle or
8  for Rising Eagle?
9      A.  Huh-uh.
10      Q.  Did he have any relationship with
11  Rising Eagle or --
12      A.  Huh-uh -- well, I believe at one
13  point he did run a call center for me.
14      Q.  For what?
15      A.  Senior medical alert devices.
16      Q.  And what is that?
17      A.  Devices that senior citizens wear
18  around their neck in case they get lost or they
19  need help or they fall or break their leg or
20  break their arm, break their back, fall down.
21  They can push it and it sends an emergency
22  vehicle out to their residence or wherever
23  they're located at.
24      Q.  And that company was not related to
25  Rising Eagle?

52

1      A.  That company was related to Rising
2  Eagle.
3      Q.  Can you describe that relationship?
4      A.  What do you mean, describe it?
5      Q.  If -- if it was related to Rising
6  Eagle, in what way?
7      A.  Rising Eagle own the contract --
8      Q.  Okay.
9      A.  -- to that -- for the senior medical
10  alerts.
11      Q.  So what did Brian do for senior
12  medical alerts?
13      A.  He ran a call center for them.
14      Q.  Okay.  And do you know a Maggie
15  Lemus?
16      A.  I do.
17      Q.  And is that her legal name?
18      A.  No.
19      Q.  Can you -- do you know her full legal
20  name?
21      A.  Yes.  Margarita DeJesus Casanova.
22      Q.  And how do you know her?
23      A.  She's my girlfriend.
24      Q.  Did she work for Rising Eagle, ever?
25      A.  No.

53

1      Q.  Did she do any services for Rising
2  Eagle?
3      A.  She did in the beginning.  I had
4  asked her if she would help me with my taxes
5  and she looked at them and she said,
6  "Absolutely not."  She wouldn't touch it
7  because she said it was crazy how I was doing
8  everything.  I was convoluting my expenses with
9  the business expenses.  I didn't have a
10  checking account until 2019, a personal
11  checking account.  I mean, that was -- all that
12  FCC statements were all true.  I did breach the
13  corporate veil with using the funds to pay for
14  things, my personal stuff in my life.
15      Q.  Rising Eagle funds?
16      A.  Uh-huh.
17      MS. REYES:  Make sure he's
18  saying "yes" or "no."
19      Q.  (BY MR. ABERNETHY)  Can we, just
20  again, make sure we're saying "yes" or "no,"
21  just for the record?
22      A.  Sure.
23      Q.  Thank you.
24      All right.  So did Rising --
25  sorry.  One second.

John Spiller - 3/2/2022

54

1    So did she -- you said she
2  didn't do your taxes on that first look.  Did
3  she ever do taxes for you?
4    A.  She did finish my taxes, one of my
5  tax returns in 2018; but she -- she had told me
6  that -- because I had basically stopped her
7  process of completing them because she was
8  asking me too many questions.  I wasn't willing
9  to get into it with her.  And she just told me
10 she wasn't going to do any of my taxes or my
11 tax work anymore.
12    Q.  And do you mean your personal taxes
13 or Rising Eagle's taxes?
14    A.  Rising Eagle's taxes.
15    Q.  Did you ever pay her or did Rising
16 Eagle ever pay her for these tax services?
17    A.  Yeah.  I -- I don't have a clue on
18 how much, but I do remember -- because back in
19 those days I only had that as my personal
20 account.  So I believe I paid her from that
21 account to pay for bills, pay for the house.
22    Q.  Do you remember if Rising Eagle ever
23 paid her a hundred thousand dollars in a single
24 check?
25    A.  Yes.

55

1    Q.  Do you remember what that payment was
2  for?
3    A.  Yes.  That was my -- I paid that to
4  myself.  That was my earned income.
5    Q.  Why did you write the check to her?
6    A.  I put it as a cashier's check because
7  I didn't think the bank would give me hundred
8  thousand dollars in cash and allow me to
9  transfer that into my own personal account.
10    Q.  So you used that to pay yourself
11 income?
12    A.  Uh-huh, and we had a joint account.
13 That's the thing she deposited that money into
14 was the joint account.
15    Q.  And when you say Rising Eagle paid
16 for other personal expenses, what do you mean
17 by that?
18    A.  Paid for the house utilities, paid
19 for -- paid for gas, paid for food, paid for
20 outings, paid for -- everything you can think
21 of, it paid for it.  I mean, that was my
22 personal checking account as well as -- as well
23 as the business.  I didn't know about piercing
24 the corporate veil.  I was a novice at owning
25 businesses.  I didn't know what the hell I was

56

1  doing.
2    Q.  Can you tell me what you mean when
3  you say "piercing the corporate veil," what
4  your understanding of it is?
5    A.  I commingled funds that were supposed
6  to stay within Rising Eagle Capital.  I used
7  them for my personal use.
8    Q.  Did you ever pay anything related to
9  your legal expenses, personal legal expenses?
10    A.  Uh-huh.
11    Q.  Your criminal legal expenses?
12    A.  Yeah.
13    Q.  All right.  So did Rising Eagle have
14 its own call centers?
15    A.  It only had one call center, and it
16 was under the company Senior Medical Alert.
17    Q.  And tell me where that was located.
18    A.  Houston, Texas.
19    Q.  Okay.  And do you know where or
20 remember where in Houston, Texas?
21    A.  Off of 610 --
22    Q.  And that --
23    A.  -- North Loop West.
24    Q.  And that's the call center that Brian
25 Failla worked at?

57

1    A.  Uh-huh.
2    Q.  How long was that there?
3    A.  A year and then he had -- I had to
4  let him go.  He was having fights with
5  neighbors.  He was argumentative with the --
6  with our representatives.  He just was a
7  horrible, bad apple.  I should have known it
8  from the beginning.
9    Q.  So did anyone take over after he
10 left?
11    A.  Huh-uh.
12    Q.  The call center just shut down?
13    A.  Uh-huh.
14    Q.  When was this, again?
15    A.  In 2019.
16    Q.  Okay.  Did you say who owned Senior
17 Medical Alert?
18    A.  MedGuard.
19    Q.  MedGuard.  Do you know who MedGuard
20 is?
21    A.  Huh-uh.
22    Q.  Do you know anybody that worked
23 there?
24    A.  If you let me look on my phone I can
25 tell you his name -- Doug Holloway.

58

1    Q.  Doug Holloway?
2    A.  Uh-huh.
3    Q.  And where was that located?
4    A.  I don't remember.
5    Q.  Okay.
6    A.  Northwest -- northeast somewhere.
7    Q.  Earlier did you say that Rising Eagle
8  had some ownership of Senior Medical Alert?
9    A.  It had complete ownership of it.
10    Q.  And then you sold it to MedGuard?
11    A.  No, no.  MedGuard owned -- they owned
12  the device.  I was selling on behalf of
13  MedGuard.  Senior Medical Alert was -- had a
14  contract owned by Rising Eagle Capital or also
15  owned by John Spiller that was able to use that
16  contract to sell medical alert devices.
17    Q.  Okay.  So the product was called
18  MedGuard?
19    A.  Uh-huh.
20    Q.  And Senior Medical Alert was what
21  here you're referring to as basically the call
22  center that sold the product?
23    A.  Uh-huh.
24    Q.  Did you have any other contracts like
25  that selling goods or services?

59

1    A.  Huh-uh, huh-uh.
2        MS. REYES:  "Yes" or "no."
3    Q  (BY MR. ABERNETHY)  "Yes" or "no," please.
4    A.  No.
5    Q.  Did Rising Eagle itself sell any
6  goods or services?
7    A.  No.  The only thing it sold was
8  calls.
9    Q.  And what does that mean when you say
10  you sold calls?
11    A.  Calls are opted in -- or I wouldn't
12  even -- once a client is called, they're played
13  a recording.  In the recording they can push
14  one or two, two to be put on our do-not-call
15  list or press one to speak with a live agent.
16  When they push one, they become a live lead.
17  That lead gets transferred to the call center.
18  The call center picks up the phone and sells
19  them.  Those are calls.
20    Q.  Okay.  And when you say "client,"
21  what do you mean by that?
22    A.  Call centers.
23    Q.  Okay.
24    A.  I don't mean to make your job harder.
25    Q.  So do you know Health Advisors of

60

1  America?
2    A.  Yes.
3    Q.  And how do you know them?
4    A.  They were my client.
5    Q.  And can you tell me again what you
6  mean by that, what that relationship was?
7    A.  They were -- Michael Smith approached
8  me first in 2017 -- or it might have been
9  sooner -- told me he had -- it might have been
10  the end of 2016, to be honest with you.
11  Irregardless, he approached me and told me he
12  needed called; and he told me how Matt Jones
13  was generating calls.
14        So I started looking into it.  I
15  started researching it, found out a way to
16  generate a massive amount of leads as long as I
17  had servers.  I found a company out of the
18  Philippines that were able to sell me servers
19  that were designed for robodialing or also
20  known as press-1 dialing; and I was able to
21  build -- in the first year I was able to build
22  three clusters.  Three clusters means -- comes
23  with three servers, each server producing
24  150,000 calls per minute.
25    Q.  And how do you know Michael Smith, or

61

1  how did you know him?
2    A.  He called me out of the blue one day
3  or sent me a text message out of the blue.
4    Q.  And do you know Scott Shapiro?
5    A.  I do.
6    Q.  How do you know Scott Shapiro?
7    A.  In 2015 I used to sell him auto
8  insurance leads through a relationship called
9  -- Brian Failla introduced me to him.  I
10  believe that was the first time I met him.
11    Q.  And do you know who O Health Group
12  is?
13    A.  Yes.
14    Q.  How do you know them?
15    A.  They were the company that took over
16  Scott Shapiro and Michael Smith's room.
17        DEFENSE COUNSEL:  Objection.
18    Q  (BY MR. ABERNETHY)  And do you know who Omar
19  Hibbert is?
20    A.  Yes, I do.
21        (Ms. Reyes quietly speaking to
22  Mr. Abernethy, inaudible to the reporter.)
23        MR. ABERNETHY:  Oh, and if we
24  can, not use the phone.  We can take breaks if
25  you need to do something on the phone; but just

62

1  to keep it focused and moving, please refrain
2  from that.
3      Q.  (BY MR. ABERNETHY)  How do you know
4  Omar Hibbert?
5      A.  Michael Smith introduced me to him in
6  2020 and when he transferred the company to his
7  name.
8      Q.  And do you know who Leon Martin is?
9      A.  No.
10     Q.  You've never heard that name?
11     A.  No, I've never heard that name.
12     Q.  Do you know if Michael Smith has any
13 connection to O Health Group?
14     A.  Any connection.
15         DEFENSE COUNSEL:  Objection.
16     A.  I don't believe so.  I mean, I don't
17 know.  Again, that's a question I think you
18 should ask them.  I don't -- I don't have a
19 clue about that.  I don't know anything about
20 their inner workings.  I know in the beginning
21 Michael Smith was there while he was
22 transitioning as the owner.
23     Q.  (BY MR. ABERNETHY)  So he does have
24 some relationship to O Health?
25         DEFENSE COUNSEL:  Objection.

63

1      A.  He potentially could.  I believe in
2  the beginning he did; but, like I'm saying,
3  after the first three to six months, he bowed
4  out.  He was -- I couldn't even reach him on
5  the phone.  He told me to reach out to Omar.
6  And Scott went dormant, as well.  I couldn't
7  reach Scott, either.
8      Q.  (BY MR. ABERNETHY)  Have you ever visited
9  those call centers in Florida?
10     A.  Uh-huh.
11     Q.  When was the last time you visited
12 those?
13     A.  I don't remember.  It was before
14 2020.  Probably 2019 was the last time I was in
15 Florida.
16     Q.  And which call centers were these
17 specifically?
18     A.  O Health Group.
19     Q.  Did you ever visit Health Advisors
20 when you were in Florida?
21     A.  Uh-huh.
22     Q.  You visited their call center?
23     A.  Uh-huh.
24     Q.  When was the last time you visited
25 there?

64

1      A.  Like I'm saying, 2019.
2      Q.  And to your understanding, does Scott
3  Shapiro have any relationship with O Health?
4         DEFENSE COUNSEL:  Objection.
5      A.  I don't believe so.  Again, Scott
6  Shapiro's role was to curate health insurance
7  contracts for rooms.  He has -- he potentially
8  used to have rooms under him that would sell
9  his products; but, you know, like I said, I
10 haven't seen Scott, besides this time today, in
11 nearly three years.
12     Q.  (BY MR. ABERNETHY)  And when you
13 would visit Health Advisors, where was that
14 located?
15     A.  In Florida.
16     Q.  Where in Florida?
17     A.  I don't have a -- I don't have -- if
18 it wasn't for GPS, I would never find it.  I
19 had to text Scott or text Mike, and they would
20 send me the address.
21     Q.  Do you know what city it was close
22 to?
23     A.  Fort Lauderdale.
24     Q.  And when you'd visit, how many people
25 would be there?

65

1      A.  The entire call center.
2      Q.  How many people would that be?
3      A.  A hundred, 110.
4      Q.  Would Mike Smith be there?
5      A.  Yes.
6      Q.  Would Scott Shapiro be there?
7      A.  Yes.
8      Q.  And the rest of the people were
9  agents?
10     A.  Uh-huh.
11     Q.  Do you remember anybody else
12 specifically that would be there?
13     A.  Huh-uh.
14     Q.  Can you say "yes" or "no," please?
15     A.  No.  I mean, I do not -- I mean,
16 you're asking me to recollect on a memory I had
17 three to four years ago.  I don't have a clue
18 about that.  I don't.  I don't know who else
19 was there.  I mean, shoot, it might have been
20 the same security guard -- they had a security
21 guard at the front door.  That might have been
22 the same security guard that I saw there all
23 the time.  I don't know.
24     Q.  Okay.  When did Michael Smith stop
25 talking to you?

66

1    A.   When he transferred the company over
2  to Omar Hibbert, around the third month of
3  doing it, probably around March of 2020.
4    Q.   Why did he stop talking to you?
5        DEFENSE COUNSEL:  Objection.
6    A.   He told me that I need to communicate
7  with Omar Hibbert and no more with them.
8    Q.   (BY MR. ABERNETHY)  And when did
9  Scott Shapiro stop talking to you?
10        MR. DAVIDSON:  Objection.
11    A.   Around the same time.  I think after
12  that I would call Scott every once in a while,
13  just to -- just to see how he was doing, things
14  of that nature; but that was mainly it.  It was
15  -- it was in 2020 when I got served with the
16  lawsuit, so.
17    Q.   Have you spoken with him since then?
18    A.   Huh-uh, not that I -- not that I
19  recall.
20    Q.   Before that how often would you visit
21  Health Advisors in person?
22    A.   I don't know.  Probably twice, three
23  times a year.
24    Q.   And what were the purposes of those
25  visits?

67

1    A.   Just to go there and see how they're
2  doing, build up some rapport with them, see how
3  their call centers are working, to talk about
4  compensation, see if they can increase -- in
5  the beginning they had us at a 250-dollar CBA;
6  and we wanted a little bit more because our
7  costs of us running the robodialer was costing
8  us around 15,000 a month, not including the
9  telecom minutes that was costing us around
10  3,000 to $5,000 a week, not including Jakob's
11  costs.  The cost of maintaining life in general
12  was adding up, so we wanted more money.  So
13  that was a couple of the reasons we went to
14  Florida was to talk about them getting us paid
15  a little bit more.
16    Q.   And since you were served with the
17  lawsuit, have you spoken with Mike Smith?
18    A.   Huh-uh.
19    Q.   And since --
20    A.   No.
21    Q.   And since you've been served, you
22  have not spoken with Scott Shapiro?
23    A.   No.
24    Q.   All right.  So while you were CEO of
25  Rising Eagle, did you go to jail?

68

1    A.   Yes.
2    Q.   And when was this?
3    A.   The end of 2018, the beginning of
4  2019, November the 26th, 27th.
5    Q.   Of 2018?
6    A.   Uh-huh.
7    Q.   And then, do you know when in 2019
8  when you got out?
9    A.   March.
10    Q.   Did Rising Eagle continue operating
11  while you were in jail?
12    A.   Yes, Jakob did continue operating it.
13    Q.   Was Jakob -- well, what was -- what
14  was his role during that time?
15    A.   I was in jail.  I would call him and
16  see how the dialers were holding up.  I'd call
17  him to see how much money Scott and Mike were
18  sending.  That's basically what I was doing.
19  Jakob would start the dialer, run the dialer,
20  manage everything.
21    Q.   How often did you talk to Jakob?
22    A.   Every day in the morning.  I'd try to
23  talk to him in the morning, and then we'd talk
24  again in the evening.
25    Q.   By telephone every time?

69

1    A.   Uh-huh.
2    Q.   Did you talk to him in any other way?
3    A.   Huh-uh.
4    Q.   "Yes" or "no," please.
5    A.   No.
6    Q.   And who paid for those phone calls,
7  while you were there, talking with Jakob?
8    A.   I did.  It was on my balance.
9    Q.   Was that with Rising Eagle funds?
10    A.   Uh-huh.
11    Q.   And so how would you describe your
12  role during that time with the company?
13    A.   I was in a 6 X 6 cell with another
14  inmate in there with me.
15    Q.   As far as when you would talk to
16  Jakob, what -- what would you describe your
17  role as when you talked to him every day?
18    A.   I was just wanting to making sure he
19  had everything running well because when I --
20  when I got arrested, I had 220,000 in the bank
21  account.  When I got out, I only had 180,000 in
22  the bank account.  So he must have -- he lost
23  40- to 80,000 when I was in jail.
24    Q.   So who was managing the Rising Eagle
25  funds during --

John Spiller - 3/2/2022

70

1    A.  Jakob was.
2    Q.  Was anybody else?
3    A.  Huh-uh.
4    Q.  Was anybody managing payments?
5    A.  Huh-uh.
6    Q.  Was anybody managing -- including
7  Jakob?
8    A.  Oh, yeah, Jakob, would manage all the
9  payments.
10    Q.  And was anybody managing Rising
11  Eagle's PayPal?
12    A.  Jakob.
13    Q.  And anyone else?
14    A.  Not that I know of.
15    Q.  And with the bank accounts, was
16  anybody managing those?
17    A.  Jakob.  Jakob had access to
18  everything.
19    Q.  Anybody else?
20    A.  Not that I remember.
21    Q.  And who was managing the Rising Eagle
22  Skype account or your Skype account?
23    A.  Jakob.
24    Q.  Anybody else?
25    A.  No.

71

1    Q.  Did Jakob ever send you money while
2  you were in jail?
3    A.  Uh-huh.
4    Q.  Through the Rising Eagle funds?
5    A.  Uh-huh.
6    Q.  Did he send you money --
7    A.  I believe he would --
8        (Simultaneous speakers.)
9    A.  I'm sorry.  Let me say yes to that.
10  I believe he would send me -- he would either
11  send himself money and send it to me from
12  Rising Eagle, or he would send it directly to
13  me and pay himself out from Rising Eagle.
14    Q.  And do you know who Mikel Quinn is?
15    A.  I do.
16    Q.  How do you know him?
17    A.  He's the owner of Great Choice
18  Telecom.
19    Q.  Did you ever send him money while you
20  were in jail?
21    A.  No, I did not know him -- oh, I guess
22  I did meet him that time while I was in jail.
23  Yeah, I did.  I guess I could have sent him
24  money in jail.
25    Q.  How did you meet him?

72

1    A.  I don't remember.
2        He was an inmate in jail with
3  me.  He told me he was trying to get sober.  He
4  was sober, trying to live a good life, that
5  kind of stuff.
6    Q.  Do you still communicate with Mikel
7  Quinn?
8    A.  The last time I spoke with Mikel
9  Quinn was last week to sign -- he moved to
10  Nacogdoches, Texas.  So he's no longer in
11  Houston, Texas, anymore.
12    Q.  What did you talk to him about?
13    A.  Just about that the business isn't
14  doing that good and that he needs to find a job
15  to pay for himself.
16    Q.  By "the business," do you mean --
17  what do you mean by "the business"?
18    A.  Great Choice Telecom.
19    Q.  And what do you mean he'll have to
20  pay for himself?
21    A.  Every month Great Choice was sending
22  him $500 in the month -- in the beginning of
23  the month.  We had to slow down from that
24  because he was spending that money in the first
25  three days of the month, and then he would come

73

1  back and ask for more the next week and then
2  ask for more the following week and then ask
3  for more the fourth week.  So it just became
4  real taxing, and the business didn't have that
5  much capital in it to begin with.
6    Q.  What was the money being sent for?
7    A.  His living expenses, his drinking
8  expenses.  He was -- he was a -- he's a
9  full-blown drunk.  That's one of the reasons we
10  went to Nacogdoches to talk to him, to let him
11  know that, moving forward, no more money, no
12  more paying of anything.  It's done.
13    Q.  So what did he sign for you last
14  week?
15    A.  He didn't sign anything.  We just
16  went there to have a conversation with him.
17    Q.  Okay.  Also, while you were in jail,
18  did you have a joint checking account with
19  Maggie during that time?
20    A.  I believe I did.  I don't remember.
21    Q.  And when you said, with Michael, "we
22  went to Nacogdoches," who's "we"?
23    A.  Me and Maggie.
24    Q.  Okay.  Did you have any internet
25  access while you were in jail?

74

1    A.  Huh-uh.
2          THE REPORTER: Counsel, is this
3  a good time for a break?
4          MR. ABERNETHY: Yeah, we can
5  take a break.
6          THE VIDEOGRAPHER: Okay. We'll
7  go off at 11:52.
8          (Off the record 11:52 a.m. to 12:05 p.m.)
9          THE VIDEOGRAPHER: Okay. We're
10  back on the record. It's 12:05.
11    Q.  (BY MR. ABERNETHY) All right. Just to -- are
12  you talking with anybody about the deposition while
13  we're --
14    A.  Huh-uh.
15    Q.  -- here today?
16    A.  I just told all -- all the people I
17  was in court today.
18    Q.  Who are "all the people"?
19    A.  My clients.
20    Q.  Okay.
21    A.  Vendors.
22    Q.  So while you were in jail, did you
23  have any access to Rising Eagle's bank account?
24    A.  Huh-uh.
25    Q.  Did you have any access to Rising

75

1  Eagle's PayPal account?
2    A.  Huh-uh.
3          MS. REYES: Please say "yes" or
4  "no."
5          THE WITNESS: No.
6    A.  I never had access to a computer.
7  How am I going to get access to any of those?
8    Q.  (BY MR. ABERNETHY) Okay. So no
9  access to Skype, either?
10    A.  No.
11    Q.  And did any of your clients know that
12  you were in jail at the time?
13    A.  I believe Scott and Mike knew because
14  Jakob told them I was in jail.
15    Q.  To your understanding, did anybody
16  else know?
17    A.  Not that I remember.
18    Q.  And you believe they knew because of
19  Jakob Mears?
20          MR. DAVIDSON: Objection.
21    A.  Uh-huh.
22          MS. REYES: Is that a "yes" or a
23  "no"?
24          THE WITNESS: Yes.
25    Q.  (BY MR. ABERNETHY) Did Jakob tell

76

1  you that he told Mike Smith that you were in
2  jail?
3          DEFENSE COUNSEL: Objection.
4    A.  Yes.
5    Q.  (BY MR. ABERNETHY) Did Jakob tell
6  you that he told Scott you were in jail?
7          DEFENSE COUNSEL: Objection.
8    A.  Yes.
9    Q.  (BY MR. ABERNETHY) Did you have any
10  contact with Mike Smith while you were in jail?
11    A.  Only on one phone call Jakob merged a
12  three-way call between myself, Scott, and Mike.
13    Q.  And what was that call about?
14          DEFENSE COUNSEL: Objection.
15    A.  I don't remember. I do not remember.
16  I think y'all have records of those phone
17  calls.
18    Q.  (BY MR. ABERNETHY) So you have no memory of
19  that call?
20    A.  Huh-uh. I think it might have been
21  calling to tell them I'm still -- still there.
22  I don't have a clue what that phone call was
23  about.
24    Q.  (BY MR. ABERNETHY) So did you ever speak to
25  Scott Shapiro outside of that one merged call while you

77

1  were in jail?
2    A.  Huh-uh.
3          MS. REYES: "Yes" or "no"?
4          THE WITNESS: No.
5    A.  Not that I recall. Again, that's how
6  many years ago? That's, like, four -- the
7  beginning of 2019, three years ago, three and a
8  half years ago.
9          MR. ABERNETHY: All right.
10  We're going to pull in Exhibit 7.
11          (Exhibit 7 discussed.)
12          MR. ABERNETHY: If we could,
13  play Exhibit 7.1 first; and that is loaded in
14  the Zoom chat for those on Zoom.
15          (Exhibit 7.1 audio clip playing
16  as follows:
17          MR. SPILLER: ...cannot do it,
18  then put me on the phone with them.
19          MR. MEARS: All right. I will
20  -- I'll do it whenever it comes closer to the
21  next commission date.
22          MR. SPILLER: No, you need to --
23  no, you need to have this out with them today.
24          MR. MEARS: All right. Well,
25  let me call them right now then.

John Spiller - 3/2/2022

78

1  MR. SPILLER: Okay. Call them
2  right now. I'll stay on the phone.
3  MR. MEARS: Thank you.
4  MR. SHAPIRO: Hello.
5  MR. MEARS: Hey, I have John on
6  the line. He wants to talk to you about --
7  about Friday's [inaudible.]
8  Here you go.
9  MR. SHAPIRO: About what?
10 MS. SPILLER: About Friday's
11 commission. So, hey. So, listen --
12 MR. SHAPIRO: About what?
13 MR. SPILLER: Friday's
14 commission.
15 MR. SHAPIRO: Friday's
16 commission?
17 MR. SPILLER: Yeah. So, you
18 know, okay, so y'all guys used to pay us $7500
19 for 36 sales, right? Well, now, we have --
20 MR. SHAPIRO: Correct.
21 MR. SPILLER: -- increased that;
22 36 sales, you pay us $8100. Okay?
23 MR. SHAPIRO: Okay.
24 MR. SPILLER: Now -- now -- now,
25 y'all guys asked us to reduce the cost of --

79

1  of -- anytime y'all hit over 200 sales in a
2  week, you wanted to reduce it from a thou--
3  from 2,000, down to a thousand dollars, right?
4  MR. SHAPIRO: That's what Mike
5  said.
6  MR. SPILLER: Yeah, exactly.
7  Exactly.
8  MR. SHAPIRO: Okay.
9  MR. SPILLER: Okay. So we
10 agreed to that. So if -- so if we agreed with
11 that, then, this past week, on Friday, we
12 should have received $9100 as a bonus. And we
13 should have been paid $8100 on top of it; but
14 since Mike --
15 MR. SHAPIRO: [Inaudible.] No,
16 no, no. You hang up with me. Call Mike, and
17 go with him because I don't know what to he's
18 done.
19 MR. SPILLER: Okay.
20 MR. SHAPIRO: I just told him he
21 has -- call him.
22 MR. SPILLER: All right. I'm
23 calling Mike right now.
24 MR. SHAPIRO: Call Mike.
25 MR. SPILLER: Thank you.

80

1  Bye-bye.")
2  (Audio playback stopped.)
3  Q (BY MR. ABERNETHY) All right. Can you tell
4  me what that was?
5  DEFENSE COUNSEL: Objection.
6  A. I'm assuming that was a discussion
7  between me and Scott Shapiro and Jakob Mears
8  about a commission that was not paid out to us
9  correctly; but, I mean, that's going way back
10 in my day. I don't have too much of a
11 recollection of any phone calls I had while I
12 was in jail.
13 Q. (BY MR. ABERNETHY) Can you, again,
14 identify the voices you heard on that call?
15 A. Yes. Scott Shapiro, myself, and
16 Jakob Mears.
17 Q. And you do not recall that specific
18 call?
19 A. Huh-uh.
20 MS. REYES: "Yes" or "no"?
21 THE WITNESS: No.
22 MR. ABERNETHY: And can we play
23 7.2?
24 THE WITNESS: Give me one
25 second. I have to just tell this person to

81

1  stop.
2  (Witness momentarily typing on
3  cell phone.)
4  (Exhibit 7.2 audio clip playing
5  as follows:
6  MR. SPILLER: ...cannot do it,
7  then, put me on the phone.
8  MR. MEARS: ...on the line right
9  here. He wants to explain some things with you
10 for -- for Friday's commission structure thing.
11 MR. SMITH: Hey, can you hear
12 me, Mike?
13 MR. SMITH: What's up, stranger?
14 MR. SPILLER: Hey, man, how you
15 doing?
16 MR. SMITH: I'm good. I'm good.
17 Hey, hold on. [Inaudible] our office phone,
18 John.
19 MR. SPILLER: Okay. Thank you.
20 MR. SMITH: Okay. Never mind.
21 Never mind.
22 MR. SPILLER: Okay. Good.
23 Okay. So --
24 MR. SMITH: [Inaudible.]

82

1      MR. SPILLER:  Okay.  Sounds
2  good.
3          Hey, so listen, man.  Okay.  So
4  listen, so -- so because -- because we're --
5  okay.  Because the old -- the old commission
6  structure, you wanted to reduce it down from
7  2,000 to $1,000 every single week that we hit
8  over 200 sales; is that correct?
9      MR. SMITH:  Yeah, I guess.
10      MR. SPILLER:  Yeah.  So -- okay.
11  So --
12      MR. SMITH:  I thought we were
13  paying -- thought we were paying on 85 -- I
14  thought we were paying 8500 for every 38 deals.
15  That is according to -- that is according to a
16  225 CBA.
17      MR. SPILLER:  85 -- 8500?  You
18  mean 8100.
19      MR. MEARS:  For 36.
20      MR. SPILLER:  Yeah --
21      MR. SMITH:  For 38.
22      MR. SPILLER:  -- exactly.
23  Exactly.  36, yeah.  36 -- 36 sales would give
24  us $8100, right?  So --
25      MR. SMITH:  So you want thirty-

83

1  -- so you want 36 deals, not 38 deals?
2      MR. SPILLER:  No, sir -- yes,
3  sir.  Yes, sir, 36.
4      MR. SMITH:  It was 38 deals, but
5  you want 36?
6      MR. MEARS:  It's always been 36,
7  yeah.
8      MR. SPILLER:  36.  So 36 deals
9  gives us $8100.  So at the -- so on Fridays --
10  so on Fridays, when we hit our bonus, right, if
11  we hit 200 sales, can you add the thousand
12  dollars to the 8100 to make it $9100?
13      MR. SMITH:  Yes.
14      MR. SPILLER:  Okay.  So --
15      MR. SMITH:  On Fridays
16  [inaudible] which we always do; and even if we
17  don't, right -- I'll still do it, John -- this
18  is John.  I -- yeah, I'll add the other
19  thousand.  That's fine.
20      MR. SPILLER:  Okay.  Thank you.
21  Okay.  Y'all guys are helping us --
22      [Inaudible.]
23      MR. SMITH:  Huh?
24      MR. SMITH:  Other than that,
25  how're you doing over there?

84

1      MR. SPILLER:  Man, I'm doing
2  good.  Man, I'm doing real good.  I'm trying to
3  keep my head up.
4      MR. SMITH:  Are you getting out,
5  or what's going on?
6      MR. SPILLER:  Yeah, I'm getting
7  -- I should be out on the 28th.  I go to court
8  on the 28th.  I should be out on the 28th.
9      MR. SMITH:  All right.
10      MR. SPILLER:  They gave me no
11  bond.
12      (Simultaneous speakers.)
13      MR. SPILLER:  Yeah, I'll stop
14  being a punk.  I'll be good.
15      MR. SMITH:  Stop being a thug
16  and just focus on getting rich.
17      MR. SPILLER:  Yes, sir.  That's
18  exactly what I'm doing.  I'm actually coming up
19  with a lot of ideas since I've been in here, a
20  lot of good ideas.
21      MR. SMITH:  Good, good, good.
22  So I want to send -- [inaudible] I'll ask,
23  John.  More than likely we [inaudible.]
24      MR. SPILLER:  Okay.
25      MR. SMITH:  I'm assuming we do.

