Page 1

1          IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION
3
    MARY BILEK, individually and on  )
4   behalf of others similarly       )
    situated,                        )
5                                    )
                    Plaintiffs,      )
6                                    )
                    -vs-             )  No. 18-CV-03083
7                                    )
    NATIONAL CONGRESS OF EMPLOYERS,  )
8   INC., et al.,                    )
                                     )
9                   Defendants.      )
10
11
12          Videotaped Rule 30(b)(6) deposition via
13   videoconference of HEALTH ADVISORS OF AMERICA, INC., by
14   and through its corporate representative MICHAEL T.
15   SMITH, JR., and MICHAEL T. SMITH, JR.,, in his personal
16   capacity, taken before TRACY L. BLASZAK, CSR, CRR, and
17   Notary Public, pursuant to the Federal Rules of Civil
18   Procedure for the United States District Courts
19   pertaining to the taking of depositions, at 10343 South
20   Barnsley Drive, in the City of Parkland, Broward County,
21   Florida at 9:36 a.m. Eastern Daylight Time on the 20th
22   day of September, A.D., 2021.
23
24

Page 2

```
1      There were present at the taking of this
2  deposition via videoconference the following counsel:
3
   BURKE LAW OFFICES, LLC by
4  MR. ALEXANDER H. BURKE
   MR. DANIEL J. MAROVITCH
5  990 Davis Street
   Suite 500
6  Evanston, Illinois 60201
   (312) 729-5288
7  aburke@burkelawllc.com
   dmarovitch@burkelawllc.com
8
       on behalf of the Plaintiffs;
9
10 LAW OFFICES OF JOSEF M. MYSOREWALA, PLLC by
   MR. JOSEF M. MYSOREWALA
11 2000 South Dixie Highway
   Suite 112
12 Miami, Florida 33133
   (305) 356-1031
13 josefm@lawjmm.com
       on behalf of the Defendant
14     National Congress of Employers, Inc.;
15
16 KING & SPALDING LLP by
   MS. DANIELLE CHATTIN
17 MR. ZACHARY A. McENTYRE
   1180 Peachtree Street, NE
18 Suite 1600
   Atlanta, Georgia 30309
19 (404) 572-4600
   dchattin@kslaw.com
20 zmcentyre@kslaw.com
21     on behalf of the Defendant
       Health Insurance Innovations;
22
23
24
```

Page 3

```
1  GENOVA BURNS LLC by
   MR. CHARLES J. MESSINA
2  Trinity Centre
   115 Broadway
3  Suite 1500
   New York, New York 10006
4  (212) 566-7188
   cmessina@genovaburns.com
5
       on behalf of the Defendants AccessOne and
6      National Benefit Builders, Inc.;
7
   GENOVA BURNS LLC by
8  MR. JEREMY M. BROOKS
   494 Broad Street
9  Newark, New Jersey 07102
   (973) 533-1112
10 jbrooks@genovaburns.com
11     on behalf of the Defendants AccessOne and
       National Benefit Builders, Inc.;
12
13 MARK MIGDAL & HAYDEN by
   MR. YANIV ADAR
14 Brickell City Tower
   80 SW 8th Street
15 Suite 1999
   Miami, Florida 33130
16 (305) 374-6623
   yaniv@markmigdal.com
17
       on behalf of the Witness;
18
19 ALSO PRESENT:  Mr. Kraig Hildahl
                  Legal Videographer.
20
21        - - - - -
22
23
24
```

Page 4

```
1         30(b)(6) DEPOSITION OF
   HEALTH ADVISORS OF AMERICA, INC. CORPORATE DESIGNEE
2         MICHAEL T. SMITH, JR.
3           September 20, 2021
4
   EXAMINATION BY:                    PAGE
5
   Mr. Alexander H. Burke             6
6                                     130
7  Ms. Danielle Chattin              88
8  Mr. Josef M. Mysorewala          117
9  Mr. Charles J. Messina           122
10 Mr. Yaniv Adar                   135
11        * * * * * *
12
           INDEX OF EXHIBITS
13
14 EXHIBIT      DESCRIPTION              PAGE
15 Exhibit 1    Subpoena for the deposition    15
                testimony of Health Advisors
16              of America
17 Exhibit 2    HII agent back office tutorial   28
18 Exhibit 3    Multiple e-mails from Brady to    42
                Griffin
19
   Exhibit 4    Declaration of Michael Smith     62
20
   Exhibit 5    HII TCPA policy                  68
21
   Exhibit 6    HII document Bates 340 to 401    70
22
23        * * * * * *
24
```

Page 5

```
1      THE VIDEOGRAPHER:  We're going on the record at
2  a.m. Eastern Time on September 20th, 2021.
3        This is media unit No. 1 of the video-recorded
4  deposition of Michael T. Smith taken in the matter of
5  Mary Bilek vs. National Congress of Employers,
6  Incorporated, et al., in the U.S. District Court,
7  Northern District of Illinois, case No. 1:18-cv-03083.
8  This deposition is being held remotely.
9        My name is Kraig Hildahl from the firm Veritext
10 Legal Solutions.  I am the videographer.  The court
11 reporter today is Tracy Blaszak, also with Veritext.
12       Will counsel please identify themselves for the
13 record.
14     MR. BURKE:  Good morning.  This is Alex Burke, here
15 for plaintiff.  And along with me is Dan Marovitch, also
16 from my office, for plaintiff.
17     MR. MYSOREWALA:  This is Josef Mysorewala on behalf
18 of National Congress of Employers, Inc.
19     MS. CHATTIN:  This is Danielle Chattin on behalf of
20 defendant Health Insurance Innovations, and with me is
21 my colleague Zach McEntyre.
22     MR. MESSINA:  Good morning, everyone.  This is
23 Charles Messina with the law firm Genova Burns on behalf
24 of defendants AccessOne and NBBI.  And, also, Jeremy
```

2 (Pages 2 - 5)

Page 6

1 Brooks is here on behalf of the same defendants.
2    MR. ADAR: Yaniv Adar with the law firm of Mark
3 Migdal & Hayden on behalf of nonparties Health Advisors
4 of America, Inc., Michael T. Smith and Marsha Griffin,
5 who is noticed concurrently with this deposition. Thank
6 you.
7    THE VIDEOGRAPHER: Will the court reporter please
8 swear in the witness and then we can proceed.
9          MICHAEL T. SMITH, JR.,
10 called as a witness herein, having been first duly sworn
11 via videoconference, was examined upon oral
12 interrogatories and testified as follows:
13              EXAMINATION
14          by Mr. Burke:
15    Q  Good morning.
16    A  Good morning.
17    Q  Would you state your name for the record,
18 please.
19    A  Michael Theron Smith, Jr.
20    Q  And, Mr. Smith, have you ever given a deposition
21 before?
22    A  The first one.
23    Q  Okay. So the deal is that I will ask questions,
24 and you just give me audible answers, okay?

Page 7

1    A  No problem.
2    Q  So head shakes and nods and that sort of thing
3 don't fly. We've got to have like an affirmative yes or
4 no or whatever you're saying, okay?
5    A  You got it.
6    Q  If you ever need a break, just let me know and
7 we'll take a break, okay?
8    MR. ADAR: Alex, this is going to be complicated
9 with all of the parties involved. Can you just give an
10 instruction how objections work including, you know, I
11 doubt I will be making many, but how objections are
12 going to work and what his responsibilities are to
13 answer.
14    If I need to correct anything you say, I'll let
15 you know, but I think you got it. I think it's worth
16 letting him know that.
17    MR. BURKE: Q  Yes. So sometimes this is even
18 weirder on Zoom. It's weird otherwise, anyway. After I
19 ask a question, your lawyer, Yaniv, has the opportunity
20 to object to my question.
21    A  Uh-huh.
22    Q  Which is totally a normal thing and the lawyers
23 are just, basically, making their record.
24    Unless he asks you or instructs you not to

Page 8

1 answer, even though he's objected, you still, you know,
2 go right ahead as if, you know, there was no objection
3 and give your answer, okay?
4    A  Okay.
5    Q  All right. What's the highest level of
6 education that you've attained?
7    A  College.
8    Q  All right. And how much college did you do,
9 just a ballpark?
10    A  Sophomore.
11    Q  Okay. And where?
12    A  Florida.
13    Q  And what did you study for a couple years in
14 your Florida college career?
15    A  Culinary, actually.
16    Q  Oh, awesome.
17    And when was that, when did you stop college?
18    A  I got into the insurance business after I want
19 to say 20 -- 2006.
20    Q  Okay. So as to the insurance business in 2006,
21 how did you get involved?
22    A  Believe it or not I was looking on Sunbiz and
23 Harvey Silverstein was advertising for insurance agents,
24 and for some reason I just had to call him.

Page 9

1    And then I was talking to Harvey, talking to
2 him for about an hour on the phone, just got a good
3 vibe, and he asked me to come over and talk to him in
4 person.
5    And we were just conversating and the career
6 path sounded like something I wanted to pursue, and I
7 started working with him and then here we are.
8    Q  Who is Harvey Silverstein?
9    A  He -- I'm not sure he is in insurance anymore,
10 but he had a brokerage firm.
11    Q  I see. And was that health insurance that
12 Mr. Silverstein was involved with?
13    A  Yes, sir.
14    Q  Okay. And so did you work for him? How did you
15 get involved with insurance originally?
16    A  Yeah, I worked for him.
17    Q  Okay. And how long did you work for
18 Mr. Silverstein around?
19    A  I want to say a couple years.
20    Q  Okay. And what did you do for him?
21    A  In the beginning when I wasn't licensed I was a
22 fronter. And then after getting licensed I was a sales
23 agent, insurance agent and then became manager.
24    Q  What's a fronter?

3 (Pages 6 - 9)

Page 10

1    A    A fronter is someone that's on the phone, a
2 representative that prequalifies, gets information down,
3 you know, see what their age, state, height and weight,
4 any -- anything like that.
5       And then if they're willing to speak to a rep,
6 they're transferred over.
7    Q    Transferred over to a licensed agent?
8    A    Yes.
9    Q    Okay.  So after you worked for Harvey for two
10 years, roughly, then what did you do?
11   A    Well, it's crazy.  Brad and Seth Cohen, his
12 nephew recruited me to go work for them, so I worked for
13 them at an insurance carrier direct.
14   Q    Okay.  How long did you work for the Cohens?
15   A    I want to say the same thing, a couple years,
16 you know.
17   Q    Was that also generating business for health
18 insurance related products?
19   A    That was the business.
20   Q    And what did you do for the Cohens?  Were you a
21 fronter, were you a licensed agent?
22   A    Yeah, I'm a licensed agent, sales rep, and then
23 manager.
24   Q    Okay.  And so now we're -- I don't know, where

Page 11

1 are we?  Around 2010 maybe in your career?
2    A    Something like that, around there.
3    Q    All right.  Will you give me the rundown of your
4 career from around that time until today?
5    A    Well, I mean, every time I left an office was
6 for advancement.
7    Q    Okay.
8    A    The whole point of getting into the insurance
9 business is to learn the back end.
10   Q    Okay.
11   A    Okay?  And end up owning my own agency type of a
12 gig.
13       So I'd say -- I'd say from there, from Brad and
14 Seth because I -- I don't want to say I was limited,
15 but, I mean, being a manager, you can only go so far.
16       So I left there and I want to say -- I want to
17 say I worked for a guy named Dan, Dan Merko, but I'm not
18 sure about his last name.  And I was working for him for
19 a couple years and so forth.
20       And then there was a couple of small rooms that
21 promised certain things and then never followed through,
22 so bounced around a couple rooms.
23       And then I was recruited to work for a company
24 Med Gap in Miami.  And then worked there.  And I guess

Page 12

1 you would want to, I want to say, save my money up and I
2 guess partnered up at Premier Health with Jeff and Bruce
3 Goldberg.  And then that's where it all began.
4    Q    So when did you get hooked up with Jeff and
5 Bruce Goldberg?
6    A    I don't remember the year.  Yeah, I don't
7 remember the year.  I want to say --
8    Q    Yeah, do your best.
9    A    2013, maybe, 2012.
10   Q    Okay.  And then at some point did you start your
11 own agency?
12   A    Yes, once I left Premier Health and then started
13 doing my own thing.
14   Q    Okay.  And so how was your business sort of
15 intertwined with Jeff and Bruce Goldberg when you had
16 your own agency?
17   A    They pretty much offered me a percentage of the
18 business that was created.
19   Q    Okay.
20   A    And with that I was able to use their office,
21 you know, equipment, any type of materials, lead
22 generation, calls, marketing, anything with regard to
23 that.
24       All I had to do was bring my own people and run

Page 13

1 it, run my own department.
2    Q    And at some point did you begin generating
3 business for Health Insurance Innovations?
4    A    Then, I want to say no.
5    Q    When did you first come to work with Health
6 Insurance Innovations on any level?
7    A    HII, when I opened up the office DBG, Direct
8 Benefits Group.
9    Q    Okay.  And that was like 2005 or something?
10   A    No, no, no.  That was I want to say 2013, '14.
11   Q    Okay.  And in 2013, '14 when you first started
12 working with HII, what was the relationship?
13   A    They were an insurance provider.  That was
14 pretty much it.  There was no really -- I mean, they had
15 good contracts, they had good commissions and just like
16 other carriers, we offer their product.
17       Again, it varies from state to state.
18   Q    Okay.
19   A    You would like to offer a consumer, I mean, the
20 best product available for them for their state.
21   Q    And what is HII?
22   A    I mean, that I know of, they're a --
23   MR. ADAR:  Objection to form.
24   THE WITNESS:  I don't know the term, but they offer

4 (Pages 10 - 13)

Page 14

1 multiple different plans that they put together to
2 create a plan.
3    MR. BURKE: Q  They're a third-party administrator?
4    A  Yes, sir.
5    Q  Okay.  And that's known as a TPA?
6    A  Yes, I believe so.
7    Q  All right.
8    A  A lot of those terms, I mean, on the back end
9 I'm not going to be familiar with, so just you have to
10 excuse me on that.
11    MR. ADAR:  Mike, and I'm sure Tracy was about to say
12 something.  It's very important because we're having --
13 I think there is 12 folks on this line -- I'm sorry, I'm
14 hearing an echo -- you can't speak over anyone.
15      So wait until Alex finishes his question just
16 like you did with me.  It makes it impossible for Tracy
17 to take down the notes because you're on your phone.
18      So wait until Alex completes his thought, and
19 then if you see anyone else objecting, wait until they
20 finish speaking.  You can pause one second and then
21 speak because there is overlap and I can't hear entirely
22 what you're saying and Tracy might have a similar
23 problem, so.  Thank you.
24    THE WITNESS:  Well, I don't -- The only person I

Page 15

1 hear talking is Alex, to be honest with you.  I don't
2 hear anyone else asking questions or anything, so it's
3 not on purpose, and I apologize.
4    MR. ADAR:  It's nothing intentional.  It's, you
5 know, we're trying to get a clean record.  Thanks, Mike.
6 Just pause when he is done speaking.  Thanks.
7    THE WITNESS:  Got it.
8    MR. BURKE:  I'm going to show you an exhibit.  And
9 the way I'm going to do these exhibits is I'm going to
10 do a screen share with them.
11      And then at the end of the deposition I will
12 e-mail them to Tracy, the court reporter, and copy all
13 counsel.  And they will be labeled as I e-mail them.
14    THE WITNESS:  Okay.
15      (Exhibit 1 marked as requested.)
16    MR. BURKE: Q  So showing on the screen Exhibit 1,
17 and this is the subpoena for the deposition testimony of
18 Health Advisors of America.
19      Mike, are you here today to testify on behalf
20 of Health Advisors of America, Inc.?
21    A  Yes.
22    Q  What is Health Advisors of America, Inc.?
23    A  Health Advisors was like an agency to offer
24 people like myself when I first started, have them

Page 16

1 pretty much offer them like equipment, an office space,
2 my advice, marketing, for them to have their contracting
3 and with their commissions we would split.
4    Q  When did Health Advisors of America begin,
5 roughly?
6    A  Roughly I want to say -- it was only a couple
7 years old.  I want to say 20 -- late 2018, maybe,
8 2019 -- or 2018, I think, to 2020.
9    Q  Okay.  So the subpoena lists a bunch of topics
10 for examination and also lists a bunch of documents that
11 we asked Health Advisors of America to put together.
12      And I'm just going to ask you if you're
13 prepared to testify on behalf of Health Advisors of
14 America?
15      First of all, is it okay with you if today we
16 refer to Health Advisors of America, Inc., as HAA?
17      Does that make sense to you?
18    A  Yes, that's fine.
19    Q  Okay.  So just scrolling through these
20 deposition testimony topics, would you agree that you
21 are prepared to testify on behalf of HAA for each of
22 these topics?
23    A  It moved.  I was reading it.
24    Q  Sorry, guys.  Yes.  It's a problem with the

Page 17

1 technology and me.
2    A  No worries.
3      Yeah.
4    Q  Okay.  Great.  There is a couple more.
5    A  Okay.
6    Q  All right.  There is a lot of topics here, 25
7 topics.
8    A  Okay.
9    Q  All right.  Do you agree that you're prepared to
10 testify on behalf of HAA for all 25 topics?
11    A  Yes.
12    Q  When you were describing HAA a moment ago, you
13 mentioned marketing.
14      Would you please tell me what HAA did as to
15 marketing?
16    A  Well, we, you know, we purchased the lead.
17    Q  Okay.  And what were the places from where HAA
18 purchased leads?
19    A  We purchased leads from Date Lot, All Web,
20 NextGen, numerous smaller companies.  I guess you guys
21 know John, John Spiller.  There was several small
22 groups, as well.
23    Q  Okay.  And how do you --
24    MR. ADAR:  Mike, don't presume they know anything.

