Page 1

1         IN THE UNITED STATES DISTRICT COURT

        FOR THE NORTHERN DISTRICT OF ILLINOIS

2              EASTERN DIVISION

3

4   MARY BILEK, individually and   )

   on behalf of others similarly   )

5   situated,                )

                           )

6         Plaintiffs,        )

                           )

7     vs.               )  No. 18-CV-03083

                           )

8   NATIONAL CONGRESS OF EMPLOYERS, )

   INC., et al.,            )

9                           )

         Defendants.        )

10

11           Videotaped subpoena deposition via

12  videoconference of AMY BRADY, taken before KELLY A.

13  BRICHETTO, CSR, pursuant to the Federal Rules of Civil

14  Procedure for the United States District Courts,

15  pertaining to the taking of depositions, at 9:00 a.m.

16  Central Standard Time on the 12th day of January, A.D.,

17  2022.

18

19

20

21

22

23

24

Page 2

```
1   REMOTE APPEARANCES:
2   On behalf of the Plaintiff:
3       BURKE LAW OFFICES, LLC, by
        MR. ALEXANDER H. BURKE
4       MR. DANIEL MAROVITCH
        990 Davis Street
5       Suite 500
        Evanston, Illinois  60201
6       (312) 729-5288
        aburke@burkelawllc.com
7
        On behalf of the Defendant National Congress
8   of Employers:
9       LAW OFFICES OF JOSEF M. MYSOREWALA, by
        MR. JOSEF M. MYSOREWALA
10      2000 South Dixie Highway
        Suite 112
11      Miami, Florida  33133
        (305) 356-1031
12      josefm@lawjmm.com
13  On behalf of the Defendant Health Insurance
    Innovations and the witness:
14
        KING & SPALDING, LLP, by
15      MS. DANIELLE CHATTIN
        1180 Peachtree Street, NE
16      Suite 1600
        Atlanta, Georgia  30309
17      (404) 572-4600
        dchattin@kslaw.com
18
        On behalf of the Defendant AccessOne National
19  Benefit Builders, Inc.:
20      GENOVA BURNS, LLC, by
        MR. CHARLES J. MESSINA
21      Trinity Centre
        115 Broadway
22      Suite 1500
        New York, New York  10006
23      (212) 566-7188
        cmessina@genovaburns.com
24
```

Page 3

```
1       On behalf of the Defendant AccessOne National
        Benefit Builders, Inc.:
2
        GENOVA BURNS, LLC, by
3       MR. JEREMY M. BROOKS
        494 Broad Street
4       Newark, New Jersey  07102
        (973) 533-1112
5       jbrooks@genovaburns.com
6
7       - - - - - - - - -
8
    ALSO PRESENT:  MR. KRAIG HILDAHL
9       Legal Videographer
10      MR. MICHAEL TALAIA
        In-house counsel for Health Insurance
11      Innovations
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
1           TRANSCRIPT INDEX
2   APPEARANCES . . . . . . . . . . . . . . . . . . . . . 2
3
4   INDEX OF EXHIBITS . . . . . . . . . . . . . . . . 5
5
6   EXAMINATION OF AMY BRADY
7   BY MR. BURKE . . . . . . . . . . . . . . . . . . . . 7
8
9
10
11  REPORTER'S CERTIFICATE . . . . . . . . . . . . . 270
12
13  EXHIBIT CUSTODY
14  COURT REPORTER
15
16
17
18
19
20
21
22
23
24
```

Page 5

```
1           INDEX OF EXHIBITS
2   NUMBER          DESCRIPTION         IDENTIFIED
3   Exhibit A       General Agent Agreement      54
4   Exhibit B       Agent training tool      63
5   Exhibit C       Module Library      76
6   Exhibit D       Bates HII 10092 to 10094      89
7   Exhibit E       Various complaints      117
8   Exhibit F       Not identified
9   Exhibit G       E-mail      254
10  Exhibit H       E-mail between Griffin
                    and Brady      215
11
    Exhibit I       E-mail Bates HII 4933      229
12
    Exhibit J       E-mail Adam Chickman to
13                  Griffin, Shapiro and Brady  238
14  Exhibit K       Telemarketing scripts      255
15  Exhibit L       E-mail Griffin to Brady      251
16  Exhibit M       Demand letter from HII to Marsha
                    Griffin      264
17
18
19
20
21
22
23
24
```

2 (Pages 2 - 5)

Page 6

1    THE VIDEOGRAPHER: We are going on the record
2 at 9:04 a.m. Central time January 12th, 2022. This is
3 media unit number one of the video recorded deposition of
4 Amy E. Brady taken in the matter of Mary Bilek, et al.
5 versus National Congress of Employers, Incorporated, et
6 al. filed in the U.S. District Court for the Northern
7 District of Illinois, Eastern Division, case Number
8 18-CV-03083.
9         This deposition is being held remotely.
10 My name is Kraig Hildahl, and I'm with Veritext Legal
11 Solutions, and I'm the videographer. The court reporter
12 today is Kelly Kilcoyne also with Veritext.
13       Will counsel please identify themselves
14 for the record.
15    MR. BURKE: Good morning. This is Alex Burke
16 for the Plaintiff.
17    MR. MAROVITCH: This is Dan Marovitch for the
18 Plaintiff.
19    MS. CHATTIN: Danielle Chattin from King &
20 Spaulding representing Defendant Health Insurance
21 Innovations and the witness.
22    MR. MYSOREWALA: Joseph Mysorewala on behalf
23 of National Congress of Employers.
24    MR. BROOKS: Jeremy Brooks and Charles Messina

Page 7

1 on behalf of National Benefit Builders, Inc., and
2 AccessOne Consumer Health.
3    THE VIDEOGRAPHER: Will the court reporter
4 please swear in the witness and then we can proceed.
5         (Witness sworn.)
6 WHEREUPON:
7         AMY BRADY,
8 called as a witness herein, having been first duly sworn,
9 was examined and testified as follows:
10          DIRECT EXAMINATION
11 BY MR. BURKE:
12    Q.   Good morning.
13    A.   Good morning.
14    Q.   Would you state your name for the record,
15 please.
16    A.   Amy Brady.
17    Q.   And, Ms. Brady, where do you work today?
18    A.   I am currently not working. I'm unemployed.
19    Q.   Okay. What was your last employment?
20    A.   My last employment was with Health Insurance
21 Innovations also called Benefit.
22    Q.   And what is Health Insurance Innovations?
23    A.   Health Insurance Innovations is an
24 administrator, a company that provides a platform where

Page 8

1 agents can submit business, can sell particular health
2 insurance products all through an on-line platform. HII
3 is the -- is the intermediary between the insurance
4 companies and the agents.
5    Q.   And does HII have customers?
6    A.   HII has -- we work with agents directly, so I
7 mean technically they are customers I guess, yes.
8    Q.   All right. What about consumers, are they
9 HII's customers?
10    A.   The -- the -- I don't -- I don't really know.
11 The customer is a -- is -- has a relationship with the
12 agent, and the agent is the one that sells the customer
13 the product, and HII's the administrator of the insurance
14 company and premiums and commissions.
15    Q.   And so --
16          (Zoom interruption.)
17    THE REPORTER: I'm sorry. Premium? I'm
18 sorry. Premium? You said premium?
19 BY THE WITNESS:
20    A.   Premiums, collection of premiums and payment
21 of commissions.
22 BY MR. BURKE:
23    Q.   Okay. And if an agent signs a new customer
24 up, who interacts with the customer in order to -- or the

Page 9

1 potential customer in order to -- Well, let me withdraw
2 that.
3         When an agent signs up a new customer,
4 what's -- what's the process for that to happen?
5    MS. CHATTIN: Object to form.
6         You can answer.
7 BY THE WITNESS:
8    A.   I mean if you could be a little more
9 specific. I don't know which part of the process you're
10 referring to.
11 BY MR. BURKE:
12    Q.   Well, how does it -- how does it -- how does
13 it work? So -- first of all, what's the primary way --
14 well, let's back up. Let's back up.
15         When you worked at HII -- how long did you
16 work at HII?
17    A.   I was at HII for about 11 1/2 years.
18    Q.   Okay. And would you give me the cliff notes
19 of your positions while you were working at HII for about
20 11 1/2 years?
21    A.   I did the same job the entire time I was
22 there. I was in the Sales Department.
23    Q.   Okay. And what did you do in the Sales
24 Department?

3 (Pages 6 - 9)

Page 10

1     A.   I would work with agents that or agencies
2  that wanted to -- that were interested in marketing the
3  products that HII offered on the platform that HII had.
4  I would work with agents and get -- help facilitate them
5  getting licensed and appointed through carriers and
6  assist them in getting launched in selling our -- the
7  products that HII had.
8     Q.   Okay.  And did you hold the same position
9  your entire time at HII?
10    A.   Yes, basically.
11    Q.   Okay.  And what was that?
12    A.   Variations of it, but it was always -- it was
13  always in the Sales unit.  The titles kind of changed
14  over the years a couple times, but it was the same exact
15  job.  My last title was a VP, Vice-President of Sales.
16    Q.   And how many Vice-President of Sales were
17  there at HII when you left?
18    A.   When I left, there were four, four
19  Vice-Presidents of Sales.
20    Q.   Okay.  And who were the other three?
21    A.   Let me think.  Actually, when I left, there
22  were three.  The other person had left prior to that.  It
23  was myself, another Vice-President of Sales.  His name
24  was Gerod Vernon.  Another Vice-President of sales, her

Page 11

1  name was Annette Dahlke.  The other Vice-President had
2  left at that point and then myself.
3     Q.   Okay.  And when did you leave?
4     A.   In July of 2021.
5     Q.   Okay.  So just, I don't know, five or six
6  months ago?
7     A.   Yeah.  Um-hum.  Exactly.
8     Q.   Okay.  Why did you leave HII?
9     A.   HII changed its focus.  I was in the under 65
10  market, meaning under 65 customers, and agents sold to
11  under 65 individuals, and HII changed its focus from the
12  under 65 to an over 65 market and released and let go a
13  group of individuals in the under 65 market.  I was one
14  of them.
15    Q.   Okay.  And HII was purchased last year or the
16  year before, wasn't it?
17         MS. CHATTIN:  Object to the form.
18  BY THE WITNESS:
19    A.   HII was taken private.  I'm not sure what
20  you -- what you call that.  Purchased, sure.  Was -- was
21  taken private I believe in August of 2020 when that
22  occurred.
23  BY MR. BURKE:
24    Q.   And did you participate in the transaction,

Page 12

1  the purchase transaction at all?
2         MS. CHATTIN:  Object to the form.
3         Go ahead.
4  BY THE WITNESS:
5     A.   No.  I had no interactions in the purchase.
6  BY MR. BURKE:
7     Q.   Did anyone interview you or anything like
8  that in association with the -- with the transaction?
9     A.   No.
10    Q.   Did anyone ask you for documents or anything
11  like that concerning, you know, sales at HII in
12  association with the transaction?
13         MS. CHATTIN:  And I'm going to instruct the
14  witness not to disclose any requests or conversations
15  that Legal counsel may -- may have initiated with
16  Ms. Brady, but otherwise you can answer.
17  BY THE WITNESS:
18    A.   No.
19  BY MR. BURKE:
20    Q.   Are you withholding information based upon
21  privilege?
22         MS. CHATTIN:  You -- you can answer that
23  question.
24  BY THE WITNESS:

Page 13

1     A.   I don't even know what you mean by that.
2  I -- sorry.  I don't know what you mean.
3  BY MR. BURKE:
4     Q.   All right.  So is it accurate to say that
5  nobody asked you at all to -- for documents or
6  information in association with the transaction?
7     A.   That's correct.  No one asked me for any
8  documents.
9     Q.   Okay.  Are you aware that anybody compiled
10  documents or information from your files in connection
11  with the transaction?
12         MS. CHATTIN:  Same -- same instruction
13  regarding disclosure of attorney communication, but
14  otherwise you can answer.
15  BY THE WITNESS:
16    A.   I am not aware.
17  BY MR. BURKE:
18    Q.   Okay.  Are you represented by King &
19  Spaulding today?
20    A.   Yes.
21    Q.   And how did you become represented by King &
22  Spaulding?
23         MS. CHATTIN:  I'm going to object.  I'm going
24  to instruct the witness not to answer questions about

4 (Pages 10 - 13)

Page 14

1 communications with King & Spaulding or in-house legal
2 counsel at -- at Health Insurance Innovation, so I'm
3 going to instruct you not to answer this question,
4 Ms. Brady.
5     MR. BURKE: Yeah, I don't think that how she
6 became represented is privileged. There were lots of
7 questions about that that HII and the other Defendants
8 asked of my client, and when you did that, you didn't
9 contend that it was privilege. I'm asking -- I'm not
10 asking for advice. I'm asking for what happened, so I'll
11 ask it again.
12 BY MR. BURKE:
13     Q. How did you become represented by King &
14 Spaulding today?
15     MS. CHATTIN: I'll instruct the witness that
16 you can answer in terms of the timing of communications
17 and the individuals with whom you communicated but not as
18 to the substance of those communications.
19 BY THE WITNESS:
20     A. Okay. I was served to be a witness in this
21 case in late summer, early fall of 2021, and then I was
22 connected with I don't even recall who at HII about this
23 case because I was no longer an employee, and they
24 connected me with the attorneys.

Page 15

1
2 BY MR. BURKE:
3     Q. And who contacted you -- was it an attorney
4 or was it an employee at -- or someone else at HII?
5     A. I honestly do not recall who contacted me.
6 At that time I was being contacted by -- going through
7 some paperwork and things like that with HII, so I -- I
8 really don't recall who exactly contacted me about this,
9 but -- but someone did reach out to me via e-mail to let
10 me know I had been served but I had been served.
11     Q. Okay. Now we were talking a few minutes ago
12 about HII's customers.
13     MR. BURKE: Oh, Kelly or Kraig, would you
14 please enable screen sharing.
15     THE REPORTER: Sure.
16     You should have it now.
17     MS. CHATTIN: Can we go off the record for one
18 second?
19     MR. BURKE: Okay.
20     THE VIDEOGRAPHER: We're going off the record
21 at 9:18 a.m.
22         (Discussion had off
23         the record.)
24     We're going back on the record at 9:20

Page 16

1 a.m.
2 BY MR. BURKE:
3     Q. Okay. So earlier today we were talking about
4 HII's customers and I think that you -- well, let me --
5 let me ask it again.
6     Would you please describe the relationship
7 between HII and consumers who purchase goods and services
8 through HII.
9     A. Sure. The relationship with HII and
10 consumers who purchased a health insurance product
11 through an agent, our relationship was a post-sale
12 relationship. We would provide fulfillment, meaning
13 contracts and ID cards through an on-line portal that the
14 customer can access at any time, and HII would process
15 payments, and we would connect the customer, send
16 eligibility files they're called to carriers. We would
17 make sure that the carriers were aware that that customer
18 had purchased, and communication with the customer
19 post-sale would be in situations like a credit card
20 declined. In month four, for example, a payment did not
21 go through, their credit card expired, whatever, things
22 like that. There would be e -- e-mail communication to
23 that customer.
24     Q. Okay. And so how does HII get paid?

Page 17

1     MS. CHATTIN: Object to the form.
2     Go ahead.
3 BY THE WITNESS:
4     A. HII works with the carriers and has direct
5 relationships with the carriers and HII -- I'm not in
6 Finance so -- I'm in the Sales Department, but it is my
7 understanding that there are relationships with the
8 carriers, and there is financial payment from the
9 carriers based on customers' sales. There's a commission
10 or a payment of some kind, and HII and the carriers
11 work -- work through that. Again, I'm not in Finance, so
12 I'm not sure where all the funds would -- would come
13 from.
14 BY MR. BURKE:
15     Q. So is it your understanding that an insurance
16 carrier like Federal Insurance Company or American
17 Security Life or Ageas Insurance pays HII for new
18 business and ongoing business?
19     MS. CHATTIN: Object to the form.
20     You can answer.
21 BY THE WITNESS:
22     A. I'm not sure how -- how the money flows, but
23 there is compensation based on HII's involvement in the
24 process.

5 (Pages 14 - 17)

Page 18

1 BY MR. BURKE:
2    Q. Okay. And when a new customer signs up for
3 H -- for insurance and other products and services
4 through HII, HII administers that -- the beginning of
5 that relationship, doesn't it?
6    MS. CHATTIN: Object to the form.
7    THE WITNESS: Do you mind repeating that? I
8 missed the beginning. Sorry.
9    MR. BURKE: Kelly, would you read that,
10 please.
11    (Requested portion of the
12    record read.)
13 BY THE WITNESS:
14    A. As I said, HII is a post-sale involvement.
15 The product is sold, and as soon as the product is sold,
16 then the company would then enter into the HII system,
17 so it's a post-sale relationship.
18 BY MR. BURKE:
19    Q. Well, HII also provides a portal for agents
20 to do their insurance and other products quoting; right?
21    MS. CHATTIN: Object to the form.
22 BY THE WITNESS:
23    A. That is correct. HII provides an on-line
24 portal for agents to use to quote and submit customers'

Page 19

1 applications.
2 BY MR. BURKE:
3    Q. Okay. So it's not all post, you know, post
4 sign-up that HII is involved with; right?
5    MS. CHATTIN: Object to the form.
6
7 BY THE WITNESS:
8    A. I was referring to our -- our -- our
9 information about the customer. We don't know anything
10 about the customer until they are in the system as --
11 after the sale occurs, so we are not aware of who the --
12 who the potential customers might be. HII would have
13 been only aware of who customers are after they are sold.
14 That is where the relationship with HII would then kick
15 in with that customer is post-sale.
16 BY MR. BURKE:
17    Q. Okay. So when an agent brings in a new
18 prospective customer, how does that customer sign up
19 for -- for goods and services?
20    A. There are several ways that a customer can
21 purchase health insurance or sign up for health insurance
22 through the HII on-line portal or tools that we're
23 talking about. One is the customer can purchase
24 themselves and go on line and into those on-line tools

Page 20

1 and purchase fully by themselves without agent
2 involvement. The second way is a customer can be
3 assisted by an agent and an agent facilitates the
4 customer applying for insurance through the portal.
5    Q. Okay. And then at some point the customer is
6 sent documents; right?
7    A. Correct.
8    Q. Okay. And those documents are like contracts
9 that the customer is supposed to sign; right?
10    A. So there are -- so what you're referring to
11 is what's called an e-signature process. That is one way
12 of the customer approving the insurance. There's also a
13 voice verification option. If the customer does not have
14 a computer or does not want to verify the documents via
15 electronically, they can also do it through a voice
16 verification, but prior to the application, you know,
17 being approved or officially in the system the customer
18 does have to verify that they through documents or
19 through a voice verification process that they understand
20 what they have purchased.
21    Q. Okay. And so when we're talking about a
22 contract that's provided by e-mail to the prospective
23 customer, who sends that e-mail?
24    A. So I just want to clarify. You're calling it

Page 21

1 a contract. It is not a contract. It is a verification
2 of understanding that the customer understands what they
3 are about to purchase, so it's not a contract. It is
4 a -- a verification tool that -- that HII and the
5 carriers put in place to make sure that that customer
6 does understand what they are purchasing before they
7 purchase it. So I just want to clarify that it's not a
8 contract. It's a verification method or a verification
9 tool.
10    Q. Okay. So I'm going to share my screen here.
11 I still don't have the power.
12    THE VIDEOGRAPHER: I'm not sure why. You
13 should have it now.
14    MR. BURKE: Got it. Got it.
15    THE VIDEOGRAPHER: Okay.
16 BY MR. BURKE:
17    Q. Okay. So I'm showing you a -- this is
18 actually an exhibit to the Second Amended Complaint from
19 a Florida case, Haasfeld versus HII, and this is docket
20 Number 140-5, Exhibit E, and -- are you generally
21 familiar with this type of document?
22    MS. CHATTIN: Alex, are you going to e-mail
23 this to us so -- as we just talked about off the record?
24 It's a 23-page document so --

6 (Pages 18 - 21)

Page 22

1          (Zoom interruption.)
2          THE REPORTER: I'm sorry. I didn't hear you.
3          MS. CHATTIN: I was just asking Mr. Burke if
4   he would e-mail this to myself and the witness so she
5   could look at the 23-page document as we talked about off
6   the record.
7          MR. BURKE: Yeah, we talked about exhibits,
8   and I wasn't going to introduce it, but I'll send it to
9   you.
10         MS. CHATTIN: Thank you.
11         MR. BURKE: Who are all the people I need to
12  send it to?
13  BY THE WITNESS:
14         A.   And I am familiar with that document to --
15  if --
16         MR. BURKE: Yeah.
17         MS. CHATTIN: Yeah, if you just send it to me,
18  Alex, I'll forward it to Amy. Okay. Thanks.
19              Also, if you're going to show her a
20  document, I think you should introduce it as an exhibit
21  so the record is clear, but it's your deposition.
22         MR. BURKE: That's right.
23  BY MR. BURKE:
24         Q.   Okay. Ms. Brady, I've e-mailed the document

Page 23

1   to your lawyer, and in the interim, I heard you say that
2   you're familiar with this document. What is it?
3          A.   This is that verification document I just
4   talked about a few minutes ago. This is a document that
5   outlines everything about the product. It has the
6   application the customer has completed. It has
7   information about the association. Has information about
8   the benefits. Has information about the premiums, when
9   they're gonna be charged to the customer's payment
10  method, and we ask that customer to sign many, many times
11  throughout this process. And this process was
12  implemented -- because we have agents in the field
13  selling product, we -- this is HII and the carrier's way
14  of knowing that everything was disclosed properly to the
15  customer.
16         Q.   Okay. And sort of scrolling --
17         A.   They sign off -- sorry.
18         Q.   No, please continue. I didn't mean to stop
19  you.
20         A.   No, that's okay. They sign off on each one
21  of these -- these sections to show that they have a full
22  understanding of what they're purchasing.
23         Q.   Okay. And I see throughout this document the
24  word application. Would it be fair to say that this is

Page 24

1   an application or is that incorrect where it says
2   application?
3          A.   They're completing an application in order to
4   secure the health insurance --
5          Q.   Okay.
6          A.   -- so --
7          Q.   It's more than just a verification. It's an
8   application for insurance and other products and
9   services; right?
10         MS. CHATTIN: Object to the form.
11  BY THE WITNESS:
12         A.   I'll -- I'll clarify because I think
13  you're -- we're mixing a couple things up. The
14  customer -- they are providing information to the agent
15  or they are submitting information themselves on this
16  portal, and either way -- I mentioned the two ways a
17  customer could purchase insurance through HII, and
18  whether they go in themselves or they go in with
19  assistance from an agent, it is required that they sign
20  off on the understanding, which is what HII called and
21  the carriers called the verification format which is what
22  this is, in order for their application to then be
23  submitted for insurance. The process is they're
24  providing information. Then they sign as you can see

Page 25

1   the -- the application is being populated throughout this
2   document. Once they sign that application and -- and
3   agree to what they -- they verified that this is the
4   information that they agree to then it gets submitted to
5   HII. So then as soon as they sign, it truly becomes the
6   application that becomes submitted to HII.
7          Q.   Okay. And who sends this e-mail from My
8   Benefits Keeper?
9          MS. CHATTIN: Object to the form.
10  BY THE WITNESS:
11         A.   This is a system-generated e-mail from the
12  HII portal that is provided to -- to agents. An
13  application cannot be submitted through the portal
14  without the verification process being completed.
15  BY MR. BURKE:
16         Q.   Now wait a second. You said the application
17  is provided to the agents. But this is an e-mail that's
18  sent directly from HII to the prospective customer;
19  right?
20         MS. CHATTIN: Object to the form.
21  BY THE WITNESS:
22         A.   Customer is providing information into
23  the -- to the agent. The agent's putting it into the
24  system. Prior to it being an application that is

7 (Pages 22 - 25)

Page 26

1 submitted to HII the agent must send out a verification.
2 The agent then will -- will send the verification how the
3 customer like wants it. It could be through their phone,
4 through their computer or through a voice verification.
5 Once that agent selects which process goes to the
6 customer for that verification process it is then system
7 generated, and it's sent to that customer. Once that
8 customer does sign off, acknowledges and signs that all
9 those -- those areas that we just reviewed, then it's
10 submitted to HII for processing.
11 BY MR. BURKE:
12 Q. So the question was HII sends this e-mail
13 directly to the customer; right, to the prospective
14 customer, to the prospective customer.
15 A. That is correct.
16 Q. Okay. And so the -- once the prospective
17 customer receives the e-mail directly from HII if the
18 customer, prospective customer fills out these forms, who
19 receives the -- the electronic copies of the forms? They
20 go to HII directly, don't they?
21 A. The -- once the forms are signed by the
22 customer -- the customer just has to review and sign each
23 of the pages that they understand what they are
24 purchasing. Once that is signed the customer then

Page 27

1 submits that verification app -- verification document.
2 A copy goes to the agent, and it gets then uploaded into
3 the HII system, and HII then can proceed with the
4 application and processing of that application.
5 Q. Okay. So when the application is submitted,
6 it goes to HII; right?
7 A. HII gets it, and the agent gets a copy as
8 well.
9 Q. Okay. And the agent gets a copy because HII
10 provides the agent with the copy; right?
11 A. Correct, through the portal --
12 Q. Okay.
13 A. -- the on-line tool.
14 Q. And so these are still prospective customers
15 before -- before the application is signed; right?
16 A. Correct. Yes. Yes.
17 Q. Okay. So HII is involved with prospective
18 customers as well as dealing with servicing issues as to
19 existing customers, consumer customers; right?
20 MS. CHATTIN: Object to the form.
21 BY THE WITNESS:
22 A. On-line tools that we provide -- that HII
23 provides to the customer is the process in which -- is
24 the system in which the agents can enter customers into

Page 28

1 the system, but HII does provide those on-line tools and
2 portals to the agents for their use.
3 BY MR. BURKE:
4 Q. Okay. And if a customer signs up and then
5 they want to cancel at some point for whatever reason,
6 can the -- can the customer contact HII directly and
7 effectuate this?
8 A. Yes.
9 Q. Okay. So HII does have direct contact with
10 both prospective customers and existing customers; right,
11 consumer customers?
12 A. I just want to clarify. You just asked if --
13 after a customer has gone through this process if they
14 want to cancel can they call HII, and my answer was yes.
15 At that point they're a customer. They have been
16 approved and they have sent in their verification. At
17 that point they -- they could then call HII and cancel
18 because at that point they are officially in the system
19 as an insured or as a -- as a customer.
20 Q. Okay. So is it accurate to say that HII
21 provides services to consumer customers such as
22 cancellation and other servicing-type issues directly?
23 A. That is correct.
24 Q. What is the insurance agent's role in all of

Page 29

1 this?
2 MS. CHATTIN: Object to the form.
3 BY THE WITNESS:
4 A. Excuse me. Insurance -- the agent's role is
5 to properly sell the -- the product and the insurance
6 benefits to a customer and make sure they understand the
7 benefits of the product they're selling and have the
8 relationship with the customer in selling the -- the
9 product.
10 BY MR. BURKE:
11 Q. And so is the insurance agent generally
12 identified in this -- in this application?
13 MS. CHATTIN: Object to the form.
14 BY THE WITNESS:
15 A. Yes.
16 MS. CHATTIN: Go ahead.
17 BY THE WITNESS:
18 A. Yes.
19 BY MR. BURKE:
20 Q. Okay. Can you show me in this document,
21 docket 140-5, where the agent is identified?
22 MS. CHATTIN: Amy, do you have the exhibit I
23 e-mailed to you?
24

8 (Pages 26 - 29)

Page 30

1  BY THE WITNESS:
2      A.   Oh, I'm sorry.  I thought you were putting --
3  Sorry.  I thought you were putting it on the screen.
4                 (Brief pause.)
5           Excuse me.  Opened.  Go and look.
6           Page 1 is blurry.  I can't really tell.
7  Okay.  On Page 6 --
8
9  BY MR. BURKE:
10     Q.   Okay.
11     A.   -- you'll see a box that states "Member --"
12 it's headed "Member Applicant Signature."  That's where
13 the applicant signs, and then you'll see two boxes down.
14 It says: "Signed by American Financial Life Insurance
15 Company agent."  The agent's name is Anne Fils.  So in
16 the verification documents the agent who sold the case,
17 working with that customer to sell the case is listed on
18 the e-sign document.
19     Q.   And so how does the con -- how does the
20 customer receive contact information for the agent when
21 they sign up in this way through HII's My Benefits
22 Keeper?
23     A.   It varies by the agency in how they are
24 communicating their information, their contact

Page 31

1  information to the customer.  On all HII tools; that is,
2  what I mean by that is where a customer could go in and
3  purchase the insurance on their own or viewing that
4  on-line tool, the HII tools are populated with the agent
5  name, agent phone number, agent e-mail address.  Then on
6  these verification documents their -- the agent name is
7  listed and then -- after the customer purchases they have
8  access to a back-end portal where they can go view any of
9  their documents at any time.  Agent information is in
10 that portal as well as I recall.
11     Q.   Okay.  So I think what you're saying is if
12 the new customer wants to find contact information for
13 their insurance agent, they have to go through HII?
14        MS. CHATTIN:  Object to the form.
15        You can answer.
16 BY THE WITNESS:
17     A.   No, that's not what I'm saying.  Most
18 agents -- most agencies will provide their own phone
19 number and maybe a customer service desk number to that
20 customer.  That is a -- a commonly used normal practice
21 where agents provide their own customer service
22 information to that customer during the sales process and
23 the verification process.  If they do not, we make sure
24 at HII -- at HII we made sure that the customer has

Page 32

1  access to come to HII directly.  In addition, we provide
2  information about the agent that sold the case.
3  BY MR. BURKE:
4      Q.   Okay.  And does HII monitor or require the
5  agents to provide their contact information directly to
6  the customer?
7      A.   HII does not monitor that every customer has
8  been provided.  The customer service number of their
9  agent is in all of the materials that HII has for that
10 customer, but, again, if -- if they don't have contact
11 information or number from their agent, they have HII's
12 contact number on all materials as well, so they've got
13 the ability to contact either the agent or HII directly.
14     Q.   And they would -- they would find that
15 information on a customer facing portal provided by HII;
16 is that right?
17     A.   In -- yes, in a portal, and HII sends a
18 welcome e-mail directly to the customer that has
19 information about who to contact for what as a welcome
20 e-mail so that they don't have to go into their portal if
21 they need to contact HII.
22     Q.   Okay.  I'm not going to mark this as an
23 exhibit, so I'm not going to send it around, but I just
24 want to see if this is what you're talking about.  So I'm

Page 33

1  going to show you an excerpt of materials that were
2  produced by HII.  This is document 4802 or Bates number
3  4802.  Let's see if we can get this on.  Okay.  Do you
4  see what I'm showing you on the screen?
5      A.   Yes.
6      Q.   Okay.  Is this the welcome e-mail that you
7  were talking about?
8      A.   Yes.
9      Q.   Okay.  And so it is branded with Health
10 Insurance Innovations; is that right?
11     A.   Correct.
12     Q.   Okay.  And it's HII that's providing the
13 information about the different services that the new
14 customer signed up; right?
15     A.   This is showing the customer where to log in
16 to the portal to go and view and download any ID cards or
17 any information about their coverage.
18     Q.   Okay.  And so I see this e-mail has a phone
19 number for HII and an address for HII.  Would you agree?
20     A.   Yes.
21     Q.   Okay.  And I don't see an address or any
22 information having to do with an agent or even the
23 carriers or the ancillary services.  None of that
24 information is provided in the welcome e-mail; is that

9 (Pages 30 - 33)

1 right?

2      MS. CHATTIN:  And for the record, the witness

3 does not have access to the document, and, Alex, you're

4 just scrolling through a couple pages.  But if you want

5 her to answer the question based on that, that's fine.

6      MR. BURKE:  Yes, she does have access to the

7 document.  I'm showing it to her on the screen.  I've

8 identified it by Bates number and I'm asking -- she's

9 testified that this is the welcome e-mail, and so I'm

10 trying to get some information about the welcome e-mail.

11      MS. CHATTIN:  That's fine.  I'm just saying

12 her answer is based on her reviewing what you're sharing

13 on the screen and not her own independent evaluation of

14 the document, but if you want her to answer, that's fine.

15      MR. BURKE:  I do.

16 BY THE WITNESS:

17      A.   This welcome e-mail does have information to

18 come to HII directly.  At this point the customer is or

19 the applicant is now -- has completed the application

20 process, has completed the verification process, is

21 now -- has now submitted their application for

22 processing.  So this welcome e-mail does have HII's

23 information on it so that if they do want to ask

24 questions or cancel or make any changes they have the

1 ability to do that and we know that they've got a phone

2 number to call.

3 BY MR. BURKE:

4      Q.   Okay.  And the insurance agent is not

5 identified on this e-mail, is it?

6      A.   The -- if you scroll up, the agent is -- is

7 in the -- look at -- looks like cc'd, and I don't know

8 who -- who the other person is but Tracy Ham was an agent

9 of HII, so the agent is listed in the e-mail address, and

10 in addition, in the portal when they do log in, they will

11 find information about their specific agent.

12      Q.   And this welcome e-mail doesn't say hey, if

13 you have questions, contact your agent, does it?

14      A.   I don't -- I don't know that it says -- it

15 just provides -- you're going kind of fast.  Hang on.

16      MS. CHATTIN:  Yeah, again, she -- the witness

17 doesn't have the ability to look through the document.

18 She's just seeing what you're showing her on the screen

19 for the record.

20      MR. BURKE:  Which is the document.

21      MS. CHATTIN:  Which are pieces of pages of the

22 document that you are showing her at any given time.  If

23 you want her to be able to answer questions about the

24 document, you should enter it as an exhibit and you

1 should send it to me and the witness.  But if you want

2 her to answer questions based on what she's looking at,

3 then just for the record, those are what her answers are.

4      MR. BURKE:  Thank you for the advice.  We're

5 doing this virtually because we're in a pandemic, so

6 there are certain limitations here, and we're all just

7 doing our best.

8 BY MR. BURKE:

9      Q.   So, Ms. Brady, there's no reference in this

10 e-mail saying hey, new customer, if you have questions or

11 you want to deal with anything having to do with your

12 service, contact the agent or anyone else; right?

13      A.   Do you mind just scrolling down a little bit?

14      Q.   Sure.  We're looking at --

15      A.   Stopping right there.

16      Q.   -- HII 4804.

17      A.   Based on what I'm looking at, I don't see

18 anything that says call your agent.  What this is saying

19 is want you to be happy with your coverage.  If you find

20 that you're -- you've purchased your plan in error, it's

21 not the right plan for you, you can get a full refund

22 within 30 days.  It provides the benefit and claims

23 information and billing and customer service information,

24 so it's providing just information where to call for

1 billing and customer service and cancellation for claims.

