Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MARY BILEK, individually and on )
behalf of others similarly )
situated, )
                                            )
                Plaintiffs, )
                                            )
                -vs-              ) No. 18-CV-03083
                                            )
NATIONAL CONGRESS OF EMPLOYERS, )
INC., et al., )
                                            )
               Defendants. )

      Videotaped deposition via videoconference of MARSHA GRIFFIN taken before TRACY L. BLASZAK, CSR, CRR, and Notary Public, pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, at 576 Riverside Drive Drive, in the City of Coral Springs, Broward County, Florida at 2:01 p.m. Eastern Daylight Time on the 20th day of September, A.D., 2021.

Page 2

1  There were present at the taking of this
2  deposition via videoconference the following counsel:
3
    BURKE LAW OFFICES, LLC by
4   MR. ALEXANDER H. BURKE
    MR. DANIEL J. MAROVITCH
5   990 Davis Street
    Suite 500
6   Evanston, Illinois 60201
    (312) 729-5288
7   aburke@burkelawllc.com
    dmarovitch@burkelawllc.com
8
         on behalf of the Plaintiffs;
9
10  LAW OFFICES OF JOSEF M. MYSOREWALA, PLLC by
    MR. JOSEF M. MYSOREWALA
11  2000 South Dixie Highway
    Suite 112
12  Miami, Florida 33133
    (305) 356-1031
13  josefm@lawjmm.com
14       on behalf of the Defendant
         National Congress of Employers, Inc.;
15
16  KING & SPALDING LLP by
    MS. DANIELLE CHATTIN
17  MR. ZACHARY A. McENTYRE
    1180 Peachtree Street, NE
18  Suite 1600
    Atlanta, Georgia 30309
19  (404) 572-4600
    dchattin@kslaw.com
20  zmcentyre@kslaw.com
21       on behalf of the Defendant
         Health Insurance Innovations;
22
23
24

Page 3

1   GENOVA BURNS LLC by
    MR. CHARLES J. MESSINA
2   Trinity Centre
    115 Broadway
3   Suite 1500
    New York, New York 10006
4   (212) 566-7188
    cmessina@genovaburns.com
5
         on behalf of the Defendants AccessOne and
6        National Benefit Builders, Inc.;
7
    GENOVA BURNS LLC by
8   MR. JEREMY M. BROOKS
    494 Broad Street
9   Newark, New Jersey 07102
    (973) 533-1112
10  jbrooks@genovaburns.com
11       on behalf of the Defendants AccessOne and
         National Benefit Builders, Inc.;
12
13  MARK MIGDAL & HAYDEN by
    MR. YANIV ADAR
14  Brickell City Tower
    80 SW 8th Street
15  Suite 1999
    Miami, Florida 33130
16  (305) 374-6623
    yaniv@markmigdal.com
17
         on behalf of the Witness;
18
19  ALSO PRESENT: Mr. Kraig Hildahl
                  Legal Videographer.
20
21         - - - - -
22
23
24

Page 4

1       DEPOSITION OF
        MARSHA GRIFFIN
2
        September 20, 2021
3
4   EXAMINATION BY:                    PAGE
5   Mr. Alexander H. Burke              6
6
            * * * * * *
7
8   INDEX OF EXHIBITS PREVIOUSLY MARKED
9
    EXHIBIT   DESCRIPTION              PAGE
10
    Exhibit 3  Multiple e-mails from Brady to   20
11             Griffin
12
13          * * * * * *
14
15
16
17
18
19
20
21
22
23
24

