Page 1

1            IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
2
3   ROBERT HOSSFELD,              )
                                  )
4                  Plaintiff,     )
                                  ) Civil Action
5        vs.                      ) No. 0:19-cv-60597
                                  )
6   AMERICAN FINANCIAL            )
    SECURITY LIFE INSURANCE       )
7   COMPANY, et al.,              )
                                  )
8                  Defendants.    )
    ------------------------      )
9                                 )
    MARY BILEK, individually      ) UNITED STATES
10  and on behalf of others       ) DISTRICT COURT FOR
    similarly situated,           ) THE SOUTHERN DISTRICT
11                                ) OF FLORIDA
                   Plaintiff,     )
12       vs.                      ) Civil Action
                                  ) No. 1:18-cv-03083
13  NATIONAL CONGRESS OF          )
    EMPLOYERS, INC., NATIONAL     )
14  BENEFIT BUILDERS, INC.,       )
    ACCESSONE CONSUMER            )
15  HEALTH, INC., UNIFIED         )
    LIFE INSURANCE COMPANY,       )
16  HEALTH INSURANCE              )
    INNOVATIONS, INC., and        )
17  DOES 1-10,                    )
                                  )
18                 Defendants.
19        THE VIDEOCONFERENCE 30(b)(6) DEPOSITION
20      OF ACTIVE PROSPECT, INC., BY ADAM CHICKMAN
21                   MARCH 16, 2022
22                    9:30 A.M.
23   REPORTED BY:  YVETTE BIJARRO-RODRIGUEZ, CSR
24   LICENSE NO.:  084-003734

Page 2

```
1        The videoconference 30(b)(6) deposition
2    of ACTIVEPROSPECT, INC., by ADAM CHICKMAN, called
3    for examination, pursuant to the Federal Rules of
4    Civil Procedure of the United States District
5    Courts pertaining to the taking of depositions,
6    taken remotely via Zoom before YVETTE
7    BIJARRO-RODRIGUEZ, CSR No. 084-003734, a Certified
8    Shorthand Reporter within and for the County of
9    Cook and State of Illinois, on the 16th day of
10   March, 2022, at 9:30 a.m. CST.
11
12                  * * * *
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
1   APPEARING REMOTELY VIA ZOOM:
2     BURKE LAW OFFICES, LLC
      909 Davis Street
3     Suite 500
      Evanston, Illinois 60201
4     BY:  MR. ALEXANDER H. BURKE
          - AND -
5        MR. DANIEL MAROVITCH
      (312) 729-5288
6     aburke@burkelawllc.com
      dmarovitch@burkelawllc.com
7
        On behalf of the Plaintiffs;
8
      GREENBERG TRAURIG, LLP
9     333 SE 2nd Avenue
      Suite 4400
10    Miami, Florida 33131
      BY:  MS. STEPHANIE PERAL
11    (305) 579-0500
      perals@gtlaw.com
12
         - AND -
13
      CARLTON FIELDS, PA
14    1025 Thomas Jefferson Street, NW
      Suite 400 West
15    Washington, DC 20057-5208
      BY:  MR. JOHN C. MCMANUS
16    (202) 865-8114
      jmcmanus@carltonfields.com
17
        On behalf of Defendant
18      American Financial Security Life
        Insurance Company;
19
      LAW OFFICE OF JOSEF MYSOREWALA, PLLC
20    2000 South Dixie Highway
      Suite 112
21    Miami, Florida 33133-2441
      BY:  MR. JOSEF MYSOREWALA
22    (305) 356-1031
      josefm@lawjmm.com
23
        On behalf of Defendant
24      National Congress of Employers,
        Inc.;
```

Page 4

```
1   APPEARANCES CONTINUED:
2     GENOVA BURNS, LLC
      494 Broad Street
3     Newark, New Jersey 07102
      BY:  MR. JEREMY M. BROOKS
4     (973) 646-3282
      jbrooks@genovaburns.com
5
        On behalf of Defendants
6       National Benefit Builders and
        Access One Consumer Health,
7       Inc.;
8     KING & SPALDING, LLP
      1180 Peachtree Street, NE
9     Suite 1600
      Atlanta, Georgia 30309
10    BY:  MS. DANIELLE D. CHATTIN
           - AND -
11       MR. MAX AFRICK
      (404) 572-4600
12    dchattin@kslaw.com
13      On behalf of Defendant
        Health Insurance Innovations,
14      Inc.;
15    WITTLIFF CUTTER PLLC
      1209 Nueces Street
16    Austin, Texas 78701
      BY:  MS. BRITTNEY MOLLMAN
17    (512) 960-4865
      brittney@witliffcutter.com
18
        On behalf of the Deponent
19      and ActiveProspect, Inc.
20  ALSO PRESENT:
21  MR. MIKE GURLIDES, VERITEXT
22  LEGAL SOLUTIONS, VIDEOGRAPHER
23
24                  * * * *
```

Page 5

```
1               I N D E X
2   WITNESS                        PAGE
3   ADAM CHICKMAN
4     Direct Examination By Mr. Burke........  8
      Cross-Examination By Ms. Chattin....... 69
5     Redirect Examination By Mr. Burke...... 87
6
7           E X H I B I T S
8   DEPOSITION EXHIBIT                  PAGE
9     Exhibit A.............................  23
      Exhibit B............................. 27
10    Exhibit C............................. 45
      Exhibit D............................. 48
11    Exhibit E............................. 48
      Exhibit F............................. 52
12    Exhibit G............................. 57
      Exhibit H............................. 60
13    Exhibit I............................. 61
      Exhibit J............................. 64
14    Exhibit K............................. 85
15
16
17
18
19
20
21
22
23
24
```

Page 6

1    THE VIDEOGRAPHER: Good morning. We are
2 going on the record at 9:35 a.m. on Wednesday,
3 March 16, 2022. Please silence all cell phones as
4 they may interfere with the deposition's audio.
5 This is Media Unit 1 in the video-recorded
6 deposition of Adam Chickman in the matter of Bilek
7 versus National Congress of Employers, et al.,
8 filed in the United States District Court for the
9 Northern District of Illinois, Case
10 No. 1-18-cv-03083 and also Hossfeld versus American
11 Financial Security Life Insurance Company, et al.,
12 filed in the United States District Court for the
13 Southern District of Florida, Civil Action
14 No. 0-19-cv-60597. This deposition is taking place
15 via Veritext Virtual. My name is Mike Gurlides,
16 legal videographer, and the court reporter is
17 Yvette Bijarro-Rodriguez, both representing
18 Veritext. Counsel will now state their appearances
19 and affiliations for the record. If there are any
20 objections to the proceeding, please state them at
21 the time of your appearance beginning with the
22 noticing attorney.
23    MR. BURKE: Good morning. Alex Burke
24 here for the Plaintiffs in both actions.

Page 7

1    MR. MAROVITCH: Good morning. Dan
2 Marovitch for the Plaintiffs.
3    MS. MOLLMAN: Brittney Mollman here
4 representing the Deponent Adam Chickman and
5 ActiveProspect.
6    MS. CHATTIN: This is Danielle Chattin
7 representing Defendant Health Insurance Innovations
8 as well as Max Africk.
9    MR. MCMANUS: Good morning. John
10 McManus representing Defendant American Financial
11 Security Life Insurance Company in the Florida
12 action.
13    MR. MYSOREWALA: Joseph Mysorewala on
14 behalf of National Congress of Employers, Inc., in
15 the Bilek action.
16    MR. BROOKS: Jeremy Brooks on behalf of
17 National Benefit Builders, Inc., and Access One
18 Consumer Health, Inc.
19    THE VIDEOGRAPHER: Will the court
20 reporter please swear in the witness.
21       (Witness sworn at 9:37 a.m.)
22    THE WITNESS: I do.
23
24

Page 8

1 WHEREUPON:
2       ADAM CHICKMAN,
3 called as a witness herein, having been first duly
4 sworn, was examined and testified as follows:
5       DIRECT EXAMINATION
6 BY MR. BURKE:
7    Q.   Good morning. Would you state your name
8 for the record, please.
9    A.   Yep. It's Adam Chickman.
10    Q.   Mr. Chickman, where do you work?
11    A.   I work at ActiveProspect.
12    Q.   How long have you worked there?
13    A.   Going on five years. I started in April
14 of 2017.
15    Q.   Have you ever given a deposition before?
16    A.   I have not.
17    Q.   All right. So my name is Alex Burke. I
18 represent the Plaintiffs in this lawsuit against
19 all the other folks who are on the Zoom. I'm going
20 to ask you questions and you just give me complete
21 and truthful answers, okay?
22    A.   Sounds good.
23    Q.   And you got to give me audible answers.
24 Nods of the head or um-hums aren't good enough,

Page 9

1 okay?
2    A.   Sounds good.
3    Q.   If you ever need a break, just let me
4 know, okay?
5    A.   Will do.
6    Q.   If you don't understand a question or
7 you need clarification, just let me know and I'll
8 work on it. But if you give an answer, I'm going
9 to understand that it was correct and complete.
10       Fair enough?
11    A.   Yep.
12    Q.   Okay. Great. Thanks.
13       What's the highest level of
14 education you've obtained?
15    A.   I got a bachelor's degree from the
16 University of Rhode Island.
17    Q.   When did you get that bachelor's?
18    A.   Technically it would have been 2016.
19    Q.   What was your degree in?
20    A.   Communications.
21    Q.   And so right out of college what
22 employment did you first obtain?
23    A.   I started my career in 2011. Actually,
24 the class that I took at University of Rhode Island

3 (Pages 6 - 9)

1  was in 2011, and I started at an internet
2  advertising company called Retargeter.
3      Q.   How long were you at Retargeter?
4      A.   13 or 14 months.
5      Q.   What did you do for them?
6      A.   I was in sales.
7      Q.   Okay.  What did you do after Retargeter?
8      A.   I worked for a company called Double
9  Positive.
10     Q.   Was that also internet advertising?
11     A.   It was, yes.
12     Q.   And just generally what kind of internet
13 advertising was it?  Was it like banner ads?  Just
14 in a general sense.
15     A.   Yeah.  Retargeter was mostly banner ads.
16 Double Positive other forms of media such was
17 leads, calls and transfers.
18     Q.   Okay.  And then what was your next job?
19     A.   After Retargeter I worked for a company
20 called Civitas Learning.
21     Q.   What was Civitas Learning?
22     A.   That was a higher education software.
23 It's a service company focused on helping with
24 retention.

1      Q.   And so what did you do for those guys?
2      A.   I was in sales as well.
3      Q.   How long were you there?
4      A.   I was there just under nine months.
5      Q.   Okay.  And then where did you go?
6      A.   From there I went to a company called
7  Lead Cloud.
8      Q.   And what did you do for Lead Cloud?
9      A.   Sales again.
10     Q.   Was that within advertising as well?
11     A.   Yes.  It was in the lead generation
12 space but it wasn't selling leads.  We were an
13 integration platform.
14     Q.   What does that mean?
15     A.   We would help lead buyers connect with
16 lead sellers to be able to pass them leads in
17 realtime.
18     Q.   Would some people call that like a lead
19 aggregator?
20     A.   Not exactly.  A lead aggregator to me is
21 somebody who is actually buying and reselling the
22 leads.  We were just the technology that allowed
23 people to receive those leads.
24     Q.   Okay.  And how long were you there?

