UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

STATE OF TEXAS, et al.,           *
                                  *
        Plaintiffs,               *
                                  *
        v.                        *   Case No. 4:20-cv-02021
                                  *
RISING EAGLE CAPITAL              *
GROUP, LLC, et al.,               *
                                  *
        Defendants.               *


IN-PERSON, VIDEOTAPED, AND

VIDEOCONFERENCED ORAL DEPOSITION OF

JAKOB A. MEARS

Tuesday, March 1, 2022

        IN-PERSON, VIDEOTAPED, AND VIDEOCONFERENCED

ORAL DEPOSITION OF JAKOB A. MEARS, produced as a

witness at the instance of the Plaintiff, the State of

Texas, and duly sworn, was taken in the above-styled

and numbered cause on Tuesday, March 1, 2022, from

9:26 a.m. to 4:23 p.m., before Debbie D. Cunningham,

CSR, in and for the State of Texas, reported via Machine

Shorthand at the offices of the Texas Attorney General,

300 W. 15th Street, 9th Floor, Austin, Texas 78701,

pursuant to the Federal Rules of Civil Procedure.

--ooOoo--

**2**

```
1        APPEARANCES
2
3   FOR PLAINTIFF STATE OF TEXAS:
4     OFFICE OF THE ATTORNEY GENERAL OF TEXAS
        Consumer Protection Division
5     300 W. 15th Street, 9th Floor
        Austin, Texas  78701
6     (T) 512.463.2100
        By:  Patrick Abernethy, Esq.   (In Person)
7          Patrick.abernethy@oag.texas.gov
           AND
8          James Holian, Esq.   (In Person)
9
    FOR PLAINTIFF STATE OF ARKANSAS:
10
      OFFICE OF THE ARKANSAS ATTORNEY GENERAL
11    323 Center Street, Suite 200
        Little Rock, Arkansas  72201
12    (T) 501.682.7506 (McCoy)
        By:  David McCoy, Esq.    (Via Zoom)
13         David.McCoy@ArkansasAG.gov
           AND
14         Peggy Johnson, Esq.    (Via Zoom)
           Peggy.Johnson@ArkansasAG.gov
15
16  FOR PLAINTIFF STATE OF INDIANA:
17    OFFICE OF THE INDIANA ATTORNEY GENERAL
        302 West Washington Street
18    IGCS - 5th Floor
        Indianapolis, Indiana 46204
19    (T) 317.232.6294 (Swetnam)
        (T) 317.234.1912 (Yeoman)
20
        By:  Douglas S. Swetnam, Esq.  (Via Zoom)
21         douglas.swetnam@atg.in.gov
           AND
22         Joseph D. Yeoman, Esq.  (Via Zoom)
           Joseph.Yeoman@atg.in.gov
23         AND
           Casey Klippel, Esq.   (Via Zoom)
24         Casey.Klippel@atg.in.gov
25
```

**3**

```
1   FOR PLAINTIFF STATE OF MICHIGAN:
2     MICHIGAN DEPARTMENT OF ATTORNEY GENERAL
        Corporate Oversight Division
3     P.O. Box 30736
        Lansing, Michigan  48909
4     (T) 517.335.7632
        By:  Kathy P. Fitzgerald, Esq. (Via Zoom)
5          fitzgeraldk@michigan.gov
6
7   FOR PLAINTIFF STATE OF MISSOURI:
8     OFFICE OF THE MISSOURI ATTORNEY GENERAL
        P.O. Box 861
9     St. Louis, Missouri  63188
        (T) 314.340.7961
10    By:  Michelle L. Hinkl, Esq.   (Via Zoom)
           Michelle.Hinkl@ago.mo.gov
11
12
    FOR PLAINTIFF STATE OF NORTH CAROLINA:
13
      NORTH CAROLINA DEPARTMENT OF JUSTICE
14    Consumer Protection Division
        P.O. Box 629
15    Raleigh, North Carolina  27602
        (T) 919.716.6000
16    By:  Tracy Nayer, Esq.     (Via Zoom)
           tnayer@ncdoj.gov
17
18
    FOR PLAINTIFF STATE OF NORTH DAKOTA:
19
      OFFICE OF ATTORNEY GENERAL OF NORTH DAKOTA
20    Consumer Protection & Antitrust Division
        1720 Burlington Drive, Ste. C
21    Bismarck, North Dakota  58504
        (T) 701.328.5570
22    By:  Parrell D. Grossman, Esq. (Via Zoom)
           pgrossman@nd.gov
23         AND
           Brian M. Card, Esq.    (Via Zoom)
24         bmcard@nd.gov
25
```

**4**

```
1   FOR PLAINTIFF STATE OF OHIO:
2     OHIO ATTORNEY GENERAL'S OFFICE
        Consumer Protection Section
3     30 E. Broad Street, 14th Floor
        Columbus, Ohio  43215
4     (T) 614.752.4730 (Leahy)
        (T) 614.728.1172 (Garrison)
5
        By:  Erin B. Leahy, Esq.    (Via Zoom)
6          Erin.Leahy@OhioAGO.gov
           AND
7          W. Travis Garrison, Esq. (Via Zoom)
           Travis.Garrison@OhioAGO.gov
8
9
    FOR DEFENDANT SCOTT SHAPIRO:
10
      BURNS & LEVINSON, LLP
11    125 High Street
        Boston, Massachusetts  02110
12    (T) 617.345.3000
        By:  Shepard Davidson, Esq.  (In person)
13         sdavidson@burnslev.com
14
15
16  FOR DEFENDANTS MICHAEL T. SMITH, JR.
    AND HEALTH ADVISORS OF AMERICA, INC.:
17    THE FRANQUI FIRM
        1451 W. Cypress Creek Rd., Ste. 300
18    Ft. Lauderdale, Florida  33309
        (T) 954.947.3023
19
        By:  Anthony G. Franqui, Esq.  (Via Zoom)
20         tony@thefranquifirm.com
21
22  FOR DEFENDANT JAKOB A. MEARS:  (PRO SE)
23    JAKOB A. MEARS         (In person)
        9009 N. FM 620 Rd., Apt. 2208
24    Austin, Texas  78726
        jakobmears2016@gmail.com
25
```