85

1  We have to.  We have to [inaudible], so; but
2  I'll check with them.  And then I'll talk to
3  you guys later.
4      MR. SPILLER:  Okay.  Sounds
5  good.  Thank you, Mike.
6      MR. SMITH:  All right.  All
7  right, man.  All right, Jakob.
8      MR. MEARS:  Thank you.)
9      (Audio playback stopped.)
10    Q.  (BY MR. ABERNETHY)  All right.  Can
11  you identify what you just heard there?
12    A.  Myself, Michael Smith, and Jakob
13  Mears speaking.
14    Q.  Do you recall that conversation?
15    A.  I believe it was about the same $8100
16  that they -- I mean, thinking back on it,
17  hindsight 20/20, I should have just let them
18  stick and pay me 8600 for 36 deals; but,
19  instead, I told them 8100 for 36 deals.  Again,
20  that was a -- that was an argument that Jakob
21  didn't have.  So the previous Friday, Scott --
22  Scott and Mike sent me 8100, instead of 9100,
23  because we had hit 200 sales in the week.
24  Whenever we hit 200 sales in a week, Mike
25  always sends me an additional thousand dollars

John Spiller - 3/2/2022

86

1  on top of the 8100.
2    Q.  He sends you an additional how much?
3    A.  A thousand dollars.
4    Q.  And what was the purpose of that
5  payment?
6    A.  For their room closing 200 deals in a
7  week.
8    Q.  And can you, again, explain what you
9  mean by "closing those deals"?
10    A.  They were selling health insurance.
11    Q.  All right.
12        MR. ABERNETHY:  Can we move to
13  Exhibit 8?
14        (Exhibit 8 discussed.)
15        MR. ABERNETHY:  And we'll play
16  8.1 and 8.2 back to back.
17        (Audio clip playing as follows:
18        MR. SPILLER:  Answer it --)
19        MR. YOEMAN:  Patrick?
20        (Playback stopped.)
21        MR. YOEMAN:  Sorry to stop it.
22  8.2 is playing.  Those are just mislabeled.
23        MR. ABERNETHY:  Okay.
24        Brian, you got that?
25        (No audible response.)

87

1        MR. ABERNETHY:  Thanks, Joe.
2        (Exhibit 8.1 and Exhibit 8.2
3  audio clips playing as follows:
4        MR. SHAPIRO:  Are you there?
5        MR. MEARS:  You're on.
6        MR. SHAPIRO:  Are you there?
7        MR. SPILLER:  Yeah, I'm here.
8  Okay.  Go ahead.
9        MR. SHAPIRO:  Yeah, I just
10  [inaudible] a little bit; but...
11        MR. SPILLER:  Okay.  Go ahead.
12        MR. SHAPIRO:  Can you hear me?
13        MR. SPILLER:  Yeah, I can hear
14  you.  Go ahead.
15        MR. SHAPIRO:  Yeah, yeah.  So, I
16  mean, they only got 1100 in Room 2; and my room
17  is only getting, like, some 11,000, twelve,
18  maybe thirteen sometimes.  I mean, I thought I
19  was going to get a lot more calls.
20        Obviously, it's a little
21  different now; but [inaudible] all the time.  I
22  told Jakob I'm having 30 to 40 people waiting
23  at one time.  At all times -- like, there's
24  never a time that everybody's on the phone.
25  Never.  You can ask Jakob.  Never.  Like,

88

1  never.
2        Even when I send him new leads,
3  it's still never like that.  That's why I think
4  the cluster is not enough [inaudible.]  I don't
5  know what the problem is, but you do.  I guess
6  is what I'm asking.
7        MR. SPILLER:  Okay.  Well, then
8  -- well, I do know -- I do know for a fact that
9  they're on a cluster, that they're already on
10  their own cluster.  They're on -- they're on
11  Cluster 48.  It used to be a cluster that we
12  used to use, right?  So we cut it in half, and
13  we gave it half to them so they could use it.
14        So what we can do is, is we can
15  retake some of the leads that they sent us; and
16  we can put them in -- we can -- we can -- we
17  can add some more -- we can add some more clout
18  to their -- their server.
19        MR. SHAPIRO:  Yeah, because 1100
20  a day is not enough for 30 people.  It's not.
21        MR. SPILLER:  No, 1100 is not
22  enough for 30 people.
23        MR. SHAPIRO:  Yeah, and then
24  mine is the same thing.  I'm asking -- I'm
25  sending leads almost every day, and nothing.  I

89

1  still have 30 people, 40 people waiting at a
2  time; and that's not done, never, like, when
3  you were there.  I know he knows what he's
4  doing, but it -- something's wrong.  That's why
5  I need you need to fix it.  Something's going
6  on that I'm not getting enough calls.
7        MR. SPILLER:  Yes, sir.  Well,
8  then --
9        MR. SHAPIRO:  Yeah.
10        MR. SPILLER:  -- ultimately what
11  it comes down to is two things:  It's the
12  leads; and then it's also the control of the
13  dialer, the dialer dialing out.  And, hey, hey,
14  hey, and that's -- and that's something else I
15  need to tell you.  You don't have to worry
16  about anything about your name being released
17  because of robodialing.  Your name is a hundred
18  percent protected on the back end because when
19  I switched you over to R Squared, I protected
20  your name of your business.
21        MR. SHAPIRO:  I don't -- I don't
22  know what you're talking about, robodialing.
23        MR. SPILLER:  Okay.
24        MR. SHAPIRO:  I don't know what
25  you mean.  Yeah, I don't know what you mean.

90

1      MR. SPILLER: Okay.
2      MR. SHAPIRO: I don't know what
3  that is. I don't know what that is.
4      MR. SPILLER: Okay.
5      MR. SHAPIRO: [Inaudible.] All
6  right. Can you fix it or get with Jakob to fix
7  it?
8      MR. SPILLER: Yes, sir. Yes,
9  sir. I'll get with Jakob to fix it.
10     MR. SHAPIRO: Yeah, the AI calls
11 need to be fixed. They're not getting enough
12 calls.
13     MR. SPILLER: Okay. Sounds
14 good. Sounds good.
15     MR. SHAPIRO: Okay. Take care.
16 Bye-bye.
17     MR. SPILLER: Thank you.
18 Bye-bye.
19     Hey, hey, so they have 40 agents
20 waiting right now?
21     MR. MEARS: No.
22     MR. SPILLER: How many agents --
23     MR. MEARS: They're fluxing --
24     MR. SPILLER: -- do they have
25 waiting?

91

1      MR. MEARS: They're fluxing
2  between 15 and 30 right now.
3      MR. SPILLER: And why do they
4  flux between 15 to 30?
5      MR. MEARS: I think one file is
6  full, but it also -- the one file's full, so
7  wait; but, also, it has six calls at the same
8  time.
9      It just -- oh, well, now, it
10 [inaudible]. It just turned 10:00 o'clock
11 their time. He put from -- the first hour's a
12 little better than the second hour, a little
13 bit. Right now, they're at 20, 19.
14     (Buzzer sound.)
15     MR. MEARS: Scott's calling me
16 now.
17     MR. SPILLER: Answer it.
18     MR. MEARS: Hi, Scott. I'm
19 still talking to John.
20     MR. SHAPIRO: Say it again --
21 you're still on with him?
22     MR. MEARS: Yeah.
23     MR. SHAPIRO: Hey, put me in --
24 put me on.
25     MR. MEARS: You're -- okay.

92

1  You're on speaker, too.
2      MR. SHAPIRO: John, this is the
3  thing: I don't want to do robocalls; and I
4  don't want to end up doing robocalls and
5  press-ones. Doing any calls --
6      MR. SPILLER: No, sir. No, sir.
7      (Simultaneous speakers.)
8      MR. SPILLER: Yes, sir. Yes,
9  sir. Yes, sir. Yes, sir. Yes, sir.
10     MR. SHAPIRO: Okay.
11     MR. SPILLER: The only thing
12 we're using is AI calls.
13     MR. SHAPIRO: Okay. Just make
14 sure it's not robocalls and -- and -- and
15 press-ones. I don't want to do that.
16     MR. SPILLER: Yes, sir.
17     MR. SHAPIRO: So I called
18 because I didn't understand what you meant.
19     MR. SPILLER: Yes, sir, I got
20 you. No worries.
21     MR. SHAPIRO: All right. So how
22 you doing, John?
23     MR. SPILLER: Feeling good.
24 Yeah, feeling good, man. Feeling good.
25     MR. SHAPIRO: All right. Call

93

1  me if you guys need me.
2      John, see if you can figure out
3  what the problem is [inaudible.]
4      MR. SPILLER: Yes, sir.
5      Hey, Scott, hey, Scott, hey,
6  Scott?
7      MR. SHAPIRO: Yes.
8      MR. SPILLER: Since we -- since
9  we put you on the -- since we're putting you on
10 your own server to increase your dial speed,
11 we're going to -- we're going to ask that y'all
12 guys pay the 225 moving forward today. Okay?
13     MR. SHAPIRO: That's fine. No
14 problem.
15     MR. SPILLER: Okay. Thank you.
16     MR. SHAPIRO: Okay. All right,
17 man. Bye.
18     MR. SPILLER: Bye-bye.
19     Okay. So [inaudible] are you
20 there?
21     MR. MEARS: Yeah.)
22     (Audio playback ended.)
23     Q.  (BY MR. ABERNETHY) All right. Can
24 you identify what you just heard?
25     A.  A conversation between myself, Scott

John Spiller - 3/2/2022

94

1  Shapiro, and Jakob Mears.
2      Q.  Do you recall that conversation?
3      A.  I do not.  Like I'm saying, these
4  conversations happened three years ago when I
5  was -- I mean, I was a hundred percent sober,
6  that's for sure.  I just don't remember a lot
7  of the conversations that I had during those
8  times.
9      Q.  Then, to your understanding, what did
10  it mean when it was said that 30 to 40 people
11  were waiting in the room?
12      A.  They have agents -- agents that are
13  waiting for phone calls.
14      Q.  And what does that mean, they're
15  waiting for phone calls?
16      A.  Either the data was destroyed and
17  Scott needed to send us another file or Michael
18  needed to send us another file or it was the
19  person running the dialer that wasn't loading
20  -- or that wasn't assessing which file to load
21  in which campaign or in which cluster.
22          Different clusters produced a
23  higher number of calls, a higher number of
24  volume, a higher number of calls in general.
25  So 68 -- Cluster 68, Cluster 60 -- so my first

95

1  clusters were Cluster 1, Cluster 24,
2  Cluster 48, Cluster 56, and Cluster 60.  I
3  eventually added on one cluster, 68, one
4  cluster -- I believe those were the only ones.
5  I believe we had one server.  That was server
6  17, or server 12, something like that.  We had
7  six clusters in all.
8      Q.  And what is a cluster?
9      A.  Built up of three servers.  Three
10  servers makes a cluster for robodialing.
11      Q.  So what do you understand it to mean
12  by cutting a cluster in half?
13      A.  We took -- so a cluster can produce
14  520,000 calls per minute.  We cut that in half.
15  Instead of us sending 520,000 calls to Scott
16  and Mike's room, we took that in half and sold
17  half of it to another room that Scott knew of
18  and gave him half of the cluster.
19      Q.  And do you know what Room 2 is?
20      A.  I don't even remember Room 2.  I
21  think it was an Indian man that was from -- I
22  would like to assume he's potentially from
23  Panama City or somewhere else, another country
24  entirely.  He was hiring Scott and Mike to show
25  them how to sell health insurance because I put

96

1  them in contact with each other.
2      Q.  And do you know who ran Room 2?
3      A.  Huh-uh.  I don't even remember the
4  gentleman's name.
5      Q.  Is it that gentleman you're talking
6  about that ran Room 2?
7      A.  Uh-huh.
8      Q.  What do you understand it to mean --
9  and sorry.  Again, if you could, just make sure
10  we're doing "yes" or "no."
11      A.  Uh-huh, yes.
12      Q.  What do you understand it means when
13  it said that leads are sent every day?
14          DEFENSE COUNSEL:  Objection.
15      A.  Leads are sent every day meaning
16  every time a client presses one, it becomes a
17  lead; and the leads are sent into rooms, every
18  time that someone pushes one.  So you have to
19  make your -- your message sound enticing, first
20  off, make it sound as if it's something they
21  would like to listen to, they would like to
22  speak to a live agent about.
23      Q.  (BY MR. ABERNETHY)  So who presses
24  one?
25      A.  The client, the prospect, the person

97

1  that we're dialing.
2      Q.  And do you know who sent Rising Eagle
3  leads every day?
4      A.  Scott and Mike Shapiro -- Scott
5  Shapiro and Michael Smith.
6      Q.  And how do you know that during that
7  time?
8      A.  Because Jakob would tell me.  Jakob
9  wouldn't be able to run the business -- well,
10  we had a stockpile of leads as well.  We had a
11  stockpile of leads that Scott and Mike sent us
12  since 2018 or 2017.  We were always saving the
13  leads that they would send us; and I would have
14  Jakob try to mark on there which leads were
15  good, which leads were not, which leads gave us
16  the best returns, what leads didn't.
17      Q.  Why were you stockpiling leads at
18  that time?
19      A.  Because we were dialing millions of
20  people a day.  We had to make sure we had the
21  data because -- because at some point we were
22  dialing more than 3 million numbers in a day
23  and Scott and Mike would only send us 3 million
24  numbers in a day; sometimes they'd only send us
25  1.5 million.

98

1      THE WITNESS:  Can I shut this?
2      MR. ABERNETHY:  Yeah.
3      Q.  (BY MR. ABERNETHY)  Did Michael Smith
4  know you were stockpiling leads?
5      DEFENSE COUNSEL:  Objection.
6  A.  Yeah, they -- they all did.
7      Q.  (BY MR. ABERNETHY)  How do you know
8  that?
9  A.  Because we told --
10     DEFENSE COUNSEL:  Objection.
11  A.  -- them.  We told them we were saving
12  the leads.  I mean, shoot, whenever this
13  lawsuit came on me, I had to call them and ask
14  them if they had any opted-in leads they can
15  send me.  And Omar tried to find them, and Omar
16  couldn't find them.
17     Q.  (BY MR. ABERNETHY)  Omar who?
18  A.  Omar Hibbert.
19     Q.  So what was your agreement with
20  Michael Smith about those leads?
21  A.  He had told me that the majority of
22  them are scrubbed against the federal
23  do-not-call registry.  When he'd send us a new
24  file, he'd say they were scrubbed against the
25  federal do-not-call registry.  We don't need to

99

1  scrub them again.  That was pretty much it.
2      Q.  And why were you contacting Smith
3  about opt-in leads?
4  A.  Because the indictment stated I
5  dialed a billion numbers, which I knew that was
6  incorrect, because R Squared told me that the
7  max amount of calls I made during those three
8  months was around 400 million, nowhere near
9  1 billion.  So I was calling Michael Smith and
10  trying to get hold of Scott Shapiro.  No one
11  answered, but Omar Hibbert answered.  Hibbert
12  answered; and I told him I needed the opted-in
13  leads for these calls that they had sent me,
14  the leads they had sent me in the past.
15     Q.  So did you talk to Scott Shapiro
16  about opt-in leads after the lawsuit?
17     DEFENSE COUNSEL:  Objection.
18  A.  I don't remember.
19     Q  (BY MR. ABERNETHY)  Did Omar Hibbert provide
20  you with any of these leads?
21  A.  Huh-uh.
22     MS. REYES:  "Yes" or "no"?
23     THE WITNESS:  No.
24  A.  By the time Omar Hibbert came into
25  being, Jakob was managing the business.

100

1      Q.  (BY MR. ABERNETHY)  And at this time
2  was R Squared the only company that you
3  obtained VoIP from?
4  A.  In 2018, yes.  In 2019, it changed.
5  I had to go and find Avid Telecom.  I found
6  other carriers as well, other vendors that are
7  no longer with me; but they were back in those
8  days.
9      Q.  What were those carriers?
10  A.  Americonnect, Avid Telecom.  I -- I
11  don't even remember all the others.  I think
12  there was one called Mash.  Another one got
13  indicted by the FTC for numerous things and got
14  shut down.  I don't remember all the names of
15  my clients from those days.
16     Q.  Do you know who Talkie Communications
17  is?
18  A.  Uh-huh.
19     MS. REYES:  "Yes" or "no"?
20     Q.  (BY MR. ABERNETHY)  Were they one of
21  those clients?
22  A.  Yes, vendors.
23     Q.  Vendors?
24  A.  Yes.
25     Q.  And are all those vendors, were those

101

1  used to send calls from your dialer?
2  A.  Say that again.
3      Q.  Did you use all of those vendors to
4  send calls through your dialers?
5  A.  Yes.
6      Q.  Okay.  In the call that we heard,
7  what do you understand it to mean when you said
8  you hid his name?
9      DEFENSE COUNSEL:  Objection.
10  A.  It means that I didn't put down the
11  name of their business, which was Health
12  Advisors of America.  I put down "health room."
13     Q  (BY MR. ABERNETHY)  So who do you understand
14  to be the "his" in that statement, hid his name?
15     DEFENSE COUNSEL:  Objection.
16  A.  Scott Shapiro and Michael Smith or
17  Health Advisors of America.
18     Q.  (BY MR. ABERNETHY)  And when you say
19  "put down," what do you mean by that?
20     DEFENSE COUNSEL:  Objection.
21  A.  Put on record so that they could --
22  so that the FCC or the FTC would be able to
23  find them relatively quickly.
24     Q.  (BY MR. ABERNETHY)  And what records
25  do you mean?

102

1      DEFENSE COUNSEL:  Objection.
2      A.  The records that are in the -- in
3  each of the carriers.  Each of the carriers I
4  had to sign up I signed up under Rising Eagle
5  Capital Group as the main company.  I protected
6  their names.  Instead of me listing them as the
7  ones buying the leads or buying the minutes, I
8  put them under Rising Eagle Capital Group as
9  buying the minutes for their room.
10     Q.  (BY MR. ABERNETHY)  And why would you
11 do that?
12     DEFENSE COUNSEL:  Objection.
13     A.  To protect them.
14     Q.  (BY MR. ABERNETHY)  Protect them from
15 what?
16     DEFENSE COUNSEL:  Objection.
17     A.  Lawsuits or any kind of -- because
18 during that time, they were getting into a lot
19 of lawsuits because of robodialing people on
20 the federal do-not-call registry or breaking
21 the TCPA laws.
22     Q.  (BY MR. ABERNETHY)  And were you
23 asked to do that?
24     DEFENSE COUNSEL:  Objection.
25     A.  I might not have been asked.  I was

103

1  just letting them know that I did it because he
2  was my only client.  They were -- they were the
3  main reason I got into what I did, you know.
4  They were the ones that paid me in the
5  beginning to get started in this business.
6  They were my main clients the entire time.
7      Q.  (BY MR. ABERNETHY)  Did they ever
8  talk to you about that before you told them
9  that you did it?
10     DEFENSE COUNSEL:  Objection.
11     A.  I never did it before that.  I
12 started it when Michael Smith called me and
13 told me that he was receiving calls from Matt
14 Jones, my ex-business partner.  And he knew I
15 wouldn't appreciate that, so I started looking
16 into it and reading about it and learning about
17 how to generate more calls for that room.
18     Q.  (BY MR. ABERNETHY)  And to your
19 understanding, what did you mean when you said
20 "AI calls"?
21     DEFENSE COUNSEL:  Objection.
22     A.  Scott and Mike had told me previously
23 not to use robocalls anymore, in phone
24 conversations; and so we decided to use "AI
25 calls" as an acronym for robocalls.  It is what

104

1  it is in that world.
2      He even -- I would also like to
3  remember when Jakob got off the phone call the
4  first time and when Scott called back the
5  second time, that Scott had texted Jakob
6  something about that, about me saying
7  "robocalls," telling me not to use robocalls.
8  I don't remember exactly how all that stuff
9  panned out, played out; but -- and so whenever
10 he brought it up to my attention, he said, "I
11 don't -- I don't want to use press-1s or
12 robocalls."  That recollected me to what we --
13 our discussion that we discussed previously,
14 probably back in September or October of 2018,
15 when he told me he didn't want me to use robo-
16 -- "robodial" acronym or use the word
17 "robodial."
18     Q.  (BY MR. ABERNETHY)  And what do you
19 mean when you say "robodial"?
20     DEFENSE COUNSEL:  Objection.
21     A.  Automatically calling numbers and
22 where someone presses one to get connected to
23 an agent.
24     Q  (BY MR. ABERNETHY)  And what do you understand
25 "press-1 calls" to mean?

105

1      DEFENSE COUNSEL:  Objection.
2      A.  Robocalls.  Automated, prerecorded
3  messages playing; and the consumer presses one
4  if they want to speak to an agent.
5      Q.  So "press-1," "AI," and "robocalls"
6  would be interchangeable?
7      DEFENSE COUNSEL:  Objection.
8      A.  AI something different.  AI uses an
9  intelligent automated system that asks
10 questions and you can do a verbal response or
11 you can press one on it.  Usually it's verbal
12 responses.  AI uses verbal responses, verbal
13 cues.  If a client's asked, "Are you currently
14 looking for health insurance between the ages
15 of 18 and 65 years of age," if the client
16 answers "yes," then it goes to next question.
17 If the answer -- the client answers "no," it
18 basically hangs up the phone.
19     Q.  (BY MR. ABERNETHY)  But, to your
20 understanding, you would also use AI calls to
21 refer to robocalls?
22     DEFENSE COUNSEL:  Objection.
23     A.  Yes.
24     Q.  (BY MR. ABERNETHY)  So when it was
25 said on the voice recording we heard -- when

106

1  they said, "Do not use robocalls," what did you
2  understand that to mean?
3         DEFENSE COUNSEL: Objection.
4      A.  Not to repeat "robocalls" on the
5  phone.  That was my -- my mistake.
6      Q.  (BY MR. ABERNETHY)  And to your understanding,
7  was that the directive of your client, Health Advisors?
8         DEFENSE COUNSEL: Objection.
9      A.  Yes.
10     Q.  (BY MR. ABERNETHY)  Did you still make
11  robocalls after this conversation?
12         DEFENSE COUNSEL: Objection.
13     A.  Absolutely.  They wanted their room
14  filled up with calls.  How else was I supposed
15  to do it?
16     Q.  (BY MR. ABERNETHY)  Were you directed by
17  Health Advisors to make robocalls after this
18  conversation?
19         DEFENSE COUNSEL: Objection.
20     A.  No, but they continued to tell Jakob
21  that their call volume was down.  I mean, they
22  knew what we were doing.  I mean, that was the
23  first thing that Michael Smith did.  He made
24  sure that I built the platform, the first two
25  servers, in the beginning of our conversations;

107

1  and then he ended up -- at some point we were
2  discussing me coming to Florida and putting the
3  servers in-house in Florida for them.  And then
4  at some point I decided not to do that because
5  I was, like, shoot, if they get access to all
6  my servers and they just cut me out, then, I
7  will be left with nothing.  So it was my
8  strategic move to keep the servers in-house on
9  my end.
10     Q.  So how long after this conversation
11  did Rising Eagle send robocalls?
12     A.  It was sending robocalls since 2017.
13     Q.  For how -- for how long after that
14  conversation did Rising Eagle send robocalls?
15     A.  After this conversation?
16     Q.  Yes.
17     A.  Oh, all the way up until 2020.
18     Q.  And why did you stop at that point?
19     A.  I got in a lawsuit with the FCC and
20  your offices.  All of y'all's state offices I
21  got in a lawsuit with, and it scared the shit
22  out of me.
23     Q.  And I want to clarify the difference,
24  again, between AI and robocalls.  Do they both
25  deliver a prerecorded voice message?

108

1         DEFENSE COUNSEL: Objection.
2      A.  Yes.
3      Q.  (BY MR. ABERNETHY)  And can you explain any
4  other difference between an AI call and a robocall?
5         DEFENSE COUNSEL: Objection.
6      A.  Not really.  An AI call is usually
7  done -- like I'm saying, verbal cues allow --
8  allows it to go to the next question.  A "yes"
9  or a "no" confirmation does, not -- a press-1
10  is:  Press one or press two.  "Are you looking
11  for health insurance?  Press one.  If you're
12  looking to speak to an agent, press one.  If
13  you're looking to be placed on our do-not-call
14  list, press two or press nine.  If you're
15  interested in putting -- being put on our
16  do-not-call list, call our 800 number, 888" --
17  or whatever our 800 number was.  I don't
18  remember what our 800 number was.
19         But, you know, that was the
20  message that Lansky helped me work out to make
21  it fit to the FTC and FCC's protocols for --
22  for prerecorded messages.  It had to come with
23  a greeting with the name of the company.  It
24  had to identify the company's name.  Then you
25  would have -- also have to put an 800 number, a

109

1  call-back number in that message; and you have
2  to explain -- you have -- within the first
3  three seconds you have to give the option to
4  opt out of receiving any calls from us.
5      Q.  (BY MR. ABERNETHY)  And who is
6  Lansky?
7      A.  The owner of Avid Telecom.
8      Q.  What's his full name?
9      A.  Michael Lansky.
10     Q.  And just to rephrase my question from
11  earlier, does an AI call deliver a prerecorded
12  message?
13         DEFENSE COUNSEL: Objection.
14     A.  Yes.
15     Q.  (BY MR. ABERNETHY)  And a robocall
16  call deliver a prerecorded message?
17         DEFENSE COUNSEL: Objection.
18     A.  Yes.
19         MR. ABERNETHY:  Okay.  Can we go
20  to Exhibit 10?
21         (Exhibit 10 discussed.)
22     Q.  (BY MR. ABERNETHY)  Can you tell me
23  what you're looking at for Exhibit 10 --
24     A.  Recordings that --
25     Q.  One second.  This is Exhibit 10,

John Spiller - 3/2/2022

110

1    Bates Number Rising_Emails005850.
2        A.  I'm looking at recordings that Jakob
3    -- or that I sent Jakob that I must have
4    received from Jakob initially.  I don't know
5    where that e-mail went to.  Jakob would be
6    creating all of our messages.
7        Q.  So can you identify the e-mail
8    addresses?
9        A.  Yeah.  John Spiller is
10   rpgleads@gmail.com.  Jakob Mears is
11   j.rpgleads@gmail.com.  John Spiller, again,
12   john@risingeaglecapital.com.  And John, again,
13   at john@jsquaredtelecom.com.
14       Q.  And can you tell me the date of the
15   e-mail?
16       A.  June 2020.
17       Q.  And was that your business e-mail
18   address?
19       A.  Yes.
20       Q.  Did anyone else have access to that
21   e-mail address?
22       A.  Jakob did.
23       Q.  Can you read the name of the
24   attachment in the e-mail?
25       A.  "Top_Health_2_&_9.wav; audio_1.wav."

111

1            MR. ABERNETHY:  And then can we
2    go to Exhibit 11, please?
3            (Exhibit 11 discussed.)
4            MR. ABERNETHY:  This is an audio
5    exhibit.
6            (Exhibit 11 audio clip playing
7    as follows:
8            Hi.  This is Ann.  I'm calling
9    to let you know that we have been granted a
10   limited health enrollment period for a few
11   weeks so you and your family can get a great
12   insurance plan at the price you can afford.
13   And we make it hassle free to sign up.  We have
14   pre-approvals ready in your area, including
15   Cigna, Blue Cross, Aetna, United, and many
16   more.  Press 1 to get a hassle-free assessment,
17   or press 2 to be places on our do-not-call
18   list.  Thanks for your time, and be healthy and
19   blessed.)
20           (Audio playback ended.)
21       Q.  (BY MR. ABERNETHY)  Can you identify
22   that?
23       A.  That was a prerecorded message that
24   we recorded to generate calls, but I don't even
25   think that was all the recording.  I think I

112

1    just ended up sending it back to Jakob and told
2    him, "At the beginning you need to list the
3    company name."  I don't know if that listed a
4    company name in the beginning.  And then, also,
5    I told him to put an 800 number in on the
6    message.
7        Q.  Did anybody else give you directions
8    for that call?
9        A.  Not that I know of.
10       Q.  And what were you going to use that
11   call for?
12       A.  Generating insurance, health
13   insurance, leads.
14       Q.  For who?
15       A.  Scott and Mike's room.
16       Q.  All right.
17       A.  And I also believe that was one of
18   the recordings that they didn't like.  They
19   ended up telling us to switch it out with
20   another one.
21       Q.  Do you recall why?
22       A.  They said they didn't like it.  I
23   don't remember why; but I do remember "Ann" in
24   the -- in the e-mails and texts back and forth,
25   saying they didn't like Ann.

113

1        Q.  So after jail did you continue to
2    work for Rising Eagle?
3        A.  Uh-huh.
4            MS. REYES:  "Yes" or "no,"
5    please.
6            THE WITNESS:  Yes.
7        Q.  (BY MR. ABERNETHY)  Did your role
8    change at all?
9        A.  No.  I mean, I was battling court
10   stuff and all other kinds of stuff in my life.
11   I was also -- had checked into a rehab center,
12   as well, after getting out of -- out of jail.
13   I stayed in rehab, I believe, for -- actually,
14   in 2019, I didn't go -- I didn't go back into
15   rehab.  I had left rehab right before my arrest
16   in 2018.  So in 2018 I pretty much stayed in
17   rehab pretty much the entire time.
18       Q.  So what duties were you handling for
19   Rising Eagle at this time?
20       A.  Just making sure that the business
21   was still afloat that the clients were paying.
22   I guess that was roughly about it.
23       Q.  And who were your clients at this
24   time?
25       A.  Michael Smith and Scott Shapiro, as

114

1 well as -- I think by that time we had lost the
2 second group, that second group that we were
3 talking about in that -- in that room, because
4 they were sending me a million leads or two
5 million leads at a time; and those leads were
6 garbage. They were crap. They wouldn't pull
7 any data. So instead of keeping them on and
8 draining our -- increasing our costs in our
9 dialer, we ended up putting 48 back on to
10 Health Advisors of America.
11     Q.  And who was in that group?
12     A.  Scott Shapiro and Michael Smith.
13     Q.  The second group?
14     A.  No, I don't -- I don't remember who
15 was in that group. I said that before.
16     Q.  Was Sumco a client at that time?
17     A.  No, Sumco didn't become a client
18 until Twenty- -- until the middle of 2020.
19     Q.  And at that time was Jakob still
20 working at Rising Eagle?
21     A.  Uh-huh.
22     MS. REYES:  "Yes" or "no"?
23     THE WITNESS:  Yes.
24     Q.  (BY MR. ABERNETHY)  What were his duties?
25     A.  Maintaining -- actually, around June

115

1 or July, we shut down the call center, all the
2 robodials.
3     Q.  Why did you do that?
4     A.  Because of the lawsuit.
5     Q.  Was there any change to Jakob's role
6 or duties once you got out of jail?
7     A.  Not initially, no. It wasn't until
8 2020, until I got the lawsuit when I -- you
9 know, he -- he bowed out. I told him he had to
10 -- I apologized for bringing him into the
11 business just to get us a house in 2018; and I
12 felt horrible for that. I drew -- I drawed him
13 into being an owner of the business; and he's
14 now getting a lawsuit, which should have only
15 fallen on me and not on him. He only used
16 Rising Eagle Capital to get us a house. That
17 was it.
18     Q.  And at this time, does Rising Eagle
19 still have any active clients?
20     A.  Currently?  No. Rising Eagle filed
21 bankruptcy.
22     Q.  When was that?
23     A.  Last year, the beginning of last
24 year.
25     Q.  Were they still active up until that

116

1 point?
2     A.  No, they were all done. No money was
3 coming in at all since June of 2020.
4     Q.  That's when Rising Eagle shut down?
5     A.  Yes. When the lawsuit happened,
6 Rising Eagle Capital shut down. It's hard to
7 -- it's hard to maneuver when you have a
8 Two-hundred-and-fifty-thou- --
9 250-million-dollar lawsuit against you.
10     MR. ABERNETHY:  Do we want to
11 take a break for lunch, a quick break? It can
12 be a short one.
13     THE VIDEOGRAPHER:  All right.
14 We'll go off at 12:53.
15     (Lunch break 12:53 to 1:32 p.m.)
16     THE VIDEOGRAPHER:  All right.
17 We're back on the record. It's 1:32.
18     Q.  (BY MR. ABERNETHY)  All right. Did you
19 communicate with anybody over the break about this
20 deposition?
21     A.  No.
22     Q.  And do you know of a company named
23 JSquared Telecom?
24     A.  Yes.
25     Q.  Were you an owner of JSquared?