5 (Pages 14 - 17)

Page 18

1 He is going to ask you a question. Answer the question
2 fully. Presume no one knows anything.
3    THE WITNESS: Well, then, the smaller groups I
4 forgot their name. Like I said, the larger companies
5 were like Data Lot, All Web, NextGen, Norvax, and then
6 John, John Spiller, I think it was Rising Eagle.
7    MR. BURKE: Q  And how did HAA keep track of where
8 leads came from?
9    A  By the dialing system. ViciDial had them on a
10 DID.
11    Q  And what's your understanding of what a DID is?
12    A  Well, it's a number that you direct from the
13 dialer to a -- I guess you would say a marketer or a
14 lead generator or whoever you want the calls going
15 directly to.
16    Q  So, for example, if Rising Eagle was making
17 outbound calls and those calls were transferred into
18 HAA, is it accurate to say that the DID, which is like a
19 phone number, would tell HAA that those particular calls
20 were being inbound transferred from Rising Eagle?
21    A  Yes.
22    Q  Okay. And that data was kept track of through
23 the ViciDial Fextel system, is that right?
24    A  ViciDial -- I'm familiar with Fextel when I read

Page 19

1 that. I don't know if Fextel is with regards to
2 ViciDial.
3    Q  Okay. Fextel is ViciDial's -- it's just another
4 corporate name for ViciDial.
5    A  All right.
6    Q  And so did HAA -- Well, who at HAA dealt most
7 with the ViciDial, you know, interface, the software?
8    A  What do you mean?
9    Q  Well, how did you guys at HAA access the
10 ViciDial system?
11    A  Well, I mean, they gave us -- we created our own
12 logins and our own profile.
13    Q  Okay. And was there a separate login for each
14 agent?
15    A  No, it was a general login for everyone.
16    Q  Okay. And how many employees did HAA have?
17    MS. CHATTIN: Objection.
18      You can answer.
19    THE WITNESS: I heard someone say objection.
20    MS. CHATTIN: You can answer.
21    MR. ADAR: Let me just explain to you how it's going
22 to work. There are likely going to be a lot of
23 objections today. It's very common in depositions.
24 There are a lot of attorneys involved, and some may not

Page 20

1 like how Alex asks a question. But at the end of the
2 day, you still need to answer it unless I specifically
3 say, Mike, I am instructing you not to answer the
4 question.
5      So unless you hear those very specific words
6 from me after an objection, give me a moment to say
7 that, then you should answer it as if the objection was
8 never stated. Just ignore the objection altogether
9 unless I specifically instruct you not to.
10      No one else in this room can tell you not to
11 answer a question except for me. All right?
12    THE WITNESS: Okay.
13    MR. BURKE: Q  And I'll just ask it again: So the
14 company HAA, as I understand it, at least had two
15 employees?
16    A  Uh-huh.
17    Q  You and a person named Marsha Griffin, right?
18    A  Uh-huh.
19    Q  Yes?
20    A  Yes.
21    Q  Did HAA itself have any other employers --
22 employees over the years?
23    A  With regards to agents or just employees in
24 general?

Page 21

1    Q  Employees of HAA.
2    A  Okay. Yes. We had verifiers, we had fronters.
3    Q  I see.
4    A  Yeah, so.
5    Q  And so how did it work with calls that were
6 being -- were transferred from Rising Eagle? Can you
7 walk me through how that would go through, say, a
8 successful sale --
9    A  Well, yeah, I mean, how it worked with John, the
10 agreement that we had was you were transferred to it and
11 you received a quote.
12      And once the consumer was transferred through
13 the DID, they would talk to the person. And if they
14 were interested, I mean, they pursued the customer up.
15 But it's pretty much -- it's probably just like every
16 other marketer.
17    Q  So a call gets transferred in from Rising Eagle,
18 and HAA knows that the call came from Rising Eagle
19 because of the DID, right?
20    A  Yes.
21    Q  All right. And that call gets transferred to a
22 fronter, is that correct?
23    A  Yes, yes.
24    Q  All right. And so how many fronters did HAA

6 (Pages 18 - 21)

Page 22

1 generally have working on a particular day?
2   MR. ADAR: Objection.
3   THE WITNESS: I want to say 25.
4   MR. BURKE: Q Okay. And were they always located
5 at HAA's office or were they sometimes remote?
6   A Sometimes remote.
7   Q Okay. Where was HAA's office?
8   A HAA's office, there was two locations, one on
9 Cypress Creek, which I forgot the address, and then the
10 address on Commercial Boulevard, 5310 Northwest 33rd
11 Avenue, Ft. Lauderdale.
12   Q And so those fronters, I guess you're saying
13 they all had their -- they all used the same login or
14 did they use a different login for the ViciDial?
15   A No, the same, the same login.
16   Q And so --
17   A Well, here is the thing, remember. That side of
18 it I'm not very familiar with.
19     So, I mean, there is a lot of things about Vici
20 that I'm not aware of that I don't know.
21     But they were on the same -- they were on the
22 same login.
23   Q Okay. And, then, so is it accurate to say that
24 the fronters would ask a series of questions of a

Page 23

1 consumer?
2   A Yes.
3   Q All right. And what kind of questions were
4 those that were asked by the fronter?
5   A Their name, state, if they're currently insured,
6 when were they wanting coverage to start.
7   Q And then if the consumer was interested after a
8 short discussion with the fronter, then what would
9 happen?
10   A They would transfer it over to an agent.
11   Q And so when you say agent, what does that mean,
12 like an insurance agent?
13   A Uh-huh, yes.
14   Q How many insurance agents did HAA work with at a
15 given time, generally?
16   A We had AORs and then agents. Ten.
17   Q And what's an AOR?
18   A Agent of record.
19   Q And what's the difference between an agent of
20 record and an agent?
21   A Well, there is certain agents that weren't
22 licensed in other states or, you know, so, and they
23 didn't want to, either, so they would write under an
24 agent of record.

Page 24

1     I believe certain -- like HII wanted to have --
2 well, all carriers wanted agents of records and then
3 they had agents underneath them to sell product.
4   Q Okay. So there is like a hierarchy of agents?
5   A Yes, sir.
6   Q Okay. I'm going to show you this exhibit again,
7 the same exhibit, on pages 3 to 4.
8   A I don't see a page --
9   MR. ADAR: Alex, I was going to say, we see your
10 private e-mails. You got to be careful about that.
11   MR. BURKE: Jesus. Sorry, everybody. No, I know.
12   MR. ADAR: You don't have to apologize. Just be
13 careful.
14   MR. BURKE: Stop reading, everybody.
15   MR. ADAR: Right now we're good. Right now we
16 see -- you should maximize the pdf would be my advice.
17   MR. BURKE: There we go. That's what I want to look
18 at.
19   MR. ADAR: You've highlighted some names.
20   MR. BURKE: Q I have, yes. I've highlighted some
21 names on this document which I intended to do while you
22 guys were watching.
23   A Well, you want me to go through the names and
24 what they were?

Page 25

1   Q Yes, please.
2   A Zach Cox was an AOR; Sergio Ortiz an AOR, Scott
3 Shapiro was a consultant; Christian, AOR; Victor -- I
4 want to say AOR, but; Sean Duffie was an AOR; Happy
5 Plans, I'm not familiar with Happy Plans; but Duffy
6 Insurance, obviously, that's, obviously, Sean Duffie;
7 Duffie Insurance, Sean Duffie, I don't know why he did
8 that; and then Duffie Insurance.
9   Q Okay.
10   A William Seminario was an AOR. Michael Saunders
11 was an AOR. Omar Reid I'm not really familiar with.
12 Alex De Luca, he was an AOR. I see a William, Billy
13 Vargas, no, he was not an AOR. Ann Fils, that name is
14 not familiar. Ashley, Ashley worked -- Ashley was an
15 agent under another group or another, I guess, manager.
16 Raymond Warren doesn't sound familiar. Alexander
17 Delucca is the same as De Luca up there. I can't see
18 the name to the right of Alexander or Alex Delucca.
19   Q It's Olivia Raffa.
20   A Olivia Raffa was a licensed agent. Marsha,
21 Marsha is a licensed agent. Leon Martin was a licensed
22 agent. Travis Ray, Travis Ray was -- Travis Ray was a
23 fronter. I don't know why he is on there. I think -- I
24 think Travis Ray was a fronter if it's the person I'm

7 (Pages 22 - 25)

Page 26

1 thinking.
2       Keith Connelly, that doesn't ring a bell.
3 Ethan Russell doesn't ring a bell. Dora Metro, she was
4 an agent. Shawna Morgan, not familiar. Christopher
5 Voltaire, not familiar.
6    Q  So thank you for that answer.
7       I guess the question is, the folks that you
8 identified as agents or AORs or fronters, did your
9 answer mean to say that the folks that you identified as
10 agents or AORs or fronters worked with HAA?
11    A  Yes, they worked with HAA, yes.
12    Q  Okay. And their job with HAA or working with
13 HAA was the identifications that you just provided,
14 right?
15    A  Yes.
16    Q  Okay. Did HAA also work with other TPAs other
17 than HII?
18    A  Yes.
19    Q  Okay. What other TPAs did HAA work with other
20 than HII?
21    A  Agentra was a company, A-1 is another, AWIS is
22 another.
23    Q  And about what percentage of the total business
24 of HAA was directed to HII?

Page 27

1    A  60 to 70 percent, maybe 60 percent.
2    Q  And HII was only accepting business for
3 particular states, is that right?
4    A  Yes.
5    Q  So if you took the states that HII was accepting
6 business for, what is your estimate of the percentage of
7 business that was being sent to HII as opposed to the
8 other TPAs?
9    A  I'd say 80, 90 percent.
10    Q  So once a fronter gets a consumer who is
11 interested in health insurance and related products, I
12 think your testimony was that that call gets warm
13 transferred to an agent, is that right?
14    A  Yes.
15    Q  And then what did the agent do then?
16    A  Well, the information they received from the
17 fronter, they go over that with the potential customer,
18 make sure it's correct and then look up -- look at the
19 policies to see what they're looking for within their
20 price.
21    Q  And if the agent was looking up a policy through
22 HII, what would they do?
23    A  Ask that question again, please.
24    Q  HII had a Web portal, didn't it?

Page 28

1    A  Yes, it did.
2    Q  Okay. And so is it accurate to say that the
3 insurance agents were generally logged into that HII Web
4 portal if they were selling business in the HII states?
5    A  Yes.
6    Q  All right. And what was the process that the
7 agents generally went through to, you know, quote and
8 sell HII -- insurance through HII?
9    A  They put their state, ZIP code in, and then go
10 through the plans with the portal. And, again, with
11 what the customer wanted from the plan, they would look
12 that up through the portal with what HII offered. And
13 then they would go over the benefits with them.
14    Q  Okay. I'm trying to show you another screen
15 share here. Can you see this document?
16    A  Yes.
17    Q  All right. Do you recognize this document at
18 all?
19    A  I mean -- yes, there we go. Yes. Those --
20 yeah, that looks familiar. Yes, there you go. Yes.
21    MR. BURKE: Okay. So this document we'll label it
22 as Exhibit 2. Let me do that. This is a challenge.
23       (Exhibit 2 marked as requested.)
24    MR. BURKE: Q  So as we sort of scroll through

Page 29

1 Exhibit 2, which is a 16-page document beginning at HII
2 499, Bates 499, what do you recognize from this document
3 generally?
4    A  It looks like an application.
5    Q  Okay. An application through HII?
6    A  Yes.
7    Q  So directing your attention to --
8    A  I mean, you're going through it kind of fast,
9 but it looks like an HII application, yes.
10    Q  Okay. So if we're looking at HII 505, which is
11 page 7 of this document.
12    A  Okay.
13    Q  Do you recognize what we're looking at here
14 generally?
15    A  Yes.
16    Q  What is it?
17    A  Freedom Spirit is the accidental death benefit.
18    Q  So is this sort of like a quoting tool or a
19 prequote tool?
20    A  Yes, sir. Sorry, I cut you off. Yes, yes.
21    Q  Okay. And so how did the -- would Bates 505,
22 would this be used by the fronter or the insurance agent
23 on an HII sale?
24    A  The fronter doesn't have access to none of this.

8 (Pages 26 - 29)

Page 30

1    Remember, fronters just get the basic
2 information like state, city, ZIP code, age, height and
3 weight, if they have insurance, why they're looking to
4 switch.
5    Q   And so did the fronter -- was the fronter
6 supposed to put that information into the ViciDial
7 system?
8    A   No.
9    Q   Okay. How did that information get conveyed
10 over to the agent?
11    A   They told them.
12    Q   They just like --
13    A   Do you want me to give you an example of what
14 I --
15    Q   Yeah, tell me how it worked.
16    A   So if I'm a fronter and I get Alex on the phone
17 and he's interested and then a guy named Tom is the
18 agent, hey, Tom, I have Alex on the phone in Illinois,
19 ZIP code da, da, da, da, looking for an individual
20 policy, he is 57 years of age, 5,10, 180, currently not
21 insured, looking to start immediately, can you help him?
22 Yes, sir, and boom, transfer.
23    Q   Got it. Got it. And then the agent would be
24 the one who goes through this interface we're looking at

Page 31

1 at 505 --
2    A   Well, remember, because they go over it again
3 with them, so that's why they make sure it's accurate.
4    Q   Okay. So the agent would ask the questions that
5 are in 505, 506, and try to fill out the information in
6 507, is that right?
7    A   No, I mean, the agent doesn't quote without --
8 yeah, they don't go over that with them.
9    Q   Okay. So tell me what the agent does to get
10 that quote?
11    A   So the agent -- because, again, that looks like
12 an application. So they haven't committed yet.
13    Q   Okay.
14    A   The agent goes over what the fronter has gone
15 through, and so the agent is -- they go over that with
16 them and the agent tells them, well, give me one second
17 here, I'm going to put you on a brief hold while I pull
18 up your information. And then I get back on the phone
19 and explain the benefits to you.
20    And then they will go onto the portal with what
21 they were looking for. And then they will plug in on
22 the quoting screen of a general of what they're looking
23 for, price, get them back on the phone, explain to them
24 the premium.

Page 32

1    And if it's affordable for them, they would
2 proceed on with the benefit and so forth. And then if
3 it's to their liking, then they proceed with an
4 application.
5    Q   So, then, if they are proceeding with an
6 application through HII, is Bates No. 507 what the HII
7 portal would generally show to make that application?
8    A   I'd say yes.
9    Q   Okay.
10    A   I didn't mean to cut you off again, sorry, but,
11 I mean, again, I wasn't on the insurance side of it. I
12 mean, I was -- that's more of the AORs and their
13 business to do the contracting.
14    So a lot of this stuff could have changed from
15 what I was seeing because I haven't sold insurance in
16 years, so things could be different with how HII works.
17    What I can remember was -- yeah, a lot of this
18 looks familiar.
19    Q   Okay. And you were present while these agents
20 were, you know, trying to sell insurance, right?
21    A   Sure. Yes.
22    Q   Okay. And so you observed them using something
23 like what we're looking at at HII 507?
24    A   Yes, that's what I'm saying, a lot of this looks

Page 33

1 familiar, yes.
2    Q   Okay. And just so we're clear, I mean, on a
3 call that was originated with Rising Eagle, I mean, when
4 the agent is selling insurance through HII, you know,
5 through this process we see in Exhibit 2, that's usually
6 on the same phone call as was initiated by Rising Eagle
7 and Spiller, is that right?
8    A   Well, yes, if the -- if a call from Rising Eagle
9 came through and the consumer wanted insurance, yes,
10 just any other, Data Lot, NextGen.
11    Q   Right. So the calls come through, the HII is
12 sold.
13    Then once the application is complete on the
14 agent side, then what happens?
15    A   They transfer them over to a verification
16 department where the verifier goes over the application
17 with them to make sure everything is correct and what
18 they agreed upon. They would do, obviously, a
19 verification with them, with the agreement.
20    And then if that consumer wanted to proceed,
21 they would. And then they would submit the application
22 to whatever carrier they submitted the application with.
23    Q   And so as to HII, when HII received the, you
24 know, the submission, is it accurate, then, the consumer

9 (Pages 30 - 33)

Page 34

1 would receive an e-mail?
2    A   They should receive a confirmation e-mail that
3 the application was submitted.
4    Q   Okay.  And was that e-mail from an e-mail
5 address that said My Benefits Keeper, by any chance?
6    A   That I don't know.  I don't know that.
7    Q   Okay.  Who did the verification process, who was
8 in charge of that?  Was that also HAA or was that HII or
9 the agents?  Who did that?
10   A   No, HII, again, is just a carrier, a product
11 that HAA offered.  HAA ran verification.
12   Q   Okay.
13   A   They hired verifiers, yes.
14   Q   Okay.  So I'm going to show you, without waiving
15 any work product here, I'm going to show you our file
16 that we received as part of the response to our subpoena
17 to HAA.  And I just want to sort of scan it together.
18       So looking at this production, I see a bunch of
19 these files that I've highlighted here that begin with
20 HII in the file name.
21   A   Yes.
22   Q   And most or all of these say they're
23 verification scripts or some sort of script of what to
24 say --

Page 35

1    A   Well, yeah, that's the -- yeah, sorry, I keep --
2    Q   What are they?
3    A   It's a verification script for the product.
4    Q   Okay.  And what's the purpose of the
5 verification scripts?
6    A   The verification script is for the consumer to
7 know the process of what they're agreeing upon.
8 Whatever the agent offered them that they're aware of,
9 that's what they agreed upon and then they proceed.
10       HII is not the only one that does this.  All
11 the carriers do this, all of them.
12   Q   Okay.  And these are the HII versions of the
13 verification scripts, is that right?
14   A   I want to say yes because I'm looking here, the
15 Cardinal is a plan, a product that HII offers.  Everest
16 is a -- yeah, that looks familiar, yeah.  Freedom Spirit
17 is a product they offered, yes.
18   Q   Where did these verification scripts come from?
19   A   I want to say HII.
20   Q   Okay.  If HII didn't design them --
21   A   No, they -- I'm sorry, they have to be HII.
22 Sorry, I keep cutting you off.  Yeah, it has to be HII
23 because it's what they -- it's what they want as a
24 carrier.