2      Q.   Okay.  In effect, it says all of the details

3 about your coverage are available to you on line at

4 HIIQuoteCustomers.com; right?

5      A.   Yes.

6      Q.   Okay.  You sort of wavered when I asked you

7 who are HII's customers earlier in the deposition.  If

8 consumers are not HII's customers, why did HII have a

9 portal that says it's for customers?

10      MS. CHATTIN:  Object to the form.

11 BY THE WITNESS:

12      A.   I mean I -- I wavered because we have a

13 lot -- we have different types of customers.  For me in

14 my particular job, my customers are the agents or the

15 agencies that I -- that I work for, so that's sort of my

16 knowledge and my information about who my customers were

17 when I worked at HII.  The Carrier Relations Department,

18 for example, might have a -- they may view a carrier as

19 one of their customers, and then we also have the actual

20 insureds or applicants that would also be considered

21 customers as well, so I wavered because I'm looking at it

22 from my own personal perspective, and for me my customers

23 were the agents that -- that I worked with.

24      Q.   Okay.  Thank you.  If you would just -- if

Page 38

1  you have a caveat like that when I ask a question like
2  who are HII's customers -- you know, we just spent 40
3  minutes flushing that out. If you would just explain in
4  the first instance what you're saying because it
5  shouldn't -- shouldn't be that hard to establish who
6  HII's customers are. Okay?
7       MS. CHATTIN: I'm going to object. She is
8  answering the question the best she can, Alex, but I
9  think we all understand now. Thank you.
10 BY MR. BURKE:
11      Q.  So is it accurate to say that insurance
12 agents are tasked with bringing in new customers for HII?
13      MS. CHATTIN: Object to the form.
14 BY THE WITNESS:
15      A.  Yes. It is the responsibility of the agents
16 to bring in the prospective customers for --
17 BY MR. BURKE:
18      Q.  Okay.
19      A.  -- to HII.
20      Q.  Okay. In fact, the agents sell the -- sell
21 the products and services; is that right?
22      A.  Correct.
23      Q.  Okay. And they sell HII products and
24 services, they sell insurance-related products and

Page 39

1  services and they sell sort of ancillary health --
2  health-related products and services; is that right?
3       MS. CHATTIN: Object to the form.
4  BY THE WITNESS:
5       A.  I just want to clarify. They're
6  selling -- the agent is selling or marketing or
7  explaining products and services and benefits that are
8  connected to specific carriers. HII is not a carrier, so
9  the insurance programs are not underwritten by HII. So I
10 just want to make sure it's clear there's another layer
11 of the carrier that's actually the underwriter and the
12 actual claims payer of the products and services, so
13 agent is to be explaining how the carrier is involved and
14 how the administrator of HII is involved as well and what
15 the roles are of those participants.
16 BY MR. BURKE:
17      Q.  Okay. So back to my question, it's my
18 understanding that agents are responsible for marketing
19 and trying to sell HII insurance products and ancillary
20 health-related products and services; is that right?
21      MS. CHATTIN: Object to the form.
22 BY THE WITNESS:
23      A.  It would be the carrier's products because
24 HII doesn't own those products. HII doesn't underwrite

Page 40

1  those products. Those are products that are on the HII
2  platform, and there is a relationship between HII and the
3  carrier, and HII's administering those programs, so the
4  benefits and the services and the insurance product is
5  through the carriers. I just want to make sure that
6  that's -- that that's clear that that isn't an HII
7  function, that the agents are to understand the
8  relationship with the carrier's responsibilities and
9  HII's responsibilities.
10      Q.  I understand that, but -- but you're not
11 answering my question. So is it true that agents are
12 tasked with trying to sell insurance policies?
13      A.  Yes.
14      Q.  Is it true that insurance agents are tasked
15 with doing so through HII?
16      MS. CHATTIN: Object to the form.
17 BY THE WITNESS:
18      A.  Through the HII platform.
19 BY MR. BURKE:
20      Q.  Is the platform some separate entity than --
21 from HII?
22      A.  It is a -- it is the only way that a customer
23 can enter into the system. It is the only way the agent
24 can get an applicant's information in the system. It

Page 41

1  is -- HII's platform is -- is an HII-owned software, so
2  it is not a separate entity. However, it is the only way
3  for -- for the customers to get into the HII system, but
4  in that process of utilizing the platform, information
5  about the carrier is listed. Information about the roles
6  and responsibilities of HII, where to contact for
7  cancellation, et cetera, that is all provided through the
8  platform. So if they go through -- if the customer gets
9  into the platform, then they have access to all the
10 information about the carriers, their product and HII as
11 well.
12      Q.  Right. So the agents are selling HII's
13 services as well as insurance services and products; is
14 that right?
15      A.  Correct.
16      Q.  All right. And they also -- agents also sell
17 ancillary services and goods; is that right?
18      MS. CHATTIN: Object to the form.
19 BY THE WITNESS:
20      A.  Do you mean ancillary products? You mean
21 separate -- so what do you mean by ancillary benefits and
22 services?
23 BY MR. BURKE:
24      Q.  Well, doesn't -- don't agents sometimes sell

11 (Pages 38 - 41)

Page 42

1  healthcare discount plans through HII?
2      A.   HII sells or sold what we call core products
3  which would be -- short-term medical, limited medical is
4  what we called them, were the core products, and in
5  addition, there were ancillary plans.  I just want to
6  make sure we're saying -- talking in the same language.
7  Ancillary plans would be additional products that the
8  customer might need.  For example, a dental program would
9  be an ancillary program.  A life insurance program would
10  be ancillary.  Critical illness, accident medical
11  expense, those would be examples of ancillary products
12  that are sold.  They could be sold with the core.  They
13  could be sold by themselves.  Some of them can be sold by
14  themselves.  So it just -- it depends on what the
15  customer's needs are and what they agree to purchase.
16      Q.   With regard to the health insurance plans,
17  was it sometimes required that membership into an
18  association be tied to the policy and the customer?
19          MS. CHATTIN:  Object to the form.
20  BY THE WITNESS:
21      A.   Yes.
22  BY MR. BURKE:
23      Q.   Okay.  Would you please explain what
24  that -- what all that means.

Page 43

1      A.   Sure.  The way products -- health insurance,
2  some health insurance products are filed with the State
3  Department of Insurances it's -- the state will determine
4  whether or not it needs to be what's called an individual
5  filing or an association filing, so it's all determined
6  at the state level.  So some states will say this product
7  cannot be sold unless it is connected to an association
8  by law, and in individual states an association is not
9  required, so it depends on the state that the customer is
10  purchasing from whether or not they are required to join
11  the association first in order to get the health
12  insurance benefits.
13      Q.   Okay.  And what are the associations that
14  agents were able to sell through HII?
15      A.   There -- HII had relationships with several
16  different associations, and some -- some products would
17  be connected to one association.  Some products would be
18  connected to other associations.  There were
19  approximately three as I can -- three or four that I can
20  recall, association programs that HII had relationships
21  with.
22      Q.   Okay.  And what were those three or four?
23      A.   One was Med-Sense Guarantee Association.
24  That's MSGA.  One was NCE, National Congress of

Page 44

1  Employers.  Another one was ACUSA, and I can't remember
2  what that stands for, and then there was another one that
3  was an entrepreneurial association.  Just the name
4  escapes me now.
5      Q.   Would it -- would it be accurate to say that
6  NCE and Med-Sense provided the -- lion's share of
7  association?
8          MS. CHATTIN:  Object to the form.
9  BY THE WITNESS:
10      A.   ACUSA was also a popular one, and so the
11  three of them, yes.
12  BY MR. BURKE:
13      Q.   Okay.  And was Illinois one of the states
14  that required an association?
15      A.   Yes.
16      Q.   Okay.  And was one association or another
17  association primarily used for Illinois --
18          MS. CHATTIN:  Object to the form.
19  BY MR. BURKE:
20      Q.   -- customers?
21          MS. CHATTIN:  Go ahead.
22  BY THE WITNESS:
23      A.   No.  It wasn't based on the state.  We
24  just -- HII Legal and Compliance Department knew that an

Page 45

1  association had to be sold in order for the health
2  insurance benefits to be offered, so it wasn't about the
3  state and that's how the association was determined.  The
4  carriers would be connected to specific associations
5  or -- for whatever reason, so it would depend on the
6  carrier and which association was connected to that
7  carrier.  So in Illinois, for example, you may have --
8  you may have had five different products and all the
9  associations may have been offered in the State of -- of
10  Illinois.  It is -- it is possible that all associations
11  could be there.
12  BY MR. BURKE:
13      Q.   And so with regard to National Congress of
14  Employers, which insurance companies worked with NCE?
15      A.   I can't -- I can't remember all of them.  I
16  can give you a sampling of a few.
17      Q.   Okay.
18      A.   American Financial was one of them.  Chubb
19  was one of them.  Unified Life was one of them.  Those
20  are the three that I can remember off the top of my head.
21      Q.   And then which ones worked with Med-Sense?
22      A.   I remember a company called Star, Axis,
23  A-X-I-S.  Chubb also worked with Med-Sense.  I believe
24  Unified also worked with Med-Sense.  It's hard -- that's

12 (Pages 42 - 45)

Page 46

1  all I can really think of.
2      Q.  Okay.  And so what services did, for example,
3  NCE provide to customers?
4          MS. CHATTIN:  Object to the form.
5  BY THE WITNESS:
6      A.  I can just talk generally about associations
7  because they're all very similar.  Associations would
8  provide non-insurance benefits to their members.
9  BY MR. BURKE:
10     Q.  Like what?
11     A.  A few examples would be ID theft, discounts
12 on gym memberships, discounts on travel, things like
13 travel expenses.  Like you could travel -- like a rental
14 car or flights or hotels, eyeglass discounts, vision
15 discounts I should say, hearing aid discounts, things
16 that are outside of health insurance technically.
17     Q.  Have you ever heard of a person named Sean
18 Duffie?
19     A.  Yes.
20     Q.  Who's Sean Duffie?
21     A.  He was a general agent that was licensed and
22 appointed through HII with several carriers.
23     Q.  Okay.  Have you ever heard of Scott Shapiro?
24     A.  I have.

Page 47

1      Q.  Who's Scott Shapiro?
2      A.  Scott Shapiro was also at one point a
3  licensed agent appointed with carriers through HII.
4      Q.  Okay.  And have you ever heard of Marsha
5  Griffin?
6      A.  Yes.
7      Q.  Who's Marsha Griffin?
8      A.  She was also a licensed agent appointed with
9  several carriers through HII at one point.
10     Q.  Okay.  And then other than being a licensed
11 agent what else did Marsha Griffin do with regard to HII?
12         MS. CHATTIN:  Object to the form.
13             You can answer.
14 BY THE WITNESS:
15     A.  Marsha was a licensed agent with HII at one
16 point, and then the relationship with her as an agent
17 ended for some reason.  I cannot recall why.  And then
18 she would work with HII as -- connected to other agents,
19 so she would be performing duties in -- in an agent's
20 office, for example, but she was not licensed and
21 appointed at that time with HII.
22 BY MR. BURKE:
23     Q.  Okay.  And what agents did she work with?
24     A.  I can't recall them.  Like she was -- she

Page 48

1  kind of moved around.  She worked with several agents,
2  but Sean Duffie is -- is one of those agents.
3      Q.  Okay.  Did she also work with Scott Shapiro?
4      A.  I don't recall if she worked with Scott --
5  no, I don't believe that she worked with Scott Shapiro
6  but I don't know.
7      Q.  Okay.  And I take it --
8      A.  I'm sorry.  Let me -- I just want to clarify.
9  I know that her and Scott were connected with -- in
10 the -- in the Duffie office, but prior to that I don't
11 know if they had a -- had a relationship is what I'm
12 getting at.
13     Q.  Would you -- I don't understand what you're
14 saying.  Sorry.
15     A.  Well, I just want to make sure we're not
16 mix -- like connecting them all.  I just want to make
17 sure that I understand your question properly.  I know
18 that Marsha and Scott worked together in some manner
19 connected to Sean Duffie.
20     Q.  Have you ever given a deposition before?
21     A.  I have.
22     Q.  Okay.  How many times?
23     A.  Four maybe.  Four.
24     Q.  Okay.  And what was the nature of those four

Page 49

1  lawsuits that you gave depositions in?
2          MS. CHATTIN:  Hold on.  I'm going to instruct
3  the witness to -- that you can answer as to the -- I'm
4  going to instruct the witness that you can answer as to
5  the parties involved in the depositions that you were
6  asked to testify in and the timing of those depositions.
7          THE WITNESS:  I'm sorry, Danielle.  Would you
8  say that again?
9          MR. BURKE:  Yeah, I don't understand,
10 Danielle.  I'm asking about prior depositions.  It's not
11 privileged.  These are depositions, sworn testimony under
12 oath by this witness.  There's nothing privileged.
13 There's nothing -- there's no valid objection to this
14 question.  I don't know why we're even having an
15 objection.
16         MS. CHATTIN:  Yeah, the fact that she
17 testified in -- that she may have provided deposition
18 testimony in other matters is not necessarily publicly
19 available information, and it -- and it is privileged.
20         So, Amy, you can answer as to the matters
21 in which you were asked to provide deposition testimony,
22 the dates and the parties involved in those matters if
23 you know but not the substance of your testimony.
24         MR. BURKE:  I disagree.  Let's just go --

13 (Pages 46 - 49)

Page 50

1 let's just go question by question and --
2     MS. CHATTIN: Okay.
3     MR. BURKE: -- you can articulate whatever
4 objection you have to my particular question. I'm not
5 asking for privileged information. I'm asking for sworn
6 testimony. It's not privileged.
7
8 BY MR. BURKE:
9     Q. So you testified, Ms. Brady, that you've
10 given about four depositions before today.
11     A. I'm sorry. I think today --
12     Q. What was the nature of those depositions?
13     A. Let me just clarify. I think today is my
14 fourth, so --
15     Q. Great.
16     A. Sorry. I meant including today.
17     Q. Okay. What's the nature of any deposition
18 that you've given before today?
19     A. One was specific to a TCPA violation.
20     Q. Okay. Was that the Moser case?
21     A. That was the Moser case, correct.
22     Q. Okay. What are the others?
23     A. The other one was in regards to Simple
24 Health. A plaintiff -- or there was a -- a -- a suit in

Page 51

1 connection to Simple Health that was -- I don't even know
2 exactly what the -- what the suit was about, but it was
3 about all kinds of different pieces to the Simple Health
4 relationship.
5     Q. Okay. And what's the -- what are the others?
6     A. The third was I was deposed in regards to
7 Matt Spiewak who was a partner at Simple Health that was
8 suing for or there was a lawsuit connected to commissions
9 that he felt that he was owed.
10     Q. Okay. Any other time when you've provided
11 sworn testimony?
12     A. I don't think so.
13     Q. Have you ever spoken with insurance
14 regulators?
15     A. I was -- I once attended a conference where
16 some insurance regulators were in attendance but nothing
17 of any importance.
18     Q. Have you ever spoken with an investigator
19 from the Federal Communications Commission?
20     A. The Federal -- no.
21     Q. Have you ever spoken with somebody from the
22 FBI or any other governmental entity?
23     MS. CHATTIN: I'm going to object. What --
24 can you limit your question to something relevant, Alex,

Page 52

1 related to the TCPA violations so we don't have a
2 problem?
3     MR. BURKE: I can't imagine why we would have
4 a problem. This is a reasonable initial question, and so
5 I'm standing on my question.
6 BY MR. BURKE:
7     Q. Have you ever spoken with any regulatory
8 personnel about HII?
9     MS. CHATTIN: I'm going to -- yeah, I'm going
10 to instruct the witness you can answer as it relates to
11 telemarketing or the TCPA.
12 BY THE WITNESS:
13     A. I have not had any conversations with any
14 regulators or government agencies about TCPA.
15 BY MR. BURKE:
16     Q. Have you had any conversations with
17 regulators or governmental entities having to do with
18 telemarketing?
19     A. No.
20     Q. Have you spoken with regulators or
21 governmental agencies concerning the actions of agents in
22 marketing goods and services through HII?
23     MS. CHATTIN: I'm going to instruct the
24 witness to answer as it relates to independent agents'

Page 53

1 telemarketing campaigns.
2     MR. BURKE: I don't agree to that limitation.
3     MS. CHATTIN: Well, that's my instruction for
4 now. We can talk about it off the record.
5     MR. BURKE: No. I want an answer or I -- you
6 know, I mean this case concerns deceptive marketing, and
7 if that was the nature of the conversations, you know,
8 it's directly relevant to the case.
9     MS. CHATTIN: The case is about unsolicited
10 phone calls to consumers not about deceptive marketing,
11 and so I'm going to instruct the witness that she can
12 answer the question as it relates to unsolicited
13 telemarketing campaigns.
14     MR. BURKE: No.
15     MS. CHATTIN: Well, we can talk about it off
16 the record, Alex. This is my instruction at this point.
17 BY MR. BURKE:
18     Q. Go ahead and answer.
19     A. No. The answer is no.
20     Q. Does HII have policies, practices and
21 procedures that insurance agents are supposed to follow
22 with regard to their marketing practices?
23     A. Yes.
24     Q. All right. How are those conveyed to the

14 (Pages 50 - 53)

Page 54

1  agents?
2      A.   Any time an agent goes into a relationship
3  with HII they are required to enter into a contractual
4  agreement, whether it be an agent, a general agent or a
5  managing general agent relationship, and that contract
6  outlines the agent's responsibilities and requirements of
7  what they do.  In addition, they are required to sign off
8  that they understand the -- any regulations or laws
9  connected to selling over the phone.  In addition, they
10  are required to go through training, and they cannot use
11  the HII portal if they do not complete full training and
12  understanding of products, understanding of clear
13  marketing direction.  They have to complete a course on
14  what's called non-negotiables which is the way to sell
15  properly, what things you can do, what things you cannot
16  do or things you must do, what things you cannot do, so
17  there's all kinds of different -- they enter in a signed,
18  several signed contracts with HII in what their
19  responsibilities and their role is in addition to
20  training that they must complete.
21      Q.   Okay.  I'm sending your lawyer Exhibit A.
22  Okay.  So I'm showing you what's been marked as Exhibit
23  A.  This is a group of documents as I understand it -- I
24  think it's two documents -- Bates labeled HII 19 through

Page 55

1  HII 36 consecutive, and you'll have a copy of that in a
2  second in your inbox.
3          So the first document is entitled "General
4  Agent Agreement," and that goes from Bates 19 to 27
5  including an exhibit to the document.  Would you agree?
6      A.   Yes.
7      Q.   Okay.  What is this first part of Exhibit A
8  entitled "General Agent Agreement"?
9      A.   This is the document I just referred to.
10  When an agent wants to become licensed and appointed
11  through a carrier that HII administers, we would require
12  them to complete an agreement.  This one that Sean Duffie
13  completed was a General Agent's Agreement.
14      Q.   And so what's the difference between a master
15  agent, a general agent and a sub agent?
16      A.   So a general agent typically means they're
17  under another individual or another agency, and the
18  highest level of agreement we have is the managing
19  general agent.  And if that managing general agent would
20  like to have agents underneath them, that individual
21  agent would complete the General Agent's Agreement.  So
22  it is a way to make sure that anyone who at any level,
23  whether it be a sub agent, a general agent or an MGA
24  agreement or an MGA, at any level they understand their

Page 56

1  own responsibilities for selling or offering or talking
2  about HII carriers or products or services.
3      Q.   Okay.  And then what about a sub agent as we
4  see on HII 28, what is that?
5      A.   So a general agent is somebody that is
6  getting paid directly by HII commissions.  A sub agent
7  would be someone who is an agent underneath a general
8  agent.  Still -- we require every single agent that ends
9  up selling our products to be in some sort of contract
10  license appointed, so if an agent is a sub agent
11  underneath a general agent, that sub agent is not
12  accepting commissions.  Any payments would roll up to his
13  or her general agent above them.
14      Q.   And then the general agent pays the sub
15  agent?
16      A.   General agent can -- typically does pay the
17  sub agent but can do whatever they want with those funds
18  because the sub agent has agreed to assign all
19  commissions up to this general agent.
20      Q.   And so why -- I see that Sean Duffie is the
21  general agent here on Bates 19, and then Sean Duffie is
22  also the sub agent as shown on Bates HII 28.  Could you
23  explain that to me?
24      A.   Sure.  I don't remember the exact reason, but

Page 57

1  I can give you reasons as to why this would occur because
2  it was a -- very common thing.  So, for example, if a
3  general agent has many agents underneath them, they may
4  want -- if they've got a separate campaign that they want
5  to run, if they want to -- for example, if they've got a
6  company that was laying off employees, for example, and
7  that agent wanted to go set up shop and enroll
8  individuals on site or to be able to meet with agents for
9  a different sort of business strategy or a different
10  marketing process, they may want to have a separate way
11  to track that business.  So in that way and for those
12  types of reasons we would allow a second set of codes, a
13  second contract to be set up underneath that same
14  individual.  So it was just mostly a tracking mechanism
15  to help agents if they were doing a different kind
16  of -- of selling campaign or a marketing process.
17      Q.   Who was the master general agent for Sean
18  Duffie?
19      A.   His name was Joshua Herman.
20      Q.   Not Matthew Herman?
21      A.   No.  The MGA was -- managing general agent
22  was Joshua Herman.
23      Q.   Who's Matthew Herman?
24      A.   Matthew Herman is Joshua's brother.

15 (Pages 54 - 57)

Page 58

1    Q.   Was Matt Herman also an agent for HII?
2    A.   He was not.  I don't believe that he was a
3  licensed agent at all.
4    Q.   What did Matt Herman have to do with HII?
5        MS. CHATTIN:  Object to the form.
6  BY THE WITNESS:
7    A.   Matt Herman worked with his brother Joshua
8  Herman.  It is not unusual to have non-licensed
9  individuals working at offices or working with agents.
10  BY MR. BURKE:
11    Q.   Okay.  Have you ever heard of Mike Smith?
12    A.   I have.
13    Q.   Who's Mike Smith?  Who is Mike Smith?
14    A.   Oh, I'm sorry.  You cut out there.  Mike --
15  Mike -- Michael Smith was a general agent that was
16  licensed and appointed with HII and some of its carriers
17  at one point.
18    Q.   Okay.  And then at another point he was not
19  licensed as an agent with HII; right?
20    A.   That is correct.
21    Q.   And so even though he was not licensed Mike
22  Smith kept working with HII; isn't that right?
23        MS. CHATTIN:  Object to the form.
24  BY THE WITNESS:

Page 59

1    A.   After Michael Smith was no longer working
2  with HII I don't recall having any conversations with him
3  or him working in -- in -- connected to HII.  I do not
4  recall that at all.
5  BY MR. BURKE:
6    Q.   Wasn't Mike Smith working directly with
7  Marsha Griffin?
8        MS. CHATTIN:  Object to the form.
9  BY THE WITNESS:
10    A.   I do not know.
11  BY MR. BURKE:
12    Q.   Okay.
13        MS. CHATTIN:  Alex, is this a good time for a
14  first break or --
15        MR. BURKE:  Sure.  You want to take five
16  minutes?
17        MS. CHATTIN:  Sure.
18        THE VIDEOGRAPHER:  We're going off the record
19  at 10:36 a.m.
20        (WHEREUPON, a break was
21            taken.)
22        This is media number two deposition of Amy
23  Brady.  Today is January 12th, 2022.  We're going back on
24  the record at 10:47 a.m.

Page 60

1  BY MR. BURKE:
2    Q.   Okay.  Have you ever heard of the concept of
3  lead generation?
4    A.   I have.
5    Q.   Okay.  What's lead generation?
6    A.   Lead generation, there are companies that
7  create what are called leads for individuals that are
8  interested in -- health insurance was the specific
9  conversation.  They create -- they generate I guess
10  connections between somebody who's interested in health
11  insurance and an agent.
12    Q.   Okay.  And what's your understanding of how
13  lead generators get leads?
14    A.   I don't really know exactly how lead
15  generators get leads.  I am not connected -- HII is not
16  connected specifically to lead generators, so, you know,
17  it's --
18            (Zoom interruption.)
19        -- but I don't know for sure how lead
20  generators create their lead.
21    Q.   Well, what's your understanding of how it
22  goes?
23        MS. CHATTIN:  Object to the form.
24  BY THE WITNESS:

Page 61

1    A.   My understanding is -- and you see it
2  everywhere on line.  If you -- you know, health insurance
3  is the number two Googled topic on line, so if you, you
4  know, you go on line and if you're interested in looking
5  for health insurance, you may put your information in a
6  website -- into a website and then an agent would call
7  you.  So my understanding is most of the lead generation
8  is done through on-line websites, but, again, I don't
9  have any understanding -- I don't know much about the
10  lead generation side.
11    Q.   Okay.  In your experience, are leads
12  sometimes also generated just through cold calling?
13        MS. CHATTIN:  Object to the form.
14  BY THE WITNESS:
15    A.   I don't know.
16  BY MR. BURKE:
17    Q.   You've never heard of anything like that?
18        MS. CHATTIN:  Object to the form.
19  BY THE WITNESS:
20    A.   I mean I've heard of the phrase cold calling,
21  but I don't know how leads would be generated through
22  cold calling.
23  BY MR. BURKE:
24    Q.   So in your -- in your understanding, lead

16 (Pages 58 - 61)

Page 62

1 generation always involves a potential customer
2 requesting a contact?
3 　　　MS. CHATTIN: Object to the form.
4 BY THE WITNESS:
5 　　A. The -- it is our -- at HII it was our
6 expectation that the lead was created because a customer
7 asked to --
8 　　　　　(Zoom interruption.)
9 　　　　-- or to receive information about health
10 insurance.
11 BY MR. BURKE:
12 　　Q. And when you were working at HII, did you
13 have occasion to communicate with agents about the source
14 of leads?
15 　　A. Occasionally.
16 　　Q. And did that happen with Scott Shapiro
17 and Sean Duffie, Marsha Griffin?
18 　　A. Could you explain what you mean by that?
19 　　Q. Did you ever send any of those folks an
20 e-mail or call them up and ask them what the source of a
21 lead was?
22 　　A. Yes.
23 　　Q. Okay. And did it ever happen that you didn't
24 get a sufficient response?

Page 63

1 　　A. I -- I don't recall. I can say most of the
2 time when I would ask any agent for information on a lead
3 I was able to get the data from -- from the customer or
4 from the agent, excuse me, most of the time.
5 　　Q. Okay. Because HII requires its agents to
6 provide information upon request; is that right?
7 　　A. That is correct.
8 　　Q. All right. And HII has the ability to
9 terminate or discipline an agent that doesn't provide
10 adequate proof that a lead was a true opt-in lead; isn't
11 that right?
12 　　A. That is correct.
13 　　Q. All right. Let's have a look at this Exhibit
14 B that I circulated.
15 　　　MS. CHATTIN: Exhibit B, Alex?
16 　　　MR. BURKE: Yeah.
17 　　　MS. CHATTIN: I don't think you circulated
18 that.
19 　　　MR. BURKE: Let's see.
20 　　　MS. CHATTIN: Did you just send it? Sorry.
21 　　　MR. BURKE: Nope. Looks like I didn't send
22 it. I'll send it right now. I intended to.
23 　　　MS. CHATTIN: Thank you.
24 　　　THE WITNESS: Am I looking at what you just

Page 64

1 sent me, an e-mail you're sending me or are you putting
2 it on the screen?
3 　　　MR. BURKE: Both, but this takes just a minute
4 to get everything to you.
5 　　　THE WITNESS: Okay. Okay. Just wanted to
6 make sure I wasn't --
7 　　　MR. BURKE: Let's go off the record for just a
8 sec, please.
9 　　　THE VIDEOGRAPHER: Going off the record at
10 10:53 a.m.
11 　　　　　(WHEREUPON, a break was
12 　　　　　taken.)
13 　　　　We're going back on the record at 10:56
14 a.m.
15 　　　MR. BURKE: Okay. We have a few newcomers to
16 the Zoom, Charles Messina who's been around the block on
17 the case. Charles.
18 　　　MR. MESSINA: Yes. And Jeremy did introduce
19 me, but I've been on this whole time. Thank you, Alex.
20 　　　MR. BURKE: Great.
21 　　　MS. CHATTIN: Yeah, and Michael Talaia from
22 Health Insurance Innovations is also on the line.
23 　　　MR. BURKE: And what's Mr. Talaia's title?
24 　　　MS. CHATTIN: Mr. Talaia is --

Page 65

1 　　　MR. TALAIA: In-house counsel.
2 　　　MS. CHATTIN: -- in-house counsel.
3 　　　Thank you, Michael.
4 　　　MR. BURKE: Oh, okay. Michael, you're an
5 attorney?
6 　　　MR. TALAIA: Yes.
7 　　　MR. BURKE: Okay. Great.
8 BY MR. BURKE:
9 　　Q. Okay. So I'm going to show you the document
10 that I circulated as Exhibit B. Are you generally
11 familiar with this -- with this document?
12 　　A. I have not seen this document before.
13 　　Q. Do you have any idea what it is?
14 　　A. No.
15 　　Q. So this is not a document that you ever sent
16 to agents?
17 　　A. No.
18 　　Q. Do you have any understanding that this might
19 be an agent training tool?
20 　　　MS. CHATTIN: Object to the form.
21 BY THE WITNESS:
22 　　A. I don't know where -- I've never seen this
23 document, and I'm only looking at a few pages, but I
24 don't know what this -- what this --

17 (Pages 62 - 65)

Page 66

1    MS. CHATTIN: Amy, do you have the -- do you
2 have the exhibit that I e-mailed you a couple minutes ago
3 called Exhibit B?
4 BY MR. BURKE:
5    Q.   Did you get the e-mail, Ms. Brady?
6    A.   I've gotten -- I have not received -- oh,
7 here. I just got B. Sorry. Okay. Oh, 62 pages.
8    Q.   All right. And this is Bates HII 340
9 consecutive to 401.
10    A.   I do not -- I've never seen this document.
11    Q.   Okay. So directing your attention to Page 3,
12 Bates 342, it says: "HII stands for Health Insurance
13 Innovations." Is that true?
14    A.   Yes.
15    Q.   All right. And then it says: "We are a
16 leading developer and administrator of affordable,
17 web-based individual health insurance plans and
18 supplemental products." Is that true as to HII?
19    A.   Yes.
20    Q.   Okay. I see on Page 6, Bates 345, it says:
21 "Everybody is given 15 days paid off." Are you at all
22 familiar with that concept as to insurance agents that
23 are working for HII?
24    MS. CHATTIN: Object to the form.

Page 67

1 BY THE WITNESS:
2    A.   Again, I don't know what this is.
3 BY MR. BURKE:
4    Q.   No, I know, but I'm just asking about the
5 concept because I understand you haven't seen this
6 document, but I'm asking about the concept.
7    MS. CHATTIN: Same objection. Same objection.
8       You can answer.
9
10 BY THE WITNESS:
11    A.   I don't even -- I don't even know who this is
12 for. Like who's everyone? Is it everybody in the
13 company? Because I had different days off than 15, so I
14 don't know who everyone is. I'm not even sure who this
15 is directed to.
16 BY MR. BURKE:
17    Q.   Right. And so the question was specific as
18 to insurance agents that were working for HII. Do you
19 remember any sort of time off that they were provided?
20    A.   There was --
21    MS. CHATTIN: Same objection.
22    THE WITNESS: Sorry. Sorry to interrupt.
23    MS. CHATTIN: Go ahead. No. Go ahead. Go
24 ahead.

Page 68

1 BY THE WITNESS:
2    A.   There was a -- what was called a Work At Home
3 Division at HII at one point of agents that were
4 employees of HII. It was very few agents. It was a
5 small division. I believe it was a testing process, but
6 I had no interaction with that team, and I don't know
7 anything about what they did or how they did it, but I
8 did -- I did know -- that's probably what this is about.
9
10 BY MR. BURKE:
11    Q.   Okay. Great. Directing your attention to
12 Page 346, it references warm transfer leads. Have you
13 ever heard of a warm transfer lead?
14    A.   I have, yes.
15    Q.   What's a warm transfer lead?
16    A.   It's my understanding a warm transfer lead is
17 a lead that a lead company or a lead vendor or a lead
18 generator would create. They would qualify that the
19 customer is looking for health insurance by whatever
20 parameters they qualify. Then they would transfer that
21 call directly to an agent that that lead vendor is
22 working with, so it would be a live person coming from
23 the vendor directly to the agent.
24    Q.   And is it your understanding that that's how

Page 69

1 Duffie and Shapiro and their agencies obtained leads --
2 through warm transfers?
3    A.   I don't know specifically how -- the majority
4 of our -- of the agents that HII worked with utilized
5 warm transfers --
6    Q.   Okay.
7    A.   -- as their method.
8    Q.   Were there any sort of efficiency guidelines
9 or quotas for insurance agents like Duffie or Shapiro?
10    MS. CHATTIN: Object to the form.
11 BY THE WITNESS:
12    A.   The agents that HII would contract with, and
13 they would become appointed with the carriers we worked
14 with, none of them were captive, meaning they weren't
15 employees outside of this Work At Home division
16 that -- that we just briefly talked about, but the agents
17 I worked with and the majority of the agents that sold
18 business for HII, they were not captive agents. They
19 were not employees. There were no quotas or requirements
20 of production, and the vast, vast majority had contracts
21 with many other insurance companies and other
22 administrators that might have offered similar type
23 projects -- products as HII but no quotas, no real
24 requirements in order for them to stay with -- with HII.