Page 5

1       THE VIDEOGRAPHER: We're going on the record at
2  p.m. Eastern Time on September 20th, 2021.
3       This is media unit No. 1 of the video-recorded
4  deposition of Marsha L. Griffin taken in the matter Mary
5  Bilek vs. National Congress of Employers, Incorporated,
6  of the U.S. District Court, Northern District of
7  Illinois, case No. 1:18-cv-03083.
8       This deposition is being held remotely. My
9  name is Kraig Hildahl from Veritext Legal Solutions, and
10 I am the videographer. The court reporter is Tracy
11 Blaszak, also with Veritext.
12      Will counsel please introduce themselves for
13 the record.
14      MR. BURKE: Good afternoon. This is Alex Burke. I
15 represent the plaintiff. And with me on the Zoom is my
16 colleague Dan Marovitch, also for the plaintiff.
17      MR. MYSOREWALA: Good afternoon, you have Josef
18 Mysorewala here on behalf of the defendant National
19 Congress of Employers, Inc.
20      MS. CHATTIN: Hi, this is Danielle Chattin. I
21 represent defendant Health Insurance Innovations. My
22 colleague Zach McEntyre is also on the lines.
23      MR. MESSINA: And Charles Messina with the law firm
24 Genova Burns here on behalf of AccessOne and National

Page 6

1 Benefit Builders. My colleague Jeremy is also on the
2 line.
3     THE VIDEOGRAPHER: Will the court reporter please
4 swear in the witness and then we can proceed.
5         MICHAEL T. SMITH, JR.,
6 called as a witness herein, having been first duly sworn
7 via videoconference, was examined upon oral
8 interrogatories and testified as follows:
9             EXAMINATION
10           by Mr. Burke:
11   Q   All right. Ms. Griffin, thanks for being here
12 virtually today.
13   A   You're welcome.
14   Q   Have you ever given a deposition before?
15   A   Once before, yes.
16   Q   Okay. What was the context of that generally?
17   A   Of the deposition?
18   Q   Yes.
19   A   Like what was it about?
20   Q   Right.
21   A   It was another -- I don't know how to describe
22 it. It was just another case that they wanted me as a
23 witness.
24   Q   Okay. And did that case involve your employment

Page 7

1 at Health Advisors of America?
2   A   No.
3   Q   Okay.
4   A   My employment there? No.
5   Q   Did it have anything to do with telemarketing,
6 the case where you gave the deposition before?
7   A   No, it did not.
8   Q   Who was suing who generally in that case?
9   A   I don't know which one was suing which one. I
10 just got called as a witness to be deposed. I don't
11 know how exactly it went.
12   Q   And what sort of things did you talk about in
13 the deposition?
14   A   Just basically what I do, what my job is.
15   Q   What your job is at HAA?
16   A   What it was at HAA.
17   Q   Okay.
18   A   What it would have been, but just all along,
19 yes.
20   Q   Okay. And do you have any idea if that case was
21 a Telephone Consumer Protection Act case?
22   A   It was not.
23   Q   It was not?
24     MR. ADAR: Alex, do you want me to tell you what it

Page 8

1 was?
2     MR. BURKE: Sure.
3     MR. ADAR: It was a dispute, a commission dispute
4 with a third party.
5     MR. BURKE: Okay.
6     MR. ADAR: That's right, Marsha, right?
7     THE WITNESS: More or less, yes.
8     MR. BURKE: Q   All right. Marsha, taking a step
9 backwards for a second. I'm going to ask you questions.
10 And if you, you know, understand the question, you're
11 going to provide a complete and truthful answer, okay?
12   A   Yes.
13   Q   Agreed?
14   A   Agreed, yes.
15   Q   Okay. And if you complete your answer, I'm
16 going to understand that that was the whole truth and
17 nothing but the truth, is that a fair way to proceed?
18   A   That is, yes.
19   Q   Okay. If you ever need a break, just let me
20 know and we'll take a break. I might want to finish a
21 question or two, but, you know, I really want to
22 respect, you know, your wishes on that front, okay?
23   A   No problem.
24   Q   All right. Did you at one point work for Health