1      A.   I was there a little over a year and a
2  half.
3      Q.   Okay.  Where next?
4      A.   A company called Invoka.
5      Q.   What's Invoka?
6      A.   Invoka is a software company that helps
7  people track phone calls to know what campaigns are
8  performing best for them, and I was in sales there
9  as well.
10     Q.   How long were you at Invoka?
11     A.   Near seven or eight months.
12     Q.   After Invoka where did you go?
13     A.   I came to ActiveProspect.
14     Q.   What was your title when you began at
15 ActiveProspect?
16     A.   Initially my title was senior account
17 executive, I believe.
18     Q.   What did you do as senior account
19 executive?
20     A.   I was in a sales role as an individual
21 contributor carrying quota, and I was focused on
22 the insurance space.
23     Q.   Around what time was that?  What year?
24     A.   That was April of 2017.

1      Q.   And then can you give me the rundown of
2  how your roles and responsibilities at TrustedForm
3  have -- or ActiveProspect have changed between
4  April 2017 and today?
5      A.   Yeah.  So I came in as an individual
6  contributor focused just on the insurance space.
7  As we started to grow, a lot of that growth could
8  be tracked back to my sales, so I got a title bump
9  from senior account executive to sales director.
10 The responsibilities didn't really change with
11 that.  That was probably about 2000 -- late 2018
12 and then in the -- in October 2019, I was promoted
13 to divisional vice president of sales and I was one
14 of two VPs of sales at that point with four people
15 reporting to me.
16          Next, after that I started taking
17 over for client success responsibilities.  So in
18 addition to managing the sales directors, I was
19 also managing client success managers and then that
20 would have been the first week of 2020.
21          In early 2020, we parted ways with
22 the other divisional vice president of sales so
23 then all of sales and client success started
24 reporting to me.  And in the -- some time in the

Page 14

1 summer of 2020 my title changed from divisional
2 vice president of sales to just vice president of
3 sales and that's the role I've been in since.
4    Q.   So what role were you in in the time
5 frame of fall 2018 to spring 2019?
6    A.   That would have been senior account
7 executive and sales director.
8    Q.   Have you ever heard of Health Insurance
9 Innovations?
10    A.   Yes.
11    Q.   When you speak -- or when you spoke
12 about Health Insurance Innovations in, you know,
13 fall 2018, spring 2019, how did you, you know, in
14 everyday parlance refer to them? Was it HII? Was
15 it Benefytt? How did you talk about the company?
16    A.   It would have most likely been HII or
17 HIIQ.
18    Q.   What's your understanding of what HII is
19 just generally?
20    A.   Yeah. A platform that allows different
21 agencies to write policies for carriers. And,
22 yeah, they provide a service that allows agencies
23 to get up and running and have access to these
24 policies that a carrier might provide.

Page 15

1    Q.   Were you the primary contact between
2 TrustedForm and -- or ActiveProspect -- I keep
3 mixing the two up -- and HII?
4    A.   Yes.
5    Q.   What's the difference between
6 ActiveProspect and TrustedForm?
7    A.   So ActiveProspect is the company and
8 TrustedForm is one of our three products.
9    Q.   What are the three products?
10    A.   At the time the three products were
11 LeadConduit, TrustedForm and SuppressionList.
12    Q.   So what was LeadConduit?
13    A.   LeadConduit is an integration platform
14 that allows lead buyers to easily connect with lead
15 sellers and receive their leads in realtime while
16 also making realtime decisions such as, do I want
17 to pay for this lead or do I not? so that you only
18 buy the leads that are a good fit for you and
19 likely a good customer.
20    Q.   Is part of LeadConduit some sort of
21 compliance element?
22    A.   Yeah. So LeadConduit has the ability to
23 integrate with different services, one of those
24 being TrustedForm which is our product. In

Page 16

1 addition to that, there's other services, like
2 known Litigator Scrubs that you could access
3 through the LeadConduit but LeadConduit itself
4 really just gives you the ability to take action on
5 the different insights that those other services
6 will provide.
7    Q.   So tell me what TrustedForm is?
8    A.   TrustedForm is our third party lead
9 certification product. It allows you to verify a
10 document, what took place on a website and when the
11 lead was filled out.
12    Q.   And just in broad strokes, how does it
13 work?
14    A.   Yeah. So it's a script-based solution
15 so what we would call publishers or lead sellers
16 who are generating leads implement our job ascript
17 on their website and that allows us to verify
18 what's taking place. So when a lead buyer is
19 acquiring a lead, they can then do things like run
20 a realtime page scan to verify that the required
21 consent language was on a form.
22        And then in addition to that, we're
23 able to -- and this is where the technical aspect
24 is actually my specialty. We're able to document

Page 17

1 what took place so that in the event, you know,
2 somebody says you called me and I didn't want to
3 receive a call, TrustedForm, if it was there
4 present for that lead, we would be able to help
5 prove that that consent was actually obtained.
6    Q.   What are SuppressionLists?
7    A.   SuppressionList is really a simple
8 product. It just allows you to check a lead
9 against any list in realtime and see if that lead
10 is present or not present.
11    Q.   So like would -- could somebody use it,
12 for example, their internal do not call list?
13    A.   Yes, exactly.
14    Q.   What other purposes do folks use
15 SuppressionLists?
16    A.   They would use it to identify exiting
17 customers or potentially duplicate leads. For
18 instance, if you just bought a lead and you don't
19 want to pay for that lead again, identify it.
20    Q.   How did HII first get hooked up with
21 ActiveProspect?
22    A.   I pursued them through sales efforts.
23    Q.   Okay. Tell me the nuts and bolts. How
24 did it go down?

5 (Pages 14 - 17)

Page 18

1    A.   Being that I spent a good amount of time
2 in the industry before coming to ActiveProspect, I
3 knew some contacts so I reached out to one of my
4 contacts and we had a good conversation.  He said
5 you should reach out to this other person.  I ended
6 up reaching out to them.  We spoke probably
7 January 2018.  That conversation didn't really go
8 anywhere at the time.  And then four or five months
9 later he reached back out to me saying, you know,
10 we really want to make sure we have a way to
11 protect ourselves against TCPA litigation.  Can we
12 talk?  And then from that point we started working
13 with them pretty quickly.
14    Q.   Who was that initial contact at HII?
15    A.   Phillip Kidwell.
16    Q.   Do you know what Mr. Kidwell does or did
17 at HII at the time?
18    A.   He actually worked for a subsidiary
19 called HealthPocket.  I think he was in charge of
20 their media buys.
21    Q.   So when HII reached out a few months
22 into 2018 to say, hey, we got to figure out our
23 TCPA compliance, was that Phillip Kidwell who
24 reached out again?

Page 19

1    A.   No.  That was Adam Wild.
2    Q.   What's your understanding of who -- what
3 Adam Wild does at HII?
4    A.   He was in charge of buying leads and
5 calls for their internal call center.  And as their
6 resident expert he also consulted with some of the
7 different down lines or agencies that HII would
8 equip.
9    Q.   Do you know the names of the internal
10 entities at HII that make outbound calls?
11    A.   I do not.
12    Q.   Is one of them Asia?
13    A.   I believe so.  Yeah, that sounds right.
14    Q.   And HealthPocket, do they make outbound
15 calls to your knowledge?
16    A.   I don't think HealthPocket makes
17 outbound calls but I'm not certain.
18    Q.   So Adam Wild reaches out to you in like
19 maybe April or May of 2019; is that right?
20    A.   Yeah.
21    Q.   And so how did that conversation go?
22    A.   He let me know that they had a desire to
23 get a TCPA solution in place.  He said that I would
24 have to talk to their VP of compliance Dan

Page 20

1 Garavuso.  He set up a call for us the next day and
2 then Dan and I connected at that point.
3    Q.   Tell me about that initial call with
4 Mr. Garavuso.  What did he say HII was looking for?
5    A.   He said they were looking for a way to
6 protect themselves against TCPA litigation and I
7 was his number one priority.
8    Q.   What products did you guys talk about?
9    A.   We first talked about TrustedForm and
10 then we talked about LeadConduit as a way for some
11 of the agencies that they work with who might be
12 less technical.  LeadConduit could act as a way to
13 allow them to leverage TrustedForm.
14    Q.   What were the entities that he was
15 trying to, you know, protect against TCPA
16 litigation?
17    A.   It was their internal call centers and
18 then the down lines for agencies that they worked
19 with.
20    Q.   Like insurance agencies?
21    A.   Yes.
22    Q.   Is this all consumer health insurance
23 that we're talking about?
24    A.   Yes.  I'm not positive if they had any

Page 21

1 ancillary products, but I know that health
2 insurance was the focus.
3    Q.   Health insurance for consumers, right?
4    A.   Correct, yes.
5    Q.   For individuals?
6    A.   Yes.
7    Q.   So after that initial call with
8 Mr. Garavuso and Mr. Wild, then what happened?
9    A.   If I recall correctly, we then had a
10 demo where Dan remained the primary contact, but he
11 might have linked in one or two other people.  And
12 then I sent a proposal and then within probably
13 weeks we had a signed agreement in place.  I want
14 to say that was July 1st of 2018.  And they were
15 anxious to get live as quickly as we could.
16    Q.   So July 1st, 2018, that's the date that
17 services went live; is that right?
18    A.   I believe that is the date that we got
19 the contract in place.  I apologize.  Sorry.  But
20 (undecipherable).  So I believe that is the date
21 that we got the contract signed give or take, you
22 know, three to five days in either direction and
23 then implementation was a very lengthy process due
24 to all the different agencies that we were trying

Page 22

1 to get live as part of their account.
2    Q.    Roughly how many agencies are we talking
3 about that needed to get live at that time?
4    A.    I would ballpark it around 20.
5    Q.    Were there certain agencies that were
6 priorities for HII?
7    A.    There were, yes.
8    Q.    What were those?
9    A.    I don't recall the names.
10    Q.    When did the agencies start coming
11 online?
12    A.    We started having conversations with the
13 agencies very shortly after that July 1st time
14 frame but then they would move at different speeds.
15 Some would get implemented live within a matter of
16 weeks.  Some would take months.  Some took even
17 longer than that.
18    Q.    Was Health Advisors of America one of
19 the initial agencies that you worked to get online?
20    A.    That sounds correct.  However, a lot of
21 the agencies had similar sounding names so I might
22 not recall which agency specific.
23    Q.    I'm going to try a screen share here for
24 the first exhibit.  I've already sent this to all

Page 23

1 the lawyers.  It's the subpoena for both actions.
2        Can you see it?
3    A.    Yes.
4    Q.    This is sort of a formality, but is it
5 your understanding that you're here to testify on
6 behalf of your employer, ActiveProspect, Inc., in
7 the Hossfeld versus American Financial case and the
8 and the Bilek versus National Congress of Employers
9 case?  My exhibit doesn't show both.  Let's try
10 this again.  I apologize, everybody.
11        All right.  I'm going to
12 recirculate Exhibit A.  That was in error.
13        (Exhibit A was identified.)
14 BY MR. BURKE:
15    Q.    I'm showing you Exhibit A.  This is both
16 subpoenas from both cases.  I scrolled down to
17 Page 3 of the Bilek subpoena and there are three
18 topics for testimony that I'm highlighting here
19 spanning Pages 3 and 4.
20        Is it your understanding that you
21 are here today to testify on these topics on behalf
22 of ActiveProspect?
23    A.    Yes.
24    Q.    The topics are identical for the