**5**

```
1   ALSO PRESENT:  Scott Shapiro       (In person)
              Leann Moch       (Via Zoom)
2             John Hathaway    (Via Zoom)
              John Isaacs      (Via Zoom)
3
4   VIDEOGRAPHER:  Bill Burns        (In person)
5
      ZOOM TECH:   Brian Christopher  (Via Zoom)
6
7             --ooOoo--
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

6

1                    INDEX
2    APPEARANCES                            2
3
4    EXAMINATION OF JAKOB A. MEARS:
5    BY MR. ABERNETHY                      10
6    BY MR. YEOMAN                        236
7    BY MR. ABERNETHY                     236
8    BY MR. DAVIDSON                      243
9    BY MR. FRANQUI                       285
10   BY MR. ABERNETHY                     292
11
12
13   CHANGES AND SIGNATURE                303
14   REPORTER'S CERTIFICATION             305
15
16            --ooOoo--
17
18
19
20
21
22
23
24
25

7

1            EXHIBIT INDEX
2   Exhibit Number    Description          Page
3   Exhibit 4   Audio clip wav file of      162
                conversation between John
4               Spiller and Jakob Mears
5   Exhibit 2   Audio clip wav file of      168
                conversation between John
6               Spiller and Jakob Mears
7   Exhibit 5   Skype communications, including  197
                conversations between John
8               Spiller and Jakob Mears, Bates
                labeled Skype000781 through
9               Skype002745
10  Exhibit 41  Skype communications Bates  219
                labeled Skype000001 through
11              Skype000011
12  Exhibit 42  Skype chat Bates labeled    230
                Skype000013 - Skype000364
13
    Exhibit 18  12/29/19 Jakob Mears e-mail to  238
14              rpgleads@gmail.com, Subject:
                Phone Messages Jakob Received
15              and titled Messages That
                Mike/Scott/Omar Sent Me
16
    Exhibit 19-40   Text message screenshots  240
17
    Exhibit A   Declaration of Jakob Mears   255
18
19            --ooOoo--
20
21
22
23
24
25

8

1         (Tuesday, March 1, 2022, 9:26 a.m.)
2                P R O C E E D I N G S
3         THE VIDEOGRAPHER:  This is the
4    deposition of Jakob Mears in the matter of
5    State of Texas, et al. versus Rising Eagle
6    Capital Group, LLC, et al.  Our location is 300
7    West 15th Street in Austin, Texas.  We're on
8    the record at 9:26.
9         I'm Bill Burns.  My business
10   address is 11309 Pickard Lane in Austin, Texas
11   77748.  Would all persons please introduce
12   themselves for the record, beginning with
13   Plaintiffs' attorneys?
14        MR. ABERNETHY:  For the State of
15   Texas I'm Patrick Abernethy.
16        MR. HOLIAN:  For the State of
17   Texas, James Holian.
18        MS. JOHNSON:  For the State of
19   Arkansas, this is Peggy Johnson.
20        MR. YEOMAN:  For the State of
21   Indiana, this is Joseph Yeoman.
22        MR. SWETNAM:  For the State of
23   Indiana, this is Douglas Swetnam.
24        MR. KLIPPEL:  For the State of
25   Indiana, this is Casey Klippel.

9

1         MS. FITZGERALD:  For the state
2    of Michigan, this is Kathy Fitzgerald.
3         MS. HINKL:  For the state of
4    Missouri, this is Michelle Hinkl.
5         MS. NAYER:  For the state of
6    North Carolina, this is Tracy Nayer.
7         MS. LEAHY:  For the State of
8    Ohio, this is Erin Leahy.
9         MR. HATHAWAY:  For the State of
10   Ohio, this is Plaintiff's representative, John
11   Hathaway.
12        MR. GARRISON:  For the State of
13   Ohio, this is Attorney Travis Garrison.
14        MR. ISAACS:  For the State of
15   Ohio, this is Investigator John Isaacs.
16        THE REPORTER:  And do we have
17   Defense Counsel that want to make
18   announcements?
19        MR. DAVIDSON:  Sure.  For Scott
20   Shapiro, this is Shepard Davidson.
21        MR. FRANQUI:  And for Michael
22   Smith and Health Advisors of America, Anthony
23   Franqui.
24        MR. CARD:  For the State of
25   North Dakota, this is Brian Card.

10

1      MR. ABERNETHY:  Okay.  Jakob?
2      THE WITNESS:  This is Jakob.
3      MR. ABERNETHY:  Can you say your
4  full name?
5      THE WITNESS:  This is Jakob
6  Alexander Mears.
7      MR. ABERNETHY:  All right.  Can
8  you swear Mr. Mears in?
9          JAKOB A. MEARS,
10  having been duly sworn, testified as follows:
11          EXAMINATION
12  BY MR. ABERNETHY:
13    Q.  All right.  Thanks Jakob.
14        We'll go ahead and get started,
15  and I apologize.  I know I had told you it
16  would just be us here today.  I didn't know
17  other Defendants would be here, so.  But, yeah,
18  we'll go ahead and get started.
19        So have you ever had your
20  deposition taken before?
21    A.  No.
22    Q.  Okay.  So --
23      MR. DAVIDSON:  Patrick,
24  stipulations?
25      MR. ABERNETHY:  Okay.  And we've

11

1  agreed to the usual stipulations.
2      MR. DAVIDSON:  Can you just put
3  them on?  So we'll reserve all objections
4  except as to the form of the question until the
5  time of trial.  We'll reserve motions to strike
6  until the time of trial.  The witness will have
7  30 days to read and sign the transcript
8  [indiscernible.]
9      THE REPORTER:  I'm sorry.  I
10  couldn't hear after "read and sign the
11  transcript."
12      MR. DAVIDSON:  Within 30 days,
13  and we'll waive notarization.
14        Is that acceptable?
15      MR. ABERNETHY:  Yes.
16      MR. FRANQUI:  There was also a
17  discussion -- I'm sorry.  This is Anthony
18  Franqui.  There was also a discussion before
19  the depo started about one objection for all on
20  either side.  Are we going to do that, or -- or
21  not?
22      MR. ABERNETHY:  No.  If we
23  could, do them by individual Defendant.
24      MR. FRANQUI:  That's fine.
25    Q   (BY MR. ABERNETHY)  Okay.  All right.  Jakob,

12

1  so you understand here today that I'm going to be asking
2  you questions and you -- any answers you give will be
3  under oath; and so that means you're sworn to tell the
4  truth.  And the court reporter's going to be
5  transcribing everything.  So it's important that we wait
6  for me to finish asking questions, you to finish
7  answering so we're not talking over each other.  And
8  make sure we're -- all answers are verbal, so no nods or
9  "uh-huhs" or "huh-uhs."  Just make sure we do verbal
10  answers.
11        And if you don't understand any of my
12  questions or any part, just please let me know; and I
13  will explain it further.  And if -- if you don't, I'll
14  just assume you understand.  So please let me know if
15  there's anything you don't understand.
16        If you need a break at any time, just let
17  us know.  We can take a break for you, whatever you
18  need.
19        Otherwise, are you prepared to answer all
20  of our questions today?
21    A.  Yes.
22    Q.  Okay.  And did you -- you currently
23  do not have counsel representing you?
24    A.  Correct.
25    Q.  And did you have anybody help prepare

13

1  you for this deposition?
2    A.  No.
3    Q.  Okay.  And there's nothing that would
4  prevent you from giving us your full attention
5  here today?
6    A.  Not at all.
7    Q.  All right.  And you're not taking
8  anything that would prevent you from giving
9  full, complete, and truthful answers?
10    A.  No.
11    Q.  Okay.  So, as I said, just let me
12  know if you don't understand any questions; and
13  if you need a break, just let us know.
14    A.  Okay.
15    Q.  All right.  Can you tell me your full
16  name again?
17    A.  Jakob Alexander Mears.
18    Q.  All right.  And where do you live
19  currently?
20    A.  9009 North FM 620.
21    Q.  Okay.  And we're going to go ahead
22  and start at the beginning with:  How did you
23  meet John Spiller?
24    A.  I had actually knocked on his door
25  for a school project, and then he owned a

14

1 business. And at that time I was very
2 interested in entrepreneurship, and so I kind
3 of just kept on going over. It piqued my
4 interest, and a relationship started from
5 there.
6    Q. And what was the business he owned at
7 that time?
8    A. All right. I want to say he did the
9 [indiscernible.]
10   Q. Okay.
11       THE REPORTER: I'm sorry. The
12 name of the company?
13       THE WITNESS: Um, I don't know
14 the name of the company he had.
15       THE REPORTER: What did you say,
16 league generation [sic]?
17       THE WITNESS: Yes.
18   Q. (BY MR. ABERNETHY) So the business
19 he was in was lead generation?
20   A. Correct.
21   Q. Okay. And you had an interest in
22 that at the time?
23   A. Not in that, but just
24 entrepreneurship in general.
25   Q. Okay.

15

1    A. Just owning a business.
2    Q. And so how long was it before you
3 started working for John?
4    A. Probably three years.
5    Q. It was three years until you started
6 working for him?
7    A. Uh-huh. I'd say, give or take, two
8 or three years because I met him while I was in
9 high school; and then I went to college. And
10 then, when I was in college, after about a year
11 and a half, I went to live with him.
12   Q. And during those three years, did you
13 help him with anything with the lead generation
14 business or just talked to him about it?
15   A. Nothing on that side. I mainly
16 helped with, I guess, like, task stuff, like,
17 doing Godaddy, login information stuff, or
18 trying to create websites that were never used.
19   Q. Okay. And that was all for lead
20 generation businesses?
21   A. Um, not that I remember. I want to
22 say it was for -- I don't remember the type of
23 businesses they were. I just know that he
24 tasked me with building some websites.
25   Q. Okay. And you don't know any of the

16

1 names of these businesses at the time?
2    A. Not that I remember, no.
3        THE REPORTER: I'm sorry to
4 interrupt, but you are trailing off at the end
5 of your sentences. I'm having a hard time
6 hearing.
7        THE WITNESS: Oh, okay.
8        THE REPORTER: Will you keep
9 your voice up, please?
10       THE WITNESS: Yes.
11   Q. (BY MR. ABERNETHY) All right. So
12 I'm going to ask that again. You don't
13 remember any of the names of those businesses
14 at the time?
15   A. I do not.
16   Q. Okay. And how old were you when you
17 met him, about?
18   A. I want to say 17, 18.
19   Q. And so you had it was three years
20 of college; and then, when you were about 20,
21 21 --
22   A. Um --
23   Q. -- you started working --
24   A. -- 20, 21. It was around that
25 time -- or, no, because I -- that's wrong,

17

1 because I had met him in 2016.
2    Q. Okay.
3    A. That's when I was a senior in high
4 school; and then I want to say it was about
5 2019 -- 2018, 2019 was when I started doing
6 small tasks for him. 2019, 2020 was around the
7 time I started working for him.
8    Q. Okay. And when you actually started
9 working for him, you were working for him full
10 time?
11   A. At first, with websites, no. It was
12 merely just a task-based thing where I was just
13 getting paid weekly. He was helping me out
14 with bills. And then it wasn't until 2019 that
15 I worked for him full time.
16   Q. Okay. And he would just call you up
17 and say, "I have a task for you. Can you --
18 can you work on it"?
19   A. Yeah.
20       MR. DAVIDSON: Objection.
21   Q. (BY MR. ABERNETHY) And so did he pay
22 you, or did you just help him out?
23   A. Actually --
24       MR. DAVIDSON: Objection.
25   A. He paid me.

18

1    Q.  (BY MR. ABERNETHY)  He paid you for
2  these -- these tasks.
3            And so you said it was 2019 when
4  you started actually working for him?
5    A.  Full time, yes.
6    Q.  And what was the name of his business
7  at the time?
8    A.  Rising Eagle.
9    Q.  That was Rising Eagle.  And what did
10  Rising Eagle do?
11    A.  They did the calls for Michael
12  Smith's business.
13    Q.  And what was the name of Michael
14  Smith's business?
15    A.  At the time I didn't know.
16    Q.  Okay.  And what do you mean, he did
17  the calls for them?  Can you elaborate on that?
18    A.  They needed health insurance lead
19  calls; and so prior to -- prior to me working
20  with John here, he had a business relationship
21  set up.  And then, during that time, I would
22  just assist him with managing data that was
23  sent over.
24    Q.  And this was in Austin?
25    A.  This was in Houston.

19

1    Q.  Okay.  And where -- did you work with
2  John in an office?
3    A.  At the house.
4    Q.  At the house.  Do you know the
5  address of that house?
6    A.  10807 Wickersham Lane.
7    Q.  So John lived there; and you ran this
8  business, Rising Eagle, out of that house?
9    A.  Yes.  He had me -- whenever he moved
10  to Houston, he had me get the house under my
11  name.  One of the main reasons why I'm on the
12  LLC paperwork for Rising Eagle, since I have
13  better credit.  And then we both moved there --
14  or he had moved there first, and then I ended
15  up moving in with him to learn the ropes of
16  what he does.
17    Q.  So that was the reason that your --
18  the house was in your name was just because of
19  your credit?
20    A.  Yes.
21    Q.  Okay.  And were there any other
22  employees of Rising Eagle at the time?
23    A.  At that time, no.
24    Q.  And were there any other clients for
25  Rising Eagle besides Michael Smith's business?

20

1    A.  Throughout the course, yes; but in
2  the beginning, I want to say it was just
3  Michael Smith.
4    Q.  Was Health Advisors of America a
5  client?
6    A.  I want to say that was Michael
7  Smith's business, so yes.
8    Q.  Okay.  And, again, you don't know
9  what Michael Smith's business was -- or it was
10  Health Advisors of America?
11    A.  Uh-huh.
12    Q.  And --
13        MR. FRANQUI:  Object to the
14  form.
15    A.  But I didn't know any types of names
16  of businesses or what things went together when
17  I was -- when I was first starting out.
18    Q.  (BY MR. ABERNETHY)  And you didn't
19  know what these calls were for?
20    A.  I just knew that they were to help
21  him sell health insurance.
22    Q.  Okay.  Do you know -- to do these
23  calls, did you work with any -- were you
24  working with any vendors or providers?
25    A.  Not me directly.

21

1    Q.  Okay.  So can you explain basically,
2  like, what -- what you were doing, like, on a
3  day-to-day basis?
4    A.  In the beginning I was cutting files
5  up to be able to load it to the dialer for them
6  to be called.
7    Q.  Okay.
8    A.  So purely using Excel, formatting
9  them in a CSV file, and then loading them into
10  the dialer.  Before that, just sending them
11  over to John to load for the client.
12    Q.  Okay.  And, again, you were the only
13  employee of Rising Eagle besides John?
14    A.  Correct.
15    Q.  And you said you were on the LLC
16  paperwork because of -- because the house was
17  in your name?
18    A.  Uh-huh.
19        MR. DAVIDSON:  Objection.
20    Q.  (BY MR. ABERNETHY)  Do you remember
21  the start date of when you became a member of
22  Rising Eagle?
23    A.  Maybe early 2019, 2018.  It was
24  before we had moved into the -- to the place
25  whenever I started working for him full time,

22

1  doing those tasks; but the exact timeframe I'm
2  not too sure of.
3      Q.  So before you were a member of Rising
4  Eagle, LLC, did you have a different role?
5      A.  Yes.  It was the -- the websites and
6  things like that.
7      Q.  And when you say you made websites,
8  can you explain that, what kind of websites you
9  made, and what were they for?
10     A.  I want to say he had -- he was trying
11 to start a construction company, so I dibble-
12 dabbled in trying to learn websites through
13 Wix.  Of course, nothing that I made ever was
14 used.  And then, other than that, I want to
15 say -- that was really the only website.  It
16 was a company called Anmac Construction that
17 never took off.
18     Q.  Can you say that name again?
19     A.  Anmac, A-N-M-A-C.
20     Q.  Construction?
21     A.  Yeah.
22     Q.  Okay.  And that was a company that
23 you and John were working on that never took
24 off, or was it for another client?
25     A.  Um --

23

1          MR. DAVIDSON:  Objection.
2      A.  -- it was a company that --
3          MR. FRANQUI:  Joined.
4      A.  -- John was working on that never
5  took off.
6      Q.  (BY MR. ABERNETHY)  Okay.  Were there
7  a lot of companies like this that you would
8  help John set up that just never took off?
9          MR. DAVIDSON:  Objection.
10     A.  Yes.
11         MR. FRANQUI:  Join.
12     Q.  (BY MR. ABERNETHY)  Can you remember
13 any other names or --
14     A.  Um --
15     Q.  -- details for these companies?
16         MR. DAVIDSON:  Objection.
17     A.  Nothing --
18         MR. FRANQUI:  Joined.
19     A.  -- that I can remember.  Anmac
20 Construction was one of the main websites that
21 I worked on at the time.  Past that, it was too
22 far back.
23     Q.  (BY MR. ABERNETHY)  Okay.
24         THE REPORTER:  I'm sorry.
25 Can -- when they object, can you pause for just

24

1  a moment so I have time to put --
2          THE WITNESS:  Oh.
3          THE REPORTER:  -- everything
4  down?
5          THE WITNESS:  Yes, ma'am.
6      Q.  (BY MR. ABERNETHY)  And at any point
7  while you were working for Rising Eagle, did
8  other employees come on board?
9      A.  Yes.
10     Q.  Who -- who were these employees?
11     A.  Brian Failla did come on board, but
12 he did help John run an office that he had that
13 was unrelated to health -- health insurance
14 with Michael Smith and those clients.
15     Q.  It was unrelated to -- you're saying
16 it was unrelated to the calls you were making
17 for Michael Smith?
18     A.  Correct.
19     Q.  What was the office that he ran?
20         MR. DAVIDSON:  Form.
21     A.  He sold medical alert devices.
22     Q.  (BY MR. ABERNETHY)  Medical alert
23 devices?
24     A.  Yes.
25     Q.  And he had a separate office, so he

25

1  did not work in the -- in the house with you
2  and John?
3      A.  Correct.
4      Q.  And he never had any role in what you
5  were doing with Michael Smith and Health
6  Advisors?
7      A.  No, John did not allow it.
8      Q.  So what did he do for the med-alert
9  business?
10     A.  Brian?
11     Q.  Yes.
12     A.  He was a manager for the employees at
13 the office; and then, sooner or later, he ended
14 up getting laid -- laid off.
15     Q.  What did these employees do at this
16 office?
17     A.  They sold over -- over the phone.
18     Q.  Okay.  So they -- it was a call
19 center, basically?
20     A.  Uh-huh.
21     Q.  And what was Rising Eagle's role in
22 that relationship?
23     A.  Putting the calls in, trying to get
24 the sales for -- for them.
25     Q.  Okay.  So they had another office

26

1  where they were making the calls, and Rising
2  Eagle was facilitating these calls?
3        MR. DAVIDSON:  Objection.
4        MR. FRANQUI:  Joined.
5     A.  They were receiving the phone calls,
6  and then Rising Eagle was facilitating them.
7     Q.  (BY MR. ABERNETHY)  Okay.  So did you
8  have any role with what Brian Failla was doing?
9     A.  Only in the matter of doing the same
10  thing of my role for Michael Smith and Health
11  Advisors, which was cutting up leads and
12  loading them.
13    Q.  And when you say "cutting up leads,"
14  can you explain that?
15    A.  The process of whenever a file is
16  received, to edit the file and make it into a
17  CSV to have it be loadable to the system
18  dialer.
19    Q.  And then, Jakob, again, can you just
20  make sure when I do ask a yes-or-no question --
21    A.  Uh-huh.
22    Q.  -- that you say "yes" if you're
23  nodding or "no" if you're shaking your head?
24    A.  Okay.  Yes.
25    Q.  And so was there ever a call center

27

1  that Rising Eagle ran, or it was only Brian
2  Failla's office?
3        MR. DAVIDSON:  Objection.
4        MR. FRANQUI:  Objection.
5     A.  It was owned by John.  I don't
6  believe it was under the Rising Eagle name.  I
7  don't -- yeah, it shouldn't have been under the
8  Rising Eagle, not to my knowledge.  I didn't
9  handle any of the paperwork or these documents
10  of the initiation of that.  I want to say it
11  was under maybe Senior Med Alert was the name
12  of the company.
13        Are you able to repeat the
14  question?
15    Q.  (BY MR. ABERNETHY)  Yeah.  What was
16  the name of the other companies that John had
17  that were not Rising Eagle that were running
18  call centers?
19    A.  Oh, that was the only one.
20    Q.  Okay.  And can you restate that?
21    A.  It was Senior Med Alert, LLC.  At
22  least I think that's what the name was.  I
23  wasn't too much affiliated with that.
24    Q.  Okay.  And were there any other
25  employees that came on with Rising Eagle at any

28

1  time?
2     A.  No.
3     Q.  And you said Brian Failla was laid
4  off?
5     A.  Uh-huh.
6     Q.  Was that by John?
7     A.  Yes.
8     Q.  What was the reason for that?
9     A.  Performance as well as
10  [indiscernible.]
11    Q.  Okay.
12        THE REPORTER:  "As well as"
13  what?
14        THE WITNESS:  Drug abuse.
15    Q.  (BY MR. ABERNETHY)  And was there
16  anybody that was not an employee that helped
17  out with any duties for Rising Eagle?
18    A.  John's girlfriend, Maggie, did taxes.
19    Q.  Okay.
20    A.  Um, but that's really about it.
21    Q.  What was her full name?
22    A.  Maggie Casanova.
23    Q.  Maggie Casanova?
24    A.  Uh-huh.
25    Q.  And she did taxes for Rising Eagle?

29

1     A.  Yes.
2     Q.  And for other businesses as well?
3     A.  And for -- and for myself.
4     Q.  And for you?
5     A.  Yeah.
6     Q.  Your personal taxes?
7     A.  Uh-huh.
8     Q.  Okay.  And that was her only role
9  with Rising Eagle?
10    A.  Correct.
11    Q.  Did she live in the house, too, with
12  you?
13    A.  No.
14    Q.  Okay.  So at one point John Spiller
15  went to jail in Travis County?
16    A.  Yes.
17    Q.  And do you know when that was, when
18  he went to jail?
19    A.  I don't remember the year exactly,
20  but I remember it was towards the end -- maybe
21  between October and December, because I do
22  remember right before he had went to jail, he
23  had a -- an incident where he was medically
24  unable to work and then, shortly after that,
25  his health was getting better and he ended up

Jakob Mears - 3/1/2022

30

1 getting sent to jail.
2    Q.  Okay.  But you don't remember the
3 year?
4    A.  I want to say maybe 2020; but at this
5 point, it's very much blurred.
6    Q.  Okay.  So what happened with Rising
7 Eagle while he was medically unable to work and
8 while he was in jail?
9    A.  Um --
10       MR. DAVIDSON:  Objection.
11       MR. FRANQUI:  Joined.
12    Q.  (BY MR. ABERNETHY)  Or what happened
13 to Rising Eagle while he was medically unable
14 to work?
15       MR. DAVIDSON:  Objection.
16    A.  Um, I had to take --
17       MR. FRANQUI:  Joined.
18    A.  -- over responsibilities.  I was
19 really doing everything that I was doing in the
20 past; but during that timeframe from when I
21 started working for them to that point, I had
22 had enough experience where I kind of knew what
23 I was doing.  And instead of just cutting
24 leads, I was then managing the dialer, which is
25 the system to send calls, and watching the

31

1 VICIdial.
2       THE REPORTER:  Watching the...?
3       THE WITNESS:  VICIdial.
4    A.  The VICIdial is a platform where
5 Health Advisors' agents would log in to receive
6 the phone calls.
7       THE REPORTER:  Can you spell
8 that?
9       THE WITNESS:  V-I-C-I, Vici, and
10 then, D-I-A-L.
11    Q.  (BY MR. ABERNETHY)  And that's one
12 word?
13    A.  I want to say it's two.
14    Q.  And when you said Rising Eagle agents
15 would log in --
16    A.  Or -- I'm sorry.  Michael Smith's
17 agents would log in to VICIdial.
18    Q.  Okay.
19    A.  They had their own system.
20    Q.  So Health Advisors' agents --
21    A.  Yes.
22    Q.  -- or just agents of Michael Smith's
23 companies?
24    A.  Correct.
25    Q.  And can you explain what this medical

32

1 incident was that Mr. Spiller had?
2    A.  He had a relapse with some drugs.
3    Q.  Okay.  And so he was just unable to
4 run the company because of that?
5    A.  Correct.
6    Q.  And so you took over the primary
7 duties of Rising Eagle while he was medically
8 unable to work?
9    A.  Most duties, not all duties.  For the
10 most part, I was only able to handle things
11 that I knew I was able to do, so -- which was
12 just run -- running the dialer, loading leads,
13 and adjusting call flow.  Past that, any type
14 of administration work, such as speaking with
15 vendors or anything of that nature, I didn't
16 do.
17    Q.  Who did that?
18    A.  Usually John did that.
19    Q.  He did that; but what about when he
20 was --
21    A.  Um, it wasn't needed.
22    Q.  --- unable to?
23    A.  For the most part, it was an
24 automated system where only I -- once
25 everything is set up and rates are pretty much

33

1 locked in, unless I'm having any problems, I
2 would reach out to some of our techs that
3 worked with -- on the Switch side.  Other than
4 that, then I would reach out to Michael Smith
5 or Scott for call performance.
6    Q.  Okay.  So you did manage those
7 clients at the time?
8       MR. DAVIDSON:  Objection.
9    A.  I managed the calls, yes, at that
10 time.
11    Q.  (BY MR. ABERNETHY)  Okay.  And you
12 said Michael and Scott.  Scott who?
13    A.  [Indiscernible.]
14       THE REPORTER:  I'm sorry?
15       THE WITNESS:  Scott Shapiro.
16    Q.  (BY MR. ABERNETHY)  And so can you
17 describe again what you mean when you were
18 managing those leads?
19    A.  Yeah.
20       MR. DAVIDSON:  Objection.
21    A.  So anytime --
22       MR. FRANQUI:  Objection.
23    A.  So in terms of me managing the leads,
24 my main goal was to watch the VICIdial, the
25 platform where agents were logged in.  It would

34

1  show how long each call and every call that was
2  going in that was transferred to an agent; and
3  anytime there was lots of calls going to agents
4  or whenever they go on lunch, I would pause out
5  the calls.  Whenever they'd go back, I would
6  resume the calls.
7        And regarding if they're making
8  sales or not would require me to adequately
9  change out files, to load new files so that
10  better leads are being called so that they're
11  able to make more sales.
12    Q.  (BY MR. ABERNETHY)  And who were the
13  people you were in contact with to do this?
14    A.  Michael Smith and Scott Shapiro.
15    Q.  Okay.  What was the timeframe for
16  this period while -- not while he was in jail,
17  but while he was -- the relapse period where
18  you were doing these duties?
19    A.  Um, September until he -- until --
20  until he went to jail.  And I wasn't too sure
21  on the exact date he went to jail, but I do
22  know it was around September for a couple of
23  months, maybe about a month and a half.
24    Q.  Okay.  And you had no other contacts
25  besides Scott Shapiro and Mike Smith?

35

1    A.  Correct.
2    Q.  Okay.  Did anybody else help you
3  manage these duties or --
4    A.  No.  I was the only one that knew how
5  to do it.
6    Q.  Okay.  And then John went to jail.
7  Did anything change as far as what duties you
8  took over then?
9    A.  No.
10    Q.  Did Mike Smith or Scott Shapiro know
11  why you were managing them during this time?
12  Did they know about Mr. Spiller's relapse?
13      MR. DAVIDSON:  Objection.
14    A.  Most likely, yes.
15    Q.  (BY MR. ABERNETHY)  Most likely, yes,
16  but you never spoke with them about it?
17      MR. FRANQUI:  Objection.
18    A.  Not that I remember.  I'm sure I did
19  because he was gone to jail for multiple
20  months; and I do know that periodically John
21  would make calls through jail to me, as well as
22  Michael Smith and Scott Shapiro.
23    Q.  (BY MR. ABERNETHY)  So John would
24  make calls from jail to Scott Shapiro?
25      MR. DAVIDSON:  Objection.

36

1    A.  Or it would be a three-way call where
2  I would -- it would be me on the line -- he'd
3  call me; and he'd get me to call them.
4    Q.  (BY MR. ABERNETHY)  Okay.  So back to
5  managing the dialer, how did you pause calls?
6    A.  I'd just push the button that says
7  "pause."
8    Q.  And why would you do that?
9    A.  Lunch or there was too many calls
10  going in and there were -- agents were all on
11  too many -- on calls in general.  So if so many
12  calls went in, it would overflow the system on
13  their side where there'd be more calls than
14  agents available; and in that case I would
15  pause it out or slow it down or whenever they
16  go for lunch.
17    Q.  So there would -- can you just
18  elaborate on:  What do you mean by there was
19  too many calls -- there's too many calls coming
20  in?
21    A.  Yes.
22      MR. DAVIDSON:  Objection.
23    A.  So any -- anytime calls would come
24  in, whenever people would transfer over, so
25  many -- whenever there's an overflow of

37

1  transfers and not enough agents to take those
2  calls, then I would slow it down or pause it so
3  that agents are able to use that time to catch
4  up on those calls and so I don't waste those
5  leads, as well, that they paid for.
6    Q.  (BY MR. ABERNETHY)  So what -- if you
7  manually paused and restarted the calls, what
8  was the dialer system for, the VICIdial?
9      MR. DAVIDSON:  Objection.
10    A.  The dialer system was connection
11  to --
12      MR. FRANQUI:  Joined.
13    A.  -- VICIdial, through ports.  That's
14  as much as I know.  I don't know that much
15  about the systems.  And so Hello Hunter, which
16  was the main platform that was able to handle
17  that type of volume for how big Michael Smith's
18  call center was, those calls would then be sent
19  to the VICIdial for the agents to answer.
20    Q.  (BY MR. ABERNETHY)  So Hello Hunter,
21  can you describe what that is?
22    A.  It's a VoIP platform where -- I know
23  that it is a platform that I use to initiate
24  those calls.
25    Q.  Okay.  And so when you paused these

---

38

1 calls, what happened while the dialer was
2 paused?
3          MR. DAVIDSON:  Objection.
4      A.  Um, it would take some --
5          MR. FRANQUI:  Joined.
6      A.  -- about a minute for them to slow
7 down; and then the calls would stop going into
8 the office.
9      Q.  (BY MR. ABERNETHY)  Okay.  Did you
10 also manage the finances of Rising Eagle at
11 this time?
12          MR. DAVIDSON:  Objection.
13     A.  Only when it came to adding credits
14 or sending wires to the vendors for more
15 minutes or paying for John's legal fees.
16 Outside of that, I didn't handle, you know,
17 finances in the way of, you know, putting
18 things on the books and, you know, doing
19 accounting work.  I was merely just making sure
20 that the business was still able to run.
21     Q.  (BY MR. ABERNETHY)  So you had access
22 to all of Rising Eagle's bank accounts?
23     A.  Yes.
24     Q.  Do you remember where these bank
25 accounts were?

---

39

1      A.  Bank of America.
2      Q.  Bank of America.  Anywhere else?
3      A.  No.
4      Q.  Was there a PayPal account that you
5 had access to?
6      A.  Yes.
7      Q.  And when John was going through these
8 issues, did Rising Eagle pay for legal fees for
9 him?
10     A.  Yes.
11     Q.  Did you manage that?
12     A.  Yes.
13     Q.  You made payments for him?
14     A.  Yes.
15     Q.  Okay.  Were there other personal fees
16 that you would pay on behalf of John at this
17 time?
18     A.  Like, through his accounts?
19     Q.  Yes --
20     A.  Um --
21     Q.  -- through the Rising Eagle accounts.
22     A.  Almost everything.  It was almost
23 like a personal bank account for him.
24     Q.  Okay.  And you were the sole manager
25 of this?

---

40

1      A.  While he was away, yes.
2      Q.  Okay.  So were these personal --
3 purely personal matters that you were paying
4 for, unrelated to Rising Eagle?
5      A.  Personal matters?
6      Q.  For John.
7      A.  Yes, since they were related to his
8 past litigations.
9      Q.  Okay.  And it was the Rising Eagle
10 Bank of America account?
11     A.  Yes.
12     Q.  Did you have access to a personal
13 account of John's that was separate from Rising
14 Eagle?
15     A.  No.
16     Q.  Okay.  So you made payments for
17 personal lawsuits for John's criminal lawsuits?
18     A.  I don't believe that he was in any
19 lawsuits back then, not that I remember.  It
20 was mainly whenever he was needing a lawyer for
21 his DUI stuff in the past.
22     Q.  So you paid for John's personal legal
23 fees with the Rising Eagle account?
24     A.  Correct.
25     Q.  Okay.  How often did you speak to

---

41

1 John while he was in jail?
2      A.  I want to say probably about every
3 day, even if it was a quick, five-minute phone
4 call; maybe every other day, just to see how
5 things were going, to make sure that they were
6 satisfied with the calls that they were
7 receiving.
8      Q.  Okay.  Just during the workweek or
9 the weekends as well?
10     A.  Mostly during the workweek.
11     Q.  Okay.  Did you ever send him money in
12 jail?
13     A.  Yes, he had me send him some money.
14     Q.  And from what accounts did you send
15 these?
16     A.  It would be from the Rising Eagle as
17 well and from my personal ones.
18     Q.  From that Rising Eagle Bank of
19 America account?
20     A.  Uh-huh, and sometimes from my
21 personal bank account.
22     Q.  Okay.  Who was managing his Skype
23 account at this time?
24     A.  That would have been me, but at that
25 time I didn't use Skype or didn't use a reason

---

42

1  to use Skype.  So I used, really, my own since
2  I had everyone I needed to be in contact with
3  at the moment.  So I still had connection with
4  the team that handled the Switch or the
5  individuals that handled the Switch side that
6  allowed us to make the calls; or if any
7  problems came up, I had their contact
8  information through my Skype account or Scott
9  Shapiro and Mike for over-the-phone call or
10 texting, no -- no Skype.
11     Q.  And when you said "these
12 individuals," do you mean only Scott Shapiro
13 and Mike Smith?
14        MR. DAVIDSON:  Objection.
15     A.  No.  So we had -- at the time we were
16 under the Switch or company R Squared, which
17 was then Globex Telecom; and so anytime I had
18 any problems on my end where, you know, calls
19 were not being able to go out, then I would
20 contact them, you know, to look into any
21 issues.  And then that -- that was as far as I
22 went with that.
23     Q.  (BY MR. ABERNETHY)  What do you mean
24 you were under R Squared?
25     A.  So in order for us to -- in order for

43

1  the calls to be sent to their room, R Squared
2  is the telecom company that we were under.  So
3  that's what was billed as minutes, I believe,
4  that were accruing.  So we would have to send
5  payments to them to -- to be able to initiate
6  these.
7      Q.  And you managed these payments?
8      A.  Correct.
9      Q.  And you said send calls to their
10 room.  Whose room do you mean?
11     A.  Health Advisors.
12     Q.  Health Advisors.  And where was this
13 call center?
14     A.  Florida.
15     Q.  Okay.  And who -- can you say again
16 who you contacted from Health Advisors during
17 this time?
18        MR. DAVIDSON:  Objection.
19        MR. FRANQUI:  Objection.
20     A.  Scott Shapiro and Michael Smith.
21     Q.  (BY MR. ABERNETHY)  Okay.  What about
22 business e-mail accounts, were you managing
23 those?
24        MR. DAVIDSON:  Objection.
25     A.  Yes.

44

1      Q.  (BY MR. ABERNETHY)  What were these
2  e-mail accounts?
3      A.  rpgleads, j.rpgleads, both
4  @gmail.com, as well as
5  rpgscottandmike@gmail.com.
6      Q.  And were you the only person with
7  access to these --
8      A.  Yes.
9      Q.  -- accounts?
10        And what were these e-mail
11 accounts used for?
12     A.  j.rpgleads was my personal work
13 account.  So anything work related would get
14 sent to there, of course.  I didn't receive
15 that many e-mails, mainly just the files from
16 John or communications via John.
17        John's e-mail was pretty much a
18 mix of everything from vendors to some lead
19 files that were sent in the past.
20        And then rpv --
21 rpgscottandmike@gmail.com was the e-mail used
22 to receive files from Health Advisors of
23 America.
24     Q.  But John didn't have access to these
25 e-mail accounts while he was in jail?

45

1      A.  Correct.
2      Q.  Okay.  So you were managing the
3  e-mail accounts and the payments at this time?
4      A.  Yes.
5      Q.  And how were you receiving payments
6  from your clients at this time?
7      A.  Via wire.
8      Q.  And you were managing these as well?
9      A.  Yes.
10     Q.  Okay.  And who did you speak with to
11 manage these payments?
12     A.  Scott Shapiro or Michael Smith.
13     Q.  Did these clients know that
14 Mr. Spiller was in jail?
15        MR. DAVIDSON:  Objection.
16        MR. FRANQUI:  Objection.
17     A.  Yes.
18     Q  (BY MR. ABERNETHY)  And when did Mr. Spiller
19 leave jail?
20        MR. DAVIDSON:  Objection.
21     A.  I don't remember.
22     Q.  (BY MR. ABERNETHY)  Do you know about
23 how long the timeframe was that he was in jail?
24        MR. DAVIDSON:  Objection.
25     A.  It was --

46

1          MR. FRANQUI:  Objection.
2      A.  -- give or take, maybe three to six
3  months.
4      Q.  (BY MR. ABERNETHY)  Okay.  And did
5  your role stay the same once he came back from
6  jail?
7      A.  Yes.  Of course, he then handled more
8  administrative tasks; but as far as handling
9  the dialing and the leads, that's what my main
10 role was.
11     Q.  What kind of administrative tasks
12 would he handle?
13     A.  Like, paperwork, talking to Michael
14 and Scott -- Michael Smith and Scott Shapiro --
15 and Health Advisors or anything else that was
16 related to building up that business.
17     Q.  And can you tell me who Mikel Quinn
18 is?
19     A.  I personally never met him, so I'm
20 not too sure.  I know John had -- had met him,
21 but I don't know the dates.
22     Q.  Do you know his relationship to John?
23     A.  No, not really.
24     Q.  How did you know his name?
25     A.  He's brought -- he's brought him up

47

1  to me before via phone call, just someone that
2  he's helped out before; but that was after that
3  I left the company.
4      Q.  So you never had any interactions
5  with Mikel Quinn?
6      A.  Correct.
7      Q.  Okay.  So when John came back, he
8  stuck to only administrative tasks at that
9  time?
10     A.  Yes.
11         MR. DAVIDSON:  Objection.
12     Q.  (BY MR. ABERNETHY)  So what -- can
13 you just walk me through what a typical day was
14 for you?
15     A.  Yeah.  So I would wake up and -- and
16 start the dialer at 9:00 a.m., which is when
17 the Health Advisors' room started their calls.
18 And then I would watch the VICIdial to make
19 sure that the quality of calls were good and
20 the volume of calls was steady, as well as
21 pausing or speeding things up, if need be.
22 Past that, that was the main objective of my
23 role was just managing the call flow for the
24 room.
25     Q.  And what -- what do you mean by

48

1  "start the dialer"?
2      A.  Pushing "play" so that the calls
3  would initiate.
4      Q.  And what do you mean by "speeding
5  things up"?
6      A.  The amount of calls per hour.  So
7  there was an arrow that you can push up to
8  increase the volume of calls or push an arrow
9  down to decrease them.  It was a very -- I
10 guess if you can imagine, like, VCR-type
11 buttons; it had the exact same type of
12 functions.
13     Q.  So this day started at 9:00 a.m.
14 Central Time?
15     A.  I want to say it was 9:00 a.m.
16 Central Time, maybe.  Yeah.  Yeah, that should
17 be right.  On the start date, I don't remember
18 the exact time.
19     Q.  Did you know what time zone the call
20 recipients were in?
21     A.  Yes, Eastern Time -- or every -- the
22 call recipients, like, who -- was called?
23     Q.  Yes.
24     A.  Throughout -- everywhere throughout
25 the U.S.

49

1      Q.  And when you say "make sure the
2  quality of calls was good," how could you tell
3  the quality of calls was good?
4      A.  The agents would have longer
5  conversations with people.
6      Q.  So you would just monitor the length
7  of the calls?
8      A.  Correct.
9      Q.  Did you talk to the agents as well?
10     A.  No.
11     Q.  Did you ever get feedback from the
12 agents?
13     A.  No.
14     Q.  So you would just watch call
15 duration?
16     A.  Uh-huh.  I would watch call duration;
17 and VICIdial, how it works is the longer the
18 call duration, it would change to a different
19 color.  So I want to say it was, like, one
20 minute, five minutes, and ten minutes plus, I
21 want to say, possibly; and then, basically,
22 anything that was a long call was purple.  And
23 so my main goal was to have as many purple
24 calls as possible; and if that wasn't
25 happening, then I knew things had to be changed

50

1 around in the system.
2    Q.  So what was a bad call?
3    A.  Less than a minute, less that 30
4 seconds where sales weren't being made.
5 Usually, they would have, I guess, possibly
6 goals where I would get a call, no sales are
7 being made and to change out the files so that
8 sales can be made.
9    Q.  And did you know anything about what
10 numbers were being called for these?
11    A.  No, no.
12    Q.  What -- what would you do if there
13 was a lot of bad calls happening?
14    A.  I would pause the file and then
15 replace it with a new one.
16    Q.  And did you know why there would be a
17 lot of bad calls?
18    A.  Just the quality of viable leads.  So
19 there was no way to exactly measure, you know,
20 what made one file better versus another.  I
21 guess that mainly depended on the source of
22 where it came from and how interested they were
23 in health insurance.
24    Q.  And so was there any way for you to
25 tell what time it was for the call recipient

51

1 when they were receiving these calls?
2    A.  No.
3    Q.  No way of knowing at all?
4    A.  No.  The only way it kind of did work
5 with that is -- so the system had a setting
6 where it would only make calls to recipients
7 if it was before or after a certain time.  And
8 so if we tried calling somebody, it would let
9 it -- the system, only if it was, you know,
10 9:00 o'clock in that time zone that it would
11 allow the call to go through.
12    Q.  So how would it know what time zone
13 the call recipient was in?
14    A.  That, I don't know.  That would be
15 the soft- -- the software.
16    Q.  Okay.  So when you say if there was a
17 lot of bad calls, you'd replace it with a new
18 one, what does that mean?  You'd replace it
19 with a new bank of --
20    A.  I would replace it with a new file.
21    Q.  Okay.  And how many files did you
22 have to be able to do this in a single day?
23    A.  In a single day, 20 plus.  Sometimes
24 it was just a matter of digging in old files
25 from the past or requesting new ones to be

52

1 bought to be able to do it.
2    Q.  And can you say again what you mean
3 by "these files"?  What was in these files?
4    A.  Phone numbers.
5    Q.  It was just a bank of phone numbers?
6    A.  Yes.
7    Q.  About how many phone numbers would be
8 in one file?
9    A.  It ranged from sometimes a couple
10 hundred thousand to around a million.
11    Q.  Around a million.  Okay.  And you
12 said you would have up to 20 of these files
13 that you'd use in a day?
14       MR. DAVIDSON:  Objection.
15       MR. FRANQUI:  Joined.
16    A.  I would say I wouldn't use 20 files
17 in a day.  We wouldn't be able to make that
18 many calls in one day.  You know, depending on
19 how good a file is, you know, I could use, you
20 know, only a handful of them and get good
21 results; or if I'm getting bad results, I would
22 have to use more files and run more at once.
23       MR. DAVIDSON:  Objection.
24    Q.  (BY MR. ABERNETHY)  What would you do
25 with a file that you got bad results?

53

1    A.  I would just label it that it was bad
2 and send it back or give feedback to Michael
3 Smith and Scott Shapiro, telling them that the
4 file's bad and that it's poor quality in these
5 files.
6    Q.  So when you say "send it back," you
7 mean send it back to Michael Smith and Scott
8 Shapiro?
9    A.  Not necessarily the --
10       MR. DAVIDSON:  Objection.
11    A.  Not necessarily the file, just
12 feedback either through a phone call or through
13 text.
14    Q.  (BY MR. ABERNETHY)  And through text you
15 would -- would you communicate with anybody besides
16 Scott Shapiro or Mike Smith?
17    A.  No.
18       MR. DAVIDSON:  Objection.
19       MR. FRANQUI:  Joined.
20    A.  No.
21    Q.  (BY MR. ABERNETHY)  Was there a limit
22 to how many calls that you would make in a day?
23    A.  No.
24    Q.  Was there a limit to how many files
25 you would use in a day?

Jakob Mears - 3/1/2022

54

1   A. No.
2   Q. What time did your day end,
3 generally?
4   A. Between -- I want to say
5 4:00 o'clock.
6   Q. So your day -- you would be running
7 the dialer --
8   A. It was --
9   Q. -- from 9:00 a.m. --
10   A. It was --
11   Q. -- to 4:00 p.m.?
12   A. -- 8:00 a.m. Central or -- yeah,
13 8:00 a.m. Central because Florida's an hour
14 ahead, so yeah.
15   Q. Okay. And how many agents would Mike
16 Smith and Scott Shapiro have logged into
17 VICIdial, generally, in one day?
18       MR. DAVIDSON: Objection.
19       MR. FRANQUI: Joined.
20   A. Usually that depended on the time of
21 year. So during open enrollment, which is
22 around November time, probably, like, 100 to
23 130; and then, before or after that, it would
24 be, like, half that size.
25   Q. (BY MR. ABERNETHY) 100 to 130

55

1 agents?
2   A. Yes.
3   Q. And so for the rest of the year, it
4 would be about half that size?
5   A. Correct.
6   Q. And how many calls, do you have an
7 idea, that an individual agent would make in a
8 day?
9       MR. DAVIDSON: Objection.
10       MR. FRANQUI: Joined.
11   A. That, I do not know. They are going
12 to be varied.
13   Q (BY MR. ABERNETHY) Okay. And what was
14 John's typical day like when you were doing this?
15   A. Usually, he would just be watching
16 me --
17       (Simultaneous speakers.)
18       THE REPORTER: I'm sorry. I
19 missed -- was there an objection?
20       MR. DAVIDSON: Yes, there was.
21       THE REPORTER: From you?
22       MR. DAVIDSON: Yes, there was.
23       MR. FRANQUI: And I joined.
24   A. Can you -- can you repeat the
25 question?

56

1   Q. (BY MR. ABERNETHY) Yeah. So what
2 was John's typical day like when you were doing
3 this?
4       MR. DAVIDSON: Objection.
5       MR. FRANQUI: Same objection.
6   A. That, I do not know. Most of the
7 time he was on his phone; but considering this
8 was really the only thing to do in -- in the
9 business, he would just sit next to me and
10 watch me do it or if he wanted to try something
11 out on his own, you know, he would take over
12 for me or if he had to say -- anything to say,
13 he would contact Michael Scott or -- Michael
14 Smith or Scott Shapiro.
15   Q. (BY MR. ABERNETHY) What do you mean,
16 if he had anything to say?
17       MR. DAVIDSON: Objection.
18   A. You know, if he saw, you know, agents
19 not taking too many calls, he'd ask, you know,
20 what's going on or you, know, why -- why are
21 these going bad; or I'd get a phone call from
22 them, from Michael Smith and Scott Shapiro, if
23 calls were going bad, then, to change things
24 up.
25   Q. (BY MR. ABERNETHY) So he was

57

1 checking in on you throughout the day?
2       MR. DAVIDSON: Objection.
3   A. Yes.
4   Q. (BY MR. ABERNETHY) Would he have
5 contact, himself, with Scott Shapiro or Mike
6 Smith?
7   A. Yes.
8       MR. DAVIDSON: Objection.
9       MR. FRANQUI: Objection.
10   Q. (BY MR. ABERNETHY) Through telephone
11 calls or...
12       MR. DAVIDSON: Objection.
13       MR. FRANQUI: Objection.
14   A. (No audible response.)
15   Q. (BY MR. ABERNETHY) Would he -- would
16 he talk to Mike Smith or Scott Shapiro on the
17 telephone?
18       MR. DAVIDSON: Objection.
19       MR. FRANQUI: Objection.
20   A. Yes.
21   Q. (BY MR. ABERNETHY) Would he e-mail
22 them?
23       MR. DAVIDSON: Objection.
24       MR. FRANQUI: Objection.
25   A. No, they didn't use e-mail, only for

58

1  lead sending.
2      Q.  (BY MR. ABERNETHY)  Would they talk
3  through Skype?
4      A.  No.
5          MR. DAVIDSON:  Objection.
6          MR. FRANQUI:  Objection.
7      Q.  (BY MR. ABERNETHY)  And were these
8  the same e-mail accounts that you discussed
9  earlier?
10         MR. DAVIDSON:  Objection.
11         MR. FRANQUI:  Joined.
12         (Simultaneous speakers.)
13     Q.  (BY MR. ABERNETHY)  That John would
14 use?
15     A.  Yes.
16     Q.  Which e-mail accounts would John use
17 for these purposes --
18         MR. DAVIDSON:  Objection.
19     Q.  -- specifically?
20         MR. FRANQUI:  Objection.
21     A.  John mainly used his personal,
22 rpgleads@gmail.com.
23     Q.  (BY MR. ABERNETHY)  Okay.  And when
24 you said John Spiller would try out different
25 things, what do you mean by that?

59

1          MR. DAVIDSON:  Objection.
2          MR. FRANQUI:  Joined.
3      A.  So he would take over and just try to
4  do, I guess, his own type of work, to take the
5  calls back for -- for them.
6      Q.  (BY MR. ABERNETHY)  What do you mean
7  by that?
8          MR. DAVIDSON:  Objection.
9          MR. FRANQUI:  Joined.
10     A.  Whether it was pausing some files and
11 playing others or adjusting the speed of one
12 and adjusting the speed of others, it was
13 really just more of like a, I guess, dibble-
14 dabbling of, you know, what you think is better
15 performance for their room.
16     Q.  (BY MR. ABERNETHY)  And you would
17 watch him do this?
18     A.  Yes.
19     Q.  Would he only step in and -- and
20 handle stuff on the dialer when there was bad
21 calls?
22         MR. DAVIDSON:  Objection.
23         MR. FRANQUI:  Joined.
24     A.  Yes, he became more hands-on if
25 things were not going right while I was

60

1  handling them.
2      Q.  (BY MR. ABERNETHY)  And you were
3  always there with him?
4      A.  Correct.
5          MR. DAVIDSON:  Objection.
6          MR. FRANQUI:  Joined.
7      Q.  (BY MR. ABERNETHY)  Do you know why
8  he wouldn't talk to Michael Smith or Scott
9  Shapiro on e-mail?
10         MR. DAVIDSON:  Objection.
11     A.  They didn't use e-mail.
12         MR. FRANQUI:  Joined.
13     Q.  (BY MR. ABERNETHY)  So you never talked to
14 Michael Smith over e-mail?
15     A.  Correct.
16     Q.  And you never talked to Scott Shapiro
17 over e-mail?
18     A.  Correct.
19     Q.  And do you know why Michael Smith did
20 not use e-mail?
21     A.  I don't know.
22         MR. DAVIDSON:  Objection.
23         MR. FRANQUI:  Objection.
24     Q.  (BY MR. ABERNETHY)  Do you know why
25 Scott Shapiro did not use e-mail?

61

1          MR. DAVIDSON:  Objection.
2          MR. FRANQUI:  Objection.
3      A.  I do not.
4      Q   (BY MR. ABERNETHY)  Okay.  So when did
5  JSquared come about?
6      A.  I want to say it was after open
7  enrollment in 2020, so around -- or maybe 2019
8  open enrollment.  So maybe the beginning of
9  2020 was when that came around because the
10 viability of -- of sustaining the calls for the
11 room at their current, I guess, like, financial
12 setup --
13     Q.  Can you repeat that?  Sorry.
14     A.  Yes.  So I want to say it was the
15 beginning of the year of 2020 was when JSquared
16 came about, where the service of collecting
17 payments based on sales changed to charging
18 them per minute as a telecom business.
19     Q.  Charging who per minute?
20     A.  Health Advisors.
21     Q.  And who started JSquared?
22     A.  John.
23     Q.  And what was the, just, primary
24 business of JSquared?
25     A.  To transition from sending calls and

Jakob Mears - 3/1/2022

62

1  the way they had the payment plan set up where
2  it was every 36 calls -- or, I'm sorry.  Every
3  36 sales that were made on Health Advisor's
4  room, a wire was sent to Rising Eagle; and then
5  that changed when JSquared came about to
6  charging them per minute, the same way as how
7  we got -- or how Rising Eagle got charged when
8  JSquared was a rate per minute.
9      Q.  Was this after John was out of jail
10 when he started JSquared?
11     A.  Yes.
12     Q.  So JSquared did not exist while John
13 was in jail?
14     A.  I don't believe so, no.
15     Q.  Do you know -- were you aware exactly
16 when John started JSquared?
17     A.  No.
18     Q.  Did you help him start JSquared?
19     A.  I want to say I probably helped him
20 do the paperwork side.  In terms of running the
21 day-to-day operations, my role stayed
22 completely the same.  It was just a matter of
23 how he accepted payments was different.
24     Q.  So the only difference in the
25 operations of Rising Eagle and JSquared was the

63

1  way they took payment?
2      A.  To my knowledge, yes.
3      Q.  Okay.  Did anybody else help you and
4  John get JSquared started?
5      A.  That, I wouldn't know.  I don't know
6  any outside help that would have helped him --
7      Q.  Did you --
8      A.  -- set that up.
9      Q.  Did you start working with anybody
10 else with JSquared?
11     A.  Like...?
12     Q.  Did you start working with any other
13 vendors?
14     A.  That would have been John's area.
15     Q.  So you did not know who he was
16 working with as far as vendors?
17     A.  Correct.
18     Q.  Do you know if you started -- so do
19 you know if John started working with
20 Veriswitch around this time?
21     A.  Yes.  I want to say he also worked
22 with them a little bit prior, but it could have
23 been when he was starting with Veriswitch.
24     Q.  So you think John worked with
25 Veriswitch with Rise- -- with Rising Eagle as

64

1  well?
2      A.  Yes.
3      Q.  And do you know who worked for
4  Veriswitch?
5      A.  Who worked for Veriswitch?  I know
6  the owner was named Umberto.  I think that's
7  what his name was.  I don't remember his last
8  name.
9      Q.  Okay.  And so once JSquared started,
10 was Rising Eagle still operating?
11     A.  No.
12     Q.  So Rising Eagle was not making any
13 calls or sending any calls for Health Advisors
14 at this time?
15     A.  It was still the exact same thing;
16 it's just the payment of that changed.
17     Q.  So Rising Eagle stopped operating
18 exactly when JSquared started?
19     A.  Yes.
20     Q.  Okay.  Do you know Dean Hansen -- if
21 you started working with Dean Hansen at this
22 time?
23     A.  Yes.  Dean Hansen was one of the
24 developers on contract that helped manage, I
25 guess, like the data on the Switch side; but he

65

1  didn't handle any type of calls or sending out
2  or receiving any calls.
3      Q.  Okay.  What did JSquared stand for?
4      A.  I want to say it mimicked R Squared,
5  but it had a "J" --
6      Q.  Okay.
7      A.  -- standing for "John" --
8      Q.  Did you --
9      A.  -- maybe.
10     Q.  Did you help register JSquared?
11     A.  I believe so.  I always was the main
12 one that handled the registration for the
13 Secretary of State.
14     Q.  So that means you would make the
15 filings?
16     A.  Yes.
17     Q.  So did you register JSquared as a 499
18 filer and VoIP provider?
19     A.  Oh, no.  All of that stuff, no.  It
20 was merely just the LLC registration.
21     Q.  Did you help John register as a 499
22 filer?
23     A.  No.
24     Q.  Did you know it was registered as a
25 499 filer?

66

1    A.   No.
2    Q.   Do you know what a 499 filer is?
3    A.   I do not.
4    Q.   Okay.  And so was your role any
5    different with JSquared than it was with Rising
6    Eagle at this time?
7    A.   No.
8    Q.   Were there any more employees at this
9    time?
10   A.   No.
11   Q.   No additional duties?
12   A.   No.
13   Q.   So can you just tell me then, again,
14   what your typical day was working under
15   JSquared?
16   A.   Yeah.  So it was starting up the
17   dialer in the morning time, I guess, 8:00 a.m.
18   my time, which was 9:00 a.m. Florida time.  And
19   then I would manage the flow of the calls and
20   the quality of the calls by gauging how long
21   the calls were that the agents were having and
22   how many sales they had by giving periodic
23   updates and changing out files if sales were
24   not being made, if not also changing out the
25   voice recordings as well.

67

1    Q.   Okay.  And who were the clients at
2    this time?
3    A.   Health Advisors.
4    Q.   And that was the only client?
5    A.   During most of the time for the whole
6    time, yes.  I want to say there were a couple
7    of other people, but I know that was before
8    JSquared.
9    Q.   So during JSquared, the only client
10   you're aware of is Health Advisors of America?
11   A.   Uh-huh, yes.
12   Q.   And were there any other employees at
13   this time for JSquared?
14   A.   No.
15   Q.   And never any employees came on with
16   JSquared?
17   A.   No.
18   Q.   Did -- how did you know if sales were
19   being made from your dialer?
20   A.   Usually if I saw a lot of what's
21   called verifications, it meant that a sale was
22   being verified; and then if I saw a lot of this
23   happening, it meant that sales were being made.
24   So that was also one way to gauge how well
25   calls were going, and then I would also get a

68

1    report at the end of the day saying how many
2    sales were made.
3    Q.   Who would you get this report from?
4    A.   Michael Smith or Scott Shapiro.
5    Q.   And how did they send you this
6    report?
7    A.   Either over the phone or through
8    text.
9    Q.   How would they give you a report over
10   the phone?
11   A.   Just how many sales they got, "X"
12   amount of sales per day.
13   Q.   They would just tell you the number
14   of sales?
15   A.   Uh-huh, so it was purely verbal
16   trust --
17   Q.   Okay.
18   A.   -- on how many sales were given.
19   Q.   And how would they give you a report
20   over text?
21   A.   "36 sales" or "40 sales."
22   Q.   And did you ever get a report from
23   anybody other than Michael Smith or Scott
24   Shapiro?
25   A.   No.

69

1    Q.   Did they give a report to John as
2    well?
3    A.   Um...
4        MR. DAVIDSON:  Objection.
5        MR. FRANQUI:  Joined.
6    A.   (No audible response.)
7    Q.   (BY MR. ABERNETHY)  Did they give
8    a -- did Michael Smith ever send John Spiller a
9    sales report?
10       MR. DAVIDSON:  Objection.
11       MR. FRANQUI:  Objection.
12   A.   Usually, he would let me or John
13   know, one or the other.  So as long as one of
14   us knew, then I would relay it to John.
15   Q.   (BY MR. ABERNETHY)  So do you know if
16   they would give you and John -- if either
17   Michael Smith or Scott Shapiro would give you
18   both a report at the end of each day?
19       MR. DAVIDSON:  Objection.
20       MR. FRANQUI:  Object to form.
21   A.   Both or one or the other.
22   Q.   (BY MR. ABERNETHY)  But there was no
23   system in place for making sure you got a
24   report each day; some days you would just not
25   get one?

Jakob Mears - 3/1/2022

70

1     MR. DAVIDSON: Objection.
2     MR. FRANQUI: Objection.
3     A.  Oh, it was purely always kind of
4  obligated for them to send one since at that
5  time, before they were on the rate-per-minute
6  on JSquared, since it was a pay per deal, you
7  know, per 36 deals, you know, that we'd always
8  get a number by the end of the day.
9     Q.  (BY MR. ABERNETHY)  And did you have
10  any information about the actual phone numbers
11  where sales were being made?
12     A.  No.
13     Q.  You didn't mark them in any way?
14     A.  (No audible response.)
15     Q.  So you would just get a sales report;
16  you wouldn't -- that wouldn't affect anything
17  with your lead files?
18     MR. DAVIDSON: Objection.
19     A.  No.
20     MR. FRANQUI: Joined.
21     A.  If anything, I would mark it saying
22  that it was a good file; and then I would relay
23  that it was a good file to them.  And then if a
24  file was really good, then they would just buy
25  more.

71

1     Q.  (BY MR. ABERNETHY)  And so you would
2  just mark it as a good file if there was a high
3  number of sales?
4     A.  Yes.
5     MR. DAVIDSON: Objection.
6     MR. FRANQUI: Joined.
7     Q.  (BY MR. ABERNETHY)  And would you
8  recycle these files?
9     MR. DAVIDSON: Objection.
10     MR. FRANQUI: Joined.
11     A.  Yes.
12     Q.  (BY MR. ABERNETHY)  And you would
13  reuse these files for more calls?
14     MR. DAVIDSON: Objection.
15     MR. FRANQUI: Joined.
16     A.  Yeah.
17     Q.  (BY MR. ABERNETHY)  Did this change
18  from Rising Eagle to JSquared affect revenue?
19     MR. DAVIDSON: Objection.
20     MR. FRANQUI: Joined.
21     A.  Yes.
22     Q  (BY MR. ABERNETHY)  Was that the purpose of
23  changing from Rising Eagle to JSquared?
24     MR. DAVIDSON: Objection.
25     MR. FRANQUI: Objection.

72

1     A.  Yes.
2     Q.  (BY MR. ABERNETHY)  Okay.  How did it
3  impact the revenue --
4     MR. DAVIDSON: Objection.
5     MR. FRANQUI: Objection.
6     Q.  -- the switch to JSquared?
7     A.  Without the change, Health Advisors
8  wouldn't have been able to stay in business,
9  at least to my knowledge, since we were the
10  only -- since we were the only ones giving the
11  calls to them, since they had -- since they
12  were the main ones providing the financials and
13  the leads to be called.  And so without this
14  change on our side to pay for the vendors and
15  the minutes, then at that past, you know,
16  36-sale plan, it wasn't financially feasible
17  for the business to stay afloat.
18     Q.  (BY MR. ABERNETHY)  So was JSquared
19  making less money?
20     A.  It was making more money.
21     Q.  JSquared was making more money at
22  this time?
23     A.  Yes.
24     Q.  But Health Advisors was able to save
25  money?

73

1     MR. DAVIDSON: Objection.
2     A.  No, they also had to pay more.  It
3  was more of like -- like a supply thing.  So
4  at -- so in order for the room to stay open,
5  they needed calls; and at the current rate that
6  they were paying with Rising Eagle, that was
7  going to be shutting down.  And so things
8  needed to switch.  And so it switched over to
9  JSquared on the per-minute plan; and then, even
10  though they had to pay more, it was just the
11  cost of doing business to allow their call
12  center to stay open.
13     Q.  (BY MR. ABERNETHY)  Okay.  Did you
14  make more money at this time?
15     A.  No.
16     Q.  Did John make more money at this
17  time?
18     A.  Yes.
19     Q.  And then Rising Eagle came in.  When
20  did -- I'm sorry.  One second.
21        Were you using the same bank
22  accounts for JSquared as you did with Rising
23  Eagle?
24     A.  That, I do not remember.
25     Q.  So you had no access to the bank

74

1  accounts with JSquared?
2      A.  I want to say -- I don't remember if
3  they were ever switched.  I want to say the
4  banking stayed the same.
5      Q.  But you never had any access to bank
6  accounts once it was JSquared?
7      A.  I've -- I've always had access to
8  bank accounts.  Merely, if -- if John had me do
9  any type of other tasks, you know, when it came
10 to making payments for non-call center or
11 dialer-related things, so, like, websites or
12 hosting or Godaddy or things that he wanted to
13 buy online or certain bills that he wanted to
14 pay or rent that needed to be paid for the
15 office or for the house, I would have access to
16 the bank accounts.
17     Q.  So you would still be making websites
18 sometimes for John or paying for websites for
19 John?
20     A.  Mainly, like, paying for hosting or
21 paying for domains that he bought that were
22 never used.
23     Q.  Okay.  And what do you mean you would
24 use the bank accounts for things John wanted to
25 buy, that John wanted to buy for himself

75

1  personally online?
2      A.  Yeah.  And sometimes it was -- just
3  came down to, you know, making sure that we
4  received payment to -- to making payments on
5  the Switch by adding credits and watching the
6  balance and notify him.  More or less, I was
7  like his second pair of eyes in his bank
8  account; but he did make all the decisions
9  higher than me.
10     Q.  But you would sometimes help him make
11 personal purchases --
12     A.  Uh-huh.
13     Q.  -- with the same bank account?
14     A.  Yes.
15     Q.  And it was the Bank of America bank
16 account?
17     A.  Yes.
18     Q.  And you never used any other bank --
19         (Simultaneous speakers.)
20     A.  No, I've only -- only been able to
21 access the Bank of America.
22     Q.  Can you just give me an example of
23 what you mean by what John would buy online
24 that was not part of payments for the services
25 related to JSquared?

76

1      A.  I mean, rent payments, bill payments,
2  miscellaneous things.  I would just kind of
3  watch balances, see that, you know, we were
4  still good or that his account was still good
5  since it was basically, like, the only source
6  of money that was coming in; and so he used it
7  as a business and a personal bank account.
8      Q.  So he would make personal rent
9  payments?
10     A.  Yes.
11     Q.  And personal bill payments?
12     A.  Yes.
13     Q.  And buy personal items?
14     A.  Yes.
15     Q.  And how were you paid at this time?
16 Was -- how were you paid at this time?
17     A.  On a weekly basis.
18     Q.  Was it a flat fee, or was it related
19 to how many successful dials you had?
20     A.  It was a little bit a mix of both.
21 Sometimes it ranged from maybe, like, 500 to
22 750 a week.  Sometimes it was a little more if
23 we had a phenomenal week, maybe, like, around a
24 thousand; but for the most part around 750, 500
25 range.  And then I know during open-enrollment

77

1  time, I did also get, you know, bonuses from
2  Michael Smith or, after that, Omar, from
3  O Health Group, through Cash App, as, like,
4  little spiff bonuses.
5      Q.  Michael Smith would send you
6  personally a bonus?
7      A.  Yes.
8      Q.  And Omar, you said --
9      A.  Uh-huh.
10     Q.  -- would send you a bonus?
11     A.  Yeah.
12     Q.  Through Cash App?
13     A.  Yeah.  And that was a very small,
14 limited window of time during the open-
15 enrollment period whenever, you know, things
16 were going really well since margins for John
17 weren't too high and so he didn't pay me that
18 much and so they gave me a little bonus since I
19 was the main one running things.
20     Q.  Can you give an example of how much a
21 bonus from Michael Smith would be?
22         MR. FRANQUI:  Objection.
23     A.  I'd say, like, $250 to $500.
24     Q.  (BY MR. ABERNETHY)  And how much
25 would a bonus from Omar be?

Jakob Mears - 3/1/2022

78

1      A.   Around -- around the same amount.
2      Q.   And those were the only two people
3  that would ever pay you besides John Spiller?
4      A.   Yes.
5      Q.   Would you ever pay for your personal
6  items with the Rising Eagle or JSquared bank
7  account?
8      A.   No.
9      Q.   Never paid for any bills with those
10  bank accounts?
11      A.   No.
12      Q.   Would John ever help you pay for
13  personal items?
14      A.   I mean, I did live with him.  So he
15  did cover most of the costs.  Most of my --
16  most of my own costs were -- came out of my own
17  bank account.  I didn't like mixing things up.
18      Q.   Okay.  Did John pay rent for you?
19      A.   Yes.
20      Q.   So you did not pay John rent to live
21  in that house?
22      A.   Correct.
23      Q.   Did you pay bills?
24      A.   No.
25      Q.   So John paid bills for you?

79

1      A.   Uh-huh.
2      Q.   And you kept all your personal
3  finances separate otherwise?
4      A.   Yes.
5      Q.   Okay.  Did John generally pay for
6  food in the house for you?
7      A.   Yes, through the business account.
8      Q.   Through the business account.  Would
9  you ever you buy groceries from your personal
10  account?
11      A.   If I did, sometimes I'd be
12  reimbursed.  There were small things where --
13  where, over time, you know, like, paying the
14  gardener to mow the grass where I had to go get
15  cash since he exceeded the cash withdrawal
16  limit; and then I had to be reimbursed for
17  small things like that.
18      Q.   Okay.  And John would reimburse you
19  from the JSquared account or Rising Eagle
20  account?
21      A.   Correct.
22      Q.   All right.  When did Rising
23  Eagle-Cayman start?
24      A.   After he got back from jail.
25      Q.   Right after he got back from -- from

80

1  jail?
2      A.   I don't know exactly.  He is the main
3  one who set that up.  I didn't have any
4  dealings in setting that up.
5      Q.   You had no help in setting up Rising
6  Eagle-Cayman?
7      A.   No.  I did only in terms of the
8  file -- the filing with the Secretary of State;
9  but past that, it was out of my hands.
10      Q.   You did -- you filed --
11           (Simultaneous speakers.)
12      A.   Yeah, because I -- because at the
13  time, I also lived in Austin.  I worked remote,
14  so I was able to do everything.  He's not too
15  tech -- tech savvy; and anything with filing
16  for the Secretary of State, I was the main one
17  who handled that.
18      Q.   Okay.  Did John tell you why he was
19  starting it?
20      A.   I don't know if it was for tax
21  purposes.  I'm assuming it was just for tax
22  purposes.
23      Q.   Okay.  But he never said it was for
24  tax purposes?
25      A.   Not to my knowledge, no.

81

1      Q.   He just said, "I want you to set up a
2  new LLC for me"?
3      A.   Yes.  As far as the reason why, you
4  know, specifically that, I'm sure he has his
5  own reasons.
6      Q.   Okay.  Did you ask why it was Rising
7  Eagle-Cayman Islands or ask what the name was
8  for?
9      A.   I didn't.  It was merely -- you know,
10  I kind of assumed so.  You know, Cayman Islands
11  is pretty publicly known just to be a place, I
12  guess --
13      Q.   Okay.
14      A.   -- for tax purposes; and so I'm
15  assuming that's why he was doing that.
16      Q.   And just one quick thing to go back,
17  when we said "Omar," can you confirm that we
18  were talking about Omar Hibbert of O Health?
19      A.   Yes.
20      Q.   And -- and Omar Hibbert of O Health
21  paid you bonuses?
22      A.   Yes, a couple of them.
23      Q.   Okay.  And do you know if those
24  bonuses were from Omar Hibbert's personal Cash
25  App?

82

1    A.  I believe so, yes.
2    Q.  It just said, "Payment from Omar
3  Hibbert"?
4    A.  Yeah.
5    Q.  And from Michael Smith, do you know
6  if that was from his personal Cash App?
7    A.  I want to say so, yes.
8    Q.  Okay.  It had no company name?
9    A.  Correct.
10   Q.  Okay.  Thank you.
11       So once Rising Eagle was
12  started, you don't know what it did?  After you
13  set up the filing, created it, you don't know
14  what its function was?
15   A.  Well, Rising Eagle was set up prior
16  to me joining.  Then, what I did was I removed
17  his past, I guess, other managing member, I
18  think is what it's called.
19   Q.  Sorry.  Rising Eagle-Cayman?
20   A.  Oh, Rising-Caymen.  Yeah, besides the
21  filing, I didn't know what was the purpose for
22  it.
23   Q.  Were you the registered agent for
24  Rising Eagle-Cayman?
25   A.  I believe so.  It was either between

83

1  me or him.
2    Q.  And you -- as far as you know, there
3  was no clients of Rising Eagle-Cayman?
4    A.  Not to my knowledge.
5    Q.  There was no employees of Rising
6  Eagle-Cayman?
7    A.  No.
8    Q.  And you have no idea what its purpose
9  was --
10   A.  Correct.
11   Q.  -- to clarify?
12       And did you help make Rising
13  Eagle-Cayman the sole member of Rising Eagle?
14   A.  Yes, through the filing.
15   Q.  Do you know why you did that?
16   A.  Because I was instructed to.
17   Q.  John didn't give you any details?
18   A.  Not that I remember.  I just remember
19  he just wanted something under the Cayman name.
20   Q.  And so just to confirm, when you say
21  you were instructed to, you mean John Spiller
22  instructed you to make Rising Eagle-Caymen the
23  sole member?
24   A.  Correct.
25   Q.  So he just told you to do it.  You

84

1  did it.  You didn't ask questions?
2    A.  Yeah, I mean, that's mostly a lot of
3  things.
4    Q.  Okay.  Did that change impact the
5  operation of Rising Eagle in any way?
6    A.  No.
7    Q.  Did it affect your role in any way?
8    A.  No.
9    Q.  And was this at the same time that
10  you made Rising Eagle-Cayman the sole member of
11  JSquared?
12   A.  Yes.
13   Q.  And did that affect your role in
14  JSquared in any way?
15   A.  No.
16   Q.  Did it affect who was employed or
17  clients in any function of JSquared?
18   A.  No.
19   Q.  And you did that for the same reason,
20  because John Spiller told you to do it?
21   A.  Yes.
22   Q.  And you don't know why?
23   A.  Correct.
24   Q.  And you didn't ask any questions?
25   A.  Correct.

85

1    Q.  Did you discuss Rising Eagle-Cayman,
2  ever, with Michael Smith?
3    A.  No.
4    Q.  Did you discuss Rising Eagle-Cayman
5  with Omar Hibbert?
6    A.  No.
7    Q.  Did you discuss Rising Eagle-Cayman
8  with Scott Shapiro?
9    A.  No.
10   Q.  Did you discuss it with anybody
11  besides John Spiller?
12   A.  No.
13   Q.  And did you get -- ever get
14  compensated for these services that you did
15  related to Rising Eagle-Cayman?
16   A.  No.
17   Q.  John wouldn't pay you any extra to
18  handle these filings?
19   A.  No.
20   Q.  And you never got paid from Rising
21  Eagle-Cayman?
22   A.  No.
23   Q.  Okay.  So that's the only thing you
24  know about Rising Eagle-Cayman is that you set
25  it up and then made it members of JSquared and

Jakob Mears - 3/1/2022

86

1  Rising Eagle?
2      A.  Uh-huh.
3      Q.  Okay.
4      A.  Yes.
5      Q.  Can you tell me what Great Choice is?
6      A.  I want to say that was John's most
7  recent telecom venture of no longer, you know,
8  doing those calls for O Health Group; and,
9  instead -- that was after I had left, so I'm
10  not too sure what he does now with that
11  company.
12      Q.  So John Spiller started it?
13      A.  Yes.
14      Q.  Did you help John set it up?
15      A.  You know, I don't actually remember
16  if I set that one up.
17      Q.  You don't remember if you set it up?
18      A.  Yeah.
19      Q.  Do you know if anybody else helped
20  set it up?
21      A.  I do not.
22      Q.  Do you know if anybody told him to
23  set it up?
24      A.  I do not.
25      Q.  So he didn't give you any reason for

87

1  why he was starting a new company?
2      A.  Probably the reason to start over,
3  something fresh, something more legitimate
4  that's not tied back to the past.
5      Q.  So to separate it from Rising Eagle?
6      A.  And JSquared.
7      Q.  And JSquared.
8          Did he tell you that he wanted
9  to do this for a fresh start?
10      A.  I would say it's more speculation.
11      Q.  It's more speculation.  He never
12  actually talked to you about setting up this
13  company?
14      A.  I know the -- the business of doing
15  rates was something that he enjoyed more since
16  it put no type of, like, the same pressure as
17  really what caused this; and so he was moving
18  away from it, to -- to Great Choice.  But
19  rather -- other than those reasons, I don't
20  know.
21      Q.  What do you mean, the business of
22  doing rates?
23      A.  So, like, how we had new rates for
24  Health Advisors of charging a per minute, he
25  continued that; but it came with no managing

88

1  leads or receiving leads from anybody or
2  managing those calls.  It was merely working as
3  a switch or, like, a telephone provider.
4      Q.  So the alternative to that -- can you
5  explain the alternative that you said created
6  pressure?
7      A.  Yes.  So -- so I would say, to lay it
8  out, so Rising Eagle was formed prior to me
9  there, which was on the 36-sale plan; and then
10  a wire would be received.  And then we would
11  also be the ones having to, you know, receive
12  the files and load them and do all the work and
13  making sure call flow was good, to then
14  switching to JSquared.  And then JSquared, you
15  know, liability and calls, you know, seemed
16  like they were still on our side.
17          And so he no longer wanted --
18  wanted to do that because of the risk and
19  because of, you know, pressure from -- what's
20  the word -- the Traceback Group; and so he
21  really wanted to get out of the business of
22  helping O Health Group and Health Advisors.
23  And so that's why he went over to Great Choice,
24  where he didn't managed anyone's data, he
25  didn't receive anyone's data, and he was purely

89

1  getting clients to use minutes on his Switch
2  platform.
3      Q.  So can you explain what you mean by
4  those risks that he wanted to avoid?
5          MR. DAVIDSON:  Objection.
6          MR. FRANQUI:  Objection to form.
7      A.  Um, getting into any further
8  litigations or having clients that ended up in
9  litigations or probably anything of that
10  nature.
11      Q.  (BY MR. ABERNETHY)  And why was that
12  specific to that form of business?
13          MR. DAVIDSON:  Objection.
14          MR. FRANQUI:  Objection.
15      A.  Purely based on, you know, what put
16  John out of pocket or got clients or got people
17  that you, know, were in trouble.  So like,
18  this, for instance, was on that JSquared plan;
19  and so he wanted to move away to a more
20  regular-type platform or business structure.
21      Q.  (BY MR. ABERNETHY)  Okay.  And going
22  back to, you said, the issue with USTelecom,
23  what do you mean by that?
24          MR. DAVIDSON:  Objection.
25      A.  And so I know that --

90

1        MR. FRANQUI:  Joined.
2    A.  -- towards the last couple of months
3  of JSquared, Traceback Group would -- would
4  send a lot of, I guess, notifications to John
5  for us to make changes or fixes that we would
6  then have to relay to O Health Group or Health
7  Advisors of things that needed to be changed or
8  done.  And so, you know, the -- that pressure
9  was always there; and, of course, the things
10  that needed to be done did decrease performance
11  in those calls that were being made as well.
12        And so he no longer wanted to be
13  in that avenue where it was more of, like,
14  micromanaging to where the business could,
15  instead, just, you know, run on autopilot,
16  where people would bring on their pay per
17  minute and there'd be no managing whatsoever.
18    Q.  (BY MR. ABERNETHY)  Okay.  So,
19  generally, Great Choice was running the same
20  type of business as JSquared?
21        MR. DAVIDSON:  Objection.
22        MR. FRANQUI:  Joined.
23    A.  No, it wasn't.  The payment of the
24  rates was the same; but the main difference was
25  there was no dialer that was used with Great

91

1  Choice and there were no leads being loaded or
2  cut and pushed, played or paused, of that
3  nature and no call rooms to look over.
4        It was merely just how you,
5  know, you pay for minutes on cell phones,
6  except, you know, people -- a business would
7  come onto a platform and have, you know, "X"
8  amount of agents that incurred minute bills;
9  and then, it would work like that.
10        And so I wasn't involved in
11  Great Choice, so I wouldn't know much past that
12  point.
13    Q.  (BY MR. ABERNETHY)  Okay.  So, as far
14  as you know, it was just a provider?
15    A.  Yes, a minutes provider.
16    Q.  A minutes provider?
17    A.  Yes.
18    Q.  Can you explain what that means?
19    A.  Yeah, so VoIP minutes.
20    Q.  Okay.  And can you explain what you
21  mean by was a VoIP minutes provider?
22    A.  Yeah.  So anytime a call center wants
23  to make over -- like, internet-based phone
24  calls online, they then incur VoIP minutes.  So
25  just like billing minutes for cell phones, this

92

1  would be online VoIP minutes; and so he'd be
2  that provider of minutes.
3    Q.  Okay.  But you did not work under
4  Great Choice at all?
5    A.  Correct.
6    Q.  Did John describe this for you, or
7  how do you know what Great Choice did?
8    A.  Yeah, he -- he described it for me.
9    Q.  Okay.  Do you know who did work for
10  Great Choice besides John?
11    A.  Only John.
12    Q.  Do you know who their clients were?
13    A.  I do not.  I want to -- actually, I
14  want to say Sumco was a member of Great Choice.
15    Q.  Sumco was a member of Great Choice?
16    A.  Or -- I'm sorry, not a member -- a
17  client of Great Choice.
18    Q.  Okay.  And what did Great Choice do
19  for Sumco?
20    A.  Sumco used the platform to make
21  calls.  That's as much as I know.
22        MR. DAVIDSON:  Patrick, are we
23  taking a break next time you get to a pausing
24  place?
25        MR. ABERNETHY:  Yeah, we can

93

1  take a break soon, just a couple more
2  questions.
3    Q.  (BY MR. ABERNETHY)  Was Sumco ever a client of
4  JSquared?
5    A.  No.
6    Q.  Was Sumco ever a client of Rising
7  Eagle?
8    A.  No.
9    Q.  Were they ever a client of any
10  business that you worked for John?
11    A.  Outside of that, nothing that I know
12  of.  He was on board after my resignation.
13    Q.  Okay.  So you never got paid by Great
14  Choice?
15    A.  Correct.
16    Q.  Did you ever make payments for Great
17  Choice?
18    A.  No.
19    Q.  Did you ever just do any side jobs or
20  tasks for John related to Great Choice?
21    A.  Actually, I did get paid by Great
22  Choice; but that was more recent than anything
23  for tasks such as, you know, GoDaddy or, you
24  know, helping with bills, you know, on my side,
25  but nothing work related.

Jakob Mears - 3/1/2022

94