117

1     A.  I was.
2     Q.  And was Jakob Mears an owner of
3 JSquared?
4     A.  No.
5     Q.  Was Jakob Mears an employee of
6 JSquared?
7     A.  No.
8     Q.  Were you the CEO of JSquared?
9     A.  Yes.
10     Q.  Did Jakob have any connections to
11 JSquared?
12     A.  No.
13     Q.  And what did JSquared do?
14     A.  Sell VoIP telecom minutes to Rising
15 Eagle Capital; and in the beginning, I had
16 Sumco as a client, as well, in 2020.
17     Q.  When did you start JSquared?
18     A.  2020.
19     Q.  More specifically, if you can
20 remember?
21     A.  December 2019, when I --
22 December 15th, 2019, I ended up telling Scott
23 and Mike that I had created another company
24 that was going to start selling them VoIP
25 telecom minutes instead of -- because in the

John Spiller - 3/2/2022

118

1    past, I was getting VoIP telecom minutes around
2    .005 cents, which was extremely expensive,
3    extremely costly. When I became a telco
4    provider, my cost per minute dropped
5    significantly and allowed me some leverage to
6    be able to sell VoIP telecom minutes to my
7    clients instead of selling them -- instead of
8    selling them per call basis.
9        Q.  So were you in jail when you started
10   JSquared?
11       A.  Huh-uh.
12           MS. REYES:  "Yes" or "no"?
13           THE WITNESS:  No.
14       A.  2018 was when I was in jail.
15       Q.  (BY MR. ABERNETHY)  And you started
16   JSquared at the end of 2019?
17       A.  Yes.
18       Q.  Did anybody start JSquared with you?
19       A.  No.
20       Q.  And did you know a company named --
21   or do you know a company named Veriswitch?
22       A.  Yes.  I explained that to you on this
23   initial e-mail spread between myself and the
24   owner of Veriswitch.
25       Q.  And can you say again who is the

119

1    owner of Veriswitch?
2        A.  Umberto Mautone.
3        Q.  And did Veriswitch help you start
4    JSquared?
5        A.  No.
6        Q.  Did they have any relationship with
7    JSquared?
8        A.  Yeah.  They were a Switch that I used
9    to facilitate the DIDs that I was buying
10   legitimately for Rising Eagle Capital.
11       Q.  And how did you come to know them?
12       A.  Through a gentleman that was a friend
13   of Umberto's, was friend of mine, as well, that
14   worked indirectly for Rising Eagle.  He would
15   download data, make sure that all the data
16   streams were running correctly.  His name was
17   Dean Hansen.
18       Q.  And how did you know Dean Hansen?
19       A.  From Ryan, the owner of R Squared.
20   Kalcowitz (PHONETICALLY SPELLED), I believe, is
21   his last name.
22       Q.  Ryan Kalcowitz?
23       A.  "Karcowitz," something like that.
24       Q.  What does JSquared stand for?
25       A.  JSquared.  I got it from R Squared.

120

1        Q.  Okay.  And did Dean Hansen help you
2    start JSquared?
3        A.  No.
4        Q.  What was his relationship with
5    JSquared?
6        A.  Just a data guy.  He helped me run my
7    Switch for the first year when I was in
8    business.
9        Q.  And you said he worked indirectly.
10   What did you mean by that?
11       A.  He worked indirectly for Rising Eagle
12   Capital as well as JSquared.  He worked
13   primarily for JSquared running the Switch.  He
14   would unload clients, unload vendors, bring
15   vendors to me, make sure I was -- because I
16   didn't know how to operate a Switch.  There's a
17   lot of in -- inherent details in running a
18   Switch.  I just didn't have that knowledge.
19   I'd never -- I'd never owned a business in the
20   telecom space before.
21       Q.  So what were your duties, generally,
22   with JSquared?
23       A.  Making sure that the business was
24   running, just -- really just try to make sure
25   that my clients were happy with the routes I

121

1    had, made sure I was talking to my clients
2    every day on Skype.  I spoke to them in regards
3    to how the routes were coming along, how the
4    routes needed to change, how they saw FAFS on
5    the -- FAFS is when a number is dialed and it
6    goes to no-man's-land or it goes to a
7    recording.  That's called FAFS calls.  Those
8    are basically ways that telecom providers run
9    up free minutes, and they bill per minute.
10           That's basically all my
11   day-to-day activities and dealings was with
12   JSquared.  I was just maintaining the
13   relationship between myself.  And with Health
14   Advisors, we never billed them per minute.  In
15   the beginning we were trying to get to that
16   point.  We were even going to try to teach
17   Michael Smith -- he -- he found one of his
18   friends or one of his guys within the room that
19   was supposed to learn how to use the dialer
20   that we built; but, you know, again, I think
21   they felt that that would make them perceive
22   that they were guilty or found guilty if they
23   were ever caught with that kind of knowledge of
24   how to run the dialer.
25       Q.  Do you have any employees for

122

1 JSquared?
2      A.  Not that I remember.
3      Q.  Did JSquared compensate Dean Hansen
4 for the work?
5      A.  $500 a week.
6      Q.  Was there anybody else that was
7 indirectly working for it?
8          (No audible response.)
9          MS. REYES:  Was that answered?
10         THE WITNESS:  No.
11     Q.  (BY MR. ABERNETHY)  Did Rising Eagle
12 compensate Dean Hansen?
13     A.  I don't remember.  Y'all guys have my
14 bank statements.  I think that's a question you
15 could answer y'all's selves.
16     Q.  Did JSquared have clients?
17     A.  Yes.  Rising Eagle Capital was a
18 client.  Sumco later became a client.  I can't
19 remember all the other clients that I was able
20 to find.  Being on Skype and telling the world
21 that I'm a VoIP telecom provider robbed me of a
22 ton of clients for VoIP telecom minutes
23 strictly, never for -- never for calls.
24         I was basically trying to shut
25 down the calls operations in 2020 before the

123

1 lawsuit happened.  I was going to trans- --
2 transition over to just selling VoIP telecom
3 minutes because I figured that would be a
4 little less risky and more profit.
5      Q.  And so was Sumco Panama a client of
6 JSquared?
7      A.  Until the end of 2020, yes, sir.
8      Q.  What did JSquared provide for Sumco?
9      A.  Telecom -- VoIP telecom minutes.
10 That was it.
11     Q.  And did you communicate with anybody
12 at Sumco?
13     A.  Yes.
14     Q.  Who?
15     A.  McDarius (PHONETICALLY SPELLED), the
16 owner.
17     Q.  Is that a last name?
18     A.  First name.
19     Q.  Do you know the full name?
20     A.  I don't remember his last name.
21     Q.  And earlier you said Michael Smith
22 was training someone to manage a dialer.  Do
23 you know who that person was?
24         DEFENSE COUNSEL:  Objection.
25     A.  I don't remember.

124

1      Q.  (BY MR. ABERNETHY)  How did you know
2 that he was training somebody to manage a
3 dialer?
4          DEFENSE COUNSEL:  Objection.
5      A.  Because Jakob had a sit-down -- had a
6 sit-down with him on the phone to go over how
7 to run the dialer.
8      Q.  (BY MR. ABERNETHY)  He had a sit-down
9 with Michael Smith?
10     A.  Huh-uh, the gentleman that Michael
11 Smith found to run the dialer.
12     Q.  Did you observe that call that Jakob
13 had with him?
14     A.  I was in the background.
15     Q.  So you were on the call?
16         DEFENSE COUNSEL:  Objection.
17     A.  No.  He had it on speaker phone.  I
18 was in the background.  It was at the house in
19 Houston.
20     Q.  (BY MR. ABERNETHY)  And you never
21 communicated with that person?
22     A.  Huh-uh.
23     Q.  When was that?
24     A.  In the beginning of 2020 or close to
25 the end of 2019.  Like I'm saying, around

125

1 December 15th, 2019, I tried to shut down
2 Rising Eagle Capital because I realized what I
3 was doing was illegal.  And Mike and Scott were
4 already in a lawsuit with one of the states --
5 I believe it was South Carolina -- and they put
6 a lot of pressure on them to where Scott called
7 me and said, "Hey, I'm going to -- I'm going to
8 drop your name.  Are you sure you're
9 protected?"
10         And I said, "Yes, I should be
11 protected."
12         And he said, "I'm going to drop
13 your name to them that you're the one sending
14 me calls."
15         And I was like, "Okay.  That
16 works."
17         So he dropped my name to them.
18 In less than six months, I was indicted with
19 this FCC lawsuit.
20     Q.  And can you tell me, again, did
21 JSquared have a business relationship with
22 Rising Eagle?
23     A.  Yes.
24     Q.  And what was the nature of that
25 relationship?

John Spiller - 3/2/2022

126

1    A.  Sold VoIP telecom minutes to Rising
2  Eagle Capital.
3    Q.  So did Rising Eagle transmit calls
4  through JSquared?
5    A.  Yeah, one would say that.
6    Q.  Did JSquared have a business
7  relationship with Health Advisors?
8    A.  No, only Rising Eagle Capital did.
9    Q.  But did JSquared have a business
10 relationship with O Health?
11   A.  I believe by O Health I had shut down
12 the Rising Eagle Capital bank account.  Like
13 I'm saying, on December 15th, 2019, I shut down
14 the bank account; and I transferred the funds
15 to JSquared Telecom so JSquared Telecom could
16 be running.  And the business relationship
17 between JSquared and Rising Eagle was to supply
18 VoIP telecom minutes and I was able to get it
19 at a cheaper rate than .005 cents, but I was
20 getting them through R Squared.  So then I was
21 able to build up my profit margin that
22 direction.
23   Q.  And what was that bank account that
24 you shut down?
25   A.  Rising Eagle Capital.

127

1    Q.  Who was that with?
2    A.  Bank of America.
3    Q.  And where did you transfer those
4  funds?
5    A.  To JSquared Telecom.
6    Q.  Where was that account?
7    A.  Bank of America.
8    Q.  So did JSquared ever bill Health
9  Advisors for any services?
10   A.  I believe we transitioned from using
11 Rising Eagle Capital's bank account, like I'm
12 saying, on December 15, 2019; and we switched
13 to JSquared Telecom's bank account from
14 December 15th, 2019, forward.  So with the
15 calls that we'd send them, with the payments
16 they would send us, they transitioned from
17 JSquared to -- from Rising Eagle to JSquared.
18   Q.  So during that period JSquared did
19 have a business relationship with Health
20 Advisors, are you saying?
21       DEFENSE COUNSEL:  Objection.
22   A.  Uh-huh.
23       MR. YEOMAN:  All right, Patrick,
24 one second.
25       For the record, John, was that a

128

1  "yes" or a "no"?
2        THE WITNESS:  Yes.
3    Q.  (BY MR. ABERNETHY)  And do you know
4  of a company named Rising Eagle Capital
5  Group-Cayman?
6    A.  Yes, sir.
7    Q.  Were you an owner of Rising
8  Eagle-Cayman?
9    A.  I set it up.  I incorporated it in
10 the Cayman Islands.  I was there on vacation.
11 I just didn't know how to set up a shell
12 company to buy -- I didn't know that the shell
13 company had to buy out Rising Eagle Capital out
14 of Texas until after the lawsuit had been filed
15 against me.  I didn't know how to run it.  Like
16 I was saying, I was a real novice when I
17 started the business.
18   Q.  I want to go back to JSquared real
19 quick.  So what -- at the end, what was that
20 relationship with JSquared and Health Advisors?
21       DEFENSE COUNSEL:  Objection.
22   A.  Strictly sending me payments for
23 calls that was delivered to them and sales that
24 they made on those calls.
25   Q   (BY MR. ABERNETHY)  And how did you bill

129

1  Health Advisors for that?
2    A.  They would send me a report of how
3  many sales that they did at the end of the week
4  and they would -- they would then take that
5  number and multiply it times $300 and that's
6  how they would pay me every week.
7    Q.  Who would send you that report?
8    A.  Sometimes it wasn't even a report.
9  Sometimes they just told me over the phone how
10 many sales that they made in a week.
11   Q.  Who was that that would tell you?
12   A.  Michael Smith, usually.
13   Q.  Did you ever bill them by minutes?
14   A.  Omar Hibbert I did.  I eventually was
15 able to get him on minutes.
16   Q.  And at that point did JSquared
17 continue making Rising Eagle calls as well?
18       DEFENSE COUNSEL:  Objection.
19   A.  JSquared never made calls.  Rising
20 Eagle Capital was the one that made the calls.
21 Again, JSquared Telecom was strictly a VoIP
22 provider for Rising Eagle Capital.
23       MR. ABERNETHY:  Again, John,
24 I'll have to ask you to not use the phone while
25 we're on the record here.

130

1    THE WITNESS:  You just went
2 silent.  So I didn't know if you were closing
3 out or what you were doing.
4    Q.  (BY MR. ABERNETHY)  Were you
5 communicating with anybody about the deposition
6 --
7    A.  No.
8    Q.  Okay.  So from your understanding,
9 was JSquared being compensated for the Rising
10 Eagle calls?
11    A.  Repeat that question.
12    Q.  Was JSquared being compensated for
13 Rising Eagle's calls?
14    A.  Yes.
15    Q.  By who?
16    A.  Health Advisors of America.
17    Q.  And did you communicate that
18 arrangement with Michael Smith?
19    A.  I'm sure.
20    Q.  Did you communicate that arrangement
21 with Scott Shapiro?
22    DEFENSE COUNSEL:  Objection.
23    A.  No, because Scott Shapiro wasn't the
24 one that sent -- was sending me my payments.
25 Scott Shapiro never sent me one payment.

131

1 Michael Smith was the one that sent me the
2 payments from the business account.
3    Q.  (BY MR. ABERNETHY)  Did anybody else
4 send you payments?
5    A.  Not that I remember.
6    Q.  Did you communicate that arrangement
7 with anybody else at Health Advisors?
8    A.  What arrangement?
9    Q.  The compensation to JSquared for
10 Rising Eagle calls.
11    A.  Yeah.  I told them I set up a new
12 company.  It's going to give us cheaper rates
13 per minute, and they can pay this new bank
14 account.  And they said, "Absolutely.  We'll
15 pay it."
16    Q.  All right.  So back to Rising
17 Eagle-Cayman, can you tell me, again, when you
18 started that?
19    A.  I think it was the summer of 2020 --
20 no.  It was the summer of 2019.
21    Q.  And what was the reason for starting
22 that?
23    A.  To protect myself against a lawsuit.
24    Q.  Did somebody advise you to do that?
25    A.  No.  Scott Shapiro told me he got in

132

1 a lawsuit with a state attorney's office and
2 they were suing him for, like -- I think they
3 settled around 50- or 2,500, something like
4 that -- 5,000 or 2,500; but, initially, they
5 were saying that it was upwards of around --
6 they were asking for somewhere around 300,000
7 or 500,000.  And during that time I was, like,
8 "I don't even have that kind of money."
9    So I -- I was in Cayman Islands,
10 working on a trading -- I signed up for a
11 workshop, a trading workshop; and it just so
12 happened to be in the Cayman Islands.  So I
13 decided to go down there and talk to an advisor
14 about starting a company in the Cayman Islands
15 to protect myself.
16    Q.  Did you talk to anybody else about
17 doing that?
18    A.  Huh-uh.
19    MS. REYES:  "Yes" or "no"?
20    THE WITNESS:  No.
21    Q.  (BY MR. ABERNETHY)  Did Rising
22 Eagle-Cayman offer any services?
23    A.  No.
24    Q.  Did it have any products?
25    A.  No.

133

1    Q.  Did it have any employees?
2    A.  No.
3    Q.  And was Jakob ever connected to
4 Rising Eagle-Cayman?
5    A.  I mean, he knew I set it up.  I told
6 him I set it up.  The only thing he ever did
7 was switch the ownership of Rising Eagle
8 Capital from mine and his name to Rising Eagle
9 Capital-Cayman.  That was the only thing he
10 did.
11    Q.  And when was that that Rising --
12 Rising-Cayman became the sole member of Rising
13 Eagle?
14    A.  Sometime at the beginning of 2020.
15    Q.  Who was the advisor that you talked
16 to about this?
17    A.  An attorney in the Cayman Islands.
18    Q.  Did that attorney recommend making
19 Rising Eagle-Cayman the sole member of Rising
20 Eagle?
21    A.  Uh-huh.
22    MS. REYES:  "Yes" or "no"?
23    THE WITNESS:  Yes.
24    Q.  (BY MR. ABERNETHY)  What was the
25 specific reason to do that?

John Spiller - 3/2/2022

134

1    A.  To protect myself against any
2   lawsuits.
3       Q.  And did anybody else besides that
4   advisor tell you to do that?
5       A.  Huh-uh.
6       Q.  And you don't know that attorney's
7   name?
8       A.  Huh-uh.
9           MS. REYES:  "Yes" or "no"?
10          THE WITNESS:  No.
11      Q.  (BY MR. ABERNETHY)  So did that
12  change the operation of Rising Eagle at all?
13      A.  No.
14      Q.  Did Rising Eagle-Cayman ever become a
15  member of JSquared?
16      A.  Yes.
17      Q.  Did it become the sole member?
18      A.  Yes.
19      Q.  And when was that?
20      A.  2020.
21      Q.  And what was the reason for that?
22      A.  The same reason for Rising Eagle,
23  just to protect it.  After Scott was going to
24  drop Rising Eagle's name to the Attorney
25  General of another state, I was like, "Oh,

135

1   shit.  I need to do something to protect
2   myself."  So I went ahead and told Jakob to add
3   it to -- Rising Eagle Capital-Cayman to
4   JSquared Telecom as well as Rising Eagle
5   Capital; but, I mean, honestly, it didn't
6   protect anything.  I didn't even do it
7   correctly.
8       Q.  And did anyone advise you to make
9   that switch for JSquared?
10      A.  No.
11      Q.  What was the reason for doing that,
12  then, just because you had been advised -- or
13  let me ask that again.
14          So nobody advised you to do that
15  switch for JSquared?
16      A.  Huh-uh.
17          MS. REYES:  "Yes" or "no"?
18          THE WITNESS:  No.
19      Q.  (BY MR. ABERNETHY)  And did that
20  change the operation of JSquared at all?
21      A.  No.
22      Q.  Did you communicate with Michael
23  Smith at all about this change?
24      A.  Yeah.  I told -- I told both of them
25  in a phone call that I was protected because I

136

1   set up a Cayman Islands bank -- company; and
2   it's going to protect me, supposedly.  I didn't
3   really understand how it was supposed to
4   protect me; but I just told them, "Yeah, I'm
5   protected."
6       Q.  And did you talk to him about that
7   lawsuit, Michael Smith?
8           DEFENSE COUNSEL:  Objection.
9       A.  Yeah, he did.  He spoke to me about
10  it.
11      Q   (BY MR. ABERNETHY)  And do you know who Great
12  Choice -- Great Choice Telecom, LLC is?
13      A.  I do.  I already answered that at the
14  beginning of this call.
15      Q.  Are you an owner of Great Choice
16  Telecom?
17      A.  No, I am not.
18      Q.  Who is the owner of Great Choice
19  Telecom?
20      A.  Mikel Quinn.
21      Q.  Did you create Great Choice Telecom?
22      A.  I did not.
23      Q.  Who created it?
24      A.  My past attorneys, Roth & Jackson.
25      Q.  Why did they create it?

137

1       A.  To make sure I have enough income to
2   be able to pay for their services.
3       Q.  And when was this started?
4       A.  July of 2020.
5       Q.  Are you an employee of Great Choice?
6       A.  I am.
7       Q.  Since when?
8       A.  Since the creation.
9       Q.  And did anyone direct your attorney
10  to create Great Choice?
11      A.  No, they -- no.
12          Listen, with the -- with the
13  attorney questions, I'd prefer if you'd ask
14  that to Roth & Jackson.  I don't have a clue on
15  any of their decisions that they made.
16      Q.  Okay.  I'm just asking what your
17  understanding is about it.  If you don't know,
18  you can say so.
19          So who came up with the business
20  name for Great Choice Telecom?
21      A.  That's a good question.  I don't
22  remember.
23      Q.  Okay.
24          MR. ABERNETHY:  All right.  Can
25  we go to Exhibit 59?

138

```
1        MR. DAVIDSON:  What page are you
2   going to go to?
3        MR. ABERNETHY:  So this is --
4   give me one second.
5        MR. FRANQUI:  Are we going to a
6   specific page, I'm assuming?
7        MR. ABERNETHY:  Yes.  We are
8   going to 019687.
9        Q    (BY MR. ABERNETHY)  And can you identify that
10  for me, again?
11       A.  John Spiller and Umberto Mautone.
12       Q.  And what is the context?
13       DEFENSE COUNSEL:  Objection.
14       A.  I haven't had an opportunity to read
15  it.  Can I read it?
16       Q.  (BY MR. ABERNETHY)  I mean, what are
17  we looking at as far as --
18       A.  I don't know.  Let me read it real
19  quick.
20       Q.  So you've identified two people in
21  the document.  Can you identify what -- what
22  these two people are doing in this document?
23       DEFENSE COUNSEL:  Objection.
24       A.  They're discussing something.
25  They're discussing Great Choice Telecom.
```

139

```
1        Q.  (BY MR. ABERNETHY)  Okay.  And what
2   platform are they discussing this on?
3        A.  Skype.
4        Q.  And can you start with the message
5   from onlywebleads at 4:20:49, starting at "yes,
6   sir" and read that for me, please?
7        A.  "Yes, sir.  I'll send it to you when
8   I get it, and you can send it to Dawz,
9   Americonnect, and Talkie" [sic.]
10          "That should come from you."
11          "Okay.  Or from Mikel Quinn."
12          "Still better, yes" [sic.]
13          "Okay.  Will do."
14          "You could always technically
15  work for Mikel Quinn," Umberto says.
16       Q.  So now we're on page 019688.
17       A.  Umberto says, "Kind of like Deniro in
18  Casino, who could not legally run his casino.
19  So he took the title of food and beverage
20  manager."
21          "Yes, I do.  He has put me as
22  the president" [sic.]
23          "I love those mafia movies,"
24  Umberto says.
25          "That's awesome."
```

140

```
1        "Casino -- Casino and
2   Goodfellas, classics."
3        "Yes, I do.  Put me on an as
4   president" [sic.]
5        "That's good, too."
6        "Yes, sir, that is true.  That
7   is the same thing I'm doing under Mikel Quinn"
8   [sic.]
9        Q.  So we're moving to 019689 now.
10       A.  "Alternative Solutions, Incorporated
11  just signed up for my services" [sic.]
12          "You can put his comp- -- his
13  company under Great Choice Telecom" [sic.]
14          "Can you make my rate deck that
15  you're giving to Carlito for Horizon at least
16  60 percent above the cost to me so that I can
17  make some money all the way around?"
18       Q.  You can stop.
19       A.  Okay.
20       Q.  Thank you.
21          So can you tell me what your
22  understanding is of --
23       A.  This is a conversation --
24       DEFENSE COUNSEL:  Objection.
25       A.  -- I was having with Umberto Mautone
```

141

```
1   and myself in regards to -- in regards to my
2   business with Great Choice Telecom.
3        Q.  (BY MR. ABERNETHY)  And can you
4   explain what you mean when you said, "Yes, I
5   do.  He has put me as the president"?
6        A.  That was an indirect statement.  That
7   wasn't a true statement.  I was embellishing.
8   I wanted to seem like I had a larger role than
9   what I did in the business.
10       Q.  Why did you want to do that?
11       A.  Because I didn't want to tell the
12  world that I'd screwed up so badly that I got
13  in a 250-
14  million-dollar lawsuit robodialing and lost
15  both my business [sic] relatively in the same
16  month, the month of June.
17       Q.  So were you the CEO of Great Choice?
18       A.  No, never was.
19       Q.  All right.
20       MR. ABERNETHY:  Can we go to
21  Exhibit 53, please?
22          (Exhibit 53 discussed.)
23       Q.  (BY MR. ABERNETHY)  And so we are on
24  Exhibit 53, page Skype 008112.  And can you
25  identify this document?
```

John Spiller - 3/2/2022

142

1   A.  It's a discussion, it looks as if,
2   with Michael Lansky and John Spiller with
3   onlywebleads.
4        Q.  And can you tell me, again, who
5   Michael Lansky is?
6        A.  The owner of Avid Telecom.
7        Q.  And can you read this for me?
8        A.  Michael Lansky, "But they also had a
9   lot of India-originated traffic, too.  I think
10  that's what put the nail in the coffin, but I'm
11  not really sure.  They received a letter from
12  the Justice Department and basically were told
13  to do business a certain way or get a huge fine
14  or just get out of business, and he chose the
15  latter.
16           "Good afternoon, John.  Any
17  update from your end on the payment?  Okay.
18  Thanks.
19           "Good morning, John.  We are not
20  seeing any traffic from you this morning."
21           "I'm still working on it" --
22  this is what I said.  "I'm still working on it
23  with PayPal right now.  I'll keep you posted.
24           "Lansky, I'm going to be the new
25  CEO of the new telecom company so I can

143

1   continue to run my traffic if the FCC shuts off
2   my business.  The company is called Great
3   Choice Telecom, LLC.  The new owner is Mikel
4   Quinn.  He will have the FCC 499 this week as
5   well" [sic.]
6           "Good morning, John.  Good to
7   know.  Let me know if you're ready to transit
8   over to the new company.  By the way, please
9   call me Michael.  I prefer it" [sic.]
10       Q.  You can stop.
11       A.  Uh-huh.
12       Q.  Thanks.
13       A.  Again, that was another embellished
14  statement that I made stating I was CEO of a
15  company that I was never CEO of.  I've never
16  been put on paper that I'm a CEO of anything.
17  It's never been said I was president of
18  anything.  I've only said I've been a sales
19  representative for it, sales consultant, or a
20  Chief Operating Officer.  I've never had any
21  ownership of it.
22       Q.  So you said earlier that Great Choice
23  paid Michael Lansky $500 a month.  Was that to
24  be CEO?
25       A.  Not Michael Lansky.

144

1        Q.  I'm sorry.
2        A.  Mikel Quinn.
3        Q.  Mikel Quinn.
4        A.  Not to be CEO.  That was his
5   agreement with us, to maintain his living
6   expenses.
7        Q.  And then one more time, just to make
8   sure we're clear on the identities of the
9   people in this conversation, who is the user
10  Michael Lansky?
11       A.  Owner of Avid Telecom.
12       Q.  And who is the user onlywebleads?
13       A.  John Spiller.
14       Q.  And where does Michael Lansky work?
15       A.  Avid Telecom, Arizona.
16       Q.  So what services did Mikel Quinn
17  provide as CEO for Great Choice?
18       A.  What services?
19       Q.  What were his duties as CEO?
20       A.  Making sure and managing the
21  day-to-day activities, such as making sure the
22  dialer, that our clients were getting on.  He
23  would text me or call me and ask me how -- how
24  the clients were doing, asking if -- if I
25  needed him to do anything for me.

145

1           I always told him I had it; or
2   if I did need him to do something, I gave him a
3   number of a place to call.  He would call it
4   and try to bring them on as a carrier for us.
5        Q.  And where did he perform these
6   services from?
7        A.  From his cell phone.
8        Q.  Where was he located?
9        A.  In Houston, Texas.
10       Q.  Did his drinking problem affect his
11  duties at all?
12       A.  Yes.
13           (The videographer requests the
14  witness to adjust his microphone.)
15           MR. ABERNETHY:  All right.  Can
16  we move to Exhibit 54?
17           (Exhibit 54 discussed.)
18       Q.  (BY MR. ABERNETHY)  So we're going to
19  be on Exhibit 54, Skype 012629.
20           Can you identify this document?
21       A.  It's a Skype chat between myself and
22  -- that's it.
23       Q.  Okay.  Can you identify the user
24  onlywebleads?
25       A.  John Spiller.

146

1    Q.  Can you start at the bottom of page
2  12629, where it starts with, "Dean, when you
3  get a call," and read that for me, please?
4    A.  "Dean, when you get a call from Jay
5  Sacks that you used to work for Mikel Quinn,
6  that is me.  That is the alias now that my name
7  got ruined by the USTelecom.  Mikel Quinn is a
8  father figure in my life and allowed me to use
9  his name and step -- step [sic] up another
10  telecom business, Great Choice Telecom, LLC.
11  He is a great guy, just old, and doesn't
12  understand how to work a computer but has a
13  huge heart and loves to help those he sees got
14  hurt by malicious law practices.  Even though I
15  admitted to everyone that I ran a robodialing
16  campaign for a health insurance room in the
17  past, I can't seem to vindicate my name.  So
18  when you receive a call from Jay Sacks, I would
19  appreciate a kind review of the ass I was to the
20  ass I was to you.  I hope in time you will
21  forgive me.  I am very sorry for hurting your
22  feelings and putting you down the way I did.
23  I'm so sorry" [sic.]
24    Q.  And you can stop.  Thank you.
25      So what did you mean when you

147

1  said that Mikel Quinn was an alias?
2    A.  I was using Mikel Quinn's name in
3  some of my business dealings with other
4  vendors.  So instead of calling Mikel Quinn and
5  having him get on the phone -- he was drunk
6  around this time -- I would use his name and
7  say, "I'm Mikel Quinn calling on behalf of
8  Great Choice Telecom."
9    Q.  And what did you mean when you said
10  Mikel Quinn does not understand how to work a
11  computer?
12    A.  Oh, I was being an ass about that
13  statement.  He knows how to use a computer, and
14  he knows how to use his phone.
15    Q.  And do you know who Jay Sacks is?
16    A.  I don't remember who he is anymore.
17    Q.  So would you consider yourself the de
18  facto CEO of Great Choice?
19    A.  No.
20    Q.  Did you perform the duties of a CEO
21  of Great Choice?
22    A.  No.  I just ran the sales division,
23  the operations.
24    Q.  Did you present yourself as Mikel
25  Quinn, the CEO of Great Choice, to people?

148

1    A.  Sometimes I did.
2    Q.  And did Maggie Lawson help set up
3  Great Choice?
4    A.  Maggie who?
5    Q.  Lawson.
6    A.  I don't know who that is.
7    Q.  Is Maggie Lawson a signature --
8  signature on the Great Choice bank account?
9    A.  No.
10    Q.  Sorry.  Lucen.
11    A.  No.
12      MR. YEOMAN:  Girlfriend.
13      THE WITNESS:  No.
14    Q.  (BY MR. ABERNETHY)  So your
15  girlfriend did not help set up Great Choice?
16    A.  No.
17      What was her last name?
18    Q.  Lucen.
19    A.  No.
20    Q.  All right.  Does Great Choice have
21  any business relationship with Health Advisors?
22    A.  Huh-uh.
23      MS. REYES:  "Yes" or "no"?
24      THE WITNESS:  No, no, no, no,
25  no.