Page 36

1    Q   Okay.  And did HII generally approve this kind
2 of thing, these verification scripts?
3    A   Well, they're the ones, I mean, they're the ones
4 that sent them.
5    Q   HII sent these verification scripts to its
6 agents or to HAA?
7    A   Of -- no, to the agents.  HII had nothing to do
8 with HAA.
9    Q   Well, they had something to do with it, each
10 other because they were -- HAA was marketing, developing
11 leads that some of which went through HII, right?
12   A   Yes, but HAA wasn't contracted with HII.
13   Q   Got it.
14       Even though there was no direct contractual
15 relationship between HII and HAA, sometimes HII
16 communicated directly with HAA, didn't it?
17   A   I mean, if there was times that HII would ask
18 for a customer's name or something like that or any type
19 of assistance, and we would do our best to support that.
20   Q   Okay.  And so is it accurate to say that
21 sometimes Amy Brady would send e-mails to Marsha Griffin
22 and Scott Shapiro having to do with HAA?
23   MR. ADAR:  Objection, foundation.
24   MR. BURKE:  Q  Go ahead.

Page 37

1    MR. ADAR:  Again, Mike, unless I specifically use
2 the magic words do not answer this question, you should
3 answer.
4       So, Alex, why don't you -- I mean, I probably
5 threw him offguard objecting.  Why don't you ask the
6 question again for a clear record.
7    MR. BURKE:  Q  Okay.  Marsha Griffin in 2018, 2019
8 was not acting as an insurance agent, isn't that right?
9    A   Yes, she wasn't.  She is an agent, but she
10 wasn't -- no, she was doing more administrative.
11   Q   And she was an employee, a direct employee of
12 HAA, isn't that right?
13   A   Yes, sir.
14   Q   Okay.
15   MR. ADAR:  Objection, vague.
16   MR. BURKE:  Q  And are you aware that Amy -- I'll
17 start over.
18       Have you ever heard of a person named Amy
19 Brady?
20   A   Yes, I have heard of Amy Brady.  I've spoken to
21 her a handful of times.
22       Marsha would -- if she was talking to Amy, it's
23 regards to more administrative.
24   Q   Okay.

10 (Pages 34 - 37)

1    A   Regards to -- you said Scott Shapiro.  Scott,
2  again, was a consultant.
3    Q   Okay.  What did Scott do for HAA, what did he
4  consult?
5    A   With regards to like, I guess, I don't know want
6  to say marketing, but more on the front support with
7  agents and so forth.
8    Q   Okay.  Including with HII-related business
9  development, right?
10    A   No, not just HII, just in general.
11    Q   Okay.  But including HII and other TPAs, right?
12    A   Yeah, yeah, yeah.  I mean, I just want to say,
13  yeah, he was an employee of HII and, no, I mean, all
14  companies, yeah.
15    Q   Okay.  So do you have any knowledge of whether
16  HII ever reached out to HAA as to, you know,
17  telemarketing-related issues?
18    A   I believe -- I believe we had some.  The issues
19  that we've had that I am familiar with is we get a lot
20  of people that were, I don't want to call them scam
21  artists.
22        The guy for a living would sabotage a call or
23  they would go on to like a marketing company, fill out
24  their information to requesting a quote, bah, bah, bah,

1  bah.  When you submit it, send it to the provider, they
2  say, well, you violated this, you violated that, which I
3  don't see how that was, but, I mean, it was a transfer
4  from the marketing company; but a lot of professional
5  baiters.
6    Q   Okay.  So as to these professional baiters, what
7  were the communications between Marsha Brady (sic) and
8  HAA?
9    A   Oh, with Amy Brady, I guess if there was a
10  complaint or something like that with regards to one of
11  these people, she would -- I'm guessing she is talking
12  to Marsha to get information, like the application or
13  details of how we get that person.
14    Q   Okay.  And then if someone, either Amy Brady or
15  someone else at HII asked for details, for example, the
16  source of the lead, what did HAA generally do?
17    A   Provide it as much as we can.
18    Q   Okay.
19    A   Anything any carrier asked for, we would provide
20  them as much as we can to the carrier.
21    Q   Did anyone at HII ever ask you or anyone else at
22  HAA whether leads were being generated through
23  prerecorded messages?
24    A   Say that again.

1    Q   Did anyone at HII ever inquire with HAA as to
2  whether leads were being generated through prerecorded
3  messages?
4    A   Not that I am aware of.
5    Q   Did anyone at HII -- Well, let's back up.
6        Do you think it's fair to say that HII was
7  aware that leads were being generated through outbound
8  telemarketing?
9    A   Yes.
10    Q   Okay.  How do you know that?
11    A   Well, I mean, that's just from being in the
12  business.  You have -- because, well, you have liaisons
13  from all carriers, including HII, that would, you know,
14  come to your office and just talk to you, shoot the, you
15  know.  And they'll ask you, you know, how do you produce
16  all your production and so forth?
17        So over the years of them going to room to
18  room, I mean, they do want to get personal with you, not
19  with HAA, but with the agent.  And over the years they
20  know these companies.  They know NextGen.  They know
21  Rising Eagle.  They know Data Lot, All Web, Norvax.
22  They know all these companies.
23        I'm pretty sure they're even talking to these
24  companies because they have their own call centers and

1  establishing relationships with them.
2    Q   You mean HII has it own call centers that you
3  believe has relationships with the same lead
4  generators --
5    A   For sure.
6    Q   -- or had?
7        Okay.  And how do you know that?
8    A   Just from, you know, it's a small business, it's
9  a small world here, I mean, it's southeast Florida.  I
10  mean, people talk.  Like I know they have a Medicare
11  office that they opened up.  You know, so same thing.
12  It's insurance, I mean, just Medicare.  So people talk.
13    Q   Did anyone at HII ever reach out to HAA to talk
14  about internal do not call?
15    A   Yes.  We've had, like I said, from what I took
16  from it is that there were these people that they didn't
17  want anyone to call them.
18        And they'll probably e-mail Marsha, hey, I have
19  John Smith here, number bah, bah, bah, bah, South
20  Carolina, put them on your do not call list.  Yes, we've
21  had that.
22        And as soon as we got that, immediately put
23  them on there.  We don't want to deal with that anyways,
24  especially from the carrier.

11 (Pages 38 - 41)

1    If they're saying put this person on the DNC,
2  you put that person on the DNC ASAP.
3    MR. BURKE: So I'm going to show you another
4  exhibit. This is a compilation of documents that HAA
5  produced. And these are -- it's ten pages. We're going
6  to mark this as Exhibit 3.
7    (Exhibit 3 marked as requested.)
8    THE WITNESS: Okay.
9    MR. BURKE: Q   And I grouped these together because
10 they all seemed to ask for similar stuff. They all
11 contain the word DNC, which what does DNC mean in the
12 context of these e-mails?
13   A  Do not call.
14   Q  Okay. And so are the e-mails that we're looking
15 at this now, this group exhibit, I'm sort of scrolling
16 through as I talk, are these the kind of e-mails that
17 you were referencing where HII said, hey, listen, quit
18 calling these guys because -- well, quit calling these
19 guys?
20   A  I mean, again, I don't know, I mean, I don't
21 know why Scott is even in that e-mail. But that's kind
22 of -- if anything, it should just be Amy Brady and
23 Marsha.
24   Q  Okay. So are these e-mails in Exhibit 3, is

1  this the kind of stuff that you were talking about when
2  you testified that sometimes HII would reach out to HAA
3  to, you know, suggest that they not call certain phone
4  numbers?
5    A  Yes.
6    Q  Because, again, Marsha worked for HAA, right,
7  not for any sort of other company or agency in 2018,
8  2019, right?
9    A  Yes.
10    So, again, HAA's job was to provide the agents
11 marketing, administrative, and pretty much a built-in
12 success plan pretty much, the plug and play system.
13    So if there were -- It's not the agent's job to
14 worry about scammers or people that just don't want to
15 be bothered or whoever that may be. That's probably why
16 Marsha is getting those e-mails to handle it.
17    So, you know, so it's -- like, for example, the
18 agents, they don't have access to the administrative of
19 ViciDial to put into the dialer --
20   Q  Okay.
21   A  That's probably why that's like that.
22   Q  Did HII ever share like a larger do not call
23 list with HAA?
24   A  I'm not familiar with that.

1    Q  So to your knowledge, there was never a
2  spreadsheet or something or a list of phone numbers that
3  was longer than, you know, a dozen or so, you know, do
4  not call list?
5    A  I'm not familiar with that, but, I mean, that
6  doesn't mean that that didn't happen. I mean, I'm
7  sure -- I mean, HII is a big company.
8    Q  Well -- Go ahead.
9    A  I can tell you -- I can tell you from firsthand
10 experience I remember another office, another big office
11 had complaints with this guy, this, again, professional
12 scammer from South Carolina, and he was using different
13 names, which I don't know how he was even doing that,
14 that should be illegal, but he was submitting different
15 applications with different aliases and then suing.
16   Q  Uh-huh.
17   A  So I know that there is times that we were
18 notified, hey, put this person on DNC not just
19 because -- I'm not saying we called them, just because
20 other offices may have called them or whatever or maybe
21 they called HII directly and they realized that the
22 person was fraudulent or disgruntled or whatever it may
23 be.
24    So I'm sure that reason why HII is sending this

1  information is just making it easier on them as well as
2  the person that's disgruntled or the scam artist,
3  whoever it may be.
4    Q  Did HII ever share its master do not call list
5  with HAA?
6    A  Not that I am aware of, no.
7    Q  Okay. Did HII ever ask HAA to share its master
8  do not call list with HII?
9    A  We had a SANS number that we would -- that we
10 would provide through.
11   Q  What does that mean?
12   A  A SANS number is a program that you pay for,
13 it's very expensive, like $17,000, and it's a national
14 do not call, which that's what you're referring to.
15   Q  Okay. So that was not what I was referring to.
16 And so there are two concepts that I want to try to keep
17 clear. One is the national do not call registry, which
18 I think is what you were just talking about. And then
19 the other is an internal do not call list.
20    And the internal do not call list is closer to
21 this exhibit that we've been looking at --
22   A  Okay.
23   Q  -- where you've got consumers who have requested
24 not to get calls who have made complaints, that sort of

12 (Pages 42 - 45)

Page 46

1 thing.

2     And so did HAA keep track of the folks who

3 asked not to get phone calls?

4   A Yes, I mean, when HAA was given a person to be

5 put on the do not call, we put them on do not call. So

6 it's forever -- it's forever in the system.

7   Q And was that notation for do not call, was that

8 done through the ViciDial system also?

9   A Well, that's what it was. It's in the ViciDial.

10 Even if the person -- I mean, if they be called back or

11 whatever, it's do not call.

12   Q Okay. And that do not call list, did HAA ever

13 share the do not call list with any of its lead

14 generators like Rising Eagle, Data Lot, All Web Leads?

15   A Sure.

16   MR. ADAR: Objection, foundation.

17   THE WITNESS: When we were given DNCs, there was no

18 reason for anyone, for us to call them. So, yes, we

19 provided that.

20   MR. BURKE: Q Okay. And how was that list

21 provided to the lead generators?

22   A I want to -- well, I'm assuming e-mail.

23   Q Okay. And did you do that or did someone else?

24   A No. I think I have sent -- I have sent data

Page 47

1 before in the past that I've purchased, you know, but I

2 was never involved -- I never was hands-on with that.

3     So that wasn't an everyday thing. Again, I'm

4 not a lead generator --

5   Q Right.

6   A So as a marketer, it's because I buy transfers

7 from multiple companies, but I don't generate calls.

8     But I've had companies reach out to me, hey,

9 I've got data here of people that have requested health

10 insurance in the last 30 days that are inquiring on

11 healthcare. So that information, stuff I've

12 transferred, I've e-mailed in the past, but not that

13 often. I mean, very -- I'd say five times at the most.

14     Again, I don't -- I'm not -- that's not

15 something I'm involved in.

16   Q Did HAA ever send its do not call list to HII?

17   A I want to say yes.

18   Q Okay. And what are the facts and circumstances

19 concerning that?

20   A I'm guessing that it's because they asked for

21 it.

22   Q Okay. Do you remember a specific instance when

23 this happened?

24   A No.

Page 48

1   Q Okay.

2   A Sorry, I don't.

3   Q Okay. And if it happened, who would the players

4 have been in your eyes, like who are the individuals who

5 would have been involved?

6   A You mean the consumers?

7   Q No. You know, who at HAA or what agents and who

8 at HII would have traded this list?

9   A Well, remember, Marsha is an administrator, so

10 the agents don't talk to the -- they're not hands-on

11 with the administration of the carriers. Marsha is.

12   Q So it would have been Marsha if anyone sent that

13 do not call list to HII?

14   A If we sent it, I want to say yes.

15   Q Okay. Did HAA have a do not call policy that

16 was in writing?

17   A I don't believe so, no.

18   Q Okay. Did HII ever provide any sort of do not

19 call policy in writing to HAA?

20   A That, I don't know if they did or not.

21   Q To your knowledge as the corporate

22 representative of HAA, do you know of any instances

23 where HII provided any sort of written do not call

24 policy to HAA?

Page 49

1   A Yeah, I don't know that answer. Again, every

2 complaint or every issue that are run by me, so.

3   Q Okay. So as you sit here today, you don't know

4 of any instances where HII provided its -- any sort of

5 do not call policy to HAA, is that correct?

6   A I know that HII has sent HAA or Marsha, yes,

7 information with regards to, again, like we talked about

8 earlier, do not call here -- not here, but do not call

9 this, do not call that.

10   Q Do you have any -- do you know for a fact that

11 HII sent a written do not call policy to HAA?

12   A Do I know for a fact? No.

13   Q Okay. How often did HII visit the offices where

14 HAA was generating business?

15   A I mean, I want to say a couple times a year.

16   Q Okay. And so if we're talking about the

17 timeframe like 2018, 2019, would it be fair to say there

18 were probably three or four visits?

19   A Could have been.

20   Q Okay. Was there a particular person or persons

21 who generally visited from HII?

22   A I'm bad with names.

23   Q How about Ruben Gardner?

24   A No, that name doesn't sound familiar.

13 (Pages 46 - 49)

Page 50

1    Q   Was it always the same person or did it sort of
2    mix up?
3    A   It mixed up. They send one person because,
4    remember, they didn't talk to me. They talked to the
5    agents or talked to the manager or whoever may be on the
6    floor. They came by and checked the operation out.
7        Ruben, now that you say it, may -- it sounds
8    familiar. There was another guy, I forgot his name,
9    too, a very nice guy, but, man, I just don't -- I just
10   don't remember them.
11   Q   And so during those site visits, would you go
12   and hide in the other room or were you just going about
13   your business?
14   A   No, I mean, there is other -- I mean, there is
15   no reason for me to hide. I mean, that's just -- that's
16   kind of crazy.
17   Q   Okay. So did you generally like say hello and
18   exchange pleasantries with the HII folks who were
19   visiting?
20   A   No, it's just -- never they said we'll be here
21   and they came. It was never like I'll be here at 1:30.
22   Q   But if you saw them -- I mean, look, I'll start
23   over.
24   A   If I saw the people there, of course, I would

Page 51

1    come up to them and shake their hands and everything.
2    But, again, I'm bad with names.
3    Q   Okay. Okay. And do you think that the HII
4    folks who were visiting knew what you were doing as a
5    marketer for the agents?
6    A   I want to say yes, but I don't know. They never
7    asked me.
8    Q   Okay.
9    A   When they would go there, shake their hands, see
10   how they were doing, they would look at me like I was
11   literally an employee of the organization and kept on
12   moving. They weren't there for me.
13       They were there for the people that were
14   generating the business, the people that were on the
15   ground, the trenches that were, you know, so.
16   Q   And who were the most, in your estimation, who
17   were the most productive business developers for HII as
18   far as the agents were concerned?
19   A   I'd say Duffie, Duffie and Sergio.
20   Q   Okay. Did HII ever, to your knowledge, reach
21   out to HAA and ask them to stop using prerecorded
22   messages to develop leads?
23   A   We never used prerecorded messages for leads.
24   Q   Right. I understand that HII never -- or HAA

Page 52

1    never used prerecorded messages. But some of those
2    leads were generated -- the inbound calls to HAA were
3    generated through outbound calls using prerecorded
4    messages, right?
5    A   Not -- not that I was aware of, no.
6    Q   And so HII never asked HAA to stop using
7    prerecorded messages, is that right?
8    A   Not that I am aware of.
9    Q   Okay.
10   A   But that doesn't mean that they didn't send out
11   to numerous of offices. It's just not that I am aware
12   of that.
13       Again, we never did -- we never purchased calls
14   that were prerecorded messages.
15   Q   Did HII ever contact HAA, you or Marsha, and
16   say, hey, you know, we got these complaints for some
17   consumers who say they received telemarketing calls with
18   prerecorded messages, did that ever happen?
19   A   Man, I want to say no.
20   Q   Okay.
21   A   I want to say no, but I'm sure HII --
22   MR. ADAR: I want to object on that previous
23   question as foundation. I mean, I know he is here as a
24   corporate representative, but he might not know