18 (Pages 66 - 69)

Page 70

1    Q.   Were there incentives for agents such as
2  Duffie and Shapiro for bringing in new customers?
3    A.   There would be some --
4       MS. CHATTIN:  Object to the form.
5  BY THE WITNESS:
6    A.   Generally speaking there may be bonus
7  programs that are put in place for specific agencies.  I
8  do not recall there ever being any incentive program set
9  up for Sean Duffie.
10 BY MR. BURKE:
11   Q.   How about Mr. Shapiro?
12   A.   There were -- when -- when Shapiro was an
13 agent for HII, I do not recall that there were any bonus
14 programs set up for him either.
15   Q.   Do you know whether Shapiro was an agent for
16 HII in 2018?
17   A.   I -- it is -- I believe that he stopped being
18 an agent for HII in 2000 -- roughly 2016, so I cannot
19 believe he was an agent in 2000 -- I do not believe he
20 was an agent in 2018.
21   Q.   Okay.  But you corresponded with Mr. Shapiro
22 in 2018, didn't you?
23   A.   I may have, yes.
24   Q.   If Mr. Shapiro wasn't an agent in 2018, why

Page 71

1  were you corresponding with him?
2    A.   So an agent -- for example, Sean Duffie, he
3  may be the general agent and he is going to be the -- the
4  main person that I would contact, for example, if there
5  were any issues or to talk about anything related to the
6  business that he was submitting.  It is very normal -- in
7  fact, every agency that -- that I've worked with has
8  non-licensed agents in their office or has individuals
9  that may not -- maybe licensed but are not licensed and
10 appointed and not selling for HII, so it is not unusual
11 for a GA like Sean Duffie to say go to X for this or call
12 Y for this, so it's -- it's not unusual to be working
13 with -- with individuals that are not licensed and
14 appointed with HII.
15   Q.   Okay.  Great.  So I'll ask the question
16 again.  Why did you correspond with Scott Shapiro in 2018
17 if he was not an agent?
18      MS. CHATTIN:  Object to the form.
19 BY THE WITNESS:
20   A.   If Sean Duffie -- I would have gone to Sean
21 Duffie for whatever the topic might have been, and if he
22 directs me to an individual, that is who I would then
23 contact for whatever I needed.  So it's -- it's a very
24 normal process.  If that agent, GA, for example, wants to

Page 72

1  provide a name of an individual that he works with to
2  help me get the information that I'm looking for, that's
3  a completely normal process, and that would have been why
4  that would have occurred.
5  BY MR. BURKE:
6    Q.   So is it your testimony that Scott Shapiro
7  was working with some agent that was -- that had a
8  relationship with HII in 2018?
9    A.   If I'm communicating with an individual,
10 whoever it may be, it's because the general agent told me
11 to communicate with that person for what I needed to get
12 back to HII.  So if Sean Duffie told me to contact an
13 individual for information, I would do that.
14   Q.   Right.  So why were you communicating with
15 Sean -- with Scott Shapiro in 2018?  You've provided a
16 bunch of hypotheticals.  I'm asking --
17   A.   Okay.
18   Q.   -- with regard to Scott Shapiro in 2018, why
19 were you communicating with him about HII.  Was there
20 some master agent that told you to do so?  Did Sean
21 Duffie tell you to do so?  Why communicate with him in
22 2018?
23   A.   If I was -- depending on what that topic was
24 about -- I don't know what topic you're referring to, but

Page 73

1  there would be a topic, for example.  I recall
2  Compliance -- the HII Compliance was going to do an
3  audit.  They were coming in to -- to meet the -- Sean
4  Duffie and the agency, and Sean Duffie said set it up
5  with Scott Shapiro, so that is what I did.  So the line
6  of communication goes the general agent that I need
7  something for, I would go to the general agent.  If he
8  connects me with someone else, that's completely normal
9  and something that happens -- would happen every day.  I
10 would work with somebody else in -- in the office or
11 somebody else that he directed me to to accomplish
12 whatever I needed.
13   Q.   And so what was your understanding in 2018 as
14 to the relationship between Mr. Duffie and Mr. Shapiro?
15   A.   I don't really know what their relationship
16 was.  I just know that if he told me to contact him I
17 would contact him and get whatever I needed from him, so
18 I don't know what their exact relationship was though.
19   Q.   Was there any contract that HII had that
20 you're aware of between Duffie and Shapiro --
21      MS. CHATTIN:  Object to form.
22 BY THE WITNESS:
23   A.   I am not aware --
24 BY MR. BURKE:

19 (Pages 70 - 73)

Page 74

1    Q.   -- in 2018?
2    A.   Sorry.  I am not aware of any contracts
3  between those individuals.
4    Q.   So it was just sort of ad hoc.  Duffie says
5  hey, talk to Shapiro about this compliance stuff and then
6  you just did?
7    A.   Correct.
8    Q.   Okay.  Is that the same with Marsha Griffin
9  in 2018?
10    A.   Correct.
11    Q.   And so did you have any understanding as to
12  the difference between Marsha Griffin and Scott Shapiro
13  with regard to Mr. Duffie and his agency?
14    A.   I'm sorry.  Do you mind asking that again?  I
15  don't understand.
16    Q.   What was Marsha Griffin's role in all --
17  in -- with regard to HII in 2018?
18       MS. CHATTIN:  Object to the form.
19  BY THE WITNESS:
20    A.   It was my understanding it was an
21  administrative-type role.
22  BY MR. BURKE:
23    Q.   For who?
24    A.   For Sean Duffie.

Page 75

1    Q.   Okay.  And what was your understanding of
2  Mr. Shapiro's relationship with Sean Duffie in 2018?
3    A.   Similar.  I mean I didn't communicate -- I
4  communicated more with Marsha on an administrative side.
5  Occasionally I would communicate with Scott Shapiro if I
6  was directed to do so.
7    Q.   Is it your understanding that Marsha Griffin
8  in 2018 was an employee of Mr. Duffie's insurance
9  agent -- agency?
10       MS. CHATTIN:  Object to the form.
11
12  BY THE WITNESS:
13    A.   I don't know what their -- their relationship
14  was.  A lot of the offices that I've worked with have
15  employees, they have 1099, independent contractors.
16  It's -- it's not unusual to have all independent
17  contractors.  It's not unusual to have a mix, so I -- I
18  don't know that relationship between Marsha and Sean
19  Duffie.
20  BY MR. BURKE:
21    Q.   Well, what was your understanding in 2018
22  when Mr. Duffie said talk to Marsha about
23  administration-related issues?  What was your
24  understanding in 2018 as to the relationship between

Page 76

1  Marsha Griffin and the Duffie insurance agency?
2    A.   It's -- it's my understanding that they had
3  some sort of working relationship.  I don't know -- I
4  didn't know exactly what that relationship was, but if I
5  was getting the admin issues resolved I needed from
6  Marsha when Sean was directing me to Marsha, I went to
7  Marsha.
8    Q.   Okay.  And is that the same with Mr. Shapiro?
9    A.   Yes.
10    Q.   Okay.  Okay.  I sent what's been marked as
11  Exhibit C.  Oh, wait.  It's in my outbox.  Let's see.
12       MR. BURKE:  Danielle, did you get that
13  exhibit?
14       MS. CHATTIN:  Not yet.
15  BY MR. BURKE:
16    Q.   All right.  I'm showing you what's been
17  marked as Exhibit C.  And I actually enlarged this guy.
18  Oh, no, I didn't.  All right.  So this is a 29-page
19  document starting at Bates HII 4440 consecutive to HII
20  4468, and the first screen -- the first page says "Module
21  Library."  Have you ever seen this document before?
22       MS. CHATTIN:  Amy, do you have the -- the
23  document that I e-mailed you yet?  I want to be clear on
24  the record.

Page 77

1       MR. BURKE:  I mean I'm showing it on the
2  screen.  I've e-mailed it.  It's a large document.
3       MS. CHATTIN:  Yeah.
4       MR. BURKE:  I'm trying to accommodate you but
5  not disrupt the deposition, so I'd like to just answer
6  some questions here.
7       MR. CHATTIN:  That's fine.  I just want Amy
8  to -- Amy, just be clear on the record whether you're
9  looking at the screen sharing or whether you're looking
10  at the document whenever you --
11  BY THE WITNESS:
12    A.   Okay.  I am looking at the document on the
13  screen that you are sharing, Alex.
14       I -- I don't -- I haven't seen this specific
15  29-page document that you're showing me, but I do
16  understand what the module -- module library is.
17  BY MR. BURKE:
18    Q.   What's the module library?
19    A.   I haven't seen this specific document that
20  you're showing me.  The module library is a training
21  program for all agents, and the training program was
22  created by the Compliance Department.  CCQ was the -- I
23  don't know what it stands for.  The Compliance Quality
24  Assurance Department and basically -- Quality Center --

20 (Pages 74 - 77)

Page 78

1  Call Center Quality and -- CCQ stands for Call Center
2  Quality. Thank you. And basically what this department
3  would do -- they were connected to the Compliance
4  Department -- is create modules or training programs that
5  every agent would have to complete in order to be able to
6  sell HII carrier products. In addition, there may be
7  some modules that aren't about carrier products. It
8  might be about proper selling techniques or, you know,
9  the non-negotiables I mentioned earlier. So this is a
10 series of training programs that every agent would have
11 to complete in order for their links to stay active, the
12 on-line tools that they would sell through, and the CCQ
13 and Compliance Department would add to this library
14 regularly. Any new product that was released, any new
15 process that was released, they would require -- HII
16 would require that the agents go through training.
17     Q.  Okay. Great. So what does non-negotiable
18 mean in the context of -- of sales solicitations for
19 agents such as Shapiro, Duffie -- or Duffie, Sergio Ortiz
20 in 2018?
21     A.  So any change -- so Sean Duffie, for example,
22 has to complete any of these modules in order to continue
23 selling for HII. So the Compliance Department would put
24 this in every agent's back office. They would have to go

Page 79

1  in and go through the training. They were required to
2  sit through a video presentation, and they would have to
3  answer questions. They were -- every agent was required
4  to get a 90 percent or above in order to be able to sell
5  for HII, so there were tests and continual training
6  processes put in place for agents. Non-negotiables
7  specifically is -- it's kind of self-explanatory --
8  non-negotiable. This is -- these are absolutes, okay,
9  things that you cannot say or do and things that you
10 absolutely need to say on every sales interaction. One
11 example, just to -- to give you an example, would be if
12 you're selling a short-term medical plan to a customer,
13 you -- it is non-negotiable that you tell that customer
14 that this is not an ACA compliant health insurance plan.
15 That is an example of one of the non-negotiables.
16     Q.  Okay. And just to be clear -- and I think it
17 says it here on Page 9 -- pardon me -- Page 4, Bates
18 4443 -- these non-negotiables are for what has to be in a
19 sales solicitation; is that right?
20     A.  Correct.
21     Q.  Okay. And what's a sales solicitation?
22     A.  A sales solicitation would be when an agent
23 is interacting with a potential customer or an individual
24 who's interested in health insurance and is learning

Page 80

1  about health insurance. That agent is entering in sales
2  solicitation if they're talking about the product or
3  health insurance or providing a quote. So the process of
4  the sale with the customer would be considered
5  solicitation.
6      Q.  Okay. And so as to Mr. Duffie's agency, for
7  example, in 2018, this would typically happen on the
8  telephone arising from some sort of warm transfer; is
9  that right?
10         MS. CHATTIN: Object to the form.
11
12 BY THE WITNESS:
13     A.  That is my understanding of -- of Duffie's
14 agency.
15 BY MR. BURKE:
16     Q.  Okay. And what about Mr. Ortiz's agency, is
17 that the same?
18         MS. CHATTIN: Object to the form.
19 BY THE WITNESS:
20     A.  Yes. Yes. That would be my same
21 understanding.
22 BY MR. BURKE:
23     Q.  Okay. Okay. So the first substantive page
24 here says that the agent must state the accurate name of

Page 81

1  the agent -- agency you're working for. In your
2  understanding of HII's requirements for Mr. Duffie,
3  Mr. Ortiz or other agents in 2018, was that a
4  non-negotiable that was effective?
5      A.  There are two ways of being set up in the HII
6  system. You can be an individual agent -- an individual
7  agent and commissions are paid to your Social Security
8  number or to you directly. There are many agents like I
9  just described that don't have an agency. They don't
10 have an agency name. They don't have an agency license,
11 and they are able to operate as an individual,
12 independent agent. That's one way of selling. Another
13 way of selling is that agent does have an agency license,
14 has an agency. That agency is health insurance licensed,
15 and commissions would be paid to a tax ID for that
16 agency. Both ways are completely acceptable in the HII
17 system. In the specifics -- specific example of Sean
18 Duffie, it was my understanding that he was an
19 independent individual agent not -- he did not have an
20 agency, so in that example -- in that situation, he
21 wouldn't be able to indicate that he has an agency. He
22 would just have to indicate his own individual agent
23 name.
24     Q.  Okay. But the -- but the -- the requirement

21 (Pages 78 - 81)

Page 82

1  was in place in 2018 as far as you know for all agents
2  such as Mr. Duffie and Mr. Ortiz; is that right?
3      A.  What pol -- what was in place for them?
4      Q.  The requirement that they state the accurate
5  name of the agency that they were working for.
6      A.  If they had an agency, they were required to
7  say their agency name.  As I stated, it is my
8  understanding that Sean Duffie was an independent agent
9  without an agency as I believe at the time we were paying
10  his Social Security number which means he did not have --
11  it's my recollection that he had no agency, so it would
12  not be required that he said the name of his agency if he
13  does not have one.
14     Q.  I see.  Okay.  And it wasn't required that he
15  state his name or that the persons who were working for
16  him state his name that they were calling for Sean Duffie; is that
17  right?
18     A.  It is the expectation that Sean Duffie is
19  selling the case and he offers and provides his full
20  name.  Sean Duffie may have had -- and I don't recall.
21  He could have agents underneath him, sub agents.  They
22  are required to give their full names.  They do not have
23  to give Sean Duffie's name if they are the ones selling
24  the case.  So whoever is selling the case, whoever is in

Page 83

1  that sales solution that we just talked about has to
2  provide their full name.
3      Q.  Did it sometimes happen that the full name of
4  the agent or the agency was not provided during Sean
5  Duffie or Sergio Ortiz agencies' sales solicitations?
6      A.  I would not know that information.
7      Q.  You don't remember that ever happening?
8          MS. CHATTIN:  Object to the form.
9  BY THE WITNESS:
10     A.  I don't know.  I don't know that information.
11  I don't know if that would be true or not.
12
13  BY MR. BURKE:
14     Q.  Okay.  Directing your attention to Page 9,
15  Bates 4448, I see HII says to make best use of its -- of
16  your time, it is important to determine whether the
17  consumer qualifies for one plan or another as early as
18  possible in the interaction.  Was that a non-negotiable
19  in 2018 that would have applied to agents such as
20  Mr. Duffie?
21     A.  Yes.  To add --
22     Q.  Um-hum.
23     A.  Sorry.
24         -- some products that HII offered through the

Page 84

1  on-line tools may not have underwriting questions, so
2  some did have underwriting questions, some did not.
3      Q.  I'm not sure what -- oh, I see.  You're
4  looking at the top of this "Pre-Qualifying Underwriting
5  Questions;" is that right?
6      A.  That's what that sentence you just asked me
7  about that you highlighted, "To make best use of your
8  time, it is important to determine whether the consumer
9  qualifies for one plan or another as early as possible in
10  the interaction," that is specific -- specifically
11  connected to the box above it which is "Pre-Qualifying
12  Underwriting Questions."  For example, short-term medical
13  has pre-qualifying underwriting questions, so if you were
14  selling a short-term medical plan, this is critical to
15  ask some of these pre-qualifying questions early in the
16  process as to not waste the customer's time.  There are
17  also products that HII offered that had no pre-qualifying
18  questions.  It was a -- called a guaranteed issue plan,
19  meaning you did not have to ask.  There would be no
20  underwriting questions that the customer would need to
21  get through.  I just wanted to make sure that was clear.
22     Q.  Okay.  Would you say it was a general
23  directive that, you know, during sales solicitations
24  agents were supposed to make best use of their time?

Page 85

1      A.  I have never used that phrase when talking to
2  an agent.  It's my understanding -- what we're talking
3  about here is in this document and on this specific page
4  is if there's a -- if there's a question that's going to
5  disqualify a customer, it's best to ask that upfront in
6  order to not -- to really -- to not waste the customer's
7  time.  The question -- one of the underwriting questions
8  is are you currently pregnant or going through
9  infertility treatment or in the process of adopting, so
10  that's a question to ask early on in the process.  In the
11  event that that customer is pregnant, you could either
12  move on to different product or realize that this is not
13  the right fit for this customer, so that's -- that's all
14  this is, is making sure that it's the right product for
15  the customer.
16     Q.  Okay.  I see also that this document about
17  non-negotiables actually provides a reason for
18  determining whether the consumer qualifies for one plan
19  or another in order to prevent wasting the agent's time.
20  Would you agree that that's one of the reasons that it's
21  important to determine whether the consumer qualifies
22  in -- in 2018 sales solicitations?
23     A.  Again, I have never seen this document, so
24  I've never seen these phrases used in -- like this.  What

Page 86

1  I would agree, that if you're talking to someone who is
2  pregnant in the example I just gave, you should find that
3  information out soon so you are not wasting your time
4  selling an improper product to a customer that doesn't
5  qualify. I think it's important that no one is wasting
6  their time and that you get the right product for the
7  right customer which is why you should ask these
8  pre-qualifying questions early in the process so no one
9  wastes their time and so that the customer is -- is
10  getting what is appropriate for them.
11     Q.  Okay. Scrolling down to 4451, Page 12, the
12  last sentence of that slide says: "The name of Health
13  Insurance Innovations, or HII, should not be used during
14  the interaction with the client." Do you see that?
15     A.  I do.
16     Q.  Was that a non-negotiable directive in 2018
17  that applied to agents such as Duffie and Ortiz?
18     A.  So I don't know what this document is. What
19  I can tell you is the boxes are the non-negotiables.
20  Okay. Anything you see on this document that is in this
21  box -- so, for example, in this slide, it says name of
22  insurance carrier. I don't know whose comments are
23  listed below it. I've never seen it before. In my
24  experience, I would tell agents to absolutely talk about

Page 87

1  Health Insurance Innovations because they are going to be
2  receiving a welcome e-mail from Health Insurance
3  Innovations. It was my -- my experience that we were
4  trained to talk about health insurance because ultimately
5  talking about Health Insurance Innovations would
6  eliminate confusion later on when they received an
7  e-mail, so I don't know whose writing this is, but I can
8  tell you the box is a non-negotiable. These comments
9  below that we're going through I've never seen and I
10  don't know who wrote them.
11     Q.  So you're saying that it's a non-negotiable,
12  for example, that Healthcare Technology Company publicly
13  traded on NASDAQ is a non-negotiable?
14     MS. CHATTIN: Object to the form.
15  BY THE WITNESS:
16     A.  It is my understanding that the name of the
17  insurance carrier is always mentioned and that the
18  administrator is Health Insurance Innovations.
19  That -- that is what I have always understood the
20  non-negotiables to be because HII is communicating with
21  the customer, and we wanted to make sure to alleviate any
22  confusion that a customer might have. So it is my -- my
23  testimony and my complete, whole-hearted opinion that you
24  say the name of the insurance company and you say that

Page 88

1  HII is the administrator.
2  BY MR. BURKE:
3     Q.  Was there a module in effect in 2018 that you
4  think said that?
5     MS. CHATTIN: Object to the form.
6  BY THE WITNESS:
7     A.  There was a module -- I believe it was
8  available in -- yes, it was available in 2018 -- that
9  talked about the non-negotiables, and this slide --
10  what's in the box is the non-negotiable. What's
11  underneath it is somebody's commentary, so I don't know
12  whose that is.
13
14  BY MR. BURKE:
15     Q.  Right, but the -- the commentary is telling
16  the agents what to say and what not to say; right?
17     MS. CHATTIN: Object to the form.
18  BY THE WITNESS:
19     A.  I don't know what this document is and who it
20  goes to. I know about the non-negotiables, and there was
21  a module specific to the non-negotiables. This is not
22  it. This is a document. I don't know where it came
23  from. I've never seen it before. All I'm doing is
24  talking about the non-negotiables. I can repeat again.

Page 89

1  I have no idea who's putting this commentary on -- on
2  these pages.
3     MR. BURKE: Sorry about these pauses. It's
4  just a function of our remoteness. Get these exhibits.
5  Normally I'd just hand them to you guys, but when we're
6  doing this on line, I've gotta like set it up. Then I
7  have to make sure that my screen is clear, all this
8  stuff.
9     So I just -- I just sent you, Danielle,
10  Exhibit C. I sent it to everybody.
11     MS. CHATTIN: I think we were just looking at
12  Exhibit C; right?
13     MR. BURKE: D.
14     MS. CHATTIN: D. Thank you.
15     MR. BURKE: Yeah, I labeled it properly.
16     MS. CHATTIN: Okay.
17  BY MR. BURKE:
18     Q.  Exhibit D is a two-document compilation. The
19  first document -- it's six pages long total. The first
20  document begins at HII 10092 and goes to 10094. And then
21  the second document goes from 3349 to 3351. And I'm
22  showing these on the screen, and I e-mailed them to you.
23     Have you ever seen this first document that
24  begins at 192?

23 (Pages 86 - 89)

Page 90

1    A.  I don't recall -- I haven't seen this exact
2  document, but the information I have -- I have seen
3  before in some other formats.
4    Q.   Where -- where have you seen this type of
5  information if not on this policy document?
6    A.  I don't know.  I just -- I don't know that
7  I've seen this exact document, but I -- I -- I know of
8  the information.
9    Q.   Okay.  And so I see this first document in
10  Exhibit D mentions the Telephone Consumer Protection Act,
11  TCPA.  Do you know what the TCPA is?
12    A.   I -- yes, I'm aware of what -- the TCPA Act.
13    Q.   Okay.  What's the TCPA?
14    A.   Telephone Consumer Protection Act, and it
15  says right here it requires that our -- our agents abide
16  by all of the regulations, and what I am aware of that
17  is -- I'm sure it's a sliver of what this Act is -- is
18  that anyone that is contacted needs to agree to have
19  received information about health insurance.  They have
20  to what we call opt-in to receive information.
21    Q.   And so as far as HII is concerned in 2018,
22  that time frame, what was a valid opt-in?  Could you
23  describe it for me, please.
24    A.   So agents would provide the opt-in based on

Page 91

1  the lead vendors they purchased from, and so the
2  information may -- at that time would vary, so it could
3  be a screenshot of the information of when the customer
4  put in their -- their name, their phone number and
5  connecting an IP address so that we knew it came from the
6  customer's computer and that we saw what the
7  screenshot -- what they were opting into.  That would be
8  an example of one opt-in that --
9          (Zoom interruption.)
10    Q.   Okay.  And so like --
11       THE REPORTER:  I'm sorry.  You -- you broke up
12  there.  You said:  "That would be an example of one
13  opt-in that."
14  BY THE WITNESS:
15    A.   HII would receive.
16  BY MR. BURKE:
17    Q.   Okay.  Were there other types of opt-ins?
18    A.   I think there were but I don't recall what
19  they -- they would be.  The majority of them would be IP
20  address and documents of what they signed off on on the
21  websites.
22    Q.   Okay.  And so this procedure that's outlined
23  on 192, 193, is this generally your understanding of what
24  the procedure was for fielding a TCPA-related complaint

Page 92

1  at HII during that time frame?
2    A.   So as you're scrolling through this document,
3  I have not seen this document.  I -- I'm in the -- I was
4  in the Sales Department, and any TCPA complaint that I
5  would be involved in would come from the Compliance
6  Department, and they would ask me to go do the leg work
7  and get some information on the -- from the agent on the
8  complaint.  So I don't know exactly all these pieces on
9  this document as I've never seen it before, but my
10  experience is I would get a -- information from the
11  Compliance Department, and I would be told what
12  information I needed to go get or how I needed to notify
13  the agent.
14    Q.   From whom in Compliance did you generally
15  receive complaints that you were supposed to run down?
16    A.   It depends who was in the Compliance
17  Department at that time as there were changes in people
18  who worked there but anybody --
19    Q.   How about --
20    A.   Go ahead.
21    Q.   How about in the 2018 time frame, late 2017,
22  early 2019, was it -- was it Christine Gillis?
23    A.   Christine Gillis would be someone I would
24  communicate with, and Dan Garavuso might be someone I

Page 93

1  communicate with but -- yeah, those would be the two from
2  that time period that I can recall that I would talk to.
3    Q.   Okay.  And do you have any reason to believe
4  that complaints didn't run through -- also through
5  Regulatory counsel's office as it says here on bullet
6  point 2?
7       MS. CHATTIN:  Object to the form.
8  BY THE WITNESS:
9    A.   Would you mind repeating that question?
10       MR. BURKE:  Kelly.
11          (Requested portion of the
12          record read.)
13       THE WITNESS:  Thank you.
14  BY THE WITNESS:
15    A.   I have -- I have no idea.  I'm not in the
16  Compliance Department.  I wasn't provided information
17  like that.  I was told to get certain things or
18  communicate with the agency or the agent or the
19  distributor, but I have no -- I don't know what occurred
20  in the Compliance Department regarding where that
21  complaint would go.
22  BY MR. BURKE:
23    Q.   Okay.  So bullet point 3 says:  "If an
24  independent distributor is involved, the HII sales

24 (Pages 90 - 93)

Page 94

1  representative is responsible for forwarding the
2  complaint to the agency and discussing whether further
3  action is needed by the agent or agency."
4        Were you the HII sales representative for
5  Duffie and Ortiz in, you know, our relevant time period,
6  late 2017, 2018 and early 2019?
7     A.  Yes.
8     Q.  Okay.  And so that's what you did; right?
9  You forwarded the complaint to Duffie or whomever and
10 discussed whether further action was needed by the agent
11 or agency?
12    A.  Yes.
13    Q.  Okay.  Bullet point 4 says the distributor --
14 when this document refers to distributor, do you
15 understand that to mean the insurance agent?
16    A.  I do.
17    Q.  Okay.  So like Duffie; right?
18    A.  Yes.
19    Q.  All right.  So did you have occasion to
20 sometimes reach out to -- to Duffie's folks with regard
21 to consumer complaints in our relevant time period, late
22 2017, 2018, early 2019?
23    A.  Yes.
24    Q.  Okay.  And did you ask -- well, let's see.

Page 95

1  When you reached out to Duffie's folks concerning TCPA
2  complaints, who did you generally reach out to -- was it
3  Duffie?
4     A.  Every complaint that I would get I'd start
5  with the agent, so I would have started with Duffie, and
6  then he would have directed me to -- so I would have
7  called him and said I've got a TCPA, how do you want to
8  handle, who do you want me to talk to, and then he would
9  connect me with whoever it might be.
10    Q.  Most of the time it was either Shapiro or
11 Marsha Griffin; right?
12       MS. CHATTIN:  Object to the form.
13
14 BY THE WITNESS:
15    A.  Yes, that's correct.
16 BY MR. BURKE:
17    Q.  Okay.  Bullet point 4 also discusses
18 obtaining proof of an opt-in essentially; is that right?
19    A.  Yes.
20    Q.  All right.  Did you ever receive proof of
21 opt-ins from Duffie whether through Duffie himself or
22 through some other person that was working with him?
23    A.  Yes.
24    Q.  Okay.  Great.

Page 96

1        And when you received that proof, was it
2  e-mailed to you?
3     A.  I believe so, yes.
4     Q.  Okay.  Was it ever dictated over the phone or
5  anything like that?  That would seem to be cumbersome.
6     A.  A hundred percent, no.  It was never dictated
7  over the phone.
8     Q.  And did you ever delete any of that stuff,
9  the proof of -- of opt-in with regard to Duffie or Ortiz
10 or any other agent from your files or e-mail?
11       MS. CHATTIN:  Object to the form.
12          You can answer.
13
14 BY THE WITNESS:
15    A.  Any -- thank you.  Any information that I
16 would get in regards to a TCPA would be immediately
17 forwarded to the Compliance Department.  If anything
18 was -- my system at HII would automatically delete any --
19 any e-mails over 18 months old, the system company-wide,
20 so in that situation it would be deleted, but it would
21 still be on the HII server, but myself personally, I
22 don't recall deleting anything ever.
23 BY MR. BURKE:
24    Q.  Did you keep a log of complaints having to do

Page 97

1  with, you know, particular agents or agencies or anything
2  else?
3     A.  Any logs of complaints regarding distributors
4  or agents or agencies is managed by the Compliance
5  Department and departments connected to the Compliance
6  Department, so the salespeople were not asked or required
7  to maintain any logs of complaints.
8     Q.  Okay.  But did you -- did you manage -- did
9  you keep any sort of list or log of complaints yourself?
10    A.  Not -- no.  No.  That I recall I didn't keep
11 any logs, no.
12    Q.  A spreadsheet or like, you know, note pad or
13 anything like that that you just kept for yourself to
14 keep track of what was going on?
15    A.  No.
16    Q.  Did you have access to the Compliance
17 Department's logs of complaints?
18       MS. CHATTIN:  Object to the form.
19 BY THE WITNESS:
20    A.  I did not have access to them, no.
21 BY MR. BURKE:
22    Q.  Did you ever see them?
23    A.  If -- if the Compliance Department thought I
24 needed to see any data on complaints, they would share

25 (Pages 94 - 97)

Page 98

1 them with me at that point, so it varied by distributor.
2    Q.   And so when data or information concerning
3 complaints was shared with you, how -- how was that
4 shared with you -- was it e-mailed, was it done through a
5 screen share, was it done on the phone, how did that go
6 down?
7    A.   Either by meeting on the phone or through
8 e-mail.
9    Q.   And was it your understanding that someone in
10 the Compliance Department had like a log of complaints?
11    A.   Yes.
12    Q.   Okay.  And who do you -- who -- who was your
13 understanding -- who kept track of that log -- was it
14 Ms. Gillis, Mr. Garavuso, someone else, everybody?
15    A.   I don't know who specifically kept control of
16 logs or documentation, but I -- it's my understanding
17 that anything complaint related was housed in the
18 Compliance Department somewhere.
19    Q.   Okay.  And what was your understanding of --
20 of what that looked like?  Was it a large database or was
21 it just a spreadsheet?  Was it a Word document?  Was it
22 something else?
23       MS. CHATTIN:  Object to the form.
24 BY THE WITNESS:

Page 99

1    A.   I don't know.  Anything I would see would be
2 a snapshot of something, so I don't know how they kept
3 all of that information.
4 BY MR. BURKE:
5    Q.   Well, what do you remember about these
6 snapshots that you saw?  Did they look like Excel
7 spreadsheets or did they look like just Word documents?
8 What did they look like?
9    A.   For a period of time the -- you know, it
10 evolved on how Compliance would share data with the sales
11 team, and at one point they were providing us sort of
12 regular just kind of a snapshot of where the agency is
13 overall.  Not just complaints.  Would be sales, health of
14 the block, cancellations, any complaints.  All positive,
15 any positive or negative information on the account from
16 a compliance standpoint would be in -- in -- in these
17 snapshots and it would -- you know, just a -- and it
18 would only be for specific agents that were, you know, a
19 little bit larger that would -- where it would be
20 important to be watching that information, extra
21 important to be watching that information.  We would see
22 those.
23    Q.   Okay.  And were those e-mailed to you?
24    A.   Typically, yes.

Page 100

1    Q.   Okay.  And what was the time frame roughly
2 when -- when those were being e-mailed?  Are we talking
3 about the time frame in 2017 to 2019?
4    A.   I believe so.  I believe we had data, some
5 data, and it was -- it was occasional data.  It wasn't on
6 a specific schedule.
7    Q.   Okay.  I see a reference here --
8    A.   And, again, I didn't -- and I just want to be
9 clear.  That was just what was provided to the Sales
10 Department.  I can only talk about what we received in --
11 in the Sales Department.
12    Q.   Sure.  I see reference here to settlements.
13 Tell me -- tell me what a settlement might be in the
14 context of TCPA.
15       MS. CHATTIN:  Object to the form.
16 BY THE WITNESS:
17    A.   It's my understanding that there are specific
18 fines associated with TCPA violations.  I don't know
19 exactly what those fines are, and I believe they varied
20 through the -- through the years.  But if there is a fine
21 that arises from a TCPA violation that is connected to an
22 agent, it is the responsibility of the agent to pay for
23 that fine.  It is not the requirement of HII.
24 BY MR. BURKE:

Page 101

1    Q.   Okay.  Although I see here the last sentence
2 of this first document, Bates 194 says:  "Should the
3 distributor," which is the agent, "prefer, HII may pay
4 the settlement amount and subsequently take deductions
5 from commissions as reimbursement."  Do you see that?
6    A.   I do.
7    Q.   So, you know, was that your understanding of
8 an option that agents had in 2017, '18, '19 with regard
9 to paying TCPA settlements?
10    A.   Yes.
11    Q.   Do you recall whether any agents ever availed
12 themselves of that benefit?
13    A.   I do not recall this process.  I mean I don't
14 recall any agents going with this process.
15    Q.   And then there's a footnote here.  It says:
16 "HII reserves the right to take appropriate action upon
17 distributor for repeated TCPA violations up to and
18 including fines or termination of contract."
19       Do you remember any agent being fined for
20 TCPA violations between, you know, and including 2017 to
21 2019?
22    A.   Do you mean the fine that I was just
23 referring to between the individual who was -- are you
24 talking about a fine from the individual or what did you

26 (Pages 98 - 101)

Page 102

1  say? Is that what you're talking about, the TCPA fine
2  that I was just referring to that is the responsibility
3  of the agent, is that what you're referring to?
4      Q.  No. I'm directing your attention to this
5  footnote that's on the screen, footnote 1 on Bates 194
6  where it says: "HII --
7      A.  Yes.
8      Q.  "-- reserves the right to take appropriate
9  action upon distributor for repeated TCPA violations up
10  to and including fines or termination of contract."
11         The question focuses first on fines. While
12  you were at HII between 2000 -- and including 2017 to
13  '19, was any agent fined for repeated TCPA violations?
14      A.  The only fines that I was ever aware of would
15  be -- regarding TCPA violations would be the fines that
16  arise from whatever lawsuits or settlements that may
17  have -- have come through. I am not aware of any other
18  fines --
19      Q.  Okay.
20      A.  -- regarding TCPA.
21      Q.  Okay. So to your knowledge, HII never said
22  hey, Duffie, you know, you've got so many TCPA
23  violations, we're going to fine you 1,000 bucks to punish
24  you for these -- for these violations; is that right?