Page 9

1 Advisors of America, Inc.?
2   A   Yes.
3   Q   Okay. And did you refer to that as HAA?
4   A   Yes.
5   Q   Okay. Was HAA also known as like sort of other
6 informal things like the enrollment center?
7   A   Not that I am aware of.
8   Q   Okay. What was your job at HAA?
9   A   I did back end support.
10   Q   Okay. And roughly what timeframe did you work
11 for HAA?
12   A   From the time they opened until the time they
13 closed.
14   Q   And what are those times? Do your best.
15   A   I'm awful with times. 2018 to 2019 from what I
16 recall.
17   Q   Something like that?
18   A   I don't know if that's an exact answer, but
19 somewhere around there, yes.
20   Q   Okay. And so as far as back office support,
21 what was -- you know, what was -- what did you do at
22 HAA?
23   A   I helped the agents with whatever they needed
24 help with. I would help them renew licenses, just

Page 10

1 whatever they needed help with I was there to assist
2 them.
3  Q  Okay.  Let's see.  Are you aware that HAA
4 accepted marketing leads from a company called Rising
5 Eagle for a while?
6  A  No, I didn't have anything to do with that
7 stuff.
8  Q  You never heard of Rising Eagle?
9  A  I mean, I've heard of them, yes.
10  Q  Okay.
11  A  I've heard of them, but I don't know what they
12 were doing, if they did anything with them.
13  Q  Okay.  Did you have occasion to speak with
14 employees of HII on the telephone while you were working
15 for HAA?
16  A  Oh, yes.
17  Q  What's HII just for background?
18  A  It's the third-party administrator for different
19 health insurance products.
20  Q  Okay.  And who are the different folks at HII
21 that you spoke with on the telephone while you were
22 working for HAA?
23  A  I've spoken to a lot of people from HII.  During
24 the exact term of HAA, I can't give you the exact names

Page 11

1 that I spoke to.  The person I spoke with the most would
2 have been Amy Brady.
3  Q  Okay.  And what was Amy Brady -- What's your
4 understanding of Amy's Brady's position at HII?
5  A  That she was a salesperson for the company, I
6 would assume.  She assisted with anything that an agent
7 needed help with.
8  Q  Okay.  Did you ever talk to Amy Brady about
9 telemarketing-related issues such as do not call or
10 anything else?
11  A  She would tell me -- she wouldn't send them
12 over.  HII would send over some DNCs occasionally.
13  Q  Okay.  Did you ever talk to them on the
14 telephone about DNCs or telemarketing?
15  A  No.
16  Q  Did HII on the phone call or in e-mail ask you,
17 you know, hey, what's, you know, HAA's process for
18 compliance with the TCPA?
19  A  Not that I recall, no.
20  Q  And when you received DNC requests from Amy
21 Brady or HII, what was your understanding of what you
22 were supposed to do with those?
23  A  I'd put them into our do not call.
24  Q  Okay.  What else?  Anything else?

Page 12

1  A  No.
2  Q  Okay.  And did HII ever provide like a big list
3 of, you know, consumers who had requested to other
4 agents or HII directly, you know, not to be called?
5  A  I believe at one point I got a -- no, that
6 wasn't do not call people, no.  It would just be a
7 random e-mail here and there from what I remember.
8  Q  Okay.  And what was your understanding of why
9 you would get these random e-mails?
10  A  Because they had been placed on a do not call
11 registry and they were clients of HII, I would assume.
12 I didn't really ever ask why they would send them over.
13 I just DNC'ed them whenever they sent a DNC number.
14  Q  Was the -- I'm sorry, I just got distracted.
15      Did anyone at HII or really anyone else ever
16 ask you about HAA's do not call compliance?
17  A  Not that I recall.
18  Q  Did anyone at HII or really anyone else ask you
19 whether you knew about prerecorded messages being played
20 during any sort of lead generation outbound calling?
21  A  No, not that I recall.
22  Q  Other than Amy Brady, did you have occasion to
23 speak with, for example, Dan Garavuso on the telephone
24 at HII?