Page 24

1 Hossfeld case scrolling down to PDF Page 15 to 16
2 of Exhibit A.  I'll just ask it again.
3        Are you prepared to speak today on
4 behalf of ActiveProspect on behalf of these topics
5 as well?
6    A.    Yes.
7    Q.    Great.  You testified a few moments ago
8 that I think the purpose of HII engaging
9 ActiveProspect was to avoid TCPA litigation.
10        Did you ever talk with Mr. Garavuso
11 or anyone else at HII about, you know, any other
12 purpose behind engaging ActiveProspect?
13    A.    Yes.  Our software helps with customer
14 acquisition and ensuring that you're protected
15 against litigation such as TCPA is one piece of how
16 we help.  But we also help people connect with
17 initial lead sources.  Additional lead sources
18 leads to more leads which should then lead to more
19 customers.  So we talked about introducing them and
20 their agencies to some of the different lead
21 sources that we know, not that we have commercial
22 relationships with but just that it worked with us,
23 you know, worked with other partners of ours so
24 that they could then scale their or their agencies'

Page 25

1 customer acquisition.
2    Q.    Okay.  Anything else?
3    A.    At different points in time, we would
4 talk about ways that we could help their internal
5 agency do things like reject duplicate leads so
6 that they save money, talked about ways that we
7 could help with DNC, but we never moved forward
8 with either of those.
9    Q.    Tell me about your discussions having to
10 do with DNC.
11    A.    So our product SuppressionList provides
12 an easy way to upload the list either
13 programatically from like a CRM or a batch upload.
14 And then once you have these lists uploaded, as
15 leads come into a platform, like a LeadConduit, you
16 could just query that list in realtime and get a
17 present or not present response.
18        So we talked about using
19 SuppressionList potentially as a way to aggregate
20 DNC lists for all their internal operations as well
21 as for their down lines to agencies so that they
22 could check for people saying, do not contact me
23 again, across all of their agencies.  But only
24 three conversations over the course of a multiyear

7 (Pages 22 - 25)

Page 26

1 relationship and we actually never moved forward
2 with that.
3    Q.   And who did you have those conversations
4 with?
5    A.   Mostly Dan Garavuso and at one point
6 Domenick DiCicco.
7    Q.   Who is Domenick DiCicco?
8    A.   He was their chief compliance officer
9 after Dan moved to I think vice president of
10 government relations.
11    Q.   Was it Mr. Garavuso or Mr. DiCicco or
12 someone else who ultimately said, hey, we're not
13 interested in the do not call compliance piece of
14 this?
15    A.   They never said we're not interested.
16 We dispositioned that as a no decision. Meaning
17 that it was never a firm but it was never a move
18 forward either.
19    Q.   Did either of them ever say, hey, we're
20 going to try looking at some other solutions or it
21 just kind of died?
22    A.   Yeah, it just kind of never closed.
23    Q.   Okay. Was there another service that
24 ActiveProspect provided to HII concerning like some

Page 27

1 sort of Litigator Scrub?
2    A.   Yes. So in LeadConduit we have what we
3 call marketplace integrations and these are
4 reseller relationships that we have with different
5 data services so that somebody could as a lead
6 comes in, easily query those leads to those
7 different data services, get a realtime response
8 and then make a decision. Two of those services
9 are Litigator Scrubs. One is by Contact Center
10 Compliance also known as gnc.com and the other is
11 by Blacklist Alliance. HII used both of those.
12    Q.   Was there a time frame where one was
13 used and not the other or did they use both the
14 whole time? How did that go down?
15    A.   I believe initially they started with
16 just using one and then for additional protection
17 they started using both but these were not used for
18 every agency. And I don't know their criteria in
19 deciding which agency used them and which one
20 didn't.
21    Q.   Okay. Let's have a look at another
22 exhibit.
23         (Exhibit No. B was identified.)
24

Page 28

1 BY MR. BURKE:
2    Q.   Showing you what I've marked and
3 circulated as Exhibit B. This is an e-mail string
4 that was produced by ActiveProspect at Bates
5 Number 629 through 633.
6         Can you see this okay?
7    A.   Yes.
8    Q.   To me this looks like an e-mail
9 conversation between you and Mr. Garavuso in around
10 January of 2019.
11         Do you agree?
12    A.   Yes.
13    Q.   Do you remember this exchange?
14    A.   Not super well. Yeah, I mean, now that
15 it's been through however many thousands of e-mails
16 I don't remember this particular one but it's
17 jogging my memory for sure.
18    Q.   And so I see on this first e-mail of the
19 string at the bottom, January 9, 2019. You say,
20 "see below for our status with each agency. I've
21 highlighted in red any agencies we need an intro to
22 or help pushing along."
23         I want to direct your attention to
24 the first part of this table that you've included.

Page 29

1 Well, first of all, where did this table come from?
2    A.   Yeah. So the table came from either we
3 created the actual table or HII created the table
4 but the purpose was to track status on getting
5 their agencies live with our technology and the
6 reason for that was because for agencies we knew
7 the different paces. So sometimes we would need --
8 HII wanted to know who was getting live and who
9 wasn't so that they could make sure to follow up
10 with any agencies that weren't moving forward as
11 quickly as they would like and encourage them to do
12 so.
13    Q.   So for this first row it says, "Health
14 Advisors of America (a.k.a. Great Health Plans,
15 Health Benefits Group, Enrollment Center, Scott
16 Shapiro)."
17         In your eyes were all those
18 entities the same thing?
19    A.   Yes.
20    Q.   And how did you come to an understanding
21 that Health Advisors of America was the same thing
22 as, for example, Health Benefits Group?
23    A.   I would just hear people refer to them
24 in different ways or use those different names.

8 (Pages 26 - 29)

Page 30

1  So, yeah, it just became clear they were all the
2  same call center.
3      Q.  Okay.  How did you first get hooked up
4  with Health Advisors of America?
5      A.  There were four VPs of sales at HII.
6  The VPs of sales were the ones that had the
7  relationships with each of the different call
8  centers or agencies.  So the different VPs of
9  sales -- I believe this one was Amy and that's why
10 it says Amy in that fourth or fifth column.  Amy
11 made the introduction.  We would then have a phone
12 call with Amy and the different agencies.  So in
13 this case it would have been Marsha or Scott and we
14 would give an overview on what we do and why we're
15 engaged with Health Insurance Innovations and then
16 we would talk through next steps on how to get live
17 with our tech.
18     Q.  So was Health Advisors of America one of
19 the first agencies to get online with
20 ActiveProspect Services?
21         (Simultaneous speaking.)
22     A.  I believe so.
23     Q.  It's one of -- well, there's a few,
24 maybe six, on this e-mail that aren't marked as

Page 31

1  red.
2          So would you agree that the ones
3  that are marked as red are the ones that are not
4  yet signed up as of January 9th?
5      A.  Yes, that would make sense.
6      Q.  Do you have a recollection of what
7  services Health Advisors of America was using in
8  2018, 2019?
9      A.  I believe it was LeadConduit and at
10 least one of the Litigator Scrubs if not both.
11     Q.  Do you have a recollection of Health
12 Advisors of America using the TrustedForm product
13 ever?
14     A.  I do not believe they ever got live with
15 TrustedForm.
16     Q.  And I see in the middle of the page
17 column it says, "Sunset."  Do you see that?
18     A.  Yes.
19     Q.  What does that refer to?
20     A.  I don't recall.
21     Q.  Did you have conversations with the
22 folks at HII about Health Advisors of America?
23     A.  Yes.
24     Q.  When you had those conversations with

Page 32

1  HII, what did you call Health Advisors of America?
2  Did you call it HAA?  Did you call it Great Health
3  Plans?  Did you call it Health Benefits Group,
4  Enrollment Center, something else?
5      A.  Probably something along Scott Shapiro's
6  agency.
7      Q.  Who at HII did you talk to about Health
8  Advisors of America specifically?
9      A.  Dan Garavuso, Amy, I believe Amy Brady
10 and potentially Adam Wild.
11     Q.  Okay.  Did you ever talk to Brian Krul?
12     A.  Yes.
13     Q.  Did you ever talk to Mr. Krul that you
14 remember about Health Advisors of America?
15     A.  I don't remember.
16     Q.  What about Mr. DiCicco, did you ever
17 speak with him about Health Advisors of America?
18     A.  I don't believe so.
19     Q.  When Health Advisors of America -- well,
20 do you remember when they first went live?
21     A.  Not specifically.  But I would guess it
22 was within the first few months of us signing
23 Health Insurance Innovations as a client.
24     Q.  So maybe something like September 2018?

Page 33

1      A.  That sounds accurate.
2      Q.  Do you remember whether there was any
3  sort of usage by Health Advisors of America of the
4  products and services of ActiveProspect --
5      A.  Yes.
6      Q.  -- around that time?
7          Okay.  Tell me what you remember.
8      A.  I remember that they were using
9  LeadConduit and I believe it was just one of the
10 known Litigator Scrubs and there's very high
11 volume.  So we had to let HII know that their
12 volume was excessive because we didn't have volume
13 caps in place at the time and it drove HII's cost
14 up significantly higher than we were anticipating
15 on spending.
16     Q.  And then I see -- still looking at
17 Exhibit B -- there's a column in the right-hand
18 column.  It says, "November 28th - due to overuse,
19 we deactivated Marsha's DNC account and are having
20 a kick-off call to get them using TF, LC and Lit
21 Scrub."
22          Tell me what you remember about
23 that notation.
24     A.  Yeah.  So that would have been right at

9 (Pages 30 - 33)

Page 34

1 the time that they had one month very high usage
2 for the Litigator Scrub because the Litigator Scrub
3 that's a reseller relationship for us. The --
4 there wasn't much we could do in the way of
5 providing a retroactive discount so Health
6 Insurance Innovations had to pay a high amount for
7 that. And then they asked if we could limit the
8 amount of Litigator Scrub queries that they could
9 do and work with them to use TrustedForm which is
10 our product for -- specific for realtime leads,
11 verifying documents and consent. So we tried to
12 talk to them about starting to leverage TrustedForm
13 and LeadConduit for realtime leads versus what we
14 believe, you know, were focused at that point on H
15 leads.
16     Q.   What's an H lead?
17     A.   Different people define it in different
18 ways. For me and in the context that we talk
19 about, it's usually a lead that was generated
20 anything over a day ago. So an H lead could be a
21 week old. It could be three weeks old. It could
22 be up to 90 days old.
23     Q.   So was it your understanding that HAA,
24 Health Advisors of America, was only using H leads?

Page 35

1     A.   It was.
2     Q.   How did you come to that understanding?
3     A.   I don't recall if they specifically said
4 they were only working with H leads but the sheer
5 volume that they were doing and lack of use of
6 TrustedForm which had been realtime leads that that
7 would have been an additional protection that would
8 have been free to them. It was just a conclusion
9 that I came to.
10     Q.   So if someone was using -- if an agency
11 was using TrustedForm, how would ActiveProspect
12 know that that script was being correctly placed
13 on, you know, opt-in websites?
14     A.   When a form is filled out on a website
15 where our script is placed, we create -- it's
16 called a TrustedForm Certificate and then that
17 certificate can be passed along with the rest of
18 the lead data and then it can be queried to be an
19 API call and the API call will return a realtime
20 response saying it's a valid certificate or not and
21 if there's either no certificate or it comes back
22 with an invalid API response, those are two signs
23 that the script wasn't placed correctly or there
24 was no script placed on the site numbers placed.