```
1    Q.  When you say for GoDaddy, you mean
2    you set up websites on Godaddy?
3       A.  Or just, like, I did small tasks,
4    like, updated his billing or making sure all
5    the websites are refreshed; or if I asked him
6    for money for having to do, you know -- you
7    know, miscellaneous tasks that he wanted to be
8    done, then, I'd get, like, a couple hundred
9    bucks.
10      Q.  Okay.  And what kind of bills would
11   you pay for Great Choice?
12      A.  What -- like, personally?
13      Q.  Yes.
14      A.  Oh, it would either go towards my
15   rent or car payments or vet bills.
16      Q.  When did you start doing tasks for
17   Great Choice?
18      A.  I wouldn't say there was a start
19   date.  It's more like if it comes up, like,
20   that's his means of paying me; and so it's
21   pretty spontaneous and -- and random.  And so I
22   want to say my last payment was maybe, like,
23   two -- two months ago, whenever I had asked him
24   for help to pay for -- for some vet bills.
25      Q.  For vet -- veterinary bills?
```

95

```
1       A.  Yeah.
2       Q.  Okay.  So two months ago is the last
3    time you did any work related to Great Choice?
4       A.  Or whenever I just got assistance
5    financially from Great Choice.
6       Q.  Okay.  So you -- you would get
7    financial assistance from Great Choice outside
8    of doing work?
9       A.  Correct.
10      Q.  Okay.  When was the last time you
11   worked for or did any kind of tasks for Great
12   Choice?
13      A.  That, I don't remember.  I wouldn't
14   be able to say.
15      Q.  Anytime last year?
16      A.  It would -- probably would have been
17   last year.
18      Q.  Okay.  But you have no sense of when
19   during the year you did the last work?
20      A.  Yeah.
21      Q.  But your last financial assistance
22   from Great Choice was two months ago?
23      A.  Yeah.  I'll say, give or take, one to
24   three months ago.
25      Q.  And John sent you this money?
```

96

```
1       A.  Yes.
2       Q.  From a Great Choice bank account?
3       A.  Uh-huh.
4       Q.  How did he send it to you?
5       A.  Yes.
6           Through Zelle.
7       Q.  Through Zelle?
8       A.  Yeah.
9       Q.  Okay.  And when did you resign?
10      A.  I want to say shortly after this --
11   or shortly -- shortly before the litigation
12   started.
13      Q.  Okay.  And is that why you resigned?
14      A.  No.  It was more just my relationship
15   with John was kind of deteriorating at -- at
16   the point.  Once O Health Group, which was
17   after Health Advisors, went out of business,
18   then I pretty much had no role because that was
19   my only role was managing their call room.
20      Q.  So is your relationship with John
21   better now, though?
22      A.  It's gotten better, yeah.
23      Q.  Enough to where he pays you financial
24   assistance?
25      A.  If I -- if I ask for any and if he's
```

97