149

1    Q.  (BY MR. ABERNETHY)  Did it ever have
2  a relationship with Health Advisors?
3    A.  No.
4    Q.  Does Great Choice have a relationship
5  with O Health?
6    A.  No.
7    Q.  Did it ever have a relationship?
8    A.  No.
9    Q.  Does Great Choice have any clients
10  right now?
11    A.  Yes.
12    Q.  Who are those clients?
13    A.  Do you want me to list them for you?
14  Are you going to let me look at my phone and
15  give you the names?
16    Q.  Can you tell me what you can recall
17  right now?
18    A.  I have some political clients,
19  fundraising clients, the Democratic National
20  Committee and the Republican Committee.  The
21  Democratic National Committee here in Austin,
22  Texas.  The Republican Committee is out of
23  Minnesota, a call center.
24      I have some clients from Germany
25  that have a live transfer program set up

John Spiller - 3/2/2022

150

1 through the Philippines. They're producing a
2 lot of transfers, lead generation for health
3 insurance, life insurance, auto insurance
4 transfers.
5         I have a client from New York --
6 or New Jersey that sells the same stuff. He
7 also sells Medicare insurance.
8         All these clients I feel that
9 KYC, know your client, already with Great
10 Choice Telecom.
11     Q.  Is Sumco Panama a client of Great
12 Choice?
13     A.  No.
14     Q.  Were they ever a client?
15     A.  Not that I remember, no. I think by
16 the time I shut down JSquared Telecom, Sumco
17 Panama fell off; or if they were a part of it,
18 they were only part of it for three months, up
19 until 2021.
20     Q.  And does Great Choice have any
21 employees right now?
22     A.  Just myself.
23     Q.  Has it had other employees in the
24 past?
25     A.  Yeah. It had a gentleman that helped

151

1 run the Switch, named Spence Davis. He was the
2 one that taught me how to run the Switch.
3     Q.  And where was that?
4     A.  Where was...?
5     Q.  Where did he work for you?
6     A.  He worked for me here in Wimberley,
7 Texas. He would log into my Switch. We didn't
8 have to be at a physical area. That's the
9 nature of the business. We can be anywhere in
10 the world as long as we have internet
11 connection.
12     Q.  So can you explain to me the
13 difference in between JSquared and Great
14 Choice?
15         DEFENSE COUNSEL:  Objection.
16     A.  JSquared was owned and operated by
17 John Spiller. It allowed Rising Eagle Capital
18 to use its VoIP telecom minutes to send out
19 massive amounts of robocalls. Great Choice
20 Telecom does no such thing. It did have some
21 bad apples, bad clients on board; but in the
22 past three weeks we've cleaned house, threw
23 away all the bad clients, added a whole bunch
24 of new good clients, political fundraising
25 clients.

152

1         And, I mean, the difference is
2 night and day. Great Choice Telecom was set up
3 correctly from some attorneys from Virginia;
4 and JSquared Telecom was set up by a young man,
5 or a kid, in his middle-to-late thirties that
6 didn't have an understanding of business or any
7 knowledge of how to run it properly.
8     Q.  What caused you to get rid of those
9 clients three weeks ago?
10     A.  Oh, they were sending calls into
11 America that were illegal robocalls; or they
12 were sending Social Security scam calls,
13 elderly scam calls, into America. So I cut --
14 I cut off every person that got me a traceback
15 in the past year. They -- they were terminated
16 from my business effective -- or from Great
17 Choice Telecom, I should say, not my business,
18 but Great Choice Telecom.
19     Q.  And how'd you find out about that?
20     A.  Tracebacks.
21     Q.  So you said you were getting those
22 tracebacks?
23     A.  Mikel Quinn was receiving those
24 tracebacks and forwarding them to me when he'd
25 receive them.

153

1     Q.  Okay.
2     A.  And he would respond to it based upon
3 the information I gave him.
4     Q.  All right. We're going to go back to
5 Exhibit 59, and we're going to go to page
6 019535. And can you identify this for me?
7     A.  It's a message between me and Umberto
8 Mautone, the owner of Veriswitch.
9     Q.  And can you identify the user
10 onlywebleads?
11     A.  John Spiller.
12     Q.  And can you identify Umberto Mautone
13 The Wise?
14     A.  The owner of Veriswitch.
15     Q.  The user name for him?
16     A.  Umberto Mautone.
17     Q.  Thank you.
18         And what was this conversation
19 on?
20     A.  Sumco Panama.
21     Q.  I mean what was the platform?
22     A.  Veriswitch -- Skype.
23     Q.  And can you start at the bottom of
24 page 19535 with the message from onlywebleads
25 that starts with, "Umberto, we need to set up

154

1 the new company"?
2          MR. FRANQUI:  Which exhibit?
3 I'm sorry.
4          MR. ABERNETHY:  This is Exhibit
5 59 that's already been introduced.  It should
6 be in the chat for you.
7          MR. FRANQUI:  Yep, thank you.
8          MR. ABERNETHY:  And we're on
9 page 19535.
10          MR. FRANQUI:  Thank you.
11      A.  "Umberto, we need to set up the new
12 company on Veriswitch; and [sic] don't give it
13 any ports.  Just create it so...we can start
14 building out the carriers on it."
15          "signup@veriswitch.com" [sic.]
16      Q.  (BY MR. ABERNETHY)  And we're now on
17 019536.
18      A.  "Sign up here."
19          "Then if or when JSquared gets
20 cut off, then you can the switch ports from
21 JSquared to Great Choice Telecom" [sic.]
22          "Easily done."
23          "Then turn the clients on from
24 JSquared to Great Choice Telecom.  We should
25 create all the clients under Great Choice

155

1 Telecom as well as under JSquared Telecom so if
2 one day they are -- they are on JSquared, then
3 the next day they can be on Great Choice
4 Telecom."
5          "I'll clone...the customer data"
6 [sic.]
7          "Thank you" [sic.]
8          "Especially TMC, Call Works,
9 Horizon, Sumco for now; and the other fall off
10 if not concerned with that" [sic.]
11      Q.  And we're now on page 019537.
12      A.  "Your bread-and-butter clients."
13          "Gotcha.  Just just gotta --
14 just got some information that can help you"
15 [sic.]
16          "It seems that the SPNI [sic]
17 law applies to wholesale carriers as well
18 (Customer Priority [sic] Network Information.)
19 The law has changed whereby information can be
20 gotten if a call is deemed fraudulent."
21          "Yes, sir, that is correct.
22 Then when I am...CEO of Great Choice Telecom,
23 then I can switch my clients from Great -- from
24 JSquared to Great Choice without letting
25 USTelecom know" [sic.]

156

1          "The traceback team has no idea
2 if your calls are fraud or not, but they mark
3 all tracebacks as fraud in order to get
4 carriers upstream to comply with the request"
5 [sic.]
6          "It is basically illegal" [sic.]
7      Q.  All right.  You can stop.  Thank you.
8          So did Great Choice take over
9 all of JSquared's clients?
10      A.  Not all of them.
11      Q.  Which ones did they take over?
12      A.  TMC is the political fundraising
13 client.  Call Works was a client.  They fell
14 off after I switched over to Great Choice.
15 Horizon had also fallen off by June.  By
16 June the 15th I got a call from Hibbert that
17 told me that he didn't want any business with
18 robodialing or us at all, and I agreed with
19 him.  I told him I was done with that.
20      Q.  Omar Hibbert?
21      A.  Uh-huh.  That was Horizon.  Horizon
22 was their group.  And Sumco Panama switched
23 over, like I'm saying, just for two months; and
24 then they fell off as well.
25      Q.  So how did that switchover change

157

1 work?
2      A.  It made me go out and find new
3 clients, cleaner traffic, clients -- more
4 clients that had -- allowed me to network with
5 TMC, the owners of TMC.  They were putting me
6 in contact with political fundraising clients
7 that they had.  They put me in contact with
8 them early on in 2020, in around June of 2020.
9 And since then I've been able to communicate
10 with their previous CEO for the past -- I'm
11 assuming I stopped talking to them around June
12 of 2021.
13      Q.  All right.  We're going to go to
14 Exhibit 64.
15          (Exhibit 64 discussed.)
16          THE WITNESS:  I just like how
17 y'all guys used all my Skype conversations.  I
18 should have edited it before I sent it.
19      Q.  (BY MR. ABERNETHY)  So we are on
20 Exhibit 64, page Skype 015264.  And can you
21 identify this for me, please?
22      A.  John Spiller, onlywebleads, "Found
23 you on hold."
24          Michael Smith, "Okay.  Cool."
25          "I added you to the Horizon

John Spiller - 3/2/2022

158

1  group. Can you see the Horizon Group on your
2  Skype chats?"
3      Q. And can you identify who the user
4  Michael Smith is?
5      A. The owner of Health Advisors.
6      Q. All right. We're going to go to
7  Exhibit 41.
8          (Exhibit 41 discussed.)
9      Q. (BY MR. ABERNETHY) All right. We
10 are on Exhibit 41, Skype 00001. And can you
11 identify this document for me, John?
12     A. John Spiller is onlywebleads. Omar
13 Aparicio is my VICIdial guy that I hired on to
14 the business to create VICIdials predictive
15 dialing for my clients. Jakob Mears is on this
16 chat. This is on the Horizon Group chat.
17     Q. Thank you.
18         And can you start at the message
19 from onlywebleads at 5:23:04 that starts,
20 "@Michael, meet my team," please?
21     A. "@Michael, meet my team. Team,
22 Michael is the big boss of the business [sic.]
23 After I get Omar, his new person that is
24 running the office, information for Skype, I'll
25 add him to this chat as well."

160

1  O Health Group, "Okay. Gonna
2  check it out now."
3      Q. And we are on page 00002 [sic] now.
4      A. onlywebleads, "So you can do some due
5  diligence with your team on the ones that they
6  just put -- they didn't push hard enough on or
7  they gave up too early. This is the tools that
8  we will send you daily so you can run your room
9  more proficiently."
10         onlywebleads, "@Jakob Mears
11 [sic] please send these reports to Omar daily
12 till I tell you otherwise."
13         "Will do."
14         "This will help him run his
15 business more smoother with less
16 complications."
17         It seems like onlywebleads added
18 michaeltheronsmithjr to the chat.
19         "Michael is added to this chat.
20 Can you see what I added today? @michael
21 smith."
22         "Removed michaeldbg from this
23 conversation."
24         Michael Smith, "Hello."
25         "Hey, Michael. How are you

159

1      "Hi, @Michael. Nice to meet
2  you," Omar says.
3          John Spiller says, "He is the
4  guy that runs everything behind the scenes for
5  Horizon Group."
6          We added someone to the chat.
7          Jakob Mears, "@John, Omar has
8  been added to chat."
9          So Omar Hibbert [sic] was added
10 to the chat.
11         "Horizon is here. This is
12 awesome."
13         "Guys, this is the group chat
14 for Horizon Group. Say hello to Omar, our
15 VICIdial tech, and to Mike -- and to Michael.
16 He's in this chat as well."
17         I don't know what that file -- I
18 don't know what those files are. It sounds
19 like the past ten minutes' calls and warm
20 transfers that were transferred over.
21     Q. Okay. Thanks.
22         Can you continue reading at,
23 "Those are the warm transfers"?
24     A. "Those are the warm transfers and the
25 regular transfers."

161

1  doing? Can you see the attachments I loaded
2  today for Omar to view it?"
3          "I'm good, bro. How are you?
4  Okay. I'll have him get on when he gets back
5  from the bank. We have four deals" [sic.]
6          That was at 11:00 a.m.
7      Q. And we're now on page 000003.
8      A. They have four deals, by the way.
9  "They have four deals, by the way," Michael
10 Smith says.
11         Jakob, "What is wrong with the
12 long calls they are getting?"
13         "That's not good, Jakob. Please
14 view their leads and switch out the ones that
15 are not performing."
16         Jakob says, "I'm on it."
17     Q. Thank you.
18         What is the Horizon Group?
19     A. It's Michael Smith's room, Michael
20 Smith's and Scott Shapiro's room. I believe by
21 that time Scott Shapiro had already bailed out
22 of Health Advisors of America, and he had
23 turned the ropes over to Michael Smith to run
24 the operations.
25     Q. And can you just read for me the date

162

1 on this -- these texts at the top of the page
2 you're on, 00003 [sic].
3   A.  6/3/2020.  That was before my
4 indictment with the FCC and y'all's group.  I
5 didn't get indicted until the 9th or the 10th.
6   Q.  And can you identify the user
7 michaeltheronsmithjr?
8   A.  The owner, Michael Smith.
9   Q.  He ran that account?
10  A.  Uh-huh.
11  Q.  And how do you know that?
12  A.  His picture's on it.
13  Q.  And what do you understand "long
14 calls" to mean?
15  A.  Calls that last over two or three
16 minutes.
17  Q.  And why is that significant?
18     DEFENSE COUNSEL:  Objection.
19  A.  It means that -- calls that last that
20 long usually means that there's supposed to a
21 close -- you're supposed to be having
22 prospective clients speaking to them through --
23 if someone's speaking to them for more than
24 five minutes, the majority of the time you know
25 that there's going to be a sale with those

163

1 calls.
2   Q.  (BY MR. ABERNETHY)  Do you have
3 access to the e-mail address that Mikel Quinn
4 would receive tracebacks on?
5   A.  No.
6   Q.  He would just forward them to you?
7   A.  Uh-huh.
8     MS. REYES:  "Yes" or "no"?
9     THE WITNESS:  Yes.
10  Q.  (BY MR. ABERNETHY)  Did you ever have
11 access to that account?
12  A.  No.
13     MR. ABERNETHY:  Can we take a
14 five-minute break?
15     THE VIDEOGRAPHER:  All right.
16 We'll go off at 2:33.
17     (Off the record from 2:33 to 2:44 p.m.)
18     THE VIDEOGRAPHER:  We're back on
19 the record.  It's 2:44.
20  Q.  (BY MR. ABERNETHY)  All right.  Do you know if
21 Health Advisors ever used a VICIdialer?
22  A.  Yes.
23  Q.  And how do you know that?
24  A.  They gave us access to it.
25  Q.  Who is "us"?

164

1   A.  Gave Rising Eagle Capital access to
2 it, myself and Jakob Mears, access to their
3 VICIdial so we can see how many calls are
4 coming from us and we can see -- because back
5 in the day we were the only vendor they used.
6 I believe they were using another vendor as
7 well; but then, I want to say it was around
8 month three I blew that vendor out of the water
9 by the amount of calls I was able to send them.
10  Q.  So did you personally have a login?
11  A.  The business had a login, not me
12 personally.  Rising Eagle Capital did.
13  Q.  Was that the only login that Rising
14 Eagle had?
15  A.  Uh-huh.  Yeah, we shared it.
16  Q.  Did Jakob have access to that login?
17  A.  Yes, he did.
18  Q.  Did JSquared have a login?
19  A.  No.  We used the same login --
20  Q.  Okay.
21  A.  -- that was created for Rising Eagle
22 Capital.
23  Q.  And could two people be logged in at
24 the same time with the same login?
25  A.  I believe so.

165

1   Q.  Can you just go back and explain:  In
2 your understanding, what is VICIdial?
3   A.  It's a PBX.  It's an operating system
4 that allows individuals -- agents, you call
5 them -- to get on the phone.  All of them are
6 connected to this VICIbox.  You could have 25
7 per one VICIbox -- 25 agents per one VICIbox;
8 and when you put them together, you can
9 increase it up to 150 agents, if you wanted, or
10 up to 200 or 300 agents, if you wanted.  The
11 VICIdial allows the agents to either be
12 considered for a predictive dialing, when the
13 call's made, someone picks up; then the agent's
14 phone also picks up; or another way to set it
15 is up, like, press-1.  When someone presses
16 one, they come on the phone the same way.  You
17 hear a beep.  You say, "Hello."  You go into
18 your pitch.
19  Q.  And do you know if Rising Eagle ever
20 made calls with Hello Hunter?
21  A.  Yes, sir.  Hello Hunter was the
22 application we used to build the robodialer.
23  Q.  And what was that application -- or
24 can you just describe --
25  A.  I have no clue about that

John Spiller - 3/2/2022

166

1 application. I'm not a programmer. And then,
2 I was introduced to those guys from Ryan or
3 from -- Dean Hansen introduced me to those guys
4 and told me that they're really good at
5 predictive dials and they're really good at
6 press-1 dials.
7      Q.   Right. From R Squared?
8      A.   Uh-huh.
9      Q.   So did you ever personally use Hello
10 Hunter --
11     A.   Yeah.
12     Q.   -- to make calls?
13     A.   That's what our be- -- that's what
14 our robodials were built out of, those servers.
15     Q.   And did you ever observe Jakob Mears
16 using Hello Hunter to make calls?
17     A.   Yeah.
18     Q.   Do you know about the average call
19 volume that Rising Eagle made for Health
20 Advisors, average daily call volume?
21          DEFENSE COUNSEL:   Objection.
22     A.   No, sir.
23     Q.   (BY MR. ABERNETHY)   Do you have any
24 idea of a metric of call volume?
25          DEFENSE COUNSEL:   Objection.

167

1      A.   I think in the beginning -- I just
2 can't say. I just can't say because, honestly,
3 in the beginning, we were barely sending them
4 any calls. It wasn't until sometime in the
5 mid- -- in the middle of it -- potentially, you
6 know, I would say in the beginning probably
7 around 250,000 calls to a million calls.
8      Q.   What would you say that would be as a
9 percentage of Rising Eagle's total calls?
10     A.   That was all of Rising Eagle's total
11 calls.
12     Q.   Did it fluctuate?
13     A.   Uh-huh.
14          MS. REYES:   "Yes" or "no"?
15          Depending on the data, yes.
16 Depending on the data and also on the DIDs that
17 we were using. Back in those days we weren't
18 using DIDs. Again, we were using disconnected
19 ANIs that we received from the owner of Globex.
20     Q.   (BY MR. ABERNETHY)   Do you know what
21 the peak of that call volume would have been?
22     A.   The peak?
23     Q.   The peak of the call volume for
24 Health Advisors.
25          DEFENSE COUNSEL:   Objection.

168

1      A.   No, I have no clue.
2      Q.   (BY MR. ABERNETHY)   Do you have any
3 clue about the low of that call volume?
4          DEFENSE COUNSEL:   Objection.
5      A.   No.
6      Q.   (BY MR. ABERNETHY)   Do you know what
7 DNC scrubbing is?
8      A.   Yes.
9      Q.   What do you understand that to mean?
10     A.   We have that on our system now,
11 federal scrubbing of the DNC list. All the
12 federal people that have gone on and removed
13 their number from the federal do-not-call
14 registry -- put their number on the general
15 call registry for the FCC.
16     Q.   And by on your system now, you mean
17 Great Choice?
18     A.   On Great Choice, on -- even on
19 JSquared we had it.
20     Q.   Did Rising Eagle have DNC scrubbing?
21     A.   Huh-uh.
22          MS. REYES:   Is that a "no"?
23          THE WITNESS:   No.
24     Q.   (BY MR. ABERNETHY)   Do you know what
25 DNC blocking is?

169

1      A.   No -- DNC blocking on Veriswitch?
2      Q.   Just do you have any understanding of
3 the phrase "DNC blocking"?
4      A.   I know it's a -- it's a functionality
5 on Veriswitch that if a call is trying to go
6 outbound and that person's on the federal
7 do-not-call registry, it automatically searches
8 for it; and it cancels the call.
9      Q.   So did Rising Eagle ever have that?
10     A.   Huh-uh.
11          MS. REYES:   "No"?
12          THE WITNESS:   No.
13     Q.   (BY MR. ABERNETHY)   Did Rising Eagle
14 ever use any other type of DNC blocking?
15     A.   No. We trusted what Smith was
16 telling us when he said he scrubbed the leads.
17 We trusted that he scrubbed the leads. We
18 never had a SAN number.
19     Q.   What's a SAN number?
20     A.   It's the FCC number you get when you
21 purchase the federal do-not-call registry
22 download.
23     Q.   So did Michael Smith tell you how he
24 was doing that?
25          DEFENSE COUNSEL:   Objection.

Integrity Legal Support Solutions
www.integrity-texas.com

170

1    A.  He said he had a SAN number.
2    Q.  (BY MR. ABERNETHY)  Did you have any other
3  call-blocking lists that you would use?
4    A.  Huh-uh.
5        MS. REYES:  "No" or "yes"?
6        THE WITNESS:  No.
7    Q.  (BY MR. ABERNETHY)  Did you have a
8  TCPA call list?
9    A.  Not that I remember.  We might have.
10  Again, I don't -- I don't have a clue in the
11  past.
12    Q.  Did you ever have a litigator list?
13    A.  Yes, we did.  We got it from one of
14  our clients, Michael O'Hare.  He had a
15  litigators list he would sell to us for $750 a
16  month.
17    Q.  And can you explain what your
18  understanding of a litigator list is?
19    A.  It's all the attorney law firms that
20  are setting up honeypots, what are called,
21  where they buy ANIs and they put them out on
22  the internet.  They want people to call them.
23  When people call them, they find out the
24  company that they're associated with.  They
25  file a lawsuit -- a TCPA violation against

171

1  them, file a lawsuit against them, and try to
2  collect anywhere from a thousand dollars up to
3  50,000 or up to a hundred thousand.
4    Q.  So if you had an opted-in list, would
5  you have a need for a TCPA litigator list?
6        DEFENSE COUNSEL:  Objection.
7    A.  Yeah, I'd still need that.
8    Q.  (BY MR. ABERNETHY)  Why would you
9  still need that if you have an opted-in list?
10    A.  Because an opted-in list doesn't
11  prevent the lead sellers from putting in
12  fictitious leads.  A lot of times lead sellers
13  would pad the leads with more aged data that
14  they acquired in the past without scrubbing
15  them against the federal do-not-call registry.
16    Q.  Can you explain what you mean by
17  "fictitious leads"?
18    A.  It's a lead.  They just never
19  scrubbed it against the federal do-not-call
20  registry.  So being that they never scrubbed it
21  against the federal do-not-call registry means
22  that they're selling us a lead that may be
23  federal DNC'ed, which means you're not supposed
24  to call any of those numbers.
25    Q.  But it's being sold as a scrubbed

172

1  list?
2    A.  It's being -- yes, as a DNC scrubbed
3  list, yes, sir.
4    Q.  Do you know what a rotating ANI is,
5  A-N-I?
6    A.  Yes.
7    Q.  What do you understand that to be?
8    A.  It's -- on Veriswitch, when we buy
9  DIDs, like the 300,000 I bought for the Horizon
10  Group in the past, we would load them into the
11  system.  The system would automatically pick a
12  next number to dial outbound.  It would pick
13  random numbers at random, and they were all
14  lists within the DID lists.
15    Q.  So did Rising -- did Rising Eagle
16  rotate ANIs?
17    A.  We personally rotated ANIs.  We never
18  used Veriswitch until the beginning of 2019.
19    Q.  What do you mean you personally
20  rotated?
21    A.  We had the DIDs that we got from
22  Mohammed Souheil, and Jakob would manually go
23  in and change it every hour.
24    Q.  Did anybody else besides Jakob do
25  that?

173

1    A.  No.
2    Q.  Did JSquared rotate ANIs?
3    A.  Yes.
4    Q.  And how did they do that?
5    A.  We'd buy legitimate DIDs, and we
6  would rotate them in the DID rotator.
7    Q.  And would you do that personally?
8    A.  Nothing was done personally.  It was
9  done via Veriswitch.
10    Q.  Okay.  So why do you rotate an ANI?
11    A.  So that the calls don't get blocked
12  as "Scam Likely."
13    Q.  Do you try and match by area code?
14    A.  No, that's neighborhood spoofing.  We
15  do not do that.  Like I said, it's picked at
16  random.
17    Q.  Does Great Choice rotate ANIs?
18    A.  No.
19    Q.  Did you ever rotate ANIs for Health
20  Advisors?
21    A.  Yes.
22    Q.  Would Rising Eagle?
23    A.  No.
24    Q.  Would JSquared?
25    A.  Yes.

John Spiller - 3/2/2022

174

1    Q.   Would Great Choice?
2    A.   No.
3    Q.   Did you ever scrub for state DNC
4    lists?
5    A.   No.  We only used the federal
6    do-not-call registry.
7    Q.   And when did you start DNC scrubbing
8    with Rising Eagle?
9    A.   2019, around May.
10   Q.   What made you start at that time?
11   A.   We were getting leads from Scott and
12   Mike and they were saying that they were
13   scrubbed and we were wondering why there were
14   so many TCPA violations coming to them.  They
15   were receiving -- at least every two to three
16   weeks they were receiving two or three
17   litigators calling them and telling them to pay
18   5,000 or $3,000.
19        So we were basically
20   presumpting that they were potentially not
21   scrubbing against the federal do-not-call
22   registry.  So we would scrub the leads after
23   they would send them to us; and it was only
24   then did we really get phone calls from Scott
25   or Mike whenever we would scrub the leads.

175

1    Let's say they sent us 3 million leads; and
2    after we scrubbed it, we would end up
3    getting -- a file would get cut all the way
4    down to somewhere around 1 million.  And they'd
5    give us a phone call and say, "What the hell?
6    Why'd you scrub those leads?  We told you we
7    already scrubbed them."
8    Q.   So did Mike Smith tell you that those
9    leads were scrubbed?
10   A.   Yes.
11        DEFENSE COUNSEL:  Objection.
12   Q.   (BY MR. ABERNETHY) And did Scott
13   Shapiro tell you that those leads were
14   scrubbed?
15        DEFENSE COUNSEL:  Objection.
16   A.   On some -- on some lists.  On some
17   lists.  He didn't send me all the lists.  A lot
18   of times Michael Smith was the one that sent me
19   the lists.  Scott Shapiro would only send me a
20   handful of lists.
21   Q.   (BY MR. ABERNETHY) Okay.  So when
22   y'all started scrubbing, how did y'all do that?
23   A.   Veriswitch has it on the back end.
24   Q.   And when did you start scrubbing for
25   JSquared?

176

1    A.   May of 2020 -- May or April of 2020.
2    Q.   And when did you start scrubbing for
3    Great Choice?
4    A.   Great Choice never facilitated calls.
5    They only sold VoIP telecom minutes.  So they
6    never had to scrub any leads.
7    Q.   Do you know what recycling leads
8    mean?
9    A.   Yeah.  When a file gets finished, you
10   go into the back end; and you're able to click
11   on "recycle leads."  When you click on "recycle
12   leads," it automatically takes out all the DNC
13   people that pushed two on it, kicks them out;
14   and it uploads all the others that either
15   people pressed one or didn't push a number on
16   those prerecorded messages, to get redialed
17   again.
18   Q.   So did Rising Eagle recycle leads?
19   A.   Yes.
20   Q.   How often?
21   A.   That's too far back.  I can't
22   remember.
23   Q.   Regularly?
24   A.   Yeah.
25   Q.   Did you communicate with Mike Smith

177

1    that you were recycling leads?
2    A.   They all knew it, yeah.
3    Q.   So you communicated with Mike Smith?
4    A.   Yes.
5    Q.   And did you communicate with Scott
6    Shapiro that you were recycling leads?
7        DEFENSE COUNSEL:  Objection.
8    A.   Yes.  We came up with a thing we
9    wouldn't recycle more than three times.
10   Q.   (BY MR. ABERNETHY) Why would you not
11   recycle more than three times?
12   A.   Because by then the data file was
13   crap.  We didn't want those people -- I mean,
14   later on, what I realized was that they didn't
15   want those people filing TCPA violations
16   against them.  Unsolicited phone calls create
17   TCPA violations.
18   Q.   All right.  We are going to Exhibit
19   5, and that is Skype000781.
20        (Exhibit 5 discussed.)
21   Q.   (BY MR. ABERNETHY) And we're going
22   to start at page 001053 on Exhibit 5.
23        MR. DAVIDSON:  What's that page
24   again?
25        MR. ABERNETHY:  That is 001053.

178

1    Q   (BY MR. ABERNETHY)  And can you identify this
2    for me?
3       A.  I don't know who Harvey or Wes is,
4    but I'm assuming this is talking about Michael
5    O'Hare's login information.  This is myself
6    with onlywebleads and Jakob Mears.
7       Q.  And is this a Skype chat?
8       A.  Yes.
9       Q.  And the user Jakob Mears, can you
10   identify for me?
11      A.  Jakob Mears.
12      Q.  And the user "onlywebleads" for me
13   one more time?
14      A.  John Spiller.
15      Q.  And can you please start at the
16   message from onlywebleads that starts, "Make
17   sure we're scrubbing?"  And can you tell me the
18   date that that is where it starts?
19      A.  10/16/2019.
20      Q.  And can you read that for me, please?
21      A.  "Make sure we're scrubbing all old
22   files against the federal do-not 'C' list on
23   Veriswitch.  If you go to e-mails that I
24   forwarded you and you go to the link in blue
25   and click on it, then you go to Incident #1035.

179

1    Click view, then read all that I replied to
2    them."
3          "So moving forward all health
4    leads from the past, scrub them from
5    Veriswitch?"
6       Q.  We're moving to page 001054.
7       A.  "Yes.  Even if they take out 50
8    percent of our leads, we must comply."
9          "Doesn't the wording on the
10   website negate that?"
11         "It does, but...I'm afraid of
12   this is the one person has to say that they
13   never went to our site or contacted the site
14   owner and asked them...when they logged into
15   the system.  When they be caught -- then they
16   will be caught, and all that -- and all -- and
17   that all goes away" [sic.]
18         "Oh, I see.  Will do.  Do you
19   also want me to call Omar and Mike and say we
20   need leads -- or a lot more leads moving
21   forward?" [sic]
22         "Yes, sir.  Tell them the reason
23   why.  Let them know until their website is
24   functional, we cannot take the risk of being
25   shut down" [sic.]