Page 53

1    necessarily what Marsha received.
2    THE WITNESS: Yes, that's what I'm saying. I mean,
3    I didn't receive every single complaint or I never -- it
4    didn't always came to me.
5        So I want to say no on that, but, again, HII
6    gets numerous complaints, I mean, just like every
7    company gets numerous complaints. People don't call you
8    to congratulate you. They call you when they're pissed.
9    MR. BURKE: Q   When did HAA stop working with HII
10   or develop -- When did HAA stop assisting with business
11   development for HII?
12   A   I mean, it changed, stopped doing business with
13   all carriers, with all agents and everything with
14   carriers I want to say May, May of 2019 I want to say,
15   2019, just get into -- I mean, the leads were -- it was
16   just too much in the red. We couldn't sustain the
17   business unfortunately.
18   Q   At any point up to when HAA closed its doors did
19   HII reach out to HAA and say, hey, you got to do a
20   better job on this whole telemarketing lead generation
21   thing?
22   A   Not that I am familiar with, no.
23   Q   How did HAA use the do not call registry, the
24   one that you testified about, you know, you had to

14 (Pages 50 - 53)

Page 54

1 purchase and it was 17,000 a year, how was that used?
2   A  The SANS number, we run it through the SANS
3 number.  And then the program that I am aware of of how
4 it works is all of the people that are on the DNC, it
5 separates them.
6   Q  Okay.  And then how did -- how was that
7 implemented by HAA, that DNC registry scrub?
8   I mean, I think your testimony earlier was that
9 HAA was never making any outbound calls, right?
10   A  No, we're not a marketer.
11   Q  Right.
12   A  We don't generate -- we don't generate like
13 transfers.
14   Q  So what were you guys -- what was HAA doing with
15 that do not call registry?
16   A  Well, I mean, it's a situation, it's better to
17 have it and not need it than need it and not have it.
18   Q  So did HAA scrub phone numbers against that do
19 not call registry list?
20   A  Yes, when we received data, yes, we definitely
21 scrubbed it.
22   Q  What do you mean you received data?
23   A  Like I said before, there is a few times that I
24 received data, like marketers want your business.  And

Page 55

1 there has been times that we have sent John data at
2 Rising Eagle.
3   Q  Okay.
4   A  He had his own -- he had the SANS number
5 himself, obviously, he is a marketer.  So all marketers
6 have the SANS numbers.  So there was no need to scrub it
7 on our end if he is saying he is doing all of the
8 protocols on his end to, you know, to do it, obviously.
9   Q  Did HII ever reach out to HAA to see whether
10 there was proper scrubbing against the do not call
11 registry database for, you know, the lead generation
12 that HAA was doing?
13   A  Again, we weren't doing lead generation, so, I
14 mean, but there was -- not that I am aware of.  Even if
15 they -- lead generation, I never was notified about
16 that, so.
17   Q  So nobody said something like, hey, you know,
18 HAA, we're getting some complaints about do not call
19 registry, would you just check and see how that
20 scrubbing is going, nobody said anything like that?
21   A  I mean, with me directly?  No.
22   Q  No, with HAA.
23   A  Again, I still want to say no.  You mean if HII
24 request that because they don't -- I mean, they're not

Page 56

1 going to say, hey, can you call your carriers to make
2 sure that they're -- they're not going to say that.
3 They're going to talk to you as the person that
4 generates the calls.
5   Q  Right.
6   A  So -- but I still want to say -- Man, that's a
7 question that sounds like a company would ask that if
8 they were --
9   Q  But --
10   A  But, I mean, I was never aware of that.
11   Q  All right.  So as far as you know as to HAA, HII
12 never reached out and asked about how the do not call
13 registry was being complied with?
14   A  I mean, I want to say they've asked if we have
15 protocols.  I want to say they asked if we had a SANS
16 number.
17   Q  Okay.
18   A  So, you know.
19   Q  But did anybody say, hey, we got these
20 complaints, would you please tell us how you're making
21 this happen, this scrubbing against the do not call
22 registry?
23   A  We've had complaints of people and they've had a
24 call.  If that's what you're asking, yes, they have done

Page 57

1 that.  That I do remember.  And, obviously, we've given
2 that information to them.
3   Q  But as to the do not call registry, do you
4 remember any specific instances where HII said, hey,
5 we're getting some complaints or we just want to know
6 how you guys are scrubbing for do not call registry, did
7 that ever happen to your knowledge, any specific
8 instances?
9   A  Man, I want to say -- I want to say no, but that
10 question is a -- I mean, I never -- I don't recall, so,
11 yeah.
12   MR. ADAR:  Alex, we can go as long as you want, by
13 the way, but, you know, Mike is feeling under the
14 weather.
15   Mike, do you just want to barrel through and
16 finish?  You turned off your camera.  You got to keep
17 that on.
18   THE WITNESS:  I'm getting a phone call, sorry.
19   MR. BURKE:  Let's take a five-minute break.
20   MR. ADAR:  Well, we don't need to take it now, Alex,
21 if you want to finish your --
22   THE WITNESS:  I'd rather bang it out, to be honest
23 with you.
24   MR. BURKE:  Okay.  We'll take a break in a few

15 (Pages 54 - 57)

Page 58

1 minutes because I need a break.
2 THE WITNESS: Okay.
3 MR. BURKE: Q Other than the site visit folks,
4 Ruben or whoever else and other than Amy Brady at HII,
5 did anyone else from HII have occasion to communicate
6 directly with HAA, you or Marsha or anyone else for HAA?
7 A Other than the few people that would come and
8 say hi, besides them, no.
9 Q Okay. Do you have a background knowledge of how
10 HII or whether HII assists insurance agents with costs
11 of marketing?
12 MR. ADAR: Objection, vague.
13 THE WITNESS: Yeah.
14 MR. ADAR: I don't understand the question, Alex.
15 If you can reword it.
16 THE WITNESS: Nor do I.
17 MR. BURKE: Q Okay. Did HII help insurance agents
18 by assisting with the costs of marketing?
19 MR. ADAR: I think your prior question was HAA,
20 that's what confused me at least.
21 THE WITNESS: So you're asking if HII has offered
22 financial help to offices?
23 MR. BURKE: Q That's right.
24 A Yes.

Page 59

1 Q Okay. How did that work?
2 A I mean, certain people they would -- again, I'm
3 guessing with regards to people coming in, certain
4 people that had a good relation with HII, if they
5 requested help financially, they would help them out.
6 Q Okay. And so to your knowledge did that
7 financial assistance happen with some of the agents that
8 were working through HAA, Duffie, Cox, Ortiz?
9 A I don't think they did.
10 Q Okay.
11 A But I know that HII does that, though, so, yeah.
12 Q And as to Spiller and Rising Eagle, how did HAA
13 pay those guys?
14 A Wire.
15 Q Wire transfer?
16 A Yes.
17 Q And it was a lot of money, wasn't it?
18 A Yeah, a lot of money.
19 Q I saw a wire transfer record that looked like it
20 was like 7,500 bucks a day, is that right?
21 A Yeah, I mean, leads are very expensive now.
22 Q Yeah. And so was it just like a -- so when HAA
23 sent a wire transfer for 7,500 bucks or for 11,000 bucks
24 or whatever it was, was that a prepay for leads for like

Page 60

1 the next day or was it payment for the prior day? How
2 did that work?
3 A Well, pretty much had a CPA with them.
4 Q What does that mean?
5 A Or CPS, cost per sale. We would tell them how
6 many deals the offices made for the day and then pay for
7 it.
8 Q Okay.
9 A Leads, unfortunately, leads are -- again, that's
10 why we shut down. Leads now, I mean, lead generators
11 are, I don't want to overtalk or overstep my boundaries,
12 but lead generators are, in my opinion, what I'm dealing
13 with now, they're just -- they're not worth -- I mean --
14 I'm going to stop talking.
15 Q Yes. So --
16 MR. ADAR: Answer the questions, Mike. There is a
17 lot of money here, a lot of attorneys.
18 MR. BURKE: Q Have you ever heard of National
19 Congress of Employers?
20 A Sure, NCE.
21 Q What's NCE?
22 A NCE is -- they offer health products, as well,
23 that's sold under HII.
24 Q Okay. As far as you know, were there any --

Page 61

1 Well, hold on.
2 What was the product that NCE was offering
3 through HII?
4 A I believe it was an indemnity health plan.
5 Q So like would it be accurate to say like a
6 health insurance discount program?
7 A I mean, the word discount is kind of harsh.
8 It's an indemnity, health indemnity plan, cash benefits
9 per situation, cash benefits for doctor visits and so
10 forth.
11 Q And so was the NCE product, was that like an
12 add-on in health insurance?
13 A Well, you remember that e-mail you sent with the
14 Cardinal and all that stuff? NCE was pretty much the
15 same thing.
16 Q Okay.
17 A It was a product that was sold under HII.
18 Q All right.
19 MR. BURKE: Guys, I do want to take that break.
20 Let's please go off the record for five minutes and come
21 back at -- let's come back at 11:15.
22 THE VIDEOGRAPHER: We're going off the record at
23 11:07 a.m.
24 (a brief recess was taken from 11:07 a.m.

16 (Pages 58 - 61)

Page 62

1     EDT to 11:23 a.m. EDT)
2     THE VIDEOGRAPHER: This is media No. 2 of the
3  deposition of Michael T. Smith. Today is September
4  20th, 2021. We're going back on the record at
5  a.m.
6     MR. BURKE: Okay. Thanks, everybody.
7        (Exhibit 4 marked as requested.)
8     MR. BURKE: Q I've got what we're going to mark as
9  Exhibit 4 on the screen.
10       This is a two-page document. It's the
11  declaration of Michael Smith. I'll sort of scroll
12  through it.
13       And the question is, Mike, are you generally
14  familiar with this document?
15    A  Yes.
16    Q  Okay. What is it?
17    A  That I can remember, the issue with John and his
18  calls with this young lady.
19    Q  Okay. So is there anything in this document
20  that you wish to change?
21    A  Yes.
22    Q  Well, that's untrue, not that you wish to
23  change. Anything that you need to change in order to
24  make it truthful?

Page 63

1     A  It's kind of crooked. Is there a way you can
2  straighten it out?
3     Q  I can try to zoom out so you can see more.
4     A  There you go. Thank you. And bring it to the
5  top, if you don't mind.
6        Yes, it's -- Yes.
7     Q  Okay. So --
8     MR. ADAR: Just for the record, to be clear, right
9  now we only see paragraphs 1 through 4. Mike, I want to
10  make sure you know there is a fifth paragraph on the
11  next page. I just want to make sure that we get the
12  complete affidavit.
13    THE WITNESS: Thank you.
14    MR. BURKE: Q  All right. So paragraph 1, is that
15  true?
16    A  Yes.
17    Q  All right. And HAA, you know, just for
18  clarification purposes, closed its doors in sort of it
19  seems like a third of the way through 2019, is that
20  right?
21    A  Yes, in May, mid-May.
22    Q  All right.
23    A  Mid-May.
24    Q  Okay. So then paragraph 2, it says, "Between

Page 64

1  2017 and 2019, HAA engaged a company called Rising Eagle
2  run by John Spiller to provide live telemarketing leads
3  for the purpose of selling health insurance and other
4  health-related products and services."
5        Is that true?
6     A  Correct.
7     Q  All right. And some of the other health-related
8  products and services, for example, included NCE, right?
9     A  Yes, sir; yes.
10    Q  And the insurance companies that we're talking
11  about included American Financial and Chubb, is that
12  right?
13    A  Yes.
14    Q  All right. What other insurance companies'
15  products were sold through Rising Eagle leads?
16    A  So through meaning?
17    Q  Were developed through Rising Eagle leads.
18    A  Okay. Yeah, Agentra, Agentra, AWIS, A-1 and
19  those carriers that you just talked about.
20    Q  What about Med-Sense, what's that?
21    A  Med-Sense sounds like a -- I want to say that's
22  an HR -- it sounds like an HR product.
23    Q  Was dental insurance ever offered or any sort of
24  dental products?

Page 65

1     A  If they wanted it, yes.
2     Q  What do you mean they wanted it?
3     A  We never add a dental on there unless they
4  request a dental.
5     Q  Okay.
6     A  I mean, some of -- yes, so, yes.
7     Q  All right. The next sentence of Exhibit 4 says,
8  "These leads came in the form of inbound call transfers
9  from HAA through Rising Eagle."
10       Is that true?
11    A  Yes.
12    Q  And the way that HAA kept track of which leads
13  were Rising Eagle leads was through DIDs, right?
14    A  Yes.
15    Q  Paragraph 3 says, "HAA worked through TPAs to
16  obtain realtime quotes for the products and services it
17  sold during these calls."
18       Is that true?
19    A  Yes.
20    Q  Well, it really was the insurance agents that
21  were obtaining realtime quotes, wasn't it?
22    A  Correct.
23    Q  And so these are the calls, the leads that were
24  developed through Rising Eagle and HAA which were

17 (Pages 62 - 65)

Page 66

1 transferred to insurance agents where the insurance
2 agents then obtained realtime quotes through HII's
3 portal, right?
4     A  Yes.
5     Q  All right.  And then the next sentence says,
6 "HAA worked directly with licensed insurance agents who
7 generally had direct contractual relationships with the
8 insurance companies whose products were being sold such
9 as Federal Insurance Company and American Financial
10 Security Life Insurance Company."
11        Is that true?
12     A  Yes.
13     Q  All right.  Paragraph 4 says, "One of the
14 companies whose products and services that HAA sold
15 during these calls was NCE."
16        I think what you meant there was one of the
17 products that was being sold during calls from Rising
18 Eagle that HAA warm transferred to agents, that the
19 agents were selling NCE, is that right?
20     A  Yes, sir; yes.
21     Q  Okay.  So it's not HAA that was selling stuff,
22 it was the agents, but they were doing so on HAA and
23 Rising Eagle derived calls, is that right?
24     A  Yes, sir.

Page 67

1     Q  All right.  Paragraph 5 says, "HII was the only
2 TPA through which HAA offered or sold NCE-branded
3 products and services."
4        Is that true?
5     A  Yes.
6     Q  All right.  And, again, this is, when you said
7 HAA in paragraph 5 of Exhibit 4, what you really meant
8 was the insurance agents who were working with the HAA
9 leads derived from Rising Eagle, isn't that right?
10     A  Yes, sir.
11     Q  Okay.  And then the final sentence in this
12 declaration says, "In other words, all HAA telemarketing
13 that offered NCE products and services were quoted
14 through HII's on-line quote portal."
15        Is that true?
16     A  Yes, sir.
17     Q  All right.  And so you know that the final
18 sentence of this declaration is true based upon your
19 work with the insurance agents that were, you know,
20 partnered with HAA, is that right?
21     A  Yes, sir.
22     Q  Okay.  To your knowledge, has any governmental
23 authority reached out to HII about marketing?  It's a
24 broad question, but I want to start there.

Page 68

1     MR. ADAR:  Don't speculate, Mike.
2     THE WITNESS:  Yeah, then, no.
3     MR. BURKE:  Q  I mean, anything you heard through
4 the grapevine?
5     A  Well, yeah, I heard -- I mean, yes.  I forgot
6 his name, but there was a guy that was selling directly
7 for HII that got into a lot of trouble for his FTC
8 violation.
9     Q  Oh, is that the Simple Health stuff?
10     A  Correct.
11     Q  Okay.  And was there ever a relationship between
12 HAA and Simple Health?
13     A  No.
14     Q  Okay.  Why do you laugh?
15     A  Because I know the guy.  I mean, I know Yaniv
16 says talk less, but I wouldn't trust him as far as I can
17 throw him.  I knew him when he was a young punk kid, so,
18 you know.
19     MR. BURKE:  I'm going to show you another exhibit.
20 All right.  So here is another exhibit.  And I'm showing
21 you to see whether you've seen this document ever
22 before.
23        (Exhibit 5 marked as requested.)
24     MR. BURKE:  Q  I'm trying to scroll through it

Page 69

1 slowly.
2        Does this look familiar at all to you?
3     A  Yes, I've seen that.
4     Q  Okay.  Did you see this document or did HAA
5 receive this document at any time between, you know,
6 2018, 2019?
7     A  Not that I am -- not that I am aware of, so, no.
8     Q  Okay.
9     A  I'm not aware of that.
10     Q  Other than Amy Brady, did any other HII employee
11 or investigator or executive ever reach out to any of
12 your -- the HAA-related agents or HAA itself concerning
13 TCPA compliance?
14     A  No.
15     Q  So like Gary Raeckers never reached out to your
16 knowledge?
17     A  I don't know Gary.
18     Q  How about Michael DeVries, did he ever reach out
19 to HAA or any of the agents that HAA was working with?
20     A  No.
21     Q  Bryan Krul, did he ever reach out?
22     A  No.
23     Q  Other than the sort of the fix -- Well, have you
24 ever heard of -- Let's just stop this for a sec.

18 (Pages 66 - 69)

Page 70

1    MR. BURKE:  I'm going to show you another exhibit
2  here.
3       (Exhibit 6 marked as requested.)
4    MR. BURKE:  Q  So I'm showing you a 62-page exhibit
5  that -- and it's possible this is a compilation, but
6  it's consecutive Bates Nos. HII 340 to 401.
7       Do you recognize this document at all from your
8  time at HAA in 2018 and '19?
9    A  All of this?
10   Q  Yes.  I know it's a tough thing, but like what
11 I'm getting at is, is this a document that HII sent to
12 HAA or any of the agents working for HAA, to your
13 knowledge?
14   A  Yes, yes.
15   Q  You would say that it is a document that they
16 sent?
17   A  Yes.
18   Q  Okay.  What is it?
19   A  Well, it looks like what they would give the
20 agents.  I mean, I never looked at it in detail like
21 that.  I know all these right here.
22   Q  Yes.  Did HAA, the fronters working for HAA, was
23 there ever any guidance from the agents or from HII
24 concerning, you know, disclosures of the companies whose

Page 71

1  products were being marketed or sold on the phone calls?
2    A  I know that HII, what I was told, had a script
3  that they used.
4       We never used their script, so.
5    Q  Okay.  Were there any instructions that you
6  understood for the fronters from HII like -- or the
7  agents or really anyone else, hey, make sure you don't
8  mention HII until late in the call, anything like that?
9    A  Fronters don't talk about any carriers or
10 they're not supposed to.
11   Q  Okay.  Why not?
12   A  Because it's not their job to talk about
13 product.  It's their job to get basic general
14 information of the potential client.
15   Q  Okay.  And HII knew that this was the process,
16 didn't it?
17   A  Yes, yes.
18   Q  And so at what point were the -- you know, was
19 the -- at what point was HII's involvement allowed to be
20 disclosed?
21   A  Well, I mean, if HII was a carrier where it was
22 a product we were going to offer.
23   Q  TPA, right?
24   A  Yes, sir, TPA.