Page 103

1      A.  No, I have not been involved in anything like
2  that or heard of anything like that.
3      Q.  How about termination of contract, in your 11
4  years at HII, do you remember any agent being terminated
5  because of TCPA complaints?
6      A.  Agents have been terminated throughout the
7  years. Specific to TCPA Duffie may have been. I don't
8  know exactly what the reason, but he may have been, but,
9  again, I don't know the exact reason for terminations
10  typically. I don't recall which agents or who would have
11  been terminated for TCPA. That would be something --
12  something that the Compliance Department could confirm.
13      Q.  Were you the primary contact with Duffie's
14  agency for HII?
15      A.  Yes.
16      Q.  Okay. What do you remember about -- so I --
17  let me ask this a little more directly. Is it your
18  understanding that Duffie and his agency were terminated
19  by HII?
20         MS. CHATTIN: Object to the form.
21  BY THE WITNESS:
22      A.  I believe that they were terminated by HII.
23  BY MR. BURKE:
24      Q.  What was your understanding of why they were

Page 104

1  terminated?
2      A.  I believe TCPA violations were a -- were
3  connected to why they were terminated.
4      Q.  Any other reasons that you know of why they
5  may have been terminated?
6      A.  No, I believe it was -- TCPA was their --
7  was -- was the big issue.
8      Q.  And when did that happen, that termination?
9      A.  I don't -- I don't recall exactly when --
10  when they were terminated.
11      Q.  Okay. Let's look at the second document here
12  that's part of Exhibit D. This is a three-page document
13  running from Bates HII 3349 to 3351. Are you familiar
14  with this document? And this is also part of what was
15  e-mailed to you, so you have it both on your screen and
16  in your inbox.
17      A.  This is the same document; correct, part of
18  the same document? Yeah, I don't -- I don't -- I don't
19  believe I've ever seen this exact document.
20      Q.  It's actually not the same document.
21      A.  Oh, okay.
22      Q.  You can tell because the -- these Bates
23  numbers in the lower right-hand corner are a few thousand
24  apart.

Page 105

1      A.  Okay.
2      Q.  This document to me seems to relate to
3  pre-recorded messages. Do you see that?
4      A.  I see that.
5      Q.  Okay. And it references pre-recorded
6  messages in the pre-solicitation process. Do you see
7  that?
8      A.  I do.
9      Q.  What does that mean to you, the
10  pre-solicitation process? Is that the lead generator?
11      A.  Correct. That is -- what this means to me is
12  the lead generator.
13      Q.  Okay. And so were agents allowed to use
14  pre-recorded messages through lead generators at HII?
15      A.  I don't know allowed to. They were -- the
16  agents would work with vendors and get leads from the
17  vendors. We had no connection to the vendor, the lead
18  vendors. Our -- all we were looking for was to make sure
19  that there was a proper opt-in for every single customer
20  that came through, so I've never -- again, I have not
21  seen this document before, so I'm -- I'm looking at it
22  for the first time.
23      Q.  Well, you were an employee of HII in November
24  2018; right?

27 (Pages 102 - 105)

Page 106

1    A.   Yes.
2    Q.   But nobody ever sent this to you?
3    A.   Again, I have not seen this document before.
4    Q.   And nobody ever sent the prior policy to you
5  either; isn't that right, the TCPA compliance policy that
6  we looked at that's part of -- the first part of Exhibit
7  D?
8    A.   Again, as I -- as I stated, I have seen some
9  of this information in pieces.  I have not seen this
10 document before.
11   Q.   Okay.  So you never saw the formal policy;
12 right?
13   A.   Correct.
14   Q.   Okay.  So with regard to pre-recorded
15 messages, I don't see anything in this formal policy that
16 says don't use pre-recorded messages.  Do you?
17        MS. CHATTIN:  I'm going to object.
18        Amy, do you have the copy of the exhibit
19 that I e-mailed you?  If you want her to look through the
20 entire document, she should look at the actual exhibit.
21        THE WITNESS:  Danielle, can you confirm this
22 is Exhibit D?  Yeah, okay.  Yes, I'm looking at it.
23        MS. CHATTIN:  That's right.
24        THE WITNESS:  Thank you.  Okay.  I mean I'm

Page 107

1  reviewing this.  This is kind of -- it's six pages.
2  BY MR. BURKE:
3    Q.   I mean -- and I know that you haven't ever
4  seen it.  I'm just wondering what your understanding of
5  the policy and practice was at HII with regards to agents
6  using lead generators that used pre-recorded messages.
7    A.   Well, it says right here "Should the company
8  learn of the use of deceptive messaging that may lead to
9  a sale of a product on its platform, it will urge
10 investigating using all available resources including
11 Legal to effect the ending of said recording.  Failure to
12 comply with these requirements can lead to the
13 termination of an agency in agreement with the company."
14 So based on what I just read, if the company would learn
15 of these pre-recorded messages used in the
16 pre-solicitation process, the company would go to the
17 distributor and have them investigate where this lead
18 came from.
19   Q.   So is this policy --
20   A.   That's my understanding.
21   Q.   Okay.  Thank you.
22        This policy that's dated November 2018, is it
23 your understanding that this general policy was in effect
24 from 2017 to 2019 or was there a different policy with

Page 108

1  regard to pre-recorded messages in effect during that
2  time frame?
3        MS. CHATTIN:  Object to the form.
4  BY THE WITNESS:
5    A.   I don't know -- thank you.  I don't know when
6  this policy was implemented.  The date on here says 11-1
7  2018.  I don't know when this was implemented.
8  BY MR. BURKE:
9    Q.   Yeah, right.  I understand.  But my question
10 is -- okay.  Well, what was the policy before
11 November 1st, 2018 with regard to pre-recorded messages?
12 Were they allowed or not?
13        MS. CHATTIN:  Object to the form.
14
15 BY THE WITNESS:
16   A.   Pre-recorded messages as I'm reading here and
17 as I recall were never something that HII approved of,
18 and as -- you know, process and what we learned about
19 lead vendors evolved.  And, for example, potentially in
20 2017 there were no pre -- we never even heard of pre --
21 pre-recorded messages.  Then all of a sudden we heard
22 about pre-recorded messages, and so it wound up in a
23 policy.  So the lead vendors changed their ways of
24 creating leads, and I don't remember even hearing about

Page 109

1  pre-recorded messages prior to this time period, so I
2  don't even know when they even began and when the vendors
3  started implementing that kind of a process, if that
4  makes sense.
5  BY MR. BURKE:
6    Q.   Okay.  I see a reference to Health Pocket.
7  Do you know what that is?
8    A.   I do.
9    Q.   What is it?
10   A.   Health Pocket is a company that HII purchased
11 at some point.  I don't know the exact year HII purchased
12 it and it was -- ultimately it was -- I thought it was
13 one thing.  It was -- it had information on ACA.  It was
14 a -- information on health insurance.  I believe it
15 created some lead generation, but I don't really know
16 much about Health Pocket.  It was a separate company from
17 HII, and we just sort of heard about it, but I didn't
18 have a lot of interaction with Health Pocket, but it was
19 a consumer site that was originally built for consumer
20 information and to be able to get -- ultimately ACA
21 quotes were a big thing on that, on Health Pocket.
22   Q.   What is ACA?  Is that Obama Care?
23   A.   I'm sorry.  Yes.
24        MR. BURKE:  Okay.  It's 12:15 Central time

28 (Pages 106 - 109)

Page 110

1  which is lunch time. I've got a good amount to go, and
2  so I would propose we take a short break for -- for
3  lunch. Why don't we go off the -- off the record to talk
4  about this?
5          THE VIDEOGRAPHER: We're going off the record
6  at 12:14 p.m.
7              (Discussion had off the
8              record.)
9              (WHEREUPON, a lunch break
10             was taken.)
11         This is media number three deposition of
12  Amy Brady. Today is January 12th, 2022. We're going
13  back on the record at 12:47 p.m.
14
15  BY MR. BURKE:
16     Q.   Okay. Back from lunch. So did -- did you --
17  well, let's see. First of all, I think your testimony
18  was that you were the primary contact between HII and
19  Duffie's agency; is that right?
20     A.   Yes.
21     Q.   And Duffie did have an agency, didn't he?
22  Wasn't it Happy Health Plans?
23         MS. CHATTIN: Object to the form.
24  BY MR. BURKE:

Page 111

1      Q.   Does that ring a bell?
2      A.   I've heard that name before, but he is -- he
3  was in our system as an individual, so that might -- it
4  oftentimes happens where somebody gets an agency after
5  getting set up with -- with our company so --
6      Q.   Okay. And HII did audits of agencies such as
7  Duffie/Happy Health Plans; right?
8      A.   Yes.
9      Q.   Tell me about those audits.
10     A.   I was typically not at the audits. I would
11  set up the audits. It was something that was done.
12  Compliance would meet with the agency typically prior to
13  the agency getting set up and being approved to sell
14  with -- with HII.
15     Q.   Okay. So there was like a pre, I don't know,
16  pre-relationship audit, for lack of a better term; is
17  that right?
18     A.   Yes.
19     Q.   Sort of like an onboarding audit maybe?
20     A.   Exactly. Yes.
21     Q.   Okay. And then after that onboarding audit
22  then there were periodic audits thereafter; is that
23  correct?
24     A.   Correct.

Page 112

1      Q.   And who was the person that performed audits
2  as to the Duffie agency?
3      A.   All audits would be -- would stem from the
4  Compliance Department. There would be different
5  individuals that would -- would do audits. We've had
6  different auditors that -- that go into the offices
7  through -- throughout the years.
8      Q.   Okay. But one -- there was one particular
9  person who audited Duffie; right?
10     A.   I just don't recall which person it was. If
11  you have the name --
12     Q.   Wasn't it Ruben Gardner?
13     A.   Yes, it could be Ruben. Ruben was around at
14  that time.
15     Q.   Okay. And so what's your understanding of
16  the process that Ruben used when he audited an agency
17  like the Duffie agency?
18     A.   Well, the auditor would have a checklist, and
19  they would go through that checklist with the agency.
20  They would ask information about the agency around,
21  potentially listen to calls if they wanted to. It was
22  really just getting some information about how the agency
23  does business, you know, giving -- giving information
24  about HII and really -- it's -- you know, they have a

Page 113

1  whole checklist. I'm not sure because I usually -- I
2  wasn't at audits. They typically didn't want the sales
3  team at the audits, and -- so -- so I don't know exactly
4  what the checklist was, but it was a just looking under
5  the hood to make sure that the agency was a good fit for
6  HII.
7      Q.   Okay. And was there a report from Ruben
8  after the audits were performed?
9      A.   He would put together some report for his
10  team in the Compliance Department, and then I would
11  typically get -- I wouldn't get that report but I would
12  get a yes, it was a great audit, they can be onboarded or
13  no, it wasn't a good audit and we're not moving forward
14  with them, so I would get a result more than -- I would
15  not be provided the audit details.
16     Q.   Okay. So I'm not sure -- was it typical for
17  you to receive the audit report by e-mail or otherwise?
18     A.   No.
19     Q.   You were responsible though for the
20  day-to-day interactions with the Duffie agency; right?
21     A.   Correct.
22     Q.   But you weren't made privy of what the audit
23  report was?
24     A.   Well, like I said, they would just give me a

29 (Pages 110 - 113)

Page 114

1  call and say okay, you can onboard, we had a great
2  meeting. They may share a detail or two with me, but I
3  was not -- I did not receive the report.
4      Q.  Well, what about the periodic reports, did
5  you receive those?
6      A.  I would receive some periodic reports on some
7  agencies, yes.
8      Q.  Okay. And if you received those reports,
9  would it -- would they come through by e-mail or
10  otherwise? How did you receive those?
11     A.  By e-mail.
12     Q.  Okay. Okay. I'm showing you a document that
13  hasn't been marked as an exhibit yet. This is Bates 4002
14  to 4015. Would you agree that this is an audit report of
15  the Happy Health Plans from June 11, 2018?
16         MS. CHATTIN: And, again, for the record, the
17  witness doesn't have the document herself, but she can
18  answer based on the screen that you're sharing.
19         MR. BURKE: Right. She can see the document.
20         MS. CHATTIN: She can see the parts of the
21  document that you are showing her for the record. She is
22  welcome to answer the question based on that review.
23  BY MR. BURKE:
24     Q.  Have you ever seen a document like this?

Page 115

1      A.  I don't recall seeing this document. Can you
2  scroll down a little bit?
3      Q.  Yeah.
4      A.  I don't recall seeing this document.
5      Q.  Okay. Do you remember anybody mentioning to
6  you that Duffie didn't have any written policies or
7  procedures ever?
8      A.  I do not recall anyone saying that to me.
9      Q.  Do you remember anybody mentioning to you
10  that Duffie had no documented training procedures?
11     A.  No.
12     Q.  Or how about no documented disciplinary
13  process, do you remember that ever coming across your
14  desk or being mentioned to you?
15     A.  Later in our -- in the relationship or later
16  after Duffie had been writing for a little while there
17  was
18  some -- I know there was some disciplinary things. I
19  don't -- but I -- this is -- this is the beginning of the
20  relationship so --
21     Q.  Well, wait. The relationship --
22     A.  Prior to that --
23     Q.  -- began in 2017, didn't it? The
24  relationship between Duf -- I'm sorry. The relationship

Page 116

1  between Duffie and HII began in 2017; right?
2         MS. CHATTIN: Object to the form.
3  BY THE WITNESS:
4      A.  Okay. I'm -- I'm just confused to what -- I
5  thought that was the original audit document that you
6  were showing me. I -- I didn't -- I'm sorry. I don't
7  know the date of that document that you just showed me,
8  if that's a later site visit.
9  BY MR. BURKE:
10     Q.  Yeah. That was dated June --
11     A.  Okay.
12     Q.  -- June 2018.
13     A.  Okay. My apologies. I did not see the date.
14  There was a site visit to approve onboarding, and then
15  there were -- as you mentioned, there are later site
16  visits where the auditor would go and -- and do follow-up
17  audits.
18     Q.  Right. So I mean to your knowledge, did the
19  Duffie agency ever implement any sort of written policy
20  or procedure at all?
21         MS. CHATTIN: Object to the form.
22  BY THE WITNESS:
23     A.  I am not -- I am not aware of any of their
24  policies and procedures. That would be something that

Page 117

1  Compliance would have reviewed.
2  BY MR. BURKE:
3      Q.  Okay. But you -- you were -- you were tasked
4  with communicating with the Duffie agency about TCPA
5  complaints; right?
6      A.  I would be asked by Compliance if I were --
7  if I was supposed to contact the agency about a TCPA
8  matter, yes. Yes.
9      Q.  Okay. Exhibit E is another compilation.
10  It's kind of a long one. I just sent it to your lawyer.
11  Okay. This document is a -- well, like I said, it's a
12  compilation of documents. It's 94 pages long, and it's
13  sort of a hodgepodge of complaints. And so we're just
14  going to run through some of these, and I'll tell you the
15  Bates range of what we're talking about as I ask these
16  questions because I think we're going to skip a few.
17         But the first two pages were produced by NCE
18  in this action, Bates 560 to 561, and it actually
19  concerns this lawsuit which was filed around spring of
20  2018. Do you remember ever investigating anything having
21  to do with this lawsuit, Mary Bilek, et al. in 2018?
22         MS. CHATTIN: I'm going to instruct the
23  witness not to disclose any communications she may have
24  had with in-house counsel or outside counsel with respect

Page 118

1  to this or any lawsuit. Otherwise she can answer.
2  BY MR. BURKE:
3    Q.  Why don't I ask it this way. Before --
4  before -- before this deposition had you ever heard of
5  Mary Bilek?
6    A.  Yes.
7    Q.  Okay. And before this lawsuit -- well, let's
8  see. That's not going to work.
9      In the spring of 2018, did you come to
10  communicate with Sean Duffie or anyone in his agency
11  having to do with Mary Bilek?
12    A.  I don't know. I don't -- I don't know.
13    Q.  Who's Janis Rosenthal I see here on 560?
14    A.  She used to be our inside -- HII's inside
15  counsel.
16    Q.  Was Ms. Rosenthal someone who was tasked with
17  dealing with TCPA complaints?
18      MS. CHATTIN: Object to the form.
19  BY THE WITNESS:
20    A.  Yes. It's my understanding she was involved
21  in any legal matters connected to HII.
22  BY MR. BURKE:
23    Q.  Okay. And this complaint mentions Cigna,
24  doesn't it?

Page 119

1    A.  The e-mail I'm looking at, yes, says Cigna.
2    Q.  Okay. Do you remember any other complaints
3  concerning HII and Cigna or Aetna or Blue Cross?
4    A.  Not specifically, no.
5    Q.  Well, generally do you remember that sort of
6  thing coming up?
7    A.  No. I would be involved in a complaint
8  specific to a specific person, policyholder, carrier.
9  Cigna was a company that HII -- a carrier that HII worked
10  with at one point, so it could be. I don't have any
11  specific recollection to any Cigna complaints. Blue
12  Cross Blue Shield was not a carrier that HII worked with,
13  so we did not have that relationship with -- with Blue
14  Cross Blue Shield.
15    Q.  Okay. Going to the next complaint, Page 3 of
16  Exhibit E at HII 4833 to 4834, do you remember doing any
17  sort of investigation as to a complaint from a person
18  named Michael Todd?
19    A.  I do not specifically remember that name.
20    Q.  Did you -- don't tell me what you guys may
21  have said to each other, but did you ever have occasion
22  to speak with Robby Birnbaum?
23    A.  I have spoken with Robby in the past, yes.
24    Q.  Okay. And I see that Dan Garavuso refers to

Page 120

1  the complainant as a bottom feeder, and I've seen bottom
2  feeder come up a few times in the documents that I've
3  reviewed. Do you remember that term ever coming up in
4  your correspondence having to do with TCPA complaints?
5    A.  Not that I recall.
6    Q.  Okay. Turning to the next complaint, this is
7  a big one in terms of pages. It was produced by HII at
8  Bates 4790 consecutive to 4832. Do you remember this
9  complaint?
10    A.  Abramson?
11    Q.  Yeah.
12    A.  He just -- his name is just very familiar
13  because he was a repeat TCPA litigant.
14    Q.  Okay. So -- and you have -- you have this
15  document also in front of you. You don't have to just
16  rely on my screen.
17      MS. CHATTIN: Sorry. Amy, do you have the
18  document? I e-mailed it to you. I just want to confirm
19  that you do.
20      THE WITNESS: Yes. The 94-pager, yes.
21  BY MR. BURKE:
22    Q.  Yeah, and we're on --
23      THE WITNESS: I have that in my inbox.
24  BY MR. BURKE:

Page 121

1    Q.  -- Page 6 of the PDF if you want to follow
2  through -- follow along.
3    A.  If -- if you're okay with it, I'm going to
4  keep looking at what you have on the screen so we're
5  talking about the same thing, and if I have to refer to
6  the other doc, I will.
7    Q.  Great. Okay. So it looks like this
8  complaint was a formal written complaint dated May 25th,
9  2018. Do you have any reason to believe that you didn't
10  receive this complaint around that date?
11    A.  I may have -- I don't have a specific
12  recollection of this exact complaint, but I have no
13  reason to think -- if I was asked to get information on
14  it, I would have seen it, yes.
15    Q.  Okay.
16    A.  But I just don't recall this specific
17  document.
18    Q.  Okay. And I see that you sent this to Scott
19  Shapiro. Do you remember why you sent it to Mr. Shapiro?
20    A.  I -- I don't.
21    Q.  Okay.
22    A.  I don't remember this.
23    Q.  I see a reference here -- you ask
24  Mr. Shapiro in this e-mail: "Can you see if this lead

Page 122

1 came from Bennett." Do you see that?
2    A. I do.
3    Q. Who is Bennett?
4    A. I have no idea. I don't know.
5    Q. Okay.
6    A. I'm assuming it's a lead vendor of some kind.
7    Q. Okay. And I see here that the allegation
8 here is that there was a pre-recorded message that says
9 that they have pre-approvals ready in your area including
10 Cigna, Blue Cross, Aetna, United and many more. Do you
11 see that?
12    A. I see that, yes.
13    Q. Okay. Did you follow up with the Duffie
14 agency, Mr. Shapiro, Mr. -- Ms. Griffin, Mr. Duffie,
15 anybody about this alleged pre-recorded message?
16    A. I don't recall this.
17       MS. CHATTIN: Object to the form.
18 BY THE WITNESS:
19    A. I don't recall this one, so I don't know what
20 sort of follow-up would have occurred.
21 BY MR. BURKE:
22    Q. Do you remember if you spoke with Mr. Shapiro
23 or anyone else on the phone about this complaint?
24    A. Again, I do not recall this complaint

Page 123

1 specifically, so no, I don't -- I don't remember.
2    Q. Did you have like a process that you usually
3 went through when you reached out to agencies such as the
4 Duffie agency having to do with complaints, TCPA
5 complaints, or was it just ad hoc?
6    A. It was -- I was told to get specific
7 information from Compliance. I was directed to get
8 specific information, and that information would vary, so
9 they might ask me would you get X, Y and Z on one case
10 and only ask for me to get X on another case, so it would
11 vary by what the complaint was and what the Compliance
12 area needed me to go get for them.
13    Q. Okay. Well, this complaint has several I
14 would call them red flags. First of all, the
15 pre-recorded message he mentions says that they have
16 pre-approvals for Blue Cross. I mean does -- does HII --
17 I think you testified earlier HII doesn't have anything
18 to do with Blue Cross; right?
19    A. Correct. We do not have -- we do not have
20 Blue Cross as a carrier.
21    Q. Okay. And you don't remember any follow-up
22 on -- on that issue -- Cigna, Blue Cross, Aetna, United;
23 is that right?
24    A. I do not. This would be -- this looks to be

Page 124

1 something that would be sitting with the Compliance and
2 Legal Department not -- not me.
3    Q. Well, you're the person who deals directly
4 with the agency; right --
5       MS. CHATTIN: Object to the form.
6 BY MR. BURKE:
7    Q. -- about complaints?
8       MS. CHATTIN: Object to the form.
9 BY THE WITNESS:
10    A. I am -- what I -- what I testified to earlier
11 is I am -- I'm the main contact for -- between the agency
12 and HII. However, every department as needed can contact
13 the agency with or the agent with whatever they need, so
14 in cases, legal cases oftentimes -- and typically the
15 Legal Department and the Compliance Department would work
16 with the agency directly and I would not be involved, but
17 I -- I would be the main contact but not the only
18 contact.
19 BY MR. BURKE:
20    Q. Okay. And did it peak your interest that
21 this pre-recorded message doesn't mention, for example,
22 Chubb or Federal Insurance or American Financial or any
23 of the other insurance agencies that you mentioned
24 earlier today that HII works with?

Page 125

1       MS. CHATTIN: Object to the form.
2 BY THE WITNESS:
3    A. Does it peak my interest right now?
4 BY MR. BURKE:
5    Q. No, at the time. At the time.
6    A. I don't recall this -- this document, so I
7 can't -- can't guess my thoughts on it.
8    Q. Well, I mean you could still remember things
9 about the complaint even though you don't remember the
10 document, so I'm just asking, right. So I mean do you
11 remember being surprised that the insurance carriers that
12 HII worked with were not mentioned in this pre-recorded
13 message?
14       MS. CHATTIN: Object to the form.
15 BY THE WITNESS:
16    A. I mean I'm -- I'm -- my -- I'm looking at
17 this and this would be -- this is something that the
18 vendor is potentially doing to create -- to do lead
19 generation, so I don't know if they're creating leads for
20 these other companies. HII carriers might fall into the
21 "and many more," so we have no way of knowing who the
22 lead vendor is selling leads to if there are -- if
23 they're selling leads to companies and agencies that sell
24 Blue Cross and Aetna, for example.

32 (Pages 122 - 125)

Page 126

1 BY MR. BURKE:
2     Q.   So would you say it's -- it's -- it was HII's
3 policy that neither HII nor HII's carriers need to be
4 mentioned during a lead generation call?
5         MS. CHATTIN:  Object to the form.
6 BY THE WITNESS:
7     A.   Again, HII is not connected to lead vendors.
8 We are connected to the agents and the products that
9 they're selling, so we need to make sure that the
10 customer when they choose an HII carrier product
11 understands what they have purchased and understands what
12 carrier and benefits are connected to that -- to that
13 product.
14 BY MR. BURKE:
15     Q.   Okay.  But the question is was it consistent
16 with HII's policy that a pre-recorded message that was
17 made by a lead generation did not have to mention HII or
18 the carriers that HII was working with.
19         MS. CHATTIN:  Object to the form.
20 BY THE WITNESS:
21     A.   I have no idea what our Compliance and Legal
22 area specifically said about this topic outside of my --
23 my job functions.
24 BY MR. BURKE:

Page 127

1     Q.   So you just don't know?
2     A.   I don't know.
3     Q.   Okay.  Do you remember the resolution of the
4 Abramson complaint, this particular complaint, or any of
5 them really?  Was there a -- was there a payment to
6 Mr. Abramson by anybody?
7     A.   I don't know.
8     Q.   Okay.  And then just to sort of close the
9 loop, we talked about cancellations and that HII was
10 effectuating cancellations.  On Bates 4799 we see a
11 cancellation here; right?
12     A.   Yes.
13     Q.   And HII did the whole -- the whole kit and
14 caboodle; right?
15         MS. CHATTIN:  Object to the form.
16 BY MR. BURKE:
17     Q.   Who effectuated the cancellation -- was it
18 HII or a carrier or an ancillary product that effectuated
19 it?
20     A.   I don't know where the -- the cancellation
21 came from.  I'm assuming it's the customer that would
22 want to cancel, and if the customer called HII or
23 e-mailed HII to cancel, HII would then cancel that
24 policy.

Page 128

1     Q.   Okay.  And this -- this is the cancellation
2 e-mail; right?
3     A.   This e-mail is from HII to the customer
4 notifying the customer that the cancellation has been
5 completed.
6     Q.   Right.  So it was HII who effectuated it
7 rather than the insurance company which I think in this
8 case was Chubb; right?
9     A.   Correct.  Correct.  It would come through HII
10 not the carrier directly.
11     Q.   Here's the Bates 4802 Welcome e-mail that we
12 reviewed before that was part of Exhibit E.  I mean as we
13 scroll through this documentation provided by Stewart
14 Abramson, is it your understanding that all these
15 documents were sent directly to Mr. Abramson who was
16 using a pseudonym Colin West by HII and not Chubb or NCE?
17         MS. CHATTIN:  Object to the form.
18 BY THE WITNESS:
19     A.   It's the signed document.  Can you go to the
20 top of what this document is?  I just want to make sure.
21 BY MR. BURKE:
22     Q.   Yeah.
23     A.   But to answer your question, if it is an
24 e-signed document, it is something that would have been

Page 129

1 system generated by the HII software sent to the customer
2 directly where the customer signs off indicating that
3 they understand what they are purchasing.
4     Q.   Okay.  And HII sent that e-mail; right, with
5 all these links to these contracts --
6     A.   Again, this is --
7     Q.   -- is that right?
8     A.   It's a system-generated e-mail by HII.
9     Q.   Oh, and I see ACUSA here.  Is this what
10 you're talking about when you mentioned ACUSA earlier?
11     A.   Where do you see that?  Yes, it's -- this is
12 ACUSA.
13     Q.   Now, is ACUSA -- what's the relationship
14 between HII and ACUSA?  I'm surprised to see an HII logo
15 on this document.
16     A.   You will see the HII doc -- e-mail -- I'm
17 sorry -- logo throughout the document because it is a
18 document that puts together all the pieces which includes
19 the association as I mentioned earlier.  It's a
20 requirement in order to have access to the health
21 insurance benefits and products.  So the relationship is
22 as I -- as I mentioned earlier today, HII has
23 relationships with many different associations.  The
24 associations are then connected to specific carriers and

33 (Pages 126 - 129)

Page 130

1  products, and per the states and the legislation of how
2  these products were filed with the states, they have to
3  purchase the association benefits in order to get health
4  insurance.
5      Q.  But does HII own ACUSA or did it?
6      A.  No.  No.  No.
7      Q.  And I see down at the bottom of this page
8  which is HII Bates 4815 the customer agrees that HII or
9  other authorized agent may debit his bank account or
10  credit card to pay for ACUSA.  Do you see that?
11      A.  Um-hum.
12      Q.  Yes?
13      A.  Yes, I do.  Yes.
14      Q.  Okay.  And so was it normal for HII to accept
15  payments for the products and services the carriers --
16  the ancillary products and services directly from
17  customers?
18      A.  HII was the administrator and HII managed --
19  did charge credit cards and bank accounts, yes.
20      Q.  Okay.  And was that what they normally did or
21  was that the exception?
22      A.  That is what they normally did.
23      Q.  Okay.  Well, gosh, this one signed up for
24  both Med-Sense and ACUSA; isn't that right?

Page 131

1      A.  I'm so sorry.  This one is -- so I mentioned
2  earlier that different products -- sorry about that.
3  Different products are connected to different
4  associations.  So a short-term medical, for example,
5  could be connected to ACUSA and a critical illness plan
6  might be connected to Med-Sense.  So depending on the way
7  the products are filed, there may be two products
8  purchased.  To give you another example, you can actually
9  purchase a short-term medical plan and a limited medical
10  plan at the exact same time to provide more benefit to a
11  customer, so that would be another example of how two
12  products were sold with two different associations.
13      Q.  And then I see on HII 4828 "Terms and
14  Conditions of Electronic Delivery of Insurance
15  Documents."  What's the purpose of this document?
16      A.  I don't know exactly what this is but --
17      Q.  Well, let me ask you something related.  Was
18  there any document like this having to do with electronic
19  delivery of -- of contracts, electronic signatures
20  between HII and insurance agents such as Sean Duffie or
21  his agency?
22      A.  I'm sorry.  Can you rephrase that?  I don't
23  understand what you're asking.
24      Q.  So sometimes the law requires -- when you

Page 132

1  have an electronic signature or documents being delivered
2  electronically, there's a requirement that before the
3  document is signed the signer has to consent to
4  electronic signatures.  So I'm asking you whether there
5  was anything like that that HII had with regard to its
6  contracts with its agents such as Duffie?
7      A.  I don't know.  That's something we'd have to
8  look -- talk to Legal or look through the contracts to
9  see what sort of language is in there.  I don't -- I
10  don't know.
11      Q.  Well, you were -- you were in charge of
12  onboarding; right?
13      A.  Correct.
14      Q.  Okay.  So at least in your --
15      A.  I'm sorry.  I'm sorry.  I assisted with
16  onboarding agents through the -- through the process, but
17  the licensing paperwork was all in the system and would
18  be e-mailed directly from the licensing system directly
19  to the agent.
20      Q.  Okay.  As far as you know, there was no sort
21  of like consent to electronic signature or e-sign consent
22  that the agents provided to HII; is that right?
23      A.  I don't know if there is or there isn't.
24  It's just not something I -- I recall.

Page 133

1      Q.  As far as you know, there's nothing like
2  that; is that right?
3      MS. CHATTIN:  Object to the form.
4  BY THE WITNESS:
5      A.  I don't know that there is or there isn't.
6  BY MR. BURKE:
7      Q.  Well, you know what you know; right?
8      A.  I don't know --
9      MS. CHATTIN:  Objection.
10  BY MR. BURKE:
11      Q.  So I'm just asking -- yeah, no, I don't have
12  an answer.  The question is have you ever seen anything
13  like this, like an e-signed consent between HII and
14  insurance agents like Duffie.  It's an easy yes or no.
15      MS. CHATTIN:  Yeah, you didn't ask that
16  question, but you can answer that question.
17
18  BY THE WITNESS:
19      A.  I don't know if it's in the GA contract.
20  That's what I'm saying.  It may be in the -- in the
21  contract.  At HII they would put the proper disclosures
22  and information in the contract with an agent.  I don't
23  know that that -- what is in -- exactly what is in that
24  contract, what is not, so I don't know if it's in there

34 (Pages 130 - 133)

Page 134

1  or not. I trust in the Legal Department and the
2  Compliance Department at HII that we're communicating
3  properly and we are within our rights communicating to
4  the agents that are licensed and appointed to market the
5  carriers we work with.
6  BY MR. BURKE:
7      Q.  Would you just answer my question?
8          MS. CHATTIN:  Objection. She answered the
9  question.
10         MR. BURKE:  She did not.
11 BY MR. BURKE:
12     Q.  Amy, have you ever seen anything like this
13 between HII and Duffie or not?
14         MS. CHATTIN:  Object to the form. Please
15 don't interrupt me or the witness.
16             You can answer the question, Amy, if you
17 are able to.
18 BY THE WITNESS:
19     A.  I don't recall this specific document, but
20 I'm not saying it doesn't exist. It may be in the GA
21 contract, and it's probably something we should look at
22 in the GA contract. I -- I do not recall seeing this
23 specific document, but I'm saying I don't know if it
24 exists or if it doesn't exist. I trust in the process of

Page 135

1  the Licensing Department and the Compliance Department
2  that we're communicating properly with the agents that
3  complete paperwork to work with us.
4  BY MR. BURKE:
5      Q.  Is it true or false that you never saw any
6  sort of e-sign consent contract between HII and an
7  insurance agent like Sean Duffie?
8          MS. CHATTIN:  Object to the form.
9  BY THE WITNESS:
10     A.  I don't know.
11 BY MR. BURKE:
12     Q.  You don't remember seeing anything like that;
13 is that true?
14         MS. CHATTIN:  Object to the form.
15 BY THE WITNESS:
16     A.  I do not recall this specific -- I do not
17 recall this specific document.
18 BY MR. BURKE:
19     Q.  I'm not asking about this specific document.
20 Please answer my questions. This is going to being a
21 long day.
22     A.  I'm not -- I'm not trying to be difficult. I
23 don't know.
24     Q.  Why are you talking about stuff like how you

Page 136

1  trust in the Legal Department when I ask you whether
2  you've ever seen a document? I'm asking whether you ever
3  saw a document that provides e-sign consent. I'll ask
4  you this. You ever heard of e-sign?
5          MS. CHATTIN:  Alex, ask her questions. We
6  don't need commentary about what she -- how she's trying
7  to answer your question. Okay?
8          MR. BURKE:  I just want --
9          MS. CHATTIN:  Ask her a question.
10         MR. BURKE:  -- answers to my questions.
11         MS. CHATTIN:  Then ask her a question.
12         MR. BURKE:  Stop it. Stop it with the
13 speaking objections. I'm asking yes or no questions, and
14 I'm getting this soliloquy about trusting the Legal
15 Department. I'm asking her what her recollection is,
16 whether she remembers ever seeing something, and she
17 gives me a five-sentence answer. It's a yes or no
18 answer.
19 BY MR. BURKE:
20     Q.  Have you ever heard of e-sign?
21         MS. CHATTIN:  Object to the form. The witness
22 can answer as best she can in whatever way she thinks is
23 the best way to answer the question.
24             Go ahead and answer.