Page 13

1  A  No.
2  Q  How about Christine Gillis?
3  A  Was she in customer service?
4  Q  I don't know.
5  A  I don't recall.  I can't tell you yes or no on
6 that, honestly.
7  Q  Does Christine Gillis sound kind of familiar I
8 guess?
9  A  Christine sounds familiar, yes.  So does Dan's
10 name, but I've never spoken to Dan either, so.
11  Q  Okay.  Are you aware that HII did site visits at
12 the property where HAA was located?
13  A  Yes.
14  Q  Okay.  And you remember those?
15  A  It's been so long ago.  I just -- I know that
16 they'd come, but.
17  Q  Do you have any idea of how those site visits
18 were set up?  Did you facilitate that?
19  A  Did I facilitate that?
20  Q  Like when HII, you know, announces, you know,
21 hey, we want to do this site visit, did that go through
22 you or was it through somebody else or you just don't
23 know?
24  A  I think I would have gotten an e-mail, if I

Page 14

1 remember correctly, saying someone would be there on XYZ
2 day. Sometimes they would just show up, though, so.
3 Q I mean, why would HII e-mail you about its site
4 visit having to do with, you know, insurance agents?
5 A Because I helped all of the agents. Like there
6 has been times in the past where they needed or Amy has
7 reached out to me for people that I've never worked for
8 or with, Marsha, can you get a hold of so and so, so.
9 Q So would it be accurate to say that HII kind of
10 knew you as the person to contact with regard to certain
11 insurance agents?
12 A Yes, if they couldn't get a hold of the agent
13 directly, absolutely.
14 Q And who were those agents?
15 A From back then?
16 Q Do your best. I know it's a --
17 A We had Sean Duffie. We had, I think, Sheila
18 Meehan maybe back then.
19 Q How about Scott Shapiro?
20 A No, he wasn't an agent.
21 Q What did Scott Shapiro do?
22 A He worked with Michael.
23 Q Okay. And what did they work on?
24 A I don't know what they worked on.

Page 15

1 Q Okay. How about Sergio Ortiz, was he an agent
2 that HII might associate with you?
3 A Yes, yes.
4 Q Okay. How about Zach Cox?
5 A Yes.
6 Q How about Christian Ortiz?
7 A Yes.
8 Q Victor Washington?
9 A Yes.
10 Q Michael Saunders?
11 A A while ago, yes. That would have been, I
12 think, before HAA.
13 Q Okay. How about Omar Reid?
14 A No.
15 Q How about Alexander De Luca?
16 A Yes.
17 Q How about Billy Vargas?
18 A Billy Vargas? No.
19 Q Have you ever heard of -- No? What about Ashley
20 Eastlack?
21 A Yes.
22 Q How about Ramon Warren?
23 A No.
24 Q How about Olivia Raffa?

Page 16

1 A Yes, I believe so.
2 Q How about Leon Martin?
3 A Yes.
4 Q How about Travis Ray? I mean, he was a fronter,
5 wasn't he?
6 A I don't recall the name.
7 Q You don't remember. Okay.
8 How about Keith Connelly, do you remember that
9 person?
10 A I remember who he was, but I don't -- he was an
11 agent, yes.
12 Q Was he an agent that HII would, you know, as far
13 as you understood, knew to contact you if they couldn't
14 get in touch with him?
15 A I think he was a subagent under another one of
16 the agents. So when it's a subagent or LOA, I think it
17 was a subagent, they go to the top of the agents.
18 Q And so is it your understanding that
19 Mr. Connelly was a person that HII understood they could
20 contact you if they couldn't get in touch with him?
21 A Yes.
22 Q Okay. How about Ethan Russell, have you ever
23 heard of him?
24 A Yes.