Page 36

1     Q.   So I think you're saying -- is it
2 accurate to say that ActiveProspect has realtime
3 information as to whether TrustedForm is being used
4 or not?
5     A.   Would you mind saying the question in a
6 different way?
7     Q.   Yeah. So my understanding of
8 TrustedForm is that if you're a lead gen and you
9 have a website where people are opting in, you just
10 imbed a script into your code on the internet; is
11 that right?
12     A.   Correct, yes.
13     Q.   And then that code does something,
14 allows ActiveProspect to track what happened on
15 that website at that particular time; is that
16 right?
17     A.   I won't say "track." We don't do any
18 cross site tracking or cooking anything of that
19 nature but it does allow us to verify a document,
20 what took place on that particular site at that
21 moment in time. And, yes, we can then via API call
22 as a lead is coming in, verify if the TrustedForm
23 script was implemented where that lead was filled
24 out.

Page 37

1     Q.   And so maybe we're getting a little
2 technical. I just don't understand how the data is
3 tracked.
4          Does the -- when you say there's an
5 API call, what does that mean?
6     A.   That would mean basically a query from
7 one platform to the trusted form saying this lead
8 is coming in. It has a TrustedForm Certificate.
9 Tell us if the certificate is valid, if it meets
10 this criteria and then TrustedForm will respond in
11 realtime -- talking milliseconds -- saying, yes,
12 this is a valid certificate. Yes, it meets this
13 criteria and then a platform such as LeadConduit
14 could take that response and make a realtime
15 decision such as, do I want to accept this lead or
16 do I not want to accept it?
17     Q.   So does ActiveProspect then maintain the
18 lead information that was submitted?
19     A.   No. That's part of where the name
20 ConduitLead comes from. We act as just a conduit
21 for the leads flowing through our system. And for
22 the actual leads, lead data, LeadConduit we only
23 store that for I believe up to 60 days.
24     Q.   Okay. And then the lead generator or

10 (Pages 34 - 37)

Page 38

1 the website operator is responsible for maintaining
2 it after the 60 days; is that right?
3     A.  Yes.  For TrustedForm certificates that
4 had been claimed by an account holder, we store
5 that TrustedForm Certificate for up to five years,
6 longer if they request to store it for longer, but
7 the only way to then access that is if the customer
8 is maintaining the TrustedForm Certificate URL
9 because we don't have any way of programmatically
10 searching for somebody's -- any given consumer for
11 instance.
12     Q.   So if the user has the URL and they send
13 it to ActiveProspect, then what can you guys do
14 with that URL, you know, outside of 90 days after
15 the lead event?
16     A.  We can then pull up what we call the
17 certificate of authenticity which verifies when and
18 where the lead was filled out, so what website,
19 time and date stamp.  And then we also have a
20 screen capture of the consumer actually filling out
21 that form.
22     Q.   Is that an actual screen capture of what
23 happened or is it sort of a virtual reconstruction
24 of using data of what it should have looked like?

Page 39

1     A.  I believe -- and this is where I start
2 to get out of my technical depth -- it's a
3 rerendering of the mouse movements, key strokes and
4 clicks, so like a reconstruction of all the HTML
5 changes on the page as they took place.
6     Q.   And data, like the name, the address,
7 the phone number, when we're outside of 60 days,
8 where does that data come from?  Does it come from
9 ActiveProspect's files or someplace else?
10     A.  It is stored -- it's stored I believe in
11 AWS.  So we maintain storing those certificates and
12 a customer could get access to those by clicking on
13 TrustedForm Certificate URL.
14     Q.   So AWS I think is Amazon Web Services,
15 right?
16     A.  Correct.
17     Q.   So there's a gigantic database somewhere
18 on Amazon Web Services that has all these
19 certificates and the consumer information; is that
20 right?
21     A.  Correct.
22     Q.   So did HII ever implement TrustedForm?
23     A.  Yes, for their internal agencies.
24     Q.   Okay.

Page 40

1     A.  Their other agencies that are online,
2 several of them recommended TrustedForm.
3     Q.   Were there some agencies that never
4 implemented TrustedForm?
5     A.  Yes.
6     Q.   What were those agencies?
7     A.  I don't recall the names.
8     Q.   Okay.  Let's go back to this exhibit.  I
9 see there's the second of three notes here.  It
10 says, "November 30th - call with Scott and Robert
11 at VICIdial; Abe working on flow and passthrough;
12 Adam/MK working on how we tell DataLot not to
13 transfer leads to Scott that do NOT have a
14 TrustedForm Certificate."
15         Can you tell, you know, me the
16 background of that note?
17     A.  Yeah.  So VICIdial was their dialer.  We
18 had to work with VICIdial to integrate LeadConduit
19 with VICIdialer.  And Abe was one of our
20 implementation engineers.  He was working on
21 getting LeadConduit set up.  I was working with
22 some of the lead providers, DataLot being one of
23 them, educating them on how TrustedForm works, how
24 to implement it and how to avoid getting leads

Page 41

1 rejected based on, you know, passing a lead without
2 a TrustedForm Certificate.
3     Q.   Now, VICIdial -- my understanding of how
4 Health Advisors of America used VICIdial is that it
5 was really more of an inbound transfer platform
6 than an outbound dialer at least insofar as how
7 they used it.
8         Is that different than your
9 understanding?
10     A.  It is different than my understanding,
11 but I wasn't super involved with the inner workings
12 of their agencies so it could have very well been.
13 You know, it was predominantly our only inbound,
14 so -- actually, as I'm rethinking through this,
15 yeah, I was supposed to tell DataLot to not send
16 transfers to this agency without a valid
17 TrustedForm Certificate.  It could have been
18 predominantly just handling inbound what we call
19 "warm transfers."
20     Q.   Okay.  If they're only scrubbing these
21 inbound warm transfers against the Litigator Scrub
22 product, I mean, it seems to me that this would
23 effectively only prevent inbound transfers of
24 litigators rather than preventing the initial

11 (Pages 38 - 41)

Page 42

1 outbound call itself.
2       Would you agree?
3    A.  Yes.  If they were only using the
4 Litigator Scrub -- and I don't remember exactly
5 what was happening because it was some time ago.
6 But based on the comment here saying "working on
7 how we tell DataLot not to transfer leads to Scott
8 that do NOT have a TrustedForm Certificate," that
9 would imply that they should not be receiving or
10 dialing out on any transfers on any leads and
11 turning those leads into a transfer that don't have
12 a valid TrustedForm Certificate.
13    Q.  Did you ever hear or see anything from
14 HII telling Health Advisors of America not to
15 accept any leads that didn't have a TrustedForm
16 Certificate?
17    A.  Yes.  I don't remember the specifics.
18 But I know that became a big initiative after the
19 high volume of Litigator Scrub queries that they
20 had in one month.  And I believe the conversation
21 went something along the lines of "you can only now
22 dial out on leads or accept transfers that have a
23 valid TrustedForm Certificate."  And the intention
24 behind that was to make sure that they were only

Page 43

1 dialing out on leads where they were actually
2 realtime and they could verify that the consumer
3 gave consent.
4    Q.  Do you have any idea of whether Health
5 Advisors of America ever did that, started
6 complying with this TrustedForm directive?
7    A.  I don't recall.
8    Q.  Does ActiveProspect have any information
9 or data that would tell us whether Health Advisors
10 of America was using TrustedForm or accepting leads
11 that had TrustedForm Certificates?
12    A.  We would have usage data and we could
13 see if Health Advisors of America was actually --
14 if they were querying TrustedForm and if they were
15 having TrustedForm usage.
16    Q.  Who had the call with Scott and Robert
17 at VICIdial?  Was that you or someone else?
18    A.  Scott would definitely have been on it.
19 I don't recall if I was on it.  If I was on it, I
20 would have been there solely for high level
21 relationship purposes explaining to them, you know,
22 our relationship with HII.  But I tried to stay out
23 of the leads so to speak because, you know, we were
24 getting a lot of these agencies live.  I mean, a

Page 44

1 lot of these types of calls from different dialers.
2    Q.  Did it come to light at some point that
3 Health Advisors of America wasn't using TrustedForm
4 certified leads?
5    A.  Well, it was certainly obvious with the
6 one month where they had a really high volume of
7 Litigator Scrub queries and no TrustedForm queries.
8 I don't recall if that, you know, was an unexpected
9 finding or if it was known that they were only
10 going to be Litigator Scrub at that point.
11    Q.  But certainly HII knew about these
12 issues?
13    A.  They knew that there was a really high
14 volume of Litigator Scrub queries and at that point
15 there were no TrustedForm queries.
16    Q.  So HII knew that HAA was not using
17 TrustedForm; is that right?
18    A.  At least for a period of time.  And I
19 believe that's what led to the -- "mandate" might
20 be a strong word but request or order to only
21 accept leads with a TrustedForm Certificate.
22    Q.  Okay.  When did that mandate happen?
23    A.  My best guess is right after the month
24 with high Litigator Scrub usage.

Page 45

1    Q.  Let's look at another exhibit.
2       Danielle, I'm going to show HII
3 confidential designated document that I sent to you
4 yesterday Bates HII4890.
5       MS. CHATTIN:  Thanks, Alex.  And just
6 for the record, this is a confidential document
7 that was produced in the Mary Bilek case, not so
8 far in the Hossfeld case.  And after confirming
9 with Mr. Burke, HII is consenting to the disclosure
10 of this document for purposes of this deposition
11 reserving all other rights under the
12 confidentiality order.
13       (Exhibit C was identified.)
14 BY MR. BURKE:
15    Q.  So we're looking at Exhibit C which is
16 another e-mail string.  It is a six-page document.
17 It's got an attachment and the top e-mail is from
18 you to Scott Shapiro, Amy Brady and Christine
19 Gillis on November 26, 2018.
20       Would you agree?
21    A.  Yes.
22    Q.  Do you remember this exchange?
23    A.  I have to read it first.
24    Q.  Okay.  And I can scroll down for you.

12 (Pages 42 - 45)

Page 46

1 Let me know.
2    A.   Okay.  Yep.
3    Q.   So, first, does this refresh your
4 recollection as to when the push for TrustedForm
5 for Health Advisors of America happened?
6    A.   A little bit.  I'm trying to remember
7 back to when -- just the language in this feels
8 like this is not HII yet mandating in saying, you
9 have to use TrustedForm.  So I don't recall exactly
10 if there is an escalation process for at first they
11 said, hey, let's encourage them to use TrustedForm.
12 Ask if they would like to and then it got to the
13 point of, hey, we aren't going to work with you
14 anymore if you don't start using TrustedForm.  So
15 this is vaguely familiar.  I remember what the
16 process was like.  This is the process of an agency
17 saying, yes, I would like to use TrustedForm and
18 then we would help them get set up.
19    Q.   I see on Page 2, Bates 4891, this
20 reference to "U65 Certified Vendors."  What does
21 that mean?
22    A.   So U65 would refer to health insurance
23 under 65.  So, you know, compared to 065, over 65,
24 Medicare and then certified vendors are lead

Page 47

1 providers that we had confirmed had implemented the
2 TrustedForm script on their websites so that they
3 could then pass what we could call TrustedForm
4 certified leads or leads with a TrustedForm
5 Certificate.
6    MR. BURKE:  Are you doing all right?
7 We've been going about an hour and 15 minutes.  I
8 can keep going for another 15, 20 minutes but this
9 is usually when we start talking about taking a
10 break.
11    THE WITNESS:  I'm good if everyone else
12 is.  If anyone needs a break.
13 BY MR. BURKE:
14    Q.   So let's go to -- I want to go back to
15 this Health Advisors of America is the same thing
16 as Health Benefits Group thing.  So I've got two
17 contracts here.  One was produced by ActiveProspect
18 and then one was produced by HII.  I guess I'll
19 label the ActiveProspect one as Exhibit D and the
20 HII as Exhibit E.
21    Danielle, Exhibit E is the document
22 I sent you this morning.  It is designated by HII
23 as confidential but it is the ActiveProspect
24 contract.