```
1    able to, then, yes.
2       Q.  Okay.  And you just directly ask him
3    whenever you need --
4       A.  Uh, yes.
5       Q.  -- financial assistance?
6       A.  Uh-huh.
7       Q.  Did you talk to John about this
8    deposition or this case?
9       A.  He had called me about it whenever we
10   had got the initial e-mail.
11      Q.  Okay.  What did y'all talk about?
12      A.  It was more of just he was -- I don't
13   know because, at the same time, right before
14   that, we weren't on equal ground.  I was still
15   pretty much in the -- you know, getting mad at
16   him for him moving me into this; and so he was
17   just -- I guess just trying to apologize to me
18   again.
19      Q.  Okay.
20          MR. ABERNETHY:  Do you want to
21   take a break now?
22          MR. DAVIDSON:  Yeah.  Great.
23          MR. ABERNETHY:  You ready for a
24   break?
25          THE WITNESS:  Yeah.
```

98

1    MR. ABERNETHY:  Okay.
2    THE VIDEOGRAPHER:  We'll go off
3  at 10:47.
4    (Off the record from 10:47 to 11:15 a.m.)
5    THE VIDEOGRAPHER:  All right.
6  We're back on the record.  It's 11:15.
7    Q    (BY MR. ABERNETHY)  All right, Jakob.  So
8  we're going to go back over the operations and kind of
9  the technical components of the company.  So with Rising
10  Eagle, can you explain to me -- just restate again what
11  it was that Rising Eagle did -- what you did with Rising
12  Eagle?
13    MR. DAVIDSON:  Objection.
14    A.   Yes.
15    MR. FRANQUI:  Joined.
16    A.   So Rising Eagle was the company that
17  was paid by Health Advisors to run the
18  operation of the lead generation for the calls
19  that were being made.  And so the operation,
20  how it was where files were sent to us to load
21  on a dialer and load a pre-generated message
22  for those calls to be made where each
23  individual file was its own campaign, just like
24  how marketing does each individual campaign,
25  where each campaign can be paused, played,

99

1  speed up, slow down, as well as edited on, you
2  know, what inputs were to be made if anyone
3  wanted to transfer over to talk to an agent.
4  And then, from there, they would be relayed to
5  the call room where the agents would try and
6  make sales off of those transfers.
7    Q.   (BY MR. ABERNETHY)  Okay.  And
8  what -- what software did Rising Eagle use?
9    A.   Hello Hunter.
10    Q.   What was Hello Hunter?
11    A.   Hello Hunter was a dialing software.
12    Q.   So can you explain what you mean by a
13  dialing software, what the actual software's
14  function was?
15    A.   It was -- the main function was to
16  make mass calls.
17    Q.   And, again, what does that mean, make
18  mass calls, like, what --
19    A.   It -- it means to load a file and
20  then call by setting the rate at calls per
21  hour.  So whether it was a file that had a
22  million records, if you wanted to make -- have
23  the system try calling those numbers at a rate
24  of, you know, a couple of hundred thousand per
25  hour; and then it would call a couple hundred

100

1  of those -- a couple hundred thousand of those
2  numbers per hour.  And so whenever it'd call
3  those, you know, some of those would connect;
4  some wouldn't.  And then, based on those, they
5  would hear a message; and then they would
6  decide to press the input to go to an agent.
7    Q.   So did you have to manually load a
8  file into the software?
9    A.   Yes.
10    Q.   And you would manly [sic] -- you
11  would manually load a file that had phone
12  numbers; is that correct?
13    A.   Yes.
14    Q.   And did you have to log into the
15  software?
16    A.   Yes.
17    Q.   And it was -- was it a user-specific
18  login?
19    A.   Yes.
20    Q.   That was your personal login?
21    A.   No.  I'm sorry.  Not user specific,
22  but just one login specific.  So one login
23  would get you to the campaigns.
24    Q.   Okay.  So was there -- did you just
25  have a Rising Eagle general login?

101

1    A.   Yes.
2    Q.   But you had to log in each time to
3  use it?
4    A.   Yes.
5    Q.   And did anybody else have access to
6  this login besides you?
7    A.   John.
8    Q.   And so would you both, you and John,
9  load files into Holly Hunter [sic]?
10    A.   Yes.
11    Q.   Or Hello Hunter?
12    A.   Correct.
13    Q.   And nobody had access to this login
14  besides you and John?
15    A.   Correct.
16    Q.   And then once you've loaded the file
17  into Hello Hunter, how does it then dial?
18    MR. DAVIDSON:  Objection.
19    A.   I'm not too sure on how it dials.  I
20  just know that once it's loaded, you push
21  "play."  And then it will show the statistics
22  of calls answered, calls unanswered, how many
23  transfers that file made over a given time; and
24  then you could see that in realtime by just
25  hitting the refresh button on that individual

102

1 campaign.
2    Q.  (BY MR. ABERNETHY)  Can you tell me
3 again what you press when you load the file?
4    A.  Yeah.  Once it's loaded, I would just
5 push "play."
6    Q.  It's just a button that says "play"?
7    A.  Yes.
8    Q.  And then, at that point, you're not
9 sure how Hello Hunter actually dials; you just
10 press "play"?
11    A.  Correct.
12        MR. DAVIDSON:  Form.
13    Q.  (BY MR. ABERNETHY)  And then, you can
14 see the durations of calls at this point?
15    A.  No.  That requires to be logged into
16 Health Advisors' VICIdial where their agents
17 are logged into.
18    Q.  Are there any settings that you have
19 to manually set for --
20    A.  Usually -- oh, sorry.
21    Q.  That's okay.
22    A.  Usually, on the Switch side, some
23 type of IP port for what was called, I want to
24 say, like, a DID number, which is, like, a port
25 number, had to be used so that it would connect

103

1 system to system.  And then, at that point,
2 VICIdial was more just the visual- -- the
3 visualization of how well the calls were doing
4 versus Hello Hunter was the visualization of
5 how well data was doing.
6    Q.  So you would put in a DID into Hello
7 Hunter?
8    A.  Correct.  That was linked to the
9 VICIdial on that system.
10    Q.  And can you explain again what a DID
11 is?
12    A.  It looks like a standard cell phone
13 number.  How it worked or how it operated, I
14 have no clue.
15    Q.  And why did it look like a cell phone
16 number?  Was it -- what -- what was that cell
17 phone number used as in that process?
18    A.  It was --
19        MR. DAVIDSON:  Objection.
20    A.  It was a blank number.  So it was a
21 number that was out of service, where if you
22 called it, then, it would get directed; and
23 you'd be -- basically, it would be like you'd
24 press, like, the opted-in number to get in
25 contact with an agent.  So if you called it,

104

1 you'd get in touch with an agent.  So if lots
2 of calls opted in, which, more or less, is the
3 same thing as them calling that number, once
4 they pushed, like, one or two to get to an
5 agent, then, they would all go to that one
6 direct number and route the call through there.
7    Q.  (BY MR. ABERNETHY)  So would call
8 recipients see that DID number?
9    A.  No.
10    Q.  Then how would they call that number?
11    A.  That, I have no clue.  That's mainly
12 all back-end stuff.  I didn't know the
13 technicalities of how it worked or how it was
14 set up.  I just know that that was mainly done
15 on the Switch side.  So we would need to have
16 a number from the Switch and as well as set up
17 a -- some type of technical schedule on the
18 VICI side with O Health -- with O Health Group
19 and Health Advisors so that the calls did
20 connect to their room.
21    Q.  So when you say "on the Switch side,"
22 who do you mean?
23    A.  So either Veriswitch or R Squared as
24 well as -- or -- or JSquared.  So basically
25 the -- the platform where you would be billed

105

1 the minutes, they would supply the -- that DID
2 number or, I want to say another term was,
3 like, a SIP port, S-I-P.  And then any kind of
4 calls that had that SIP or DID attached to it
5 would go directly to their call center.  And so
6 each campaign had to have that certain SIP or
7 that certain DID number that was connected to
8 the room for those leads that were being called
9 for anyone that was interested in health
10 insurance to be directed to them.  So it was
11 mainly the traffic channel of how each call got
12 connected.
13    Q.  And how were these -- when you say
14 "campaigns," how were these campaigns
15 configured?
16    A.  I would just push a button that says
17 "create new campaign," and I would name it the
18 file number.
19    Q.  So you configured the campaigns?
20    A.  Yes.
21    Q.  And it -- so you would just get a raw
22 lead list, and then you would just randomly
23 configure the campaign?
24    A.  Yeah.  So I would just need the DID
25 number that connects to the room.  I wouldn't

106

1  be the one that sets that up.  Usually I would
2  have got that either by John or the Switch and
3  then I would get on a phone call with Scott or
4  Mike, Scott Shapiro or Michael Smith, to set
5  stuff up on their end so that anytime that a
6  lead goes through, they would get it.
7       And so that was kind of how the
8  traffic was created through those ports or SIP
9  and DID.  And so when the campaign created, I
10  named it the file name, just made organization
11  a lot more easier to track the stats of that
12  file.  And then, once I pushed "play," calls
13  would start going out; and all transfers go to
14  their room.
15       Q.  Would sometimes phone numbers that
16  were in one campaign, could they still appear
17  in another campaign?
18       A.  Yes.
19       Q.  And so you configured the campaigns.
20  Did you have any input from anybody else on
21  configuring these campaigns?
22       A.  No.
23       Q.  Did anybody ever direct you on
24  configuring these campaigns?
25       A.  Oh, I was taught how to do it by

107

1  John; and then it just became a habit of, you
2  know, a day of work, setting up campaigns and
3  loading the -- loading the lead lists and then
4  pushing "play" on them and watching the stats.
5       Q.  Would you ever share information
6  about these campaigns with the clients?
7       A.  Yes.
8       Q.  So you would -- would you share them
9  with Mike Smith?
10       A.  Yeah, Mike Smith and Scott Shapiro or
11  O Health Group or Health Advisors.
12       Q.  And --
13       A.  And so I would share those statistics
14  on how well that file did.
15       Q.  So you would just share what -- what
16  statistics --
17       (Simultaneous speakers.)
18       A.  How many transfers that file was
19  getting as well as I was able to see for each
20  individual campaign if there were recordings
21  that were long, send it over to them because,
22  you know, that may have been a sale that they
23  can listen to; and that was really the gist of
24  it.
25       Q.  Can you explain what a transfer is?

108

1       A.  Whenever someone would have pushed a
2  dial tone to get connected to an agent.
3       Q.  Okay.  And who told you to share
4  these reports with clients?
5       A.  I want to say it was either -- John
6  but, also, Scott and Mike also wanted to know
7  because if a file did good, then they would buy
8  more.
9       Q.  Okay.  How would you share it,
10  these -- these statistics or these --
11       A.  Over -- over the phone or through
12  text.
13       Q.  So what would you say on the phone --
14       (Simultaneous speakers.)
15       A.  It'd be, like:  Oh, file that was
16  sent on "X" date or this file name was really
17  good; buy more of them, you know, with the same
18  stats.
19       Q.  Okay.  And the same -- what -- what
20  would you say over a text message?
21       A.  More or less the same thing, just
22  name of -- the name of the file; and, you know,
23  if they were doing good one day with, you know,
24  File A, then, you know, they'd want to buy more
25  of File A because -- as an example.

109

1       Q.  And did you ever get feedback from
2  Michael Smith about these statistics?
3       A.  Not the statistics in general.
4  Mainly, just if the calls they were getting
5  were backlogging, then, I would change them
6  out.
7       Q.  And did you ever get feedback from
8  Scott Shapiro about these?
9       MR. DAVIDSON:  Objection.
10       A.  Yes.
11       Q.  (BY MR. ABERNETHY)  What kind of
12  feedback would you get?
13       MR. DAVIDSON:  Objection.
14       A.  Just change out the -- change out the
15  lead list or change out the message or speed
16  things up or slow things down.
17       Q.  (BY MR. ABERNETHY)  Okay.  And when you say
18  "campaign," do you mean lead list, just to clarify?
19       MR. DAVIDSON:  Objection.
20       A.  Yes.
21       Q.  (BY MR. ABERNETHY)  So those -- you
22  mean the same thing when you say "campaign" and
23  when you say "lead list"?
24       MR. DAVIDSON:  Objection.
25       A.  Yes.

Jakob Mears - 3/1/2022

110

1    MR. FRANQUI:  Joined.
2    Q.  (BY MR. ABERNETHY)  And when you
3  would say in these reports "buy more," do you
4  mean go back to the original source of that
5  lead list and buy more lead lists from that
6  source?
7    MR. DAVIDSON:  Objection.
8    A.  Can you --
9    MR. FRANQUI:  Joined.
10    A.  Can you repeat that?
11    Q.  (BY MR. ABERNETHY)  Well, when you
12  would say to buy -- you would recommend to buy
13  more lead campaigns or lead lists, correct?
14    MR. DAVIDSON:  Objection.
15    A.  Yes.
16    MR. FRANQUI:  Joined.
17    Q.  (BY MR. ABERNETHY)  So what did you
18  mean by that?
19    MR. DAVIDSON:  Objection.
20    A.  Yes.  So --
21    MR. FRANQUI:  Joined.
22    A.  -- let's say File A that was bought,
23  you know, yesterday did really well, then I
24  would relay, you know, how well the transfers
25  did; and then, if they got a lot of sales, too,

111

1  then that would also let them know that they
2  should probably buy more of those same files.
3    Q.  (BY MR. ABERNETHY)  Okay.  And would you
4  regularly get feedback?
5    A.  Yes.
6    Q.  From Scott -- you would regularly get
7  feedback from Scott Shapiro?
8    MR. DAVIDSON:  Objection.
9    A.  And Michael Smith.
10    Q.  (BY MR. ABERNETHY)  So you regularly
11  got feedback from Scott Shapiro, as well as
12  from Michael Smith --
13    A.  Yes.
14    MR. DAVIDSON:  Objection.
15    Q.  -- about those campaigns?
16    MR. FRANQUI:  Object to the
17  form.
18    Q.  (BY MR. ABERNETHY)  Do you know how
19  the system would select DIDs?
20    A.  I do not.
21    Q.  Were you aware each time of what DID
22  you were using?
23    A.  And is DID -- do you mean -- do you
24  mean as regarding the traffic from one or the
25  other or the Caller ID?

112

1    Q.  I guess I mean Caller ID.
2    A.  Caller ID?  So in the beginning, I
3  know that when I first started, they did re- --
4  John did receive Caller IDs from Health
5  Advisors; and then after that, that was stopped
6  being supplied.  And then we had gotten a
7  Caller ID list from Globex Telecom, I want to
8  say from Mike Globex specifically.  And I
9  wasn't too sure of the source of these, but I
10  know that I was just told to use a modem and to
11  make test calls to my phone.  If it showed
12  "Scam Likely," not -- not to use it.  And so my
13  job also became part of checking to make sure
14  the Caller ID was still good.
15    Past that, then John started
16  having to buy actual Caller IDs from telecom
17  companies that didn't belong to anyone that can
18  be used as Caller IDs.
19    Q.  So you said originally you would
20  receive these Call IDs from Health Advisors?
21    A.  Correct.
22    Q.  Why did you stop getting them from
23  Health Advisors?
24    MR. DAVIDSON:  Objection.
25    MR. FRANQUI:  Joined.

113

1    A.  For the reason, I'm not too sure.
2    Q.  (BY MR. ABERNETHY)  You don't know.
3  It just stopped one day, and you had to find a
4  new source?
5    A.  Correct.
6    Q.  How did you choose a new source for
7  these Caller IDs?
8    A.  I didn't choose a new source.
9    Q.  Who chose the --
10    A.  John.
11    Q.  Okay.  And so then you would manually
12  test these Caller IDs?
13    A.  Correct.
14    MR. DAVIDSON:  Objection.
15    Q.  (BY MR. ABERNETHY)  And you would
16  call them; and --
17    MR. FRANQUI:  Joined.
18    Q.  -- if it said "Scam Likely," you
19  would say that was a bad Caller ID, correct?
20    A.  Correct.
21    MR. DAVIDSON:  Objection.
22    MR. FRANQUI:  Object to the
23  form.
24    Q.  (BY MR. ABERNETHY)  Do you know why
25  it would show up as "Scam Likely"?

114

1      MR. DAVIDSON:  Objection.
2      MR. FRANQUI:  Objection.
3    A.  I do not.
4    Q.  (BY MR. ABERNETHY)  Did you ever --
5  one second.
6      So, I guess, back to loading
7  these Caller IDs, how did you do that?
8    A.  So I just had a large file that had a
9  lot of numbers on them -- it probably had a
10  million numbers -- and then I would randomly
11  choose one.  And then there was a Caller ID
12  section for each campaign, and so I would
13  attach that number.  And before the campaign
14  was loaded, I would make a test call to my
15  phone to see if it was "Scam Likely."  If it
16  wasn't, then it stayed in there; and I'd push
17  "play" to make that Caller ID for that specific
18  campaign.
19    Q.  And after you stopped receiving them
20  from Health Advisors, who did you receive them
21  from?
22    A.  Then they were received from probably
23  John's telecom companies -- oh, I'm sorry.
24  After Health Advisors, it was then Globex, and
25  then the telecom companies.

115

1    Q.  And when you would use a Caller ID,
2  would you use the same Caller ID for the entire
3  campaign?
4    A.  Yes, until it showed spam.
5    Q.  Until it showed spam?
6    A.  Yeah.  And the VICIdial reflected
7  whenever a Caller ID went to "scam" because it
8  did play into performance and the answer rate
9  of those calls and how well the transfers were
10  being made.
11    Q.  Do you know which -- do you know why
12  it would show spam?
13    A.  I do not.
14    Q.  Do you know if it was a certain
15  number of calls made from this number?
16    A.  At the point it was pretty random,
17  where some numbers, depending on the -- I guess
18  the source of where it came from -- I didn't
19  know where it came from besides from Globex on
20  this large list -- some were marked spam faster
21  than others; some lasted longer than others.
22    Q.  And do you know the name of any of
23  those telecom companies that provided those
24  Caller IDs?
25    A.  To Globex or after Globex?

116

1    Q.  Total.
2    A.  Total?  Well, I do know John did end
3  up buying -- this is after Globex.  This is
4  for -- when JSquared was around.  Then, he
5  started to buy them.  Avid Telecom, I want to
6  say, was one big source.  I'm not too sure who
7  else.  He was the main one who handled the
8  Caller IDs.
9    Q.  By "he," do you mean John Spiller?
10    A.  Correct.
11    Q.  Are you aware of any other telecom
12  companies besides Avid Telecom, you said?
13    A.  There were a handful of others.  I
14  want to say Americonnect was one of them.  That
15  one, and -- Americonnect, Avid.  Those are the
16  only two that come to mind at the moment.
17    Q.  Do you know the timeframe that you
18  were working with Avid Telecom?
19    A.  I do not.
20    Q.  Do you know the timeframe of
21  Americonnect?
22    A.  No.  John was the administrator and
23  handled all the connections and that kind of
24  back-end stuff.
25    Q.  Did you ever work with Talkie

117

1  Communications?
2    A.  I do remember Talkie Communications.
3  He -- he did get Caller IDs from them --
4    Q.  Do you know --
5      (Simultaneous speakers.)
6    Q.  And by "he," you mean John Spiller?
7    A.  Correct.
8    Q.  Do you know the timeframe that you
9  would get them from Talkie?
10    A.  I do not.
11    Q.  Did you ever use Caller IDs that
12  Rising Eagle did not own?
13    A.  I'm assuming that that was probably
14  the ones from Globex Telecom.  Those were given
15  to us.  Those weren't bought like how he did
16  submit payments for Avid, Talkie, Americonnect.
17  Those were actually bought directly from them
18  versus the ones from Globex were just kind of
19  like a large Skype list, just -- a large list
20  of numbers that were just given with no type
21  of, I guess, like, agenda to it.  And so I
22  don't know if those belonged to us or if they
23  were bought or the source of those numbers --
24    Q.  Do you --
25    A.  -- but I know those were used at one

118

1 point.
2    Q.  Okay.  But you don't know why you got
3 them for free?
4    A.  Correct.
5    Q.  Did you have any other relationship
6 with Globex besides just getting Caller IDs?
7    A.  Well, he ended up taking over
8 R Squared.  Anytime we had any traffic problems
9 related to the technicalities in the back end,
10 he was mainly the go-to person.
11    Q.  By "he," do you mean John Spiller?
12    A.  "He" as in Globex.  So that was --
13 since we were routing all the calls through his
14 Switch, any type of traffic interruptions he
15 would know more about; and so if we had
16 problems where calls were not going out or
17 calls were not connecting, we would contact him
18 to figure out where those problems were coming
19 from and so he could fix them so that the calls
20 can resume for O Health Group -- I'm sorry --
21 for Health Advisors.
22    Q.  So Mike Globex took over R Squared?
23    A.  To my knowledge, yes.
24    Q.  Do you know when this was?
25    A.  I do not.

119

1    Q.  Do you have a rough timeframe or
2 year?
3    A.  2019.
4    Q.  2019.
5         Okay.  For these campaigns, do
6 you know what was being dialed out or what --
7 what a call recipient would -- if I -- if I
8 picked up a call from this campaign, do you
9 know what I would hear?
10         MR. DAVIDSON:  Objection.
11    A.  I know --
12         MR. FRANQUI:  Joined.
13    A.  -- one started, "This is Ann."  And
14 then others, they would have random company
15 names, where I was tasked with changing that
16 introduction to differ the performance to make
17 campaigns better.
18    Q   (BY MR. ABERNETHY)  So was it a person that
19 would answer the phone --
20         MR. DAVIDSON:  Objection.
21         MR. FRANQUI:  Joined.
22    Q.  -- for these campaigns?
23         Was there an actual person on
24 the other end of the call?
25         MR. DAVIDSON:  Objection.

120

1    A.  Uh, not --
2         MR. FRANQUI:  Object to form.
3    A.  -- until they transferred over.  So
4 they would hear the prerecorded message.
5    Q.  (BY MR. ABERNETHY)  Did you choose
6 these prerecorded messages for the campaigns?
7    A.  Yes.
8    Q.  And then, just to confirm one more
9 time again, when we were saying "he" at Globex,
10 you said Mike Globex?
11    A.  Correct.
12    Q.  Was that his name, Mike Globex?
13    A.  That, I am unsure about.  I know
14 that's what the name of his company was was
15 Globex.  I'm not sure if Globex was his last
16 name.
17    Q.  Okay.  But as far as -- did you have
18 direct communications with him?
19    A.  Only through Skype.
20    Q.  Only through Skype.  And his -- what
21 was his name on Skype?
22    A.  Mike Globex.
23    Q.  Okay.
24    A.  And communication through me and him
25 was very minimal.  He didn't really talk to me

121

1 that much.  He more spoke to John.
2    Q.  What was the communication that you
3 would have with him usually about?
4    A.  Technical difficulties.
5    Q.  Technical difficulties with...?
6    A.  With the call routing or call --
7 interruption of calls not connecting.
8    Q.  Okay.  So back to the calls
9 themselves, so a prerecorded message would be
10 transmitted at first?
11    A.  Correct.
12    Q.  And then if somebody answered the
13 phone and heard the prerecorded message, then
14 what -- what happened?
15         MR. DAVIDSON:  Objection.
16    A.  It would --
17         MR. FRANQUI:  Joined.
18    A.  -- play the message and then they
19 would choose to get transferred to an agent or
20 it would hang up on them if they chose a
21 different route number; and then if they chose
22 a DNC number, it would populate on the campaign
23 that they pushed the DNC number.
24    Q.  (BY MR. ABERNETHY)  And how did you
25 know that agents were answering the phones?

122

1        MR. DAVIDSON:  Objection.
2    A.  By --
3        MR. FRANQUI:  Joined.
4    A.  -- seeing the stats on the campaign
5  of the connected call/the transfers.  And so if
6  it showed a transfer -- let's say one phone
7  number transferred over, I'd be able to see
8  that exact phone number on the VICIdial as
9  well.
10    Q.  (BY MR. ABERNETHY)  Did you ever
11  speak with agents that were --
12    A.  No.
13    Q.  -- answering these phones?
14        Did you ever talk to anybody
15  that managed these agents?
16    A.  Yes.
17    Q.  And whose agents were these?
18        MR. DAVIDSON:  Objection.
19    A.  They were --
20        MR. FRANQUI:  Joined.
21    A.  -- Michael Smith's agents or Health
22  Advisors of America.
23    Q.  (BY MR. ABERNETHY)  So would you talk
24  to Michael Smith about these agents regularly?
25        MR. DAVIDSON:  Objection.

123

1    A.  I wouldn't --
2        MR. FRANQUI:  Joined.
3    A.  -- say about the agents; mainly about
4  the calls.
5    Q.  (BY MR. ABERNETHY)  And did you talk to Scott
6  Shapiro about these agents?
7        MR. DAVIDSON:  Objection.
8        MR. FRANQUI:  Joined.
9    A.  I -- I would say both, sometimes
10  about the agents; sometimes about their calls
11  relative to, you know, feedback that they may
12  have been getting to change out the lists or
13  giving a lot of back -- feedback, so to adjust
14  it.
15    Q.  (BY MR. ABERNETHY)  So you would talk
16  to Mike Smith about feedback he got from his
17  agents about the calls?
18    A.  Correct.
19        MR. DAVIDSON:  Objection.
20    Q.  (BY MR. ABERNETHY)  Would you get --
21  what would you get feedback about through Mike
22  Smith from these agents?
23        MR. DAVIDSON:  Objection.
24        MR. FRANQUI:  Joined.
25    A.  That calls were not doing well, a lot

124

1  of "take me off your list" or a lot of
2  litigations or lawyer offices or people that
3  weren't interested; and so even if a file was
4  relatively good on transfers, if they were not
5  getting sales and getting a lot of bad calls in
6  terms of the quality of the ability to sell on
7  them, then I would change them out.
8    Q.  And what would you talk to Scott
9  Shapiro about, what kind of feedback from these
10  agents?
11        MR. DAVIDSON:  Objection.
12    A.  The exact same thing --
13        MR. FRANQUI:  Joined.
14    A.  -- as Michael Smith.
15    Q  (BY MR. ABERNETHY)  Okay.  And were you
16  creating these prerecorded messages?
17        MR. DAVIDSON:  Objection.
18        MR. FRANQUI:  Objection.
19    A.  Yes, I was tasked with -- with
20  creating those.
21    Q.  (BY MR. ABERNETHY)  Would you get --
22  who would direct you to create these
23  prerecorded messages?
24        MR. DAVIDSON:  Objection.
25    A.  Usually it was advised --

125

1        MR. FRANQUI:  Joined.
2    A.  -- by either Michael Smith, Scott
3  Shapiro, or John Spiller on how those recorded
4  messages goes or what they wanted in those
5  prerecorded messages.
6    Q.  (BY MR. ABERNETHY)  So you would talk
7  to Mike Smith about the content of the
8  prerecorded messages?
9        MR. DAVIDSON:  Objection.
10        MR. FRANQUI:  Objection.
11    A.  On some of them, yes.
12    Q.  (BY MR. ABERNETHY)  And you would
13  talk to Scott Shapiro about the content --
14        MR. DAVIDSON:  Objection.
15    A.  Correct.
16    Q.  -- about these messages?
17        MR. DAVIDSON:  Objection.
18    Q.  (BY MR. ABERNETHY)  You said "some of
19  the messages."  What about the other messages?
20        MR. DAVIDSON:  Objection.
21    A.  And so there were --
22        MR. FRANQUI:  Objection.
23    A.  -- some of them where, you know, more
24  or less, the message was the same; but maybe,
25  you know, the numbers were, you know, changed

Jakob Mears - 3/1/2022

126

1  where instead of if someone pushed an input of
2  one to be transferred to an agent, I changed
3  the input to, you know, three.  The message was
4  the same; it's just the inputs are different,
5  so I didn't relay those over.
6      Q.  (BY MR. ABERNETHY)  What do you mean
7  by "the input"?
8      A.  So anytime in a voice-recorded
9  message, there'd be two options; or we could
10  add that in later on.  So it was DNC,
11  transfer, and then not interested; and so,
12  usually, that -- I did change the numbers
13  around.  So instead of, like, one, two, and
14  three, it was, like, three, four, five.
15      Q.  Do you know why you would do this?
16          MR. DAVIDSON:  Objection.
17      A.  To try and bypass call-blocking apps.
18      Q.  (BY MR. ABERNETHY)  Sorry.  Can you
19  repeat that?
20      A.  To try and bypass call-blocking apps.
21      Q.  So how would the call-blocking app
22  work for these inputs?
23          MR. DAVIDSON:  Objection.
24      A.  If it read that it was a prerecorded
25  message, usually most prerecorded messages at

127

1  the time, you know, it was "Press one to speak
2  to an agent."  So -- so, basically, apps and,
3  you know, services to block calls knew that;
4  and so they had a harder time blocking those
5  because one wasn't the option to get
6  transferred or to take them off the list.  And
7  so the call's more likely to go through if it
8  had a different input than what their systems
9  were used to.
10      Q.  (BY MR. ABERNETHY)  So if a campaign
11  was having a lot of blocked calls, would you be
12  directed to first just change the input?
13          MR. DAVIDSON:  Objection.
14      A.  Yes.
15          MR. FRANQUI:  Joined.
16      Q.  (BY MR. ABERNETHY)  And you would
17  get -- who would you get directed by to do
18  this?
19          MR. DAVIDSON:  Objection.
20          MR. FRANQUI:  Joined.
21      A.  Either by John Spiller, Scott
22  Shapiro, or Michael Smith.
23      Q.  (BY MR. ABERNETHY)  Okay.  And would
24  they ever give you -- or would you ever receive
25  from Mike Smith a script for a prerecorded

128

1  message?
2          MR. DAVIDSON:  Objection.
3          MR. FRANQUI:  Objection.
4      A.  Not a typed-out script, no.
5      Q.  (BY MR. ABERNETHY)  Would Mike Smith
6  tell you on the phone any direction for the
7  prerecorded message?
8          MR. DAVIDSON:  Objection.
9      A.  I would say --
10          MR. FRANQUI:  Objection.
11      A.  -- direction as a way as kind of like
12  spitball ideas, but not a word for word.
13      Q.  (BY MR. ABERNETHY)  Okay.  So can you take
14  me through the process of making these prerecorded
15  messages?  What was the first step and what -- any
16  direction you would get?
17      A.  Yes.  So --
18          MR. DAVIDSON:  Objection.
19          MR. FRANQUI:  Joined.
20      A.  So, they would contact me and say,
21  like:  Open enrollment's coming around.  Like,
22  get a message created that has open enrollments
23  or rush in, like, a special deal or something
24  of that nature where, you know -- you know,
25  we're running some type of, you know -- I would

129

1  say probably along the lines of that nature.
2  Mainly, open enrollments.
3          I know one of them was like,
4  "This is Ann," you know, sell policies similar
5  to, you know, Blue Cross/Blue Shield, and
6  things like that.
7          And then I would go to Fiverr.
8  More or less, I would try to create something
9  along the lines that they wanted; and then I
10  would draft it up, go to Fiverr, get it created
11  and loaded it.
12      Q.  (BY MR. ABERNETHY)  Okay.  So what
13  would -- can you walk me through the process of
14  going to Fiverr?  What would you give -- can
15  you explain how Fiverr works for this process?
16          MR. DAVIDSON:  Objection.
17      A.  Yes.  So Fiverr is a --
18          MR. FRANQUI:  Objection.
19      A.  -- freelance platform to hire people
20  to do tasks.  And so I went on Fiverr to look
21  at voice-recording professionals, gave them a
22  script; and then they get paid, like, a hundred
23  dollars or less, depending on the person.  And
24  then they would record themselves saying that
25  script.

130

1    Q.   (BY MR. ABERNETHY)  So you would
2    draft a script?
3    A.   I would draft a script based on the
4    ideas that were given.
5    Q.   Did you -- when you drafted the
6    script, did you send it directly to Fiverr?
7    A.   Yes.
8    Q.   Did you have anybody ever check the
9    script first?
10   A.   No.
11   Q.   So there was no approval process for
12   the -- for the script?
13   A.   Only after it was created wherein I
14   would probably do a test phone call of some of
15   them to either Scott Shapiro or Michael Smith
16   to listen to it and gather feedback if they
17   wanted it.  It didn't happen for every one of
18   them; but it happened for some where they heard
19   one they took a liking to it, so they wanted to
20   try that one.
21   Q.   But you did not share every script?
22   A.   Not every one of them because, more
23   or less, there were small tweaks where the
24   general message was the same, but maybe there
25   was one or two words different so it didn't

131

1    require, you know, constant communication on
2    that point.
3    Q.   And would you ever get, like,
4    specific feedback on specific things to include
5    in these messages that you weren't including?
6          MR. DAVIDSON:  Objection.
7          MR. FRANQUI:  Joined.
8    A.   Yes.
9    Q.   (BY MR. ABERNETHY)  What's an example
10   of something that you would be told to include
11   in a message?
12         MR. DAVIDSON:  Objection.
13   A.   So, like --
14         MR. FRANQUI:  Joined.
15   A.   -- like the -- like the past, so,
16   like, open enrollment, to include that in the
17   message.  Certain, you know, promotions were to
18   include Blue -- Blue Cross/Blue Shield or all
19   those other companies, Cigna; or John had some
20   recordings in the past that he had used with
21   them prior to me being on board that were
22   created where they've had success with those
23   messages, so they wanted to use them again.
24   And so sometimes I would just gather my ideas
25   based on the messages that worked, that were

132

1    requested, and draft something up of a similar
2    nature.
3    Q.   (BY MR. ABERNETHY)  Okay.  Was there
4    anything ever more specific to include in these
5    audio recordings besides just general campaign
6    information like that that you just described?
7          MR. DAVIDSON:  Objection.
8          MR. FRANQUI:  Object to form.
9    A.   Not that I can remember, no.
10   Q.   (BY MR. ABERNETHY)  But you were never given
11   at any point a script specifically to use for these,
12   correct?
13         MR. DAVIDSON:  Objection.
14   A.   Correct.
15         MR. FRANQUI:  Joined.
16   A.   No, I was never given a exact script
17   to go off of unless it was something that
18   worked in the past that was created before I
19   was hired.
20   Q    (BY MR. ABERNETHY)  Okay.  And at any point
21   did you ever start tagging calls with specific numbers
22   in these prerecorded messages?
23         MR. DAVIDSON:  Objection.
24         MR. FRANQUI:  Joined.
25   A.   Can you elaborate "tagging"?

133

1    Q.   (BY MR. ABERNETHY)  Was there anything you
2    were ever instructed to add in at the end of a message
3    that was not just part of the prerecorded message, a
4    tag, like, UST456?
5          MR. DAVIDSON:  Objection.
6    A.   Yes, I do remember doing those or the
7    1-800 number.  Some of those implementations
8    were having to be made later on.
9    Q.   (BY MR. ABERNETHY)  And who directed
10   you to do this?
11         MR. DAVIDSON:  Objection.
12   A.   John.
13         MR. FRANQUI:  Objection.
14   Q.   (BY MR. ABERNETHY)  Do you know why?
15   A.   Because of Traceback Group.
16   Q.   Do you know what -- can you elaborate
17   on what you mean by because of the Traceback
18   Group?
19         MR. DAVIDSON:  Objection.
20   A.   Yes, flagged calls --
21         MR. FRANQUI:  Joined.
22   A.   -- from the Traceback Group had
23   language that wanted UST tags at the end of
24   that voice message.  So I then added -- I then
25   created the voice message to have those extra

Jakob Mears - 3/1/2022

---

134

1    tags at the very end, as well as the 1-800
2    number or number for callbacks.
3            MR. ABERNETHY:  Sorry.  One
4    second.  My internet has gone out.
5        Q.   (BY MR. ABERNETHY)  And so back to
6    you said there were options on these
7    prerecorded messages, and one of them was a
8    call would be marked DNC?
9        A.   Uh-huh.
10       Q.   Can you describe what you mean by
11   that?
12       A.   Do not call.
13       Q.   And what would trigger that option?
14       A.   If they had pushed the input that
15   said "do not call."
16       Q.   So the call recipient would press a
17   button that would say "do not call"?
18       A.   Correct.
19       Q.   And what did you do with those calls?
20       A.   They would populate on the system as
21   do not call; but the main cycle behind that was
22   if a file were to be loaded into a different
23   server, because there were multiple servers on
24   Hello Hunter, the do not call did not transfer
25   over.

---

135

1        Q.   And what do you mean it would
2    populate the system as "do not call"?
3        A.   And so if -- I guess the one -- the
4    biggest example is let's say there's one really
5    good file, and it was a really good file that
6    had a lot of sales and a good amount of
7    transfers.  Well, if 25 percent of that file
8    was put on DNC, or do not call, if I tried
9    loading into that same server, it wouldn't load
10   in that 25 percent; and, of course, that number
11   only grows.  And so, over time, if you keep on
12   loading that same file, that million just
13   dwindles down to, let's say, a hundred thousand
14   after a year of constant reloading; but if --
15   since money was paid for those files by Health
16   Advisors, if they wanted to use it again and
17   call all the numbers, then I would load it into
18   a different server where it still called the
19   DNC people.
20       Q.   Okay.  And so was it possible for a
21   phone number to be on two different files of --
22       A.   That was also possible, yes.
23       Q.   And so if it was marked as DNC in one
24   file, was there any way for it to be marked DNC
25   on another file?

---

136

1        A.   No.  And so each campaign was --
2    if -- if -- let's say there was two identical
3    numbers on two campaigns.  If one pushed DNC,
4    the other one would still get called because
5    it's in the other one because in that specific
6    campaign it did not do a DNC.
7        Q.   Would you ever take any measures to
8    search for a number that was marked DNC in
9    other files?
10       A.   There was no technical way to do so.
11       Q.   There was no technical ability?
12       A.   Correct.
13       Q.   Did you ever discuss with John a way
14   to do that?
15       A.   I did not.  I know at one point, once
16   Veriswitch was implemented, then a blacklist
17   was created where anyone who called the number
18   or did a DNC on that way, it would then get
19   added to a blacklist where the call would still
20   initiate; but it would never connect because it
21   would be blocked by the Switch from the
22   internal blacklist, which was something that
23   was separate than Hello Hunter.
24       Q.   Now, so how did that internal
25   blacklist work?

---

137

1            MR. DAVIDSON:  Objection.
2        A.   And so --
3            MR. FRANQUI:  Joined.
4        A.   -- anytime someone would DNC by a
5    certain digit, then it would populate the
6    blacklist on Veriswitch's end, once that was
7    implemented; or if they called the 1-800 to be
8    taken off the call list, just basically another
9    way to make it harder to get taken off the call
10   list that was implemented.  And so that way, in
11   case, you know, there were multiple numbers in
12   multiple files, we didn't want them to be
13   called multiple times; and so the blacklist was
14   there to stop it on the Switch's end.  And so
15   it stopped the connection on that call
16   specifically.
17       Q.   "The blacklist was on the Switch's
18   end," what do you mean by that?
19       A.   It was on Veriswitch's end.
20       Q.   Okay.  And did you build this
21   blacklist?
22       A.   I did not build it, no.
23       Q.   How was it created?
24       A.   It was automated through -- it was
25   created by Veriswitch and numbers would

---

138

1 automatically go there through an input on the
2 campaign from Hello Hunter; or if I got a batch
3 of numbers from Health Advisors through texts
4 or through pictures, then I would manually
5 input those numbers into the blacklist to not
6 be called.
7 Q. Back to that, what do you mean by
8 through pictures? How would Health Advisors
9 send you --
10 A. Either through texts --
11 MR. DAVIDSON: Objection.
12 A. Either through texts or through
13 sticking --
14 MR. FRANQUI: Joined.
15 A. -- up pictures of just phone numbers
16 of -- phone numbers that are not allowed to be
17 called.
18 Q. (BY MR. ABERNETHY) What do you mean,
19 not allowed to be called?
20 A. So if they're a litigation or -- or
21 scammer people or people that have ever wasted
22 time or that are not serious, then I would put
23 them on the blacklist so they don't get called
24 again.
25 Q. So those numbers, the call recipients

139

1 would be scammers or litigants -- or can you --
2 can you explain that?
3 A. Yeah, so on that list --
4 MR. DAVIDSON: Objection.
5 MR. FRANQUI: Joined.
6 A. On that list there would be, you
7 know, regular people; and then, there would be,
8 also, you know, maybe some government numbers
9 in there or banks or lawyers or people that are
10 there to waste time, where they seem interested
11 but are not interested really.
12 Q. (BY MR. ABERNETHY) Okay.
13 A. And so those people specifically,
14 they did not want those calls to be connected.
15 So I made sure that even if they were in
16 duplicate files, that they do not connect
17 through the Switch platform.
18 Q. And was -- through the DNC option
19 on -- when it was dialed out, was that the only
20 way you would have a DNC mark on a phone
21 number?
22 MR. DAVIDSON: Objection.
23 A. Yes, or if it was texted to me
24 through Health Advisors to be put on the DNC
25 list, then I would manually put it in there.

140

1 Q. (BY MR. ABERNETHY) Why would they
2 text you to put it on the DNC list?
3 MR. DAVIDSON: Objection.
4 A. Where they --
5 MR. FRANQUI: Objection.
6 A. Because if that person or that phone
7 number transferred over but was not viable and
8 someone that they didn't want to call again,
9 then they would text me that number
10 specifically.
11 Q. (BY MR. ABERNETHY) And Health
12 Advisors explained why --
13 A. Yes.
14 MR. DAVIDSON: Objection.
15 Q. -- they would put that on --
16 MR. FRANQUI: Objection.
17 A. -- the DNC list?
18 MR. DAVIDSON: Objection.
19 MR. FRANQUI: Objection.
20 Q. (BY MR. ABERNETHY) Did you ever use
21 a state's DNC list?
22 A. No.
23 Q. Or ever use the federal DNC list?
24 A. Later, when -- once Veriswitch came
25 on board, yes.

141

1 Q. Why did you start using a federal DNC
2 list then?
3 A. The reason why, I wouldn't know. I
4 just know that at one point we needed to use
5 that. I know Health Advisors was against it
6 since a lot of the leads that were sent, a
7 large majority of them were on the DNC list.
8 So thousands of dollars on a lead file where
9 only half of it is viable is a lot of lost
10 money, I would -- I would assume.
11 And so those lead lists at one
12 point, you know, had to have those -- the DNC
13 list loaded on Veriswitch's end where then I
14 would have to clean the file before I load it
15 through the federal DNC; but I do not know the
16 nature if the state's DNCs were also loaded on
17 Veriswitch's platform.
18 Q. So who told you specifically that
19 they did not like using the DNC list?
20 A. Health --
21 MR. DAVIDSON: Objection.
22 MR. FRANQUI: Objection, form.
23 A. Health Advisors.
24 Q. (BY MR. ABERNETHY) Who at Health
25 Advisors told you --

Jakob Mears - 3/1/2022

142

1       MR. DAVIDSON: Objection.
2   Q.  -- not to use the DNC list?
3       MR. FRANQUI: Objection.
4   A.  Either --
5       MR. FRANQUI: Objection.
6   A.  -- Scott Shapiro or Michael Smith.
7   Q.  (BY MR. ABERNETHY) Did Scott Shapiro
8  tell you not to use the DNC list?
9       MR. DAVIDSON: Objection.
10      MR. FRANQUI: Joined.
11   A.  I do not -- I do not remember the
12  nature of who exactly, but I know it was Health
13  Advisors in general.
14   Q.  (BY MR. ABERNETHY) Okay. Did they
15  specifically say, "Do not use a DNC list"?
16      MR. DAVIDSON: Objection.
17   A.  There have been times --
18      MR. FRANQUI: Joined.
19   A.  -- where it was stated to load a list
20  as is, without running it through the DNC list.
21   Q.  (BY MR. ABERNETHY) But you don't
22  remember who specifically told you?
23   A.  Correct.
24   Q.  Do you remember how you were told not
25  to use the DNC list?

143

1       MR. DAVIDSON: Objection.
2   A.  Over the phone --
3       MR. FRANQUI: Joined.
4   A.  That was the main point of
5  communication.
6   Q.  (BY MR. ABERNETHY) Do you know when
7  this was that you were told not to use a DNC
8  list?
9       MR. DAVIDSON: Objection.
10   A.  I do not.
11      MR. FRANQUI: Objection.
12   Q  (BY MR. ABERNETHY) And you have no
13  recollection of who specifically told you not to
14  use the DNC list?
15      MR. DAVIDSON: Objection, asked
16  and answered.
17   A.  Correct.
18      MR. FRANQUI: Joined.
19   Q.  (BY MR. ABERNETHY) So when did you
20  start using Veriswitch?
21   A.  I want to say it was closer to when
22  JSquared Telecom was created.
23   Q.  So did you use Veriswitch with Rising
24  Eagle?
25   A.  Maybe towards the end, but not the

144

1  whole time. That -- before Veriswitch, it was
2  R Squared or Globex.
3   Q.  Okay. And right when you started
4  using Veriswitch, you started using a federal
5  DNC list?
6   A.  No. That platform or that typical
7  service of scrubbing didn't come until later
8  on.
9   Q.  So it was a service provided by
10  Veriswitch?
11   A.  Correct.
12   Q.  And can you explain what you mean by
13  scrubbing?
14   A.  Scrubbing as in loading the file in
15  and then scrubbing out the DNC numbers that
16  were on that file.
17   Q.  And so this was never -- this was not
18  available, the scrubbing, when you were
19  operating under Rising Eagle?
20   A.  Correct.
21   Q.  It was not immediately when you
22  started JSquared?
23   A.  Correct.
24   Q.  But you have -- you're not sure
25  about --

145

1   A.  The timeline.
2   Q.  -- the timeframe?
3   A.  Correct.
4   Q.  Did you ever use another list for
5  scrubbing numbers, like a TCPA litigator list?
6   A.  Yes. I want to say there was an
7  individual who John got those types of lists
8  from. I want to say his name was Michael
9  O'Hare. It was an outside source where he had
10  litigator lists, scammer lists loaded in and
11  for sale; and so John had bought those to be
12  loaded into our system.
13   Q.  And can you explain what a TCPA
14  litigator list is?
15   A.  I wouldn't be able to explain that.
16   Q.  Okay. Do you know any other list
17  that you would use like this that would scrub
18  numbers?
19   A.  I do not.
20   Q.  And you only used the federal DNC
21  list, correct?
22   A.  To my knowledge --
23      MR. DAVIDSON: Objection.
24   A.  -- correct.
25   Q.  (BY MR. ABERNETHY) Okay. So can you

146

1 walk me through the VICIdial now?  Can you
2 describe what VICIdial did?
3     A.  Not really.  That was mainly Health
4 Advisors' domain, where they had a contract set
5 up with VICIdial for their agents to receive
6 those calls and to log in with the servers to
7 handle the volume of calls receivable; and so
8 they had their own guy that handled that
9 technicality on that part.  I don't really know
10 too much about VICIdial besides the main view
11 where I was able to see the calls.
12     Q.  What do you mean, the main view?
13     A.  The main agent view, where it would
14 show the color coordination of the length of
15 calls that were being received by the agents,
16 how many agents were logged in, how many
17 available agents were there to receive a phone
18 call, and just the statistics of agents
19 available and their timestamps per calls.
20     Q.  So did Rising Eagle have a login for
21 VICIdial?
22     A.  Yes.  One was given -- one was
23 provided.
24     Q.  Did you ever use it?
25     A.  Yes.  That is how we were able to log

147

1 in to see the screen of agents to gauge how the
2 quality of the calls were going.
3     Q.  And you said the guy at Health
4 Advisors.  Who was that?
5     A.  I do not remember his name.  He was
6 the main point of contact that handled their
7 VICI system.
8     Q.  And how did you communicate with him?
9     A.  Usually through Michael Smith or
10 Scott Shapiro.
11     Q.  Could there be multiple users that
12 you might have been interacting with?
13     A.  No, there would only have been those
14 two.
15     Q.  And do you know if it has to be a
16 single user logged in at one time?
17     A.  That, I do not know, either.
18     Q.  Did you -- were you the only person
19 at Rising Eagle that would log into VICIdial?
20     A.  No.  John would also be logged into
21 VICIdial.
22     Q.  Would you ever be logged in at the
23 same time?
24     A.  To the same account, I'm not too
25 sure; but logged in at the same time, yes, so

148

1 that we were both able to see all the agents
2 that were taking calls.
3     Q.  So you're not sure if it was the same
4 account that you would both be using?
5     A.  Correct.
6     Q.  Was the account that you used a
7 Rising Eagle-specific account?
8     A.  Yes.  It was just a general login
9 with limited permissions to only run standard
10 reports or to see the -- all of the agents
11 logged in and their -- and their calls.
12     Q.  Could you see if John was logged in?
13     A.  I would not be able to see that
14 unless I saw his phone and the screen on his
15 screen.
16     Q.  Okay.  Did John ever communicate with
17 Health Advisors about what he would see on
18 VICIdial?
19     A.  Yes.
20         MR. FRANQUI:  Objection.
21     Q.  (BY MR. ABERNETHY)  Do you know who
22 he would talk to?
23     A.  Either --
24         MR. FRANQUI:  Objection, form.
25     A.  -- Scott Shapiro or Michael Smith.

149

1     Q.  (BY MR. ABERNETHY)  Did Rising Eagle
2 have its own servers?
3     A.  On VICIdial?
4     Q.  Yeah.
5     A.  No.
6     Q.  Did it have its own servers of any
7 kind?
8     A.  Through Hello Hunter.
9     Q.  And how many of these servers were
10 set up?
11     A.  I think five.
12     Q.  Do you know what company hosted these
13 servers?
14     A.  Hello Hunter.
15     Q.  Hello Hunter.
16         But can you -- what was the
17 purpose of these servers?
18         MR. FRANQUI:  Objection.
19     A.  To run multiple campaigns at once.
20 And so each server only had a limited threshold
21 of how many calls can go out; but given the
22 size of Health Advisors' call center, multiple
23 servers were needed to run more campaigns.
24     Q.  (BY MR. ABERNETHY)  Where were these
25 servers located?

Jakob Mears - 3/1/2022

---

150

1    A.  I do -- I do not know.
2    Q.  And can you say again who were your
3  downstream providers at this time?
4        MR. DAVIDSON:  Objection.
5        MR. FRANQUI:  Objection.
6    A.  I would say Americonnect, Avid, and
7  Talkie were three of the most familiar names.
8    Q.  (BY MR. ABERNETHY)  Okay.  So back
9  to the recordings that you would get from
10  Fiverr --
11    A.  Uh-huh.
12    Q.  -- how did you upload these
13  recordings?
14    A.  There was just a standard upload
15  button for each campaign to upload a wav file,
16  which is another MP3 file format.
17    Q.  Did Rising Eagle ever spoof calls?
18    A.  Spoofing?  Are you able to describe
19  spoofing?
20    Q.  Did Rising Eagle ever send out calls
21  that would display a Caller ID that was not the
22  number of the outgoing call?
23    A.  To my knowledge, no, though, I don't
24  know if that may have happened with the Globex
25  numbers since I don't know how those originated

---

151

1  from.  I don't know if it happened during that
2  time because, of course, they weren't of the
3  same nature as the ones that were bought.  I
4  know the ones that were bought, most likely
5  that did not happen; but if it did happen, then
6  it most likely happened with the Globex
7  numbers.
8    Q.  Why do you say that it most likely
9  did not happen then?
10    A.  Just the nature of how they're
11  received, for me, personally, was a little
12  weird, since they were just like -- kind of
13  like dropped in my Skype message to use; and
14  their -- the way they were formatted, it was,
15  like, a hundred million numbers on this, like,
16  notepad, just to use.  And I was checking for
17  them to be "Scam Likely" or not; and sometimes,
18  even they were -- even if they were non-working
19  numbers, they would show as businesses.  Even
20  if it did show up businesses, I wouldn't load
21  those in.  I only loaded the ones that didn't
22  show any Caller ID, just the number only, and
23  that were not "Scam Likely."
24    Q.  So you said you would get a notepad
25  with millions of phone numbers on it?

---

152

1    A.  Yeah.  So, like, the notepad document
2  on the computer.  It's like a text file.
3    Q.  And how did you -- what did you do
4  with that file to get those numbers into
5  working files?
6    A.  I'd just copy and paste the number
7  into an Excel spreadsheet and say that it was
8  used and then I would put it into the system
9  and then make a test call to a phone, making
10  sure it didn't show up as a "Scam Likely" or a
11  business number; and in that case, I would load
12  it.
13    Q.  Okay.  And how would you know when
14  they were nonworking numbers?
15    A.  That, I wouldn't -- I wouldn't know.
16  That's just what I was told, that all numbers,
17  you know, were nonworking but to make sure that
18  nothing showed up or that they were spam when I
19  did the test call.
20    Q.  How did the test call process work?
21    A.  Whenever the numbers loaded on a
22  campaign, I would just push a button on that
23  individual campaign to make a test call where
24  I'd put my phone number in where, then, my
25  phone number would ring with a Caller ID or

---

153

1  just the number or "Scam Likely."  And then if
2  I answer it, it will play a prerecording.
3    Q.  And you would do this for every
4  number?
5    A.  Correct.
6    Q.  Millions of phone numbers?
7    A.  Not millions.  Usually one at a time
8  when it was -- when I was -- when we were
9  using -- having to use Globex Caller IDs that
10  they had supplied us.  That was during a point
11  where it was one at a time.
12        I do know at one point, once
13  Veriswitch became involved, that process was
14  then automated where, then every number was its
15  own number; but I don't know what lists were
16  used once Veriswitch came on board.  But it --
17  I don't believe it was the same number as that
18  Globex supplied once Veriswitch joined the
19  system because once we used Veriswitch, Globex
20  was no longer in the picture.
21    Q.  Did you ever do any process to match
22  area codes when calling, to match the area code
23  to the call recipient?
24    A.  I think that was at one point
25  something that Veriswitch did.

---

154

1    Q.   Veriswitch would match a area code
2  for you?
3    A.   Correct.  And then I'm not too sure
4  how long that lasted, but I do know that at one
5  point that had stopped.
6    Q.   What had stopped, the area code
7  matching?
8    A.   Correct.
9    Q.   Did your clients know when you were
10  doing the area code matching?
11       MR. DAVIDSON:  Objection.
12       MR. FRANQUI:  Joined.
13    A.   I do not know.
14    Q.   (BY MR. ABERNETHY)  When did
15  Veriswitch shut down that process, the area
16  code matching?
17    A.   That, I'm not too sure.  It was a
18  very limited time.
19    Q.   It was a very limited time that they
20  did area code matching?
21    A.   Correct.
22    Q.   Do you know why they shut it down?
23    A.   I do not.  A lot of higher-end
24  technicalities like that would have been
25  relayed with John.

155

1    Q.   Who would relay this to John?
2    A.   Umberto, the owner of Veriswitch.
3  Any major changes like that would have been
4  told to John.
5    Q.   So was -- do you know Umberto's full
6  name?
7    A.   I do not.
8    Q.   And he -- was he -- he would handle
9  area code matching with John?
10    A.   Yes.
11       MR. ABERNETHY:  Do you want to
12  take a lunch break now?
13       MR. DAVIDSON:  Fine with me.
14       MR. ABERNETHY:  Are you good for
15  a break right now?
16       THE WITNESS:  If -- if you want
17  to.  It doesn't matter to me.
18       MR. ABERNETHY:  Yeah, let's take
19  a short break.
20       THE VIDEOGRAPHER:  Okay.  We'll
21  go off the record at 12:12.
22       (Lunch break 12:12 to 1:06 p.m.)
23       THE VIDEOGRAPHER:  All right.
24  We're back on the record.  It's 1:06.
25    Q   (BY MR. ABERNETHY)  All right.  Did you talk

156

1  to anybody about this deposition while you were --
2  during our break?
3    A.   No.
4    Q.   Okay.  We just had a couple of
5  questions going back to some things we talked
6  about earlier.  When we were talking about
7  the audio recordings for the prerecorded
8  messages --
9    A.   Yeah.
10    Q.   -- do you know the voice artist that
11  recorded the "Ann" recording --
12    A.   I do not.
13    Q.   -- you mentioned?
14       Are there records that would
15  show that information?
16    A.   No.
17    Q.   Do you have payment receipts or
18  information?
19    A.   That was created before I was hired.
20    Q.   That -- that recording was?
21    A.   Yeah.
22    Q.   Okay.  Do you have, like, a Fiverr
23  account, or did Fiverr work through an account
24  that you would pay --
25    A.   For that one?

157

1    Q.   -- to hire people?
2    A.   For not -- for not that one
3  specifically.
4    Q.   Okay.  So you started a new account?
5    A.   (Witness nods head.)
6    Q.   So there'd be no records of any
7  transactions from before?
8    A.   Correct.
9    Q.   Do you know who hired and paid for
10  that recording?
11    A.   I do not.
12    Q.   Would it have been anybody besides
13  John?
14    A.   That, I --
15       MR. DAVIDSON:  Objection.
16    A.   That, I wouldn't know.
17    Q.   (BY MR. ABERNETHY)  Did anybody, to your
18  knowledge, hire Fiverr's recording artists besides you?
19    A.   No, not to my knowledge.
20    Q.   And then you mentioned that there
21  were some insurance companies named in those
22  audio recordings?
23    A.   Uh-huh.
24    Q.   Can you tell us again those insurance
25  companies?

158

1      A.  I want to say Cigna, Blue Cross/Blue
2  Shield, Aetna, and United were probably those.
3      Q.  Okay.  And do you know what type of
4  insurance Health Advisors was selling with
5  these messages?
6      A.  No.
7      Q.  Did you ever ask?
8      A.  Yes, but never got a response.
9      Q.  You never got a response from Health
10  Advisors?
11      A.  Correct.
12      Q.  Do you know if they'd sell the type
13  of insurance that you had mentioned in the
14  recordings?
15          MR. DAVIDSON:  Objection.
16          MR. FRANQUI:  Objection.
17      A.  That, I don't know.  I -- I know that
18  I was told to put that in there, or at least
19  that's something that was put into the original
20  "Ann" recording that, you know, got performance
21  with them; and so that performance was wanting
22  to be mimicked.
23      Q.  (BY MR. ABERNETHY)  So who told you
24  to mimic that performance?
25          MR. DAVIDSON:  Objection.

159

1          MR. FRANQUI:  Objection.
2      A.  Either John Spiller or both Health
3  Advisors.
4      Q.  (BY MR. ABERNETHY)  And who told you
5  to add those insurance companies to the
6  message?
7          MR. DAVIDSON:  Objection.
8          MR. FRANQUI:  Joined.
9      A.  Either John Spiller or Health
10  Advisors.
11      Q.  (BY MR. ABERNETHY)  Okay.  And from
12  Health Advisors, who would it have been that
13  told you?
14          MR. DAVIDSON:  Objection.
15          MR. FRANQUI:  Objection.
16      A.  Either -- either Michael Smith or
17  Scott Shapiro.
18      Q.  (BY MR. ABERNETHY)  And how would
19  y'all communicate about that?
20          MR. DAVIDSON:  Objection.
21      A.  Via phone.
22          MR. FRANQUI:  Joined.
23      Q.  (BY MR. ABERNETHY)  All right.  And
24  then back to some of the technical components,
25  did Rising Eagle-Cayman have any technical

160

1  components that you know of?
2      A.  Not that I know of.
3          MR. DAVIDSON:  Objection.
4          MR. FRANQUI:  Joined.
5          Excuse me a second.  If we could
6  ask the -- the deponent just to take a breath
7  between the questions and the answers for our
8  objections for both the court reporter's sake
9  and then also so we can get the responses out.
10          (Witness nods head.)
11      Q.  (BY MR. ABERNETHY)  All right.
12  Did -- did John Spiller ever tell you that he
13  hid Rising Eagle from the FTC?
14      A.  No.  That he hid from the FTC?
15      Q.  That he hid Rising Eagle from the
16  FTC.
17      A.  No, I didn't know that he hid from
18  the FTC.  I think that was probably one of his
19  goals, but I don't know if that was
20  accomplished or not.
21      Q.  Why do you think that was one of his
22  goals?
23      A.  Just with the Traceback Group and
24  helping better get performance for Health
25  Advisors, I don't know if it was in regards to

161

1  hiding or regards to just getting better
2  performance.  I don't know if the correlation
3  is reasonable.
4      Q.  So did he ever tell you that he hid
5  Health Advisors from the FTC?
6      A.  No.  It want to say it was more
7  speculation of him wanting to than it actually
8  happening.
9      Q.  Do you know of him trying to hide?
10          MR. DAVIDSON:  Objection.
11      A.  No, I do not.
12          MR. FRANQUI:  Joined.
13      Q.  (BY MR. ABERNETHY)  Did Spiller ever
14  tell you that he cloned when he registered with
15  R Squared?
16      A.  I don't know what that means.
17      Q.  Did John tell you anything about --
18  or anything else about trying to hide from the
19  FTC or just -- sorry.  Answer that question.
20          MR. DAVIDSON:  Objection.
21          MR. FRANQUI:  Objection.
22      A.  No.
23      Q.  (BY MR. ABERNETHY)  So did you ever
24  take any actions related to your suspicions
25  that he was trying to hide from the FTC?

162

1    A.  No.
2         MR. DAVIDSON:  Objection.
3         MR. FRANQUI:  Objection.
4         (Exhibit 4 discussed.)
5    Q    (BY MR. ABERNETHY)  So I think we're going to
6    play Exhibit 4 right now.  It's an audio recording.
7    A.  Okay.
8         MR. ABERNETHY:  I have to
9    re-open Zoom.
10        MS. NAYER:  There's the full and
11   the edited version there, Patrick.
12        ZOOM TECH:  This is Brian
13   Christopher.  I will be playing the audio.  I
14   just need to know if you want the full or the
15   edited.
16        MR. ABERNETHY:  I think just the
17   edited.
18        ZOOM TECH:  Yes, sir.
19        (Video clip playing as follows:
20        MR. SPILLER:  Give me back the
21   controls to help you out yeah.
22        [Faint speaking, indiscernible
23   to the reporter.]
24        MR. MEARS:  So what -- what
25   parts are you taking over?

163

1         MR. SPILLER:  Loading the leads
2    and talking to the clients again, making sure
3    everyone's staying on track, making sure
4    payments are coming in on the day of, not the
5    day after, making sure business flow is back
6    running smoothly again to where I can -- I can
7    expect Scott and Mike to pay me on the day that
8    they finish their -- their numbers.  It's --
9    it's bred into them.  I'm going to help you
10   manage the accounts, and then I'm going to
11   bring three more people on and then manage
12   their accounts.)
13        (Audio playback stopped.)
14        MR. ABERNETHY:  Okay.  I think
15   that's actually the wrong clip.  One second.
16   Q    (BY MR. ABERNETHY)  While we're
17   working on getting that other exhibit, do you
18   recognize the voices on that recording?
19   A.  Yes.
20   Q.  Can you tell me who that was?
21   A.  They are mine and John's.
22   Q.  Okay.  John Spiller's?
23   A.  Yes.
24   Q.  All right.  While we're looking for
25   that other one, can you -- can you tell me what

164

1    you understand a traceback to be?
2         MR. DAVIDSON:  Objection.
3         MR. FRANQUI:  Joined.
4    A.  Um, supposed to mean just a flag on a
5    call, I think.
6    Q    (BY MR. ABERNETHY)  Do you know who sends
7    tracebacks?
8         MR. DAVIDSON:  Objection.
9         MR. FRANQUI:  Joined.
10   A.  I want to say the FCC.
11   Q.  (BY MR. ABERNETHY)  Do you know how
12   you would receive a traceback?
13        MR. DAVIDSON:  Objection.
14   A.  By e-mail.
15        MR. FRANQUI:  Joined.
16   Q.  (BY MR. ABERNETHY)  By e-mail to the
17   Rising Eagle e-mails?
18   A.  Correct.
19   Q.  Which account?
20   A.  rpgleads.
21   Q.  And would you handle these tracebacks
22   when you received an e-mail?
23   A.  No, John would.
24   Q.  What would John do?
25        MR. DAVIDSON:  Objection.

165

1         MR. FRANQUI:  Joined.
2    A.  He would request the opt-in data from
3    Health Advisors; and if they weren't able to
4    provide it, then we would try digging through
5    the files that they had sent in the past.
6    Q.  (BY MR. ABERNETHY)  And did you see
7    John do this?
8         MR. DAVIDSON:  Objection.
9         MR. FRANQUI:  Joined.
10   A.  Like, meaning...?
11   Q.  (BY MR. ABERNETHY)  Would he respond?
12   A.  I wouldn't see him do the response,
13   no.
14   Q.  Would he explain to you what he was
15   doing with the tracebacks?
16        MR. DAVIDSON:  Objection.
17   A.  Yes.
18   Q.  (BY MR. ABERNETHY)  And did you ever
19   help him with these tracebacks?
20        MR. DAVIDSON:  Objection.
21   A.  In terms of try looking for the
22   opted-in information that was requested, that's
23   the kind of help that I was there for.
24   Q.  (BY MR. ABERNETHY)  And can you
25   explain what the opt-in information is?

166

1    MR. DAVIDSON:  Objection.
2    MR. FRANQUI:  Joined.
3    A.   Just the customer's information,
4  phone number, first and last name, whatever was
5  on the file that was created to initiate that
6  phone call.
7    Q.   (BY MR. ABERNETHY)  What -- what
8  files were these?
9    A.   The phone number files.  And so since
10  we only got phone numbers on the files with no
11  information, even if they were labeled "opted
12  in," once we got a traceback, we would then try
13  and request from Health Advisors.
14    Q.   And where did these come from?
15    A.   The files?
16    Q.   Yes.
17    A.   Health Advisors.
18    Q.   How did you understand that these
19  opt-ins were obtained by Health Advisors?
20    MR. DAVIDSON:  Objection.
21    MR. FRANQUI:  Joined.
22    A.   Purely by vocal responses and file
23  names, saying that they are opted in.
24    Q    (BY MR. ABERNETHY)  Okay.
25    MR. ABERNETHY:  I think we can

167

1  play that other recording now.
2    MR. DAVIDSON:  So just so we're
3  clear, you sent out a bunch of exhibits.  Which
4  one did you play before, and which one are you
5  playing now?
6    MR. ABERNETHY:  So that was
7  Exhibit 4, and then --
8    MR. DAVIDSON:  Okay.  There are
9  two documents that -- that I have here that you
10  sent out as Exhibit 4.
11    MR. ABERNETHY:  This is
12  Exhibit 2 now.
13    MR. DAVIDSON:  Okay.  There's
14  two that have Exhibit 2 as well, so which one
15  are you playing?  One says avi; one says wav.
16    MR. ABERNETHY:  I believe
17  they're the same file, just in different
18  formats.
19    MR. DAVIDSON:  Okay.
20    MR. ABERNETHY:  Can we confirm
21  that?
22    MR. YEOMAN:  Yes.  This is Joe
23  Yeoman from the State of Indiana.  They are --
24  the larger exhibit -- there's two different
25  files sizes.  There's the full length of the

168

1  audio recording so if anybody wanted to listen
2  to it later, that's the full 20-minute call
3  recording.  The av- -- that's the wav file.
4  The avi file is the actual set minute marks
5  that we want to listen to.
6    MR. DAVIDSON:  Okay.  Thank you.
7    MR. YEOMAN:  So then we don't to
8  listen to the full 20 minutes or try to skip
9  around.
10    (Exhibit 2 discussed.)
11    ZOOM TECH:  This is Brian.  Are
12  you ready for me to play it back?
13    MR. ABERNETHY:  Yes.  Thanks.
14    (Audio clip playing as follows:
15    MR. SPILLER.  ...and all the
16  expenses that we have per -- per week.  I'm
17  able to determine what -- you know, how much --
18  how much money we need on hand for the
19  business, you know.
20    MR. MEARS:  Yes.  Well, um --
21  and, well, would you want to have that
22  conversation with him in session?
23    MR. SPILLER:  No, I do not.  You
24  start it.
25    MR. MEARS:  Okay.

169

1    MR. SPILLER:  And I'll -- I'll
2  be on the phone the next day or the day after.
3    MR. MEARS:  Okay.
4    MR. SPILLER:  Okay.  Just
5  gotta -- you've gotta pick a side because I let
6  them know that we paid $9,000 for servers per
7  month for his room only; and now he has Room 2
8  as well.  Room 2's gonna -- you know, Room 2
9  costs 1500 per -- per month just for Room 2.
10  And -- and if $7500 is what -- you know, 78 --
11  you know, if you increase it and say that 8500,
12  $8800 a day is our spend for his room and
13  Room 2 spend, then -- then they're only paying
14  us in some -- in some instances $7500 a day.
15  That's barely covering the cost of the minutes
16  that they're spending.
17    MR. MEARS:  Yeah.
18    MR. SPILLER:  So when they pay
19  us double time, then that covers it; and it
20  leaves us a little extra so we can pay the
21  end-of-the-month bill.  The end-of-the-month
22  bill is going to be $9,000 at the end, so we
23  need the -- so every -- so every -- every week
24  we've got to hill [sic] it -- hit it twice.
25  We've got to hit it twice.  We've got to get

170

1  paid 7500 twice in a day; and -- and Room 2
2  doesn't make that every day, do they?
3          MR. MEARS:  No, not even close.
4          MS. SPILLER:  Okay.  This is --
5  see, this is what I'm saying.  This is exactly
6  what I'm saying.
7          MR. MEARS:  What exactly are you
8  saying?
9          MR. SPILLER:  Because the
10 money's not coming as -- as it was if it was
11 Scott's room.  If -- if it was coming in every
12 day, they were sending us 7500 every day,
13 Room 2, as well as Scott's room sending us
14 every day 7500, we'd have enough money to cover
15 the cost of the bills.
16         MR. MEARS:  Yeah, but you -- you
17 liked how Room 2 is small compared to Scott's,
18 right?
19         MR. SPILLER:  Yeah.  Room 2 is,
20 like, 30 people.  That -- that was Scott's room
21 initially.  Scott's room, when we first started
22 this, he had 30 people on the phones; and they
23 were still making 20 to -- 20 sales a day off
24 my leads.
25         MR. MEARS:  Well, I'm not

171

1  running on your leads, what they're running.
2  I'm running them on their own leads --
3          MR. SPILLER:  I know that.
4          MR. MEARS:  -- enough to go
5  around.
6          MR. SPILLER:  I know that.  I
7  know that; but, still, you can still -- you can
8  still itemize how many -- how many leads it
9  would cost to get that done, you know.  And
10 then, on top of it, they're paying for their
11 own leads.  That's good; but -- but then -- but
12 then there's a cost.  There's a cost for
13 everything.
14         MR. MEARS:  Yeah.
15         MR. SPILLER:  There's a cost
16 for everything.  And right -- and right now
17 we're not -- we're barely hitting enough money
18 to cover our costs for the -- for the -- for
19 the -- for the month, you know, for our
20 servers.
21         And that's -- and that's the
22 only thing I want to get across to him.  Look,
23 we gave him dedicated servers.  We've given him
24 dedicated space.  We've given him dedicated
25 everything.  We've cloned his -- we've cloned

172

1  his name outside of -- so when he -- when he
2  registered for -- for -- for Ryan for
3  R Squared, we cloned -- we cloned another name
4  under his name so that he's hidden from the --
5  from the FTC, so he's hidden from FTC.  And
6  then -- and then, what else are we doing?  I
7  mean, we've already -- you know, we've gone to
8  bat for him for VICIdial.  We've gone to bat
9  for VICIdial.  We've gone to bat for a lot of
10 things, you know.
11         MR. MEARS:  Yeah.
12         MR. SPILLER:  So, I mean,
13 there's a lot of expenses that we've covered
14 initially that we haven't been paid back for
15 yet.  And now, the $9,000 a month for server
16 costs is -- is go- -- you know, only increases
17 when they add more people on.
18         MR. MEARS:  Yeah.
19         MR. SPILLER:  And they -- and
20 they don't help cover the cost of the 9,000
21 because if their -- if you -- if you increase
22 their cost, their daily cost for the entire
23 dialer cost at 8500, $8800 a day and they're
24 only paying one time 7500, that doesn't cover
25 our total costs.

173

1          MR. MEARS:  Yeah.
2          MR. SPILLER:  And so you've got
3  to -- so you've got to let them know:  Listen,
4  John said either -- either -- either we --
5  either -- either you and -- you and Mike step
6  it up so that we can cover our costs or John's
7  going to have to add more people onto his
8  clusters; but he doesn't want to do that.  He
9  wants to only keep you and him on, and that's
10 the only one he wants.  He only wants you and
11 Mike on.  So y'all have to --
12         MR. MEARS:  Yeah.
13         MR. SPILLER:  -- work with him.
14 Okay?
15         MR. MEARS:  Gotcha.
16         MR. SPILLER:  You just have to
17 let them know all the expense that we have
18 per -- per week.  I'm able to determine what --
19 you know, how much -- how much money we need on
20 hand...
21         (Audio playback stopped.)
22         ZOOM TECH:  That was it.  It
23 just started back over again.
24    Q.  (BY MR. ABERNETHY)  All right.  So
25 can you identify those voices?

174