180

1          "What would the website need in
2    order to be 'functional'?"
3          "They need to be able to capture
4    a person's information; and then they need to
5    get a reply from the website, 'Thank you, and
6    someone will be contacting you shortly'" [sic.]
7       Q.  Okay.  You can stop.
8       A.  Uh-huh.
9       Q.  So were you scrubbing leads before
10   this conversation?
11      A.  No.  Before this conversation, like
12   I'm saying, Mike would tell us that these leads
13   were scrubbed; and that when Umberto brought
14   me into understanding that leads don't get
15   scrubbed that easily, usually.  When you're
16   having TCPA violations, that means that leads
17   are not being scrubbed.
18      Q.  Okay.  And can we move to, in the
19   same Exhibit 5, page 001324; and can you
20   identify this as the same Skype conversation?
21      A.  Yes.
22      Q.  Can you please start on the message
23   in the middle of the page from onlywebleads
24   starting, "We should have been"?
25      A.  "We should have been scrubbing

181

1    against the federal do-not-call list since the
2    start of November, not just recently.  I wish
3    we never listened to Scott or Mike."
4          "Yep, it's greed."
5          "Yes, sir, it is a horrible
6    decision that we were associated with [sic.]
7    As long as they" --
8       Q.  Okay.  You can stop.
9          Can you tell me the date of this
10   conversation?
11      A.  December 5th, 2019.
12      Q.  And were you scrubbing leads before
13   this date?
14      A.  We were except for the leads that
15   they were telling us were already scrubbed.
16      Q.  So from your understanding, what is
17   this conversation about?
18         DEFENSE COUNSEL:  Objection.
19      A.  It was a disappointment under -- it
20   was me agreeing with Jakob that we should have
21   started scrubbing leads November of 2018
22   instead of in December of 2019.  We were only
23   scrubbing leads that we had already dialed
24   through.
25      Q.  (BY MR. ABERNETHY)  And then can we

John Spiller - 3/2/2022

182

1  move to -- it's the last page of Exhibit 5 --
2  001899.  And can you read at the bottom --
3  identify the user in the conversation and the
4  date and read that message for me starting, "We
5  might have to scrub"?
6          DEFENSE COUNSEL:  Objection.
7      A.  John Spiller, onlywebleads, and Jakob
8  Mears, "We might have to scrub all leads
9  against the national DNC list moving forward
10  because we received a subpoena about calls on
11  the no-call list this week."
12          "I gotcha [sic.]  So what shall
13  I do with the opted-in leads I have loaded?"
14      Q.  (BY MR. ABERNETHY)  Thank you.
15      A.  Uh-huh.
16      Q.  So were you scrubbing leads before
17  that date?
18      A.  Yes.  We were just not scrubbing the
19  new lead files that we had received from Scott
20  and Mike because they said to us that they were
21  already scrubbed.
22      Q.  All right.  Did you ever keep an
23  internal do-not-call list?
24      A.  Yeah, I believe our -- our system,
25  Hello Hunter, kept it whenever someone would

183

1  opt out.
2      Q.  I'm sorry.  Just to confirm, if --
3  I'm not sure if we had you identify the date
4  for that last item on Exhibit 5 at 001899.
5      A.  It was December 5th -- no, it was
6  March 2nd, 2020.
7      Q.  Thank you.
8      A.  Uh-huh.
9      Q.  So did you ever add any code to your
10  code for Health Advisors?
11      A.  Yes.
12      Q.  When did that happen?
13      A.  Twenty- -- sometime in 2019.  I mean,
14  y'all have my Skype chats.
15      Q.  What was the code?
16      A.  I think RPG, some number, US, uh...
17      Q.  That's okay.
18      A.  UST.
19      Q.  And why did you add that code?
20      A.  RPG -- because we wanted it to
21  identify to USTelecom that it was me making
22  those dials so they would stop trace- -- doing
23  tracebacks on it.  They were saying that we
24  were supporting someone running fraud, when, in
25  actuality, I knew the room that was buying

184

1  those transfers, at no point were they selling
2  fake insurance.  They were selling good
3  insurance to people that needed it, people that
4  couldn't afford Obamacare; and there was
5  nothing fake about it.  It wasn't fraud, as
6  they tried to paint me in the pictures of
7  saying that I sold illegal robocall fraud,
8  which that's a bunch of crap because I never
9  sold fraud.  I sold health calls and my health
10  room would sell them insurance that was viable
11  and I'm certain today they're still using it.
12      Q.  So the calls that were delivered with
13  those codes were your calls?
14      A.  Yes.
15      Q.  Did Rising Eagle receive any
16  tracebacks?
17      A.  Yeah.
18      Q.  Can you tell me what your
19  understanding of a traceback is?
20      A.  It's a call that's made -- no.  A
21  traceback is calls that are made to potential
22  TCPA violators for potential people that said
23  that they're on the federal do-not-call
24  registry for people they'd say they were --
25  they never signed up for health insurance.

185

1          But you've got to understand
2  something.  There's something I learned about
3  from All Web Leads.  There was a lot of people
4  that filled out opted-in leads in the past.
5  They don't have a clue on where they filled
6  them out.  They don't understand that going to
7  a game -- that they're playing a game online
8  and they put in phone number -- it asks them
9  for their first name, last name, and their
10  phone number; and they put that in so they can
11  try to get some free gems or something along
12  those lines.  That's called co-reg leads.  A
13  lot of those leads are sold in health
14  insurance.  I mean, that's how they opt in.
15  That's how all those people opt in.
16          So a lot of times traceback
17  teams try to identify something illegal going
18  on; and they say that -- in the beginning, they
19  used to send us that we were spoofing, which we
20  never spoofed.  Then they switched to we were
21  sending calls for an illegal health insurance,
22  but that's completely false as well.  I was
23  able to provide them with the opted-in
24  information of all the leads that we had.
25          What else?  So a traceback

186

1  basically identifies me as a perpetrator of
2  allowing that call to get into America,
3  allowing that call to reside with the consumer,
4  and whatever violations that the USTelecom came
5  up with deemed necessary for it to be
6  considered a traceback.
7      Q.  And what is USTelecom?
8      A.  The company that was started by David
9  Frankel that eventually got fired last year for
10  snaking clients.
11     Q.  Who handled tracebacks at Rising
12  Eagle?
13     A.  John Spiller.
14     Q.  You handled all the -- those
15  tracebacks?
16     A.  Uh-huh, unless Jakob -- I don't
17  remember Jakob ever helping me.
18     Q.  So where did Rising Eagle get its
19  opt-in information from?
20     A.  Scott Shapiro and Michael Smith.
21     Q.  How did they get opt-in information
22  from Michael Smith?
23     A.  From the leads that they purchased --
24  or in the lead that they purchased.  They
25  purchased them from lead companies that had the

187

1  opted-in information.  They would send it to
2  us.
3      Q.  And how did they get that -- how did
4  Rising Eagle get that opt-in information from
5  Scott Shapiro?
6      A.  The same way.
7      Q.  Can you explain what your role was in
8  getting that opt-in information?
9      A.  I ended up picking up the phone and
10  calling Scott or Mike and telling them:  Hey,
11  listen, we got a traceback for X, Y, and Z call
12  on this file.  Can you send me the opted-in
13  information, or can you send it to Jakob?
14         "Yes, yes, yes."
15     Q.  All right.  Can we go to Exhibit 50?
16         (Exhibit 50 discussed.)
17     Q.  (BY MR. ABERNETHY)  So we have
18  Exhibit 50, Skype 05- -- 015202.  And can you
19  identify this document for me?
20     A.  This was a mistake that I was
21  discussing onlywebleads with a gentleman named
22  James Wilson that was supposed to find for me
23  opted-in information.
24     Q.  And is this a Skype chat?
25     A.  Yes, it is.

188

1      Q.  So who is the user James Wilson?
2      A.  I don't have a clue, an individual
3  that wanted me to send him $10,000 in bit
4  coins.
5      Q.  And can you read from the top of page
6  1- -- 015202 and tell me the date that it
7  starts, please?
8      A.  On August 15th, 2020 James Wilson
9  says, "Hi.  How are you -- how are you doing?"
10         "Hello.  I am -- how may I help
11  you?"
12     Q.  And can you tell me who is saying
13  each?
14     A.  Yeah.
15         John Spiller, "How may I help
16  you?"
17         James Wilson, "It's nice to meet
18  you."
19         James, "I'm James, the
20  programmer handling the project for 69 million
21  numbers [sic.]  I didn't hear a word from you
22  to get started [sic] with the job.  That wasn't
23  nice.
24         "Same here.  I was waiting for
25  your reply to get started on WhatsApp, but you

189

1  didn't reply.  I'm sorry, but I'm trying to
2  put" -- John Spiller says, "I'm sorry.  I'm
3  trying to put together money to find the best
4  person for my -- for my best job possible."
5         James, "I think you feel I'm not
6  good for the job.  You should have let me know
7  your mind instead of wasting each other's time.
8  I would have...done [sic] designing the program
9  that would solve the problems for you.  Do you
10  think I can't handle your job?"
11         "How do I know it off a bot" --
12  or John Spiller says, "How do I know if off the
13  bot that needs to be in placed in on a website?
14  [sic]  That is what I was asking.  How is it
15  the bot going to find me that information on
16  the internet, which site, or how does it work?"
17     Q.  We're now on page 015203.
18     A.  Again, this conversation had started
19  on 8/15/2020; and the conversation, I believe,
20  ended as well on that same day.  This is an
21  individual who had reached out to me and told
22  me he was going to create me a bot to search
23  the internet, for $10,000 in bit coins.  For 69
24  million numbers, he was going to find me all
25  the opted-in information that Scott and Mike

190

1  couldn't give me.
2      Q.  Can you just go ahead and read the
3  rest, and then we'll go over it?
4      A.  Yeah.
5      Q.  This is at the top of 015203.
6      A.  Yeah.
7          "And no -- and now I got tools
8  for this job from the dark web" [sic.]
9          James Wilson, "How do I know it
10 off the bot that needs to be in place on the
11 website that is what" -- okay.  That's what
12 John Spiller quoted.  I quoted what he said.
13         "The both [sic] sorts numbers
14 and groups them into a hundred each."
15         John Spiller says, "I didn't
16 know, but okay.  I'm listening.  I'm just not a
17 programmer and that is why I needed more
18 explanation on what you were talking about
19 first before I send you 10,000 in bit coins
20 because I've already been scammed this year and
21 I don't want to be scammed again" [sic.]
22         "I've done jobs much more
23 complicated [sic] than this.  No one will
24 charge you less.  That's why I insisted you pay
25 to the company for the bot while I do the job

191

1  without the company knowing."
2          "Where are you going to find the
3  matching numbers?"
4          "What I need is the numbers
5  which you have sent me.  Then I sort out the IP
6  address and names.  Now we need to create a bot
7  to a group this numbers and make work faster"
8  [sic.]
9          "I have no problem paying you
10 directly.  I just want to know that I'm getting
11 and I want to make sure I don't get scammed
12 [sic.]  I have already found at least 30
13 million opted-in information from the 69
14 million numbers" -- or, actually, I put
15 correction -- "79 million numbers."
16         "Sir, I need you to trust me;
17 and I need to trust you.  This is the reason
18 why you should -- shouldn't pay me for the job
19 until -- pay for the bot to the company while I
20 start soon" [sic.]
21         "That works.  Thank you for the
22 explanation.  I'll be able to test the" --
23     Q.  So now we're at the top of page
24 015204.
25         MR. DAVIDSON:  Hey, Patrick,

192

1  this is kind of ridiculous.  First off, he's
2  not even reading it accurately.  He reads all
3  these statements, and then you don't even ask
4  him a question about a specific statement.
5  It's -- I mean, the documents are what they
6  are.  I don't see why we're wasting our time
7  doing this.
8          MR. ABERNETHY:  Do you have an
9  objection?
10         MR. DAVIDSON:  I just stated it,
11 yes.
12     Q.  (BY MR. ABERNETHY) Can you continue reading,
13 please?
14     A.  Yeah.
15         "...first to see that it is
16 getting the information:  First name, last
17 name, state of which the number resides in, and
18 the IP address before I have to put you out to
19 another [sic] half of the bill?"
20         "Okay.  You have to make the
21 deposit now."
22     Q.  Thank you.
23     A.  Okay.
24     Q.  All right.  So how did you meet James
25 Wilson?

193

1      A.  I met him in a group chat on
2  WhatsApp.  He reached out to me.  I told -- I
3  told a lead generator that I was looking for 69
4  million opted-in leads because the FCC was
5  charging me with dialing -- I believe at that
6  time Jakob and I had aggregated roughly 250
7  million leads; and out of those million leads,
8  we only needed 79 million opted-in information.
9          So I put out some feelers with
10 some lead providers that I knew of if they can
11 find me some opted-in information.  Then, when
12 that didn't pan out, I got a text message from
13 this guy on WhatsApp; and I was taken back on
14 how blunt he was about things and how he's
15 going to create a bot.  And then when I started
16 reading up about bots, I realized he was full
17 of shit; and I ended the conversation.  I told
18 him I wasn't going to send him any money; and I
19 was done with the conversation after the 15th
20 of April -- of -- August 15th, 2020.
21     Q.  So did you need opt-in information
22 for Health Advisors' calls?
23     A.  Yes, those are the calls that got me
24 sent to the FCC.
25     Q.  How many calls did you need that

194

1   opt-in information for?
2          DEFENSE COUNSEL: Objection.
3      A.  69 million.  It was in the thing that
4   I read.
5      Q.  (BY MR. ABERNETHY)  All right.  We
6   are done with that exhibit.
7          MR. FRANQUI: Can we take a
8   bathroom break when you get a minute?
9          MR. ABERNETHY: Sure, we can
10  take a quick break.  How long do you need,
11  Tony?
12         MR. FRANQUI: Just a minute or
13  two.
14         MR. ABERNETHY: Two minutes?
15  Okay.
16         MR. FRANQUI: Okay.
17         THE VIDEOGRAPHER: We'll go off
18  at 3:22.
19         (Off the record from 3:22 to 3:23 p.m.)
20         THE VIDEOGRAPHER: Okay.  We're
21  back on the record at 3:23.
22     Q   (BY MR. ABERNETHY)  All right.  To go back,
23  Health Advisors was a client of Rising Eagle, correct?
24     A.  Uh-huh.
25     Q.  And who were your primary contacts at

195

1   Health Advisors?
2          DEFENSE COUNSEL: Objection.
3      A.  Scott Shapiro and Michael Smith.
4      Q.  (BY MR. ABERNETHY)  And what was
5   Michael Smith's role?
6          DEFENSE COUNSEL: Objection.
7      A.  He was under Scott Shapiro.  Scott
8   Shapiro was the provider of the health
9   insurance contracts, and Michael Smith ran --
10  ran the operations for the room.  I believe
11  that's correct.
12     Q.  (BY MR. ABERNETHY)  How often did you
13  talk to Michael Smith?
14     A.  Pretty regularly.
15     Q.  And did he know that you were
16  dialing?
17     A.  Yes.
18     Q.  And can you tell me what your contact
19  with Scott Shapiro was?
20         DEFENSE COUNSEL: Objection.
21     A.  My contact?
22     Q.  (BY MR. ABERNETHY)  What was his
23  role?
24         DEFENSE COUNSEL: Objection.
25     A.  His role was making sure that the

196

1   room sold health insurance.
2      Q.  (BY MR. ABERNETHY)  Can you elaborate
3   or explain that?
4          DEFENSE COUNSEL: Objection.
5      A.  He sold the room health insurance
6   contracts.  So every sale that they made, he
7   made a percentage of each sale that was made on
8   a monthly recurring basis.
9      Q.  (BY MR. ABERNETHY)  So did Rising
10  Eagle send calls that played prerecorded
11  messages?
12     A.  Did who?
13     Q.  Did Rising Eagle send calls that
14  played prerecorded messages?
15     A.  Uh-huh.
16     Q.  Do you know who wrote the content on
17  those prerecorded messages?
18     A.  Jakob and I did.  At some point in
19  2019 we got with Scott and Mike because they
20  didn't like how Ann's voice sounded; or
21  something about Ann, they didn't like it and
22  they wanted to block it.  So at that point we
23  started collaborating with them about our
24  message that we would send out to the media --
25  or to the consumers.

197

1          MR. ABERNETHY: Okay.  My
2   internet is...
3      Q.  (BY MR. ABERNETHY)  All right.  How often did
4   you change the content of those prerecorded messages?
5      A.  Once every month, once every two
6   weeks.
7      Q.  And why did you change it?
8          DEFENSE COUNSEL: Objection.
9      A.  To try to get more people pressing
10  one instead of pressing two.
11     Q.  (BY MR. ABERNETHY)  Did anyone direct
12  you to change that?
13         DEFENSE COUNSEL: Objection.
14     A.  Yeah.  I mean, every once in a while
15  I'd get a call from Mike or Scott telling us to
16  change it.  They said it was going on too long
17  or they were getting -- sometimes they were
18  getting lawsuits based upon -- in the lawsuit
19  they would have the recording of the individual
20  that was on the call.
21     Q.  (BY MR. ABERNETHY)  And where did
22  leads come from for Health Advisors?
23         DEFENSE COUNSEL: Objection.
24     A.  I don't know.
25     Q.  (BY MR. ABERNETHY)  Did Rising Eagle

198

1 ever purchase lead lists for Health Advisors?
2     A.  No, I never purchased a single lead
3 list.  We were given a lead list.
4     Q.  By who?
5     A.  By -- indirectly, I took the list
6 from someone I was helping.  I got it from a
7 gentleman named Chris Basso.
8     Q.  And how did you know Chris Basso?
9     A.  I met him in 2015 when I was selling
10 insurance leads.
11     Q.  And why did he give you these lead
12 lists?
13     A.  He didn't give it to me.  Like I
14 said, I got it indirectly from him.
15     Q.  What does that mean, "indirectly"?
16     A.  The leads were used in someone else's
17 dialers and I had access to the dialer, so I
18 downloaded the lead list.  And these leads I
19 would use randomly throughout the year.  They
20 were all opted in.
21     Q.  And did those lists purportedly have
22 consumer consent to be called?
23     A.  Uh-huh.
24     Q.  Do you know how that consent was
25 obtained?

199

1     A.  By them going to Chris Basso's
2 website and signing up on his website that they
3 were looking for health insurance.
4     Q.  Do you know what website that was?
5     A.  No, I do not.
6     Q.  And that website was operated by only
7 Chris Basso?
8     A.  Uh-huh.
9         MS. REYES:  "Yes" or "no"?
10        THE WITNESS:  Yes.
11     Q.  (BY MR. ABERNETHY)  Do you know who
12 wrote the opt-in language on that website?
13     A.  I do not.
14     Q.  And did you ever take any steps to
15 confirm consent was given for those leads?
16     A.  No.
17     Q.  Did you ever call any of the leads to
18 verify consent?
19     A.  Some -- I don't know if I ever took
20 it that far, but I used to listen in to the
21 phone recordings that Scott and Mike would make
22 on the VICIdial.  And a lot of the people were
23 saying:  Yes, yes, yes, we -- we requested
24 information, like, a year ago; but we don't
25 need health insurance right now.

200

1     Q.  Did you ever visit those websites
2 where the opt-in information was?
3     A.  I don't know where the opted-in
4 information was procured.
5     Q.  So you don't know anything about the
6 language on those websites?
7     A.  I know about some language because,
8 like I said, I worked for All Web Leads; and I
9 was able to go to All Web Leads' page, their --
10 their portal that they were using back in the
11 day which they no longer use.  But I was able
12 to copy the language on that and send it to
13 Mike and Scott when they were building their
14 website so that they would be able to use that
15 wording in their landing page.
16     Q.  And what kind language was that?
17        DEFENSE COUNSEL:  Objection.
18     A.  Opted-in leads, saying that a prere-
19 -- they're going to receive a prerecorded
20 message from us.
21     Q.  (BY MR. ABERNETHY)  Did that language
22 reference the federal E-sign law or other
23 similar state laws?
24     A.  Yeah.  It said by clicking -- by
25 clicking the checked box, you agree to receive

201

1 in the future text messages or prerecorded
2 calls from this company to your cell phone,
3 your mobile device, or your landline phone.
4     Q.  And did you or any of your businesses
5 ever create or have any of your own websites
6 that collected consent from consumers?
7     A.  We tried to start that, but it was
8 way too expensive for us.  We never -- never
9 actually implemented one.
10     Q.  Did you ever operate a website for
11 somebody else that collected consent?
12     A.  Huh-uh.
13        MS. REYES:  Is that a "yes" or
14 "no"?
15     A.  No.
16     Q  (BY MR. ABERNETHY)  And do you know about --
17 of the e-mail account rpgscottandmike@gmail.com?
18     A.  RPG?
19     Q.  rpgscottandmike@gmail.com.
20     A.  Yeah, I know about that.  Someone
21 tried to log into that this morning, and on --
22 WhatsApp sent -- or YouTube sent me an e-mail
23 someone was trying to access it, and I blocked
24 it.
25     Q.  What's that e-mail account for?

202

```
1              DEFENSE COUNSEL:  Objection.
2      A.  E-mails from Scott and Mike to
3  rpgleads.
4      Q.  (BY MR. ABERNETHY)  And who would
5  have access -- access to that?
6              DEFENSE COUNSEL:  Objection.
7      A.  I believe Jakob set it up for Scott
8  and Mike to send e-mails to him through that.
9      Q.  (BY MR. ABERNETHY)  So to confirm,
10 who had access to that website?
11             DEFENSE COUNSEL:  Objection.
12     A.  Jakob, Scott, and Mike.  I -- I
13 didn't even have the password.  I didn't even
14 know what the password was.
15     Q.  Who managed the account?
16     A.  Jakob, usually.
17     Q.  Did you ever receive leads on that
18 account?
19     A.  I don't know what we received on that
20 account; but I'm assuming that's why the person
21 tried to get access to it this morning, just to
22 see if they had any leads in there that they
23 could either try to download for themselves or
24 delete it.  I don't even know the password for
25 it, so that'd be a Jakob Mears question.
```

203

```
1      Q.  Do you know if Jakob ever received
2  leads from Scott Shapiro on that account?
3              DEFENSE COUNSEL:  Objection.
4      A.  I can't say for sure, but I'm certain
5  he received leads from Scott and Mike on
6  multiple e-mail addresses.
7      Q.  (BY MR. ABERNETHY)  And do you know
8  who accessed the account last night or this
9  morning?
10     A.  I do not.  It said it was from
11 someone from Miami, Florida.  I'll go to it
12 real quick.
13             MR. DAVIDSON:  Oh, you don't
14 have to do that.  Things will go a lot quicker,
15 actually, if you don't.
16     Q.  (BY MR. ABERNETHY)  All right.  Do
17 you know when the transition from Health
18 Advisors to O Health occurred?
19     A.  Like I'm saying, at the end of 2019,
20 the beginning of 2020.
21     Q.  And so back to the leads that were
22 sent from -- that you said were sent to Jakob
23 Mears from Scott and Mike, did Jakob Mears ever
24 forward those leads to Sumco?
25     A.  Hell no.
```

204

```
1      Q.  You never directed him to forward
2  those leads to Sumco?
3      A.  No, unless we were trying to find
4  opted-in data because when we met Sumco, they
5  actually had a system in place to -- they had
6  someone that worked in a U.S. department
7  somewhere that had access to all the IP
8  addresses for every person in the United
9  States, so.  If I would have sent it to them,
10 it'd have been for that option only.
11     Q.  What do you mean "worked for us"?
12             DEFENSE COUNSEL:  Objection.
13     A.  What do you mean, worked for us?
14     Q   (BY MR. ABERNETHY)  Sorry.  What do you mean
15 worked for the U.S., the United States?
16     A.  Oh, they worked high up in the United
17 States somewhere where a programmer had access
18 to all the IP addresses for every person in
19 this room.  As long as they had the last four
20 numbers of the phone number, they can find an
21 IP address to anyone.
22     Q.  And who told you that?
23     A.  Sumco.
24     Q.  Who at Sumco?
25     A.  McDarius.
```

205

```
1      Q.  And when you say "worked for the
2  United States," you do mean worked for the
3  United States Government?
4      A.  Yes, high up somewhere that had
5  access to a database of all IP addresses for
6  every individual in this entire world -- or
7  entire United States.
8      Q.  Do you have any more details about
9  that?
10             DEFENSE COUNSEL:  Objection.
11     A.  No, just that they had access to
12 them.  So if I would have sent them an e-mail
13 -- and I believe that's where we sent them the
14 69 million numbers; and they sent us back 30
15 million numbers opted-in leads.
16     Q.  (BY MR. ABERNETHY)  So do you believe
17 that those opt-ins were valid?
18             DEFENSE COUNSEL:  Objection.
19     A.  Yeah.  I made phone calls on some of
20 them and asked them if their names were such
21 and such and I looked up the IP address for
22 each of the individuals and I made sure that
23 that's their address, their state -- city and
24 state and IP lookup.  You can IP lookup.  You
25 can match which city and state that they're --
```

206
1  that they reside in from the IP lookup page.
2      Q.  (BY MR. ABERNETHY)  So why would they
3  need that list from the U.S. Government if
4  those opt-ins were valid?
5          DEFENSE COUNSEL:  Objection.
6      A.  If whose opt-ins were valid?
7      Q.  (BY MR. ABERNETHY)  On the leads that
8  we were just talking about.
9          DEFENSE COUNSEL:  Objection.
10     A.  Those leads were not opted in.
11  That's what we came to realize at the beginning
12  of 2020, and I had told Jakob we should have
13  been scrubbing the leads from back in November
14  of 2018 instead of us having all this
15  supposedly fresh data that was being scrubbed.
16  In actuality, none of it was being scrubbed;
17  and it was all residing on Rising Eagle as if
18  we were saying it was scrubbed because Scott
19  and Mike told us it was scrubbed.  Therefore,
20  we were found guilty of dialing numbers on the
21  federal do-not-call registry, which we had been
22  told otherwise.
23     Q.  (BY MR. ABERNETHY)  So can you
24  clarify specifically which leads were not valid
25  opt-ins?

207
1          DEFENSE COUNSEL:  Objection.
2      A.  What leads?
3      Q.  (BY MR. ABERNETHY)  The leads that
4  you're referring to that were not valid for
5  those -- for Sumco specifically.
6          DEFENSE COUNSEL:  Objection.
7      A.  No, I'm not even talking about
8  Sumco's leads.  I'm talking about the health
9  insurance leads that we dialed on, the majority
10  of them were not scrubbed against the federal
11  do-not-call registry; and we didn't even know
12  if some of them were opted in.  We asked Scott
13  and Mike to send opted-in information, and they
14  were unable to do so.  That's when I took it
15  upon myself to go out and try to find it.
16     Q.  (BY MR. ABERNETHY)  Can we go back to
17  Exhibit 5?
18     A.  What does that number start with?
19     Q.  So that is -- that's going to be
20  000781 is the first page, right here
21  (indicating.)  Can we turn to Skype page
22  001189?
23          All right.  Can you identify
24  this document?
25     A.  It's between myself, onlywebleads,

208
1  and Jakob Mears.
2      Q.  And can you start from the message
3  from onlywebleads, yourself, at 11/4/2019, that
4  begins, "From the traceback team," and read
5  that for me?
6      A.  "From the traceback team, 'To the
7  extent you want to show opt-in, the opt-in text
8  to which the specific called party actually
9  consented should be shown, with the date of
10  signing by the [sic] party (not the text as it
11  is -- appears today on the site.)  The burden
12  to prove consent falls upon the caller; they
13  must retain and [sic] have access to those
14  records.'"
15          So Jakob Mears says, "So they
16  are asking for old text?"
17          And I said, "No, they are --
18  they are not.  They are asking for opted-in
19  date, time slot as well.  See your e-mail.  I
20  sent you the traceback request for two
21  numbers."
22     Q.  And then we're going to the next
23  page, 001190.
24     A.  "I need -- I need to date and
25  timestamp and the IP address and URL and an

209
1  example of an e-mail that they send out to the
2  person that has requested information?"
3          Jakob Mears says, "Do you know
4  the timestamp will be made up so that [sic] the
5  e-mail sent out?  Do you want me to have the
6  [sic] date and timestamp a week before the
7  first call?"
8          "Please provide this infor-" --
9  and then John Spiller says, "Please provide
10  this information to Mike and get his friend
11  that created the website to create an e-mail
12  that says something like, 'Thank you for
13  applying to receiving more information
14  on health insurance.  Someone will contact you
15  shortly.'  Give an e-mail address for them to
16  put [sic] out later or if they want or are not
17  satisfied with the company for providing them
18  the information they are requesting."
19          So I quoted, "Do you -- do you
20  know the timestamp will be made up so that
21  -- so that the e-mail sent out?  Do you want me
22  to have them the date [sic] and timestamp a
23  week before the first call?"
24          "Yes, I know, Jakob.  I am --
25  I'm the one that created this whole thing with

210

1 Mike and Scott."
2    Q. All right. So do you know what the
3 purpose of this conversation was?
4       DEFENSE COUNSEL: Objection.
5    A. Yeah. It was Scott and Mike's
6 website that we were creating to accept
7 opted-in leads.
8    Q. (BY MR. ABERNETHY) And what website
9 were you discussing?
10    A. I don't even remember the name of the
11 website. It's not in there.
12    Q. So when you wrote "Mike," who did you
13 mean?
14    A. Michael Smith.
15    Q. And when you wrote "Scott," who did
16 you mean?
17    A. Scott Shapiro.
18    Q. And what did you mean by, "Get his
19 friend that created the website to create an
20 e-mail that says something like" --
21    A. Michael Smith hired --
22       DEFENSE COUNSEL: Objection.
23       You can answer. Go ahead.
24       THE WITNESS: Okay.
25    A. So hired a friend of his to --

211

1    Q. (BY MR. ABERNETHY) Can I finish
2 reading that thing real quick?
3       "...get his friend that created
4 the website to create an e-mail that says
5 something like, 'Thank you for applying to
6 receiving more information on health insurance.
7 Someone will contact you shortly.' Give an
8 e-mail address for them to opt out later."
9       DEFENSE COUNSEL: Objection.
10    Q. (BY MR. ABERNETHY) What did you mean
11 by that?
12       DEFENSE COUNSEL: Objection.
13    A. To create an e-mail so that whenever
14 they'd go in and they'd put in their e-mail
15 address on the opted- in page, they'd submit --
16 submit. They'd click "submit." Then we'd
17 automatically send them an e-mail that says,
18 "Thank you for applying with us. We'll have
19 someone contact you shortly," giving them a
20 heads-up that we're going to be calling them
21 shortly with a prerecorded message.
22    Q. And do you know the website
23 besthealthdeals.us?
24    A. I can't remember if that was the
25 website; but if that was the website, then,

212

1 that was the website.
2    Q. Then that was a website that they
3 were discussing?
4       DEFENSE COUNSEL: Objection.
5    A. Yeah.
6    Q. (BY MR. ABERNETHY) And then, what did you
7 mean by: Do you know what timestamp will be made up for
8 the e-mail to be sent out?
9       DEFENSE COUNSEL: Objection.
10    A. I don't have a clue what I was
11 meaning there.
12    Q. (BY MR. ABERNETHY) Do you know what
13 the purpose of that timestamp would be?
14       DEFENSE COUNSEL: Objection.
15    A. It would be to comply with the
16 traceback team, the FCC team, to make sure that
17 they have a timestamp on all opted-in leads
18 that shows the IP address that they logged in
19 from, that they filled out the information
20 from, that they pushed "submit" from.
21    Q. (BY MR. ABERNETHY) So what would
22 Jakob mean when he wrote, "Do you want me to
23 have them date the timestamp a week before the
24 first call"?
25       DEFENSE COUNSEL: Objection.

213

1    A. I don't have a clue.
2    Q. (BY MR. ABERNETHY) Do you know why
3 he would backdate the timestamps like that?
4       DEFENSE COUNSEL: Objection.
5    A. To make sure that the leads that we
6 were receiving -- because the leads that Scott
7 and Mike would send us would have the IP
8 address sometimes included in it. A lot of
9 times, though, they would scrub those out
10 because they knew back in the day I used to
11 sell insurance leads; and they didn't want me
12 to resell the leads that they were sending me.
13 So they would sometimes retract that
14 information, the IP information.
15    Q. (BY MR. ABERNETHY) Okay.
16    A. So I believe that's why I made that
17 statement, told Jakob to date it back a week
18 before they start, so when we started, the
19 opted-in leads would be starting a week prior,
20 instead of a week -- a week ahead.
21    Q. All right. Back to the -- the
22 transition from Health Advisors to O Health,
23 again, do you know why that happened?
24       DEFENSE COUNSEL: Objection.
25    A. Yes, because Michael Smith and Scott

John Spiller - 3/2/2022

214

1  Shapiro were bowing out of running the room;
2  and they wanted to put in a new person in
3  because they were also under a lot of lawsuits
4  from our robodialing.  There were -- a lot of
5  TCPA violations were going on during that time,
6  and they wanted to pull away from the company.
7      Q.  (BY MR. ABERNETHY)  Do you know the
8  e-mail address carsandtrucksgofast@gmail.com?
9      A.  Yeah.  That's an e-mail Jakob, I
10 think, created; or it might have been Michael
11 Smith created it.  I don't remember which one
12 created it.
13     Q.  Do you know who ran it?
14         DEFENSE COUNSEL:  Objection.
15     A.  I do not.
16     Q.  (BY MR. ABERNETHY)  Do you know what
17 it was used for?
18         DEFENSE COUNSEL:  Objection.
19     A.  Sending leads.
20     Q.  (BY MR. ABERNETHY)  Sending leads to
21 who?
22         DEFENSE COUNSEL:  Objection.
23     A.  From Michael Smith to Jakob Mears.
24     Q.  (BY MR. ABERNETHY)  Did you ever have
25 access to that e-mail?