Page 72

1    Q  All right.  So once it was determined that the
2  quote was going to go through HII, then you were allowed
3  to disclose HII, is that right?
4    A  Well, the agent, yes.
5    Q  All right.  Yes, right, the agent.
6       I mean, on some level even if an Agentra TPA
7  product was eventually sold, if the phone call went out
8  in a state where HII was doing business, on some level
9  the lead could have gone to either one, isn't that
10 right?
11   A  Sure.  If we didn't -- we prefer to sell HII in
12 HII states.  It seems like the commissions were higher,
13 but also the plans for that state had more options.  So
14 we'd prefer to go that route.
15      The only way we didn't sell HII in an HII state
16 is if the customer didn't want it, which that happened,
17 or if they already were insured by them.
18   Q  So are you saying the general rule was, hey, if
19 it's an HII state, try to sell HII unless the consumer
20 says it doesn't want it or unless the consumer already
21 has HII, is that right?
22   A  Yes.
23   Q  And what were the states for HII?
24   A  Oh, that's, I mean, I think there is like 20

Page 73

1  some states.
2    Q  Is there like a document that can help us figure
3  out which states they are?
4    A  There is a list of states that we have.  I don't
5  have it right on me, though, but there is a list of
6  states.  I would need my phone to get it.
7    Q  Okay.  If it's okay with your lawyer, I would
8  ask you to do that.
9    MR. BURKE:  Yaniv?
10   MR. ADAR:  Can you repeat that, please.
11   MR. BURKE:  We're talking about Mike going to his
12 phone to find the list of states that HII had approved.
13 You can provide it outside the deposition later, too.
14   MR. ADAR:  I mean, that's just -- I want to know
15 specifically what was there.
16      I think what I would prefer is, I mean, Mike,
17 we can talk offline about what you would look at on your
18 phone, but I would prefer we research it and we can
19 provide it to you through a sworn statement if that's
20 okay with all the other attorneys on the call.
21      If not, we can take a break and I can talk to
22 Mike and see what we get.  I'm uncomfortable with him
23 just going on his phone now without knowing what he is
24 looking at.

19 (Pages 70 - 73)

Page 74

1    MR. BURKE: Let's take a quick break.
2    MR. ADAR: Let's do that.
3    THE VIDEOGRAPHER: Going off the record at
4  a.m.
5       (a brief recess was taken from 11:43 a.m.
6       EDT to 11:50 a.m. EDT)
7    THE VIDEOGRAPHER: Going back on the record at
8  a.m.
9    MR. BURKE: Q  All right. So we went off the
10 record to try to find this list of states, and we
11 couldn't find it. Thank you for looking.
12      Do you know whether Illinois was one of the
13 states that HII was, you know, accepting business
14 through in 2018?
15   A  I don't know that answer. I would want to say
16 yes because, I mean, Illinois is, I mean, a popular
17 state for all carriers, so the answer is yes.
18   Q  Okay. And Florida?
19   A  Florida, yes.
20   Q  Okay. Have you ever heard of National Benefit
21 Builders?
22   A  National Benefit Builders, no.
23   Q  NBBI, have you ever heard of those guys?
24   A  Unfortunately, no, sorry.

Page 75

1    Q  Okay. How about AccessOne?
2    A  AccessOne? No.
3    Q  Nobody ever, to your knowledge, ever forwarded
4  like a complaint that included HII, NBB and/or
5  AccessOne?
6    A  Not to my knowledge. If they did, I didn't
7  notice who they were.
8    Q  Okay. No telemarketing complaints that you guys
9  saw that mentioned NBBI or AccessOne, is that right?
10   A  No, no.
11   Q  Okay. Was there a Wiki page that you knew of at
12 HII that showed the different products and services that
13 HII offered?
14   A  A Wiki page?
15   Q  Yes.
16   A  No.
17      Wiki, you can put whatever you want on Wiki,
18 right?
19   Q  I know.
20   A  No, I never heard of that. That's the first --
21 you saying that is the first time I've heard of it.
22   Q  I know. Wiki is what like they teach like my
23 fifth-grade son not to use for research.
24   A  Correct.

Page 76

1    Q  What was the instruction from HII about the --
2  to the signatures having to do with the verification
3  scripts? Were they allowed to deviate from those
4  scripts?
5    A  No.
6    Q  They were not allowed to deviate?
7    A  No, they're not -- they're to just stay on
8  course. Verifiers would, you know, talk to customers
9  during verification. Like if they're from a certain
10 state, yeah, I've been there, a beautiful city you live
11 in, something like that, but nothing pertaining to the
12 actual script. It's word to word.
13   Q  And thinking about logins, all right, so say you
14 are a fronter or an agent that's working and accepting
15 leads from Rising Eagle, what are the logins that you
16 would be logged into? Probably you would be logged into
17 ViciDial, right?
18   A  That's it, just Vici.
19   Q  Well, you'd also be logged into HII's portal,
20 no?
21   A  The agent, yes.
22   Q  The agent, but not the fronter?
23   A  Not the fronter.
24   Q  And did the agents have their own logins for

Page 77

1  HII's system?
2    A  Every agent, yes.
3    Q  Okay. And did the agents have their own logins
4  for the ViciDial system?
5    A  No, it was a -- nope. It was -- there was, I
6  believe, two separate, one for agents, one for
7  administrative.
8    Q  But we've looked at some of this data that we
9  got from ViciDial, and it identifies maybe extensions
10 where the phone calls were transferred to.
11      Does that make sense to you?
12   A  I believe that's for verification.
13   Q  Okay.
14   A  Because there is multiple verifiers, so they
15 would transfer to extension such and such for this
16 verification, that verification and so forth.
17   Q  And it knew, at least the data we see suggests
18 that the system kept track of where each call went.
19      Does that make sense?
20   A  Yes.
21   Q  The inbound phone calls were also recorded
22 through the ViciDial system, weren't they?
23   A  Yes.
24   Q  Okay. And those recordings began upon warm

20 (Pages 74 - 77)

Page 78

1 transfer to HAA, right? In other words, the recordings
2 don't include what happened over at Rising Eagle?
3     A No, I think the -- well, the call started when
4 the call comes to us.
5     Q Okay. So the recording started when the calls
6 came to HAA, right? Yes?
7     A Correct.
8     Q Okay.
9         And is it your understanding that ViciDial
10 provided those recordings pursuant to a subpoena to us?
11    A I think they did, yes.
12    Q Okay. And you authorized that to happen?
13    A Yes.
14    Q Okay. Have you ever heard of EchoSign?
15    A No.
16    Q Could EchoSign have been part of like the
17 verification process, like after a consumer receives an
18 e-mail they got to like electronically sign the contract
19 that they received from HII, does that ring a bell?
20    A I've never heard of EchoSign.
21    Q Okay. Are you aware that there was a process by
22 which the consumer would receive an e-mail from HII
23 while they were on the phone with, you know, HAA related
24 agents?

Page 79

1     A Yes.
2     Q Okay. And so what were the agents supposed to
3 do when HII sent that e-mail?
4     A Well, the verification sends that e-mail.
5     Q Okay. So verification -- and is verification
6 different than the insurance agents?
7     A Yes. Verification, their job is to do the
8 verification script with the consumer, make sure
9 everything is correct, spelled correct, physical
10 address, et cetera, make sure that the plan that they
11 agreed upon is the right plan that they wanted at the
12 right price and so forth.
13    Q And whose employees were those verification
14 folks?
15    A Well, they're self-employed.
16    Q Oh, they're like independent?
17    A Yes, independent.
18    Q Who paid them?
19    A HAA paid them.
20    Q Okay. And who required that those verifications
21 happen, was that HII that required it?
22    A Yes, sir.
23    Q Did HII ever reach out to HAA, either you or
24 Marsha or anyone else to try to get evidence of consent

Page 80

1 for particular phone calls, do you know?
2     A No.
3     Q Okay. Did they ever ask whether there was
4 consent to be making outbound calls?
5     A When you say consent, from the consumer?
6     Q Right.
7     A I don't think they've ever asked if we're having
8 calls where they asked for consent or not. I don't
9 believe so.
10        But the transfers we -- I mean, we do
11 transfers, I mean, you have someone that's agreed to
12 speak to someone for a quote, so.
13    Q So it was your understanding that Rising Eagle
14 was making phone calls to folks who had asked to receive
15 phone calls, right?
16    A 100 percent.
17    Q And you provided some of those phone numbers to
18 call, right?
19    A Yes.
20    Q And where did you get those phone numbers that
21 you provided to Rising Eagle to call?
22    A You're saying the ID numbers, is that what
23 you're referring to?
24    Q No, the consumer phone numbers. Did you guys --

Page 81

1 did you or HAA or any of the agents ever provide Spiller
2 or Rising Eagle with the phone numbers that it ought to
3 be reaching out to?
4     A Oh, yes, we've -- I mean, I've sent John data
5 before, like 30-day-old health insurance data.
6     Q And where did you get that data?
7     A We've bought it from like lead providers, people
8 that are in marketing, et cetera, yes.
9     Q Like can you give me a couple examples of
10 companies that you bought a good amount of leads from?
11    A I know we've bought data from Data Lot. I know
12 a guy named Phil that's in marketing. He's mostly from
13 Florida, but he does have under 65 data that I've done
14 business with. And he wanted my business, so we've
15 bought data from him, as well.
16    Q So like if you took a particular phone number
17 today, like Mary Bilek's phone number, the plaintiff in
18 this lawsuit, would there be any way to figure out to
19 recreate where that -- where, you know, somebody
20 obtained that phone number for a phone call?
21    A That's above my intelligence level. I mean, I
22 wouldn't even -- I wouldn't even know how to pinpoint
23 that.
24    Q Okay. And that's not just as to Mary Bilek,

21 (Pages 78 - 81)

Page 82

1 that's like if you got any particular phone number
2 today, there would be no way to trace that back to any
3 sort of real opt-in or consent, is that right?
4    A  Unfortunately, yes.
5    Q  Unfortunately, that's correct?
6    A  Yes, that's correct.
7    Q  And I think that you touched on this earlier,
8 but what was the financial arrangement between HAA and
9 these insurance agents that were working with it?
10    A  They get a percentage after all of the bills
11 were paid, all of the other self-employed people and so
12 forth in the operation.
13    Q  And was it the same percentage for all or most
14 of them?  What are we talking about?
15    A  It's 25 percent of what they receive once
16 everything is -- once everything was paid for.
17    Q  So HAA takes 75 percent and they get 25?
18    A  Not 75 percent.  Remember, lead expense, paying
19 for all the fronters, all the verifiers, administrative,
20 yes.
21    Q  So I think what you're saying is like Sean
22 Duffie would get about 25 percent, and then HAA would
23 take 75 percent, a lot of which would cover the costs,
24 is that right?

Page 83

1    A  Unfortunately most of it did.
2    Q  Okay.
3    A  That's why we were in the red, so.
4    Q  But that's how it works, right?
5    A  Yes, sir; yes.
6    Q  Okay.  Okay.  I see that early on with your
7 personal relationship with HII there is some documents
8 that suggest that you told them that you were working
9 with the ViciDialer.
10       Do you remember that?
11    A  When you say working with the ViciDialer, as in
12 running it?
13    Q  Yes.  Like I've got these site visits from early
14 on, 2015, 2016 reports from HII, and they say, oh, yeah,
15 Direct Benefits Group is using ViciDial.
16       Do you remember telling them that you were
17 using ViciDial?
18    A  I don't remember saying that, but I can see
19 that -- I can see me saying that, sure, because we were
20 using ViciDial at Direct Benefits Group with HII.
21       I had a contract with HII at that time.  And
22 that's when I actually spoke to Amy Brady and so forth
23 at that time.
24    Q  And so how did that work with HII when you

Page 84

1 terminated your agent relationship with those guys, what
2 did you tell them?
3    A  Told Amy that the office is shutting down, I
4 mean, that's pretty much it, to be honest with you.
5 They never tried to say -- they never asked why or
6 nothing, just another agent, another number to them.
7    Q  Right.  And so you shut down Direct Benefits
8 Group.  And then how long did it take to open HAA after
9 you shut down Direct Benefits Group?
10    A  I want to say a couple years.
11    Q  Oh, I see.  What did you do in the middle, in
12 the interim?
13    A  Just residuals, residuals, getting by, saving
14 and, yeah, pretty much it.  Self-employed I guess you
15 would say.
16    Q  Okay.  And you've given some testimony about how
17 things worked with leads received from Rising Eagle.
18       Did it work differently with leads received
19 from other lead sources like Data Lot, All Web leads, or
20 was it generally the same for each of them?
21    A  No, it was different with them.
22    Q  Okay.
23    A  Because they charged -- their marketing was ran
24 different.  They charged per transfer instead of like a

Page 85

1 CPA deal.
2    Q  Okay.  Other than the charge, I mean, was the --
3 were the scripts the same and was the, you know, HII
4 relationship the same as to the other lead generators
5 other than Rising Eagle?
6    A  Well, the lead generators had nothing to do with
7 the insurance, the TPAs.
8    Q  Okay.  So yes?
9    A  Yes.  There was no correlation with the
10 insurance companies and the marketers.
11    Q  Okay.  And would you say when HII TPA was being
12 sold, what percentage of those HII sales included NCE,
13 do you know?  Was it most of them?  What's your sense as
14 you sit here today?  Was it all of them?  Was it some,
15 was it scattered?
16    A  I'll honestly say not many, to be honest with
17 you.  I'd say maybe 15 to 20 percent, if that.
18    Q  Okay.
19    A  If even that.  The NCE really didn't have too
20 many products.  And to my knowledge, it was only sold
21 for a certain duration of time.  It wasn't on there for
22 long.
23    Q  When did they stop, do you know, roughly like?
24    A  Yeah, I wouldn't know that, sorry.

22 (Pages 82 - 85)

Page 86

1    Q   Okay.  Have you done any declarations having to
2   do with TCPA compliance or telemarketing outside of this
3   case?
4    A   You mean you're asking me if I'm dealing with
5   some issues --
6    MR. ADAR:  Hold on a second.  I am concerned because
7   one of the declarations may deal with confidential --
8   may be subject to a confidentiality agreement on an
9   unrelated matter involving a government entity.
10       So if we can carve out, just I would need to
11  check, Alex, at the break whether it is subject to it.
12   MR. BURKE:  Okay.
13   MR. ADAR:  That's my only concern.
14   MR. BURKE:  Q   Okay.  Excluding the governmental
15  one, any other declarations or affidavits that you've
16  signed that have to do with telemarketing?
17   A   No, I don't know, no.
18   MR. BURKE:  All right.  Well, Yaniv, if you would
19  look at that, please.  You know, I'm going to leave the
20  depo open because we've got some --
21   MR. ADAR:  It's involving the State of Missouri.
22  There is a publicly filed consent decree that's there.
23       Can we go off the record?
24   MR. BURKE:  Yes.

Page 87

1    THE VIDEOGRAPHER:  We're going off the record at
2   12:11 p.m.
3       (a brief recess was taken from 12:11 p.m.
4       EDT to 12:32 p.m. EDT)
5    THE VIDEOGRAPHER:  We're going back on the record at
6   12:32 p.m.
7    MR. BURKE:  So we had a discussion off the record.
8   I have completed my examination for the day, but there
9   were some questions that I think are responsive to the
10  deposition notice that we didn't get totally complete
11  responses, and for that reason I'm going to leave the
12  deposition open.
13       But I'll say it on the record.  I mean, we're
14  committed to trying not to have you sit again, Mike.
15       We appreciate your hard work today and, you
16  know, putting together the subpoena response.  And, you
17  know, with that said, I can turn it over to I don't know
18  whoever else wants to do some work here.
19   MR. ADAR:  Just for the record, this is Mr. Smith's
20  counsel.  You know, we believe we've satisfied all of
21  our obligation under the subpoena and object to any
22  continued deposition.  This should be a one shot in this
23  case.
24       But we appreciate that the goal pursuant to

Page 88

1   Rules 1, 26 and 45 is to proceed efficiently.  And, you
2   know, to the extent it needs to, we'll work with
3   Mr. Burke to try and resolve them without the need for
4   either another deposition or additional production.  So
5   thank you.
6       I do have questions, but I'm going to defer to
7   Danielle to go first and then I'll do my cross at the
8   end.
9    MS. CHATTIN:  Okay.  Thanks.
10              EXAMINATION
11            by Ms. Chattin:
12   Q   Mr. Smith, good afternoon.  My name is Danielle
13  Chattin, and I represent Health Insurance Innovations,
14  who we've been calling HII today.
15       So I just have a couple of questions for you.
16  I apologize if they seem a little repetitive of what you
17  already talked about with Mr. Burke this morning.  But
18  if you would bear with me, I would really appreciate it.
19   A   No worries.
20   Q   Okay.  Mr. Smith, you --
21   MR. ADAR:  Just, Mike, the same rules apply.  Sorry,
22  Danielle.  If there is anyone that objects, you know,
23  nothing changes.  It's the same as if Alex was asking.
24       So just pause, let her ask, don't do what I

Page 89

1   just did to Danielle, and I apologize, speak over
2   someone.  But, you know, give everyone the opportunity
3   to object, wait until they finish speaking.  And unless
4   I specifically instruct you not to answer, you are to
5   answer all questions.
6    MS. CHATTIN:  Q   Great.  Okay.  Mr. Smith, you
7   testified earlier today that you, Michael Smith, had a
8   general agent agreement with HII when you were operating
9   through Direct Benefits, is that correct?
10   A   Yes, ma'am.  Yes.
11   Q   Okay.  And what was the time period of that
12  agent relationship that you had with HII?
13   A   I want to say 2014 to 2016.  I want to say that,
14  yes.
15   Q   Okay.  And during that time that you were
16  working through Direct Benefits, did you purchase any
17  telemarketing leads through Rising Eagle or John
18  Spiller?
19   A   I didn't know John at that time.
20   Q   Okay.  And this time that you worked with HII
21  through Direct Benefits, that preceded your time where
22  you started HAA, is that right?
23   A   Yes, ma'am.
24   Q   Okay.  And once you started HAA, you no longer

23 (Pages 86 - 89)

1 worked as an agent through HII, is that correct?