Page 137

1          MR. BURKE:  That's an improper -- that's an
2  improper objection, and, Danielle, if you keep doing
3  that, we're calling the Court. Stop it.
4          MS. CHATTIN:  Well, you're yelling at the
5  witness, Alex, and you're bullying her, and you're making
6  inappropriate testimony on the record.
7          MR. BURKE:  I certainly --
8          MS. CHATTIN:  Ask your questions, and she will
9  answer them.
10         MR. BURKE:  I certainly am not. All I am
11 asking is for a yes or no, and I'm not getting it.
12 BY MR. BURKE:
13     Q.  I don't care whether you trust the Legal
14 Department. That's not what I'm asking. I'm asking
15 whether you've ever seen a document that mentions e-sign.
16 Have you ever seen any document at HII that mentions
17 e-sign?
18         MS. CHATTIN:  Object to the form.
19             Go ahead and answer.
20 BY THE WITNESS:
21     A.  I am not trying to be difficult. What I'm
22 saying is this information may be in the general --
23 general agent's contract and I just don't recall this
24 exact information, so I can't say yes or no because I

35 (Pages 134 - 137)

Page 138

1  don't recall what's in the GA contract. I haven't looked
2  at the GA contract.
3  BY MR. BURKE:
4      Q.  I'm asking you what you remember.
5      A.  I don't recall this.
6      Q.  Okay. You don't recall ever hearing about
7  e-sign; is that correct?
8      A.  E-sign --
9      Q.  Just answer it.
10     A.  -- is part of the -- yes.
11     Q.  It's correct that you never heard of e-sign?
12     A.  No.
13     Q.  All right. Tell me --
14     A.  I heard of e-sign.
15     Q.  Tell me about how you've heard of e-sign in
16 the context of HII.
17     A.  E-sign is in the verification process that we
18 have discussed many times. There is a document that the
19 customer will e-sign in many different places throughout
20 that verification document to show HII that they
21 understand the product, its benefits, services.
22     Q.  Any other context in which you dealt with
23 e-sign while at HII?
24     A.  No, not that I can recall.

Page 139

1      Q.  Great. All right. Here we are PDF Page 48,
2  Bates 4256 to 4257. All right. Do you remember dealing
3  with this complaint from George Moore at all?
4      A.  I do not recall this specific individual.
5      Q.  Okay. Okay. Complains about use of a
6  pre-recorded voice. Did you ever speak with anybody at
7  the Duffie agency or on their behalf about using a
8  pre-recorded voice at all?
9      A.  I don't recall that specific conversation.
10 That was a general conversation that we had with many
11 agents to make sure that they were working with proper
12 vendors and that we did not approve of pre-recorded
13 voice.
14     Q.  Well, that policy that we looked at before, I
15 think it was Exhibit, Exhibit D, didn't prohibit
16 pre-recorded voices; isn't -- messages; isn't that true?
17     MS. CHATTIN:  Object to the form.
18 BY MR. BURKE:
19     Q.  Here it is.
20     A.  Yes, that's --
21     Q.  I mean my reading of this --
22     A.  Yes.
23     Q.  -- says go ahead and use pre-recorded voices
24 as long as it's not deceptive messaging.

Page 140

1      MS. CHATTIN:  Object to the form.
2  BY MR. BURKE:
3      Q.  Would you agree -- would you agree or would
4  you disagree?
5      MS. CHATTIN:  Object to the form, and for the
6  record, you can put up Exhibit D to look at.
7  BY THE WITNESS:
8      A.  I don't -- I don't know what our -- what
9  our -- what the Compliance Department's specific opinion
10 about pre-recorded message is. I'm looking at a document
11 that I have not seen before today that -- reading right
12 now and it says if -- said it's about deceptive
13 messaging, that that is the issue with pre-recorded
14 calls. That's what I'm reading here for the first time
15 today.
16 BY MR. BURKE:
17     Q.  Okay. And is that inconsistent -- is that
18 inconsistent with your understanding of the policy as to
19 pre-recorded messages in 2017 and '18?
20     A.  My understanding of the pre-recorded messages
21 is what we just talked about, that they cannot be
22 misleading.
23     Q.  Okay. So you don't remember this George
24 Moore complaint at all I think was your testimony? I'll

Page 141

1  put it back up.
2      A.  I don't recall that specific individual.
3      Q.  Do you remember -- do you remember any
4  conversations at all or communications with the Duffie
5  agency, Shapiro, Duffie, Griffin, anyone else about
6  pre-recorded messages?
7      A.  I don't recall conversations specifically
8  about pre-recorded messages.
9      Q.  Do you have any recollection of whether there
10 was any sort of discipline to the Duffie agency having to
11 do with TCPA issues, whether it's pre-recorded message,
12 whether it's do not call, whether it's internal do not
13 call before, you know, the end of 2018?
14     A.  I recall that there were a number of TCPA
15 violation complaints that came in, and HII Compliance
16 Department came to me and said they need to be on a
17 program called Trusted Form or a product called Trusted
18 Form and that we were requiring that of the agency.
19     Q.  What was the Trusted Form?
20     A.  Trusted Form was a program that -- that an
21 agent required their lead vendor to -- to participate in,
22 and Trusted Form would be a document that if the agent
23 requested it, they would have a copy of the Trusted Form
24 document, could share it with HII, that ultimately would

36 (Pages 138 - 141)

Page 142

1  show that that customer fully opted in and would have all
2  the information about this opt-in on this form called
3  Trusted Form, and it was the best way of making sure that
4  the -- the customers were properly opted in before they
5  were transferred to an HII agent.
6      Q.   Isn't it true that Duffie never really
7  implemented that Trusted Form that you -- that you
8  described?
9          MS. CHATTIN:  Object to the form.
10 BY THE WITNESS:
11     A.   I don't -- I know that they were in the
12 process of setting up the Trusted Form system immediately
13 after I asked them to get on it, and that was verified by
14 this company which was a third party called Active
15 Prospect who was working with them to get the process set
16 up.
17 BY MR. BURKE:
18     Q.   Okay.  But the process that you set up wasn't
19 the process that you just described; right?
20     A.   I don't understand your question.
21     Q.   Isn't it true that Duffie really only used a
22 service that scrubbed problem phone numbers out of its
23 dialer?
24         MS. CHATTIN:  Object to the form.

Page 143

1  BY THE WITNESS:
2      A.   So the -- Active Prospect is the name of the
3  company that provided the Trusted Form process.  Getting
4  set up on the Trusted Form process could take a month in
5  some cases based on the technology talking to -- to each
6  other between the vendor and the agent.  Immediate
7  benefit to using Active Prospect is they allowed the
8  agents to use a do not call list scrubber and some other
9  technology that would -- that would assist in making sure
10 that those calls were -- were not on the do not call list
11 while the Trusted Form was being implemented, so we tried
12 to do something immediate while Trusted Form was getting
13 set up.
14 BY MR. BURKE:
15     Q.   Wait a second.  Isn't it true that -- that
16 the Duffie agency was just scrubbing a serial litigator
17 DNC list rather than a true internal DNC list?
18         MS. CHATTIN:  Object to the form.
19 BY THE WITNESS:
20     A.   I can tell you what Active Prospect provides
21 the agents that are getting on Trusted Form.  I cannot
22 tell you what --
23 BY MR. BURKE:
24     Q.   I want to know what happened with Duffie.

Page 144

1      A.   I don't know what Duffie did.  All I know
2  is -- is the -- the program that we provided Duffie
3  through Active Prospect had three components.  One was a
4  serial litigator.  Two was a full DNC scrub, and three
5  was Active -- I'm sorry -- Trusted Form, so all three
6  were components of the Active Prospect company and what
7  they offered.
8      Q.   To your knowledge, did HII ever have a
9  company-specific or internal do not call list?
10     A.   HII would compile any numbers -- numbers of
11 any individuals that are on a do not -- that we were --
12 that we would learn about that people would call and say
13 or let us know that they didn't want to be called.  We
14 would compile -- any information that we would get from
15 anybody that doesn't want to be called we would put on a
16 list.
17     Q.   Okay.  And did HII -- so -- so was there a
18 written policy having to do with that list?
19         MS. CHATTIN:  Object to the form.
20 BY THE WITNESS:
21     A.   I -- I don't know -- I don't know what you
22 mean by written policy.  I don't know of any written
23 policy connected to that list.
24 BY MR. BURKE:

Page 145

1      Q.   Okay.  So as far as you know, there was no
2  formal internal do not call policy in writing at HII; is
3  that right?
4          MS. CHATTIN:  Object to the form.
5  BY THE WITNESS:
6      A.   You asking about if we compiled a list, and
7  the answer is we did compile a list.  Any time anyone
8  said do not call me they were put on a list, and that
9  list was maintained by the Compliance Department.
10 BY MR. BURKE:
11     Q.   Was there any formal written policy having to
12 do with internal do not call at HII, that, for example,
13 if a consumer asked for a copy HII would provide it?
14         MS. CHATTIN:  Object to the form.
15 BY THE WITNESS:
16     A.   I don't know.  I don't know if -- if -- if
17 there was something like that to provide to customers.
18
19 BY MR. BURKE:
20     Q.   Okay.
21     A.   I'm not aware.
22     Q.   Did you ever receive training on anything
23 like that?
24     A.   No.

37 (Pages 142 - 145)

Page 146

1   Q.  Okay.  Let's continue with this exhibit.
2   Okay.  So you were talking about making a do not call
3   list from complainants.  So like would you expect that
4   George Moore would be on the do not call list because he
5   sent a complaint?
6       A.  If George Moore sent this complaint to HII
7   which it appears that he had -- he did, I would expect
8   his phone number to be on the list of not to call, on our
9   internal list, yes.
10      Q.  Okay.  And is there a -- like a spreadsheet
11  with that list somewhere?
12      MS. CHATTIN:  Object to the form.
13  BY THE WITNESS:
14      A.  Yes.  Yes.  Sorry.
15  BY MR. BURKE:
16      Q.  Yes?
17      A.  Yes.
18      Q.  Who maintained that list?
19      A.  The Compliance Department.
20      Q.  Did you ever see that spreadsheet?
21      A.  Yes.
22      Q.  Are you sure that spreadsheet wasn't a list
23  of customers who asked not to be called by telephone
24  rather than a list of non-customers who asked not to

Page 147

1   receive robocalls or other telemarketing calls?
2       MS. CHATTIN:  Object to the form.
3   BY THE WITNESS:
4       A.  Sales Department -- I was given a list of
5   customers and individuals that said do not call me, okay,
6   that HII somehow connected with that said do not call me.
7   That was a list.  I don't know the specifics as to what
8   individuals were on that list, but those are people that
9   said to HII in some way, shape or form do not call me.
10  So Sales would be provided a list on regular -- on a
11  regular basis.  We would e-mail that list out to as many
12  agents as we could, anybody that would be selling over
13  the phone.  We wanted them to have that list.  So --
14  that's it.
15  BY MR. BURKE:
16      Q.  When the e-mail with the list was sent, who
17  sent it -- was it you or someone else?
18      A.  So -- so the process evolved a little bit.
19  In the beginning, it was just kind of a manual list that
20  somebody managed in Compliance, sent it to the Sales
21  team.  The Sales individuals, the Sales reps would send
22  it to all of their accounts.  Ultimately it became a list
23  that was housed in the back end portal for agents so that
24  they could go and view it at any point and export that

Page 148

1   list at any point but -- so it did evolve into --
2       Q.  If there was no written policy having to do
3   with the internal do not call list, how were agents
4   supposed to know that it was there?
5       MS. CHATTIN:  Object to the form.
6   BY THE WITNESS:
7       A.  Can you ask that question again?
8       MR. BURKE:  Kelly, would you read it back?
9           (Requested portion of the
10          record read.)
11  BY MR. BURKE:
12      Q.  If there was no written policy, how were
13  agents supposed to know that the do not call list was
14  there?
15      MS. CHATTIN:  Object to the form.
16  BY THE WITNESS:
17      A.  At some -- at some point HII had every single
18  agent sign the document specific to selling over the
19  phone with their responsibility of understanding all of
20  the different rules, laws, regulations connected to
21  selling over the phone.  HII Compliance and Legal
22  Department came out with a form, an agreement that every
23  agent did have to sign in order to continue to offer HII
24  products, so there was a document that every agent had to

Page 149

1   sign specifically connected to selling over the phone.
2   BY MR. BURKE:
3       Q.  Isn't it true that each agent was required to
4   keep its own do not call list but that it was not
5   required to coordinate that list with HII's list?
6       MS. CHATTIN:  Object to the form.
7   BY THE WITNESS:
8       A.  We provided the list to the agents for them
9   to put it into their own do not call database.
10  BY MR. BURKE:
11      Q.  Let me ask you this.  Were agents required to
12  provide notice of do not call requests to HII?
13      MS. CHATTIN:  Object to the form.
14  BY THE WITNESS:
15      A.  Yes.
16  BY MR. BURKE:
17      Q.  Okay.  Was there a document that said they
18  were supposed to do that?
19      A.  That document I just described to you, I
20  believe in that document it says if they are provided any
21  information of do not call that they're to share with
22  HII.  I believe that is in that document.
23      Q.  But you don't know what that document was?
24  I'm just surprised by all this because, you know, we've

Page 150

1  had lots of conversations about do not call policies and
2  lists, and I believe I have interrogatories, sworn
3  interrogatory answers that say there's no policy, and I
4  also have sworn interrogatory responses that I think I
5  can dig up that say that there's no DN -- do not call
6  list except for existing customers.  So I'm surprised to
7  hear this testimony.  I didn't really put that stuff
8  together to ask you about because I didn't expect you to
9  say this stuff.  So either -- either I just had a
10 misunderstanding of what was going on or maybe, you know,
11 is it possible that your testimony about this stuff is
12 incorrect?
13       MS. CHATTIN:  Objection.  Alex, Ms. Brady is a
14 fact witness.  She's not a corporate representative.  She
15 is answering to the best of her knowledge and
16 recollection.  If you have a question for her, just ask
17 her the question.
18
19 BY MR. BURKE:
20    Q.  Yeah, I'm just -- that's my question.
21       MS. CHATTIN:  Can you repeat your question?  I
22 lost it in the -- in the testimony you were giving.  So
23 what was the question?
24 BY MR. BURKE:

Page 151

1    Q.  Ms. Brady, go ahead.
2    A.  You asked me if --
3       MS. CHATTIN:  I would like to -- no.  No.  No.
4  Wait a minute.  I would like you to repeat what your
5  question is so I can form an objection if I need to,
6  Alex.
7       MR. BURKE:  You're -- you're charged with
8  listening to my questions and objecting and you're
9  charged with doing it and not disrupting my deposition
10 which you're doing on a regular basis.  Stop it,
11 Danielle.
12 BY MR. BURKE:
13    Q.  Ms. Brady, please answer the question.
14       MS. CHATTIN:  Ms. Brady, you can answer the
15 question if you know what the question is.
16       MR. BURKE:  Do that -- that's your second
17 warning, Danielle.
18       MS. CHATTIN:  Alex --
19       MR. BURKE:  If you ever -- just one moment.
20 If you ever say that again, we're calling the judge.
21 Stop it.  That's your second warning.
22       MS. CHATTIN:  If I ever say what -- if I ever
23 say what again?
24       MR. BURKE:  If you -- if you give speaking

Page 152

1  objections ever again, we're calling the judge tute
2  sweet.  Stop it.
3       MS. CHATTIN:  If we can tell the judge that
4  you're giving testimony and bullying the witness and
5  giving your own proclamations and representations, that's
6  fine, Alex.  Go right ahead.
7       MR. BURKE:  Danielle, we have -- we have very
8  good case law out of the 7th Circuit.  You don't live
9  here, so maybe you don't understand.  Your only objection
10 that you're allowed to make is form.  That's it.  You're
11 not allowed to say anything else unless you're objecting
12 based upon privilege.  Any other objections are totally
13 improper, and it's sanctionable, so stop it.  You're
14 disrupting the deposition purposefully and illegally.
15 Stop it.  We're going to call the judge, and we'll see
16 what he says.  Just stop it.
17       I can find a case citation for the -- for
18 the case if you'd like, but you're charged with knowing
19 the law in the jurisdiction of the case.  And it's a 7th
20 Circuit controlling case that says this.  And don't you
21 roll your eyes.  You're out of line.  You're disrupting
22 my deposition on purpose.  Stop it.
23       MS. CHATTIN:  I disagree.  I'm not disrupting
24 this deposition on purpose.  I want the record clear, and

Page 153

1  I want the witness to be able to answer to the best she
2  can.  That is -- I'm entitled to make sure that that is
3  the case.
4       MR. BURKE:  You are not.
5       MS. CHATTIN:  Please go ahead with your
6  questions, Alex.  Go ahead.
7       MR. BURKE:  You are not.  If she doesn't --
8       MS. CHATTIN:  Yes, I am.
9       MR. BURKE:  No, you are not.  If she doesn't
10 understand a question, she will say so.  If you don't
11 understand a question, tough.
12       MS. CHATTIN:  Okay.
13       MR. BURKE:  Ms. Brady -- Kelly, would you
14 please read the question back.  It's a long question.
15       I won't tolerate any more disruptions,
16 Danielle.  You know better.
17       MS. CHATTIN:  I disagree, Alex.  Okay.
18       MR. BURKE:  Then you don't know better.  And
19 you ought to read your case law.
20       MS. CHATTIN:  Okay.
21            (Requested portion of the
22             record read.)
23 BY MR. BURKE:
24    Q.  That was the question.  That was the

39 (Pages 150 - 153)

Page 154

1  question.  Is it possible that your testimony about this
2  internal do not call stuff is incorrect?
3       MS. CHATTIN:  Object to the form.
4  BY THE WITNESS:
5       A.  I have no idea.  There's so -- I just want to
6  be clear about the list that you're talking about at HII.
7  It was an informal list.  I said -- it was my testimony
8  that I don't know where these people are from.  I get a
9  list in Sales from Compliance that says these are people,
10  share with your agents to add to their do not call, and I
11  do what I am instructed.  I don't know where those
12  numbers are from, who those people are, how those phone
13  numbers are -- are procured.  It is -- I am told to share
14  a list with the agents I work with, and I share it.  I
15  hope I did not give you -- that I didn't confuse you on
16  that answer, but it's very, very simple.  I'm given a
17  list by Compliance.  They compile it, and I send it out.
18
19  BY MR. BURKE:
20       Q.  Okay.  And was it a piecemeal list or was it
21  like an Excel file?
22       A.  Piecemeal.
23       Q.  Piecemeal; right?
24       A.  Piecemeal.

Page 155

1       Q.  So it's not really a list.  It's like one by
2  one; is that right?
3       A.  It would be a list.  There was always more
4  than one, but it could be five one month, one the next
5  month.
6            (Zoom interruption.)
7       THE REPORTER:  I'm sorry.  I can't hear you.
8  BY THE WITNESS:
9       A.  The list was piecemeal.  We would get an
10  e-mail with a list of individuals and phone numbers or
11  phone numbers not individual's names, phone numbers not
12  to call, and we would send them out.  Some months it
13  would be five phone numbers on the list.  Sometimes it
14  would be 20.  It was very inconsistent, very piecemeal.
15  It was all in an e-mail format.
16  BY MR. BURKE:
17       Q.  Thank you.
18       A.  You're welcome.
19       MS. CHATTIN:  Alex, is this a good time for a
20  break or soon?
21       MR. BURKE:  Soon.
22  BY MR. BURKE:
23       Q.  Okay.  Here's another complaint that you sent
24  on June 12th, 2018 to Scott Shapiro.  "Hey, Scott, see

Page 156

1  below.  You called one of our employees today."  Do you
2  remember this situation?
3       A.  I do.
4       Q.  All right.  Who is Gamlen?
5       A.  Gamlen was an employee.  He worked mainly in
6  the Customer Service area.
7       Q.  Okay.  And you ask Scott Shapiro:  "Hey,
8  how'd you get this number and can you remove from your
9  dialer?"  So what did Scott tell you about where he got
10  that number, Gamlen's number?
11       MS. CHATTIN:  Object to the form.
12  BY THE WITNESS:
13       A.  This is not isolated to this individual
14  agent.  HII had a series of many, many agents calling
15  many, many employees at HII at their desk, desk phones
16  not just cell phones, desk phones, and somehow it -- it
17  appears that the employee directory of HII got in the
18  hands of a lead vendor, and so HII employees got in the
19  mix, and so HII employees were getting phone calls from
20  many agents not just about HII products, about all kinds
21  of different carrier products, so it was -- it was a
22  widespread thing that happened for a few months.  So
23  whenever we could find out who the agent was we would
24  then go to that agent and say can you help us figure out

Page 157

1  how this occurred.
2  BY MR. BURKE:
3       Q.  Right.  And my question was what did Scott
4  say when you asked him how did you get this number.
5       A.  I don't recall what the solution was.
6       Q.  What did he say?  I'm not asking about the
7  solution.
8       A.  He -- he --
9       Q.  You asked how did he get his number.  What
10  did he say?
11       MS. CHATTIN:  Object to the form of the
12  question.
13  BY THE WITNESS:
14       A.  He said what's the phone number and I will
15  look into it.
16  BY MR. BURKE:
17       Q.  Wait a second.  The phone number's in your
18  e-mail.  You even say:  "How did you get this number
19  below."
20       A.  Okay.
21       Q.  So that's not true, is it?
22       A.  Well, I'm saying --
23       Q.  What you said, it's not true, Ms. Brady.
24       MS. CHATTIN:  Object to the form.

40 (Pages 154 - 157)

Page 158

1  BY THE WITNESS:
2      A.   Okay.  I'm not --
3  BY MR. BURKE:
4      Q.   I would like --
5      A.   I'm looking at my --
6      Q.   I would like the truth, ma'am.
7          MS. CHATTIN:  Objection.  I think everyone
8  should ask a question, wait, answer the question, wait.
9  Let's try to keep the record clean.  Wait for the person
10  to finish talking, please.  Thank you.
11  BY THE WITNESS:
12      A.   My apologies.  I didn't look at the second
13  part of the e-mail.  I was just looking at my e-mail to
14  Scott in reading that.  So in this situation I would -- I
15  would have said to Scott how did you get this
16  information, how did you get his number, and Scott would
17  have said to me and probably said to me as he did with
18  all of the -- any time I asked him for information on a
19  number or a vendor he'd say let me go find it for you,
20  I'll go look into it.  So that is my recollection of it.
21  It is truth.  It is my recollection that he said to me I
22  will try and find out.
23  BY MR. BURKE:
24      Q.   Okay.  What did he determine?  Did he ever

Page 159

1  get back to you?
2      A.   I do not recall what the solution was or how
3  he responded.  I don't recall.
4      Q.   I mean did HII think that Gamlen opted in on
5  some website?
6          MS. CHATTIN:  Object to the form.
7          Go ahead.
8  BY THE WITNESS:
9      A.   He knew.  We knew agent -- our employees
10  never opted in, so that was sort of the hunt that I was
11  describing, that we were trying to find out how all of
12  our employees' information got connected to a lead
13  vendor, so I don't know that we ever found out, and
14  eventually the calls stopped, but it was something that
15  was going on for a while and the set -- it was coming
16  from all kinds of agents and all kinds of products.  So
17  it was just a very strange thing that happened that
18  nobody could really explain.
19
20  BY MR. BURKE:
21      Q.   Well, I mean this cell -- this call went to
22  Gamlen's cell phone not his office line as you said;
23  right?
24      A.   So on our direct --

Page 160

1          MS. CHATTIN:  Object to the form.
2  BY THE WITNESS:
3      A.   Okay.  So to -- to clarify -- I'm trying not
4  to talk for -- to give you -- talk and talk and talk.  In
5  our directory, anybody that worked in the home office had
6  a desk phone listed.  Any remote employees -- Gamlen
7  happened to be a remote employee, I was a remote
8  employee, for example -- would be our cell phones because
9  we didn't have desk phones, so our cell phones would be
10  in the company directory.
11  BY MR. BURKE:
12      Q.   So just to be clear, you don't remember what
13  Scott or someone else told you about where Happy Health
14  Plans got this phone number; is that right?
15      A.   I don't recall.
16      Q.   And why did you ask Scott to remove the
17  number from his dialer?
18      A.   If the call came from Sean Duffie's dialer,
19  which is what I'm being told by Dan Garavuso and Gamlen,
20  then want to make sure that any phone number that is not
21  an opt-in phone number isn't in an agent's dialer, so
22  that is a completely normal thing that we would tell an
23  agent to remove a number from their dialer if it wasn't
24  an appropriate number.

Page 161

1      Q.   Why -- why remove it?  Who cares if Gamlen
2  gets calls?  What's the harm?
3          MS. CHATTIN:  Object to the form.
4  BY THE WITNESS:
5      A.   Gamlen didn't opt-in, so shouldn't be getting
6  phone calls.
7  BY MR. BURKE:
8      Q.   Okay.  I mean was it your understanding that
9  Gamlen's time was being wasted by the robocall?
10          MS. CHATTIN:  Object to the form.
11  BY THE WITNESS:
12      A.   Gamlen didn't opt-in.
13  BY MR. BURKE:
14      Q.   How do you know that?
15      A.   He shouldn't be getting phone calls.  Because
16  Gamlen did not opt-in, and it was verified that none of
17  the employees opted in with their cell phones or home
18  phone numbers.
19      Q.   Right, but -- they didn't opt-in but they're
20  still getting robocalls and robocall means pre-recorded;
21  right?
22          MS. CHATTIN:  Object to the form.
23  BY THE WITNESS:
24      A.   I think so, yes.

41 (Pages 158 - 161)

Page 162

1 BY MR. BURKE:
2    Q.   Okay.  So I mean this seems like a big
3 problem; right?  I mean certainly Garavuso marked it high
4 importance; right?
5        MS. CHATTIN:  Object to the form.
6 BY THE WITNESS:
7    A.   That's something that the Compliance
8 Department -- Compliance Department was digging into
9 because it was happening as I said to many employees and
10 by many agents, and agents that weren't even HII agents
11 were making -- calling as well.  So this was a project
12 that the Compliance Department was involved in, digging
13 into and -- and finding out what -- what occurred.
14 BY MR. BURKE:
15    Q.   Well, but you're the one who reached out;
16 right?  So it --
17    A.   As I said earlier --
18    Q.   -- wasn't just the Compliance Department.  It
19 was you, and you asked how he got the number.  I can't
20 imagine how you would forget what his explanation was.
21 I'll ask it again.  I'll ask it this way.  Did Scott
22 Shapiro or anyone else at the Duffie agency provide an
23 explanation about where they got the number?
24    A.   I do not recall ever getting an explanation

Page 163

1 about these specific types of calls that came into
2 employees.  I don't recall ever hearing what -- if
3 anybody was able to -- to find out how these happened or
4 what lead vehicle they were from.  Again, it wasn't just
5 specific to this agent.  It was a lot of different agents
6 this occurred with, but I do not recall any solution or
7 any outcome about this specific situation.
8    Q.   Are you aware of any discipline or
9 termination or slap on the hand or even talking to that
10 Duffie or Shapiro or anyone over -- Marsha Griffin,
11 anyone over at the Duffie agency received arising from
12 this situation where there was an obviously
13 non-consensual robocall to an employee's cell phone?
14        MS. CHATTIN:  Object to the form.
15 BY THE WITNESS:
16    A.   I'm not aware of -- sorry.  I'm not aware of
17 any consequences that came down from Compliance.  I do
18 not recall any consequences about this specific
19 situation.  I just don't recall what occurred with it.
20        MR. BURKE:  Okay.  Let's take that break.
21 Let's get -- come back at quarter after.
22        MS. CHATTIN:  Okay.
23        THE VIDEOGRAPHER:  We're going off the record
24 at 2:09 p.m.

Page 164

1        (WHEREUPON, a break was
2         taken.)
3        This is media number four deposition of
4 Amy Brady.  Today is January 12th, 2022.  We're going
5 back on the record at 2:20 p.m.
6 BY MR. BURKE:
7    Q.   Okay.  So back to this Trusted Form and DNC
8 scrubbing, do you remember reaching out to the Duffie
9 agency to ask about do not call compliance?
10    A.   I don't -- I -- I don't know what you mean by
11 do not call compliance.  If you could elaborate on that,
12 it would be great.
13    Q.   Do not call scrubbing.
14    A.   I -- I connected the Duffie -- Sean Duffie
15 with Active Prospect which was the company that's
16 connected to Trusted Form, and with Active Prospect they
17 offered those three different things that I talked about
18 -- a DNC scrub, a serial litigator scrub and the Trusted
19 Form.  So I connected Duffie with an individual at Active
20 Prospect to get all those pieces in place, and they had
21 agreed and said they were putting these things in place.
22    Q.   And when was that?
23    A.   I don't recall the exact dates.  In this time
24 frame that we're -- that you keep referring to.

Page 165

1    Q.   I mean isn't it true that you reached out to
2 the Duffie agency, to Marsha and asked for all sorts of
3 information about their DNC compliance and she didn't
4 respond?
5        MS. CHATTIN:  Object to the form.
6 BY THE WITNESS:
7    A.   I don't recall that.  I recall receiving
8 information on -- because I know they use their own DNC
9 scrub and their own system in addition to adding Active
10 Prospect, but it's my recollection that they did respond
11 and did provide information on what process for DNC they
12 were using.
13 BY MR. BURKE:
14    Q.   Have you ever heard of the DNC Project.org?
15    A.   I don't know anything about it.  It sounds
16 familiar, but I don't know exactly what -- what it is.  I
17 believe it's a scrub, a DNC scrub, but I don't know
18 exactly what it is.
19    Q.   Okay.  Let's keep going through these
20 complaints.  Okay.  So we're back to Exhibit E, and I'm
21 on Page 51 of that exhibit looking at the Daniel Graham
22 complaint through the West Florida Better Business Bureau
23 produced by HII at 4246 about national do not call
24 compliance.  Do you remember this complaint?

42 (Pages 162 - 165)

Page 166

1    A.   I don't.
2    Q.   Do you remember speaking with -- with anyone
3  at the Duffie agency about national do not call
4  compliance?
5    A.   Just -- just what I described earlier.
6    Q.   Do you have an understanding of the
7  difference between national do not call registry and
8  internal do not call?
9    A.   Internal -- you mean at HII internal or what
10  do you mean internal?  Internal for whom?
11    Q.   I mean have you heard of internal do not call
12  or company-specific do not call?
13    A.   I don't know the -- I know that there is a
14  national do not call list.  I don't know the difference
15  between that and internal.  I don't know what you mean by
16  internal.
17    Q.   Okay.  So turning the page to PDI Page 52,
18  this is HII Bates 4939, another complaint that you
19  reached out to both Griffin and Scott Shapiro about and
20  you say: "See attached.  Call me to discuss."  And the
21  complaint is from August 3rd, 2018 from a consumer named
22  Robert A. Doane.  Do you remember this complaint?
23    A.   No.
24    Q.   Okay.  And this looks like this was also sent

Page 167

1  to -- well, it looks like it was sent to outside counsel
2  Greenspoon Marder; right?
3    A.   Yes.
4    Q.   Okay.  And the CEO of HII at the time; right?
5    A.   Yes.
6    Q.   And then -- I mean I would -- I would deduce
7  that since it wound up on your desk one of those guys
8  read it; right?
9      MS. CHATTIN:  Object to the form.
10  BY MR. BURKE:
11    Q.   Yes?  No?
12    A.   I'm sorry.  Was that a question?  You're -- I
13  apologize.  You're asking if they read it --
14    Q.   Yeah.  One of them must have --
15    A.   -- or if I -- I read it?
16    Q.   One of them must have read it; right?
17      MS. CHATTIN:  Object to the form.
18
19  BY THE WITNESS:
20    A.   Yes.
21  BY MR. BURKE:
22    Q.   All right.  Did you read it?
23    A.   I don't recall this -- this document.  Just
24  as an understanding of how the Sales unit works, if we

Page 168

1  receive anything legal in nature, we are to send it over
2  to our inside counsel and not to respond or not to do
3  anything with it, so it's anything legal, if I'd seen
4  this, it would have gone directly back to Legal.
5    Q.   Now, wait a second.  That's not what you did;
6  right?  You reached out --
7    A.   I thought you said if I read it, if I read
8  it.
9    Q.   Well, you received it from Regulatory; right?
10    A.   Oh, okay.  Okay.  Yeah.
11    Q.   I mean you must have.  I don't know.  I don't
12  have that document.
13    A.   Yes, and I'm just -- I'm sorry.  I was
14  just -- I was just giving you the process of how it
15  works.  If we got something legal, it would go directly
16  to -- go to our inside counsel.  So this -- this I didn't
17  get.  I'm sorry.  I didn't get this.  This went to our --
18  our inside counsel, and then they sent it to me.  Was
19  that what this is?  I want to clarify before answering.
20    Q.   I mean that's what it seems like to me but
21  you're --
22    A.   Yes.
23    Q.   You were the one who was there.
24    A.   Yeah.  It was a few years ago.  Yes, it

Page 169

1  looked like I must have received this, and then I
2  forwarded it on to Marsha and Scott for more information.
3    Q.   Okay.  And you said: "Call me to discuss."
4  Did that happen?
5    A.   I don't recall this case, so, you know, I
6  don't recall if they -- I mean -- they always called to
7  discuss, but I don't recall the conversation.
8    Q.   Well, what was your process?  If you received
9  a call back to discuss, what did you do?  Did you take
10  notes?  Did you -- what did you do?
11      MS. CHATTIN:  Object to the form.
12  BY THE WITNESS:
13    A.   So I would just gather as much information as
14  I could, what I was told to get.  I don't recall what I
15  was told to get from them, you know, what sort of
16  information.  Then I would relay it back to the
17  Compliance Department.  As I stated earlier, I wasn't
18  really involved in the dealings with the legal for these
19  complaints.  I was there to facilitate getting
20  information between the agent, agency and the Compliance
21  Department, so anything --
22  BY MR. BURKE:
23    Q.   Okay.
24    A.   -- I would have received from that call or in

43 (Pages 166 - 169)

Page 170

1  an e-mail would have gone to Compliance and -- and Legal
2  as they would handle it.
3      Q.   Okay.  In the form of an e-mail or a -- I
4  don't know -- something else?  How would you convey the
5  results of your investigation?
6      A.   Any information that I received -- I'm not
7  really doing the investigation.  It would be Legal and
8  Compliance that are technically doing the investigation.
9  I'm facilitating.  I'm helping.  Any information that I
10  would have received, I may have e-mailed back information
11  depending on how I got it back to Compliance if it was
12  documentation or if it was a conversation, I might call
13  Compliance and go through the results of that call with
14  the Compliance team.
15      Q.   Did you ever receive any sort of legal hold
16  for TCPA-related materials while you were at HII?
17          MS. CHATTIN:  Object to the form.
18
19  BY THE WITNESS:
20      A.   What is a legal hold?  I don't know what that
21  is.
22  BY MR. BURKE:
23      Q.   Did anyone tell you hey, listen, make sure
24  none of your documents or e-mails are -- are deleted