Page 17

1 Q Who is he?
2 A He was another agent.
3 Q Is he another agent that HII, at least as far as
4 you understood, could reach out to you if Mr. Russell
5 was unavailable?
6 A Yes.
7 Q Okay. How about Dora Metro?
8 A Yes.
9 Q Is Dora Metro another person that HII
10 understood, at least as far as you knew, that they could
11 reach out to you if they had -- if they were having
12 trouble reaching Ms. Metro?
13 A Yes.
14 Q Shawna Morgan, the same question?
15 A I don't recall Shawna's name.
16 Q Okay. What about Christopher or Chris Voltaire?
17 A I don't recall his name.
18 Q Okay. Do you remember anyone else other than
19 the folks that we've just been talking about who was an
20 insurance agent that was working with HII where it was
21 your understanding that HII, you know, could reach out
22 to you, HII knew that it would reach out to you if it
23 was having trouble reaching those folks, anyone else?
24 A No.

Page 18

1  Q  Okay. I mean, is there any place where you
2  could -- where you might be able to look and find a
3  list?
4  A  Not that I know right off the top. I'm sure I
5  would think maybe doing digging I could maybe find, but
6  I don't know for sure.
7  Q  Maybe you could follow the money, so like the
8  agents that were working with HAA had financial
9  agreements with HAA, right?
10  A  I don't know.
11  Q  Well, were you in charge of like keeping track
12  of contracts and stuff like that?
13  A  I would submit the contracts.
14  Q  Submit them to?
15  A  From the agents to HII.
16  Q  How did you submit those agents' contracts to
17  HII?
18  A  I would scan them and e-mail them back.
19  Q  So you were the person -- and whose contracts
20  with HII did you e-mail to HII, like Sean Duffie or
21  these -- you don't know?
22  A  It's possible. I don't recall which all ones I
23  helped with.
24  Q  Okay. And to whom at HII would you have

Page 19

1  e-mailed those contracts?
2  A  It would have probably been Amy.
3  Q  Okay.
4  A  Unless it was required that it was sent
5  elsewhere.
6  Q  Who at HAA was in charge of do not call
7  compliance, anybody?
8  A  I don't know who that is.
9  Q  Okay. And are you aware of any sort of training
10  that HAA did for compliance with the TCPA?
11  A  That's not something I was involved in, so, no.
12  Q  You never heard of anything like that?
13  A  I didn't need to be involved, so I don't know.
14  Q  So, I mean, do you remember hearing anything
15  about, you know, training or anything like that having
16  to do with TCPA compliance?
17  A  No, I don't recall.
18  Q  Okay. Is it your understanding that HII knew
19  that HAA was assisting certain insurance agents with
20  marketing through making outbound calls?
21  A  I -- no. I don't know. I have no idea on that
22  one.
23  Q  Well, you spoke with Amy Brady about do not
24  call, right?

Page 20

1  A  She would send e-mails. I don't even think they
2  came from Amy Brady. But I would get like DNC, like
3  please add this to your DNC type e-mails.
4  Q  Right. So why do you think Amy Brady was
5  sending you the do not call e-mails to you rather than
6  to like the agents themselves?
7  A  They would come to me, they would come to the
8  agents. It comes to all agents, it's like a mass e-mail
9  that's sent out.
10  Q  Okay. I'm going to share my screen as soon as I
11  figure this out.
12     Okay. I'm showing you this is a group exhibit
13  of some e-mails that were produced by Health Insurance
14  Innovations in this litigation. And it's a group
15  exhibit, so it's ten pages long. It's got a few
16  e-mails, one, two -- you know, maybe five or six e-mails
17  here.
18     (Exhibit 3 previously marked and tendered.)
19  MR. BURKE: Q  Are these the types of e-mails that
20  you were testifying about just now where Amy Brady
21  reached out on an individual basis to you concerning
22  DNC?
23  A  No, I didn't recall these e-mails. It's been,
24  what, four years ago.