Page 48

1    MS. CHATTIN:  Yes.  Thanks, Alex.  Same
2 as to Exhibit C.  We'll consent to the disclosure
3 of the document for purposes of the deposition
4 today.
5         (Exhibit D and E were
6          identified.)
7 BY MR. BURKE:
8    Q.   I'm going to try something very advanced
9 and show you both of them at the same time.  So
10 Exhibit D is in color.  Exhibit E is in black and
11 white and they're related insofar as this e-mail
12 exchange in Exhibit E which is HII7116 consecutive
13 eight pages attaches a version of what appears to
14 me to be a version of Exhibit D.  So if I scroll
15 down, we're still looking at the first page of
16 Exhibit D, Bates 170, ActiveProspect170 and then on
17 Exhibit E we're looking at Bates Number 7118.
18    First of all, do you remember
19 Exhibit E, this color contract, that was produced
20 by ActiveProspect?
21    A.   Vaguely.  If you were to scroll down,
22 then I could see the specifics of it.  That might
23 help.
24    Yes.

Page 49

1    Q.   What is Exhibit D?
2    A.   If I recall correctly, it was us getting
3 the actual paperwork in place with Scott Shapiro's
4 agency.  And I believe the reason for it, if memory
5 serves, is saying HII will pay for the LeadConduit,
6 TrustedForm and Litigator Scrub for any leads that
7 come through and first they are able to validate.
8 There's a valid TrustedForm Certificate which would
9 be a way to validate that it is a realtime lead and
10 then we would query the Litigator Scrub after that.
11 So it happened serially first TrustedForm query,
12 then Litigator Scrub query.  And I believe the
13 purposes of this was to say that HII would not be
14 covering the cost for any leads, any queries to
15 dnc.com's Litigator Scrub where they weren't first
16 able to verify that via TrustedForm that it was an
17 opted realtime lead.
18    Q.   And why do you say that part of it?  Is
19 that -- did you read something in the contract that
20 says that?
21    A.   No.  That was an inference I made based
22 on, as I recall, you know, the purposes of an
23 agreement that, you know, otherwise as your dollar
24 valued contract.

13 (Pages 46 - 49)

Page 50

1    And the marketplace integration
2  pricing calls out -- these are services that the
3  agency could leverage but would not be paid for by
4  HII.
5    Q.  Let's get into that in a minute.
6    Turning to Exhibit E, do you
7  remember ever seeing a contract like this with
8  Health Advisors of America written in?
9    A.  I don't remember.
10   Q.  Was there ever a formal contract with
11 Health Advisors of America and ActiveProspect?
12   A.  It looks like this would be that.  But
13 this -- I don't particularly remember this
14 contract.
15   Q.  I see there's a difference between
16 Exhibit D and Exhibit E.  Exhibit E is signed both
17 by Michael Smith from Health Advisors of America
18 and you, right?
19   A.  Yes.
20   Q.  So is it your understanding that
21 Exhibit E was the operative contract --
22   A.  Yes.
23   Q.  -- between Health Advisors of America
24 and ActiveProspect that was negotiated by HII?

Page 51

1    A.  Yes.
2    Q.  And did HII wind up paying for H --
3  Health Advisors of America's services at
4  ActiveProspect?
5    A.  I would assume so.  HII has been a
6  paying customer for years now with ActiveProspect
7  and they've been paying on behalf of themselves and
8  several of their agencies based on the work that we
9  did.  And I don't recall if Scott Shapiro's agency
10 ever paid us directly, so my logic would assume
11 that HII was paying on behalf of that agency.
12   Q.  ActiveProspect produced a bunch of
13 invoices.
14   A.  Actually, as I think through it more, I
15 can confirm that at least in a few instances HII
16 certainly paid on behalf of Scott Shapiro's agency
17 because that was a big -- there were heavy overages
18 due to the Litigator Scrub queries that they had in
19 that large month reference before.  Yeah, they at
20 least covered the cost for that period of time if
21 not longer.
22   Q.  Okay.  Even though Health Advisors of
23 America never used TrustedForm, right?
24   A.  I'm not sure that they never used

Page 52

1  TrustedForm.  I can't confirm that they have based
2  on the e-mail threads previously.  It seems there
3  was an effort to get them to use TrustedForm, but I
4  can't confirm that they never did or that they
5  actually did.
6    (Exhibit F was identified.)
7    Q.  So I'm showing what's been marked as
8  Exhibit F.  This is a two-page document produced by
9  ActiveProspect at Bates 785 to 786.
10   What is this?
11   A.  This looks like an invoice for
12 December -- or actually, it probably would have
13 been for November 2018.
14   Q.  And so I see Health Advisors of America
15 was doing some litigator scrubbing.  Would you
16 agree?
17   A.  Yes.
18   Q.  And that HII paid for it?
19   A.  Yes.
20   Q.  And I see some other activity.  Well,
21 let's see.  LeadConduit usage for Health Advisors
22 of America is not charged.  It looks like this
23 quantity of 612 and 610 -- what does that tell us?
24   A.  That tells us how many queries they made

Page 53

1  which there should be a one-to-one relationship
2  between leads and queries to the service.
3    Q.  And so what does a query mean?  Does
4  that mean that they, like, inquired as to 610
5  leads?
6    A.  Yeah.  So 610 leads come in.  We then
7  make the call out to the Litigator Scrub service
8  for each one of those leads.  And I can't speak to
9  the discrepancy between 612 and 610, why there's
10 two more Litigator Scrub queries than there are
11 LeadConduit inbound leads.  But generally this
12 would say that 610 leads came in.  For each one of
13 those leads we queried the Litigator Scrub service
14 to see if these were known litigators for the -- in
15 the dnc.com's database.
16   Q.  I see here at the bottom of 785 it looks
17 like there was a lot of dnc.com direct upload
18 activity.
19   Do you see that?
20   A.  Yes.
21   Q.  I don't see a line item as to who was
22 using that service.  Is there any way to tell
23 whether it was Health Advisors of America or HII or
24 someone else?

14 (Pages 50 - 53)

Page 54

1    A.   I believe it was Health Advisors of
2 America.
3    Q.   Is it your understanding that HII paid
4 this invoice?
5    A.   Yes.
6    Q.   When HII was invoiced for goods and
7 services through ActiveProspect, how were those
8 invoices transmitted to HII?
9    A.   I believe by e-mail coming from our
10 accounting department.
11    Q.   Who do those e-mails go to?
12    A.   I don't recall the specifics.  I wasn't
13 ever in accounts receivable so I wasn't responsible
14 for sending invoices.
15    Q.   Did you ever have conversations with
16 Mr. Garavuso or Mr. Krul or Mr. DiCicco about
17 invoices?
18    A.   Yes.
19    Q.   So is it your understanding that they,
20 you know, had seen generally invoices that were
21 coming from ActiveProspect?
22    A.   Yes.
23    Q.   Is it your understanding that
24 Mr. Garavuso knew who Health Advisors of America

Page 55

1 was, you know, from the outset?
2    A.   Yes.
3    Q.   How about Mr. Krul, did he know how
4 Health Advisors of America was from the outset in,
5 you know, July, August 2018?
6    A.   I don't recall speaking with Brian about
7 this agency specifically.
8    Q.   How about Mr. DiCicco, was it your
9 understanding that he knew who Health Advisors of
10 America was?
11    A.   I don't recall speaking with Domenick
12 either.  He got involved or he joined HII as I
13 recall after we went through the heavy overages
14 that you're seeing here, and I mostly spoke with
15 Dan Garavuso about those.
16    Q.   Did you ever talk to anyone at HII about
17 these lawsuits, about TCPA lawsuits?
18    A.   No specific lawsuits.  But, yes,
19 generally.  The nature of our relationship was to
20 help first and foremost ensure that the agencies
21 were complying with the TCPA and as part of that
22 HII and the agencies how to prove they were
23 complying.  So it was my understanding that our
24 relationship stemmed from, you know, TCPA lawsuits

Page 56

1 that they were either a party to or that they were
2 tangentially involved in.
3    Q.   Well, I think your testimony earlier was
4 that their only interest was avoiding litigation?
5    A.   Yes.
6    Q.   Okay.  I mean, avoiding litigation is
7 different than compliance, right?
8    A.   Yes.
9    Q.   And so -- I mean, I think I got an
10 e-mail here where you tell your colleagues that
11 HII's sole interest in the services is to avoid
12 litigation.
13         Are you backing off of that
14 testimony?
15    A.   I think that might have been acridly to
16 say only.  My purpose -- I think that's an internal
17 e-mail -- was to stress the point that all they
18 really care about is being able to make sure
19 that -- as I think through it more, I don't know if
20 I would say that avoiding litigation was their only
21 purpose or if they were there to verify that people
22 were in compliance with TCPA.
23    Q.   Well, let's look at the e-mail.
24    A.   I would say they were most interested in

Page 57

1 avoiding litigation.
2         MS. MOLLMAN:  Alex, are we coming up on
3 a good time to take a short five-minute break maybe
4 after this line of questioning?
5         MR. BURKE:  Yeah.
6         (Exhibit G was identified.)
7 BY MR. BURKE:
8    Q.   So I've circulated Exhibit G to the
9 gang.  And I'm going to show you the e-mail chain.
10         So Exhibit G is ActiveProspect 230
11 to 234.  The verbiage I'm interested in is here
12 where you say, "HII is using our services for the
13 soul purpose of limiting the amount of TCPA
14 lawsuits they and their agencies face.  This
15 particular agency" -- which I think you're talking
16 about Health Advisors of America.
17    A.   Correct.
18    Q.   -- "has had a TON of TCPA issues because
19 they upload aged leads into a dialer."
20         So first of all, who told you that
21 HAA, Health Advisors of America uploads leads into
22 the dialer?
23    A.   I don't recall.
24    Q.   Do you have any understanding as to