```
1       A.   Yes.  They're my voice and John
2  Spiller's.
3       Q.   And do you know what the
4  circumstances of that call were?
5       A.   Yes.
6       Q.   What were they?
7       A.   Just relying over the costs of Health
8  Advisors' servers to run the calls on the room
9  and that basically their costs of having them
10  run was outweighing -- outweighing the revenue
11  that was being generated.
12       Q.   And can you tell me where that call
13  took place?
14       A.   I want to say that was probably while
15  he was away in -- in jail.
16       Q.   Okay.  So what was Room 2?
17       A.   Room 2 was Health Advisors' second
18  call center that they brought on to receive
19  phone calls.
20       Q.   And do you know what he meant, what
21  John meant there when he said "cloned"?
22       A.   I do --
23           MR. DAVIDSON:  Objection.
24           MR. FRANQUI:  Joined.
25       A.   I do not.
```

175

```
1       Q.   (BY MR. ABERNETHY)  To your
2  knowledge, what did he mean when he said that
3  he was adding more people to the clusters?
4           MR. DAVIDSON:  Objection.
5           MR. FRANQUI:  Joined.
6       A.   So clusters mean servers; and while
7  calls were going for Health Advisors, basically
8  saying since they were pretty much the
9  dedicated where the majority of revenue and the
10  majority of calls were coming from, that John
11  was going to have to look at other
12  opportunities to help cover costs.
13       Q.   (BY MR. ABERNETHY)  So do you know
14  why somebody would not want him to add more
15  people to the clusters?
16           MR. DAVIDSON:  Objection.
17       A.   I do not.
18           MR. FRANQUI:  Joined.
19       Q.   (BY MR. ABERNETHY)  Do you know who
20  would not want more people added to the
21  clusters?
22           MR. DAVIDSON:  Objection.
23       A.   Hello Hunter.
24           MR. FRANQUI:  Joined.
25       Q.   (BY MR. ABERNETHY)  How would you
```

176

```
1  know this?
2           MR. DAVIDSON:  Objection.
3           MR. FRANQUI:  Joined.
4       A.   There's been lots of talks between
5  John Spiller and Health Advisors regarding they
6  only work mutually together with no other
7  people.
8       Q.   (BY MR. ABERNETHY)  And were you a
9  part of these talks?
10       A.   I was not a part of those, no.
11       Q.   How were you made aware of these
12  talks?
13       A.   By John.
14       Q.   He would just tell you the contents
15  of the talks he would have?
16       A.   Uh-huh.  And also sometimes by Health
17  Advisors by, you know, if a lead list was used
18  by somebody else or anything of that nature,
19  they would contact us to see if we were the
20  ones that were possibly sharing a file, or not.
21       Q.   And who is "they" that would contact
22  you?
23       A.   Michael Smith or Scott Shapiro.
24       Q.   Do you know if the R Squared cloning
25  was communicated to anybody at Health Advisors?
```

177