215

1      A.  I don't remember.  I don't believe
2  so, no.
3      Q.  And do you know the e-mail address
4  baconbitsforlife@gmail.com?
5      A.  No, sir.
6      Q.  You've never heard of that e-mail
7  address?
8      A.  No, sir.
9      Q.  I'm sorry.  That's
10 baconbits4forlife@gmail.com, just for the
11 record.
12     A.  No.
13     Q.  All right.  A portion of the lawsuit
14 pertains to auto warranty robocalls.  Did you
15 have a client involved in sending auto warranty
16 calls?
17     A.  I did.
18     Q.  Who was that client?
19     A.  Sumco Panama.
20     Q.  And when did that relationship begin?
21     A.  At the end of 2020 or in the middle
22 of 2020.  I don't remember when the
23 relationship began.
24     Q.  And did you have any other clients
25 doing auto warranty robocalls?

216

1      A.  No.
2      Q.  How did you come into contact, again,
3  with Sumco?
4      A.  Mohammed Souheil introduced me to
5  them.
6      Q.  But did you contact them first?
7      A.  He contacted me.
8      Q.  And --
9      A.  McDarius reached out to me through
10 Skype.
11     Q.  Through Skype?
12     A.  Uh-huh.
13     Q.  And you don't remember his full name?
14     A.  McDarius Senette (PHONETICALLY
15 SPELLED) or something along those lines.
16     Q.  You never talked to anybody else at
17 Sumco.
18     A.  Huh-uh.
19     Q.  Did you bring them on as a client?
20     A.  Yes.
21     Q.  Did Mears play a role in bringing on
22 Sumco?
23     A.  Huh-uh.
24         MS. REYES:  Is that a "no"?
25         THE WITNESS:  No.

217

1      Q.  (BY MR. ABERNETHY)  And did you
2  communicate any other way than Skype?
3      A.  No.
4      Q.  No other --
5      A.  Yeah, we -- we sometimes called each
6  other.
7      Q.  Okay.
8      A.  He called me; I called him.  I don't
9  even -- I believe any text messages we shared
10 was only one way.  I would send him text
11 messages, and he would pick up the phone and
12 call me.
13     Q.  And so when you spoke on the
14 telephone, was it a man or a woman on the
15 phone?
16     A.  A man.
17     Q.  And do you still have that telephone
18 number?
19     A.  I believe I do.
20     Q.  Did you ever do anything to verify
21 any of the contact information for that
22 company?
23     A.  Yeah.  Anytime I got a traceback, I'd
24 ask them for opted-in information; and they
25 would send it to me within three hours.

218

1    Q.  Did you give us that phone number or
2  any other contact information?
3    A.  I did.
4    Q.  Did you ever take any steps to verify
5  the contact information for the owners of
6  Sumco?
7    A.  No, that was their job.
8    Q.  Did you do any background review
9  prior to bringing on Sumco as a client?
10    A.  I did.  I made sure -- I made sure,
11  first off, that they had regularly responded to
12  all tracebacks that were sent to them.  I also
13  talked at length with Mohammed Souheil, the
14  owner of Globex.  He gave me the go-ahead.  He
15  said that Sumco's a good client; he pays real
16  well.  He's a real good client.  He's need to
17  keep -- as long as you keep him happy, he'll
18  pay you well.
19    Q.  And how did you verify that they had
20  responded to tracebacks?
21    A.  Contacted a attorney that was able to
22  look it up with the traceback team, asked the
23  traceback team if Sumco Panama had responded to
24  all tracebacks; and they said yes.
25    Q.  And how would you communicate with

219

1  Souheil?
2    A.  I haven't spoken with him recently.
3    Q.  But when you did, how did you
4  communicate with him?
5    A.  By phone call, picked up the phone
6  and called him.
7    Q.  So do you have his telephone number?
8    A.  I -- I don't know.  I haven't checked
9  lately.
10    Q.  Okay.  But you did have it at one
11  point?
12    A.  Yes, I did.
13    Q.  Do you know if you gave us that
14  telephone number?
15    A.  I gave you access to my cell phones.
16  I'm certain you guys have it in there
17  somewhere.
18    Q.  Okay.  So do you know if Sumco sells
19  auto warranty services to consumers?
20    A.  It would be under "Mike" on my cell
21  phone.
22    Q.  Okay.
23    A.  Mark -- "Mike R Squared."
24    Q.  "Mike R Squared" would be Souheil's
25  number?

220

1    A.  Yep.
2    Q.  Why would it be under "Mike
3  R Squared"?
4    A.  Because he's the owner of R Squared.
5  He bought R Squared for 15 million.
6    Q.  All right.  Again, do you know if
7  Sumco actually sells auto warranty services to
8  consumers?
9    A.  Yes, they do.
10    Q.  How do you know that?
11    A.  One of my -- I had a client that had
12  called me and told me he was looking for a auto
13  warranty.  I put him in connected [sic] with
14  Sumco, and Sumco sold them a auto warranty for
15  their truck.
16    Q.  And when did Sumco buy R Squared?
17    A.  Sumco didn't buy R Squared.  Globex
18  bought R Squared.
19    Q.  Okay.  Souheil's number is under
20  "Mike R Squared"?
21    A.  Yes.
22    Q.  When did Globex buy R Squared?
23    A.  2019, I believe.
24    Q.  And do you know if Sumco has a call
25  center?

221

1    A.  I'm not for certain if they do or
2  don't.
3    Q.  Okay.
4    A.  I know they manage call centers.
5  They manage the calls for the call centers.
6    Q.  Do you know where any of these call
7  centers are?
8    A.  Overseas somewhere.
9    Q.  Do you know if they sell live
10  transfer leads to third parties?
11    A.  I don't know.
12    Q.  Have ever reviewed a website for
13  Sumco?
14    A.  No -- actually, yeah.  They sent me
15  three websites initially on Skype.  I don't
16  remember what the websites were, but one of
17  them was autowarranty.com.  Another one was
18  freeautowarranty or something along that --
19  those lines.  I don't remember what each of --
20  each of the names were, but they sent me three
21  on Skype that would have been attributed to
22  Sumco's opted-in leads that they were getting
23  them from.
24    Q.  Did you ever get business references
25  -- references for Sumco besides Souheil?

John Spiller - 3/2/2022

222

1    A.  That was the only one.
2    Q.  There aren't any bank or financial
3  references?
4    A.  Huh-uh.  I never do that.  I've never
5  done that.
6    Q.  Did you ever just search them on
7  Google?
8    A.  I did.  I didn't find anything on
9  them.
10    Q.  Found no history about them?
11    A.  Huh-uh.
12        MS. REYES:  Is that a "no"?
13        THE WITNESS:  No.
14    Q.  (BY MR. ABERNETHY)  Did Sumco ever
15  provide any information about the car
16  warranties that they were offering in their
17  prerecorded messages?
18    A.  No, sir.  I never asked.  Again, I
19  didn't make money when they made a sale.  I
20  only sold them VoIP telecom minutes.
21    Q.  And who was your friend that was
22  looking for a warranty that put you in touch
23  with Sumco, do you remember?
24    A.  I don't remember the individual's
25  name, but I know he was a client of mine.  I

223

1  would sell him VoIP telecom minutes.  He was
2  looking for a auto warranty.  I put him in
3  contact with Sumco.  I sent Sumco his name and
4  number and told them he's looking for a auto
5  warranty for, like, a 2003 truck.  I don't
6  remember the truck.
7    Q.  Did you ever confirm a telephone
8  number for anyone at Sumco?
9    A.  No.
10    Q.  Did you ask if they had a customer
11  service number?
12    A.  No.
13    Q.  Did you ever communicate with anyone
14  that Rising Eagle was making auto warranty
15  calls for Sumco?
16    A.  Rising Eagle never made auto warranty
17  calls for Sumco.  Not one auto warranty call
18  was made through Rising Eagle Capital for
19  Sumco.  Rising Eagle Capital was only set up to
20  send calls for health insurance for Scott
21  Shapiro and Michael Smith's room.
22    Q.  What about JSquared?
23    A.  Only set up to facilitate the VoIP
24  telecom minutes for Rising Eagle Capital to the
25  said party.

224

1    Q.  And Great Choice?
2    A.  Never did any.
3    Q.  Did you ever tell anyone that you
4  were making -- even if you weren't, did you
5  ever tell anybody that you were making calls
6  for Sumco?
7    A.  (Witness shakes head.)
8        MS. REYES:  Is that an answer?
9    A.  Not that I remember, no.
10    Q.  (BY MR. ABERNETHY)  So, again, what
11  type of services was Sumco seeking from you or
12  your company?
13    A.  VoIP telecom minutes.
14    Q.  And what type of service did you
15  actually provide?
16    A.  VoIP telecom minutes.
17    Q.  Voice termination?
18    A.  Yes.
19    Q.  Did you provide any inbound calling
20  services for them?
21    A.  I believe I gave them an 800 number
22  that they can use in their voice re- -- in
23  their message that they are playing.  I sold
24  them DIDs as well, but they had their own
25  appear application that allowed them to trade

225

1  out -- they had their own ANI rotator on their
2  own Switch that was built specifically for
3  McDarius.
4    Q.  Did Sumco seek service for
5  short-duration calls from you?
6    A.  What do you mean, short duration?
7  Define "short duration."
8    Q.  What do you understand "short
9  duration" to be, short-duration calls?
10    A.  It can be anywhere from under 6
11  seconds -- it could be under 30 seconds.  It
12  can be under a minute, whatever your definition
13  of "short duration" is.
14    Q.  Okay.
15    A.  I mean, if you're asking -- I think
16  what you're trying to ask is did I supply them
17  with short duration.  I supplied them with
18  short duration, long duration, whatever dura-
19  -- the majority of times their calls would come
20  in around 12 seconds to 18 seconds.  I don't
21  know if that's defined as short duration or
22  not.
23    Q.  Okay.  We can move on from that.
24        Were you aware that Sumco
25  intended to use your services to provide

226

1 prerecorded messages on their calls?
2    A.   Yes and no.  I knew that they were
3 running robodialing in the beginning; but after
4 I told them that they needed to switch up their
5 message because their message wasn't working
6 properly for at least the FCC and the FTC,
7 based upon what Michael Lansky had told me,
8 they had told me they're going to move to using
9 AI functionality.
10   Q.   What do you mean it wasn't working,
11 wasn't working in what way?
12   A.   They weren't providing a name in the
13 beginning of the call.  They weren't providing
14 an opted-out number.  They weren't providing an
15 opted-out area within the first three seconds
16 of the call.  And those were the three top
17 points that the FCC requires on prerecorded
18 messages.
19   Q.   Do you know why Sumco didn't disclose
20 their business name on the recording?
21   A.   Because they didn't want people to
22 know who they were, I'm assuming.
23   Q.   Do you know why they would not want
24 people to know who they were?
25   A.   I have no clue.

227

1    Q.   Did you ever ask why they didn't?
2    A.   I did, and they ended up telling me
3 that they didn't know that they needed to put a
4 name to their business beforehand.  I was like,
5 "Yeah, you have to put a name of the business
6 beforehand."  After I said that, then they
7 start- -- they switched the AI portal to have
8 auto warranty -- "This is a message from auto
9 warranty company.  If you're looking for a auto
10 warranty, press one.  We have the best rates in
11 the industry.  If you're looking to opt out,
12 press two now; or you may call the 800 number
13 at the end of this call."
14   Q.   Did they ever actually add the name
15 Sumco?
16   A.   No, they never did; but neither did
17 Rising Eagle.  Rising Eagle never added the
18 name Rising Eagle.
19   Q.   And was that AI message prerecorded?
20   A.   Yes.
21   Q.   So when you say "AI," what was your
22 understanding of how that AI would be better
23 than the previous version?
24   A.   It would talk about -- the AI would
25 come on and say, "Hi, this is" -- with a mono-

228

1 -- I mean, it sounds like a person.  AI sound
2 very friendly.  It says:  This is such and such
3 with -- calling on behalf of autowarranty.com
4 -- or whatever -- and we heard you were
5 interested in a auto warranty; if this is true,
6 say "yes" or "no."  And they would say "yes,"
7 and it would go to the next question:  Are you
8 still currently looking for auto warranty,
9 "yes" or "no"?  "Yes."  And then the third
10 question would be:  Would you like to speak
11 with a live agent about your auto warranty
12 needs, "yes" or "no"?  "Yes."  "Yes," they
13 would transfer the call.  "No," they would --
14 they hung up on them.  "Okay.  Thank you.  You
15 have a wonderful day."
16   Q.   But did you still consider that a
17 prerecorded message?
18   A.   Yeah.
19   Q.   Okay.  And did JSquared ever provide
20 any dialer services for Sumco?
21   A.   Huh-uh.
22   Q.   Did Rising Eagle ever provide any
23 services for Sumco?
24   A.   Huh-uh.
25   Q.   Did you ever sell them any lead lists

229

1 --
2    A.   Huh-uh.
3    Q.   -- from any company?
4    A.   Huh-uh.
5       MS. REYES:  "Yes" or "no"?
6       THE WITNESS:  No.  No, no, no,
7 no, no.
8    Q.   (BY MR. ABERNETHY)  So do you know if
9 Sumco had consent to call individuals
10 identified in their tracebacks?
11   A.   They did give opted-in information.
12   Q.   But do you know if they had consent?
13   A.   I don't know.
14   Q.   Do you know where they obtained their
15 opted-in information?
16   A.   Like I say, they -- in the beginning,
17 they had told me they were receiving opted-in
18 information on their websites; and in the
19 beginning, I believed it.  It wasn't until I
20 got indicted with the FCC lawsuit that I had
21 reached out to them and told them, "Hey,
22 listen.  Can you get ahold of your data guy and
23 see if he can -- how much he would charge to
24 send me 69 million opted-in information?"
25       He's like, "Why?"

John Spiller - 3/2/2022

230

1    And I was like, "Because the
2 guys I was selling my health insurance calls
3 to, they were sending me the leads, cannot
4 provide me with any opted-in leads."
5    So at that point he said, "Well,
6 let me see what I can do."
7    And that's when he came back on
8 the phone. He called me potentially -- I
9 called him around 8:00 in the morning. He
10 called me sometime around 3:00 or 2:00 that
11 afternoon and said, "Listen, we have a good
12 friend of ours that works high up in the
13 government, in the United States Government.
14 He has access to everyone's IP address in the
15 United States. You need to send them -- if you
16 send me your -- your numbers, I'll send it to
17 him; and he'll put it together for you."
18    I said, "Okay. How much is this
19 going to cost me?"
20    He was, like -- well, in the
21 beginning, he said -- I -- I don't remember how
22 much he said. I think he only said probably
23 about probably 3- to 5,000. Then, by the end
24 of it, he was quoting me somewhere around
25 80,000 to a hundred thousand dollars. I was,

231

1 like, "I can't afford that."
2    Q.  (BY MR. ABERNETHY)  All right. So
3 according to the records that we, the
4 Plaintiffs, have obtained from Industry
5 Traceback Group, 14 tracebacks were sent to
6 JSquared between February 2022 through
7 July 2022 [sic] related to auto warranty calls.
8 Would those --
9    A.  2022?
10    Q.  2020 through -- February 2020 through
11 July of 2020.
12    A.  Oh, yeah. I was about to say they
13 are definitely not a part of 2022. Okay.
14    Q.  So would those calls have been
15 related to Sumco Panama?
16    A.  Only Sumco Panama, yes, sir.
17    Q.  And their service with JSquared?
18    A.  Yes.
19    Q.  And who at JSquared would have
20 received those traceback requests?
21    A.  John Spiller.
22    Q.  And were you -- so you're aware of
23 all -- every one of those tracebacks --
24    A.  During that time I spoke with Michael
25 Lansky. Michael Lansky had told me that David

232

1 Frankel was not someone I needed to be
2 concerned about. He also told me he was kind
3 of like a snake in the grass. So I decided to
4 not respond to the tracebacks until July of
5 2020 or -- no. Actually, I was responding to
6 those tracebacks of 2020. Yeah, I responded to
7 all those tracebacks.
8    Q.  Did you ignore any of them?
9    A.  Yeah, I ignored the initial ones that
10 he sent me. I think he sent me initial ones in
11 2018, 2019. I ignored almost all those.
12    Q.  But you responded to every one in
13 2020?
14    A.  Uh-huh.
15    Q.  And did those traceback requests
16 contain audio recordings of those reported
17 illegal robocalls?
18    A.  Some of them did. Some of the audio
19 recordings were incorrect.
20    Q.  Did you listen to all those
21 recordings?
22    A.  Uh-huh.
23    Q.  Did each of those recordings include
24 the name Sumco?
25    A.  Huh-uh.

233

1    Q.  Was any other business name included
2 on those recordings?
3    A.  Not that I remember.
4    Q.  Did any of those recordings include a
5 telephone number that a consumer could call to
6 opt out?
7    A.  Uh-huh.
8    MS. REYES:  "Yes" or "no"?
9    A.  An 800 number, yes.
10    Q.  (BY MR. ABERNETHY)  All of them?
11    A.  Yes. I mean, sometimes the traceback
12 team would cut off the recording so you
13 couldn't hear the end of the recording.
14 Sometimes they would start the recording after
15 the recording had already started off with the
16 consumer's name or the caller's name. So, I
17 mean, there's a lot of hearsay in that by the
18 traceback team.
19    Q.  And how do you know they were
20 altering the recordings?
21    A.  Because you would hear them hang up
22 the phone before the end of the message and you
23 would also hear it -- hear the message come up
24 in the beginning and you wouldn't hear the
25 first five seconds of it; but you'd definitely

234

1   hear the op- -- the operator that they were
2   using to say, "Press one." And you know that
3   there's a section before that that's already
4   been said, so you know that that traceback team
5   was omitting the first part of the call and
6   taking out the last number of the call as well.
7       Q.   And did you help write any of those
8   messages or scripts?
9       A.   No.
10      Q.   But you knew there would be missing
11  parts how?
12      A.   Because they did that to me on
13  JSquared Telecom and Rising Eagle Capital after
14  we changed the message in 2019.
15      Q.   Did you ever confirm that the
16  messages were altered?
17      A.   Yeah. I spoke to my attorney about
18  it, and my attorney told me to -- I brought him
19  on to one conversation we had with David
20  Frankel.
21      Q.   And your attorney confirmed that the
22  messages were altered?
23      A.   No. He -- he went -- he went back to
24  David Frankel and told him, "Why are you
25  editing the messages?"

235

1           And he was like, "We're not
2   editing the messages."
3           He was like, "You're capturing
4   the message, but you're only putting in the
5   first -- not from zero, from point zero.
6   You're putting it in from point 10 seconds --
7   or point 3 seconds to point 20 seconds, and
8   you're leaving out the beginning of the message
9   and the end of the message."
10      Q.   Were you ever told by USTelecom that
11  those messages were obtained from call
12  recipients' voicemails?
13      A.   Yes. But then if they were obtained
14  by the voicemails, then their voicemails should
15  have picked it up from the beginning; but I
16  guess a lot of times it's when the voicemail
17  picks up, they're going to say: Hi. This is
18  such and such. Please leave your name and
19  number after the beep.
20          However many seconds that goes
21  on for from the time they say hello to the
22  beep, that's the gap I'm talking about in those
23  messages that are being recorded.
24      Q.   Okay. So how did -- generally, did
25  JSquared respond to these traceback requests

236

1   then?
2       A.   By answering them directly.
3       Q.   And what would -- what would that
4   response -- what would that answer look like?
5       A.   To Sumco's tracebacks?
6       Q.   To JSquared's tracebacks.
7       A.   About Sumco?
8       Q.   Uh-huh.
9       A.   Asking for opted-in information, I
10  would provide them with the opted-in
11  information within three days.
12      Q.   Did you ever request full versions or
13  copies of the robocalls from Sumco?
14      A.   Huh-uh.
15      Q.   Did you ever request anything to
16  confirm the contents of those messages?
17      A.   Huh-uh.
18          MS. REYES: "Yes" or "no"?
19          THE WITNESS: No.
20      Q.   (BY MR. ABERNETHY) Why not?
21      A.   Because I was only selling them VoIP
22  telecom minutes. I didn't think it was my
23  responsibility to do due diligence on a company
24  that was only buying one point of currency from
25  me, which was VoIP telecom minutes. I wasn't

237

1   making money off of the sales he was making. I
2   wasn't invested in his company. I wasn't a
3   partner in his company. I was only selling him
4   VoIP telecom minutes.
5       Q.   Did Sumco ever give opt -- opt-in
6   information to you to give --
7       A.   Yes.
8       Q.   -- to the traceback group?
9       A.   Yes.
10      Q.   Did they provide copies of the actual
11  agreements signed by the call recipients?
12      A.   They -- they didn't give that. They
13  sent me the website of the jargon at the bottom
14  and the timestamp of the date that the e-mail
15  went out as well as the information that they
16  went in and clicked a button and pushed
17  "submit" on their website.
18      Q.   So you personally visited their
19  website?
20      A.   Uh-huh.
21          MS. REYES: "Yes" or "no"?
22          THE WITNESS: Yes.
23      Q.   (BY MR. ABERNETHY) And how do you
24  know that website language was the same? How do
25  you know that it was the same language

John Spiller - 3/2/2022

238

1  that they sent you that the call recipient saw
2  on that website?
3      A.  You can look at the timestamp at the
4  bottom of the web page and you can look at the
5  timestamp at the bottom of the page that they
6  sent me with the date stamp on it.  Those would
7  usually match up.  If those never matched up,
8  then we would have an issue; but I don't
9  believe that it never -- ever never matched up.
10     Q.  And that website contained language
11 about the law on electronic signatures?
12     A.  Yes.
13     Q.  Did those opt-ins contain information
14 about the companies that were the actual
15 sellers of those car warranty services?
16     A.  No.  I just always assumed that Sumco
17 was the seller.  It wasn't until later on I
18 realized that they were not the seller.  They
19 were a reseller of VoIP telecom minutes.
20     Q.  So according to those records from
21 the traceback group, it looks like JSquared
22 received four tracebacks related to auto
23 warranty calls within that first month of
24 bringing Sumco on as a client for you.  After
25 that did you take any steps additionally to

239

1  verify the consent related to those calls?
2      A.  Yeah.  I asked them for opted-in
3  information for all the leads they were dialing
4  on, and he sent -- he always sent me opted-in
5  information.  When he sent me opted-in
6  information, I would send it to USTelecom team
7  and send them the URL that they went to; and
8  I'd send them a copy of the URL that they went
9  to and filled in the information.
10     Q.  According to those records, again,
11 from Industry Traceback Group, Great Choice was
12 sent 26 tracebacks from August 2020 to August
13 2021 related to auto warranty calls.  Would
14 those have gone to Mikel Quinn's e-mail address
15 for Great Choice?
16     A.  You said what?
17     Q.  So Great Choice was sent 26
18 tracebacks from August 2020 to October 2021
19 related to auto warranty robocalls.
20     A.  Right.
21     Q.  Would those have gone to Mikel
22 Quinn's gmail?
23     A.  Yes.
24     Q.  Did you ever see those?
25     A.  No.  He must have forwarded them to

240

1  me.  And they wouldn't have gone to his gmail.
2  I think they went to his -- his business e-mail
3  address.
4      Q.  And did he forward all 26 of those to
5  you?
6      A.  Yes.
7      Q.  Did he ever respond?
8      A.  Yeah.
9      Q.  He responded to the traceback
10 requests?
11     A.  Uh-huh.
12     Q.  Did you also help respond to those
13 traceback requests?
14     A.  I had told him that, "This is the
15 opted-in information" or I would send him a
16 list of the numbers that they were dialed the
17 opted-in information; and then he would put his
18 own words in it and send it in.
19     Q.  So you took additional steps to ver-
20 -- to verify the consent at that point?
21     A.  (Witness nods head.)
22     Q.  Did you ever respond for Great Choice
23 by the name John Caldwell to those traceback
24 requests?
25     A.  I don't believe I did.  I did go by

241

1  the alias John Caldwell after the lawsuit
2  happened.
3      Q.  Why is that?
4      A.  Because my name was destroyed.
5      Q.  And did you only use it in responding
6  to traceback requests?
7      A.  No.
8      Q.  Who did you go under that alias with
9  or to?
10     A.  People that were my clients, vendors.
11     Q.  Did you ever respond to any legal
12 requests by the name John Caldwell?
13     A.  I might have used John Caldwell at
14 john@greatchoicetelecom.com to respond, yes,
15 sir.
16     Q.  To respond to what?
17     A.  To subpoenas.
18     Q.  By who?
19     A.  By state departments, by the FBI.
20     Q.  Do you know which state departments?
21     A.  Huh-uh.
22         MS. REYES:  "Yes" or "no"?
23         THE WITNESS:  No.
24     Q.  (BY MR. ABERNETHY)  And did Sumco
25 ever use a different business name when doing

242

1 business with Great Choice?
2    A.  Yeah.  Moby Telecom, Sumco Panama,
3 Sumco, and Moby Telecom -- or Moby Telco.
4    Q.  What about Techni-Logic?
5    A.  No.  They -- they sent me an e-mail
6 once from Techni-Logic, and that's when I knew
7 that -- when I looked up that name, that name
8 popped up with all sorts of fraud shit that
9 populated up with it.  And I realized, "Oh,
10 wow, this company wasn't good."  And they
11 didn't send me that e-mail until the end of
12 their time with me in 2021.
13    Q.  But Techni-Logic was not operated by
14 Sumco?
15    A.  It was.
16    Q.  Were all those companies operated by
17 the same individual?
18    A.  Uh-huh.  McDarius, yeah.
19    Q.  Do you know why they changed those
20 names?
21    A.  They continued changing names and
22 bank account information on the regular.
23    Q.  Did you ever tell USTelecom about
24 these other company names of Sumco --
25    A.  I did.

243

1    Q.  -- in responding to tracebacks?
2    A.  I did.
3    Q.  All of them?
4    A.  Whatever ones I knew at the time.
5    Q.  And did you ever lead USTelecom to
6 believe that JSquared or Great Choice were
7 making the auto warranty leads?
8    A.  No.  I never one time admitted to
9 David Frankel any of those lies that he told on
10 the FCC.
11    Q.  And did these concerns that you had
12 -- or these concerns about Sumco ever lead you
13 to reconsider whether those opt-ins were valid
14 or not?
15    A.  Yes.  After he had told me he was
16 able to opt in 30 million -- opted-in
17 information on 30 million -- on numbers that I
18 had gotten from Scott and Mike, I had to assume
19 that they were potentially fraudulent as well,
20 how they were obtained.
21    Q.  And when was that conversation about
22 the 30 million leads?
23    A.  Two months, three months after the
24 FCC filed bankrupt-- -- filed a lawsuit against
25 me, in August or September.

244

1    Q.  And when you told USTelecom that Moby
2 Telecom sent you Sumco's calls, was that false
3 information?
4    A.  Say that again.
5    Q.  When you told USTelecom that Moby
6 Telecom had sent you Sumco's calls, was that
7 false information?
8    A.  It wasn't false information.  It was
9 the truth.  Moby Telecom was the new alias for
10 Sumco Panama.
11    Q.  But do you think they were separate
12 companies?
13    A.  I believe Sumco set up Moby Telecom
14 to sell VoIP telecom minutes to his call
15 centers.  So, yes, I believe they were separate
16 entities; but at the same time, they were still
17 ran by the same individual.
18    Q.  So you don't think that was false
19 information?
20    A.  No.
21    Q.  Do you think it was misleading?
22    A.  No.  I told them the truth.  I said
23 Moby Telecom also known as Sumco.
24    Q.  And what's your understanding of what
25 an alias means?

245

1    A.  It's an assumed name.  It could be a
2 name that someone uses.  It could be a -- it's
3 not illegal to do.
4       MR. ABERNETHY:  All right.
5 We'll pass the witness.
6       MR. DAVIDSON:  Why don't we take
7 a break?
8       THE VIDEOGRAPHER:  All right.
9 We'll go off at 4:20.
10       (Off the record from 4:20 to 4:29 p.m.)
11       THE VIDEOGRAPHER:  All right.
12 We're back on the record.  It's 4:29.
13           EXAMINATION
14 BY MR. DAVIDSON:
15    Q.  Mr. Spiller, my name's Shepard
16 Davidson.  I represent Scott Shapiro in the
17 matter we're here for today, and it's my turn
18 to ask you some questions.  I'd like you to
19 answer them to the extent you know the answer.
20 If you don't know the answer, just let me know
21 that you don't know the answer.  If you know
22 some of the information but not all of it, let
23 me know what you do know; and then just tell me
24 you don't know the rest of it.
25       If you don't understand any of

246

1 my questions, let me know. I'll try to
2 rephrase it and make it understandable. If you
3 do answer, I'm going to assume that you do
4 understand the question.
5        If you make a statement at any
6 point and you want to go back and add to or to
7 change your testimony at any point, just let me
8 know; and we'll go back to that. Do you
9 understand all that?
10    A. Yes, sir.
11    Q. Okay. So -- and some of this stuff,
12 I apologize. You may have answered some of
13 these questions before, but -- but probably not
14 all of them.
15        I think you said you haven't had
16 any conversations about this deposition with
17 anyone? Well, let me just ask you: Have you
18 had any conversations about this deposition
19 with anyone?
20    A. Not that I'm aware of.
21    Q. Okay. Well, you'd be aware if you
22 had conversations about --
23    A. Yeah, I would. I mean, the only
24 person I had a conversation with was with my
25 girlfriend.

247

1    Q. Okay. When did you have that
2 conversation?
3    A. Yesterday.
4    Q. Okay. What did you say, and what did
5 she say in that conversation?
6    A. I was nervous about coming in here,
7 going in front of Scott Shapiro and yourself.
8 She told me just to pray about it and to just
9 tell the truth. And I said, "Okay. Will do."
10    Q. Did you discuss anything about what
11 you might say or what the subject matter of
12 your testimony might be?
13    A. No, sir.
14    Q. Okay. I think you said you didn't
15 discuss this deposition with Jakob Mears?
16    A. That's correct.
17    Q. Okay. And have you discussed this
18 lawsuit with anybody other than your attorneys
19 when you've had attorneys representing you?
20    A. Yeah.
21    Q. Who else did you discuss this lawsuit
22 with?
23    A. Just about everyone in my life at
24 that point.
25    Q. And what kinds of things did you talk

248

1 to them about?
2    A. Talked to them about my robodialing,
3 about how I -- almost everyone in my past knew
4 that I was working for Scott and much --
5 Michael Smith and Scott Shapiro during that
6 time. So when the lawsuit fell on me, everyone
7 in Florida was talking about it. I even tried
8 to reach out to Seth Cohen; and he told me on a
9 phone call, "Don't -- don't contact me again.
10 I don't want to have anything to do with you."
11        I said, "Okay."
12    Q. Okay. You just said you worked for
13 Scott Shapiro. You never worked for Scott
14 Shapiro, did you?
15    A. I did.
16    Q. Did you have an agreement with Scott
17 Shapiro?
18    A. Yeah. When we hit X amount of sales
19 calls, he would end up paying me through
20 Michael Smith's or Health Advisors' room. In
21 the beginning it was $250 a sale.
22    Q. You had an agreement with Health
23 Advisors of America; isn't that correct?
24    A. No. I had an agreement with Scott
25 Shapiro and Michael Smith that were the owners

249

1 of Health Advisors of America.
2    Q. Okay. Aren't you aware Scott Shapiro
3 never had any ownership interest in Health
4 Advisors of America?
5    A. But he did because they were selling
6 exclusively his products.
7    Q. Aren't you aware that Scott Shapiro
8 never had any ownership interest in Health
9 Advisors of America?
10    A. I do not know.
11    Q. You don't know.
12        Okay. You were paid ultimately
13 by Health Advisors of America, not by Scott
14 Shapiro; isn't that correct?
15        MR. FRANQUI: Objection.
16    A. I believe so, yes.
17    Q. (BY MR. DAVIDSON) Okay. I think you said you
18 didn't believe you'd ever been deposed before, correct?
19    A. That's correct.
20    Q. Okay. Have you ever been a witness
21 at a trial?
22    A. No, sir.
23    Q. Okay. Have you ever been convicted
24 of a crime?
25    A. Yes.