2　A　It had nothing to do with HII.

3　Q　Okay. And HAA never had a contract with HII, is

4 that right?

5　A　Yes, ma'am, no contract, nothing.

6　Q　Okay. And I believe your testimony is that HAA

7 supported independent agents that may have had

8 agreements with different third-party administrators to

9 sell insurance, is that right?

10　A　Uh-huh.

11　Q　Okay. And these agents, some of these agents

12 had agreements with HII to sell insurance products, is

13 that right?

14　A　Yes, ma'am, they had contracts with them, yes.

15　Q　Okay. And you said that these independent

16 agents had contracts with multiple third-party

17 administrators, is that right?

18　A　Yes.

19　Q　Okay. So they had agreements with HII and they

20 had agreements with other third-party administrators at

21 the same time, is that right?

22　A　Well, I mean, not all of them had all of the

23 same contracts; but, yes, there were several that were

24 like that, licensed with HII, Agentra, A-1, yes.

1　Q　Okay. And I believe you testified that HAA did

2 not get involved with the relationships between

3 independent agents and the third-party administrators,

4 is that right?

5　A　Yes, ma'am.

6　Q　Okay. So is it fair to say that I would have to

7 go to every independent agent to ask them which

8 third-party administrators they worked with at any given

9 time?

10　MR. BURKE: Objection.

11　THE WITNESS: I mean, if you had to, sure. Again,

12 these agents, we pretty much had a platform for them to

13 just -- again, pull everything.

14　　Yes, they're licensed and so forth and

15 different carriers. I mean, in my honest opinion, a lot

16 of these agents, you can go ahead and ask them, but

17 they're just not going to know all of the questions

18 you're going to ask because they never dealt with Marsha

19 or whoever. The administrator dealt with anything

20 pertaining to them.

21　　Like saying like if it's a do not call number

22 or whatever, we would notify the managers, hey, listen,

23 number da, da, da, da, make sure it's in the -- it's in

24 the DNC. They just don't know why or, you know.

1　　They're there to build a book and to develop

2 customers. That's what they're there for.

3　MS. CHATTIN: Q　Sure. And I think -- and I

4 appreciate that. Thank you.

5　　I think what I'm asking is, for these

6 independent agents and their relationships with HII, for

7 example, you, Michael Smith, or HAA, you don't get

8 involved with, facilitate, or otherwise keep track of

9 those relationships between the agents and the

10 third-party administrators, is that fair?

11　MR. BURKE: Objection, form.

12　THE WITNESS: Yes, the -- with regards to you mean

13 their relationship with the carrier as in -- I'm sorry.

14 I'm kind of confused with the question.

15　MS. CHATTIN: Q　Sure. Let me strike that and ask

16 you a different question.

17　A　Yes, yes.

18　Q　So, first of all, you testified earlier that the

19 independent agents are the only ones who have access to

20 the HII portal to get quotes or sell insurance products,

21 is that right?

22　A　Them and administration has the login, yes.

23 They don't share that -- they don't share their login

24 with other agents, no.

1　Q　Okay. When you say administration, what do you

2 mean by administration?

3　A　Like, for example, let's say HII has a question

4 on Joe Schmo, administration can log into their login,

5 look the customer up, oh, yeah, we signed him up here

6 September 12th, blah, blah, blah, blah, I mean, to

7 retrieve the information.

8　Q　Who is administration? Who do you mean by

9 administration?

10　A　HAA.

11　Q　And do you mean Marsha Griffin?

12　A　Marsha, maybe customer service.

13　Q　So let me just make sure I understand.

14　　So Marsha Griffin may have access to the HII

15 portal that provides quotes for products?

16　A　Not quotes, more on the administration end of

17 it.

18　Q　Okay.

19　A　Not quotes.

20　Q　Okay. So for the interface that Mr. Burke was

21 showing you earlier where an agent is able to generate a

22 quote or fill out an application for a consumer for HII,

23 only the independent agent has access to that portal

24 interface, is that your understanding?

24 (Pages 90 - 93)

Page 94

1    A  Yes, ma'am, that's for that agent, yes.
2    Q  Okay.  And does Marsha Griffin have access to
3  that portal?
4    A  Not that I am aware of, no.
5    Q  Okay.  And you didn't use that portal when you
6  were working with HAA, right?
7    A  No, ma'am.  I haven't done a quote in years.
8    Q  And the fronters who worked for HAA, they did
9  not have access to that portal, is that right?
10   A  No, no, not at all.
11   Q  Okay.  So you testified earlier that independent
12  agents may have contracts with more than one third-party
13  administrator or carrier, is that right?
14   A  Yes, ma'am.
15   Q  Okay.  Would HAA have records of which
16  third-party administrators each independent agent is
17  working with at any given time?
18   A  I think -- I believe so, yes, yes.
19   Q  Okay.  And how would HAA have records of that?
20   A  I believe the administration, Marsha might have
21  that information, yes.
22   Q  Let me ask you this.  When an independent agent
23  was working with HAA for support, were any of these
24  agents ever getting support elsewhere like lead

Page 95

1  generation services or office support as far as you
2  know?
3    A  From outside of the organization?
4    Q  From outside of HAA, yes.
5    A  Not that I am aware of.
6    Q  Okay.  Do you know for sure one way or the other
7  whether they were?
8    A  I don't know.  They could have been because at
9  the end of the day they're individual agents.  So we've
10  had agents work there and then gone to do on their own,
11  so, yeah.
12   Q  Okay.  Earlier today Mr. Burke was asking you
13  about a carrier called NCE.
14      Do you remember that?
15   A  Yes, ma'am, uh-huh.
16   Q  Okay.  And you had said that NCE offered certain
17  insurance-related products, is that right?
18   A  Yes.
19   Q  Okay.  And I believe you testified HAA never
20  sold any NCE products, is that right?
21   A  No, HAA never sold any products like that.
22   Q  Right.  Because HAA does not sell insurance
23  products at all, right?
24   A  Correct.

Page 96

1    Q  Okay.  But certain of the agents that HAA
2  supports may have sold NCE products, is that correct?
3    A  With -- on HII's platform.
4    Q  Right.  Okay.  So I wanted to follow up with you
5  about that.
6      And I know Mr. Burke was showing you a
7  declaration that you executed for this case and that
8  Mr. Burke showed you.  And I believe your --
9    MS. CHATTIN:  Well, Alex, are you able to put
10  Exhibit 4 back up on the screen or do you want me to try
11  to put my own up?
12   MR. BURKE:  Give me two seconds.
13   MS. CHATTIN:  Thank you.
14   Q  You know, while he is doing that, Mr. Smith, let
15  me ask you another question.
16      You said that only the agents have access to
17  the HII portal to generate a quote for a consumer, is
18  that right?
19   A  I believe so, yes.
20   Q  Okay.  As far as you know, is there any -- Let
21  me start over.
22      As far as you know, if an agent is on the phone
23  with a consumer and they log in to HII to generate a
24  quote for that consumer, is there any record of that

Page 97

1  quote generation created?
2    A  Not that I am aware of, no.
3    Q  Okay.  Sorry, go ahead.
4    A  No, it doesn't save the quote.
5    Q  Right.  It doesn't save the quote.  Okay.
6      And if an agent is on the phone with a consumer
7  and they pull a quote for a policy from HII and the
8  consumer doesn't like that quote --
9    A  Sure.
10   Q  -- can't that agent go onto -- log onto another
11  third-party administrator portal and generate a quote
12  for a different policy to offer to that consumer?
13   A  Correct.  Yes, ma'am, uh-huh.  Yes, he can, yes.
14   Q  Okay.  And there is no record or no way to know
15  on any particular phone call, you know, where these
16  quotes were generated from, there is no record of that,
17  right?
18   MR. BURKE:  Objection.
19   THE WITNESS:  No.  Yeah, there is no way to figure
20  out what all quoting engines they used for quotes
21  unfortunately.  It doesn't keep track of it.
22   MS. CHATTIN:  Q  Sure.  Okay.  You also said
23  earlier today that -- I think you said the general rule
24  for the states in which HII operated, the general rule

Page 98

1 was to go through HII first --
2    A  Yes.
3    Q  -- as opposed to other third-party
4 administrators, is that right?
5    A  Yes, ma'am.
6    Q  Okay.  But that wasn't a rule -- that wasn't an
7 HAA rule, was it?
8    MR. BURKE:  Objection, form.
9    THE WITNESS:  I mean, I wouldn't say it's a -- I
10 guess you can say it's an HAA because it just seems HII,
11 the reason why we sold HII as our primary is just they
12 had more options at the time.
13    MS. CHATTIN:  Q  Sure.  But wasn't it up to each
14 independent agent how they marketed the insurance
15 products depending on the third-party administrator
16 agreements they were entered into?
17    A  Sure.
18    MR. BURKE:  Objection, asked and answered.
19    Go ahead, Mike.  Sorry.
20    THE WITNESS:  No, you're good.  No, it's the agent's
21 job to give the consumer the best option for them, not
22 what they want, what the consumer wants.
23    And with HII at that time they had more options
24 compared to certain carriers.  That's why we went with

Page 99

1 them for the states that they were offered in, so.
2    MS. CHATTIN:  Q  Okay.  Did you ever tell all of
3 the agents that were supported by HAA what this general
4 rule was?
5    A  Yes, we told them lead with HII.  If it's not
6 what they're looking for, give them what they want.
7    Q  And you did also say that even for the states in
8 which HII operated, I believe you testified that the
9 policies marketed in those states through the agents
10 that you worked with were about 80 to 90 percent
11 marketed through HII, is that right?
12    A  Yes, around 80, 90, yes.
13    Q  Okay.  So even in the states in which HII
14 operated, you agree that agents on the phone with
15 consumers in those states could have been pulling quotes
16 from and selling policies through other third-party
17 administrators other than HII, is that fair?
18    A  Yes, ma'am.
19    Q  Okay.
20    MS. CHATTIN:  Alex, do you have that exhibit up?
21    MR. BURKE:  Yes.
22    MS. CHATTIN:  Great.
23    Q  Okay.  Mr. Smith, we're looking at what's been
24 marked as Exhibit 4 by Mr. Burke earlier today.  And

Page 100

1 this is the declaration that you executed and offered in
2 this case.
3    A  Uh-huh.
4    Q  And I want to go to paragraph 5 again.  And I do
5 appreciate you going through this with Mr. Burke and
6 kind of giving a little more context to some of your --
7 these paragraphs, that was very helpful.
8    But let's look at paragraph 5 again.  It says,
9 "HII was the only third-party administrator through
10 which HAA offered or sold NCE-branded products and
11 services."
12    So first of all -- Go ahead.
13    A  I was saying yes, ma'am.  I was agreeing.
14    Q  Okay.  Thanks.  I read it correctly.  Good.
15    So first I want to clarify again, HAA did not
16 offer or sell NCE-branded products, is that right?
17    A  Yes, I made a mistake about wording that.  I
18 apologize for that.  That was -- I mean, it's a force of
19 habit, but, yes, the wording was wrong.
20    Q  No.  Understood.  And lawyers are sticklers, so,
21 you know --
22    A  Oh, yes.
23    Q  -- you just have to deal with our nitpicky
24 questions.  But I appreciate it.  You're fine.

Page 101

1    A  No, I understand.  But, yeah, not HAA that
2 offered it.  It was the agents that were under HAA.
3    Q  Right.  And I guess what I want to ask you is,
4 you know, you testified that agents could be working
5 with more than one third-party administrator.
6    And I wanted to ask you, how do you know for
7 sure that an agent could not have sold or marketed an
8 NCE product through another third-party administrator
9 other than HII?
10    MR. BURKE:  Objection, asked and answered.
11    THE WITNESS:  I don't believe -- I believe NCE has a
12 contract with HII strictly.  That's what I was told.
13 But, again, whose to say that's not correct?
14    So we were told that -- again, we weren't -- we
15 weren't in business to sell NCE.  We're in the business
16 of selling HII's TPA and whatever products they offered.
17 And NCE was just at that time for a duration of time was
18 a product that was under HII.  So that's all.
19    I mean, it had nothing to do with NCE.  It was
20 just certain states had NCE as an option.  And if that
21 was the right option for the consumer, we sold it.
22    MS. CHATTIN:  Q  So who told you that NCE and HII
23 had an exclusive arrangement or how else did you come to
24 form that belief?

26 (Pages 98 - 101)

1    A  I honestly don't know who told me that.  I mean,
2  that sounds kind of crazy, but it's true.  I don't know.
3  Again, business -- this business, it's a small world.
4  It really is.  Everyone -- it's like a small town.
5  Everyone knows your name and your business and stuff, so
6  people talk because there was a time that NCE sold their
7  own like separate.  And then like it merged.
8        So, I mean, I forgot who said that, but it
9  didn't really matter because we never sold NCE as their
10  own entity separate.  It was always through HII.
11    Q  And, again, I just, you know, want to make it
12  clear.  How do you know for sure that the NCE products
13  your agents were marketing were only sold through HII?
14  Is it simply because you believed that there was an
15  exclusive arrangement between HII and NCE?
16    A  That, yes.  And then are you asking me how do we
17  know that the agents like not sell some other products
18  without us knowing?
19    Q  No, I'm asking -- Yeah.  How do you know for
20  sure that an agent was not marketing NCE products
21  through another third-party administrator that they were
22  working with?
23    A  We paid for their licenses.  We paid for their
24  states.  And we would look -- we would look at the

1  contracting that they had to see who they were appointed
2  with.  And not all, to be honest with you.  So in
3  reality, could a rogue agent do something like that?
4  Yes.  Has it been done?  Many of times.  So, I mean,
5  they could have, sure.
6    Q  And HAA was aware that the agents were working
7  with third-party administrators other than HII, right?
8    A  Yes.
9    Q  You named a couple of them?
10    A  Yes, ma'am, with -- through, yes, with us, yes.
11    Q  Okay.  And if any of those TPAs also had NCE
12  products available, it's possible that your agents could
13  have marketed NCE products through those other
14  third-party administrators, right?
15    A  Unfortunately, the other carrier, the other TPAs
16  didn't have NCE as an option.
17    Q  Okay.  Have you ever heard of a product, a
18  specific product called NCE Premier Plus or NCE Premier
19  Platinum?
20    A  I want to say I have heard it.  I also want to
21  say that that sounds like a plan when NCE was NCE by
22  themselves.
23    Q  And when you say when they were by themselves,
24  you mean when they were marketing their own products?