Page 171

1  because we got this lawsuit and we gotta make sure that
2  we keep track of all this stuff?  Did anyone ever say
3  that to you?
4      A.   We were -- HII's a public company.  It was
5  known that you don't -- number one, you don't delete or
6  destroy any materials.  In addition, HII, this is their
7  server.  They've got access to every e-mail in and out of
8  an employee's inbox or through their e-mail address, so
9  it was understood that you do not -- don't delete any --
10  anything or destroy anything or get rid of anything, but,
11  again, HII has access to every e-mail.
12  BY MR. BURKE:
13      Q.   But didn't you testify earlier today that HII
14  as a matter of course destroys e-mails after several
15  months?
16      A.   No.
17          MS. CHATTIN:  Object to the form.
18
19  BY THE WITNESS:
20      A.   I absolutely did not say that.  I said on the
21  system that I have after 18 months the e-mails drop off.
22  They don't -- they're not destroyed.  They then are in
23  the server forever, but like if I wanted to go back to an
24  e-mail that was 18 months old, I wouldn't be able to --

Page 172

1  to retrieve that e-mail myself.
2  BY MR. BURKE:
3      Q.   And so if you needed to retrieve that e-mail,
4  what would you do -- would you contact somebody in tech
5  support?
6      A.   Correct.
7      Q.   Did that ever happen that you had to do that?
8      A.   I don't recall ever having to do that.
9      Q.   I mean because I've gone through the stuff
10  that I have having to do with this case.  There's 20,000
11  documents, and I don't have that I can find any follow-up
12  from you to anyone else at HII explaining what happened
13  with these complaints.  I haven't seen any opt-in
14  information e-mailed from you to Garavuso or Gillis.  I
15  haven't seen any, you know, with regard to this, you
16  know.  This guy Doane says that there was spoofing,
17  deceptive caller ID.  He says that there were
18  pre-recorded message.  He says there were violations of
19  the TCPA and Massachusetts state law.  He's very
20  specific.  He's got a 13-page letter outlining all these
21  conversations.  The person at Duffie apparently called
22  him a faggot.  You don't remember that?
23          MS. CHATTIN:  Object to the form.
24  BY MR. BURKE:

Page 173

1      Q.   It's pretty jarring, isn't it?
2      A.   It is.
3      Q.   I mean that's offensive.
4      A.   Agree.  Agree.
5      Q.   What did HII do about that?
6      A.   Again, this is something -- I'm in the Sales
7  Department, and this is something that would have been
8  handled by our Legal Department.  I was not --
9      Q.   No, it was being handled by you.  You were
10  the one -- I'm sorry.  I just have to interject here.
11  You are the one who they asked to call or to send the
12  complaint.  You must have read it if you were supposed to
13  discuss it.  "See attached and call me to discuss."  This
14  is an e-mail from you, Amy.  And you don't remember --
15      A.   Yes.
16      Q.   -- that profanity?
17      A.   Now that I just saw it, I do recall seeing
18  that because that is not something you see every day.  So
19  I do now recall because I don't -- I don't recall this
20  complaint, but when I see that language, I do -- that did
21  jar my memory, and I do remember seeing that.  Again,
22  this is a -- you know, this is something that our Legal
23  Department probably has all kinds of information about.
24  I don't have the information.  I may have called them and

44 (Pages 170 - 173)

Page 174

1 said this is something that's going on. They then
2 connect with our -- our Legal Department potentially. I
3 don't know. I am not involved in the legal proceedings
4 when -- when they become to this point. I may have been
5 asked just to provide this to them and that's it. I do
6 exactly what the Compliance Department or the Legal
7 Department asks of me.
8    Q.   If you were just a person who was tasked with
9 sending the complaint along, why did you say "call me to
10 discuss"?
11       MS. CHATTIN: Object to the form.
12 BY MR. BURKE:
13    Q.   You didn't say call Legal to discuss. You
14 didn't say call Dan Garavuso in Compliance. You said
15 call me. If what you said is the truth just a moment
16 ago, why did your e-mail say call me instead of call
17 Legal or Compliance?
18       MS. CHATTIN: Object to the form.
19          Go ahead.
20 BY THE WITNESS:
21    A.   It's -- it's -- it's part of my job to
22 connect agencies to the right departments and the right
23 individuals. So this was me notifying them, "call me to
24 discuss," and I would connect them with the right

Page 175

1 individuals. I am not the right individual to discuss a
2 lawsuit --
3 BY MR. BURKE:
4    Q.   Well, that's what you said.
5    A.   -- like this.
6    Q.   It's not a lawsuit. It's a complaint; right?
7    A.   Okay. A complaint.
8    Q.   Why didn't you copy Garavuso --
9       MS. CHATTIN: Object to the form.
10 BY MR. BURKE:
11    Q.   -- or Gillis or someone else?
12       MS. CHATTIN: Object to the form.
13 BY THE WITNESS:
14    A.   I don't know. I just sent it -- I was
15 probably -- I was -- most likely I was -- I received this
16 document. I was asked to send it on, and I said call me
17 to discuss, and if they called me to discuss, I would
18 have connected them with the right individuals or if I
19 was given any instruction to talk with them about, I do
20 not recall any instructions, but what I would have done
21 is connected them with the Compliance Department who had
22 a relationship with this agency already.
23 BY MR. BURKE:
24    Q.   I see then later in this transcription the

Page 176

1 Duffie telemarketing agent told Mr. Doane to go fuck
2 himself. Do you see that?
3    A.   I do.
4    Q.   Did you ever ask for the recording of that
5 call?
6    A.   I did not ask for -- I personally did not ask
7 for the recording of that call. I don't know if
8 Compliance or Legal did.
9    Q.   Why didn't you ask for the recording? I mean
10 you're entitled to ask for it; right?
11       MS. CHATTIN: Object to the form.
12 BY THE WITNESS:
13    A.   Again, unless I was told go get the recording
14 of the call I wouldn't have asked for the recording of
15 the call. I sent this information. I -- it appears that
16 I was asked to send this information to the agency, and
17 at that point I -- I don't get involved in these issues
18 past the initial, you know, assistance that -- that the
19 Compliance or Legal Department ask of me.
20    Q.   I mean the Duffie insurance agency also
21 called my client retarded. That's also offensive, isn't
22 it?
23    A.   Agreed.
24       MS. CHATTIN: Object to the form.

Page 177

1 BY MR. BURKE:
2    Q.   I mean what did HII do about these
3 profanities, anything that you know of?
4    A.   I believe the agency was ultimately
5 terminated. You know, the agency was ultimately
6 terminated, so I don't know specifically what Compliance
7 did about the profanities specifically or Legal.
8 Ultimately they were terminated.
9    Q.   Well, I mean the profanities are just the
10 icing on the cake; right? I mean the complaint's really
11 about pre-recorded messages, a variety of spoofed
12 numbers. I'm quoting. Have you ever heard of National
13 Health Enrollment?
14    A.   I've heard that phrase. I don't know what
15 agency that is, but I've heard that phrase before.
16    Q.   Well, you know what agency because you
17 forwarded this to Shapiro; right?
18    A.   That's not an agency that is connected to --
19 I mean I've never -- I don't know who -- who owns that
20 agency and why it would be in this document. I didn't
21 ask about National Health Enrollment. I've heard that
22 phrase before but --
23    Q.   The fact is that --
24    A.   -- I don't know who that is.

45 (Pages 174 - 177)

Page 178

1    Q.   -- it's not an agency, is it?
2         MS. CHATTIN:  Object to the form.
3    BY THE WITNESS:
4    A.   I don't know.  I don't know if it's an agency
5    or not.
6    BY MR. BURKE:
7    Q.   What about Health Advisors of America, have
8    you ever heard of that?
9    A.   I have.
10   Q.   What is Health Advisors of America?
11        MS. CHATTIN:  Object to the form.
12   BY THE WITNESS:
13   A.   It is an agency somehow connected to this
14   case.  That's how I learned about the name of the agency.
15   BY MR. BURKE:
16   Q.   Okay.  Well, Health Advisors -- if Health
17   Advisors of America was speaking with consumers
18   developing leads for HII, it was required to identify
19   itself, wasn't it?
20        MS. CHATTIN:  Object to the form.
21   BY THE WITNESS:
22   A.   Health Advisors of America was never a
23   licensed appointed agent or agency with -- with HII.  Do
24   we -- HII had no relationship with that agency.  Again, I

Page 179

1    had not heard of that agency until this case.
2    Q.   I get it, but the caller is supposed to
3    identify itself during phone calls under the TCPA; right?
4         MS. CHATTIN:  Object to the form.
5    BY THE WITNESS:
6    A.   Correct.
7    BY MR. BURKE:
8    Q.   And so if the caller was Health Advisors of
9    America, they were supposed to say this is Health
10   Advisors of America; right?
11        MS. CHATTIN:  Object to the form.
12   BY THE WITNESS:
13   A.   I don't even know what -- we didn't -- didn't
14   know what Health Advisors of America was.  The agent, if
15   they are licensed as an independent individual agent with
16   HII, they need to disclose their name.  Again, as we
17   talked about early on in this -- in this day, if they
18   don't have an agency, they weren't required to say their
19   agency.  If they were -- if it was Sean Duffie, he was
20   supposed to say his full name.  That's what we required,
21   so I don't -- I don't know about Health Advisors of
22   America.
23   BY MR. BURKE:
24   Q.   Have you ever heard of Rising Eagle?

Page 180

1    A.   Not prior to this case.
2    Q.   Well, I mean this case pre -- predates these
3    calls.  This complaint predates this complaint.  We filed
4    our case in March 2018, and these illegal calls
5    continued.  This complaint is from August 2018.  So I
6    mean can you explain that?
7         MS. CHATTIN:  I object to the form.
8    BY THE WITNESS:
9    A.   You asked me if I knew of Rising Eagle.  I
10   just said I never heard about -- never heard of Rising
11   Eagle prior to information connected to this case we're
12   talking about today.
13   BY MR. BURKE:
14   Q.   Right, and I'm saying this case precedes this
15   complaint.  It's okay.
16        This complaint also says that the
17   pre-recorded message suggested that they were calling on
18   behalf of major insurers such as, you know, we've talked
19   about this earlier today, Blue Cross.  I mean do you know
20   that HII did anything to make sure that Duffie was using
21   pre-recorded messages that accurately identified the
22   carriers that he was selling?
23        MS. CHATTIN:  Object to the form.
24   BY THE WITNESS:

Page 181

1    A.   No.
2    BY MR. BURKE:
3    Q.   Just to be clear, do you have a specific
4    recollection of Duffie ever sending you an e-mail or
5    other communication with opt-in information in it?  And I
6    mean anyone at the Duffie agency, Shapiro, Marsha
7    Griffin, anyone.
8    A.   I don't recall.  Any information that would
9    have been sent to me I would have sent to Compliance.  I
10   don't recall.  I don't recall.
11   Q.   You don't recall that ever happening; right?
12   A.   No.  You said specific to Duffie.  I -- I
13   recall sending many opt-ins in general to the Compliance
14   Department.  I do not recall specific agents or specific
15   time frames.  I just remember sending opt-ins to the
16   Compliance Department.
17   Q.   Do you ever -- do you remember ever receiving
18   opt-in information from the Duffie agency?
19   A.   Again, I don't recall specific agents that
20   sent it to me.  I recall receiving opt-in information and
21   then forwarding it, but I don't know and I don't recall
22   the exact agents that -- that would have sent it to me.
23   Q.   So you don't have any specific recollection
24   of anyone at the Duffie agency sending you opt-in

46 (Pages 178 - 181)

Page 182

1  information; right?
2      MS. CHATTIN: Object to the form.
3  BY THE WITNESS:
4      A. I don't -- I just don't recall specifically.
5  I -- I -- I remember receiving opt-ins often from many
6  different agents. I just don't recall specifically who
7  the agents were that sent it to me, and I don't want to
8  provide incorrect information. I receive information
9  regarding the opt-in. I forward it to Compliance. I
10  just do not recall the exact agents who sent them.
11  BY MR. BURKE:
12      Q. So the question is -- I get -- I get your
13  testimony just now. You're saying hey, listen, I receive
14  stuff. I forward it on. I don't remember from whom.
15  I'm asking whether you have any recollection of receiving
16  opt-in information from the Duffie agency ever. It's a
17  yes or no.
18      MS. CHATTIN: Object to the form.
19      Go ahead.
20  BY THE WITNESS:
21      A. I don't recall. I don't recall.
22  BY MR. BURKE:
23      Q. So no?
24      A. I don't recall. It's not a yes and it's not

Page 183

1  a no. I literally do not recall. I -- exactly what you
2  just said. I would get these opt-in. I would forward
3  them on to Compliance. I just don't recall the specific
4  agents that -- that sent them to me because it did happen
5  often.
6      Q. Well, if it didn't happen often, then it
7  should be easier to remember; right?
8      A. It -- I said it did, did happen often.
9      Q. Oh, did.
10      A. Yes. Yes. Any time we would ask for
11  opt-ins, you know, that -- you know, we would get them,
12  so it did happen often where I would just -- that's why I
13  can't recall because I would get the opt-ins. I would
14  send them on, and Compliance would take it from there, so
15  I don't -- the issue is I can't recall which agents it
16  would come from.
17      Q. Did you have a process to make sure that you
18  received a response to e-mails like the one that we were
19  just looking at having to do with the Doane complaint?
20  So on -- for example, on -- on August 14th, 2018 at 4:04
21  p.m., you forwarded this complaint to Marsha and Scott
22  Shapiro. Did you have any process or way to keep track
23  of whether you received a response at all?
24      A. I would utilize my inbox and -- for -- I

Page 184

1  would not move messages from my inbox into my deleted
2  folder or my trash folder until they were complete. So
3  whatever my objective was in an e-mail, if it was
4  complete, it would move out of my inbox. If it was
5  ongoing, it would stay in my inbox.
6      Q. So on what occasions would you move your
7  e-mails into the trash folder?
8      A. When the e-mail was complete and there was
9  nothing more to do with it.
10      Q. Do you think that might be what happened with
11  the response to this e-mail and some of these others
12  where you reached out to Marsha or Scott or Duffie
13  insurance agency and we just don't have a response --
14      MS. CHATTIN: Object to the form.
15  BY THE WITNESS:
16      A. No. What I --
17  BY MR. BURKE:
18      Q. -- that the response was placed into the --
19  the trash can?
20      A. No. If it was complete, meaning I was -- I
21  did what was asked of me by Compliance or Legal, then it
22  would be moved out of my inbox, so only if I had done
23  exactly what Compliance and Legal had asked of me. So if
24  they required a follow-up, it would stay in my inbox. If

Page 185

1  they did not require a follow-up and asked me just to
2  provide information to an agency, that's what it would
3  be.
4      Q. Well --
5      A. It would be specific to what I was asked of
6  for that specific task.
7      Q. Well, let me ask you this: Why did you say
8  call me to discuss rather than forward me the
9  documentation concerning these calls, the recordings, the
10  call records, the opt-in? Why did you ask them to call
11  you rather than demand the proof?
12      MS. CHATTIN: Object to the form.
13  BY THE WITNESS:
14      A. In this situation, it appears that I was not
15  asked to demand the proof. I was asked to give this
16  information to the agency. I also said call me to
17  discuss if there's any questions or if they want to
18  discuss. It is my understanding and I would -- you know,
19  this type of a complaint is elevated to Legal and
20  Compliance. This is not something that fits with a
21  salesperson to go and demand proof. This is -- this is
22  an elevated situation that would fit with Compliance and
23  Legal.
24  BY MR. BURKE:

47 (Pages 182 - 185)

Page 186

1    Q.   And you don't remember whether they ever
2  called you or not; right?
3    A.   I do not.
4    Q.   Do you have any idea whether HII or Duffie or
5  anyone else ever paid Mr. Doane money?
6    A.   I have no information about that.
7    Q.   Here we have a litigation hold notice sent by
8  Mr. Doane.  Did you read this at the time
9  contemporaneously?
10       MS. CHATTIN:  Object to the form.
11  BY THE WITNESS:
12    A.   I would have scanned a document like this.  I
13  don't -- like I said, I recall seeing the language in
14  this, the jarring language, but I don't recall the, you
15  know, the legalese that's listed in -- in documents like
16  this.
17  BY MR. BURKE:
18    Q.   Right, 'cause you told me earlier that you
19  didn't know what a litigation hold was; right?
20    A.   Correct.
21    Q.   And so what was your thought process when you
22  saw this part of the letter about a little legal hold,
23  did you just think that's mumbo jumbo and you don't have
24  any duties or did you think you had some duties?

Page 187

1       MS. CHATTIN:  Object to the form.
2  BY THE WITNESS:
3    A.   If I have personal duties, I will hear about
4  them from Legal and Compliance as to what I need to do.
5  BY MR. BURKE:
6    Q.   Right.  And Legal and Compliance never --
7    A.   So I don't -- I don't remember.
8    Q.   I'm sorry.  I didn't mean to interrupt you.
9  Go ahead.
10    A.   No.  That's okay.  I think I was done.
11    Q.   And Legal and Compliance never asked you to
12  preserve; right, preserve documents?
13    A.   As I mentioned earlier, anything that goes in
14  and out of my inbox HII has access to, so they don't I
15  guess have to ask me to preserve because it's already
16  preserved.
17    Q.   So the question was nobody in Legal or
18  Compliance asked you to preserve; right.
19    A.   Not that I recall.
20    Q.   All right.  All right.  Here's another
21  complaint.  John Frey.  And there's a title here.  I
22  don't know who wrote this, but it says it was sent to the
23  execs.  Gavin Southwell I see here.  Who was Gavin
24  Southwell?  He was the -- he was the general counsel;

Page 188

1  right?
2    A.   No.  He was actually our CEO, and the
3  president.  At this time Mike Kosloske was our CEO, and
4  then he had stepped down and Gavin Southwell took his
5  position.
6    Q.   And who is M. Hirshberger?
7    A.   Michael Hirshberger, he was the Chief
8  Financial Officer.
9    Q.   So all the brass received this complaint it
10  would -- it would seem; is that right?
11    A.   Three of them, yes.
12    Q.   I mean arguably the three most important
13  people; no?
14       MS. CHATTIN:  Object to the form.
15  BY THE WITNESS:
16    A.   Yes.  Sure.  Yes.
17  BY MR. BURKE:
18    Q.   Okay.  Do you remember ever seeing this
19  complaint?
20    A.   I do not.
21    Q.   Okay.  Do you remember the Duffie agency
22  being disciplined at any time in June, July, August 2018
23  having to do with telemarketing?
24    A.   I recall sometime in this period is when we

Page 189

1  required them to be on Trusted Form or to start the
2  process of Trusted Form or there -- there may be
3  termination, so that was the -- what I was involved in
4  regarding consequences of complaints.
5    Q.   But that stuff happened in late fall,
6  early -- early December, didn't it?
7    A.   I don't know the dates of it.  I'm just -- to
8  my recollection, that's -- cause of complaints -- again,
9  I have never seen -- I don't recall seeing this -- this
10  complaint, but I recall my involvement of discipline was
11  forcing them to be on Trusted Form or termination.
12    Q.   I mean if there was any sort of discipline,
13  you ought to have known about it because you were the --
14  you were the day-to-day contact; right, between HII and
15  Duffie?
16       MS. CHATTIN:  Object to the form.
17  BY THE WITNESS:
18    A.   Again, I was the day-to-day contact, but I
19  was not the only contact, so there would be a
20  relationship between the agency and Compliance especially
21  with situations like this where I -- I was never involved
22  in this.  They would have had a direct communication to
23  the agent on this.
24  BY MR. BURKE:

48 (Pages 186 - 189)

Page 190

1    Q.   What was the process that was used at HII to
2  figure out who the agent was affiliated with a particular
3  complaint?
4    A.   If the customer had completed an application
5  and submitted an application, it would have connected
6  that individual to an agent, so you could determine who
7  the agent was in the tool, completed the application.
8    Q.   So like this particular John Frey complaint
9  doesn't say I don't think -- oh, he does have an
10  application ID.  So the application ID number should have
11  been enough for HII to look up what agent was affiliated
12  with these calls; right?
13    A.   That would be correct.
14    Q.   Okay.  Yeah, and he also mentions Happy
15  Health Plans, doesn't he?  Let's see.  I mean -- yeah,
16  Happy Health.  And that was Duffie; right?  We know Happy
17  Health is Duffie; right?
18    A.   I mean it appears that way, yeah.
19    Q.   Yeah.  Okay.  Well, that's what the -- that's
20  what the Ruben Gardner's files say for Duffie; right?
21  It's no secret.  Duffie is Happy Health; right?
22    A.   Correct.  Yeah.  I just never referred to him
23  in that way, so it's a new one.
24    Q.   Gosh, here's another one you sent to -- this

Page 191

1  time you sent it both to Matt Herman and to Scott
2  Shapiro.  And the complaint came from attorney Tammy
3  Hussin; right?
4    A.   I don't know if she was an attorney.  I'm
5  just looking at this -- oh, I see.  I'm just looking at
6  this for the first time.
7    Q.   You're not looking at it for the first time;
8  right?
9    A.   Well, I'm -- I'm saying -- I haven't seen
10  this since 2018, so I have -- I am looking at this now.
11  I have not seen this in several years.
12    Q.   Okay.
13    A.   I don't recall it, so I'm looking at it right
14  now for the first time, so I just want to refresh my
15  memory on what this is.
16    Q.   Of course.  It's just one page, this one.
17    A.   Okay.  Okay.
18    Q.   And the Bates number is 5006, HII 5006.
19      So --
20    A.   So --
21    Q.   -- what Christine -- oh, go ahead.  Please,
22  yeah.
23    A.   -- I'm -- I'm reviewing this now.  What this
24  is is kind of what we talked about.  It is what we talked

Page 192

1  about earlier, about an ad hoc process as to notifying
2  agents of phone numbers and people to add to their do not
3  call list.  That's what this is, so I don't know who
4  Tammy Hussin received calls from.  It says from an
5  agency.  I -- now that I'm reviewing this, I sent this on
6  to Matt Herman and Scott Shapiro as a phone number to add
7  to their DNC list.  This is one more to add, and if you
8  look at this message from Christine Gillis, that's simply
9  what it is.  It goes to the entire Sales Department, and
10  it is just a notification of a person and a phone number.
11  So I then sent that on to these two individuals.
12    Q.   Okay.  And so when you say "one more to add,"
13  that just meant hey -- well, what did that mean, "one
14  more to add"?
15    A.   That is one more phone number to add to your
16  DNC list, and as we talked about, the lists that I would
17  send at this time were ad hoc.  I'd get one, I'd send it.
18  I'd get five, I'd send them.  So this was to add to
19  overall DNC lists which is why I would include Matt
20  because he also worked with other agencies and wanted him
21  to make sure that this was added to as many people's do
22  not call lists as possible.
23    Q.   How many agents did Matt Herman work with
24  around June 2018?

Page 193

1    A.   You know, a dozen.
2    Q.   And did you send this -- this request to
3  other agencies other than Herman and Duffie or just to
4  Herman and Duffie?
5    A.   Yes.  Yes.  So this would be specific to
6  Herman so that he could disseminate this information to
7  his downlines, but I would have sent DNC information to
8  many other agency -- other agencies as well.
9    Q.   Well, the question is did you forward this
10  DNC request to other folks other than Herman and Shapiro.
11    A.   Based on the -- my behavior and what I did
12  with DNC calls, I -- I would assume that I would.  Any
13  time I got a number I would send it on to a group of
14  agents, handfuls of agents.
15    Q.   And so who were those agents that you would
16  send it to?  I mean -- and why not -- well, go ahead and
17  answer that one.  Who are the other agents that you
18  believe you sent this to?
19    A.   Well, I don't recall exactly who I would have
20  sent them to, but other agents that I would -- that I
21  worked with I would send do not call lists to.  But to
22  get -- specifically Joshua Herman, partner Matt Herman
23  got this to a dozen agencies with one e-mail.
24      (Zoom interruption.)

49 (Pages 190 - 193)

Page 194

1       THE REPORTER: I'm sorry. Can you repeat
2   that? You faded out, the last part.
3       THE WITNESS: Sorry. My headset just shut
4   off. I'm so sorry. Where did I leave off?
5       THE REPORTER: You said: "To get --
6   specifically Joshua Herman, partner Matt Herman got this
7   to a dozen agencies with one e-mail," and then you faded
8   out.
9       THE WITNESS: Yep that's exactly where I
10  stopped.
11  BY THE WITNESS:
12      A.   So it's just convenient to send it to Matt so
13  that he would then provide it to all of his downlines.
14  BY MR. BURKE:
15      Q.   Okay. And Scott was one of the downlines;
16  right?
17      A.   Correct.
18      Q.   So why did you choose to send this to Scott
19  in particular?
20      A.   Because -- I don't know exactly. Usually I
21  would send it separately, so I'm not sure why I chose to
22  do it in one.
23      Q.   I mean the Duffie agency did make that call?
24      MS. CHATTIN: Object to the form.

Page 195

1       Go ahead.
2   BY MR. BURKE:
3       Q.   Did you investigate who made the call before
4   you sent this e-mail?
5       A.   I didn't. I -- I would not. This is not
6   typical of -- like I said, I -- just reading this, this
7   is another customer that Christine sent to the team. I
8   do not call, so I would not -- I don't recall ever
9   investigating who the agent was prior to sending out the
10  do not call notification that I would have received from
11  Christine.
12      Q.   Okay. Let's move on. Another complaint a
13  few days later. Do you remember this one?
14      A.   So this one to me -- can you scroll down to
15  show me Christine?
16      Q.   That's it. You were looking at the whole
17  thing on the screen.
18      A.   Oh, okay. Okay. Okay. So --
19          (Zoom interruption.)
20      THE REPORTER: I'm sorry. I can't hear
21  anything you're saying. I don't know if anybody else is
22  having trouble.
23      THE WITNESS: Can you hear me now? Is that
24  better?

Page 196

1       MR. BURKE: Yeah.
2       THE WITNESS: Okay. Sorry.
3   BY THE WITNESS:
4       A.   This would be a similar situation as to what
5   I just described. This looks to be information that I
6   received from Christine, and this looks like a cut and
7   paste of Christine's information. Her -- this looks like
8   her writing. We received a report from an agency about a
9   potential TCPA litigator. Has already taken out several
10  policies and immediately cancelled. "While we are
11  conducting our investigation, please contact your
12  accounts and have them add these numbers to their DNC
13  list." This is language from Christine sent to the Sales
14  Department, and then I would have sent that out. Again,
15  I sent it to -- to Matt and Scott.
16  BY MR. BURKE:
17      Q.   Okay. And as to the Brian Smith stuff, as
18  far as you remember, you -- you were never responsible
19  for trying to figure out if there was a valid opt-in or
20  anything like that; is that correct?
21      A.   No. Correct.
22      MS. CHATTIN: Object to the form.
23      THE WITNESS: Sorry. Sorry, Danielle.
24  BY THE WITNESS:

Page 197

1       A.   This was simply notification as Christine
2   asked.
3   BY MR. BURKE:
4       Q.   Okay. And that was Bates 5007 that we were
5   talking about. Let's go to the next one. More
6   complaints from June 2018. This is Bates 5005.
7       A.   This would be additional from Christine,
8   additional DNC individuals and phone numbers to add to
9   agents' DNC lists. So I -- I don't know that these are
10  specifically -- you know, if they're connected to a
11  complaint or if somebody called and just said put me on
12  your DNC list, so I don't know where these would arrive
13  from, but Christine would send them to the Sales team,
14  and we would distribute to accounts accordingly.
15      Q.   Well, I've highlighted the portion of this
16  e-mail that says that these three individuals including
17  Frey who we talked about earlier had concerns about calls
18  being received. Does that refresh your recollection?
19      A.   Again, I don't know what -- what the details
20  are with these individuals. We get a list. We send them
21  out to -- Sales sends them out to the distributors. We
22  don't do any research on them. We send them out to make
23  sure that agents have this information.
24      Q.   All right. Next one, Bates 4258 from just a

Page 198

1 few weeks later. Do you remember ever seeing this one?
2     A. I don't -- I don't recall this one.
3     Q. This guy Jourey Newell, this person asks for
4 a written copy of your company's do not call policy. If
5 you had received a request like that, is there some
6 document that you would have thought oh, yeah, that's
7 what I'll -- that's what I'll send to this consumer, copy
8 of the do not call policy?
9     MS. CHATTIN: Object to the form.
10 BY THE WITNESS:
11     A. I would not send anything to a consumer. I
12 would send this over to Compliance for them to handle.
13 BY MR. BURKE:
14     Q. Okay. This next complaint starts at 4954.
15 You'll see it goes for a few pages. It's actually an
16 e-mail that you sent. There it is, your e-mail
17 signature. The document ends at Bates HII 4957. So
18 there's a bunch of information here. Do you remember
19 this communication?
20     A. I mean I'm looking at it. I sent it, but I
21 don't -- I don't recall the specifics of this specific
22 case, but I -- I requested an opt-in for the lead.
23     Q. Okay. And so -- yeah, I was going to ask.
24 So you say here to Marsha and Scott at the Duffie agency:

Page 199

1 "Please go through the usual procedure." What was the
2 usual procedure that Marsha and Scott were supposed to
3 do? Because it comes up all the time. What was their
4 usual procedure?
5     A. To provide Compliance or me directly proof of
6 opt-in for the customer.
7     Q. Well, your testimony earlier today was that
8 you don't have a recollection of -- of them
9 specifically providing anything to you in the terms of
10 opt-ins; right?
11     A. No, that is not correct. I said I received
12 lots of opt-ins, many opt-ins and I just don't recall who
13 they came from, so I didn't say they did or didn't. I
14 said because I received many opt-ins I just don't recall
15 who they came from. So as I see this -- I have not seen
16 this e-mail in four years. So shows me that they
17 provided opt-in information to either myself or directly
18 to Compliance.
19     Q. Isn't it true that the Duffie agency never
20 provided any consent for any of these to you?
21     MS. CHATTIN: Object to the form.
22 BY THE WITNESS:
23     A. Again, I -- I received many opt-ins for
24 agents and would send them to Compliance. They would

Page 200

1 also work directly with Compliance to provide opt-ins. I
2 don't know specifically what I have received or not
3 received specific to this agency. I do not recall
4 specifics of any -- of any agent.
5 BY MR. BURKE:
6     Q. Isn't it true that the Duffie agency had the
7 most complaints for TCPA out of any agency that was
8 working for T -- for HII in 2018?
9     A. I believe that is correct.
10     Q. How did you know that?
11     A. I recall having a conversation with
12 Compliance that there was a -- there were too many TCPAs
13 specifically about this agency, and that is what prompted
14 Compliance to require this agency going on to the Trusted
15 Form format or be terminated. Those were the options.
16     Q. So do you have any recollection as to whether
17 you received any response to this e-mail at all from the
18 Duffie agency?
19     A. I don't -- I mean I didn't have anything
20 connected to this e-mail. I don't -- I don't know if I
21 received anything. Again, it's been four years, so I
22 don't know the follow-up on it and whether it went to
23 Compliance directly or if it came --
24     (Zoom interruption.)