Page 21

1  Q  Yes. Does looking at these e-mails refresh your
2  recollection about your conversations with Amy Brady?
3  A  She would send over numbers.
4  Q  Okay. And what was your understanding of what
5  these numbers were? Were these consumers had complained
6  or something else?
7  A  To add them to the DNC list. I think that they
8  would get complaints like TCPA complaints, and they
9  would share the number to make sure that everyone DNCs,
10  if I remember correctly, which I'm not promising that I
11  do.
12  Q  So do you have any idea why -- Well, I think you
13  testified earlier that HII never asked about, or at
14  least never asked you, about, you know, HAA's lead
15  generation practices, is that correct?
16  A  Yeah, not that I recall.
17  Q  So like as to Gregory Hasiak on the first page
18  of this exhibit, which is Exhibit 3, I think, nobody
19  said to you, hey, you know, we got this complaint from
20  Gregory Hasiak, the caller ID was, you know, XYZ and,
21  you know, he says he got a prerecorded message and,
22  gosh, you know, if they're really prerecorded messages,
23  then we better make that stop? I mean, did anything
24  even remotely close to that happen with regard to HII?

6 (Pages 18 - 21)

Page 22
1  A  Not that I recall, no.
2  Q  I see this one on page 7 mentions LifeShield.
3  What is that?
4  A  That's an insurance carrier.
5  Q  Is there like some corporation behind it or is
6  that a product, LifeShield?
7  A  I think that that is the insurance company but,
8  again, don't quote me on that.  It may be the
9  underwriter of a product.  It may even be the name of a
10 product or both.
11 Q  Did you ever have occasion to see a written
12 policy having to do with the TCPA or do not call from
13 HII?
14 A  Will you repeat that, please.
15 Q  Did you ever have occasion to see or even hear
16 about a written policy from HII concerning the TCPA or
17 do not call?
18 A  I believe so.
19 Q  Okay.  Tell me about it.
20 A  I believe there was one.  That's all I can tell
21 you.
22 Q  Okay.  Do you remember what it said?
23 A  No.
24 Q  Was there any suggestion that you got that HAA

Page 23
1  distribute that policy or what were you supposed to do
2  with it?
3  A  I just recall there being one.  I don't recall
4  like receiving an e-mail with the TCPA with their DNCs.
5  Q  Was there any written policy at HAA concerning
6  DNC, anything in writing?
7  A  Not that I have written.
8  Q  Anything you ever saw that was written having to
9  do by the TCPA?
10 A  No, but those kind of things I didn't deal with
11 generally.
12 Q  Well, there is only two employees, right?
13 A  Two employees?
14 Q  At HAA?
15 A  Well, I mean, I guess, yes, you could say that.
16 I don't know how many more were in there.  There was
17 different organizations underneath it, so I don't know
18 how you want to count the people that were there.
19 Q  And would it be accurate to say you were
20 responsible for keeping track of, you know, documents
21 and stuff like that, policies, contracts?
22 A  Not contracts.  Policies, the contracts with the
23 different insurance companies the agents did, yes.  What
24 was the rest of the items that you listed?

Page 24
1  Q  That kind of stuff.
2     And so did you ever have occasion to, you know,
3  file or keep track of or save any sort of TCPA-related
4  documents other than, you know, e-mails received from
5  HII concerning individual do not call requests?
6  A  Did I ever file them?
7  Q  Did you ever have occasion to even see anything
8  like that?
9  A  No, unless they would have -- unless I had to
10 write an e-mail or something like that about it.
11 Q  Do you specifically remember writing e-mails to
12 anybody about having to do with TCPA compliance or DNC
13 compliance?
14 A  Not from that long ago, no.
15 Q  To your recollection, did HII ever send the
16 actual consumer complaint to you or anyone else at HAA
17 or any agent for that matter, the actual consumer
18 complaint?
19 A  If I remember correctly, yes, I think so.
20 Q  Okay.  Tell me, you know, what's your
21 recollection as to how many times that happened?
22 A  I don't know.
23 Q  I mean, if it had happened, you probably would
24 have produced the e-mail where it happened, right?