Page 58

1  whether HII knew that HAA was using aged leads?
2      A.   I don't recall, no.
3      Q.   For example, a conversation with
4  Mr. Garavuso or someone at HII about how HAA,
5  Health Advisors of America, was only using the
6  Litigator Scrub and not TrustedForm, did that ever
7  happen?
8      A.   Yes.
9      Q.   Did you ever explain to the HII person
10 that the reason they couldn't use TrustedForm is
11 that they were using aged leads?
12     A.   Yes.  I'm sure I had that conversation.
13     Q.   Would that have been with Mr. Garavuso?
14     A.   Yes.
15     Q.   Does this e-mail sort of refresh your
16 recollection as to HII's purpose for using
17 ActiveProspect?
18     A.   It does.  As I read back, I'm not sure
19 that I was qualified to speak to the sole intention
20 that they had.  I know that we often and still do
21 position TrustedForm as a way to ensure that you
22 are complying with the TCPA.  So, you know, I think
23 that guides a lot of my thoughts why people use it.
24 Re-reading this e-mail I think that just speaks to

Page 59

1  how much they cared about making sure that they and
2  their agencies weren't in lawsuits.  I can't really
3  speak to their level of concern with, you know, the
4  compliance, but I don't know how much of a concern
5  that was.
6      Q.   Well, can you tell me were there any
7  conversations or any particular employees at HII
8  that led to you writing this e-mail that says their
9  sole purpose was to limit TCPA lawsuits?
10     A.   Yeah.  I'm certain there were
11 conversations that led me to feel that way.  I
12 don't recall the specific conversations.
13     Q.   You say later here that you have three
14 top contacts at HII who repeatedly reached out
15 telling you that Health Advisors of America is
16 their top priority.
17         Who were those three top contacts
18 at HII?
19     A.   It would have certainly been Dan
20 Garavuso, Adam Wild and the next is a guess.  I
21 would guess it was Brian Krul but I can't confirm.
22     MR. BURKE:  All right.  This is a good
23 time for a break.  Let's take ten minutes because
24 we've done so well so far.  So let's reconvene at

Page 60

1  11:20.
2      THE VIDEOGRAPHER:  We are going off the
3  record at 11:07 a.m.
4          (Whereupon, a break was taken,
5          after which the following
6          proceedings were had:)
7      THE VIDEOGRAPHER:  We are back on the
8  record at 11:21 a.m.  This marks the beginning of
9  Media Unit 2.
10         (Exhibit H was identified.)
11 BY MR. BURKE:
12     Q.   So I'm going to show you another
13 exhibit.  Exhibit H is two pages, ActiveProspect
14 Bates Number 481 to 482.  And this is just giving
15 us another, sort of, timestamp here.
16         Would you agree that as of roughly
17 the end of November there were three agencies that
18 were live and active on ActiveProspect including
19 Health Advisors of America?
20     A.   Yes.
21     Q.   I see under there it says Dan Garavuso
22 says, "And in Vendor list and agencies started and
23 sent to Krul."  My guess is he meant to say, add in
24 vendor list and agencies started and sent to Krul.

Page 61

1          But regardless of what he meant,
2  did you send the vendor list and agencies that had
3  started to Brian Krul after he got this?
4      A.   Yeah, I would believe that I did.
5      Q.   And what you were forwarding is a
6  presentation, is that right, and certain documents?
7      A.   Yes.
8      Q.   What were those generally?
9      A.   I would presume that was some sort of
10 presentation or slide deck outlining our services
11 and how their different agencies could leverage
12 them with the purposes of helping their agencies
13 understand why HII and they, you know, would be
14 working with us.
15         (Exhibit I was identified.)
16     Q.   Let's look at Exhibit I.  I'm showing
17 you what's been marked as Exhibit I.  It's
18 ActiveProspect Page 374 --
19         (Whereupon, a phone
20          interruption was had in the
21          deposition proceedings.)
22 BY MR. BURKE:
23     Q.   So this is 374 to 377 and it looks like
24 it's an e-mail exchange between you and Kara.  Who

16 (Pages 58 - 61)

Page 62

1  is Kara?
2     A.  Kara Krieghauser was a client success
3  manager at ActiveProspect and she was the original
4  client success manager for the HII or I believe she
5  was the original client success manager for Health
6  Insurance Innovations.
7     Q.  There's some discussion here about
8  Health Advisors of America that HII is paying for
9  it says at the bottom of 374.  So it corroborates
10  that they were only using Litigator Scrub.  And
11  Litigator Scrub, by the way, that they are talking
12  about is not an ActiveProspect product.
13           I think you mentioned that before;
14  is that right?
15     A.  Correct.  It's a third party that we
16  have a reseller relationship with.
17     Q.  Okay.  So for the Litigator Scrub, is
18  that different from what we're talking about or the
19  same product that we're talking about at dnc.com?
20     A.  Yeah.  The Litigator Scrub would be
21  either dnc.com, also known as contacts in our
22  compliance or black list alliance.  In this case it
23  seems it's specific to DNC.
24     Q.  Okay.  At the bottom of 375 beginning at

Page 63

1  376 there's a discussion about HII using the
2  Litigator Scrub a whole bunch; is that right?
3     A.  Yeah.
4     Q.  Kara says that according to Adam they're
5  prepared for this.  I think what that means is HII
6  is prepared for a large Litigator Scrub bill or
7  invoice.
8           Is that what your reading says as
9  well?
10     A.  Correct.  I believe this refers to they
11  know that this large charge is coming given that I
12  had a conversation with Dan Garavuso saying
13  overages for this last month were very high.  You
14  know, we haven't sent the invoice yet but we're
15  going to so I prepped him.
16     Q.  Did you tell Mr. Garavuso that it was
17  Health Advisors of America that had the overages?
18     A.  Yes.  That makes sense.
19     Q.  Mr. Garavuso, what was his reaction when
20  you told him Health Advisors of America was going
21  to have a big invoice?
22     A.  He was very surprised.  He asked what
23  could be done on pricing because there was limits
24  on what we could do on pricing being that it was a

Page 64

1  reseller relationship.  So, you know, I told him
2  we'll figure something out but he was -- he was
3  very surprised.  And before that conversation he
4  wasn't anticipating that the charges would be that
5  high.
6           (Exhibit J was identified.)
7     Q.  I'm going to show you Exhibit J.  We're
8  looking at Exhibit J.  This is Bates 2456 produced
9  by ActiveProspect.
10           What is visitor track?
11     A.  I believe it's a service that our
12  marketing department uses to be notified of
13  certain -- you know, who's coming to our website
14  for, like, remarketing purposes but it's not a
15  service that I, in sales, am responsibile for so
16  it's kind of a cursory understanding.
17     Q.  So this e-mail is from March 2021 and it
18  says that -- well, it mentions Health Advisors of
19  America.
20           What do you understand this to mean
21  as to Health Advisors of America in March 2021?
22     A.  That they came to our website eight
23  times.
24     Q.  I see.  So they were just visiting the

Page 65

1  website, not necessarily using the website?
2     A.  Exactly.  The purpose why marketing
3  would send this to show things such as Health
4  Advisors of America somebody from that company is
5  coming to our website repeatedly.  Clearly there's
6  some level of interest in what we do and then in
7  sales we would say, okay, let's reach out to our
8  contacts and it's just kind of a notification that
9  somebody might be reengaged.
10     Q.  I see.
11           So about when -- at some point did
12  ActiveProspect stop working with Health Advisors of
13  America?
14     A.  I don't recall.
15     Q.  I think that you testified that HII is
16  still a customer; is that right?
17     A.  That's correct.
18     Q.  Is HII using the do not call suppression
19  product today?
20     A.  I don't know off the top of my head.
21  That we could figure out by looking at a recent
22  invoice.
23     Q.  To your knowledge, has HII ever used the
24  suppression product?

17 (Pages 62 - 65)

Page 66

1    A.   The Litigator Scrub?
2    Q.   Yes.
3    A.   Or SuppressionList?
4    Q.   The SuppressionList, yeah.
5    A.   I'm not certain.  As we get closer to --
6  in 2020, I started becoming less directly involved
7  with Health Insurance Innovations just given the
8  change in my role, so we handed off Health
9  Insurance Innovations completely to client success.
10  Their client success manager at the time there were
11  two different CSMs and I would only come in from
12  time to time if they had more high-level questions.
13  But my relationship started to -- I was no longer
14  the day-to-day contact or writing point.
15    Q.   Okay.  I'm going to refer to this -- I
16  don't think I'm going to introduce it as an exhibit
17  because it's an Excel spreadsheet.  It was produced
18  by ActiveProspect and its usage data.  It's been
19  produced to all the parties.  Let's see if we can
20  glean anything from this.  We might not be able to.
21  So I'm showing you a spreadsheet which I understand
22  from communications with counsel that this is usage
23  data.
24       Does this mean anything to you,

Page 67

1  this spreadsheet that's entitled "HII Request" and
2  then it's got a date 2022-02-23.xlx?
3    A.   Yes.  So this would refer to usage.  I
4  can't confirm it -- let's see, module ID.  Yeah,
5  this would refer to usage of our different services
6  such as you see in outbound integration for
7  LeadConduit which is what we would call a
8  transaction.  That's one of the billable activities
9  outbound to Litigator Scrub which would correlate
10  with an inquiry to dnc.com's Litigator Scrub.
11       And I don't know why there -- you
12  know, lines 2 through 17 if these were all of the
13  different agencies that were working with us or
14  just a subset of them.
15    Q.   Okay.  I'm going to the second tab which
16  is called Sheet 3.  Does this information mean
17  anything to you?
18    A.   So the SSO_ID is how we track each
19  account.  It's just an alphanumeric code that, you
20  know, I would not have the slightest clue as to
21  which SSO_ID associates with each different
22  account.
23    Q.   How about this last tab which is called
24  "Account List"?

Page 68

1    A.   Where are you seeing Account List?
2    Q.   The tab name down here.
3    A.   Okay, yeah.  So this, yeah, to me would
4  associate with the different agencies that HII
5  would want us to get live on their behalf.  And I
6  would presume that those that had an associate had
7  SS_OID at least got an account set up with us.
8  That account was under the HII umbrella, but I
9  wouldn't be able to confirm whether that account
10  ever actually got live with usage.
11    Q.   And the invoices I guess you said
12  earlier would tell us the products and extent to
13  which HII and its agencies are currently using or
14  did use or didn't use ActiveProspect over the last
15  few years; is that right?
16    A.   Correct.
17       MR. BURKE:  You know, I think I can work
18  this out with Brittney about the -- counsel, about
19  the usage and that sort of thing.  Although it's
20  responsive to our topics and the ongoing
21  relationship, I'm going to hold it open, the
22  deposition, for that purpose but otherwise I'm
23  done.
24       THE WITNESS:  All right.  Well, thank

Page 69

1  you all for your time.  This was my first time so
2  thank you.
3       MR. BURKE:  Thank you.
4       MS. CHATTIN:  Mr. Chickman, sorry to
5  burst your bubble but I think I have a couple of
6  questions myself.  But can we take like a
7  ten-minute break so I can get a little organized?
8  And I don't know if other folks are going to have
9  questions as well.  On behalf of HII I have just a
10  couple of questions.
11       THE WITNESS:  Sure thing.
12       MR. BURKE:  Okay.
13       THE VIDEOGRAPHER:  We're going off the
14  record at 11:38 a.m.
15       (Whereupon, a break was taken,
16        after which the following
17        proceedings were had:)
18       THE VIDEOGRAPHER:  We are back on the
19  record at 11:52 a.m.  This marks the beginning of
20  Media Unit Number 3.
21       CROSS-EXAMINATION
22  BY MS. CHATTIN:
23    Q.   Hi, Mr. Chickman.  My name is Danielle
24  Chattin.  I represent Health Insurance Innovations

18 (Pages 66 - 69)

Page 70

1  in both of these cases. I just have a couple more
2  questions to ask you so thanks for sticking around
3  for a few more minutes.
4      A.   No problem. You can call me, Adam.
5      Q.   Got you. Thanks for that Adam.
6           So earlier today we were looking at
7  an exhibit. It was Exhibit B and Mr. Burke was
8  asking you about several agencies that are listed
9  in the exhibit as Health Advisors of America
10 (a.k.a. Great Health Plans, Health Benefits Group,
11 Enrollment Center, Scott Shapiro)."
12          Do you remember when we were
13 talking about that exhibit?
14     A.   Yes.
15     Q.   And I believe you said it was your
16 understanding that all of those entities were the
17 same thing or something along those lines.
18          Do you recall that?
19     A.   Correct, yes.
20     Q.   I think you told Mr. Burke that your
21 understanding that all those entities were one in
22 the same were based on conversations you heard
23 people talking about those entities in the same
24 way.