```
1           MR. DAVIDSON:  Objection.
2       A.   Not to my knowledge.
3           MR. FRANQUI:  Joined.
4       Q   (BY MR. ABERNETHY)  Do you think that there'd
5  be any reason to communicate that cloning to Health
6  Advisors?
7           MR. DAVIDSON:  Objection.
8           MR. FRANQUI:  Objection.
9       A.   No.
10       Q   (BY MR. ABERNETHY)  Okay.  Regarding law
11  enforcement, did you use any burning -- burner e-mails
12  for Rising Eagle to hide from law enforcement?
13       A.   No.
14       Q.   Did you use any burner e-mails for
15  JSquared?
16       A.   No.
17       Q.   Did you have any e-mails for any
18  purposes for Rising Eagle, JSquared, or any
19  other company to hide from law enforcement?
20       A.   No.
21       Q.   All right.  And moving on to Health
22  Advisors of America, do you know when the
23  relationship between John Spiller and Health
24  Advisors began?
25           MR. DAVIDSON:  Objection.
```

178

1        MR. FRANQUI:  Joined.
2     A.  I do not.
3     Q.  (BY MR. ABERNETHY)  When you started
4  working with Rising Eagle, did that
5  relationship exist?
6     A.  Yes.
7     Q.  And so what was -- when did your
8  relationship with Health Advisors begin?
9        MR. DAVIDSON:  Objection.
10    A.  Whenever we had just moved to Houston
11  and when I had started working for John.
12    Q.  (BY MR. ABERNETHY)  And what was your
13  role with regards to Health Advisors at that
14  time?
15    A.  Very minimal, really just learning
16  the ropes of how to manage the leads and watch
17  the dialer and how to make them successful.
18    Q.  Did you learn any of this from people
19  at Health Advisors?
20    A.  No.
21    Q.  So you would -- you were shown by
22  John Spiller how to work with Health Advisors?
23    A.  Correct.
24    Q.  What was John's role at that time
25  with Health Advisors?

179

1        MR. DAVIDSON:  Objection.
2        MR. FRANQUI:  Joined.
3     A.  I mean, I know he pretty much handled
4  my responsibilities that I had taken on later
5  on, such as handling the dialers and the leads.
6  So his tasks were pretty similar in the very
7  beginning, but he was just a lot more vocal and
8  hands on than I was in communicating with
9  Health Advisors; and so there was a lot more
10  follow-through with conversations with them.
11    Q.  (BY MR. ABERNETHY)  And when did you
12  begin to take over that role from John?
13        MR. DAVIDSON:  Objection.
14        MR. FRANQUI:  Joined.
15    A.  I would say completely take over,
16  probably September, before he got arrested; and
17  then, when he got arrested, that was when I
18  basically had to take over.
19    Q.  (BY MR. ABERNETHY)  And so when he was in
20  jail, what was your role with Health Advisors?
21    A.  To just manage the dialer, request
22  new leads if need be, create messages that --
23  if need be, and collect payments and pay
24  vendors for the minutes.
25    Q.  So were you in communication with

180

1  Health Advisors often?
2        MR. DAVIDSON:  Objection.
3     A.  Yes.
4     Q.  (BY MR. ABERNETHY)  And who at Health
5  Advisors were you in communication with?
6        MR. DAVIDSON:  Objection.
7        MR. FRANQUI:  Joined.
8     A.  Michael Smith and Scott Shapiro.
9     Q.  (BY MR. ABERNETHY)  And how were you
10  in contact with Michael Smith?
11    A.  Through phone.
12    Q.  Through telephone calls and through
13  text messages, correct?
14    A.  Correct.
15    Q.  And how were you in contact with
16  Scott Shapiro?
17    A.  Telephone calls and through text
18  messages.
19    Q.  And how did that role change once
20  John was out of jail, if it changed?
21    A.  He tried a little bit to be more
22  hands on, again, like he was in the past; but
23  for the most part, I was able to handle a lot
24  of the things that I was still continuing to
25  do.  So he let me do that.  He would step in if

181

1  things were not performing well; and he'd be
2  the one to get on phone calls, especially if he
3  was the one to be requested by Health Advisors
4  to get on the phone and talk to him.  So, for
5  the most part, if things were going well, I
6  wasn't bothered.  If things were going south,
7  then usually I got a call or John got a call.
8     Q.  Do you know what they would request
9  to talk to John specifically for?
10        MR. DAVIDSON:  Objection.
11    A.  The performance of the calls that
12  they were receiving.
13    Q.  (BY MR. ABERNETHY)  And would John
14  tell you this?
15    A.  Yes.
16        MR. DAVIDSON:  Objection.
17        MR. FRANQUI:  Joined.
18    Q.  (BY MR. ABERNETHY)  And how was
19  Rising Eagle compensated by Health Advisors?
20    A.  I want to say --
21        MR. FRANQUI:  Objection.
22    A.  -- it was a pay-per deal, with a
23  minimum of 36 deals, I want to say was the
24  initial.  It started off at 7500, I think, and
25  up to 9500; and it fluctuated between those.

Jakob Mears - 3/1/2022

182

1  And so every time that happened, we would -- he
2  would request a wire from them. And once we
3  requested a wire from them, then he would pay
4  the vendors and then pay the servers at the end
5  of the month.
6      Q.  John would pay the vendors?
7      A.  Uh-huh.
8      Q.  And can you explain what you mean by
9  paid per deal, just --
10     A.  Yes. So I wouldn't say exactly paid
11 per deal, so paid per every -- per deal for 36.
12 It's more like paid for a batch of deals so
13 every time Health Advisors got 36 sales, they
14 would submit a payment to us.
15     Q.  And if there were no sales, would
16 Rising Eagle be paid?
17     A.  No, and that also goes for if it's
18 under 36; and this does follow through for the
19 following day. So if it's 28 one day and then
20 you need 8 more the next, then once they got 8
21 sales the next day, then they would send over
22 the wire for 36 sales.
23     Q.  And how did this change when it
24 became JSquared? How was JSquared compensated?
25     A.  It was --

183

1          MR. DAVIDSON: Objection.
2          MR. FRANQUI: Objection.
3      A.  It was a pay-per-minute deal. So
4  there was a rate that John made up or created
5  based on what he was being charged and so that
6  he was able to cover servers and minutes to
7  cover his costs more -- more efficiently.
8      Q.  (BY MR. ABERNETHY) To your
9  knowledge, what specifically was Michael
10 Smith's role with Health Advisors?
11         MR. DAVIDSON: Objection.
12         MR. FRANQUI: Objection.
13     A.  He was the CEO.
14     Q.  (BY MR. ABERNETHY) And so what was
15 his -- in your interactions, what was his -- what
16 did that mean as far as his role?
17         MR. DAVIDSON: Objection.
18         MR. FRANQUI: Objection.
19     A.  That he was pretty much the boss of
20 everybody. Every manager listened to him. If
21 he requested something, more or less, it got
22 done or needed to be done. And so anytime he
23 needed to talk to someone in the call center,
24 you know, he would do so; and so he was, like,
25 the main person managing the call center and

184

1  the teams.
2      Q.  (BY MR. ABERNETHY) And how often
3  would you talk with Michael Smith?
4      A.  Maybe once a day or once every two
5  days.
6      Q.  And, to your knowledge, what was
7  Scott Shapiro's role with Health Advisors?
8          MR. DAVIDSON: Objection.
9      A.  Either --
10         MR. FRANQUI: Joined.
11     A.  -- Michael Smith's partner; if not,
12 consultant.
13     Q.  (BY MR. ABERNETHY) And what did that mean in
14 your interactions with him?
15         MR. DAVIDSON: Objection.
16         MR. FRANQUI: Joined.
17     Q.  (BY MR. ABERNETHY) What were his
18 duties?
19         MR. DAVIDSON: Objection.
20         MR. FRANQUI: Joined.
21     A.  In my eyes, I think pretty equal
22 since they both pulled a lot of weight in the
23 office in terms of management; and so if I
24 spoke to one, it pretty much seemed to me that
25 I was speaking to both of them.

185

1      Q.  (BY MR. ABERNETHY) And how often did
2  you talk with Scott Shapiro?
3      A.  Probably once or twice a day, usually
4  regarding Scott and Mike. It'd increase if
5  there were problems.
6      Q.  What kind of problems would there be?
7      A.  Performance problems or technical
8  problems.
9      Q.  And did you ever receive leads from
10 Michael Smith directly?
11     A.  Not Michael Smith directly.
12     Q.  Did you ever receive leads from Scott
13 Shapiro?
14     A.  Yes.
15     Q.  And how would he send leads?
16     A.  Through e-mail.
17     Q.  What e-mail address?
18     A.  rpgscottmike@gmail.com.
19     Q.  And why was that e-mail address
20 created?
21         MR. DAVIDSON: Objection.
22     A.  Storage for leads so they wouldn't
23 get mixed up with the rest of the e-mails.
24     Q.  Did you create that address?
25     A.  I did.

186

1    Q.  And so did you use it for anything
2  besides receiving leads from Scott Shapiro?
3    A.  No.
4    Q.  And Mike would never send leads to
5  that e-mail address?
6         MR. FRANQUI:  Object to form.
7    A.  Not to my knowledge.
8    Q.  (BY MR. ABERNETHY)  Do you know where
9  Scott Shapiro got these leads?
10   A.  I do not.
11   Q.  Did you ever ask?
12   A.  I did not.
13   Q.  Do you know Marcia Griffin?
14   A.  I want to say one of the main
15  assistants there.  She was also one of the ones
16  that was sending the leads to the e-mail for
17  Health Advisors.
18   Q.  One of the assistants, lead
19  assistants, at Health Advisors?
20   A.  Yes.
21   Q.  And she would send leads to you as
22  well?
23   A.  Correct.
24   Q.  Where would she send those?
25   A.  Through e-mail.

187

1    Q.  Which e-mail?
2    A.  rpgscottmike@gmail.com.
3    Q.  Did anybody besides Marcia Griffin
4  and Scott Shapiro, to your knowledge, send
5  leads to you to that e-mail?
6    A.  No.
7    Q.  How often would she send leads to
8  you?
9    A.  Depending on the time of year, but
10  most of the time either daily, if not weekly.
11   Q.  And how often did Scott Shapiro send
12  leads to you?
13   A.  Daily, if not weekly.
14   Q.  And how many leads would they send in
15  a day?
16   A.  It really varies.  Sometimes it was
17  smaller files, around a hundred thousand;
18  sometimes it was millions of files that lasted
19  a couple of weeks.
20   Q.  And once you received these files
21  from Health Advisors, when would you upload
22  those to Hello Hunter?
23   A.  Either as soon as possible or if it
24  was at the end of the business day, the
25  following morning.

188

1    Q.  Did you ever send the leads that you
2  had received from Health Advisors to anybody
3  else?
4    A.  Can you say that again?
5    Q.  Did you ever send the leads received
6  from Health Advisors to anybody else?
7    A.  Yes.
8    Q.  Who did you send those to?
9    A.  Sumco Panama.
10   Q.  And who would you send them to at
11  Sumco Panama?
12   A.  Say that again.
13   Q.  Who did you send them to at Sumco
14  Panama?
15   A.  An e-mail address.
16   Q.  What was the e-mail address?
17   A.  I'm not too -- I'm not too sure what
18  the e-mail address was.
19   Q.  Do you know who you were sending them
20  to at Sumco Panama?
21   A.  That individual.
22   Q.  What individual?
23   A.  Sumco.
24   Q.  So who is Sumco?
25   A.  I have no idea.

189

1    Q.  Who directed you to send them to
2  Sumco?
3    A.  John.
4    Q.  And he never said who they were?
5    A.  This was way in the future, closer to
6  when this started.  So it was after everything
7  had already shut down.  I don't know who he is.
8  I just know that he was or is probably a
9  previous client of John's.
10   Q.  What do you mean this -- when you say
11  "this start," do you mean this lawsuit?
12   A.  Correct.
13   Q.  Did he ever say why you were sending
14  them to Sumco?
15   A.  To help cover the attorney fees.
16   Q.  Did you ever communicate with Health
17  Advisors that you were sending these leads to
18  Sumco?
19   A.  No.
20   Q.  So do you have any reason to think
21  that Health Advisors knew you were sending
22  these leads to Sumco?
23   A.  Can you say that one more time?
24   Q.  Do you have any reason to think that
25  Health Advisors knew you were sending these

190

1  leads to Sumco?
2      A.  No.
3              MR. FRANQUI:  Object to form.
4      Q   (BY MR. ABERNETHY)  So when you would purchase
5  these leads from Health Advisors, did you know how
6  people had consented to -- to receive these calls?
7      A.  We never purchased leads from Health
8  Advisors.
9      Q.  So remind me how you got the leads
10  from Health Advisors.
11      A.  Through e-mail.
12      Q.  But you did not purchase them?
13      A.  Correct.
14      Q.  The leads that you received from
15  Health Advisors, then how did people consent?
16      A.  That is not to my knowledge.
17      Q.  You have no idea how people opted in
18  for these leads?
19      A.  Correct, that was not something that
20  I -- that was not one of my responsibilities.
21      Q.  Did Rising Eagle or JSquared ever
22  take steps to confirm that consent was
23  established for these leads?
24      A.  Not that I'm aware of on my side, but
25  most likely not.  Usually, we would have

191

1  thought that that would have been on Health
2  Advisors' area because they were the lead
3  provider.
4      Q.  Did you ever discuss with Health
5  Advisors consent?
6      A.  Yes, but I never really got any
7  response from them.  At some point getting lead
8  files with information besides just numbers was
9  a lot more expensive, and so we just got
10  numbers from them.  And if something was
11  requested, then they said they'd be able to get
12  it.
13      Q.  So what do you mean, they were not
14  responsive?
15      A.  Can you say it one more time?
16      Q.  What did you mean when you said
17  Health Advisors was not responsive?
18      A.  Yes, not responsive in providing us
19  the opt-in information that we requested, where
20  if they sent lots of files, the majority of
21  them were numbers only; and so they wouldn't be
22  able to get us the full files of opt-in
23  information.  For the reason, I'm not too sure.
24      Q.  And who did you ask specifically for
25  this opt-in information?

192

1      A.  Omar Hibbert, Mike Smith, and Scott
2  Shapiro.
3      Q.  You asked all three of those
4  individuals at different times about the opt-in
5  information?
6      A.  Correct.
7      Q.  And none of them ever responded?
8              MR. FRANQUI:  Objection.
9      A.  Sometimes they'll be able to get me
10  one, depending on the traceback; or I might
11  have to dig in older files.  So that's how that
12  worked.  And then sometimes I just wouldn't get
13  anything, so I would have to keep digging.
14      Q.  (BY MR. ABERNETHY)  Were you ever
15  told by anybody at Health Advisors that these
16  lists were being scrubbed?
17              MR. DAVIDSON:  Objection.
18              MR. FRANQUI:  Joined.
19      A.  Yes.  They said that they were opted
20  in, and some of them were labeled as scrubbed
21  files.
22      Q.  (BY MR. ABERNETHY)  And when you say
23  you would do the digging, what -- what does
24  that mean?
25      A.  Like, I would have to search through

193

1  files on the ones that did contain information
2  to find the match number for the one that's
3  requested from the Traceback Group.
4      Q.  Can you explain what you mean by the
5  matching number?
6      A.  So if Traceback Group flagged a
7  number and Health Advisors was not -- was not
8  able to generate that opt-in information, I
9  would have to go back in the past to
10  previously-sent files that did have that
11  information and try and look -- and try and
12  look for it.
13      Q.  And do you know which websites
14  collected this opt-in information?
15      A.  I do not.
16      Q.  You never saw any information about
17  where the opt-in information was collected?
18      A.  Correct.
19      Q.  Were you ever told how the opt-in
20  information was collected?
21      A.  No.
22      Q.  So you said when there was not a
23  match for -- for these tracebacks, you would
24  remove from some list or -- sorry.  Let me
25  rephrase that.

194

1    When you would remove a number
2  from the list, did you remove that number from
3  all lists?
4    A.  I would put it in -- I would put it
5  into the blacklist on Veriswitch because
6  removing it from every list would be close to
7  impossible.
8    Q.  And did you ever or did Rising Eagle
9  ever purchase leads from any other vendors?
10    A.  From -- there was one individual,
11  Stellar Prospects.
12    Q.  Can you say that again?
13    A.  Stellar Prospects.
14    Q.  Seller...?
15    A.  Stellar Prospects.  I don't remember
16  the individual's name, but that was the name of
17  the company.  It was an individual that did
18  lead generation or knew people that generated
19  leads and sold lists.
20    Q.  Can you spell that for me?
21    A.  S-T-E-L-L-A-R and then "prospects."
22  And the -- the leads that were from Stellar
23  Prospects did have the full information
24  attached to them, the opt-in information.
25    Q.  And did you ever do anything to

195

1  confirm this opt-in information?
2    A.  I did not.
3    Q.  Did you ever use lists purchased from
4  other vendors for Health Advisors' calls?
5    A.  Only Stellar Prospects.
6    Q.  I'm going to show another exhibit now
7  in one second.
8    All right.  We'll come back to
9  that.
10    Do you know when the
11  relationship with Health Advisors and Rising
12  Eagle ended?
13    A.  I don't remember the exact timeframe.
14  It happened after one of their lawsuits, and
15  then that's when O Health Group took over.
16    Q.  Do you know, is -- do you know why
17  they stopped using Rising Eagle?
18    MR. FRANQUI:  Objection.
19    MR. DAVIDSON:  Objection.
20    MR. FRANQUI:  Object to form.
21    A.  Why they...?
22    Q.  (BY MR. ABERNETHY)  Do you know why
23  Health Advisors stopped using Rising Eagle?
24    MR. DAVIDSON:  Objection.
25    MR. FRANQUI:  Same objection.

196

1    A.  That, I do not know.
2    Q.  (BY MR. ABERNETHY)  How did you learn
3  that they stopped using Rising Eagle?
4    A.  Whenever they had gotten into a
5  lawsuit and then had to change the structure of
6  ownership to -- Michael Smith to Omar Hibbert,
7  O Health Group.
8    Q.  So who is Omar Hibbert?
9    A.  He was the new manager for the call
10  center.
11    Q.  For which call center?
12    A.  Health Advisors'.
13    Q.  And then what is O Health?
14    A.  I believe that was the name that they
15  had used instead of Health Advisors.
16    Q.  Who's "they"?
17    A.  "They" is Health Advisors.
18    Q.  So Mike Smith and Scott Shapiro?
19    MR. DAVIDSON:  Objection.
20    A.  I want to say --
21    MR. FRANQUI:  Objection.
22    A.  -- Mike Smith.  I don't know if Scott
23  Shapiro was affiliated with Health Advisors --
24  I mean, was affiliated with O Health Group.
25    Q.  (BY MR. ABERNETHY)  Do you know if

197

1  Michael Smith was affiliated with O Health?
2    MR. FRANQUI:  Objection.
3    A.  That, I do not know.
4    Q.  (BY MR. ABERNETHY)  And you said you
5  do not know the timeframe of when the
6  transition from Health Advisors to O Health
7  happened?
8    A.  Correct.
9    Q.  And so with O Health, what was Omar
10  Hibbert's role?
11    A.  The same role as Mike Smith's role or
12  Scott Shapiro's role.
13    Q.  All right.  I think we're going to
14  drop another exhibit into the Zoom.  I think
15  this one is one page.
16    All right.  I'll give that to
17  you.
18    MR. ABERNETHY:  Were you able to
19  get the -- the file in the Zoom drop?
20    MR. DAVIDSON:  I have the
21  documents before me in the share file, yes.  So
22  what number?
23    (Exhibit 5 discussed.)
24    MR. ABERNETHY:  It's Exhibit 5
25  and it's going to be page Skype 001190 for the

198

1  Bates number and it's page 409.
2         MR. YEOMAN:  This is Joe Yeoman
3  in Indiana.  Just as a clarification, we're
4  starting at Skype 1189.  It's the page before
5  is where the conversation starts.
6         MR. FRANQUI:  I'm sorry.  Which
7  exhibit is this?
8         MR. YEOMAN:  This is Exhibit 5.
9         MR. FRANQUI:  Thank you.
10        MR. ABERNETHY:  Sorry.  My
11 internet is slow.
12        MR. DAVIDSON:  So the Bates
13 number is Skype 1189, is that right?
14        MR. ABERNETHY:  Yes.
15    Q.  (BY MR. ABERNETHY)  So can you tell
16 me who the user onlywebleads on Skype is?
17    A.  John Spiller.
18    Q.  Did you ever use this account?
19    A.  No.
20    Q.  Did only John use this account?
21    A.  Yes.
22    Q.  And then if you can look at the
23 message in the middle of the page, 11/4/2019
24 8:25:01 a.m., it says, "From the traceback
25 team, 'To the extent you want to show opt-in,

199

1  the opt-in text to which the specific party --
2  called party actually consented should be
3  shown, with the date of signing by that party
4  (not the text as it appears today on the site.)
5  The burden to prove consent falls upon the
6  caller; they must retain or have access to
7  those records.'"
8     A.  Uh-huh.
9         MR. FRANQUI:  I'm sorry.  We're
10 on Exhibit 5?
11        MR. ABERNETHY:  That's
12 attorney -- did you ask where we are?
13        MR. FRANQUI:  Yeah.  Are we on
14 Exhibit 5?
15        MR. ABERNETHY:  Yes, Exhibit 5.
16 It's going to be Bates Number Skype 001189.
17        MR. FRANQUI:  Okay.  Thank you.
18    Q.  (BY MR. ABERNETHY)  And so we started
19 with the message starting from the traceback
20 team?
21    A.  Uh-huh.
22    Q.  And then the next response is Jakob
23 Mears.  Is that your Skype user name?
24    A.  Yes.
25    Q.  So you say, "So they are asking for

200

1  old text?"
2         And then onlywebleads, which is
3  John Spiller, responds, "No, they are not.
4  They are also asking for the opted-in date and time
5  slot as well.  See your e-mail.  I sent you the
6  traceback request for two numbers.  I need to
7  date and timestamp and the I -- and the IP
8  address and URL and an example of an e-mail
9  that they send out to the person that has
10 requested information?"
11        And then you replied, "Do you
12 know that the timestamp will be made up and so
13 will the e-mail sent out?  Do you want me to
14 have them date the timestamp a week before the
15 first call?"
16        So what are you talking about in
17 this conversation?
18        MR. DAVIDSON:  Objection.
19        MR. FRANQUI:  Joined.
20    A.  That is relating to the timestamp of
21 the opted-in information where if I was only
22 able to pull some information from a requested
23 traceback for one of the numbers that was
24 called in a file sent by Health Advisors, where
25 I was tasked with getting the IP and URL

201

1  basically made up fast, like he told me to.
2     Q.  (BY MR. ABERNETHY)  Why would he tell
3  you to make up the timestamp?
4         MR. DAVIDSON:  Objection.
5         MR. FRANQUI:  Joined.
6     A.  That, I don't know.
7     Q.  (BY MR. ABERNETHY)  And then can you read
8  John's next response?
9     A.  "Please" -- the "please provide,"
10 that line?
11    Q.  Yes.
12    A.  "Please provide this information to
13 Mike and get his friend that created the
14 website to create an e-mail that says something
15 like, 'Thank you for applying to receive more
16 information on health insurance.  Someone will
17 contact you shortly.'  Give an e-mail address
18 for them to opt out later or if they want or
19 are not satisfied with the company for
20 providing them with the information they were
21 requesting."
22    Q.  And who is Mike in this message?
23        MR. DAVIDSON:  Objection.
24        MR. FRANQUI:  Object to the
25 form.

202

1    A.   Michael Smith.
2    Q.   (BY MR. ABERNETHY)  And then, if we could,
3  move to Skype Bates Number 001324.  I can do that for
4  you.
5    A.   Yeah.
6    Q.   And can you start with the message by
7  onlywebleads at 4:45:25 that says, "We should
8  have been scrubbing"?  Can you read from there?
9    A.   Yes.  onlywebleads, John Spiller,
10  said, "We should have been scrubbing against
11  the federal DNC since the start of November."
12         Keep on going?
13    Q.   Uh-huh.
14    A.   "Not just recently.  I wish we never
15  listened to Scott and [sic] Mike."
16         And I responded, "Yep, it's
17  greed."
18         He said, "Yes, sir.  It was a
19  horrible decision that we are [sic] associated
20  with.  As long as they have the website up and
21  you keep the e-mails from Mike about the
22  website and all the leads they send, [sic] we
23  should be able to -- we should be able to be
24  tied to their room when the FCC comes after
25  us."

203

1    Q.   And who is Scott that John Spiller is
2  referring to?
3         MR. DAVIDSON:  Objection.
4         MR. FRANQUI:  Joined.
5    A.   Scott Shapiro.
6    Q.   (BY MR. ABERNETHY)  And who is Mike
7  that John Spiller is referring to?
8         MR. DAVIDSON:  Objection.
9    A.   Michael Smith.
10         MR. FRANQUI:  Joined.
11    Q.   (BY MR. ABERNETHY)  And do you recall
12  what the horrible decision is that John's
13  referring to?
14         MR. DAVIDSON:  Objection.
15         MR. FRANQUI:  Joined.
16    A.   Yes, initiating the robocalls as well
17  as just working with them in general.
18    Q.   (BY MR. ABERNETHY)  And what does he
19  mean by, "We should be able to be tied to the
20  room when the FCC comes after us"?
21         MR. DAVIDSON:  Objection.
22         MR. FRANQUI:  Joined.
23    A.   Basically, I'm assuming what he meant
24  was a paper trail that tied us to Health
25  Advisors as the originator of the leads that

204

1  were being called.
2    Q.   (BY MR. ABERNETHY)  And if you could turn to
3  the last page, it's -- and then on the Bates number it's
4  Skype 001899.
5    A.   Can you say it one more time?
6    Q.   It is Skype 001899 at the bottom.
7    A.   Oh, 1899?
8    Q.   It should be the last page that you
9  have there.  And can you start with --
10         MR. DAVIDSON:  Well, can you --
11  can you wait?
12         MR. ABERNETHY:  Yeah.  Just let
13  me know when you're ready.
14         MR. DAVIDSON:  One -- again, one
15  more time with the number.
16         MR. ABERNETHY:  001899.
17         (Unmuted conversation between
18  unidentified Zoom participants.)
19         MR. ABERNETHY:  Everybody make
20  sure we're all muted, too.
21    Q.   (BY MR. ABERNETHY)  All right.  Jakob, could
22  you please read from the message from only --
23         MR. YEOMAN:  One -- one second.
24  Sorry.  Sorry.
25         MR. ABERNETHY:  Yeah, no

205

1  problem.
2         MR. YEOMAN:  Sorry, Patrick.
3         Peggy, are you muted now?  It
4  looks like it.  So, okay.  It looked like we
5  had one muted -- unmuted on our end.  Sorry
6  about that.
7    Q.   (BY MR. ABERNETHY)  Okay.  Sorry.  Can you
8  please read the onlywebleads messages starting at
9  9:44:17 a.m.?
10    A.   "Jakob, please add U.S. Health
11  Advisors to Omar's and Mike's website, please,
12  as a company that are authorized to call back
13  the lead." [sic]
14         "Will do.  I'll make that
15  request now."
16    Q.   Will you tell me when it's you?
17    A.   Oh, and then I am saying, "Will do.
18  I'll make the request now."
19         And then onlywebleads says,
20  "Thank you.  I paid Hello Hunter," which is HH,
21  "$500 today.  We might have to scrub all the
22  leads against the national DNC list moving
23  forward because we received a subpoena about
24  calls on the no-call list this week."
25         And then I had said, "Gotcha.

Jakob Mears - 3/1/2022

206

1  So what shall I do with the opt-in leads I have
2  loaded?"
3        MR. ABERNETHY: I'm sorry. My
4  computer has rebooted.
5        MR. HOLIAN: Why don't we go off
6  the record for just a couple of minutes then?
7        MR. ABERNETHY: Yeah.
8        THE VIDEOGRAPHER: Okay. We'll
9  go off at 2:05.
10       (Off the record from 2:05 to 2:11 p.m.)
11       THE VIDEOGRAPHER: Okay. We're
12  back on the record. It's 2:11.
13    Q  (BY MR. ABERNETHY) All right, Jakob. So
14  we're going to go back and start over on that
15  Exhibit 5, page 1899.
16    A  Uh-huh.
17    Q  It's the page that you're still on.
18  If you could, start with the onlywebleads
19  message a 9:44:17.
20    A  Yes. "Jakob, please add U.S. Health
21  Advisors to Omar's and Mike's website, please,
22  as a company that are authorized to call back
23  the leads back -- call the lead back."
24       And then I said, "Will do. I'll
25  make that request now."

207

1        Then onlywebleads responds,
2  "Thank you. I paid HH," which means Hello
3  Hunter, "$500 today." He then says, "We might
4  have to scrub all leads against the national
5  DNC list moving forward because we received a
6  subpoena about calls on the no-call list this
7  week."
8        And I had responded, "Gotcha.
9  So what shall I do with the opted-in leads I
10  have loaded?"
11    Q  And do you recognize this document?
12    A  Vaguely, yes.
13    Q  So you recognize that this is a Skype
14  conversation?
15       MR. DAVIDSON: Objection.
16    A  Yes.
17    Q  (BY MR. ABERNETHY) And, again, who
18  is the Skype user onlywebleads?
19    A  John Spiller.
20    Q  And who is the Skype user Jakob
21  Mears?
22    A  Me.
23    Q  And what's your understanding of what
24  this conversation is about right here?
25       MR. DAVIDSON: Objection.

208

1    A  Yes. So O Health Group/Health
2  Advisors of America had set up a proxy website
3  to make it seem like they had a website to
4  collect the opted-in information that they had
5  created. So at one of the language that was
6  used where you would click a button saying that
7  you opted in, in that body of language, John
8  had wanted to make sure that Health Advisors --
9  U.S. Health Advisors Company was in that
10  language on the website.
11    Q  (BY MR. ABERNETHY) And can you
12  explain again what that website is, what your
13  understanding of that website is?
14       MR. DAVIDSON: Objection.
15    A  My understanding of the website was
16  just a proxy site to be used and set up to put
17  on the traceback as a -- a URL.
18    Q  (BY MR. ABERNETHY) And from your
19  understanding, did anyone opt in through this
20  website?
21       MR. DAVIDSON: Objection.
22    A  No.
23       MR. FRANQUI: Joined.
24    Q  (BY MR. ABERNETHY) So how do you know that
25  nobody opted in to that website?

209

1        MR. DAVIDSON: Objection.
2        MR. FRANQUI: Joined.
3    A  No traffic was generated from it. No
4  lead lists were pulled from the website. All
5  lead lists seemed like they were coming around
6  as usual. The website generally wasn't that
7  nice to begin with. It was mainly used just as
8  a deterrent to put on the Traceback Group URL
9  for the opted-in information.
10    Q  (BY MR. ABERNETHY) And how did you
11  know that there was no traffic to that website?
12       MR. DAVIDSON: Objection.
13       MR. FRANQUI: Joined.
14    Q  (BY MR. ABERNETHY) How did you know
15  there was no traffic to that website?
16       MR. DAVIDSON: Objection.
17       MR. FRANQUI: Joined.
18    A  Speculation based on the file leads
19  that we were still receiving were of the same
20  nature.
21    Q  (BY MR. ABERNETHY) What do you mean by
22  speculation?
23       MR. DAVIDSON: Objection.
24    A  So --
25       MR. FRANQUI: Joined.

210

1    A.  -- files that we were receiving to
2   load on their behalf didn't change, and so
3   there was no input on:  Hey, we're going to be
4   sending new leads generated from this website.
5   Here is the requested opt-in information for
6   all new leads.
7          That never happened.
8    Q.   (BY MR. ABERNETHY)  And so, again, what
9   was -- did you understand the purpose of this
10  website to be?
11         MR. DAVIDSON:  Objection.
12   A.  Just as a --
13         MR. FRANQUI:  Joined.
14   A.  -- a smoke screen to say that there
15  was a website where people would, quote,
16  unquote, "opt in."
17   Q.   (BY MR. ABERNETHY)  Do you know the web
18  address to this website?
19   A.  I do not remember it anymore, no.
20  Though it may be in Skype text, if not SMS
21  messages.
22   Q.  Skype texts that you were a part of?
23   A.  Yes, or SMS messages.
24   Q.  And who would you have talked about
25  this with?

211

1          MR. DAVIDSON:  Objection.
2    A.  John.
3          MR. FRANQUI:  Joined.
4    Q.   (BY MR. ABERNETHY)  Only John?
5    A.  John Spiller or --
6          MR. DAVIDSON:  Objection.
7    A.  -- or Omar Hibbert.
8    Q.   (BY MR. ABERNETHY)  Was this the only
9   website that you are aware that they used for
10  this purpose?
11   A.  Yes.
12   Q.  And were you doing any scrubbing for
13  DNC leads at this time?
14   A.  No, not that I remember based on the
15  message on 10:00 o'clock a.m. on 3/2/20.
16   Q.  And you're referring to the message
17  on Exhibit 5?
18   A.  Yes.  Now, I would note that he said
19  "all leads."  So there is a possibility that we
20  were scrubbing some, and so that is why I
21  pointed out about the opted-in leads on the
22  past message.
23   Q.  So what did you do with the opt-in
24  leads after that?
25   A.  Oh, that, I would not remember.

212

1    Q.  Can you tell me who is Leon Martin?
2    A.  I don't know who that is.
3    Q.  You never heard the name?
4    A.  No.
5    Q.  And did you ever talk with Mike Smith
6   about these websites?
7    A.  Not to my knowledge.  That was --
8   this website didn't come up until Health
9   Advisors transitioned to O Health Group.
10   Q.  So you don't recall ever talking to
11  Mike Smith about that website?
12   A.  If I did --
13         MR. FRANQUI:  Objection.
14   A.  -- it was very minimal conversation
15  since Omar was the new go-to person to call for
16  anything.
17   Q.   (BY MR. ABERNETHY)  And do you
18  remember ever talking to Scott Shapiro about
19  this website?
20         MR. DAVIDSON:  Objection.
21   A.  I do not.
22   Q.   (BY MR. ABERNETHY)  Can you tell me
23  who ran the e-mail address
24  carsandtrucksgofast@gmail.com?
25   A.  Yes.  That was the new designated

213

1   website that John and I used to gather all the
2   data sent from Health Advisors/O Health Group
3   and Omar.
4    Q.  And what kind of data was this?
5    A.  The same data that Health Advisors
6   sent, numbers only, turned in to some data with
7   full information to be loaded to the call.
8    Q.  Why did you make a new e-mail for
9   this?
10   A.  Separation of data, organization
11  purposes.
12   Q.  Did anyone have access on your end to
13  this e-mail?
14   A.  John.
15   Q.  Only John?
16   A.  Correct.
17   Q.  Did he use it often?
18   A.  No.  It was merely just for storage,
19  just like rpgscottmike.
20   Q.  And did you receive e-mails on this
21  address from anybody besides Omar?
22   A.  No -- maybe, actually.  Maybe Marcia
23  Griffin, if not an alias of Marcia Griffin.  I
24  don't know if she continued to work there, but
25  I know that the sending of the lead files

Jakob Mears - 3/1/2022

214

1  didn't change from O Health Group and Health
2  Advisors.  They were pretty much the same
3  consistently.
4      Q.   What aliases?
5      A.  It depends on the e-mails that were
6  used.  There were multiple e-mails that we had
7  received e-mails from them, but they were the
8  only ones who knew about the e-mails to get
9  leads from.
10     Q.   Did you ever send leads that you
11 received on this e-mail address to Sumco?
12     A.  Yes.
13     Q.  Who directed you to do that?
14     A.  John.
15     Q.  Did anybody else?
16     A.  No.
17     Q.  And did he say why?
18     A.  To help pay for litigation fees.
19     Q.  Did you -- did you handle payments
20 from Sumco?
21     A.  No.
22     Q.  Do you know where they were sent to?
23     A.  No.
24     Q.  John received payments from Sumco?
25     A.  Yes, or through the Switch that he

215

1  was on through Veriswitch.
2      Q.  But you were no longer handling the
3  accounts to see anything --
4      A.  Correct.
5      Q.  -- from Sumco?
6          And who ran the e-mail account
7  baconbitz, B-I-T-Z, 44life@gmail.com?
8      A.  That would have also been O Health
9  Group.
10     Q.  O Health?
11     A.  Yes.
12     Q.  And who at O Health?
13     A.  Who, I am not too sure.
14     Q.  And what was that e-mail address used
15 for?
16     A.  To re- -- that e-mail, baconbitz?
17     Q.  Yes.
18     A.  baconbitz was one of the senders of
19 the lead files from O Health room -- O Health
20 Group.
21     Q.  And just circling back to the website
22 that generated the opt-in information, you said
23 that website did not exist for Health Advisors?
24     A.  Correct.
25     Q.  Or they did not have access to that?

216

1      A.  I don't believe it existed before.
2      Q.  So how did you get consents from
3  Health Advisors?
4          MR. DAVIDSON:  Objection.
5          MR. FRANQUI:  Joined.
6      A.  Either it was in the file, or we
7  didn't get consent from them.  They wouldn't
8  give it to us.
9      Q   (BY MR. ABERNETHY)  So the consents that
10 you discussed with John Spiller in the Skype
11 messages in Exhibit 5 that we just read --
12     A.  Uh-huh.
13     Q.  -- what consents were those?
14         MR. DAVIDSON:  Objection.
15         MR. FRANQUI:  Joined.
16     A.  Regarding to the traceback?
17     Q.  (BY MR. ABERNETHY)  Yes.
18     A.  So the traceback would have been
19 consents from files that did have opted-in
20 information that were just part of the files
21 that were being sent to us from O Health Group
22 or Health Advisors and so I would pull it from
23 there or I would -- or he had told me to -- if
24 I didn't find it, to timestamp it and put it on
25 the website URL as a source, the website

217

1  belonging to O Health Group.
2      Q.  So in the conversation with -- sorry.
3          Can you tell me who ran the
4  e-mail address kora575@gmail.com?
5          MR. DAVIDSON:  Objection.
6      Q.  (BY MR. ABERNETHY)  K-O-R-A
7  575@gmail.com.
8          MR. FRANQUI:  Join.
9      A.  That, I don't know.
10     Q.  (BY MR. ABERNETHY)  Did you ever
11 interact with that e-mail address?
12     A.  I'm not too sure.  I know that
13 carsandtrucksgofast@gmail.com, that e-mail did
14 receive multiple lead files from O Health Group
15 with different addresses.
16     Q.  Sorry.  Can you say that again?
17         MR. DAVIDSON:  Objection.
18     A.  Yes.  So --
19         MR. FRANQUI:  Join.
20     A.  -- carsandtrucksgofast e-mail
21 address, the storage address for leads for
22 O Health Group, received multiple files of
23 different e-mail addresses from O Health Group.
24 And so baconbitz was one of those e-mails.  I'm
25 not too sure if the one you just stated, the

218

1  kora e-mail, was also one of the ones of the
2  senders of a lead file to carsandtrucksgofast.
3      Q.  (BY MR. ABERNETHY)  So how many
4  people would send lead lists to
5  carsandtrucksgofast that you're aware of?
6      A.  Well, only O Health Group sent them
7  to there; but they used multiple different
8  e-mails to send those files.
9      Q.  Do you know why they would use
10  different e-mails?
11      A.  That, I do not know.
12      Q.  Are you aware of a Skype chat titled
13  Horizon Group?
14      A.  It sounds vaguely familiar, yes.
15      Q.  Do you know what it was for?
16          MR. DAVIDSON:  Objection.
17          MR. FRANQUI:  Joined.
18      A.  Not that I remember.  I want to say
19  that was the name of the account under O Health
20  Group was Horizon on Veriswitch.
21      Q.  (BY MR. ABERNETHY)  So do you know
22  who was a part of that Skype chat?
23          MR. DAVIDSON:  Objection.
24      A.  I do not.
25      Q   (BY MR. ABERNETHY)  I'm going to pull up

219

1  another exhibit, Exhibit 41.
2          (Exhibit 41 discussed.)
3          MR. ABERNETHY:  Did you receive
4  that exhibit?
5          MR. DAVIDSON:  Yep.  It's eleven
6  pages, right?
7          MR. ABERNETHY:  Yes.
8          MR. DAVIDSON:  Okay.
9          MR. ABERNETHY:  Yeah, it's
10  mislabeled.  I'm sorry.  These are mislabeled.
11  Give me one second.
12      Q   (BY MR. ABERNETHY)  I'm handing you
13  Exhibit 41.  Do you recognize this document?
14      A.  Yes.
15      Q.  Can you describe it for me?
16      A.  It looks like a Skype conversation
17  whenever Horizon, which is the name O Health
18  Group used whenever they registered on
19  Veriswitch's platform, to talk over Skype.
20      Q.  Horizon was the name that Health
21  Advisors used on Veriswitch?
22          MR. DAVIDSON:  Objection.
23      A.  O Health Group.
24      Q.  (BY MR. ABERNETHY)  O Health.  And
25  do -- can you tell me who is in this

220

1  conversation that you recognize?
2          MR. DAVIDSON:  Objection.
3          MR. FRANQUI:  Joined.
4      A.  Yes.  The onlywebleads was John
5  Spiller, as well as michaeldbg -- I'm unsure
6  who that is -- Omar Aparicio.
7      Q.  (BY MR. ABERNETHY)  Can you say that
8  again?
9      A.  Omar Aparicio; of that, I am unsure.
10  But I do see onlywebleads on 5:23:04 p.m. where
11  he asks Michael -- where he describes him as
12  the big boss and relating to Omar as the new
13  person to run the office.
14      Q.  Describes who as the big boss?
15      A.  Michael Smith.
16      Q.  And do you know who Omar Aparicio is?
17      A.  I do not.
18      Q.  Can you read from -- the message from
19  onlywebleads at 5:21:45 p.m.?  And that's on
20  Exhibit 41 Skype 00001.
21      A.  "This is the new chat for Horizon's
22  Group.  @Michael, meet my team.  And team, meet
23  Michael.  He is the big boss of the business.
24  After I get Omar, his new person that is
25  running the office, information for Skype, I'll

221

1  add him to this chat as well."
2          And I do actually remember who
3  Omar Aparicio is.  Omar is the VICIdial tech
4  that John had hired to try and build out more
5  VICIdial systems, if need be, as well as help
6  manage them, if need be, since he knew a lot
7  about those.
8          And did you want me to keep on
9  going?
10      Q.  Yes, please.
11      A.  So Omar says, "Hey [sic] Michael,
12  nice to meet you."
13          Then John says, "He is the guy
14  that runs everything behind the scenes for
15  Horizon Group."
16          And then he added -- and then I
17  say, "@John, Omar has been added to the [sic]
18  chat."
19          "Horizon is here.  That is
20  awesome," said by John.  And then John says,
21  "Guys, this is the group chat for Horizon
22  Group.  Say hi [sic] to Omar, our VICIdial
23  tech, and to Michael.  He's in this chat as
24  well."
25          And it looks John proceeded to

222

```
 1   send over some files that were some warm
 2   transfers, as well as pulling some calls where
 3   they lasted past ten minutes; and that one is
 4   marked 6/3/2020 6:24 a.m. [sic]
 5           Do you want me to keep going
 6   onto the next page?
 7       Q.  Yeah, please.
 8       A.  Okay.  Next page, "O Health Group,
 9   'Okay.  Gonna check it out.'"
10           "onlywebleads, 'So you can do
11   some due diligence with your team on the ones
12   that they just didn't push hard enough or they
13   give [sic] up too early.  This is one of the
14   [sic] tools that we will send you daily so you
15   can run your room more proficiently.'"
16           Then John says, "Jakob, please
17   send these reports to Omar daily till I tell
18   you otherwise."
19           And I respond, "Will do."
20           John then says, "This will help
21   him run his business more smoother with less
22   complications."
23           And then John, onlywebleads,
24   added michaeltheronsmithjr to the conversation;
25   and then Michael was added to the chat.
```

223

```
 1           And then John says, "Can you see
 2   what I added today? @michael smith."
 3           And then onlywebleads has
 4   removed michaeldbg from the conversation.
 5           And Michael Smith says, "Hello."
 6           "Hey, Michael.  How are you
 7   doing?" from John.  And then John says, "Can
 8   you see the attachments I loaded today for Omar
 9   to view?" [sic]
10           Michael says, "I'm good, bro'.
11   How are you?" [sic]
12           Michael Smith says, "Okay.  I'll
13   have him get on it [sic] when he gets back from
14   the bank."
15           Michael Smith says, "He has
16   [sic] four deals."  And then, "They have four
17   deals, by the way."
18           And then I point out this is
19   "what is wrong with the long calls they are
20   getting."
21           Then John says, "That's not good
22   @Jakob.  Please view their leads and switch out
23   the ones that are not performing."
24           And then I say, "I'm on it."
25   And then I say to --
```

224

```
 1       Q.  You can stop.
 2       A.  Okay.
 3       Q.  Thanks.
 4           And do you remember this
 5   conversation?
 6       A.  No.
 7       Q.  Do you remember being part of this
 8   chat group now?
 9       A.  Very vaguely.  I don't -- I don't
10   remember the chat lasting too long in general.
11       Q.  But, to your understanding, that is
12   Michael Smith from Health Advisors --
13           MR. DAVIDSON:  Objection.
14           MR. FRANQUI:  Objection.
15       Q.  -- under the user name michael smith?
16           MR. DAVIDSON:  Objection.
17           MR. FRANQUI:  Objection.
18       A.  Correct.
19       Q.  (BY MR. ABERNETHY)  And why -- why do you
20   say that?
21           MR. DAVIDSON:  Objection.
22       Q.  (BY MR. ABERNETHY)  Why do you think
23   that -- can you say the user name and -- again?
24           MR. DAVIDSON:  Objection.
25           MR. FRANQUI:  Joined.
```

225

```
 1       A.  (No audible response.)
 2       Q.  (BY MR. ABERNETHY)  Or can you just
 3   tell me who you believe the user michael smith
 4   on Skype is that you're talking to?
 5           MR. DAVIDSON:  Objection.
 6       A.  I believe that is Michael --
 7           MR. FRANQUI:  Joined.
 8       A.  -- from Health Advisors.
 9       Q.  (BY MR. ABERNETHY)  And what is the
10   user name again?
11       A.  Michael Smith, michaelthe --
12   michaeltheronsmithjr.
13       Q.  And the user Omar Aparicio, who do
14   you understand that to be in this conversation?
15           MR. DAVIDSON:  Objection.
16           MR. FRANQUI:  Joined.
17       A.  That is someone that John had
18   hired to help build out VICIdial systems.
19       Q.  (BY MR. ABERNETHY)  I mean, and who
20   do you understand that -- behind the user name
21   Omar Aparicio, that user to be?
22           MR. DAVIDSON:  Objection.
23       A.  Omar Aparicio.
24       Q.  (BY MR. ABERNETHY)  And what is your
25   understanding of the four deals that user
```

226

1  michael smith is talking about?
2          MR. DAVIDSON:  Objection.
3      A.  Four sales created at the moment.
4      Q.  (BY MR. ABERNETHY)  And can you just
5  give me your understanding of what you're
6  talking about at the top of that last page,
7  0003, starting with michael smith saying, "They
8  have four deals, by the way" and ending with
9  you saying "I'm on it"?
10          MR. DAVIDSON:  Objection.
11          MR. FRANQUI:  Joined.
12      A.  Because it was already on
13  11:00 o'clock, so it was almost close to lunch,
14  so they were low on sales at the moment; and so
15  I point out that they have tons of long calls
16  so that they should be getting more sales
17  shortly.
18      Q   (BY MR. ABERNETHY)  And can you identify for
19  me who ran O Health Group?
20          MR. DAVIDSON:  Objection.
21          MR. FRANQUI:  Objection.
22      A.  Omar.
23      Q.  (BY MR. ABERNETHY)  Can you give me
24  his full name?
25      A.  Omar Hibbert or Michael Smith.

227

1      Q.  So they both ran O Health Group is
2  what you're saying?
3          MR. DAVIDSON:  Objection.
4      A.  From my understanding --
5          MR. FRANQUI:  Objection.
6      A.  -- Omar was more of the hands on,
7  full time, where if assistance needed be
8  needed, then Michael would step in for higher-
9  level conversations.
10      Q.  (BY MR. ABERNETHY)  And who ran the
11  O Health Group user in the Skype chat?
12          MR. FRANQUI:  Joined.
13      A.  That would most likely be Omar
14  Hibbert as well.
15      Q.  (BY MR. ABERNETHY)  Do you know if
16  anybody else ever ran it?
17          MR. DAVIDSON:  Objection.
18      A.  I do not.
19      Q.  (BY MR. ABERNETHY)  You do not?
20      A.  I do not.
21      Q.  All right.  And do you know who is
22  sending auto warranty calls?
23      A.  That would have been Sumco.
24      Q.  How do you know that?

228

1      A.  I believe he -- I believe John had
2  told me that he did auto warranty calls, but
3  that was after -- that was after Health
4  Advisors and that was a bit after O Health
5  Group went out of business.
6      Q.  And do you know why they were sending
7  them to you?
8      A.  That, I do not know.  I wasn't during
9  a part of the business whenever Sumco was doing
10  those calls.
11      Q.  And this is JSquared --
12      A.  Yes.
13      Q.  -- that they sent auto warranty calls
14  through?
15      A.  Yes.
16      Q.  And so you don't recall the exact
17  timeframe of when these auto warranty calls
18  started?
19      A.  It -- I don't remember the exact time
20  frame.  It was a little bit before this
21  litigation started.  It wasn't while O Health
22  Group or Health Advisors was still active.
23      Q.  And did this start right, as far as
24  you know, at the beginning of the relationship
25  between JSquared and Sumco?

229

1      A.  For the auto warranty calls?
2      Q.  Yes.
3      A.  Yes.
4      Q.  And what exactly was JSquared
5  providing for Sumco to make these auto warranty
6  calls?
7      A.  Only the minutes such as VoIP
8  platform, so through Veriswitch.  So they just
9  charged -- he charged him per minute.
10      Q.  They did not use the JSquared dialer?
11      A.  No.
12      Q.  What was your role in these auto
13  warranty calls?
14      A.  I played no role.
15      Q.  At any point?
16      A.  At any point.
17      Q.  Did Rising Eagle purport to be the
18  one making the calls beyond just providing VoIP
19  minutes?
20          MR. DAVIDSON:  Objection.
21      A.  And can you elaborate?
22      Q   (BY MR. ABERNETHY)  Did JSquared --
23  their only role with the auto warranty calls with
24  Sumco was providing minutes?
25      A.  Correct.

230