250

1    Q.  Okay.  How many times?
2    A.  Five times, six times.
3    Q.  Okay.  What were you convicted of?
4    A.  DWI one, DWI two, DWI three, DWI
5  four.
6    Q.  Okay.
7    A.  Evading arrest.  Another one was -- I
8  forgot the name; I forgot what it's called.  It
9  fell off my record in Twenty- -- 2006.  I made
10  some comments to an officer when they arrested
11  me.
12    Q.  Okay.  So four variations of DWIs --
13    A.  Uh-huh.
14    Q.  -- evading arrest, and then something
15  you said to an officer.
16    A.  Uh-huh.
17    Q.  Those are the convictions?
18    A.  Yes, sir.
19    Q.  Okay.  And what is your current
20  status?  I think you said you're on probation?
21    A.  Yes.
22    Q.  Explain to me what the terms of your
23  probation are.
24    A.  I'm supposed to report once a month.
25  I have a Breathalyzer in my vehicle; I have to

251

1  blow into it every morning.  I have to pay my
2  court fees, which is around $65 a month.
3  That's pretty much about it.
4    Q.  How long are you on probation for?
5    A.  In Travis County I'm on probation
6  until 2025.  In Harris County I come off of
7  probation this year.
8    Q.  And are both of those probations
9  related to the incarceration that you testified
10  about earlier today, or not?
11    A.  Yes.
12    Q.  Okay.  Other than in relation to
13  those six different convictions we talked
14  about, have you ever been arrested?
15    A.  Yes.
16    Q.  Okay.  How many times have you been
17  arrested other than in connection with any of
18  those six convictions?
19    A.  Well, all of those were all related
20  to drinking.  Therefore, I was an alcoholic by
21  the age of 20.  So I was arrested from the age
22  of 20 on up.
23    Q.  How many times were you arrested
24  other than in direct connection with each one
25  of those convictions you just told me about?

252

1    A.  I don't remember.
2    Q.  More than ten?
3    A.  Potentially.
4    Q.  Okay.  And that was all related to --
5    A.  Alcohol abuse and public intoxication
6  or speeding violations.
7    Q.  You testified earlier today about
8  downloading some lists from I think it's a
9  Chris Basso --
10    A.  Uh-huh.
11    Q.  -- or his company?
12    A.  Uh-huh.
13    Q.  Again, you have to say "yes" or "no."
14    A.  Yes.
15    Q.  Okay.  Essentially, you stole those
16  lists; is that correct?
17    A.  That's correct.
18    Q.  Okay.  Now, I think you testified --
19  and correct me if I'm wrong; I may not have
20  this right -- you were out of the business of
21  selling leads sometime late 2020?
22    A.  Yes, sir.
23    Q.  Okay.  Can you explain to me why,
24  then -- well, why you would have left a
25  voicemail message for Michael Smith on December

253

1  31, 2020 offering to sell him transfers from
2  Blue Cross?
3    A.  I had found a company called U.S. --
4  I think they are called U.S. Health Advisors.
5  They're an insurance company.  And they were
6  hiring a gentleman in the Philippines to
7  generate them live transfers, which those are
8  considered live transfers when they've got a
9  person on the phone that answers the criteria
10  for the call.  And they were selling them at a
11  really cheap rate, so I wanted to connect them
12  with Michael Smith.
13    Q.  Well, didn't you leave him a message
14  saying, "I've been selling live transfers"?
15    A.  I think that was a false statement if
16  I did say that because I don't sell live
17  transfers.  I never sold them.  I've always
18  been a middleman in selling them, where I'm
19  able to find people that want to buy them to
20  put them in contact with the seller of it.  And
21  then that seller would pay me a dollar per
22  transfer.
23    Q.  So if you left a voicemail for him on
24  December 31, 2020 saying "I've been selling
25  live transfers," that was another lie?

John Spiller - 3/2/2022

254

```
1      A.  It wasn't a lie.  It was saying that
2  I've been selling live transfers indirectly
3  from a company that had already live trans- --
4  so I had -- I was selling live transfers for a
5  company, yes.
6      Q.  Okay.  So you were selling -- so let
7  me ask you again.
8      A.  Live transfers are not the same
9  things as paper leads.  Let's get that
10 straight.
11     Q.  I've got that straight.
12         Okay.  So as of December 31,
13 2020, is it true or false that you had been
14 selling live transfers for Blue Cross for the
15 past two months?
16     A.  Not for Blue Cross.
17     Q.  Okay.  So that would be a lie if you
18 said that?
19     A.  I don't know if I even said that.
20     Q.  Well, if I've got a voice message on
21 Mike Smith's answering machine that says you
22 said that, that would be a lie; is that fair?
23     A.  Yes.
24     Q.  Okay.  Just going back to something
25 real quick -- you've testified about this a
```

255

```
1  couple of times -- what's a press-1 call?
2      A.  A robocall.
3      Q.  And as December 31, 2019, you were
4  selling press-1 calls and making other illegal
5  robocalls; is that correct?
6      A.  I was calling on behalf of Scott
7  Shapiro and Michael Smith since 2017, making
8  illegal robocalls for their room specifically.
9      Q.  Okay.  If you can just answer my
10 questions, we'll get done with this a lot
11 quicker.
12     A.  I'm answering it to the complete
13 detail that I have in my recollection.
14     Q.  That's fine.  If you can just listen
15 to my question, it's pretty straightforward.
16         As of December 31, 2019, you
17 were selling press-1 calls and making other
18 illegal robocalls.  Is that correct, or is that
19 not correct?
20     A.  For Scott Shapiro and Michael Smith,
21 yes, sir.
22     Q.  So it's correct.  The statement I
23 said is correct?
24     A.  Yes.
25     Q.  Okay.  Great.
```

256

```
1          Earlier today the Plaintiff's
2  counsel played a few different voice
3  recordings; and there was at least one -- maybe
4  two -- that was, I think, you and Mr. Mears and
5  Mr. Shapiro.  Do you recall that?
6      A.  Uh-huh.
7      Q.  You have to say "yes" or "no."
8      A.  Yes.
9      Q.  Okay.  When -- when you had that
10 conversation that we heard, you didn't know
11 that you were being recorded; is that correct?
12     A.  That's correct.
13     Q.  Okay.  Do you have any reason to
14 believe or any reason to think anybody on that
15 call thought they were being recorded?
16     A.  Yeah.  I'm pretty sure now, looking
17 back on it, that's one of the reasons why Scott
18 got back on the phone and said, "Listen, I
19 don't want any robocalls sent to me.  I don't
20 want any press-1s sent to me," because he knew
21 the phone call was being recorded --
22     Q.  Okay.
23     A.  -- and he was trying to hit me up.
24     Q.  You didn't know the phone call was
25 being recorded, right?
```

257

```
1      A.  I did know it because it said that
2  sometimes on those voice -- on those voice
3  calls.  When you pick up the phone it says,
4  "This phone call may be recorded."
5      Q.  So you did know that phone call was
6  being recorded?
7      A.  Yes.
8      Q.  Okay.  I'm just trying to get your
9  testimony straight here.
10         Have you ever abused Jakob
11 Mears?
12     A.  Abused?
13     Q.  Yes.
14     A.  What does that mean?
15     Q.  You don't understand what the word
16 "abuse" means?
17     A.  No.
18     Q.  Have you ever hit him?
19     A.  No.
20     Q.  Okay.  So if Jakob Mears testified
21 yesterday, here in this room, that you hit him,
22 he's a liar.  Is that your testimony?
23     A.  I never touched Jakob.
24     Q.  Listen to my question.  If Jakob
25 Mears testified in this room yesterday that you
```

258

1  hit him, it's your testimony that he's a liar.
2  Is that correct or not?
3      A.  Yes.
4          MR. SWETNAM:  Objection.
5      Q.  (BY MR. DAVIDSON)  And if Jakob Mears
6  said that he felt that your relationship with
7  him was abusive, you'd disagree with that.  Is
8  that your testimony?
9      A.  I believe that potentially -- in the
10 beginning I was on methamphetamines.  So during
11 those times on methamphetamines, my mood swings
12 would go from super hot to super cold
13 immediately.
14         MR. DAVIDSON:  Could you read
15 back the question, please?
16         THE REPORTER:  "QUESTION" -- I'm
17 sorry.  I think I wrote something down wrong
18 when I got an objection.
19         MR. DAVIDSON:  If you don't have
20 it, I'll restate it.  I thought it'd be easier
21 to just read it.
22         THE REPORTER:  Well, I have
23 before the objection and then I was trying to
24 see who objected and I think I lost something.
25         MR. DAVIDSON:  Okay.

259

1      Q.  (BY MR. DAVIDSON)  Mr. Spiller, let
2  me try again.  My question's pretty simple.
3  All right?  If Jakob Mears testified yesterday
4  that he felt that your relationship with him
5  was abusive, you'd disagree with that; is that
6  correct?
7      A.  I would agree with that.  If he would
8  have testified, then, I had mis- -- mis-viewed
9  our relationship from the start.
10     Q.  Okay.  So we're clear, you don't
11 dispute his testimony that he felt your
12 relationship was abusive?
13     A.  No, sir.
14     Q.  And I asked you about hitting
15 Mr. Mears.  Did you ever threaten him?
16     A.  I don't remember.  Again, those days
17 I was on methamphetamines.  Therefore, a lot of
18 the things I did I don't have a recollection
19 of.
20     Q.  So you might have threatened him; you
21 just don't recall?
22     A.  Yes.
23     Q.  Okay.  You're not going -- if
24 somebody testified that they saw you threaten
25 him, you're not going to dispute that?

260

1      A.  No, sir.
2      Q.  Okay.
3          MR. DAVIDSON:  Can we go -- is
4  it 57, you said, for the Affidavit?
5          MR. ABERNETHY:  Yes.  Do you
6  need me to give him a copy?
7          MR. DAVIDSON:  Oh, I've got a
8  copy.
9          (Exhibit 57 discussed.)
10     Q.  (BY MR. DAVIDSON)  I've just handed
11 you, Mr. Mears -- Mr. Spiller, what's been
12 marked as Exhibit 57, which is your Declaration
13 in the FCC case; is that correct?
14     A.  Yes, sir.
15     Q.  All right.  And you signed that
16 Declaration under the penalty of perjury; is
17 that correct?
18     A.  That's correct.
19     Q.  All right.  And so you knew that was
20 a very serious document when you signed it,
21 correct?
22     A.  That's correct.
23     Q.  What does it mean to you to sign
24 something under the penalty of perjury?
25     A.  It means I'd better be very honest

261

1  and straightforward in this message.
2      Q.  Okay.  So you knew people were going
3  to rely on that Declaration; isn't that
4  correct?
5      A.  That's correct.
6      Q.  And is there anything in that
7  document that's not truthful?
8      A.  Not that I remember.
9      Q.  Okay.  And who did you talk to about
10 that document, if anyone, before you signed it?
11     A.  My attorneys.
12     Q.  Okay.  Anybody else?
13     A.  Not that I recall.
14     Q.  You had a chance to go over it with
15 your attorneys and make sure it was accurate
16 before you signed it, correct?
17     A.  I believe I did.
18     Q.  Okay.  So let's turn to Page 2.
19     A.  Uh-huh.
20     Q.  You see Paragraph 4 up there?
21     A.  Yes, sir.
22     Q.  So it says, "From the middle of 2018
23 through December 2019, Rising Eagle provided
24 marketing-related consulting and services to a
25 large client, Health Advisors of America, Inc."

John Spiller - 3/2/2022

262

1 Did I read that correctly?
2    A.  Yes, sir.
3    Q.  Okay.  Tell me what those marketing
4 and consulting-related services were.
5    A.  Calls, generating calls.
6    Q.  Okay.  And I believe you testified
7 earlier you came to work for Health Advisors.
8 Mike Smith reached out to you; is that right?
9    A.  That's correct.
10    Q.  Okay.
11    A.  He didn't tell me the name of his
12 company when he reached out to me.
13    Q.  So you negotiated that deal with Mike
14 Smith.  Mr. Shapiro wasn't even in the picture
15 at that point, correct?
16    A.  In the beginning, he wasn't.  It
17 wasn't until he told me -- Mr. Smith called me
18 and told me that the reason he didn't want to
19 bring up his business partner, Scott Shapiro,
20 was because he didn't know if me and him had --
21 we had a rough outing in the past when I sold
22 him auto insurance leads, which I don't even
23 remember.
24    Q.  Well, actually, in 2015, didn't Seth
25 Cohen hire you to, quote, "take down," close

263

1 quote, Scott Shapiro?
2    A.  Not Scott Shapiro.  He hired me to
3 take down Matt Herman.
4    Q.  So if Mr. Cohen were to have given a
5 Declaration under oath saying that he hired you
6 to take down Scott Shapiro, he'd be perjuring
7 himself?  Is that your testimony?
8    A.  No.
9    Q.  It's not.  So he'd be correct if he
10 said that?
11    A.  I mean, if he did say that, then he
12 did say it.  I'm not -- I wasn't in the room.
13 I can't tell you if he said it or didn't say
14 it.
15    Q.  Okay.  And if Matt Jones had signed a
16 declaration saying that you admitted to him
17 that you'd been hired to take down Scott
18 Shapiro, would he be perjuring himself?
19    A.  I never brought up Scott Shapiro in
20 any of my conversations with Matt Jones or Seth
21 Cohen.
22    Q.  Okay.  Mr. Spiller, listen to my
23 question; and answer my question.  Okay?
24    A.  But your question is convoluted.
25 You're not even asking me a direct question.

264

1    You're asking me if someone made a statement,
2 would it be perjuring.  And the answer to that
3 question is:  I wasn't there.  How would I even
4 know what was said, what was communicated?
5    Q.  Mr. Spiller, if Matt Jones were to
6 have given a Declaration saying that you
7 admitted to him that you had been hired to take
8 down Scott Shapiro, would he have been
9 committing perjury if he did that?
10    A.  Yes.
11    Q.  Okay.  Let's go back to your
12 Declaration.  Paragraph 6, the last sentence
13 says, "For each of the campaigns, Health
14 Advisors provided Rising Eagle the lists of
15 consumer telephone numbers to be called via the
16 Health Advisors calling platform."  Did I read
17 that correctly?
18    A.  Yes.
19    Q.  Is that a true statement?
20    A.  This -- this -- this information
21 written up by Roth & Jackson's Senior Advisor
22 or whatever he was, a cocounsel individual,
23 these are his words.  I had spoke to him over
24 the phone, told him what Mike and Scott's leads
25 were about; and he ended up writing them out in

265

1 his own words.
2    Q.  Okay.  Who signed the last page of
3 that Declaration?
4    A.  I did.
5    Q.  You signed it under the penalty of
6 perjury, right?
7    A.  Yes, I know I did; but at the same
8 time, a lot of these words are words I don't
9 even use in my vocabulary.  Therefore, that
10 should automatically state that not these words
11 are not from me directly.  They are from the
12 attorney group that I had hired to fight my
13 case for me.  One of the reasons why I had to
14 fire them or they had to leave me because I had
15 no more money to pay them.
16    Q.  So you don't know whether the
17 statements in this Declaration are true or not,
18 do you?
19    A.  I do know they're all true.
20    Q.  Okay.
21    A.  But I will say that the words that
22 they used are not from me directly.
23    Q.  Okay.  Let's go back to Paragraph 6
24 --
25    A.  Uh-huh.

266

1    Q.  -- the last sentence.  All right?
2    A.  Uh-huh.  "For each of these
3  campaigns, Health Advisors provided Rising
4  Eagle the lists of consumer telephone numbers
5  to be called via the Health Advisors calling
6  platform."  Now, that "via the Health Advisors
7  calling platform," I don't even have a clue on
8  what that -- what that means.
9    Q.  Okay.  So you don't know if that
10 statement's true or not; is that correct?
11   A.  Well, I know that statement, part of
12 it would be true because it would be Health
13 Advisors providing Rising Eagle Capital the
14 lists of consumer telephone numbers.  That's
15 true.  But I don't know what Health Advisors
16 calling platform is.
17   Q.  So you don't know if all of that
18 statement is true or not.  Is that fair?
19   A.  That's true.
20   Q.  Okay.  Again, yet, you signed also
21 saying this is true under the penalty of
22 perjury?
23   A.  That's true; but at the same time, my
24 attorneys sent this to me on a -- they gave me
25 three days to review it.  I did a fast read on

267

1  it the first day.  The second day -- and during
2  this time I was trying to manage -- my life was
3  up in a -- up in array.  I don't even have a
4  clue on a lot of these...
5       (Witness quietly reading
6  document to himself, indistinguishable to the
7  reporter.)
8    Q.  (BY MR. ABERNETHY)  Okay.
9  Mr. Spiller?
10   A.  Uh-huh.
11   Q.  Rising Eagle never made calls for
12 Health Advisors of America from lists other
13 than ones that Health Advisors of America
14 provided; is that your testimony?
15   A.  No, sir.
16   Q.  Okay.  How many calls did Rising
17 Eagle make for HAA?
18   A.  Umm...
19   Q.  Millions?
20   A.  Yes, sir.
21   Q.  Okay.  Tens of millions?
22   A.  Yes, sir.
23   Q.  Okay.  Did you promise that you were
24 going to scrub leads that HAA or Mr. Shapiro
25 provided to you for making calls?

268

1    A.  Not in the beginning.
2    Q.  Okay.  So at some point you did?
3    A.  Yes.
4    Q.  Okay.
5    A.  And that was -- and that was refuted
6  by both parties.  They were telling me, "Why
7  are you going to scrub the leads when we've
8  already scrubbed them?"
9    Q.  And are you familiar with -- well,
10 you testified about what an opt-in clause is?
11   A.  Uh-huh.
12   Q.  You have to say "yes" or "no."
13   A.  Yes.
14   Q.  Okay.  And are you aware that an
15 opt-in clause is only good for a certain amount
16 of time?
17   A.  Yes, 90 days.
18   Q.  Okay.  And --
19   A.  That's why after we were running the
20 leads, I told Jakob to start scrubbing the
21 leads after the 90th day to make sure that
22 those leads are no longer -- because those
23 leads are no longer opted in.
24   Q.  And of the lists that Mr. Shapiro
25 directly gave to you, as opposed to any that

269

1  you got from Michael Smith or somebody else at
2  Health Advisors of America, didn't Mr. Shapiro
3  warn you that the lists he was providing you
4  were old?
5    A.  Some of them he did, but the majority
6  of them I asked him were they within 90 days.
7  And he said yes, or sometimes he would say the
8  leads were already scrubbed.
9    Q.  So if Mr. Shapiro says that he did
10 tell you that the lists he provided you were
11 old, all of the lists, he's lying?
12   A.  In some case, yes.
13   Q.  What do you mean "in some case"?
14   A.  Because some of the lists he sent me,
15 when he said that they were old, I asked him
16 how old were they.  I asked him directly, "Are
17 they less than 90 days?"  And sometimes he
18 would say yes.  Sometimes, when he would say
19 no, I would get Jakob to scrub those lists.
20   Q.  So if he made the blanket statement,
21 okay, "All the -- every time I gave John
22 Spiller lists, I told him" --
23   A.  But that's bullshit.  He never -- he
24 never told me that.  That's a lie.  That's a
25 straight-up lie.

270

```
1      Q.  Let me just ask the question.  Okay?
2   If Mr. Shapiro says, "Every time I gave Mr.
3   Spiller lists, I told him they were old,"
4   you're saying he'd be lying, right?
5      A.  Yes.
6      Q.  Okay.  Now, at the same time you're
7   making calls for Health Advisors of America,
8   you're also making calls for other companies;
9   isn't that correct?
10     A.  That's correct.
11     Q.  Okay.  And if you called one of the
12  numbers on lists Mr. Shapiro gave you, there's
13  no way to tell whether you were calling that
14  number on behalf of HAA or some other client of
15  yours, correct?
16     A.  Yes, there was.
17     Q.  Okay.
18     A.  Based upon the clusters that we had
19  assigned.  Some were assigned to Scott and
20  Mike.  Some clusters were assigned to other
21  clients that we met through either Matt Herman
22  or caught wind from Scott Shapiro or Michael
23  Smith that they were buying calls from him.
24     Q.  Okay.  I didn't make myself clear.
25  Is there any way today to tell --
```

271

```
1      A.  No.
2      Q.  Okay.  Let me just ask the question.
3      A.  Unless -- unless -- actually, there
4   possibly could be if -- because I'm certain
5   that Hello Hunter still has records of every
6   number dialed because I contacted them back in
7   2021; and I asked them if they had records of
8   all the numbers ever dialed.  And they said,
9   "Yes."
10          And I said, "Okay," because
11  Jakob and I had a list down, Number 1 Cluster,
12  Number 24 Cluster; Number 48 was divided
13  between Scott Shapiro's room and Michael
14  Smith's room and the other clients; Cluster 56
15  was Scott's and Shapiro's room -- or Scott's
16  and Smith's room; 60 and 68 was also Scott and
17  Mike's room.
18     Q.  Do you think there's a way today that
19  if there was a number dialed on March 12th,
20  2020, you could -- you could determine whether
21  that was called on behalf of Health Advisors of
22  America or another customer of yours?
23     A.  If it was broken down by cluster,
24  yes, sir.
25     Q.  What do you mean, if it was broken
```

272

```
1   down by cluster?
2      A.  So if Hello Hunter had the calls that
3   were made from Cluster 1, 24, 48, 60, 68, and
4   56, and let's say they say it came from
5   Cluster 48, then they would be able to
6   determine relatively quickly on who -- whose --
7   whose information we were sending that call to
8   because Scott gave us -- Scott and Mike gave us
9   certain DIDs to send calls to.  All the other
10  numbers were given other DIDs to send calls to.
11     Q.  Let's go back to your Declaration,
12  Paragraph 7 on page 2.
13     A.  Uh-huh.
14     Q.  "Health Advisors consistently
15  represented to Rising Eagle that all consumer
16  information it provided to Rising Eagle was
17  from consumers who had provided prior express
18  consent to be contacted by Health Advisors, or
19  parties making calls on Health Advisors'
20  behalf."  Did I read that correctly?
21     A.  Yes.
22     Q.  That was important to you, right?
23     A.  Yes.
24     Q.  And that's because you knew it would
25  be illegal for Rising Eagle to make calls that
```

273

```
1   you were making if you didn't have those
2   consents?
3      A.  That's correct.
4      Q.  Okay.  Did you ask how HAA was able
5   to get consents from tens of millions of people
6   on the lists that you were given?
7      A.  They said that they were buying them
8   from a wholesaler that had consent, IP
9   addresses, and all that.  I even asked Scott
10  for the IP addresses at one point.  He told me
11  no.  He said he's afraid that I was going to
12  resell them.
13     Q.  Let's turn to page 3, Paragraph 9.
14  The last sentence says, "Health Advisors
15  provided and/or approved the content of
16  prerecorded messages that were sent to
17  consumers via calling Health Advisors' calling
18  platform."  Did I read that correctly?
19     A.  Yes.
20     Q.  Okay.  Who at Health Advisors of
21  America provided or approved that content?
22     A.  Michael Smith.
23     Q.  Okay.  Let's go down to Paragraph 12.
24  It says, "Additionally, Health Advisors
25  instructed that its calls were to be made using
```

274

1  unassigned caller ID numbers; and Health
2  Advisors either directly provided Rising Eagle
3  with those unassigned call I -- caller ID
4  numbers to be used or otherwise instructed
5  Rising Eagle to ascertain additional unassigned
6  numbers that could be used for Health Advisors'
7  calls." Did I read that correctly?
8      A.  Yes, you did.
9          And at one point Scott Shapiro
10 and Michael Smith sent me a hundred DIDs from
11 their dialer company, VICIdial, that they had
12 acquired from them for us to use as our DIDs.
13     Q.  Okay. I appreciate that. Again, if
14 you'd just answer my questions, we'll get done
15 with this a lot quicker. I assume you want to
16 get out of here, as do I. Okay?
17         Who gave you that instruction
18 that I just read from Paragraph 12?
19     A.  Michael Smith or -- I mean, I don't
20 remember. It might have been Michael Smith; it
21 might have been Scott Shapiro.
22         I just remember during those
23 times Scott --
24     Q.  Mr. Spiller, you answered my
25 question, really.

275

1      A.  Okay.
2      Q.  And would that have been verbally or
3  in writing?
4      A.  Verbally.
5      Q.  Okay. Do you have any documentation
6  showing that you were given that instruction?
7      A.  I might have it in my cell phones.
8      Q.  Let's go to Paragraph 13 at the
9  bottom of page 3. It says, "Health Advisors
10 provided Rising Eagle with access to Health
11 Advisors' VICIdial calling platform to
12 facilitate Rising Eagle in carrying out Health
13 Advisors' marketing campaigns." Did I read
14 that correctly?
15     A.  Yes.
16     Q.  Now, did you and Mr. Mears have the
17 ability to load lists of consumers onto HAA's
18 VICIdial communications platform --
19     A.  No.
20     Q.  -- on your own?
21     A.  No, sir.
22     Q.  You just had the ability to view what
23 was going on?
24     A.  Yes, sir.
25     Q.  Okay. And run reports, as I

276

1  understand it, right?
2      A.  Yes, sir.
3      Q.  Okay. Let's go to page 5,
4  Paragraph 18. It says, "During the time I was
5  incarcerated I had no involvement with Rising
6  Eagle -- Eagle's operations and did not direct,
7  oversee, or receive any significant information
8  regarding Rising Eagle's actions. Although I
9  had minimal telephone contact with Mr. Mears,
10 my incarceration" -- sorry -- "during my
11 incarceration, any mention of Rising Eagle was
12 cursory and not at all detailed. Any
13 business-related discussions were confined to
14 high-level conversations about the overall
15 financial condition of the company." Did I
16 read that correctly?
17     A.  Yes, you did.
18     Q.  Okay. That's just not true, is it?
19     A.  I didn't have any involvement in
20 Rising Eagle's operations. I told Jakob to
21 load lists, better data lists, to send help to
22 HAA, more calls. I only spoke to him in the
23 morning and one time in the afternoon, usually.
24     Q.  Let me break it down for you. It
25 says right in the first line, "During the time

277

1  I was incarcerated I had no involvement with
2  Rising Eagle's operations." That's false,
3  right?
4      A.  How is that false?
5      Q.  So you're saying you had no
6  involvement with Rising Eagle's operations?
7      A.  How -- how -- I don't even have
8  access to a computer. How -- how else would I
9  have involvement with the operations?
10     Q.  Well, you talked to Mr. Mears twice
11 every day about the business, didn't you?
12     A.  I did. I spoke to him for five
13 minutes in the morning and five minutes in the
14 evening.
15     Q.  Okay. So you did have involvement
16 with Rising Eagle's operations, didn't you?
17     A.  No. I had -- I had conversations
18 with him about the finances, about Scott and
19 Mike not have -- or being upset with the calls
20 that they're receiving; they're not receiving a
21 lot of calls. I was trying to help them as
22 best as I could from where I was sitting, but
23 where I was sitting was inside a 6 X 6 cell
24 with videoconference and a telephone that's
25 attached to a wall.

John Spiller - 3/2/2022

278

1    Q.  So having calls and discussing Rising
2  Eagle's finances and having calls discussing
3  about the source of the only business that
4  Rising Eagle significantly had, you don't
5  consider that to be involvement with Rising
6  Eagle's operations?
7    A.  No.
8    Q.  Okay.  And -- and you say in here, "I
9  had minimal telephone calls with Mr. Mears."
10  Do you think it's minimal to say you talked to
11  him twice a day?
12    A.  Yeah.  Some people stay on the phone
13  in jail just about from morning until evening,
14  talking to their girlfriend or talking to their
15  lawyer or whoever they're talking to.
16    Q.  Okay.  So you testified earlier today
17  about -- I think you testified Rising Eagle
18  paid for Mr. Mears' housing expenses, correct?
19    A.  It didn't only pay for Mr. Mears.  It
20  paid for my housing expenses and everything
21  else.
22    Q.  Okay.  And -- and you also paid for
23  his food and gas and --
24    A.  Uh-huh.
25    Q.  -- and utilities --

279

1    A.  Uh-huh.
2    Q.  And other living experiences,
3  correct?
4    A.  Uh-huh.
5    Q.  You have to say "yes" or "no."
6    A.  Yes.
7    Q.  And --
8    A.  I already admitted that I broke the
9  corporate veil -- or breached it.
10    Q.  Okay.  Do you realize you -- you
11  committed tax fraud when you did all of that as
12  well?
13    A.  Yes, I do.
14    Q.  Okay.  Do you know who Gregory
15  Robbins is?
16    A.  No, sir.
17    Q.  So we established you signed this
18  Affidavit under the penalty of perjury not
19  knowing some of the information in here,
20  correct?
21    A.  That's correct.
22    Q.  Okay.  You lied about being the CEO
23  of Great Choice, correct?
24    A.  That's correct.
25    Q.  Okay.  You lied --

280

1    A.  I misled.  I misled.  I wouldn't say
2  I lied.  I misled.
3    Q.  Well, you told people you were the
4  CEO, didn't you?
5    A.  I know I did; but, again, that was
6  misleading.  I felt like my world was turned
7  upside down when I got sued by the FCC.
8    Q.  Were you ever CEO of Great
9  Choice?
10    A.  No.
11    Q.  You told people you were the CEO of
12  Great Choice?
13    A.  Well, I said that in a statement --
14    Yeah, you said that in a statement.
15    A.  -- on Skype, yes.
16    Q.  Okay.  Well, do Skype statements not
17  count?
18    A.  They do.
19    Q.  Okay.  I'm just trying to understand.
20    And you lied when you told
21  people your name was John Caldwell, right?
22    A.  I didn't lie.  My name is John
23  Caldwell Spiller.  So when I said "John
24  Caldwell," that's half my name.
25    Q.  So you were just misleading then; you

281

1  weren't lying?
2    A.  Yes.
3    Q.  Okay.  And you admitted you stole
4  lists from Chris Basso?
5    A.  Not directly Chris Basso, but from
6  another --
7    Q.  From his company?
8    A.  Yeah -- no, from another individual
9  that had the leads.
10    Q.  Okay.  And in light of all that, let
11  me just ask you:  How can somebody know whether
12  or not any of your testimony today was
13  truthful?
14    A.  Because I swore under oath in front
15  of this entire room that I was going to be
16  honest and truthful about the entire
17  conversation with everything.
18    Q.  Okay.
19    A.  I've been making eye contact with you
20  as well.
21    Q.  Did you swear to tell the truth in
22  your Declaration?
23    A.  I never raised my right hand in my
24  Declaration.
25    Q.  Okay.  So that doesn't count, even

282

1  though you signed it?
2      A.  No, I'm not saying it doesn't count.
3  I'm just saying that during this Declaration, I
4  signed it based upon my attorneys telling me,
5  "Hey, listen, we have less than two hours to
6  sign it.  Sign it and get it over to us.  Read
7  it as thoroughly as you can."
8          I read it as thoroughly as I
9  can; and I said, "So far all the information in
10  here is correct.  I don't -- I don't know some
11  of the wording y'all guys used."
12          And they were like, "Okay."  And
13  they asked me to explain some of the wording,
14  and I explained some of it.
15          And then they described it to
16  me; and I said, "Yeah, that's correct."  So --
17      Q.  Mr. Spiller, you just said you had
18  less than two hours; but then earlier, you
19  testified that you had three days to review
20  this.
21      A.  I know.  I know, but what I'm saying
22  is:  By the time they told me to sign it, they
23  had told me I only had two hours to sign it.
24  So by then, I'd had -- I was already trying to
25  run my other business, trying to get up on my

283

1  feet, trying to -- I was drowning because my
2  businesses were turned upside down.
3      Q.  So if you were rushed, you might
4  agree to statements that may or may not be
5  true.  Is that fair?
6      A.  That's not correct.
7      Q.  Okay.
8      A.  I read this thing entirely.  Like,
9  I'm saying some of the wording was more
10  attorney wording than it was my words.
11      Q.  Okay.
12          MR. DAVIDSON:  I don't have any
13  further questions.
14          MR. FRANQUI:  Okay.
15              EXAMINATION
16  BY MR. FRANQUI:
17      Q.  Mr. Spiller, my name's Anthony
18  Franqui.  I represent Michael Smith and Health
19  Advisors of America in this lawsuit.
20          If Jakob -- you testified
21  earlier, I believe at least twice, that you did
22  not speak with Jakob Mears prior to your
23  deposition.  If Jakob Mears testified that he
24  did speak with you, is that false or a lie?
25      A.  Yes.