1    A  Yes, ma'am, that's what I want to say, I think,
2  yes.
3    Q  And this was a time period that you understand
4  NCE was not selling products through HII, is that right?
5    A  I don't know that answer to be honest with you.
6    Q  Okay.
7    A  I'm speculating if I would say that.  I don't
8  want to do that.  I don't want to mislead you.  No, I'm
9  just going to say I don't want to mislead you, so I
10  don't know that.
11    Q  Okay.  So you're not sure one way or the other
12  whether NCE sold a product called Premier Plus or
13  Premier Platinum through HII --
14    A  That sounds familiar.
15    Q  -- or not?
16    A  Yes, ma'am, that sounds very familiar, yes.
17    Q  It sounds familiar, but you're not sure if NCE
18  marketed that directly or marketed it through HII, is
19  that fair?
20    A  Yeah, yeah.  It could have been either, but it
21  does sound familiar.
22    Q  Okay.  And if I told you that HII had submitted
23  sworn testimony that HII never offered an NCE Premier
24  Platinum Plus or NCE Premier Plus product, would that

1  change your mind about your testimony regarding NCE
2  products being sold exclusively through HII?
3    MR. BURKE:  Objection, form.
4    THE WITNESS:  Well, I mean, if HII is saying --
5  they're a publicly traded company.  If they're saying
6  they never sold it, who am I to tell them they're wrong?
7        I mean, it sounds familiar, but I don't want --
8  I wouldn't put my money on it either way that it's
9  guaranteed.  But the name sounds familiar.
10        But if they're saying on record that they never
11  did, then who am I to tell them they're wrong?  It's not
12  my place.  I don't know.
13    MS. CHATTIN:  Okay.  Got it.  Thank you.
14        Alex, you can take it down if you want to.
15    Q  I wanted to go back to Mr. Burke asked you a lot
16  of questions this morning about information that HII may
17  have shared with HAA and vice versa, information that
18  HII asked HAA for.
19        HII may have been communicating directly with
20  the independent agents that they had contracts with, is
21  that right?
22    A  No, no.  I believe when there was an issue, they
23  would go through administration.  It's a lot easier to
24  do it that way just because there is -- I mean, when you

27 (Pages 102 - 105)

1 have ten or so agents, they don't -- I mean, you tell
2 them and then you explain it to them, hey, whatever it
3 is that they need to fix, change, whatever it may be,
4 address it as a group instead of individually.
5    Q  Okay.  Do you know for sure one way or the other
6 whether HII ever communicated directly with the agents
7 or not?
8    A  No, I don't because no agents ever came to me
9 and told me HII spoke with them.  Nor has HII ever came
10 to me and told me they spoke to the agent, so yeah.
11    Q  Okay.  Do you know for sure whether an agent
12 would tell you if HII ever communicated with them?
13    A  Honestly, I think the agent wouldn't tell me in
14 fear of their losing their job, to be honest with you.
15 That's just my opinion, I mean.
16    Q  Why would they be in fear of losing their job?
17    A  Because if I was an agent working for -- like if
18 I was -- I'm sure you remembered, if I was working for
19 Harvey Silverstein as an agent.
20    Q  Uh-huh.
21    A  At the time we were selling UnitedHealthcare.
22 And if I told Harvey, hey, Harvey, UnitedHealthcare is
23 talking to me about contracting, Harvey is probably
24 thinking why are they talking to him about contracting

1 when he's under me.
2    Q  Right.  But for HAA, HAA did not have contracts
3 with HII, right?  The independent agents had their own
4 contract with HII, right?
5    A  Yes, but we have an agreement with the agent,
6 you're in HAA's office using their toolage, their
7 marketing, their everything, all you got to do is sit on
8 your bottom, work your butt off, and they made a good
9 living.  Pretty much plug and play.
10    So, I mean, if an agent was -- if an agent was
11 trying to do something, I don't know, it just seemed --
12 it would seem kind of weird that they would, to be
13 honest with you.
14    Q  Okay.
15    A  It's never happened.  I've never had an agent
16 tell me otherwise.  It's never happened.
17    Q  Got it.
18    Okay.  I want to ask you about John Spiller and
19 Rising Eagle.
20    You testified that HAA purchased leads from
21 John Spiller and Rising Eagle and shared those leads
22 with the agents that HAA supported, is that right?
23    A  Yes, ma'am.
24    Q  Okay.  During what time period did you purchase

1 leads from Rising Eagle and John Spiller?
2    A  Man, see, I said '18 -- I said '18 to '20
3 before, but it's '17, I guess.
4    We didn't start taking transfers from the
5 beginning.  We started taking it down the road.  I'd say
6 maybe -- I want to say '18, '18 to '19.
7    Q  Okay.  And you testified that during this same
8 time period HAA was purchasing leads from other lead
9 generators, as well, is that right?
10    A  Yes.
11    Q  Okay.  And I think you testified that HAA had
12 certain DID numbers, is that correct?
13    A  Yes, ma'am.
14    Q  What does DID stand for, if you know?
15    A  I think it's called a direct -- direct something
16 something, to be honest with you.
17    It's very simple.  Let's say you have five
18 marketers and you don't want them to intertwine the
19 calls, you want to make sure because let's say --
20    MR. ADAR:  Mike, she just asked you if you knew what
21 it stood for.  We all love spending time here, but let's
22 try and --
23    THE WITNESS:  Well, I don't understand what it
24 means, direct something.

1    MS. CHATTIN:  Q  Okay.
2    MR. ADAR:  Sorry.  Danielle, thank you for giving me
3 that liberty.  I'm just trying to move things along.
4 Thanks.
5    THE WITNESS:  All right.
6    MS. CHATTIN:  Q  Thank you, Mr. Smith.  I
7 appreciate that.
8    I think earlier today and maybe you were about
9 to say this, but you testified that certain DIDs were
10 associated with the lead generators, is that right?
11    A  Yes.
12    Q  Okay.  So there is certain DIDs that are
13 associated with the Rising Eagle leads, is that right?
14    A  Yes, they were just provided an 800 number.
15 There was nothing special about it, yes, just DID.
16    Q  Okay.  And were these DID numbers exclusively
17 associated with Rising Eagle or were the DID numbers
18 ever used for different lead generators?
19    A  I'm sure we've used DIDs with one provider and
20 stopped and then used that same DID with another
21 provider.  I'm sure that's happened because you pay for
22 the DID.
23    So you never want to -- I mean, you have to buy
24 more.  So I guess you can say we have recycled DIDs.

28 (Pages 106 - 109)

Page 110

1  Q  Okay.  How many DIDs did HAA have associated
2  with Rising Eagle?
3  A  I wouldn't know.  That I don't know.
4  Q  Okay.  Who would know that?
5  A  I guess Vici, Vici would know that because DIDs
6  were given by Vici, certain DIDs were.  So they would
7  exchange or swap or whatever.
8  Q  Got it.
9      Mr. Smith, you believed that the leads that you
10  purchased from Rising Eagle and John Spiller were
11  compliant with the TCPA, is that right?
12  A  100 percent.
13  Q  Okay.  And that's because you told John Spiller
14  that you, HAA, required TCPA-compliant leads, is that
15  right?
16  A  Yes, we confirmed with him like every other lead
17  provider we dealt with, and they all said the same.
18  They run them through a SANS number.  They are opted in.
19  I mean, that was -- so, yeah, we took him just for like
20  every other company for what they're worth to do the
21  right thing and so forth.
22  Q  Okay.  And John Spiller and Rising Eagle, they
23  told you that they were complying with the TCPA and
24  scrubbing the numbers and everything that you just laid

Page 111

1  out, is that right?
2  MR. BURKE:  Objection.
3  MS. CHATTIN:  Q  Go ahead.
4  A  Yes, ma'am.  Yes, ma'am.
5  Q  Did you ever have any reason to believe that
6  Rising Eagle was providing leads that they didn't have
7  express prior consent from the consumer?
8  A  Towards the end when we stopped using him, yes.
9  Q  And how did you come to that belief?
10  A  Well, with regards to people that were calling
11  in or asking why are you calling.
12      So towards the end when we cut it off with him,
13  stopped doing business with him, I mean, so -- it just
14  in the beginning it wasn't like that.  And then at the
15  end when we shut it, who knows with what he was doing.
16  I just know what he was doing was wrong and -- but at
17  least at the end and --
18  Q  So -- Sorry.  So you or HAA did not receive
19  telemarketing complaints about Rising Eagle leads until
20  close to the end of the relationship, is that fair?
21  A  That's fair.
22      Now, with that being said, like I was talking
23  about with Alex with these professionals, they do it for
24  a living.  We did get calls, we did get complaints under

Page 112

1  him.  We got complaints with other vendors, too, and it
2  wasn't just him.
3  Q  Okay.
4  A  But those were the same professional people, so.
5  Q  Got it.  Rising Eagle had access to the ViciDial
6  system, is that right?
7  A  Towards the end he wanted access to make it more
8  efficient and to be more profitable.
9      So, I mean, obviously, we had a good
10  relationship with John prior to all of the nonsense.
11  And he is, you know, at that time a professional, so,
12  yes, we gave him access to it.
13  Q  Okay.  And --
14  A  There was nothing he could have taken.
15  Q  Go ahead.
16  A  Well, there was nothing he could have taken from
17  that that could jeopardize it.  That's the reason why,
18  too.
19  Q  Sure.  Understood.
20      And the ViciDial system had HAA's do not call
21  list embedded in the ViciDial, is that right?
22  A  Yes, yes, ma'am.  Every time you put a number in
23  to dial, it stays in that system, yes.  As a matter of
24  fact, I even have a column for it, yes.

Page 113

1  Q  So when Rising Eagle had access to ViciDial, it
2  also had access to the do not call numbers, is that
3  right?
4  A  I don't know about removing.  I know about
5  adding.
6  Q  Okay.
7  A  Yeah, he didn't have access to -- he didn't have
8  administrative access to change things on his own that
9  he were aware of.
10      He was side by side with Vici to -- if there
11  was any change that needed to be done, he needed to tell
12  them to do it.
13  Q  Okay.  Did you ever ask Rising Eagle or John
14  Spiller for proof of consumer's consent to be called?
15  A  No.
16      I take that back.  Man, I thought -- I had a
17  conversation with him before about it because of the
18  professional people, but I don't know if I asked him to
19  send it to me in writing because our relationship was a
20  verbal relationship.
21  Q  Got it.  But when you -- so let me try and
22  understand.
23      When you got some complaints about calls that
24  came in through Rising Eagle, you did have conversations

29 (Pages 110 - 113)

Page 114

1 with John Spiller about their TCPA compliance
2 procedures, is that fair?
3     A  Yes, ma'am.  Yes, ma'am.  I told him the name
4 and everything.  I told him, I mean, I don't know what's
5 going on, but he said that him and his attorneys would
6 handle it to make sure that this scammer, I mean, it
7 wouldn't happen again.
8         There was times that, I forgot the guy's name
9 in South Carolina, I forgot his name, but he would
10 always change his name, but, yet, verification would
11 find out.  I don't know how that's even legal, but.
12     Q  And I believe you testified that you did not
13 know that Rising Eagle was using a prerecorded voice in
14 any of its calls, is that right?
15     A  Yes.
16     Q  That's right that you did not know that, is that
17 right?
18     A  Yes, prerecorded, no.
19     Q  Okay.  Did HAA -- HAA did not ask Rising Eagle
20 to use unassigned caller ID numbers to make outbound
21 calls, right?
22     A  Definitely, definitely not.  I mean, yeah,
23 that's -- yeah, that's crazy.
24     Q  So, Mr. Smith, did you ever personally discuss

Page 115

1 Rising Eagle or John Spiller with anyone at HII?
2     A  I believe -- I believe so.  Actually, me
3 personally, no, not me personally.  But I would say I
4 think Marsha has because they asked -- they asked the
5 DID and then what call it came from, so.
6     Q  Okay.  But you personally don't remember ever
7 talking to anyone at HII about Rising Eagle, is that
8 right?
9     A  I didn't have a relationship with HII, so.
10     Q  Okay.  And I think earlier today you mentioned
11 that you thought HII probably knows about Rising Eagle
12 potentially through its own call centers.
13         Do you remember testifying about that?
14     A  Say that again.  Sorry.
15     Q  I think earlier you said something to the effect
16 of HII may have run into Rising Eagle through HII's own
17 call centers.
18         Do you remember talking about that?
19     A  I wouldn't doubt it.  I mean, I wouldn't doubt
20 it.  I mean, we weren't the only people that were using
21 Rising Eagle.  There was numerous people that were, just
22 like every other carrier, you know.
23     Q  Yeah, sure.  I understand.
24         But I guess what I wanted to ask you is you

Page 116

1 don't know, personally you don't know for sure one way
2 or the other whether HII ever used Rising Eagle to
3 purchase telemarketing leads --
4     A  Yeah --
5     Q  -- correct?
6     A  Yeah, not for their own personal, no.
7         I just know they have their own sales force,
8 but I don't know how they generate their own calls.
9     Q  Okay.  Give me one minute.
10     MS. CHATTIN:  Okay.  Mr. Smith, I think that's all
11 the questions that I have for you maybe depending on if
12 your own lawyer or Mr. Burke have any follow-up
13 questions.
14         I'll pass you off to Yaniv or anyone else.  I
15 really appreciate your time today, Mr. Smith.  Thank
16 you.
17     THE WITNESS:  Thank you.
18     MR. ADAR:  I'd like to go last, so Josef or Charles.
19     MR. MYSOREWALA:  Yes, I have a few questions here.
20 This is Josef on behalf of NCE.
21     MR. ADAR:  Alex, and if you have any follow-up, you
22 know, just, obviously, we don't object.  We'd like to
23 get this all done with today.  So are we all in
24 agreement with the way we should proceed is NCE and then

Page 117

1 if Charles or Jeremy have anything, they can go, Alex,
2 then you and then I'll wrap up?
3     MR. BURKE:  Yes, that fine.
4     MR. ADAR:  Okay.  Danielle, we can come back to you
5 if you feel obliged.  Mike wants to knock this out.
6         Go ahead, Josef.
7     MR. MYSOREWALA:  All right.  So, yeah, I'll try and
8 be quick here.  I got a few for you, Mike, hopefully not
9 too long.
10             EXAMINATION
11         by Mr. Mysorewela:
12     Q  You testified earlier that NCE offers certain
13 insurance-related products.  Are you familiar with how
14 NCE operates?
15     A  Not completely but a little bit.
16     Q  Okay.  Have you ever communicated with NCE
17 directly?
18     A  No.
19     Q  Okay.  As counsel for NCE, I mean, I know that
20 NCE didn't sell any products directly, only through
21 TPAs.
22         However, you recently testified that NCE offers
23 products directly.  What information leads you to
24 believe that NCE offered products directly?

30 (Pages 114 - 117)

Page 118

1   MR. BURKE:  Wait, I have an objection.  Josef, you
2   can't ask a question like that and like try to insert
3   facts and try to change the witness' impression of what
4   the facts are.  Don't do that.  You can't.  You can't do
5   that.
6   MR. MYSOREWALA:  I'm not trying to, Alex.  I'm not
7   trying to impact the witness in any way.  I'm just
8   recalling what was discussed and what we're going
9   through now.
10   MR. BURKE:  No, you didn't.  You said something you
11   believe to be true which you think is contrary to what
12   the witness said.  Don't do that.  If you do that, I'm
13   going to stop the deposition.
14   MR. MYSOREWALA:  Okay.  I apologize, Alex.
15   Q   I'll start the question for you, Mike.
16   A   Okay.
17   Q   You recently testified that NCE offers products
18   directly.  However, what information leads you to
19   believe that NCE only -- or offered products directly?
20   A   Okay.  So I thought NCE in 2014, 2015 sold their
21   products separately --
22   MR. ADAR:  Can I just -- I'm just going to clarify
23   what may be an issue for a clean record, okay?  So,
24   Josef, you used the word -- and if anyone objects to me

Page 119

1   trying to clarify it, you can feel free to tell me to
2   stop and I will stop.
3   But, Josef, you've used the word recently,
4   okay?  I am not Tracy, so I am not the court reporter
5   taking a record.
6   But it's my understanding that Mike said that
7   at some point NCE may have offered independent products.
8   So I think the disconnect there and the reason why we're
9   have having a tough, you know, record is because of the
10   word recently.
11   So maybe just to avoid us having to come back,
12   if you can flush out with Mr. Smith what his testimony
13   is, you know, rather than rely on the record what it is
14   now, and then he could articulate what the source is.
15   I just -- I see ships crossing, and I want to
16   avoid having to come back.  So thank you all for
17   indulging me.
18   If you can ask the question again, Josef.
19   MR. MYSOREWALA:  Q   All right.  Mike, apologies for
20   that.  So you recently testified when Danielle was
21   asking that NCE offered products directly.
22   What information leads you to believe that NCE
23   offered products directly?
24   A   What I thought because of what I was told at

Page 120

1   Premier Health years ago, 2013, something like that, at
2   that time period, I believed.
3   And I might be wrong because, I mean, I was an
4   owner of my own group just like how HAA was with theirs,
5   I was.  And I was told NCE, not, you know, not the TPA.
6   So I might be wrong pertaining to that.
7   I didn't mean to mislead or anything that way.
8   But, yes, but I know that NCE when we sold it was under
9   HII.
10   Q   Okay.
11   A   So I didn't mean for it, you know, when I
12   said -- I always thought in the past that they were
13   their own entity just because of Premier when the
14   product was offered, it was presented that way at that
15   time --
16   Q   Okay.
17   A   -- through.
18   Q   And what was the time period with Premier?
19   A   I want to say 2013, 2013, 2014 -- no, no, excuse
20   me, 2012, 2013.
21   Q   Okay.  You also testified earlier that the NCE
22   products that the HAA agents had access to were only
23   available through HII, is that correct?
24   A   Yes.

Page 121

1   Q   All right.  Did the HAA agents ever offer any
2   NCE products directly?
3   A   Directly?  No, no.  It was always through HAA --
4   it was always through HII.
5   Q   Also you testified earlier that NCE products
6   that HAA -- that the HAA agents had access to through
7   HII were not offered on every call that an HII product
8   was offered or sold on, is that correct?
9   A   Yes.
10   Q   So just to clarify, NCE was not sold or offered
11   on every call?
12   A   Not every call, no.
13   Q   And I think based on your testimony a little
14   while ago, there is no way to determine what calls an
15   NCE product would have been offered or sold on, right?
16   A   I believe that it's a state situation and a
17   consumer-based situation.  It's what the consumer wanted
18   regardless of a certain type of benefit.
19   And if NCE was available and if that's what
20   they wanted, then we offered it.  But NCE wasn't
21   available in every state that HII offered products in
22   that I am aware of.
23   MR. MYSOREWALA:  Okay.  I think that's it for me.
24   MR. BURKE:  Okay.  Charles?

31 (Pages 118 - 121)

1    MR. MESSINA: Yes, I have a few follow-up questions.
2        How you doing, Mike?
3    THE WITNESS: How you doing, sir?
4    MR. MESSINA: We're almost at the end here. I'll be
5  quick.
6    MR. ADAR: Never trust any lawyer that says that,
7  Mike, so I reiterate my warning.
8    MR. MESSINA: You can trust me.
9    THE WITNESS: I'm getting my second wind, so I'm
10  good. I'm good. Throw it at me.
11          EXAMINATION
12        by Mr. Messina:
13   Q  So how many, if you can describe, how many
14  agents were there that you or someone gave a directive
15  to, you know, lead first with selling HII in states
16  where HII operates?
17      I know I am butchering your testimony a little
18  bit, but that's essentially what you testified about
19  earlier, right?
20   MR. BURKE: Objection.
21   THE WITNESS: Yes, sir.
22   MR. MESSINA: Q  How many agents does that include
23  and did you give that -- well, let me start with that.
24   MR. BURKE: Objection.