Page 201

1     Q. Okay.
2     THE REPORTER: I'm sorry. "If it came"?
3 BY THE WITNESS:
4     A. If it went to the Compliance Department or if
5 it came to me directly.
6 BY MR. BURKE:
7     Q. Okay. The next one is at Bates 950, NCE950.
8 Looks like it's nine pages long. Who is Chris Sabatella?
9     A. I believe he is connected to NCE.
10     Q. And what is Mid First?
11     A. I have no idea.
12     Q. Who's Scott Trapani?
13     A. He is connected also to NCE and some of the
14 carriers.
15     Q. In what way?
16     A. I don't know exactly the relationship. I
17 just know that he is connected to carriers that HII had
18 worked with, so I'm not sure what the connection was, but
19 he was connected to them.
20     Q. Does NC -- does HII keep track of which
21 customers have NCE and Med-Sense subscriptions?
22     A. I don't know. I don't know.
23     Q. Here's another complaint that you sent to
24 Scott Shapiro and Marsha Griffin. And you say: "Let me

51 (Pages 198 - 201)

Page 202

1  know where the lead came from and if Trusted Form failed
2  or if this was outside that system. Thanks." This is
3  October 1st, 2018, Bates number 6913 to 6914. So you say
4  to -- to Scott and Marsha: "Let me know where the lead
5  came from." Where did that lead come from?
6      MS. CHATTIN: Object to the form.
7  BY THE WITNESS:
8      A.  I don't know. Is there a follow-up to -- to
9  this e-mail?
10 BY MR. BURKE:
11     Q.  I don't think so.
12     A.  I'm looking at one e-mail. So -- let me -- I
13 don't recall this. This individual purchased an FSP.
14 That's an AD and D product, so it wasn't -- it looks like
15 it was a competitor's product so --
16     Q.  Accidental death and dismemberment is AD and
17 D; right?
18     A.  Sorry. Yes. I apologize.
19     Q.  And HII offers AD and D policies through
20 Chubb; right?
21     A.  Correct.
22     Q.  Okay. So this could have been an HII call;
23 right, made by --
24     A.  Well, it says here -- it says here that this

Page 203

1  customer only purchased -- so I mentioned earlier that
2  agents that we work with have contracts with other
3  companies like HII or other carriers. A-1 is an example
4  of a company that is a subsidiary type of company to HII
5  where they bring in carrier products, so it appears that
6  this individual purchased an A-1 product and then an HII
7  ancillary plan.
8      Q.  And so what is FSP?
9      A.  It stands for Freedom Spirit Plus which is --
10 I believe at this time it was an accidental death and
11 dismemberment with some life insurance as those two
12 benefits.
13     Q.  Okay. And those are Chubb policies; right?
14     A.  I believe so. We've got a -- we had a few
15 carriers that offered those products, and Chubb was one
16 of them, so I'm just not sure which -- which carrier it
17 would have been.
18     Q.  Okay.
19     A.  A-1 also -- also sold Chubb products, so it's
20 hard to say.
21     Q.  And did you ever receive the information
22 about where the lead came from?
23     A.  Again, I don't -- I -- I received many, many
24 opt-ins and Trusted Form verifications and opt-ins and

Page 204

1  I'd send them on to Compliance, so I'm -- I'm also
2  struggling, but there's no -- no follow-up on this, but I
3  don't -- I cannot recall specifically, but the Compliance
4  Department was very serious about getting the opt-ins
5  from -- from the individuals whether they went direct or
6  through the Sales Department.
7      Q.  And then you say: "If Trusted Form failed or
8  if this was outside the system." Do you remember what
9  the results of that question was?
10     A.  I do not.
11     Q.  I mean you know that -- that Duffie wasn't
12 using the Trusted Form opt-in verification in October
13 2018; right?
14     A.  I don't know that information. I don't
15 recall. I know that there were many agents that were put
16 on the Trusted Form process, and either he was to get on
17 the process or he was terminated, so this e-mail shows me
18 that he's on Trusted Form if I ask the question "Trusted
19 Form failed." So that to me shows me that he's on
20 Trusted Form, so I can't say that he wasn't.
21     Q.  Yeah, but you know because of your dealings
22 with Duffie that he wasn't on a Trusted Form in October
23 2018; right?
24     A.  No. I just explained. Many, many --

Page 205

1      Q.  You explained in the context of this e-mail,
2  but I'm asking generally. I mean what proof did you
3  receive from Duffie that he was really using Trusted Form
4  in the fall or winter of 2018, if any?
5      MS. CHATTIN: Object to the form.
6  BY THE WITNESS:
7      A.  Compliance had a -- had a contract with or
8  had a relationship with Active Prospect where Active
9  Prospect was providing updates on agencies and where they
10 were in the implementation of the Trusted Form process,
11 so they would know if an agency was on it or not, and I
12 don't -- I don't know why or if -- when Duffie was
13 terminated and if that was the reason why. My e-mail
14 right here that I'm looking at that I can talk about
15 is did Trusted Form fail or was it outside the system.
16 So I'm looking at this thinking okay, he's on Trusted
17 Form and did it fail. So I can't -- I can't say -- I can
18 only say what -- what I'm looking at.
19 BY MR. BURKE:
20     Q.  In your experience, did you ever come across
21 a Trusted Form failure?
22     A.  As I recall, there were some failures. It
23 was not a foolproof system, but it was not common.
24     Q.  Tell me about those failures. How did they

Page 206

1 happen?
2     A.  Some -- I don't know exactly how they
3 happened, but it would be something in the communication
4 between the two companies, between the vendor and the
5 Trusted Form and the agent, some -- some failure in that
6 process.
7     Q.  Do you understand how Trusted Form works?
8     A.  Not the -- not the absolute details on how
9 it's set up.  That is why we -- Compliance brought in a
10 rep from Active Prospect that HII would connect or the
11 sales rep would connect with the agent and they would set
12 up the whole system so it was done properly and so that
13 that individual from Active Prospect could manage that
14 process and get it set up, so the sales reps were
15 involved in connecting those parties but not for
16 implementing the program.
17     Q.  Isn't it true that Trusted Form only works if
18 there's a particular computer code that's integrated into
19 the opt-in website where the opt-in allegedly occurs?
20     A.  Again, I don't know the details of how it
21 works, but there were other forms of Trusted Form, other
22 companies that did the same type of process which would
23 be what I mentioned here is outside the system.  So --
24 but I don't know the -- the -- the technical side of how

Page 207

1 Trusted Form reports.
2     Q.  Did you ever receive a valid Trusted Form
3 response from Duffie, from the Duffie agency?
4     A.  Again, I don't -- I do not recall
5 specifically what agent sent me what.  I received many
6 opt-ins from many different agents, and I would send them
7 on to the Compliance Department.
8     Q.  By e-mail; right?
9     A.  If I received them, they would go by e-mail
10 to Compliance from me if I received them.  If the
11 agent -- the agents were also allowed to send them
12 directly to the Compliance Department if they wanted to,
13 but if I received them, I would forward every single one
14 on.
15     Q.  Maybe that's the disconnect.  If an agent
16 sent the Trusted Form or any other information directly
17 to Compliance and in particular Duffie, who would they
18 send it to?
19     A.  I don't -- I don't know.  Christine or Ruben
20 probably --
21             (Zoom interruption.)
22     THE REPORTER:  I'm sorry.  I didn't hear that
23 after you said I don't know.
24 BY THE WITNESS:

Page 208

1     A.  I don't know exactly who they would have sent
2 their documents to.  And I said maybe Ruben because Ruben
3 was their auditor.  Maybe Christine because Christine was
4 in that department.
5 BY MR. BURKE:
6     Q.  Do you know that that really happened or are
7 you just sort of speculating that it may have happened?
8     A.  I don't know that -- I don't know if they
9 sent it directly.  I'm saying if they -- some agents did
10 send them directly to Compliance.
11     Q.  Another complaint here, Bates HII 6915.  Oh,
12 this has to do with Hasiak.
13     A.  Okay.  I -- I feel so much better, Alex.
14     Q.  Okay.
15     A.  Compliance does communicate directly with the
16 agencies asking for information on complaints as well.
17     Q.  Okay.  And yeah, you're on this too.  Do you
18 remember -- I mean we already talked about Hasiak, but do
19 you remember whether there was any opt-in verification
20 provided?  Does this refresh your recollection, this
21 e-mail chain with you and --
22     A.  Yes.
23     Q.  -- Ruben Gardner about it?
24     A.  Yeah, I just do not -- again, I saw a lot of

Page 209

1 opt-ins.  I just don't know who they came from, and
2 because there were many that -- that -- that I saw, so,
3 again, I don't know if -- what the -- what the follow-up
4 on this one was --
5     Q.  There was a formal --
6     A.  -- but it's directly --
7     Q.  Go ahead.
8     A.  It was directly between Compliance and the
9 agency.
10     Q.  And -- and there was a formal settlement with
11 this complainant Hasiak; right?
12     MS. CHATTIN:  Object to the form.
13 BY THE WITNESS:
14     A.  I don't know.  I don't know.
15 BY MR. BURKE:
16     Q.  Okay.  We got another complaint here.  Oh,
17 man.  You said:  "Wow.  This is not good" on this one
18 from November 26, 2018.
19     A.  Scroll down.  That would be appreciated.
20     Q.  Okay.  So we've got -- who's Casey --
21     A.  Hrvatin.
22     Q.  -- Hrvatin?
23     A.  She was that sales force person I mentioned
24 earlier in the call.  She was a sales -- a VP of sales at

53 (Pages 206 - 209)

1  HII but has -- left prior to last July. If you wouldn't
2  mind scrolling down, that would be great.
3      Q.  So Vice-President of Sales at HII in late
4  November 2018, almost December gets a robocall Press 1
5  campaign offering Blue Cross Blue Shield and Cigna,
6  companies which -- with which HII has no relationship;
7  right?
8      A.  So --
9      Q.  Just answer the question.
10     A.  -- if you scroll up -- HII does not have a
11 relationship with Blue Cross Blue Shield.
12     Q.  Does HII have a relationship or did they have
13 a relationship with Cigna?
14     A.  Yes.
15     Q.  What was the relationship with Cigna?
16     A.  Cigna was one of our dental carriers.
17     Q.  In November 2018?
18     A.  I don't recall the dates, but they were one
19 of our dental programs.
20     Q.  Okay.
21     A.  If you don't mind scrolling up. This is --
22 to right there. Right -- no. Go back. Robert Byrnes
23 and Steve Jones, I mentioned a company called A-1
24 earlier. That's a competitor of HII's, and Casey

1  received a call. She is an internal employee. She
2  received it -- she would have received -- this is one of
3  those calls that employees were getting that we talked
4  about earlier. So she received this phone call, went
5  through the entire process. Anybody that received these
6  phone calls at HII we went through the entire process to
7  see who the agent might be so we could find out how HII
8  employee numbers got into a lead vendor system. So this
9  individual, whatever agent, called Casey's line and sold
10 her a non-HII product --
11     Q.  Okay.
12     A.  -- to a company called A-1 or Adroit. So
13 Casey then -- so this is not an HII plan, so Sean Duffie
14 and Marsha Griffin were apparently appointed and set up
15 to sell with Adroit Health and purchased a lead, and it
16 went to Casey. Casey then went to the owners of Adroit
17 and let them know and then also sent it to me, and so I
18 sent it to -- to Scott and said not good. They're calls
19 coming into HII employees.
20     Q.  Okay. So to me this complaint tells -- tells
21 me that Duffie is using -- still using pre-recorded
22 message calls just like the one that we saw in the May
23 complaint from Stewart Abramson that did go to HII.
24 Would you agree?

1      A.  I don't -- I mean -- I don't -- I don't -- I
2  mean I don't know exactly what she means by a Press 1
3  campaign, so I'm not sure exactly what she's referring
4  to, so I can't say what kind of call it was but --
5      Q.  I've got sort of a corollary to this Hasiak
6  complaint. All right. So I'm showing you a document
7  that was produced by HII Bates 4622 consecutive to 4624,
8  and this is a settlement agreement that was e-mailed from
9  Marsha Griffin to you and Ruben copying Scott Shapiro
10 with a settlement agreement calling for HII to pay Hasiak
11 $1500 for the call or calls. Does this refresh your
12 recollection as to whether there was a settlement with
13 Mr. Hasiak?
14     A.  Yeah, I -- I have no recollection of -- of
15 there being a settlement now that I see it. Just to add
16 to what you just said, it says " Duffie/HII shall pay,"
17 so it wasn't just HII. I just want to make sure --
18     Q.  Right.
19     A.  -- we're clear.
20     Q.  And look at here it calls for -- another
21 party to the settlement is Health Advisors of America
22 which you told me earlier today I think, and maybe you
23 can clarify, you had never heard of before this lawsuit?
24     MS. CHATTIN:  I object to the form.

1  BY THE WITNESS:
2      A.  Correct. Correct. I mean I -- I never knew
3  of Health Advisors of America prior to this lawsuit.
4  That was the first time I recall hearing about Health
5  Advisors of America. If you notice, they also mention
6  Adroit Health, so if I saw -- if I read this close enough
7  to see Health Advisors of America, that wouldn't have
8  meant anything to me because it also has Adroit Health in
9  it which is a competitor.
10 BY MR. BURKE:
11     Q.  But you know who Adroit Health is; right, and
12 you knew at the time?
13     A.  Correct, but I don't -- I mean Health
14 Advisors of America could have been something connected
15 to Adroit. It just wouldn't have raised any red flags
16 for me. I would have just skimmed over it and assumed it
17 had something connected to Adroit if I would have read
18 this.
19     Q.  Okay. We're still on Exhibit E. This is PDF
20 Page 90, Bates HII 4252. This is a complaint from a
21 person named Maurice Woolman. Do you remember anything
22 about this complaint?
23     A.  I do not.
24     Q.  And this is going into December 2018. Okay.

Page 214

1    Again, it's complaining about a pre-recorded sales call,
2    isn't it?  Yes?
3        A.   Yes.  I mean based on what you just
4    highlighted, yes.
5        Q.   Okay.  Okay.  Do you have any idea whether
6    HII responded to this complaint from the -- that was sent
7    through the Department of Agriculture and Consumer
8    Services of Florida?
9        A.   I -- I do not have any recollection of the
10   case or I don't know this case.
11       Q.   Okay.  Here's another complaint that was
12   produced to us by NCE, NCE900 to 901.  And you're not on
13   this, so maybe you don't know anything about it, but do
14   you remember a complaint concerning a Mr. Pelland?
15       A.   I don't.
16       Q.   It says he was unable to obtain any agent
17   information because the agents were disconnecting calls
18   for when he asked for names or agent numbers.
19       A.   Okay.
20       Q.   What is Life Shield National Insurance
21   Company?
22       A.   Life Shield was another carrier, was another
23   insurance carrier.  Sorry.  It was another insurance
24   carrier that HII worked with.

Page 215

1        Q.   Okay.  You talked about calls being made to
2    HII employees in the context of some incidents in 2018
3    or, pardon me, Duffie making calls in the context of
4    2018.  But the calls to HII employees began much earlier
5    than that, didn't they?
6        MS. CHATTIN:  Object to the form.
7    BY THE WITNESS:
8        A.   Yeah, I don't know when the calls started or
9    ended.  I just remember there was a period of, I'm
10   estimating, of maybe 90 days where we got those calls, so
11   it was -- I just don't know when they started or stopped.
12   It was just in that period.
13   BY MR. BURKE:
14       Q.   Okay.
15       A.   And that's my recollection of the time frame.
16       Q.   Could it have been earlier?
17       A.   No, I don't know when it occurred.  I just
18   remember the time period being somewhere around 90 days,
19   30 -- 3 months.  I just don't recall when exactly it
20   happened but it's -- the dates of 2018 are in those
21   e-mails, so that's -- that's what I'm -- I'm connecting
22   it to, but I don't know when they started or when they
23   ended.  I just recall them being -- for a short period of
24   time getting those calls.

Page 216

1        Q.   Okay.  I'm going to show you Exhibit H.  I'll
2    e-mail it to the gang.  And while I figure out this
3    e-mail, you think about this.  This is -- this is a few
4    e-mails in this long exhibit, but the first few are from
5    2016.  I'm going to e-mail the last few exhibits just in
6    case I forgot to do that earlier.  But this e-mail
7    includes Exhibit H.
8        So the first e-mail in Exhibit H is between
9    you and Marsha Griffin over at Duffie's agency; right?
10       A.   It's between Marsha and I.  I don't -- I
11   don't know who Pete was at that time.  I mentioned
12   earlier in this deposition that she did kind of jump
13   around a bit, and she also was an agent of HII, so when I
14   see turn my links back on, I'm wondering -- because this
15   is 2016.  I'm wondering if these are specific to her
16   links versus Duffie's, so I just don't recall.  I'm
17   waiting to see the rest of the e-mail.
18       Q.   What is a link in the context of this Exhibit
19   H?
20       A.   So a link is -- you know, we talked about a
21   portal that the agents use in order to submit an
22   application to HII on behalf of a customer.  We call that
23   a portal.  We also call that links, and, for example, if
24   an agent does not do the module training, we would turn

Page 217

1    their links off.  If the agent is -- or their portal off.
2    If the agent is doing something wrong or there's
3    something wrong with their licenses or they expire, we
4    would turn their links off so that no business could be
5    submitted.
6        Q.   Okay.  Do you remember this incident or
7    exchange, what happened with Marsha?
8        A.   I don't.  Scroll up.
9        Q.   The way it was produced it's pretty spread
10   out here.  Okay.  You told Marsha on December 14th at
11   10:19:  "Make sure these numbers are out of your dialer
12   ASAP."  Let's see what numbers we're talking about.  Oh,
13   man.
14       A.   Oh, hey.  That's it.  Sorry.  Got excited.
15   That is our company directory that -- maybe it was longer
16   than what I thought.  This is our company directory.
17       Q.   Okay.  So now is it accurate -- now is it
18   accurate to understand that -- oh, and I see it's Casey
19   again.  Was it Casey who received the call in 2016 also?
20       A.   I -- I thought hers was 2018 but --
21       Q.   Me too.
22       A.   Yeah.
23       Q.   But this is a different exchange that
24   involves Casey.

55 (Pages 214 - 217)

Page 218

1   A.  Yeah.
2   Q.  Do you know if Casey received two robocalls
3 from Duffie or Marsha?
4   A.  No, no idea.
5   Q.  So that's -- but that's a -- I gave
6 you a sneak peak of the next document but it's from two
7 years ago.
8   A.  Okay.
9   Q.  Just for the record, this is HII -- what
10 we've been looking at, the first document in Exhibit H
11 is -- it ends at HII 5129, and that document begins at
12 5101.  On 5102 you're -- you receive an e-mail from
13 Marsha that says yeah she spoke with Jeremy about the
14 call.  He's being fined and is on disciplinary status.
15 Does this refresh your recollection what this was all
16 about?
17   A.  I -- I don't know what this is about, but it
18 would be consistent -- it would be consistent with I'm
19 told to tell her about something and she, you know,
20 provided me the status of what occurred, but I don't
21 recall this specific situation, and I can't really tell
22 who's who in this one because it's spread out but --
23   Q.  Yeah, I know.  This is the way I received it.
24 Can you tell who Terry is?

Page 219

1   A.  No idea who Terry is.
2   Q.  Did this communication arise from an HII
3 person, employee receiving a call from Marsha Griffin or
4 an agency she was associated with?
5   A.  No, this one doesn't make sense to me because
6 it's got our directory but it's talking about
7 disciplinary action against an agent, so it's not about
8 the call, so I don't really -- I can't really understand
9 how these are connected.
10   Q.  Okay.  Let's go to the second page -- the
11 second e-mail.  Okay.  So the second e-mail in the
12 Exhibit H is Bates number 7081, and Christine Gillis
13 sends you an e-mail that says in June 2018, so that's at
14 least 18 months after that last incident with Marsha
15 Griffin.  Here you are e-mailing --
16   A.  Like I said, I don't -- I don't recall those
17 calls occurring for that long of a period but I could be
18 wrong.
19   Q.  It says:  "Several calls from the below
20 numbers attached to a recorded message that talks about
21 special enrollment periods for Blue Cross Blue Shield,"
22 and you forwarded this to Scott and Matt Herman.  Did you
23 receive any response to this from Scott or Matt or
24 anyone?

Page 220

1   A.  I do not -- I don't -- I don't recall if
2 there was a response to this e-mail.  It's not connected.
3   Q.  I mean why didn't you just ask Scott to send
4 you his last month of call data to see whether Scott or
5 Matt was affiliated with these calls?
6   MS. CHATTIN:  Object to the form.
7 BY THE WITNESS:
8   A.  Compliance never asked me or Legal never
9 asked me to get involved to do something like that.  You
10 know, if -- if they wanted something like that kind of
11 information, that would have come from them directly.
12 BY MR. BURKE:
13   Q.  But isn't it sort of loosey goosey and almost
14 like, you know, dismissive of the situation just to send
15 a one-liner to Scott and -- Scott Shapiro and Matt Herman
16 saying hey, any of these numbers familiar with -- to you
17 guys?  Did you really expect a substantive response to a
18 one-liner like that?
19   MS. CHATTIN:  Object to the form.
20 BY THE WITNESS:
21   A.  So all of these e-mail from Christine tell us
22 to remind our accounts that they should be verifying
23 their lead vendors and the type of campaigns their leads
24 are receiving so -- but the Sales Department, what we

Page 221

1 would do is take her e-mail and send it to -- to
2 different agents, and I just happened to ask them "any of
3 these numbers familiar to you."  So there would be
4 situations where we would just send the e-mail from
5 Christine and forward.  I just happened to ask if they're
6 familiar.
7 BY MR. BURKE:
8   Q.  Okay.  And you didn't remind them that they
9 should be verifying with their lead vendors the types of
10 campaigns and leads that they are receiving; right?
11   A.  I forwarded Christine's e-mail that has that
12 information specifically in it from Compliance.
13   Q.  Did you ever ask Shapiro or Matt Herman or
14 Duffie or Marsha whether they were able to validate the
15 leads that the leads were compliant with all local, state
16 and federal regulations?
17   MS. CHATTIN:  Object to the form.
18 BY THE WITNESS:
19   A.  Again, when I -- same answer I've given
20 before.  When I would ask for verification or
21 documentation that the lead was an opt-in lead or was
22 compliant, I would get those responses and I would send
23 them on to Compliance or they would go directly to
24 Compliance.  So I just don't know exactly which agents

56 (Pages 218 - 221)

1 sent them, so I was verifying. Compliance was verifying
2 that leads were opt-in -- opt-in.
3 BY MR. BURKE:
4     Q.   So did you verify that these were opt-ins?
5          MS. CHATTIN: Object to the form.
6 BY THE WITNESS:
7     A.   It was -- I was not asked to verify in this
8 e-mail. I was not asked to verify anything. I was asked
9 to -- to send this e-mail on to agents.
10 BY MR. BURKE:
11     Q.   Okay. And then -- oh, man. We've got
12 another several months later. This last e-mail we were
13 talking about was from June 2018. Then we got another
14 e-mail from you to -- pardon me. This is from Marsha to
15 you -- I think that's probably a response -- listing a
16 bunch of phone numbers. So it looks like in
17 document 4919, HII 4919 you essentially just flipped them
18 what seems to be a company directory. Would you agree?
19          MS. CHATTIN: Object to the form.
20 BY THE WITNESS:
21     A.   I flipped them?
22 BY MR. BURKE:
23     Q.   You e-mailed them a company directory with no
24 other words in your e-mail?

1     A.   If you look at the subject line, it says "HII
2 DNC." These -- any numbers I was sending them were
3 numbers to -- to put on the HII DNC list, so --
4     Q.   I mean isn't this sort of a Bandaid solution
5 here? I mean if these folks are getting robocalls from
6 the Duffie insurance agency, isn't there a bigger
7 problem?
8     A.   The -- the bigger problem --
9          MS. CHATTIN: Object to the form of the
10 question. Sorry. I was just waiting for Alex to be
11 done.
12          Go ahead, Amy.
13          THE WITNESS: Sorry.
14 BY THE WITNESS:
15     A.   The bigger issue was that it was -- these
16 calls were coming from multiple agents. It wasn't just
17 one agent. It wasn't just Duffie. Coming from multiple
18 agents, multiple carrier products. Multiple companies
19 were being offered, so this wasn't just Sean Duffie
20 calling HII employees. This was many agents calling
21 employees, many different products being sold. So this
22 was an issue of somehow a lead vendor got all these
23 numbers for HII employees and were selling them all over
24 the place, so it wasn't just specific to -- to one -- one

1 individual agent.
2
3 BY MR. BURKE:
4     Q.   Okay. But here you're just sending it to
5 Scott; right, and Marsha?
6     A.   In this specific e-mail. I'm sure I sent it
7 to many other agents as well. We're sending this list to
8 many, many agents to stop these phone calls from -- from
9 happening.
10     Q.   Well, did you ever ask or are you aware of
11 anyone asking the Duffie insurance agency whether its
12 lead generator called any of these phone numbers?
13     A.   I don't recall that conversation -- those
14 conversations.
15     Q.   Because I think they did.
16     A.   What? Sorry.
17          MS. CHATTIN: Just wait -- just wait until he
18 asks you a question, Amy.
19 BY MR. BURKE:
20     Q.   I mean wouldn't -- wouldn't a thorough
21 investigation include requesting the call records from
22 the time period, the lead generation call records from
23 the time period associated with the phone calls to the
24 HII employees to see whether Duffie had anything to do

1 with those calls?
2          MS. CHATTIN: Object to the form of the
3 question.
4 BY THE WITNESS:
5     A.   The Compliance Department was doing as you
6 saw in earlier e-mails from Christine, that the
7 Compliance area was doing its own internal investigation,
8 so I don't know what that investigation involved. I just
9 know that our Compliance area did have an investigation
10 going, so I'm not sure what they were doing.
11 BY MR. BURKE:
12     Q.   I didn't ask you if you knew what they were
13 doing. I asked you whether you thought a thorough
14 investigation would be -- would include requesting the
15 call records and recordings from Duffie and other agents.
16          MS. CHATTIN: Object to the form.
17 BY THE WITNESS:
18     A.   Sure. I mean that would -- that might be one
19 way of -- of determining this information. I don't know
20 if that's something that our Compliance Department did or
21 didn't do. My -- my job wasn't about investigations and
22 getting call logs and things like that. That would have
23 been something that the Compliance Department would
24 determine within their -- you know, the bounds of their

Page 226

1  investigation.
2  BY MR. BURKE:
3      Q.  So what was your job again?  Because I see
4  lots of e-mails where you send the complaint and you say
5  call me to discuss, and we've got like well over a dozen
6  complaints here for a period of like seven months, and
7  all of the complaints are consistent with each other, and
8  they're -- all these complaints are tied to Duffie.  Why
9  didn't HII do more to prevent these calls?
10     MS. CHATTIN:  Object to the form.
11  BY MR. BURKE:
12     Q.  Isn't that something you considered when you
13  were working at HII?  Like holy moly there are so many
14  complaints arising from Duffie, what's going on, we
15  should discipline this guy or something?  I mean jeeze,
16  you're dealing with it on a weekly basis -- complaints
17  alleging the same thing that all tie back to Duffie.  I
18  mean what did you think in 2018 about these complaints?
19     MS. CHATTIN:  Object to the form of the
20  question.
21  BY THE WITNESS:
22     A.  Discipline -- thank you.  Disciplinary action
23  or red flags or concerns or things like that are handled
24  in the Compliance Department.  It is not something that

Page 227

1  the Sales team is supposed to be doing.  We are -- we can
2  help and assist, get information or send information, but
3  ultimately it is the job of the Compliance Department to
4  manage any complaints or concerns that they have about
5  agencies, and they have an entire team that does that.
6  BY MR. BURKE:
7      Q.  I'm sorry.  My question was in 2018 what did
8  you think of all these complaints.
9      MS. CHATTIN:  Object to the form.
10  BY THE WITNESS:
11     A.  I don't like a single complaint.  I don't
12  want to see a single complaint.  I want no complaints, so
13  I don't like complaints.  The issue -- you know, the
14  issue is what is my Compliance Department telling me to
15  do and what are they doing in order to help alleviate the
16  situation, eliminate the complaints or ultimately
17  terminate, and those are functions of the Compliance
18  Department not the Sales Department.
19  BY MR. BURKE:
20     Q.  I mean did you recommend -- did you talk to
21  anybody in Compliance about like hey, listen, this is a
22  lot of -- this is a lot of complaints at any time in --
23  in 2018?
24     A.  I had discussed with the Compliance

Page 228

1  Department that there were a lot of complaints,
2  specifically TCPAs, and I was asked by the Compliance
3  Department to tell the agency they either get on Trusted
4  Form or they are terminated.  Those are the options.
5      Q.  When did that happen?
6      A.  So I don't recall the dates, but I do recall
7  having to communicate with them I believe via e-mail and
8  phone conversations that if they didn't get on Trusted
9  Form they were going to be terminated.  I connected them
10  with Active Process -- Prospect, excuse me, Active
11  Prospect in order to get Trusted Form implemented.  That
12  was the solution to stop TCPAs, and if they didn't
13  participate, they were going to be terminated.
14     Q.  But like --
15     A.  So we had discussions.
16     Q.  So discussions were in late 2018; right?
17     A.  I don't recall the exact timing of them, as I
18  just said.  I just know that we had them as soon as there
19  was a point where there were too many complaints and we
20  needed to step in and do something.
21     Q.  How many complaints is too many for TCPA
22  compliance --
23     MS. CHATTIN:  Object to form.
24  BY MR. BURKE:

Page 229

1      Q.  -- in your view?
2      MS. CHATTIN:  Same objection.
3
4  BY THE WITNESS:
5      A.  I don't want to see one.  I don't want to see
6  one TCPA complaint, but they come in, and it's -- it was
7  HII's responsibility to figure out a way to stop them,
8  and Trusted Form was that solution.
9  BY MR. BURKE:
10     Q.  Okay.  I'm going to show you what I'm
11  circulating and has been marked as Exhibit I.
12     MS. CHATTIN:  Alex, can we take like a
13  five-minute break?  We've been going for a while.
14     MR. BURKE:  Sure.
15     MS. CHATTIN:  Thanks.
16     THE VIDEOGRAPHER:  We're going off the record
17  at 4:11 p.m.
18          (WHEREUPON, a break was
19          taken.)
20     This is media number five deposition of
21  Amy Brady.  Today is January 12th, 2022.  We're going
22  back on the record at 4:23 p.m.
23  BY MR. BURKE:
24     Q.  Okay.  So I want to show you what I've marked

58 (Pages 226 - 229)

Page 230

1  as Exhibit I. I e-mailed it around so you had a sneak
2  preview. Exhibit I is a single page. HII 4933 is the
3  Bates. Do you remember this e-mail?
4      A.   Yes.
5      Q.   Okay. Tell me what it's all about.
6      A.   So this e-mail is outlining this agency had
7  13 TCPAs between March and September, and I mentioned
8  this earlier today, where the Compliance team came to me
9  and said if they don't get on Trusted Form we're
10  terminating them, so at this point their notification
11  getting on Trusted Form is required. If not --
12     Q.   If not, then they would be terminated?
13     A.   Yes.
14     Q.   Okay.
15     A.   So I say in this e-mail: "We are not
16  terminating you at this point but we need to get this
17  under control and fast to avoid anything like that
18  occurring."
19     Q.   Okay. So, first of all, where did this list
20  of complaints come from?
21     A.   This would have come directly from the
22  Compliance Department.
23     Q.   Do you remember who sent it to you?
24     A.   No.

Page 231

1      Q.   Did you receive it by e-mail from someone?
2      A.   I -- I would have received this from the
3  e-mail, correct.
4      Q.   And why did you decide to reach out to Jeff
5  Shapiro here instead of Marsha or even the head honcho
6  Duffie?
7      A.   I have no -- I probably talked to Duffie. He
8  told me to send it to Shapiro. I always contact the
9  agent first to see where it should go.
10     Q.   So are you saying every time you sent a
11  complaint you called the managing agent first to see
12  whether you should send the complaint?
13     A.   Typically that would be a process where I
14  would call the agent, ask them where I -- what I should
15  do with it. So this is a serious situation. I would
16  have called Sean Duffie and said how do you want to
17  handle. That's -- that is my typical process.
18     Q.   Is that what you did with this one?
19     A.   I can't recall. That is my typical process.
20  So you're asking me why I would send it to Scott, and it
21  would be because that's where Sean Duffie told me to send
22  it.
23     Q.   Okay. You say in your e-mail that the TCPA
24  activity has garnered a lot of attention from our

Page 232

1  Compliance area, carriers and exec team. Who at the
2  Compliance area was giving these complaints a lot of
3  attention?
4      A.   As I recall, Christine, Dan Garavuso, Ruben
5  that were -- that I worked closest with in the department
6  at this time.
7      Q.   And who was in charge of the Compliance team?
8      A.   I believe Dan Garavuso was the head of
9  Compliance at this time.
10     Q.   Okay. And you also say: "There are carriers
11  who these complaints are garnering a lot of attention
12  from." Who are the carriers that were concerned about
13  these complaints?
14     A.   So I don't know which carrier in particular,
15  but often with the complaints or TCPA lawsuits they would
16  often list the carrier as well, so those documents would
17  go to the carrier, and then the carriers obviously worked
18  with our Compliance team and --
19          (Zoom interruption.)
20          THE REPORTER: I'm sorry. You're breaking up
21  again.
22          THE WITNESS: Sorry.
23          THE REPORTER: Can you repeat that?
24          THE WITNESS: Where did I leave off?

Page 233

1          THE REPORTER: "So documents would go to the
2  carrier and then the carriers obviously worked with our
3  compliance team."
4
5  BY THE WITNESS:
6      A.   And the carriers would express their being
7  unhappy about these TCPAs.
8  BY MR. BURKE:
9      Q.   Okay. And really in Exhibit D that we looked
10  at earlier -- I can pull it up for a second -- the
11  carriers are required to be notified of the complaint;
12  isn't that right?
13     A.   It says if applicable, so I don't know when
14  it's applicable to notify the carrier or not. That's
15  something that Compliance and Legal team would determine.
16     Q.   Oh, yeah, because this is a document -- this
17  is a policy you never saw; right?
18     A.   Right.
19         MS. CHATTIN: Object to form.
20  BY MR. BURKE:
21     Q.   Okay. So -- okay. So perhaps the carriers
22  learned about these complaints through the formal policy
23  concerning dealing with TCPA complaints or perhaps
24  something else; right?

59 (Pages 230 - 233)

Page 234

1    A.   Correct.
2    Q.   Who told you that the carriers were garnering
3  a lot of attention about these multiple complaints about
4  TCPA from the Duffie agency?
5    A.   That would have been from someone in
6  Compliance.  Most likely Dan or Christine.
7    Q.   Okay.  And then you also say that "the exec
8  team was giving this a lot of attention."  Who did you
9  mean when you said "the exec team"?  I assume -- I assume
10  exec means executive; right?
11    A.   That is correct.
12    Q.   So like are we talking about -- who are we
13  talking about exec team?
14    A.   So on those -- some of the complaints you
15  showed earlier individuals like Gavin Southwell, Mike
16  Kosloske, Michael Hirshberger were listed.
17    Q.   And so those are the folks who were concerned
18  about the Duffie agency and TCPA Compliance?
19    A.   The -- the executive team was concerned about
20  any TCPA complaint.
21    Q.   Well, you say:  "Your list of TCPA violation
22  is long."  Then you say:  "As you know, this activity has
23  garnered a lot of attention from our Compliance area,
24  carriers and exec team."  To me that means Duffie's

Page 235

1  activity or -- Duffie's agency's activity; right?
2       MS. CHATTIN:  Object to the form.
3  BY THE WITNESS:
4    A.   Yes.
5  BY MR. BURKE:
6    Q.   All right.
7    A.   Yes.
8    Q.   So then you start talking about Trusted Form;
9  right?
10    A.   Yes.
11    Q.   And your reference to Trusted Form in this
12  e-mail only references the part of the Trusted Form
13  service that relates to serial litigators; right?
14    A.   I do say that, but Trusted Form would have
15  caught them all.  That is an error in the -- in what I
16  have said there.  Trusted Form would have been full
17  opt-in on anyone, so Trusted Form -- so we would call
18  Trusted Form the system, and I say here the Trusted Form
19  system.  The serial -- it did have a serial litigator
20  scrub that would have caught six, but the Trusted Form in
21  itself would have caught them all, so that's just not a
22  very complete and correct sentence.
23    Q.   What do you mean "Trusted Form would have
24  caught them all"?  What do you mean?