Page 25
1  A  If I had the e-mail, yes.
2  Q  Okay.  And we didn't get any e-mails like that.
3     Do you agree that at least when you -- I'll
4  back up.
5     Did you search through the e-mails that you had
6  in connection with this case?
7  A  No.  The e-mail that you have on here --
8  Q  Yes.
9  A  -- hasn't been listed for a while.
10 Q  Okay.
11    MR. BURKE:  That's all I've got.
12    MR. ADAR:  Alex, do you want to stop sharing the
13 screen?
14    THE WITNESS:  I'm sorry?
15    MR. ADAR:  Do you want to stop sharing -- Oh, he did
16 it.  It was for Alex.
17    Danielle?
18    MS. CHATTIN:  I don't have any questions.  Thanks.
19    MR. ADAR:  Josef?
20    MR. MYSOREWALA:  I don't have any questions, either.
21 Thank you.
22    MR. ADAR:  Charles?
23    MR. MESSINA:  I'm in the same boat.  No questions.
24    MR. ADAR:  Tracy?

Page 26

1 THE COURT REPORTER: No questions.
2 MR. ADAR: All right. Marsha, I don't have any
3 questions, either. Thank you so much for your time. I
4 really appreciate it.
5 THE WITNESS: All right. Thank you, everyone.
6 MR. BURKE: Thanks, Marsha.
7 THE VIDEOGRAPHER: We're going off the record at
8 2:32 p.m.
9     (Whereupon, the deposition concluded at
10     p.m.)
11             - - - - -

Page 27

1  STATE OF ILLINOIS  )
                      ) ss:
2  COUNTY OF COOK     )
3
4     The within and foregoing deposition of the
5 aforementioned witness was taken before TRACY L.
6 BLASZAK, CSR, CRR, and Notary Public, at the place, date
7 and time aforementioned.
8     There were present during the taking of the
9 deposition the previously named counsel.
10    The said witness was first duly sworn and was
11 then examined upon oral interrogatories; the questions
12 and answers were taken down in shorthand by the
13 undersigned, acting as stenographer and Notary Public;
14 and the within and foregoing is a true, accurate and
15 complete record of all of the questions asked of and
16 answers made by the aforementioned witness, at the time
17 and place hereinabove referred to.
18    The signature of the witness was not waived,
19 and the deposition was submitted, pursuant to
20 Rules 30(e) and 32(d) of the Rules of Civil Procedure
21 for the United States District Court, to the deponent
22 per copy of the attached letter.
23    The undersigned is not interested in the within
24 case, nor of kin or counsel to any of the parties.

Page 28

1  Witness my official signature and seal as
2 Notary Public in and for Cook County, Illinois, on this
3 5th day of October, A.D. 2021.
4
5
6
7
8       *Tracy L. Blaszak*
        TRACY L. BLASZAK, CSR, CRR
9       CSR No. 084-002978
        One North Franklin Street
10      Suite 3000
        Chicago, Illinois  60606
11      Phone:  (312) 442-9087

Page 29

1       Veritext Legal Solutions
        1100 Superior Ave
2       Suite 1820
        Cleveland, Ohio 44114
3       Phone: 216-523-1313
4
   October 5, 2021
5
   To: YANIV ADAR
6
   Case Name: Bilek, Mary, etc. v. National Congress Of Employers, Inc.,
7  et al.
8  Veritext Reference Number: 4804881
9  Witness:  Marsha Griffin      Deposition Date:  9/20/2021
10
   Dear Sir/Madam:
11
12 Enclosed please find a deposition transcript.  Please have the witness
13 review the transcript and note any changes or corrections on the
14 included errata sheet, indicating the page, line number, change, and
15 the reason for the change.  Have the witness' signature notarized and
16 forward the completed page(s) back to us at the Production address
   shown
17
   above, or email to production-midwest@veritext.com.
18
19 If the errata is not returned within thirty days of your receipt of
20 this letter, the reading and signing will be deemed waived.
21
   Sincerely,
22
   Production Department
23
24 NO NOTARY REQUIRED IN CA

8 (Pages 26 - 29)