Page 71

1           Is that -- am I remembering your
2  testimony correctly?
3      A.   Yes, that's correct.
4      Q.   Can you just tell me a little bit more
5  about those conversations or those things that you
6  heard people say that led you to believe that all
7  those entities were the same -- were one in the
8  same?
9      A.   Yeah. So it is my understanding that
10 agencies would often change names regularly for
11 reasons I wasn't privy to. So most often the
12 people that I worked with at HII would just refer
13 to "call center" or sometimes "rooms" as they refer
14 to them whoever the agency owner was.
15          So in this case they would refer to
16 it as Scott Shapiro or, you know, another agency
17 owner for different agencies. And then we listed
18 out the different names that, you know, either at
19 the same time that concurrently went by the
20 different names or that these are all the different
21 names that it went by. I don't know if all two or
22 three of those names would go by those at the same
23 time or if it switched names but we had those
24 listed out so in the event that somebody referred

Page 72

1  to it as Health Advisors of America we could tie it
2  back to, say, Scott Shapiro.
3      Q.   So you said some of those conversations
4  were with folks at HII that led you to believe that
5  these were all the same call centers or agencies;
6  is that right?
7      A.   Yes.
8      Q.   Do you remember who specifically at HII
9  you had conversations with about these various
10 agency names or call center names?
11     A.   Yeah. It would have been all of the
12 different VPs of sales. There were four of them
13 because they were the ones that had the
14 relationships with these call centers and their
15 owners. So that's how I came to know that we would
16 just refer to them by the agency owner's name
17 because that's how the different VPs of sales
18 would.
19          And then in conversations with Dan
20 Garavuso, he would also refer to them by the
21 owner's name. But them some would refer to it by
22 name such as Health Advisors of America. So that's
23 why we kept the two links together on those types
24 of spreadsheets.

Page 73

1      Q.   When you're saying the owner's name for
2  purposes of Health Advisors of America and these
3  other agencies or call center names, I think you
4  testified earlier that the primary way that you
5  refer to that entity was the Scott Shapiro agency
6  or something like that; is that right?
7      A.   Correct.
8      Q.   So in speaking with -- and I think you
9  said the VP of sales for that call center was Amy
10 Brady; is that right?
11     A.   Yes.
12     Q.   So in speaking with Amy Brady about this
13 entire grouping of call centers and agencies, did
14 you primarily refer to Scott Shapiro when you
15 talked to Amy Brady?
16     A.   I believe so.
17     Q.   And that's how you and Amy discussed
18 this entity is referring to Scott Shapiro; is that
19 right?
20     A.   Correct. There might have been
21 instances where we would refer to them by one of
22 their names but if memory serves the majority of
23 the time we would refer to them just by in this
24 case Scott Shapiro's agency or just Shapiro.

19 (Pages 70 - 73)

Page 74

1    Q.   Okay.  And you have -- I think you
2  testified earlier that you have spoken with Scott
3  Shapiro personally before, right?
4    A.   Yes.
5    Q.   And you personally worked with him in
6  implementing the ActiveProspect product; is that
7  right?
8    A.   Yes.  He didn't handle any of the
9  technical details or really the implementation
10  itself.  But I would work with him, you know, in an
11  effort to say, hey, this is what we need your team
12  to do to get live.  We had several conversations.
13    Q.   How many times would you say that you
14  spoke to Scott Shapiro?
15    A.   I would ballpark it between 10 and 20.
16    Q.   And over what period of time would you
17  say?
18    A.   It was probably concentrated over the
19  course of one or two months but he had my cell
20  phone number and he would call me sporadically.
21  And, you know, probably the last time he called me
22  was probably some time late 2019.  I don't remember
23  exactly.  Our conversations definitely tapered off.
24  But as we were working to get live, he would reach

Page 75

1  out to me via cell phone pretty frequently.
2    Q.   Okay.  And you said Scott Shapiro didn't
3  handle the technical details of the implementation
4  for his call center.
5         Do you recall who did handle those
6  technical details?
7    A.   It was mostly Marsha Griffin or
8  Griffith.  She was like our day-to-day contact but
9  I think she also pulled in one of her technical
10  resources.  And largely we were working with, like,
11  the different technologies that they licensed, so
12  VICIdialer would be one example.
13    Q.   Okay.  So you were personally
14  interacting directly with the VICIdialer folks; is
15  that right?
16    A.   I believe I was part of some of those
17  conversations.  I also was not the ActiveProspect
18  technical contact so that would have been one of
19  their client success managers such as Kara.
20    Q.   How many conversations would you
21  ballpark that you had with Marsha Griffith?
22    A.   Probably not as many as Scott.  I would
23  guess somewhere between five and ten, closer to
24  ten.

Page 76

1    Q.   And over the same time period as your
2  conversations with Scott Shapiro; is that correct?
3    A.   Yes.  It was heavily concentrated during
4  the period of time which HII wanted them to get
5  live.  But similar to Scott she had my cell phone
6  number.  She would reach out sporadically.  Also,
7  the last time I heard from her was probably 2019,
8  2020.
9    Q.   Did you speak to -- did you personally
10  speak to anybody else in Scott Shapiro's agency?
11    A.   I can't recall, no.
12    Q.   Do you think you did talk to anybody
13  else or you just can't recall whether you did or
14  didn't?
15    A.   I would guess that one time or another
16  probably pulled one or two other resources when I
17  was on a call with them, but I don't think I ever
18  had direct communication with -- one-to-one
19  communication with anyone other than Scott or
20  Marsha.
21    Q.   Did you ever talk to someone named
22  Michael Smith?
23    A.   The name doesn't ring a bell.  That's
24  not to say that I didn't.  I just don't remember

Page 77

1  that name.
2    Q.   Did anyone else from ActiveProspect have
3  direct contact with the -- Scott Shapiro's agency?
4  I think you mentioned Kara and I forget what her
5  last name is.
6    A.   Kara Krieghauser.
7    Q.   Um-hum.
8    A.   Scott McKee and Courtney Webb.
9    Q.   Can you just run down what each of those
10  ActiveProspect folks did in relation to the Scott
11  Shapiro agency or call center?
12    A.   Yes.  So they were each client success
13  managers.  So it was their job to largely manage
14  the business relationship with existing customers.
15  So they were quarterbacking, getting customers
16  live.  And then we also had implementation
17  engineers who actually handled the technical
18  limitation.  So those I believe for this agency
19  would be Biswas, B-I-S-W-A-S and Jeremy Brown.
20    Q.   We've been using some terms of art here
21  probably loosely, agencies, calls centers and
22  rooms.
23         What's your understanding, if you
24  have any, of the difference between insurance

Page 78

1  agent, call centers, rooms and if there's any other
2  terms of art that are relevant here?
3      A.   Yeah.  To me they were all pretty
4  synonymous.  And another term it would be "down
5  line."
6      Q.   Okay.
7      A.   So, yeah, it just kind of depended who
8  you were talking to, how they referred to -- how
9  would you usually use the term "agency" but some
10 would refer to them as "rooms," "call center," "the
11 down line."
12     Q.   So was it your understanding that Scott
13 Shapiro was working with other insurance agents or
14 was it your understanding he was purchasing leads
15 for himself at some job insurance agents or both or
16 something else?
17     A.   My understanding was that he -- our work
18 was centered around his own agency.  He was buying
19 leads for it to dial out on.  And I don't know if
20 he had any down lines.
21     Q.   When you say "his own agency," you're
22 only aware of himself as an insurance agent?
23     A.   Correct.  Yep.  When we say himself as
24 an insurance agent, he would -- I think the size of

Page 79

1  their agency was 30 to 50 if not more agents at the
2  agency.  But he was the owner of that agency to my
3  understanding.
4      Q.   That's what I wanted to ask you.  So it
5  was your understanding that he was working with 30
6  to 50 insurance agents?
7      A.   Correct.
8      Q.   In his -- as you call it "agency"?
9  Sorry.  Go ahead.
10     A.   Yeah.  I've been to call his center
11 once, his agency.  The 30 to 50 agent number comes
12 from the ballparking, you know, what I saw four
13 years ago when I was there.
14     Q.   Can you tell me more about that visit to
15 the call center?
16     A.   Yeah.  So this happened early on when we
17 had first signed Health Insurance Innovations as a
18 customer and because a lot of the agencies that
19 they worked with were in the Fort Lauderdale/South
20 Florida area, I went down on a couple trips to meet
21 with some of the agencies just to help educate them
22 on why we were partnering with Health Insurance
23 Innovations and how we could provide a service to
24 them.

Page 80

1          So those visits were usually very
2  high level.  I would meet with the agency owner,
3  explain who I was.  You know, they would usually be
4  set up by the VP of sales associated with that
5  different agency.  In this case, Amy Brady probably
6  brokered that meeting.  It was fairly quick.  My
7  guess is about a 30-minute meeting.  Went in, said
8  hi, introduced myself.  They said, yep.  Sounds
9  great.  Let's do this.  And then at that point I
10 pulled in the client success managers to get more
11 into the leads on how we would actually hook up
12 with them.
13     Q.   Okay.  Great.
14          So your understanding of I guess
15 the composition of Scott Shapiro's agency, was that
16 based solely on this site visit or did you have
17 additional conversations with Scott Shapiro about
18 how he ran his agency?
19     A.   It was largely based on the site visit
20 but then also the sheer volume and number of leads
21 that they were querying against the Litigator
22 Scrub, not leveraging TrustedForm with.
23          I think -- I don't remember the
24 conversations super well.  But just based on the

Page 81

1  leads and the dialers they were using, I was able
2  to make some inferences that, you know, I can't
3  confirm or correct but I felt very strongly were
4  likely the case.
5      Q.   Did you ever have any conversations with
6  Amy Brady about how many agents Scott Shapiro was
7  supporting or whether Scott Shapiro was an
8  insurance agent or anything like that?
9      A.   No.  We would have conversations about
10 them being a sizable agency, but we never got into
11 specifics, this is how many agents they have or,
12 you know, if licensed or not.  I saw two months
13 everyone would be licensed.  If that wasn't the
14 case, this is the first I'm finding out about that.
15     Q.   Got it.  You said a lot of the times
16 folks at HII would refer to agencies like the ones
17 Scott Shapiro was running as rooms; is that right?
18     A.   Correct.  Exactly.
19     Q.   And your understanding of rooms is just
20 another word for agency; is that your
21 understanding?
22     A.   Yes.
23     Q.   Got it.  Have you ever heard of Rising
24 Eagle?