```
 1      Q.  And did they make out like they
 2   were -- had any other greater control?
 3      A.  Not that I'm aware of.
 4           MR. ABERNETHY:  All right.  We
 5   have another exhibit added to the chat in Zoom.
 6           MR. DAVIDSON:  What number,
 7   Patrick?
 8           MR. ABERNETHY:  It's going to be
 9   Skype 00070, and it's Exhibit 41.
10           MR. FRANQUI:  You said
11   Exhibit 41?
12           MR. HOLIAN:  42.
13           MR. ABERNETHY:  Yes, 42.  Sorry
14   Exhibit 42 and it's...
15           MR. FRANQUI:  0070.
16           MR. ABERNETHY:  Yeah.
17           (Exhibit 42 discussed.)
18      Q   (BY MR. ABERNETHY)  All right.  So we're
19   actually going to be on Skype 000013.  And we're going
20   to start on -- I'm sorry.  Let me see that.  Right
21   there.
22           Apologies.  00070, like we had originally
23   said.  And so do you recognize this document?
24      A.  Yes.
25      Q.  And do you recognize this as a Skype
```

231

```
 1   chat?
 2      A.  Yes.
 3      Q.  Do you recognize the user AW?
 4      A.  Yes.  I'm looking at it.  It looks
 5   like -- I'm assuming auto warranty is what the
 6   abbreviation stands for.
 7      Q.  And do you know who that would be?
 8           MR. DAVIDSON:  Objection.
 9      A.  Sumco Panama.
10      Q.  (BY MR. ABERNETHY)  And then can you
11   identify the other users in this conversation?
12      A.  Yes.  Jakob Mears, which is myself;
13   and onlywebleads is John Spiller.
14      Q.  All right.  Can you read from your
15   first message at 4:45:18? [sic]
16      A.  Yes.  It says, "Hey there.  So first
17   thing is, you want to make sure you have an
18   800 number, which we can give you guys.  We
19   have some available.  We recommend switching
20   these 800 numbers out every month, if not every
21   other month.  I would also dedicate someone in
22   your office to come up with a 'fake' business
23   name [sic] so that they're [sic] not related to
24   any business that has already been made in any
25   state, not just the ones you're calling,
```

232

```
 1   something very generic.  In the beginning of
 2   these messages [sic] you need to state the
 3   company name (recommend switching out every one
 4   to three weeks.)"
 5           And AW said, "But who -- who
 6   will that 800 number be given to?"
 7           And then John says, "It will be
 8   put in your messages [sic] to the prospects
 9   that you're calling and [sic] so in the
10   instance they want to call the 800 number to
11   opt out or to see if the names on the company
12   match before they might be thinking that this
13   is a scam because everyone knows how touchy
14   everything is right now in the industry."
15           Then I say, "After the message
16   states the name, there needs to...info on how
17   to opt out.  We recommend the recording to
18   [sic] be sped up, just [sic] like you see in
19   medicine commercials, where you can't really
20   understand all the side effects the narrator is
21   saying, something along the lines of 'to opt
22   out, call our toll-free number at the end this
23   message.'"
24           And then AW responds, "The
25   toll-free number will be in the message?"
```

233