284

1      Q.  Okay.
2          MR. FRANQUI:  I've got to take a
3  quick, brief moment.  I'll be less than a
4  minute.
5          All right.  I'm back.  Sorry
6  about that.
7      Q.  (BY MR. FRANQUI)  When you -- when
8  you listed Jakob Mears as an owner of Rising
9  Eagle, he wasn't an actual owner of the
10  company, correct?
11      A.  That's correct.
12      Q.  Okay.  And so when you represented to
13  the landlord that Jakob Mears was making 30- or
14  $40,000 per month, you were essentially lying
15  to your landlord?
16      A.  No.  He was the owner on the
17  business.  That's one of the reasons we put him
18  down, listed him as an owner of the business;
19  and the business was making 30- to 40,000 a
20  month.  Therefore, indirectly, he was making
21  30- to 40,000 a month.
22      Q.  Jakob Mears -- you just got through
23  stating Jakob Mears was not making 30- to
24  40,000 a month?
25      A.  No, but the business --

285

1      Q.  And he was not an actual -- and he
2  was not an actual owner of the business?
3      A.  He was on paper, but he never was in
4  reality.
5      Q.  Okay.  So then, when you represented
6  to the landlord that Jakob Mears --
7      A.  I never -- I never -- I never
8  represented anything to the landlord.  The
9  landlord spoke directly with Jakob Mears.  I
10  never spoke with the landlord.
11      Q.  Okay.  Were you involved in the plan
12  to -- to represent that Jakob Mears was an
13  owner of the business, making 30- to $40,000 a
14  month?
15      A.  I asked him if he wouldn't mind
16  coming onboard Rising Eagle Capital as an owner
17  so he can use the business as an opportunity
18  for him to obtain the house.
19      Q.  So you were involved with that?
20      A.  Yes.
21      Q.  And did you direct him to tell the
22  landlord that he was responsible for this so
23  that he could rent the place because you were a
24  felon at the time and could not rent it?
25      A.  No.  I don't -- I don't have a

John Spiller - 3/2/2022

286

1 recollection of that conversation with Jakob.
2     Q. You didn't testify to that fact
3 earlier today --
4     A. I don't --
5     Q. -- that you made Jakob --
6     A. -- remember if I did.
7     Q. You -- you didn't testify earlier
8 today you made Jakob Mears an owner of -- of
9 the company on paper so you can show a landlord
10 that he was making 30- or $40,000 a month so
11 that you could rent this place because you
12 weren't eligible because you were a felon?
13     A. Yes, that is true; but what I'm
14 saying --
15     Q. Thank you.
16     A. But what I'm saying is --
17     Q. Thank you. That answers the
18 question.
19         THE WITNESS: I'm about done
20 with this.
21     Q. (BY MR. FRANQUI) Is Margarita
22 DeJesus Casanova a CPA?
23     A. No.
24     Q. Do you know if Margarita DeJesus
25 Casanova prepared Jakob Mears' tax records?

287

1     A. I don't have a recollection of that.
2 I don't have information of it.
3     Q. Did you ever direct Margarita DeJesus
4 Casanova to pay Jakob -- to -- to prepare Jakob
5 Mears' taxes?
6     A. No.
7     Q. Okay. The $100,000 that you
8 testified earlier that you had Rising Eagle pay
9 to Margarita DeJesus Casanova via cashier's
10 check to pay for yourself, did you report that
11 as income?
12     A. I have not filed my taxes since 2016
13 and I have a conference now with the IRS to get
14 that settled with them once I file bankruptcy
15 and they --
16     Q. Do you know if --
17     A. Huh?
18     Q. Do you know if Mar- -- do you know if
19 Margarita DeJesus Casanova reported that
20 hundred thousand dollars as income?
21     A. Yes, she did -- or I'm not for
22 certain -- let's say that -- because we paid it
23 to her; but we deposited it into our joint bank
24 account. So I used that money for myself.
25     Q. But your testimony earlier was that

288

1 you paid it -- you made it out to her; but it
2 was paying -- it was, in actuality, paying
3 yourself for that?
4     A. Yes.
5     Q. Okay. Now, you were saying earlier
6 that there might be a way to -- to trace on
7 Hello Hunter the calls that were paid out --
8 placed out and whether they were for Health
9 Advisors of America or another room, based on
10 the call -- on the phone number?
11     A. The DID.
12     Q. The DID. But you also said based on
13 the numbers called?
14     A. No. It was -- it was specific -- so
15 whenever a person presses one, that number gets
16 sent to a DID in Hello Hunter that's assigned
17 by the individual room that gives them to me.
18 Those are not interchangeable.
19     Q. Okay. And so when you reused the
20 list of leads, were -- were you reusing
21 information that had DIDs on them?
22     A. What does that mean, reuse them that
23 had DIDs on them?
24     Q. Yeah. So -- so when you reused the
25 information, when you recycled the leads for

289

1 other companies, did they have -- were you
2 using individuals for -- calls for HAA for --
3     A. No.
4     Q. -- or whether or not they pressed
5 one?
6     A. No.
7     Q. Are you aware of any e-mails, text
8 messages, Skypes, or recorded jail calls
9 wherein Michael Smith or Scott Shapiro told you
10 not to scrub the leads that's per your
11 testimony?
12     A. I believe there was text messages
13 given to Jakob Mears or even e-mails sent to
14 Jakob Mears, upset because he scrubbed the
15 leads against the federal do-not-call registry
16 when Scott Shapiro and Michael Smith had
17 already told us that they had already scrubbed
18 those leads themselves. Why were we scrubbing
19 them again was the answer we received.
20     Q. Okay. So -- so you have writings
21 wherein Michael Smith and where Scott Shapiro
22 are directing you not to scrub calls?
23     A. I'm not for -- I'm not for certain if
24 Jakob Mears or myself ever gave them that --
25 those text messages. I'm about to give them a

290

1 new phone today that was basically during the
2 few years of 2017 and 2018 that has a lot of
3 conversations between Michael Smith and I and
4 Mike -- and Scott Shapiro and myself in it.
5 And I'm certain they have information on there
6 that they'll be able to pull out and give to
7 y'all as well.
8    Q.  Who is "they"?
9    A.  The Attorney General of Texas.
10    Q.  And when are you giving that over?
11    A.  Here in a few minutes when this
12 deposition is over.
13    Q.  You're handing in a phone today?
14    A.  Yes, and I'm going to pick up my two
15 other phones that I already gave them.
16    Q.  Okay.  Why did you never scrub for
17 state DNC?
18    A.  State DNC?  I don't --
19    Q.  Yes.
20    A.  I didn't even know that was an --
21 even an option.  I always knew that we had to
22 scrub at least for the federal DNC list, never
23 a -- never a state DNC list; and it wasn't
24 until 2019 that I started scrubbing because by
25 then, the TCPA violations are coming in so

291

1 thick I knew that something was off with the
2 leads that they were not scrubbed.
3    Q.  Do you have any e-mails, text
4 messages, Skype messages or know of any
5 recordings wherein Michael Smith or Scott
6 Shapiro are approving the content of the
7 recorded messages as per your testimony today?
8    A.  There were some e-mails that were
9 exchanged back in the past.  I'm certain that
10 I've already turned over all the e-mails to the
11 FCC and the states.
12    Q.  Okay.
13    A.  They should be in evidence somewhere.
14    Q.  Okay.
15        MR. FRANQUI:  All right.  That's
16 all I have.
17        FURTHER EXAMINATION
18 BY MR. ABERNETHY:
19    Q.  Earlier you said the live transfers
20 are not paper leads.  What'd you mean by that?
21    A.  Live transfers are a live transfer
22 lead.  They're not paper.  They're not --
23 they're opted in because they've either been --
24 they've either told the person that they opted
25 in through a paper lead or they called in to an

292

1 800 number, that they got in to a person.  All
2 call-ins are considered not -- I mean, they are
3 considered opted in when they make the phone
4 call themselves.
5    Q.  So what is a paper lead, then?
6    A.  A paper lead is an opted-in lead that
7 they have to enter in manually.
8    Q.  So that includes electronic versions
9 of lead lists?
10    A.  Yes.
11    Q.  And what type of leads did Health
12 Advisors, Mike Smith, or Scott Shapiro send to
13 you to load into the dialer?
14    A.  Opted-in leads.
15    Q.  Exclusively opted-in leads?
16    A.  Yes.
17    Q.  And while you were in jail, you knew
18 that all of your calls were being recorded,
19 correct?
20    A.  Yes.
21    Q.  And Scott Shapiro knew that he was
22 speaking to you on the phone while you were in
23 jail?
24    A.  Yes.
25    Q.  Can we look at Exhibit 57 real quick?

293

1 It's the same Declaration.
2    A.  Uh-huh.
3    Q.  Can you please just read Paragraph 5
4 on page 2 for me?
5    A.  "Rising Eagle's points of contact
6 with Health Advisors during the time [sic] were
7 its owner, Michael Smith, and corporate --
8 corporate consultant, Scott Shapiro.
9 Mr. Shapiro was primarily responsible for
10 directing how Rising Eagle supported Health
11 Advisors' marketing campaigns."
12    Q.  And after your testimony today, do
13 you still believe that statement to be true?
14        DEFENSE COUNSEL:  Objection.
15    A.  I still do.
16    Q.  (BY MR. ABERNETHY)  And can we move
17 to Paragraph 21 on page 5?
18    A.  "Rising Eagle reluctantly remained
19 open.  At this point, Rising Eagle essentially
20 operated under the total control of Mr. Shapiro
21 and Health Advisors, with Mr. Shapiro sending
22 orders to Mears [sic] multiple times per day
23 with instructions on how to conduct Health
24 Advisors' calling operations.  This arrangement
25 continued until late May or early June of

John Spiller - 3/2/2022

294

1   2019."
2       Q.   And after your testimony today, do
3   you still believe that statement to be true?
4           DEFENSE COUNSEL:  Objection.
5       A.   Yes, I do.
6       Q.   (BY MR. ABERNETHY)  You've been asked
7   about whether you have written agreements about
8   your business relationships.  Do you typically
9   have written agreements with your customers or
10  members?
11      A.   Now I do.
12      Q.   Why did you not before?
13      A.   Because before, I trusted them.  I
14  believed that they were good people and they
15  were going to look out for me.  I never thought
16  I'd be used as a patsy the way they used me for
17  this entire sheningo (PHONETICALLY SPELLED.)
18      Q.   And so is that why you use written
19  agreements with all customers and vendors now?
20      A.   Yes.
21      Q.   And what do you mean by "patsy"?
22          DEFENSE COUNSEL:  Objection.
23      A.   They used me as a pawn in the game.
24  They knew what they were doing from the
25  beginning.  That's one of the reasons why I

295

1   believe Scott Shapiro wasn't brought up to me
2   until around month three, and it was indirectly
3   brought up to me from Mike -- from Michael
4   Smith.  When he brought up Scott Shapiro, I
5   said, "Oh, okay."  I said, "Yeah, I know that
6   guy."
7           He says, "Yeah, yeah, he's my
8   business partner."
9           I said, "Okay."
10          And since then -- he put me back
11  in contact with Scott Shapiro; and since then,
12  we were able to build a pretty good room.  I
13  thought we were -- we had a really good
14  business.  I mean, shit, they made a shit ton
15  of cash.  I thought for sure they're -- they're
16  -- you know, that they would definitely always
17  take care of me and never let me go out like
18  this; but that was definitely not the case.
19          The case they used me as a
20  pawn.  They knew their end goal.  They knew
21  they were going to screw me; and, eventually,
22  they did.  And when they did it, it hurt.  It
23  stung like hell.  And everyone in Florida knows
24  about it because I told everyone in Florida.  I
25  had phone calls with people in Florida.  I

296

1   mean, you know, I spoke to a mentor of mine in
2   Florida for a while; and he -- he was -- he
3   basically tried to keep me calm.  I was pretty
4   upset, pretty pissed off.  I didn't like how
5   they did me.  They did me dirty, and they did
6   me wrong.
7       Q.   And who is Matt Jones?
8       A.   Was a former business partner of mine
9   in 2016.
10      Q.   Where did he work?
11      A.   Where?
12      Q.   Yes.
13      A.   He worked in California.
14      Q.   What was the nature of that business
15  relationship?
16      A.   We were generating calls for clients.
17  We were generating live transfers for clients.
18      Q.   Did he have a company name that he
19  worked under?
20      A.   Yeah.  I don't -- I don't remember
21  it.  Marketing Advisors.  Marketing Advisors,
22  something like that.
23      Q.   Was he the owner of that company?
24      A.   Yes, he was.
25      Q.   And who is Seth Cohen?

297

1       A.   Seth Cohen is -- he owned a room in
2   Florida.  I know -- I have no clue what he does
3   anymore.
4       Q.   Did he work for any company?
5       A.   Huh-uh.  He owned his own products.
6       Q.   And what do you mean by "room in
7   Florida"?
8       A.   He had agents under him that sold his
9   products, his insurance contracts that he had.
10      Q.   Any other products besides insurance
11  contracts?
12      A.   No, just those.
13      Q.   And who is Matt Herman?
14      A.   Matt Herman is -- he was the manager
15  for Bruce Goldberg's room in Florida and was
16  right down the road from Scott Shapiro and Seth
17  Cohen's room.  He ran off with Bruce Goldberg's
18  book of business; and a little after that time,
19  that's when Seth Cohen hired me to come in and
20  to shut down Matt Herman's business that they
21  were doing.
22      Q.   And did anyone ever pay you any money
23  or other benefits to take down Scott Shapiro?
24      A.   No one ever told me to take town
25  Scott Shapiro, but they did tell me to take

298

1 down Matt Herman.  And, yes, Seth Cohen paid me
2 for it.  Take him down in business, not take
3 him down literally.
4     Q.   But nobody ever told you to do that
5 to Scott Shapiro?
6     A.   No.
7     Q.   At times that Shapiro give you lead
8 lists, Scott Shapiro, did he ever give you any
9 specific instructions to scrub them against the
10 do-not-call lists?
11     A.   No.
12     Q.   And can we look back at Exhibit 57?
13 Can you look at Paragraph 13 on page 3?  So you
14 were asked about this paragraph -- I'll let you
15 take a look at it first.
16     A.   Paragraph what?
17     Q.   If you can, go ahead and read
18 Paragraph 13 at the bottom of the page.
19     A.   "Health Advisors provided Rising
20 Eagle with access to Health Advisors' VICIdial
21 calling platform to facilitate Rising Eagle in
22 carrying out Health Advisors' marketing
23 campaigns."
24     Q.   So in what manner did you access the
25 VICIdial platform to carry out the marketing

299

1 campaigns?
2     A.   We would open up their -- I even
3 forget what it's called right now; I think it's
4 called the realtime report.  That would show
5 the agents that are all logged in.  We would
6 use that to know how -- how fast we should dial
7 the dialer to call the numbers or slow it down,
8 depending on how many agents are still
9 available to answer calls or not.
10     Q.   And you had previously testified that
11 you had an agreement with Health Advisors for
12 Rising Eagle to initiate calls on behalf of
13 Health Advisors on your dialing platform; is
14 that correct?
15     A.   Uh-huh.
16     Q.   Was there ever any agreement that you
17 would use VICIdial to initiate those calls?
18     A.   Huh-uh.
19         MS. REYES:  "Yes" or "no"?
20         THE WITNESS:  No.
21     Q.   (BY MR. ABERNETHY)  And for calls
22 that were made on behalf of others than Health
23 Advisors, which accounts were those?
24         DEFENSE COUNSEL:  Objection.
25     Q.   By Rising Eagle?

300

1         DEFENSE COUNSEL:  Objection.
2     A.   Tovere (PHONETICALLY SPELLED), Matt
3 Panzer, Matt Herman for a little bit.  I'm
4 saying someone else from a downline.  I don't
5 even remember the room's name.
6     Q.   (BY MR. ABERNETHY)  And when were
7 those accounts operational?
8     A.   In 2019.
9     Q.   Can you estimate the volume of those
10 calls that were other than Health Advisors?
11     A.   Less than 500,000.  They were small
12 rooms.  They only had -- Matt Panzer had 8
13 clients -- 8 agents.  Tovere had 10 or 15
14 agents.  Matt Herman had a group that was in
15 Florida -- that was in California he was
16 working with that had 20 agents.
17     Q.   As a percentage of your total volume
18 of calls, what would you say were made for
19 others than Health Advisors?
20     A.   Five to ten percent.
21     Q.   And earlier Mr. Davidson asked you
22 about personal expenses that the business paid
23 on behalf of Mears and other personal
24 expenditures that the business paid for.  Do
25 you recall that testimony?

301

1     A.   Yes, sir.
2     Q.   Have you ever provided any of your
3 tax information or tax returns to Mr. Davidson
4 or Mr. Shapiro?
5     A.   No, sir.
6     Q.   Are you aware of any reason that Mr.
7 Davidson or Mr. Shapiro would have any
8 information about your taxes or the taxes of
9 your business?
10     A.   No, sir.
11     Q.   Are you a tax attorney?
12     A.   No, sir.
13     Q.   Are you a Certified Public
14 Accountant?
15     A.   No, sir.
16     Q.   Are you an accountant?
17     A.   No, sir.
18     Q.   Are you a financial advisor?
19     A.   No, sir.
20     Q.   And can you clarify how you knew what
21 information to include in the prerecorded calls
22 that Rising Eagle used for Health Advisors --
23         DEFENSE COUNSEL:  Objection.
24     Q.   -- who gave those instructions?
25         DEFENSE COUNSEL:  Objection.

302

1    A.  Okay.  Those instructions for the
2  prerecorded messages.  In the beginning it was
3  Michael Lansky that sat down with me and told
4  me that the recordings that we had already
5  following were incorrect.  He told me I needed
6  to add a name to the beginning of the message.
7  He told me within the first three seconds I
8  needed to have an opt-out information, as well,
9  offering.  And then, at the end of the call, I
10 needed to provide an 800 number so that the
11 clients that were receiving the calls could
12 call back in and put themselves on the
13 do-not-call list.
14       So we -- then it wasn't until
15 2019, I would say -- the end of 2018, the
16 beginning of 2019, around the time I got out of
17 jail, that we played the recording of Ann; and
18 that upset Scott and Mike because they didn't
19 like it.  They said it -- it was horrible.  So
20 we ended up changing it out.  With their help,
21 we orchestrated a new one.  On that new one, we
22 just changed the voices on it.  We got a man to
23 do it and we got a woman to do it and continued
24 changing it out from there on out.
25    Q.  (BY MR. ABERNETHY)  And how did you

303

1  know specifically what services Health Advisors
2  was selling?
3    A.  Health insurance.
4    Q.  How did you know that?
5    A.  They told me.
6    Q.  Who is "they"?
7    A.  Scott Shapiro and Michael Smith.
8    Q.  And from your understanding, did
9  Scott Shapiro know Rising Eagle was making
10 calls for Panzer?
11       DEFENSE COUNSEL:  Objection.
12    A.  Yes.  That's one of the reasons he
13 called me out on it, told me to stop.
14    Q.  (BY MR. ABERNETHY)  Is that how you
15 knew that he knew?
16       DEFENSE COUNSEL:  Objection.
17    A.  Yes.
18    Q.  (BY MR. ABERNETHY)  From your
19 understanding, did Scott Shapiro know Rising
20 Eagle was making calls for Johnson?
21       DEFENSE COUNSEL:  Objection.
22    A.  Yes.  I believe Michael Smith was the
23 one that called me out on that.
24    Q.  (BY MR. ABERNETHY)  And he told you
25 that Scott Shapiro knew?

304

1       DEFENSE COUNSEL:  Objection.
2    A.  Yes.
3    Q.  (BY MR. ABERNETHY)  From your
4  understanding, did Scott Shapiro know Rising
5  Eagle was making calls for Herman?
6       DEFENSE COUNSEL:  Objection.
7    A.  Yes.
8    Q.  (BY MR. ABERNETHY)  How did you know
9  this?
10       DEFENSE COUNSEL:  Objection.
11    A.  Because he told me.
12    Q.  (BY MR. ABERNETHY)  Who told you?
13       DEFENSE COUNSEL:  Objection.
14    A.  Scott Shapiro called me up one day,
15 pissed off, saying why the hell am I calling
16 for Scott -- for Matt Herman.  I told him I had
17 only started him up for a week.  And he said,
18 "You need to shut him off now; or if you don't
19 shut him off, I'm going to turn you off."
20       And I said, "Man, I'm just --
21 just trying to make an extra dollar here."
22       He's like, "You need to stop
23 doing that.  We're paying you enough."
24       And I said, "Yeah, I agree, you
25 are."

305

1    Q.  (BY MR. ABERNETHY)  And when was
2  this?
3    A.  2019.  I don't remember the month.
4    Q.  And did you stop making calls for
5  Herman immediately after this?
6    A.  Yes.  I only had him on, like I said,
7  for a week and a half -- a week, week and a
8  half, less than two weeks.
9    Q.  Did you stop making calls for Panzer
10 after Shapiro addressed this with you?
11       DEFENSE COUNSEL:  Objection.
12    A.  Uh-huh.
13    Q.  (BY MR. ABERNETHY)  And did you stop
14 making calls for Johnson after Shapiro
15 addressed this with you?
16       DEFENSE COUNSEL:  Objection.
17    A.  Uh-huh.
18       MS. REYES:  "Yes" or "no"?
19       THE WITNESS:  Yes.  Yes, yes,
20 yes, yes, yes.
21    Q.  (BY MR. ABERNETHY)  And from your
22 understanding, did Michael Smith know Rising
23 Eagle was making Panzer's calls?
24       DEFENSE COUNSEL:  Objection.
25    A.  I don't think he knew about Panzer.

306

1  I think it was only Scott Shapiro heard it
2  through the grapevine.  As I'm saying, Scott
3  has a lot of downlines that sell his insurance
4  plans.  And I'm certain Matt Panzer brags about
5  these calls he was receiving, and it got down
6  the line to someone in Scott's downline that
7  ended up telling him.
8       Again, they never told me the
9  details on how they knew.  They just knew.
10      Q.  (BY MR. ABERNETHY)  And then, from
11  your understanding, did Mike Smith know Rising
12  Eagle was making the Johnson calls?
13          DEFENSE COUNSEL:  Objection.
14      A.  Yes, he was the one that brought it
15  to my attention with Johnson -- about Johnson.
16      Q.  (BY MR. ABERNETHY)  And from your
17  understanding, did Mike Smith know Rising Eagle
18  was making Herman calls?
19          DEFENSE COUNSEL:  Objection.
20      A.  I'm not for certain about that.
21      Q.  (BY MR. ABERNETHY)  And overall, in
22  communications with Health Advisors, did you
23  have more communications with Mike Smith or
24  Scott Shapiro?
25          DEFENSE COUNSEL:  Objection.

307

1       A.  About the same.  I actually favored
2  talking to Scott more than I did Mike.
3       Q.  (BY MR. ABERNETHY)  Why is that?
4       A.  Because we would talk -- we would
5  talk about other stuff outside of
6  business-related stuff.  He was real kind.
7       Q.  Anything specifically?
8          DEFENSE COUNSEL:  Objection.
9       A.  No.  Just in general, we'd just talk
10  about stuff that was going on in my life; and I
11  would ask him questions about things that he
12  went through in his life and things of that
13  nature, you know.
14      By that time I was coming off of
15  heavy drugs.  I had kicked a heroin addiction
16  in 2018.  That's one of the reasons why my
17  recollection of the end of 2018, the beginning
18  of 2019 is so blurry, because I OD'ed on heroin
19  where I flatlined in the hospital.  I died.  I
20  was pronounced dead for ten minutes.  Out of
21  the blue, I breathed real sudden; and the
22  doctor said he was about to sign my death
23  certificate.  And at that point I came back
24  alive, and I couldn't walk.  I couldn't talk.
25  It's like I had to relearn who I was again.

308

1       That's one of the reasons why I
2  -- one of the reasons why when I got arrested
3  in 2018, the end of 2018, I knew it was the
4  best place for me to be so I could be able to
5  get away from all the drug scene and all the
6  crap I was into.
7       When I got out of jail, I turned
8  my life around.  I haven't touched drugs or
9  alcohol in over -- alcohol in over four years
10  and drugs in over three and a half years.
11  September 12th, 2018 was the last time I
12  touched heroin, any drugs for that matter, so.
13  That's on record, right?
14          MR. ABERNETHY:  We're done.
15          MR. DAVIDSON:  I have a couple
16  of follow-ups.
17          FURTHER EXAMINATION
18  BY MR. DAVIDSON:
19      Q.  So, Mr. Spiller, it's your testimony
20  that in March, April, May of 2019, Rising Eagle
21  essentially operated under the total control of
22  Mr. Shapiro and Health Advisors; is that
23  correct?
24      A.  Under which months, and -- and where
25  are you reading this at?

309

1       Q.  I'm asking if this is true or not.
2       A.  I'm asking where you're reading at,
3  sir.
4       Q.  I know, but I get to ask the
5  questions here.  Okay?
6       A.  Well, then, I'm not going to answer.
7  How does that sound?
8       Q.  You can refuse to answer, and that
9  will be used against you.
10      A.  How is it going to be used against
11  me?  This isn't a court of law.
12      Q.  In March, April, and May of 2019, is
13  it your testimony that Rising Eagle essentially
14  operated under the total control of Mr. Shapiro
15  and Health Advisors, or not?  Is that true or
16  not?
17      A.  I'm trying to see where I stated
18  that.  I don't remember stating that.
19      Q.  Does the truth of that statement
20  depend upon whether it's written down in your
21  Declaration?
22      A.  Yes.
23      Q.  So if it's not there, it's not true;
24  if it is there, it is true?
25      A.  That's correct.

John Spiller - 3/2/2022

310

1        When am I released?
2        Q.   And that's because your lawyer wrote
3    this, right?
4        A.   Nope.
5        Q.   Let me ask you a different question,
6    Mr. Spiller.  You admitted that with respect to
7    Matt Herman that you were hired to, quote,
8    "take him down in business," close quote.
9    That's what you just said?
10       A.   Yes.
11       Q.   Okay.  What did that mean?  How did
12   you take him down in business?
13       A.   I was supposed to -- they were
14   reaching out to rooms, to Seth Cohen's rooms
15   and downlines.  He had a bunch of downlines
16   under him, and they were taking clients away
17   from Seth Cohen.  So they -- he had hired me to
18   come out with -- to generate leads so that they
19   were able to then get those leads and give them
20   to his rooms so his rooms are inundated with
21   leads so they don't ever come back to -- they
22   don't ever come back -- or so they don't ever
23   leave and go to Scott Shapiro or -- or Matt
24   Herman.
25       Q.   Oh, so you were taking downed Scott

311

1    Shapiro and Matt Herman?
2        A.   No, I was only taking down Matt
3    Herman.  I saw Scott write a note to you.  That
4    distracted me, and I said Scott Shapiro instead
5    of Matt Herman.
6        Q.   Oh, do you know there was a
7    relationship between Mr. Shapiro and Mr.
8    Herman?
9        A.   No.
10       Q.   You didn't know that?
11       A.   Huh-uh.
12       Q.   Okay.  But, in essence, taking him
13   down meant sabotaging Mr. Herman's business?
14       A.   Yes.
15       Q.   Okay.
16            MR. DAVIDSON:  I don't have
17   anything further.
18            MR. FRANQUI:  Nothing further.
19            MR. ABERNETHY:  Off record.
20   We're done.
21            THE VIDEOGRAPHER:  We'll go off
22   the record at 5:41.
23            (Deposition concluded at 5:41 p.m.)
24            --ooOoo--
25

312

1            CHANGES AND SIGNATURE
2    WITNESS NAME:              DATE OF DEPOSITION:
3    JOHN C. SPILLER, II        March 2, 2022
4    PAGE/LINE   CHANGE          REASON
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____

313

1            I, JOHN C. SPILLER, II, have read the
2    foregoing deposition and hereby affix my signature that
3    same is true and correct, except as noted herein.
4
5            _____
6            JOHN C. SPILLER, II
7
8    THE STATE OF _____ )
9            Before me, _____, on
10   this day personally appeared JOHN C. SPILLER, II, known
11   to me (or proved to me under oath or through
12   _____) (description of identity card or other
13   document) to be the person whose name is subscribed to
14   the foregoing instrument and acknowledged to me that
15   they executed same for the purposes and consideration
16   therein expressed.
17           Given under my hand and seal of office on
18   this _____ day of _____, _____.
19
20
21           _____
22           NOTARY PUBLIC IN AND FOR
23           THE STATE OF _____
24           My Commission Expires:_____
25

314

1  STATE OF TEXAS    )
2           REPORTER'S CERTIFICATION
3
4      I, DEBBIE D. CUNNINGHAM, CSR, hereby certify that
5  the witness was duly sworn and that this transcript is a
6  true record of the testimony given by the witness.
7      I further certify that I am neither counsel for,
8  related to, nor employed by any of the parties or
9  attorneys in the action in which this proceeding was
10 taken.  Further, I am not a relative or employee of any
11 attorney of record in this cause, nor am I financially
12 or otherwise interested in the outcome of the action.
13     I further certify that pursuant to FRCP
14 Rule 30(f)(1) that the signature of the deponent was
15 requested by the deponent or a party before the
16 completion of the deposition and that the signature is
17 to be before any notary public and returned within 30
18 days from date receipt of the transcript.  If returned,
19 the attached Changes and Signature Page contains any
20 changes and the reasons therefore.
21     Subscribed and sworn to by me this day, March 8,
22 2022.
23
24      _____
        Debbie D. Cunningham, CSR
25

| B | | |
|---|---|---|
| **Bill** 5:5 | | |
| **Brian** 5:7 | | |
| **Burns** 5:5 | | |
| C | | |
| **Christopher** 5:7 | | |
| O | | |
| **ooOoo** 5:8 | | |
| P | | |
| **person** 5:5 | | |
| V | | |
| **Via** 5:7 | | |
| Z | | |
| **Zoom** 5:7 | | |