1    THE WITNESS: Yeah, I mean, all the agents on the
2  floor, I mean, we offered HII in the states they offered
3  it first.
4        I mean, they had the most options with regards
5  to products, and the rates were affordable for the
6  consumer.
7    MR. MESSINA: Q  So the question was, how many
8  agents approximately?
9   A  Man. I want to say 10, 15, maybe at one point
10  maybe 20, maybe open enrollment or something like that,
11  maybe 20 I want to say. I'm not sure.
12   Q  Okay. And were the agents all in the same --
13  sort of the same physical space when they were receiving
14  these inbound sort of warm transfers --
15   A  Yes, sir.
16   Q  -- or were any of them remote?
17   A  No, they were all in the office.
18   Q  Okay. In addition to, you know, sort of that
19  directive to lead first with selling HII, you also
20  testified about this emphasis on making sure the
21  consumers receive what products they wanted, too, right?
22   A  Yes, sir; yes.
23   Q  So when you say you gave a directive to lead
24  first with HII, was it, just to clarify for the record,

1  was it both that we want to make sure the clients or the
2  potential customers get what products they wanted, you
3  know, but HII has a lot more products? Can you just
4  describe a little more what that directive was for the
5  record?
6    A  It was just that HII always had -- they always
7  had more options. So it always -- it was always chances
8  are, I mean, instead of spending 10, 15 minutes on the
9  phone looking for those certain products, whatever, I
10  mean, lead off with the best option with regards to more
11  options and then if they have it, then, I mean, carry
12  on.
13      Just as an example, not to talk more, but A-1
14  seems to be very expensive, so, for the same type of
15  benefit.
16   Q  Okay. So let's just use that as an example.
17  Maybe A-1 is a bad one, right? So let's say you have
18  the agent that has the option in one state to offer a
19  potential customer A-1 and a product through a TPA like
20  HII. Is it possible that not every agent followed the
21  directive we're going to sell HII first, is that a
22  possibility that could have happened?
23   A  Sure. Absolutely.
24   Q  Okay.

1   A  Yes.
2    MR. BURKE: Objection.
3    MR. MESSINA: Q  And, you know, you also mentioned
4  that there were agents that were supposed to follow
5  scripts, correct?
6   A  Verification.
7   Q  Verification? Okay. And that's part of the
8  reason why I'm asking because in the beginning I recall
9  you testifying that there were no scripts they had to
10  follow. Now you're saying verification.
11      Can you describe just to make it clear for the
12  record, what a verification means, that they were
13  following a verification script?
14   A  Yes, a verifier -- so when a deal is written by
15  the agent, it's not finalized. It doesn't go to the
16  carrier. It goes to verification.
17      The verifier, what their job is, is to go over
18  the verification to make sure everything is spelled
19  correctly, make sure the address is right, the plan is
20  what they agreed to and what the insurance carrier, they
21  have a verification script that the verifier has to read
22  off for the consumer to agree with before it's --
23   Q  So -- I didn't mean to interrupt you. I want to
24  let you finish, Mike.

32 (Pages 122 - 125)

Page 126

1  A  No, that's all.  The company has a verification
2  script, the insurance company has a verification script
3  for certain plans that the verifier needs to go over
4  with the consumer and they have to agree to before
5  submitting the application and processing it.
6  Q  Okay.  So that's what the agents, when you say
7  the agents were supposed to follow at least the
8  verification forms, that's what you mean.
9      And can you describe more or less what they had
10  to verify with the consumer over the phone to the extent
11  you can recall that?
12  MR. BURKE:  Objection.
13  THE WITNESS:  Well, the verifier?  The verifier has
14  to go over, make sure that, again, obviously, their name
15  is spelled correctly, their e-mail address is right,
16  physical address and you're signing up for a -- I'm just
17  making up some stuff -- a plan 500, the premium here is
18  going to be $200 for the health, that you have a
19  whatever Rx plan with HII that's going to be 29.99 a
20  month and this is going to be $15 a month which totals a
21  proper, is this correct?  Yes.  And then you go over it.
22  Hi, this is da, da, da, da.  HII is not a major medical
23  company.  It is a whatever, I mean, an indemnity health
24  insurance, whatever verification it is.  You are

Page 127

1  aware -- I mean, so whatever script that it is they read
2  it, the consumer is aware of it, again, to clarify so
3  there is no misleading.
4      And then once everything is fine, they process
5  the application, they send it to the carrier, the
6  consumer receives a confirmation e-mail of the product
7  they signed up for, and then they get their package in
8  the mail I'd say within the next two weeks.
9  Q  Okay.  And then similar to the question I asked
10  you earlier about agents following directives that
11  they're given.
12      So one such directive was if they had a script
13  from an insurance carrier, as you put it, as a verifier,
14  what they're supposed to do at the end, I suppose, is
15  read through this script, correct?
16  MR. BURKE:  Objection.
17  THE WITNESS:  I think you're confusing verifiers and
18  agents.  Agents and verifiers are two different people.
19  MR. MESSINA:  Q  Okay.
20  A  The agents didn't have it.  HII has a sell
21  script that they offered.  We didn't go by their sell
22  script because --
23  Q  That's what I was going to get to next.
24  A  Yes, sir.

Page 128

1  Q  But I interrupted you, so I'm going to let you
2  finish, Mike.
3  A  We didn't go by their sell script because
4  they're not the only carrier we offered.
5      And to be honest with you, we didn't go by
6  their sell script because of that incident with the
7  other guy, you know, that big -- the troubles they had
8  with him.  It was the same sales script, so.
9  Q  So the --
10  A  We just had a lot -- we didn't go along with
11  their pitch.  The agents, the agents knew how to pitch
12  the product, how the benefits work and, you know, so.
13  Q  And that's exactly what I was going to ask you.
14  Even if your agents had scripts at the time, and it
15  sounds like they did have scripts from like a TPA like
16  HII, the question is, did they follow the scripts or
17  not?
18      And I think you answered that question, right?
19  MR. BURKE:  Objection.
20  THE WITNESS:  No, they didn't.
21  MR. MESSINA:  Q  Just to clarify your answer, can
22  you tell everyone what the answer is.  Did they follow
23  that script that they would have received from a company
24  like HII or not?

Page 129

1  A  The HII script they didn't follow because,
2  again, they weren't -- that wasn't the only company
3  we -- they sold.  So you can't pitch an HII script if
4  you're offering A-1 or an Agentra plan, so.
5  Q  Okay.  And just one more follow-up question and
6  I think I'm done.
7      Is it fair to say that anything you learned
8  about NCE, whether it was back in 2013 or 2014 or since
9  then was through hearsay or people in the industry
10  talking about the NCE product or was it based on
11  otherwise firsthand knowledge?
12  MR. BURKE:  Objection.
13  THE WITNESS:  Just firsthand knowledge.  It was
14  firsthand knowledge.  I was never told bad things about
15  NCE at all.
16      I mean, did they get complaints?  Sure.  Every
17  company gets complaints, every one of them.  So do Blue
18  Cross, they get millions of complaints, I mean.  It's
19  part of the business, unfortunately.
20  MR. MESSINA:  Okay.  I have no other questions.
21  Thanks for your time today, Mike.
22  THE WITNESS:  Thank you, sir.
23  MR. ADAR:  Alex.
24

33 (Pages 126 - 129)

Page 130

1    FURTHER EXAMINATION
2        by Mr. Burke:
3    Q  Okay.  Do you remember if Missouri was an HII
4 state?
5    A  I want to say yes.
6    Q  What is MultiPlan?
7    A  MultiPlan is the network.  It is actually the
8 largest network in the country that a lot of
9 insurance -- a lot of TPAs use as their --
10   Q  Okay.  Is it your understanding that HII used
11 MultiPlan?
12   A  Yes, sir.
13   Q  Were there other TPAs that HAA-connected agents
14 were working with that also used MultiPlan?
15   A  Yes.
16   Q  All right.  What were the other ones?
17   A  I would say -- I would say A-1, Agentra.
18   Q  Okay.  We talked a little about DIDs with the
19 other lawyers.  Once Rising Eagle started generating
20 leads and sending them through DIDs, do you have any
21 specific recollection of those DIDs changing from Rising
22 Eagle to someone else?
23   A  I don't have any recollection with regards to
24 that, but it has happened.  I mean, we've used DIDs with

Page 131

1 other providers that we stopped using and then used that
2 same DID with another company.
3    Q  So is it fair to say that while HAA was
4 accepting leads from Rising Eagle, it used the same DIDs
5 for that entire time until it stopped working with
6 Rising Eagle?
7    MS. CHATTIN:  Object to the form.
8        Go ahead.
9    THE WITNESS:  Yeah, I mean, I don't see why not, I
10 mean, unless the number -- sometimes DIDs go bad, so for
11 some reason, I don't know why, it's a -- that's a phone
12 carrier thing.  But, I mean, yeah, that's a phone
13 carrier thing.
14   MR. BURKE:  Q  As far as you know, Rising Eagle had
15 the same DIDs the whole time that HAA was accepting
16 leads from Rising Eagle, is that right?
17   A  I'd say, yes.  I'd say, yes, they had the same
18 DID.  I'd also say that they had -- they tried out new
19 DIDs with Vici because that's who we got our DID numbers
20 from.
21   Q  Okay.
22   A  With the ViciDial and the technical side of it.
23   Q  I think you testified on some of these other
24 questions that HII asked for some of the DIDs that were

Page 132

1 being used for lead generation.
2        Did I hear that right?
3    A  They might have asked for DIDs, yes.
4    Q  Okay.
5    A  I'm sorry, let me take that back, sorry.  I
6 don't know about DIDs.  I know the phone numbers of the
7 customers but -- I mean, I guess DIDs, they might have
8 asked for that, too.  They could have.
9    Q  Okay.  And DIDs are what you use to identify who
10 the inbound transfer is from, right?
11   A  Yes, sir; yes.
12   Q  Okay.  And what can we look at to to try to figure
13 out the exact dates that HAA was accepting leads from
14 Rising Eagle?  What documents would show that?  Maybe
15 the invoices?
16   A  I would say the wires, yes.
17   Q  The wire transfers, okay.
18       And although NCE might not have been sold or,
19 you know, specifically mentioned on phone calls, would
20 you agree that NCE was available as an option to sell
21 during any particular Rising Eagle call that was
22 transferred to HAA as long as they were working in that
23 state with HII?
24   A  Sure.

Page 133

1    Q  Okay.  And have you ever heard of phone number
2 spoofing?
3    A  I've heard of something like that, yes.
4    Q  Just generally.  What's your understanding of
5 what spoofing is on like a telemarketing call?
6    A  I still get them.
7    Q  Yeah.
8    A  Warranties, another big one is your Social
9 Security number has been compromised, so whatever -- I
10 mean, they're from India, you can hear the accent, but
11 the number says they're local, like local presence.
12   Q  Okay.
13   A  So that's what you're referring to.
14   Q  Right.
15       So the caller ID that the consumer sees is for
16 a different phone number than where the call originated,
17 is that basically your understanding of what spoofing
18 is?
19   A  I'm guessing that's what it is.
20   Q  Okay.  So that's your understanding, at least,
21 right?
22   A  Yes.
23   Q  Okay.  Did HII ever inquire with HAA about
24 spoofing?

34 (Pages 130 - 133)

Page 134

1    A  No.
2    Q  Did HII ever ask HAA what the origin of a
3  particular call was and provide the caller ID for that
4  phone number so that you could maybe use it to help
5  trace it back?
6    A  I want to say no to that.  I've never been asked
7  that before.
8    Q  Okay.
9    A  I've never been asked about spoofing, either, by
10  anybody, so.
11    Q  So HII never asked HAA or to your knowledge any
12  of the agents working with HAA about spoofing, is that
13  right?
14    A  Never.
15    MR. BURKE:  All right.  The same reservation of
16  rights as to holding this open, but I don't have any
17  further right now.
18    MR. ADAR:  The same declaration that we feel we've
19  complied with everything we're required to under this.
20    MR. BURKE:  Understood.
21    MR. ADAR:  Danielle?
22    MS. CHATTIN:  No more questions from me.
23    MR. ADAR:  Mike, I have a few for you.
24    THE WITNESS:  Sure.

Page 135

1              EXAMINATION
2           by Mr. Adar:
3    Q  Earlier you testified that you referenced HAA's
4  employees.
5       Can you clarify who was an employee of HAA?
6    A  Yes, I mean, again, HAA is me and Marsha as the
7  administrator.  I mean, the employees were 1099, so, I
8  mean, they were their own entity.
9    Q  And the fronters that you were referring to
10  worked for the individual agencies, not HAA, correct?
11  We need to have an audible answer.
12    A  Well, yes, they were for the 1099s, they weren't
13  for HAA.
14    Q  Earlier you testified that some agents were only
15  licensed in some states, but for clarity for the record,
16  any time that an insurance agent spoke with a customer,
17  that agent was licensed in the state where that customer
18  was a resident, correct?
19    A  100 percent.  Yes.  I should clarify that, too.
20  So, yes, that is correct.
21    Q  Several times today you've referred to HII as a
22  carrier.  Can you please clarify what you meant by that?
23    A  A TPA.
24    Q  Okay.  So HII to your knowledge at all times

Page 136

1  that any of the insurance agencies working with HAA had
2  a relationship with HII, HII was a third-party
3  administrator, not an insurance carrier, correct?
4    A  Yes, sir.
5    Q  Lastly, when Ms. -- and I might be
6  mispronouncing your last name and I apologize --
7  Ms. Chattin, is that right?
8       Okay.  When Ms. Chattin was asking you about
9  whether you had certain records that were able to
10  identify what products each of the insurance agents
11  affiliated with HAA sold, you said that you thought you
12  had those records, correct?
13    A  Yes, meaning the -- it's been like two years, so
14  what I'm referring to as if it's an operating business
15  and it's up and running and you signed them up last week
16  or whatever that may be, you can look them up and
17  retrieve that information.
18    Q  But for clarity, Mike, if you had those records
19  in your possession, you have already searched for them
20  and you would have produced them, correct?
21    A  100 percent.
22    Q  And if they're not in your production means you
23  don't have them, correct?
24    A  Correct.

Page 137

1    MR. ADAR:  Okay.  That's all that I have.  If anyone
2  else would like to ask questions of Mr. Smith, feel free
3  to do so.
4       Excellent.  And as the last person that asked
5  him questions, I have the power to conclude this
6  deposition subject to Mr. Burke's reservations.
7       I would like to conclude the deposition of
8  Mr. Smith and HAA's corporate designee.
9       We do have another deposition, but I think for
10  a clean record, Kraig, we should probably end this and
11  we will start the other.
12    THE VIDEOGRAPHER:  We're going off the record at
13  1:42 p.m.
14    (Whereupon, the deposition concluded at
15    p.m. EDT)
16       - - - - -
17
18
19
20
21
22
23
24

35 (Pages 134 - 137)

Page 138

1 STATE OF ILLINOIS )
) ss:
2 COUNTY OF COOK )
3
4      The within and foregoing deposition of the
5 aforementioned witness was taken before TRACY L.
6 BLASZAK, CSR, CRR, and Notary Public, at the place, date
7 and time aforementioned.
8      There were present during the taking of the
9 deposition the previously named counsel.
10      The said witness was first duly sworn and was
11 then examined upon oral interrogatories; the questions
12 and answers were taken down in shorthand by the
13 undersigned, acting as stenographer and Notary Public;
14 and the within and foregoing is a true, accurate and
15 complete record of all of the questions asked of and
16 answers made by the aforementioned witness, at the time
17 and place hereinabove referred to.
18      The signature of the witness was not waived,
19 and the deposition was submitted, pursuant to
20 Rules 30(e) and 32(d) of the Rules of Civil Procedure
21 for the United States District Court, to the deponent
22 per copy of the attached letter.
23      The undersigned is not interested in the within
24 case, nor of kin or counsel to any of the parties.

Page 139

1      Witness my official signature and seal as
2 Notary Public in and for Cook County, Illinois, on this
3 5th day of October, A.D. 2021.
4
5
6
7
8           *Tracy L. Blaszak*
           TRACY L. BLASZAK, CSR, CRR
9           CSR No. 084-002978
           One North Franklin Street
10          Suite 3000
           Chicago, Illinois  60606
11          Phone:  (312) 442-9087
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 140

1                Veritext Legal Solutions
                1100 Superior Ave
2                Suite 1820
                Cleveland, Ohio 44114
3                Phone: 216-523-1313
4
October 5, 2021
5
To: YANIV ADAR
6
Case Name: Bilek, Mary, etc. v. National Congress Of Employers, Inc.,
7 et al.
8 Veritext Reference Number: 4804881
9 Witness:  Michael T. Smith, Jr.      Deposition Date:  9/20/2021
10
Dear Sir/Madam:
11
12 Enclosed please find a deposition transcript.  Please have the witness
13 review the transcript and note any changes or corrections on the
14 included errata sheet, indicating the page, line number, change, and
15 the reason for the change.  Have the witness' signature notarized and
16 forward the completed page(s) back to us at the Production address
   shown
17
   above, or email to production-midwest@veritext.com.
18
19 If the errata is not returned within thirty days of your receipt of
20 this letter, the reading and signing will be deemed waived.
21
   Sincerely,
22
   Production Department
23
24 NO NOTARY REQUIRED IN CA

Page 141

1           DEPOSITION REVIEW
          CERTIFICATION OF WITNESS
2
     ASSIGNMENT REFERENCE NO: 4804881
3     CASE NAME: Bilek, Mary, etc. v. National Congress Of
   Employers, Inc., et al.
     DATE OF DEPOSITION: 9/20/2021
4     WITNESS' NAME: Michael T. Smith, Jr.
5     In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6 my testimony or it has been read to me.
7     I have made no changes to the testimony
   as transcribed by the court reporter.
8 _____
9 Date        Michael T. Smith, Jr.
10    Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
     They have read the transcript;
13    They signed the foregoing Sworn
        Statement; and
14    Their execution of this Statement is of
        their free act and deed.
15
     I have affixed my name and official seal
16
   this _____ day of_____, 20____.
17 _____
18    Notary Public
19 _____
   Commission Expiration Date
20
21
22
23
24
25

36 (Pages 138 - 141)