Page 236

1    A.   Trusted Form requires a true and -- and
2  correct opt-in and proof of the opt-in, so we would have
3  had an opt-in on anyone that they sold, so that's what I
4  mean by it would have caught them.  We would have had --
5  the agency would have had an opt-in for every single
6  customer listed here, individual listed here if Trusted
7  Form had been implemented.
8    Q.   Okay.  And so when you say that, you're sort
9  of implying that there wasn't opt-in information for
10  these complaints; right?
11    A.   I don't know if there was or there wasn't.
12  I -- I -- I don't know that I have or had that
13  information.  All I can do is read this and say of the
14  seven complaints, individuals that complained, submitted
15  complaints, six were from serial litigators.  So I don't
16  have any information -- I don't seem to have the
17  information of what was opted in and what wasn't based on
18  what I'm reading.
19    Q.   Well, what about your recollection of these
20  facts and circumstances?  I mean this seems pretty
21  extraordinary to me to send an e-mail like this.  Was
22  this the type of e-mail that you sent to agents all the
23  time?
24    A.   This would be the one -- you know, I sent

Page 237

1  like this because this was -- as you see, it has the most
2  violations of anyone in our company and it needed to get
3  under control immediately.
4    Q.   Okay.  And so where in the e-mail do you talk
5  about Trusted Form and opt-in -- opt-ins?
6    A.   I don't.
7    Q.   Okay.  So really at least insofar as what you
8  communicated to Scott Shapiro, the only thing you
9  communicated about was this serial litigator program at
10  Trusted Form; right?
11    A.   That is not correct.  As I stated, that
12  sentence is clumsy and it is not clear.  The Trusted Form
13  system -- we called it the Trusted Form system even
14  though it was really called -- the company was Active
15  Prospect.  I should have said the Active Prospect system,
16  and the serial litigator scrub would have caught six of
17  seven of these individuals.  These individuals are serial
18  litigators, so -- so part of the Active Prospect would
19  have caught six out of seven of these individuals is what
20  I'm saying.  So it is just wording in a clumsy way, but
21  Trusted Form, that piece of the Active Prospect system
22  would have provided an opt-in for every single one of
23  these individuals.  That is what Trusted Form is.
24    Q.   Okay.  Okay.  Okay.  And then did -- did the

60 (Pages 234 - 237)

Page 238

1  Duffie agency sign up for Trusted Form?
2      A.   Yes.  In fact, Adam Chickman who was our rep
3  at Active Prospect did meet with the agency, did work on
4  getting them set up, so that -- that was under way.
5      Q.   Okay.  I'll send you another exhibit, an
6  e-mail from the following day.  Oh, Adobe's mad at me.
7          Okay.  All right.  So Exhibit I was from
8  September 17th, and then Exhibit J is from
9  September 18th, 2018, the very next day.  Looks to me
10 like it's an e-mail from Adam Chickman at Active Prospect
11 to Marsha, Scott and you; right?
12     A.   Yes.
13     Q.   And if we scroll down in this document, we
14 see it's an Active Prospect service proposal.  Is this
15 the -- is this the document that you referred to when you
16 were saying that Duffie signed up for Trusted Form?
17     A.   I don't recall ever seeing this document.  I
18 don't know if this is in my e-mail.  I don't know that --
19 or it was in this e-mail.  I don't remember looking at
20 the contract -- that document.  My goal is to make sure
21 that these parties are talking and getting started,
22 getting set up.
23     Q.   Okay.  Great.  So it looks to me like
24 Duffie --

Page 239

1      A.   Oh.
2      Q.   -- did not sign the Trusted Form contract.
3  Instead this mysterious company you say you never heard
4  of, Health Advisors of America, signed it.
5          MS. CHATTIN:  Object to the form.
6  BY MR. BURKE:
7      Q.   Would you agree?
8          MS. CHATTIN:  Same objection.
9  BY THE WITNESS:
10     A.   I mean you're showing it to me.  I guess
11 that's the case.  As I said, I -- I don't ever recall
12 seeing this document or looking at this document.
13 BY MR. BURKE:
14     Q.   Okay.  But you received it; right?  Do you
15 deny that?
16     A.   If you're showing it to me and saying I
17 received it, I believe that I received it.
18     Q.   No.  No.  No.  No.  I'm asking -- I'm asking
19 you -- I'm not testifying here.  This is your deposition.
20 This is an e-mail to you from Adam Chickman who you just
21 testified about on the prior exhibit from the prior day
22 to you attaching the contract.  Do you deny receiving
23 this?
24     A.   No, I do not deny receiving this.  I'm

Page 240

1  looking at it.  I see that I received it.  I just don't
2  recall opening it or looking at it.  I -- I see that I
3  received this, and what I'm saying is this shows me the
4  conversations are starting between Active Prospect and
5  the Duffie agency.
6      Q.   Well, the Duffie agency didn't execute a
7  contract with Active Prospect, did it, at least not in
8  this e-mail?
9      A.   Correct, not in this e-mail.
10     Q.   Okay.  Do you -- are you aware of another
11 e-mail where the Duffie agency --
12     A.   No.
13     Q.   -- Duffie, Shapiro, Marsha, anybody executed
14 a contract with Active Prospect?
15         MS. CHATTIN:  Object to the form.
16 BY THE WITNESS:
17     A.   No.  Health Advisors of America is -- was not
18 set up with HII, was not an agency of HII.  I don't know
19 what this means or why they're on this document.  Our
20 requirement was for Sean Duffie's agency to get on
21 Trusted Form.  This e-mail shows me that Marsha, Scott
22 and the individual from Active Prospect are in
23 communications and getting set up to -- to get on Trusted
24 Form.  I don't know what this -- this contract is about

Page 241

1  between the two parties.
2  BY MR. BURKE:
3      Q.   Well, you received it.  Did you just not read
4  it?
5          MS. CHATTIN:  Object to the form.
6
7  BY THE WITNESS:
8      A.   Probably.
9  BY MR. BURKE:
10     Q.   I see.
11     A.   I don't recall seeing this.
12     Q.   And this is Michael Smith.  I think you
13 testified earlier that you had -- you didn't even know
14 who Michael Smith was at least in the context of 2018 or
15 is that wrong?
16         MS. CHATTIN:  Object to the form.
17 BY THE WITNESS:
18     A.   That is -- that is incorrect.  Michael Smith
19 was an agent that was licensed and appointed with HII's
20 carriers and through HII prior to 2016, and then that
21 relationship ended, and my testimony was that I've not
22 worked with him after that period.  That's what I recall
23 saying about Michael Smith.
24 BY MR. BURKE:

61 (Pages 238 - 241)

Page 242

1    Q.   I guess except that Michael Smith on behalf
2  of his company -- he's the CEO I guess of Health Advisors
3  of America, Incorporated -- signed up for Trusted Form
4  when you asked Duffie to sign up for Trusted Form; right?
5    A.   Correct.
6    Q.   And did HII -- HII certainly facilitated the
7  sign-up but what other -- did HII help pay for Trusted
8  Form?  Because I see that the contract terms at least for
9  Health -- Health Advisors of America call for zero
10 dollars.
11   A.   It is my recollection that HII was paying for
12 any and all agents to be on Trusted Form.  That is my
13 recollection.
14   Q.   Okay.  So do you have any reason to -- to
15 doubt whether HII was paying for Health Advisors of
16 America's Trusted Form account?
17      MS. CHATTIN:  Object to the form.
18 BY THE WITNESS:
19   A.   HII was paying for any of its agents to -- to
20 get on Trusted Form.  Again, I don't -- I don't recall
21 ever seeing this document, and why -- why Michael Smith's
22 name is on it, that I cannot explain.
23 BY MR. BURKE:
24   Q.   Okay.  Well, this contract at least says that

Page 243

1  the subscriptions for Health Advisors of America were
2  covered, "covered by HII."  I see that on Page 7122.  Do
3  you deny that?
4      MS. CHATTIN:  Object to the form.
5  BY THE WITNESS:
6    A.   I'm looking at it.  I'm looking at it, and
7  that's what it says.
8  BY MR. BURKE:
9    Q.   I know, but I'm asking --
10   A.   I --
11   Q.   I'm asking you whether you have any reason to
12 think that that was not the case.
13      MS. CHATTIN:  Object to the form.
14 BY THE WITNESS:
15   A.   The contract is -- sorry, Danielle.  It's
16 like scratched out too.  There's like -- it was meant for
17 specific people and it was scratched out and other names
18 are listed, so I just don't know what this means exactly,
19 if this is the active contract because these go to
20 Compliance.  Compliance works with these contracts, and I
21 don't know if they said this is incorrect or -- and a new
22 contract was set up.  I don't know.  I just know what I'm
23 looking at is a little funky because there's scratched
24 out information and it doesn't have an agent of ours

Page 244

1  listed.
2  BY MR. BURKE:
3    Q.   I mean do you -- do you believe --
4    A.   So --
5    Q.   -- it to be invalid?
6      MS. CHATTIN:  Object to the form.
7
8  BY THE WITNESS:
9    A.   It's not my place to call it valid or
10 invalid.  It just seems a little odd to me with the
11 scratched out information.
12 BY THE WITNESS:
13   Q.   Well, wait a second.  You were charged with
14 assisting Duffie in setting up Trusted Form; right?
15   A.   I was instructed to connect these two parties
16 to get Sean Duffie on Trusted Form with the HII on-line
17 tools.  Michael Smith is not an agent of ours, so I don't
18 know why his name would be on this document and it's --
19 Scott Shapiro's name shouldn't be on this document
20 because it should be Sean Duffie, and Scott Shapiro is
21 not an agent of HII, so I don't know what this contract
22 means and whether or not Compliance looked at it and said
23 correct.  So I'm looking at a contract that hasn't been
24 executed, that doesn't look like it's been executed by

Page 245

1  anybody at HII so, and this would go directly to
2  Compliance, so this one just seems funny to me because
3  there's so many scratched out -- scratched out pieces of
4  information and individuals that are not agents with HII.
5    Q.   Well, so did you ever receive a note or a
6  phone call or any communication from Regulatory or
7  Compliance saying hey, wait a second, this isn't Duffie,
8  it's not Shapiro, it's Health Advisors of America who is
9  the subject of a lawsuit for TCPA; no?
10      MS. CHATTIN:  Object to the form.
11 BY THE WITNESS:
12   A.   I never -- oh, sorry.  Sorry, Danielle.
13       I never received any call or information like
14 that from Compliance.
15 BY MR. BURKE:
16   Q.   I mean before September 18th -- before
17 September 18th HII knew that Duffie was working with
18 Michael Smith; isn't that right?
19      MS. CHATTIN:  Object to the form.
20 BY THE WITNESS:
21   A.   That is not right.  I didn't -- we did not
22 know -- we did not know that Duffie was working, if he
23 his or he isn't working with Michael Smith.
24 BY MR. BURKE:

Page 246

1    Q.   Well, I guess maybe you -- maybe HII didn't
2  care whether --
3        MS. CHATTIN:  Object to the form.
4  BY MR. BURKE:
5    Q.   -- whether Duffie was working with Health
6  Advisors of America or Michael Smith?
7        MS. CHATTIN:  Object to the form.
8  BY THE WITNESS:
9    A.   HII had a relationship with Sean Duffie
10  contractually.  HII had no relationship with Health
11  Advisors of America or Michael Smith.  Michael Smith was
12  not included in e-mails that we've looked at today.  It's
13  been Scott Shapiro and Marsha Griffin.  So I don't know
14  what to say.  We have no relationship with HAA or Michael
15  Smith.
16    Q.   Well, we talked earlier about Marsha Griffin
17  in 2017, 2018 after she stopped being an agent.  Do you
18  know who Marsha Griffin's employer was during that time?
19  I think you testified earlier you didn't know and didn't
20  bother to find out.  Did you know who Marsha Griffin
21  worked for in 2017, '18, '19?
22        MS. CHATTIN:  Object to the form.
23  BY THE WITNESS:
24    A.   I do not -- when I talked to Sean Duffie and

Page 247

1  Sean Duffie tells me to contact Marsha Griffin for
2  admin-related issues, I go to Marsha for admin-related
3  issues.  I do not know the relationship, their
4  contractual relationship or employee/employer
5  relationship.
6  BY MR. BURKE:
7    Q.   So do you now know today that Marsha was an
8  employee of Health Advisors of America that whole time?
9        MS. CHATTIN:  Object to the form of the
10  question.
11        Go ahead.
12  BY THE WITNESS:
13    A.   I do -- I do not know that.
14  BY MR. BURKE:
15    Q.   Do you deny that that's the -- that's a fact?
16        MS. CHATTIN:  Object to the form.
17  BY THE WITNESS:
18    A.   I do not know who Marsha worked for, works
19  for, past, present, future.  I don't know.
20  BY MR. BURKE:
21    Q.   So if Marsha was working for HAA, Health
22  Advisors of America, for 2017, '18, '19, all those do not
23  call requests that you sent or the lists that you called
24  them originally, those were being sent directly to HAA.

Page 248

1  Do you understand that?
2        MS. CHATTIN:  Object to the form.
3  BY THE WITNESS:
4    A.   I am sending the do not call numbers to an
5  individual, Marsha Griffin, at her e-mail address at the
6  direction of our agent Sean Duffie.
7  BY MR. BURKE:
8    Q.   And it makes sense, doesn't it?  You've got
9  do not call requests.  He's like okay, talk to Marsha,
10  and the reason he said talk to Marsha is because she's
11  the lead generator; right?
12        MS. CHATTIN:  Object to the form.
13  BY THE WITNESS:
14    A.   I have no idea what --
15  BY MR. BURKE:
16    Q.   That never occurred to you?
17        MS. CHATTIN:  Objection to form.
18  BY THE WITNESS:
19    A.   No.  No.
20  BY MR. BURKE:
21    Q.   Did Scott -- did Mr. Duffie ever lie to you
22  about what Mr. -- Ms. Griffin's role was?
23        MS. CHATTIN:  Object to the form.
24  BY THE WITNESS:

Page 249

1    A.   Sean Duffie told me to go to Marsha for
2  admin-related issues, and I did that.  He is the agent of
3  record, and he directed me where to go, and you can see
4  from e-mail history that we went through today that is
5  what I did.
6
7  BY MR. BURKE:
8    Q.   Right.  And Marsha worked directly for HAA?
9    A.   I'm not aware of that information.
10    Q.   Isn't that also consistent with HAA signing
11  the Trusted Form document?  I mean it wasn't a secret.
12        MS. CHATTIN:  Object to the form.
13  BY THE WITNESS:
14    A.   Again, I don't recall ever seeing that
15  document, and I also -- I have to stand by saying that's
16  kind of a funny document because everything is scratched
17  off, and he's listed on there, and he's not connected to
18  HII in any way.
19    Q.   Except he works for -- he's a CEO of a
20  company that you've been communicating with regarding
21  TCPA Compliance for Duffie for a year and a half.
22    A.   I am not --
23        MS. CHATTIN:  Object to the form.  Sorry.
24        THE WITNESS:  Yeah.

63 (Pages 246 - 249)

Page 250

1      MS. CHATTIN: I object to form, and wait --
2  just wait for a question. I don't think there was a
3  question, Alex.
4  BY MR. BURKE:
5      Q.  And these settlement agreements that started
6  coming out of the woodwork, I don't know why you just
7  started getting copied on these settlements in around
8  September 2018, but the settlement agreements likely,
9  Hasiak one we looked at, also release Health Advisors of
10  America. I mean did that cause you or Regulatory or
11  Compliance or even Legal any sort of pause? Why would
12  they be included in those settlement agreements?
13      MS. CHATTIN: Object to the form.
14  BY THE WITNESS:
15      A.  I can only speak for me. I -- I never even
16  recognized the name. As I said, the one document that
17  you showed me that had that agency name also had Adroit
18  Health. It didn't raise any red flags. I assumed it was
19  something connected to Adroit Health. It was not
20  somebody connected to HII. That's what I knew, and
21  that's what I saw.
22  BY MR. BURKE:
23      Q.  Okay. And you were responsible for
24  collecting these settlement agreements on behalf of HII,

Page 251

1  weren't you?
2      MS. CHATTIN: Object to the form.
3  BY THE WITNESS:
4      A.  I was -- I was not.
5  BY MR. BURKE:
6      Q.  Well, Marsha sent them to you; right?
7      MS. CHATTIN: Object to the form.
8  BY THE WITNESS:
9      A.  You showed me one settlement I believe that
10  Marsha sent to me. Those were -- typically the
11  settlement agreements were between the Compliance
12  Department and the agency.
13  BY MR. BURKE:
14      Q.  I see. All right. I'll show you another
15  one.
16      A.  I don't know. I was not -- that is not a
17  typical thing. If I was cc'd in on something or it was
18  sent to me to send to Compliance, that may have occurred,
19  but as a general practice, settlement agreements were not
20  run through the sales team.
21      Q.  Okay. Well, here's another one.
22      A.  Okay.
23      Q.  Aussieker settlement agreement. Do you agree
24  that this was an e-mail, Exhibit L was an e-mail that

Page 252

1  Marsha Griffin sent to you? This document is three pages
2  long beginning at 5049.
3      A.  Okay. I see that there's a settlement
4  agreement. I would have taken that e-mail and forwarded
5  it to Compliance.
6      Q.  Okay. And here we go. Health Advisors of
7  America and Health Insurance Innovations just side by
8  side. Let me ask you this: I mean did HII approve this
9  settlement agreement?
10      MS. CHATTIN: Object to the form.
11  BY THE WITNESS:
12      A.  I have no -- I have no idea. Again, I am not
13  in -- involved in settlement agreement discussions or
14  legal language. If I get a copy of one, I forward it
15  to --
16  BY MR. BURKE:
17      Q.  You forward it to who?
18      A.  Compliance.
19      Q.  Who at Compliance did you send settlement
20  agreements having to do with TCPA?
21      MS. CHATTIN: Object to the form.
22  BY THE WITNESS:
23      A.  Typically it would be Christine or Dan or
24  whoever is in charge of the Compliance Department.

Page 253

1  BY MR. BURKE:
2      Q.  And so do you have any reason to believe that
3  you never forwarded this settlement agreement to Dan or
4  to Christine or to anyone else --
5      MS. CHATTIN: Object to the form.
6
7  BY MR. BURKE:
8      Q.  -- Exhibit L?
9      A.  Yes, I would have forwarded this agreement to
10  Compliance.
11      Q.  Because I don't think I have a copy of that.
12  We've looked for it. And I'm supposed to have it --
13  everything. So I'm going to put Exhibit D on here for
14  another second. This is again the policy that you said
15  you'd never saw, but I wanted to direct your attention to
16  Bates 193. This is Page 2 of Exhibit D. It says: "HII
17  and any named carrier reserve the right to review,
18  comment and approve settlement agreements." My question
19  to you is even though you never saw this policy was that
20  your understanding that HII had the right to review,
21  comment and approve TCPA settlements.
22      MS. CHATTIN: Object to the form.
23  BY THE WITNESS:
24      A.  I -- I -- I don't -- I don't know. I didn't

64 (Pages 250 - 253)

Page 254

1 know what HII's rights or requirements were regarding
2 settlements.
3 BY MR. BURKE:
4    Q.  Do you have any idea why Marsha thought it
5 was a good idea to send the settlement to you --
6    MS. CHATTIN:  Object to the form.
7 BY MR. BURKE:
8    Q.  -- in Exhibit L and Exhibit I think it was K?
9    MS. CHATTIN:  Object to form.
10 BY MR. BURKE:
11    Q.  I mean that would be curious.
12    A.  I'm sure she sent it to me just so that I
13 would send it to Compliance.  I would love it if she
14 would skip a step and send it directly to Compliance, but
15 if it did come to me, I am required to forward it to
16 Compliance.
17    Q.  Oh, this is the wrong exhibit.  I mean gosh,
18 Exhibit L and Exhibit G look really similar, don't they?
19 I'm just sort of putting them side by side here on the
20 screen.  I mean my goodness.  They are almost verbatim,
21 aren't they?
22    MS. CHATTIN:  Object to the form of the
23 question.
24 BY THE WITNESS:

Page 255

1    A.  Yes.  Yes, they look familiar or they look
2 similar.  Excuse me.
3 BY MR. BURKE:
4    Q.  Yeah.  Okay.  Let's just shift gears for
5 another sec.  I'm going to show you another exhibit, K.
6 This one has to do with telemarketing scripts.  So
7 Exhibit K is -- oh, my gosh.  It's 187 pages long and
8 it --
9    A.  Yeah, each -- each of the scripts are super,
10 super long so.
11    Q.  Yeah.
12    (Zoom interruption.)
13    A.  Yep.
14    Q.  And so just for continuity's sake, Exhibit K
15 starts at 7327, and I believe it is consecutive to 7513
16 produced by HII.  And so why did you send Marsha the
17 verification scripts?
18    A.  Verification scripts are -- if you recall,
19 earlier today we talked about two different ways that a
20 customer can verify that they understand the coverage
21 they've purchased.  One was through the e-sign documents
22 that we went through.  The second way that a customer can
23 verify that they understand what they purchased is
24 through a voice verification.  A voice verification must

Page 256

1 be read word for word to the customer, and that's what
2 these are.  These are verification scripts that cannot be
3 adjusted.  They have to be read word for word to the
4 customer, and the customer has to approve at certain
5 places and say they agree.  That call has to be recorded
6 and uploaded to HII.
7    Q.  Okay.  So would you agree that each of these
8 scripts represent verification scripts provided by HII
9 for sales of products and services through HII?
10    A.  These are verification scripts that the
11 carrier requires input from the carrier on these scripts.
12 The carriers have to approve these scripts.  They're
13 provided by the carrier and HII to the agent so that the
14 agent knows exactly what to say word for word to a
15 customer during a voice verification.
16    Q.  I'm sort of just scrolling through this
17 sucker.  I can -- I can e-mail it to you too.  I think I
18 was delinquent in e-mailing these things for a couple
19 exhibits.
20    Okay.  And so these verification scripts were
21 to be read during the telemarketing call with the
22 consumer; is that right?
23    A.  This is what -- verification at this point.
24 This is what is being read to the customer with the

Page 257

1 customer giving a verbal approval in order for the
2 applicant -- in order for the application to be submitted
3 to the carrier or to HII.  Excuse me.
4    Q.  Okay.  So it's prospective customer; right?
5    A.  Correct.  This is prior to submitting the
6 application to HII, invoice verification.
7    Q.  And so if, for example, Duffie receives a
8 warm transfer and was successful in getting a -- a
9 potential customer interested after the fronter talked to
10 the potential customer and then perhaps a licensed agent
11 spoke with the potential customer and outlined the
12 policies and different products, is it accurate to say
13 that the final part of a non-e-mailed contract is for
14 someone at the Duffie agency to read the -- whatever
15 applicable scripts were applicable to the products that
16 were being sold during that phone call?
17    A.  Couple things.  A licensed agent is required
18 to have a conversation with the insured or the potential
19 insured, the customer.  You said potentially.  I just
20 want to make sure it is required that a licensed agent is
21 the one that's selling the health insurance product.  At
22 the point where the customer says yes, I want this plan
23 and is -- agrees with the agent, this verification does
24 have to be read as I said word for word.  It does not

Page 258

1  have to be done by a licensed agent, so a non-licensed
2  agent can go through this document and read word for word
3  with no commentary with the customer, only the customer
4  agreeing or not agreeing, but this is the verification
5  and final part of the process before that application
6  goes into the HII system.
7      Q.  Okay.  And do you remember why you sent all
8  these scripts to Marsha?
9      A.  So back in 2016, you know, the majority of
10  the business at HII was being sold through e-sign.  You
11  can see I talk about how e-sign is awesome.  It is -- so
12  but we -- not all customers have the ability to e-sign,
13  so we have to make sure that customers can voice verify
14  as well.  So I must have sent her these.  I must have
15  sent her those just so that she had them in the event
16  that she would do -- team -- her verification team would
17  need to do a voice verification, Duffie's team.
18  Actually, I take that back.  I don't even know whose
19  team.  That was 2016, so I would send that to any -- any
20  agent, any agency that wants to do voice verifications as
21  well as e-signs.
22      Q.  Okay.  And so -- you say here:  "The zip file
23  is for every product we have."  Did you mean every
24  product HII had?

Page 259

1      A.  Yes, that is what I would mean, and what I
2  would mean by that are the core, as I mentioned earlier,
3  the core products which would be Everest short-term
4  medical, Unified short-term medical, Unified limited
5  medical and Companion limited medical.  At that time
6  those were the four core products HII was selling or that
7  agent was licensed and appointed to sell.
8      Q.  Okay.  So on 7347 I see, for example, one
9  that has to do with NCE Premier short-term medical
10  verification.  Do you see that?
11      A.  I do.
12      Q.  Is that one you remember HII selling?
13      A.  I'm looking for the carrier name.  I -- I
14  know them by carrier.  Oh, it says -- I was just looking
15  for the carrier name.  The carrier is Unified Life.  It
16  really should say by in that top section.
17      Q.  I see.
18      A.  Usually how -- how HII would list it, so I
19  don't know why it doesn't, but the carrier's Unified, and
20  NCE would have been the --
21          (Zoom interruption.)
22      THE REPORTER:  I'm sorry.  "NCE would have
23  been the"?
24  BY THE WITNESS:

Page 260

1      A.  The association.
2  BY MR. BURKE:
3      Q.  Okay.  And then I see another reference to
4  the NCE Premiere product.  Is this also a -- a product
5  that was sold through HII?
6      A.  Hang on.  Yeah, I'm just looking for the
7  carrier name 'cause --
8      Q.  I'm just scrolling.  This is around 7445
9  Bates that was produced by HII, yeah.
10      A.  I'd have to -- you have to -- go on.
11      Q.  You think it's down below or above?
12      A.  I don't know.
13      MS. CHATTIN:  Amy, you should have this
14  Exhibit K in your e-mail if that would be helpful to look
15  at.
16  BY THE WITNESS:
17      A.  Hang on.  Stop.  Wait.  Stop.  Here we go.
18  If you look at the middle of that first section, it says
19  American Financial or Life Shield, so those would be the
20  two carriers that were connected to this plan.  NCE would
21  have been the --
22          (Zoom interruption.)
23      THE REPORTER:  I'm sorry.  "NCE would have
24  been the"?

Page 261

1  BY THE WITNESS:
2      A.  The association.
3  BY MR. BURKE:
4      Q.  Right.  And didn't Unified stop working with
5  HII at some point in around 2017?
6      A.  I believe -- I don't know if it was 2017.  I
7  know that Unified -- we did stop working with -- with
8  Unified for whatever reason.
9      Q.  You don't know the reason that Unified
10  stopped --
11      A.  No.
12      Q.  -- working with HII?
13      A.  No.
14      Q.  Would it surprise you to hear that the reason
15  was illegal telemarketing?
16      MS. CHATTIN:  Object to the form.
17  BY THE WITNESS:
18      A.  I don't know the reason.  I mean that -- I
19  have no idea what the reason would be.
20  BY MR. BURKE:
21      Q.  Okay.
22      MS. CHATTIN:  Can -- we can we go off the record
23  for a second?
24      MR. BURKE:  Sure.

66 (Pages 258 - 261)

Page 262

1      THE VIDEOGRAPHER: We're going off the record
2 at 5:16 p.m.
3          (WHEREUPON, a break was
4          taken.)
5         We're going back on the record at 5:20
6 p.m.
7 BY MR. BURKE:
8   Q.  Okay. Was there some sort of program at HII
9 where HII would sometimes advance the cost of marketing
10 or lead generation to an agent if the agent assigned
11 future earnings to HII or something like that?
12   A.  No. There was no program like that that had
13 anything to do with paying for marketing or anything like
14 that. There was a standard commission advance agreement
15 which is standard in the industry that if an individual
16 wrote a case there may be some advances paid on that
17 case, but it was specific to the premiums, specific to
18 the commissions. It had nothing to do with any marketing
19 dollars, anything to do with anything outside of the
20 specific premium.
21   Q.  And so is a marketing fee -- what is a
22 marketing fee? Is that the fee that agents earn from
23 HII?
24   A.  I don't know where you're seeing marketing

Page 263

1 fee. It would depend on -- on what you're referring to.
2   Q.  All right. I'm looking at Exhibit A,
3 "Assignment of Marketing Fees."
4   A.  Oh, okay. So within -- so within the product
5 there may be a fee, for example, an enrollment fee. That
6 would not be considered a commission. Commission is
7 strictly connected to the premium, so in that case, that
8 would be all under the category of a marketing fee
9 because it is not technically commission, so that's what
10 that would mean.
11   Q.  And so the -- HII is advancing those
12 marketing fees and the agents can use that money for
13 whatever they want, is that what you're saying?
14   A.  In the example I just gave, there wouldn't be
15 an advance on an enrollment fee because an enrollment fee
16 is a one-time payment, but commissions -- so, for
17 example, if the agent was to receive X commission, there
18 may be -- there would be an -- there could be an advance
19 depending on if the agent qualified for it on the
20 commission side of -- of the policy. So there would be
21 an advance on that policy, and then it would what's
22 called earn out as the -- as the policy stayed on the
23 books, but yes, there -- there were advance commissions,
24 and they could use those funds for whatever they needed.

Page 264

1   Q.  Okay. And what did you do to prepare for
2 today's deposition?
3   A.  Spoke with my attorney here that are present
4 on the call or on the -- in the deposition.
5   Q.  Anything else?
6   A.  They're the only ones I -- I communicated
7 with about the deposition.
8   Q.  I'm going to show you one more exhibit
9 because it's -- I think it's weird and I don't get it.
10 This is Exhibit M like Mary. And this is you in March
11 2017 sending a demand letter from HII to Marsha Griffin.
12 Do you remember that?
13   A.  No. So let me just take a look at this.
14 Wait. Let me just see this. Don't go down yet.
15   Q.  Okay.
16   A.  Okay. "Please see attached demand letter."
17 Okay. Now you can scroll.
18   Q.  By the way, who's Nick Marley?
19   A.  Nick Marley was -- I don't know if he was
20 officially an employee or not. He was an individual that
21 was brought in when Gavin Southwell came in and he was
22 heavily involved on the Compliance side of things.
23   Q.  For HII?
24   A.  For HII.

Page 265

1   Q.  When did Mr. Marley leave HII or when did he
2 stop working with HII?
3   A.  When or why?
4   Q.  When?
5   A.  When? I don't know. He'd -- he'd been there
6 a number of years. I don't know when he -- he left. He
7 was in -- he was in England, so he was out of the
8 country, so he was -- for part of the time, so he was a
9 part-time individual, so I don't know how -- what his
10 status was with HII but --
11   Q.  Okay. Do you remember this situation at all
12 where I guess Marsha was calling existing policyholders
13 and trying to get them to cancel their policies and take
14 out new policies?
15   A.  Is this from HII to her?
16   Q.  Yeah. It's from outside counsel. This is
17 Bates 7273 to 7276 and -- yeah. Robby Birnbaum says he
18 represents HII, and he's asking for 4600 bucks to
19 compensate HII.
20   A.  I don't know what -- I don't --
21   Q.  You don't remember this?
22   A.  I don't know what -- I don't know what this
23 is.
24   Q.  Well, notwithstanding --

67 (Pages 262 - 265)

1    A.   I don't know what this is.

2    Q.   Notwithstanding that Marsha or her agents

3  were allegedly stealing existing customers from other HII

4  agents, at least you continued working with Marsha in her

5  capacity as, you know, the person to speak to for the

6  Duffie agency; is that right?

7    A.   We didn't -- what date -- what's the date on

8  this?  Oh, Feb -- March of 2017.  At one point, and maybe

9  this is why, we did -- we -- we -- Marsha was no longer

10  an agent for HII.  I'm not sure how that relationship

11  ended.  I don't recall if it was termination due to this

12  or not but she stopped being an agent with us, so we

13  stopped allowing her to write -- be an agent for HII, but

14  that does not preclude her from becoming an employee at

15  -- at a different agency.  What we cared about was that

16  the agent -- if we chose to not work with an agent, we

17  would not allow them to become licensed and appointed

18  with the HII carriers.

19    Q.   Okay.  And then instead of being a licensed

20  agent with HII, Marsha went to work for HAA and became

21  your primary contact for the Duffie agency with regard to

22  TCPA Compliance; is that right?

23       MS. CHATTIN:  Object to the form.

24  BY THE WITNESS:

1    A.   Again, this -- she -- she was an individual

2  that Sean Duffie, the licensed appointed agent with HII,

3  told me to contact for administrative and some

4  TCPA-related issues, so that was a directive from the

5  licensed agent with HII.

6  BY MR. BURKE:

7    Q.   No, I understand.

8       MR. BURKE:  Okay.  Well, I think I've used up

9  my seven hours.  And, you know, I don't want to do this

10  but I'm going to hold it open to read the transcript

11  because I'm not sure I got complete and truthful answers

12  to all my questions, but aside from that, I have no

13  further questions and I'm finished for the day.

14       MS. CHATTIN:  Okay.  Well, for the record, I

15  think we object to leaving the deposition open, but we'll

16  deal with it if necessary.

17       MR. BURKE:  Okay.  Thank you very much,

18  Ms. Brady.

19       THE VIDEOGRAPHER:  We're going off the record

20  at 5:30 p.m

21       MS. CHATTIN:  Kelly, can I just e-mail you our

22  order?

23       THE REPORTER:  Does anybody else need a copy?

24       MR. BURKE:  Yeah, I'll take a copy, and I did

1  a remarkably good job of keeping track of my exhibits for

2  today.  Kelly, if you're missing any, let me know.  This

3  is like a model -- it's a model in organization.

4       THE REPORTER:  Danielle, are you reserving

5  signature?

6       MS. CHATTIN:  Yes, the witness will read and

1            SIGNATURE:

2  It was agreed by and between counsel and the parties that

3  the Deponent will read and sign the transcript of said

4  deposition.

68 (Pages 266 - 269)

Page 270

1  STATE OF ILLINOIS )
                     ) SS:
2  COUNTY OF C O O K )
3
4      I, KELLY A. BRICHETTO, a Certified Shorthand
   Reporter of said state, do hereby certify
5  that the within named witness, AMY BRADY, was by me first
6  duly sworn to testify the truth, the whole truth and
7  nothing but the truth in the cause aforesaid; that the
8  testimony then given by the above-referenced witness was
9  by me reduced to stenotype in the presence of said
10 witness; afterwards transcribed, and that the foregoing
11 is a true and correct transcription of the testimony so
12 given by the above-referenced witness.
13     I do further certify that this deposition was
14 taken at the time and place in the foregoing caption
15 specified and was completed without adjournment.
16     I do further certify that I am not a relative,
17 counsel or attorney for either party or otherwise
18 interested in the event of this action.
19
20
21
22
23
24

Page 271

1      IN WITNESS WHEREOF, I do hereunto set my hand
2  this 26th day of January, 2022.
3
4
5
6          *Kelly Brichetto*
7      KELLY A. BRICHETTO
8      CSR License No. 84-3252
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 272

1  1 Danielle D Chatin
2  2 dchatin@kslaw.com
3    January 26th, 2022
4  4 RE:   Bilek, Mary v. National Congress Of Employers, Inc.
5  5    1/12/2022, Amy Brady (#5009783)
6  6    The above-referenced transcript is available for
7  7 review.
8  8    Within the applicable timeframe, the witness should
9  9 read the testimony to verify its accuracy. If there are
10 10 any changes, the witness should note those with the
11 11 reason, on the attached Errata Sheet.
12 12    The witness should sign the Acknowledgment of
13 13 Deponent and Errata and return to the deposing attorney.
14 14 Copies should be sent to all counsel, and to Veritext at
15 15 erratas-cs@veritext.com
16 16
17 17 Return completed errata within _____ days from
18 18 receipt of testimony.
19 19    If the witness fails to do so within the time
20 20 allotted, the transcript may be used as if signed.
21 21
22 22       Yours,
23 23       Veritext Legal Solutions
24 24

Page 273

1  Bilek, Mary v. National Congress Of Employers, Inc.
2  Amy  Brady (#5009783)
3      E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____  _____
24 Amy  Brady                    Date
25

69 (Pages 270 - 273)