21 (Pages 78 - 81)

Page 82

1     A.   No, I don't think so.
2     Q.   So you never had any conversations with
3  anybody at HII about Rising Eagle; is that right?
4     A.   I'm not sure that we ever had a
5  conversation about Rising Eagle.  I just don't
6  remember hearing that name.
7     Q.   How about someone named John Stiller,
8  does that ring a bell to you?
9     A.   That does not ring a bell.
10     Q.   Adam, the last thing I want to ask you
11  is about how you prepared for your deposition
12  today.
13          I understand you're here
14  representing ActiveProspect as a corporate
15  representative; is that right?
16     A.   Yes, I believe so.
17     Q.   Well, I guess I should have asked you.
18          Is that your understanding you're
19  here as a corporate representative of
20  ActiveProspect?
21     A.   Yes.
22     Q.   Okay.  Great.
23          Did you do anything to prepare for
24  your deposition today?

Page 83

1     A.   I had a quick conversation with Brittney
2  yesterday.  This was my first time being deposed so
3  I was just kind of curious how it would go and that
4  was really the extent to it.
5     Q.   And you're doing a great job for your
6  first time so --
7     A.   Thank you.
8     Q.   -- kudos.
9          Did you speak to anyone else at
10  ActiveProspect to prepare for what you were going
11  to talk about at your deposition today?
12     A.   Yes.  Jason Smith.  He is our internal
13  counsel.  I believe that's his title.
14          (Simultaneous speaking.)
15     Q.   I should have said so before, Adam.  I
16  appreciate you telling me who you spoke to.  You
17  don't have to tell me the substance of any of your
18  conversations with either your outside counsel or
19  in-house counsel, so you can stop there.  So you
20  spoke to Jason Smith.
21          Anyone else at ActiveProspect that
22  you spoke to to prepare for your deposition?
23     A.   Not to prepare for it but others are
24  aware of the deposition and, you know, hallway

Page 84

1  conversations such as, why can't you be at a
2  meeting tomorrow at noon?  I'm being deposed.
3     Q.   Okay.  Great.
4          I guess what I'm getting at is the
5  testimony you've given today is pretty much based
6  on your own personal recollection of being involved
7  in these events over the relevant time period; is
8  that right?
9     A.   Yes, exactly.  I wasn't pulling anyone
10  else together to get their recollection or any
11  additional data.  As you know, we share a number of
12  e-mails so that might be considered part of the
13  preparation for the deposition but that's really
14  the extent.
15     Q.   I'm sorry.  I lied.  I do want to ask
16  you about one more thing.
17          I sent around an e-mail to all the
18  counsel of Exhibit K.
19          Alex, I don't know if you want to
20  share your screen for me.  I might hold things up
21  if I try to do it for the first time.
22          MR. BURKE:  Sure.
23          MS. CHATTIN:  Great.  Thank you.  Alex,
24  do you mind scrolling down to the bottom of Page 2.

Page 85

1          (Exhibit K was identified.)
2  BY MS. CHATTIN:
3     Q.   Adam, do you see at the bottom of this
4  invoice and this is an invoice from April 4th,
5  2019.  It's an ActiveProspect invoice to HII.  The
6  Bates label is Active -- ACTPRO7292.  At the bottom
7  of the second page it looks like there's an entry
8  for "TrustedForm - Health Advisors of America
9  February Usage - Retained certificates."  It looks
10  like the quantity was two.
11          Do you see that line item?
12     A.   I do, yes.
13     Q.   What does this mean, if you can tell me?
14     A.   Yeah.  So the way we charge for
15  TrustedForm there was a subscription fee which
16  would be a monthly fee based on volume and then any
17  overages, you know, over that allotted volume would
18  be charged.  Stars one piece.  The other piece was
19  for storing of the TrustedForm certificates.  And
20  here this shows that we were only storing two
21  TrustedForm certificates on behalf of Health
22  Advisors of America, so that would mean we've seen
23  two leads come through with TrustedForm
24  Certificates.

22 (Pages 82 - 85)

Page 86

1    Q.  Okay.  I know earlier when we were
2  talking about the TrustedForm product in HAA, I
3  believe you testified you weren't sure whether they
4  ever implemented TrustedForm or not.  I know this
5  is a pretty low count.
6        So I guess my question is:  Does
7  this mean that they did implement TrustedForm
8  product or could it mean something else?
9    A.  This would indicate that they did
10  implement it but only queried two TrustedForm
11  Certificates so only two leads came through with a
12  TrustedForm Certificate.
13    Q.  Okay.  Got it.
14        One more question.  Have you ever
15  heard of someone named Sean Duffy?
16    A.  Sean Duffy?  That does ring a bell, but
17  I don't remember specifics.
18    Q.  Does it ring a bell in connection with
19  your work with HII or you just can't place it at
20  all?
21    A.  No.  I do think it rings a bell related
22  to the work with HII.  If I were to guess, you
23  know, he was an agency owner or partner at an
24  agency, but I can't place his face or place, you

Page 87

1  know, what agency he was with.
2    Q.  Okay.  Anything else that you can tell
3  me about Sean Duffy or have we reached the extent
4  of your memory about him?
5    A.  Yeah, that's about all that I remember.
6        MS. CHATTIN:  Okay.  Those are all the
7  questions I have for you, Mr. Chickman.  Thank you
8  again for staying on for a few more minutes.
9        THE WITNESS:  Absolutely.
10        MR. BURKE:  Anyone else?
11        (No response.)
12        REDIRECT EXAMINATION
13  BY MR. BURKE:
14    Q.  I just have a follow-up.  This is Alex
15  Burke.
16        Adam, we talked -- or you talked
17  with Ms. Chattin about Shapiro and Health Advisors
18  of America, an independent agency or agency.  I
19  just wanted to clarify.
20        When you talk about Scott Shapiro,
21  you're talking about Health Advisors of America and
22  Health Benefits Group and Great Health Plans and
23  the Enrollment Center; isn't that right?
24    A.  Definitely about Health Advisors of

Page 88

1  America.  If the other two names are the other
2  names associated with Scott Shapiro's agency, then,
3  yes, I don't remember all three.  I didn't even
4  remember if it was three names or -- three or four.
5  But, yes, if those were the ones that were
6  associated with him on that spreadsheet.
7    Q.  Okay.  Let's just go back.
8        Exhibit B, as in boy, is this the
9  sheet that you were referring to at ACTPRO630?
10    A.  Yes.
11    Q.  And then we've got in this column here
12  Health Advisors of America also known as Great
13  Health Plans, Health Benefits Group, Enrollment
14  Center, Scott Shapiro.
15        Does that refresh your recollection
16  as to the entities that when you spoke about Scott
17  Shapiro you understood were the same thing?
18    A.  Yes.
19    Q.  Those were one in the same with Scott
20  Shapiro in your mind; is that right?
21    A.  Yes.
22        MR. BURKE:  Subject to my prior
23  objection, I'm done today.  I think we're finished.
24        THE REPORTER:  Signature, Brittney?

Page 89

1        MS. MOLLMAN:  We can read.
2        THE VIDEOGRAPHER:  We are going off the
3  record.  This concludes today's deposition.  The
4  time is 12:18 p.m.  We are off the record.
5        THE REPORTER:  Mr. Burke, are you
6  ordering at this time, sir?
7        MR. BURKE:  Yes.  We'd like -- we'll
8  just take, like, a PDF version.
9        THE REPORTER:  Ms. Mollman, would you
10  like a copy?
11        MS. MOLLMAN:  No, thank you.
12        (Witness excused at 12:19 p.m.)
13        (Signature reserved.)

23 (Pages 86 - 89)

Page 90

1    REPORTER'S CERTIFICATE
2
3
4        I, Yvette Bijarro-Rodriguez, a Certified
5    Shorthand Reporter, do hereby certify that on March
6    16, 2022, the deposition of the witness, ADAM
7    CHICKMAN, called by the Plaintiffs, was taken
8    before me, reported stenographically and was
9    thereafter reduced to typewriting through
10   computer-aided transcription.
11       The said witness, ADAM CHICKMAN, was
12   first duly sworn to tell the truth, the whole
13   truth, and nothing but the truth, and was then
14   examined upon oral interrogatories.
15       I further certify that the foregoing is
16   a true, accurate and complete record of the
17   questions asked of and answers made by the said
18   witness, at the time and place hereinabove referred
19   to.
20       The signature of the witness was not
21   waived by agreement.
22       Pursuant to Rule 207(a) of the Rules of
23   the Supreme Court of Illinois if deponent fails to
24   read and sign this deposition transcript within 28

Page 91

1    days or make other arrangements for reading and
2    signing thereof, this deposition transcript may be
3    used as fully as though signed, and the instant
4    certificate will then evidence such failure to read
5    and sign this deposition transcript as the reason
6    for signature being waived.
7        The undersigned is not interested in the
8    within case, nor of kin or counsel to any of the
9    parties.
10       Witness my official signature on this
11   30th day of March, 2022.
12
13
14
15   Yvette Bijarro-Rodriguez, CSR
     One North Franklin Street
16   30th Floor
     Chicago, Illinois 60606
17
18   License No. 084-003734
19
20
21
22
23
24

Page 92

1        Veritext Legal Solutions
             1100 Superior Ave
2              Suite 1820
            Cleveland, Ohio 44114
3           Phone: 216-523-1313
4    March 31, 2022
5    To: Brittney Mollman, Esq.
6    Case Name: Bilek, Mary, etc. v.
         National Congress of Employers, Inc., et al.
7
     Veritext Reference Number: 5136872
8
     Witness: Adam Chickman, 30(b)(6)    Deposition Date: 3/16/2022
9
     Dear Sir/Madam:
10
     The deposition transcript taken in the above-referenced
11   matter, with the reading and signing having not been
12   expressly waived, has been completed and is available
13   for review and signature. Please call our office to
14   make arrangements for a convenient location to
15   accomplish this or if you prefer a certified transcript
16   can be purchased.
17   If the errata is not returned within thirty days of your
18   receipt of this letter, the reading and signing will be
19   deemed waived.
20
21   Sincerely,
22   Production Department
23
24   NO NOTARY REQUIRED IN CA

Page 93

1        DEPOSITION REVIEW
         CERTIFICATION OF WITNESS
2
     ASSIGNMENT REFERENCE NO: 5136872
3    CASE NAME: Bilek, Mary, etc. v.
         National Congress of Employers, Inc., et al.
     DATE OF DEPOSITION: 3/16/2022
4    WITNESS' NAME: Adam Chickman, 30(b)(6)
5    In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6    my testimony or it has been read to me.
7    I have made no changes to the testimony
     as transcribed by the court reporter.
8
     _____    _____
9    Date        Adam Chickman, 30(b)(6)
10   Sworn to and subscribed before me, a
     Notary Public in and for the State and County,
11   the referenced witness did personally appear
     and acknowledge that:
12
     They have read the transcript;
13   They signed the foregoing Sworn
         Statement; and
14   Their execution of this Statement is of
         their free act and deed.
15
     I have affixed my name and official seal
16
     this _____ day of _____, 20____.
17
18   _____
     Notary Public
19
     _____
     Commission Expiration Date
20
21
22
23
24
25

24 (Pages 90 - 93)