```
 1           And then John --
 2      Q.  Sorry.  Go ahead.
 3      A.  And then it looks like John had
 4   quoted, "The toll-free number will be in the
 5   message?"  And responded back by saying, "Yes."
 6           And then it looks like there was
 7   a message deleted on John's side.
 8           And so AW says, "Okay.  So the
 9   opt-out digit in the message means nothing?"
10           And then I say, "After that you
11   can make your message any way you want and at
12   the end make sure there is a function to opt
13   out in your system as well as saying to" -- oh,
14   I can't read that last sentence on this page.
15      Q.  That's okay.  You can actually jump
16   to on page 000219 --
17      A.  Uh-huh.
18      Q.  -- the message at the top from
19   onlywebleads --
20           MR. YEOMAN:  Sorry.  Patrick,
21   sorry.  This is Joe.  We are not going to be
22   using 219 right here --
23           MR. ABERNETHY:  Okay.
24           MR. YEOMAN:  -- just 70.
25           MR. ABERNETHY:  Gotcha.
```

234

1    Q.  (BY MR. ABERNETHY)  So then, the
2  conversation that you just read, do you
3  remember having this conversation?
4    A.  Yes.  Vaguely, yes.
5    Q.  And can you just give me your
6  understanding of what this conversation was
7  about?
8    A.  Yes.  It was in trying to be in some
9  type of compliance for this new person that
10  John was bringing on for the Traceback Group.
11    Q.  And can you explain what these fake
12  business names were to be used for?
13    A.  Yes.  That was basically where it
14  asked for a business name in the beginning or
15  in the message according to one of the rules in
16  the Traceback Group.  That was also used during
17  the O Health and Health -- yeah, O Health.
18    Q.  And you -- can you just explain a
19  little bit more your understanding of why you
20  were recommending the recording be sped up, as
21  you said in the message at 4:58?
22    A.  To make the message shorter so that
23  the minutes incurred do not rack up because the
24  longer the message is, the longer that plays
25  out, from my understanding, it does get billed

235

1  more.  And so you only want to have the message
2  be a certain length.
3    Q.  And were you compensated for working
4  with these auto warranty calls?
5    A.  No.
6    Q.  But you did help facilitate them?
7    A.  Facilitate them?  No.
8    Q.  So what would you say you were doing
9  in this conversation?
10    A.  Giving general direction on what
11  possibly should be done to try and be in
12  compliance for the calls that they were going
13  to be doing on the Switch system before they
14  were actually online on just some general
15  guidelines that should be included.
16    Q.  But you weren't compensated for this?
17    A.  Correct.
18    Q.  And then last, just from your
19  understanding, did Michael Smith have any
20  relationship with Sumco?
21    A.  No.
22    Q.  And, from your understanding, did
23  Scott Shapiro have any relationship with Sumco?
24    A.  No.
25        MR. ABERNETHY:  Okay.  I think

236

1  that's the questions we have.  If any other
2  state has a question, we can do that.
3  Otherwise, we have some authentication of
4  business records.
5        MR. YEOMAN:  This is Joe --
6  sorry, Patrick.  This is Joe Yeoman in the
7  state of Indiana.  I do have one quick question
8  to circle to the beginning.
9          EXAMINATION
10  BY MR. YEOMAN:
11    Q.  One of the people you had mentioned
12  was Maggie Lumas, who had worked for the
13  company, Rising Eagle, every once in a while.
14  Did Rising Eagle pay her a hundred thousand
15  dollars in one check?
16    A.  That, I'm unsure about.  John would
17  be the main one to answer that question.
18    Q.  All right.  Thank you.
19        FURTHER EXAMINATION
20  BY MR. ABERNETHY:
21    Q.  Okay.  So I'm going to show you just
22  some documents that you had sent to me; and I
23  just want to confirm what they are, that you
24  sent them to me as business records.  So this
25  first --

237

1        MR. DAVIDSON:  Are you going to
2  tell me what they are?
3        MR. ABERNETHY:  Yeah.  So these
4  are -- let me load them.
5    Q.  (BY MR. ABERNETHY)  Can you tell me what these
6  are?
7        MR. DAVIDSON:  Can you tell me
8  what they are?  I don't know what you're
9  showing the witness.
10        MR. ABERNETHY:  Okay.  We're
11  showing text messages from an iPhone to Omar,
12  room manager.
13        MR. DAVIDSON:  Are they in the
14  documents that you sent me as exhibits?
15        MR. ABERNETHY:  No.  We're just
16  authenticating these documents.
17        MR. DAVIDSON:  How am I supposed
18  to know what you're authenticating when you're
19  showing him the documents?
20        MR. FRANQUI:  I also can't see
21  anything.
22        MR. DAVIDSON:  I object to this.
23        MR. HOLIAN:  Why don't we --
24        MR. FRANQUI:  Joined.
25        MR. HOLIAN:  -- send them an

Jakob Mears - 3/1/2022

238

1 e-mail with that and mark it as an exhibit.
2          MR. ABERNETHY: Okay. Yeah, we
3 can share this with you. It's discovery
4 documents.
5          MR. DAVIDSON: Okay.
6          MR. HOLIAN: Why don't we go off
7 the record for a minute and get that all
8 figured out?
9          MR. ABERNETHY: Yeah, we can go
10 off the record real quick and figure out the
11 best way to do this.
12         THE VIDEOGRAPHER: Okay. We'll
13 go off at 2:49.
14         (Off the record from 2:49 to 3:06 p.m.)
15         THE VIDEOGRAPHER: All right.
16 We're back on the record. It's 3:06.
17         MR. ABERNETHY: Okay. So we're
18 going to be looking at Exhibit 18.
19         (Exhibit 18 discussed.)
20     Q   (BY MR. ABERNETHY) I'm going to hand that to
21 you, Jakob. And so this is an e-mail with a link --
22     A.  Uh-huh.
23     Q.  -- that was sent from you to
24 rpgleads; and it says, "Messages that
25 Mike/Scott/Omar sent me." Can you tell me what

239

1 this e-mail is?
2          MR. DAVIDSON: Objection.
3     A.  Yes.
4          MR. FRANQUI: Joined.
5     A.  Those are some screenshots from my
6 Motorola phone that I had sent to John for the
7 litigation for the lawyers.
8     Q.  (BY MR. ABERNETHY) And was this an
9 e-mail that you -- was made in the normal
10 course of business?
11         MR. DAVIDSON: Objection.
12         MR. FRANQUI: Joined.
13     A.  Can you elaborate?
14     Q   (BY MR. ABERNETHY) Yeah. This was -- this
15 was an e-mail that you sent to John in the normal course
16 of business?
17         MR. DAVIDSON: Objection.
18         MR. FRANQUI: Joined.
19     A.  Yes.
20     Q.  (BY MR. ABERNETHY) Okay. And you
21 produced that e-mail to us as a business record
22 in response to a Request For Production of
23 Documents?
24     A.  Uh-huh.
25         MR. DAVIDSON: Objection.

240

1          MR. FRANQUI: Joined.
2     A.  Yes.
3     Q   (BY MR. ABERNETHY) Okay. I'm now going to
4 give you Exhibits 19 through 40.
5          (Exhibit 19-40 discussed.)
6     Q.  (BY MR. ABERNETHY) And so this is
7 the download from the link that you had sent in
8 Exhibit 18?
9     A.  Okay.
10     Q.  And can you tell me what is contained
11 in that one?
12         MR. DAVIDSON: Objection.
13     A.  Yes. Looking through it --
14         MR. FRANQUI: Joined.
15     A.  -- it looks like they are screenshots
16 from text messages received from -- from Scott
17 Shapiro, Michael Smith, and Omar Hibbert.
18     Q.  (BY MR. ABERNETHY) And these were
19 messages sent in the ordinary course of
20 business?
21     A.  Yes.
22         MR. DAVIDSON: Objection.
23         MR. FRANQUI: Joined.
24     Q.  (BY MR. ABERNETHY) And you sent
25 these to us as part of a production for our

241

1 Request For Production of Documents?
2     A.  Yes.
3          MR. DAVIDSON: Objection.
4          MR. FRANQUI: Joined.
5          MR. ABERNETHY: Okay. And can
6 y'all make sure y'all have those exhibits
7 available in the chat?
8          MR. DAVIDSON: They're in the --
9 yeah, there's all kinds of stuff here that you
10 sent.
11         MR. ABERNETHY: And you should
12 have Exhibit 18 and Exhibits 19 through 40.
13         MR. DAVIDSON: Yeah.
14         MR. ABERNETHY: All right. Then
15 I believe we are ready to -- we are through
16 with questioning. Yeah, we will pass the
17 witness.
18         MR. DAVIDSON: So I have one
19 exhibit, and so maybe you want to make a PDF
20 and send it out to people?
21         (Unmuted conversation between
22 unidentified Zoom participants.)
23         MR. DAVIDSON: Do you want to do
24 a PDF and PDF this out to everybody because I
25 have one exhibit that I want to use?

242

1      MR. ABERNETHY:  Yeah, we can do
2  that.  Do you have PDFs available --
3      MR. DAVIDSON:  No.
4      MR. ABERNETHY:  -- or just
5  the --
6      MR. DAVIDSON:  I didn't know how
7  you were doing this today, so...
8      MR. HOLIAN:  Why don't we go
9  scan it.
10      Do you mind if I take that from
11  you and scan it?
12      MR. DAVIDSON:  No, no, no.
13  Yeah, this is a clean one.  That's -- that's --
14  there's one blank page in there, but don't
15  worry.  You can pull it out if you want to.
16      THE REPORTER:  Are we going off
17  the record?
18      MR. DAVIDSON:  I guess for --
19      MR. ABERNETHY:  Yeah, we can go
20  off record.
21      THE VIDEOGRAPHER:  We'll go off
22  at 3:11.
23      (Off the record from 3:11 to 3:18 p.m.)
24      THE VIDEOGRAPHER:  All right.
25  We're back on the record.  It's 3:18.

243

1           EXAMINATION
2  BY MR. DAVIDSON:
3      Q.  Mr. Mears, my name's Shepard
4  Davidson.  I represent Scott Shapiro in the
5  matter that we're here for today.
6      A.  Uh-huh.
7      Q.  Like Attorney Abernethy, I'm going to
8  ask you some questions.  I want you to answer
9  them to the extent you know the answer.  If you
10  don't know the answer, just tell me that you
11  don't know the answer.
12      A.  Okay.
13      Q.  If you don't understand a question,
14  let me know.  If you answer the question, I'm
15  going to assume you do understand it.
16      And if you make any sort of
17  statement and then at any point later on you
18  want to come back and add to your testimony or
19  amend it in any way, just let me know; and we
20  can do that.
21      A.  Okay.
22      Q.  Do you understand all that?
23      A.  Sure do.
24      Q.  Okay.  The last few questions you
25  answered from Attorney Abernethy dealt with

244

1  some documents.  Do you recall that?
2      A.  Yes.
3      Q.  Okay.  And he asked you some
4  questions somewhat along the lines of, "Is this
5  a document that was prepared in the ordinary
6  course of Rising Eagle business?"  Do you
7  remember that?
8      A.  Uh-huh.
9      Q.  You have to say "yes" or "no."
10      A.  Yes.
11      Q.  Okay.  And you said "yes," correct?
12      A.  Correct.
13      Q.  Okay.  You don't know what it means
14  legally to prepare a document in the ordinary
15  course of business, do you?
16      A.  That's correct.
17      MR. SWETNAM:  Objection.
18      MR. DAVIDSON:  What's your
19  objection?
20      MR. SWETNAM:  Yeah, objection as
21  to form.
22      MR. DAVIDSON:  What was wrong
23  with the form of the question?
24      MR. SWETNAM:  Well, I thought
25  under our stipulation we were just going to

245

1  have the objections; isn't that correct?
2      MR. DAVIDSON:  Well, we reserved
3  objections except as to the form of the
4  question.  You said you objected to the form.
5  I'm just asking you if you want to explain what
6  was wrong with the form because I'm happy to
7  correct the form if that's really your
8  objection.
9      MR. SWETNAM:  Yeah, I think
10  you're -- I think it presumes facts not in
11  evidence.
12      MR. DAVIDSON:  What facts were
13  not in evidence that I presumed?
14      MR. SWETNAM:  About his legal
15  knowledge.
16      MR. DAVIDSON:  Well, I asked him
17  if he had any legal knowledge; and he said
18  "no."
19      MR. SWETNAM:  Fair enough.
20      MR. DAVIDSON:  Do you want to
21  persist with that objection, or do you want to
22  withdraw it?
23      MR. SWETNAM:  I'm going to leave
24  it on.
25      MR. DAVIDSON:  Okay.  What state

Jakob Mears - 3/1/2022

246

1  are you?
2       MR. SWETNAM: Indiana.
3       MR. DAVIDSON: Okay. Thank you.
4    Q. (BY MR. DAVIDSON) So some of these
5  questions you may have answered, but I have
6  them in here and it'll be easier to go through
7  them again, a little bit of overlap.
8       Did you discuss your deposition
9  with anybody --
10   A. No.
11   Q. -- before today?
12      Okay. So you didn't discuss it
13 with Mr. Spiller?
14   A. No. He was aware via through
15 e-mails, just like how I got notified; but we
16 didn't discuss the facts of what we were going
17 to talk about.
18   Q. So did you discuss the fact that you
19 were going to both be deposed?
20   A. Yes, because we both got the e-mail.
21   Q. Okay. So tell me everything you
22 recall that you said and that he said in that
23 discussion.
24      MR. SWETNAM: Objection,
25 overbroad.

247

1    A. He had apologized to me for bringing
2  me in this lawsuit, to begin with and that --
3  that he just wanted to really make that clear
4  that he was really just apologetic that I was
5  really brought into this in the first place,
6  since we were both notified around the same
7  time through that e-mail chain that we were
8  both going to be dipositioned [sic.]
9    Q. (BY MR. DAVIDSON) And what did you
10 say in that conversation?
11   A. I just told him I --
12      MR. SWETNAM: Objection.
13   A. -- understand. I said, "It is what
14 it is. I mean, it's happening now, I mean. So
15 there's nothing much either of us can do about
16 it, so."
17   Q. (BY MR. DAVIDSON) Do you recall
18 anything else that either you said or
19 Mr. Spiller said in that conversation?
20   A. No.
21      MR. SWETNAM: Same objection.
22   Q. (BY MR. DAVIDSON) Okay. Did you
23 have any discussion with -- with anybody -- any
24 of the attorneys representing the Plaintiffs
25 before today about this deposition?

248

1    A. No.
2    Q. Okay. Did you have any discussion
3  today at any of the breaks with anybody on
4  behalf of the Plaintiffs about any of the
5  questions you were going to be asked today?
6    A. No.
7    Q. Okay. Have you ever been deposed
8  before?
9    A. I have not.
10   Q. Okay. Have you ever been a witness
11 at a trial?
12   A. No.
13   Q. Okay. Has anybody filed any sort of
14 grievance or complaint against you for any kind
15 of professional misconduct outside of this
16 lawsuit?
17   A. No.
18   Q. Okay. Do you remember there was an
19 action filed by the FCC against Rising Eagle
20 and you and Mr. Spiller?
21   A. Yeah.
22   Q. Okay. Tell me what your
23 understanding was of what that action was
24 about.
25   A. For the most part, all of the blame

249

1  for any of calls initiated to O Health or the
2  other company, Health Advisors, was all merely
3  our doing; and so they had named both of us
4  into it. And so that was my impression.
5    Q. It wasn't just limited to the calls
6  you made on behalf of O Health and Health
7  Advisors, though, was it?
8    A. That's what my gist of it was. That
9  was my recollection of it since they were the
10 only clients that we had on.
11   Q. Well, they weren't the only clients
12 that -- that Rising Eagle had, though; do you
13 know that?
14      MR. SWETNAM: Objection.
15   Q. (BY MR. DAVIDSON) That's my -- well,
16 I thought you testified earlier today that --
17 that you made calls on behalf of other clients,
18 didn't you?
19   A. After they were off. So I know Sumco
20 was one of them. That was after. That was not
21 while I was on board.
22   Q. So it's your testimony that during
23 the time that Rising Eagle provided services to
24 Health Advisors of America, it didn't make
25 calls for any other company? Is that your

250

1  testimony?
2      A.  They -- he did make calls for other
3  companies as -- as well that are also cited in
4  the Plaintiffs' I want to say.
5      Q.  Okay.  I want to make sure we're
6  clear on this because I thought you said two
7  contradictory things, right?
8      A.  Yeah, but relating to the auto
9  warranty policies, that was not during them
10  while they were on board.
11      Q.  Okay.  At the time -- over the period
12  of time that Rising Eagle provided services to
13  Health Advisors of America --
14      A.  Uh-huh.
15      Q.  -- it also helped make calls for
16  other companies; isn't that right?
17      A.  Correct.
18      Q.  Okay.  How many other companies?
19      A.  That, honestly, John would have a
20  better answer for that.  I want to say two.
21      Q.  Okay.  What are those companies?
22      A.  I know Tovere [PHONETICALLY SPELLED]
23  Johnson was one of them.  I don't know the
24  actual name of the company.
25      Q.  Okay.

251

1      A.  And -- and what was the name?
2  Panzer.  Panzer was another individual.  I
3  think it was Mike Panzer.
4      Q.  Okay.  And do you have any ability to
5  sort of break down as a percentage of the calls
6  that Rising Eagle was making while it was
7  making calls for Health Advisors what
8  percentage were for Health Advisors and what
9  percentage were for these other two entities
10  combined?
11      A.  Yeah, Health Advisors was between 90
12  to 95 percent.
13      Q.  Okay.  And how do you know that?
14      A.  By the amount of servers that were
15  required to run their Health Advisors' room as
16  well as their individual costs compared to the
17  other clients.
18      Q.  Have you ever been convicted of a
19  crime, Mr. Mears?
20      A.  No.
21      Q.  Have you ever been arrested?
22      A.  No.
23      Q.  Had John Spiller ever threatened you?
24      A.  Yes.
25      Q.  Okay.  How many times?

252

1      A.  More than once, less than five, I
2  would say, give or take, over the years that
3  I've known him.
4      Q.  Okay.  Describe for me what those
5  threats were.
6      A.  Um...
7      Q.  That's a bad question.  Let me ask
8  you a different question.
9          Do you recall the first time he
10  threatened you?
11      A.  I remember one time.
12      Q.  Okay.  That one time that you
13  remember, tell me what the threat was.
14      A.  It wasn't more of a threat.  It was
15  more of, like, a -- like, a physical type of
16  abuse at one point; and so this was while we
17  were managing either Health Advisors or Omar's
18  room and the performance they were having.  And
19  this was right after that he had undergone his
20  relapse, and so he was just recovering from it.
21  And so during that time, there was a lot of --
22  a lot of physical combatance [sic] with him
23  where I knew his state of mind wasn't exactly
24  right.  So I kind of just, you know, took the
25  hits as -- as is to where it pretty much

253

1  dampered [sic] the relationship during that
2  moment.
3      Q.  When you say you took it, you mean he
4  physically hit you?
5      A.  Correct.
6      Q.  Okay.  How many times?
7      A.  Just once, like, on -- or once on the
8  hand and once on the arm, like -- you know,
9  like a backhand or something.
10      Q.  Were you-all still roommates at that
11  time?
12      A.  Correct, yes.
13      Q.  Okay.  You didn't move out?
14      A.  No.
15      Q.  Why not?
16      A.  Because I -- I'm a very passionate
17  individual.  I knew the state of mind that he
18  was in.  I knew that later on that day he was
19  very apologetic.  It was a very in-the-moment
20  thing.  So, yeah, for some reason, I've -- I've
21  forgiven John more times than I can count on my
22  hand when I shouldn't have.
23      Q.  It sounds sort of like a classic
24  abusive relationship.  Do you look at it that
25  way?

254

1    A.  I used to while -- while I did work
2  for him in Houston.  Sometimes, you know, like
3  anybody, you have the fun times; and then
4  sometimes you have the bad.  So, you know,
5  sometimes the bad do stick out a lot more.  So
6  I was very stressed during working for Rising
7  Eagle and JSquared.
8    Q.  And when did your working
9  relationship with Mr. Spiller end?
10   A.  Working relationship?
11   Q.  Or is it still ongoing?
12   A.  I would say the relationship's still
13  there.  The working relationship is no longer
14  there.  I don't do anything for him work-wise.
15   Q.  Okay.  Yeah, that was my question.
16  When did your working relationship with him
17  end?
18   A.  When -- when Omar Hibbert's O Health
19  room closed down.
20   Q.  Okay.  And do you recall when that
21  was, approximately?
22   A.  A couple of months before this
23  litigation started.
24       MR. DAVIDSON:  Could we show the
25  witness what we've marked as Exhibit A, please?

255

1       (Exhibit A discussed.)
2    Q.  (BY MR. DAVIDSON)  Take a moment, if
3  you would, Mr. Mears, to take a look at
4  Exhibit A as you need to.  My first question's
5  just going to be:  Do you recognize it?
6    A.  (Witness silently reading document.)
7    Q.  And I will ask you some more
8  questions later on about the document, but...
9    A.  Yes, it does have some familiarity to
10  it.
11   Q.  Okay.  This is a declaration that you
12  signed in August of 2020; is that correct?
13   A.  Yes, that's my signature.
14   Q.  Okay.  And you signed it under the
15  penalty of perjury, correct?
16   A.  Correct.
17   Q.  And what does it mean to you to sign
18  something under the penalty of perjury?
19   A.  That pretty much I can get in trouble
20  if anything is false.
21   Q.  You recognize this was an important,
22  serious document, right?
23   A.  Correct.
24   Q.  Okay.  And you knew people were going
25  to rely on this document, correct?

256

1    A.  Yes.
2    Q.  And you knew you had to tell the
3  truth in this document, correct?
4    A.  Correct, yeah.
5    Q.  Is there anything in that document
6  that's not true?
7    A.  There shouldn't be.  I did sign this.
8    Q.  Okay.  And who did you talk to about
9  that document before you signed it?
10   A.  Dated August 2020.  I'm not too sure
11  I talked to anybody about it.  I think it was
12  sent to me to look over and sign that
13  everything was factual --
14   Q.  Okay.
15   A.  -- by our past lawyers, possibly,
16  whenever they sent this over because we were
17  represented in the beginning.
18   Q.  Did you discuss that document with
19  Mr. Spiller?
20   A.  No.
21   Q.  Okay.  You did -- I'm not asking you
22  what was said, but you did discuss it with
23  whatever attorney was representing you at the
24  time?
25   A.  I'm not too sure if I actually

257

1  discussed it with them.  I think they had just
2  sent it over to make sure everything that I had
3  listed on here was up to my knowledge.
4    Q.  Do you know how the attorney got the
5  information to put into that document to send
6  to you?
7       Well, let me ask it this way:
8  You gave your attorney information, and from
9  that information your attorney generated the
10  document; is that fair?
11   A.  That could be fair, yes.
12   Q.  Well, that could be fair; or that is
13  fair?
14   A.  That -- that is fair.  I want to say
15  there was a document where they had me, you
16  know, go by -- line by line on certain
17  paperwork and answer those questions on the
18  best of my ability.
19   Q.  Okay.  So let me ask you to turn to
20  the second page, and let me direct your
21  attention to Paragraph 4.
22   A.  Okay.
23   Q.  And the first sentence says, "From
24  the middle of 2018 through December of 2019,
25  Rising Eagle provided marketing-related

258

1 consulting and services to a large client,
2 Health Advisors of America, Inc." Did I read
3 that correctly?
4     A.  Yes.
5     Q.  Okay.  Tell me what those marketing-
6 related consulting services were.
7     A.  I wouldn't be best to be able to do
8 that.  This sounds like language that was put
9 in there by the people that were representing
10 us.
11     Q.  Okay.
12     A.  Since, like I said, I didn't come up
13 with this language.
14     Q.  Okay.  So you don't even know what
15 that means?
16     A.  Vaguely.
17     Q.  Okay.  What's your vague
18 understanding of what that means?
19     A.  My vague understanding is marketing-
20 related consulting and services, meaning the
21 marketing of the products and the consulting of
22 the services that were provided to Health
23 Advisors.
24     Q.  Okay.  Why did you sign this document
25 if you didn't really understand what that

259

1 paragraph meant?
2     A.  Because I did understand to a point.
3     Q.  You didn't think it was important
4 that you understood this fully, even though you
5 were signing it under the penalty of perjury?
6     A.  To me, it did sound like the right
7 language for them to use.  I'm not a lawyer, so
8 I wouldn't know the right language to use in
9 the document.
10     Q.  Correct me if I'm wrong:  You don't
11 know how it is that Rising Eagle came to work
12 with Health Advisors of America; is that right
13 or --
14     A.  That is correct.
15     Q.  Okay.  Do you know the terms of the
16 relationship, the business relationship,
17 between the two companies?
18     A.  I do not.  That was before I was
19 brought on board.
20     Q.  Okay.  You are aware that Mr. Shapiro
21 didn't negotiate the arrangement between Rising
22 Eagle and Health Advisors of America, though,
23 aren't you?
24     A.  I am not aware, no.
25     Q.  Okay.  And those other companies we

260

1 talked about a minute ago that Rising Eagle did
2 work for, the ones owned by Tovere Johnson and
3 Panzer --
4     A.  Uh-huh.
5     Q.  -- okay -- did Rising Eagle provide
6 those same consulting and marketing-related
7 services for those companies?
8     A.  Yes.
9     Q.  How much money did Rising Eagle make
10 annually while you worked for the company?
11     A.  That, I wouldn't know.
12     Q.  Okay.  You never saw any
13 documentation saying how much money the company
14 made?
15     A.  That wasn't part of my
16 responsibilities to look at how much it was
17 making, just to make sure that rooms were
18 getting the calls that they were needing and
19 watching the finances to make sure bills were
20 being paid.
21     Q.  Okay.  So -- but you don't know?
22     A.  I do not know.  I didn't -- I
23 didn't -- I don't look at the W-2s or any type
24 of tax forms that are received for Rising
25 Eagle.

261

1     Q.  And Mr. Spiller never told you?
2     A.  He never showed them to me, and he
3 never told me.  The most I saw what was being
4 brought in.
5     Q.  Okay.
6     A.  So I don't know the avenue -- the
7 revenue on a yearly basis.
8     Q.  Let's go down to Paragraph 6.  And
9 let me direction your attention to the last
10 sentence, which starts the third line from the
11 bottom, Paragraph 6.
12     A.  Uh-huh.
13     Q.  "For each of the campaigns, Health
14 Advisors provided Rising Eagle the lists of
15 consumer telephone numbers to be called via the
16 Health Advisors communications platform."  Did
17 I read that correctly?
18     A.  Yes.
19     Q.  Is that a true statement?
20     A.  No, that's not a true statement.
21     Q.  Okay.  What's not true about that
22 statement?
23     A.  The times when Spiller bought leads
24 on behalf of Health Advisors from Stellar
25 Prospects to supply their rooms with better

Jakob Mears - 3/1/2022

262

1 calls.
2    Q.  Okay.  So why did you sign this
3 Affidavit when that -- you knew that statement
4 wasn't true?
5    A.  I don't have an answer for that.
6    Q.  Okay.  Let me ask you this question:
7 Today you took an oath to tell the truth at
8 your deposition; is that right?
9    A.  That is right.
10    Q.  Okay.  How are we supposed to know if
11 you told the truth today when you just admitted
12 you didn't tell the truth in an Affidavit that
13 you signed?
14    A.  [Indiscernible to the reporter.]
15    Q.  Okay.
16        THE REPORTER:  I'm sorry.  I
17 couldn't hear.
18    A.  I wouldn't be able to answer that.
19    Q.  (BY MR. ABERNETHY)  How many calls
20 did Rising Eagle make for Health Advisors of
21 America?
22    A.  Millions.
23    Q.  Can you be any more specific than
24 "millions"?
25    A.  I cannot.

263

1    Q.  Okay.  More than a hundred million?
2    A.  Most likely.
3    Q.  Okay.  And did you promise that you
4 were going to scrub the leads that HAA or
5 Mr. Shapiro provided?
6    A.  Did I promise to scrub -- can you say
7 it one more time?
8    Q.  Sure.  Did you promise to scrub leads
9 that HAA provided or that Mr. Shapiro provided?
10    A.  If requested, yes.
11    Q.  Okay.  And can you just explain for
12 the record:  What does it mean to scrub a list?
13    A.  To run it through the national DNC
14 list.
15    Q.  Okay.  Are you familiar with
16 something called a SAN number?
17    A.  Yes.
18    Q.  Okay.  What's a SAN number?
19    A.  I want to say -- isn't that the
20 number that allows you to be able to scrub?  I
21 could be wrong.  It sounds familiar, but...
22    Q.  Okay.  I just want to know what your
23 understanding is.  That's fine.
24        You testified a little bit
25 earlier about something called an opt-in

264

1 clause.  Do you recall that just generally?
2    A.  Opt-in clause?
3    Q.  Well, I thought that's what you said;
4 but I'm not trying to put words in your mouth.
5 Are you familiar with something called an
6 opt-in clause?
7    A.  No.
8    Q.  Okay.  Are you familiar with
9 something called opting in?
10    A.  Yes.
11    Q.  Okay.  Can you explain just for the
12 record:  What does it mean -- what's your
13 understanding of opting in?  What does that
14 mean?
15    A.  Where you're giving permission to
16 someone to do something.
17    Q.  Okay.  In the context of
18 telemarketing, do you have an understanding of
19 what opting in means?
20    A.  Vaguely.
21    Q.  Okay.  What's your understanding?
22    A.  Permission to call somebody.
23    Q.  Okay.  And are you aware that when
24 somebody gives an opt-in, it's only good for 90
25 days?

265

1    A.  I am not aware of that.
2    Q.  Okay.  When you received lists from
3 Mr. Shapiro, isn't it true that he told you
4 that the lists were old?
5    A.  No.
6    Q.  Okay.  So are you saying he actually
7 didn't tell you that, or you don't recall
8 whether he told you that or not?
9    A.  Neither.  I've received both old
10 files and new files from Shapiro.
11    Q.  Okay.  So sometimes he told you the
12 lists were old?
13    A.  Correct.
14    Q.  Okay.  Did you do anything about
15 verifying those lists that were old to make
16 sure that anybody who opted in, the opt-in was
17 still operative?
18    A.  No.
19    Q.  So if Mr. Shapiro says that the only
20 times he gave you lists, he told you they were
21 old, he's not telling the truth; is that your
22 testimony?
23    A.  Can you repeat that?
24    Q.  Sure.  You said sometimes Mr. Shapiro
25 gave you lists and told you they were old; and

266

1 other times, he gave you lists and he didn't
2 tell you that they were old. Do I have that
3 right?
4     A. Correct.
5     Q. So if Mr. Shapiro says he always told
6 you when he gave you lists that they were old,
7 then he's lying. Is that your testimony?
8     A. Correct.
9         MR. SWETNAM: Objection.
10     Q. (BY MR. DAVIDSON) Now, you testified
11 that you made calls for other companies, those
12 two others companies, at the same time you were
13 making calls for HAA, right?
14     A. Correct.
15     Q. Okay. Is there any way to tell when
16 a phone call was made out of Rising Eagle,
17 regardless of what list it came from, whether
18 it was for HAA or whether it was for one of
19 those other two companies?
20     A. Can you repeat that one more time?
21     Q. Sure. So to set the stage, during
22 the time period when you were making calls for
23 HAA, Tovere Johnson's company, and Panzer's
24 company, okay, during that time period, if a
25 call goes out of Rising Eagle, is there any way

267

1 to know that a particular call or telephone
2 number is on behalf of HAA, as opposed to
3 Panzer's company or Tovere Johnson's company?
4     A. Yes, by the [indiscernible] -- not
5 only the DID in which the count -- the calls
6 were being routed to, but the campaign of the
7 origina- -- origination of the file.
8     Q. Is there any way now to look back and
9 figure that out?
10     A. No.
11     Q. Okay. Let's go to Paragraph 7 of
12 your Declaration.
13     A. Okay.
14     Q. And -- and just so you're clear, I've
15 said "Affidavit" a couple of times. To me,
16 those words, Declaration and Affidavit, are
17 interchangeable. So if I slip again, you'll
18 understand what I'm talking about.
19         Let's look at the first
20 sentence. It says, "Health Advisors
21 consistently represented to Rising Eagle that
22 all consumer information it provided to Rising
23 Eagle was from consumers who had provided prior
24 express consent to be contacted by Health
25 Advisors or parties making calls on Health

268

1 Advisors' behalf." Did I read that correctly?
2     A. Correct.
3     Q. Okay. That was important to you,
4 wasn't it?
5     A. Uh-huh.
6     Q. You just have to say "yes" or "no."
7     A. Yes.
8     Q. Okay. And that's because you knew it
9 would be illegal for you and Rising Eagle to
10 make calls, the calls you were making, if the
11 consumers you called didn't consent; is that
12 right?
13     A. Correct.
14     Q. Okay. Did you ask how HAA was able
15 to get consents from the tens, maybe hundreds,
16 of millions of people?
17     A. Did I ask?
18     Q. Yeah.
19     A. No, I did not ask.
20     Q. Didn't it occur to you that it seemed
21 improbable that they could have consents from
22 that many people?
23         MR. SWETNAM: Objection.
24     A. I mean, it is -- I don't know the
25 speculations of how possible that is.

269

1     Q. (BY MR. DAVIDSON) Okay. But -- so you didn't
2 ask anybody?
3     A. No, that wasn't my responsibility.
4     Q. I didn't ask whether it was your
5 responsibility. You didn't ask anybody,
6 though?
7     A. Correct.
8     Q. Okay. Do you know who Andre Suarez
9 is?
10     A. No.
11     Q. You never heard that name before?
12     A. It doesn't sound familiar.
13     Q. Okay. Let's go to page 3 of your
14 Declaration.
15     A. Okay.
16     Q. And the last sentence of Paragraph 9,
17 which ends at the top there --
18     A. Uh-huh.
19     Q. -- "Health Advisors provided and/or
20 approved the content of the prerecorded
21 messages that were sent to consumers." Did I
22 read that correctly?
23     A. Which line?
24     Q. Sure. The second line.
25     A. Oh.

Jakob Mears - 3/1/2022

270

1    Q.  "Health Advisors provided and/or
2    approved the consent [sic] of the prerecorded
3    messages that were sent to consumers."  Did I
4    read that correctly?
5          MR. SWETNAM:  Actually, I
6    believe it was content, "content," rather than
7    consent.
8          MR. DAVIDSON:  I appreciate
9    that.  Thank you very much.  Let me try again
10   and see if I can read it.  I should have put my
11   glasses on.
12   Q.   (BY MR. DAVIDSON)  "Health Providers provided
13   and/or approved the content of the prerecorded messages
14   that were sent to consumers."  Did I finally read that
15   correctly?
16         MR. SWETNAM:  I believe you did.
17   Thank you.
18         MR. DAVIDSON:  Thank you.
19   Q.   (BY MR. DAVIDSON)  Who at HAA
20   provided or approved that content?
21   A.   That would have been either Michael
22   Smith or Scott Shapiro.
23   Q.   Okay.  Do you have any evidence that
24   Mr. Shapiro provided any of that content?
25   A.   No.

271

1    Q.   How do you -- how do you know that he
2    did provide that content then?
3    A.   Because my role was to facilitate one
4    job, and that was to maintain these calls and
5    any type of input of changes in the messages
6    would have come from either Scott Shapiro or
7    Michael Smith to change those messages where,
8    then, I would have to make a test call, once
9    one is made, to get their approval.
10   Q.   Okay.  It may not matter to you, but
11   it matters a lot to me.  You said it would have
12   come from either Michael Smith or Mr. Shapiro.
13   A.   Uh-huh.
14   Q.   I'm asking just about Mr. Shapiro.
15   Did Mr. Shapiro provide that content to you?
16   A.   That, I'm not for sure.  I do not
17   remember.
18   Q.   Let's move on to Paragraph 12 of your
19   Declaration.
20   A.   Page 3?
21   Q.   Yeah, still on page 3.  It says, "At
22   no time did Rising Eagle knowingly attempt to
23   use another person's or entity's active
24   telephone number."
25   A.   Uh-huh.

272

1    Q.   Did I read that correctly?
2    A.   That is correct.
3    Q.   Can you just tell me:  What does that
4    mean?  I just don't understand what you're
5    trying to convey through that paragraph.
6    A.   From my understanding, this seems
7    like it was relating to either using a Caller
8    ID that belonged to somebody or an entity's.
9    Q.   Let's look at Paragraph 13.
10   A.   Okay.
11   Q.   "Health Advisors provided Rising
12   Eagle with access to Health Advisors' VICIdial
13   communications platform to facilitate Rising
14   Eagle in carrying out Health Advisors'
15   marketing campaigns."  Did I read that
16   correctly?
17   A.   You did.
18   Q.   Okay.  So you and Mr. Spiller had the
19   ability to load lists of consumers' phone
20   numbers on to HAA's VICIdial communications
21   platform on your own; is that right?
22   A.   We did not have --
23         PLAINTIFFS' COUNSEL:  Objection.
24   A.   -- the ability to load on that
25   VICIdial platform.

273

1    Q.   (BY MR. DAVIDSON)  You didn't?
2    A.   Correct.
3    Q.   Did you have -- what access did you
4    have to their VICIdial platform?
5    A.   To run reports as well as to see the
6    agent view of the calls that were going in.  So
7    we saw every agent that was logged in, and we
8    got to see the duration of each call that was
9    happening.
10   Q.   And when you say you had access to
11   run reports, what does that mean?  Can you
12   explain that to me?
13   A.   Yeah.  So we were able to run a
14   report of any type -- how many calls the call
15   center received to how many transfers, as well
16   as the disposition of each of those transfers
17   and how it went, whether it was unanswered,
18   busy, a dead line, a sale, et cetera.
19   Q.   And so your access was limited to
20   running reports and then looking at what was
21   going on in the VICIdial platform; is that
22   right?
23   A.   That is right.
24   Q.   You didn't have any other access to
25   affect anything else on the platform?

274

1    A.  That is correct.
2    Q.  Okay.  Let's turn to page 4,
3  Paragraph 16.
4    A.  Okay.
5    Q.  The second sentence, starting on the
6  second line.
7    A.  Uh-huh.
8    Q.  "Mr. Spiller was incarcerated due to
9  his arrest from November 27, 2018 through
10  March 25, 2019.  Due to his incarceration,
11  Mr. Spiller had no part in Rising Eagle's
12  operations or Health Advisors' calling
13  campaign."  Did I read that correctly?
14    A.  You did.
15    Q.  Okay.  That's just not true, is it?
16    A.  He -- not in the same operations of
17  what I was doing.
18    Q.  Well, let's get more specific here.
19  "During -- due to his incarceration,
20  Mr. Spiller had no part in Rising Eagle's or
21  Health Advisors' calling campaign."  That's not
22  true, is it?
23    A.  That is not true.
24    Q.  Okay.  Why did you include that
25  statement in here and sign this under the

275

1  penalty of perjury if that wasn't true?
2    A.  Because he wasn't operating anything
3  through a jail cell.  He was merely checking in
4  to see how everything was doing and getting
5  feedback, and so he wasn't running anything.
6    Q.  Well, it doesn't say he wasn't
7  running anything.  It says he had no part in
8  Rising Eagle's operations.  That's not true, is
9  it?
10    A.  That's correct, that is not true.
11    Q.  Okay.  And he was involved in Health
12  Advisors' calling campaign even from prison,
13  wasn't he?
14    A.  Yes.
15    Q.  Okay.  Let's go down to Paragraph 17,
16  still on page 4.  "After Mr. Spiller was
17  incarcerated and following the close of open
18  enrollment, I informed Health Advisors that
19  Rising Eagle intended to cease all involvement
20  with Health Advisors' telemarketing operations
21  while Mr. Spiller was incarcerated.  Mr. Smith
22  and Mr. Shapiro responded that if Rising Eagle
23  did not continue to operate to assist Health
24  Advisors in conducting its telemarketing
25  campaign, Health Advisors would terminate its

276

1  relationship with Rising Eagle immediately and
2  refuse to do business with Rising Eagle,
3  Spiller, or myself at any point in the future."
4  Did I read that correctly?
5    A.  That is correct.
6    Q.  Okay.  Why did Rising Eagle say that
7  it would cease involvement with HAA simply
8  because Mr. Spiller was incarcerated?
9    A.  Because the performance of the
10  business was going down and it was no longer
11  feasible and so Mr. Spiller had thought that
12  it'd be best to close the business down and
13  continue once he's back out.
14    Q.  Now, if, as you said, your role was
15  just marketing and consulting, why wouldn't HAA
16  just get somebody else, instead of Rising
17  Eagle, to fulfill Rising Eagle's role?
18    A.  That, I wouldn't know.
19    Q.  Okay.  You can't think of a reason
20  they would care, can you?
21    A.  Besides us being the one and only
22  provider they were using for an extended length
23  of time, I wouldn't know.
24    Q.  And why was this threat something
25  that concerned you or Mr. Spiller or Rising

277

1  Eagle?
2    A.  Because he was still paying for rent
3  where we were living as well as bills that
4  needed to be paid and so we were -- he was at a
5  spot where it was comfortable to close the
6  doors and close the operation down, but it was
7  insisted that we keep the doors open or the
8  relationship would cease to exist.  And John
9  did not want to do that.
10    Q.  So let's turn to the next page,
11  Paragraph 18.  It says, "Rising Eagle
12  reluctantly remained open.  At this point
13  Rising Eagle essentially operated under the
14  total control of Mr. Shapiro and Health
15  Advisors, with Mr. Shapiro sending orders to me
16  multiple times per day with instructions on how
17  to conduct Health Advisors' calling operations.
18  Specifically, Mr. Shapiro directed when and
19  what telephone numbers would be input into
20  Health Advisors' VICIdial system, gave orders
21  as to exactly when to begin Health Advisors --
22  start the oper- -- operation of Health
23  Advisors' communication platform each day, and
24  monitored, often on an hourly basis, the amount
25  of call traffic maintained through Health

Jakob Mears - 3/1/2022

278

1  Advisors' VICIdial system. This arrangement
2  continued until late May or early June 2019."
3  Did I read that correctly?
4      A. You did.
5      Q. Okay. So what were you doing at that
6  point?
7      A. I was doing what I had to before. I
8  was, you know, receiving leads from Health
9  Advisors to load and to manage them, just like
10 how I was doing, and was listening to any
11 direction or advice or feedback, as well as
12 orders that Mr. Shapiro or Health Advisors or
13 Michael Smith had gave me, to help them conduct
14 business better.
15     Q. So just so we're clear, it's your
16 testimony that, as said in Paragraph 18 here in
17 this Declaration, that at that point in time,
18 Mr. Shapiro and Health Advisors were
19 controlling everything Rising Eagle was doing?
20     A. Through me, yes.
21     Q. Okay. Except for, obviously, Tovere
22 Johnson's company and Panzer?
23     A. They were not on there in that
24 timeframe.
25     Q. They were not. Okay.

279

1          So you were just completely
2  doing whatever Mr. Shapiro and HAA told you to
3  do?
4      A. Correct.
5      Q. Okay. Let's turn to page 6,
6  Paragraph 24. And you testified about this a
7  little bit earlier; but Paragraph 24 says,
8  "During my time as member of Rising Eagle,
9  Rising Eagle covered all housing expenses for
10 myself and Mr. Spiller." Did I read that
11 correctly?
12     A. You did.
13     Q. And how much was your housing expense
14 at that time?
15     A. Like, the rent for the house?
16     Q. Yeah.
17     A. I want to say it was maybe 2000 a
18 month.
19     Q. That was your portion of it?
20     A. Oh, no, I didn't pay any expense.
21     Q. Okay. That was the -- but you were
22 living there with Mr. Spiller?
23     A. Correct.
24     Q. Okay. So it was 2,000 a month,
25 roughly, for the house; and you were sharing

280

1  the house?
2      A. Yes.
3      Q. Were you sharing it equally?
4      A. Yes.
5      Q. Okay. And did Rising Eagle cover
6  other expenses for you, as well?
7      A. I would say all the expenses were
8  mainly shared. So if he bought groceries, they
9  were for everybody. He covered my phone bill.
10 He paid for gas because he was the one who
11 mainly needed to drive -- be driven everywhere.
12 And so, for the most part, he did pay for
13 everything; but anything that was of my own, I
14 did pay out of pocket or my own account.
15     Q. Okay. Although you did testify
16 earlier you often got reimbursed for things
17 that you came out of pocket for, right?
18     A. Correct.
19     Q. Okay. So, basically, all your
20 living -- your general living expenses, not
21 just the rent, Rising Eagle was covering?
22     A. Yes.
23     Q. Okay. Did you have a car at that
24 time?
25     A. I did.

281

1      Q. Okay. Did Rising Eagle cover any of
2  the expenses -- you mentioned gas; but other
3  than gas, did they cover insurance or other --
4      A. He did cover insurance, and he did
5  cover half the car payment.
6      Q. Okay. And how about, you had a cell
7  phone, I assume, at that time?
8      A. Yes.
9      Q. Did Rising Eagle cover that expense?
10     A. Yes.
11     Q. Any other expenses you can think of
12 that Rising Eagle covered that we haven't
13 already talked about?
14     A. Food.
15     Q. Okay. And when -- you filled out tax
16 returns years 2018, 2019, 2020?
17     A. Yes.
18     Q. Okay. Did you declare --
19     A. I -- at this point, I don't know if
20 I've done 2020 yet --
21     Q. Okay.
22     A. But yes.
23     Q. In the years when you were receiving
24 these expenses, you filled out tax returns?
25     A. Uh-huh.

282

1    Q.   You have to say "yes" or "no."
2    A.   Yes.
3    Q.   Okay.  Did you declare as income any
4  of these expenses that were covered for you by
5  Rising Eagle?
6    A.   Yes.
7    Q.   What expenses did you declare?
8    A.   I know that there were -- there was
9  money sent to me while he was away in prison to
10  send to his family, and that was sent to me to
11  withdraw out.  Any type of food expense that I
12  had that I charged myself and reimbursed myself
13  was charged -- was also counted as income.  Any
14  income that he provided me to take out cash in
15  general was also put on my tax payment as well.
16    Q.   How about the rent?
17    A.   The rent, no.  That purely just came
18  out of his account.
19    Q.   Okay.  You didn't declare that on
20  your tax return?
21    A.   No.
22    Q.   Why didn't you declare that on your
23  tax return?
24    A.   That was not marked as income for me.
25    Q.   I understand it wasn't.  I'm asking

283

1  why you didn't declare it as income on your tax
2  return.
3    A.   Why I didn't declare it as income on
4  my tax return?
5    Q.   Yes.
6    A.   I didn't get reimbursed for rent.  I
7  didn't pay rent out of my account, so it didn't
8  go on my taxes.
9    Q.   Okay.  You didn't realize that
10  getting something in kind was still income to
11  you?
12    A.   Say that one more time.
13    Q.   You didn't -- so one way this could
14  have worked out was you could have been --
15  Mr. Spiller could have paid you an extra
16  thousand dollars per month, and then you could
17  have paid a thousand dollars towards rent.
18    A.   He didn't do that.
19    Q.   Right.  If he had done that, you
20  would have declared the thousand dollars that
21  he paid you, right?
22    A.   Correct, yes.
23    Q.   Okay.  In this case, he didn't pay
24  you the thousand dollars; you didn't pay any
25  rent.  So it works out the same way to you.  Do

284

1  you understand that?
2    A.   Uh-huh.
3    Q.   You have to say "yes" or "no."
4    A.   Yes.
5    Q.   Okay.  So my question is:  Since it
6  worked out the same way, why didn't you declare
7  that thousand dollars as income?
8    A.   I didn't know that would be on my
9  part to declare as income.
10    Q.   Okay.  Nobody ever explained to you
11  that that could be tax fraud that you didn't
12  declare that as income?
13    A.   No.  He paid the rent with his
14  business and I worked for him and he allowed me
15  to stay there while I worked for him; and if I
16  didn't work for him, then I couldn't live
17  there.
18    Q.   But when he covered your food
19  expenses, you did declare that as income?
20    A.   Yes.
21    Q.   Why is that?
22    A.   Well, his wife, Maggie, did my taxes;
23  and so --
24    Q.   Okay.
25    A.   -- any money -- any money that they

285

1  sent me, they all put in my -- as income, any
2  money that John sent to me.
3    Q.   The house that he lived in, this was
4  leased, right?
5    A.   Yes.
6    Q.   The lease was in your name?
7    A.   Yes.
8    Q.   Okay.  And where did the money come
9  from, technically, to pay that?  That just came
10  right from Rising Eagle and went right to the
11  landlord?
12    A.   To the -- yeah.  I would say yes, to
13  the company that managed the property.
14    Q.   Okay.  Do you know who Gregory
15  Robbins is?
16    A.   No.
17        MR. DAVIDSON:  I don't have any
18  further questions.
19        MR. FRANQUI:  Just one second.
20          EXAMINATION
21  BY MR. FRANQUI:
22    Q.   You testi-- good afternoon, sir.
23  My name is Anthony Franqui.  I represent
24  Michael Smith and Health Advisors of America.
25  Can you hear me okay?

Jakob Mears - 3/1/2022

286

1    A.  Yes.
2    Q.  Okay.  Good.  You testified earlier
3  that part of the equipment that you were using
4  was a dialer?
5    A.  Yes.
6       MR. FRANQUI:  I'm getting -- I'm
7  sorry.  I'm getting a message saying that the
8  host is asking me to start the video.
9       MR. ABERNETHY:  Are you talking
10  about your Zoom connection?
11      MR. FRANQUI:  Yeah.  Well, yeah,
12  I got a -- I got a notification saying that the
13  host wanted me to start the video, so.
14      ZOOM TECH:  I just wanted to
15  make sure if you knew whether or not you had
16  your video off or not.  So the witness couldn't
17  see your face talking to him.  You still had
18  your video off.
19      MR. FRANQUI:  Oh, sure.  I
20  apologize.  Thank you.
21    Q.  (BY MR. FRANQUI)  So, Mr. Mears, you
22  testified earlier that part of the equipment
23  you used was a dialer?
24    A.  Yes.
25    Q.  Okay.  And if my understanding of

287

1  your testimony earlier was correct, you were
2  provided with files with the phone numbers to
3  be dialed and loaded into the dialer?
4    A.  Correct.
5    Q.  So as part of these marketing
6  campaigns, you didn't have a dialer just
7  generate random phone numbers to be called?
8    A.  That is correct.
9    Q.  Okay.  And, also, you did not use a
10  dialer to have sequential phone numbers to dial
11  out?
12    A.  Can you elaborate on "sequential"?
13    Q.  Yeah.  So the number 1, 2, 3, 4,
14  those are all sequential numbers.  So it
15  wouldn't just start with a phone number and
16  dial every phone number after that?
17    A.  Yes.  I want to say there was the
18  option to -- whenever a lead list was loaded,
19  to call from top to bottom; or it would be
20  randomized.
21    Q.  I understand.  Not the actual lead
22  list itself, but the phone number.  In other
23  words, to generate the phone number to call,
24  it wasn't calling numbers sequentially, so
25  (555)1111, then (555)1112, (555)1113, in other

288

1  words, sequentially generating numbers to be
2  called.  You were not doing that, correct?
3    A.  Correct, unless the file was
4  formatted in that way and then the setting was
5  set up to where it would read the phone numbers
6  in that order, then, no.  They would have been
7  loaded and called randomly.
8    Q.  Right.  But you were adding phone
9  numbers -- the phone numbers to be added,
10  however they were in the files; but you weren't
11  asking the dialer to just create phone numbers
12  on its own?
13    A.  Correct.
14    Q.  Okay.  I think you testified that
15  when you first started working with Rising
16  Eagle, they were already working with Health
17  Advisors?
18    A.  Correct.
19    Q.  Okay.  So the original "This is Ann"
20  call, was that done prior to you working with
21  Rising Eagle?
22    A.  Yes.
23    Q.  Okay.  So, as we sit here today, do
24  you have any firsthand information with regards
25  to who directed that call to be made?

289

1    A.  I do not know.
2    Q.  Okay.  Do you know who created the
3  content for the, "This is Ann" call --
4    A.  I do not know.
5    Q.  -- originally?
6    A.  I do not know.
7    Q.  Do you know what marketing campaign
8  the "This is Ann" call was originally used for
9  with Rising Eagle?
10    A.  I do not know the original campaign,
11  no.
12    Q.  Okay.  You had testified that when
13  you first started working with the company, you
14  did some training; and then, eventually, when
15  you were doing the operations, it was John
16  could do other things.  He didn't necessarily
17  have to be hands on with -- with your
18  operations, correct?
19    A.  Correct.
20    Q.  And, occasionally, he did hand --
21  handle things -- I think you said, you know,
22  turning it up or turning it down as he thought
23  would be best -- and sometimes he would sit
24  next to you; but, by and large, he could do
25  other things and you could be handling that

290

1 aspect of it. Correct?
2   A. Correct.
3   Q. Okay. So when you were brought to
4 your Declaration Paragraph 7 -- Paragraph 18 --
5 excuse me -- from your Declaration, wherein you
6 said Shapiro and Smith, HAA, were running
7 things when John was in jail at the time,
8 things were already on autopilot for you?
9   A. For the most part, yes, while I was
10 still being receptacle [sic] to feedback and
11 with any changes that they wanted to have made.
12   Q. Okay. But things were running the
13 same as things were running from before when
14 John went to jail, correct?
15   A. Correct.
16   Q. Okay. Just looking through my notes
17 real quick.
18   A. And I would like to add a note to
19 that as well.
20   Q. Go ahead.
21   A. Things -- in terms of daily
22 operations, they weren't -- they were running
23 the same; but considering that he was in jail,
24 Health Advisors was a little bit more hands on
25 in communicating with me.

291

1   Q. Where do you work now?
2   A. I work at a company called Listening
3 Spark.
4   Q. Excuse me?
5     THE REPORTER: What's the name?
6     THE WITNESS: Listening Spark.
7   Q. (BY MR. FRANQUI) Listening Spark.
8 And what is it that you do with Listening
9 Spark?
10   A. I am a sales closer.
11   Q. What is it that Listening Spark
12 sells?
13   A. The service to sell your home without
14 a real estate agent.
15   Q. So is it -- are you on phones doing
16 sales?
17   A. Yes.
18     MR. FRANQUI: I don't think I
19 have any other questions for you at this time.
20     That's all I have for you, sir.
21 Thank you.
22     MR. DAVIDSON: Are you all set,
23 Patrick?
24     MR. HOLIAN: Are you going to do
25 Redirect, or no?

292

1     MR. ABERNETHY: Yeah, I think we
2 do have some Redirect questions.
3     FURTHER EXAMINATION
4 BY MR. ABERNETHY:
5   Q. All right. Jakob, when you were
6 operating the dialer, sending calls for Health
7 Advisors, were there any instances where you
8 were aware that you were not sending
9 prerecord- -- prerecorded messages?
10     MR. DAVIDSON: Objection.
11   A. Can you say it --
12     MR. FRANQUI: Joined.
13   A. -- one more time?
14   Q. (BY MR. ABERNETHY) When you were
15 operating the dialer for Health Advisors'
16 calls, was there any point where you were aware
17 that you were not sending prerecorded messages?
18     MR. DAVIDSON: Objection.
19     MR. FRANQUI: Joined.
20   A. No, I was aware.
21   Q. (BY MR. ABERNETHY) So there were
22 times where you were sending calls without
23 prerecorded messages?
24   A. Oh, no, that would never happen.
25   Q. Okay. And you mentioned Matthew

293

1 Panzer earlier. Do you know the time period
2 that he was using Rising Eagle services?
3   A. It would have been during the first
4 couple of months before -- while I was just
5 getting started, I want to say. I don't
6 remember the exact year. I want to say
7 probably, like, 2018, end of 2018.
8   Q. And at that time did you ever use any
9 recordings from Health Advisors for these
10 calls?
11     MR. FRANQUI: Objection.
12     MR. DAVIDSON: Objection.
13   A. Yes.
14   Q. (BY MR. ABERNETHY) You did use Health
15 Advisors' recordings for calls made for Matthew Panzer?
16   A. Yes.
17     MR. FRANQUI: Objection.
18   Q. (BY MR. ABERNETHY) Did you ever use
19 Health Advisors' leads for calls for Matthew
20 Panzer?
21     MR. FRANQUI: Objection.
22   A. Yes.
23   Q. (BY MR. ABERNETHY) And was that
24 throughout the entire time that you were aware
25 of that you were -- that Rising Eagle was

Jakob Mears - 3/1/2022

294

1  making calls for Matthew Panzer you were using
2  Health Advisors' leads and recordings that
3  entire time?
4          MR. FRANQUI:  Objection.
5      A.  Not the entire time.
6      Q   (BY MR. ABERNETHY)  Can you estimate about the
7  number of calls you made for Matthew Panzer?
8      A.  My estimate would be pure
9  speculation.  I wouldn't know.
10     Q.  And do you have any idea of how many
11 of the calls that you did make for Matthew
12 Panzer were using Health Advisors' recordings?
13         MR. FRANQUI:  Objection.
14     A.  I wouldn't know that.  That would be
15 speculation as well.
16     Q   (BY MR. ABERNETHY)  Okay.  And then the same
17 question:  Do you have any idea the number of calls that
18 you made for Matthew Panzer that used Health Advisors'
19 leads?
20     A.  I wouldn't know.  I don't know.
21     Q.  Just how -- generally, do you have an
22 idea of the number of calls that you made for
23 Matthew Panzer relative to the number of calls
24 Rising Eagle was making for Health Advisors
25 during that time?  Like -- sorry.  Go ahead.

295

1      A.  I would say the only way we'd be able
2  to gauge that is just -- a call count would be
3  hard to gauge; but I know that in terms of
4  volume of calls, it was maybe, like, less than
5  a tenth of what Health Advisors calls made.
6      Q.  Less than 10 percent of your total
7  calls each day?
8      A.  Correct.
9      Q.  Okay.  Did you ever change the --
10 when you used prerecorded messages for Health
11 Advisors, would you change the message to use
12 them for calls for Matthew Panzer?
13     A.  Yes.
14     Q.  And, from your understanding, did
15 Michael Smith know that Rising Eagle was making
16 these calls for Michael Panzer?
17     A.  Not to my understanding.
18     Q.  And did you -- from your
19 understanding, did Scott Shapiro know that
20 Rising Eagle was making these calls for Michael
21 Panzer?
22     A.  No.
23     Q.  Do you know how Panzer was billed for
24 these calls from Rising Eagle?
25     A.  The same way as Health Advisors.

296

1      Q.  And can you say how?
2      A.  It was a pay-per-bundle deal.  I
3  don't remember the exact number of it.  I don't
4  know.  That -- that was mainly John's area.
5      Q.  So it was by sales, like, for 36 or
6  something like that, not by minutes?
7      A.  Correct.
8      Q.  Do you know if there'd be any
9  invoices that would reflect these payments?
10     A.  No, there wouldn't.
11     Q.  Because they weren't kept or you
12 don't know where they are?
13     A.  Invoices were never created.
14     Q.  Okay.  And then for Tovere Johnson,
15 did you know the time period that he was using
16 Rising Eagle's services?
17     A.  I want to say it was -- I don't
18 remember the year, but I do remember one time
19 it was during open enrollment whenever he had
20 joined for a limited time.
21     Q.  But only during that period of open
22 enroll?
23     A.  Yes.  Him and John ended up having a
24 fall-through where they didn't get along.
25     Q.  And for Tovere Johnson, did you or

297

1  Rising Eagle use Health Advisors' call
2  recording for those calls?
3      A.  Yes.
4      Q.  And did you use Health Advisors'
5  leads for those calls?
6      A.  No, Tovere used his own leads.
7      Q.  Okay.  Always?
8      A.  Yes.
9      Q.  And can you estimate about the number
10 of calls that you made for Tovere Johnson?
11     A.  I'd say less than 5 percent, probably
12 even smaller than that.  His -- his average
13 room size was only between 15 to 20 people, so
14 the volume that was needed was nowhere needed
15 to match the type of call volume that was
16 needed for Health Advisors.
17     Q.  And when you made calls for Tovere
18 Johnson using Health Advisors' recordings,
19 would you change those recordings?
20     A.  Sometimes, yes.
21     Q.  Okay.  And who directed you to change
22 those recordings?
23     A.  Usually it was John.
24     Q.  Usually it was who?
25     A.  John.

298

1    Q.   Okay.  And how was Tovere Johnson
2  billed for those calls?
3    A.   The same way, pay-for-bundle of
4  deals.
5    Q.   Okay.  And are there any invoices
6  that reflect those calls?
7    A.   No.
8    Q.   So if y'all never kept invoices, how
9  did you track billing?
10   A.   Purely by relaying how many sales
11  they got and then billing them for that number
12  and so just by keeping track on paper just they
13  got this many sales per day and this week, so
14  they need to send this much since they hit that
15  number.
16   Q.   So what -- what did you do with those
17  pieces of paper that tracked that?
18   A.   I want to say John may have them.
19  They may be on a computer.  I don't have them.
20  I haven't seen those in a long time.
21   Q.   Okay.  But there was some form of
22  bookkeeping where you would keep track of --
23   A.   Yes.
24   Q.   -- call volume for billing purposes?
25   A.   Just -- just sales volume, not call

299

1  volume.
2    Q.   And did you get that information from
3  VICIdial?
4    A.   No.
5    Q.   Where did you get the information for
6  the sales?
7    A.   Usually, it was over the phone,
8  verbal.
9    Q.   Okay.  And did -- from your
10  understanding, did Michael Smith know that
11  Rising Eagle was making calls for Tovere
12  Johnson?
13   A.   No.
14   Q.   And, from your understanding, did
15  Scott Shapiro know that Rising Eagle was making
16  calls for Tovere Johnson?
17   A.   Not to my knowledge.
18   Q.   Okay.  And we're going to go back to
19  Exhibit A real quick.  Can you read Paragraph 5
20  for us?
21   A.   Yeah.  "Rising Eagle's point of
22  contact with Health Advisors during that period
23  were its owner, Michael Smith, and corporate
24  consultant, Scott Shapiro.  Mr. Shapiro was
25  primarily responsible for directing how Rising

300

1  Eagle supported Health Advisors' marketing
2  campaigns."
3    Q.   And after your testimony today, do
4  you still believe that statement to be true?
5    A.   I would say that is true but that
6  Michael Smith would also be included.
7    Q.   Included in what way?
8    A.   As a, you know, primary communicator
9  during that time.
10   Q.   So the only change would be that you
11  would say Michael Smith and Mr. Shapiro were
12  primarily responsible for directing how Rising
13  Eagle supported the Health Advisors' marketing
14  campaigns?
15   A.   Yes.
16   Q.   And can you go down to Paragraph 18,
17  again, on the same Exhibit A?
18   A.   Do you want me to read it?
19   Q.   Yes, please.
20   A.   "Rising Eagle reluctantly remained
21  open.  At this point, Rising Eagle essentially
22  operated under the total control of Mr. Shapiro
23  and Health Advisors, with Mr. Shapiro sending
24  orders to me multiple times per day with
25  instructions on how to conduct Health Advisors'

301

1  calling operations.  Specifically, Mr. Shapiro
2  directed when and what telephone numbers would
3  be input into Health Advisors' VICIdial system,
4  gave orders as to exactly when to begin Health
5  Advisors' start the operation communications
6  platform each day, and monitored, often on an
7  hourly basis, the amount of call traffic
8  maintained through Health Advisors' VICIdial
9  system.  This arrangement continued until late
10  May or early June of 2019."
11   Q.   And do you still believe that
12  statement to be true after your testimony
13  today?
14   A.   I would say the only edit would need
15  to be on the fourth line where it says,
16  "Specifically Mr. Shapiro directed when and
17  what telephone numbers would be input into
18  Health Advisors' VICIdial system."  That line
19  right there is not accurate.  He did not direct
20  what numbers or have any input on the numbers
21  entered into the VICIdial system since I did
22  not have any access to load anything in the
23  VICIdial system.  So I made that note there.
24   Q.   Okay.  And, otherwise, that statement
25  is true?

302

```
 1      A.  Yes.
 2      Q.  Okay.
 3          MR. ABERNETHY:  And that's all
 4  the questions we have.
 5          MR. DAVIDSON:  I have no
 6  additional questions.
 7          MR. FRANQUI:  I have nothing
 8  further.
 9          MR. ABERNETHY:  Off record.
10          THE VIDEOGRAPHER:  We'll go off
11  at 4:21 --
12          THE REPORTER:  Excuse me, Bill,
13  on the record, don't you need to get transcript
14  orders?
15          (No transcripts or videos were
16  order by the Zoom participants.)
17          THE VIDEOGRAPHER:  We'll go off
18  at 4:23.
19          (Deposition concluded at 4:23 p.m.)
20              --ooOoo--
21
22
23
24
25
```

303

```
 1        CHANGES AND SIGNATURE
 2  WITNESS NAME:        DATE OF DEPOSITION:
 3  JAKOB A. MEARS         March 1, 2022
 4  PAGE/LINE   CHANGE       REASON
 5  _____
 6  _____
 7  _____
 8  _____
 9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____
```

304

```
 1        I, JAKOB A. MEARS, have read the foregoing
 2  deposition and hereby affix my signature that same is
 3  true and correct, except as noted herein.
 4
 5          _____
 6          JAKOB A. MEARS
 7
 8  THE STATE OF _____  )
 9          Before me, _____, on
10  this day personally appeared JAKOB A. MEARS, known to me
11  (or proved to me under oath or through _____)
12  (description of identity card or other document) to be
13  the person whose name is subscribed to the foregoing
14  instrument and acknowledged to me that they executed
15  same for the purposes and consideration therein
16  expressed.
17          Given under my hand and seal of office on
18  this _____ day of _____, _____.
19
20
21          _____
22          NOTARY PUBLIC IN AND FOR
23          THE STATE OF _____
24          My Commission Expires:_____
25
```

305

```
 1  STATE OF TEXAS    )
 2        REPORTER'S CERTIFICATION
 3        I, DEBBIE D. CUNNINGHAM, CSR, hereby certify
 4  that the witness was duly sworn and that this transcript
 5  is a true record of the testimony given by the witness.
 6        I further certify that I am neither counsel
 7  for, related to, nor employed by any of the parties or
 8  attorneys in the action in which this proceeding was
 9  taken.  Further, I am not a relative or employee of any
10  attorney of record in this cause, nor am I financially
11  or otherwise interested in the outcome of the action.
12        I further certify that pursuant to FRCP
13  Rule 30(f)(1) that the signature of the deponent was
14  requested by the deponent or a party before the
15  completion of the deposition and that the signature is
16  to be before any notary public and returned within 30
17  days from date receipt of the transcript.  If returned,
18  the attached Changes and Signature Page contains any
19  changes and the reasons therefore.
20        Subscribed and sworn to by me this day,
21  March 11, 2022.
22
23
24          _____
             Debbie D. Cunningham, CSR
25
```

| **B** |
| --- |
| **Bill** 5:4<br>**Brian** 5:5<br>**Burns** 5:4 |
| **C** |
| **Christopher** 5:5 |
| **O** |
| **ooOoo** 5:7 |
| **P** |
| **person** 5:4 |
| **V** |
| **Via** 5:5 |
| **Z** |
| **Zoom** 5:5 |